## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| AUXIN SOLAR INC. AND CONCEPT CLEAN ENERGY, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| UNITED STATES; UNITED STATES DEPARTMENT OF COMMERNCE; GINA M. RAIMONDO, SECRETARY OF COMMERCE; UNITED STATES CUSTOMS AND BORDER PROTECTION; AND TROY A. MILLER, UNITED STATES CUSTOMS AND BORDER PROTECTION ACTING COMMISSIONER, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Court. No. 23-00274

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND OTHER JURISDICTIONAL ARGUMENTS

Thomas M. Beline
Roop K. Bhatti*
James E. Ransdell
Chase J. Dunn
Sydney C. Reed

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street, NW, Suite 400
Washington, D.C. 20006

Phone: (202) 567-2316
Fax: (202) 567-2301

*Counsel for Auxin Solar Inc. and
Concept Clean Energy, Inc.*

February 16, 2024

* Admitted in Illinois; practice
limited to matters before federal
courts and agencies.

**Table of Contents**

Page

ISSUES PRESENTED..................................................................................................... 3

STATEMENT OF FACTS ............................................................................................... 4

SUMMARY OF ARGUMENT ........................................................................................ 8

ARGUMENT ................................................................................................................. 11

I.   Legal Standard ..................................................................................................... 11

II.  Solar Plaintiffs' Challenge to the *Final Solar Duty Holiday Rule* Concerns
     Administration & Enforcement of Commerce's Circumvention Determinations ............... 14

     A.   Binding Precedent Confirms Solar Plaintiffs' Ability to Challenge Commerce's
          Failure to Enforce its Circumvention Determinations under Section 1581(i) ............. 14

     B.   The Citation Underpinning Defendants' Entire Argument Is Incomplete and the
          Federal Circuit's Final Holding in *Ugine* Expressly Reaffirms the Proposition
          Opposite to Defendants' Theory .................................................................... 16

     C.   USCIT Decisions Cited by Defendants Concerned Situations Bearing No
          Resemblance to the Facts of Solar Plaintiffs' Enforcement Challenge ....................... 19

III. Because the "True Nature" of Solar Plaintiffs' Action is Not a Challenge to
     Commerce's Determination as to Whether Circumvention Occurred, Jurisdiction Is
     Not Available Under Section 1581(c) .................................................................... 21

     A.   Textually, Defendants Fail to Grapple with the Narrow Language of Section
          1516a(a)(2)(B)(vi), Which Only Permits Appeals of Commerce's
          Determination as to Whether Circumvention Occurred—Something Solar
          Plaintiffs Do Not Challenge in this Action .................................................... 21

     B.   Defendants' Inclusion of Ancillary Material in the Announcement of the
          Determination Appealable Under 1581(c) Does Not Confer Jurisdiction Over
          Matters Outside of that Appealable Determination .......................................... 23

IV.  Relief Available Under Section 1581(c) Would be Manifestly Inadequate,
     Precluding the Reliquidation of Billions of Dollars' Worth of CSPV Imports that
     Were Unlawfully Liquidated Duty-Free Based on Defendants' *Post Hoc*
     Recharacterizations of Agency Action .................................................................. 26

     A.   Federal Circuit Precedent Establishes that Plaintiffs' Opportunities for Relief
          under Section 1581(c) Would Fail to Redress the Extent of the Harm Caused by
          the *Final Solar Duty Holiday Rule* .............................................................. 27

B.    Federal Circuit Precedent and Commerce's Characterization of the *Final Solar Duty Holiday Rule* as Dispositive Confirm that Section 1581(c) Relief Is Inadequate ............................................................................................... 29

C.    As Solar Plaintiffs Expressly Stated in their Complaint, Commerce's Ordinary Circumvention Certification Regime Is Not at Issue in this Litigation and Has No Bearing on this Court's Jurisdictional Analysis........................................ 32

D.    Waiver Principles Do Not Bar this Court's Consideration of Its Subject Matter Jurisdiction .............................................................................................. 34

CONCLUSION............................................................................................................... 36

## Table of Authorities

Page(s)

<u>Statutes</u>

19 U.S.C. § 1318(a) ................................................................................................. *passim*

19 U.S.C. § 1504(a)(1) ......................................................................................................28

19 U.S.C. § 1516a ..................................................................................................... *passim*

19 U.S.C. § 1516a(a)(2)(A) ........................................................................ 20, 22-23, 33

19 U.S.C. § 1516a(a)(2)(B)(iii) ................................................................................ 18-20

19 U.S.C. § 1516a(a)(2)(B)(vi) ................................................................................. *passim*

28 U.S.C. § 1581(c) ................................................................................................... *passim*

28 U.S.C. § 1581(i) ................................................................................................... passim

28 U.S.C. § 1581(i)(1)(B) ...................................................................................... 2, 13-15

28 U.S.C. § 1581(i)(1)(D) ...................................................................................... 2, 13-15

<u>Regulations</u>

19 C.F.R. § 351.226(e)(2) ..................................................................................................28

19 C.F.R. § 351.226(l) ............................................................................................. *passim*

19 C.F.R. § 362.103 .................................................................................................. *passim*

19 C.F.R. § 362.103(a) ..................................................................................................5, 30

19 C.F.R. § 362.103(b) .....................................................................................................33

19 C.F.R. § 362.103(b)(1) ...............................................................................................5, 30

19 C.F.R. § 362.103(c) ................................................................................................5, 30, 33

19 C.F.R. § 362.104 .............................................................................................................5

<u>Court Decisions</u>

*Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (Ct. Int'l Trade 2021)
........................................................................................................................................22

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) ..............................................................35

*Consolidated Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003) ...................... *passim*

*Corus Staal B.V. v. United States*, 493 F. Supp. 2d 1276 (Ct. Int'l Trade 2007) ........................19

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ...............................................................................................31

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010) ............................................. 29-30

*Erwin Hymer Grp. N. Am., Inc. v. United States*, 930 F.3d 1370 (Fed. Cir. 2019) ...............................................................................................12, 24

*Ex parte McCardle*, 74 U.S. 506 (1868) ...................................................................................18

*Ford Motor Co. v. United States*, 688 F.3d 1319 (Fed. Cir. 2012) ...............................................12

*Hutchison Quality Furniture, Inc. v. United States*, 827 F.3d 1355 (Fed. Cir. 2016) ...............................................................................................12, 13, 15

*Hylsa v. United States*, 22 C.I.T. 44 (1998) ...............................................................................14

*Indus. Chems., Inc. v. United States*, 941 F.3d 1368 (Fed. Cir. 2019) ........................................35

*Intercontinental Chemicals, LLC v. United States*, 483 F. Supp. 3d 1232 (Ct. Int'l Trade 2020) ...............................................................................................20, 35

*Int'l Custom Prods., Inc. v. United States*, 467 F.3d 1324 (Fed. Cir. 2006) ..........................14, 30

*Juancheng Kangtai Chem. Co. v. United States*, 932 F.3d 1321 (Fed. Cir. 2019) ...............................................................................................12, 30

*J.D. Irving, Ltd. v. United States*, 615 F. Supp. 3d 1323 (Ct. Int'l Trade 2023) ...............................................................................................19

*McCarthy v. Madigan*, 503 U.S. 140 (1992) ...............................................................................14

*Medline Indus., Inc. v. United States*, 911 F. Supp. 2d 1358 (Ct. Int'l Trade 2013) ...............................................................................................27

*Mid Continent Nail Corp. v. United States*, 846 F.3d 1364 (Fed. Cir. 2017) ..............................29

*Montgomery Ward & Co., Inc. v. United States*, 673 F.2d 1254 (C.C.P.A. 1982) ...............................................................................................22

*Murphy Exploration & Prod. Co. v. U.S. Dep't of Interior,* 270 F.3d 957 (D.C. Cir. 2001) ...............................................................................................30

*NEC Corp. v. United States*, 151 F.3d 1361 (Fed. Cir. 1998) ...................................................14

*Norman G. Jensen, Inc. v. United States*, 687 F.3d 1325 (Fed. Cir. 2012) ...........................12, 23

*Pac Fung Feather Co., Ltd. v. United States*, 111 F.3d 114 (Fed. Cir. 1997) .................11, 14, 30

*Perfectus Aluminum, Inc. v. United States*, 391 F. Supp. 3d 1341 (Ct. Int'l Trade 2019)................................................................................................................................27

*Shinyei Corp. of America v. United States*, 355 F.3d 1297 (Fed. Cir. 2004) ....................... *passim*

*South Corp. v. United States*, 690 F.2d 1368 (Fed. Cir. 1982) ................................................13

*Sunpreme Inc. v. United States*, 892 F.3d 1186 (Fed. Cir. 2018) ....................................11, 13, 29

*Suntec Indus. Co., Ltd. v. United States*, 857 F.3d 1363 (Fed. Cir. 2017) ............................14, 32

*Ugine and ALZ Belgium v. United States*, 452 F.3d 1289 (Fed. Cir. 2006) ......................... 16-18

*Ugine and ALZ Belgium v. United States*, 551 F.3d 1339 (Fed. Cir. 2009) ........................ *passim*

*United States v. Cotton*, 535 U.S. 625 (2002) ...........................................................................35

*U.S. Cane Sugar Refiners' Ass'n v. United States*, 683 F.2d 399 (C.C.P.A. 1982) ...............................................................................................................................13

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000) ........................... 17-18

*Wanxiang America Corp. v. United States*, 12 F.4th 1369 (Fed. Cir. 2021) ................... 12, 34-35

*Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142 (D.C. Cir. 2014) .........................30

*Zenith Radio Corp. v. United States*, 710 F.2d 806 (Fed. Cir. 1983) ...................................11, 28

Administrative Determinations

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.*, 63 Fed. Reg. 8,908 (Feb. 23, 1998)................................................25

*Antifriction Bearings (Other Than Tapered Rolled Bearings) and Parts Thereof From the Federal Republic of Germany*, 62 Fed. Reg. 32,755 (June 17, 1997) ................................................................................................................................25

*Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Aug. 23, 2023) ................................................... *passim*

*Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 Fed. Reg. 75,221 (Dec. 8, 2022)................................................................................................................................29

*Stainless Steel Plate in Coils from Belgium*, 70 Fed. Reg. 18,374 (Apr. 11, 2005) ....................................................................................................................25

Other Administrative Materials

*Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord with Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022) (Final Rule) ........ *passim*

Other Legislative Materials

H.R. Rep. No. 96-1235 (1980)................................................................................11, 22

Pub. L. No. 96-417, title II, § 201 (1980) ......................................................................21

Pub. L. No. 100-449, title IV § 402(a) (1988) ...............................................................21

Pub. L. No. 116–113, title IV, § 423(a)(1) (2020) .......................................................21

S. Rep. 100-509 (1988)....................................................................................................21

S. Rep. No. 96-249 (1979) ..............................................................................................21

S. Rep. 116-283 (2020)....................................................................................................21

Jurisdiction under 28 U.S.C. § 1581(c) is not, nor could it have been, available for the claims raised in the instant action, and the relief available pursuant to that statutory provision are otherwise manifestly inadequate. Plaintiffs do not challenge the Department of Commerce's ("Commerce") determinations as to whether certain crystalline silicon photovoltaic ("CSPV") cells and modules are circumventing the antidumping and countervailing duty orders concerning imports of CSPV products from the People's Republic of China ("PRC"). Instead, Plaintiffs' claims concern Commerce's rulemaking and consequent failure to administer and enforce its separate circumvention findings, as manifested in Commerce's liquidation instructions to U.S. Customs and Border Protection ("CBP"). Thus, the U.S. Court of International Trade ("USCIT") has subject matter jurisdiction under 28 U.S.C. § 1581(i).

Defendants' Motion to Dismiss, ECF Doc. 16 (Jan. 22, 2024), makes several errors of law and fact germane to the disposition of their motion. *First*, Defendants ignore on-point appellate decisions that confirm jurisdiction over this action lies only under 28 U.S.C. § 1581(i) and they otherwise ignore subsequent appellate proceedings that control the primary authority Defendants cite. *Second*, having ignored such precedent, Defendants broaden the jurisdictional statute beyond its plain language, but the statute's narrower terms establish that this action could not have been brought pursuant to 28 U.S.C. § 1581(c). *Third*, Defendants' reliance on ancillary citations to the *Final Solar Duty Holiday Rule* in Commerce's announcement of its circumvention determinations ignores Commerce's underlying substantive administrative decisions that treated the circumvention inquiries and determinations as distinct from *Final Solar Duty Holiday Rule* rulemaking proceedings. *Finally*, Defendants fail to grapple with the reality that 28 U.S.C. § 1581(c) jurisdiction would be manifestly inadequate to provide any meaningful remedy.

Pursuant to Rule 7(d) of the USCIT Rules, Plaintiffs Auxin Solar Inc. ("Auxin Solar") and Concept Clean Energy, Inc. ("CCE") (together, "Solar Plaintiffs") timely respond to Defendants' motion. Solar Plaintiffs also respond herein to the jurisdictional arguments set forth in the non-party papers styled as motions to dismiss, which largely duplicate or incorporate by reference the arguments already advanced in Defendants' papers.[1] *See* ECF Doc. 32 (Jan. 26, 2024) ("NEE Dismissal Arguments"); ECF Doc. 36 (Jan. 26, 2024) ("BYD Dismissal Arguments"); ECF Doc. 39 (Deemed Filed Jan. 29, 2024) ("ACP Dismissal Arguments"); ECF Doc. 40 (Deemed Filed Jan. 29, 2024) ("Canadian Solar Dismissal Arguments"); ECF Doc. 41 (Deemed Filed Jan. 29, 2024) ("JA Solar Dismissal Arguments"); ECF Doc. 44-1 (Jan. 29, 2024) ("Invenergy Dismissal Arguments"); ECF Doc. 48 (Jan. 29, 2024) ("Trina Dismissal Arguments"); ECF Doc. 49 (Jan. 30, 2024) ("SEIA Dismissal Arguments"); ECF Doc. 53 (Jan. 31, 2024) ("Risen Dismissal Arguments").[2]

As we demonstrate below, Defendants' motion to dismiss and the non-party jurisdictional arguments are meritless.

---

[1] Solar Plaintiffs are submitting a response in opposition to Proposed Defendant-Intervenors' motions to intervene under separate cover today.

[2] To streamline the Court's disposition of these challenges to subject matter jurisdiction, Solar Plaintiffs provide this consolidated response and cite nonparty proposed intervenors' dismissal papers only to the extent additional matters are raised therein. Otherwise, nonparty proposed intervenors' papers reiterate—and thus suffer the same defects as—Defendants' motion to dismiss, but Solar Plaintiffs do not repeat every duplicative argument here.

## ISSUES PRESENTED

28 U.S.C. §§ 1581(i)(1)(B) and/or (D) confer jurisdiction over any action that "arises out of {a} law of the United States providing for" "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue" and/or "administration and enforcement of" such laws.  Given that *Consolidated Bearings Co. v. United States*, 348 F.3d 997, 1002-03 (Fed. Cir. 2003), establishes that antidumping duties are intended "to protect domestic markets" and are therefore within the ambit of Section 1581(i)(1)(B), do Solar Plaintiffs' claims challenging the *Final Solar Duty Holiday Rule* and related liquidation instructions implicate the "administration and enforcement" of such duties under Section 1581(i)(1)(D)?

When 19 U.S.C. § 1516a(a)(2)(B)(vi) provides for appeals of a "determination…as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing…antidumping or countervailing duty order" through 28 U.S.C. § 1581(c) jurisdiction, is Solar Plaintiffs' challenge of the regulations published by Commerce, pursuant to 19 U.S.C. § 1318(a) and Proclamation 10414, and the related liquidation instructions issued by Commerce to CBP an appeal of such a determination?

Given that Commerce precluded Solar Plaintiffs from obtaining an enforcement remedy in connection with its administrative anti-circumvention proceedings and that billions of dollars in unlawful duty-free entries had already liquidated pursuant to Commerce's unlawful tariff duty holiday before it was possible to initiate a case under 28 U.S.C. § 1581(c), is any remedy that could be conferred through such proceedings "manifestly inadequate" to redress harm to Solar Plaintiffs?

## STATEMENT OF FACTS

The following facts are essential to resolving the present dispute concerning jurisdiction. Following the proclamation of a time-delimited emergency, Commerce acted under an ancillary provision of the Tariff Act of 1930, as amended (*i.e.*, Section 318), to promulgate a new regulation using notice-and-comment procedures that preemptively precluded Commerce from enforcing any determination that CSPV imports from specific Southeast Asian countries were being unfairly traded.  The injury caused by Commerce's application of that regulation falls squarely within the Court's residual jurisdiction.  Indeed, Commerce itself administratively recognized that finding circumvention is one thing, whereas enforcing the trade remedy laws is quite another.  Specifically, Commerce's administrative circumvention proceedings precluded parties from commenting on the lawfulness of the non-enforcement regulation, stated that the regulation meant Commerce "cannot" implement its circumvention determinations, and otherwise characterized the regulatory and circumvention proceedings as "distinct" to avoid disclosing *ex parte* communications.  These are discussed in the following paragraphs.

As detailed in Solar Plaintiffs' Complaint, *see* Complaint at ¶¶51-55, 65-71, the *Final Solar Duty Holiday Rule* was published on September 16, 2022—several months <u>before</u> Commerce had rendered either preliminary or final determinations in the then-ongoing circumvention inquiries covering CSPV cells and modules imported from Cambodia, Malaysia, Thailand, and Vietnam using parts and components from the PRC. *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties In Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022) ("*Final Solar Duty Holiday Rule*"). Commerce characterized its *Final Solar Duty Holiday Rule* as "set{ting} forth the actions the Secretary is taking to respond to the emergency declared in Presidential Proclamation 10414," 19 C.F.R. § 362.101, and promulgated this regulation despite extensive objections to Commerce's

violation of law and common sense.  *See, e.g.*, Complaint at ¶¶72-82, Ex. 3.  Its regulation

applied broadly, to the ongoing circumvention inquiries as well as to new trade actions.

Once in place, Section 362.103 of the *Final Solar Duty Holiday Rule* set forth a

mandatory course of action, summarized in relevant part below:

> *Subsection (a)*: "The Secretary <u>will</u> permit the importation of Applicable Entries
> free of the collection of antidumping and countervailing duties and estimated duties
> under sections 701, 731, 751 and 781 of the Act until the Date of Termination. Part
> 358 of this chapter <u>shall not</u> apply to these imports."
>
> *Subsection (b)(1)*:   "To facilitate the importation of certain Southeast Asian-
> Completed Cells and Modules without regard to estimated antidumping and
> countervailing duties, notwithstanding § 351.226(l) of this chapter, the Secretary
> <u>shall</u> do the following with respect to estimated duties:" (i) "The Secretary <u>shall</u>
> instruct CBP to discontinue the suspension of liquidation of entries and collection
> of cash deposits for any Southeast Asian-Completed Cells and Modules that were
> suspended;" and (ii) "the Secretary <u>will not</u>, at th{e} time {of an affirmative
> circumvention determination}, direct CBP to suspend liquidation of Applicable
> Entries and collect cash deposits of estimated duties on those Applicable Entries."
>
> *Subsection (c)*: "In the event the Secretary issues an affirmative final determination
> of circumvention in the Solar Circumvention Inquiries and thereafter, in accordance
> with other segments of the proceedings, pursuant to section 751 of the Act and §
> 351.212(b) of this chapter, issues liquidation instructions to CBP, the Secretary <u>will</u>
> direct CBP to liquidate Applicable Entries without regard to antidumping and
> countervailing duties that would otherwise apply pursuant to an affirmative final
> determination of circumvention."

19 C.F.R. § 362.103 (emphasis supplied).  The *Final Solar Duty Holiday Rule*—and not any

other administrative proceeding—also established regulatory definitions of, *e.g.*, "Applicable

Entries," "Utilization," and the "Utilization Expiration Date," 19 C.F.R. § 362.102, that Solar

Plaintiffs target in their Complaint, *see, e.g.*, Complaint at Counts 1, 3, and 5.

The course of action mandated by Commerce's *Final Solar Duty Holiday Rule*

undermined its then-pending circumvention inquiries prior to any decision on the merits.  But it

was an entirely separate act that purported to rely upon statutory authority (19 U.S.C. § 1318(a))

and Presidential authorization (Proclamation 10414) outside the antidumping and countervailing

duty statutes being applied in the context of Commerce's circumvention inquiries (Chapter 4, Subtitle IV of Title 19 of the U.S. Code).  Recognizing this, Commerce itself specifically limited administrative briefing to everything except the lawfulness of the *Final Solar Duty Holiday Rule* itself.  *See* Memorandum from Commerce, "Announcement of Briefing Schedule for First Tranche of Case and Rebuttal Briefs," Case No. A-570-979, Circumvention Inquiries, ACCESS Barcode: 4344410-01 (Feb. 22, 2023) at 1 ("Commerce Circumvention Inquiries Briefing Memo") (Exhibit 1) ("briefs should only contain interested parties' comments concerning the following items," in relevant part, "the headings 'Certified Entries,' 'Certifications,' 'Certification Requirements,' and Appendi{x} IV…of the Notice of Preliminary Determinations" and "{CBP} Message Number 3041408…and CBP Message Number 3047409").  Notably, the aspects upon which parties were permitted to comment in the circumvention proceedings were limited to details that the *Final Solar Duty Holiday Rule* did not conclusively resolve.  *See* 19 C.F.R. § 362.104 (empowering Commerce to require certifications in service of the *Final Solar Duty Holiday Rule*, without setting forth certification language).[3]

Far from engaging with comments on the separate rulemaking, Commerce's final circumvention determinations simply and summarily reiterated the agency's view that it was bound by the *Final Solar Duty Holiday Rule* and could not deviate from that regulation administratively.  Indeed, Commerce characterized the situation as follows in response to comments from importers of the circumventing products:

---

[3] Auxin Solar's administrative case brief accordingly detailed issues that Commerce had purported to "clarify" in the context of its circumvention inquiries, *see* Memorandum from Commerce, "Clarification of Product Coverage," Case No. A-570-979, 2022 Circumvention Inquiries, ACCESS Barcode: 4321381-01 (Dec. 19, 2022) at 2 (concerning the timing of application), and the certifications themselves. *See, e.g.*, Letter from Auxin Solar, "Auxin's Case Brief (Tranche 1)," Case No. A-570-979, 2022 Circumvention Inquiries, ACCESS Barcode: 4350936-01 (Mar. 6, 2023) (Pub. Ver.) at 17-26.

> {I}n response to Presidential Proclamation 10414, Commerce added Part 362 to its regulations to implement the Proclamation and these regulations, as well as CBP instructions issued by Commerce, specify that no Ads/CVDs will be collected on solar cells and modules entering the United States to which Presidential Proclamation 10414 applies. Thus, Commerce's affirmative circumvention findings <u>cannot be implemented</u> until the provisions of the Presidential Proclamation 10414 expires.

*Cambodia Final IDM* at 77 (Exhibit 2); *Malaysia Final IDM* at 69 (Exhibit 3); *Thailand Final IDM* at 77 (Exhibit 4); *Vietnam Final IDM* at 70 (Exhibit 5) (emphasis supplied).

The government concedes the limited authority Commerce had to address the *Final Solar Duty Holiday Rule* in its motion. *See* Def. Mtn. at 7-8 (characterizing Commerce as having "announced, <u>prior to any determination</u>, that were it to make an affirmative circumvention determination, it would apply the {*Final Solar Duty Holiday Rule*}") (emphasis in original). To the limited extent that Commerce's circumvention determinations responded to critiques of the *Final Solar Duty Holiday Rule*, Commerce merely quoted or paraphrased the justifications taken from the September 16, 2022, preamble to the unlawful regulation. For example:

> Commerce has already addressed the legality of its authority to issue the regulations under *Presidential Proclamation 10414 Final Rule Preamble*, itself. That rule, which was issued pursuant to lawful notice and comment process, confirms that 'Commerce is taking action now (*i.e.*, during the period of the emergency) to extend the period before it directs CBP to suspend liquidation and collect cash deposits and to waive any AD/CVD estimated duties and duties for these unliquidated goods.' 'In other words, the final rule stated, ahead of any imposition of such duties, that there will be no such duties.'

*Cambodia Final IDM* at 119-120 (Exhibit 2); *Malaysia Final IDM* at 111 (Exhibit 3); *Thailand Final IDM* at 120 (Exhibit 4); *Vietnam Final IDM* at 117-18 (Exhibit 5); *see also Cambodia Final IDM* at 119-122 (Exhibit 2); *Malaysia Final IDM* at 111-14 (Exhibit 3); *Thailand Final IDM* at 120-22 (Exhibit 4); *Vietnam Final IDM* at 117-20 (Exhibit 5).

Commerce acknowledged that the *Final Solar Duty Holiday Rule* was "distinct from" the circumvention inquiries. Commerce administratively asserted that this separation permitted the

agency to lawfully refuse to supply *ex parte* memoranda related to communications between the government and interested parties in the lead-up to the *Final Solar Duty Holiday Rule*. *Cambodia Final IDM* at 113 (Exhibit 2); *Malaysia Final IDM* at 104 (Exhibit 3); *Thailand Final IDM* at 113 (Exhibit 4); *Vietnam Final IDM* at 111 (Exhibit 5) ("Commerce was not required to memorialize for the record communications on matters distinct from the AD/CVD proceedings at hand, including Presidential Proclamation 10414 or the rulemaking resulting from that Proclamation.") (emphasis supplied).  The government's motion to dismiss omits this language, as well as Commerce's statement that the *Final Solar Duty Holiday Rule* meant its circumvention findings "cannot be implemented."  *See* Def. Mtn. at 2-11.

## SUMMARY OF ARGUMENT

Defendants invite this court to dismiss Solar Plaintiffs' action, theorizing that Solar Plaintiffs could have raised their challenges to Commerce's *Final Solar Duty Holiday Rule* and related liquidation instructions which fail to enforce Commerce's affirmative circumvention determinations under 28 U.S.C. § 1581(c) and obtained an adequate remedy.  Defendants are wrong.

First, the Federal Circuit has held that antidumping duties are "for reasons other than the raising of revenue" within the ambit of Section 1581(i)(1)(B), and Solar Plaintiffs' claims concerns Commerce's failure to "enforce" such duties under Section 1581(i)(1)(D). Solar Plaintiffs' conclusion that jurisdiction lies in subsection (i) of Section 1581 is corroborated by at least three controlling decisions of the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit")—*Consolidated Bearings*, *Shinyei*, and *Ugine CAFC II*.  By contrast, Defendants rest their entire claim on the Federal Circuit's interlocutory decision in *Ugine CAFC I*.  In so doing, they fail to grapple with the Federal Circuit's subsequent "hold{ing} that the Court of International Trade had jurisdiction under 28 U.S.C. § 1581(i)" to hear an importers' challenge

to liquidation instructions that were entirely consistent with the originating administrative

determination. *Ugine and ALZ Belgium v. United States*, 551 F.3d 1339, 1341 (Fed. Cir. 2009)

("*Ugine CAFC II*") (rehearing and rehearing *en banc* denied).  Solar Plaintiffs' action takes

Commerce's affirmative circumvention determinations as-is.  Like the plaintiff in *Consolidated*

*Bearings*, Solar Plaintiffs "seek{} application of those final results," 348 F.3d at 1002, and

challenge Defendants' unlawful failure to enforce the antidumping and countervailing duty laws

in reliance on the *Final Solar Duty Holiday Rule*.  This action also takes as-is the President's

authorization to permit importation free of Tariff Act duties, whether resulting from

circumvention determinations or new investigations.  Solar Plaintiffs' action therefore is properly

brought under Section 1581(i).  (**Section II**).

Second, by its plain terms, Section 1581(c) does not encompass Solar Plaintiffs' suit.  In

relevant part, 19 U.S.C. § 1516a permits challenges to "factual findings or legal conclusions

upon which" "determination{s}…as to whether a particular type of merchandise is within the

class or kind of merchandise described in an existing…antidumping or countervailing duty

order" are based.  This is a narrow designation of congressionally conferred jurisdiction.  But the

*Final Solar Duty Holiday Rule* challenged by Solar Plaintiffs is no such determination.  The

*Final Solar Duty Holiday Rule* takes effect separately from and regardless of Commerce's

determination as to "whether" circumvention is occurring.  To be sure, by the express terms of

19 C.F.R. § 103(a), the *Final Solar Duty Holiday Rule* applies broadly to any duties imposed

pursuant to the Tariff Act of 1930, as amended, including duties resulting from an original

investigation of unfairly traded imports.  (**Section III.A**).

Third, beyond misconstruing the statutory text and misapplying legal precedent,

Defendants' only substantive contention relies on citations to the ancillary material included in

the document setting forth Commerce's affirmative circumvention determinations. Section 1516a speaks of appealable "determinations," not appealable "documents." *See Shinyei Corp. of America v. United States*, 355 F.3d 1297, 1309 (Fed. Cir. 2004). Moreover, after administratively precluding parties from challenging the lawfulness of the *Final Solar Duty Holiday Rule*, *see* Commerce Circumvention Inquiries Briefing Memo at 1 (Exhibit 1), Commerce affirmatively rejected the notion that its circumvention inquiries encompassed review of the *Final Solar Duty Holiday Rule*, characterizing the "AD/CVD proceedings" as "distinct from" "the rulemaking resulting from {Proclamation 10414}" in every single decision memorandum across all four inquiries, and asserting that this "distinct{ion}" validated Commerce's refusal to disclose *ex parte* communications, *Cambodia Final IDM* at 113 (Exhibit 2); *Malaysia Final IDM* at 104 (Exhibit 3); *Thailand Final IDM* at 113 (Exhibit 4); *Vietnam Final IDM* at 111 (Exhibit 5). Even assuming *arguendo* that reference to separate proceedings in Commerce's administrative determinations is relevant to jurisdiction, the Federal Circuit has repeatedly found Section 1581(i) jurisdiction over liquidation instructions that intersect with administrative determinations that are appealable under Section 1581(c), and Solar Plaintiffs' action is no different. (**Section III.B**).

Fourth, even if this Court were to entertain that Section 1581(c) could conceivably apply to Solar Plaintiffs' cause of action just because Commerce referenced the *Final Solar Duty Holiday Rule* alongside its final affirmative circumvention determinations, forcing Solar Plaintiffs to pursue relief under Section 1581(c) would be manifestly inadequate. During the gap between the date on which Commerce began applying the unlawful *Final Solar Duty Holiday Rule* to permit duty-free entry and liquidation of circumventing CSPV cells and modules, and the date on which Commerce mailed notice of the affirmative circumvention determinations and thus

enabled parties to open appeals of those determinations before this court, roughly $2.65 billion dollars' worth of circumventing CSPV cells and modules liquidated duty free. Because Section 1516a does not permit reliquidation through appeals brought thereunder, Solar Plaintiffs would be unable to obtain relief vis-à-vis such entries in an action brought under Section 1581(c). Moreover, the *Final Solar Duty Holiday Rule* applies more broadly than to just circumvention determinations; it applies to new unfair trade investigations concerning imports from specific countries, which would go unredressed by any challenge to the failure to apply duties to circumventing imports. This denial of judicial review constitutes "irreparable harm" and therefore "manifestly inadequate" relief under controlling Federal Circuit precedent in *Zenith*. Section 1581(c) was additionally inadequate because the mandatory terms of the *Final Solar Duty Holiday Rule* predetermined its application in the context of Commerce's circumvention inquiries. Arguing against the rule would have been a mere formality—a scenario like that in *Pac Fung* which the Federal Circuit has held to be manifestly inadequate. Indeed, Commerce expressly stated in its circumvention determinations that it "cannot" apply its affirmative results because of the *Final Solar Duty Holiday Rule*. (**Section IV**).

Under any of these four reasons, this Court should therefore deny Defendants' motion to dismiss and proceed to consider the merits of Solar Plaintiffs' claims.

## ARGUMENT

### I.    Legal Standard

The USCIT's jurisdiction is governed by 28 U.S.C. § 1581. *Sunpreme Inc. v. United States*, 892 F.3d 1186, 1191 (Fed. Cir. 2018). Section 1581(i) grants "broad residual jurisdiction to the United States Court of International Trade" where relief is unavailable under another subsection of § 1581. H.R. Rep. No. 96-1235 at 33 (1980). To ensure that an action truly is residual, "{a}n inquiry into § 1581(i) jurisdiction thus primarily involves two questions. First,

we consider whether jurisdiction under a subsection other than § 1581(i) was available.  Second, if jurisdiction was available under a different subsection of § 1581, we examine whether the remedy provided under that subsection is 'manifestly inadequate.'" *Erwin Hymer Grp. N. Am., Inc. v. United States*, 930 F.3d 1370, 1375 (Fed. Cir. 2019) (citing *Ford Motor Co. v. United States*, 688 F.3d 1319, 1323 (Fed. Cir. 2012)).  If the answer to either question is "no," then jurisdiction is available under Section 1581(i) as long as the plaintiff's action fits within the broad terms of that subsection.  The court "must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant." *Juancheng Kangtai Chem. Co. v. United States*, 932 F.3d 1321, 1326 (Fed. Cir. 2019).

In assessing the availability of jurisdiction under other subsections of Section 1581, "court{s} will 'look to the true nature of the action' brought before the USCIT under 1581(i) to determine whether the action could have been brought under another subsection." *Wanxiang America Corp. v. United States*, 12 F.4th 1369, 1374-75 (Fed. Cir. 2021).  "The true nature of a particular action will depend upon the attendant facts asserted in the pleadings." *Hutchison Quality Furniture, Inc. v. United States*, 827 F.3d 1355, 1360 (Fed. Cir. 2016).  For example, where the gravamen of a complaint concerns "issues routinely first brought up and challenged in…administrative reviews," *id.* at 1375, then pushing litigants through the checkpoints imposed by Section 1581(c) avoids "swallow{ing} the specific grants of jurisdiction contained within the other subsections," *Norman G. Jensen, Inc. v. United States*, 687 F.3d 1325, 1329 (Fed. Cir. 2012).  However, Courts assess whether "the suit actually before the court"—not some alternative suit seeking different relief that the government might find more convenient—"could be brought under another subsection of § 1581." *Id.* at 1331.  "Determining the true nature of an action under § 1581 requires us to discern the particular agency action that is the source of the

alleged harm so that we may identify which subsection of § 1581 provides the appropriate

vehicle for judicial review." *Hutchison*, 827 F.3d at 1360.  In particular, the Federal Circuit has

repeatedly held that "If the party challenges the liquidation instructions issued by Commerce to

implement a final order, review is available under 28 U.S.C. § 1581(i){(1)(B), (D)}." *Ugine*

*CAFC II*, 551 F.3d at 1347; *see also Consolidated Bearings*, 348 F.3d at 1002 ("{A}n action

challenging Commerce's liquidation instructions is not a challenge to the final results, but a

challenge to the "administration and enforcement" of those final results. {It} challenges the

manner in which Commerce administered the final results. Section 1581(i)(4) grants jurisdiction

to such an action.").

Regarding the adequacy of relief, courts look to whether the plaintiff "would {be}

depriv{d} of the opportunity for full relief." *Sunpreme Inc. v. United States*, 892 F.3d 1186,

1194 (Fed. Cir. 2018) (noting that Commerce's scope ruling regulation "clearly contemplate{s},

that Customs can suspend liquidation" which would "ensure{} the return of cash deposits

pending the merits of {plaintiff's} scope dispute").  Although "delays inherent in the statutory

process" or allegations of "financial hardship" do not make alternative jurisdictional avenues

manifestly inadequate, *see id.* at 1193-94, a "potential for immediate injury and irreparable harm

to an industry and a substantial impact on the national economy" stemming from delays under

another jurisdictional pathway can render that pathway manifestly inadequate, *U.S. Cane Sugar*

*Refiners' Ass'n v. United States*, 683 F.2d 399, 402 n.5 (C.C.P.A. 1982).[4]  Relief is also

manifestly inadequate where procedural defects in the administrative proceeding at issue

---

[4] *South Corp. v. United States*, 690 F.2d 1368, 1369 (Fed. Cir. 1982) (holding that "the holdings
of our predecessor courts, the United States Court of Claims and the United States Court of
Customs and Patent Appeals (CCPA), announced by those courts before the close of business
September 30, 1982, shall be binding as precedent in this court.").

impeded the plaintiff's ability to avail itself of an alternative basis for jurisdiction. *See Suntec Indus. Co., Ltd. v. United States*, 857 F.3d 1363, 1368 (Fed. Cir. 2017) ("Suntec's claim on the merits is that it could not have participated because it did not get notice of the proceeding and hence did not know that the proceeding was underway. 28 U.S.C. § 1581(c) is manifestly inadequate where a party is challenging the initiation of an administrative review based on the contention that it did not participate in the review precisely because it did not get the legally required notice."). Finally, where agency "regulations… 'unmistakably' indicate{} how it would determine the issue in dispute," alternative jurisdictional pathways are "futile" and associated relief is "manifestly inadequate." *Int'l Custom Prods., Inc. v. United States*, 467 F.3d 1324, 1328 (Fed. Cir. 2006) (quoting *Pac Fung Feather Co., Ltd. v. United States*, 111 F.3d 114, 116 (Fed. Cir. 1997)); *see also NEC Corp. v. United States*, 151 F.3d 1361, 1368 (Fed. Cir. 1998)) ("when a plaintiff alleges that the outcome is preordained, the case 'is the very type of situation which is intended to be addressed under 28 U.S.C. § 1581(i)'") (parenthetical quoting, with approval, *Hylsa v. United States*, 22 C.I.T. 44, 47-48 (1998)); *McCarthy v. Madigan*, 503 U.S. 140, 148 (1992) ("{A}n administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it.").

## II. Solar Plaintiffs' Challenge to the *Final Solar Duty Holiday Rule* Concerns Administration & Enforcement of Commerce's Circumvention Determinations

### A. Binding Precedent Confirms Solar Plaintiffs' Ability to Challenge Commerce's Failure to Enforce its Circumvention Determinations under Section 1581(i)

The "true nature" of Solar Plaintiffs' action is a facial attack on the *Final Solar Duty Holiday Rule* promulgated in a purported exercise of Commerce's authority under 19 U.S.C. § 1318(a). *See, e.g.*, Complaint at p.2, ¶16, ¶19, ¶¶72-82, p.63. Commerce has unlawfully relied on this regulation as a means of refusing to "administer or enforce" its affirmative circumvention determinations. Given that *Consolidated Bearings* held that antidumping and countervailing

duties are intended "to protect domestic markets" and thus constitute duties "for reasons other than the raising of revenue" within the meaning of 28 U.S.C. § 1581(i)(1)(B), 348 F.3d at 1002-03, this case is precisely the sort of challenge to "administration and enforcement" that Congress intended to be reviewed under 28 U.S.C. § 1581(i)(1)(D). Solar Plaintiffs' action does not implicate Commerce's determination of "whether" circumvention is occurring within the meaning of 19 U.S.C. § 1516a(2)(B)(vi). As this Court weighs what "particular agency action…is the source of the alleged harm," *Hutchison*, 827 F.3d at 1360, Solar Plaintiffs emphasize that they were <u>not</u> harmed by Commerce's determinations that circumvention was, in fact, occurring.[5]

To be sure, because Commerce has relied upon its *Final Solar Duty Holiday Rule* regulations to avoid <u>enforcing</u> its circumvention determinations, the two intersect, as manifested in Commerce's liquidation instructions to CBP, which Solar Plaintiffs cite repeatedly in their Complaint. *See, e.g.*, Complaint at ¶18, 78-79, 86, Ex. 4. However, the Federal Circuit has repeatedly and unambiguously held that "an action challenging Commerce's liquidation instructions is not a challenge to the final results, but a challenge to the 'administration and enforcement' of those final results. {It} challenges the manner in which Commerce administered the final results. Section 1581(i)(4) grants jurisdiction to such an action." *Consolidated Bearings*, 348 F.3d at 1002; *see also Ugine CAFC II*, 551 F.3d at 1347 ("If the party challenges the liquidation instructions issued by Commerce to implement a final order, review is available under 28 U.S.C. § 1581(i){(1)(B), (D)}."); *Shinyei*, 355 F.3d at 1304 ("the determinations

---

[5] As noted in Solar Plaintiffs' Complaint, because Commerce excluded certain producers from its circumvention determinations and developed an unworkable regime for establishing a product as non-circumventing, *inter alia*, Auxin Solar initiated separate actions under Section 1581(c). *See* Complaint at ¶3 n.1. Unlike the instant action, those cases contest Commerce's "determination…as to whether" circumvention is occurring. *See* 19 U.S.C. § 1516a(a)(2)(B)(vi).

enumerated in section 516A(a)(2)(B) do not include the Commerce instructions challenged by

Shinyei in this action"). These binding precedents—which Defendants gloss over in their

motion—are directly on point. *See* Def. Mtn. at 17-18. Defendants' omission is even more

egregious given that Commerce's circumvention determinations expressly distinguish the

"circumvention inquiries" (which can proceed despite the *Final Solar Duty Holiday Rule*) from

the "implement{ation}" of Commerce's "circumvention findings" (which is precluded by the

*Final Solar Duty Holiday Rule*):

> Nothing in the proclamation states that Commerce <u>cannot conduct circumvention inquiries</u> with respect to solar cells and modules. In fact, in response to Proclamation 10414, Commerce added {the *Final Solar Duty Holiday Rule*}…and these regulations, as well as CBP instructions issued by Commerce, specify that no AD/CVD duties will be collected on solar cells and modules entering the United States to which Proclamation 10414 applies. Thus, <u>Commerce's affirmative circumvention findings cannot be implemented</u> until the provisions of the Proclamation 10414 expire.

*Cambodia Final IDM* at 77 (Exhibit 2); *Malaysia Final IDM* at 69 (Exhibit 3); *Thailand Final

IDM* at 77 (Exhibit 4); *Vietnam Final IDM* at 70 (Exhibit 5) (emphasis supplied).

**B.    The Citation Underpinning Defendants' Entire Argument Is Incomplete and the Federal Circuit's Final Holding in *Ugine* Expressly Reaffirms the Proposition Opposite to Defendants' Theory**

Defendants cite *Ugine and ALZ Belgium v. United States*, 452 F.3d 1289, 1296 (Fed. Cir.

2006) ("*Ugine CAFC I*"), for the proposition that jurisdiction over a challenge to liquidation

instructions lies under Section 1581(i) "only" where the instructions are alleged to be

inconsistent with underlying determination. *See* Def. Mtn. at 17-18. Defendants further claim

that the USCIT has rejected jurisdiction under Section 1581(i) where liquidation instructions "<u>are</u>

consistent with the underlying final determination." *See id.* at 18. Defendants' reliance on

*Ugine CAFC I* is inapposite, as that opinion explicitly declined to "decide the scope of *Shinyei* in

a preliminary injunction context," 452 F.3d at 1297, and was followed by a subsequent Federal

Circuit decision that "h{e}ld that the Court of International Trade had jurisdiction under 28 U.S.C. § 1581(i)" but which Defendants fail to acknowledge, *Ugine CAFC II*, 551 F.3d at 1341 (rehearing and rehearing *en banc* denied); *see also* Def. Mtn. at 14-19.

In *Ugine CAFC I*, an importer brought suit under Section 1581(i) challenging liquidation instructions issued in connection with the first, second, and third administrative reviews based on Commerce's resolution of a country-of-origin issue that was not raised or addressed until the final determination in the fourth administrative review. 452 F.3d at 1291. The importer did not allege any inconsistency between the final determinations in the first, second, or third administrative reviews and their respective liquidation instructions, but rather argued that Commerce's <u>new</u> findings in the fourth administrative review required a retroactive change to the first, second, and third review instructions. *See id.* at 1293, 1296. The importer sought to enjoin liquidation of unliquidated entries subject to the challenged instructions, which the USCIT declined to do. *Id.* at 1293.

On appeal, the Federal Circuit addressed the merits of the USCIT's preliminary injunction denial, reversed the USCIT, and remanded "for entry of a preliminary injunction and for further proceedings on the merits." *Id.* at 1297. Before doing so, the Federal Circuit acknowledged that Ugine's challenge to Commerce's liquidation instructions differed from the plaintiff in *Shinyei*, insofar as the latter contended "that Commerce's instructions…did not reflect the results of the administrative review," whereas Ugine "contended that Commerce's instructions for entries imported prior to the fourth administrative review are inconsistent with Commerce's determination in the subsequent fourth administrative review." *Id.* at 1296. Had *Ugine CAFC I* concluded that this difference divested the court of subject matter jurisdiction under Section 1581(i), this result would have been procedurally impossible. *See, e.g.*, *Vermont*

*Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 778-79 (2000) ("if there is no jurisdiction there is no authority to sit in judgment of anything else…'when {jurisdiction} ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'") (quoting *Ex parte McCardle*, 74 U.S. 506 (1868)).  On remand, the USCIT exercised jurisdiction over plaintiff's action under Section 1581(i).  *See Ugine & Alz Belgium, N.V. v. United States,* 517 F. Supp. 2d 1333, 1343 (Ct. Int'l Trade 2007).  And the Federal Circuit affirmed the USCIT's jurisdictional determination in a subsequent appeal, *Ugine CAFC II*, 551 F.3d at 1350, which Defendants inexplicably omit to acknowledge, *see* Def. Mtn. at 18.  *Ugine CAFC II* is fatal to Defendants' misguided understanding of *Ugine CAFC I* because the Federal Circuit "h{e}ld that the Court of International Trade had jurisdiction under 28 U.S.C. § 1581(i)." *Ugine CAFC II*, 551 F.3d at 1341.

Given the facts and holding of *Ugine CAFC II*, the subsequent USCIT opinions cited by Defendants cannot, as a legal matter, stand for the proposition that Section 1581(i) jurisdiction is only available where liquidation instructions are inconsistent with a final determination that is otherwise appealable under Section 1581(c).  None addressed a situation analogous to the case at bar.  All three cases related to the results of administrative reviews.  Notably, Section 516A provides significantly more open-ended language governing appeals of administrative reviews, *see* 19 U.S.C. § 1516a(a)(2)(B)(iii) (permitting appeals of "{a} final determination…<u>under section 1675</u> of this title") (emphasis supplied), than it does for appeals of circumvention determinations, *see id.* § 1516a(a)(2)(B)(vi) (permitting appeals of "{a} determination…<u>as to whether</u> a particular type of merchandise is within the class or kind of merchandise described in an existing…antidumping or countervailing duty order.") (emphasis supplied).  Indeed, that *Ugine CAFC II* affirmed jurisdiction under Section 1581(i) in a challenge to liquidation

instructions associated with the final results of an administrative review, *see Ugine CAFC II*, 551 F.3d at 1341, 1343, despite Section 1516a(a)(2)(B)(iii)'s more open-ended grant of Section 1581(c) jurisdiction for appeals of such determinations, establishes *a fortiori* that Section 1516a(a)(2)(B)(vi)'s narrower grant of Section 1581(c) jurisdiction for appeals of circumvention determinations does not encompass liquidation instructions.

### C.   USCIT Decisions Cited by Defendants Concerned Situations Bearing No Resemblance to the Facts of Solar Plaintiffs' Enforcement Challenge

Beyond the material distinction in procedural posture, Defendants' cases bear no factual resemblance to Solar Plaintiffs' action.

*Corus Staal* concerned a foreign producer's claim "that the dumping margin underpinning th{e} liquidation instructions {issued after an administrative review was withdrawn} should be different." *Corus Staal B.V. v. United States*, 493 F. Supp. 2d 1276, 1285 (Ct. Int'l Trade 2007). Corus had not requested an administrative review but wished to force Commerce to calculate a new margin without zeroing. *See id.* at 1280-81. The Court reasoned that Corus could have obtained a new margin and sought review under Section 1581(c) if it had requested a review of itself. *See id.* at 1285.

*JD Irving* was similar to *Corus Staal*, in that the plaintiff was displeased with the "all others" rate assigned to non-mandatory respondents in an administrative review. *See J.D. Irving, Ltd. v. United States*, 615 F. Supp. 3d 1323, 1326-27 (Ct. Int'l Trade 2023). Although nominally targeting the cash deposit instructions implementing that rate, the Court concluded that plaintiff's challenge actually "involves Commerce's determination in the AR 2 Final Results," and concluded that relief available through ongoing USMCA Binational Panel proceedings was not manifestly inadequate. *See id.* at 1332-33.

Finally, *Intercontinental* concerned an importer who did not participate in the underlying administrative review but wished to be named for a particular rate in the liquidation instructions. *See Intercontinental Chemicals, LLC v. United States*, 483 F. Supp. 3d 1232, 1239-40 (Ct. Int'l Trade 2020). The Court found this, in substance, to be a challenge to Commerce's final determination, insofar as the naming of parties on the liquidation instructions carried forward factual information adduced by respondents during the underlying proceedings. *See id.* at 1240. Rate disputes and the identification of entities to be assessed a given rate are generic "factual findings or legal conclusions upon which the {final} determination {in an administrative review} is based." 19 U.S.C. § 1516a(a)(2)(A); *see also id.* § 1516a(a)(2)(B)(iii). But Solar Plaintiffs are not herein challenging rate calculations or the listing of a given company. Commerce found circumvention, which Solar Plaintiffs take as a given for purposes of this litigation. *See, e.g.*, Complaint at ¶3. What occasions Solar Plaintiffs' complaint is Commerce's failure to enforce its circumvention findings due to the *Final Solar Duty Holiday Rule* and liquidation instructions effectuating that unlawful regulation.

<u>After</u> Commerce determined that circumvention was in fact occurring, Solar Plaintiffs were (and are) harmed by Commerce's issuance of liquidation instructions that contravene Commerce's circumvention findings by failing to satisfy the mandates of 19 C.F.R. § 351.226(l). *See, e.g.*, Complaint at ¶18-20. Commerce's liquidation instructions were predicated upon Commerce's reliance on the unlawful *Final Solar Duty Holiday Rule* regulations. *See id.* at Ex. 4 at ¶¶4-5. Thus, Solar Plaintiffs' action concerns the administration and (lack of) enforcement of Commerce's determinations as to whether circumvention occurred.

**III. Because the "True Nature" of Solar Plaintiffs' Action is Not a Challenge to Commerce's Determination as to Whether Circumvention Occurred, Jurisdiction Is Not Available Under Section 1581(c)**

**A. Textually, Defendants Fail to Grapple with the Narrow Language of Section 1516a(a)(2)(B)(vi), Which Only Permits Appeals of Commerce's Determination as to Whether Circumvention Occurred—Something Solar Plaintiffs Do Not Challenge in this Action**

Defendants' motion to dismiss is predicated on the argument that jurisdiction cannot lie under 28 U.S.C. § 1581(i) because Solar Plaintiffs could have brought their challenge under 28 U.S.C. § 1581(c). *See* Def. Mtn. at 14-19. This is incorrect. Subsection (c) jurisdiction was not and could not have been available for the causes of action set forth in Solar Plaintiffs' complaint.

The USCIT's jurisdictional statute remains unchanged in all material respects since its introduction. *See* Pub. L. No. 96–417, title II, § 201 (1980), 94 Stat. 1728.[6] Subsection (c), in relevant part, provides the USCIT "jurisdiction of any civil action commenced under section 516A…of the Tariff Act of 1930." 28 U.S.C. § 1581(c). As the Federal Circuit recognized in *Shinyei*, the legislative history establishes that Section 516A was intended to "provide increased opportunities for appeal of…final <u>rulings</u> by the administering authority, or the U.S. International Trade Commission in antidumping and countervailing duty <u>cases</u>." *Shinyei*, 355 F.3d at 1311 n.9 (quoting S. Rep. No. 96-249 at 27 (1979)) (emphasis supplied). But, as the

---

[6] The United States-Canada Free-Trade Agreement Implementation Act of 1988 amended 1581(i) to add what is currently subsection (i)(2). Pub. L. No. 100–449, title IV, § 402(a) (1988), 102 Stat. 1883. This was a conforming amendment attendant to the introduction of the binational panel procedures associated with the free trade agreement. S. Rep. 100-509 at 35 (1988) (describing the amendments as "needed to assure that a litigant cannot invoke the USCIT's 'residual jurisdiction' provision, 28 U.S.C. 1581(i), for the purpose of circumventing the binational panel system established under the Agreement."). The language was subsequently converted from flush text under 1581(i) into a separate subsection (1581(i)(2)) without substantive change by the United States-Mexico-Canada Agreement Implementation Act, Pub. L. No. 116–113, title IV, § 423(a)(1) (2020), 134 Stat. 65. This section was further amended upon entering into force of the United States-Mexico-Canada Agreement. *See* S. Rep. 116-283 at 48 (2020) ("Section 423 makes conforming changes to Chapter 95 of Title 28.").

Federal Circuit has recognized, "subsection {1581}(i), and in particular paragraph {(1)(D)}, makes it clear that the court is not prohibited from entertaining a civil action relating to an antidumping or countervailing duty proceeding so long as the action does not involve a challenge to a determination specified in section 516A of the Tariff Act of 1930." *Montgomery Ward & Co., Inc. v. United States*, 673 F.2d 1254, 1261 (C.C.P.A. 1982) (quoting H.R. Rep. No. 96-1235 at 48 (1980)). Unlike the specific inclusion of certain antidumping and countervailing duty appeals in Section 516A, nothing related to 19 U.S.C. § 1318(a) appears in Section 516A.

The plain text of Section 516A is unequivocal. "Section 516A is limited on its face to the judicial review of 'determinations'" and "enumerates specific 'reviewable determinations.'" *Shinyei*, 355 F.3d at 1309. In relevant part, Section 516A establishes the USCIT's jurisdiction over "{a} determination by the administering authority as to <u>whether</u> a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi) (emphasis supplied). Defendants omit this statutory language, incorrectly paraphrasing it as "the final determinations in the circumvention inquiries at issue here," *see* Def. Mtn. at 13, and repeatedly conflate the "final determination" writ large with the narrow set of substantive determinations appealable under Section 1516a(a)(2)(B)(vi), *i.e.*, whether merchandise falls within an existing AD/CVD order, *see, e.g.*, Def. Mtn. at 14-16.

A party may challenge Commerce's circumvention determinations, *see, e.g.*, *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357, 1364 (Ct. Int'l Trade 2021), *aff'd*, 65 F.4th 1351 (Fed. Cir. 2023), and thereby obtain judicial review of "any factual findings or legal conclusions <u>upon which the determination</u> is based," 19 U.S.C. § 1516a(a)(2)(A) (emphasis supplied). But, as Solar Plaintiffs expressly state in their Complaint, the instant action does not

challenge Commerce's "determination…as to <u>whether</u>" circumvention is occurring, *id.* § 1516a(a)(2)(B)(vi) (emphasis supplied), nor does it challenge the factual findings or legal conclusions on which Commerce based its determination as to whether circumvention is occurring, *see id.* § 1516a(a)(2)(A). Complaint at ¶3. The court must assess "the suit actually before the court." *Norman G. Jensen*, 687 F.3d at 1331. Solar Plaintiffs' suit falls outside the ambit of determinations contemplated by Section 1581(c).

**B.    Defendants' Inclusion of Ancillary Material in the Announcement of the Determination Appealable Under 1581(c) Does Not Confer Jurisdiction Over Matters Outside of that Appealable Determination**

Defendants attempt to bootstrap their way into Section 1581(c) jurisdiction on the basis that Commerce stated that it would apply the *Final Solar Duty Holiday Rule* and would not enforce its circumvention regulations in the same document that set forth an appealable Section 1581(c) determination. *See* Def. Mtn. at 16; *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419, 57,421-22, 57,425-33 (Aug. 23, 2023). At base, this is simply another iteration of Defendants' argument that Section 1581(i) cannot encompass an appeal of an action that is "consistent with" a determination appealable under Section 1581(c), which the Federal Circuit conclusively rejected in *Ugine CAFC II*. *See* Section II, *supra*.

The discussion of the *Final Solar Duty Holiday Rule* in the Federal Register notice that also set forth Commerce's affirmative circumvention determinations has no effect on the statutory analysis. Section 516A "enumerates specific 'reviewable <u>determinations</u>'"—not reviewable documents. *Shinyei*, 355 F.3d at 1309 (emphasis supplied). The relevant determination reviewable under Section 516A concerns "whether a particular type of

merchandise is within the class or kind of merchandise described in an existing…antidumping or

countervailing duty order." 19 U.S.C. § 1516a(a)(2)(B)(vi).  As explained, the Federal Circuit

has drawn a line between such determinations and the administration and enforcement of such

determinations, *e.g.*, through liquidation instructions—even instructions that were consistent

with the associated determination.  *See Consolidated Bearings*, 348 F.3d at 1002; *Ugine CAFC

II*, 551 F.3d at 1347; *Shinyei*, 355 F.3d at 1304.  Congress's choice of words in defining

appealable agency action under Section 516A(a)(2)(B)(vi) demonstrates that it did not intend to

permit Commerce to gerrymander the jurisdictional framework based on how much

enforcement-related information it elects to publish alongside <u>another</u> determination that is

appealable under Section 516A.

The facts of this case illustrate why Congress limited Section 1581(c) jurisdiction based

on "determinations."  Courts have often admonished private litigants not to circumvent the

procedural strictures applicable to jurisdiction under Sections 1581(a)-(h) through "artful or

creative pleading," *see, e.g.*, *Erwin Hymer*, 930 F.3d at 1370, but the same principle of

fundamental fairness that animates such warnings must apply to what the government publishes

as well.  Commerce specifically limited administrative briefing in the circumvention proceeding

to preclude arguments concerning the lawfulness of the regulation, *see* Commerce

Circumvention Inquiries Briefing Memo at 1 (Exhibit 1), and refused to disclose *ex parte*

communications on the theory that "Commerce was not required to memorialize for the record

communications on matters <u>distinct from the AD/CVD proceedings at hand</u>, including

Presidential Proclamation 10414 <u>or the rulemaking resulting from that Proclamation</u>."

*Cambodia Final IDM* at 113 (Exhibit 2); *Malaysia Final IDM* at 104 (Exhibit 3); *Thailand Final

IDM* at 113 (Exhibit 4); *Vietnam Final IDM* at 111 (Exhibit 5).  Now the government argues

Solar Plaintiffs are obliged to pursue their claims in an appeal of the determination that Commerce administratively characterized as "distinct."

The Federal Circuit has implicitly rejected Defendants' interpretation by repeatedly permitting the litigation of challenges to liquidation instructions under Section 1581(i) despite liquidation having been discussed in a dumping determination that was appealed under Section 1581(c).  *See Antifriction Bearings (Other Than Tapered Rolled Bearings) and Parts Thereof From the Federal Republic of Germany*, 62 Fed. Reg. 32,755, 32,756 (June 17, 1997) ("we are amending our final results of review in these matters and we will subsequently instruct the U.S. Customs Service to liquidate entries subject to these reviews") (cited at *Consolidated Bearings*, 348 F.3d at 1000 n.3);  *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al*., 63 Fed. Reg. 8,908 (Feb. 23, 1998) (same) (cited at *Shinyei*, 355 F.3d at 1301); *Stainless Steel Plate in Coils from Belgium*, 70 Fed. Reg. 18,374, 18,375 (Apr. 11, 2005) ("we are amending our final results of review and we will instruct the U.S. Customs and Border Protection (''CBP'') to liquidate entries subject to this review.") (cited at *Ugine CAFC II*, 551 F.3d at 1344).  As clearly set forth in Solar Plaintiffs' Complaint, Solar Plaintiffs' aim is to have Commerce's *Final Solar Duty Holiday Rule* <u>vacated</u>, and for Commerce to comply with its regulation governing liquidation instructions, 19 C.F.R. § 351.226(l), as if the *Final Solar Duty Holiday Rule* had never existed.  Complaint, ECF Doc. 2 (Dec. 29, 2023) at 63.

With the *Final Solar Duty Holiday Rule* declared a nullity, Solar Plaintiffs' complaint ultimately requests that Defendants be ordered to suspend liquidation and collect cash deposits for all circumventing CSPV entries dated on or after the initiation of Commerce's circumvention inquiries (April 1, 2022) that did not liquidate before the date of Commerce's affirmative preliminary circumvention determinations, and which were subject to Commerce's *Final*

*Affirmative Determinations of Circumvention*.  Solar Plaintiffs' action could not be brought

under Section 1581(c), which does not provide a pathway for aggrieved parties to challenge 19

U.S.C. § 1318(a) regulations such as the *Final Solar Duty Holiday Rule* or liquidation

instructions tainted by such regulations, and Defendants therefore fail to overcome the first prong

of the jurisdictional analysis.

**IV. Relief Available Under Section 1581(c) Would be Manifestly Inadequate, Precluding the Reliquidation of Billions of Dollars' Worth of CSPV Imports that Were Unlawfully Liquidated Duty-Free Based on Defendants' *Post Hoc* Recharacterizations of Agency Action**

As an initial matter, the Court need not reach this prong of the analysis, because relief

was not available to Solar Plaintiffs under Section 1581(c).  If the Court does consider the

adequacy of relief, remedies available under Section 1581(c) would be "manifestly inadequate"

because even if Solar Plaintiffs had sought judicial review at the first possible opportunity,

roughly $2.65 billion in circumventing CSPV imports had already liquidated and would have

been ineligible for judicial review.  Review under Section 1581(c) would perversely guarantee

unlawful duty-free treatment of those entries.  (**Section IV.A**).  Moreover, like other cases

wherein the Federal Circuit has found other remedies "manifestly inadequate," Commerce's

*Final Solar Duty Holiday Rule* set forth in unmistakable mandatory language how Commerce

would fail to enforce any affirmative circumvention findings.  Given this, and the fact that

Commerce precluded briefing on the lawfulness of that regulation during the circumvention

proceedings, the outcome was predetermined and relief through those proceedings was

manifestly inadequate.  (**Section IV.B**).

Intervenors also raise ancillary considerations aside from the merits.  The existence of a

separate regime for certifying a product as non-circumventing in character simply reflects

Commerce's determination as to what constitutes circumvention.  It is entirely separate from

*Final Solar Duty Holiday Rule* certification and does not bear upon the jurisdictional analysis in this action. (**Section IV.C**). Finally, the Court should reject nonparties' invitation, based on inapposite precedent, to refuse to consider Solar Plaintiffs' arguments concerning the inadequacy of relief (**Section IV.D**).

### A. Federal Circuit Precedent Establishes that Plaintiffs' Opportunities for Relief under Section 1581(c) Would Fail to Redress the Extent of the Harm Caused by the *Final Solar Duty Holiday Rule*

Defendants suggest that Solar Plaintiffs could have obtained an adequate remedy by appealing Commerce's affirmative circumvention determinations. This Court's precedent establishes that subject matter jurisdiction over an appeal from a decision described in 19 U.S.C. § 1516a(a)(2)(B)(vi) is not available until the date that notice of the decision in question has been physically mailed. *See, e.g.*, *Medline Indus., Inc. v. United States*, 911 F. Supp. 2d 1358, 1361 (Ct. Int'l Trade 2013); *Perfectus Aluminum, Inc. v. United States*, 391 F. Supp. 3d 1341, 1350–51 (Ct. Int'l Trade 2019), *aff'd*, 836 F. App'x 883 (Fed. Cir. 2020).[7] The determination at issue was mailed on September 20, 2023. Meanwhile, Federal Circuit precedent establishes that "under section 516As parallel liquidation and injunction provisions, subject merchandise that is entered prior to publication of the final decision of the Court of International Trade or this court is liquidated as entered unless liquidation is enjoined." *Shinyei*, 355 F.3d at 1307-08.

Therefore, any entry that was liquidated because of the *Final Solar Duty Holiday Rule* and liquidation instructions purporting to implement that unlawful regulation prior to September 20, 2023, would have been finally liquidated. No matter how quickly Solar Plaintiffs had raced

---

[7] Several proposed Defendant-Intervenors evidently misunderstood this rule and filed premature appeals before the date of mailing. *See, e.g.*, USCIT Ct. Nos. 23-00194; 23-00196; 23-00197; 23-00198.

into court,[8] they would have had no possible way to obtain recourse for the unlawful duty-free liquidation of these entries in a case brought under Section 1581(c).  Just as denial of judicial review of a competitor's entry constitutes irreparable harm, *Zenith Radio Corp. v. United States*, 710 F.2d 806, 810 (Fed. Cir. 1983) ("liquidation would indeed eliminate the only remedy available to Zenith for an incorrect review determination by depriving the trial court of the ability to assess dumping duties on Zenith's competitors in accordance with a correct margin on entries in the '79–'80 review period….Zenith's statutory right to obtain judicial review of the determination would be without meaning…"), it also renders relief under Section 1581(c) manifestly inadequate.

While detailed data concerning liquidation status is not publicly available, Solar Plaintiffs can reasonably estimate that proceeding under Section 1581(c) would have necessarily deprived them of review of $2.65 billion dollars' worth of circumventing CSPV imports from Cambodia, Malaysia, Thailand, and Vietnam.  *See* USITC Dataweb Query Results (Exhibit 6) (the figure represents all CSPV cell and module imports from the four countries between April 2022 and August 2022).  This is because virtually all entries between the date Commerce published notice of initiation of the circumvention inquiries (April 1, 2022) and the date one year before Commerce mailed notice of the final determinations (September 19, 2022) had liquidated by operation of law – before Solar Plaintiffs' could have initiated an appeal.  *See* 19 U.S.C. § 1504(a)(1).  Notably, Commerce itself exacerbated this problem, both by delaying the date of its final circumvention determinations <u>more than four months</u> beyond its regulatory deadline, *see* 19

---

[8] Defendants' observation that "Auxin Solar has not requested an injunction in any of the section 1581(c) cases" is beside the point, *see* Def. Mtn. at 10, as no request for an injunction could have secured Section 1581(c) jurisdiction over the already-liquidated entries.

C.F.R. § 351.226(e)(2) (maximum deadline of 365 days from date of notice of initiation), and by then waiting nearly an additional month to mail notice of its determination.

Were it not for the *Final Solar Holiday Rule* that Solar Plaintiffs challenge in this case, liquidation of those same entries would have been suspended by operation of 19 C.F.R. § 351.226(l)(2)(ii) once Commerce published its preliminary affirmative determinations of circumvention on December 8, 2022, *i.e.*, less than one year after their date of entry. *See Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 Fed. Reg. 75,221, 75,221 (Dec. 8, 2022). Because of the *Final Solar Duty Holiday Rule*, this did not occur, and those entries liquidated—defeating the potential for judicial review under Section 1581(c)—before a request for Section 1581(c) judicial review was even possible. By itself, this catch-22 renders the remedies available under Section 1581(c) manifestly inadequate because Solar Plaintiffs "would {be} deprive{d} of the opportunity for full relief." *Sunpreme*, 892 F.3d at 1194.

## B.  Federal Circuit Precedent and Commerce's Characterization of the *Final Solar Duty Holiday Rule* as Dispositive Confirm that Section 1581(c) Relief Is Inadequate

Defendants briefly argue that because the Court *might* invalidate a Commerce regulation incidental to the Court's review of a determination under 19 U.S.C. § 1516a, Plaintiffs could have obtained adequate relief under Section 1581(c). *See* Def. Mtn. at 19-20. Yet, Defendants mischaracterize their Federal Circuit citations as supporting a proposition that none, in fact, addressed. Neither *Mid Continent*, nor *Dorbest*, nor their underlying USCIT opinions ever considered or addressed the propriety of 1581(c) vs. 1581(i) jurisdiction. *See id.* at 20 (citing *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364 (Fed. Cir. 2017); *Dorbest Ltd. v.*

*United States*, 604 F.3d 1363 (Fed. Cir. 2010)).[9]  Here, Commerce administratively considered itself bound by the *Final Solar Duty Holiday Rule* and "incapable" of enforcing its affirmative circumvention determinations in the context of those administrative proceedings, rendering them "manifestly inadequate" for obtaining relief.  *See, e.g.*, *Juancheng*, 932 F.3d at 1327.

As an initial matter, Defendants' *post hoc* characterization of Commerce's circumvention determinations as somehow "deciding" upon the *Final Solar Duty Holiday Rule* is inaccurate. *See, e.g.*, Def. Mtn. at 16.  The *Final Solar Duty Holiday Rule* was "decided" upon by the regulatory preamble promulgating the final rule.  *See* 87 Fed. Reg. at 56,868.  As discussed above, once published in September 2022, Section 362.103 of the *Final Solar Duty Holiday Rule* prescribed a mandatory course of action that obliged Commerce to, *inter alia*, forego the suspension of liquidation and collection of cash deposits that would otherwise have been required by 19 C.F.R. § 351.226(l).  *See* 19 C.F.R. §§ 362.103(a), (b)(1), (c).  Commerce's subsequent invocation of the *Final Solar Duty Holiday* rule during its CSPV circumvention inquiries was "a mere formality," as in *Pac Fung*, agency "regulations… 'unmistakably' indicate{d} how it would determine the issue in dispute," rendering Section 1581(c) "futile" and associated relief is "manifestly inadequate."  *Int'l Custom Prods.*, 467 F.3d at 1328 (quoting *Pac Fung*, 111 F.3d at 116).  Commerce expressly embraced this understanding, asserting that because of the *Final Solar Duty Holiday Rule*, "Commerce's affirmative circumvention findings

---

[9] BYD attempts to supplement Defendants' citations by reference to inapposite out-of-circuit decisions.  *See* BYD Dismissal Arguments at 11 (citing *Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142, 145 (D.C. Cir. 2014); *Murphy Exploration & Prod. Co. v. U.S. Dep't of Interior*, 270 F.3d 957, 959 (D.C. Cir. 2001)).  Although BYD invokes these as support for its contention that Section 1581(c) jurisdiction was available, the decisions in question were <u>not</u> applying the USCIT's jurisdictional statute, considering the relief available under Section 1581(c), or addressing the distinction between anti-circumvention enforcement and "whether" circumvention occurred in the first instance.  *See id.*; Section III, *supra*.

<u>cannot</u> be implemented until the provisions of the Presidential Proclamation 10414 expires." *Cambodia Final IDM* at 77 (Exhibit 2); *Malaysia Final IDM* at 69 (Exhibit 3); *Thailand Final IDM* at 77 (Exhibit 4); *Vietnam Final IDM* at 70 (Exhibit 5) (emphasis supplied).

Defendants cannot defeat this Court's jurisdiction over the legality of the *Final Solar Duty Holiday Rule* by retroactively recharacterizing its circumvention inquiries in terms that Commerce expressly disclaimed during those proceedings. The principle that "{j}udicial review of agency action, however, is limited to 'the grounds that the agency invoked when it took the action'" forecloses Commerce's argument. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1896 (2020). Commerce is limited to defending itself based on "the agency's reasoning at the time of the agency action." *Id.*

Defendants also suggest that Solar Plaintiffs are attempting to circumvent exhaustion requirements by proceeding under Section 1581(i) to press arguments absent from case briefs filed in the course of circumvention proceedings.[10] *See, e.g.*, Def. Mtn. at 15, 19-20. This is yet another instance where the Government's litigating position contradicts its administrative behavior. After domestic producers argued that Commerce's *Final Solar Duty Holiday Rule* was unlawful in advance of the preliminary circumvention inquiry determinations, *see* Auxin Solar

---

[10] Despite declaring issues of exhaustion in the Section 1581(c) context "beyond the scope" of Defendants' motion, Def. Mtn. at 12 n.5, Defendants repeatedly rely on the unexplained assertion that Auxin Solar is somehow attempting to "circumvent the exhaustion requirement" by invoking Section 1581(i) jurisdiction, *id.* at 15, 19-20. The arguments presented in Solar Plaintiffs' complaint were fully exhausted during the administrative proceedings that preceded publication of the *Final Solar Duty Holiday Rule*, *see generally* Complaint at Ex. 3, and Commerce expressly stated in its final circumvention determinations that it was powerless to take any action contrary to the *Final Solar Duty Holiday Rule*, *see Cambodia Final IDM* at 77 (Exhibit 2); *Malaysia Final IDM* at 69 (Exhibit 3); *Thailand Final IDM* at 77 (Exhibit 4); *Vietnam Final IDM* at 70 (Exhibit 5) ("Commerce added {the *Final Solar Duty Holiday Rule*} to its regulations to implement the Proclamation {10414}…Commerce's affirmative circumvention findings <u>cannot be implemented</u> until the provisions of the Presidential Proclamation 10414 expires.") (emphasis supplied).

Circumvention Inquiries Pre-Preliminary Comments (Exhibit 7), it was <u>Commerce</u> that decided in the first instance to limit briefing on the *Final Solar Duty Holiday Rule* to the minutiae of Commerce's certifications and preliminary CBP messages, *see* Commerce Circumvention Inquiries Briefing Memo at 1 (Exhibit 1). Indeed, far from uncovering Solar Plaintiffs' hidden motives, the reality of the situation further establishes the manifest inadequacy of proceeding under Section 1581(c). Now, Defendants seek to use those same limits on administrative briefing as a cudgel to preclude fulsome judicial review of the *Final Solar Duty Holiday Rule* on exhaustion grounds. Analogous to *Suntec*, procedural defects in Defendants' circumvention inquiries would impede Solar Plaintiffs' ability to obtain review of all counts in their Complaint under Section 1581(c).

## C. As Solar Plaintiffs Expressly Stated in their Complaint, Commerce's Ordinary Circumvention Certification Regime Is Not at Issue in this Litigation and Has No Bearing on this Court's Jurisdictional Analysis

ACP and JA Solar highlight the supposed "interrelation" between Commerce's ordinary circumvention certification regimes (*i.e.*, the "Wafer + 2" certification which, in Commerce's view, establishes that a product's physical components are of a non-circumventing character) and the *Final Solar Duty Holiday Rule* certification regimes (*i.e.*, certification by which a circumventing product may nevertheless obtain duty-free treatment). ACP Dismissal Arguments at 7-9; JA Solar Dismissal Arguments at 7-9; *see also See Affirmative Final Determinations of Circumvention*, 88 Fed. Reg. at 57,420 (stating that "these circumvention inquiries do not cover" CSPV modules meeting the "Wafer + 2" standard); *id.* at 57,422 (describing the different purposes of each certification). [11]  ACP and JA Solar do not explain how this relates to the test

---

[11] "Wafer + 2" certification concerns "the component contents" of imports, *Affirmative Final Determinations of Circumvention*, 88 Fed. Reg. at 57,422, *i.e.*, whether modules "were

*(footnote continued on next page)*

for subject matter jurisdiction, but instead attempt to steer the court away from a correct jurisdictional analysis with vague claims of "complexity." *See id.* An interrelationship between a determination appealable under Section 1581(c) and an appeal of the "administration and enforcement" of that determination under Section 1581(i) is not unique and does not divest this Court of Section 1581(i) jurisdiction over Solar Plaintiffs' complaint. After all, the Federal Circuit upheld Section 1581(i) jurisdiction over plaintiff's challenge to Commerce's liquidation instructions after Commerce had revised its antidumping rates in *Shinyei. See* 355 F.3d at 1302-03.

Commerce's ordinary circumvention certification regime is part and parcel of its analysis as to "whether" circumvention is occurring. *See* 19 U.S.C. § 1516a(a)(2)(B)(vi). Stated simply, the "Wafer + 2" certification demonstrates where Commerce drew the line between circumventing products and non-circumventing products. *See Affirmative Final Determinations of Circumvention*, 88 Fed. Reg. at 57,420 ("Merchandise Subject to the Circumvention Inquiries" heading). Auxin Solar has separately challenged the "Wafer + 2" certification in its Section 1581(c) actions, because that line-drawing represents a "factual finding{} or legal conclusion{} upon which {Commerce's} determination {as to whether circumvention occurred} is based." 19 U.S.C. § 1516a(a)(2)(A); *see also, e.g.*, Auxin Solar's Complaint in USCIT Ct. No. 23-223, ECF Doc. 10 at 8-10 (Nov. 20, 2023). By contrast, the *Final Solar Duty Holiday Rule* and its associated liquidation instructions and certifications are of an entirely different character. As detailed in Section III, *supra*, the *Final Solar Duty Holiday Rule* by its nature assumes that circumvention <u>is</u> occurring and precludes the <u>enforcement</u> of AD/CVD cash deposit and

---

manufactured using wafers produced in China but <u>no more than two</u>" of six listed components, *id.* at 57,432 (listing silver paste, aluminum frames, solar glass, backsheets, ethylene-vinyl acetate, and junction boxes).

suspension of liquidation requirements against products that were otherwise found to be circumventing.  *See* 19 C.F.R. § 362.103(b)-(c).[12]

The true nature of ACP's and JA Solar's argument is to prematurely question how this Court might exercise its powers in equity to design a remedy, an implicit vote of confidence in the substantive merits of Solar Plaintiffs' challenge to the *Final Solar Duty Holiday Rule* and its associated liquidation instructions and certification regimes.  However, the existence of a separate certification regime unrelated to the *Final Solar Duty Holiday Rule* does not render the remedies available under Section 1581(c) adequate.  To the extent these separate regimes interact, such details can be addressed after the merits of Solar Plaintiffs' case.

### D.   Waiver Principles Do Not Bar this Court's Consideration of Its Subject Matter Jurisdiction

Proposed Defendant-Intervenors (but not Defendants) suggest that Solar Plaintiffs have "waived" any argument that relief available under Section 1581(c) is inadequate.  Proposed Defendant-Intervenors all rely on the following passage from a Federal Circuit opinion:

> Wanxiang does not argue in its opening brief {before the panel} that relief under another subsection of § 1581 would be manifestly inadequate.  Nor did Wanxiang raise a 'manifestly inadequate' argument at the USCIT.  Given these circumstances, we find that Wanxiang has waived or forfeited the argument that any other relief that may have been available to it was manifestly inadequate.

---

[12] ACP's and JA Solar's arguments are also practically dubious.  The cash deposit and suspension of liquidation benefits of each certification regime are identical.  *See Affirmative Final Determinations of Circumvention*, 88 Fed. Reg. at 57,422 (describing products accompanied by "Wafer + 2" certificate as "not subject to suspension of liquidation or the collection of cash deposits").  It seems illogical for an importer to certify that its products were of a circumventing character under the *Final Solar Duty Holiday Rule* only to obtain the same benefit it could have obtained by certifying that its products were of a non-circumventing character.  Solar Plaintiffs therefore doubt that the scenario described by ACP and JA Solar is widespread.

ACP Dismissal Arguments at 5-6; Canadian Solar Dismissal Arguments at 12; Invenergy

Dismissal Arguments at 4; JA Solar Dismissal Arguments at 5-6 (each citing *Wanxiang Am.*

*Corp. v. United States*, 12 F.4th 1369 (Fed. Cir. 2021) (internal citations omitted)). The

procedural posture of *Wanxiang* is not analogous to this action.[13]

Wanxiang had omitted the argument in question from <u>all</u> of its USCIT papers as well as

its opening brief before the Federal Circuit. 12 F. 4th at 1374; *see also Indus. Chems., Inc. v.*

*United States*, 941 F.3d 1368, 1373 n.3 (Fed. Cir. 2019) (plaintiff-appellant failed to raise

jurisdictional argument before the USCIT). This is dissimilar from a lack of reference to

manifest inadequacy in a complaint. Indeed, as this Court has recognized, it has an independent

obligation to investigate its subject matter jurisdiction, *Arbaugh v. Y&H Corp.*, 546 U.S. 500,

514 (2006), as well as an obligation to "freely give leave {to amend a complaint} when justice so

requires," USCIT R.15(a)(2). Together, these strongly counsel against refusing to consider Solar

Plaintiffs' arguments with respect to the adequacy of relief merely because those arguments were

not expounded until Solar Plaintiffs' response to a motion to dismiss for lack of subject matter

jurisdiction. *Cf. United States v. Cotton*, 535 U.S. 625, 630 (2002) ("subject-matter jurisdiction,

because it involves a court's power to hear a case, can never be forfeited or waived."). Counsel

is unaware of any case wherein the USCIT has relied on waiver to avoid considering a plaintiff's

jurisdictional response in such circumstances, and notes that the USCIT considered such

arguments despite their omission from a plaintiff's complaint in *Intercontinental Chemicals, LLC*

*v. United States*, 483 F. Supp. 3d 1232, 1241 (Ct. Int'l Trade 2020).

---

[13] Wanxiang also seemed to have a straightforward alternative to challenge CBP's assignment of
a particular cash deposit rate, but had neither filed a protest nor paid the challenged duties before
commencing suit. *See Wanxiang*, 12 F.4th at 1372.

**CONCLUSION**

For the reasons stated above, Solar Plaintiffs ask that this Court find subject matter jurisdiction over this action under 28 U.S.C. §§ 1581(i)(1)(B), (D), and deny all Motions to Dismiss filed by Defendants and non-party proposed Defendant-Intervenors.

*    *    *

Respectfully submitted,

/s/ Thomas M. Beline

Thomas M. Beline
Roop K. Bhatti[*]
James E. Ransdell
Chase J. Dunn
Sydney C. Reed

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street, NW, Suite 400
Washington, D.C. 20006

Phone: (202) 567-2316
Fax: (202) 567-2301

*Counsel for Auxin Solar Inc. and*
*Concept Clean Energy, Inc.*

February 16, 2024

---

[*] Admitted in Illinois; practice limited to matters before federal courts and agencies.

# EXHIBIT 1

Barcode:4344410-01 A-570-979 CIRC - Anti Circumvention Inquiry - Kern Cambodia 2022

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-979;
Circumvention Inquiries
From Cambodia 2022; From Malaysia 2022;
From Thailand 2022; From Vietnam 2022
**Public Document**
E&C/OIV:  EBG

**DATE:**                    February 22, 2023

**MEMORANDUM TO:**           The File

**FROM:**                    Eric B. Greynolds  *EBG*
                             Director
                             Office IV
                             AD/CVD Operations

**RE:**                      Circumvention Inquiries:  Crystalline Silicon Photovoltaic Cells,
                             Whether or Not Assembled into Modules, from the People's
                             Republic of China

**SUBJECT:**                 Announcement of Briefing Schedule for First Tranche of Case and
                             Rebuttal Briefs

We hereby inform interested parties that the Department of Commerce (Commerce) is separating the briefing schedule for the circumvention inquiries referenced above into two tranches.  The first tranche of the briefs should only contain interested parties' comments concerning the following items:  (1) the headings "Certified Entries," "Certifications," "Certification Requirements," and Appendices IV through VI of the *Notice of Preliminary Determinations*;[1] (2) product coverage/definition of inquiry merchandise contained under the heading "Merchandise Subject to the Circumvention Inquiries" of the *Notice of Preliminary Determinations* and in the Product Coverage Clarification Memorandum;[2] and (3) Customs and Border Protection (CBP) Message Number 3041408, dated February 10, 2023, and CBP Message Number 3047409, dated February 16, 2023.[3]

To ensure consistency across the concurrent circumvention inquiries, we instruct interested parties to submit the first tranche of their case and rebuttal briefs on the records of the four antidumping duty (AD) circumvention inquiries under the following schedule:[4]

---

[1] *See Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 FR 75221 at 75224-25, 75227-31 (December 8, 2022) (*Notice of Preliminary Determinations*).
[2] *Id*., 87 FR at 75222; *see also* Memorandum, "Clarification of Product Coverage," dated December 19, 2022 (Product Coverage Clarification Memorandum).
[3] *See* Memorandum, "Placement of Customs and Border Protection (CBP) Messages on Record of Proceedings," dated February 17, 2023.
[4] Under 19 CFR 351.226(m)(2), interested parties need not file their case and rebuttal briefs on the records of the companion countervailing duty circumvention inquiries.

Case briefs due:  **5:00 p.m. (Eastern Time (ET)) on Monday, March 6, 2023**
Rebuttal briefs due :  **5:00 p.m. (ET) on Thursday, March 16, 2023**

Interested parties whose case and/or rebuttal briefs contain proprietary information are instructed to file the proprietary and public versions of the case and/or rebuttal briefs on the record of the inquiry in which they are an interested party and file the public versions of the case and/or rebuttal briefs on the remaining AD inquiry records.

The second tranche of the briefs may only address all the other issues not listed above in the circumvention inquiries.  The due date for the second tranche of case briefs in each inquiry remains seven days from the date that the last verification report is issued in that inquiry and the due date for the second tranche of rebuttal briefs is seven days thereafter.[5]

No new factual information may be presented in the case and rebuttal briefs.

---

[5] *See Notice of Preliminary Determinations*, 87 FR at 75226.

2

# EXHIBIT 2

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-979/C-570-980
Circumvention Inquiry
Cambodia 2022
**Public Document**
E&C/OVII: TP/JR

August 17, 2023

**MEMORANDUM TO:**     Lisa W. Wang
                      Assistant Secretary
                        for Enforcement and Compliance

**FROM:**              James Maeder
                      Deputy Assistant Secretary
                        for Antidumping and Countervailing Duty Operations

**SUBJECT:**           Antidumping and Countervailing Duty Orders on Crystalline
                      Silicon Photovoltaic Cells, Whether or Not Assembled Into
                      Modules, from the People's Republic of China: Issues and
                      Decision Memorandum for the Circumvention Inquiry With
                      Respect to the Kingdom of Cambodia

---

## I.    SUMMARY

We have analyzed the case and rebuttal briefs of the interested parties in the circumvention inquiries of the *Orders*.[1]  As a result of our analysis, we continue to find, consistent with the *Preliminary Determination*, that solar cells and modules completed in Cambodia from parts and components manufactured in China, are circumventing the *Orders*.  We find that BYD HK and NE Solar are circumventing the *Orders* and that a country-wide determination is most appropriate to prevent further circumvention of the *Orders* by non-examined producers of inquiry merchandise in Cambodia.  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.  Based on our analysis of the comments received, we made certain changes to the language in the certification.

Further, in December 2022, Sonali filed a scope ruling request[2] seeking that Commerce determine that the solar modules it imports into the United States, which were manufactured in Cambodia using solar cells manufactured in Cambodia from silicon wafers produced in China, are not covered by the scope of the *Orders*.  On the basis of our analysis of Sonali's request and the sources described in 19 CFR 351.225(k)(1), we determine that Sonali's solar cells and modules are not included in the scope of the *Orders*.[3]

---

[1] Appendices I, II, and III attached to this memorandum identify, respectively, the acronyms and abbreviations, court and case citations, and proceeding documents.
[2] *See Sonali Scope Application*.
[3] *See Orders*.



Below is the complete list of issues for which we received comments and rebuttal comments from interested parties:

**A.    Methodological Issues**

Comment 1.    Whether Solar Cells With a p/n Junction Formed Outside of China Should Be Subject to the Circumvention Inquiries

Comment 2.    Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China

Comment 3.    Whether Commerce Should Analyze Investment Data on a Per-Unit Basis

Comment 4.    Whether to Depart from the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the *Preliminary Determinations*

Comment 5.    Whether the Nature of Third-Country Processing Indicates the Processing is Minor or Insignificant Under Section 781(b)(2)(C) of the Act

Comment 6.    How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act

Comment 7.    Whether Material Costs Should be Included in the Value of Third-Country Processing

Comment 8.    Whether Commerce Should Rely on Surrogates to Value Chinese Inputs Consumed in the Inquiry Country

**B.    Country-Specific Issues**

Comment 9.    Whether Commerce Should apply AFA to NE Solar

Comment 10.    Whether NE Solar's Production Process Data Support a Negative Final Determination

Comment 11.    Whether to Include BYD HK's Tollers in Determining Whether the Process of Assembly or Completion is Minor or Insignificant

Comment 12.    Whether BYD HK's Process of Assembly in Cambodia is Minor or Insignificant Under Section 781(b)(1)(C) of the Act

**C.    Overall Determinations**

Comment 13.    Whether the Factors Under 781(b)(3) of the Act Justify an Affirmative Final Determination

Comment 14.    Whether Commerce's Country-wide Affirmative Circumvention Determination was Appropriate

Comment 15.    Affirmative Circumvention Determinations Would not be Appropriate Under Section 781(b)(1)(E) of the Act

**D.    Certification Issues**

Comment 16.    Whether Commerce Should Allow AFA Companies to Certify

Comment 17.    Certification Requirements and Corrections

Comment 18.    Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*

2

Comment 19.  Whether Exporters and Importers Should be Permitted to Submit Multiple Certifications, as Applicable
Comment 20.  Whether or Not Companies Found Not to Be Circumventing Should Be Required to Certify and to Identify Their Wafer Suppliers
Comment 21.  Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews
Comment 22.  Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements
Comment 23.  Clarification and Enforcement of the Utilization Requirement
Comment 24.  Whether the "Wafer-Plus-Three" Requirement is Appropriate

## E.    Other Issues

Comment 25.  Whether Commerce Properly Placed *Ex Parte* Memoranda on the Record That Concerned the Circumvention Inquiries
Comment 26.  Whether Commerce's Determination to Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law
Comment 27.  Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

## II.    BACKGROUND

On December 8, 2022, Commerce published the *Preliminary Determination*.  Between February 6 and 9, 2023, we conducted verification of BYD HK.[4]  On January 29, 2023, NE Solar informed Commerce officials that it was canceling verification.[5]  Pursuant to section 781(e) of the Act, on May 30, 2023, we notified the ITC of our affirmative preliminary determination of circumvention and informed the ITC of its ability to request consultations with Commerce regarding the possible inclusion of the products in question within the *Orders* pursuant to section 781(e)(2) of the Act.[6]  The ITC did not request consultations with Commerce.

In accordance with 19 CFR 351.309, we invited parties to comment on the *Preliminary Determination* and our verification findings.[7]  Between March 6 and April 3, 2023, parties

---

[4] *See* BYD HK's Verification Report.
[5] *See* NE Solar January 29, 2023 *Ex Parte* Memorandum.
[6] *See* ITC Notification Letter.
[7] *See* First Tranche Briefing Schedule; and Second Tranche Briefing Schedule – Cambodia.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

submitted case and rebuttal briefs.[8]  Additionally, numerous parties requested a hearing.[9]  On July 18, 2023, Commerce held a public hearing.[10]

Pursuant to 19 CFR 351.225(d)(2), Commerce, on January 20, 2023, informed interested parties via a memorandum of its intent to address Sonali's scope ruling application in this circumvention inquiry.[11]  Accordingly, on January 25, 2023, Sonali's full scope ruling application was filed on the record of this inquiry.[12]  In the scope ruling application, Sonali requested that Commerce determine that the solar modules that it imports into the United States, which were manufactured in Cambodia using solar cells manufactured in Cambodia from silicon wafers produced in China, are outside the scope of the *Orders*.[13]  On the basis of our analysis of Sonali's request and the sources described in 19 CFR 351.225(k)(1), we determine that Sonali's solar cells and modules manufactured in Cambodia are not included in the scope of the *Orders.*

## III.     MERCHANDISE SUBJECT TO THE SCOPE INQUIRY

The products at issue are Sonali's solar modules manufactured and assembled in Cambodia by Enalex Energy (KH) Co. Ltd (Enalex).  Such panels could be considered within the *Orders* if produced/assembled from solar cells originating in China.  Sonali states that the Chinese input at issue consists of the silicon wafers that are imported into Cambodia from China and are then manufactured into solar cells in Cambodia by Comalex PV (KH) Technology Co., Ltd. (Comalex) and then into solar modules, also in Cambodia, by Enalex.[14]  The solar cells embedded in the solar modules at issue are produced using Chinese-origin silicon wafers purchased and manufactured by C&B International Holdings Co., Ltd (C&B International), a Chinese wafer manufacturer.[15]  Sonali cites entry declaration forms, as well as solar cell and solar module processing procedures conducted by Comalex and Enalex within Cambodia as examples of the processing that takes place in Cambodia.[16]  Sonali states that Comalex

---

[8] *See* Auxin's March 6, 2023 Case Brief; BYD HK's March 6, 2023 Case Brief; CSIL's March 6, 2023 Case Brief; First Solar Malaysia's March 6, 2023 Case Brief; First Solar Vietnam's March 6, 2023 Case Brief; Hanwha's March 6, 2023 Case Brief; Jinko's March 6, 2023 Case Brief; Maxeon's March 6, 2023 Case Brief; NE Solar's March 6, 2023 Case Brief; NextEra's March 6, 2023 Case Brief; Risen's March 6, 2023 Case Brief; Silfab's March 6, 2023 Case Brief; TTL's March 6, 2023 Case Brief's March 6, 2023 Case Brief; VINA's March 6, 2023 Case Brief's March 6, 2023 Case Brief; VSUN's March 6, 2023 Case Brief's March 6, 2023 Case Brief; Auxin's March 17, 2023 Rebuttal Brief; Boviet's March 17, 2023 Rebuttal Brief; BYD HK's March 17, 2023 Rebuttal Case Brief; CSIL's March 17, 2023 Rebuttal Brief; First Solar Malaysia's March 17, 2023 Rebuttal Brief; First Solar Vietnam's March 17, 2023 Rebuttal Brief; JA Solar, LONGi, VINA and VSUN's March 17, 2023 Rebuttal Brief; Hanwha's March 17, 2023 Rebuttal Brief; Jinko's March 17, 2023 Rebuttal Brief; Maxeon's March 17, 2023 Rebuttal Brief; NextEra's March 17, 2023 Rebuttal Brief; Risen's March 17, 2023 Rebuttal Brief; Silfab's March 17, 2023 Rebuttal Brief; TTL's March 17, 2023 Rebuttal Brief; BYD HK's March 24, 2023 Case Brief; Silfab's March 24, 2023 Case Brief; Auxin's March 24, 2023 Case Brief; Auxin's March 24, 2023 Rebuttal Brief; Auxin's April 3, 2023 Rebuttal Brief; BYD HK's April 3, 2023 Rebuttal Brief; NextEra's April 3, 2023 Rebuttal Brief.
[9] *See* Auxin's Hearing Request; BYD HK's Hearing Request; NextEra's Hearing Request; NE Solar's Hearing Request; Silfab's Hearing Request.
[10] *See* Hearing Transcript
[11] *See Sonali Scope Inquiry*.
[12] *See Sonali Scope Application.*
[13] *Id.* at Attachment 1.
[14] *Id.* at 8.
[15] *Id.*
[16] *Id.* at Exhibits C, E, F, G, H, and J.

4

manufactures solar cells from the imported silicon wafers in Cambodia by performing a series of high-tech production processes in order to transform them into energy-collecting solar cells, including the formation of the p/n junctions necessary to convert solar energy into electrical currents, before they are further processed and assembled into solar modules that are exported to the United States.[17]

## IV.    SCOPE OF THE *ORDERS*

The merchandise covered by the *Orders* is crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

The *Orders* cover crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Merchandise under consideration may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits.  Such parts that otherwise meet the definition of merchandise under consideration are included in the scope of the *Orders*.

Excluded from the scope of the *Orders* are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS).  Also excluded from the scope of the *Orders* are crystalline silicon photovoltaic cells, not exceeding $10,000mm^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell.  Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Additionally, excluded from the scope of the *Orders* are panels with surface area from 3,450 $mm^2$ to 33,782 $mm^2$ with one black wire and one red wire (each of type 22 AWG or 24 AWG not more than 206 mm in length when measured from panel extrusion), and not exceeding 2.9 volts, 1.1 amps, and 3.19 watts.  For the purposes of this exclusion, no panel shall contain an internal battery or external computer peripheral ports.

Also excluded from the scope of the *Orders* are:

1)    Off grid crystalline silicon photovoltaic cells (CSPV) panels in rigid form with a glass cover, with the following characteristics:

---

[17] *Id.* at 14-15.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

(A) A total power output of 100 watts or less per panel;
(B) a maximum surface area of 8,000 cm2 per panel;
(C) do not include a built-in inverter;
(D) must include a permanently connected wire that terminates in either an 8mm male barrel connector, or a two-port rectangular connector with two pins in square housings of different colors;
(E) must include visible parallel grid collector metallic wire lines every 1–4 millimeters across each solar cell; and
(F) must be in individual retail packaging (for purposes of this provision, retail packaging typically includes graphics, the product name, its description and/or features, and foam for transport); and

2)    Off grid CSPV panels without a glass cover, with the following characteristics:

(A) A total power output of 100 watts or less per panel;
(B) a maximum surface area of 8,000 cm2 per panel;
(C) do not include a built-in inverter;
(D) must include visible parallel grid collector metallic wire lines every 1–4 millimeters across each solar cell; and
(E) each panel is
    1. permanently integrated into a consumer good;
    2. encased in a laminated material without stitching, or
    3. has all of the following characteristics:  (i) the panel is encased in sewn fabric with visible stitching, (ii) includes a mesh zippered storage pocket, and (iii) includes a permanently attached wire that terminates in a female USB–A connector.

In addition, the following CSPV panels are excluded from the scope of the *Orders*:

1)    Off-grid CSPV panels in rigid form with a glass cover, with each of the following physical characteristics, whether or not assembled into a fully completed off-grid hydropanel whose function is conversion of water vapor into liquid water:
(A) A total power output of no more than 80 watts per panel;
(B) A surface area of less than 5,000 square centimeters (cm2) per panel;
(C) Do not include a built-in inverter;
(D) Do not have a frame around the edges of the panel;
(E) Include a clear glass back panel; and
(F) Must include a permanently connected wire that terminates in a two-port rectangular connector.

Additionally excluded from the scope of the Orders are off-grid small portable crystalline silicon photovoltaic panels, with or without a glass cover, with the following characteristics: (1) a total power output of 200 watts or less per panel; (2) a maximum surface area of 16,000 cm2 per panel; (3) no built-in inverter; (4) an integrated handle or a handle attached to the package for ease of carry; (5) one or more integrated kickstands for easy installation or angle adjustment; and (6) a wire of not less than 3 meters either permanently connected or attached to the package that terminates in an 8mm diameter male barrel connector.

6

Barcode:4419739-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Cambodia 2022

Modules, laminates, and panels produced in a third country from cells produced in China are covered by the *Orders*; however, modules, laminates, and panels produced in China from cells produced in a third country are not covered by the *Orders*.

Merchandise covered by the *Orders* is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.71.0000, 8501.72.1000, 8501.72.2000, 8501.72.3000, 8501.72.9000, 8501.80.1000, 8501.80.2000, 8501.80.3000, 8501.80.9000, 8507.20.8010, 8507.20.8031, 8507.20.8041, 8507.20.8061, 8507.20.8091, 8541.42.0010, and 8541.43.0010.  These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of the *Orders* is dispositive.[18]

## V.    REGULATORY FRAMEWORK FOR SCOPE INQUIRY

When a scope application is filed, Commerce examines the scope language of the order(s) at issue and the description of the product contained in the scope ruling application.[19]  Pursuant to Commerce's regulations, in determining whether a product is covered by the scope of an order, Commerce may make its determination on the basis of the scope language alone where such language is dispositive.[20]

Commerce may also take into account primary interpretive sources in determining a scope ruling, including the descriptions of the merchandise contained in the petition and investigation; previous or concurrent determinations by Commerce, including prior scope rulings, memoranda, or clarifications pertaining to the order at issue or other orders with same or similar language; and determinations of the ITC pertaining to the order at issue.[21]  Additionally, Commerce may consider secondary interpretive sources, such as any other determinations of Commerce or the ITC, CBP rulings or determinations, industry usage, dictionaries, and any other relevant record evidence, in determining a scope ruling.  However, to the extent that these secondary interpretive sources conflict with primarily interpretive sources under 19 CFR 351.225(k)(1)(i), the primary interpretive sources will normally control.[22]  If Commerce determines that these sources are determinative of the matter, it will issue a final scope ruling as to whether the merchandise is covered by the order(s).[23]

Where the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the five additional factors set forth at 19 CFR 351.225(k)(2)(i).  These factors are:  (A) the physical characteristics of the merchandise; (B) the expectations of the ultimate purchasers; (C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E) the manner in which the product is advertised and displayed.  In the event of a conflict between these factors, the physical characteristics of the merchandise will normally be allotted greater weight than other factors.[24]

---

[18] *See Orders*; *see also Solar CCR Excluding Certain Off-Grid Solar Products*.
[19] *See Walgreen Co.*, 620 F.3d 1350, 1357 (Fed. Cir. 2010).
[20] *See* 19 CFR 351.225(k)(1).
[21] *See* 19 CFR 351.225(k)(1)(i).
[22] *See* 19 CFR 351.225(k)(1)(ii).
[23] *See* 19 CFR 351.225(h).
[24] *See* 19 CFR 351.225(k)(2)(ii).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

Commerce's scope rulings are made on a case-by-case basis, and may be applied on a producer-specific, exporter-specific, or importer-specific basis, or some combination thereof, or to all products from the same country with the same relevant physical characteristics as the product at issue, on a country-wide basis, regardless of the producer, exporter, or importer of the products.[25]

## VI.    INTERESTED PARTY SCOPE COMMENTS

Sonali states that the solar modules it imported into the United States from Cambodia using solar cells produced from Chinese-origin silicon wafers fall outside of the scope of the *Orders* because the silicon wafer lacks the physical characteristics required to be considered a solar cell. Specifically, the p/n junction, which is the characteristic that plays a key role in converting solar energy into electrical current, is added to the wafer in Cambodia.  As stated in the SunSpark Scope Ruling, "wafers are not cells."[26]  Accordingly, the silicon wafer does not determine the country of origin of the solar cell.  Rather, Sonali states that the Chinese-origin wafers "underwent substantial transformation in Cambodia, where diffusion occurred creating the completed p/n junction and enabling activation resulting in a new product, having a new name, character and use."[27]  As such, Sonali contends, based on the evidence provided within its scope request, the solar modules at issue do not fall within the scope of the *Orders* because the solar cells used are not Chinese.

No additional comments were filed by interested parties, including the domestic industry.

## VII.    SCOPE DETERMINATION

Based on Sonali's scope ruling application and its description of the processing taking place in Cambodia, the solar cells assembled into solar modules in Cambodia from Chinese-origin silicon wafers, do not fall within the scope of the *Orders* because the formation of the p/n junction occurred in Cambodia.  As the Chinese-origin silicon wafers did not undergo the activation of the p/n junction until reaching Cambodia, the raw material is not a solar cell from China within the meaning of the scope of the *Orders*.  We view the facts of the SunSpark Scope Ruling to be analogous with the facts of this scope request.  As stated in the SunSpark Scope Ruling, "wafers are not cells."[28]  Therefore, based on the record evidence and descriptions submitted by Sonali and the language of the scope of the *Orders*, the merchandise at issue in this scope inquiry is not within the scope of the *Orders*.

## VIII.    SCOPE OF THE CIRCUMVENTION INQUIRY

This circumvention inquiry covers:  (A) crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the *Orders*, subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in Cambodia from wafers produced in China; and (B) modules, laminates, and panels

---

[25] *See* 19 CFR 351.225(m)(1).
[26] *See SunSpark Technology Final Scope Ruling.*
[27] *See Sonali Scope Application* at 11-13.
[28] *See SunSpark Technology Final Scope Ruling* at 5.

consisting of crystalline silicon photovoltaic cells, subject to the exclusions for certain panels in the scope of the *Orders*, whether or not partially or fully assembled into other products, that were produced in Cambodia from wafers produced in China and where more than two of the following components in the module/laminate/panel were produced in China: (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes. If modules, laminates, and panels consisting of crystalline silicon photovoltaic cells do not meet both of the conditions in item (B) above, then this circumvention inquiry does not cover the modules, laminates, and panels, or the crystalline silicon photovoltaic cells within the modules, laminates, and panels, even if those crystalline silicon photovoltaic cells were produced in Cambodia from wafers produced in China. Wafers produced outside of China with polysilicon sourced from China are not considered to be wafers produced in China for purposes of this circumvention inquiry.

## IX.    PERIOD OF THE CIRCUMVENTION INQUIRY

The period of the inquiry is January 1, 2008, through December 31, 2021.

## X.    CHANGES SINCE THE *PRELIMINARY DETERMINATION*

As detailed below, we made a change to the *Preliminary Determination* by making an affirmative determination of circumvention with respect to NE Solar due to its cancelation of verification (*see* Comment 9). For a complete description of our analysis, *see* the *Preliminary Determination* and for a complete description of the change to this analysis, *see* the Final Analysis Memorandum.[29]

## XI.    DISCUSSION OF THE ISSUES

**Methodological Issues**

**Comment 1.    Whether Solar Cells With a p/n Junction Formed Outside of China Should Be Subject to the Circumvention Inquiries**

*CSIL*[30]
- Because Commerce has long held that solar cells and modules with a p/n junction formed outside of China are not subject to the *Orders*,[31] solar cells and modules with p/n junctions formed in the four inquiry countries should not be subject to these circumvention inquiries.

*Auxin*[32]
- Commerce's practice with respect to the p/n junction does not prevent it from issuing an affirmative circumvention finding that solar cells and modules with a country of origin

---

[29] *See* Memorandum, BYD HK Final Analysis Memorandum.
[30] *See* CSIL's March 6, 2023 Case Brief at 2-3.
[31] *Id.* at 2 (citing the *Orders*).
[32] *Id.* at 9-13; *see also* Auxin's March 17, 2023 Rebuttal Brief at 30-31.

other than China are covered by the scope of the *Orders*.[33]  Thus, solar cells and modules with a p/n junction formed outside of China should be subject to the circumvention inquiries.

**Commerce's Position:**  We disagree with CSIL.  Commerce previously determined that it is the addition of a p/n junction that transforms a silicon wafer into a solar cell.[34]  Thus, the country where the p/n junction is formed is the country-of-origin of the solar cell.  While products with a country-of-origin other than the country subject to the order are not normally covered by the order, the Act expressly provides an exception to this rule under the circumvention provisions in section 781 of the Act.  Circumvention inquiries under section 781(b) of the Act can bring within the discipline of an order merchandise that would not be subject to the order under a country-of-origin analysis.[35]

The circumvention provisions in section 781(b)(1)(A) of the Act, only require that the merchandise imported into the United States be of the same class or kind as the merchandise produced in the country that is the subject of the order.  It does not require the merchandise to have the same country-of-origin as the merchandise that is the subject of the order.

In fact, "{c}ircumvention can only occur if the articles are from a country not covered by the relevant AD or CVD orders."[36]  To read section 781(b) of the Act as applying to a class or kind of merchandise that is covered by an AD and/or CVD order only when the country of origin of the merchandise is the order country would render section 781(b) of the Act moot.  Hence, there is no basis for not examining the solar cells and solar modules at issue (*i.e.*, solar cells and solar modules where the country-of-origin is Cambodia, Malaysia, Thailand, or Vietnam) in these circumvention inquiries.

**Comment 2.   Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China**

*Whether Wafers Sliced from Chinese Polysilicon Outside of China Should Be Considered a Chinese Input*

Commerce preliminarily defined inquiry merchandise as solar cells produced in Cambodia, Malaysia, Thailand, or Vietnam, from wafers produced in China, and solar modules produced in Cambodia, Malaysia, Thailand, or Vietnam that contain such solar cells where three or more of the following components in the module/laminate/panel were produced in China:  (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes.  Commerce also preliminarily determined that wafers produced outside of China using polysilicon sourced from China are not Chinese wafers for purposes of the circumvention inquiries.

---

[33] *See* Auxin's March 17, 2023 Rebuttal Brief at 30-31 (citing *Bell Supply CAFC*, 888 F.3d at 1229-31).
[34] *See* Solaria Scope Ruling.
[35] *See 2021 Regulations Final Rule*, 86 FR at 52342.
[36] *See Bell Supply CAFC*, 888 F.3d at 1229.

10

*Auxin*[37]

- Commerce should determine that wafers sliced from Chinese-origin polysilicon ingots outside of China are Chinese wafers for purposes of defining inquiry merchandise.
- Commerce's decision to the contrary is arbitrary, inconsistent with record evidence, and undermines its affirmative findings of circumvention.
- Slicing Chinese-origin polysilicon ingots into wafers outside of China does not constitute substantial transformation of the ingot; thus, the wafers remain of Chinese-origin. Significant processing is required to produce polysilicon ingots used to make wafers (*i.e.,* several stages of melting and doping polysilicon, crystal growth, use of 70 percent of the total energy consumed in producing a wafer); whereas slicing the ingots into wafers is minor (*i.e.*, cutting the ingot, submerging it in a chemical bath, cleaning, and inspecting).[38]
- Commerce's decision allows parties to continue to exclusively rely on Chinese-origin materials to produce solar cells and modules and evade AD and CVDs by simply slicing polysilicon ingots into wafers outside of China.  Commerce should not permit this.
- The CAFC held that Commerce has discretion to fashion a remedy in its proceedings that will prevent simple avoidance of AD/CVDs and that it should do so.[39]

*BYD HK*,[40] *CSIL*,[41] *Jinko*,[42] *NextEra*,[43] *TTL*,[44] *Silfab*[45]

- Granting Auxin's request would inappropriately expand the coverage of the circumvention inquiries which were initiated to examine cell and module assembly outside of China only where "all of the manufacturing process up through the production of wafers takes place in China."[46]  Commerce should reject Auxin's *post hoc* attempts to expand the circumvention inquiries.
- Auxin's argument that the country of origin of the wafer should be based on the location of the polysilicon ingot production because of the significance of that production is undermined by its separate argument that Commerce should determine that any wafer produced from Chinese-origin polysilicon—regardless of where the ingot is produced, is a Chinese wafer for purposes of the circumvention inquiries.[47]
- Auxin's arguments about the polysilicon and wafer-making processes and substantial transformation are irrelevant because polysilicon and wafers are not subject merchandise.[48]
- Commerce should not examine whether a product is circumventing an AD/CVD order simply because an input into an input in that product comes from the order country.  To

---

[37] *See* Auxin's March 6, 2023 Case Brief at 4-9; *see also* Auxin's March 17, 2023 Rebuttal Brief at 5-13.

[38] *See* Auxin's March 6, 2023 Case Brief at 4-6 (citing Circumvention Request at 18-19; and the *NREL Report* in Exhibit 97).

[39] *Id.* at 7 (citing *Canadian Solar CAFC*, 918 F.3d at 919.

[40] *See* BYD HK's March 17, 2023 Rebuttal Brief at 3-7.

[41] *See* CSIL's March 6, 2023 Rebuttal Brief at 6-10.

[42] *See* Jinko's March 17, 2023 Rebuttal Brief at 1-5.

[43] *See* NextEra's March 17, 2023 Rebuttal Brief at 3-6.

[44] *See* TTL's March 17, 2023 Rebuttal Brief at 3-6.

[45] *See* Silfab's March 17, 2023 Rebuttal Brief at 7-8.

[46] *See* NextEra's March 6, 2023 Case Brief at 5 (citing Circumvention Request at 67).

[47] *See* NextEra's March 17, 2023 Rebuttal Brief at 5 (citing Auxin's March 6, 2023 Case Brief at 5-6).

[48] *See* Jinko's March 17, 2023 Rebuttal Brief at 3.

11

do so here essentially means that solar cells produced anywhere in the world from Chinese polysilicon would be subject to the *Orders,* which would render the original scope of the *Orders*, *i.e.*, solar cells from China, meaningless.[49]

- Auxin failed to demonstrate how domestic producers of solar cells and modules are harmed by Commerce's decision that wafers produced outside of China using polysilicon sourced from China are not Chinese wafers for purposes of the circumvention inquiries.[50]

- Commerce should exercise its "substantial discretion in interpreting" the circumvention provisions in the Act and continue to find that solar cells made from wafers produced outside of China are not inquiry merchandise. [51]

*Whether Wafers Sliced from Non-Chinese Polysilicon Inside China Should Be Considered a Chinese Input*

*TTL,*[52] *NextEra,*[53] *Maxeon,*[54] *Risen,*[55] *Jinko*[56]

- Inquiry merchandise should not include solar cells and modules assembled in an inquiry country using Chinese wafers made from non-Chinese polysilicon because Auxin did not request circumvention inquiries with respect to such merchandise. Rather, Auxin requested circumvention inquiries with respect to solar cells and modules produced in an inquiry country where, "all of the manufacturing process up through the production of wafers takes place in China."[57]

- Auxin explained that the examples of circumvention described in its request for circumvention inquiries "involve exporters {in Cambodia, Malaysia, Thailand, and Vietnam} that do not produce polysilicon ingots or wafers — the key upstream inputs in CSPV cells and modules — in those countries, but instead sourced these and other necessary materials and inputs *from China*" (emphasis added).[58] Thus, it is clear that Chinese-origin polysilicon is a key factor in the circumvention inquiries. As such, wafers produced from non-Chinese origin polysilicon should be excluded from the circumvention inquiries.[59]

- Commerce incongruently considers solar cells/modules made in the inquiry countries from non-Chinese wafers containing Chinese polysilicon to be outside the scope of these inquiries, while it considers solar cells/modules made in the inquiry countries from Chinese wafers containing non-Chinese polysilicon to be inquiry merchandise even though those cells and module contain much less Chinese content than the former solar cells/modules. Commerce should correct this inconsistency and find solar cells/modules

---

[49] *Id.* at 2.

[50] *Id.* at 4.

[51] *Id.* at 3.

[52] *See* TTL's March 6, 2023 Case Brief at 3-7; *see also* TTL's March 17, 2023 Rebuttal Brief at 5-6.

[53] *See* NextEra's March 6, 2023 Case Brief at 2-4.

[54] *See* Maxeon's March 6, 2023 Case Brief at 2-3; *see also* Maxeon's March 17, 2023 Rebuttal Brief at 2-3.

[55] *See* Risen's March 6, 2023 Case Brief at 1-5; *see also* Risen's March 17, 2023 Rebuttal Brief at 1-2.

[56] *See* Jinko's March 17, 2023 Rebuttal Brief at 1-5.

[57] *See, e.g.*, NextEra's March 6, 2023 Case Brief at 3 (citing Circumvention Request at 67).

[58] *See* Risen's March 6, 2023 Case Brief at 3.

[59] *Id.*

made in the inquiry countries from Chinese wafers containing non-Chinese polysilicon are not inquiry merchandise.[60]

- It neither makes sense, nor comports with the law, to find solar cells that are assembled in the inquiry countries from non-Chinese polysilicon to be circumventing the *Orders* when the value added in China for such solar cells may be less than 33 percent of the total value of the solar cell.[61] A circumvention determination that is not properly targeted to provide relief only for cell assembly in a third country that is truly circumventing the *Orders* will exacerbate the solar cell shortages faced by module assemblers in the United States.[62]

- Moreover, because the value of the polysilicon in solar cells/modules is a significant portion of the total value of the solar cells/modules, if the wafers in those products were made from non-Chinese polysilicon it is less likely that the solar cells and modules would meet the criterion for finding circumvention under section 781(b)(1)(D) of the Act (*i.e.,* the value of the merchandise produced in the order country is a significant portion of the total value of the merchandise exported to the United States).[63]

- Under certain existing measures, CBP already requires U.S. importers to identify the origin of the polysilicon in imported solar modules.[64] Thus, administration of a decision that solar cells/modules with wafers containing non-Chinese polysilicon are not inquiry merchandise would not be burdensome.

*Auxin*[65]

- Auxin's request for circumvention inquiries was not limited to solar cells and modules that contain Chinese-origin polysilicon; rather, Auxin requested that Commerce initiate circumvention inquiries with respect to solar cells and modules assembled in the inquiry countries where "the vast majority of the materials and equipment … {were} sourced from China."[66]

- Auxin's description of inquiry merchandise as solar cells and modules produced in an inquiry country where, "all of the manufacturing process up through the production of wafers takes place in China," was simply a factual description of the nature of the circumvention that was occurring.[67]

- In order to find circumvention, the Act requires, among other things, that the merchandise imported into the United States be assembled in a foreign country from merchandise produced in the order country and that the value of the merchandise produced in the order country be a significant portion of the total value of the imported merchandise. The Act

---

[60] *See* TTL's March 6, 2023 Case Brief at 6-7 (citing TTL's May 19, 2022, and JA Solar's May 2, 2022 Comments at Exhibit 2).

[61] *See* Maxeon's March 6, 2023 Case Brief at 2-3 (citing *NREL Report* included in NextEra May 2, 2022 Comments at Attachment 24; and *Malaysia* PDM at 19-20).

[62] *Id.* at 3.

[63] *See* NextEra's March 6, 2023 Case Brief at 3 (citing the *NREL Report* in NextEra's May 2, 2022 Comments at Attachment 24).

[64] *See* Risen's March 6, 2023 Case Brief at 3; *see also* TTL's March 6, 2023 Case Brief at 7 (citing *DHS Order Re: Forced Labor in Xinjiang*; *see also* the Uyghur Forced Labor Prevention Act).

[65] *See* Auxin's March 17, 2023 Rebuttal Brief at 6-13.

[66] *Id.* at 11.

[67] *Id.* at 9.

13

does not require that every component assembled in the foreign country be sourced from the order country.

- Polysilicon accounts for less than 10 percent of the cost of a solar module.[68]  It makes no sense to exclude solar modules made with non-Chinese polysilicon from inquiry merchandise when all the other module components, representing over 90 percent of the value of the module, may have been sourced from China.

**Commerce's Position:**  For purposes of this inquiry, we have continued to find that a wafer is produced in China if the ingot was sliced to form the wafer in China.  The circumvention provisions under section 781(b) of the Act involve merchandise imported into the United States that was completed or assembled in a foreign country from merchandise that was produced in the order country.  The phrase "produced in" is not further explained or defined in the Act.  We find the Senate Report concerning the Omnibus and Trade Competitiveness Act of 1988, and other sections of the circumvention provisions in the Act provide insights into how to properly apply the phrase "produced in" to the present facts.

When Congress passed the Omnibus and Trade Competitiveness Act in 1988, it explained that section 781 of the Act "addresses situations where 'parts and components … are *sent* from the country subject to the order to the third country for assembly and completion"[69] (emphasis added).  Additionally, section 781(b)(1)(c) of the Act provides that when determining whether an AD or CVD order should cover merchandise assembled or completed in a third-country, Commerce should examine whether third-country imports of the merchandise that was produced in the order country and assembled or completed in that third country increased after initiation of the investigation that led to the order.  These provisions, which indicate that the focus is on the part or component exported (sent) from the order country in the form ultimately used in the finished product in the third country, taken together with the "produced in" requirement, lead us to conclude that the "production" that must occur in the order country involves those production steps that transform the raw materials into the part or component that is sent to the third country for assembly into the finished product.  In other words, we have considered merchandise to be "produced in" the order country for purposes of section 781(b)(1)(B)(ii) of the Act if the final manufacturing step occurs there.

Auxin identified three stages of wafer production:  (1) refining polysilicon; (2) forming the refined polysilicon into an ingot; and (3) processing the ingot into wafers.[70]  Only the last stage of production results in the merchandise that was shipped from China to the inquiry countries for assembly and completion into solar cells and solar modules.  Neither of the intermediate products produced in this process (refined polysilicon and polysilicon ingots) is the merchandise that was shipped/exported to the third country for assembly into the final product.  Hence, wafers processed outside of China from ingots made of Chinese polysilicon do not satisfy the "produced in" the order country requirement of section 781(b)(1)(B)(ii) of the Act (the production step that resulted in the part or component that is used in completion or assembly in the third country (the wafer) did not occur in China).  Similarly, wafers processed in China from ingots made of non-Chinese polysilicon do satisfy the "produced in" the order country requirement of section

---

[68] *Id.* at 12 (citing the *NREL Report* in NextEra's May 2, 2022 Comments at PDF page 496).
[69] *See Senate Report 100-71* at 101.
[70] *See, e.g.*, Circumvention Request at 15.

14

781(b)(1)(B)(ii) of the Act (the production step that resulted in the part or component (the wafer) that is used in completion or assembly in the third country occurred in China).

Auxin contends that Commerce should conduct a substantial transformation analysis and find that wafers processed outside of China from ingots made of Chinese polysilicon are "produced in" China for purposes of section 781(b)(1)(B)(ii) of the Act because minimal processing is required to process an ingot into wafers. However, we do not find that a substantial transformation analysis is the appropriate analysis here.

Commerce typically conducts a substantial transformation analysis to determine whether the country of origin of a product that is within the class or kind of merchandise covered by an AD/CVD order, is the country covered that order. First, wafers are not in a class or kind of merchandise covered by any AD/CVD order. Second, the only requirement in section 781(b)(1)(B)(ii) of the Act is that the merchandise be "produced in the foreign country with respect to which such order or finding applies" not that its country of origin is the country to which such order or finding applies. Thus, we need only identify the country where the raw materials were transformed into the part or component that was used in assembly in the inquiry country. There is no need to consider the substantial transformation criteria (*e.g.*, the class or kind of the upstream and downstream products, where the essential component of the product is substantially transformed, and the extent and value of the processing) to identify the country where the ingots are sliced into wafers, thus, forming the product that was used as an input. Consequently, we have not used a substantial transformation analysis to determine whether wafers were "produced in" China for purposes of section 781(b)(1)(B)(ii) of the Act where the relevant production steps occurred in multiple countries.

While Auxin contends that Commerce's focus on the country where the ingot was sliced into wafers allows parties to evade AD and CVDs by simply slicing Chinese polysilicon ingots into wafers outside of China, Auxin did not point to anything in the Act or Commerce's practice in circumvention cases that compels Commerce to determine that a component was "produced in" the order country for purposes of section 781(b)(1)(B)(ii) of the Act based on where an input into that component was produced. There is no mention in section 781(b)(1)(B)(ii) of the Act of inputs into components. Rather, section 781(b)(1)(B)(ii) of the Act requires that the component that was assembled in the third country be produced in the order country. Moreover, in prior circumvention inquiries involving merchandise completed or assembled in third countries, Commerce focused its analysis on where the component that was assembled into the finished product in the third country was produced, not where the materials that were used to produce the component were produced. For example, in *CORE from China (UAE)*[71] which typically involved processing hot-rolled steel made in China into CORE in the UAE, Commerce did not consider where the iron ore or billets that were used to make the hot-rolled steel were sourced, but rather it considered where the hot-rolled steel was produced.

We find that the country in which the ingot is sliced to form the wafer is, pursuant to the language in section 781(b)(1)(B)(ii) of the Act, the most reasonable interpretation of where the wafer is produced. To the extent that this raises evasion concerns, we do not find that such concerns are sufficient to warrant a deviation from our interpretation of the statute. Indeed,

---

[71] *See CORE from China (UAE) Final*, 85 FR at 41957.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

Auxin's proposed alternative would potentially require Commerce to find circumvention based on wafers that, in our interpretation, are not "produced" in China. While this alternative may address evasion concerns, it is contrary to the statute, and therefore, impermissible.

We also disagree with interested parties' arguments that Auxin's request for these circumvention inquiries established that inquiry merchandise must contain wafers made from Chinese-origin polysilicon. Although Auxin noted in its request that all the manufacturing processes for the merchandise subject to the inquiries, up through the production of wafers, takes place in China, Auxin appears to have been describing the existing situation that it viewed as constituting circumvention. In fact, Auxin explained in its request that "{r}easonably available evidence establishes that certain companies may complete the production process through polysilicon refinement, ingot formation, and the production of the wafers in China, after which the wafers are converted to CSPV cells in the third country using additional and substantial Chinese-origin components."[72] However, the circumvention inquiries that Auxin specifically requested, and on which Commerce initiated, cover solar cells and modules assembled and completed in Cambodia, Malaysia, Thailand, or Vietnam using Chinese-produced inputs, not necessarily Chinese-produced inputs where all the materials that were used to produce the inputs in China were also produced in China.

Interested parties that oppose finding circumvention also argued that it makes no sense to find solar cells and solar modules containing wafers made from non-Chinese polysilicon to be circumventing the *Orders*, because the wafers in those solar cells and modules have very little Chinese content. However, those parties did not provide a basis in the Act, Commerce's regulations, or its practice, for interpreting the "produced in" the order country requirement in section 781(b)(1)(B)(ii) of the Act as a content percentage requirement. Rather, the plain meaning of "produced" is to make from components or raw materials. Thus, "produced in" the order country means the production steps that transformed the raw materials into the part or component that is sent to the third country for assembly into the finished product occurred in the order country.

Therefore, based on the foregoing, we consider wafers to be a product of China if the ingot was sliced to form the wafer in China. As a result, we have not defined inquiry merchandise as solar cells and solar modules assembled in an inquiry country from wafers produced outside of China using Chinese polysilicon (as advocated by Auxin), and we have not excluded from our definition of inquiry merchandise solar cells and solar modules assembled in an inquiry country from wafers produced inside China using polysilicon produced outside of China (as advocated by parties opposed to finding circumvention).

Lastly, certain interested parties argued that determining whether wafers were produced in China based on the country-of-origin of the polysilicon in the wafer would not be administratively burdensome because under certain existing measures, CBP already requires U.S. importers to identify the origin of the polysilicon in imported solar modules. Because we deem the country of origin of polysilicon to be irrelevant to the question of whether a wafer is produced in China, this argument is moot. In any case, it is not clear that it is administratively feasible to uniformly apply "percentage-of-Chinese-content" or "source-of-component-inputs" definitions of the

---

[72] *See* Circumvention Request at 27.

16

phrase "produced in" in section 781(b)(1)(B)(ii) of the Act to all the components that could be exported from China to the inquiry countries for assembly into solar cells and solar modules (such as aluminum frames, junction boxes, *etc.*). Such a rule appears to be complicated and administratively burdensome given that there could be as many as 100 different inputs used to produce a solar module.

**Comment 3.   Whether Commerce Should Analyze Investment Data on a Per-Unit Basis**

*NextEra*[73]

- Commerce must consider the large upstream industry in China that supplies virtually all of the world's demand for wafers. Failing to do so results in an overly simplistic and distortive comparison that does not properly account for differences in scale and market structure.
- Consistent with legislative history, Commerce's past practice, and congressional intent, an alternative approach is warranted in this case. Commerce has also acknowledged that there is no one-size-fits-all approach and that it may determine an appropriate analysis. Thus, Commerce should analyze investment on a per-unit basis for this final determination.
- Commerce has the data needed to calculate the investment of mandatory respondents on a per-megawatt basis, which allows Commerce to account for differences in scale, market size, and demand, and thus more accurately compare the size of investments in the two countries.

*Auxin*[74]

- NextEra argues that a per-MW analysis is more appropriate because it accounts for differences in scale, market size, and demand, and thus, more accurately compares the size of investments in the two countries.[75]
- However, it has been Commerce's practice under section 781(b)(2) of the Act to evaluate the absolute level of investment, as opposed to the per-unit level of investment, because it is a proper and relevant analysis for identifying the level of investment in the third country.[76]
- Commerce's practice is grounded in the recognition that per-unit levels of investment can be distortive, fail to reflect initial threshold levels of investment, and thus fail to capture circumventing activity.
- CSPV production facilities in China require significant threshold levels of investment to capitalize on economies of scale. Commerce should therefore follow its practice and compare the absolute level of investment rather than the per-unit level of investment.
- In *CORE from China (Vietnam)*, Commerce rejected per-unit comparisons because comparing per-unit investment overlooks the relative requirements for establishing integrated production facilities in China, as compared with processing facilities in the

---

[73] *See* NextEra's March 24, 2023 Case Brief at 20-22.
[74] *See* Auxin's April 3, 2023 Rebuttal Brief at 36-41.
[75] *Id.* (citing NextEra's March 24, 2023 Case Brief at 20-22).
[76] *Id.* (citing *CORE from China (Vietnam), CORE from China (UAE)* and *CRS from China (Vietnam)*).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

third country, as they dilute the large necessary initial investments required by the volume of the facilities.[77]

- If Commerce were to utilize a per-unit comparison, it would delay closing the circumvention loophole because only when the circumventing company achieved scale would it achieve a per-unit investment figure that approaches the per-unit investment figure of a fully scaled production facility in the original country.

- Benefiting from economies of scale is crucial to realize lower per-megawatt investment costs for polysilicon, ingot and wafer manufacturing.

- NextEra fails to recognize that Chinese over-investment in its CSPV production process has decimated the industry in the United States and allowed Chinese producers to realize lower per-unit costs.

- Commerce should continue to evaluate the level of investment on an absolute basis because such an analysis is consistent with Commerce's practice and ensures that China's industrial policy, heavy subsidies to its PV industry, and other non-market practices do not distort Commerce's overall analysis by failing to capture initial threshold levels of investment in China.

**Commerce's Position:**  We agree with Auxin that Commerce should evaluate investment on an absolute basis as opposed to a per-unit basis.  For these final determinations, we continue to find that the absolute level of investment is a proper and relevant analysis for evaluating the level of investment in Cambodia under section 781(b)(2)(A) of the Act.

The statute does not instruct Commerce to employ a particular analysis when evaluating the level of investment in the foreign country for purposes of section 781(b)(2)(A) of the Act.  Given the statute's silence on the issue, Commerce may determine an appropriate analysis to apply.  We find that a comparison between the level of investment in the third country and the level of investment of respondents' Chinese affiliates, on an absolute as opposed to a per-megawatt basis, is a proper and relevant analysis for identifying "the level of investment in the third country" under the Act.  We disagree with NextEra's argument that we should compare the levels of investment on a per-unit basis because we find the proposed alternative of adjusting for per-unit production capacity to be inappropriate in this case.  Comparing per-unit investment overlooks the relative requirements of establishing ingot and wafer production facilities in China, as compared with the cell and module production facilities in Cambodia, as this would dilute the large necessary initial investments required by the production volume of the facilities.

Accounting for the threshold level of investment in the Chinese facilities, therefore, captures the investment in the production process that would otherwise be ignored if we were to compare per-unit investment or that would otherwise not be representative if we adjusted for capacity.  Thus, the absolute level of investment of the finishing process relative to the production process of the respondents' affiliates is the appropriate comparison.

In addition to the high levels of investments and large manufacturing facilities required for ingot and wafer manufacturing, the size of China's solar industry can also have a direct impact on the economies of scale that can be realized, allowing ingot and wafer manufacturers to realize lower

---

[77] *Id.* (citing *CORE from China (Vietnam)*).

18

per-unit investment costs, and thus distorting our analysis.  China's dominance in the global ingot and wafer manufacturing capacity means Chinese ingot and wafer producers are able to benefit from economies of scale in order to achieve lower per-unit investment costs.  China currently accounts for 97 percent of global wafer manufacturing capacity, a feat achieved thanks to economies of scale, supply chain integration, and government support.[78]  China has a lower global manufacturing capacity for cells and modules, accounting for 80 percent and 70 percent of the world's production capacity, respectively.[79]  China's ingot and wafer manufacturing industries have therefore been able to benefit heavily from economies of scale, they have been able to achieve steep drops in manufacturing costs at every step of the production process, thus diluting investment amounts in a per-unit figures analysis.[80]

As explained above, the much larger threshold levels of investment required to establish ingot and wafer manufacturing facilities and the resulting economies of scale distort the investment figures for a per-unit analysis.  Therefore, with respect to section 781(b)(2)(A) of the Act, we have continued to compare the investments of the cell and module production process in Cambodia to investments of the ingot and wafer production process in China on an absolute basis.

**Comment 4.   Whether to Depart from the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the *Preliminary Determination*s**

*Auxin*[81]

*Commerce Arbitrarily Broke with its Longstanding Practice Without Explanation*
- Commerce departed from its longstanding merchandise-centric comparative methodology when conducting its "minor or insignificant" analysis under section 781(b)(1)(C) of the Act in favor of a new affiliate-centric approach without explanation.  Commerce is required to explain the reasons for a departure from its practice.  Its failure to do so here is arbitrary and unlawful.[82]
- Since 2012, Commerce has applied a consistent merchandise-centric comparative methodology, which follows the flow of goods, when conducting its "minor or insignificant" analysis under sections 781(b)(1)(C) and (b)(2) of the Act.  This approach has been applied by Commerce in circumvention cases involving a broad range of merchandise and industries.[83]

---

[78] *See* Auxin's July 29, 2022 Comments at Exhibit 1 (citing IEA Report at 24).

[79] *Id.* (citing IEA Report at 24-27).

[80] *Id.* (citing IEA Report at 17); *see also* Auxin's April 3, 2023 Rebuttal Brief at 39-41.

[81] *See* Auxin's March 24, 2023 Case Brief at 7-17 and 19-25; and Auxin's April 3, 2023 Rebuttal Brief at 4-9 and 29-34.

[82] *See* Auxin's March 24, 2023 Case Brief (citing *Save Domestic Oil*, 357 F.3d at 1283; and *Encino Motorcars*, 579 U.S. at 212).

[83] In all of the following cases cited in Auxin's March 24, 2023 Case Brief, Commerce compares operations, R&D and investment in the third country to the order country with identifying affiliation as a consideration:  In *SDGE from China (UK)*, Commerce explained that "the purpose of the analysis set out in sections 781(b)(1)(C) and (b)(2)(E) of the Act is to evaluate whether a process is minor or insignificant within the context of the totality of the production of subject merchandise.  That is, {Commerce's} analysis addresses the relative size and significance of the processing provided by {the respondent} in comparison to the processing necessary to produce the overall

19

- Commerce's approach has been affirmed by the CIT as a reasonable interpretation of the circumvention statue and consistent with its past practice in 781(b) cases. Specifically, the CIT explained that "a determination of the third country's portion of the total sum of investment is useful to gauge the level of investment in a third country. Comparative analysis helps also to ensure that larger companies with much smaller operations in a third country – operations that may appear significant in absolute terms given the size of the firm, but that comprise a small share of total operations – will not be able to elude an AD/CVD order simply on account of the firm's large overall size. Accordingly, a comparative analysis was reasonable."[84]

- The CIT affirmed Commerce's analysis, in part, because it was consistent with Commerce's longstanding practice. The CIT noted that Commerce had a longstanding practice of "us{ing} a similar type of comparative analysis and arrived at similar conclusions" and therefore Commerce's merchandise-centric comparative methodology "aligns with its past practice."[85]

- In recent cases Commerce has continued to apply its merchandise-centric comparative framework comparing the production steps taken by the mandatory respondents in those cases to the entire production process in the order country.[86]

- In *SDGE from China (UK)*, *CORE from China (Vietnam)*, *CRS from China (Vietnam)*, and *HFC from China (India)*, Commerce found the process of completion in the third country to be minor or insignificant even when the respondents were not affiliated with producers or exporters in the country subject to the order.[87]

- Commerce's affiliate-centric methodology is inconsistent with the language and purpose of the statute as it raises affiliation to a mandatory criterion for finding circumvention.

- Sections 781(b)(1)(C) and 781(b)(2) of the Act do not instruct Commerce to consider affiliation when determining whether the process of assembly or completion is minor or insignificant. Under section 781(b) of the Act, only sub-paragraph (3) specifies affiliation as a consideration.

- Commerce's affiliate-centric methodology allows unaffiliated entities to circumvent AD/CVD orders with impunity, such that, many of Commerce's previous affirmative

---

finished product." *See SDGE from China (UK)*, 77 FR at 47599. In *PET Film from the UAE (Bahrain)*, Commerce repeated that under its 781(b) analysis, "{i}t is appropriate to compare the cost of the process and completion in the third-country facilities with the cost of the process and completion of the facilities needed to produce the subject merchandise in the home country." *See PET Film from the UAE (Bahrain)* IDM at Issue 2. In *CORE from China (Vietnam)* at Comment 5, Commerce again reiterated that its practice has been to "compare the total investment required (as well as, separately, the R&D, production process, and facilities) from the beginning of the production process in the country subject to an antidumping or countervailing duty order to the investment required (as well as, separately, the R&D, production process, and facilities) to finish the final product in a third country, rather than to compare the investments (as well as, separately, the R&D production process, and facilities) required to perform the same finishing steps in each country." *See CRS from China (Vietnam)* IDM at Comment 5; *CORE from Taiwan (Malaysia)* IDM at Comment 1; *OCTG from China* (*Brunei and the Philippines)* IDM at Comment 1; and *HFCs from China (India)* IDM at Comment 3.

[84] *See* Auxin's March 24, 2023 Case Brief (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368).

[85] *Id.*

[86] *Id.* (citing *SSSS from China (Vietnam) Preliminary* PDM at 20; *see also Pipe and Tube from India (UAE and Oman)* IDM at Comment 6).

[87] *Id.* (citing *SDGE from China (UK)*, 77 FR at 47600; *CORE from China (Vietnam)* IDM at Comment 12; *CRS from China (Vietnam)* at Comment 12; *HFC from China (India) Preliminary* PDM at 22, unchanged in *HFC from China (India) Final*.

findings of circumvention since 2012 would now require a negative finding of circumvention under this framework.  Not only is this requirement unnecessary, but it contradicts frequent Commerce determinations that affiliation is not a necessary condition for circumvention.[88]

- Commerce's condition that it will only consider affiliated operations in the order country as a basis for comparison would allow a party to easily evade detection of circumvention by selling inputs through an unaffiliated trading company in the order country.

- Commerce's merchandise-centric framework dates back as early as 1993, where in *Granular PTFE Resin from Italy*, Commerce "evaluated the level of respondent's investments in the United States within the context of the level of investment required for an integrated facility for the production of granular PTFE resin" in Italy.[89]

- It is rare that Commerce has not conducted a minor or insignificant comparative analysis, and only when the record of a proceeding lacked sufficient data for such an analysis or when the third country operations being evaluated pre-dated the issuance of the relevant order.

- In departing from its established practice in the *Preliminary Determinations*, Commerce did not conclude that the record lacked sufficient data or that the respondents' operations pre-dated the issuance of the order.

- In *Hot-Rolled Lead and Bismuth*, Commerce acknowledged that it was departing from comparing to a fully integrated producer explaining that "rolling mills which subsequently roll lead billets into hot-rolled lead bar predate the order and have always been considered a distinct part of the industry."[90]

- In *Ferrovanadium from Russia*, Commerce rejected petitioner's "argument that {Commerce} should compare the U.S. vanadium pentoxide process to the overall ferrovanadium process" finding that such an analysis was "misplaced in this case."[91] Commerce acknowledged the standard practice and explained that "{w}here the company completing the processing is unaffiliated to foreign producers/exporters and the processing activity … existed prior to the antidumping order, {Commerce} finds the analysis which it employed for the Preliminary Results of U.S. processing activity without comparison to overall production activities is the appropriate analysis."[92]

- For BYD HK, there is no record evidence demonstrating that the company was established before the imposition of the *Order*.

---

[88] *See* Auxin's March 24, 2023 Case Brief (citing *Butt-Weld Pipe Fittings from China (Thailand)* IDM at Comment 3, where Commerce explained that "a relationship between the Chinese manufacturer and Thai converter/exporter is not a necessary condition for finding circumvention" and "{i}t is possible for circumvention to occur between unrelated companies."; In *Brass Sheet and Strip from Canada* IDM at Comment 5 Commerce mentioned "{w}hile we have noted that it is 'more likely' for related parties to engage in circumvention activity, a relationship between the exporter and importer is not a necessary condition for finding circumvention.  While circumvention may be more likely to occur between related parties, it is also possible for circumvention to occur between unrelated companies;"; In *CORE from China (Vietnam)* IDM at Comment 12; and *CRS from China (Vietnam)* at Comment 12 Commerce once again reiterated recently that the "lack of affiliation does not constitute evidence that circumvention is not occurring.").

[89] Auxin's April 3, 2023 Rebuttal Brief (citing *Granular PTFE Resin from Italy* at Comment 12).

[90] *Id.* (citing *Hot-Rolled Lead and Bismuth* at Comment 5).

[91] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 1; *see also Ferrovanadium from Russia Preliminary Determination*, 77 FR 6537.

[92] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 1).

*Commerce's Approach Results in It Ignoring the Most Important Stage of Production*

- Commerce's affiliate-centric approach results in its analysis ignoring the first stage of the production process: the mining and refining of solar-grade polysilicon.[93] As noted by the ITC, polysilicon is the "main underlying raw material input" for solar cells.[94] Commerce has previously recognized that "{b}y any reasonable measurement, polysilicon is the most important input used in solar modules."[95]
- Producing and achieving the requisite level of purity for solar-grade polysilicon "requires large capital investments to build a plant, large corporate investment to learn and refine the production process, highly skilled labor to operate the plant, and low electricity costs due to the large amount of energy needed to produce polysilicon."[96]
- Auxin's circumvention request explicitly identified production of solar-grade polysilicon in China as the first stage of solar cell/module production.[97]
- Auxin uploaded information on the record showing that the average investment required to produce subject merchandise in China is $4.7 billion. Should Commerce change its analysis for the final to a "merchandise-centric approach" it should compare third country operations to the $4.7 billion.[98]
- IEA and DOE reports placed on the record by Auxin note that polysilicon, ingots, and wafers require a higher level of investment compared to solar cell and module production.[99]

*NextEra*[100] and *BYD HK*[101]

*The Act Does Not Mandate a Specific Methodology Under Section 781(b)(2)*

- Commerce's analysis must "vary from case to case depending on the particular circumstances unique to each circumvention inquiry."[102]
- While section 781(b)(2) of the Act does not instruct Commerce to consider affiliation when determining whether the process of assembly or completion in a third country is minor or insignificant, the statute does not preclude Commerce from considering affiliation. Commerce has stated that it has the discretion under the circumvention statute to determine the appropriate minor or insignificant analysis under section 781(b)(2) "depending on the totality of the circumstances of the particular anti-circumvention inquiry."[103] Thus, Auxin reads a limitation into the statute where one does not exist.

---

[93] *See* Auxin's March 24, 2023 Case Brief (citing *Cambodia* PDM at 15).
[94] *Id.* (citing *ITC Solar Monitoring* at I-60 and VI-1).
[95] *Id.* (citing *Solar Cells from China 2017-2018 AR* IDM at Comment 4).
[96] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5).
[97] *Id.* (citing Circumvention Request at 27).
[98] *See* Auxin's April 3, 2023 Rebuttal Brief (citing Auxin's July 29, 2022 Investment and R&D Information at Excel Attachment).
[99] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5; and Auxin's July 29, 2022 Investment and R&D submission at Exhibit 1).
[100] *See* NextEra's April 3, 2023 Rebuttal Brief at 4-15.
[101] *See* BYD HK's April 3, 2023 Rebuttal Brief at 4-8.
[102] *See* NextEra's April 3, 2023 Rebuttal Brief (citing *PET Film from the UAE (Bahrain) Preliminary Determination* IDM at 5).
[103] *Id.* (citing *CORE from China (Vietnam)* IDM at 7).

22

- In the CIT *Al Ghurair* determination, the CIT prefaced its decision by stating that "the statute does not outline a specific methodology for Commerce to follow to determine the level of investment."[104]  The CIT further explained that when there is an absence of a designated methodology, Commerce has the discretion on its own method of analysis.[105]

- Commerce reasonably exercised this discretion and determined to make an affiliation comparison for its analysis for certain factors.

- The SAA explains that "Commerce will evaluate each of {the statutory} factors as they exist either in the United States or a third country, depending on the particular circumvention scenario."[106]  This guidance has been adopted in various circumvention cases cited by Auxin, including *PET Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia)*, *HFCs from China (India)*, *OCTG from China (Philippines and Brunei)*.[107]

- Commerce has repeatedly stated that its analysis must be tailored to the particular facts of the case,[108] based on the "factors as they exist in the third country, depending on the totality of the circumstances of the particular anti-circumvention inquiry."[109]

- As such, Auxin is incorrect that its "merchandise-centric" analysis is appropriate because it is product and industry neutral.  Instead, Commerce's analysis must be tailored to the specific facts of the circumvention inquiries.

*Commerce's Reliance on Affiliation Accurately Represents Auxin's Request*

- Commerce's affiliate-centric approach is consistent with Auxin's original request for circumvention and record evidence.  Auxin's circumvention request defined the alleged circumventing activity as "assemblers of CSPV cells and modules … that use affiliated Chinese input suppliers and a fully integrated Chinese supply chain to circumvent the existing Orders."[110]  Moreover, Auxin clarified that its allegations "rely heavily upon the relationships between certain Chinese input suppliers and their affiliates in the targeted third countries," and claimed that the affiliation relationships " narrow{} the alleged circumvention activity in this petition to major Chinese companies that use other countries as export platforms."[111]

*Chinese Solar Producers are not Integrated with Polysilicon Producers*

- There is no record evidence of fully integrated production in China (from polysilicon to module production) during the period of inquiry.  Neither of the two mandatory respondents are fully integrated.[112]

---

[104] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368)

[105] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368 (*Timken Co.*, 968 F. Supp. 2d at 1286 n.7, *aff'd* 589 F. App'x 995 (Fed. Cir. 2015))).

[106] *Id.* (citing *SAA* at 893)

[107] *Id.* (citing *PET Film from the UAE (Bahrain) Preliminary* PDM at 5; *CRS from China (Vietnam)* IDM at Comment 5; *CORE from Taiwan (Malaysia)* IDM at 19-20; *HFCs from China (India) Preliminary* PDM at 17; *OCTG from China (Philippines and Brunei) Preliminary* PDM at 9).

[108] *Id.* (citing *Pet Film from the UAE (Bahrain) Preliminary* PDM at 5; *CORE from China (Vietnam)* IDM at 7).

[109] *Id.* (citing *CORE from China (Vietnam)* IDM at 7; *CRS from China (Vietnam)* IDM at Comment 5; *HFCs from China (India) Preliminary* PDM at 11-12, 17; *CORE from Taiwan (Malaysia)* IDM at 8; *OCTG from China (Philippines and Brunei) Preliminary* PDM at 6; *SSSS from China (Vietnam)* IDM at 15; *Pipe and Tube from India (UAE and Oman)* IDM at 8, 12).

[110] *Id.* (citing Circumvention Request at 1-2).

[111] *Id.* (citing Circumvention Request at 87).

[112] *Id.* (citing BYD HK Initial QR Part I at 15; and NE Solar IQR Part I at 11).

23

- Auxin identified only one company in China with investments in progress for production of polysilicon, ingot, wafers, cells, and modules; and most companies Auxin identified produce at only one or two of these production stages.[113]
- This demonstrates that solar cell and module production is not fully integrated in China back to the polysilicon refinement stage of production.
- In steel cases Commerce used the facts on the record to compare final processing steps in the third country to the operations of integrated steel mills in the country subject to the order.[114]  However, there is no such facts regarding integration in the solar industry.
- Thus, including the polysilicon stage as part of Commerce's consideration of the Chinese solar industry would ignore the reality of the industry subject to the inquiry as the refinement of polysilicon is separate from the other stages of the solar cell and module production process.

*Auxin's Suggested Remedies are Unreasonable*

- Auxin's proposal would require Commerce to calculate an absolute investment figure by averaging the investments of various producers at different stages of the supply chain and summing them to create an estimate of the cost of a hypothetical fully integrated facility. For the solar industry, doing so would not represent the actual structure of the industry and, thus, would be an inappropriate basis for Commerce's comparison.

*Commerce has Considered Affiliation in Performing Its Analysis under 782(b)(2)*

- Contrary to Auxin's claims, Commerce has focused on comparisons with affiliates in prior circumvention inquiries.  In *PET from the UAE (Bahrain),* Commerce collected data from a third-country manufacturer in Bahrain and its affiliate in the UAE to conduct its comparative analysis, making the same comparison between affiliates' investments and operation that Auxin asserts is not appropriate here.[115]  In *CRS from Korea (Vietnam)* and *Diamond Sawblades (Thailand)*, Commerce had data on the record from affiliated parties and opted to make a direct comparison between the respondents' investments and the operations of its affiliate in the country subject to the order.[116]
- Auxin ignores the significant portion of Commerce's analysis that did not consider affiliation at all.  When analyzing the factors under section 781(b)(2) of the Act, Commerce did not consider affiliation when evaluating section 781(b)(2)(C) and 781(b)(2)(E) of the Act.

**Commerce's Position:**  We disagree with Auxin that Commerce should revise its application of the "minor or insignificant" factors, as enumerated in section 781(b)(2) of the Act.[117]  The statute and the SAA grant Commerce discretion in evaluating the five minor or insignificant factors.

---

[113] *Id.* (citing Auxin's Investment and R&D Information at Excel Attachment).

[114] *Id.* (citing *CORE from China (Vietnam)*; *CRS from China (Vietnam);* and *SSSS from China (Vietnam)*).

[115] *Id.* (citing *PET Film from the UAE (Bahrain) Cambodia* PDM at 5-6, unchanged in *PET Film from the UAE (Bahrain)*).

[116] *Id.* (citing *CRS from Korea (Vietnam) Preliminary* PDM at 14-17 (unchanged in *CRS from Korea (Vietnam)*); and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*).

[117] The five factors listed under section 781(b)(2) of the Act:  (A) level of investment in the foreign country; (B) level of research and development in the foreign country; (C) nature of the production process in the foreign country; (D) extent of production facilities in the foreign country; and (E) value of processing performed in the foreign country.

The statute only provides that Commerce "shall take into account" the five factors, without further instruction. According to the SAA, Commerce will evaluate the five factors under section 781(b)(2) of the Act "as they exist either in the United States or a third country, depending on the *particular circumvention scenario*," and that "{n}o single factor will be controlling."[118] Thus, Commerce must tailor its analysis to the facts on the record. Here, we place particular emphasis on affiliation, aided by the circumvention request itself, because the 'circumvention scenario' alleged by Auxin is unique and distinguishable from most of those examined in our previous circumvention inquiries.

In this circumvention inquiry, the particular circumvention scenario, per Auxin's request, is centered around third country companies using "affiliated Chinese input suppliers and a fully integrated supply chain to circumvent the existing *Orders*."[119] Auxin notes that "{t}he circumvention allegations contained herein rely heavily upon the relationships between certain Chinese input suppliers and their affiliates in the targeted third countries, a factor that Commerce must consider."[120] Again, Auxin describes that the "fact pattern significantly narrows the alleged circumventing activity in this petition to major Chinese companies that use other countries as export platforms to continue selling cheap CSPV cells and modules to the United States."[121] In accordance with the SAA's language instructing Commerce to "evaluate the factors … depending on the particular circumvention scenario," we applied our minor and insignificant analysis, with respect to the respondents' level of investment, level of research and development, and extent of production facilities, using a comparative approach that accounts for the production activities of the upstream affiliates of the third country producers, mirroring Auxin's request.

Auxin's circumvention request is why we also disagree with Auxin's arguments that we should adopt a "merchandise-centric" comparative approach for the final determination and include solar-grade polysilicon in our 781(b)(2) analysis. Auxin focuses on the language in *SDGE from China (UK)* stating that the purpose of the analysis under section 781(b)(1)(C) of the Act is to "evaluate whether a process is minor or insignificant within the context of the totality of the production of subject merchandise" such that Commerce's analysis addresses "the relative size and significance of the processing provided by {the respondent} in comparison to the processing necessary to produce the overall finished product."[122] Again, Congress and our past practice require us to consider the unique facts and circumstances of each specific case. In *Al Ghurair CAFC 2023*, the CAFC noted that Commerce "is not bound by its prior determinations" and should there be a reason to deviate from its past practice, Commerce may explain why it is appropriate to do so.[123] In the underlying CIT decision, the CIT noted that Commerce has the discretion to decide its own analysis to determine the level of investment as section 781(b)(2) of the Act does not outline a specific methodology."[124] In accordance with *Timken Co.,* the CIT provided Commerce the discretion "to adapt to different factual circumstances to address

---

[118] *See* SAA at 893 (emphasis added).
[119] *See* Circumvention Request at 1-2.
[120] *Id.* at 87.
[121] *Id.*
[122] *See SDGE from China (UK)*, 77 FR at 47599.
[123] *See Al Ghurair CAFC 2023*, 65 F.4th at 1360 (citing *Hyundai Electricity CAFC*, 15 F.4th at 1089).
[124] *See Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368 (citing *Timken Co.*, 968 F. Supp. 2d at 1286 n.7, aff'd, 589 F. App'x 995 (Fed. Cir. 2015)).

circumvention."[125]  In *CRS from China (Vietnam)*, Commerce applied a similar logic where it stated that the statute does not instruct Commerce to apply a particular analysis, and therefore, "Commerce may determine an appropriate analysis to apply."[126]  Again, Congress and our past practice require us to consider the unique facts and circumstances of each specific case.  In accordance with the recognized discretion granted to Commerce in circumvention inquiries, for this inquiry, Commerce utilized an approach which is specific to the upstream affiliates of each respondent.  Because none of the respondents to this inquiry were affiliated with upstream producers of polysilicon, we did not consider Chinese polysilicon production as part of our comparative analysis of the 'minor or insignificant' factors.

Auxin's circumvention request alleges a circumvention fact pattern that involves integrated Chinese solar producers spinning off the last steps of production (*i.e.*, solar cell and solar module production) to the inquiry countries to undermine the existing *Orders* and avoid AD/CVD duties. With that fact pattern in mind, after selecting the largest producers/exporters of solar cells and/or solar modules in the third countries, we requested a litany of information related to the corporate structure and operations of the respondents, examining any affiliation links to producers involved in the production of solar cells and modules in China.  After examining the information placed on the record by the respondents, the facts indicated that:  (1) none of our respondents' affiliates in China had fully integrated production back to the mining and refining of solar-grade polysilicon during the period of inquiry; and (2) there is no substantial record evidence of fully integrated production in China during the period of inquiry.[127]  BYD HK provided information showcasing that its upstream affiliates in China started at the ingot stage of production, thus we decided it was appropriate to directly compare BYD HK's Cambodian facilities to that of its upstream affiliates in China, starting from the ingot stage of production when examining sections 781(b)(2)(A), (B), and (D) of the Act.[128]  Such facts, on the respondent-specific level, were subsequently authenticated by us when conducting the verification of BYD HK.

Based on the facts above, we disagree with Auxin's insistence that Commerce include in its comparison to the order country the first stage of production of solar cells and modules, *i.e.*, the mining and refining of solar-grade polysilicon.  The pre-URAA cases Auxin relies on in support of starting the comparative analysis at the first stage of the production process, *Granular PTFE Resin from Italy* and *Brass Sheet and Strip from Canada*, are cases where Commerce compared third country operations to fully integrated producers in the country subject to the order.[129] Moreover, other post-URAA cases cited by Auxin, *CORE from China (Vietnam)*, *CRS from China (Vietnam)*, and *SSSS from China (Vietnam)*, are cases where Commerce used the facts on the record to compare fully integrated steel producers in China to the operations conducted in the third country.  These cases are not comparable to the present circumvention inquiry as our record demonstrates that fully integrated production (*i.e.*, production facilities that manufacture polysilicon, wafers, ingots, solar cells, and solar modules) is not typical of the solar industry in

---

[125] *Id.*
[126] *See CRS from China (Vietnam) Final* IDM at Comment 5; *CORE from China (Vietnam) Final* IDM at 34; *OCTG from China (Brunei and the Philippines) Final* IDM at 7.
[127] *See Cambodia* PDM at 14.
[128] *Id.*
[129] *See Granular PTFE Resin from Italy* IDM at 12-13, n.16 (citing *Brass Sheet and Strip from Canada*, 58 FR at 33613 ("compar{ing} {respondents' rerolling} activities to that of *vertically integrated producers*, such as brass mills, which cast, roll, and finish the product") (emphasis added)).

China.  Auxin's argument that Commerce should compare the level of production in the third country to a fully integrated producer in China, as it did in prior circumvention inquiries, is therefore inapposite.  Even if Commerce were to determine that such an approach was appropriate to evaluate the circumvention scenario alleged by Auxin, the record lacks evidence of a 'fully integrated' solar cell and module producer comparable to the fully integrated steel mills which has been used as a basis for comparison in other cases.

The solar industry is distinguishable from the industries involved in the cases cited by Auxin, and therefore warrants a different methodological approach, when considering the 'minor or insignificant' factors, to that applied in past cases.  In the steel industry, producers in the order country typically are fully integrated starting at the first stage of production.[130]  We do not have a similar fact pattern on this record.  Prior to the *Preliminary Determination,* we provided all parties, including Auxin, an opportunity to place investment and R&D information on the record of the proceeding.  However, no party provided substantial record evidence of fully integrated production in China during the period of inquiry.  Regarding the Chinese solar industry as a whole, Auxin, in its July 29, 2022 Investment and R&D submission, identified only one company in China with in-progress investments in all stages of production, *i.e.*, solar-grade polysilicon, ingot, wafers, solar cells, and solar modules.[131]  An interested party, NextEra, placed information on the record indicating that the solar industry is not composed of fully integrated producers starting with mining or refining solar-grade polysilicon.[132]  In fact, a report Auxin itself placed on the record, and cited in its March 24, 2023 Case Brief, confirms that integration in the Chinese solar industry does not begin at the mining and refining of solar-grade polysilicon stage of production, and instead involves the later stages of the solar cell and module production process (*i.e.*, wafer through module production).[133]  Auxin argues that we should use its July 29, 2022 Investment and R&D submission to extrapolate an estimate of the investment and R&D needed for one fully integrated solar cell and module producer in China from a number of different companies that operate in different stages of the production process and use those estimates as the basis for our comparison to the order country.  Given the fragmented nature of the solar industry in China, we find a comparison to a fully integrated producer in China, in accordance with Auxin's proposed "merchandise-centric" approach to be inappropriate.

The solar industry is also unique in other respects.  First, solar cell production is more technically complex and dependent on skilled labor to a greater degree than most other products that Commerce has examined in prior circumvention inquiries.[134]  For this reason, we placed particular emphasis on the "level of research and development" factor when evaluating whether the production in the third country was minor or insignificant.  *See* Comment 12.  However, the

---

[130] *See CORE from China (Vietnam) Preliminary* PDM at 18, n.82.

[131] *See* Auxin's Investment and R&D Information at Excel Attachment.  Auxin did not provide information establishing that this company had actually commenced production of solar cells and modules.

[132] *See* NextEra's May 2, 2022 Comments at Att. 2 and at 9 ("Of the leading global polysilicon producers by capacity in 2021, only two, the Chinese companies GCL and Tongwei, participate in supply chain stages other than polysilicon. Of these two companies, GCL is a significant wafer producer, and Tongwei is a leading CSPV cell producer. All other polysilicon producers … operate exclusively in the polysilicon stage of the CSPV manufacturing supply chain.").

[133] *See* Auxin's May 16, 2022 Comments at Exhibit 5.

[134] *See ITC Solar Final* at I-15 (solar cell production is "a highly automated, capital intensive, and technologically sophisticated process, requiring skilled technicians and employees with advanced degrees.").

27

nature of research and development is such that, once carried out, it is easily transmissible across national borders.  Further, solar cells and modules are unique products insofar as one country, here China, accounts for almost one hundred percent of the global production of a primary upstream input, *i.e.*, solar wafers.[135]  These factors, when taken into consideration together, contribute to a circumvention scenario in which large solar conglomerates are incentivized to 'spin off' production of solar cells into third countries, and in which third country producers are left with little choice but to source solar wafers from China.  Our comparative analysis of the 'minor or insignificant' factors, in which we compare respondents' level of investment, level of research and development, and extent of production facilities to those of their affiliated Chinese input suppliers, is the most appropriate manner in which to account for *these particular facts*, which again are unique to the solar industry.

Further, contrary to the language Auxin cites from *SDGE from China (UK)*, there is precedent for Commerce to not examine whether the process of assembly in the third country is minor or insignificant in comparison to the entirety of the production process in the order country.  This was the case in *PET Film from the UAE Preliminary Determination,* where Commerce found it appropriate to compare PET film facilities in the third country, Bahrain, to PET film facilities in the order country, and did not include all production stages in the comparative analysis.[136]  This was also the case in *SSSS from China (Vietnam), Pipe and Tube from India (UAE and Oman)*, *CORE from China (UAE)*, and *OCTG from China (Brunei and the Philippines)* where similar to this circumvention inquiry, for the factors under section 781(b)(2) of the Act, Commerce compared upstream production in the order country to downstream production in the third country.[137]

Citing *Ferrovanadium from Russia Final Determination* and *Hot-Rolled Lead and Bismuth*, cases where Commerce decided against conducting a comparative analysis under section 781(a)(2) of the Act, Auxin argues that the absence of a comparative analysis under 781(a)(2) is only appropriate where there is "no affiliation between the relevant parties *and* third country (or U.S.) operations pre-existed the relevant order"[138]  Although these two cases were circumvention inquiries conducted under section 781(a) of the Act, similar statutory language applies to sections 781(a)(2) and 781(b)(2).  While we agree with Auxin that these are two important aspects to consider, in this specific case, we also consider Auxin's circumvention request, which focused heavily on upstream solar input producers working in tandem with affiliated third country solar cell and solar module producers to circumvent the existing *Orders,* an important distinction that must be considered.  Auxin's proposed standard, which aims to compare third country producers to the entire solar cell and module production process in the order country, fails to account for the rapid growth of the solar cell industry in the years following the issuance of the *Orders*, and may inappropriately target certain third country producers with no upstream affiliates in the order

---

[135] *See* Circumvention Request at 28-30 (citing Bloomberg NEF Report at 1, 9).

[136] *See PET Film from the UAE Preliminary Determination* PDM at 5.

[137] *See CORE from China (UAE)* at Comment 1; *SSSS from China (Vietnam)* IDM at 18-19 "where Commerce compared the R&D activities of the upstream hot-rolling of stainless steel in China to the R&D activities of the further processor in the third country;" *Pipe and Tube from India (UAE and Oman)* IDM at Comment 6; and *OCTG from China (Brunei and the Philippines) Preliminary* PDM at 10, unchanged in *OCTG from China (Brunei and the Philippines)* IDM at Comment 1.

[138] *See* Auxin's April 3, 2023 Rebuttal Brief at 6-8.

country.[139]  Therefore, for third country solar cell and module producers with no upstream input affiliates in the order country, we find a comparative analysis in the manner requested by Auxin for sections 781(b)(2)(A), (B), and (D) of the Act to be inappropriate.

Auxin also argues that we have gone against our practice by elevating affiliation to a mandatory criterion under section 781(b)(2) of the Act, therefore, making affiliation a prerequisite for finding circumvention.  However, this point by Auxin is a misrepresentation of our minor or insignificant analysis applied in the *Preliminary Determination*.  Although Auxin is correct that, in this specific case, for our evaluation of the level of investment, the level of research and development, and the extent of the production process, we centered our analysis around upstream input affiliates, Auxin incorrectly conflates our analysis with respect to sections 781(b)(2)(A), (B), and (D) to the entire determination made under section 781(b)(1)(C) of the Act and our circumvention finding writ-large.  In evaluating whether the process of assembly in the third country was minor, for the criterion under section 781(b)(2)(C) of the Act, nature of production process, we compared third country operations to the production of a silicon wafer in China, starting from the solar-grade polysilicon stage of production, regardless of affiliation.  Specifically, in the *Preliminary Determination*, we found that the nature of the production process, as examined under section 781(b)(2)(C) of the Act, is "not minor or insignificant compared to either *processing polysilicon into wafers*, or ingots into wafers, in China, which does not weigh in favor of finding circumvention."[140]  Similarly, when examining the criteria under section 781(b)(2)(E) of the Act, value of processing, in the *Preliminary Determination* we again did not factor in affiliation and note that the silicon wafer is naturally inclusive of the polysilicon that went into it.[141]  As such, Auxin's reliance on *Butt-Weld Pipe Fittings from China (Thailand)* and *CORE from China (Vietnam)*, cases where Commerce noted that affiliation does not have to be present for circumvention to occur, is misplaced as we did not, in this case, elevate affiliation to a mandatory criterion under section 781(b)(2) of the Act or consider affiliation a prerequisite to finding circumvention.  For similar reasons, Auxin's dependence on *SDGE from China (UK)*, affirmed in *U.K. Carbon & Graphite, CORE from Vietnam (China), Retail Carrier Bags from Taiwan Final Determination, CRS from China (Vietnam), Tissue Paper from China (India), SDGE from China (UK),* and *HFC from China (India), i.e.*, prior circumvention cases where the process of assembly was found minor even for respondents that did not have affiliates in the order country, adds no value within the context of this proceeding as the methodology applied in the *Preliminary Determination* does not preclude a company with no affiliates in the order country from being found to be circumventing an order.

We note that Commerce, in the cases cited by Auxin, has opted to conduct a direct comparison under section 781(b)(2) of the Act between a respondent's third country operations and the operations of its affiliate in the country subject to an AD/CVD order.  For example, *PET Film from the UAE (Bahrain), CORE from Taiwan (Malaysia)*, *CRS from Korea (Vietnam)*, and *Diamond Saw Blades from China (Thailand)* are examples of prior circumvention cases where Commerce conducted a direct comparison between the respondents and their affiliates in the

---

[139] *See* Circumvention Request at 57-58, n. 231.
[140] *See* Cambodia PDM at 18.  Our approach with respect to 781(b)(2)(C), nature of the production process in the foreign country, remains unchanged in this final determination.
[141] *Id.* at 19.  Our approach with respect to 781(b)(2)(E), value of processing in the foreign country, remains unchanged in this final determination.

country subject to the order when examining the criteria under 781(b)(2)(A), level of investment, 781(b)(2)(B), R&D, 781(b)(2)(C), nature of production process, and 781(b)(2)(D), extent of production facilities.[142]  In line with *PET Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia)*, *CRS from Korea (Vietnam)*, and *Diamond Saw Blades from China (Thailand)*, when examining 781(b)(2)(A), level of investment, 781(b)(2)(B), R&D, and 781(b)(2)(D), extent of production facilities, we reasonably opted to make a direct comparison between a respondent's operations in the third country and its upstream affiliates in the country subject to an AD/CVD order.

Therefore, the assumption by Auxin that unaffiliated suppliers will get a free path to circumvent the existing *Orders* is false.  Rather, in accordance with the SAA, our finding as to whether the extent of processing was minor or insignificant was supported by our evaluation of all five factors listed in section 781(b)(2) of the Act, including the nature of the production process and the value added in the third country, which Commerce evaluated without comparison to respondents' upstream affiliates.

Therefore, our minor or insignificant determination, under section 781(b)(1)(C) of the Act, was a "multi-factor"[143] analysis and did not rely merely on affiliation or the exclusion of a stage of production as the linchpins of our circumvention findings.  For these reasons, for the final determination, we will not depart from the minor or insignificant analysis applied in the *Preliminary Determination*.

**Comment 5.    Whether the Nature of Third-Country Processing Indicates the Processing is Minor or Insignificant Under Section 781(b)(2)(C) of the Act**

*Auxin*[144]
- Commerce incorrectly determined, based on the nature of third-country processing, that the processing is not minor or insignificant[145]  In making that decision, Commerce failed to properly weigh:  (1) capital requirements; (2) costs associated with building; (3) the time required to build, the manufacturing facility; (4) technical hurdles associated with starting up operations; (5) energy to require to produce the product; (6) labor demands; (7) number of stages of production; and (8) number of inputs used to produce the product.[146]  Each of these items are addressed below.
- Commerce based its finding that solar cell production is the most capital intensive part of the manufacturing process on outdated data from 2009 to 2012.[147]  Recent data from IEA's 2021 report, show that "polysilicon and ingots/wafers together account for almost 70% of all investment in solar PV manufacturing due to their high capital

---

[142] *See PET Film from the UAE (Bahrain) Preliminary* PDM at 5-6, unchanged in *PET Film from the UAE (Bahrain)*; *CORE from Taiwan Preliminary Determination* PDM at 14-17, unchanged in *CORE from Taiwan Final*; and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*).
[143] *See Al Ghurair CAFC 2023*, 65 F.4th at 1363.
[144] *See* Auxin's March 24, 2023 Case Brief at 19-20, 23-32.
[145] *Id.* (citing *Cambodia* PDM at 14).
[146] *Id.* (citing *Cambodia* PDM at 15-18).
[147] *Id.* (citing *Cambodia* PDM at 17).

30

requirements"[148] and "polysilicon plants and ingot and wafer factories are significantly more CAPEX-heavy than cell- and module-manufacturing facilities."[149]

- The IEA reported that "… polysilicon and ingots/wafers together account for almost 70% of all investment in solar PV manufacturing ..." while cells and modules have low minimum investment requirements.[150]

- The BloombergNEF Report indicated that polysilicon and wafer facilities "take the longest to construct"[151] (12-40 months for polysilicon plants but only 3-12 months for cell and module facilities according to IEA; 3-4 years for polysilicon plants but only 1-3 years for ingot, wafer, solar cell and module facilities according to DOE).[152]

- The BloombergNEF Report concluded that "{t}echnical hurdles are highest for plants that make polysilicon and wafers";[153] thus, "{g}iven low technical and financial barriers, it is also easier for module companies to open shop in other countries in response to tariffs or other policy developments."[154]  The DOE noted that "the module production process … does not require the same level of technical skill …"[155]

- According to the IEA, "{p}olysilicon production accounts for 40% of all energy consumed to manufacture solar PV modules, the largest {energy consumption} of all supply chain segments" followed by ingot and wafer production."[156]  Less than one third of energy consumption is for the production of solar cells and solar modules.

- The DOE found ingot and wafer production to be the most labor-intensive stages of solar cell production.  Although there are lower labor requirements for polysilicon production, it "requires highly skilled labor to operate a plant."[157]

- Based on information from the ITC and the DOE, there are 21-24 discrete steps to produce polysilicon, ingots, and wafers (seven steps to produce polysilicon and 14 to 17 steps to produce wafers depending on the type of wafer produced) but only 17-19 steps to produce solar cells and modules.

- Although more inputs are used to produce solar cells and modules than polysilicon, ingots, and wafers, the greater time and costs to start up, the significant energy required to run, and the higher technical hurdles associated with, polysilicon, ingot, and wafer facilities compared to solar cells and module facilities, and the fact that most inputs used to the produce solar cells and modules in the inquiry country are sourced from China, support finding solar cell and module production in the inquiry country to be minor or insignificant.

---

[148] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47)).

[149] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing IEA Report at 85)).

[150] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47 and 86)).

[151] *Id.* (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 1)).

[152] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 65); Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 12)).

[153] *Id.* (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 1)).

[154] *Id.* (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 3.4)).

[155] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 45)).

[156] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 36-37)).

[157] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 25)).

*BYD HK*[158]
- Commerce correctly concluded that the nature of solar cell and module production in the inquiry country is not minor or insignificant.
- As Commerce previously noted, "cell production is where the essence of a solar module is realized" because "{t}he essential component of solar modules/panels is the solar cell …"[159]

*NextEra*[160]
- Processing in the inquiry country is significant because it creates the p/n junction which forms the solar cell and it is "where the essence of a solar module is realized."[161]
- Solar cell and solar module production in the inquiry country requires substantial initial and ongoing investments, extensive production facilities, sophisticated and highly technical equipment, and skilled laborers with specialized training.[162]
- Auxin failed to address record information about the transformative nature of production in the inquiry country, ignored information regarding the production equipment used, and relied on irrelevant facts regarding energy consumption and lead times in its analysis.
- Commerce's finding that the nature of production in the inquiry country is not minor or insignificant supports a negative circumvention determination.

**Commerce's Position:** We continue to find that the nature of the production process in the inquiry country is not minor or insignificant.

As an initial matter, it is useful to repeat here our description of the production process from the *Preliminary Determination,* which is not specific to any one respondent but encompasses the essence of the manufacturing performed by all the respondents. As described in the *Preliminary Determination*:

> According to the ITC, to produce ingots, polysilicon rocks are placed into a quartz crucible along with a small amount of boron, which is used to provide a positive electric orientation. The crucible is then heated in a furnace to approximately 2,500 degrees Fahrenheit to produce monocrystalline silicon, currently the most common form of polysilicon used in producing solar cells. Once the polysilicon is melted, a seed crystal is lowered into the material and rotated, with the crucible rotated in the opposite direction. The melt starts to solidify on the seed and the seed is slowly raised out of the melt—creating a single long crystal. The crystal is then cooled before it is moved onto the next step. The process of growing the crystal takes approximately 2.5 days.[163]

> To produce wafers, the top and tail of the ingot are cut off and the remaining portion is cut into equal length pieces and then squared. A wire saw is used to

---

[158] *See* BYD HK's April 3, 2023 Rebuttal Brief at 8-11.
[159] *Id.* (citing *Cambodia* PDM 18).
[160] *See* NextEra's April 3, 2023 Rebuttal Brief at 15-17.
[161] *Id.* (citing *Cambodia* PDM at 18).
[162] *See* NextEra's April 3, 2023 Rebuttal Brief (citing NextEra' May 2, 2022 Submission at 3-40).
[163] *See Cambodia*  PDM at 16 (citing *ITC Solar Monitoring* at I-62).

32

slice the ingots into wafers.  Typically, diamond wire saws are used for monocrystalline wafer slicing.  The wafers are then cleaned, dried, and inspected.[164]

Solar cell production typically involves phosphorus being diffused into a thin layer on the wafer surface at high heat, which gives the surface of the wafer its negative potential electrical orientation.  The combination of that layer, and a boron-doped layer below, creates the positive-negative (p/n), junction.  A thin layer of silicon is removed from the edge of the solar cell to separate the positive and negative layers.  A silicon nitride antireflective coating is then added to the solar cell to increase the absorption of sunlight and metals are printed on the solar cell to collect electricity.  Aluminum and silver layers are applied, and then the solar cell is placed in a furnace, where the high temperature causes the silver paste to become imbedded in the surface of the silicon layer, forming a reliable electrical contact.  The final step in the process is testing and sorting the solar cells based on their characteristics and efficiency.[165]

To assemble solar cells into solar modules, a piece of glass is placed on the production line, and EVA or another encapsulant is placed on top of the glass.  Then a group of solar cells is placed in a line and soldered together, creating a string.  The strings are then placed on top of the encapsulant, and the string interconnections are soldered together.  After this, another layer of EVA and a backsheet are added, and the product is laminated and cured.  Usually a frame is added, and a junction box is attached to the back of the module.[166]

As explained in Comment 4, we did not consider the production of polysilicon in our analysis because none of the respondents' affiliates in China produced polysilicon, and there is no substantial evidence on the record to support finding that the Chinese solar industry is vertically integrated from the production of polysilicon to the production of solar modules.

We examined the nature of the production process by comparing the production of solar cells and solar modules in the inquiry country to the production of ingots and/or wafers in China, depending on whether the respondents' affiliates in China produced ingots and/or wafers.

Because Auxin claims that Commerce failed to properly weigh certain factors in its analysis of the nature of third-country processing (i.e., capital requirements, building costs and time, technical hurdles, energy consumed in production, labor demands, number of production stages, and number of inputs used) we have addressed each of Auxin's factors below.  While we have addressed each of the factors relied upon by Auxin, it is important to note that Commerce has not established these factors as criteria for analyzing the nature of the production process in the foreign country, but examines the nature of that production process on a case-by-case basis.

---

[164] *Id.* (citing *ITC Solar Monitoring* at I-64).
[165] *Id.* (citing *ITC Solar Monitoring* at I-65 to I-66).
[166] *Id.* (citing *ITC Solar Monitoring* at I-67).

33

For the final determination, we have not considered capital expenditures/requirements or the cost associated with building production facilities in our analysis of the nature of production because we analyzed the level of investment in the production facilities under section 781(b)(2)(A) of the Act.  Thus, Auxin's comments regarding capital requirements and the cost to build manufacturing facilities are moot.

With respect to the time required to construct each type of production facility, according to the *DOE Solar Deep Dive*, ingot and wafer facilities, solar cell facilities, and solar module facilities require one to three years to build.[167]  Thus, this factor does not indicate that the nature of solar cell and solar module production in the inquiry country differs from the production of ingots and wafers in China.

With respect to technical hurdles, the *Bloomberg Report notes that* wafer factories "bear many technical hurdles, which makes it difficult for new factories to be built outside of China,"[168] whereas "{c}ell manufacturing … compared to wafers and polysilicon … has lower technical hurdles"[169]  and "{b}uilding a new module factory has low technical hurdles compared with wafer and polysilicon."[170]  Nonetheless, record evidence indicates that there are significant technical requirements that must be met for, and changing technologies with respect to, producing solar cells.

According to the *FTI report*, "the equipment and technology, as well as the number of processing steps required to produce a {solar} cell are far more technically sophisticated than those of the polysilicon or wafer manufacturing operations. … Cell manufacturing alone requires a fully integrated, multi-step manufacturing line with equipment to perform {multiple} processes … . Each of these processes requires one or more uniquely designed and calibrated machines to advance the wafer from a commodity product to a finished cell …" [171]

Moreover, while the technology required to produce ingots has not significantly changed since it was created,[172] the same is not true for solar cells.  "Technology improvements in the wafer-to-cell process are responsible for most of the performance improvements of solar panels."[173]  Because of technological improvements to solar cells, module makers must regularly upgrade their production lines to avoid becoming obsolete.[174]  Hence, there are also meaningful technological requirements that must be met before producing solar cells.

Regarding energy, according to the *IEA Report* ingot and wafer production consumes higher amounts of energy when compared to the solar cell and solar module production, which "require less heat and lower temperatures for drying and cooling, and most of the electricity is used for automated mechanical work."[175]  However, it is not clear that energy consumption is necessarily

---

[167] *See DOE Solar Deep Dive* at 12.
[168] *See Bloomberg Report* at 3.2.
[169] *Id.* at 3.3.
[170] *Id.* at 3.4.
[171] *See FTI Report at 11.*
[172] *See Denis De Ceuster Report* at 9.
[173] *Id.* at 1.
[174] *See Bloomberg Report* at 3.4.
[175] *See IEA Report* at 37.

informative when examining whether the nature of the production process is minor or insignificant. Energy consumption may have more to do with the type of processing required than the scale or extent of the processing. Therefore, the record does not support a finding that the lower energy consumption required to produce solar cells and modules contributes in a meaningful way to our evaluation of the nature of the production process.

With respect to labor, according to the *DOE Solar Report* 0.40 - 0.80 direct employees are required per MW of ingot and wafer production, while 0.15-0.45 and 0.50-0.70 direct employees are required per MW of solar cell and solar module production, respectively.[176] This means that a one GW ingot and wafer production facility requires 400-800 direct manufacturing workers, while one GW solar cell and solar module production facilities require 150-450 direct manufacturing workers and 500-700 direct manufacturing workers, respectively.[177] Based on this information, the labor requirements for a solar cell and solar module facility are greater than the labor requirements for an ingot and wafer production facility.

With respect to the skill level, the ITC reported that processing wafers into solar cells involves sophisticated machinery, which requires "skilled technicians and employees with advanced degrees."[178] There is no information on the record that indicates that the production of ingots and wafers require skilled workers.

According to the *DOE Solar Deep Dive,* producing ingots and wafers requires 14 or 17 steps (depending on the type of wafer produced, *i.e.*, monocrystalline or multicrystalline), producing solar cells requires seven or 11 steps (depending on whether a full-area AI-BSF cell or full-area PERC cell is being produced), and producing solar modules requires nine steps.[179] Thus, it requires fewer steps to produce ingots and wafers in China, than to produce solar cells and solar modules in the inquiry country.

More significant, however, is the nature of the production performed in each production step. The *IEA Report* specifies that while each segment of the manufacturing processes require various types of special equipment, solar cell production requires sophisticated, precise and advanced automation equipment, and solar module production requires "highly automated machinery and accurate quality-testing equipment at multiple stages."[180] Meanwhile, the IEA Report indicates that ingot production uses "simpler, more conventional equipment …"[181] Therefore, producing solar cells and solar modules in the inquiry country involves a multi-step production process that requires more precise and sophisticated equipment at multiple stages compared to producing ingots and wafers in China.

Regarding inputs, solar cell and solar module production requires approximately 100 different inputs, whereas converting polysilicon into wafers only involves a handful of inputs.[182]

---

[176] *See DOE Solar Report* at 11.
[177] *Id.* at 11.
[178] *See ITC Solar Final* at I-18; *see also ITC Solar Safeguard Proceeding 2017* at I-22 – I-23.
[179] *See DOE Solar Deep Dive* at 30-31, 35-36, and 44.
[180] *See IEA Report* at 35.
[181] *Id.* at 3.
[182] *See Cambodia* PDM at 17.

More importantly, producing wafers from polysilicon in China is less extensive of a transformation of the input than producing solar cells and solar modules from wafers in the inquiry country. The essence of the solar module is realized in solar cell production. In the *Preliminary Determination,* we noted that:

> once a wafer is doped and an opposite electrical orientation is imparted on the surface, it results in the creation of a p/n junction. When sunlight strikes the cell, the positive and negative charge carriers are released, causing electrical current to flow. It is at this point that the cell is capable of generating electricity from sunlight.[183]

> Therefore, Commerce has determined that it is only when the p/n junction is created that a wafer is no longer just a wafer, but is a solar cell that is subject to *the Orders*.[184]

In sum, the production of solar cells and solar modules in the inquiry countries has greater labor demands, more steps, and requires more inputs than ingot and wafer production in China. Moreover, the multi-step solar cell and solar module production process requires sophisticated, precise, and technologically advanced equipment, and a skilled workforce. Production of solar cells and wafers involves more than attaching Chinese components together. Solar cell and solar modules production involve exacting processes (*e.g.*, molecular-level impregnation of phosphorus into the wafer at a high heat,[185] printing solar cells (metals, such as silver paste, are printed onto the solar cell to collect electricity[186])) and treatments to, and preparation of, inputs used in production (such as lamination and curing of EVA, solar cells, and the backsheet).[187]

Importantly, the essential nature of the final product is imparted and realized through production in the inquiry country when the p/n junction is formed in the wafer. The p/n junction "… results in the creation of solar cells—albeit unfished solar cells—capable of converting sunlight into electricity via the photovoltaic effect."[188] Moreover, other components in the solar cell and solar module are important to its ability to function because they channel the electricity out of the cell so that the product can be used as intended. We do not believe that the technical hurdles associated with ingot and wafer production outweigh the above facts when comparing the nature of producing ingots and wafers to the nature of producing solar cells and solar modules.

Based on the foregoing, we continue to find that the nature of the production process in the inquiry country performed by the mandatory respondent(s) does not support finding the process of assembly or completion in the inquiry country to be minor or insignificant.

---

[183] *Id.* at 18 (citing Solaria Scope Ruling at 10-11).
[184] *Id.* at 18 (citing SunSpark Scope Ruling at 6).
[185] *See* Circumvention Request at 20.
[186] *Id.* at 20.
[187] *Id.* at 21.
[188] *See* ET Solar Scope Ruling at 7.

36

**Comment 6.   How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act**

*Auxin*[189]

- Section 781(b)(2)(E) of the Act requires Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."
- Commerce should base the value of the merchandise that is imported into the United States on the COM of that merchandise rather than U.S. sales price because U.S. sales prices could be transfer prices, prices that reflect dumping or subsidization, or prices below costs.
- Commerce has acknowledged that section 781 of the Act does not define "value," and it explained that in determining value under that section of the Act it considers the items that are being valued and the "availability and reliability of reported prices and costs."[190]
- In *Plywood from China (Vietnam) Preliminary*, Commerce valued the merchandise imported into the United States using COM where it noted that " … the U.S. price is insufficient to cover even the Chinese veneer content of the finished hardwood plywood."[191]
- This same logic should be applied in these circumvention inquiries where Commerce finds a similar fact pattern when comparing the cost of Chinese inputs used in the inquiry merchandise (based on surrogate values) to the sales value of the merchandise imported into the United States.

*NextEra*[192]

- Using COM to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act directly conflicts with Commerce's statutory mandate and is inconsistent with its practice.
- In *Glycine from China (India)*, Commerce explained that "although the statute does not specify a method for determining value {under section 781(b)(2)(E) of the Act}, it does clearly specify that this is a *value-based test,* and *not a cost-based test.*"[193]
- In *PET Film from the UAE (Bahrain),* Commerce confirmed that it must use "the value of the merchandise exported to the United States", not costs, in its calculations under section 781(b)(2)(E) of the Act, "consistent with use of the phrase 'value of processing performed'" in that section of the Act.[194]
- In *Plywood from China (Vietnam)*, Commerce was forced to base its calculations under section 781(b)(2)(E) of the Act on whatever facts were available since there were no usable data from respondents on the record (Commerce applied total AFA). The unique methodology used in that case is not relevant here.[195]

---

[189] *See* Auxin's March 24, 2023 Case Brief at 37-39.
[190] *Id.* (citing *SDGE from China (UK)* IDM at Comment 3).
[191] *Id.* (citing *Plywood from China (Vietnam) Preliminary*).
[192] *See* NextEra's April 3, 2023 Rebuttal Brief at 19-21.
[193] *Id.* (citing *Glycine from China (India)* IDM at 18).
[194] *Id.* (citing *PET Film from the UAE (Bahrain)* IDM at 5).
[195] *Id.* (citing *Plywood from China (Vietnam) Preliminary* PDM at 15, 24).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

*BYD HK*[196]
- Section 781(b)(2)(E) of the Act, directs Commerce to determine "the value of merchandise imported into the United States,"[197] and Commerce has noted that "although the statute does not specify a method for determining value, it does clearly specify that this is a *value-based test* and *not a cost-based test*."[198]

**Commerce's Position:**  We disagree with Auxin's position that Commerce should use COM to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.  Although the word "value" is not defined in section 781(b)(2)(E) of the Act, Congress described this section of the Act as determining "whether the value of the processing performed in … the third country represents a small portion of the value of the merchandise sold in, or imported into, the United States."[199]  The phrase "value of the merchandise sold" indicates a sales value that generally reflects all costs incurred, not just the cost of materials, labor, and factory overhead (COM), as well as a profit.

Commerce has taken this position in other cases.  In *Glycine from China (India)* Commerce explained that "although the statute does not specify a method for determining value {in section 781(b)(2)(E) of the Act,} it does clearly specify that this is a value-based test, and not a cost-based test."[200]  This plain reading of the statute is also consistent with Commerce's calculations in other circumvention inquiries.[201]

Neither *SDGE from China (UK)* nor *Plywood from China (Vietnam)* supports Auxin's position.  The issue in *SDGE from China (UK)* involved how to value third-country processing (the numerator in the ratio of third-country processing divided by the value of the merchandise imported into the United States), not how to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.[202]

In *Plywood from China (Vietnam)*, Commerce did not have any usable data from Vietnamese producers or exporters of hardwood plywood to determine the relative value of the processing performed in Vietnam.  Consequently, Commerce used data that were provided by the requester of the circumvention inquiry and submitted in the Vietnam Finewood Scope Inquiry.  The requester in *Plywood from China (Vietnam)* argued that most of the production costs for hardwood plywood were incurred in China and thus Vietnamese processing is relatively minor.  In the absence of data from Vietnamese producers or exporters of hardwood plywood, Commerce attempted to confirm the requester's allegation by examining the percentage of COM represented by core veneers from China and Vietnamese processing (*i.e.*, Commerce sought to

---

[196] *See* BYD's April 3, 2023 Rebuttal Brief at 14 and 15.
[197] *Id.* (citing section 781(b)(2)(E) of the Act).
[198] *Id.* (citing *Glycine from China (India)* IDM at 18).
[199] *See* S. Rep. No. 103-412 (1994), at 82.
[200] *See Glycine from China (India)* IDM at 18.
[201] *See, e.g.*, *CORE from China (UAE) Preliminary* PDM at 21, unchanged in *CORE from China (UAE)*; *Pipe and Tube from India (Oman and UAE)* IDM at 37; *OCTG from China (Brunei and Philippines) Preliminary* PDM at 13, unchanged in *OCTG from China (Brunei and Philippines)*.
[202] *See SDGE from China (UK)* IDM at Comment 3 ("… UKCG requests that the Department reconsider the methodology used to determine the numerator of the quantitative portion of the analysis of further processing … As discussed below, the Department has indeed reconsidered its calculation of the value included in the numerator").

confirm whether most costs were incurred in China). Although Commerce applied AFA in its determination, it noted that it based its analysis on "the value associated with completing hardwood plywood using Chinese-origin core veneers (and potentially Chinese face and back veneers) in Vietnam is relatively insignificant in comparison to the primary stages of production that are completed in China."[203]  Thus, Commerce's cost-based approach in *Plywood from China (Vietnam)*, was unique to the facts of that case and should not necessarily stand as precedent for all circumvention inquiries.  In fact, in the final determination in *Plywood from China (Vietnam)*, Commerce explained that:

> Although the U.S. Importers and {Vietnamese} Exporters assert that the methodology relied on in other circumvention inquiries to calculate the value added in a third country differs from the methodology Commerce used in the Preliminary Determination, we continue to find that our determination relied on the best available information on our record. … Given the limited information available on the record, we have continued to apply our quantitative analysis from the Preliminary Determination.[204]

Lastly, we do not find Auxin's arguments that the reported U.S. prices are distorted to be persuasive.  Auxin based its arguments on a comparison of the total value, based on surrogate values, of Chinese inputs in a solar module, to the U.S. sales value of the module.  However, Commerce calculated the total value of Chinese inputs in a solar cell or solar module that Auxin used in its comparison for purposes of section 781(b)(1)(D) of the Act, not section 781(b)(2)(E) of the Act.  Auxin never explains why it would be distortive to compare the cost of processing solar cells and modules in, for example, Cambodia, Malaysia, or Thailand, to the U.S. sales value of those solar cells and modules when presumably, the sales value would reflect the processing costs incurred in those countries.  Moreover, it is not appropriate to find that inquiry merchandise is being dumped or unfairly subsidized in the context of a circumvention inquiry.

For the foregoing reasons, we have continued to use U.S. sales prices to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.

**Comment 7.  Whether Material Costs Should be Included in the Value of Third-Country Processing**

*Auxin*[205]
- When applying section 781(b)(2)(E) of the Act (*i.e.*, determining whether the value of the processing performed in the third country represents a small proportion of the value of the merchandise imported into the United States), Commerce must exclude the value of material inputs in the value of the processing.  By using the phrase "processing performed," the Act focused on the processing operations in the third country, not the value of the material inputs used in those processing operations.
- This interpretation is consistent with *HFCs from China (India)* where Commerce determined that "when the Act is referring to the value of the processing, it is referring to

---

[203] *See Plywood from China (Vietnam) Preliminary* PDM at 10, 23 and 24.
[204] *See Plywood from China (Vietnam) Final* IDM at Comment 2.
[205] *See* Auxin's March 24, 2023 Case Brief at 33-39.

the process of completion or assembly of the parts or components, not the process to manufacture the parts or components."[206]

- In *HFCs from China (India)*, Commerce noted that "Congress acknowledged in {certain} passages of the SAA that, under the previous statutory criteria, the inclusion of the parts or components from a third country proved to be problematic.  Therefore, Congress enacted the revisions to section 781(b) of the Act, which allowed Commerce to focus on whether the process of assembly or completion is minor or insignificant pursuant to section 781(b)(2) of the Act." [207]

- Rather, material inputs used in third-country processing should be considered when determining the total value of the exported merchandise under section 781(b)(1)(D) of the Act (where Commerce must determine whether the portion of the product produced in the order country is a significant portion of the total value of the product exported to the United States) and sections 781(b)(2)(A) (level of investment in the third country), (C) (nature of the production process in the third country), and (D) (extent of the production facilities in the third country) of the Act.[208]

*BYD HK*[209] *NextEra*[210]

- Ignoring third-country direct materials in the value-added calculation, as proposed by Auxin, would force Commerce to disregard a component of the subject processing, thereby distorting the analysis.

- Commerce has a longstanding practice of including the value of material inputs used in third-country processing in the value of that processing under section 781(b)(2)(E) of the Act and should not depart from that practice here.[211]

- Auxin did not explain why here Commerce should depart from its overwhelming prior practice based on a single instance (*HFCs from China (India)*), where it excluded the value of material inputs used in third-country processing from the value of that processing.[212]

- The statutory language contains no limitation that supports Auxin's proposal to arbitrarily exclude non-Chinese materials as a part of the value of foreign processing and Commerce's interpretation of the statute is clearly reasonable and permissible.

- The fact that section 781(b)(1)(D) of the Act requires Commerce to consider the value of the Chinese inputs relative to the "total value of the exported merchandise" does not qualify or limit the statutorily distinct analysis required under section 781(b)(2)(E) as to whether the "value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."

---

[206] *Id.* (citing *HFCs from China (India)* IDM at 17).

[207] *Id.*

[208] *Id.*

[209] *See* BYD HK's April 3, 2023 Rebuttal Brief at 11-14.

[210] *See* NextEra's April 3, 2023 Rebuttal Brief at 18-20.

[211] *See, e.g., CORE from China (UAE)* IDM at 20; *CRS from Korea (Vietnam) Preliminary* PDM at 17 (unchanged in *CRS from Korea (Vietnam)*); *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*.

[212] *See* NextEra's April 28, 2023 Vietnam Rebuttal Brief at 36-37.

40

**Commerce's Position:**  We disagree with Auxin's position that in this circumvention inquiry, Commerce should exclude material costs from the value of processing for purposes of section 781(b)(2)(E) of the Act.

Section 781(b)(2)(E) of the Act directs Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."  Although Auxin claims that the phrase "the value of the processing performed" means the value of the processing operations performed in the third country, not the value of the material inputs used in those processing operations, the phrase "processing operations" is not further defined in the Act, and the individual items to be included in, or excluded from, the value of processing are not identified in the Act.  Moreover, Auxin did not cite any accounting authority or other authority showing that a manufacturer's processing costs do not include material costs.

Processing generally entails subjecting something to a series of actions in order to achieve a particular result or the act of taking something through a set of prescribed procedures.  For example, the Executive Summary and portions of the narrative in the *Bloomberg Report*, which is a report that Auxin relied on in its Circumvention Request, indicate that processing refers to the entire manufacturing activity[213] and processing costs refer to the total cost of a certain stage of production.[214]  In contrast, a graph in the *Bloomberg Report* indicates that processing costs include depreciation and fixed overhead costs.[215]  Therefore, it appears that the word "processing" is not consistently used to refer to the same types of costs.  Thus, the plain meaning of "processing," as used in section 781(b)(2)(E) of the Act, does not answer the question of whether the value of processing includes material costs.

Auxin primarily rests its argument on Commerce's decision in *HFCs from China (India)* and Commerce's discussion of the SAA in that case.  When Commerce calculated the value of processing for purposes of section 781(b)(2)(E) of the Act in *HFCs from China (India)*, it did not include the processing and material costs that the respondent incurred in the third country to produce the HFC component (R-125) that the respondent blended with the Chinese HFC component (R-32) to form the hydrofluorocarbon blend (R-410A) sold in the United States. Commerce explained that "when the Act is referring to the value of the processing, it is referring to the process of completion or assembly of the parts or components, *not the process to manufacture the parts or components*.  This interpretation of the language in the Act is consistent with Congress' intent towards this portion of the statute" (emphasis added).[216]

Thus, the issue in *HFCs from China (India)* involved the material costs that the respondent incurred to self-produce a product that it used to "complete" the Chinese product, and not the question of whether the cost of materials and supplies used when assembling and completing the Chinese product in the third-country should be included in the value of processing for purposes of section 781(b)(2)(E) of the Act.  In fact, in *HFCs from China (India)*, the respondent did not

---

[213] *See Bloomberg Report* at the Executive Summary at PDF page 5, item 5.
[214] *Id.* at PDF page 15.
[215] *Id.* at Figure 9.
[216] *See HFCs from China (India)* PDM at Comment 3.

use any materials in its "completion" of the Chinese R-32, it merely blended the self-produced R-125 with the Chinese R-32 to form the hydrofluorocarbon blend (R-410A) sold in the United States.[217]  Hence, we do not find Commerce's decision in *HFCs from China (India)*, to be directly applicable in this case.

Moreover, the decision in *HFCs from China (India)*, which Commerce described as "consistent with Congress' intent towards this portion of the statute,"[218] was to focus on the process of completing the Chinese components in the third country, as opposed to the process of manufacturing parts that were used to finish the Chinese components in the third country. Commerce's decision in *HFCs from China (India)* was to not focus on the processing that had nothing to do with the assembly or completion of the merchandise imported from the order country (China).  Thus, this decision was entirely consistent with Congress' revisions to Section 781(b) which directed "Commerce to focus on whether the process of assembly or completion {in the third-country} is minor or insignificant pursuant to section 781(b)(2) of the Act."[219] Additionally, Commerce's decision in *HFCs from China (India)* was fact specific and did not necessarily establish a broader practice regarding which costs should be included in the value of processing being performed in the foreign country for purposes of section 781(b)(2)(E) of the Act.

Auxin's argument is based, in part, on Commerce's citation in *HFCs from China (India)* to the SAA's discussion of a "third-country parts" problem that existed in the pre-URAA version of the Act, which required that the difference between the value of the order country product that was processed in the third country and the final product imported into the United States be small to find circumvention.  Congress found this provision was ineffective in identifying circumvention because in some cases only minor assembly was performed in the third country, yet the difference in value was not small (*e.g.*, a "screwdriver" operation in the third country where high value third-country electronic components were simply connected together with electronic components from the order country into a finished product).  Therefore, Congress revised the Act by removing the "difference in value" provision and adding, among other things, section 781(b)(2)(E) of the Act (whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States).[220]

However, after discussing the third-country parts problem, the SAA simply explains that new section 781(b)(2)(E) of the Act requires that Commerce determine whether the value of the third-country processing is small and notes that this requirement is consistent with the overall focus of revisions to the Act, which is to determine whether the process of assembly or completion in the third country is minor or insignificant.  The SAA never indicated that the cost of all the materials used in third-country processing should be excluded from the value of that processing for purposes of section 781(b)(2)(E) of the Act, and Commerce has not taken that position in numerous prior circumvention cases.[221]

---

[217] *Id*. ("… we valued only the respondents' direct labor, manufacturing overhead, SG&A expenses, and net interest expenses in valuing the production process as these are the *only* expenses incurred by GFL … in performing the processing on the components to make HFC blends" (emphasis added).
[218] *Id*.
[219] *Id*.
[220] *See* SAA at 892-94.
[221] *Id*.

42

A discussion of this matter is in Commerce's summary of the comments that it received on its revisions to the regulations that it proposed pursuant to the URAA. Specifically, one party "argued that because the emphasis in anticircumvention inquiries concerning completion or assembly in … a third country is now on whether that process is minor or insignificant, any parts or components sourced from third countries should not be included in making that judgement."[222] Commerce replied to that comment by stating that "we have not adopted this suggestion."[223] While Commerce went on to explain that third-country parts and components must still be considered under section 781(b)(1)(D) of the Act, the issue raised by the commenter was clearly focused on the issue at hand here, namely how third-country parts should be treated in determining whether completion or assembly in a third country was minor.[224] Yet, Commerce did not indicate, at that time, that its policy would be to exclude the cost of materials from the value of the processing in all circumvention inquiries, as suggested by Auxin.

Moreover, Commerce's regulations under 19 CFR 351.226(i) specify that "{i}n determining the value of … processing performed … under section 781(b)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(e) of the Act—or, in the case of nonmarket economies, on the basis of section 773(c) of the Act." Thus, Commerce's regulations discuss valuing parts or components when determining the value of processing under section 781(b)(2)(E) of the Act.

Similarly, we do not find it appropriate to exclude the cost of processing materials from the value of third-country processing in this circumvention inquiry. Here, we are not facing the situation described in the SAA, where a few high value third-country components are being connected together with components from the order country into a finished product. Auxin itself claimed that "{t}he total cost components from China represent a significant portion of the total value of the merchandise ultimately exported to the United States."[225] Moreover, the process of completing certain of the Chinese components in the third country involves more than simply attaching Chinese and third-country components together. Some third-country materials are applied to, or infused into, the Chinese components to modify their properties (*e.g.*, phosphorus is diffused into wafers to effect a molecular-level impregnation that changes the electrical properties of the wafer).[226] As a result, the processing involves more than just the activities performed on the components; it includes third-county materials interacting with the Chinese components to change the properties of the component. It is not clear, in this case, that all third-country materials should be excluded from the value of third-country processing, even the materials that form the nature of the processing.

Moreover, we do not find it reasonable to apply Auxin's interpretation of the SAA in this case, given the cost structure of solar cells and solar modules. Record evidence indicates that non-material costs account for significantly less than half the price for solar modules. The ITC noted that "{r}aw material costs for the production of solar modules (much of which are the cost of the

---

[222] *See Antidumping Duties; Countervailing Duties*, 62 FR at 27329.
[223] *Id*.
[224] *Id*.
[225] *See* Circumvention Request at 78.
[226] *Id.* at 20.

cells) accounted for 81.5 percent of U.S. producers' total cost of goods sold."[227]  The *Bloomberg Report* (2021), indicates that material inputs account for 67 percent of the cost of converting a solar cell into a solar module while other processing costs account for 13 percent and labor and electricity costs accounted for 20 percent of total costs.[228]  Given that the total non-material costs incurred to produce solar cells and solar modules, even in China, are limited, we do not find that Auxin's proposal to only consider non-material costs when calculating the value of third-country processing would provide a meaningful measure of the significance of the assembly or completion in the third-country.  Therefore, in order to calculate a meaningful measure of third-country processing of solar cells and solar modules under section 781(b)(2)(E) of the Act, and for the other reasons explained above, we have continued to include material costs in the value of processing performed in the foreign country for purposes of 781(b)(2)(E) of the Act.

**Comment 8.   Whether Commerce Should Rely on Surrogates to Value Chinese Inputs Consumed in the Inquiry Country**

*BYD HK*[229]
- Commerce should value the Chinese inputs that were used to assemble modules in Cambodia based on their purchase prices, not surrogate values, because Cambodia is a market-economy country, Commerce is not calculating a normal value, and the Act directs the use of surrogate values only to determine normal value in NME countries.[230]
- There is no methodological reason to disregard actual costs in favor of surrogate values and doing so overstated the value of Chinese inputs.[231]

*Auxin*[232]
- Commerce should value the Chinese inputs that were used to assemble modules in Cambodia based on surrogate values because assembly in a market-economy country does not undermine Commerce's authority to use surrogates to value inputs that were produced in an NME country (in this case China)[233] and the *Orders* under consideration are on an NME country.[234]

**Commerce's Position:**  We continue to find that it is appropriate to value Chinese-produced inputs that were used to produce solar cells and modules in the inquiry country based on surrogate values.  When determining whether circumvention occurred, section 781(b)(1)(D) of the Act instructs Commerce to determine whether "the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the value of the merchandise that was exported to the United States."  Neither the Act nor Commerce's regulations describe how it is to determine "value."  In this case we have interpreted "value" to mean the cost of the input.  While we are not determining the cost of production or constructed

---

[227] *See USITC Solar Investigation Final* at V-1.
[228] *See Bloomberg Report* at PDF page 18 and Figure 12 and PDF page 22 and Figure 18.
[229] *See* BYD HK's March 24, 2023 Case Brief at 17.
[230] *Id.* (citing section 773(c)(1) of the Act).
[231] *Id.* (citing BYD HK's Preliminary Analysis Memorandum at 4).
[232] *See* Auxin's April 3, 2023 Rebuttal Brief at 70-71.
[233] *Id.* (citing *U.K. Carbon and Graphite*, 931 F. Supp. 2d at 1322; *see also Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1377-78).
[234] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1376, 1377).

value here, we find section 773(f)(1) of the Act instructive in considering the issue before us.
When calculating cost of production and constructed value, section 773(f)(1) notes that:

> {c}osts shall normally be calculated based on the records of the exporter or
> producer of the merchandise, if such records are kept in accordance with the
> generally accepted accounting principles of the exporting country (or the
> producing country, where appropriate) and reasonably reflect the costs associated
> with the production and sale of the merchandise.

Use of the word "normally" indicates that there may be circumstances where it is inappropriate
to use the respondent's records to determine costs. In such cases, Commerce has the discretion to
determine costs by some other reasonable means.

Under the Act, the prices of goods produced in NME countries cannot generally be relied upon.
The presence of government controls on various aspects of NMEs renders calculation of costs
based on actual prices paid for NME inputs invalid under Commerce's normal methodologies.
Because the respondent assembled solar modules in the inquiry country using inputs that were
produced in China, and China is an NME country, we believe the prices paid by the respondent
could be distorted by controls in the NME country. Given these facts, we find it would be
inappropriate to use the respondent's records to determine the cost of the Chinese-produced
inputs.

In such situations, Commerce must determine costs by some other reasonable means.
Commerce's longstanding practice is to use surrogates to value inputs in an NME country.
While the inquiry country is not an NME country, this inquiry concerns the *Orders* on an NME
country, China, and the inputs in question were produced in China. Thus, for the reasons noted
above, and consistent with Commerce's practice of using surrogate values in circumvention
inquiries involving NME countries,[235] we find it appropriate to use surrogates, rather than the
respondent's purchase prices, to value Chinese-produced inputs that were used to produce solar
cells and modules in the inquiry country.

We disagree with the respondent's position that purchase prices should be used to value the
Chinese produced inputs because the inquiry country is a market economy country. We find the
current situation similar to the one described in Policy Bulletin 94.1, where Commerce noted that
"{i}n view of the economic distortion created by state control in NMEs, and the absence of
market directed decisions on price and output, it is unrealistic to expect the prices of NME
produced goods sold to third {country} resellers to be unaffected by that distortion."[236]
Moreover, the CIT "has sustained Commerce's use of surrogate values in previous
circumvention inquiries involving merchandise assembled in an ME country, because the
decision to do so reflects Commerce's reasonable construction of the statute.[237]

---

[235] *See, e.g.*, *SDGE from China (UK)* IDM at Comment 2; *see also CORE from China (UAE)* IDM at Comment 2;
*CORE from China (Vietnam)*; and *Hangers from China (Vietnam)*.
[236] *See* Policy Bulletin 94.1.
[237] *See Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1378 (citing *U.K. Carbon and Graphite*, 931 F. Supp. 2d at 1336).

45

**Country-Specific Issues**

**Comment 9.    Whether Commerce Should apply AFA to NE Solar**

*Auxin*[238]
- Notwithstanding Commerce's preliminary finding that NE Solar was not circumventing *the AD and CVD Orders*, NE Solar's cancellation of verification renders all of its submitted information unreliable and unusable, and thus warrants the application of AFA pursuant to sections 776(a) and (b) of the Act.
- Commerce's preliminary finding that NE Solar was not circumventing the *Orders* was premised on NE Solar's questionnaire responses being accurate, complete, and verifiable.
- Commerce applying total AFA to NE Solar for the final determination would be consistent with Congress' intent in the SAA that a respondent not benefit from its own lack of cooperation.[239]
- Furthermore, in accordance with *Nippon Steel* and other court cases, Commerce may use an adverse inference when selecting from among the facts available when a party has not fully cooperated to the best of its ability to provide reliable or usable information.[240]
- In *Fish Fillets from Vietnam (Cambodia)*, Commerce applied total AFA to the respondent, Lian Heng, because it submitted questionnaire responses but then terminated the verification.[241]
- Thus, Commerce may rely on AFA pursuant to sections 776(a)(2)(D) and 776(b) of the Act with respect to NE Solar for the final determination since Commerce was not able to verify NE Solar's questionnaire responses.
- Accordingly, Commerce should find, as AFA, that NE Solar is circumventing the *Orders* and should preclude NE Solar from participating in any certification regime.

*NextEra*[242]
- Commerce should reject Auxin's arguments regarding applying total AFA to NE Solar due to the cancellation of its verification because there's no record evidence regarding the circumstances surrounding the cancelation.[243]
- NE Solar cancelling verification does not negate Commerce's preliminary findings that "the nature of the production performed by the respondents in the third country is not

---

[238] *See* Auxin's March 24, 2023 Case Brief at 39-42; and Auxin's April 3, 2023 Rebuttal Brief at 71-72.
[239] *Id.*
[240] *See* Auxin's March 24, 2023 Case Brief; and Auxin's April 3, 2023 Rebuttal Brief (citing *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27340; *Nippon Steel*, 337 F.3d 1373, 1382; *Building Sys. De Mex.*, 567 F. Supp. 3d 1306, 1316; *Mukund CIT*, 37 CIT 443, 452; and *Mukund Fed. Cir.*, 767 F.3d 1300, 1308 ("In general, use of partial facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty.").
[241] *See* Auxin's March 24, 2023 Case Brief and Auxin's April 3, 2023 Rebuttal Brief (citing *Fish Fillets from Vietnam (Cambodia)* IDM at Comment 2).
[242] *See* NextEra's April 3, 2023 Rebuttal Brief at 21-22.
[243] *Id.* (citing NE Solar January 29, 2023 *Ex Parte* Memorandum).

46

minor or insignificant compared to either processing polysilicon into wafers, or ingots into wafers, in China, which does not weigh in favor of finding circumvention."[244]

- Commerce applied its finding regarding the production process universally to all mandatory respondents in the inquiry countries based on substantial publicly available information, and not mandatory respondents' questionnaire responses[245]
- Commerce's finding regarding the significant nature of the production process alone warrants a negative circumvention determination for the final.

**Commerce's Position:**  For this final determination, Commerce is applying AFA to NE Solar and will not rely on its questionnaire responses.  According to section 776(a) of the Act, Commerce shall use facts otherwise available in reaching a determination if:  (1) necessary information is not available on the record; or (2) an interested party or any other person:  (A) withholds information that has been requested by the administering authority or the Commission under this title; (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsection (c)(1) and (e) of section 782; (C) significantly impedes a proceeding under this title; or (D) provides such information that cannot be verified as provided in section 782(i).  Section 776(b) of the Act permits the application of an adverse factual inference where a party fails to act to the best of its ability in complying with a request for information from Commerce.  In the instant circumvention inquiry, Commerce finds that NE Solar has impeded this proceeding by not allowing Commerce to verify all of the information it submitted.[246]  By canceling verification, NE Solar also provided information that could not be verified.  Therefore, NE Solar's failure to cooperate with Commerce by cancelling verification is grounds for us to apply a factual inference in accordance with section 776(a)(2)(D) of the Act.  Further, NE Solar's cancellation of verification was uncooperative with our requests for information, and therefore constitutes a failure to act to the best of its ability, warranting the application of AFA pursuant to section 776(b) of the Act.

We disagree with NextEra's comment that NE Solar's failure to participate in verification warrants no change to Commerce's preliminary finding of no circumvention.  As noted by Auxin, the cancellation of verification precluded Commerce from verifying NE Solar's reported information.  NextEra's argument that the preliminary finding regarding the nature of the production process is enough for a negative finding for NE Solar overall is misplaced because Commerce was not able to verify NE Solar's production process.  Importantly, Commerce was unable to verify any of the information NE Solar reported.  Because NE Solar refused to permit verification of its submitted information, Commerce finds NE Solar's reported information to be unreliable for purposes of the final determination.  Further, even if Commerce were to find that the nature of the production process for NE Solar supported a finding that the production process in Cambodia was minor or insignificant, Next Era's argument would not prevail because Commerce would lack data relevant to the four remaining minor or insignificant factors.  Because NE Solar's lack of cooperation precluded Commerce from conducting a holistic evaluation of the factors contained in section 781(b)(2) of the Act, Commerce's application of

---

[244] *See* NextEra's April 3, 2023 Rebuttal Brief (citing *Cambodia* PDM at 18 ("{T}he nature of the production performed by the respondents in the third country is not minor or insignificant compared to either processing polysilicon into wafers, or ingots into wafers, in China, which does not weigh in favor of finding circumvention.")).
[245] *Id.* (citing *Cambodia* PDM at 15).
[246] *See* NE Solar January 29, 2023 *Ex Parte* Memorandum.

47

AFA to find that NE Solar's production process in Cambodia was minor or insignificant is warranted.

We also disagree with NextEra's argument that Commerce can rely on NE Solar's questionnaire responses for our final determination even though Commerce was not able to verify the submitted questionnaires. As noted by Auxin, in *Fish Fillets from Vietnam (Cambodia)* Commerce applied AFA to a non-cooperative respondent, in accordance its practice, that cancelled verification despite the respondent's questionnaire responses being timely.[247]  As noted by NextEra, Commerce stated in the *Cambodia* PDM that we would apply our finding regarding the production process universally to all mandatory respondents in the inquiry countries based on substantial publicly available information, and not mandatory respondents' questionnaire responses; however, the matter at hand here is the fact that NE Solar cancelled verification and thus did not cooperate to the best of its ability during the proceeding.  We also stated in the *Cambodia* PDM that we intended to verify the information relied upon in making our preliminary determination.[248]  The fact that NE Solar cancelled verification made it impossible for Commerce to confirm and verify the information we used to make our preliminary determination that NE Solar did not circumvent the *Orders*.  In addition to Commerce precedent, the courts have affirmed Commerce's ability to apply AFA to non-cooperative companies as noted in *Nippon Steel*, *Building Sys. De Mex.*, *Mukund CIT*, *and Mukund Fed. Cir.*[249]  Thus, in accordance with section 776(a)(D) of the Act, Commerce has applied AFA to NE Solar for the final determination.

**Comment 10. Whether NE Solar's Production Process Data Support a Negative Final Determination**

*NextEra*[250]

- Commerce preliminarily determined that cell and module production by NE Solar in Cambodia was not circumventing the Orders and concluded that NE Solar's level of investment, level of R&D, and the extent of its facilities in Cambodia were not minor or insignificant.[251]
- Considering that Commerce preliminarily determined that its nature of the production process in Cambodia was not minor or insignificant, NE Solar's data support a negative final determination.

**Commerce's Position:**  Since we have made an affirmative final determination for NE Solar because of AFA, NextEra's argument is moot.

---

[247] *See Fish Fillets from Vietnam (Cambodia)*) IDM at Comment 2.

[248] *See Cambodia* PDM at 23; *see also* 19 CFR 351.226(f)(3).

[249] *See Nippon Steel*, 337 F.3d 1373, 1382; *Building Sys. De Mex.*, 567 F. Supp. 3d 1306, 1316; *Mukund CIT*, 37 C.I.T. 443, 452; and *Mukund Fed. Cir.*, 767 F.3d 1300, 1308 ("In general, use of partial facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty.").

[250] *See* NextEra's March 24, 2023 Case Brief at 29-31.

[251] *See Preliminary Determinations*, 87 FR 75221, 75227.

48

**Comment 11. Whether to Include BYD HK's Tollers in Determining Whether the Process of Assembly or Completion is Minor or Insignificant**

*BYD HK* [252] and *NextEra*[253]

- Commerce unlawfully accorded "particular importance" to BYD HK's use of toll processors in Cambodia rather than using its own production facilities in Cambodia. Commerce additionally accorded such importance to ownership of the production facilities particularly with respect to the level of investment and extent of production facilities in the foreign country.

- Exclusion of BYD HK's tollers is unlawful under section 781(b)(2) of the Act as the statute does not state or imply that the identity or ownership of the company performing the processing is relevant in determining whether the processing at issue is minor or insignificant.

- Commerce failed to fully and properly investigate whether the process of assembly is minor or insignificant by focusing on BYD HK's reliance on tolling and should properly follow the statute and consider BYD HK's tollers when evaluating the factors under 781(b)(2).

- Commerce provided no explanation as to why the tolling agreements had no bearing on the selection of BYD HK as a mandatory respondent but were pivotal to the preliminary affirmative determination.

- Commerce's minor or insignificant analysis with respect to BYD HK was inconsistent with a recent preliminary determination, *SSSS from China (Vietnam) Preliminary,* involving a respondent that was a trading company (Silverwood), and not the producer of the merchandise.[254]

- In *SSSS from China (Vietnam) Preliminary,* Commerce noted that "Silverwood reports that it operates solely as a trading company, engaged in back-to-back resales of finished stainless steel products which it purchases from POSCO VST, and that it did not import any stainless steel inputs from China nor perform any further processing on stainless steel merchandise in Vietnam. During the POR, Silverwood sold SSSS to the United States which it purchased and had shipped directly to the U.S. customer from POSCO VST. Therefore, the analysis to determine whether the SSSS sold to the United States by Silverwood is in-scope merchandise or merchandise circumventing the *Orders*, is an analysis of the SSSS products produced and sold by POSCO VST."[255]

- Although BYD engages in activities beyond what Silverwood reported in *SSSS from China (Vietnam) Preliminary* (*i.e.*, procuring inputs), Commerce preliminarily found that BYD HK is a trading company not involved in production operations related to solar cells and modules and, thus, it is in fundamentally the same position as Silverwood. As a result, Commerce should incorporate the tollers' data when determining whether the merchandise exported by BYD is circumventing the orders.

- AD/CVD law supports taking into account the information of BYD's tollers.[256] In AD cases involving NMEs, Commerce requires trading companies or companies that use

---

[252] *See* BYD HK's March 24, 2023 Case Brief at 5, 8, 9 and 17-19.
[253] *See* NextEra's March 24, 2023 Case Brief at 14-20.
[254] *Id.* at 18 (citing *SSSS from China (Vietnam) Preliminary*).
[255] *Id.* at 18 (citing *SSSS from China (Vietnam) Preliminary* PDM at 10).
[256] *Id.* at 19 (citing section 773(c)(1) of the Act).

49

tollers to report the FOPs of not only itself but the respondent's supplier and tollers, because the FOPs are utilized to produce the merchandise that is exported by the respondent.[257]  In CVD cases, Commerce examines both the producing entity and the exporter, cumulating the subsidies received by the two entities.[258]

- It would be inconsistent for Commerce to require the information of a toller in an AD/CVD investigation or administrative review but disregard the tollers' data in a determination of whether the "process of assembly or completion" is minor or insignificant in a circumvention inquiry.

*Auxin*[259]

- Commerce should continue to center its analysis on BYD HK, because BYD HK, not its unaffiliated tollers, was selected for individual examination because it was the exporter of inquiry merchandise.
- In *SSSS from China (Vietnam)*, the respondent, Silverwood, was a trading company only engaged in back-to-back resales and the subject merchandise was produced by another mandatory respondent (POSCO Vietnam) whose information was on the record and verified.[260]  Unlike BYD HK, Silverwood did not procure any inputs for POSCO Vietnam, did not maintain ownership of the intermediary products, and did not supervise POSCO Vietnam's operations.  Moreover, BYD HK pays a processing fee to its three Cambodian tollers for their tolling services that covers the expenses and profits of the tollers, which Commerce appropriately considered in the analysis of the value of processing in Cambodia under section 781(b)(2)(E) of the Act.
- Commerce verified BYD HK's questionnaire responses, not those of the unaffiliated tollers.  Thus, the facts of this case are distinguishable from *SSSS from China (Vietnam)*. As such, Commerce should continue focusing its analysis on BYD HK alone.

**Commerce's Position:**  We disagree with BYD HK and NextEra's argument that we should include BYD HK's unaffiliated tollers in our analysis of whether BYD HK's processing in Cambodia was minor or insignificant under section 781(b)(2) of the Act.

BYD HK and NextEra argue that Commerce's decision in the *Preliminary Determination* unlawfully accorded undue importance to BYD HK's reliance on toll processors as the Act neither states nor implies that the identity or ownership of the company performing the processing is important when evaluating whether the process of assembly or completion in the third country is minor or insignificant.  BYD HK and NextEra also argue that Commerce's treatment of BYD HK's tollers contradicts AD/CVD law and the treatment of the producer of the inquiry merchandise in *SSSS from China (Vietnam)*, a recent circumvention inquiry.

The SAA provides that, when evaluating whether the production in a third country is minor or insignificant, "Commerce will evaluate each of these factors as they exist either in the United

---

[257] *Id.* at 19 (citing *SDGE from China* IDM at 14-17 and 27-37; and *Tapered Roller Bearings from China* IDM at 6-7).
[258] *Id.* at 19-20 (citing 19 CFR 351.525(c)).
[259] *See* Auxin's April 3, 2023 Rebuttal Brief at 9-12.
[260] *Id.* at 11 (citing *SSSS from China (Vietnam) Preliminary* PDM at 3, 10, unchanged in *SSSS from China (Vietnam)*).

States or a third country, depending on the particular circumvention scenario."[261]  In this case, we based our evaluation, in part, on Auxin's allegation that third country companies are relying on affiliated upstream input affiliates in China to circumvent the existing *Orders*.  *See* Comment 4 for additional details.  BYD HK does not engage in production operations, have its own manufacturing equipment, or engage in R&D related to solar cells and modules.  Rather, BYD HK purchases inputs for the production of solar cells and modules and provides those inputs to unaffiliated tollers for further processing before exporting the finished merchandise.[262]  At no point after procuring them does BYD HK relinquish ownership of these inputs, and throughout the production process BYD HK supervises the production of the intermediary tollers for quality control purposes.[263]  We view these facts, which were verified by Commerce, to be highly relevant because they establish that our selected respondent, BYD HK, does not invest in production facilities or incur R&D expenses related to solar cells and modules in Cambodia.  Rather, in line with the circumvention fact pattern Auxin laid out in its circumvention request, BYD HK, working in tandem with its affiliated Chinese solar conglomerate, Shangluo BYD, ships Chinese inputs into Cambodia to circumvent the existing *Orders*.  Therefore, for section 781(b)(1)(C) of the Act and our analysis under sections 781(b)(2)(A), (B), and (D), we compared BYD HK's own investment, R&D, and production facilities in Cambodia to the reported investments of its affiliate, Shangluo BYD, in China.  We find that evaluation of these factors in this manner is appropriate based on the circumvention scenario evinced by BYD HK and Shangluo BYD, which involves the conveyance of Chinese inputs to Cambodia solely for purposes of assembly or completion.

Regarding BYD HK's and NextEra's arguments related to the treatment of tollers in the context of an AD/CVD investigation or review, we note that this is not an AD/CVD investigation or review.  Rather, this is a circumvention inquiry.  Commerce is not examining whether subject merchandise is being sold for less than fair value or calculating subsidies – instead, we are determining whether the process of assembly or completion is minor or insignificant using the factors enumerated in sections 781(b)(2)(A)-(E) of the Act.  We find it unreasonable to use the investments/production facilities of BYD HK's unaffiliated tollers as the basis for comparison in Cambodia when BYD HK contributed nothing to such investments/production facilities.  Nevertheless, we included the processing fee that BYD HK pays its tollers when evaluating the value of the processing occurring in Cambodia pursuant to section 781(b)(2)(E) of the Act.[264]

Additionally, at the time of respondent selection, we did not consider the toll processing agreements of BYD HK.  When selecting respondents, we relied upon entry data from CBP and Q&V questionnaires that were issued to Cambodian producers of solar cells and/or modules listed in Auxin's circumvention request to identify the largest exporters or producers of inquiry merchandise in Cambodia.[265]  We also invited parties to which we did not issue the Q&V questionnaire to provide a response by the deadline for responses.[266]  We stated at the time of respondent selection that section 781(b) of the Act "does not address how Commerce should

---

[261] *See* SAA at 893.

[262] *See* BYD HK Preliminary Analysis Memorandum at 2 (citing BYD HK Initial QR Part II at 1-2, 17-19).

[263] *See* BYD HK's Verification Report at 13.

[264] *See* BYD HK Preliminary Analysis Memorandum at 2 and 4.

[265] *See Cambodia* PDM at 1-2.

[266] *Id.* at 2.

51

select companies for individual examination under that provision."[267]  For Cambodia, we found that because of "the large number of exporters/producers of solar cells and solar modules from Cambodia," along with our initiation of a country-wide circumvention inquiry, it was appropriate to select respondents for individual examination using section 777A(c)(2)(B) as guidance.[268] Accordingly, the data received indicated that BYD HK was one of the largest exporters of Cambodian solar cells and modules to the United States and was subsequently chosen as a respondent in the circumvention inquiry.[269]

BYD HK and NextEra cite to *SSSS from China (Vietnam)* to argue that our treatment of BYD HK's tollers contradicts our previous determinations.  In *SSSS from China (Vietnam)*, Commerce noted that one respondent, Silverwood, operated solely as a trading company that sold SSSS to the United States which was produced by another respondent in the proceeding, POSCO VST.[270] When evaluating the factors under section 781(b)(2) of the Act, Commerce analyzed the SSSS products produced and sold by POSCO VST to determine whether the SSSS sold to the United States by Silverwood is merchandise circumventing the order.[271]  As such, BYD HK argues that its situation is similar to that of Silverwood in that it is also a trading company and Commerce should, therefore, incorporate the information of its tollers.  In *SSSS from China,* Commerce verified the questionnaire responses of POSCO VST because it was a mandatory respondent in that inquiry.  Unlike in *SSSS from China*, BYD's tollers were not separately selected as mandatory respondents and we were not able to verify its unaffiliated toll processors.[272] Therefore, the facts of *SSSS from China (Vietnam)* are inapplicable here.

Based on the information above, in the final determination, for section 781(b)(1)(C) of the Act, and our analysis under sections 781(b)(2)(A), (B), and (D), we continue to find it reasonable to compare BYD HK's own investment, R&D, and production facilities in Cambodia to the reported investments of its affiliate, Shangluo BYD, in China.

**Comment 12. Whether BYD HK's Process of Assembly in Cambodia is Minor or Insignificant Under Section 781(b)(1)(C) of the Act**

*Auxin*[273]
- BYD HK's operations are minor when compared to the full solar cell and module production process or when compared with the production operations of BYD HK's affiliated Chinese ingot and wafer producer, Shangluo BYD.

*Level of Investment*
- Commerce correctly concluded that BYD HK is "a trading company involved in the sale of subject merchandise" that "does not engage in production operations" and "does not

---

[267] *See* Cambodia RSM at 6.
[268] *See* 19 CFR 351.226(f)(3).  The Secretary may limit issuance of questionnaires to a reasonable number of respondents.
[269] *See* Cambodia RSM at 7.
[270] *See SSSS from China (Vietnam) Preliminary* PDM at 10.
[271] *Id.*
[272] *See SSSS from China (Vietnam)* at 88 FR 18522; and BYD HK Preliminary Analysis Memorandum at 3.
[273] *See* Auxin's March 24, 2023 Case Brief at 17-19.

52

have manufacturing equipment."[274]  Rather, "to produce solar cells and modules in Cambodia, BYD HK arranged tolling agreements with three unaffiliated Cambodian toll processors."[275]

- BYD HK "made no investments in Cambodia related to solar cells and modules" compared to its affiliate in China, Shangluo BYD, who made investments in China related to the ingots and wafer stages of production.[276]  Thus, BYD HK's "investments in Cambodia {are} minor or insignificant" within the meaning of section 781(b)(1)(C) of the Act.

*R&D*

- Commerce correctly concluded that BYD HK "is a trading company involved in the sale of subject merchandise" and "reports no R&D expenses with respect to manufacturing solar cells and modules."[277]  "With respect to BYD HK's affiliates' R&D in China, BYD HK indicated that its Chinese affiliates, Shangluo BYD and Shanghai BYD Company Limited, conduct R&D related to solar cells and modules."[278]
- Given "BYD HK's lack of R&D activities in Cambodia… BYD HK's R&D expenses in Cambodia during the inquiry period were minor or insignificant"[36] within the meaning of section 781(b)(1)(C) of the Act.[279]

*Extent of Production Facilities*

- Commerce correctly concluded that BYD HK "is a trading company involved in the sale of subject merchandise" but "does not invest in manufacturing equipment nor conduct R&D related to solar cells and modules" and, therefore, has no production facilities in Cambodia.[280]
- BYD HK's Chinese affiliate, Shangluo BYD, produces ingots and wafer in China.[281] Accordingly, the extent of BYD HK's production facilities are minor or insignificant when compared to the extent of Shangluo BYD's production facilities in China under a merchandise-centric and affiliate-centric framework.

*BYD HK*[282] and *NextEra*[283]

*Level of Investment*

- Commerce's analysis of the level of investment in the foreign country in the *Preliminary Determination* is legally deficient.  Rather than analyze the investment in Cambodia as the foreign country at issue, and as the statute directs, Commerce instead evaluated BYD HK's own investments, excluding the investments of BYD HK's tollers.

---

[274] *Id.* (citing BYD HK Preliminary Analysis Memorandum at 3).
[275] *Id.*
[276] *Id.*; and *Cambodia* PDM at 14.
[277] *See* Auxin's March 24, 2023 Case Brief (citing BYD HK Preliminary Analysis Memorandum at 3).
[278] *Id.* (citing *Cambodia* PDM at 15).
[279] *Id.*
[280] *Id.* (citing BYD HK Preliminary Analysis Memorandum at 4).
[281] *Id.* (citing *Cambodia* PDM at 14).
[282] *See* BYD HK's March 24, 2023 Case Brief at 9-19.
[283] *See* NextEra's March 24, 2023 Case Brief at 22-26.

53

- There is no basis or support in the statute for Commerce to exclude from its assessment of the level of investment in the foreign country investments that were not made by BYD HK. Commerce must revise this level of investment analysis for the final determination to account for all of the investments associated with the processing performed in Cambodia, including those of the unrelated tollers.[284]
- When the unrelated tollers of BYD HK are taken into consideration, on a per-MW or absolute basis, the record demonstrates that the investments in manufacturing in Cambodia are very large and substantial. Thus, providing further significant support to a negative circumvention finding for BYD HK.

*Research and Development*
- BYD HK agrees with Commerce's analysis of 781(b)(2)(B), R&D, in the *Preliminary Determination.* Nevertheless, "no single factor, by itself, controls Commerce's determination of whether the process of assembly or completion in a third country is minor or insignificant."[285]
- Given the record evidence, Commerce cannot reasonably conclude that the process of assembly or completion of solar modules in Cambodia is minor or insignificant.
- Significant innovation in cell technology is generated outside of China.[286] Specifically, Germany, Belgium, the Netherlands, and Singapore have contributed to the development of new cell technologies.[287]
- Commerce recently determined that "{a} lack of research and development expenses does not necessarily mean that circumvention exists."[288] In this case, the level of R&D in Cambodia should not undermine the facts on the record as applied to the other statutory factors, which demonstrate that BYD HK's production process in Cambodia is not minor or insignificant.

*Extent of Production Facilities*
- Commerce's evaluation of 781(b)(2)(D), extent of production facilities in the foreign country, Cambodia, suffers from identical legal deficiencies as its analysis of the investments in Cambodia. Rather than following the language of the statute, Commerce limited its analysis to analyzing the production facilities owned by BYD HK in Cambodia. The production facilities in Cambodia actually used to process the inputs, the production facilities of BYD HK's unrelated toll processors, were improperly ignored in the *Preliminary Determination.*
- Commerce too narrowly focused on square footage, capacity, and number of employees when evaluating the extent of production facilities. Such an approach deviates from past practice where Commerce has examined both qualitative and quantitative factors when consider the nature of production processes and extent of production facilities.[289]

---

[284] *See* BYD HK's March 24, 2023 Case Brief (citing Section 781(b)(2)(A) of the Act).

[285] *Id*. (*citing Cambodia* PDM at 10).

[286] *See* NextEra's March 24, 2023 Case Brief (citing *NextEra's* May 2, 2022 Comments at 22-23).

[287] *Id.* (citing *NextEra's* May 2, 2022 Comments at Attachment 1).

[288] *Id.* (citing *Pipe and Tube from India (Oman and the UAE) Preliminary* PDM at 16, unchanged in *Pipe and Tube from India (Oman and the UAE)*).

[289] *Id.* (citing *Diamond Sawblades (Thailand)* IDM at 8)

54

- When the production facilities of BYD HK's tollers are properly taken into account, the figures demonstrate that the production facilities in Cambodia were extensive in their own right when compared to those of Shangluo BYD in China and favor a negative circumvention finding.

*Value of Processing*

- The value of processing performed in Cambodia is also substantial and compels a negative determination.
- Based on Commerce's determination in the *Preliminary Determination* with respect to 781(b)(2)(E), value of processing, the value of the processing in the third country must account for at least a majority of the total cost of the finish product, which goes against the statute. Such a standard is not consistent with the language of the statute that uses the terms "minor or insignificant."
- There are prior circumvention cases where Commerce determined that lower levels of value added, 12 to 26 percent,[290] 10-29 percent,[291] and 34 percent[292] did not support an affirmative circumvention finding. These prior decisions undermine Commerce's finding that BYD HK's value of processing is small, minor, or insignificant. Thus, it should be corrected in the final determination.
- In *Ferrovanadium from Russia Final Determination,* Commerce concluded that the value added of 15 to 20 percent did not constitute a small proportion pursuant to section 781(b)(2)(E) of the Act when viewed in conjunction with the processes involved in production.[293]
- The statute directs Commerce to determine whether the value of processing performed in the third country represents a small proportion of the value of the merchandise imported into the United States.[294] Congress has "directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the parts and components imported into the processing country."[295]
- Congress has instructed Commerce to adopt "a more qualitative focus on the nature of the production process," rather than "a rigid numerical calculation of value-added."[296] Moreover, in past circumvention cases, Commerce has stated that circumvention inquiries "focus more on the nature of the production process and less on the difference in value between the subject merchandise and the imported parts or components."[297]
- Specifically, Commerce explained that Congress redirected the agency's value of processing focus to the nature of the production process.[298] In this circumvention inquiry,

---

[290] *See* BYD HK's March 24, 2023 Case Brief (citing *Ferrovanadium from Russia Preliminary Determination*; and *Ferrovanadium from Russia Final Determination*.

[291] *Id.* (citing *Hot-Rolled Lead and Bismuth* at 64 FR 40340).

[292] *See* NextEra's March 24, 2023 Case Brief (citing *Tissue Paper from China (Vietnam) Preliminary Determination*, 73 FR at 21585).

[293] *Id.* (citing *Ferrovanadium from Russia Preliminary Determination*, FR 77 FR 6541, 6542).

[294] *See* BYD HK's March 24, 2023 Case Brief (citing section 781(b)(2)(E) of the Act).

[295] *Id.* (citing *PET Film from UAE (Bahrain) Preliminary* PDM at 7).

[296] *Id.* (citing SAA at 893).

[297] *Id.* (citing *Hot-Rolled Lead and Bismuth*, 64 FR at 40347; *see also CORE from Taiwan (Malaysia) Preliminary* PDM).

[298] *Id.* (citing *SDGE from China (UK) Preliminary* at 33413; *see also Pasta from Italy (U.S.) Circumvention Preliminary* at 68 FR 46575, unchanged in *Pasta from Italy (U.S.) Circumvention*; and *CORE from Taiwan* at n. 85.

Commerce expressly acknowledged that the nature of production process in Cambodia was significant and complex.

*Nature of Production Process*

*NextEra*[299]

- Commerce correctly determined in the *Preliminary Determination* that "the nature of the production performed by the respondents in the third country is not minor or insignificant compared to either processing polysilicon into wafers, or ingots into wafers, in China, which does not weigh in favor of finding circumvention."[300]  As noted above, Commerce concluded that cell production is the "most capital intensive part of the manufacturing process," and "a highly automated, capital intensive, and technologically sophisticated process, requiring skilled technicians and employees with advanced degrees," and that "module production also involves a large number of varied inputs consumed in a complex, multi-step production process that requires precision, highly skilled workers, and accurate quality-testing equipment at multiple stages."[301]
- Having concluded that the nature of the production process in the inquiry country is not minor or insignificant and its "all-inclusive description of the production process … covers the range of the production scenarios applicable to various respondents,"[302] Commerce has authority to render a negative country-wide determination in this circumvention inquiry.
- Relying on the significant nature of the production process is consistent with past practice, the statute, and legislative history and alone supports a negative circumvention determination.[303]
- The SAA repeatedly refers to circumventing activity as the establishment of a "screwdriver operation" in the United States or third country, and also notes that it would be "relatively easy" for a foreign exporter to circumvent orders by establishing such screwdriver operations.[304]  The solar cell and module production in the targeted countries is clearly not a simple and small-scale "screwdriver operation" as described in the SAA.
- Commerce found that the process to produce a solar cell in the inquiry country is "where the essence of the solar module is realized."[305]

*BYD HK*[306]

- Commerce's finding that the nature of production performed by the respondents in the inquiry country is not minor or insignificant strongly supports a negative circumvention determination.
- Commerce has recognized that the essential component of a solar cell is the p/n junction.

---

[299] *See* NextEra's March 24, 2023 Brief at 5-13.
[300] *Id.* at 5 (citing *Cambodia* PDM at 18).
[301] *Id.* at 10 (citing *Cambodia* PDM at 17).
[302] *Id.* at 6 (citing *Cambodia* PDM at 15).
[303] *Id.* at 6-7 (citing *Aluminum Foil from China (Korea and Thailand)* IDM at 15).
[304] *Id.* at 8 (citing SAA at 893-94).
[305] *Id.* at 9 (citing *Cambodia* PDM at 17).
[306] *See* BYD HK's March 24, 2023 Brief at 9-1; *see also* BYD HK's April 3, 2023 Rebuttal Brief at 8-11.

56

- Prior to the process undertaken by BYD HK's tollers in Cambodia, raw wafers are inert minerals capable of generating solar power.
- The production of solar cells and solar modules in Cambodia is a multi-step, technologically complex, and sophisticated manufacturing process that requires expensive automated production lines.
- Auxin's arguments regarding Commerce's findings with respect to the nature of processing performed in Cambodia are erroneous.

*Silfab*[307]
- Commerce's finding that the nature of production performed by the respondents in the inquiry country is not minor or insignificant strongly supports a negative circumvention determination.
- Commerce appears to have never previously reached an affirmative circumvention determination while also concluding that the nature of the production process in the third country was not minor or insignificant.
  Commerce found the solar cells and solar module production process in the inquiry country significant activities to be multi-step, highly-technical, technically sophisticated, capital intensive, requiring highly skilled workers and skilled technicians and employees with advance degrees, thus making the process not minor or insignificant when compared to the production of polysilicon, ingots and wafers.

*Auxin*[308]
- Record evidence demonstrates that BYD HK's operations in Cambodia are minor or insignificant.  Thus, BYD HK and NextEra's arguments are without merit.
- The ITC's report is outdated and does not reflect commercial reality.  The *IEA Report* contradicts the ITC's analysis by demonstrating that the polysilicon, ingot and wafer production process is more capital intensive than the solar cells and solar module facilities.[309]
- NextEra's assertion that the CEA's market intelligence report demonstrates that solar cell production is the most capital-intensive part of the production process is false.  The CEA did not provide any exhibits, or data underlying its analysis which it based on "estimates compiled by CEA from supplier announcements and press releases detailing factory investment disclosures."[310]
- Additionally, the CEA admitted that it "prepared {its} report for NextEra Energy" for use in this inquiry.[311]  Commerce has previously recognized that "report{s} commissioned for the purposes of {a proceeding}… carry only limited weight given {their} potential for bias and conclusions that were tailored to generate a desired result."[312]
- No party cites to record evidence to support the finding that BYD HK's tollers solar cell and solar module production in Cambodia require a greater number of steps/stages than

---

[307] *See* Silfab's March 24, 2023 Brief at 15-18.
[308] *See* Auxin's April 3, 2023 Brief at 12-21.
[309] *Id.* at 15 (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 17).
[310] *Id.* at 15-16 (citing Next Era's May 2, 2022 Submission at Attachment 2).
[311] *Id.* at 16 (citing Next Era's May 2, 2022 Submission at Attac hment 2).
[312] *Id.* (citing *Softwood Lumber from Canada* IDM at Comment 45).

57

polysilicon, ingots, and wafer manufacturing in China.  Rather record evidence demonstrates that BYD HK's tollers production in Cambodia does not require more stages of production than polysilicon, ingot and wafer production in China.[313]

- Commerce, BYD HK and NextEra fail to recognize that the formation of a p/n junction resulting in a solar cell is only possible with solar-grade polysilicon and polysilicon wafers.  At best this factor is mixed and does not weigh in favor of, or against finding circumvention.

- Commerce has previously recognized that, "{b}y any reasonable measurement, polysilicon is the most important input used in solar modules."[314] The ITC,[315] the IEA,[316] the BNEF,[317] and SolarWorld[318] agree with the importance of polysilicon in the production of solar cells.

- With respect to labor intensity, the *IEA Report* is somewhat inconsistent with the DOE analysis of the number of direct manufacturing jobs required at each stage of the solar production process at one GW scale.  According to the DOE, 400-800 direct manufacturing jobs are required for the production of ingots and wafers, which is higher than 100-150 jobs in the production of solar cells and 500-700 than the production of solar modules.[319]

- Taking the IEA and the DOE analysis on the labor intensity for all the solar production stages, labor intensity does not weigh in favor of, or against, finding BYD HK's solar cell and solar module production in Cambodia to be minor or insignificant.

- Auxin does not dispute that solar cell and solar module production require a greater number of inputs.  However, compared to the technical hurdles, capital requirements, lead times and energy required to produce polysilicon, ingots, and wafers, using a greater number of inputs (most of which are sourced from China) do not weigh in favor of finding that the solar cell and solar module production in Cambodia is minor or insignificant compared with the production of polysilicon, ingots and wafers.

- Although the production of solar cells and solar modules may require more expensive and sophisticated equipment, this factor must be balanced against the fact that polysilicon, ingot, and wafer manufacturing facilities are more expensive to build and have higher capital requirements.[320]

*Auxin*[321]

*Level of Investment*
- In a response to a request from Commerce, Auxin filed a submission containing over 94 exhibits and an Excel database analyzing all major public announcements of solar investments in China for the last several years.[322]

---

[313] *Id.* at 21 (citing BYD HK IQR at Exhibit A20-2b)
[314] *Id.* at 22 (citing *Solar Cells from China 2017-2018 AR* IDM at Comment 4).
[315] *Id.* at 23 (citing *ITC Report* at VII-1).
[316] *Id.* (citing Auxin's July 29, Comments at Exhibit 1 (citing *IEA Report* at 7)).
[317] *Id.* (citing Auxin's Request at Exhibit 4).
[318] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 18).
[319] *Id.* at 25 (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 11)).
[320] *Id.* at 26 (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47)).
[321] *See* Auxin's April 3, 2023 Rebuttal Brief at 28-36 and 41-46.
[322] *Id.* (citing Auxin's July 29, 2022 Investment and R&D Submission).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

- The record demonstrates that the level of investment in China to produce subject merchandise is enormous, with an average investment of $4.7 billion.
- Consistent with Commerce practice, this is the appropriate benchmark against which Commerce should compare BYD HK's investments for cell fabrication and module assembly in Cambodia.
- Commerce correctly found that BYD HK made no investments in Cambodia related to cell fabrication or module assembly and should continue to find that its level of investment is minor or insignificant.
- Even if Commerce includes BYD HK's tollers in their analysis, when compared to the level of investment for the full production process in China, the level of investment in Cambodia is minor or insignificant.
- Commerce's analysis excludes the polysilicon stage of production, which, if included, would result in the investment in the order country being greater than the investment in the third country.[323]

*Research and Development*
- Commerce should reject BYD HK and NextEra's arguments that attempt to trivialize the importance of R&D to the solar cell and module production process and continue to find the lack of any R&D being done in Cambodia supports a determination that the process of assembly in Cambodia is minor or insignificant.
- In a response to a request from Commerce, Auxin filed a submission containing publicly available data on R&D conducted in China for the full solar cell and module production process, from the solar-grade polysilicon through module assembly.[324]
- The record demonstrates that R&D is critical for the solar cell and module sector. Record evidence demonstrates that Tongwei, GCL, Xinite Energy Co., Ltd., and the LONGi Group have spent millions conducting R&D related to solar cells and modules in China.[325]
- NextEra and Silfab USA fail to recognize that although "R&D might be a significant factor in some industries, it is not in others … the significance of its presence or absence depends on the industry and product under investigation."[326]
- The IEA explained that R&D has been key for technological advances throughout the solar supply chain increasing the conversion efficiency of solar cells, reduced material usage and improved energy efficiency per module.[327] Without R&D, the solar would not be the most affordable electricity generating technology in many parts of the world.[328]
- Commerce appropriately found BYD HK's and its tollers' lack of R&D in Cambodia to be uniquely significant in this case and should continue to find this factor to support an affirmative finding of circumvention.

---

[323] *Id.* (citing NextEra's May 2, 2023 Comments at Attachment 2).
[324] *Id.* (citing Auxin's July 29, 2022 Investment and R&D Submission).
[325] *Id.* (citing Auxin's July 29 Investment and R&D Submission at Exhibit RD-1 at 180, RD-2, RD-4, and RD-5).
[326] *Id.* (citing *Hot-Rolled Lead and Bismuth* at Comment 8).
[327] *Id.* (citing Auxin's July 29, 2022 Investment and R&D Submission at Exhibit 1 at 121).
[328] *Id.*

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

*Extent of Production Facilities*

- Commerce correctly excluded BYD HK's unaffiliated tollers' production facilities in its analysis as BYD HK is the respondent in this inquiry, is the entity exporting merchandise to the United States and is the respondent that underwent verification.
- Nevertheless, BYD HK's tollers' facilities are minor when compared to production facilities for the full solar cell and module production process. For example, JinkoSolar and BYD HK's Chinese affiliates have solar facilities in China that are larger than the tollers' respective facilities in Cambodia.[329]
- Commerce should continue to find that BYD HK's facilities in Cambodia are minor or insignificant.

*Value of Processing*

- Commerce should reject BYD HK's and NextEra's arguments that BYD HK's value of processing is not small.
- Commerce's value-added calculation overstates BYD HK's processing operations by including direct materials in its processing calculation, which is inconsistent with prior practice, and relying on BYD HK's sales value as the denominator.
- Although there is no bright-line test, Commerce has generally found processing operations to be "minor or insignificant" under section 781(b)(2)(E) of the Act even when the processing accounted for approximately one-third of the total value.[330]
- NextEra's reliance on *Tissue Paper from China (Vietnam)* is misplaced as the value added to the finished merchandise was 34 percent but Commerce "ranged the values by plus or minus 10 percent."[331] Further, Commerce held "the statutory factor, section 781(b)(2)(E) of the Act, is inconclusive."[332]
- BYD HK's and NextEra's cites to *Ferrovanadium from Russia Final Determination*, and *Hot-Rolled Lead and Bismuth* are misplaced in this proceeding. For *Ferrovanadium from Russia Final Determination*, Commerce acknowledged that the value of processing range of 12 to 26 percent "fell within the range of value-added percentages that the {Commerce} has found to be 'small' in previous cases."[333] In *Hot-Rolled Lead and Bismuth*, Commerce again provided a value-added range of 10 to 29 percent and did not

---

[329] *Id.* (citing Circumvention Request at Exhibit 14; and BYD HK IQR Part I at Exhibits A22-1a and A22-1b).

[330] Auxin notes that in the *Preamble (Final Rule)* at 27329 Commerce explicitly rejected setting a bright line of 35 percent as determining whether the value of processing implicated circumvention explaining: "to establish a 'safe harbor' or specific guidelines might result in the incorrect classification of substantial production operations as 'insignificant' and 'screwdriver' operations as 'significant." In *CORE from China (Malaysia)*, Commerce noted that record evidence demonstrated "the value-added by CORE producers, such as those in the third countries, is approximately 10 percent to 31 percent … {which} support{ed} a finding that the completion process performed in Malaysia represents a small proportion of the merchandise exported to the United States" under section 781(b)(2)(E) of the Act. *See CORE from China (Malaysia) Preliminary* PDM, unchanged in *CORE from China (Malaysia) Final.*

[331] *Id.* (citing *Tissue Paper from China (Vietnam) Preliminary Determination*, unchanged in *Tissue Paper from China (Vietnam) Final Determination*).

[332] *Id.* (citing *See Tissue Paper from China (Vietnam) Preliminary Determination*, 73 FR at 21585).

[333] *Id.* (citing *Ferrovanadium from Russia Preliminary Determination*, 77 FR 6359; unchanged in *Ferrovanadium from Russia Final Determination* IDM at Comment 1).

affirmatively find that a value-added in the United States as high as 29 percent was small.[334]

- Even taking BYD HK's value of processing in the *Preliminary Determination* at face value, Commerce followed prior practice and appropriately determined that BYD HK's value added in Cambodia was a small proportion of the value of the merchandise imported into the United States.

**Commerce's Position:**  We continue to find that based on the totality of evidence gathered pursuant to section 781(b)(1)(C) of the Act and the factors specified under section 781(b)(2) of the Act, BYD HK's process of assembly or completion in Cambodia of the solar modules shipped to the United States is minor or insignificant.  In the *Preliminary Determination*, we compared BYD HK's own investments, R&D, and production facilities in Cambodia related to the production of inquiry merchandise to the reported investments, R&D, and production facilities of its affiliate in China.[335]  Additionally, "to determine the percentage of the value of imported inquiry merchandise represented by third country processing {781(b)(2)(E), value of processing}, we summed the per-unit costs incurred in the third country by each mandatory respondent for non-Chinese material inputs, labor, fixed and variable overhead, selling, general, and administrative items, and interest and divided the sum by the per-unit weighted-average value of the respondent's U.S. sales of inquiry merchandise during 2021."[336]  For the final determination, we see no reason to depart from such analyses.  *See* Comments 4, 6, 7, and 11 for further discussion.  We also note no change with respect to our analysis and determination for section 781(b)(2)(C) of the Act, nature of the production process, and section 781(b)(2)(E) of the Act, value of processing.  *See* Comment 5 for additional discussion.

*Level of Investment*

In BYD HK's Preliminary Analysis Memorandum, we noted that "BYD HK is a trading company not involved in production operations related to solar cells and modules."[337]  Further, we preliminary found that "BYD HK has made no investments in Cambodia related to solar cells and modules and find BYD HK's investments in Cambodia to be minor or insignificant."[338]  Thus, we preliminary found that BYD HK's investments in Cambodia were minor or insignificant, and thus, weighed in favor of finding circumvention.[339]

For the final determination, we continue to find that BYD HK is a trading company that has made no investments in Cambodia related to solar cells and modules.  Therefore, we continue to find BYD HK's level of investment in Cambodia to be minor or insignificant, and thus,

---

[334] *Id.* (citing *Hot-Rolled Lead and Bismuth* 64 FR 40342).
[335] *See Cambodia* PDM at 14 and 18; and BYD HK Preliminary Analysis Memorandum at 4.
[336] *See Cambodia* PDM at 19; and BYD HK Preliminary Analysis Memorandum at 4.  For BYD HK, to calculate the value of processing, "we summed the per-unit non-Chinese raw material input costs of BYD HK, the per-unit processing fee paid to the three Cambodian tollers, and any labor, fixed and variable overhead, selling, general, and administrative (SG&A) items, and interest incurred by BYD HK, and divided the sum by the per-unit weighted-average value of BYD HK's U.S. sales of inquiry merchandise during 2021"
[337] *See* BYD HK Preliminary Analysis Memorandum at 3.
[338] *Id.*
[339] *See Cambodia* PDM at 14; BYD HK Preliminary Analysis Memorandum at 3.

continues to weigh in favor of circumvention.  *See* Comment 11.

*Research and Development*

As stated in the *Preliminary Determination*, BYD HK reported that it "does not engage in research and development related to CSPV cells and/or modules."[340]  We preliminary found that "BYD HK reports no R&D expenses with respect to manufacturing solar cells and modules"[341] Thus, we preliminary found that BYD HK's research and development in Cambodia were minor or insignificant, and thus, weighed in favor of finding circumvention.[342]

NextEra cites to *CORE from China (Vietnam)* where Commerce states that "{a} lack of research and development expenses does not necessarily mean that circumvention exists."[343]  Further, although BYD HK agrees with our finding with respect to section 781(b)(2)(B) of the Act, R&D, the company notes that "no single factor, by itself, controls Commerce's determination of whether the process of assembly or completion in a third country is minor or insignificant."[344] However, Commerce has previously explained that the "importance of any one of {the section 781(b)(2)} criteria 'can vary from case to case depending on the particular circumstances unique to each circumvention inquiry.'"[345]  Accordingly, although "R&D might be a significant factor in some industries, it is not in others…the significance of its presence or absence depends on the industry and product under investigation."[346]  For this circumvention inquiry, we find R&D to be of preeminent importance in the solar industry.  Such a finding is supported by the *Bloomberg Report* which notes that R&D is of particular importance to solar makers, especially to ingot and wafer production that is exclusively done by the affiliate of BYD HK and not done in Cambodia.[347]  Moreover, the IEA explained that R&D has been key for technological breakthroughs in the solar cell and module industry.[348]  Nevertheless, our finding under section 781(b)(1)(C) of the Act and of circumvention involved a multi-factor test that was supported by many findings other than our analysis of 781(b)(2)(B).  Thus, we find BYD HK and NextEra's arguments to be misplaced.

For the final determination, we continue to find that BYD HK is a trading company that has conducted no R&D in Cambodia related to solar cells and modules.  Therefore, we continue to find BYD HK's R&D in Cambodia to be minor or insignificant, and thus, this factor continues to weigh in favor of circumvention.  *See* Comment 11.

---

[340] *See Cambodia* PDM at 15.
[341] *See* BYD HK Preliminary Analysis Memorandum at 3
[342] *See Cambodia* PDM at 15; BYD HK Preliminary Analysis Memorandum at 3.
[343] *See Pipe and Tube from India (Oman and the UAE).*
[344] *See Cambodia* PDM at 10.
[345] *See Diamond Sawblades from China (Thailand)* IDM at Comment 5.
[346] *See Hot-Rolled Lead and Bismuth* IDM at Comment 8.
[347] *See* Circumvention Request at Exhibit 4.
[348] *See* Auxin's April 3, 2023 Rebuttal Brief (citing Auxin's July 29, 2022 Investment & R&D Submission at Exhibit 1 at 121).

*Nature of the Production Process*

For the final determination, we continue to find the nature of production process in Cambodia to be significant, and thus, not weighing in favor of circumvention. *See* Comments 4 and 5 for additional discussion.

*Extent of Production Facilities*

As stated in the *Preliminary Determination*, we preliminary found that BYD HK is a trading company that is not involved in production operations.[349] Further, BYD HK does "not invest in manufacturing equipment or conduct R&D related to solar cells and modules."[350] We preliminary found the extent of BYD HK's production facilities to be minor when compared to the extent of Shangluo BYD's production facilities in China, and thus, this factor weighed in favor of finding circumvention.[351]

We disagree with NextEra that Commerce focused too narrowly on square footage, capacity, and number of employees when evaluating the extent of production facilities. In supporting its argument, NextEra cites to *Diamond Saw Blades from China (Thailand)* stating that our approach in the *Preliminary Determination* deviates from past practice where Commerce examined both qualitative and quantitative factors when considering the nature of the production process and extent of production facilities. Further, NextEra states that it is illogical for us to find the nature of the production process in Cambodia to be significant but the facilities to be insignificant. However, unlike *Diamond Saw Blades from China (Thailand)*, we did not combine 781(b)(2)(C), nature of the production process, and 781(b)(2)(D), extent of the production facilities when conducting our analysis under section 781(b)(2) of the Act. Thus, the facts of that case are not analogous to this current proceeding. Instead, we analyzed each factor separately, analyzing the nature of the production process via qualitative factors and viewing extent of production facilities as a quantitative scale-based analysis. With such an approach in mind, we decided that quantitative factors (*i.e.*, square footage, capacity, and number of employees) were an appropriate lens to gauge the extent of the production facilities in Cambodia. Nevertheless, this argument is rendered moot as we did not consider the tollers of BYD HK. *See* Comment 11.

For the final determination, we continue to find that BYD HK is a trading company with no production facilities, investments and R&D related to solar cells and modules. Therefore, we continue to find BYD HK's extent of production facilities in Cambodia to be minor or insignificant, and thus, this factor continues to weigh in favor of circumvention.

*Value of Processing*

Based on minor corrections submitted by BYD HK during the course of verification, the value of processing percentage for BYD HK has changed. In the *Preliminary Determination,* we preliminarily found that the value of processing performed in Cambodia by BYD HK was a small proportion of the value of the inquiry merchandise imported into the United States, and

---

[349] *See* BYD HK Preliminary Analysis Memorandum at 3.
[350] *Id.*
[351] *See Cambodia* PDM at 18; and BYD HK Preliminary Analysis Memorandum at 4.

63

thus, weighed in favor of finding circumvention.[352]  This finding remains unchanged for the final determination.

Section 781(b)(2)(E) of the Act directs Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."  We find that in the context of section 781(b)(2)(E) of the Act, the word "value" denotes monetary value.  Consequently, section 781(b)(2)(E) of the Act directs Commerce to perform a quantitative, rather than a qualitative, evaluation of the value of third-country processing.

This interpretation is supported by 19 CFR 351.226(i), which provides that "{i}n determining the value of … processing performed … under section 781(b)(2)(E) of the Act, {Commerce} may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(e) of the Act—or, in the case of nonmarket economies, on the basis of section 773(c) of the Act."  Costs are measured numerically, as is the value of merchandise.  Therefore, section 781(b)(2)(E) of the Act describes a quantitative measurement of the value of third-country processing.  This interpretation is reinforced by Congress' discussion of value under section 781(b)(1)(D) of the Act (determining whether the value of merchandise produced in the order country is a significant portion of the total value of the merchandise exported to the United States) when Congress noted that the statue did:

> not to establish a rigid numerical standard for determining "significance" nor does the Committee expect Commerce to establish a specific numerical test.  The determination of whether the value of the parts or components is a significant portion of the total value of the merchandise should be made on a case-by-case basis, looking at the totality of the circumstances.  However, where the proportion of the value is relatively high (*e.g.*, the value of a television tube in relation to a finished television set), the conclusion should be clear.[353]

In addition, Commerce's statement that Congress directed it to focus more on the nature of the production process and less on differences in value, concerned the overall decision of whether third-country processing was minor or insignificant rather than the value calculation described under section 781(b)(2)(E) of the Act.  When Commerce stated in *PET Film from the UAE Preliminary Determination*[354] that Congress directed it to focus more on the nature of the production process and less on differences in value, it referenced *Hangers from China (Vietnam)*[355], which referred to *Certain Pasta from Italy (U.S.) Circumvention*[356] and *Hot-Rolled Lead and Bismuth*.[357]

---

[352] *See Cambodia* PDM at 19; *See* BYD HK Preliminary Analysis Memorandum at 4.
[353] *See S. Rep. No. 103-412* at 82.
[354] *See PET Film from the UAE Preliminary Determination* PDM at 7.
[355] *See Hangers from China (Vietnam) Preliminary Determination*, 76 FR at 27011-27013; unchanged in *Hangers from China (Vietnam)*, 76 FR at 66895.
[356] *See Pasta From Italy (U.S.) Circumvention Preliminary*, 68 FR at 46575; unchanged in *Pasta From Italy (U.S.) Circumvention*, 68 FR at 54888.
[357] *See Hot-Rolled Lead and Bismuth*, 64 FR at 40347.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

In *Certain Pasta from Italy (U.S.) Circumvention*, Commerce stated that:

> While some of the statutory factors are inconclusive, the information on the record tends to show that the repackaging operation in the United States *is minor and insignificant*. … Congress directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the imported parts or components. *See S. Rep. No. 103-412*, at 81-82 (1994).  Thus, we believe that it is appropriate to place more weight on the nature of the production and packaging process (the latter of which merely involves removing pasta from larger bags and placing it in smaller packages) rather than attempt to establish a numerical standard, which would be contrary to the intentions of Congress.[358]

In *Hot-Rolled Lead and Bismuth* Commerce stated that:

> The legislative history to section 781(a) establishes that Congress intended {Commerce} *to make determinations regarding circumvention* on a case-by-case basis in recognition that the facts of individual cases and the nature of specific industries vary widely.  In particular, Congress directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the imported parts or components. (*See S. Rep. No. 103-412*, 81-82 (1994)). Thus, we believe that any attempt to establish a numerical standard would be contrary to the intentions of Congress.

> The URAA, which became effective on January 1, 1995, redirected the focus of a circumvention inquiry away from a numerical calculation of value-added towards a more qualitative focus on the nature of the production process.  Under the URAA, which provides the current statutory language for section 781 of the Act, the numerical calculation of value-added is just one of five factors {Commerce} is to examine in {its} determination of whether the processing undertaken in the United States is minor or insignificant.[359]

In these cases, Commerce applied Congress' direction to focus more on the nature of the production process and less on value with respect to the overall decision of whether processing is minor or insignificant or the overall determination of whether circumvention is occurring and not its determination under section 781(b)(2)(E) of the Act.

This is consistent with the explanation in *S. Rep. No. 103-412* cited in these cases.  In *S. Rep. No. 103-412*, Congress noted that the provision in section 781(b)(1)(C) of the pre-URAA Act (*i.e.*, that there is a small difference between the value of the order country parts that were assembled in the inquiry country and the value of the finished merchandise imported into the United States) "has not proved effective in curbing the circumvention of antidumping and countervailing duty

---

[358] *See Pasta From Italy (U.S.) Circumvention Preliminary*, 68 FR at 46575 (emphasis added).
[359] *See Hot-Rolled Lead and Bismuth*, 64 FR at 40348 (emphasis added).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

orders."[360]  Congress then explained that it was amending "sections 781(a) and (b) to shift the *focus of the anticircumvention inquiry* away from a test of the difference in value between the subject merchandise and the imported parts or components toward the nature of the process performed in the United States or a third country"[361] (emphasis added).  Thus, the shift in focus related to the overall circumvention inquiry.

Moreover, the shift away from a difference in value analysis toward a nature of the production process analysis was directed toward section 781(b)(1)(C) of the pre-URAA version of the Act, not section 781(b)(2)(E) of the current version of the Act.  In fact, section 781(b)(2) of the Act, including the numeric value determination under section 781(b)(2)(E) of the Act, were added "to focus the anticircumvention inquiry on the question of whether minor or insignificant assembly or completion is taking place,"[362] which is a consideration of the nature of the third-country processing.  Hence, we disagree with the respondents' claim that Commerce's analysis under section 781(b)(2)(E) of the Act wrongly centered on a quantitative measure, without considering the nature of the production process.

With regard to whether BYD HK's value of processing in the third country is minor or insignificant, BYD HK and NextEra cite to *Ferrovanadium from Russia Final Determination*, *Tissue Paper from China (Vietnam)*, and *Hot-Rolled Lead and Bismuth* for support that Commerce has found value of processing percentages lower than BYD HK's to be not minor.  However, as Auxin has noted, we have also found similar ratios to be minor.[363]  In *Tissue Paper from China (Vietnam)*, Commerce calculated a value added of 34 percent but noted that the values were ranged by plus or minus 10 percent.[364]  Further, Commerce held that the statutory factor, section 781(b)(2)(E) of the Act, was inconclusive.[365]  Rather, in making the circumvention determination, Commerce relied on the four other statutory factors under section 781(b)(2) of the Act, which favored a finding of circumvention.[366]  In *Hot-Rolled Lead and Bismuth*, Commerce again did not find circumvention with value-added ratios ranging between 10 to 29 percent.[367]  In fact, Commerce did not provide an explicit determination as to whether the value of processing was small.[368]  Rather, in reaching its circumvention determination, Commerce relied on the respondent not being affiliated with U.S. rerollers and their facilities being operational before the imposition of the orders.[369]

In *Ferrovanadium from Russia Preliminary Determination*, Commerce did not find circumvention despite the value added ratios ranging between 12 to 26 percent."[370]  However,

---

[360] *See* S. Rep. No. 103-412, 81 (1994)).
[361] *See* S. Rep. No. 103-412, 81-82 (1994)).
[362] *See* SAA at 894.
[363] *See CORE from China (Malaysia) Preliminary*, 85 FR at 8823, unchanged in *CORE from China (Malaysia) Final.*
[364] *See Tissue Paper from China (Vietnam) Preliminary Determination*, unchanged in *Tissue Paper from China (Vietnam) Final Determination.*
[365] *See Tissue Paper from China (Vietnam) Preliminary Determination*, 73 FR at 21585.
[366] *Id.*
[367] *See Hot-Rolled Lead and Bismuth*, 64 FR at 40340
[368] *Id.*, 64 FR at 40341-43
[369] *Id.*, 64 FR at 40342.
[370] *See Ferrovanadium from Russia Preliminary Determination*, 77 FR at 6359, unchanged in *Ferrovanadium from Russia Final Determination* IDM at Comment 1.

66

Commerce stressed in *Ferrovanadium from Russia Final Determination* that its finding with regard to the value added in in the third country was an anomaly.[371] Commerce specified "that the value of U.S. processing of vanadium pentoxide into ferrovanadium, as calculated by {Commerce}, fell within the range of value-added percentages that {Commerce} has found to be "small" in previous cases."[372] Thus, we do not find that our assessment of whether the value of BYD HK's inquiry country processing is a small proportion of the value of the inquiry merchandise imported into the United States is necessarily inconsistent with some of the "small" percentages found in *Ferrovanadium from Russia Final Determination*, *Tissue Paper from China (Vietnam)*, or *Hot-Rolled Lead and Bismuth* and find the facts of those case to be misplaced in this current circumvention inquiry. While Commerce ultimately determined in *Ferrovanadium from Russia Final Determination* that the value percentages were not small based on the extensive and substantial processing that occurred, as explained above we find it is appropriate to consider the nature of processing in the overall circumvention decision rather than in assessing the percentage calculated under section 781(b)(2)(E) of the Act.

In the discussion of changes to the Act, the SAA noted that "{t}hese new provisions do not establish rigid numerical standards for determining the significance of the assembly (or completion) activities …"[373] Here, we determined that the limited value percentage that we calculated for BYD HK's inquiry country processing is a small proportion of the value of the merchandise imported into the United States.[374] Where the value of the processing performed in the inquiry country is a small proportion of the value of the inquiry merchandise imported into the United States, this factor weighs in favor of finding circumvention.

Thus, for the final determination, and after careful consideration of the change to BYD HK's value of processing, we continue to find that the value of the processing performed in Cambodia by BYD HK is a small proportion of the value of the inquiry merchandise imported into the United States, and thus, weighs in in favor of finding circumvention. For a complete analysis of BYD HK's updated value of processing in Cambodia, *see* BYD HK's Final Analysis Memorandum.

Concerning the three factors under section 781(b)(3) of the Act (*i.e.*, pattern of trade and sourcing, affiliations, and whether imports of parts and components from China increased), as addressed in Comment 13, Commerce finds that each of these factors supports an affirmative determination of circumvention for BYD HK.

Therefore, after analyzing the five factors under 781(b)(2), we find that the an evaluation of the factors based on this particular circumvention scenario demonstrates that BYD HK's process of assembly or completion in Cambodia is minor or insignificant pursuant to section 781(b)(1)(C) of the Act.

---

[371] *See Ferrovanadium from Russia Final Determination* IDM at Comment 1.

[372] *Id.*

[373] *See* SAA at 894.

[374] *See* BYD HK Final Analysis Memorandum where we calculated a ratio similar to the *Preliminary Determination*.

**Overall Determination**

**Comment 13. Whether the Factors Under 781(b)(3) of the Act Justify an Affirmative Final Determination**

*NextEra*[375]

- Section 781(b)(3) of the Act directs Commerce to take into account three factors in determining whether the merchandise produced in a foreign country is within the scope of an order, but the record does not support an affirmative determination based on these factors.
- None of the factors under section 781(b)(3) are dispositive and should not override a finding that the processing in Cambodia is not minor or insignificant.
- Pursuant to section 781(b)(3)(A) of the Act, Commerce analyzed U.S. import statistics and the mandatory respondent's data to find that import volumes from Cambodia have increased since the *Orders* were imposed, while imports from China declined.[376]
- Imports from Cambodia increased in response to growing U.S. demand.
- The U.S. installed significantly more solar energy capacity in 2021 than it did in 2011. Thus, the patterns of trade reflect a growing domestic market and weighs against finding circumvention.
- Under section 781(b)(3)(B) of the Act, Commerce found that affiliation to suppliers in China weighs in favor of circumvention; however, only one of two mandatory respondents reported having affiliated suppliers in China.[377]
- Commerce has previously stated that such analysis is not conclusive of whether circumvention is occurring.[378]
- Demand has driven imports from Cambodia, not ties to China. Commerce should reverse its finding with respect to affiliation in the final determination as not dispositive of circumvention.
- Under section 781(b)(3)(C) of the Act, Commerce examined the mandatory respondents' purchases of Chinese-produced inputs from 2008 to 2021 to determine whether shipments of inputs from China to Cambodia has increased.[379]
- Cell and module production in Cambodia is developed based on the industry's understanding of Commerce's interpretation of the *Orders* regarding the production stage in which the wafer is substantially transformed into a cell and therefore subject to the *Orders*.
- An affirmative determination would undermine this understanding. Commerce should therefore not rely on section 781(b)(3) of the Act to find circumvention.
- If Commerce concludes that any of the factors in section 781(b)(3) of the Act weigh in favor of finding circumvention, Commerce should not base an affirmative determination solely on section 781(b)(3) of the Act.

---

[375] *See* NextEra's March 24, 2023 Case Brief.
[376] *Id.* (citing *Cambodia* PDM at 20).
[377] *Id.* (citing *Cambodia* PDM at 21).
[378] *Id.* (citing *PET Film from the UAE (Bahrain)*; and *CORE from China (Vietnam)*).
[379] *Id.* (citing *Cambodia* PDM at 21).

68

- A negative determination is required, in accordance with the statute and Commerce practice, because processing in Cambodia, per NextEra's arguments, is not minor or insignificant, and therefore not all of the mandatory criteria in section 781(b)(1) of the Act are met.
- Section 781(b)(1) of the Act lists five criteria that must be met before imports from a third country may be included within an existing order. In contrast, section 781(b)(3) of the Act references three factors that Commerce shall take into account.
- The phrase "take into account" is plainly different from the mandatory language in section 781(b)(1) of the Act, and thus, the section 781(b)(3) factors are clearly not dispositive.
- If processing in the third country is not minor or insignificant, then the factors listed under section 781(b)(3) of the Act are not relevant because not all of the mandatory statutory criteria have been met.
- Commerce has previously emphasized that circumvention determinations are based on the totality of circumstances and the facts of each case.[380]

*Auxin*[381]
- NextEra asserts that Commerce evaluated the factors under section 781(b)(3) of the Act in isolation without taking due consideration of various market conditions. Therefore, Commerce incorrectly found these factors to weigh in favor of finding circumvention.
- In 2021, U.S.-bound solar cell and module shipments from Cambodia exceeded U.S.-bound solar cell and module shipments from China. This represents a dramatic shift in the pattern of trade.
- Nonetheless, NextEra asserts that the changes in the pattern of trade simply reflect a growing domestic market. However, Chinese direct shipments have forgone this burgeoning market, and NextEra's assertion reflects a blindness to the deterioration of the U.S. solar industry precipitated by the Chinese government.
- Accordingly, the extraordinary shifts in the pattern of trade and sourcing patterns strongly support an affirmative determination.
- With respect to section 781(b)(3)(B) of the Act, Auxin agrees with NextEra that affiliation between Cambodian solar cell and module producers is not conclusive of circumvention. Although affiliation is a critical element to Commerce's circumvention evaluation, and circumvention may be more likely to occur via related parties, it is also possible for circumvention to involve unrelated companies.[382]
- However, Commerce did not find circumvention solely on account of affiliation. Commerce reasonably, and in accordance with practice, found that BYD HK's affiliation merely weighs in favor of finding circumvention.[383]
- Commerce should continue to find that BYD HK's affiliation with upstream Chinese suppliers weighs in favor of finding circumvention in the final determination.

---

[380] *Id.* (citing *Pipe and Tube from India (Oman and UAE)*).
[381] *See* Auxin's April 3, 2023 Rebuttal Brief.
[382] *See* Auxin's April 3, 2023 Rebuttal Brief (citing *CORE from China (Vietnam)*; *Tissue Paper from China (Vietnam) Preliminary Determination*; and *Brass Sheet and Strip from Canada* IDM).
[383] *Id.* (citing *Cambodia* PDM).

69

- With respect to section 781(b)(3)(C) of the Act, NextEra found Commerce's finding to be improper because solar cell and module production in Cambodia developed based on the shared understanding of the industry from Commerce's interpretation and administration of the *Orders* regarding the stage in the production cycle that renders a product subject to the *Orders*. NextEra has failed to grasp the distinction between a substantial transformation finding and section 781(b) of the Act.
- Additionally, NextEra's admission that parties were searching for export platforms to imbue silicon wafers with a p/n junction admits to circumvention.

**Commerce's Position:**  We conclude that the evidence on the record in the Cambodia segments regarding section 781(b)(3) of the Act supports those affirmative circumvention determinations. Therefore, Commerce appropriately issued affirmative determinations of circumvention in Cambodia based, in part, on consideration of the factors enumerated in section 781(b)(3) of the Act.

Section 781(b)(3) of the Act provides that, in determining whether to include merchandise assembled or completed in a third country in an AD/CVD order, Commerce shall consider the following additional factors:  (A) the pattern of trade, including sourcing patterns; (B) whether the manufacturer or exporter of the merchandise is affiliated with the person who, in the third country, uses the merchandise to complete or assemble the merchandise which is subsequently imported into the United States; and (C) whether or not imports of the merchandise into the third country have increased after the initiation of the AD and/or CVD investigation that resulted in the issuance of an order.

In the *Preliminary Determinations*, Commerce analyzed section 781(b)(3)(A) of Act by examining the pattern of trade by each mandatory respondent and its Chinese affiliates since the initiation of the underlying investigation.[384]  Commerce additionally examined the trade patterns of Chinese shipments of subject merchandise into the U.S. and Cambodian shipments of subject merchandise into the U.S.  Commerce concluded that import volumes from Cambodia increased since the *Order* was imposed, while imports from China declined, and thus this pattern weighed in favor of circumvention.[385]  NextEra contends that Commerce must not evaluate the patterns of trade within a vacuum and must consider the context of the global market. Notably, U.S. domestic demand has grown significantly since the imposition of the *Order*, as a result of multiple factors, including the Administration's focus on the development of renewable energy. As NextEra stated, deployment of solar energy capacity has grown significantly, and therefore imports from Cambodia have become increasingly important to fulfill U.S. demand.  Therefore, Commerce must consider the growing U.S. domestic market within its analysis of trade patterns.

The plain language of the Act under section 781(b)(3)(A) directs Commerce to consider the pattern of trade since the initiation of the investigation of solar cells and modules.  The evidence on the record for each mandatory respondent showed extraordinary shifts in the pattern of trade from China to Cambodia.  U.S.-bound solar cell and module shipments from Cambodia replaced and exceeded U.S.-bound solar cell and module shipments from China.[386]  Additionally, pursuant

---

[384] *See Cambodia* PDM at 20.
[385] *See* BYD HK Preliminary Analysis Memorandum.
[386] *Id*.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

to section 781(b)(3)(A) of the Act, Commerce evaluated the specific sourcing patterns of the mandatory respondents in Cambodia. Evidence on the record further supported a shift in the pattern of trade from China to Cambodia.[387] Thus, the pattern of trade since the initiation of the investigation shows that this factor weighs in favor of finding circumvention.

In the *Preliminary Determinations*, Commerce analyzed section 781(b)(3)(B) of the Act by taking into consideration each mandatory respondent's affiliation with Chinese producers of solar cells, modules, ingots, and wafers.[388] NextEra stated that only BYD HK reported having affiliated suppliers in China, and further expressed that affiliation is not conclusive of whether circumvention is occurring. Consistent with past practice, we generally consider circumvention to be more likely to occur when the manufacturer of the subject merchandise is related to the third country assembler.[389] However, the lack of affiliation does not constitute evidence that circumvention is not occurring; therefore, affiliation is one of several factors that is considered when reaching our determination. We reach our determination regarding circumvention based on our consideration of all the 781(b)(3) factors, including affiliation. For all respondents in Cambodia, we find that sections 781(b)(3)(A) and 781(b)(3)(C) of the Act weigh in favor of circumvention, in addition to the mandatory findings listed in section 781(b)(1) of the Act. Therefore, we determine that record evidence as a whole supports a finding that weighs in favor of finding circumvention.

Commerce analyzed section 781(b)(3)(C) of the Act by taking into consideration whether the shipments of Chinese inputs that were used to complete or assemble the final product in Cambodia increased.[390] NextEra alleges that Commerce improperly found that this factor weighs in favor of circumvention, and that an affirmative determination would undermine the clear understanding of Commerce's interpretation regarding the stage in the production cycle that renders a product subject to the *Orders*. The plain language of the Act under section 781(b)(3)(C) instructs Commerce to examine whether imports of Chinese inputs into Cambodia used for the production of subject merchandise have increased after the initiation of the underlying investigation. Evidence on the record clearly shows that imports of Chinese inputs for all companies into Cambodia have increased since the year of the initiation of the investigation. Therefore, this factor weighs in favor of finding circumvention. Additionally, we agree with domestic parties that there is a clear distinction between a substantial transformation finding and section 781(b) of the Act. Although substantial transformation and circumvention inquiries may be similar, they are conducted pursuant to different regulatory standards and serve different purposes.[391] The purpose of a substantial transformation analysis is to determine a product's country of origin, while the purpose of a circumvention analysis is to counteract evasion of AD/CVD orders. Commerce may find a product that was substantially transformed to still be subject to an AD/CVD order after conducting a circumvention inquiry. Therefore, given the fact that Chinese inputs into Cambodia have increased since the year of the initiation of the *Orders*, we continue to find this factor to weigh in favor of circumvention.

---

[387] *Id.*

[388] *See Cambodia* PDM.

[389] *See CORE from China (Vietnam)*; *Tissue Paper from China (Vietnam) Preliminary Determination*; and *Brass Sheet and Strip from Canada* IDM.

[390] *See Cambodia* PDM.

[391] *See Bell Supply CAFC*; *see also* 19 CFR 351.225(j).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

Barcode:4419739-02 A-570-979 CIRC - Anti Circumvention Inquiry - from Cambodia 2022

NextEra additionally argues that Commerce cannot base an affirmative determination solely on section 781(b)(3) of the Act, and that a final negative determination is required because the processing in Cambodia is not minor or insignificant and therefore not all of the mandatory criteria in section 781(b)(1) have been met. Contrary to NextEra's arguments, we continue to find the process of assembly in Cambodia to be minor or insignificant for all mandatory respondents, and therefore, all mandatory criteria in section 781(b)(1) have been met. For additional information, *see* Comment 12.

For Commerce to make an affirmative determination of circumvention, all elements under section 781(b)(1) of the Act must be satisfied, including the minor or insignificant criteria listed in section 781(b)(2) of the Act. In contrast, section 781(b)(3) of the Act references three factors for Commerce to "take into account," a phrase plainly different from the mandatory language in section 781(b)(1) of the Act. These factors are relevant to Commerce's holistic analysis but are not dispositive of whether circumvention is occurring. Consistent with past practice, Commerce reaches its determination regarding circumvention based on the totality of the evidence for all factors, including those listed under section 781(b)(3) of the Act.[392] Commerce agrees with NextEra that section 781(b)(3) of the Act does not overturn a negative determination under 781(b)(1) of the Act if the process of assembly or completion in the third country is found to be not minor or insignificant under section 781(b)(2). Here, we have determined the process of assembly or completion in Cambodia to be minor or insignificant, and therefore a finding that solar cells and modules produced in Cambodia are circumventing the *Orders* is appropriate.

Based on the above analysis, we conclude that Commerce has correctly determined that the factors under section 781(b)(3) of the Act weigh in favor of circumvention and that Commerce appropriately issued an affirmative determination of circumvention in Cambodia based on a totality of the factors, including section 781(b)(3) and the determination that the process of assembly or completion in Cambodia is minor or insignificant.

## Comment 14. Whether Commerce's Country-wide Affirmative Circumvention Determination was Appropriate

*NextEra*[393]
- Commerce cannot reach a country-wide affirmative circumvention determination with respect to Cambodia because record evidence demonstrates that the process of assembling and completing solar cells and modules in Cambodia is not minor or insignificant.

No other interested party commented on this issue.

**Commerce's Position:** We have addressed NextEra's argument in Comments 10 and 12.

---

[392] *See Pipe and Tube from India (Oman and UAE).*
[393] *See* NextEra's March 24, 2023 Case Brief at 3-38.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

## Comment 15.  Affirmative Circumvention Determinations Would not be Appropriate Under Section 781(b)(1)(E) of the Act

*BYD HK*[394]
- Commerce did not provide any meaningful discussion regarding the appropriateness of the action, as is required by the statute in the *Preliminary Determination* pursuant to section 781(b)(1)(E) of the Act.
- Commerce's affirmative determinations to expand the scope of the *Orders* contradict Commerce's longstanding precedents regarding the nature and significance of certain vital processes in the production of solar cells and modules.
- Commerce indicated in the AD investigation that converting Chinese-origin wafers into solar cells in a third country does not warrant circumvention inquiries, advising that "{p}etitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country."[395]
- President Biden has made it clear that duties on imports from these inquiries are inappropriate in the face of the current energy emergency and, accordingly, waived new duties on solar modules from Thailand, Vietnam, Malaysia, and Cambodia for two years.[396]
- An affirmative determination would be contrary to Commerce's own recently-promulgated circumvention regulations because the purpose of the proposed modifications was not to penalize companies acting in good faith, but to ensure that circumvention determinations are properly applied to merchandise found to be circumventing an order.[397]

*NextEra*[398]
- Commerce can reach a negative final determination under section 781(b)(1)(E) of the Act, which states that Commerce "may" (not "shall" or "must") include products completed in third countries within the scope of an order.
- Including solar cells and modules produced in Cambodia, Malaysia, Thailand, and Vietnam within the scope of the *Orders* is not appropriate since there is no evasion to prevent when the processing that occurs in the third country is so significant.
- AD/CVD proceedings are not exempt from the directive to integrate climate considerations into its policies, strategic planning, and programs.[399]

---

[394] *See* BYD HK's March 24, 2023 Case Brief at 20-23.
[395] *Id.* (citing the *AD Order*, 77 FR at 73018).
[396] *Id.* (citing the *Proclamation Procedures*, 87 FR at 5686).
[397] *Id.* (citing *2021 Regulations Final Rule*, 86 FR at 52300, 52338).
[398] *See* NextEra's March 24, 2023 Case Brief at 31-33.
[399] *Id.* (citing NextEra's May 2, 2022 Comments at Att. 12 (U.S. Department of Commerce, Department Administrative Order 216-22, Addressing the Climate Crisis).

*Silfab*[400]
- The final determinations must address whether expanding the scope of the *Orders* to encompass cells manufactured in third countries (and the modules produced using those cells) would be appropriate under section 781(b)(1)(E) of the Act.
- Auxin and Commerce have not met the requirements for appropriateness because:  (1) no other U.S. producers support Auxin's petitions before Commerce; (2) an unwarranted expansion of the existing *Orders* would cause substantial harm to the U.S. solar industry; and (3) the requested relief would further impede the development of the U.S. solar industry, making it impossible to achieve the Biden administration's green energy initiatives.
- U.S. manufacturers have been denied due process in the form of procedural safeguards and eligibility requirements governing AD/CVD relief under U.S. law and Commerce's regulations.  Put simply, Auxin unlawfully made an end-run around the strict procedures and eligibility requirements governing AD/CVD relief under U.S. law, sections 701 and 703 of the Act and 19 CFR 351.203.
- U.S. manufacturers sourced cells from locations outside of China to enable U.S. manufacturing of solar modules in good-faith recognition of existing AD/CVD orders as they had been administered by Commerce and CBP for a decade.
- U.S. manufacturers were never given any notice that such cells could be circumventing the *Orders*.  In fact, as explained above, Commerce's administration of the *Orders* throughout this period consistently confirmed that such merchandise was not subject to the *Orders*.  Accordingly, affirmative final determinations would, without notice, potentially penalize Silfab for its good-faith efforts to comply with U.S. law and grow U.S. module manufacturing.
- Affirmative final determinations would contradict the emergency declared in *Proclamation 10414*.

*Auxin*[401]
- Commerce appropriately determined that a circumvention inquiry for the *Orders* is appropriate under section 781(b)(1)(E) of the Act.
- The arguments put forth by several interested parties that Commerce's actions are not "appropriate" notwithstanding Commerce's affirmative finding of circumvention are false.
- Commerce followed its practice in determining that action is appropriate to address circumvention pursuant to section 781(b)(1)(E) of the Act in the *Preliminary Determinations*.[402]
- Commerce and the CIT have held as a matter of statutory interpretation that Commerce's evaluation of whether action is appropriate to prevent evasion pursuant to section 781(b)(1)(E) of the Act is tied to consideration of the factors outlined in section 781(b)(3) of the Act.[403]

---

[400] *See* Silfab's March 6, 2023 Case Brief at 4 and Silfab's March 24, 2023 Cambodia Case Brief at 5-12.
[401] *See* Auxin's March 17, 2023 Rebuttal Brief at 28-30 and Auxin's April 3, 2023 Rebuttal Brief at 61-70.
[402] *See* Auxin's April 3, 2023 Rebuttal Brief (citing, *e.g.*, the *Cambodia* PDM at 23-26).
[403] *Id.* (citing *CORE from China (Vietnam)* IDM at 11; *CORE from China (Vietnam)* IDM at *Tung Mung CIT* 219 F. Supp. 3d 1333, 1343 and *Peer Bearing Co.*, 36 CIT 1700, 1707).

74

- Commerce did not address circumvention in the underlying investigation of the *Orders* because its substantial transformation analysis at that time was limited to comparing cell fabrication to module assembly and not comparing cell fabrication to module assembly to prior stages of solar cell production, which is the analysis Commerce is conducting now pursuant to 781(b)(1) of the Act.[404]

- Commerce stated in the *Solar Cells from China Investigation* that the "{p}etitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country" which does not indicate that Commerce meant that future circumvention inquiries regarding solar cells would not be warranted.[405]

- The CAFC stated in *Bell Supply CAFC* that "if Commerce applies the substantial transformation test and concludes that the imported article has a country of origin different from the country identified in an AD or CVD order, then Commerce can include such merchandise within the scope of an AD or CVD order only if it finds circumvention under" section 781 of the Act.[406]

- Auxin is an interested party as defined by section 771(9)(C) of the Act and was, and is, well within its rights to request that Commerce initiate and conduct these circumvention inquiries.

- Congress rejected a standing requirement for circumvention inquiries when it enacted section 781(b) of the Act, which allows any interested party, including small and medium-size businesses like Auxin, to enforce U.S. trade laws.[407]

- Commerce does not have discretion under the statute to disregard circumventing behavior based on a concern that such a finding would impede other government policy objectives, or any other factor not explicitly provided for in the statute.

- Commerce previously rejected arguments that an affirmative final determination is not appropriate and would impose economic costs by stating that comments regarding economic impact address issues outside the purview of the analysis prescribed by section {781(b)} of the Act.[408]

- This circumvention inquiry does not threaten growth of U.S. solar deployment or hinder efforts to address climate change because, as noted by the DOE, there has been a steady increase in installed CSPV capacity from 2010-2020 in spite of the *Orders* and temporary safeguard measures.[409]

- The DOE confirmed that rehabilitating U.S. solar manufacturing by effectively enforcing U.S. trade laws and combatting climate change are not mutually exclusive.[410]

- Auxin's analysis of the solar cell production process is consistent with analyses from the DOE and the IEA, and was ultimately vindicated by Commerce's preliminary affirmative findings of circumvention.

- Silfab's argument that these circumvention queries violate its due process are unfounded since Congress enacted the circumvention section of the Act in 1988 in order to prevent

---

[404] *Id.* (citing *Solar Cells from China Investigation* IDM at Comment 1).
[405] *Id.* (citing *Solar Cells from China Investigation* IDM at Comment 1).
[406] *Id.* (citing *Bell Supply CAFC*, 888 F.3d 1222, 1230 and *Diamond Sawblades (Thailand)* IDM at Comment 3).
[407] *Id.* (citing 19 CFR 351.226(c)).
[408] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 4).
[409] *Id.* (citing Auxin's May 16, 2023 Comments at Exhibit 5 (DOE Solar Deep Dive at 2)).
[410] *Id.* (citing Auxin's May 16, 2023 Comments at Exhibit 5 (DOE Solar Deep Dive at iv)).

evasion and circumvention of AD/CVD orders and did not establish an industry support requirement.

- Silfab's argument that its due process rights have been violated is belied by the fact that it has been allowed to participate in this inquiry from the very start.[411]
- Silfab USA's contention that affirmative final determinations would contradict the emergency declared in *Proclamation 10414* is similarly without merit because although the proclamation effectively eliminates the remedy that Auxin is entitled to by law, nothing in *Proclamation 10414* is inconsistent with an affirmative final determination in these inquiries.

**Commerce Position:** We disagree with BYD HK, NextEra, and Silfab's assertions that we did not determine the appropriateness of the instant circumvention inquiries pursuant to section 781(b)(1)(E) of the Act. As an initial matter, we conducted a full analysis pursuant to section 781(b) of the Act in order to determine if the merchandise assembled or completed in a foreign country is within the scope of the *Orders*.[412] Section 781(b)(1)(E) of the Act authorizes Commerce to include merchandise alleged to be circumventing in the scope of an order if Commerce "determines that action is appropriate … to prevent evasion of such order or finding." Commerce found that the criteria for a finding circumvention of the *Orders* was met, and further that the factors listed in section 781(b)(3) of the Act indicated that circumvention of the *Orders* was occurring. The statute does direct Commerce to consider factors other than whether action under the circumvention statute is appropriate to prevent evasion of the *Orders*. Here, because: we have found that the criteria for finding circumvention were met, and the factors under section 781(b)(3) of the Act further evinced the existence of circumventing behavior, and because no information on the record suggested that circumvention would cease absent inclusion of inquiry merchandise in the scope of the *Orders*, we find that action is appropriate under section 781(b)(1)(E) of the Act.

With respect to Auxin's standing to request a circumvention inquiry, there is no stipulation in the regulations regarding who can and cannot bring a circumvention inquiry beyond that it be an interested party. Pursuant to 19 CFR 351.226(c), an interested party may submit a circumvention inquiry request as long as it follows the proper procedures and include the requisite product information necessary for Commerce to make an initiation determination. In the instant case, we examined Auxin's circumvention requests and determined that it satisfied the criteria under 19 CFR 351.226(c), thus giving it standing to proceed.[413]

We also disagree with the arguments raised by BYD HK, NextEra, and Silfab that Commerce precluded future circumvention inquiries on the inquiry merchandise in the language of the investigation. In the investigation, we stated that there was the option for bringing additional petitions regarding assembly of solar cells and modules in a third country,[414] but did not prelude circumvention inquiries, which are requested in response to specific trade pattern and activities that may constitute circumvention as defined in the Act. As noted above, Auxin followed

---

[411] *Id.* (citing *Techsnabexport, Ltd.*, 16 CIT 420, 427 (noting the "essential elements of due process are notice and the opportunity to be heard")).
[412] *See Cambodia* PDM at the section, "Summary of Statutory Analysis."
[413] *See Initiation Notice*, 87 FR 19071, 19072.
[414] *See Solar Cells from China Investigation* IDM at Comment 1.

Commerce's requisite procedures for requesting a circumvention inquiry and thus we proceeded accordingly.

We also disagree with Silfab's claim that it and other U.S. cell and module producers have been denied due process in the instant proceeding. Silfab claims that because U.S. manufacturers were never given any notice that their cells could be circumventing the *Orders,* their rights to due process were violated. The Act and Commerce's regulations provide for ample notification and comment on Commerce's *Preliminary Determinations* by interested parties. In accordance with the CIT's ruling in *Techsnabexport, Ltd.*, the "essential elements of due process are notice and the opportunity to be heard." [415] As evidenced by the case record of the instant circumvention inquiries, Silfab as well as both domestic and foreign solar cell producers have had ample opportunity to file comments and, thus, be heard throughout this inquiry.

Finally, we disagree with BYD HK, NextEra, and Silfab's contention that these circumvention inquiries contradict *Proclamation 10414*. Nothing in the proclamation states that Commerce cannot conduct circumvention inquiries with respect to solar cells and modules. In fact, in response to *Proclamation 10414*, Commerce added Part 362 to its regulations to implement the Proclamation and these regulations, as well as CBP instructions issued by Commerce, specify that no AD/CVD duties will be collected on solar cells and modules entering the United States to which *Proclamation 10414* applies.[416] Thus, Commerce's affirmative circumvention findings cannot be implemented until the provisions of the *Proclamation 10414* expire.

**Certification Issues**

**Comment 16. Whether Commerce Should Allow AFA Companies to Certify**

*NE Solar*[417]
- Commerce should not deny any party the eligibility to participate in its certification regime based on the application of AFA.
- In *Oman Fasteners*, the CAFC informed Commerce that an adverse inference rate cannot be punitive or aberrational.[418]
- The only conclusions that can result from Commerce's circumvention inquiries pursuant to section 781(b)(1)(A)-(E) of the Act is whether or not the inquiry merchandise is circumventing an existing order.
- Forbidding AFA companies from certifying entries with CBP is a punitive measure that goes beyond the statutory purpose of a circumvention inquiry especially since the certifying statements are subject to verification by CBP.[419]

---

[415] *See Techsnabexport, Ltd.*, 795 F.Supp at 428.
[416] *See Cambodia* PDM at the section, "Certification Process and Country-Wide Affirmative Determination of Circumvention" and *Appendix IV-Certification for "Applicable Entries."*
[417] *See* NE Solar's March 6, 2023 Case Brief at 2-5.
[418] *Id.* (citing *Oman Fasteners*, Slip Op. 23-17 at 20).
[419] *See Id.* (citing the *Preliminary Determinations*, 87 FR at Appendix VI(M) ("I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.")).

- Section 781 of the Act does not grant Commerce the authority to create a certification regime and then prospectively dismiss the veracity of certifications provided under that regime before those certifications are made.
- Commerce would be enforcing the *Orders* against specific companies rather than enforcing the existing *Orders* against merchandise covered by the scope of the *Orders* or the instant queries.

*Auxin*[420]

- Commerce should follow its longstanding, court-affirmed practice of precluding non-cooperative companies (either by not responding to the Q&V questionnaires or cancelling verification) from participation in any certification regime.
- Commerce's preliminary findings with respect to NE Solar was premised on its questionnaire responses being accurate, complete, and verified.  Thus, NE Solar's cancellation of verification warrants AFA pursuant to sections 776(a), (b) of the Act.
- Accordingly, Commerce should find, as AFA, that NE Solar is circumventing the *Orders* and should be precluded from participating in any resulting certification regimes.

**Commerce's Position:**  Commerce's decision to bar uncooperative respondents from the certification process is an agency practice affirmed by the CIT, is not impermissibly punitive, and minimizes the impact of AFA findings on parties not found circumventing, while ensuring that Commerce's AFA finding induces cooperation, consistent with Commerce's established practice.  As noted by Auxin, Commerce has the authority to and the discretion to determine the eligibility of parties to participate in the certification regime.[421]

Commerce notified interested parties that it was initiating the circumvention inquiry on a country-wide basis (*i.e.*, not exclusive to the producers mentioned) and would solicit information from certain Cambodian, Malaysian, Thai, and Vietnamese companies concerning their production and shipment of solar cells and modules to the United States.[422]  Commerce also stated in the *Initiation Notice* that a company's failure to completely respond to our request for information may result in the application of partial or total facts available which may include adverse inferences.[423]  In conducting a country-wide circumvention inquiry, Commerce must evaluate a representative selection of companies to determine whether merchandise has been completed or assembled in the third country, and must take necessary action to prevent evasion.[424]  Commerce is not required by the Act or regulations to impose a certification regime in instances where such a regime is inconsistent with preventing evasion and permits uncooperative parties to benefit from their lack of cooperation.  Commerce's previous findings that foreign producers' ability to "trace the country of origin of its shipments and identify which shipments to the United States are of Chinese origin on a transaction-specific basis," is crucial to administration of affirmative anti-circumvention findings.[425]  Commerce is not obligated to

---

[420] *See* Auxin's March 17, 2023 Rebuttal Brief at 23-26; and Auxin's March 24, 2023 Case Brief at 39-42.
[421] *See Cold-Rolled Steel from Korea* IDM at Comment 6.
[422] *See Initiation Notice*, 87 FR at 19072.
[423] *Id.*
[424] *See* Cambodia RSM at the section, "Selection of Respondents."
[425] *See Butt-Weld Pipe Fittings from China (Malaysia)* IDM at Comment 3; *Hangers from China (Vietnam)* IDM at Comment 4; and *Tissue Paper from China (India) Final Determination* IDM at Comment 2.

78

permit a previously uncooperative party to certify if that party has, by its unwillingness to cooperate, prevented Commerce from using that party's information to conduct its analysis, or to assess and verify such party's ability to trace its inputs to particular U.S. sales. Rather, Commerce's establishment of a certification process in which non-cooperative respondents may not participate is consistent with our obligation to administer the law in a manner that prevents evasion of the *Orders*.[426]

Thus, we disagree with the argument submitted by NE Solar that excluding uncooperative producers and their importers from the certification process is overly punitive and not supported by evidence. Commerce's decision to preclude uncooperative respondents from participating in the certification process is necessary to ensure cooperation and does not exceed what is minimally necessary and reasonable to ensure cooperation. The reliance on *Oman Fasteners* as an example of the CIT finding Commerce's decision to apply AFA as impermissibly punitive is inapplicable here, where the question is whether precluding companies from certifying based on an adverse inference is permissible; not whether the application of AFA itself is warranted.

Commerce has repeatedly applied certification requirements in other circumvention inquiries which were subject to an affirmative country-wide decision.[427] Therefore, in a case where the affirmative circumvention determination is made entirely on record evidence, uncooperative respondents would be able to benefit from their failure to cooperate (*e.g.*, not filing timely Q&Vs or not participating in verification) merely by the fact that they avoided the inconvenience and expense of participating, including being selected as a mandatory (complete questionnaire) respondent, knowing that their lack of participation might not (or would not) alter Commerce's finding of circumvention. Such non-cooperation could also frustrate Commerce's ability to conduct a circumvention inquiry, should the largest third-country producers fail to provide Q&V responses. Finally, an uncooperative respondent retains the right to participate in a future review, and thus remedy its uncooperative status and potentially gain the opportunity to participate in a certification regime. For these reasons, Commerce's decision to preclude non-cooperating respondents from the certification regime is legitimately based on the need to induce cooperation and is not punitive.

**Comment 17. Certification Requirements and Corrections**

*BYD HK*[428]

- Commerce should simplify its certifications by replacing them with declarations from only importers that the entry(ies) meet the requirements for duty-free treatment based on the *Presidential Proclamation 10404* (*i.e.*, the entry is an "Applicable Entry") or Commerce's determinations in these circumvention inquiries (*i.e.*, either Commerce's negative circumvention determination applies to the entry or the merchandise that was entered into the United States meets the non-Chinese content requirements identified by Commerce).

---

[426] *See Butt-Weld Pipe Fittings from China (Malaysia) Preliminary* PDM at 12-13 and 22, unchanged in *Butt-Weld Pipe Fittings from China (Malaysia)*.
[427] *See Butt-Weld Pipe Fittings from China (Malaysia)*; *CRS from China (Vietnam)*; *CORE from China (Vietnam)*; and *CORE from China (UAE)*.
[428] *See* BYD HK's March 6, 2023 Case Brief at 2-3.

- CBP already enforces other duty exemptions using simplified certifications and requiring anything more than simple declarations will impede the flow of goods into the United States.
- Commerce should provide importers 60 days to provide simplified declarations for entries that have already been made.

*Jinko*[429]

- To avoid CBP requiring AD/CVD cash deposits on entries with deficient certifications: (1) an importer should be allowed to appeal CBP's decision that a certification is deficient to Commerce and submit a corrected certification, if necessary; (2) an importer should be allowed to submit corrected certifications in the absence of gross negligence or fraudulent intent; and (3) the documentation required to be maintained in connection with the certification should be limited to documents that demonstrate that the entry is an "Applicable Entry" (*i.e.*, the p/n junction in the solar cells was not formed in China) or not an entry of inquiry merchandise (*i.e.*, the solar cells do not contain wafers produced in China).

*Auxin*[430]

- Commerce should continue to require exporters to complete the requisite certifications because:  (1) Commerce's preliminary affirmative country-wide circumvention determination applies to all exporters in the inquiry countries; (2) exporters possess certain information necessary for completing the certifications that imports may not have; and (3) BYD HK never explained why requiring certifications from exporters would be burdensome.
- Contrary to BYD HK's claim that "there is no legitimate need or purpose for Commerce to require certifications from exporters or to require the level of factual detail specified in the current certifications," Commerce has specifically stated that the "addition of the certification requirements … strengthens the administration and enforcement of the AD and CVD orders by reducing the possibility that entries may be inaccurately classified by importers."[431]

**Commerce's Position:**  We have decided not to revise the certifications as suggested by BYD HK because requiring exporters to complete the certifications is consistent with Commerce's practice and is necessary, and because BYD HK never explicitly identified which parts of the certifications are too burdensome.  Commerce has a history of requiring both importers and exporters of goods that are entered into the United States to complete and maintain certifications in certain proceedings or proceeding segments, including as a result of circumvention inquiries.[432]  Certifications from exporters are particularly important for implementing the results of this circumvention inquiry because whether merchandise is inquiry merchandise is based on the country where the merchandise was produced and whether certain inputs into that

---

[429] *See* Jinko's March 6, 2023 Case Brief at 1-5.
[430] *See* Auxin's March 17, 2023 Rebuttal Brief at 26-28.
[431] *Id.* at 27 (citing *Core from China (Vietnam)* IDM at Comment 4.
[432] *See CORE from China (UAE)*; *see also Aluminum Extrusions from China Minor Alterations Circumvention Final*, 82 FR at 34631-34632.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

merchandise were produced in China.[433]  Neither of these characteristics can be determined through a physical inspection of the merchandise at the border.  Moreover, entry documents that are typically available to the importer may not be helpful in identifying where certain inputs in the imported merchandise were produced, as the source of such inputs may not be apparent from invoices, bills of lading, *etc.*, especially where the input passed through multiple parties (producer, exporter, trading company).  As Commerce noted in the Preamble to its regulations:

> Given the complex supply chains that may be involved with certain types of subject merchandise (which may involve input producers, intermediate processors, producers, exporters, trading companies, importers, *etc.*), certifications provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order.[434]

Requiring exporters to complete and maintain certifications provides the added assurance that adequate information was obtained to accurately certify to the facts listed in the certifications. Moreover, simply requiring "declarations" from importers that an entry qualifies as an "Applicable Entry" or meets the non-Chinese content requirements does not provide the same level of assurance that the entry meets those requirements as the certifications that Commerce developed for this circumvention inquiry.  Commerce's certifications contain a list of each requirement that must be met to make clear that the importer and exporter have been informed of each requirement by way of the certification and both have specifically certified that each and every requirement has been met.

Furthermore, we disagree that it is inappropriate for Commerce to "require the level of factual detail specified in the current certifications" as argued by BYD HK.[435]

> As a general matter, importers are expected to perform their due diligence and exercise reasonable care {when completing entry documents} … . {A} reasonable importer may be expected to know, at a minimum, the identity of certain parties in the transaction chain, understand the imported product, including where it was made, how it was made, and the components of the product (and, in some instances, the source of those components).[436]

Commerce's certifications do not go beyond these already existing expectations for importers. Hence, we have not revised the certifications as suggested or waived the certification requirement with respect to exporters.

We next turn to the comments regarding deficient or incorrect certifications and the documentation that must be maintained in connection with the certifications.  If CBP determines that an importer or exporter's certification does not conform to Commerce's requirements, such that the entry is subject to the *Orders*, the importer or exporter can request an administrative

---

[433] *See Preliminary Determinations*, 87 FR at Appendix IV.
[434] *See 2021 Regulations Final Rule*, 87 FR at 52364.
[435] *See* BYD HK's March 6, 2023 Case Brief at 3.
[436] *See 2021 Regulations Final Rule*, 87 FR at 52347-48.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

review of that entry wherein Commerce will determine the appropriate AD/CVD duty assessment for the entry.  Regarding corrections to certifications, CBP already has provisions in place for importers to correct entry summary information, including certification information, through such means as a post summary correction or a prior disclosure.

With respect to documentation requirements, parties who complete the "Applicable Entries" certification must certify to more than the fact that the solar cells or solar modules were not already subject to the *Orders*; or the AD order on certain crystalline silicon photovoltaic products from Taiwan (certain existing solar orders).  For example, such parties must certify that the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated.

Similarly, parties who complete the "Chinese Component" certification must certify to more than the fact that the solar cells or solar modules do not contain wafers produced in China.  For example, such parties must certify that the solar cells and/or solar modules were not already subject to the *Orders*.

Consequently, it would not be appropriate to limit the documentation requirements as suggested by Jinko.  Commerce noted in the certifications that the certifying party "is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, *etc.*)."[437]  This means that the certifying party must maintain sufficient documentation to support the certification in its entirety.  Therefore, we have not limited the documentation requirement as requested by Jinko.

### Comment 18. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*

*NE Solar*[438]
- Commerce cannot require exporters of solar cells or solar modules that were not manufactured using Chinese wafers to certify to that fact because such merchandise is not subject to the circumvention inquiry.  Commerce cannot change the language of the *Orders* or interpreted that language "in a way contrary to {its} terms.[439]
- Thus, Commerce should revise its certifications to remove references to merchandise that is outside the scope of the circumvention inquiries and that is not subject to the underlying *Orders* (*i.e.*, language in the certification that the imported or exported solar cells and solar modules were not manufactured using wafers produced in China).

No other interested party commented on this issue.

---

[437] *See Preliminary Determinations*, 87 FR at Appendix VI.
[438] *See* NE Solar's March 6, 2023 Case Brief at 5-8.
[439] *Id*. at 5-7 (citing *Wheatland*, 161 F.3d at 1370 (quoting *Smith Corona*, 915 F.2d at 686; and *Ericsson*, 60 F.3d at 782).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

**Commerce's Position:**  We disagree with NE Solar's claim that Commerce cannot place certification requirements on interested parties who exported solar cells and/or solar modules to the United States that were produced in the countries under consideration that do not meet the definition of inquiry merchandise.  Section 351.226(m)(1)(iv) of Commerce's regulations provides that, "{i}n conducting a circumvention inquiry under this section, the Secretary shall consider, based on the available record evidence, the appropriate remedy to address circumvention and to prevent evasion of the order.  Such remedies may include … {t}he implementation of a certification requirement under 19 CFR 351.228."  Under 19 CFR 351.228, Commerce may require "an importer or other interested party" to "{m}aintain a certification for entries of merchandise into the customs territory of the United States" and that if such certificate is not maintained or is false, Commerce "may instruct the Customs Service to suspend liquidation of entries of the importer or entries associated with the other interested party and require a cash deposit of estimated duties at the applicable rate …"

Thus, the certification described in 19 CFR 351.228 relates to an entry that was not declared as subject to antidumping or countervailing duties, such as the entries described by NE Solar, as only if the certification was not maintained or was found to be false would such duties be imposed.  This interpretation is consistent with Commerce's statement in the Preamble to the regulations that "Commerce uses the certification program, as described in {19 CFR 351.228}, to allow parties who have not engaged in the practices which Commerce determined were circumventing an order to certify that they did not participate in such conduct."  Therefore, requiring importers and exporters to certify that the imported/exported solar cells or solar modules produced in the countries under consideration were not manufactured using wafers produced in China is entirely consistent with Commerce's regulations and its authority to administer the Act in a manner that prevents evasion of its determinations, including developing certifications that it finds will be effective in preventing such evasion.  As the CIT noted, "Commerce has a certain amount of discretion to act in order to 'prevent {} the intentional evasion or circumvention' of the Act … .  To that end, Commerce may impose measures such as mandatory certification programs where it believes they will be effective in preventing future circumvention of its orders."[440]

Such certifications are particularly important in this circumvention inquiry because inquiry merchandise is not physically distinguishable from non-inquiry merchandise (inquiry and non-inquiry merchandise only differ with respect to the countries where certain materials in the merchandise were produced).  As Commerce noted in the Preamble to its regulations:

> We note that Commerce frequently imposes certifications in instances in which CBP may not be able to ascertain certain identifying details relevant to the product's classification as either subject to, or not subject to, an AD and/or CVD proceeding through physical inspection or the relevant sales documentation accompanying the entry summary, and, thus, could not confirm through these means alone whether a particular entry has been properly designated as {subject

---

[440] *See Appleton Papers Inc.*, 929 F. Supp. 2d at 1337 (citing *Tissue Paper from China (Vietnam) Final Determination* IDM at 9-12); *Solar Cells from China Investigation* IDM at 80-81 (finding that a certification regime is necessary and appropriate to prevent evasion of the antidumping and countervailing duty orders on solar cells); *CORE from China (UAE)*, 85 FR at 41957, 41958.

83

to antidumping or countervailing duties}. In such instances, both CBP and Commerce would rely on the certifications as an additional tool to ascertain whether the entry correctly was filed as an entry type not subject to an AD and/or CVD proceeding.[441]

Commerce went on to note in the Preamble that:

> … enforcement of the AD/CVD laws, including taking steps to prevent evasion and circumvention of AD and CVD orders by producers, exporters, and importers, is well within Commerce's authority and is of paramount importance to Commerce.  The addition of a certification requirement, where necessary based on a given case, strengthens the administration and enforcement of the AD and CVD orders by reducing the possibility that entries may be inaccurately filed by importers.  Given the complex supply chains that may be involved … certifications provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order.[442]

Revising the certification as suggested by NE Solar by removing statements that the imported/exported merchandise was not manufactured using wafers, and/or certain other materials, produced in China would contravene the purpose of the certification at issue which is to "provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order."[443]

Lastly, Commerce's certifications do not redefine the scope of the *Orders* or inquiry merchandise.  Rather, the certifications are tools used to enforce the *Orders* and the circumvention determination in this proceeding so as to prevent evasion of such determinations.

### Comment 19. Whether Exporters and Importers Should be Permitted to Submit Multiple Certifications, as Applicable

*BYD HK*[444] and *CSIL*[445]
- Commerce should clarify that exporters and importers eligible to complete both the Appendix IV "Certification for 'Applicable Entries' Under 19 CFR Part 362 Importer Certification" and Appendix VI "Certification Regarding Chinese Components Importer Certification" certifications may file both certifications.
- Commerce's clarification would provide certainty to importers whose imports comply with the conditions of both certifications should *Presidential Proclamation 10414* and/or Commerce's related September 16, 2022 Final Rule be amended or terminated.[446]

---

[441] *See Adoption of CFR 351.228*, 86 FR at 52364.
[442] *Id.*
[443] *Id.*
[444] *See* BYD HK's March 6, 2023 Case Brief at 4-6.
[445] *See* CSIL's March 6, 2023 Case Brief at 3-4.
[446] *See* BYD HK's March 6, 2023 Case Brief (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56868).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

- There is no principled basis for Commerce to preclude parties from filing two certifications and clarifying an importer's ability to submit more than one certification would assist in Commerce's administration of the final determination in these inquiries.
- Commerce should amend its certifications and related appendices to allow importers to submit both the Appendix IV "Certification for 'Applicable Entries' Under 19 CFR Part 362 Importer Certification" and Appendix VI "Certification Regarding Chinese Components Importer Certification" certifications to clarify the certification regime, and in turn, promote its administrability.

No other interested party commented on this issue.

**Commerce's Position:**  We confirm that importers and exporters may complete certifications under ***both*** Appendix IV and Appendix VI of the *Preliminary Determination.*  Following the release of the *Preliminary Determinations*, Commerce informed interested parties of the certification requirement[447] and established the following types of certifications to administer *Presidential Proclamation 10414* and the findings from the *Preliminary Determinations*:  (1) importer and exporter certifications that specific entries meet the regulatory definition of "Applicable Entries"; (2) importer and exporter certifications that specific entries are not subject to suspension of liquidation or the collection of cash deposits based on the preliminary negative circumvention determinations (in combination with certain of its wafer exporters); and (3) importer and exporter certifications that specific entries of inquiry merchandise are not subject to suspension of liquidation or the collection of cash deposits pursuant to this preliminary country-wide affirmative determination of circumvention because the merchandise was not manufactured using certain components produced in China.[448]

Copies of the certifications and information regarding the certification requirements were provided in the Appendices to the *Preliminary Determination.*[449]  Appendix IV of the *Preliminary Determinations* related to the certification for "Applicable Entries" under 19 CFR Part 362, whereas Appendix VI relates to the certification regarding Chinese components.  We acknowledge that exporters/importers shipping inquiry merchandise from the four countries subject to the circumvention inquiry (*i.e.*, Cambodia, Malaysia, Thailand, and Vietnam) may qualify under the "Applicable Entries" Appendix IV certification related to the *Presidential Proclamation 10414* and the Chinese components Appendix VI certification.  Thus, exporters/importers may elect to complete both the Appendix IV and Appendix VI certifications.

---

[447] *See Preliminary Determination* 87 FR at 75225.
[448] *See Cambodia* PDM at 23-24.
[449] *See Preliminary Determination* 87 FR at 75227-75231.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

**Comment 20. Whether or Not Companies Found Not to Be Circumventing Should Be Required to Certify and to Identify Their Wafer Suppliers**

*Hanwha*[450]

*Commerce Should Not Request Certifications for Companies Found Not to Be Circumventing the Orders*

- The significance of a negative determination of circumvention is that merchandise exported by a respondent found not to be circumventing the orders is not within the scope of the relevant AD/CVD orders.[451]  Yet, contrary to law, Commerce has imposed a certification regime on Hanwha's entries.
- Commerce has the discretion to act to prevent the evasion or circumvention of antidumping duty law.[452]  Commerce may impose measures such as a certification regime if they believe it will be effective in the prevention of future circumvention.[453]
- Hanwha was found not to be circumventing and, thus, Commerce should not require any certification on exports of solar cells and modules produced by Hanwha because they are not subject merchandise.
- Commerce's stated objective is to craft certification language that targets as closely as possible the merchandise that is circumventing the *Orders*.  Imposing a certification requirement on merchandise exported by Hanwha is contrary to this principle.
- Commerce should take reasonable steps to ensure that merchandise from an exporter found not to be circumventing the orders is not subject to suspension of liquidation and ADs/CVDs.[454]
- In prior negative circumvention determinations, Commerce has consistently not adopted any certification requirements.[455]  Therefore, companies for which Commerce reaches a negative determination should be exempt from a certification requirement.
- Commerce may implement a certification requirement under 19 CFR 351.228 if Commerce finds the merchandise subject to the inquiry pursuant to 19 CFR 351.226(m)(1)(iv).  However, neither the statue nor Commerce's regulations require a certification requirement in the event of a negative circumvention determination.
- If Commerce makes a negative determination, it is required to terminate the inquiry and terminate the suspension of liquidation with a refund of any cash deposit.[456]  Therefore, if Commerce makes a negative final circumvention determination, that merchandise must not be included in the *Orders* or subject to duties.
- Because Hanwha is not disclosing its wafer suppliers it is unfairly placed in the same position as the respondents for which Commerce made an affirmative circumvention finding.  This is inconsistent with the statute and Commerce's own regulations, which

---

[450] *See* Hanwha's March 6, 2023 Case Brief at 2-15.
[451] *Id.* (citing 19 CFR 351.226(g)(2)).
[452] *Id.* (citing *Tung Mung CIT*).
[453] *Id.* (citing *Butt-Weld Pipe Fittings from China (Malaysia)*).
[454] *Id.* (citing *Mitsubishi Heavy Industries*).
[455] *Id.* (citing *CORE from China (Guatemala)*; *CORE from China (South Africa)*; *PET Film from the UAE (Bahrain)*; and *Pipe and Tube from India (Oman and UAE)*).
[456] *Id*. (citing section 731(c)(3) of the Act).

86

requires Commerce to terminate the suspension of liquidation in the event of a negative determination in an antidumping investigation.

*Commerce Has Requested Certifications Where Exporters Reported No Shipments but that Situation is Not Analogous to a Negative Determination*

- Commerce has previously imposed certification requirements on companies found to have no shipments in affirmative circumvention determinations. Those scenarios are not the same as a negative circumvention determination.[457]

- In these cases, Commerce found the companies to have no shipments, finding that there are no reviewable entries or no reviewable shipments and not investigating a company's books and records to determine if it is circumventing pursuant to section 781(b) of the Act.

- Conversely, a negative circumvention determination is made after Commerce has analyzed a respondent's information. Hanwha has provided multiple questionnaire responses, thousands of pages of confidential information, and conducted verification of all information needed.

- In *Pipe and Tube from India (Oman and UAE)*, Commerce reached a negative country-wide determination and did not impose any certification requirements.[458] Similar to this, Hanwha was found not to be circumventing, a certification is not required and requiring one is contrary to law.

*If Commerce Continues to Require Certifications for Companies Found Not to Be Circumventing, Commerce Should Modify the Appendix V Certification Requirement and Allow Hanwha to Certify Without Disclosing the Identity of its Wafer Exporters*[459]

- Hanwha objects to the requirement of publicly disclosing the names of its wafer exporters in order to use the certification regime imposed in the *Preliminary Determination*, as it is contrary to Commerce's APO practice and imposes significant harm to Hanwha's business relationships.

- Specifically, 19 CFR 351.105(c)(6) states that Commerce will normally consider the names of particular customers, distributors or suppliers as BPI if so designated by the submitter. Hanwha has properly requested BPI treatment of the names of its unaffiliated suppliers.

- Requiring Hanwha to disclose the identity of its wafer exporters is therefore inconsistent with the APO, and also seems to violate the spirit of the Trade Secrets Act.

- The identity of wafer exporters/suppliers is extremely sensitive for a variety of commercial reasons, making it virtually impossible for Hanwha to comply.

- None of the five statutory factors under section 781(b)(1)(C) of the Act required an examination of the identity of Hanwha's wafer exporters/suppliers, beyond the fact that the wafers were of Chinese origin.

---

[457] *Id.* (citing *Butt-Weld Pipe Fittings from China (Malaysia)*; and *CORE from China (UAE)*).

[458] *Id.* (citing *Pipe and Tube from India (Oman and UAE)*).

[459] Hanwha refers to the wafer exporters (the companies that ship the wafers from China to Malaysia) as wafer suppliers. For our analysis these terms are interchangeable. We note that the Appendix V certification asks for companies to confirm their wafer "exporter."

87

- Commerce should allow Hanwha to certify that the solar cells and modules are produced in the same general manner as examined in the investigation, without requiring it to trace such exports to a specific wafer supplier.
- The identity of the wafer exporters/suppliers also has no bearing on Commerce's analysis with respect to section 781(b)(1)(D) of the Act.
- In past cases where Commerce has established certification requirements, such as in *CORE from China (UAE)*, respondents were not required to provide the names of their substrate providers. The respondents were simply required to certify that the substrate was not Chinese.
- The identity of an input supplier has never been part of any certification regime in a circumvention inquiry.
- The proposed certification regime does not take into account that Hanwha and others may qualify new wafer suppliers. Hanwha seeks confirmation that it will not be barred from using new wafer suppliers for future shipments, should Commerce continue to require the identification of wafer suppliers.
- If Commerce believes a certification regime is necessary, Commerce should modify the certification language and allow a company who received a negative determination to certify that the subject merchandise was produced by that company using a substantially similar production process, without having to publicly disclose the identity of its wafer suppliers.
- Companies found not to be circumventing should be allowed to certify that cells exported to the U.S. are for use in modules produced by affiliated parties in the U.S. Such a certification would be easy to enforce and administer by CBP and would not be detrimental to the U.S. industry in any way as the cells would be dedicated for consumption by an affiliated supplier to produce U.S. modules.
- While Hanwha's inability to use the Appendix V certification could be mitigated by using the Applicable Entries certification, it is inadequate for a company found not to be circumventing.

*Boviet*[460]
- The inclusion of a specific wafer supplier requirement is unnecessary to prevent circumvention, is unrelated to the reasoning underlying Commerce's negative determination, imposes an unnecessary burden on Boviet, and complicates administrability for CBP.
- Commerce reached a *Preliminary Determination* that Boviet is not circumventing, based on a number of factors, none of which has any connection to the identity of the Chinese exporter supplying Boviet wafers.
- Boviet's wafer supplier was not a part of Commerce's negative determination for Boviet, and as it is not related to Commerce's determination, Commerce should remove this aspect of the certification requirement.
- The wafer supplier restriction unnecessarily complicates Boviet's compliance with and CBP's administration of Commerce's certification. It hinders Boviet's ability to make normal commercial decisions regarding its supply of wafers.

---

[460] *See* Boviet's March 6, 2023 Case Brief at 1-4.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

- Boviet requests that Commerce modify the Appendix V certification to exclude the wafer exporter/supplier requirement for the importer in paragraph F(3) and for the exporter in paragraph D(3), if not remove the certification requirement altogether.

*Auxin*[461]

- Commerce should not weaken its certification regime by carving out certain solar producers, exporters, or importers, making certain requested changes, or delaying its implementation.
- Hanwha argues that Commerce should not impose a certification requirement for companies that received a negative circumvention determination, but because of Commerce's preliminary country-wide affirmative circumvention findings, such a certification regime is necessary to give full effect to Commerce's determination.
- Auxin's proposed certification regime as provided in section II of the rebuttal brief, should make certification easy for companies like Hanwha that have been found to not be circumventing.
- Allowing a producer temporary or permanent exemption from the affirmative ruling and its certification requirements because it is not currently relying on Chinese substrate creates the possibility of future circumvention by that producer.[462]
- With respect to *CORE from China (Guatemala)*, *CORE from China (South Africa)*, *PET film from the UAE (Bahrain)*, and *Pipe and Tube from India (UAE)*, these were negative country-wide circumvention determinations, and therefore, Commerce did not institute certification regimes.
- Where a certification requirement is imposed, it must be imposed on a country-wide basis to avoid evasion of the order and circumvention findings.
- Commerce should alter its certification regime by applying rules proposed by Auxin. Adopting these rules would obviate respondents' arguments regarding the need to publicly identify their wafer suppliers, provide flexibility to respondents in qualifying new wafer suppliers, allow respondents to make commercial decisions, and simplifies the records importers are required to maintain.
- Auxin's proposal is better because it: (1) avoids the need for respondents to publicly identify their wafer suppliers; (2) provides flexibility to respondents so they are not locked into certain wafer suppliers; (3) allows respondents to determine what is best for their commercial interests when securing Chinese inputs; and (4) simplifies the types of records needed to be maintained by importers.

**Commerce's Position:**  We continue to find the certification requirements implemented in the *Preliminary Determinations* to be adequate and appropriate.  For the final determinations, we have made slight modifications regarding the wafer exporter language included in the certifications at Appendix V.

Based on record information, Commerce initiated a country-wide circumvention inquiry to determine whether imports of solar cells and modules exported from, and produced in,

---

[461] *See* Auxin's March 17, 2023 Rebuttal Brief at 17-21.
[462] *Id.* (citing *CRS from China (Vietnam)*).

Cambodia, Malaysia, Thailand, and Vietnam were circumventing the *Orders*.[463]  On December 8, 2022, we preliminarily found that solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam were circumventing the *Orders* on a country-wide basis.  Under 19 CFR 351.226(m)(1), Commerce is authorized to take the appropriate remedy to address circumvention and prevent evasion of an order, including the application of a determination on a country-wide basis.  Therefore, Commerce applied the affirmative determination of circumvention to all shipments of inquiry merchandise from all four countries on or after April 1, 2022, the date of publication of the *Initiation Notice.*

As stated in the *Preliminary Determination*, we determined that shipments of inquiry merchandise by Hanwha, in combination with certain wafer exporters, completed in Malaysia using certain parts and components manufactured in China are not circumventing the *Orders*.  In order to administer the country-wide affirmative determination of circumvention, and the company-specific negative determinations of circumvention, Commerce established the certification regime.  The certification regime was implemented to ensure that the merchandise from Hanwha using the specific supply-chain that was found to be not circumventing the *Orders*, is not improperly subject to the *Orders*.

Hanwha argues that companies found not to be circumventing the *Orders* should not be required to certify, as the negative determination of circumvention means that the merchandise exported by the respondent is not within the scope of the relevant order.  In previous negative circumvention determinations, Hanwha notes, Commerce has not adopted any certification requirements.[464]  Additionally, Hanwha contends that in accordance with section 735(c)(2) of the Act, Commerce is required to terminate the inquiry following a negative determination, and to terminate the suspension of liquidation.  The CIT has held that Commerce is expected to take reasonable steps to prevent the suspension of liquidation of non-subject merchandise.  According to Hanwha, based on past precedent where Commerce reached a negative determination, Commerce has indicated that importers and exporters are no longer required to certify their products, lifted the suspension of liquidation, and ordered CBP to refund any cash deposits.[465]

As stated above, Commerce is authorized under 19 CFR 351.226(m)(1) to take the appropriate remedy to address circumvention, including the application of the determination on a country-wide basis to all products from the same country as the product at issue.  Accordingly, Commerce initiated these circumvention inquiries on a country-wide basis and reached an affirmative country-wide determination in its *Preliminary Determinations*.  Therefore, we find the facts of the cases cited by Hanwha not to be analogous to these proceedings.  Commerce did not require certifications in *CORE from China (Guatemala)*, *CORE from China (South Africa)*, and *Pipe and Tube from India (UAE and Oman)* because these were negative country-wide determinations.  In *PET Film from UAE (Bahrain)*, the inquiry was initiated on a specific respondent, not on a country-wide basis.  Commerce has repeatedly applied certification requirements in other circumvention inquiries which were subject to an affirmative country-wide

---

[463] *See Initiation Notice.*
[464] *See* Hanwha's March 6, 2023 Case Brief (citing *CORE from China (Guatemala)*; *CORE from China (South Africa)*; *Pipe and Tube from India (UAE)*; and *PET Film from the UAE (Bahrain)*).
[465] *See* Hanwha's March 6, 2023 Case Brief (citing *Shelter Forest*).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

decision.[466]  Hanwha also asserted that the facts in *Butt-Weld Pipe Fittings from China (Malaysia)* and *CORE from China (UAE)* were not relevant because the respondents reported no shipments.  However, we find these cases to be relevant, as they were circumvention inquiries initiated on a country-wide basis and found to be affirmative.  The country-wide affirmative decision was what resulted in the need for certifications for importers and exporters.

Given the affirmative country-wide determinations in the instant inquiries, there is no basis for Commerce to terminate the inquiries, and instead, pursuant to section 781(b)(1)(E) of the Act and 19 CFR 351(m)(1)(iv), Commerce deems a certification regime to be necessary and appropriate administer the determinations and prevent evasion of the *Orders* in the future.  The certification regime allows companies found not to be circumventing the *Orders* opportunities to avoid the application of ADs/CVDs.  As such, we find the certification regime to be a reasonable step to prevent the suspension of liquidation of non-subject merchandise.  Thus, requiring Hanwha to complete certification requirements is not equivalent to treating Hanwha as an affirmative company, but a measure to ensure that Hanwha can certify entries that are not subject to the *Orders* as a consequence of the negative determination regarding Hanwha, while also allowing for the continued administration and enforcement of *Orders*.  If Hanwha and other parties are accurately filling out the certifications, they will not be subject to the *Orders*.  The facts of this case do not resemble those of *Shelter Forest* as we reached an affirmative country-wide determination in this case.  In *Shelter Forest*, Commerce made a negative determination and as a result, indicated that respondents no longer needed to certify, lifted the suspension of liquidation, and ordered CBP to refund any cash deposits.[467]  Therefore, we find the facts of *Shelter Forest* to not be relevant.

Hanwha next argues that should Commerce continue to require companies found not to be circumventing, Commerce should modify the Appendix V certification and allow Hanwha to certify without disclosing the identity of its wafer suppliers/exporters.  Specifically, Hanwha notes that requiring it to publicly disclose the names of its wafer suppliers/exporters is contrary to APO practice, and pursuant to 19 CFR 351.105(c)(6), a supplier's identity should be treated as BPI.  Additionally, per Hanwha, the identity of specific wafer suppliers has no bearing on Commerce's analysis under sections 781(b)(1)(C) and 781(b)(1)(D) of the Act.  Boviet further contends that the inclusion of a specific wafer supplier is unnecessary and is unrelated to the reasoning underlying Commerce's determination.

Commerce finds the request to treat the names of wafer exporters/suppliers as BPI within the Appendix V certification to be appropriate and has modified the certification accordingly.  19 CFR 351.105(c)(6) states that Commerce will normally consider the names of particular customers, distributors, or suppliers to be BPI, if so designated by the submitter.  As Hanwha has requested the business proprietary treatment of its unaffiliated wafer suppliers, the regulations state that Commerce will normally treat it as BPI.  Therefore, Commerce has modified the certification under Appendix V to allow the business proprietary treatment of wafer exporters for all respondents found not to be circumventing.  Certifications submitted to CBP as part of an

---

[466] *See Butt-Weld Pipe Fittings from China (Malaysia)*; *CRS from China (Vietnam)*; *CORE from China (Vietnam)*; and *CORE from China (UAE)*.
[467] *See Shelter Forest.*

entry package are not made publicly available, and such information will not be publicly disclosed.

With respect to arguments related to the inclusion of specific wafer exporters in the certification, we continue to find it necessary for the names of specific wafer exporters to still be required on the certification under Appendix V, with the modification for BPI treatment described above.  In the *Preliminary Determinations*, and as affirmed in this final determination, we performed an analysis based on the particular supply chains of each mandatory respondent.  The *Preliminary Determination* specifically states that we determined that Hanwha's exports of inquiry merchandise produced with wafers exported by the specific parties reported in their questionnaire responses are not subject to the *Orders*.  Therefore, the certification under Appendix V is established to provide companies found not to be circumventing on a company-specific basis to certify that their specific supply chain is not subject to the *Orders*.  As a result, Commerce continues to require respondents found not to be circumventing to include the names of its wafer exporters in the certification.  Our analysis under section 781(b)(2) of the Act is done at an exporter-specific level and the country of origin of the wafer is a critical aspect of our analysis.  Because we are permitting parties to certify shipments as not circumventing only if the shipment utilizes the supply chain examined in this inquiry and we are requiring both the exporter and importer to certify this, the exporter may need to disclose their wafer supplier to their importer.  Should respondents wish to use new wafer suppliers for future shipments, the certifications under Appendix IV and Appendix VI remain available to all companies found not to be circumventing.

Lastly, Auxin argues that Commerce should alter its certification regime by adopting the rules it proposed.  Doing so, according to Auxin, would obviate the need for respondents to publicly identify their wafer suppliers, provide flexibility to respondents in qualifying new wafer suppliers, allow respondents to make commercial decisions, and simplifies the records importers are required to maintain.  Commerce has addressed this proposed certification under Comment 24.

Based on the analysis above, Commerce finds the certification regime established at the *Preliminary Determinations* to be appropriate.  With respect to the certification listed under Appendix V, Commerce continues to require the names of specific wafer exporters but will allow respondents to treat them as BPI.

### Comment 21. Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews

*Vina/LONGi*[468]
- A changed circumstances review is preferable to an administrative review as a proceeding segment in which Commerce could reconsider a company's eligibility to participate in the solar circumvention certification regime.

---

[468] *See* Vina/LONGi's March 6, 2023 Case Brief at 3-6.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

- The Act and Commerce's regulations indicate that administrative reviews are used to determine final liabilities for ADs and CVDs, not to address matters related to circumvention inquiries.[469]
- It would take too long for a company to gain access to the solar circumvention certification regime through an administrative review and the company would need to participate in multiple administrative reviews.
- For example, under *Presidential Proclamation 10414* and Commerce's implementing regulations (which provide that Commerce will instruct CBP to discontinue suspension of liquidation and the collection of cash deposits on "Applicable Entries" of inquiry merchandise on or before June 6, 2024, (the current Date of Termination of *Presidential Proclamation 10414*)), unless a company incorrectly declared that it had a reviewable suspended entry before June 6, 2024, it will not have any reviewable entries until the twelfth administrative review of the *AD Order* (which covers the period December 1, 2023, through November 30, 2024). The final results of 2023-2024 AD review may not be issued until as late as June 2026. Meanwhile, the company would not be able to use solar circumvention certifications during the POR of the thirteenth administrative review of the *AD Order* (covering the period December 1, 2024, through November 30, 2025) and would need to request that its shipments/entries during the 2024-2025 POR be reviewed. The final results of that review may not be issued until as late as June 2027.
- Moreover, if a company in an inquiry country requested an administrative review and was selected as a mandatory respondent, it would be a waste of resources to conduct a complete analysis of the company's exports/entries when the reason the company requested the review was to establish its eligibility to certify that its solar cells and/or solar modules are not inquiry merchandise subject to review.
- In contrast, in changed circumstances reviews Commerce does not need to issue a questionnaire,[470] or conduct the full analysis performed for mandatory respondents but may focus on the precise reason the company was determined to be ineligible to participate in the solar circumvention certification regime.
- In a changed circumstances review a company could be given the opportunity to establish its eligibility to participate in the solar circumvention certification regime by demonstrating that it is able to trace the components in solar cells or modules to the country in which the wafer and other significant material inputs were produced and thus satisfy the certification requirements.
- Thus, Commerce can address a "change" in its determination that a company was not eligible to participate in the solar circumvention certification regime in a changed circumstances review. Commerce followed this approach in *OCTG from China CCR*.[471]
- Commerce should consider examining certification eligibility in changed circumstances reviews as an alternative to reviewing such eligibility in administrative reviews.

No other interested party commented on this issue.

---

[469] *Id.* (citing section 751(a)(A)-(B) of the Act).

[470] *Id.* at 5 (citing 19 CFR 351.221(c)(3)(iii)).

[471] *Id.* at (citing *OCTG from China CCR*, 87 FR at 15915).

**Commerce's Position:**  We disagree with Vina/LONGi's position that Commerce should reconsider a company's ineligibility to participate in the solar circumvention certification regime in changed circumstances reviews.  Rather, Commerce will consider requests for eligibility to participate in the solar circumvention certification regime in administrative reviews.

Section 751(b)(1) of the Act provides that "{w}henever {Commerce} receives information concerning, or a request from an interested party for a review of {a final determination, suspension agreement, or continued investigation} which shows changed circumstances sufficient to warrant a review of such determination or agreement, {Commerce} shall conduct a review of the determination or agreement …"  The phrase "changed circumstances" is not defined in the Act, the SAA, or Commerce's regulations and none of those primary and secondary sources contain an explanation of what aspects of a determination may be reconsidered in light of changed circumstances.  While Commerce has broad discretion in determining whether to initiate a changed circumstances review and in deciding the range of matters that can be considered in such a proceeding, its discretion is limited by the statutory requirement that there be "changed circumstances sufficient to warrant a review" of the antidumping order.[472]  In practice, Commerce has conducted changed circumstances reviews to address a wide variety of issues, some of which could also be addressed in the context of an administrative review.[473]  Commerce's practice is to determine, on a case-by-case basis, whether changed circumstances sufficient to warrant a review exist.[474]

Here, Vina/LONGi failed to identify any circumstance that has changed.  Rather, Vina/LONGi argued that "… a changed circumstances review can address a "change" in Commerce's determination that a company was not eligible to participate in its certification program."  However, the circumstance that led Commerce to prohibit importers/exporters from certifying as to the non-Chinese content in inquiry merchandise from certain companies[475] is the fact that those companies did not cooperate in the circumvention inquiry (they either failed to respond to Commerce's quantity and value questionnaire or failed to permit Commerce to verify their questionnaire responses).  The fact that these companies did not cooperate in the inquiry has not changed.  Without any changed circumstances, we find no basis for conducting a changed circumstances review.

In contrast, in *OCTG from China CCR*, the case cited by Vina/LONGi to support its position, there was a change in the facts underlying Commerce's determination.  Specifically, in the underlying circumvention inquiry, Commerce did not implement certifications "because the HLD companies were "unable to track welded OCTG to the country of origin of inputs used in

---

[472] *See* 751(b)(1) of the Act.

[473] *See, e.g., Aluminum Extrusions from China Preliminary CCR*, 83 FR at 34548 (finding sufficient information to initiate a changed circumstances review to recalculate certain cash deposit rates); *see also Nails from Malaysia CCR Initiation*, 80 FR at 71772 (finding sufficient information and "good cause" to initiate a changed circumstances review to evaluate whether a company was properly utilizing the correct cash deposit rate); and *Pure Magnesium from Canada CCR Initiation*, 57 FR at 41473 (finding sufficient information and "good cause" to initiate a changed circumstances review to evaluate changes to the major subsidy program at issue in the underlying investigation).

[474] *See Tapered Roller Bearings from China*, 67 FR at 10665.

[475] Commerce did not prohibit exporters or importers from certifying that an entry was an "Applicable Entry" under 19 CFR 362.102.

the production of welded OCTG …"[476]  In the related changed circumstances review Commerce found that there was a change in circumstances because "the HLD companies are now able to identify and effectively segregate welded OCTG produced by either HLDS (B) in Brunei or HLD Clark in the Philippines using non-Chinese hot-rolled steel from other OCTG produced at their facilities."[477]  We do not have this fact pattern in this circumvention inquiry, and *OCTG from China CCR* did not involve or address companies that failed to cooperate in the earlier circumvention inquiry.

Our approach is consistent with *Plywood from China (Vietnam)* where Commerce stated that "we decline to reconsider eligibility for the certification programs established by these circumvention inquiries in the context of a CCR and instead, determine that the appropriate mechanism by which to assess previously ineligible exporters' eligibility for the certification programs for purposes of this proceeding is in the ongoing ARs of the *Orders*."[478]  In that case, Commerce explained that in contrast to other cases where companies subsequently claimed that they had changed the methods by which they tracked their raw materials, and Commerce conducted CCRs to verify these new facts, "companies always had the ability to participate or to provide accurate data, and we do not see this as a change in the future."[479]

Vina/LONGi contends that it is preferable for Commerce to consider a company's eligibility to participate in the solar circumvention certification regime in a changed circumstance review, rather than an administrative review for a number of reasons.  Specifically, Vina/LONGi contends that the purpose of an administrative review is to determine final liabilities for ADs and CVDs, not to address matters related to circumvention inquiries. Moreover, Vina/LONGi maintains that it would take too long and require multiple reviews to gain access to the certification regime, and it could lead to significant and unnecessary work and analysis (*e.g.*, a party simply seeking access to the certification regime may have to file a separate rate application and could be selected as a mandatory respondent).  We have responded to those concerns below.

First, Commerce must determine if entries of solar cells or modules are inquiry merchandise or not, and how to assess duties on merchandise deemed subject to these circumvention inquiries. Certifications are relevant to that decision because whether or not importers and exporters have met the certification requirements affects whether or not AD/CVDs will be assessed on the entries.  Because the Act directs Commerce to determine final assessment rates in administrative reviews, we find that considering certification eligibility in administrative reviews is consistent with the purpose of that proceeding segment as provided in the Act.

Second, we do not find that our decision to reconsider certification eligibility in an administrative review places importers or exporters of inquiry merchandise from AFA companies in a different position, in terms of timing or requesting multiple reviews, than if they were to import or export subject merchandise from a company that currently has a dumping margin based on AFA.  In both cases, parties would need to wait until the anniversary month of the

---

[476] *See OCTG from China CCR*, 87 FR at 15915.
[477] *Id.*, 87 FR at 15916.
[478] *See Plywood from China (Vietnam) Final* IDM at Comment 13.
[479] *Id.*

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

AD/CVD order to request an administrative review and then would need to wait until the final results of that review were published before, depending on the outcome of the review, entries may no longer be subject to an AFA rate. Exporters/producers seeking reconsideration with respect to certification eligibility would face a similar timeline before certifications could be used.

Moreover, Commerce did not prohibit importers/exporters from certifying that entries of inquiry merchandise from AFA companies are "Applicable Entries" under 19 CFR 362.102.[480] Thus, importers and exporters of inquiry merchandise from AFA companies may currently participate in that part of the certification regime and do not need to wait for an administrative review. Furthermore, in the *Preliminary Determination*, which was issued on December 1, 2022, Commerce noted that:

> If it is determined that an importer and/or exporter has not met the certification and/or related documentation requirements for certain entries, Commerce intends to instruct CBP to suspend, pursuant to these preliminary country-wide affirmative determinations of circumvention and the *Orders*, all unliquidated entries for which these requirements were not met and require the importer to post applicable AD and CVD cash deposits equal to the rates noted above.[481]

> Interested parties that wish to have their suspended non-"Applicable Entries," if any, reviewed, and their ineligibility for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders* (*i.e.*, December 2022 for the *Solar Cells AD Order* and December 2023 for the *Solar Cells CVD Order*).[482]

As indicated above, Vina/LONGi claims that unless a company incorrectly declared that it had a reviewable suspended entry before June 6, 2024, it will not have any reviewable suspended entries until the 12th administrative review of the *AD Order* (which covers the period December 1, 2023, through November 30, 2024) and could not request an administrative review until December 2024. Under section 751(a) of the Act, Commerce does not conduct an administrative review of an exporter/producer absent a suspended entry of subject merchandise from that exporter/producer.[483] However, a U.S. entry of inquiry merchandise made prior to the date of termination of the Proclamation (currently June 6, 2024), that does not meet the "Applicable Entries" certification requirements, could be suspended by CBP. Specifically, 19 CFR 362.103(b)(iii) provides that "{i}n the event of an affirmative preliminary or final determination of circumvention in the Solar Circumvention Inquiries, the Secretary will direct CBP to suspend liquidation of entries of, and collect cash deposits of estimated duties on, imports of Southeast Asian-Completed Cells and Modules that are not Applicable Entries." Commerce has so directed

---

[480] *See Preliminary Determinations*, 87 FR at 75221, 75223. "Applicable Entries" are not subject to suspension of liquidation or the collection of ADs or CVDs.
[481] *See Preliminary Determinations*, 87 FR at 75221, 75225.
[482] *Id.*, 87 FR at 75223.
[483] *See Shanghai Sunbeauty Trading Co.*, 380 F. Supp. 3d 1328 (CIT 2019) (affirming Commerce's decision not to conduct a review absent a suspended entry).

CBP.[484]  Therefore, an AFA company could have a reviewable suspended entry before the AD administrative review covering the period December 1, 2023, through November 30, 2024.

Furthermore, as explained above, if such a company's inquiry merchandise was entered into the United States as an "Applicable Entry" before the date of termination of the Proclamation, such an entry will not be subject to ADs or CVDs.  In other words, "Applicable Entries" of Vina/LONGi's inquiry merchandise prior to June 2024 are not treated any differently in a substantive way than if the company had been able to participate in the components portion of the certification program.

Lastly, as noted above, Vina/LONGi expressed concerns that if a party requests an administrative review of an AFA company for Commerce to reconsider certification ineligibility, the AFA company could be selected as a mandatory respondent or need to unnecessarily complete a separate rate application.  In such cases, the requestor should note in the request for an administrative review that it believes that all the imported merchandise from the AFA company would meet the certification requirements and it is seeking a review in order for Commerce to reconsider the exporters/producer's eligibility to certify to that fact.  Commerce could then establish segment-specific procedures in the administrative review for addressing such situations.

In sum, neither the facts in this case, nor Vina/LONGi's arguments, provide a basis for reconsidering certification ineligibility for AFA companies in a changed circumstances review.  As noted in the *Preliminary Determination*, "{i}nterested parties that wish to have their … ineligibility for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders*."[485]

**Comment 22. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements**

*First Solar Malaysia*[486] and *First Solar Vietnam*[487]
- Commerce did not include CdTe thin film photovoltaic products in its definition of inquiry merchandise.
- Because CdTe thin film photovoltaic products were excluded from the definition of inquiry merchandise and are explicitly excluded from the *Orders* scope language, the circumvention inquiries do not cover CdTe thin film photovoltaic products.
- The ITC intentionally excluded CdTe thin film products from its injury analysis in the underlying affirmative final material injury determinations.[488]
- Given the ITC's intentional exclusion of CdTe products, Commerce cannot lawfully include CdTe thin film products in its circumvention inquiries.[489]

---

[484] *See* CBP Messages Memorandum atmsg. no. 3041408 at paragraphs 5, 9, and 12b.
[485] *See Preliminary Determinations*, 87 FR at 75221, 75223.
[486] *See* First Solar Malaysia's March 6, 2023 Case Brief at 2-6.
[487] *See* First Solar Vietnam's March 6, 2023 Case Brief at 2-6.
[488] *See* First Solar Malaysia's March 6, 2023 Case Brief at 3 (citing *ITC Solar Final* at Attachment 37-A.).
[489] *Id.* (citing *Wheatland*, 161 F.3d at 1371).

- Auxin limited its request for circumvention inquiries to CSPV products and Commerce initiated on that request stating that the class or kind of circumventing merchandise is identical to the CSPV products completed in China that are subject to the *Orders*.[490]
- The certification requirements in the *Preliminary Determination* do not apply to CdTe thin film products.  The three certifications created by Commerce are instead meant to cover CSPV cells or modules.
- The *Preliminary Determination* and its certification requirements do not pertain to CdTe thin film products.  However, given the language of the certifications, it is possible for mistakes to occur, such as a misinterpretation of the term "solar cells and/or solar modules."
- Commerce should take steps to minimize the risk that any affirmative final determination and related certification requirements would be misinterpreted to extend beyond certain CSPV products.
- Should Commerce continue using terms such as "solar cells and modules" or "solar cells and/or solar modules", Commerce should clearly define such terms upon first use to indicate that the terms only pertain to CSPV products.[491]

No other interested party commented on this issue.

**Commerce's Position:**  We confirm that the final affirmative determinations and the related certification requirements apply only to CSPV cells and modules but disagree with First Solar Malaysia and First Solar Vietnam that an affirmative determination of circumvention could be inadvertently applied to non-CSPV products.  As described in the *Preliminary Determinations*, the scope of the *Orders* explicitly exclude "thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide."[492] When discussing the merchandise subject to the circumvention inquiry, the *Cambodia* PDM and accompanying *Federal Register* notice described that "{t}his circumvention inquiry covers, "crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the underlying AD/CVD orders, subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in {Cambodia, Malaysia, Thailand, and Vietnam} from wafers produced in China."[493]  Therefore, CdTe thin film solar products are not covered by the final affirmative determinations and the related certification requirements.  Given the exclusionary language referenced within the scope of the *Orders*, we find it unnecessary to update the language included in the certifications.

**Comment 23. Clarification and Enforcement of the Utilization Requirement**

To qualify to enter inquiry merchandise under *Presidential Proclamation 10414* without regard to ADs and CVDs inquiry merchandise imported into the United States after November 15, 2022, but on or before the Date of Termination of the proclamation, must be used or installed in the

---

[490] *Id.* (citing Initiation Memorandum at 6).
[491] *See* First Solar Malaysia's March 6, 2023 Case Brief at 6.
[492] *See Cambodia* PDM at 5.
[493] *Id.* at 7.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

United States by no later than 180 days after the Date of Termination of the proclamation (the Utilization Expiration Date).[494]

*Auxin*[495]

- Commerce and CBP cannot administer or enforce the use provision in Part 362 of the regulations because:  (1) the Utilization Expiration Date is unknown at the time of importation (the *Presidential Proclamation 10414* can be terminated before the stipulated June 6, 2024, date); (2) the definition of "utilization and utilized" is too vague; and (3) no enforcement mechanism has been provided (CBP possesses limited means to track how inquiry merchandise is used once it is entered into the United States).  These deficiencies in the regulation create an enormous loophole through which parties can enter inquiry merchandise without regard to AD and CVDs.[496]

- Commerce could redress these deficiencies by implementing the provisions under 19 CFR 358, which include, among other things, use of importer- or exporter-specific duty waiver requests that contain detailed information related to intended uses of the imported product and other relevant information.  19 CFR 358 also includes an enforcement mechanism to address abuses and violations that could include seizures and other penalties.[497]

- Commerce should not consider the resale of inquiry merchandise to an unaffiliated U.S. customer who commits to use the merchandise within 180 days of the Date of Termination of the *Presidential Proclamation 10414*, as use.  Commerce specifically stated in 19 CFR 362.102 that resales do not constitute use for this provision. Additionally, it is not clear how Commerce or CBP could confirm that the purchaser honored its commitment.[498]

*TTL*[499]

- Commerce must provide guidance on how to comply with the use requirement in 19 CFR 362 because the requirement could be interpreted in multiple ways.

- Principally, Commerce must confirm that reselling inquiry merchandise to another party does not automatically mean that the use requirement is not met.  Because most importers of solar modules do not use the solar modules but sell them to other parties, this interpretation must be correct because to interpret the use requirement otherwise would mean that the requirement limits the precise activity that *Presidential Proclamation 10414* was intended to permit (it was intended to allow sufficient U.S. imports of solar modules from the inquiry countries).

- Even if U.S. resale is permissible, but insufficient to demonstrate use, under 19 CFR 362, further clarification is required regarding how parties engaged in resales can comply with the use requirement.

---

[494] *See* 19 CFR 362.102.
[495] *See* Auxin's March 6, 2023 Case Brief at 24-26; *see also* Auxin's March 17, 2023 Rebuttal Brief at 31.
[496] *Id.* (citing CBP Messages Memorandum at msg. no. 3041408).
[497] *See* Auxin's March 6, 2023 Case Brief at 25-26 (citing *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 FR 63230).
[498] *See* Auxin's March 17, 2023 Rebuttal Brief at 32 (citing *Preliminary Determinations*, 87 FR 75223).
[499] *See* TTL's March 6, 2023 Case Brief at 8-13.

99

Barcode:4419739-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Cambodia 2022

- The majority of parties who import solar modules do not install the solar modules that they import, but resell them directly, or indirectly, to other parties in diverse distribution networks that include utility developers, distributors, contractors, subcontractors, and residential and commercial installers.  It is unreasonable, and would be an unprecedented burden, to require the companies, most of which do not have access to entry documents, to maintain records for at least five years that allow them to track the installation dates for specific solar modules and link those dates to specific entries of solar modules.  This is an unnecessary burden and cost, especially considering the limited possibility that distributors and contractors would stockpile solar modules.

- Thus, Commerce must clarify that the use requirement in 19 CFR 362 is met if evidence is maintained that shows:  (1) solar modules sold to utility developers were sold for a specific project; (2) the unaffiliated purchaser committed, either by contract or certification, to install the purchased solar modules within 180 days after the Date of Termination of the *Presidential Proclamation 10414*; or (3) imported solar cells were incorporated in a solar module in the United States within 180 days after the Date of Termination.

*BYD HK*[500]

- Commerce must clarify that the use requirement of 19 CFR 362 is met if the inquiry merchandise is used or installed in the United States within 180 days after the Date of Termination of *Presidential Proclamation 10414*, even if another entity takes ownership of the merchandise and is responsible for its use or installation.

*NextEra*[501]

- Auxin's arguments regarding administration of the use requirement in 19 CFR 362 are unpersuasive.

- Contrary to Auxin's claim, the Utilization Expiration Date is known because it is specified in 19 CFR 362 as 180 days after the Date of Termination of *Presidential Proclamation 10414*.  In the unlikely event that *Presidential Proclamation 10414* is terminated before the currently specified termination date, provisions could be made at the time to address Auxin's concerns.

- While Auxin claims that the definition of "utilization and utilized" is too vague, those terms are clearly defined in 19 CFR 362 as "used or installed in the United States."  However, Commerce should clarify that "used" includes solar modules that are dedicated to a particular project or delivered to a project site by the utilization expiration date.

- Although Auxin contends that Commerce did not provide any mechanism for enforcing the provisions of 19 CFR 362, Commerce followed its practice by requiring certifications for entries that purportedly qualify for duty free treatment under *Presidential Proclamation 10414*.  In those certifications, importers and exporters must certify to various facts regarding the relevant entries and acknowledge that they are "aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S.

---

[500] *See* BYD HK's March 6, 2023 Case Brief at 4.
[501] *See* NextEra's March 17, 2023 Rebuttal Brief at 19-23.

government."[502]  This passage provides an adequate deterrence against parties submitting fraudulent certifications.

- Part 358 of the regulations contains nothing to improve enforcement of *Presidential Proclamation 10414* and Commerce specifically noted in 19 CFR 362.103(a) that "Part 358 of this chapter shall not apply to {duty free imports under Part 362}."[503]

**Commerce's Position:**  Interested parties have raised concerns and certain questions regarding the use requirement in 19 CFR Part 362.  We have addressed those concerns and questions below.

The waiver of ADs and CVDs and estimated duties pursuant to 19 CFR Part 362 only applies to certain Southeast Asian-Completed solar cells and modules that are entered into the United States, or withdrawn from warehouse, for consumption before the termination of *Presidential Proclamation 10414*, and, for entries after November 15, 2022, are used in the United States by no later than 180 days after termination of the emergency described in *Presidential Proclamation 10414* (the Utilization Expiration Date).  In the Preamble to 19 CFR Part 362, Commerce also used the word "utilized" when it noted that the duty waiver provided by this part of the regulations applies only to Southeast Asian-Completed solar cells and modules entered into the United States after November 15, 2022, "that are utilized in the United States by the Utilization Expiration Date."  Under 19 CFR 362.102, Commerce defines "utilized and "utilization" as follows:

> Utilization and utilized means the Southeast Asian-Completed Cells and Modules will be used or installed in the United States. Merchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions.

"Used" means the solar cells or solar modules are in operation or functioning in the United States by the Utilization Expiration Date.  "Installed" means the solar cells or solar modules have been affixed to the structure or in the system in the United States on which, or in which, they will operate by the Utilization Expiration Date, but they are not in operation by that date.  The mere sale of solar modules to a party for a specific project, incorporating solar cells into a solar module in the United States, dedicating solar cells or solar modules to a particular project, or delivering solar cells or solar modules to a project site do not constitute being "used" or "installed."  Additionally, as noted in 19 CFR 362.102, "{m}erchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions."

The use requirement in 19 CFR Part 362 was added because this part of the regulations was "not intended to benefit those who would stockpile {Southeast Asian}-Completed Cells and Modules for an extended period of time … .  It is not Commerce's goal to have merchandise that enters

---

[502] *See* NextEra's March 17, 2023 Rebuttal Brief at 22 (citing *Preliminary Determinations*, 87 FR 75228-29).
[503] *Id.* at 20.

101

before the Date of Termination be used in projects long into the future, as the emergency declared by the President exists at this very moment."[504]

The act of reselling solar cells or solar modules to another party who will use or install the merchandise does not, in itself, mean that the use requirement in 19 CFR Part 362 cannot be met. However, in order for an importer who sells the solar cells or solar modules that it imported to accurately certify that the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated, the importer must have knowledge of, and documentation supporting, this fact.  TTL has argued that a commitment by a purchaser, either by contract or certification, to install the purchased solar modules within 180 days after the Date of Termination of the *Presidential Proclamation 10414*, should satisfy this documentation requirement.  However, the documentation that must be maintained is documentation that supports the actual use or installation of the solar cells or solar module by the Date of Termination and that will allow the party completing the certification to certify to the use or installation by that date.  Parties that falsify such certifications will be in violation of U.S. law (including, but not limited to, 18 USC section 1001) that imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.  Given the range of companies that could be involved in the transaction chain between the importer of the solar cells and solar modules and the ultimate end-user of those solar cells and solar modules and the potential complexity of the supply chain, we find that it is not feasible for Commerce to list specific types of supporting documentation.

We disagree with Auxin's claim that the use provision in Part 362 of the regulations cannot be administered because the Date of Termination of *Presidential Proclamation 10414* could change and thus the Utilization Expiration Date is unknown at the time of importation.  The Date of Termination is not a constantly changing date but is presently a fixed date, June 6, 2024, that has been publicly announced and thus is known to importers.  In the Preamble to Part 362 of the regulations, Commerce noted that in setting a suspension of liquidation and collection of cash deposit date upon early termination of the Presidential Proclamation, it would "consider the implementation and direction of the President in terminating the emergency."[505]  Similarly, if *Presidential Proclamation 10414* is terminated early, at that time, Commerce will "consider the implementation and direction of the President in terminating the emergency" when determining what additional guidance, if any, should be provided regarding the impact of such an early termination on other provisions and requirements in Part 362 of the regulations.

We also disagree with Auxin's claim that no enforcement mechanism has been provided with respect to the use requirement.  U.S. law (including, but not limited to, 18 U.S.C. section 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government, including fines and imprisonment for not more than 5 years.  Moreover, 19 USC section 1592 provides civil penalties for fraud, gross negligence, and negligence.  Thus, there are enforcement mechanisms in place and significant consequences for parties who falsely certify that the use requirement will be met.

---

[504] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56879.
[505] *Id.*, 87 FR at 56880.

Additionally, Commerce informed certifying parties that they must maintain sufficient documentation supporting the facts to which the party certified for the later of five years after the last entry covered by the certification or three years after the conclusion of any litigation in United States courts regarding such entries.[506]  Commerce also informed certifying parties that they are required to provide CBP and/or Commerce with any documents supporting the certification upon the request of either agency and that the claims made in the certification are subject to verification by CBP and/or Commerce.[507]  In addition, Commerce informed certifying parties that failure to maintain the required certifications and supporting documentation, failure to substantiate the claims made in the certifications, or not allowing CBP and/or Commerce to verify the claims made in the certifications, may result in suspension of liquidation of all unliquidated entries for which the requirements were not met, the importer being required to post antidumping duty and countervailing duty cash deposits on those entries, and the importer being precluded from participating in the certification process.[508]  These certification provisions mirror Commerce's regulations at 19 CFR 351.228, which provide that Commerce may instruct CBP to suspend liquidation of entries and required cash deposits of estimated ADs or CVDs where, among other things, "the certification contained materially false, fictitious or fraudulent statements or representations, or contained material omissions."  Therefore, contrary to Auxin's claim, Commerce clearly explained the requirements that must be fulfilled to ensure compliance with the certification regime, including the end use provision, and the consequences of not meeting those requirements.  Hence, Commerce has instituted enforcement mechanisms with respect to the certifications.

While Auxin contends that CBP possesses limited means to track how inquiry merchandise is used once it is entered into the United States, it is incumbent on importers and exporters to maintain sufficient documentation to substantiate their claims in the certifications, including their claims regarding the use requirement.  Moreover, CBP has experience administering similar certifications, namely end-use certifications, in other proceedings,[509] and experience in this proceeding where importers and exporters must track the source of the solar cells used in solar modules imported into the United States in order to certify that the solar cells were not produced in China.

Finally, we disagree with Auxin that provisions in 19 CFR Part 358 should be applied here.  As an initial matter, according to 19 CFR 362.103(a), "Part 358 of this chapter shall not apply to {the importation of Applicable Entries}."  In addition, as Commerce explained in the Preamble to Part 362 of its regulations, "{t}he purpose of the {Presidential} Proclamation is to increase the supply of United States solar energy for electricity generation purposes... and "to allow for more imports ..."[510] Part 358 of the regulations, which covers the importation of supplies used for emergency relief work free of AD/CVDs, requires that a party mail an advance request, in triplicate, to the Secretary of Commerce in which the party asks for approval to import the

---

[506] *See Preliminary Determinations*, 87 FR at, *e.g.*, Appendix VI.
[507] *Id.*
[508] *Id.*
[509] *See Wire Rod from Korea and United Kingdom CCR*, 84 FR 13888 ("Consequently, we are changing the scope of the orders on wire rod from Korea and the United Kingdom by adding exclusion language related to grade 1078 and higher tire cord quality wire rod and requiring that a certification of end-use be filed with CBP at the time of the filing of the Entry Summary with CBP as provided in the Attachment to this notice.")
[510] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56878.

103

merchandise free of AD/CVDs, and supplies detailed information about the shipment such as the price, quantity, proposed date of entry, mode used to transport, the destination, and the intended uses of, the imported merchandise and other relevant information, much of which does not relate to the date of use.  Part 358 of the regulations also includes an enforcement mechanism to address abuses and violations of Section 318(a) of the Act that could include seizures and other penalties.[511]  Requirements such as these, including the need for Commerce to specifically approve the importation of solar cells/solar modules free of AD/CVDs for each and every entry, could reduce, rather than increase, the supply of United States solar energy for electricity generation purposes and thus is not in keeping with the purpose of *Presidential Proclamation 10414* .  Moreover, Commerce typically requires CBP to suspend liquidation and collect AD/CVD cash deposits for entries where the certification requirement was not met, rather than seizing the imported merchandise.  Therefore, we have not implemented the requirements of Part 358 of the regulations in this case.

## Comment 24. Whether the "Wafer-Plus-Three" Requirement is Appropriate

In the *Preliminary Determination*, Commerce stated that a solar module produced in one of the inquiry countries would be subject to its affirmative circumvention determination only if the solar module contains solar cells produced from Chinese-produced wafers and three or more of the following components in the module were produced in China:  (1) silver paste; (2) aluminum frames; (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes. Below we have referred to this prerequisite as the "Wafer-Plus-Three" requirement.

*Auxin*[512]
- Commerce's "Wafer-Plus-Three" requirement is arbitrary, inconsistent with how it has applied the *Orders* in the past, and allows companies to use a high percentage of Chinese components and not be covered by Commerce's affirmative circumvention determination.
- Commerce arbitrarily selected the six components used and the four non-Chinese component rule in its requirement without any explanation.
- Commerce previously determined that if a solar module contains subject solar cells, it is subject to the *Orders*, regardless of the country where the solar module was produced. Commerce should follow that rule here.  Because Commerce reached an affirmative circumvention determination that solar cells produced in Cambodia, Malaysia, Thailand, or Vietnam from Chinese-produced wafers are covered by the scope of the *Orders*, solar modules produced from those solar cells must be subject to the *Orders* irrespective of Commerce's "Wafer-Plus-Three" requirement.
- The "Wafer-Plus-Three" requirement provides an inexpensive path for companies to continue to evade the *Orders* by continuing to heavily rely on Chinese-produced components while sourcing the four least expensive components outside of China.[513]
- Commerce should discard its "Wafer-Plus-Three" requirement and determine that a solar module produced in a third country that contains in-scope solar cells is also in scope. Alternatively, Commerce should determine that only solar modules where at least 50

---

[511] *See generally* 19 CFR 358.103.

[512] *See* Auxin's March 6, 2023 Case Brief at 9-17; *see also* Auxin's March 17, 2023 Rebuttal Brief at 5-6.

[513] *Id.* at 15 (citing the *Preliminary Determination* calculations for all four determinations).

percent of the value of the solar module comes from components produced outside of China are not subject to Commerce's affirmative circumvention determination.

- A percentage of value test is administrable (companies maintain the records required by CBP) and has been used before (*e.g.*, the United States-Mexico-Canada Agreement).
- Moreover, a percentage of value test benefits exporters/producers because: (1) there is no need for them to use certain wafer suppliers or publicly identify their wafer supplier; (2) it provides them with the flexibility to determine which inputs they will obtain from inside, or outside, of China; and (3) it simplifies the types of records that importers must maintain.

*BYD HK*,[514] *CSIL*,[515] *Jinko*,[516] *NextEra*,[517] *Risen*,[518] and *TTL*[519]

- Contrary to Auxin's claim, Commerce did not arbitrarily select the six components that it used in the Wafer-Plus-Three requirement.  Rather, Commerce selected these components because it knows, based on information in this segment of the proceeding (including Auxin identifying these components as the "most important and significant" factors of production) and its experience in other segments of the proceeding, that these are the most significant components used to produce solar modules.[520]
- By requiring at least four of the six components to be sourced from outside China, Commerce's "Wafer-Plus-Three" requirement ensures that a substantial portion of value of the module is added in the inquiry country.
- Based on the scope of the *Orders*, modules produced in a third-country from solar cells produced in China (subject solar cells) are covered by the *Orders* (*i.e.*, solar modules with subject solar cells are covered by the *Orders*).  Meanwhile solar modules not containing subject solar cells are not covered by the *Orders*.  Commerce's "Wafer-Plus-Three" requirement is consistent with this principle because Commerce indicated that the solar cells in a solar module that meets the "Wafer-Plus-Three" requirement are not covered by the circumvention inquiry and the solar module is also not covered by the circumvention inquiry (the solar cells are not in-scope merchandise and the solar module is not in-scope merchandise).
- Auxin has made contradictory arguments.  On the one hand, Auxin requested a circumvention inquiry, which resulted in Commerce ignoring the scope of the *Orders* that requires subject solar modules to contain Chinese produced subject solar cells (subject solar cells).  Subsequent to Commerce's finding that solar cells produced in Southeast Asian countries from Chinese wafers are "subject solar cells," Auxin argues that Commerce must return to the "subject solar cell requirement" in the scope of the *Orders* and find that all modules, irrespective of where they are manufactured and the other components that they contain, are subject merchandise if they contain Southeast Asian produced "subject solar cells."

---

[514] *See* BYD HK's March 17, 2023 Rebuttal Brief at 7-13.

[515] *See* CSIL's March 17, 2023 Rebuttal Brief at 10-14.

[516] *See* Jinko's March 17, 2023 Rebuttal Brief at 5-13.

[517] *See* NextEra's March 17, 2023 Rebuttal Brief at 6-11.

[518] *See* Risen's March 17, 2023 Rebuttal Brief at 2-3.

[519] *See* TTL's March 17, 2023 Rebuttal Brief at 6-10.

[520] *See* Risen's March 17, 2023 Rebuttal Brief at 2; *see also* NextEra's March 17, 2023 Rebuttal Brief at 8-9.

- Auxin's argument that solar modules containing solar cells with Chinese-produced wafers should be subject to Commerce's affirmative circumvention determination, regardless of the other components that they contain, contradicts its own allegation that companies are circumventing the *Orders* by using various Chinese components to produce solar modules in the inquiry countries.  Moreover, Auxin's argument is inconsistent with Commerce's approach in this inquiry of examining the module production process to determine whether parties selling modules to the United States that were produced in an inquiry county are circumventing the *Orders*, rather than making that determination based on the solar cells in the solar module.[521]

- Auxin's percentage of value test should be rejected because Auxin arbitrarily determined the 50 percent requirement.[522]  There is no precedent, or basis in the Act or Commerce's regulations, for using such a test, which would require Commerce to speculate as to future values of solar module components and use a yet undetermined certification.[523]

- Moreover, Auxin failed to consider that significant swings in market prices could skew the test and dramatic changes in surrogate values may mean that the actual value added in the third country is not properly reflected by the test.[524]

- Auxin's percentage of value test is also contrary to Commerce's practice of conducting a qualitative, rather than a quantitative (*e.g.*, a value added) analysis of third-country processing.[525]

- Auxin's percentage of value test means that even if as much as 49.99 percent of the value of the solar module was added outside of China (such as in an inquiry country) the module would be covered by Commerce's affirmative circumvention determination, thus, indicating that the third-country processing of the module was "minor or insignificant." This is illogical.[526]

- Furthermore, Auxin failed to adequately support its argument that the "Wafer-Plus-Three" requirement allows a significant proportion of Chinese components to be used if the four least expensive components out of the six components in that requirement are sourced from outside of China.  Auxin's argument is based on erroneous calculations and incorrect figures.[527]  Additionally, expenses, such as conversion costs[528] and G&A expenses, are missing from Auxin's calculations, and the source of certain figures that Auxin used in its calculations is unclear.[529]  Auxin's argument also ignores its claim that these six inputs are the "principal" and some of the "most important and significant" factors of production.[530]  It is commercially unrealistic to conclude that companies in the inquiry countries would suddenly source all their raw materials from China.[531]

---

[521] *See* NextEra's March 17, 2023 Rebuttal Brief at 7-8.

[522] *See* NextEra's March 17, 2023 Rebuttal Brief at 10.

[523] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9.

[524] *See* Jinko's March 17, 2023 Rebuttal Brief at 8-10.

[525] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9-10 (citing *Pasta from Italy Circumvention*); *see also* Jinko's March 17, 2023 Rebuttal Brief at 10-12; and CSIL's March 17, 2023 Rebuttal Brief at 12.

[526] *See* BYD HK's March 17, 2023 Rebuttal Brief at 10.

[527] *Id.* at 11-12 and Exhibit 1 (citing Auxin's March 6, 2023 Case Brief at 13-17).

[528] *See* Risen's March 17, 2023 Rebuttal Brief at 2.

[529] *See* BYD HK's March 17, 2023 Rebuttal Brief at 11-12; *see also* CSIL's March 17, 2023 Rebuttal Brief at 13; and TTL's March 17, 2023 Rebuttal Brief at 8-9.

[530] *See* NextEra's March 17, 2023 Rebuttal Brief at 9-10.

[531] *See* Risen's March 17, 2023 Rebuttal Brief at 2-3.

Barcode:4419739-02 A-570-979 CIRC - Anti Circumvention Inquiry - from Cambodia 2022

- Because China is a NME country, Commerce uses surrogate values to determine the cost of material inputs from China. Auxin's percentage of value test is not admissible because Commerce/CBP would need to verify the prices of, and surrogate values for, solar module components. CBP is not structured to handle certifications based on value[532] and, because it has no experience selecting and applying, surrogate values, it would not be able to verify the accuracy of such value-added based certifications.[533]

- Additionally, no parties, including Commerce and CBP, would know the appropriate surrogate values for solar module components when the solar module was exported to, or imported into, the United States. This information is needed to determine the Chinese and non-Chinese content percentages required for Auxin's test.[534] Alternatively, Commerce would have to use actual costs in China to implement Auxin's percentage of value test, which is contrary to its practice.[535]

- Auxin's claim that its percentage of value test is administrable based on the procedures that CBP uses for the United States-Mexico-Canada Agreement is misplaced. CBP evaluates regional value content under the United States-Mexico-Canada Agreement, but this is not certified on an entry-by-entry basis.[536] Confirming the sources of materials is less burdensome than establishing valuation.[537]

**Commerce's Position:** We disagree with Auxin's contention that, based on Commerce's affirmative circumvention determination, solar modules produced in the inquiry countries, or any country, using solar cells from the inquiry countries made from Chinese-produced wafers are automatically covered by the *Orders*. Auxin based its argument on a mischaracterization and misapplication of Commerce's country-of-origin determination from the investigations underlying these *Orders*. In the underlying investigations, Commerce conducted a substantial transformation analysis and determined "that where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced."[538]

The purpose of a substantial transformation analysis is to determine whether merchandise that is further processed outside the order country remains the product of the order country, and thus subject merchandise. The purpose of the analysis conducted under section 781(b) of the Act is to determine whether minor assembly or completion of merchandise from the order country in a third-country was used to circumvent the order. As Commerce noted in the Preamble to its regulations "Commerce's substantial transformation analysis under {19 CFR} 351.225(j) and the test for determining whether a product was completed or assembled in other foreign countries under {19 CFR} 351.226(i) (and section 781(b) of the Act) are two distinct analyses used for different purposes … "[539]

---

[532] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9-13; *see also* TTL's March 17, 2023 Rebuttal Brief at 9.

[533] *See* NextEra's March 17, 2023 Rebuttal Brief at 11.

[534] *See* Jinko's March 17, 2023 Rebuttal Brief at 12 and NextEra's March 17, 2023 Rebuttal Brief at 11.

[535] NextEra's March 17, 2023 Rebuttal Brief at 11.

[536] *See* TTL's March 17, 2023 Rebuttal Brief at 9.

[537] *Id.*

[538] *See* Trina's May 2, 2022 Comments at Attachment 8, page 8.

[539] *See 2021 Regulations Final Rule*, 86 FR at 52342.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

Nowhere in the Act or Commerce's regulations is there a provision to use a substantial transformation analysis to identify circumvention.  To determine whether solar modules are covered by this affirmative circumvention determination based on Commerce's country-of-origin rule from the underlying investigations ignores the criterion in section 781(b) of the Act, including determining whether the value of the order country merchandise that is assembled in the third country is a significant portion of, and the value of the third-country processing is a small proportion of, the total value of the solar module.  Moreover, in applying Commerce's country-of-origin rule to identify solar modules covered by the affirmative circumvention determination, Auxin has ignored the Chinese content of the solar module.  Auxin's approach is inconsistent with how Commerce has analyzed circumvention in other circumvention inquiries (*i.e.*, Commerce applies the circumvention criteria to the merchandise entering the United States, in this case the solar module, and not a component within the imported product, the solar cell, and determines whether the order country input(s) is a significant share, and the processing in the third country is a minor or insignificant share, of the value of the merchandise entering the United States)[540] and disregards the very nature of the alleged circumvention that Auxin requested that Commerce investigate.  Specifically, Auxin requested "that Commerce promptly initiate an anti-circumvention inquiry concerning {solar} cells and modules assembled and completed in Malaysia, Thailand, Vietnam, and Cambodia using Chinese-produced inputs."[541]  In contrast to Auxin's approach of focusing on the solar cell, Commerce's "Wafer-Plus-Three" requirement focuses on the Chinese content of the solar module and reflects the nature of the production in the third-country.  Furthermore, the "Wafer-Plus-Three" requirement is consistent with section 781(b)(1) of the Act, which requires Commerce's circumvention determination to be made with respect to the "merchandise imported into the United States."  Hence, when a solar module is the merchandise that is imported into the United States, Commerce must examine the components of that solar module, not the solar cells alone.

In its Circumvention Request, Auxin simply described inquiry merchandise as solar modules assembled and completed in one of the inquiry countries using Chinese-produced inputs.[542]  This broad description of inquiry merchandise could have the unintended consequence of including solar modules with miniscule Chinese content (such as a bolt and a screw) as inquiry merchandise.  Therefore, Commerce found it necessary to define the relevant Chinese content to consider a solar module as inquiry merchandise.[543]  As explained in more detail below, we find that it is reasonable, and consistent with Auxin's Circumvention Request, to use the "Wafer-Plus-

---

[540] *See e.g., CORE from China (UAE) Preliminary* PDM at 1 and 27-28 (unchanged in *CORE from China (UAE)*) where we determined whether exporters of CORE from the UAE to the United States must pay AD duties based on whether the CORE contains Chinese hot-or cold-rolled steel.  The certification requirement in that case was based on a determination that "the value of hot-or cold-rolled steel represents a significant portion of the total value of the {CORE} exported to the United States."  *See CORE from China (UAE) Preliminary* PDM at 23.  However, the solar cells that Auxin argues we should solely consider when determining whether the solar module containing such solar cells is covered by the circumvention determination, are not entirely made in China (as opposed to the hot-or cold-rolled steel  in *CORE from China (UAE)*) and Auxin has not explained to what extent the solar cell should contain Chinese inputs to be considered covered by the *Orders*.  Auxin has additionally failed to explain, contrary to Commerce determinations in *CORE from China (UAE)* and other circumvention proceedings, why such solar cell content is a sufficient basis for determining that the solar module should be covered by the *Orders*.
[541] *See* Circumvention Request at 88.
[542] *Id*.
[543] *See Preliminary Determinations*, 87 FR at 75221, 75222.

Three" requirement to define solar modules as inquiry merchandise where the wafer and at least three of the other primary materials in the solar module were produced in China.

We did not arbitrarily select the seven material inputs used in the "Wafer-Plus-Three" requirement, but based our selection on record evidence, including data provided by the respondents and solar industry surveys in which wafers and the six material inputs used in the "Wafer Plus Three" requirement are identified as major solar cell/module inputs.[544]  Auxin itself identified the primary materials from the order country that it claims were being assembled and completed in the inquiry countries to circumvent the *Orders*.  Specifically, Auxin stated that "reasonably available evidence indicates that the primary direct material used to complete {solar} cells in the subject third countries, *i.e.*, wafers, silane, phosphorus oxychloride (POC13), aluminum and/or silver paste, and the additional components used to assemble the {solar} cells into modules, *i.e.*, solar glass, EVA, backsheet, aluminum frames, and junction boxes, were sourced from China, the country subject to *the Orders*."[545]  We did not include silane and phosphorus oxychloride (POC13) in the "Wafer-Plus-Three" requirement because, as opposed to wafers and the six other inputs identified in the "Wafer-Plus-Three" requirement, they were not identified as major inputs in the majority of the solar industry reports/surveys that are on the record and no parties argued that other material inputs should be included in the requirement or that some of the material inputs should be removed from the requirement.

We determine that the "Wafer-Plus-Three" requirement is appropriate on a qualitative basis.  The circumvention activity alleged by Auxin involves Chinese-produced wafers being converted into solar cells and solar modules in a third country using additional and substantial Chinese-origin components.  Commerce's "Wafer-Plus-Three" requirement directly addresses the situation described by Auxin in its Circumvention Request because it requires producers in the inquiry countries to either no longer use Chinese wafers, which are the products that are being assembled and completed in the inquiry country, or to source less than half of the other major components that are required to convert the wafers into solar cells/modules from China.  We have determined that this qualitative approach to defining inquiry merchandise is reasonable because it focuses on the number of major components sourced from China.  This approach is also consistent with the concerns described by Auxin that led it to request the circumvention inquiries, namely its claim that "the vast majority — if not all — of the other materials used to convert the Chinese wafers to cells and then assemble the cells into modules in Malaysia, Thailand, Vietnam, and Cambodia

---

[544] *See*, *e.g.*, the *Bloomberg Report* below Figure 17 (identifying aluminum frames, glass; backsheets, ethylene vinyl acetate sheets, and junction boxes as the most important solar module inputs) and above Figure 12 (identifying silver as the costliest input added at the cell processing stage).  The *Bloomberg Report* also emphasizes the importance of wafers and indicates the importance of these aforementioned seven inputs in making solar modules; *see also* *NREL 2018 Report* at 37 (identifying wafers, metallization pastes (silver), glass, backsheets and junction boxes as the costliest items to produce solar modules) and 33 (identifying the principal solar module input materials as cell stringing and tabbing ribbons, front glass, backsheet, ethylene-vinyl acetate (EVA), encapsulant (2 sheets), Al (aluminum) frame and edge sealant, junction box, junction box potting agent and tape, and coded module sticker label), and the *DOE Solar Deep Dive* at iii ({s}ilicon wafers are processed to make the solar cells that are interconnected and sandwiched between glass and plastic sheets to make c-Si modules"), 36 ("{s}ilver paste is an important component in c-Si solar cells"), and 44 (identifying the aluminum frame, glass, backsheet, encapsulant ("the predominant resins used to make encapsulant are ethylene vinyl acetate (EVA) …" (*see* page 19)), and the junction box as the components of a solar module).

[545] *See* Circumvention Request at 73.

are obtained from China."[546]  Under the "Wafer-Plus-Three" requirement, where the majority of the major inputs used to convert the Chinese wafers to cells and then assemble the cells into modules were obtained from (produced in) China, the module is inquiry merchandise and will be subject to Commerce's affirmative circumvention determination.

Further, Auxin itself noted that where:

> the primary direct material inputs used to complete {solar} cells in the subject third countries, *i.e.*, wafers, silane, phosphorus oxychloride (POCl3), aluminum and/or silver paste, and the additional components used to assemble the {solar} cells into modules, *i.e.*, solar glass, EVA, backsheet, aluminum frames, and junction boxes, were sourced from China…a qualitative analysis itself would be sufficient to conclude that the value of processing in {the inquiry countries}" would represent "a small proportion of the value of the merchandise imported to the United States.[547]

Thus, by limiting the amount of Chinese content in the solar module, the "Wafer-Plus-Three" requirement addresses, on a qualitative basis, Auxin's concern and increases the non-Chinese portion of the value of the merchandise.

We also determine that the "Wafer-Plus-Three" requirement is appropriate on a quantitative basis.  Under the "Wafer-Plus-Three" requirement, a solar module is not inquiry merchandise if it has no Chinese-produced wafers, or where four of its six major inputs, other than the wafer, were not produced in China.  Based on record evidence regarding the value of wafers and conversion costs in a solar module,[548] and the statement in the *Bloomberg Report* that "Southeast Asian nations account for just 27% of the value of a typical {solar} module exported to the U.S."[549] we find that the "Wafer-Plus-Three" requirement would not result in a small value of inputs from outside of China as contended by Auxin.[550]

Moreover, we find there are flaws with the analysis that Auxin provided to support its claim that the "Wafer-Plus-Three" requirement would continue to allow a solar module to contain a significant proportion of Chinese inputs and not be subject to Commerce's affirmative circumvention determination.  Specifically, Auxin provided a table of per-unit costs for the inputs identified in the "Wafer-Plus-Three" requirement showing that a solar module could contain Chinese components that represent a high percentage of the total per-unit direct material cost of a solar module and yet, under the "Wafer-Plus-Three" requirement, the solar module would not be considered inquiry merchandise.[551]  Besides the questions raised by certain respondents regarding the source of Auxin's per-unit costs, we find that Auxin failed to account for other

---

[546] *Id.* at 30.

[547] *Id.* at 73.

[548] *See* our summary of the data in the *DOE Solar Deep Dive, IEA Report*, and Bloomberg Report, as well as our calculations based on these reports showing the costs of the wafers and other six inputs in the Solar Survey Analysis Memorandum.

[549] *See* the *Bloomberg Report* at the narrative below Figure 22. that "Southeast Asian nations account for just 27% of the value of a typical PV module exported to the U.S."

[550] *See* Auxin's March 6, 2023 Case Brief at 15 and Solar Survey Analysis Memorandum.

[551] *Id.*

material costs and conversion costs incurred in the inquiry countries in its analysis.  Further, if one accounts for these additional material and conversion costs, even relying on Auxin's per-unit costs, non-Chinese inputs would comprise much more than the "small" percentage of total value claimed by Auxin.[552]

Thus, we find that Auxin's analysis does not provide the proper measure of the extent to which companies in an inquiry country are using Chinese-produced inputs to convert wafers into solar modules.  In contrast, by defining solar modules subject to the inquiry as solar modules where the wafer and at least three of the other major inputs were produced in China, Commerce has addressed Auxin's concern that "major Chinese companies have set up minor assembly operations in Southeast Asia — using their existing dedicated supply base in China for almost the entirety of the bill of materials — to circumvent the Orders …"[553]  Also the "Wafer-Plus-Three" requirement is consistent with Congressional direction away from a rigid numerical approach.[554]  This approach is also consistent with how Commerce has identified inquiry merchandise in other circumvention inquiries, namely based on whether certain content in the merchandise came from the order country.[555]

We also find that Auxin's percentage of value test is not administrable.  Because the *Orders* apply to China, an NME country, Chinese-produced components are valued based on surrogate values.[556]  However, Auxin never explained how Commerce's NME methodology would be used in its proposed percentage of value test.  For example, Auxin never explained, under its proposal, whether surrogate values would be used to determine total value and, if so, how importers and exporters would properly select any surrogate values used.  Commerce normally selects surrogate values in a proceeding segment after considering record evidence and comments provided by interested parties.[557]  However, Auxin never explained how Commerce would evaluate any surrogate values used in the percentage of value test, or the type proceeding in which Commerce would conduct such an evaluation.  Furthermore, it is not feasible for Commerce to evaluate and examine potentially numerous surrogate value calculations that could change from entry to entry.

Auxin claimed that "{g}iven the records kept and maintained by the foreign producers, these data can be supplied to CBP to validate the value-added calculation."[558]  However, applying Commerce's NME methodology to the percentage of value test would require the use of surrogate values.  CBP is not charged with evaluating surrogate value selections, and it cannot be expected to validate a value-added test based on surrogate values.  Additionally, we find it would not be feasible for exporters and importers that are unfamiliar with Commerce's NME methodology to select the appropriate surrogate values to determine the percentage of a solar module's total value represented by Chinese components.  Thus, we find that it is unclear how

---

[552] *Id.*
[553] *See* Circumvention Request at 32.
[554] *See* SAA at 893-94.
[555] *See e.g.*, *CORE from China (UAE) Preliminary* PDM at 1, 23, and 27-28 (unchanged in *CORE from China (UAE)*).
[556] *See* section 773(c) of the Act.
[557] *See Cambodia* PDM at 3-4 and 7-9.
[558] *See* Auxin's March 6, 2023 Case Brief at 16.

Auxin's proposed percentage of value test would be implemented in light of Commerce's NME methodology.

Lastly, Auxin maintains that its proposed percentage of value test benefits exporters/producers because there is no need for them to publicly identify their wafer supplier and simplifies the types of records that importers must maintain. Neither claim is valid. Exporters do not need to publicly identify their wafer supplier(s) under Commerce's "Certification Regarding Chinese Components."[559] Thus, in this regard, Auxin's proposed percentage of value test, in which exporters would not need to publicly identify their wafer supplier(s), does not provide any benefit to exporters that is not already in place. Further, it is unclear how Auxin's proposed percentage of value test would simplify record keeping when solar modules can have hundreds of inputs and exporters/producers would need to maintain records to determine whether each input was produced in China or outside of China and to calculate the value of the non-Chinese and/or Chinese inputs in the solar module. Moreover, under Auxin's proposed approach, a number of records, such as surrogate value information, that are generally not kept in the ordinary course of business would need to be maintained. In contrast, when using the "Certification Regarding Chinese Components" parties need to maintain records to determine where only the seven inputs listed in Commerce's "Wafer-Plus-Three" requirement were produced.

**Other Issues**

**Comment 25. Whether Commerce Properly Placed *Ex Parte* Memoranda on the Record that Concerned the Circumvention Inquiries**

*Auxin*[560]
- Commerce unlawfully omitted communication related to the issuance of *Proclamation 10414* and Commerce's final rule implementing aspects of that proclamation.[561]
- Commerce's omission resulted in an incomplete administrative record for the circumvention inquiries.

No other interested party commented on this issue.

**Commerce's Position:** We disagree. By statute, Commerce shall maintain a record of any *ex parte* meeting between interested parties or other persons providing factual information in connection with a segment of an AD/CVD proceeding and the person charged with making the determination if information relating to that AD/CVD proceeding was presented or discussed at such meeting.[562] Throughout the course of the circumvention inquiries, Commerce consistently

---

[559] *See Preliminary Determinations*, 87 FR at Appendix VI.
[560] *See* Auxin's March 24, 2023 Case Brief at 43; Auxin's April 19, 2023 Case Brief at 80; Auxin's April 24, 2023 Case Brief at 58-59; and Auxin's April 26, 2023 Case Brief at 79.
[561] *See* Auxin's March 24, 2023 Case Brief, Auxin's April 19, 2023 Case Brief, Auxin's April 24, 2023 Case Brief, and Auxin's April 26, 2023 Case Brief (citing *Presidential Proclamation 10414*, 87 FR 35067; and *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR 56868).
[562] *See* section 777(a)(3) of the Act ("{AD/CVD} proceedings are investigatory rather than adjudicatory in nature, and {the ex parte} provision is intended to ensure that all parties to the preceeding {*sic*} are more fully aware of the

placed summaries of *ex parte* contacts concerning the circumvention inquiries on the administrative record.[563]  Commerce was not required to memorialize for the record communications on matters distinct from the AD/CVD proceedings at hand, including Presidential *Proclamation 10414* or the rulemaking resulting from that Proclamation.[564]

## Comment 26. Whether Commerce's Determination to Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law

*Auxin*[565]

- Commerce unlawfully retroactively applied regulations developed pursuant to the declaration of emergency announced in *Presidential Proclamation 10414*.  Specifically, Commerce waived application of affirmative circumvention findings to all entries of inquiry merchandise after initiation of these inquiries on April 1, 2022, but before the Presidential Proclamation was issued on June 6, 2022.[566]

- The retroactive application of *Presidential Proclamation 10414* is:  "(a) *ultra vires* because Commerce possesses no independent legal authority to issue an emergency declaration; (b) is contrary to the explicit wording of *Presidential Proclamation 10414*; (c) is unlawful under the statutory authority under which the proclamation was issued, and (d) is otherwise inconsistent with Commerce's circumvention regulations, which require Commerce to issue suspension of liquidation and cash deposit instructions to CBP in the event of an affirmative finding of circumvention."[567]

- Commerce should "follow its regulations and request that CBP suspend liquidation and collect cash deposits on all entries after April 1, 2022, until June 6, 2022."[568]

- In the *Preliminary Determinations*, Commerce stated that entries prior to the Date of Termination that have met the certification requirements will not be subject to suspension of liquidation, or the cash deposit requirements described above.[569]  Commerce justified this departure from its practice and regulations by citing 19 CFR Part 362.

- Commerce specifically stated that pursuant to 19 CFR 362.103(b)(1)(i), "Commerce will direct U.S. Customs and Border Protection (CBP) to discontinue the suspension of liquidation and collection of cash deposits that were ordered based on Commerce's initiation of these circumvention inquiries.  In addition, pursuant to 19 CFR 362.103(b)(1)(ii) and (iii), Commerce will not direct CBP to suspend liquidation, and

---

presentation of factual information to the administering authority or the ITC"); and S. Rep. No. 96-249, at 99-100 (1979); *F Lli De Cecco*, 980 F. Supp 485.

[563] *See, e.g.*, Auxin November 9, 2022 *Ex Parte* Memorandum and NE Solar January 29, 2023 *Ex Parte* Memorandum.

[564] *See Baker Hostetler*, 473 F.3d 312 (conversations focused on matters other than AD/CVD proceedings do not fall under the section 777(a)(3) *ex parte* provision).

[565] *See* Auxin's March 6, 2023 Case Brief at 17-24.

[566] *Id.* at 17-18 and n. 41.  "In making this argument and stating that June 6, 2022, is the operable date for lifting of suspension and collection of cash deposits, Auxin is not suggesting in any way that *Presidential Proclamation 10414* and/or Commerce's implementing regulations are lawful. Indeed, Auxin has explained in detail in previous submissions on this record and in response to Commerce's request for comments why *Presidential Proclamation 10414* and Commerce's regulations were devoid of any factual underpinnings to support the purported emergency and that Commerce superseded existing regulations to implement the proclamation."

[567] *Id.* (citing 19 CFR 351.226(l)(2)(ii) and 19 CFR 351.226(l)(2)(iii)).

[568] *Id.*

[569] *Id.* (citing *Preliminary Determinations*, 87 FR at 75224).

113

require cash deposits, of estimated ADs and CVDs based on these affirmative preliminary determinations of circumvention on, any 'Applicable Entries.'"[570]

- Commerce confirmed that "suspension of liquidation procedures would only apply to 'imports of Southeast Asian-Completed solar cells and modules that are not 'Applicable Entries' that were entered, or withdrawn from warehouse, for consumption on or after April 1, 2022."[571]

- First, Commerce possesses no legal authority to declare a national emergency and does not cite any such authority in its *Preliminary Determination.*  Commerce explicitly expanding the scope of *Presidential Proclamation 10414* by applying it to entries of inquiry merchandise that entered the United States prior to the identification of the emergency while lacking such legal authority renders the decision *ultra vires*.[572]

- Second, Commerce's retroactive actions are not consistent with the authority relied upon for adoption of Part 362 of its regulations:  *Presidential Proclamation 10414*.  The Proclamation does not authorize retroactive effect of the national emergency declared on June 6, 2022.[573]

- *Presidential Proclamation 10414* specifically states that any actions taken by Commerce to permit duty-free entries of solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam last "until 24 months *after* the date of this proclamation or until the emergency declared herein has terminated, whichever occurs first."[574]

- *Presidential Proclamation 10414* does not authorize any actions for entries before the June 6, 2022, date.  Thus, *Presidential Proclamation 10414* does not authorize Commerce to take any action affecting entries before June 6, 2022.

- Third, section 318(a) of the Act, the statutory authority under which *Presidential Proclamation 10414* was issued, does not allow action before the declaration of an emergency, and only authorizes action "*during* the continuance of" an emergency "declare{d}" by presidential proclamation.[575]  No emergency was declared prior to June 6, 2022.

- The *Preliminary Determination* is inconsistent with the statute and regulations as Commerce's circumvention regulations state that following an affirmative preliminary determination:  (1) the Secretary will direct the Customs service to continue the suspension of liquidation and apply the applicable cash deposit rate; and (2) direct the Customs service to begin the suspension of liquidation and require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry on or after the date of publication of the notice of initiation of the inquiry.[576]

- In the *Initiation Notice,* Commerce notified all interested parties of the initiation of circumvention inquiries, including a description of the products subject to the inquiries and an explanation of the reasons for Commerce's decision to initiate such inquiries.[577]

---

[570] *Id.* (citing *Preliminary Determinations*, 87 FR at 75223).

[571] *Id.* (citing *Clarification of Product Coverage Memorandum* at 2).

[572] *Id.* (citing *Cf. Stark v. Wickard*, 321 U.S at 288; *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. at 1679).

[573] *Id.* (citing *Presidential Proclamation 10414*, 87 FR at 35067-69).

[574] *Id.* (citing *Presidential Proclamation 10414*, 87 FR at 35068).

[575] *Id.* (citing Section 318(a) of the Act).

[576] *Id.* (citing 19 CFR 351.226(1)(2)(i)-(ii)).

[577] *Id.* (citing *Initiation Notice*, 87 FR at 19072).

- With respect to suspension of liquidation, Commerce explained that it would follow 19 CFR 351.226(l)(1), notifying CBP of its initiation and direct CBP to continue suspension of liquidation and apply the cash deposit rate that would be applicable if the products were determined to be covered by the scope of the *Orders*. Commerce also mentioned that it would follow the suspension of liquidation rules under 19 CFR 351.226(l)(2)-(4) should it issue preliminary or final circumvention determinations.[578]

- Thus, Commerce provided all interested parties with notice of initiation, the reasons for initiation, and Commerce's intention to suspend liquidation for merchandise that entered after the date of initiation, April 1, 2022, consistent with Commerce's regulations. As such, suspension of liquidation retroactive to the date of initiation was appropriate and lawful.[579]

- Commerce's failure to suspend liquidation and collect cash deposits from April 1, 2022, through June 6, 2022, is unlawful for many reasons and should be reversed in the final determination.

*NextEra*,[580] *BYD HK*,[581] *CSIL*,[582] *TTL*,[583] *Silfab*,[584] and *Risen*[585]

- Auxin's argument that Commerce "unlawfully retroactively applied" its regulations in 19 CFR Part 362 has no place in these circumvention inquiries, which are meant to examine whether circumvention has taken place under the relevant statute and regulations, and not to assess whether Commerce's regulations are proper.

- Commerce has no basis to disregard the 19 CFR Part 362 regulations that exempt entries between April 1, 2022, and June 6, 2022 (and certain entries made after June 6, 2022) from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from these inquiries, without engaging in a new notice-and-comment procedure separate from this circumvention inquiry.

- Although Auxin urges Commerce to suspend liquidation and collect cash deposits on merchandise entered between April 1, 2022, and June 6, 2022, it is unlawful for Commerce to do so as "Commerce, like other agencies, must follow its own regulations."[586]

- Pursuant to 19 CFR Part 362, entries between April 1, 2022, and June 6, 2022, are exempt from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from this circumvention inquiry. Specifically, 19 CFR 362.103 exempts "Applicable Entries" from those obligations. 19 CFR 362.102 defines "Applicable Entries" as "entries of Southeast Asian-Completed Cells and Modules that

---

[578] *Id.*

[579] *Id.* (citing *Aluminum (Taishan)*, 983 F.3d 487).

[580] *See* Next Era's March 17, 2023 Case Brief at 11-18.

[581] *See* BYD HK's March 17, 2023 Rebuttal Brief at 13-18.

[582] *See* CSIL's March 17, 2023 Rebuttal Brief at 14-20.

[583] *See* TTL's March 17, 2023 Rebuttal Brief at 10-11.

[584] *See* Silfab's March 17, 2023 Rebuttal Brief at 8-13.

[585] *See* Risen's March 17, 2023 Rebuttal Brief at 3-4.

[586] *See* NextEra's March 17, 2023 Rebuttal Brief (citing *See Torrington*, 82 F.3d at 1049; *see also, e.g., Fort Stewart*, 495 U.S. at 654 ("It is a familiar rule of administrative law that an agency must abide by its own regulations."); and *Saddler*, 68 F.3d at 1358 (finding that agency "must abide by its own regulation")).

are entered into the United States, or withdrawn from warehouse, for consumption before the Date of Termination."[587]

- Commerce's regulations apply to all entries made prior to the "Date of Termination," and there is no basis to limit application of the exemptions to entries made after June 6, 2022. Moreover, the *Presidential Proclamation 10414 Final Rule Preamble* confirms that the 19 CFR Part 362 regulations are intended to apply to entries made between April 1, 2022, and June 6, 2022.[588]

- Given that "agency regulations are to be interpreted in a similar manner to statutes, which includes a consideration of the text, history, and purpose of a regulation, 19 CFR Part 362 clearly requires Commerce to exempt entries between April 1, 2022, and June 6, 2022, from any suspension of liquidation, cash deposits, or final duties resulting from these inquiries."[589]

- Commerce "promulgated the Part 362 regulations through notice-and-comment rulemaking.[590]  The APA requires notice-and-comment procedures to be followed not only when rules are formulated, but also when they are amended or repealed."[591]

- Commerce cannot amend and implement regulations without a new informal rulemaking process under the APA.[592]

- The U.S. Supreme Court has explained that the APA requires agencies to "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."[593]

- Commerce may not repeal or amend the portions of 19 CFR Part 362 exempting entries between April 1, 2022, and June 6, 2022, from duties as part of its final determination in this circumvention inquiry.  Instead, Commerce would be required to publish a notice of proposed rulemaking informing the public that it is considering a change to 19 CFR Part 362 of its regulations, allow an opportunity for comment, and then publish a final rule responding to such comments.[594]  There is no basis for Commerce to depart from 19 CFR Part 362 in the final determination until Commerce does so.

- Although Auxin claims that Commerce has no legal authority to declare a national emergency and expanded the scope of *Presidential Proclamation 10414* or acted inconsistently with *Presidential Proclamation 10414* by extending the duty waiver to entries made between April 1, 2022, and June 6, 2022, Commerce did not declare a national emergency.  Instead, it was the President that made the declaration in *Presidential Proclamation 10414*, as allowed by section 318(a) of the Act.

---

[587] *Id.*  "Date of Termination" in turn is defined as "June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* has been terminated, whichever occurs first."  *See also* 19 CFR 362.102.

[588] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877*)*.

[589] *Id.* (citing *Kisor*, 139 S. Ct. at 2423-24).

[590] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*; and *Presidential Proclamation 10414 Proposed Rule*).

[591] *See* BYD HK's March 17, 2023 Rebuttal Brief (citing 5 USC 551(5); and 5 USC 553).

[592] *Id.* (citing *Alaska*, 177 F.3d at 1033-34, 1036:  In clarifying this requirement, the Supreme Court has interpreted the APA to require the same procedures when an agency amends or repeals a rule as to when the agency issued that rule)).

[593] *Id.* (citing *Perez*, 575 U.S. at 101; *see also Ass'n of Priv. Sector*, 681 F.3d at 462-63 (finding that agency violates the APA when it does not give notice of proposed rule and opportunity to affected parties to comment); *Invenergy*, 422 F. Supp. 3d at 1285 ("The court concludes that the Exclusion constituted agency rulemaking. Repealing the rule, therefore, also requires rulemaking subject to APA notice and comment.")).

[594] *Id.* (citing 5 USC 553).

116

- Commerce addressed the arguments regarding the consistency of 19 CFR Part 362 with *Presidential Proclamation 10414* when it promulgated the regulation.  Commerce is "taking action now (*i.e.*, during the period of the emergency) to extend the period before it directs CBP to suspend liquidation and collect cash deposits and to waive any AD/CVD estimated duties and duties for these unliquidated goods."[595]

- Commerce's Part 362 regulations are prospective in application because "Commerce's regulation stated prior to the imposition of duties that there would be no such duties, and because Commerce was extending the deadline for actions that it had not yet taken."[596]

- Commerce also explained that the authorization to waive duties under *Presidential Proclamation 10414* "until 24 months after the date of this proclamation or until the emergency declared herein has terminated" specified only the end date for duty-free treatment, without specifying a start date or limiting application of the waiver to entries made after the *Presidential Proclamation 10414*.[597]

- Commerce recognized that providing duty-free treatment to entries made prior to June 6, 2022, furthers the emergency relief goals reflected in *Presidential Proclamation 10414* (specifically, the market uncertainty caused by the initiation of these circumvention inquiries).[598]

- Subjecting entries made prior to June 6, 2022, to AD/CVD cash deposit rates that were unknown at the time of entry and to assessment rates that would not be determined until many months or even years in the future would have increased, not decreased, the market uncertainty the *Presidential Proclamation 10414* and Commerce's Part 362 were seeking to address.[599]  Such an application would limit the capital available to complete solar projects and otherwise build capacity.[600]

- Auxin's arguments regarding the scope of authority provided in section 318(a) of the Act are also meritless as Auxin reads far too much into the following statutory language:  the President "may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act."[601]  At most this provision of the statute prevents extension of deadlines after the emergency subsided.

- The provision noted by Auxin does not prohibit the application of the statute to entries that remain unliquidated at the time of the emergency declaration and Commerce's extension of deadlines for ordering cash deposits and assessment of duties occurred after the emergency was declared.

- Section 318(a) of the Act contains two separate grammatical clauses stating what the President may authorize the Secretary to do:  (1) the President "may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act"; and (2) the President "may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical,

---

[595] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877).
[596] *Id.*
[597] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877 and 56878).
[598] See NextEra's March 17, 2023 Rebuttal Brief (citing *Presidential Proclamation 10414 Proposed Rule*, 87 FR at 39430; *see also Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56872, 56875-77).
[599] *Id.* (citing *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56875-78).
[600] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble,* 87 FR at 56878).
[601] *Id.* (citing Auxin March 17, 2023 Case Brief at 20).

117

surgical, and other supplies for use in emergency relief work."  The use of the word "authorize" a second time in a separate clause indicates that the authority in the second clause is distinct from the first.

- The language "during the continuance of such emergency" qualifies only the authority in the first clause (the authority to extend deadlines), not the second (the separate authority to waive duties).  Therefore, the authority to permit the duty-free importation of supplies for emergency relief work is less constrained than the authority to extend deadlines under the Tariff Act.[602]

- Commerce explained in the *Presidential Proclamation 10414 Final Rule Preamble* that applying the waiver to entries that remained unliquidated at the time of the President's Proclamation harmonizes the authority provided under section 318(a) of the Tariff Act with the retrospective AD/CVD system, which is also part of the Tariff Act.

- Even if Commerce did not have authority under section 318(a) to waive duties on entries made prior to *Presidential Proclamation 10414*, Commerce possesses separate authority to exempt such entries from ADs/CVDs.

- Commerce invoked its authority to issue regulations pertaining to section 781 of the Act when it promulgated 19 CFR Part 362 of its regulations.[603]  Section 781 of the Act states that Commerce "may include within the scope" merchandise completed or assembled in other foreign countries if certain criteria are met.[604]  Thus, even if the criteria for an affirmative circumvention determination are found, section 781 provides Commerce with the discretion to determine whether to include merchandise within the scope of an AD/CVD order.

- Section 781 is silent on when an order will be applied after Commerce determines to extend the order to cover merchandise completed or assembled in other foreign countries.  Commerce exercised its gap-filling authority regarding the administration of section 781 by issuing 19 CFR 351.226.  However, nothing in the statute mandates the particular procedures that Commerce adopted in 19 CFR 351.226 and that Auxin would like Commerce to apply.

- Commerce is free to adopt additional regulations through notice-and-comment rule making that supersede the provisions in 19 CFR 351.226 in order to address the policy issues raised by this case.  Commerce recognized this in the *Presidential Proclamation Final Rule 10414 Preamble.*[605]

- It was reasonable for Commerce to exempt merchandise entered prior to June 6, 2022, from duties when that merchandise was outside of the scope of the *Orders* as a matter of law at the time of entry and the nature of the cell and/or module production process occurring in Southeast Asia is significant.

- Auxin does not cite any language from the AD/CVD statute or section 318(a) requiring Commerce to apply AD/CVD duties to pre-*Presidential Proclamation 10414* entries.  Additionally, Auxin does not cite any authority that would require Commerce to suspend liquidation, apply cash deposit, and duty assessment provisions in 19 CFR 351.226(1) instead of the exception to those rules found in Part 362.

---

[602] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877-78).

[603] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877-78; and *Presidential Proclamation 10414 Proposed Rule*, 87 FR at 39429).

[604] *Id.* (citing 19 CFR 351.226(b)(1)).

[605] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56876-78).

Barcode:4419739-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Cambodia 2022

- 19 CFR Part 362 regulations were adopted following notice-and-comment rulemaking to address the situation presented in these circumvention inquiries and should prevail over general provisions in 19 CFR 351.226(l).[606]  Moreover, the 19 CFR Part 362 regulations make it clear that they are intended to be employed as an exception to any otherwise applicable rules found within 19 CFR 351.226 through the language "notwithstanding § 351.226(l) of this chapter."
- Given that 19 CFR Part 362 is explicitly identified as an exception to 19 CFR 351.226(l), Auxin's argument that Commerce was required to follow 19 CFR 351.226(l) is incorrect.
- *Presidential Proclamation 10414, Presidential Proclamation 10414 Final Rule Preamble,* Commerce's affirmative circumvention determinations, and the accompanying instructions issued to CBP by Commerce, clearly state that merchandise entered for consumption between April 1, 2022, and June 6, 2022, are not subject to AD/CVD liability.[607]
- Auxin's argument that Commerce unlawfully retroactively applied regulations promulgated pursuant to the declaration of emergency announced in *Presidential Proclamation 10414* is not made in the proper forum.  Commerce is bound by law to follow the requirements of *Presidential Proclamation 10414* and 19 CFR Part 362 of its regulations.
- This policy, combined with the meaning of 19 CFR Part 362, means that Commerce cannot retroactively impose duties on imports designated as "Applicable Entries" in the final determinations, especially given the general presumption against retroactive applications of law.[608]
- Amending or repealing 19 CFR Part 362 in the context of these circumvention inquiries would create unfair surprise and deprive parties of a meaningful opportunity to comment on a significant change in Commerce's regulations.[609]
- Commerce should continue to exempt entries made between April 1, 2022, and June 6, 2022, from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from these circumvention inquiries.

**Commerce's Position:**  Commerce disagrees with Auxin that the regulations promulgated under *Presidential Proclamation 10414* are unlawfully retroactive.  Auxin makes four primary claims that the regulations are unlawful, none of which we find to be persuasive or sufficient to change our reasoning with respect to this circumvention inquiry.

First, Auxin claims that Commerce possesses no legal authority to declare a national emergency, yet "explicitly expanded the scope" of *Presidential Proclamation 10414 ultra vires* by applying it to inquiry merchandise that entered the United States "prior to the identification of the emergency."[610]  However, as Auxin notes, Commerce has already addressed the legality of its

---

[606] *Id.* (citing *Romani*, 523 U.S. at 532 (later, more specific statute governs); *Fourco Glass Co.,* 353 U.S. at 228 ("However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment.")).

[607] *See* BYD HK's March 17, 2023 Rebuttal Brief (citing CBP MSGs Memorandum at Message No. 3047409).

[608] *Id.* (citing *Bowen*, 488 U.S. at 208; and *I.N.S.*, 533 U.S. at 316.

[609] *Id. (*citing *Kisor*, 139 S Ct. at 2418-2419); *see also* CSIL's March 17, 2023 Rebuttal Brief (citing *Skidmor*e, 323 U.S. at 140 (1944); and *Cathedral Candle*, 400 F.3d at 1366).

[610] *See* Auxin's March 6, 2023 Case Brief at 17-18.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:41 AM, Submission Status: Approved

authority to issue the regulations under *Presidential Proclamation 10414 Final Rule Preamble*, itself.[611]  That rule, which was issued pursuant to lawful notice and comment process, confirms that "Commerce is taking action now (*i.e.*, during the period of the emergency) to extend the period before it directs CBP to suspend liquidation and collect cash deposits and to waive any AD/CVD estimated duties and duties for these unliquidated goods."[612]  "In other words, the final rule stated, ahead of any imposition of such duties, that there will be no such duties."[613]  Such a statement is not expanding the scope of the emergency retroactively; rather, "such a decision is prospective in its application"[614] because it concerns the establishment of duties that have not yet been determined but may be determined during the course of the emergency.

Second, Auxin argues that the retroactive application of *Presidential Proclamation 10414* is contrary to the explicit wording of the proclamation itself, because it only authorizes Commerce to take actions to permit duty-free entries of solar cells "until 24 months after the date of this proclamation."[615]  Auxin argues that because the *Presidential Proclamation 10414* only authorizes Commerce to take action *after* the date of *Presidential Proclamation 10414*, Commerce is precluded from taking action with respect to entries prior to June 6, 2022.[616]  Commerce addressed this argument in the notice and comment period, as discussed in the *Presidential Proclamation 10414 Final Rule Preamble*.[617]  While the *Presidential Proclamation 10414* does declare an end date to the time period of duty-free treatment, it did not specify a start date, nor did it limit the application of the waiver to only entries made after *Presidential Proclamation 10414*.[618]  Additionally, the goods that entered the country prior to *Presidential Proclamation 10414* remain unliquidated, and have yet to have a final decision with respect to applicable duties.  By taking action with respect to those goods, in accordance with the regulations promulgated in *Presidential Proclamation 10414 Final Rule*, Commerce is not acting retroactively:  before any duties were determined to be applicable to these entries, the regulations stated that there would be no duties imposed on these entries.[619]  We also agree with the respondents that the actions taken by Commerce in enacting this rule to provide duty-free treatment to entries prior to June 6, 2022, furthers the relief goals for the national emergency declared in *Presidential Proclamation 10414*, and subjecting entries made prior to June 6, 2022, to duties would increase uncertainty in the market for solar cells and run contrary to the intent of *Presidential Proclamation 10414*.[620]

Third, Auxin argues that the *Presidential Proclamation 10414 Final Rule* is inconsistent with *Presidential Proclamation 10414* and the authority under which it was issued (*i.e.*, section 318(a) of the Act), which provides for action to be taken "during" an emergency.  Auxin states that there was no emergency declared prior to June 6, 2022; therefore, the Act does not allow Commerce

---

[611] *Id.*
[612] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.
[613] *Id.*, 87 FR at 56877.
[614] *Id.*
[615] *See* Auxin's March 6, 2023 Case Brief (quoting *Presidential Proclamation 10414*, 87 FR at 35068).
[616] *Id.* at 20.
[617] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.
[618] *Id.*, 87 FR at 56877-78.
[619] *Id.*, 87 FR at 56877.
[620] *Id.*, 87 FR at 56875-78.

act before that date.[621]  We disagree with this interpretation.  Section 318(a) of the Act states "{w}henever the President shall by proclamation declare an emergency to exist … he may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act, and may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work."[622]  This provision contains two distinct clauses:  (1) authorizing the Secretary to "extend during the continuance of such emergency the time … for the performance of any act," and (2) authorizing the Secretary to "permit … the importation free of duty of food, clothing, and medical, surgical, and other supplies."[623]  We agree with respondents' argument that the grammatical construction of the statute, in particular using the word "authorize" in each of the two clauses, indicates that the authority in the second clause is independent from the authority in the first.  Accordingly, the President may authorize individually each of these two actions, or both, and the actions are not necessarily required to be implemented in unison or otherwise qualify each other.  In any event, Auxin's interpretation of the phrase "during the continuance of such emergency" is misleading.  Because these two clauses are independent, the phrase "during the continuance of such emergency" applies only to the first clause and does not limit the second clause concerning the waiver of duties.  Additionally, while it is true that the entries in question entered the country prior to June 6, 2022, Commerce's *taking action* with respect to setting a definitive amount of duties for those entries (which were unliquidated at the time of the rule, with no final amount of duties set) is not retroactive in nature as it is occurring during the continuance of the emergency as declared by the President.[624]

We also disagree with Auxin's reading of section 318 of the Act as prohibiting the retrospective application of duties (or lack thereof) to unliquidated merchandise because the general operation of the AD/CVD system in the United States is a retrospective one.  The "final liability for duties is determined after the merchandise is imported," and under this system entries are suspended and cash deposits are collected in order to wait for the final ascertainment of duties at a later time.[625]  That is the same situation of "retrospective" application of duties that Auxin is concerned about here; that merchandise entered the country and remains unliquidated while awaiting the final amount of duties owed.  To argue that section 318 of the Act prohibits this type of action is to ignore the fact that the passage by Congress of these provisions underpinning the AD/CVD system in the same Act supports reading them in harmony.[626]

Fourth, Auxin argues that the regulations promulgated under the *Presidential Proclamation 10414* are inconsistent with Commerce's circumvention regulations, which require Commerce to issue suspension of liquidation and cash deposit instructions to CBP in the event of an

---

[621] *See* Auxin's March 6, 2023 Case Brief at 20.

[622] *See* section 318(a) of the Act.

[623] *Id.*

[624] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.

[625] *Id.*, 87 FR at 56877 (citing 19 CFR 351.212(a) and sections 703(d), 705(c), 706, 733(d), 735(c), and 736 of the Act).

[626] *Id.*, 87 FR at 56877 (citing *FDA v. Brown & Williamson*, 529 U.S. at 132-133 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme … .  A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme … and fit, if possible, all parts into an harmonious whole.")).

121

affirmative finding of circumvention.[627]  Auxin also states that this language was also included in Commerce's *Initiation Notice* and *Preliminary Determination*, which supposedly means that any failure to suspend liquidation and collect cash deposits from April 1, 2022, to June 6, 2022 is unlawful and should be reversed in the final determination.[628]  We disagree that Commerce must continue to follow the liquidation and cash deposit rules provided for in 19 CFR 351.226 in this specific case.  The 19 CFR Part 362 regulations carve out an exception to otherwise applicable rules (*i.e.*, those found in 19 CFR 351.226).[629]  Specifically, the 19 CFR Part 362 regulations state that "notwithstanding 351.226(l) … the Secretary shall instruct CBP to discontinue the suspension of liquidation of entries and collection of cash deposits for any Southeast-Asian-Completed Cells and Modules that were suspended pursuant to {section} 351.226(l) of this chapter."[630]  If Commerce were to follow the liquidation and cash deposit rules provided for in 19 CFR 341.226, it would be acting contrary to the explicit language of the 19 CFR Part 362 regulations.  Furthermore, in situations in which a regulation is adopted following a notice and comment process and is more specific than an existing regulation, the more specific regulation prevails.[631]  Therefore, if a conflict arises between 19 CFR 362 and 19 CFR 351.226, the stipulations of 19 CFR 362 prevail.

**Comment 27. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate**

*NextEra*[632]
- If Commerce reaches a country-wide affirmative circumvention determination, it should permit third-country exporters that neither have their own AD cash deposit rate, nor use a wafer exporter in China with its own AD cash deposit rate, to deposit ADs based on the separate rate determined in the China AD solar cells proceeding, rather than deposit ADs at the cash deposit rate of the China-wide entity.
- In *CORE from China (Vietnam)*, Commerce applied the AD cash deposit rate of Chinese companies granted a separate rate in the China AD investigation to imports of CORE produced in Vietnam using Chinese substrate."[633]
- Commerce cannot assume that companies in a third-country are part of the China-wide entity like it does for companies in China that cannot demonstrate their independence from the Chinese government.  Moreover, Commerce should not apply its NME methodology to companies in Cambodia, Malaysia, or Thailand, which are independent market economy countries.
- Commerce clearly explained in the *AD Order* that the China-wide AD rate is based on AFA.  The purpose of the statutory AFA provision is to encourage respondents' cooperation and ensure that they do not obtain a more favorable result by failing to

---

[627] *See* Auxin's March 6, 2023 Case Brief at 18 (citing 19 CFR 351.226(l)(2)(ii) and (iii)).

[628] *Id.* at 20-21.

[629] *See* 19 CFR 362.103(b)(1).

[630] *See* 19 CFR 362.103(b)(1)(i).

[631] *See Romani*, 523 U.S. at 532 (discussing the statutory canon that a later, more specific statute governs in the case of conflict); *Fourco Glass Co.*, 353 U.S. at 228 (holding that the general language of a statute "will not be held to apply to a matter specifically dealt with in another part of the same enactment."); *see also Roberto*, 440 F.3d at 1350 ("{t}he rules of statutory construction apply when interpreting an agency regulation.").

[632] *See* NextEra's March 6, 2023 Case Brief at 4-8.

[633] *Id.* (citing *CORE from China (Vietnam)* IDM at Comment 3).

122

cooperate than if they had cooperated.[634]  The third-country exporters fully cooperated with Commerce's requests for information in the circumvention inquires, and thus, there is no reason to apply an AFA rate, *i.e.*, the China-wide rate, to these exporters.

- Secretary Raimondo testified before Congress that a tariff rate in the range of 200 percent is "excessive" and "exceedingly unlikely."[635]  The China-wide AD cash deposit rate is 238.95 percent.  To avoid uncertainty and limit the damage to solar deployment in the United States, Commerce should permit third-country companies without their own AD rate, or without a Chinese wafer exporter with its own AD rate, to deposit ADs at the cash deposit rate of companies granted a separate rate in the China AD solar cells proceeding.

- Alternatively, Commerce should establish a procedure for companies to obtain separate rate status either by submitting separate rate applications in this inquiry, submitting separate rate applications in the ongoing AD administrative review in this proceeding, even if the exporter is not under review, or requesting a changed circumstances review to establish separate rate status on an expedited basis.

*Auxin*[636]
- Consistent with its long-standing practice, Commerce should continue to assign exporters without an individual AD rate or without a separate AD rate, the China-wide AD rate.[637]

- Commerce applied that practice in *CRS from China (Vietnam)*,[638] and contrary to NextEra's claim, in *CORE from China (Vietnam)*.[639]

- The purpose of a circumvention inquiry is to determine whether circumvention of an order has occurred, not conduct a separate rates analysis.  If Commerce reaches an affirmative circumvention determination, then it will order the suspension of liquidation of entries of inquiry merchandise and the collection of AD/CVD cash deposits pending conduct of an administrative review where Commerce will, among other things, determine the appropriate cash deposit rates and conduct separate rate analyses.[640]

**Commerce's Position:**  We disagree with NextEra.  Pursuant to Commerce's affirmative country-wide circumvention determinations, duties under the *Orders* will apply to U.S. entries of inquiry merchandise from Cambodia, Malaysia, Thailand, and Vietnam unless at least one of the certification requirements is met.  Because the applicable *Orders* are on China, in this circumvention inquiry Commerce followed the methodology that it employs in AD proceedings involving China to determine the appropriate AD cash deposit rate for U.S. entries of inquiry merchandise.  Commerce considers China to be an NME country.[641]  In proceedings involving NME countries, Commerce maintains a rebuttable presumption that all exporters are subject to government control and, thus, should be assigned a single antidumping duty deposit rate. It is Commerce's policy to assign all exporters of subject merchandise this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate

---

[634] *Id.* (citing SAA at 200; and *Changzhou Wujin Fine Chem*, 701 F.3d at 1378).

[635] *Id.* (citing NextEra's May 19, 2022 Comments at Attachment 3).

[636] *See* Auxin's March 17, 2023 Rebuttal Brief at 13-16.

[637] *Id.* (citing *Preliminary Determinations*, 87 FR at 75224; and Policy Bulletin 05.1).

[638] *Id.* (citing *CRS from China (Vietnam)*, 83 FR at 23892).

[639] *Id.* (citing *CORE from China AD Investigation*, 81 FR at 35318).

[640] *Id.* (citing *Tissue Paper from China (Vietnam) Final Determination* IDM at Comment 5; and *Hangers from China (Vietnam)* IDM at Comment 5).

[641] *See Aluminum Foil* PDM at the section, "China's Status as a Non-Market Economy."

123

rate.[642]  Therefore, as we explained in the *Preliminary Determination*, entries from Cambodia, Malaysia, Thailand, and Vietnam will be assessed at the China-wide entity rate unless either:  (1) the relevant cell or module exporter from Cambodia, Malaysia, Thailand, or Vietnam has its own company-specific AD and/or CVD rate under the *Orders* or; (2) if it does not, the Chinese company that exported the wafers to that third-country cell/module exporter has its own company-specific AD and/or CVD rate under the *Orders*.[643]

Although NextEra asserts that Commerce cannot assume that companies in a third-country are part of the China-wide entity, Commerce's position in AD proceedings involving China is clear - "'the {China}-wide rate applies to all entries of subject merchandise' unless Commerce has determined a firm is eligible for a separate rate … .  If a third-country exporter of subject merchandise wishes to have its own rate, it is incumbent upon that exporter to request a review."[644]

While exporters that are wholly-foreign owned do not need to demonstrate *de jure* and *de facto* independence from government control to receive a separate rate, they must nonetheless demonstrate that they are wholly owned by entities located in market-economy countries and that their ultimate owners are located in market-economy countries to receive a separate rate.[645]  Such entities must demonstrate this by completing the relevant portions of Commerce's separate rate application.[646]  As the CIT explained, while "… Commerce recognizes that companies organized outside of China are *per se* independent from the control of the {Chinese} government" it is only "{o}nce a party demonstrates that it is foreign owned, {that} Commerce accords that company a rate separate from the {China}-wide rate."[647]  Thus, Commerce's practice in NME cases is to require exporters inside and outside the NME country to demonstrate that they are not part of the NME-wide entity in order to obtain separate rate status.

There is no basis in this circumvention inquiry to grant separate rate status to companies that currently do not have a separate rate, or whose wafer suppliers do not have a separate rate. Commerce does not conduct a separate rates analysis in circumvention inquiries and did not do so here.  The purpose of the circumvention statute is to give Commerce the authority, and the criteria to follow, to administer "AD and {CVD} orders in such a way as to prevent circumvention and diversion of U.S. law."[648]  Therefore, Commerce focused its analysis in the circumvention inquiry on applying the relevant methodology in section 781 of the Act to

---

[642] *See Sparklers from China*, 56 FR 20588; s*ee also Silicon Carbide from China*, 59 FR 22585; and 19 CFR 351.107(d).
[643] *See Preliminary Determinations*, 87 FR at 75224.
[644] *See Xanthan Gum from China 2016-2017* IDM at Comment 1.
[645] *See Chlorinated Isocyanurates from China 2019-2020 Preliminary Results* PDM ("{t}o establish whether a company is sufficiently independent to be eligible for a separate, company-specific rate, Commerce analyzes each exporting entity in an NME country under the test established in *Sparklers* as amplified in *Silicon Carbide*, and further refined by *Diamond Sawblades*.  However, if Commerce determines that a company is wholly foreign-owned or located in a market economy (ME) country, then a separate-rate analysis is not necessary to determine whether it is independent from government control."); unchanged in *Chlorinated Isocyanurates from China 2019-2020 Final Results.*
[646] *See* https://enforcement.trade.gov/nme/nme-sep-rate.html.
[647] *See Decca Hospitality Furnishings*, 391 F. Supp. 2d at 1300.
[648] *See Senate Report 100-71* at 101; *see also Tissue Paper from China (Vietnam) Final Determination* at Comment 1 ("The overall purpose of an anti-circumvention inquiry is to prevent the evasion of an AD order").

124

determine whether circumvention was occurring and did not conduct a separate rates analysis. Commerce conducts separate rates analyses in administrative reviews.[649]  Commerce conducts administrative reviews to determine "the amount of any antidumping duty,"[650] and a separate rates analysis is integral to this.  Separately, Commerce conducts circumvention inquiries to establish whether certain goods must be subject to an order,[651] not to establish the duty rates for those goods.  Further, Commerce's application of the China-wide entity AD rate to exporters that do not have their own separate rate, or whose wafer suppliers do not have a separate rate, in this circumvention inquiry is consistent with its practice in other circumvention inquiries involving China including, contrary to NextEra's claim, *CORE from China (Vietnam)* in which Commerce stated that it "will instruct CBP to require AD cash deposits equal to the rate established for the China-wide entity (199.43 percent) …"[652]

We disagree with NextEra's claim that Commerce reached a determination based on adverse facts available with respect to certain cooperative third-country exporters that do not have a separate rate by requiring cash deposits equal to the China-wide rate on U.S. entries of their inquiry merchandise.  Commerce made determinations based on adverse facts available only with respect to uncooperative companies.  As adverse facts available, Commerce determined that the uncooperative companies "exported inquiry merchandise and that U.S. entries of that merchandise are circumventing the *Orders*."[653]  Additionally, Commerce prohibited importers and exporters from using certain certifications with respect to U.S. entries of inquiry merchandise from the uncooperative companies.[654]  Commerce did not require a cash deposit equal to the China-wide rate on U.S. entries of inquiry merchandise from any company as part of an adverse facts available determination.  Rather, Commerce required that importers deposit ADs equal to the China-wide rate on entries of inquiry merchandise from cooperative third-country exporters only where the third-country exporters or their Chinese wafer supplier(s) do not have a separate rate.  In fact, a company that is barred from certifying that its exports contain no Chinese wafers or module components may still receive a company-specific rate if it already has such a rate under the *Orders* or if its Chinese wafer exporter has its own rate under the *Orders*.[655]

Both the CIT and the CAFC recognized that even if Commerce based the China-wide entity's dumping margin on adverse facts available, that "does not change its applicability to an NME

---

[649] *See Tissue Paper from China (Vietnam) Final Determination* IDM at Comment 5 ("{c}ontrary to MFVN's suggestion, in conducting this inquiry, the Department has not determined a cash deposit rate, conducted a separate rate analysis, or calculated an individual margin of dumping for MFVN, which is done during an administrative review.").

[650] *See* section 751(a)(1)(B) of the Act.

[651] *See* section 781(b) of the Act; *see also Bell Supply CAFC.*

[652] *See CORE from China (Vietnam)*, 83 FR at 23896; *see also CORE from China AD Investigation*, 81 FR at 35318; *Tissue Paper from China (India) Final Determination* IDM at 15*; Aluminum Extrusions from China (Vietnam),* 84 FR at 39806*; Butt-Weld Pipe Fittings from China (Malaysia)*, 84 FR at 29165; and *SDGE from China (UK)* IDM at Comment 5*.

[653] *See Preliminary Determinations*, 87 FR at 75221, 75223.

[654] *Id*.

[655] *See Preliminary Determinations*, 87 FR at 75224; *see also* the section "Entries on or After Termination of the Proclamation" in the *Federal Register* notice accompanying this memorandum.

entity that cooperated, but ultimately failed to qualify for a separate rate."[656]  For example, in *Advanced Technology*, the CIT stated:

> Commerce did not apply adverse facts available to {respondent}, Commerce rather found that {respondent} had not rebutted the presumption of state control and assigned it the {China}-wide rate.  These are two distinct legal concepts:  a separate AFA rate applies to a respondent who has received a separate rate but has otherwise failed to cooperate to the best of its ability whereas the {China}-wide rate applies to a respondent who has not received a separate rate. [657]

Consequently, we will continue to instruct CBP to require a cash deposit equal to the China-wide rate on U.S. entries of inquiry merchandise from any company that neither has its own AD cash deposit rate, nor uses a wafer exporter in China with its own AD cash deposit rate.

## XII.    RECOMMENDATION

Based on our analysis of the comments received and our findings at verification, we recommend adopting the above positions.  Additionally, we recommend finding that Sonali's solar cells and modules produced in Cambodia from silicon wafers imported from China are not subject to the scope of the *Orders*.  However, we recommend finding, based on the analysis and findings detailed above and in the *Preliminary Determination*, that imports of solar cells and modules, completed in Cambodia using certain parts and components manufactured in China, are circumventing the *Orders*, except for shipments complying with the certification requirements described in the *Federal Register* notice.

If this recommendation is accepted, we will publish the final determination in these inquiries in the *Federal Register*.

☒                              ☐
_____                    _____
Agree                         Disagree

                              8/17/2023

X   *Lisa W. Wang*
_____

Signed by: LISA WANG
Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[656] *See Walk-Behind Lawn Mowers from China* IDM at Comment 9 (citing *Diamond Sawblades Coalition*, 866 F.3d at 1313).
[657] *Id.* at Comment 9 (citing *Advanced Technology*, 938 F. Supp. 2d  at 1351 (citing *Watanabe Group*, 34 CIT 1545, Slip Op. 10-139 at 9, n. 8)).

126

**Appendix I - Acronyms/Abbreviations**

| Acronym/Abbreviation | Complete Name |
|---|---|
| $ | United States Dollars |
| ACCESS | Antidumping and Countervailing Duty Centralized Electronic Service System |
| AD | Antidumping Duty |
| AFA | Adverse Facts Available |
| APA | Administrative Procedure Act |
| APO | Administrative Protective Order |
| AR | Administrative Review |
| Auxin | Auxin Solar Inc. |
| bn | Billion |
| Boviet | Boviet Solar Technology Co., Ltd. |
| BPI | Business Proprietary Information |
| BYD HK | BYD (H.K.) Co., Ltd. |
| Shangluo BYD | BYD (Shangluo) Industrial Co., Ltd. |
| CAFC | U.S. Court of Appeals for the Federal Circuit |
| Cambodia | Kingdom of Cambodia |
| Canadian Solar or the Canadian Solar Group | Canadian Solar International Limited; Canadian Solar Manufacturing (Changshu) Inc.; Canadian Solar Manufacturing (Luoyang) Inc.; CSI Cells Co., Ltd.; CSI Solar Co., Ltd.; CSI Manufacturing (Fu Ning) Co., Ltd.; Canadian Solar Manufacturing (Thailand) Co., Ltd.; and Canadian Solar Manufacturing Vietnam Co., Ltd. |
| CBP | U.S. Customs and Border Protection |
| CCR | Changed Circumstances Review |
| CdTe | Cadmium Telluride |
| CEA | Clean Energy Associates, LLC |
| China | The People's Republic of China |
| CIT | U.S. Court of International Trade |
| COM | Cost of manufacturing |
| Commerce | The U.S. Department of Commerce |
| CORE | Certain Corrosion-Resistant Steel Products |
| CRS | Certain Cold-Rolled Steel Flat Products |
| CSIL | Canadian Solar International Limited |
| CSIL | Canadian Solar International Limited. Also, any reference to the author of case briefs and rebuttals submitted by CSIL and any member of the Canadian Solar Group. |

| CSPV | Crystalline Silicon Photovoltaic |
|------|------|
| CVD | Countervailing Duty |
| Date of Termination | Date of termination of Presidential Proclamation 10414 |
| DOE | United States Department of Energy |
| EPCG | Export Promotion Capital Goods |
| ET | Eastern Time |
| EVA | Ethylene Vinyl Acetate |
| FA | Facts Available |
| First Solar Malaysia | First Solar Malaysia Sdn. Bhd. |
| First Solar Vietnam | First Solar Vietnam Manufacturing Co., Ltd. |
| FY | Fiscal Year |
| GW | Gigawatt |
| G&A | General and Administrative Expenses |
| Hanwha | Hanwha Q Cells Malaysia Sdn. Bdh. |
| HFC | Hydrofluorocarbon |
| HRS | Hot Rolled Steel |
| HTS | Harmonized Tariff Schedule |
| IDM | Issues and Decision Memorandum |
| IEA | International Energy Agency |
| Inquiry Countries | Cambodia, Malaysia, Thailand and Vietnam |
| ITC | U.S. International Trade Commission |
| Jinko | Jinko Solar Technology Sdn. Bhd./ Jinko Solar (Malaysia) Sdn. Bhd. |
| Le Shan Jinko | Jinko Solar (Le Shan) Co., Ltd |
| KHR | Cambodian Riel |
| LONGi | LONGi (H.K) Trading Limited in the Vietnam segment, and LONGi (Kuching) Sdn. Bhd. and LONGi Technology (Kuching) Sdn. Bhd. in the Malaysia segment |
| LWRPT | Light-Walled Rectangular Pipe and Tube |
| Maxeon | Maxeon Solar Technologies, Ltd. |
| mn | Million |
| MW | Megawatts |
| MYR | Malaysian Ringgit |
| NE Solar | New East Solar Energy (Cambodia) Co., Ltd. |
| NextEra | NextEra Energy Constructors, LLC |
| Ningbo Kyanite | Ningbo Kyanite International Trade Co., Ltd |
| NME | non-market economy |

| OCTG | Oil Country Tubular Goods |
|---|---|
| p/n | Positive/Negative |
| PDM | Preliminary Decision Memorandum |
| PERC | Passivated Emitter and Rear Contact |
| PET Film | Polyethylene Terephthalate Film, Sheet, and Strip |
| PLI | Product-Linked Incentive |
| POR | Period of Review |
| Q&V | Quantity and Value |
| R&D | Research and Development |
| Red Sun | Red Sun Energy Long An Company Limited |
| Risen | Risen Solar Technology Sdn. Bhd |
| RMB | Renminbi |
| Silfab | Silfab Solar WA Inc. |
| solar cells and modules | certain crystalline silicon photovoltaic cells, whether or not assembled into modules |
| Sonali | Sonali Energees USA LLC |
| Tata Power | Tata Power Solar System Limited |
| TBH | Thai Bhat |
| Thailand | Kingdom of Thailand |
| the Act | Tariff Act of 1930, as amended |
| The LONGi Group | LONGi (Kuching) Sdn. Bhd., LONGi Technology (Kuching) Sdn. Bhd. , LONGi (H.K.) Trading Limited, LONGi Solar Technology (H.K.) Limited, LONGi Solar Technology (U.S.) Inc. |
| THSM | Canadian Solar Manufacturing (Thailand) Co., Ltd. |
| Trina or the Trina Group | Trina Solar (Vietnam) Science & Technology Co., Ltd, Trina Solar Energy Development Company Limited, and Trina Solar Co., Ltd. in Vietnam segment and Trina Solar Science & Technology (Thailand) Ltd. in Thailand segment |
| TTL | Trina Solar Science & Technology (Thailand) Ltd. |
| TTL | Trina Solar Science & Technology (Thailand) Ltd. Also, any reference to the author of case briefs and rebuttals submitted by TTL and any member of the Trina Group. |
| TSSD | Trina Solar (Singapore) Science & Technology Pte. Ltd. |

|  |  |
|---|---|
| TCZ | Trina Solar Co., Ltd. |
| URAA | Uruguay Round Agreements Act |
| Vietnam | Socialist Republic of Vietnam |
| Vina | Vina Solar Technology Company Limited |
| Vina Cell | Vina Cell Technology Company Limited |
| VND | Vietnamese Dong |
| VSUN | Vietnam Sunergy Joint Stock Company |
| Websol Energy | Websol Energy System Limited |

## Appendix II - Court and Case Citation Table
### This Section is Sorted by Short Citation

| Short Citation | Administrative Case Determinations |
|---|---|
| *2003 Policy Bulletin* | *Proposed Policies Regarding the Conduct of Changed Circumstance Reviews of the Countervailing Duty Order on Softwood Lumber from Canada (C 122 839)*, 68 FR 37456 (June 24, 2003) |
| *2021 Regulations Final Rule* | *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021) |
| *Activated Carbon from China* | *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 53214 (October 22, 2018), and accompanying IDM |
| *Orders* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order*, 77 FR 73017 (December 7, 2012) |
| *AD Order* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012) |
| *Adoption of CFR 351.228* | *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021) |
| *Advanced Technology* | *Advanced Technology & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1351 (CIT 2013) (citing Watanabe Group v. United States, 34 CIT 1545 (CIT 2010), Slip Op. 10-139 |
| *Ajmal Steel* | *Ajmal Steel Tubes & Pipes Indus. LLC v. United States*, Slip Op. 22-121 (CIT October 28, 2022) |
| *AK Steel Corp.* | *AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) |
| *Al Ghurair CAFC 2023* | *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351 (Fed. Cir. 2023) |
| *Al Ghurair CIT 2021* | *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (CIT 2021) |

| | |
|---|---|
| *Alaska* | *Alaska Pro. Hunters Ass'n v. FAA*, 177 F.3d 1030, 1033-34, 1036 (D.C. Cir. 1999) |
| *Albemarle Corp.* | *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) |
| *Allegheny v. U.S.* | *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368 (Fed. Cir. 2003) |
| *Aluminum (Taishan) Co.* | *Aluminum (Taishan) Co. v. United States,* 983 F.3d 487 (Fed. Cir. 2020) |
| *Aluminum Extrusions from China* | *Aluminum Extrusions from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 76 FR 18524 (April 4, 2011) |
| *Aluminum Extrusions from China (Vietnam)* | *Aluminum Extrusions from the People's Republic of China:  Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders, and Partial Rescission*, 84 FR 39805 (August 12, 2019) |
| *Aluminum Extrusions from China Minor Alterations Circumvention Final* | *Aluminum Extrusions from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders and Rescission of Minor Alterations Anti-Circumvention Inquiry*, 82 FR 34630 (July 26, 2017), and accompanying IDM |
| *Aluminum Extrusions from China Preliminary CCR* | *Aluminum Extrusions from the People's Republic of China:  Initiation and Preliminary Results of Expedited Changed Circumstances Review*, 83 FR 34548 (July 20, 2018) |
| *Aluminum Foil from China* | *Certain Aluminum Foil from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 83 FR 9282 (March 5, 2018) |
| *Aluminum Foil from China (Korea and Thailand)* | *Antidumping and Countervailing Duty Orders on Certain Aluminum Foil from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to the Republic of Korea and the Kingdom of Thailand,* 88 FR 17177 (March 22, 2023) |
| *Aluminum Foil from China (Korea and Thailand) Preliminary* | *Antidumping and Countervailing Duty Orders on Certain Aluminum Foil from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to the Republic of Korea and the Kingdom of Thailand*, 88 FR 17177 (March 22, 2023), and accompanying PDM |
| *Aluminum Foil from Oman* | *Certain Aluminum Foil from the Sultanate of Oman: Final Affirmative Countervailing Duty Determination*, 86 FR 52888 (September 23, 2021) |

| | |
|---|---|
| *Aluminum Foil PDM* | *Antidumping Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination*, 82 FR 50858, 50861 (November 2, 2017), and accompanying PDM (citing Memorandum, "China's Status as a Non-Market Economy," dated October 26, 2017) |
| *Aluminum Sheet from Bahrain* | *Common Alloy Aluminum Sheet from Bahrain: Final Affirmative Countervailing Duty Determination*, 86 FR 13333 (March 8, 2021) |
| *Amanda Foods CIT* | *Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d at 1381 |
| *Antidumping and Countervailing Duties FR* | *Antidumping Duties; Countervailing Duties*, 61 FR 7308 (February 27, 1996) |
| *Antidumping Duties; Countervailing Duties; Final Rule* | *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27340 (May 19, 1997) |
| *API v. U.S.* | *API v. United States EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) |
| *Appelton Papers Inc.* | *Appelton Papers Inc. v. United States*, 37 CIT 1034 Slip Op.13-87 (July 2013) |
| *Archer Daniels* | *Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1279 (CIT 2014) |
| *Ass'n of Priv. Sector* | *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462-63 (D.C. Cir. 2012) |
| *Ausimont* | *Ausimont United States v. United States*, 882 F. Supp. 1087, 1098 (CIT 1995) |
| *B.F. Goodrich v. U.S.* | *B.F. Goodrich Co. v. United States*, 794 F. Supp. 1148 (CIT 1992) |
| *Baker Hostetler* | *Baker Hostetler v. United States*, 473 F.3d 312 (D.C. Cir. 2006) |
| *Ball Bearings from Thailand* | *Final Affirmative Countervailing Duty Determination and Partial Countervailing Duty Order: Ball Bearings and Parts Thereof from Thailand; Final Negative Countervailing Duty Determinations: Antifriction Bearings (Other Than Ball or Tapered Roller Bearings) and Parts Thereof from Thailand*, 54 FR 19130 (May 3, 1989) |
| *Beijing Tianhai* | *Beijing Tianhai Industry Co. v. United States*, 52 F. Supp. 3d 1351 (CIT 2015) |
| *Bell Supply CAFC* | *Bell Supply Co., LLC v. United States*, 888 F.3d 1222 (Fed. Cir. 2018) |

| | |
|---|---|
| *Bethlehem Steel v. U.S.* | *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (CIT 2001) |
| *Bloomberg Report* | BloombergNEF, Solar PV Trade and Manufacturing: A Deep Dive (2021) |
| *BMW of N. Am. LLC* | *BMW of N. Am. LLC v. United States*, 926 F.3d 1291 (Fed. Cir. 2019) |
| *Bomont Indus.* | *Bomont Indus. v. United States*, 733 F. Supp. 1507 (CIT 1990) |
| *Borusan v. American Cast Iron Pipe* | *Borusan Mannesmann Boru Sanayi v. American Cast Iron Pipe Co.*, Ct. No. 20-2014 2021 U.S. App. (Fed. Cir. 2021) |
| *Borusan  2015* | *Borusan Mannesmann Boru Sanayi v Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (CIT 2015) |
| *Borusan  2017* | *Borusan Mannesmann Boru Sanayi v Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1327-30, *aff'd* 857 F.3d 1353 (Fed. Cir. 2017) |
| *Bowen* | *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) |
| *Brass Sheet and Strip from Canada* | *Brass Sheet and Strip from Canada:  Final Affirmative Determination of Circumvention of Antidumping Duty Order,* 58 FR 33610 (June 18, 1993), and accompanying IDM |
| *Building Sys. De Mex.* | *Building Sys. De Mex., S.A. de C.V. v. United States*, 567 F. Supp. 3d 1306, 1316 (CIT 2022) |
| *Butt-Weld Pipe Fittings from China (Malaysia)* | *Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 84 FR 29164 (June 21, 2019) |
| *Butt-Weld Pipe Fittings from China (Thailand)* | *See Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 59 FR 15155 (March 31, 1994) |
| *Canada – Feed-In Tariff Program* | *Canada – Measures Relating to the Feed-In Tariff Program, (WT/DS426/AB/R)*, adopted May 6, 2013 |
| *Canadian Solar CAFC* | *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 919 (Fed. Cir. 2019) |
| *Carbon and Alloy Steel Wire Rod from Italy* | *Countervailing Duty Investigation of Carbon and Alloy Steel Wire Rod from Italy:  Final Affirmative Determination*, 83 FR 13242 (March 28, 2018) |
| *Carbon Steel Flanges from Italy* | *Finished Carbon Steel Flanges from Italy:  Final Determination of Sales at Less Than Fair Value,*  82 FR 29481 (June 29, 2017), and accompanying IDM |

| | |
|---|---|
| *Carlisle Tire & Rubber v. U.S.* | *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (CIT 1983) |
| *Cathedral Candle* | *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1366 (Fed. Cir. 2005) |
| *Celik Halat* | *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348 (CIT 2022) |
| *Ceramica Regiomontana* | *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (CIT 1986) |
| *Certain Pasta from Italy AR11* | *Certain Pasta from Italy: Final Results of the Eleventh (2006) Countervailing Duty Administrative Review*, 74 FR 5922 (February 3, 2009) |
| *Certain Pasta from Italy AR7* | *Certain Pasta from Italy: Final Results of the Seventh Countervailing Duty Administrative Review*, 69 FR 70657 (December 7, 2004) |
| *Certain Steel Products from Korea* | *Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations: Certain Steel Products from Korea*, 58 FR 37338 (July 9, 1993) |
| *Certain Wheat from Canada* | *Final Affirmative Countervailing Duty Determinations: Certain Durum Wheat and Hard Red Spring Wheat from Canada*, 68 FR 52747 (September 5, 2003) |
| *Cf. Stark v. Wickard* | *Cf. Stark v. Wickard,* 321 U.S. 288 (1944) |
| *CFS from China* | *Coated Free Sheet Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 72 FR 60645 (October 25, 2007) |
| *Changzhou Trina Solar Energy v. U.S. (2016)* | *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334 (CIT 2016) aff'd 264 F. Supp. 3d 1325, 1334 (CIT 2017) |
| *Changzhou Trina Solar Energy v. U.S. (2018)* | *Changzhou Trina Solar Energy Co. Ltd. v. United States*, 352 F. Supp. 3d 1316 (CIT 2018) |
| *Changzhou Trina Solar Energy v. U.S. (2020)* | *Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287 (CIT 2020) |
| *Changzhou Wujin Fine Chem* | *Changzhou Wujin Fine Chem. Factory Co. v. United States,* 701 F.3d 1367 (Fed. Cir. 2012) |
| *Chevron* | *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) |
| *Chlorinated Isocyanurates from China* | *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Countervailing Duty Administrative Review, and Partial Rescission of Countervailing Duty Administrative Review*, 82 FR 27466 (June 15, 2017) |

| | |
|---|---|
| *Chlorinated Isocyanurates from China 2019-2020 Final Results* | *Chlorinated Isocyanurates from the People's Republic of China: Final Determination of No Shipments; 2019–2020 Administrative Review*, 86 FR 36253 (July 9, 2021) |
| *Chlorinated Isocyanurates from China 2019-2020 Preliminary Results* | *Chlorinated Isocyanurates from the People's Republic of China: Preliminary Determination of No Shipments; 2019-2020*, 86 FR 13291 (March 8, 2021) |
| *Cinsa* | *Cinsa, S.A. de C.V. v. United States*, 966 F. Supp. 1230 (CIT 1997) |
| *Circular Welded Carbon-Quality Steel Pipe from China (Vietnam) Preliminary* | *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 88 FR 21975 (April 12, 2023) |
| *Circular Welded Carbon-Quality Steel Pipe from Oman* | *Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman: Final Affirmative Countervailing Duty Determination*, 77 FR 64473 (October 22, 2012) |
| *CITIC Trading Company, Ltd. Remand* | *Final Results of Redetermination Pursuant to Court Remand, CITIC Trading Company, Ltd. v. United States of America and ABC Coke, et al: Final Results Pursuant to Remand*, Court No. 01-00901, Slip Op. 03-23 (CIT March 4, 2003), dated June 17, 2003, available at https://access.trade.gov/resources/remands/03-23.pdf |
| *Citric Acid from China* | *Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of Countervailing Duty Administrative Review*, 77 FR 72323 (December 5, 2012) |
| *COALITION I* | *Comm. Overseeing Action for Lumber Int'l Trade Investigations v. United States*, 483 F. Supp. 3d 1253 (CIT 2020) |
| *COALITION II* | *Comm. Overseeing Action for Lumber Int'l Trade Investigations v. United States*, 535 F. Supp. 3d 1336 (CIT 2021) |
| *Coated Paper from China* | *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 FR 59212 (September 27, 2010) |
| *Cold Rolled Steel from China (Vietnam) Preliminary* | *Certain Cold-Rolled Steel Flat Products from the People's Republic of China: Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 82 FR 58178 (December 11, 2017) |

| | |
|---|---|
| *CORE from China (Guatemala)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China: Negative Final Determination of Circumvention Involving Guatemala*, 85 FR 41954 (July 13, 2020) |
| *CORE from China (Guatemala) Preliminary* | *Negative Preliminary Determination of Circumvention Involving Guatemala: Certain Corrosion-Resistant Steel Products from the People's Republic of China*, 85 FR 8840 (February 18, 2020) |
| *CORE from China (Malaysia) Final* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Final Determination of Circumvention Involving Malaysia*, 86 FR 30263 (June 7, 2021) |
| *CORE from China (Malaysia) Preliminary* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Preliminary Determination of Circumvention Involving Malaysia*, 85 FR 8823 (February 18, 2020) |
| *CORE from China (South Africa)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China: Negative Final Determination of Circumvention Involving South Africa*, 86 FR 30253 (June 7, 2021), and accompanying IDM |
| *CORE from China (South Africa) Preliminary* | *Negative Preliminary Determination of Circumvention Involving South Africa: Certain Corrosion-Resistant Steel Products from the People's Republic of China*, 85 FR 8844 (February 18, 2020) |
| *CORE from China (UAE)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 FR 41957 (July 13, 2020) |
| *CORE from China (UAE) Preliminary* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Preliminary Determination of Circumvention Involving the United Arab Emirates*, 85 FR 8841 (February 18, 2020) |
| *CORE from China (Vietnam)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 FR 23895 (May 23, 2018) |

| | |
|---|---|
| CORE from China AD Investigation | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 35316 (June 2, 2016) |
| CORE from Korea (Vietnam) | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Final Determinations of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 84 FR 7034 (December 26, 2019) |
| CORE from Taiwan (Malaysia) | *Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Final Determination of Circumvention Involving Malaysia*, 86 FR 30257 (June 7, 2021) |
| CORE from Taiwan Final | *Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Final Determination of Circumvention Inquiry on the Antidumping Duty Order*, 84 FR 70937 (December 26, 2019) |
| CORE from Taiwan Preliminary Determination | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 32875 (July 10, 2019) |
| CRS from Brazil | *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from Brazil:  Final Affirmative Determination,* 81 FR 49940 (July 29, 2016), and accompanying IDM |
| CRS from China (Vietnam) | *Certain Cold-Rolled Steel Flat Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 FR 23891 (May 23, 2018) |
| CRS from Korea (Vietnam) | *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Affirmative Final Determinations of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 70948 (December 26, 2019) |
| CRS from Korea (Vietnam) Preliminary | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 32875 (July 10, 2019) |

| | |
|---|---|
| *CVD Order* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Countervailing Duty Order*, 77 FR 73017 (December 7, 2012) |
| *CVP 23 from China* | *Carbazole Violet Pigment 23 from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 75 FR 36630 (June 28, 2010) |
| *CWCS from India (Oman and India) Final* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India:  Final Negative Determinations of Circumvention of the Antidumping Duty Order*, 88 FR 12917 (March 1, 2023) |
| *CWCS from India (Oman and India) Preliminary* | *Preliminary Negative Determinations of Circumvention of the Antidumping Order:  Certain Welded Carbon Steel Standard Pipes and Tubes from India*, 87 FR 52507 (August 26, 2022) |
| *DAK Americas* | *DAK Americas LLC v. United States*, 517 F. Supp. 3d 1349, 1360 (CIT 2021) |
| *Decca Hospitality Furnishings* | *Decca Hospitality Furnishings, LLC, et al. v. United States*, 391 F. Supp. 2d 1298 (August 2005) |
| *Diamond Sawblades (Thailand)* | *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Determination of AntiCircumvention Inquiry*, 84 FR 33920 (July 16, 2019) |
| *Diamond Sawblades (Thailand) Preliminary* | *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Circumvention*, 83 FR 57425 (November 15, 2018) |
| *Diamond Sawblades Coalition* | *Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304, 1313 (Fed. Cir. 2017) |
| *Diamond Sawblades Coalition CIT* | *Diamond Sawblades Manufacturers Coalition v. United States*, 816 F. Supp. 2d 1342 (CIT January 2012) |
| *Dillinger France* | *Dillinger France S.A. v. United States,* 981 F.3d 1318, 1322 (Fed. Cir. 2020) |
| *Dongtai Peak* | *Dongtai Peak Honey Indus. v. United States,* 777 F.3d 1343 (Fed. Cir. 2015) |
| *Encino Motorcars* | *Encino Motorcars, LLC v. Navarro*, 570 U.S. 211 (2016) |
| *Ericsson* | *Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995) |
| *Essar Steel* | *Essar Steel Ltd. v. United States,* 678 F.3d 1268 (Fed. Cir. 2012) |

| | |
|---|---|
| *F Lli De Cecco* | *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 980 F. Supp 485 (CIT 1997) |
| *F Lli De Cecco Fed. Cir.* | *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) |
| *FDA v. Brown & Williamson* | *FDA v. Brown & Williamson Tobacco*, 529 U.S. 120 (2000) |
| *PSF from Korea* | *Fine Denier Polyester Staple Fiber from the Republic of Korea:  Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24743 (May 30, 2018) |
| *PSF from Taiwan* | *Fine Denier Polyester Staple Fiber from Taiwan: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24745 (May 30, 2018) |
| *Federal–Mogul Corp.* | Federal–Mogul Corp. v. United States, 63 F.3d 1572, 1575 (Fed. Cir. 1995) |
| *Ferrostaal Metals GmbH* | *Ferrostaal Metals GmbH v. United States*, 518 F. Supp. 3d 1357 (CIT 2021) |
| *Ferrovanadium from China Final Determination* | *Notice of Final Determination of Sales at Less Than Fair Value:  Ferrovanadium from the People's Republic of China*, 67 FR 71137 (November 29, 2002) |
| *Ferrovanadium from China Preliminary Determination* | *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Ferrovanadium from the People's Republic of China*, 67 FR 45088 (July 8, 2002) |
| *Ferrovanadium from Russia Final Determination* | *Ferrovanadium and Nitrided Vanadium from the Russian Federation:  Negative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 46712 (August 6, 2012) |
| *Ferrovanadium from Russia Preliminary Determination* | *Preliminary Negative Determination and Extension of Time Limit for Final Determination of Circumvention of the Antidumping Duty Order on Ferrovanadium and Nitrided Vanadium from the Russian Federation*, 77 FR 6537 (February 8, 2012) |
| *Fish Fillets from Vietnam* | *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and New Shipper; 2010-2011*, 78 FR 17350 (March 21, 2013), and accompanying IDM |

| | |
|---|---|
| *Fish Fillets from Vietnam (Cambodia)* | *Circumvention and Scope Inquiries on the Antidumping Duty Order on Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Partial Affirmative Final Determination of Circumvention of the Antidumping Duty Order, Partial Final Termination of Circumvention Inquiry and Final Rescission of Scope Inquiry*, 71 FR 38608 (July 7, 2006) |
| *Fort Stewart* | *Fort Stewart Schs. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990) |
| *Fource Glass Co.* | *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222 (1957) |
| *Gallant Ocean (Thai.) Co.* | *Gallant Ocean (Thai.) Co., v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) |
| *Glycine from China (India)* | *Glycine from the People's Republic of China:  Final Partial Affirmative Determination of Circumvention of the Antidumping Duty Order*, 77 Fed. Reg. 73,426 (December 10, 2012) |
| *Glycine from India CVD* | *Glycine from India:  Final Results of Countervailing Duty Administrative Review; 2020,* 87 FR 76611 (December 15, 2022) |
| *Granular PTFE Resin from Italy* | *Polytetrafluoroethylene Resin from Italy:  Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 58 FR 26100 (April 30, 1993) |
| *Graphite Electrodes from China (U.K.) Prelim* | *Small Diameter Graphic Electrodes from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 77 FR 33405, 33413 (June 6, 2012) |
| *Grobest* | *Grobest & I-Mei Industries (Vietnam) Co., Ltd. v. United States*, 815 F. Supp. 2d 1342 (CIT 2012) |
| *Hangers from China (Vietnam)* | *Steel Wire Garment Hangers from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order, 76 FR 66895 (October 28, 2011), and accompanying IDM* |
| *Hangers from China (Vietnam) Preliminary Determination* | *Steel Wire Garment Hangers from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Order and Extension of Final Determination*, 76 FR 27007 (May 10, 2011) |

| | |
|---|---|
| Hardwood Plywood from China | *Certain Hardwood Plywood Products from the People's Republic of China:  Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 FR 46470 (July 20, 2023) |
| HFCs from China (India) | *Hydrofluorocarbon Blends from the People's Republic of China:  Final Negative Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-401A Blend; Affirmative Final Determination of Circumvention of the Antidumping Duty Order by Indian Blends Containing Chinese Components*, 85 FR 61930 (October 1, 2020) |
| HFCs from China (India) Preliminary | *Hydrofluorocarbon Blends from the People's Republic of China:  Preliminary Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-410A Blend; Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Indian Blends Containing Chinese Components*, 85 FR 20244 (April 10, 2020) |
| Hot-Rolled Lead and Bismuth | *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom; Negative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders*, 64 FR 40336 (July 26, 1999) |
| Hot-Rolled Steel from Korea AD | *Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 32720 (July 9, 2019) |
| Huvis | *Huvis Corp. v. United States*, 570 F.3d 1347, 1356 (Fed. Cir. 2009) |
| Hyundai Electricity CAFC | *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078 (Fed. Cir. 2021) |
| Hyundai Electricity CIT | *Hyundai Electric & Energy Systems Co., Ltd v. United States*, 477 F. Supp.3d 1324, 132 (CIT 2020) |
| I.N.S. | *I.N.S. v. Enrico St. Cyr*, 533 U.S. 289, 316 (2001) |
| Initiation Notice Dated February 2, 2023 | *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 FR 7060, 71062 (February 2, 2023) |
| Inmax SDN | *Inmax SDN v. United States,* 277 F. Supp. 3d 1367 (CIT 2017) |
| Invenergy | Invenergy Renewables LLC v. United States, 422 F. Supp. 3d 1255, 1285 (CIT 2019) |
| Jiasheng | *Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States,* 28 F. Supp. 3d 1317 (CIT 2014) |
| Kisor | *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) |

| | |
|---|---|
| *KYD, Inc.* | *KYD, Inc. v. United States*, 607 F.3d 760, 767-68 (Fed. Cir. 2010) |
| *Lined Paper Products from India* | *Certain Lined Paper Products from India:  Notice of Final Results of the First Antidumping Duty Administrative Review*, 74 FR 17149 (April 14, 2009) |
| *LWR from China (Vietnam) Preliminary* | *Light-Walled Rectangular Pipe and Tube from the People's Republic of China:  Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 88 FR 21985 (April 12, 2023) |
| *LWR from Taiwan (Vietnam) Preliminary* | *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan:  Preliminary Affirmative Determination of Circumvention of the Antidumping Duty Order*, 88 FR 21980 (April 12, 2023) |
| *Macao CIT* | *Macao Commer. & Indus. Spring Mattress Mfr. v. United States,* 437 F. Supp. 3d 1324 (CIT 2020) |
| *Max Fortune Indus. Co.* | *Max Fortune Indus. Co. v. United States*, Slip Op. 13-52 (CIT 2013), 37 CIT 549, 560-62 (CIT 2013) |
| *Merck Sharp & Dohme Corp. v. Albrecht* | *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) |
| *Michigan* | *Michigan v. EPA*, 576 U.S. 743, 752 (2015) |
| *Mid Continent* | *Mid Continent Steel & Wire, Inc. v. United States*, Slip Op. 2023-45 (CIT 2023) |
| *Mitsubishi Elec. Corp.* | *Mitsubishi Elec. Corp. v. United States,* 700 F. Supp. 538, 555 (CIT 1988), *aff'd* 898 F. 2d 1577 (Fed. Cir. 1990) |
| *Mitsubishi Heavy Industries* | *Mitsubishi Heavy Industries v. United States,* 986 F. Supp. 1428 (CIT 1997) |
| *Mukund CIT* | *Mukand, Ltd. v. United States*, 37 CIT 443, 452 (CIT 2013) |
| *Mukund Fed. Cir.* | *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir. 2014) |
| *Nails from Malaysia CCR Initiation* | *Certain Steel Nails from Malaysia:  Initiation of Antidumping Duty Changed Circumstances Review*, 80 FR 71772 (November 17, 2015) |
| *Nails from Oman* | *Final Results of Antidumping Duty Administrative Review; 2021:  Certain Steel Nails from the Sultanate of Oman*, 87 FR 78639 (December 22, 2022) |
| *Nippon Steel* | *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) |

Barcode:4419739-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Cambodia 2022

| | |
|---|---|
| *OCTG from China (Brunei and Philippines)* | *Oil Country Tubular Goods from the People's Republic of China:  Final Affirmative Determinations of Circumvention,* 86 FR 67443 (November 26, 2021) |
| *OCTG from China (Brunei and Philippines) Preliminary* | *Oil Country Tubular Goods from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention,* 86 FR 43627 (August 10, 2021) |
| *OCTG from China CCR* | *Oil Country Tubular Goods from the People's Republic of China:  Final Results of Antidumping and Countervailing Duty Changed Circumstances Reviews,* 87 FR 15915 (March 21, 2022) |
| *Off-the-Road Tires from China* | *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 40485 (July 15, 2008), and accompanying IDM |
| *Oman Fasteners* | *Oman Fasteners LLC v. United States,* Slip Op. 23-17 (February 22, 2023) |
| *Omnibus Trade & Competitiveness Act* | Conference Report to the 1988 Omnibus Trade & Competitiveness Act, H.R. Rep. No. 100-576, (1988), at 590, reprinted in 1988 U.S.C.C.A.N. 1547, 1623-24 |
| Omnibus Trade Act, Report of the Senate Finance Committee | Omnibus Trade Act, Report of the Senate Finance Committee, S. Rep. No. 71, 100th Cong., 1st Sess. 100 (1987) |
| *Paper from Brazil SII* | *Certain Uncoated Paper from Brazil:  Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Successor-in-Interest Determination; 2019-2020,* 86 FR 30000 (June 4, 2021), unchanged in *Certain Uncoated Paper from Brazil:  Final Results of Antidumping Duty Administrative Review; 2019-2020,* 86 FR 55820 (October 7, 2021) |
| *Pasta from Italy (U.S.) Circumvention* | *Certain Pasta from Italy:  Affirmative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders,* 68 FR 54888 (September 19, 2003) |
| *Pasta from Italy (U.S.) Circumvention Preliminary* | *Certain Pasta from Italy:  Affirmative Preliminary Determinations of Circumvention of Antidumping and Countervailing Duty Orders,* 68 FR 46571 (August 6, 2003) |
| *Pasta from Italy Circumvention Final* | *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order,* 63 FR 54672 (October 13, 1998) |

| | |
|---|---|
| *Pasta from Italy Circumvention Preliminary* | *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 63 FR 18364 (April 15, 1998) |
| *Peer Bearing Co.* | *Peer Bearing Co. v. United States*, 36 CIT 1700 (2012) |
| *Perez* | *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) or *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015) |
| *Pesquera Mares* | Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1380 (Fed. Cir. 2001) |
| *PET Film from India* | *Polyethylene Terephthalate Film, Sheet, and Strip from India: Preliminary Results of Countervailing Duty Administrative Review, and Rescission, in Part; 2020*, 87 FR 48453 (August 9, 2022), and accompanying PDM |
| *PET Film from India Final* | *Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from India: Final Results of Countervailing Duty Administrative Review; 2020*, 87 FR 76024 (December 12, 2022), and accompanying IDM |
| *PET Film from the UAE Preliminary Determination* | *Preliminary Negative Determination of Circumvention of the Antidumping Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, 80 FR 26229 (May 7, 2015) |
| *PET Film from the UAE (Bahrain)* | *Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates: Negative Final Determination of Circumvention of the Antidumping Duty Order*, 80 FR 47463 (August 7, 2015) |
| *Pipe and Tube from India (Oman and UAE)* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India: Final Negative Determinations of Circumvention of the Antidumping Order*, 88 FR 12917 (March 1, 2023) |
| *Pipe and Tube from India (Oman and UAE) Preliminary* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India: Preliminary Negative Determinations of Circumvention of the Antidumping Order*, 87 FR 52507 (August 26, 2022) |
| *Plywood from China (Vietnam) Final* | *Certain Hardwood Plywood Products from the People's Republic of China: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders,* 88 FR 46740 (July 20, 2023), and accompanying IDM |

| | |
|---|---|
| *Plywood from China (Vietnam) Preliminary* | *Certain Hardwood Plywood Products from the People's Republic of China:  Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders,* 87 FR 45753 (July 29, 2022), and accompanying PDM |
| Policy Bulletin 05.1 | Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in Investigations involving Non-Market Economy Countries," (April 5, 2005), available on Commerce's website at https://www.trade.gov/policy-bulletin-051 |
| Policy Bulletin 94.1 | Enforcement and Compliance's Policy Bulletin No. 94.1, regarding, "Cost of Production - Standards for Initiation of Inquiry," (March 25, 1994), available on Commerce's website at https://www.trade.gov/policy-bulletin-941 |
| *Polyvinyl Alcohol from China Final Determination* | *Notice of Final Determination of Sales at Less Than Fair Value:  Polyvinyl Alcohol from the People's Republic of China,* 68 FR 47538 (August 11, 2003) |
| *Polyvinyl Alcohol from China Preliminary Determination* | *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Polyvinyl Alcohol from the People's Republic of China,* 68 FR 13674 (March 20, 2003) |
| *Preamble (Final Rule)* | *Antidumping Duties; Countervailing Duties,* 62 FR 27296 (May 19, 1997) |
| *Preserved Mushrooms from China* | *Certain Preserved Mushrooms from the People's Republic of China:  Final Results and Final Partial Rescission of the Sixth Administrative Review,* 71 FR 40477 (July 17, 2006) |
| *Presidential Proclamation 10414* | *Proclamation No. 10414, Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia,* 87 FR 35067 (June 9, 2022) |
| *Presidential Proclamation 10414 Final Rule Preamble* | *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414,* 87 FR 56868 (September 16, 2022) |
| *Presidential Proclamation 10414 Proposed Rule* | *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414:  Proposed Rule,* 87 FR 39426 (July 1, 2022) |

Barcode:4419739-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Cambodia 2022

| | |
|---|---|
| *PrimeSource Bldg. Prods.* | *PrimeSource Bldg. Prods. v. United States*, 497 F. Supp. 3d 1333 (CIT 2021) (citing U.S. Const. art I, § 8, cl. 1 & cl. 3) |
| *Procedures for Importation of Supplies for Use in Emergency Relief Work* | *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 FR 63230 (October 30, 2006) |
| *Pure Magnesium from Canada CCR Initiation* | *Initiation of Changed Circumstances Countervailing Duty Administrative Reviews; Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 41473 (September 10, 1992) |
| *QSPs from China CCRs* | *Certain Quartz Surface Products from the People's Republic of China:  Initiation of Antidumping and Countervailing Duty Changed Circumstances Reviews; Global Stone,* 88 FR 41377 (June 26, 2023); and *Certain Quartz Surface Products from the People's Republic of China:  Initiation of Antidumping and Countervailing Duty Changed Circumstances Reviews; AM Stone,* 88 FR 41386 (June 26, 2023) |
| *Retail Carrier Bags from Taiwan Final Determination* | *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 79 FR 61056 (October 9, 2014)) |
| *Retail Carrier Bags from Taiwan Preliminary Determination* | *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 79 FR 31302 (June 2, 2014) |
| *Roberto* | *Roberto v. Dep't of Navy*, 440 F.3d 1341 (Fed. Cir. 2006) |
| *Romani* | *United States v. Est. of Romani*, 523 U.S. 517 (1998) |
| S. Rep. No. 103-412 | Joint Report of the Committee on Finance, Committee on Agriculture Nutrition and Forestry, Committee on Governmental Affairs of the United States Senatre to Accompany S. 2467, Uruguay Round Agreements Act |
| SAA | Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, Vol. I (1994) |
| *Saddler* | *Saddler v. Dep't of the Army*, 68 F.3d 1357, 1358 (Fed. Cir. 1995) |
| *Save Domestic Oil* | *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004) |
| *SDGE from China* | *Small Diameter Graphite Electrodes from the People's Republic of China:  Final Results of the First Administrative Review of the Antidumping Duty Order and Final Rescission of the Administrative Review, in Part*, 76 FR 56397 (September 13, 2011) |

| | |
|---|---|
| SDGE from China (UK) | *Small Diameter Graphite Electrodes from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 47596 (August 9, 2012) |
| Senate Report 100-71 | *U.S. Senate, Committee on Finance, Omnibus Trade Act of 1987*, S. Rep. No. 100-71, at 101 (1987) |
| Shakeproof Tool Works, Inc. | *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) |
| Shanghai Sunbeauty Trading Co. | *Shanghai Sunbeauty Trading Co. v. United States*, 380 F. Supp. 3d. 1328 (CIT 2019) |
| Shelter Forest CIT | *Shelter Forest Int'l Acquisition, Inc. v. United States*, Slip Op. 2021-90 (CIT 2021) |
| Shenzhen Xinboda | *Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 494 F. Supp. 3d 1347 (CIT 2021) |
| Shrimp from China | *Certain Frozen Warmwater Shrimp from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 85 FR 83891 (December 23, 2020), and accompanying IDM |
| Silicon Carbide from China | *Notice of Final Determination of Sales at Less Than Fair Value:  Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994), |
| Silicon Metal from Brazil | *Silicon Metal from Brazil:  Final Affirmative Countervailing Duty Determination*, 83 FR 9838 (March 8, 2018), and accompanying IDM |
| SKF CIT | *SKF USA Inc. v. United States*, 675 F. Supp. 2d 1264 (CIT 2009) |
| Skidmore | *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) |
| Smith Corona | *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Cir. 1990)) |
| Softwood Lumber from Canada | *Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017), and accompanying IDM |
| Solar Cells from China 2017-2018 AR | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 62275 (October 2, 2020), and accompanying IDM |
| Solar Cells from China Investigation | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Determination of Sales at Less Than* |

| | |
|---|---|
| | *Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012) |
| *Solar Products from China* | *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China:  Final Determination of Sales at less Than Fair Value*, 79 FR 76970 (December 23, 2014) |
| Solaria Scope Ruling | Memorandum, "The Solaria Corporation Scope Ruling," dated April 8, 2021 (placed on the record in NextEra's Letter, "Pre-Preliminary Determination Comments," dated October 20, 2022, at Attachment 22 |
| *Sonali Scope Application* | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Sonali Scope Application," dated January 25, 2023 |
| *Sonali Scope Inquiry* | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Sonali Scope Inquiry," dated January 20, 2023 |
| *Soybean Meal from India AD* | *Final Affirmative Determination of Sales at Less than Fair Value:  Organic Soybean Meal from India*, 87 FR 16458 (March 23, 2022) |
| *Soybean Meal from India CVD* | *Final Affirmative Countervailing Duty Determination of Sales at Less than Fair Value:  Organic Soybean Meal from India*, 87 FR 16453 (March 23, 2022) |
| *Sparklers from China* | *Notice of Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588 (May 6, 1991) |
| *SSF from India SII* | *Stainless Steel Flanges from India:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Successor-in-Interest Determination, and Partial Rescission; 2019-2020,* 86 FR 60792 (November 4, 2021), unchanged in *Stainless Steel Flanges from India:  Final Results of Antidumping Duty Administrative Review; 2019–2020,* 87 FR 27568 (May 9, 2022) |
| *SSSS from China (Vietnam)* | *Stainless Steel Sheet and Strip from the People's Republic of China:  Final Scop Ruling and Final Affirmative Determination of Circumvention for Exports from the Socialist Republic of Vietnam*, 88 FR 18521 (March 29, 2023) |
| *SSSS from China (Vietnam) Preliminary* | *Stainless Steel Sheet and Strip from the People's Republic of China:  Scope Ruling and Preliminary Affirmative Determination of Circumvention for Exports from the Socialist Republic of Vietnam*, 87 FR 56626 (September 15, 2022) |

| | |
|---|---|
| *Steel Flanges from India* | *Finished Carbon Steel Flanges from India: Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86 FR 500032 (September 7, 2021), and accompanying PDM |
| *Steel Flanges from India Final* | *Finished Carbon Steel Flanges from India:  Final Results of Countervailing Duty Administrative Review; 2019*, 86 FR 67909 (November 30, 2021), and accompanying IDM |
| *Steel Flanges from Spain AD* | *Finished Carbon Steel Flanges from Spain:  Final Results of Antidumping Duty Administrative Review; 2017–2018*, 85 FR 7919 (February 12, 2020) |
| *Steel Threaded Rod from Thailand Final* | *Steel Threaded Rod from Thailand:  Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 79 FR 14476 (March 14, 2014) |
| *Steel Threaded Rod from Thailand Preliminary* | *Steel Threaded Rod from Thailand:  Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 FR 79670 (December 31, 2013) |
| *Steel Tubing from Taiwan Preliminary Results (Taiwan)* | *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan*, 88 FR 21980 (April 12, 2023) |
| *Tapered Roller Bearings from China* | *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 FR 3987 (January 22, 2009) |
| *Tapered Roller Bearings from China* | *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of New Shipper Reviews*, 67 FR 10665 (March 8, 2002) |
| *Techsnabexport, Ltd.* | *Techsnabexport, Ltd. v. United States*, 795 F.Supp. 428 (CIT 1992) |
| *Timken Co.* | *Timken Co. v. United States*, 968 F. Supp. 2d 1279 (2014), *aff'd* 589 F. App'x 995 (Fed. Cir. 2015) |
| *Tissue Paper from China (India) Final Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 83 FR 40101 (July 3, 2013) |
| *Tissue Paper from China (India) Preliminary Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 78 FR 14514 (March 6, 2013), and accompanying IDM |
| *Tissue Paper from China (Thailand) Final Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Final Determination of* |

| | |
|---|---|
| | *Circumvention of the Antidumping Duty Order*, 74 FR 29172 (June 19, 2009) |
| *Tissue Paper from China (Vietnam) Final Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 73 FR 57591 (October 3, 2008) |
| *Tissue Paper from China (Vietnam) Preliminary Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 73 FR 21580 (April 22, 2008) |
| *Torrington* | U.S. Senate, Committee on Finance, Omnibus Trade Act of 1987, S. Rep. No. 100-71, at 101 (1987) |
| *TPP from China (Thailand)* | *Affirmative Final Determinations of Circumvention of the Antidumping Order:  Certain Tissue Paper Products from the People's Republic of China*, 73 FR 57591 (October 3, 2008) |
| *Tung Mung CIT* | *Tung Mung Dev. Co. v. United States*, 219 F. Supp. 3d 1333, 1343 (CIT 2002) |
| *U.K. Carbon and Graphite* | *U.K. Carbon and Graphite Co., Ltd. v United States*, 931 F. Supp. 2d 1322 (CIT 2013) |
| *Uncoated Paper from China Final Determination* | *Certain Uncoated Paper from Brazil, the People's Republic of China, and Indonesia:  Affirmative Final Determinations of Circumvention of the Antidumping Duty Orders and Countervailing Duty Orders for Certain Uncoated Paper Rolls*, 86 FR 71025 (December 14, 2021) |
| *Uncoated Paper from China Preliminary Determination* | *Certain Uncoated Paper from the People's Republic of China:  Affirmative Preliminary Determinations of Circumvention of the Antidumping and Countervailing Duty Orders for Uncoated Paper Rolls*, 85 FR 72624 (November 13, 2020) |
| *Uncovered Innerspring Units from China (Malaysia) Final Determination* | *Uncovered Innerspring Units from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 80 FR 74758 (November 30, 2015) |
| *Uncovered Innerspring Units from China (Malaysia) Preliminary Determination* | *Uncovered Innerspring Units from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 80 FR 64392, 64393 (October 23, 2015) |
| *USITC Solar 2021 Determination* | *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. No. TA-201-75 (Extension), USITC Pub. 5266 (December 2021) |

| | |
|---|---|
| *USITC Solar Investigation Final* | *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. No. TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (November 2012) |
| *Uyghur Forced Labor Prevention Act:  U.S. Customs and Border Protection Operational Guidance for Importers* | *Uyghur Forced Labor Prevention Act:  U.S. Customs and Border Protection Operational Guidance for Importers June 13, 2022*, CBP Publication No. 1793-0522 |
| *Vietnam Finewood* | *Vietnam Finewood Company Limited, et.al v. United States*, 466 F. Supp. 3d 1273 (CIT 2023) |
| *Walk-Behind Lawn Mowers from China* | *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 27384 (May 20, 2021) |
| *Walk-Behind Lawn Mowers from China Circumvention Rescission* | *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China:  Notice of Intent to Rescind Circumvention Inquiry on the Antidumping and Countervailing Duty Orders*, 88 FR 13434 (March 3, 2023) |
| *Walgreen Co.* | *Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) |
| *Wantanabe Group* | *Watanabe Group v. United States*, 34 CIT 1545, Slip Op. 10-139 (CIT 2010) |
| *Wheatland* | *Wheatland Tube Co. v. United States* 161 F.3d 1365, 1371 (Fed. Cir. 1998) |
| *Wire Rod from Korea and United Kingdom CCR* | *Carbon and Alloy Steel Wire Rod from the Republic of Korea and the United Kingdom:  Notice of Final Results of Antidumping Duty Changed Circumstances Review*, 84 FR 13888 (April 8, 2019) |
| *Xanthan Gum from China 2016-2017* | *Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Discontinuation of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 65142 (December 19, 2018) |
| *Yangtai CIT* | *Yantai Oriental Juice Co. v. United States*, Slip Op. 03-33 (CIT March 21, 2003) |
| *Yangzhou CAFC* | *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) |
| *Youngstown Sheet & Tube Co.* | *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) |

**Appendix III -Documents on Record**
**This Section is Sorted by Short Citation**

| Short Citation | Document Title and Date |
|---|---|
| *Appendix IV-Certification for "Applicable Entries"* | *Preliminary Determination at Appendix IV; Certification for "Applicable Entries"* |
| *Appendix V-Certification for Non-Circumventing Companies* | *Preliminary Determination at Appendix IV; Certification for Entries of Inquiry Merchandise from Companies Preliminarily Found Not to Be Circumventing* |
| *Appendix VI-Certification Regarding Chinese Components* | *Preliminary Determination at Appendix IV; Certification Regarding Chinese Component* |
| Auxin November 9, 2022 *Ex Parte* Memorandum | Memorandum, "Meeting with Counsel for Auxin," dated November 14, 2022 |
| Auxin's April 26, 2023  Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)—Thailand," dated April 26, 2023 |
| Auxin's April 26, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)—Thailand," dated April 26, 2023 |
| Auxin's August 3, 2022 SV Rebuttal Comments | Auxin's Letter, "Rebuttal Surrogate Value Comments and Information," dated August 3, 2022 |
| Auxin's March 24, 2023 Case Brief | Auxin's Letter,  "Auxin's Case Brief (Tranche 2)," dated March 24, 2023 |
| Auxin's April 19, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche2)—Vietnam," dated April 19, 2023 |
| Auxin's April 24, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2) - Malaysia," dated April 24, 2023 |
| Auxin's April 27, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Case Brief (Tranche2)—Thailand," dated April 27, 2023 |
| Auxin's April 28, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)—Vietnam," dated April 28, 2023 |
| Auxin's April 3, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)," dated April 3, 2023 |
| Auxin's Hearing Request | Auxin's Letter, "Auxin Solar, Inc.'s Request for Public Hearing," dated December 29, 2022 |
| Auxin's Investment and R&D Information | Auxin's Letter, "Submission of Investment and Research and Development Information," dated July 29, 2022 |
| *Auxin's ITC Posthearing Brief* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products): Posthearing Brief on Behalf of Auxin Solar Inc.*, Inv. No. TA-201-75 (Safeguard Extension) (November 2021) |
| *Auxin's ITC Prehearing Brief* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products): Prehearing Brief on Behalf of Auxin Solar Inc.*, Inv. No. TA-201-75 (Safeguard Extension) (October 2021) |

| | |
|---|---|
| Auxin's July 27, 2022 SV Comments | Auxin's Letter, "Submission of Surrogate Value Information for Vietnamese Factors of Production," dated July 27, 2022 |
| Auxin's July 29, 2022 Comments | Auxin's Letter, "Submission of Investment and Research and Development Information," dated July 29, 2022 |
| Auxin's March 17, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 1)," dated March 17, 2023 |
| Auxin's March 24, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)," dated March 24, 2023 |
| Auxin's March 6, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 1)," dated March 6, 2023 |
| Auxin's March 7, 2022 Submission | Auxin's Letter, "Response to NextEra's Request to Reject Anti-Circumvention Ruling Requests," March 7, 2022 |
| Auxin's May 16, 2022 Comments | Auxin's Letter, "Auxin's Response to Rebuttal Comments and Factual Information," dated May 16, 2022 |
| Auxin's May 5, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2) - Malaysia," dated May 5, 2023 |
| Auxin's May 9, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)," dated May 9, 2023 |
| Auxin's October 20, 2023 Pre-Preliminary Comments | Auxin's Letter, "Pre-Preliminary Comments Concerning Jinko Solar Technology Sdn. Bhd. and Hanwha Q Cells Malaysia Sdn. Bhd.," dated October 20, 2022 |
| *Bloomberg Report* | BloombergNEF, *Solar PV Trade and Manufacturing: A Deep Dive* (2021) |
| Boviet 1st SQR | Boviet's Letter, "Boviet First Supplemental Questionnaire Response," dated August 11, 2022 |
| Boviet 2nd SQR | Boviet's Letter, "Boviet Second Supplemental Questionnaire Response," dated August 12, 2022 |
| Boviet 3rd SQR | Boviet's Letter, "Boviet Third Supplemental Questionnaire Response," dated October 7, 2022 |
| Boviet 4th SQR | Boviet's Letter, "Boviet Fourth Supplemental Questionnaire Response," dated November 2, 2022 |
| Boviet Final Analysis Memorandum | Memorandum, "Final Analysis Memorandum for Boviet Solar Technology Co., Ltd.," dated concurrently with this memorandum |
| Boviet Preliminary Analysis Memorandum | Memorandum, "Preliminary Analysis Memorandum for Boviet Solar Technology Co., Ltd.," dated December 1, 2022 |
| Boviet's May 5, 2023 Rebuttal Brief | Boviet's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Second Tranche Rebuttal Brief," dated May 5, 2023 |

| | |
|---|---|
| Boviet's April 28, 2023 Rebuttal Brief | Boviet's Letter, "Boviet Rebuttal Brief re Tranche II," dated April 28, 2023 |
| Boviet's August 3, 2022 SV Rebuttal Comments | Boviet's Letter, "Boviet Rebuttal Surrogate Value Information," dated August 3, 2022 |
| Boviet's IQR Part I | Boviet's Letter, "Boviet Initial Circumvention Inquiry Questionnaire Response," dated June 3, 2022 |
| Boviet's IQR Part II | Boviet's Letter, "Boviet Circumvention Inquiry Questionnaire Response – Part II," dated June 23, 2022 |
| Boviet's July 27, 2020 SV Comments | Boviet's Letter, "Boviet Surrogate Value Information," dated July 27, 2022 |
| Boviet's March 17, 2023 Rebuttal Brief | Boviet's Letter, "Boviet's Letter in Lieu of Rebuttal Brief re Tranche 1," dated March 17, 2023 |
| Boviet's March 6, 2023 Case Brief | Boviet's Letter, "Boviet Case Brief re Tranche 1," dated March 6, 2023 |
| BYD HK Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Cambodia:  Final Analysis Memorandum for BYD (H.K.) Co., Ltd.," dated concurrently with this memorandum |
| BYD HK Hearing Request | BYD HK's Letter, "Request for Hearing," dated January 6, 2023 |
| BYD HK Initial QR Part I | BYD HK's Letter, "Response to Initial Questionnaire," dated June 7, 2022 |
| BYD HK Initial QR Part II | BYD HK's Letter, "Response to Second Circumvention Inquiry Questionnaire," dated June 23, 2022 |
| BYD HK 1st SQR | BYD HK's Letter, "Response to First Supplemental Questionnaire," dated August 9, 2022 |
| BYD HK 2nd SQR | BYD HK's Letter, "Response to Second Supplemental Questionnaire," dated August 19, 2022 |
| BYD HK 3rd SQR | BYD HK's Letter, "Response to Third Supplemental Questionnaire," dated October 12, 2022 |
| BYD HK Verification Exhibits | BYD HK's Letter, "Verification Exhibits of BYD (HK) Co., Ltd.," dated February 16, 2023 |
| BYD HK's Verification Report | Memorandum, "Verification of the Questionnaire Responses of BYD (H.K.) Co., Ltd. in the Circumvention Inquiry of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - with Respect to Cambodia," dated March 15, 2023 |
| BYD HK Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Cambodia:  Preliminary Analysis Memorandum for BYD (H.K.) Co., Ltd.," dated December 1, 2022 |
| BYD HK's April 3, 2023 Rebuttal Brief | BYD HK's Letter, "Second Tranche Rebuttal Brief of BYD HK," dated April 3, 2023 |

| BYD HK's March 17, 2023 Rebuttal Brief | BYD HK's Letter, "First Tranche Rebuttal Brief of BYD," dated March 17, 2023 |
|---|---|
| BYD HK's March 24, 2023 Case Brief | BYD HK's Letter, "Second Tranche Case Brief," dated March 24, 2023 |
| BYD HK's March 6, 2023 Case Brief | BYD HK's Letter, "First Tranche" Letter in Lieu of Case Brief of BYD," dated March 6, 2023 |
| *Cambodia* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia," dated December 1, 2022 |
| Cambodia RSM | Memorandum, "Circumvention Inquiry with Respect to Cambodia:  Respondent Selection," dated May 12, 2022 |
| CBP Data Release Memorandum | Memorandum," Release of Customs and Border Protection Entry Data," dated March 29, 2022 |
| CBP Messages Memorandum | Memorandum, "Placement of Customs and Border Protection (CBP) Messages on Record of Proceedings," dated February 17, 2023 |
| *CEA Report* | Clean Energy Associates, *Crystalline Silicon PV - Sector Background* (2022) |
| Circumvention Questionnaires | Circumvention Inquiry Questionnaire," dated May 13 and 16, 2022 |
| Circumvention Request | Auxin's Letter, "Auxin Solar's Request for an Anti-Circumvention Ruling to Section 781(b) of the Tariff Act of 1930, As Amended," dated February 8, 2022 |
| Clarification of Product Coverage Memorandum | Memorandum, "Clarification of Product Coverage," dated December 19, 2022 |
| May 2, 2022 Memorandum | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Comments on Potential Certification Requirements," dated May 19, 2022 Circumvention Inquiries With Respect to Cambodia, Malaysia,  Thailand, and Vietnam – Potential Certification Requirements," dated May 2, 2022 |
| Commerce's December 1, 2022 Rejection Letter | Commerce's Letter, "Rejection Letter of Red Sun's Q&V Questionnaire Response," dated December 1, 2022 |
| CSIL Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand:  Final Analysis Memorandum for Canadian Solar International Limited," dated concurrently with this memorandum |
| CSIL's 1st SQR | CSIL's Letter, "Response to First Supplemental Questionnaire," dated August 8, 2022 |
| CSIL's 2nd SQR | CSIL's Letter, "Response to Second Supplemental Questionnaire," dated August 12, 2022 |
| CSIL's 3rd SQR | CSIL's Letter, "Response to Third Supplemental Questionnaire," dated October 7, 2022 |

| CSIL's 4th SQR | CSIL's Letter, "Response to Fourth Supplemental Questionnaire," dated November 2, 2022 |
|---|---|
| CSIL's April 19, 2023 Case Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 19, 2023 |
| CSIL's April 26, 2023 Rebuttal Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 26, 2023 |
| CSIL's April 27, 2023 Case Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 27, 2023 |
| CSIL's Hearing Request | CSIL's Letter, "Request for Hearing," dated January 6, 2023 |
| CSIL's IQR Part I | CSIL's Letter, "Response to Circumvention Inquiry Questionnaire," dated June 3, 2022 |
| CSIL's IQR Part II | CSIL's Letter, "Response to Second Circumvention Inquiry Questionnaire," dated June 23, 2022 |
| CSIL's March 17, 2023 Rebuttal Brief | CSIL's Letter, "First Tranche Rebuttal Brief," dated March 17, 2023 |
| CSIL's March 6, 2023 Case Brief | CSIL's Letter, "First Tranche Case Brief," dated March 6, 2023 |
| CSIL's May 9, 2023 Rebuttal Brief | CSIL's Letter, "Second Tranche Rebuttal Case Brief of Canadian Solar International Limited," dated May 9, 2023 |
| CSIL's October 20, 2022 Pre-Preliminary Comments | CSIL's Letter, "Comments in Advance of the Preliminary Determination," dated October 20, 2022 |
| CSIL Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand: Preliminary Analysis Memorandum for Canadian Solar International Limited," dated December 1, 2022 |
| CSIL's Verification Exhibits | CSIL's Letter, "Verification Exhibits," dated February 22, 2023 |
| CSIL's Verification Report | Memorandum, "Verification of the Information Reported by Canadian Solar International Limited," dated April 19, 2023 |
| *Denis De Ceuster Report* | Denis De Ceuster and DDC Solar LLC, *Crystalline Silicon Photovoltaic Supply Chain: from Polysilicon to Solar Panel* (2022) |
| DHS Order Re: Forced Labor in Xinjiang | The Department of Homeland Security Issues Withhold Release Order on Silica-Based Products Made by Forced Labor in Xinjiang," U.S CUSTOMS AND BORDER PROTECTION (June 24, 2021), available at https://www.cbp.gov/newsroom/national-media-release/departmenthomeland- security-issues-withhold-release-order-silica |

| | |
|---|---|
| *DOE Solar Deep Dive* | *U.S. Department of Energy Response to Executive Order 14017 "America's Supply Chains," Solar Photovoltaics: Supply Chain Deep Dive Assessment* (February 24, 2022) included in the memorandum, "Meeting with the Department of Energy," dated June 3, 2022 |
| ET Solar Scope Ruling | Memorandum, "Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China: ET Solar Inc.," dated June 15, 2021 |
| Factor Valuation Memorandum | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - Circumvention Inquiries with Respect to Cambodia, Malaysia and Thailand: Factor Valuation Memorandum," dated December 1, 2022 |
| First Solar Malaysia's April 24, 2023 Case Brief | First Solar Malaysia's Letter, "Letter in Lieu of Case Brief for Second Tranche of Issues," dated April 24, 2023 |
| First Solar Malaysia's Hearing Request | First Solar Malaysia's Letter, "Request to Participate at Hearing," dated January 6, 2023 |
| First Solar Malaysia's March 17, 2023 Rebuttal Brief | First Solar Malaysia's Letter, "Letter in Lieu of Rebuttal Brief for First Tranche of Issues," dated March 17, 2023 |
| First Solar Malaysia's March 6, 2023 Case Brief | First Solar Malaysia's Letter, "Case Brief for First Tranche of Issues," dated March 6, 2023 |
| First Solar Malaysia's May 5, 2023 Case Brief | First Solar Malaysia's Letter, "Letter in Lieu of Rebuttal Brief for Second Tranche of Issues," dated May 5, 2023 |
| First Solar Vietnam's April 28, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief for Second Tranche of Issues," dated April 28, 2023 |
| First Solar Vietnam's March 17, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief for First Tranche of Issues," dated March 17, 2023 |
| First Solar Vietnam's March 6, 2023 Case Brief | First Solar Vietnam's Letter, "Case Brief for First Tranche of Issues," dated March 6, 2023 |
| First Solar's April 28, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief of Second Tranche of Issues," dated April 28, 2023 |
| First Tranche Briefing Schedule | Memorandum, "Announcement of Briefing Schedule for First Tranche of Case and Rebuttal Briefs," dated February 22, 2023 |
| *FTI Report* | FTI Consulting, Inc., *The Photovoltaic Value Chain In Southeast Asia: Response to BloombergNEF's Solar PV Trade and Manufacturing: Deep Dive* (2021) |

| Hanwha Final Analysis Memorandum | Memorandum, "Hanwha Q CELLS Malaysia Sdn. Bhd. (Hanwha) – Final Analysis Memorandum," dated concurrently with this memorandum |
|---|---|
| Hanwha IQR Part I | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Response to Circumvention Inquiry Questionnaire (Part I)," dated June 3, 2022 |
| Hanwha IQR Part II | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Response to Circumvention Inquiry Questionnaire (Part II)," dated June 23, 2022 |
| Hanwha's 1st SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s First Supplemental Questionnaire Response," dated August 9, 2022 |
| Hanwha's 2nd SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Second Supplemental Questionnaire Response," dated August 19, 2022 |
| Hanwha's 3rd SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Fourth Supplemental Questionnaire Response," dated October 11, 2022 |
| Hanwha Preliminary Analysis Memorandum | Memorandum, "Hanwha Q CELLS Malaysia Sdn. Bhd. (Hanwha) – Preliminary Analysis Memorandum," dated December 1, 2022 |
| Hanwha's April 24, 2023 Case Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Case Brief Regarding Comments on Certification Issues (Second Tranche)," dated April 24, 2023 |
| Hanwha's December 14, 2022 Certification Comments | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd's Comments on Proposed Certification Process," dated December 14, 2022 |
| Hanwha's Hearing Request | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Hearing Request," dated January 6, 2023 |
| Hanwha's March 17, 2023 Rebuttal Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Rebuttal Brief Regarding Comments on Certification Issues (First Tranche)," dated March 17, 2023 |
| Hanwha's March 6, 2023 Case Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Case Brief Regarding Comments on Certification Issues (First Tranche)," dated March 6, 2023 |
| Hanwha's May 5, 2023 Rebuttal Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Rebuttal Brief (Second Tranche)," dated May 5, 2023 |
| Hearing Transcript | Hearing Transcript, "Solar Cells from China Circumvention Inquiries covering Cambodia, Malaysia, Thailand and Vietnam," dated July 25, 2023 |
| IEA Report | International Energy Agency, *Solar PV Global Supply Chains* (2022) |

| Initiation Memorandum | Memorandum, "Initiation of Circumvention Inquiries," dated March 25, 2022 |
| --- | --- |
| *Initiation Notice* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders*, 87 FR 19071 (April 1, 2022) |
| ITC Notification Letter | Commerce's Letter, "Notification of Affirmative Preliminary Determinations of Circumvention," dated May 30, 2023 |
| *ITC Solar Final* | *Crystalline Silicon Photovoltaic Cells and Modules from China,* Inv. No. 701-TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (November 2012) |
| *ITC Solar Monitoring* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled into Other Products: Monitoring Developments in the Domestic Industry,* Inv. No. TA-201-75 (Monitoring), USITC Pub. 5021 (February 2020) |
| *ITC Solar Safeguard Proceeding 2017* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products),* Inv. No. TA-201-75 (Safeguard), USITC Pub. 4739 (November 2017) |
| *ITC Solar Safeguard Proceeding 2019* | *Crystalline Silicon Photovoltaic Cells and Modules from China,* Inv. No. 701-TA-481 and 731-TA-1190 (Review), USITC Pub. 4874 (March 2019) |
| JA Solar, LONGi, VINA and VSUN's March 17, 2023 Rebuttal Brief | VSUN's Letter, "Letter in Lieu of Rebuttal Brief," dated March 17, 2023 |
| JA Solar's Hearing Request | JA Solar's Letter, "JA Solar's Request for Hearing," dated January 6, 2023 |
| JA Solar's May 2, 2022 Comments | JA Solar's Letter, "JA Solar Comments and Rebuttal Factual Information on Anti-Circumvention Inquiry Request," dated May 2, 2022 |
| Jinko Final Analysis Memorandum | Memorandum, "Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. – Final Analysis Memorandum," dated concurrently with this memorandum |
| Jinko IQR Part I | Jinko's Letter, "Jinko Initial Questionnaire Part I Questionnaire Response," dated June 6, 2022 |
| Jinko IQR Part II | Jinko's Letter, "Jinko Initial Questionnaire Part II Questionnaire Response," dated June 23, 2022 |
| Jinko's 1st SQR | Jinko's Letter, "Jinko First Supplemental Questionnaire Response," dated August 8, 2022 |

| | |
|---|---|
| Jinko's 2nd SQR | Jinko's Letter, "Jinko Second Supplemental Questionnaire Response," dated August 19, 2022 |
| Jinko's 3rd SQR | Jinko's Letter, "Jinko Third Supplemental Questionnaire Response," dated October 11, 2022 |
| Jinko's 4th SQR | Jinko's Letter, "Jinko Fourth Supplemental Questionnaire Response," dated November 2, 2022 |
| Jinko Preliminary Analysis Memorandum | Memorandum, "Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. – Preliminary Analysis Memorandum," dated December 1, 2022 |
| Jinko Verification Report | Memorandum, "Verification of the Questionnaire Responses of Jinko," dated April 12, 2023 |
| Jinko's April 24, 2023 Case Brief | Jinko's Letter, "Jinko Second Tranche Case Brief," dated April 24, 2023 |
| Jinko's Hearing Request | Jinko's Letter, "Jinko Request to Participate at Hearing," dated January 6, 2023 |
| Jinko's March 17, 2023 Rebuttal Brief | Jinko's Letter, "Jinko First Tranche Rebuttal," dated March 17, 2023 |
| Jinko's March 6, 2023 Case Brief | Jinko's Letter, "Jinko First Tranche Letter Concerning Certification Requirements," dated March 6, 2023 |
| Jinko's May 5, 2023 Rebuttal Brief | Jinko's Letter, "Jinko Second Tranche Rebuttal Brief," dated May 5, 2023 |
| *Malaysia* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to Malaysia," dated December 1, 2022 |
| Malaysia RSM | Memorandum, "Circumvention Inquiries With Respect to Malaysia:  Respondent Selection," dated May 12, 2022 |
| Maxeon's Hearing Request | Maxeon's Letter, "Request to Appear at Public Hearing," dated January 2, 2023 |
| Maxeon's March 17, 2023 Rebuttal Brief | Maxeon's Letter, "Maxeon's Rebuttal Brief," dated March 17, 2023 |
| Maxeon's March 6, 2023 Case Brief | Maxeon's Letter, "Maxeon's Case Brief," dated March 6, 2023 |
| NE Solar IQR Part I | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Initial Questionnaire Response," dated June 3, 2022 |
| NE Solar IQR Part II | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China;-Circumvention Inquiry Initial Questionnaire Response," dated June 23, 2022 |

| | |
|---|---|
| NE Solar Hearing Request | NE Solar's Letter, "New East Solar Energy's Request to Participate in Hearing," dated January 6, 2023 |
| NE Solar January 29, 2023 *Ex Parte* Memorandum | Memorandum, "Meeting with Counsel for New East Solar," dated January 29, 2023 |
| NE Solar Preliminary Analysis Memorandum | Memorandum, "Preliminary Analysis Memorandum for New East Solar (Cambodia) Co., Ltd.," dated December 1, 2022 |
| NE Solar's August 17, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Surrogate Value Questionnaire Response," dated August 17, 2022 |
| NE Solar's November 4, 2022 SQR | NE Solar's Letter, " Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire Response," dated November 4, 2022 |
| NE Solar's October 11, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire III Response," dated October 11, 2022 |
| NE Solar's August 8, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire I Response," dated August 8, 2022 |
| NE Solar's March 6, 2023 Case Brief | NE Solar's Letter, "New East Solar Energy's Case Brief," dated March 6, 2023 |
| Next Era's March 17, 2023 Rebuttal Brief | Next Era's Letter, "First Tranche Rebuttal Brief," dated March 17, 2023 |
| Next Era's March 6, 2023 Case Brief | Next Era's Letter, "Tranche 1 Case Brief," dated March 6, 2023 |
| NextEra's April 28, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 28, 2023 |
| NextEra's April 3, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 3, 2023 |
| NextEra's May 19, 2022 Comments | NextEra's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Comments on Potential Certification Requirements," dated May 19, 2022 |
| NextEra's May 9, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated May 9, 2023 |

| NextEra's April 19, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 19, 2023 |
|---|---|
| NextEra's April 24, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 24, 2023 |
| NextEra's April 26, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 26, 2023 |
| NextEra's April 28, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 28, 2023 |
| NextEra's Hearing Request | NextEra's Letter, "Request to Appear at Hearing," dated January 6, 2023 |
| NextEra's March 24, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated March 24, 2023 |
| NextEra's May 2, 2022 Comments | NextEra's letter, "NextEra Comments on Auxin's Circumvention Ruling Request," dated May 2, 2022 |
| NextEra's May 2, 2022 Submission | NextEra's Letter, "NextEra Comments on Auxin's Circumvention Ruling Request," dated May 2, 2022 |
| NextEra's May 5, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated May 5, 2023 |
| *NREL 2018 Report* | National Renewable Energy Laboratory, *Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing* (February 2020) at Attachment 24 of NextEra's 5.2.22 Submission |
| *NREL Report* | National Renewable Energy Laboratory, *Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing* (2020) |
| *Preliminary Determinations* | *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 FR 75221 (December 8, 2022) |
| Preliminary Determination Corrections | Memorandum, "Preliminary Determinations Corrections," dated January 24, 2023 |
| Q&V Questionnaire | Quantity and Value Questionnaire for Circumvention Inquiries With Respect to Cambodia, Malaysia, Thailand, and Vietnam, dated March 30, 2022 |
| Q&V Questionnaire Deadline Extension | Memorandum, "Extension of the Deadline to Respond to the Quantity and Value Questionnaire," dated April 20, 2022 |
| Red Sun's April 19, 2023 Case Brief | Red Sun's Letter, "Red Sun's Second Tranche Case Brief," dated April 19, 2023 |

Barcode:4419739-02 A-570-979 CIRC - Anti Circumvention Inquiry - from Cambodia 2022

| | |
|---|---|
| Red Sun's January 6, 2023 Request Letter | Red Sun's Letter, "Request to Supplement Rejection Memo and Place Correspondence with Red Sun on the Record," dated January 6, 2023 |
| Request for Comments on Surrogate Countries | Memorandum, "Request for Economic Development, Surrogate Country Comments and Information," dated May 13, 2022 |
| Risen's March 17, 2023 Rebuttal Brief | Risen's Letter, "Risen Solar Rebuttal Brief – Tranche 1," dated March 17, 2023 |
| Risen's March 6, 2023 Case Brief | Risen's Letter, "Risen Solar Case Brief – Tranche 1," dated March 6, 2023 |
| Risen's May 5, 2023 Rebuttal Brief | Risen's Letter, "Risen Solar Rebuttal brief - Tranche II," dated May 5, 2023 |
| Second Tranche Briefing Schedule for Cambodia | Memorandum, "Announcement of Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for Cambodia," dated March 15, 2023 |
| Second Tranche Briefing Schedule for Malaysia | Memorandum, "Announcement of Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for Malaysia," dated April 12, 2023 |
| Second Tranche Briefing Schedule for Thailand | Memorandum, "Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for the Circumvention Inquiry Covering the Kingdom of Thailand (Thailand)," dated April 19, 2023 |
| Second Tranche Briefing Schedule for Vietnam | Memorandum, "Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for the Circumvention Inquiry Covering the Socialist Republic of Vietnam (Vietnam)," dated April 12, 2023 |
| Silfab's April 19, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated April 19, 2023 |
| Silfab's April 24, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc, "dated April 24, 2023 |
| Silfab's April 26, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated April 26, 2023 |
| Silfab's Hearing Request | Memorandum, "Request for Hearing," dated January 6, 2023 |
| Silfab's March 17, 2023 Rebuttal Brief | Silfab's Letter, "Letter in Lieu of First Tranche Rebuttal Brief of Silfab Solar WA Inc.," dated March 17, 2023 |
| Silfab's March 24, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated March 24, 2023 |
| Silfab's March 6, 2023 Case Brief | Silfab's Letter, "First Tranche Letter in Lieu of Case Brief of Silfab Solar WA Inc.," dated March 6, 2023 |

| | |
|---|---|
| Silfab's May 2, 2022 Comments | Silfab's Letter, "Comments and Factual Information to Rebut, Clarify and Correct Factual Information Contained in Auxin's Request for a Circumvention Ruling, dated May 2, 2022 |
| *Solar CCR Excluding Certain Off-Grid Solar Products* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Changed Circumstances Reviews, and Revocation of Antidumping and Countervailing Duty Orders, in Part*, 86 FR 71616, 71617 (December 17, 2021) (excluding certain off-grid CSPV) |
| Solar Surveys Analysis Memorandum | Memorandum, "Analysis Memorandum Regarding Solar Industry Surveys," dated concurrent with this memorandum. |
| Solar Investigation Scope Clarification Memorandum | Memorandum, "Scope Clarification:  Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, A-570-979, C-570-980," dated March 19, 2012. |
| Solaria Scope Ruling | Memorandum, "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China, and Certain Crystalline Silicon Photovoltaic Product from Taiwan:  The Solar Corporation Scope Ruling," dated April 8, 2021 |
| SunSpark Scope Ruling | Memorandum, "SunSpark Technology Inc. Scope Ruling," dated October 23, 2020 |
| *Thailand* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Thailand," dated December 1, 2022 |
| Thailand RSM | Memoranda, "Circumvention Inquiry With Respect to Thailand:  Respondent Selection," dated May 12, 2022 |
| Third Supplemental Questionnaire | Commerce's Letter, "Third Supplemental Questionnaire," dated September 23, 2022 |
| Trina's April 19, 2023 Case Brief | Trina's Letter, "Trina's Second Tranche Case Brief," dated April 19, 2023 |
| Trina's March 17, 2023 Rebuttal Brief | Trina's Letter, "Trina's First Tranche Rebuttal Brief," dated March 17, 2023 |
| Trina's March 6, 2023 Case Brief | Trina's Letter, "First Tranche Case Brief of Trina," dated March 6, 2023 |
| Trina's May 2, 2022 Comments | Trina's Letter, "Trina's Comments on Auxin's Circumvention Inquiry Request and Factual Information Submission to Rebut, Clarify, or Correct Facial Information Contained in Auxin's Request," dated May 2, 2022 |

| | |
|---|---|
| TTL Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand: Final Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd.," dated concurrently with this memorandum |
| TTL IQR Part II | TTL's Letter, "May 16, 2022 Anti-Circumvention Inquiry Initial Questionnaire Response," dated June 23, 2022 |
| TTL Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand: Preliminary Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd.," dated December 1, 2022 |
| TTL's May 9, 2023 Rebuttal Brief | TTL's Letter, "TTL's Second Tranche Rebuttal Brief," dated May 9, 2023 |
| TTL's 1st SQR | TTL's Letter, "First Supplemental Questionnaire," dated August 8, 2022 |
| TTL's 2nd SQR | TTL's Letter, "Second Supplemental Questionnaire," dated August 9, 2022 |
| TTL's 3rd SQR | TTL's Letter, "Third Supplemental Questionnaire," dated October 7, 2022 |
| TTL's 4th SQR | TTL's Letter, "Fourth Supplemental Questionnaire," dated November 2, 2022 |
| TTL's April 26, 2023 Case Brief | TTL's Letter, "TTL's Second Tranche Case Brief," dated April 26, 2023 |
| TTL's April 27, 2023 Rebuttal Brief | TTL's Letter, "Trina's First Tranche Rebuttal Brief," dated April 27, 2023 |
| TTL's Hearing Request | Memorandum, "Request for Public Hearing," dated January 6, 2023 |
| TTL's IQR Part I | TTL's Letter, "May 13, 2022 Anti-Circumvention Inquiry Initial Questionnaire Response," dated June 3, 2022 |
| TTL's May 19, 2022 Comments | TTL's Letter, "Trina's Comments on Potential Certification Requirements," dated May 19, 2022, Thailand. |
| TTL's Verification Report | Memorandum, "Verification of the Information Reported by Trina Solar Science & Technology (Thailand) Co. Ltd.," dated April 19, 2023 |
| Uyghur Forced Labor Prevention Act | Uyghur Forced Labor Prevention Act," U.S CUSTOMS AND BORDER PROTECTION, available at https://www.cbp.gov/trade/forced-labor/UFLPA |
| *Vietnam* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Socialist Republic of Vietnam," dated December 1, 2022 |
| Vietnam Preliminary SV Memo | Commerce's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not, Assembled Into Modules, from the People's Republic of China - Circumvention |

| | Inquiries with Respect to the Socialist Republic of Vietnam:  Factor Valuation Memorandum," dated December 1, 2022 |
|---|---|
| Vietnam RSM | Memoranda, "Circumvention Inquiry With Respect to the Socialist Republic of Vietnam:  Respondent Selection," dated May 12, 2022 |
| Vina Cell's Q&V Questionnaire | Commerce's Letter, "Vina Cell re:  Quantity and Value Questionnaire for Circumvention Inquiries with Respect to Cambodia, Malaysia, Thailand, and Vietnam," dated March 30, 2022 |
| Vina Cell's Q&V Response | Vina Cell's Letter, "Quantity and Value Questionnaire," dated April 21, 2022 |
| Vina Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Vietnam:  Preliminary Analysis Memorandum for Vina Solar Technology Company Limited," dated December 1, 2022 |
| Vina/LONGi's March 6, 2023 Case Brief | Vina/LONGi's Letter, "Case Brief on General Issues," dated March 6, 2023 |
| Vina's 1st SQR | Vina's Letter, "Vina Solar's Response to the Department's First Supplemental Questionnaire," dated August 10, 2022 |
| Vina's April 19, 2023 Case Brief | Vina's Letter, "Letter in Lieu of Case Brief on Additional Issues," dated April 19, 2023 |
| Vina's April 28, 2023 Rebuttal Brief | Vina's Letter, "Rebuttal Case Brief (Tranche 2) - Vietnam," dated April 28, 2023 |
| Vina's Initial Questionnaire | Commerce's Letter, "Vina Circumvention Inquiry Questionnaire," dated May 16, 2022 |
| Vina's IQR Part I | Vina's Letter, "Vina Solar's Response to Part 1 of the Department's Questionnaire," dated June 7, 2022 |
| Vina's IQR Part II | Vina's Letter, "Vina Solar's Response to Part 2 of the Department's Questionnaire," dated June 23, 2022 |
| Vina's Q&V Questionnaire | Commerce's Letter, "Vina Solar re:  Quantity and Value Questionnaire for Circumvention Inquiries with Respect to Cambodia, Malaysia, Thailand, and Vietnam," dated March 30, 2022 |
| Vina's Q&V Response | Vina's Letter, "Quantity and Value Questionnaire," dated April 21, 2022 |
| Vina's Verification Agenda | Commerce's Letter, "Verification of Vina Solar Technology Company Limited's Questionnaire Responses," dated February 2, 2023 |
| Vina's Verification Memorandum | Memorandum, "Verification of Vina Solar Technology Company Limited," dated April 12, 2023 |
| Vina's Verification Questionnaire | Commerce's Letter, "Verification Preparedness Questionnaire," dated October 12, 2022 |

| VSUN's March 6, 2023 Case Brief | VSUN's Letter, "VSUN's Letter in Lieu of Case Brief," dated March 6, 2023 |
|---|---|

# EXHIBIT 3

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-979/C-570-980
Circumvention Inquiry
Malaysia 2022
**Public Document**
E&C/OVII: PS

August 17, 2023

**MEMORANDUM TO:**    Lisa W. Wang
                      Assistant Secretary
                        for Enforcement and Compliance

**FROM:**              James Maeder
                      Deputy Assistant Secretary
                        for Antidumping and Countervailing Duty Operations

**SUBJECT:**       Antidumping and Countervailing Duty Orders on Crystalline
                      Silicon Photovoltaic Cells, Whether or Not Assembled Into
                      Modules, from the People's Republic of China: Issues and
                      Decision Memorandum for the Circumvention Inquiry With
                      Respect to the Malaysia

---

## I.    SUMMARY

We have analyzed the case and rebuttal briefs of the interested parties in the circumvention inquiries of the *Orders*.[1]  As a result of our analysis, we continue to find, consistent with the *Preliminary Determination*, that solar cells and modules completed in Malaysia from parts and components manufactured in China, are circumventing the *Orders*.  With regard to Hanwha and Jinko, as well as for the 18 companies that timely responded to the Q&V questionnaire, we continue to find that they are not circumventing the *Orders*.  With regard to the five companies that failed to timely respond to the Q&V questionnaire, we continue to find that they are circumventing the *Orders*, and that a country-wide determination is most appropriate to prevent further circumvention of the *Orders* by non-examined producers of inquiry merchandise in Malaysia.  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.  Based on our analysis of the comments received, we made certain changes to the language in the certification.  Below is the complete list of issues for which we received comments and rebuttal comments from interested parties:

### A.    Methodological Issues

Comment 1.    Whether Solar Cells With a p/n Junction Formed Outside of China Should Be
                 Subject to the Circumvention Inquiries

---

[1] Appendices I, II, and III attached to this memorandum identify the naming conventions, acronyms and abbreviations (Appendix I), court and case citations (Appendix II), and documents on record (Appendix III)



Comment 2.    Whether a Wafer Should be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China

Comment 3.    Whether Commerce Should Analyze Investment Data on a Per-Unit Basis

Comment 4.    Whether to Depart from the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the *Preliminary Determination*s

Comment 5.    Whether the Nature of Third-Country Processing Indicates the Processing is Minor or Insignificant Under Section 781(b)(2)(C) of the Act

Comment 6.    Whether Material Costs Should be Included in the Value of Third-Country Processing

**B.    Country-Specific Issues**

Comment 7.    Whether Commerce Should Correct Certain Ministerial Errors and Minor Verification Corrections

Comment 8.    Whether Jinko's Cell and Module Manufacturing is Minor or Insignificant Under Section 781(b)(1)(C) of the Act

Comment 9.    Whether Hanwha's Cell and Module Manufacturing is Minor or Insignificant under Section 781(b)(1)(C) of the Act

Comment 10.   Whether Hanwha's Shipments of Chinese Inputs Weighs in Favor of Circumvention Under Section 781(b)(3)(C) of the Act

**C.    Overall Determinations**

Comment 11.   Whether Commerce's Country-wide Affirmative Circumvention Determination Was Appropriate

Comment 12.   Affirmative Circumvention Determinations Would Not Be Appropriate Under Section 781(b)(1)(E) of the Act

**D.    Certification Issues**

Comment 13.   Whether Commerce Should Allow AFA Companies to Certify

Comment 14.   Certification Requirements and Corrections

Comment 15.   Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the Orders

Comment 16.   Whether Exporters and Importers Should be Permitted to Submit Multiple Certifications, as Applicable

Comment 17.   Whether or Not Companies Found Not to be Circumventing Should be Required to Certify and to Identify Their Wafer Suppliers

Comment 18.    Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews

Comment 19.   Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements

Comment 20.   Clarification and Enforcement of the Utilization Requirement

Comment 21.   Whether the "Wafer-Plus-Three" Requirement is Appropriate

2

### E.    Other Issues

Comment 22.   Whether Commerce Properly Placed Ex Parte Memoranda on the Record That
Concerned the Circumvention Inquiries
Comment 23.   Whether Commerce's Determination to Apply *Presidential Proclamation 10414*
Retroactively is Contrary to Law
Comment 24.   Whether Third-Country Exporters Without an AD Rate Should Receive the
Separate Rate

## II.    BACKGROUND

On December 8, 2022, Commerce published the *Preliminary Determination*.  Between
December 6 and 16, 2022, we conducted verification in Malaysia.[2]  Pursuant to section 781(e) of
the Act, on May 30, 2023, we notified the ITC of our affirmative preliminary determination of
circumvention and informed the ITC of its ability to request consultations with Commerce
regarding the possible inclusion of the products in question within the *Orders* pursuant to section
781(e)(2) of the Act.[3]  The ITC did not request consultations with Commerce.

In accordance with 19 CFR 351.309, we invited parties to comment on the *Preliminary
Determination* and our verification findings.[4]  Between March 6 and May 9, 2023, parties
submitted case and rebuttal briefs.[5]  Additionally, numerous parties requested a hearing.[6]  On
July 18, 2023, Commerce held a public hearing.[7]

## III.    SCOPE OF THE *ORDERS*

The merchandise covered by the *Orders* is crystalline silicon photovoltaic cells, and modules,
laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially

---

[2] *See* Hanwha Verification Report; and Jinko Verification Report.
[3] *See* ITC Notification Letter.
[4] *See* First Tranche Briefing Schedule; and Second Tranche Briefing Schedule for Malaysia.
[5] *See* Auxin's March 6, 2023 Case Brief; BYD HK's March 6, 2023 Case Brief; CSIL's March 6, 2023 Case Brief;
First Solar Malaysia's March 6, 2023 Case Brief; First Solar Vietnam's March 6, 2023 Case Brief; Hanwha's March
6, 2023 Case Brief; Jinko's March 6, 2023 Case Brief; Maxeon's March 6, 2023 Case Brief; New East's March 6,
2023 Case Brief; NextEra's March 6, 2023 Case Brief; Risen's March 6, 2023 Case Brief; Silfab's March 6, 2023
Case Brief; TTL's March 6, 2023 Case Brief's March 6, 2023 Case Brief; VINA's March 6, 2023 Case Brief's
March 6, 2023 Case Brief; VSUN's March 6, 2023 Case Brief; Auxin's March 17, 2023
Rebuttal Brief; Boviet's March 17, 2023 Rebuttal Brief; BYD HK's March 17, 2023 Rebuttal Case Brief; CSIL's
March 17, 2023 Rebuttal Brief; First Solar Malaysia's March 17, 2023 Rebuttal Brief; First Solar Vietnam's March
17, 2023 Rebuttal Brief; JA Solar, LONGi, VINA and VSUN's March 17, 2023 Rebuttal Brief; Hanwha's March 17,
2023 Rebuttal Brief; Jinko's March 17, 2023 Rebuttal Brief; Maxeon's March 17, 2023 Rebuttal Brief; Next Era's
March 17, 2023 Rebuttal Brief; Risen's March 17, 2023 Rebuttal Brief; Silfab's March 17, 2023 Rebuttal Brief;
TTL's March 17, 2023 Rebuttal Brief; Auxin's April 24, 2023 Case Brief;  First Solar Malaysia's April 24, 2023
Case Brief; Hanwha's April 24, 2023 Case Brief;  Jinko's April 24, 2023 Case Brief;  NextEra's April 24, 2023 Case
Brief; Silfab's April 24, 2023 Case Brief;  Auxin's May 5, 2023 Rebuttal Brief;  First Solar Malaysia's May 5, 2023
Case Brief;  Hanwha's May 5, 2023 Rebuttal Brief;  Jinko's May 5, 2023 Rebuttal Brief;  NextEra's May 5, 2023
Rebuttal Brief; and Risen's May 5, 2023 Rebuttal Brief.
[6] *See* Auxin's Hearing Request; First Solar Malaysia's Hearing Request; Hanwha's Hearing Request; Jinko's
Hearing Request; Maxeon's Hearing Request; NextEra's Hearing Request; and Silfab's Hearing Request.
[7] *See* Hearing Transcript.

or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

The *Orders* cover crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Merchandise under consideration may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits. Such parts that otherwise meet the definition of merchandise under consideration are included in the scope of the *Orders*.

Excluded from the scope of the *Orders* are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of the *Orders* are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell. Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Additionally, excluded from the scope of the *Orders* are panels with surface area from 3,450 mm$^2$ to 33,782 mm$^2$ with one black wire and one red wire (each of type 22 AWG or 24 AWG not more than 206 mm in length when measured from panel extrusion), and not exceeding 2.9 volts, 1.1 amps, and 3.19 watts. For the purposes of this exclusion, no panel shall contain an internal battery or external computer peripheral ports.

Also excluded from the scope of the *Orders* are:

1)     Off grid crystalline silicon photovoltaic cells (CSPV) panels in rigid form with a glass cover, with the following characteristics:

    (A) A total power output of 100 watts or less per panel;
    (B) a maximum surface area of 8,000 cm2 per panel;
    (C) do not include a built-in inverter;
    (D) must include a permanently connected wire that terminates in either an 8mm male barrel connector, or a two-port rectangular connector with two pins in square housings of different colors;
    (E) must include visible parallel grid collector metallic wire lines every 1–4 millimeters across each solar cell; and
    (F) must be in individual retail packaging (for purposes of this provision, retail packaging typically includes graphics, the product name, its description and/or features, and foam for transport); and

4

2)    Off grid CSPV panels without a glass cover, with the following characteristics:

     (A) A total power output of 100 watts or less per panel;
     (B) a maximum surface area of 8,000 cm2 per panel;
     (C) do not include a built-in inverter;
     (D) must include visible parallel grid collector metallic wire lines every 1–4 millimeters across each solar cell; and
     (E) each panel is
        1. permanently integrated into a consumer good;
        2. encased in a laminated material without stitching, or
        3. has all of the following characteristics:  (i) the panel is encased in sewn fabric with visible stitching, (ii) includes a mesh zippered storage pocket, and (iii) includes a permanently attached wire that terminates in a female USB–A connector.

In addition, the following CSPV panels are excluded from the scope of the *Orders*:

1)    Off-grid CSPV panels in rigid form with a glass cover, with each of the following physical characteristics, whether or not assembled into a fully completed off-grid hydropanel whose function is conversion of water vapor into liquid water:
     (A) A total power output of no more than 80 watts per panel;
     (B) A surface area of less than 5,000 square centimeters (cm2) per panel;
     (C) Do not include a built-in inverter;
     (D) Do not have a frame around the edges of the panel;
     (E) Include a clear glass back panel; and
     (F) Must include a permanently connected wire that terminates in a two-port rectangular connector.

Additionally excluded from the scope of the Orders are off-grid small portable crystalline silicon photovoltaic panels, with or without a glass cover, with the following characteristics: (1) a total power output of 200 watts or less per panel; (2) a maximum surface area of 16,000 cm2 per panel; (3) no built-in inverter; (4) an integrated handle or a handle attached to the package for ease of carry; (5) one or more integrated kickstands for easy installation or angle adjustment; and (6) a wire of not less than 3 meters either permanently connected or attached to the package that terminates in an 8mm diameter male barrel connector.

Modules, laminates, and panels produced in a third country from cells produced in China are covered by the *Orders*; however, modules, laminates, and panels produced in China from cells produced in a third country are not covered by the *Orders*.

Merchandise covered by the *Orders* is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.71.0000, 8501.72.1000, 8501.72.2000, 8501.72.3000, 8501.72.9000, 8501.80.1000, 8501.80.2000, 8501.80.3000, 8501.80.9000, 8507.20.8010, 8507.20.8031, 8507.20.8041, 8507.20.8061, 8507.20.8091, 8541.42.0010, and 8541.43.0010.  These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of the *Orders* is dispositive.[8]

---

[8] *See Orders*; *see also Solar CCR Excluding Certain Off-Grid Solar Products*.

## IV.    SCOPE OF THE CIRCUMVENTION INQUIRY

This circumvention inquiry covers:  (A) crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the *Orders*, subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in Malaysia from wafers produced in China; and (B) modules, laminates, and panels consisting of crystalline silicon photovoltaic cells, subject to the exclusions for certain panels in the scope of the *Orders*, whether or not partially or fully assembled into other products, that were produced in Malaysia from wafers produced in China and where more than two of the following components in the module/laminate/panel were produced in China:  (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes.  If modules, laminates, and panels consisting of crystalline silicon photovoltaic cells do not meet both of the conditions in item (B) above, then this circumvention inquiry does not cover the modules, laminates, and panels, or the crystalline silicon photovoltaic cells within the modules, laminates, and panels, even if those crystalline silicon photovoltaic cells were produced in Malaysia from wafers produced in China.  Wafers produced outside of China with polysilicon sourced from China are not considered to be wafers produced in China for purposes of this circumvention inquiry.

## V.    PERIOD OF THE CIRCUMVENTION INQUIRY

The period of the inquiry is January 1, 2008, through December 31, 2021.

## VI.    CHANGES SINCE THE *PRELIMINARY DETERMINATION*

As detailed below, we made minor calculation changes to Hanwha (*see* Comment 9) and Jinko (*see* Comment 8).  These changes did not result in a change from our *Preliminary Determination*. For a complete description of our analysis, *see* the *Preliminary Determination* and for a complete description of the change to this analysis, *see* the Final Analysis Memoranda.[9]

## VII.    DISCUSSION OF THE ISSUES

**Methodological Issues**

**Comment 1.    Whether Solar Cells With a p/n Junction Formed Outside of China Should Be Subject to the Circumvention Inquiries**

*CSIL*[10]
- Because Commerce has long held that solar cells and modules with a p/n junction formed outside of China are not subject to the *Orders*,[11] solar cells and modules with p/n junctions formed in the four inquiry countries should not be subject to these circumvention inquiries.

---

[9] *See* Jinko Final Analysis Memorandum; and Hanwha Final Analysis Memorandum.
[10] *See* CSIL's March 6, 2023 Case Brief at 2-3.
[11] *Id.* at 2 (citing the *Orders*)

6

*Auxin*[12]

- Commerce's practice with respect to the p/n junction does not prevent it from issuing an affirmative circumvention finding that solar cells and modules with a country of origin other than China are covered by the scope of the *Orders*.[13]  Thus, solar cells and modules with a p/n junction formed outside of China should be subject to the circumvention inquiries.

**Commerce's Position:**  We disagree with CSIL.  Commerce previously determined that it is the addition of a p/n junction that transforms a silicon wafer into a solar cell.[14]  Thus, the country where the p/n junction is formed is the country-of-origin of the solar cell.  While products with a country-of-origin other than the country subject to the order are not normally covered by the order, the Act expressly provides an exception to this rule under the circumvention provisions in section 781 of the Act.  Circumvention inquiries under section 781(b) of the Act can bring within the discipline of an order merchandise that would not be subject to the order under a country-of-origin analysis.[15]

The circumvention provisions in section 781(b)(1)(A) of the Act, only require that the merchandise imported into the United States be of the same class or kind as the merchandise produced in the country that is the subject of the order.  It does not require the merchandise to have the same country-of-origin as the merchandise that is the subject of the order.

In fact, "{c}ircumvention can only occur if the articles are from a country not covered by the relevant AD or CVD orders."[16]  To read section 781(b) of the Act as applying to a class or kind of merchandise that is covered by an AD and/or CVD order only when the country of origin of the merchandise is the order country would render section 781(b) of the Act moot.  Hence, there is no basis for not examining the solar cells and solar modules at issue (*i.e.*, solar cells and solar modules where the country-of-origin is Cambodia, Malaysia, Thailand, or Vietnam) in these circumvention inquiries.

**Comment 2.   Whether a Wafer Should be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China**

*Whether Wafers Sliced from Chinese Polysilicon Outside of China Should Be Considered a Chinese Input*

Commerce preliminarily defined inquiry merchandise as solar cells produced in Cambodia, Malaysia, Thailand, or Vietnam, from wafers produced in China, and solar modules produced in Cambodia, Malaysia, Thailand, or Vietnam that contain such solar cells where three or more of the following components in the module/laminate/panel were produced in China:  (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6)

---

[12] *Id.* at 9-13; *see also* Auxin's March 17, 2023 Rebuttal Brief at 30-31.
[13] *See* Auxin's March 17, 2023 Rebuttal Brief at 30-31 (citing *Bell Supply CAFC*, 888 F.3d at 1229-31).
[14] *See* Solaria Scope Ruling.
[15] *See 2021 Regulations Final Rule*, 86 FR at 52342.
[16] *See Bell Supply CAFC*, 888 F.3d at 1229.

7

junction boxes.  Commerce also preliminarily determined that wafers produced outside of China using polysilicon sourced from China are not Chinese wafers for purposes of the circumvention inquiries.

*Auxin*[17]

- Commerce should determine that wafers sliced from Chinese-origin polysilicon ingots outside of China are Chinese wafers for purposes of defining inquiry merchandise.
- Commerce's decision to the contrary is arbitrary, inconsistent with record evidence, and undermines its affirmative findings of circumvention.
- Slicing Chinese-origin polysilicon ingots into wafers outside of China does not constitute substantial transformation of the ingot; thus, the wafers remain of Chinese-origin. Significant processing is required to produce polysilicon ingots used to make wafers (*i.e.,* several stages of melting and doping polysilicon, crystal growth, use of 70 percent of the total energy consumed in producing a wafer); whereas slicing the ingots into wafers is minor (*i.e.*, cutting the ingot, submerging it in a chemical bath, cleaning, and inspecting).[18]
- Commerce's decision allows parties to continue to exclusively rely on Chinese-origin materials to produce solar cells and modules and evade AD and CVDs by simply slicing polysilicon ingots into wafers outside of China.  Commerce should not permit this.
- The CAFC held that Commerce has discretion to fashion a remedy in its proceedings that will prevent simple avoidance of AD/CVDs and that it should do so.[19]

*BYD HK*,[20] *CSIL*,[21] *Jinko*,[22] *NextEra*,[23] *TTL*,[24] *Silfab*[25]

- Granting Auxin's request would inappropriately expand the coverage of the circumvention inquiries which were initiated to examine cell and module assembly outside of China only where "all of the manufacturing process up through the production of wafers takes place in China."[26]  Commerce should reject Auxin's *post hoc* attempts to expand the circumvention inquiries.
- Auxin's argument that the country of origin of the wafer should be based on the location of the polysilicon ingot production because of the significance of that production is undermined by its separate argument that Commerce should determine that any wafer produced from Chinese-origin polysilicon—regardless of where the ingot is produced, is a Chinese wafer for purposes of the circumvention inquiries.[27]

---

[17] *See* Auxin's March 6, 2023 Case Brief at 4-9; *see also* Auxin's March 17, 2023 Rebuttal Brief at 5-13.
[18] *See* Auxin's March 6, 2023 Case Brief at 4-6 (citing Circumvention Request at 18-19; and the *NREL Report* in Exhibit 97).
[19] *Id.* at 7 (citing *Canadian Solar CAFC*, 918 F.3d at 919).
[20] *See* BYD HK's March 17, 2023 Rebuttal Brief at 3-7.
[21] *See* CSIL's March 6, 2023 Rebuttal Brief at 6-10.
[22] *See* Jinko's March 17, 2023 Rebuttal Brief at 1-5.
[23] *See* NextEra's March 17, 2023 Rebuttal Brief at 3-6.
[24] *See* TTL's March 17, 2023 Rebuttal Brief at 3-6.
[25] *See* Silfab's March 17, 2023 Rebuttal Brief at 7-8.
[26] *See* NextEra's March 6, 2023 Case Brief at 5 (citing Circumvention Request at 67).
[27] *See* NextEra's March 17, 2023 Rebuttal Brief at 5 (citing Auxin's March 6, 2023 Case Brief at 5-6).

8

- Auxin's arguments about the polysilicon and wafer-making processes and substantial transformation are irrelevant because polysilicon and wafers are not subject merchandise.[28]
- Commerce should not examine whether a product is circumventing an AD/CVD order simply because an input into an input in that product comes from the order country. To do so here essentially means that solar cells produced anywhere in the world from Chinese polysilicon would be subject to the *Orders,* which would render the original scope of the *Orders*, *i.e.*, solar cells from China, meaningless.[29]
- Auxin failed to demonstrate how domestic producers of solar cells and modules are harmed by Commerce's decision that wafers produced outside of China using polysilicon sourced from China are not Chinese wafers for purposes of the circumvention inquiries.[30]
- Commerce should exercise its "substantial discretion in interpreting" the circumvention provisions in the Act and continue to find that solar cells made from wafers produced outside of China are not inquiry merchandise. [31]

*Whether Wafers Sliced from Non-Chinese Polysilicon Inside China Should be Considered a Chinese Input*

*TTL,[32] NextEra,[33] Maxeon,[34] Risen,[35] Jinko[36]*

- Inquiry merchandise should not include solar cells and modules assembled in an inquiry country using Chinese wafers made from non-Chinese polysilicon because Auxin did not request circumvention inquiries with respect to such merchandise. Rather, Auxin requested circumvention inquiries with respect to solar cells and modules produced in an inquiry country where, "all of the manufacturing process up through the production of wafers takes place in China."[37]
- Auxin explained that the examples of circumvention described in its request for circumvention inquiries "involve exporters {in Cambodia, Malaysia, Thailand, and Vietnam} that do not produce polysilicon ingots or wafers — the key upstream inputs in CSPV cells and modules — in those countries, but instead sourced these and other necessary materials and inputs *from China*" (emphasis added).[38] Thus, it is clear that Chinese-origin polysilicon is a key factor in the circumvention inquiries. As such, wafers produced from non-Chinese origin polysilicon should be excluded from the circumvention inquiries.[39]
- Commerce incongruently considers solar cells/modules made in the inquiry countries from non-Chinese wafers containing Chinese polysilicon to be outside the scope of these

---

[28] *See* Jinko's March 17, 2023 Rebuttal Brief at 3.

[29] *Id.* at 2.

[30] *Id.* at 4.

[31] *Id.* at 3.

[32] *See* TTL's March 6, 2023 Case Brief at 3-7; *see also* TTL's March 17, 2023 Rebuttal Brief at 5-6.

[33] *See* NextEra's March 6, 2023 Case Brief at 2-4.

[34] *See* Maxeon's March 6, 2023 Case Brief at 2-3; *see also* Maxeon's March 17, 2023 Rebuttal Brief at 2-3.

[35] *See* Risen's March 6, 2023 Case Brief at 1-5; *see also* Risen's March 17, 2023 Rebuttal Brief at 1-2.

[36] *See* Jinko's March 17, 2023 Rebuttal Brief at 1-5.

[37] *See, e.g.*, NextEra's March 6, 2023 Case Brief at 3 (citing Circumvention Request at 67).

[38] *See* Risen's March 6, 2023 Case Brief at 3.

[39] *Id.*

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

inquiries, while it considers solar cells/modules made in the inquiry countries from Chinese wafers containing non-Chinese polysilicon to be inquiry merchandise even though those cells and module contain much less Chinese content than the former solar cells/modules. Commerce should correct this inconsistency and find solar cells/modules made in the inquiry countries from Chinese wafers containing non-Chinese polysilicon are not inquiry merchandise.[40]

- It neither makes sense, nor comports with the law, to find solar cells that are assembled in the inquiry countries from non-Chinese polysilicon to be circumventing the *Orders* when the value added in China for such solar cells may be less than 33 percent of the total value of the solar cell.[41] A circumvention determination that is not properly targeted to provide relief only for cell assembly in a third country that is truly circumventing the *Orders* will exacerbate the solar cell shortages faced by module assemblers in the United States.[42]

- Moreover, because the value of the polysilicon in solar cells/modules is a significant portion of the total value of the solar cells/modules, if the wafers in those products were made from non-Chinese polysilicon it is less likely that the solar cells and modules would meet the criterion for finding circumvention under section 781(b)(1)(D) of the Act (*i.e.,* the value of the merchandise produced in the order country is a significant portion of the total value of the merchandise exported to the United States).[43]

- Under certain existing measures, CBP already requires U.S. importers to identify the origin of the polysilicon in imported solar modules.[44] Thus, administration of a decision that solar cells/modules with wafers containing non-Chinese polysilicon are not inquiry merchandise would not be burdensome.

*Auxin*[45]

- Auxin's request for circumvention inquiries was not limited to solar cells and modules that contain Chinese-origin polysilicon; rather Auxin requested that Commerce initiate circumvention inquiries with respect to solar cells and modules assembled in the inquiry countries where "the vast majority of the materials and equipment … {were} sourced from China."[46]

- Auxin's description of inquiry merchandise as solar cells and modules produced in an inquiry country where, "all of the manufacturing process up through the production of wafers takes place in China," was simply a factual description of the nature of the circumvention that was occurring.[47]

---

[40] *See* TTL's March 6, 2023 Case Brief at 6-7 (citing TTL's May 19, 2022, and JA Solar's May 2, 2022 Comments at Exhibit 2).

[41] *See* Maxeon's March 6, 2023 Case Brief at 2-3 (citing *NREL Report* included in NextEra May 2, 2022 Comments at Attachment 24 and Malaysia PDM at 19-20).

[42] *Id.* at 3.

[43] *See* NextEra's March 6, 2023 Case Brief at 3 (citing the *NREL Report* in NextEra's May 2, 2022 Comments at Attachment 24).

[44] *See* Risen's March 6, 2023 Case Brief at 3; *see also* TTL's March 6, 2023 Case Brief at 7 (citing *DHS Order Re: Forced Labor in Xinjiang*; *see also* the Uyghur Forced Labor Prevention Act).

[45] *See* Auxin's March 17, 2023 Rebuttal Brief at 6-13.

[46] *Id.* at 11.

[47] *Id.* at 9.

10

- In order to find circumvention, the Act requires, among other things, that the merchandise imported into the United States be assembled in a foreign country from merchandise produced in the order country and that the value of the merchandise produced in the order country be a significant portion of the total value of the imported merchandise. The Act does not require that every component assembled in the foreign country be sourced from the order country.

- Polysilicon accounts for less than 10 percent of the cost of a solar module.[48] It makes no sense to exclude solar modules made with non-Chinese polysilicon from inquiry merchandise when all the other module components, representing over 90 percent of the value of the module, may have been sourced from China.

**Commerce's Position:** For purposes of this inquiry, we have continued to find that a wafer is produced in China if the ingot was sliced to form the wafer in China. The circumvention provisions under section 781(b) of the Act involve merchandise imported into the United States that was completed or assembled in a foreign country from merchandise that was produced in the order country. The phrase "produced in" is not further explained or defined in the Act. We find the Senate Report concerning the Omnibus and Trade Competitiveness Act of 1988, and other sections of the circumvention provisions in the Act provide insights into how to properly apply the phrase "produced in" to the present facts.

When Congress passed the Omnibus and Trade Competitiveness Act in 1988, it explained that section 781 of the Act "addresses situations where 'parts and components … are *sent* from the country subject to the order to the third country for assembly and completion"[49] (emphasis added). Additionally, section 781(b)(1)(c) of the Act provides that when determining whether an AD or CVD order should cover merchandise assembled or completed in a third-country, Commerce should examine whether third-country imports of the merchandise that was produced in the order country and assembled or completed in that third country increased after initiation of the investigation that led to the order. These provisions, which indicate that the focus is on the part or component exported (sent) from the order country in the form ultimately used in the finished product in the third country, taken together with the "produced in" requirement, lead us to conclude that the "production" that must occur in the order country involves those production steps that transform the raw materials into the part or component that is sent to the third country for assembly into the finished product. In other words, we have considered merchandise to be "produced in" the order country for purposes of section 781(b)(1)(B)(ii) of the Act if the final manufacturing step occurs there.

Auxin identified three stages of wafer production: (1) refining polysilicon; (2) forming the refined polysilicon into an ingot; and (3) processing the ingot into wafers.[50] Only the last stage of production results in the merchandise that was shipped from China to the inquiry countries for assembly and completion into solar cells and solar modules. Neither of the intermediate products produced in this process (refined polysilicon and polysilicon ingots) is the merchandise that was shipped/exported to the third country for assembly into the final product. Hence, wafers processed outside of China from ingots made of Chinese polysilicon do not satisfy the "produced

---

[48] *Id.* at 12 (citing the *NREL Report* in NextEra's May 2, 2022 Comments at PDF 496).
[49] *See* Senate Report 100-71 at 101.
[50] *See, e.g.*, Circumvention Request at 15.

in" the order country requirement of section 781(b)(1)(B)(ii) of the Act (the production step that resulted in the part or component that is used in completion or assembly in the third country (the wafer) did not occur in China). Similarly, wafers processed in China from ingots made of non-Chinese polysilicon do satisfy the "produced in" the order country requirement of section 781(b)(1)(B)(ii) of the Act (the production step that resulted in the part or component (the wafer) that is used in completion or assembly in the third country occurred in China).

Auxin contends that Commerce should conduct a substantial transformation analysis and find that wafers processed outside of China from ingots made of Chinese polysilicon are "produced in" China for purposes of section 781(b)(1)(B)(ii) of the Act because minimal processing is required to process an ingot into wafers. However, we do not find that a substantial transformation analysis is the appropriate analysis here.

Commerce typically conducts a substantial transformation analysis to determine whether the country of origin of a product that is within the class or kind of merchandise covered by an AD/CVD order, is the country covered that order.   First, wafers are not in a class or kind of merchandise covered by any AD/CVD order.  Second, the only requirement in section 781(b)(1)(B)(ii) of the Act is that the merchandise be "produced in the foreign country with respect to which such order or finding applies" not that its country of origin is the country to which such order or finding applies.  Thus, we need only identify the country where the raw materials were transformed into the part or component that was used in assembly in the inquiry country.  There is no need to consider the substantial transformation criteria (*e.g.*, the class or kind of the upstream and downstream products, where the essential component of the product is substantially transformed, and the extent and value of the processing) to identify the country where the ingots are sliced into wafers, thus forming the product that was used as an input.  Consequently, we have not used a substantial transformation analysis to determine whether wafers were "produced in" China for purposes of section 781(b)(1)(B)(ii) of the Act where the relevant production steps occurred in multiple countries.

While Auxin contends that Commerce's focus on the country where the ingot was sliced into wafers allows parties to evade AD and CVDs by simply slicing Chinese polysilicon ingots into wafers outside of China, Auxin did not point to anything in the Act or Commerce's practice in circumvention cases that compels Commerce to determine that a component was "produced in" the order country for purposes of section 781(b)(1)(B)(ii) of the Act based on where an input into that component was produced.  There is no mention in section 781(b)(1)(B)(ii) of the Act of inputs into components.  Rather, section 781(b)(1)(B)(ii) of the Act requires that the component that was assembled in the third country be produced in the order country.  Moreover, in prior circumvention inquiries involving merchandise completed or assembled in third countries, Commerce focused its analysis on where the component that was assembled into the finished product in the third country was produced, not where the materials that were used to produce the component were produced.  For example, in *CORE from China (UAE)*[51] which typically involved processing hot-rolled steel made in China into CORE in the UAE, Commerce did not consider where the iron ore or billets that were used to make the hot-rolled steel were sourced, but rather it considered where the hot-rolled steel was produced.

---

[51] *See CORE from China (UAE) Final*, 85 FR at 41957.

We find that the country in which the ingot is sliced to form the wafer is, pursuant to the language in section 781(b)(1)(B)(ii) of the Act, the most reasonable interpretation of where the wafer is produced.  To the extent that this raises evasion concerns, we do not find that such concerns are sufficient to warrant a deviation from our interpretation of the statute.  Indeed, Auxin's proposed alternative would potentially require Commerce to find circumvention based on wafers that, in our interpretation, are not "produced" in China.  While this alternative may address evasion concerns, it is contrary to the statute, and therefore impermissible.

We also disagree with interested parties' arguments that Auxin's request for these circumvention inquiries established that inquiry merchandise must contain wafers made from Chinese-origin polysilicon.  Although Auxin noted in its request that all the manufacturing processes for the merchandise subject to the inquiries, up through the production of wafers, takes place in China, Auxin appears to have been describing the existing situation that it viewed as constituting circumvention.  In fact, Auxin explained in its request that "{r}easonably available evidence establishes that certain companies may complete the production process through polysilicon refinement, ingot formation, and the production of the wafers in China, after which the wafers are converted to CSPV cells in the third country using additional and substantial Chinese-origin components."[52]  However, the circumvention inquiries that Auxin specifically requested, and on which Commerce initiated, cover solar cells and modules assembled and completed in Cambodia, Malaysia, Thailand, or Vietnam using Chinese-produced inputs, not necessarily Chinese-produced inputs where all the materials that were used to produce the inputs in China were also produced in China.

Interested parties that oppose finding circumvention also argued that it makes no sense to find solar cells and solar modules containing wafers made from non-Chinese polysilicon to be circumventing the *Orders*, because the wafers in those solar cells and modules have very little Chinese content.  However, those parties did not provide a basis in the Act, Commerce's regulations, or its practice, for interpreting the "produced in" the order country requirement in section 781(b)(1)(B)(ii) of the Act as a content percentage requirement.  Rather, the plain meaning of "produced" is to make from components or raw materials.  Thus, "produced in" the order country means the production steps that transformed the raw materials into the part or component that is sent to the third country for assembly into the finished product occurred in the order country.

Therefore, based on the foregoing, we consider wafers to be a product of China if the ingot was sliced to form the wafer in China.  As a result, we have not defined inquiry merchandise as solar cells and solar modules assembled in an inquiry country from wafers produced outside of China using Chinese polysilicon (as advocated by Auxin), and we have not excluded from our definition of inquiry merchandise solar cells and solar modules assembled in an inquiry country from wafers produced inside China using polysilicon produced outside of China (as advocated by parties opposed to finding circumvention).

Lastly, certain interested parties argued that determining whether wafers were produced in China based on the country-of-origin of the polysilicon in the wafer would not be administratively burdensome because under certain existing measures, CBP already requires U.S. importers to

---

[52] *See* Circumvention Request at 27.

identify the origin of the polysilicon in imported solar modules. Because we deem the country of origin of polysilicon to be irrelevant to the question of whether a wafer is produced in China, this argument is moot. In any case, it is not clear that it is administratively feasible to uniformly apply "percentage-of-Chinese-content" or "source-of-component-inputs" definitions of the phrase "produced in" in section 781(b)(1)(B)(ii) of the Act to all the components that could be exported from China to the inquiry countries for assembly into solar cells and solar modules (such as aluminum frames, junction boxes, etc.). Such a rule appears to be complicated and administratively burdensome given that there could be as many as 100 different inputs used to produce a solar module.

**Comment 3.  Whether Commerce Should Analyze Investment Data on a Per-Unit Basis**

*NextEra*[53]
- Commerce must consider the large upstream industry in China that supplies virtually all of the world's demand for wafers. Failing to do so results in an overly simplistic and distortive comparison that does not properly account for differences in scale and market structure.
- Consistent with legislative history, Commerce's past practice, and congressional intent, an alternative approach is warranted in this case. Commerce has also acknowledged that there is no one-size-fits-all approach and that it may determine an appropriate analysis. Thus, Commerce should analyze investment on a per-unit basis for this final determination.
- Commerce has the data needed to calculate the investment of mandatory respondents on a per-megawatt basis, which allows Commerce to account for differences in scale, market size, and demand, and thus more accurately compare the size of investments in the two countries.

*Auxin*[54]
- NextEra argues that a per-MW analysis is more appropriate because it accounts for differences in scale, market size, and demand, and thus, more accurately compares the size of investments in the two countries.[55]
- However, it has been Commerce's practice under section 781(b)(2) of the Act to evaluate the absolute level of investment, as opposed to the per-unit level of investment, because it is a proper and relevant analysis for identifying the level of investment in the third country.[56]
- Commerce's practice is grounded in the recognition that per-unit levels of investment can be distortive, fail to reflect initial threshold levels of investment, and thus fail to capture circumventing activity.
- CSPV production facilities in China require significant threshold levels of investment to capitalize on economies of scale. Commerce should therefore follow its practice and compare the absolute level of investment rather than the per-unit level of investment.

---

[53] *See* NextEra's March 24, 2023 Case Brief at 20-22.
[54] *See* Auxin's April 3, 2023 Rebuttal Brief at 36-41.
[55] *Id.* (citing NextEra's March 24, 2023 Case Brief at 20-22).
[56] *Id.* (citing *CORE from China (Vietnam), CORE from China (UAE)* and *CRS from China (Vietnam)*).

14

- In *CORE from China (Vietnam)*, Commerce rejected per-unit comparisons because comparing per-unit investment overlooks the relative requirements for establishing integrated production facilities in China, as compared with processing facilities in the third country, as they dilute the large necessary initial investments required by the volume of the facilities.[57]
- If Commerce were to utilize a per-unit comparison, it would delay closing the circumvention loophole because only when the circumventing company achieved scale would it achieve a per-unit investment figure that approaches the per-unit investment figure of a fully scaled production facility in the original country.
- Benefiting from economies of scale is crucial to realize lower per-megawatt investment costs for polysilicon, ingot and wafer manufacturing.
- NextEra fails to recognize that Chinese over-investment in its CSPV production process has decimated the industry in the United States and allowed Chinese producers to realize lower per-unit costs.
- Commerce should continue to evaluate the level of investment on an absolute basis because such an analysis is consistent with Commerce's practice and ensures that China's industrial policy, heavy subsidies to its PV industry, and other non-market practices do not distort Commerce's overall analysis by failing to capture initial threshold levels of investment in China.

**Commerce's Position:**  We agree with Auxin that Commerce should evaluate investment on an absolute basis as opposed to a per-unit basis.  For these final determinations, we continue to find that the absolute level of investment is a proper and relevant analysis for evaluating the level of investment in Malaysia under section 781(b)(2)(A) of the Act.

The statute does not instruct Commerce to employ a particular analysis when evaluating the level of investment in the foreign country for purposes of section 781(b)(2)(A) of the Act.  Given the statute's silence on the issue, Commerce may determine an appropriate analysis to apply.  We find that a comparison between the level of investment in the third country and the level of investment of respondents' Chinese affiliates, on an absolute as opposed to a per-megawatt basis, is a proper and relevant analysis for identifying "the level of investment in the third country" under the Act.  We disagree with NextEra's argument that we should compare the levels of investment on a per-unit basis because we find the proposed alternative of adjusting for per-unit production capacity to be inappropriate in this case.  Comparing per-unit investment overlooks the relative requirements of establishing ingot and wafer production facilities in China, as compared with the cell and module production facilities in Malaysia, as this would dilute the large necessary initial investments required by the production volume of the facilities.

Accounting for the threshold level of investment in the Chinese facilities, therefore, captures the investment in the production process that would otherwise be ignored if we were to compare per-unit investment or that would otherwise not be representative if we adjusted for capacity.  Thus, the absolute level of investment of the finishing process relative to the production process of the respondents' affiliates is the appropriate comparison.

---

[57] *Id.* (citing *CORE from China (Vietnam)*).

15

In addition to the high levels of investments and large manufacturing facilities required for ingot and wafer manufacturing, the size of China's solar industry can also have a direct impact on the economies of scale that can be realized, allowing ingot and wafer manufacturers to realize lower per-unit investment costs, and thus distorting our analysis. China's dominance in the global ingot and wafer manufacturing capacity means Chinese ingot and wafer producers are able to benefit from economies of scale in order to achieve lower per-unit investment costs. China currently accounts for 97 percent of global wafer manufacturing capacity, a feat achieved thanks to economies of scale, supply chain integration, and government support.[58] China has a lower global manufacturing capacity for cells and modules, accounting for 80 percent and 70 percent of the world's production capacity, respectively.[59] China's ingot and wafer manufacturing industries have therefore been able to benefit heavily from economies of scale, they have been able to achieve steep drops in manufacturing costs at every step of the production process, thus diluting investment amounts in a per-unit figures analysis.[60]

As explained above, the much larger threshold levels of investment required to establish ingot and wafer manufacturing facilities and the resulting economies of scale distort the investment figures for a per-unit analysis. Therefore, with respect to section 781(b)(2)(A) of the Act, we have continued to compare the investments of the cell and module production process in Malaysia to investments of the ingot and wafer production process in China on an absolute basis.

**Comment 4.    Whether to Depart from the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the *Preliminary Determination*s**

*Auxin* [61]

*Commerce Arbitrarily Broke with its Longstanding Practice Without Explanation*
- Commerce departed from its longstanding merchandise-centric comparative methodology when conducting its "minor or insignificant" analysis under section 781(b)(1)(C) of the Act in favor of a new affiliate-centric approach without explanation. Commerce is required to explain the reasons for a departure from its practice. Its failure to do so here is arbitrary and unlawful.[62]
- Since 2012, Commerce has applied a consistent merchandise-centric comparative methodology, which follows the flow of goods, when conducting its "minor or insignificant" analysis under sections 781(b)(1)(C) and (b)(2) of the Act. This approach has been applied by Commerce in circumvention cases involving a broad range of merchandise and industries.[63]

---

[58] *See* Auxin's July 29, 2022 Comments at Exhibit 1 (citing IEA Report at 24).

[59] *Id.* (citing IEA Report at 24-27).

[60] *Id.* (citing IEA Report at 17); *see also* Auxin's April 3, 2023 Rebuttal Brief at 39-41.

[61] *See* Auxin's April 24, 2023 Case Brief at 8-25, 30-33, and 41-45.

[62] *Id.* (citing *Save Domestic Oil*, 357 F.3d at 1283; and *Encino Motorcars*, 579 U.S. at 212).

[63] In all of the following cases cited in Auxin's April 24, 2023 Case Brief, Commerce compares operations, R&D and investment in the third country to the order country with identifying affiliation as a consideration: In *SDGE from China (UK)*, Commerce explained that "the purpose of the analysis set out in sections 781(b)(1)(C) and (b)(2)(E) of the Act is to evaluate whether a process is minor or insignificant within the context of the totality of the production of subject merchandise. That is, {Commerce's} analysis addresses the relative size and significance of

16

- Commerce's approach has been affirmed by the CIT as a reasonable interpretation of the circumvention statue and consistent with its past practice in 781(b) cases. Specifically, the CIT explained that "a determination of the third country's portion of the total sum of investment is useful to gauge the level of investment in a third country. Comparative analysis helps also to ensure that larger companies with much smaller operations in a third country – operations that may appear significant in absolute terms given the size of the firm, but that comprise a small share of total operations – will not be able to elude an AD/CVD order simply on account of the firm's large overall size. Accordingly, a comparative analysis was reasonable."[64]

- The CIT affirmed Commerce's analysis, in part, because it was consistent with Commerce's longstanding practice. The CIT noted that Commerce had a longstanding practice of "us{ing} a similar type of comparative analysis and arrived at similar conclusions" and therefore Commerce's merchandise-centric comparative methodology "aligns with its past practice."[65]

- In recent cases Commerce has continued to apply its merchandise-centric comparative framework comparing the production steps taken by the mandatory respondents in those cases to the entire production process in the order country.[66]

- In *CRS from China (Vietnam), PET Bags from Taiwan (USA), CORE from China (Vietnam)*; and *Tissue Paper from China (India) Final Determination,* Commerce found the process of completion in the third country to be minor or insignificant even when the respondents were not affiliated with producers or exporters in the country subject to the order.[67]

- Commerce's affiliate-centric methodology is inconsistent with the language and purpose of the statute as it raises affiliation to a mandatory criterion for finding circumvention.

- Sections 781(b)(1)(C) and 781(b)(2) of the Act do not instruct Commerce to consider affiliation when determining whether the process of assembly or completion is minor or insignificant. Under section 781(b) of the Act, only sub-paragraph (3) specifies affiliation as a consideration.

---

the processing provided by {the respondent} in comparison to the processing necessary to produce the overall finished product." *See SDGE from China (UK)*, 77 FR at 47599. In *PET Film from the UAE (Bahrain)*, Commerce repeated that under its 781(b) analysis, "{i}t is appropriate to compare the cost of the process and completion in the third-country facilities with the cost of the process and completion of the facilities needed to produce the subject merchandise in the home country." *See PET Film from the UAE (Bahrain)* IDM at Issue 2. In *CORE from China (Vietnam)*, Commerce again reiterated that its practice has been to "compare the total investment required (as well as, separately, the R&D, production process, and facilities) from the beginning of the production process in the country subject to an antidumping or countervailing duty order to the investment required (as well as, separately, the R&D, production process, and facilities) to finish the final product in a third country, rather than to compare the investments (as well as, separately, the R&D production process, and facilities) required to perform the same finishing steps in each country." *See CRS from China (Vietnam)* IDM at Comment 5; *CORE from Taiwan (Malaysia)* IDM at Comment 1; *OCTG from China (Brunei and the Philippines)* IDM at Comment 1; and *HFCs from China (India)* IDM at Comment 3.

[64] *See* Auxin's April 24, 2023 Case Brief (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368).

[65] *Id.*

[66] *Id.* (citing *SSSS from China (Vietnam) Preliminary* PDM at 20; *see also Pipe and Tube from India (UAE and Oman)* IDM at Comment 6).

[67] *Id.* (citing *CRS from China (Vietnam)* IDM at VII.F; *see also Tissue Paper from China (India) Preliminary Determination*, 78 FR 14514 (unchanged in *Tissue Paper from China (India) Final Determination*, 83 FR 40101; *CORE from China—Vietnam*, 83 FR 23895; *Retail Carrier Bags from Taiwan Preliminary Determination*, 79 FR 31302 (unchanged in final, *Retail Carrier Bags from Taiwan Final Determination*, 79 FR 61056).

17

- Commerce's affiliate-centric methodology allows unaffiliated entities to circumvent AD/CVD orders with impunity, such that, many of Commerce's previous affirmative findings of circumvention since 2012 would now require a negative finding of circumvention under this framework.  Not only is this requirement unnecessary, but it contradicts frequent Commerce determinations that affiliation is not a necessary condition for circumvention.[68]

- Commerce's condition that it will only consider affiliated operations in the order country as a basis for comparison would allow a party to easily evade detection of circumvention by selling inputs through an unaffiliated trading company in the order country.

- When amending the circumvention statute as part of the implementation of the URAA, Congress codified the "minor or insignificant" standard Commerce had already been using, thereby endorsing the overall production process (*i.e.*, merchandise-centric) comparative framework.[69]

- In post-URAA cases, Commerce continued to adopt a merchandise-centric comparative framework to analyze third country assembly operations in the context of the totality of the production of subject merchandise.[70]

- In *Diamond Sawblades from China (Thailand)* and *Aluminum Extrusions from China (Vietnam)*, Commerce again described its practice of analyzing the significance of the assembly and completion process in the third country relative to the full production process for the subject merchandise, noting that it is consistent with prior practice.[71]

- In *Plywood from China (Vietnam) Preliminary*, Commerce compared third country assembly operations to the full production process of subject merchandise in the country subject to the order.[72]

- Commerce has continued up until this case to follow its practice of comparing third country assembly operations to the full production process of subject merchandise in the country subject to the order.[73]

- It is rare that Commerce has not conducted a minor or insignificant comparative analysis, and only when the record of a proceeding lacked sufficient data for such an analysis or

---

[68] *Id.* (citing *Butt-Weld Pipe Fittings from China (Thailand)* IDM at Comment 3, where Commerce explained that "a relationship between the Chinese manufacturer and Thai converter/exporter is not a necessary condition for finding circumvention" and "{i}t is possible for circumvention to occur between unrelated companies."; In *Brass Sheet and Strip from Canada* IDM at Comment 5 Commerce mentioned "{w}hile we have noted that it is 'more likely' for related parties to engage in circumvention activity, a relationship between the exporter and importer is not a necessary condition for finding circumvention.  While circumvention may be more likely to occur between related parties, it is also possible for circumvention to occur between unrelated companies"; In *CORE from China (Vietnam)* IDM at Comment 12; and *CRS from China (Vietnam)* at Comment 12 Commerce once again reiterated recently that the "lack of affiliation does not constitute evidence that circumvention is not occurring."
[69] *Id.* (citing *Granular PTFE Resin from Italy*).
[70] *Id.* (citing *Tissue Paper from China (Vietnam) Preliminary Determination*, 73 FR at 21584; unchanged in *Tissue Paper from China (Vietnam) Final Determination* IDM).
[71] *Id.* (citing *Diamond Sawblades (Thailand)* IDM at Comment 3; and *Aluminum Extrusions from China (Vietnam)* IDM at 9).
[72] *Id.* (citing *Plywood from China (Vietnam) Preliminary*, 87 FR 45753).
[73] *Id.* (citing *LWR from China (Vietnam) Preliminary* PDM at 20; *LWR from Taiwan (Vietnam) Preliminary* PDM at 13; and *Circular Welded Carbon-Quality Steel Pipe from China (Vietnam) Preliminary* PDM at 18).

when the third country operations being evaluated pre-dated the issuance of the relevant order.[74]

- In departing from its established practice in the *Preliminary Determination*, Commerce did not conclude that the record lacked sufficient data or that the respondents' operations pre-dated the issuance of the order.

- In *Hot-Rolled Lead and Bismuth*, Commerce acknowledged that it was departing from comparing to a fully integrated producer explaining that "rolling mills which subsequently roll lead billets into hot-rolled lead bar predate the order and have always been considered a distinct part of the industry."[75]

- In *Ferrovanadium from Russia Final Determination*, Commerce rejected petitioner's "argument that {Commerce} should compare the U.S. vanadium pentoxide process to the overall ferrovanadium process" finding that such an analysis was "misplaced in this case."[76]  Commerce acknowledged the standard practice and explained that "{w}here the company completing the processing is unaffiliated to foreign producers/exporters and the processing activity … existed prior to the antidumping order, the Department finds the analysis which it employed for the Preliminary Results of U.S. processing activity without comparison to overall production activities is the appropriate analysis."[77]

- For Jinko, Commerce verified that the company was established after the imposition of the *Orders* and that it was affiliated with Chinese producers and exporters of solar cells and modules, and other solar components.  Thus, Commerce's reasoning in *Ferrovanadium from Russia Final Determination* does not justify a departure from its comparative minor or insignificant methodology with respect to Jinko.

- In contrast, Hanwha was established prior to the imposition of the *Orders*, is the subsidiary of Hanwha Solutions Corporation, a Korean company, and was not affiliated with entities in China that provided parts and components for use by Hanwha to produce solar cells and modules.  Thus, an alternative methodology for evaluating Hanwha may be reasonable, which would result in a negative determination, although Auxin considers Hanwha's operations in Malaysia to be minor or insignificant under established standards.

*Commerce's Approach Results in It Ignoring the Most Important Stage of Production*

- Commerce's affiliate-centric approach results in its analysis ignoring the first stage of the production process:  the mining and refining of solar-grade polysilicon.[78]  As noted by the ITC, polysilicon is the "main underlying raw material input" for solar cells.[79]

---

[74] *Id.* (citing *Uncovered Innerspring Units from China (Malaysia) Preliminary Determination*, 80 FR at 64393. ("Because Goldon failed to respond to the questionnaire, the record does not contain complete information regarding the factors set forth in section 781(b)"), unchanged in *Uncovered Innerspring Units from China (Malaysia) Final Determination*, 80 FR 74758; *Tissue Paper from China (Thailand) Final Determination*, 74 FR 29172 (applying AFA to the respondent for "refus{ing} to respond to {Commerce's} questionnaire").

[75] *See* Auxin's April 24, 2023 Case Brief (citing *Hot-Rolled Lead and Bismuth* IDM at Comment 5).

[76] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 1; *see also Ferrovanadium from Russia Preliminary Determination*, 77 FR 6537.

[77] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 1).

[78] *Id.* (citing *Malaysia* PDM at 16).

[79] *Id.* (citing *ITC Solar Monitoring* at I-60 and VI-1).

19

Commerce has previously recognized that "{b}y any reasonable measurement, polysilicon is the most important input used in solar modules."[80]

- Producing and achieving the requisite level of purity for solar-grade polysilicon "requires large capital investments to build a plant, large corporate investment to learn and refine the production process, highly skilled labor to operate the plant, and low electricity costs due to the large amount of energy needed to produce polysilicon."[81]

- Auxin's circumvention request explicitly identified production of solar-grade polysilicon in China as the first stage of solar cell/module production.[82]

- The statute requires Commerce to "determine whether the difference between the value of the merchandise imported into a third country {for further processing} and the value of the completed merchandise exported to the United States is small."[83]  Consistent with the statutory language, Commerce began assessing third-country production "within the context of the overall production process."[84]  Commerce consistently adopted this approach in its pre-URAA circumvention inquiries.[85]

- Auxin uploaded information on the record showing that the average investment required to produce subject merchandise in China is $4.7 billion.  Should Commerce change its analysis for the final to a "merchandise-centric approach" it should compare third country operations to the $4.7 billion.[86]

- IEA and DOE reports placed on the record by Auxin note that polysilicon, ingots, and wafers require a higher level of investment compared to solar cell and module production.[87]

*NextEra*,[88] *Risen*,[89] *Jinko's*,[90] and *Hanwha*[91]

*The Act Does Not Mandate a Specific Methodology Under Section 781(b)(2)*

- Auxin's comments overgeneralize past practice and fail to appreciate that Commerce's analysis will "vary from case to case depending on the particular circumstances unique to each circumvention inquiry."[92]

- While section 781(b)(2) of the Act does not instruct Commerce to consider affiliation when determining whether the process of assembly or completion in a third country is minor or insignificant, the statute does not preclude Commerce from considering affiliation.  Commerce has stated that it has the discretion under the circumvention statute to determine the appropriate minor or insignificant analysis under section 781(b)(2)

---

[80] *Id.* (citing *Solar Cells from China 2017-2018 AR* IDM at Comment 4).

[81] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5).

[82] *Id.* (citing Circumvention Request at 27).

[83] *Id.* (citing SAA at 893).

[84] *Id.* (citing *Granular PTFE Resin from Italy*, 58 FR at 26102).

[85] *Id.* (citing *Butt-Weld Pipe Fittings from China (Thailand)*, 59 FR at 15156; and *Brass Sheet and Strip from Canada* IDM at Comment 2).

[86] *Id.* (citing Auxin's July 29, 2022 Investment and R&D Information at Excel Attachment).

[87] *Id.* citing Auxin's May 16, 2022 Comments at Exhibit 5; and Auxin's July 29, 2022 Investment and R&D submission at Exhibit 1).

[88] *See* NextEra's May 5, 2023 Rebuttal Brief at 4-19.

[89] *See* Risen's May 5, 2023 Rebuttal Brief at 1-3.

[90] *See* Jinko's May 5, 2023 Rebuttal Brief at 9-17.

[91] *See* Hanwha's May 5, 2023 Rebuttal Brief at 4-6 and 8-9.

[92] *See* Risen's May 5, 2023 Rebuttal Brief (citing PDM at 16)

20

"depending on the totality of the circumstances of the particular anti-circumvention inquiry."[93] Thus, Auxin reads a limitation into the statute where one does not exist.

- Although the CAFC may have upheld Commerce's merchandise-centric approach in *Al Ghurair CAFC 2023*, the CAFC noted in that case that "Commerce is not bound by its prior determinations" if there is reason to deviate from past practice.[94]

- In the CIT *Al Ghurair* determination that the CAFC affirmed in *Al Ghurair CAFC 2023*, the CIT prefaced its decision by stating that "the statute does not outline a specific methodology for Commerce to follow to determine the level of investment."[95] The CIT further explained that when there is an absence of a designated methodology, Commerce has the discretion on its own method of analysis.[96]

- Both the CIT and CAFC have affirmed Commerce's right to depart from past practice when: "(1) there is good reasons to prompt its departure; or (2) the prior determinations are inapposite such that it is not in fact a departure at all."[97]

- Congress did not mandate a rigid one-size-fits-all methodology for circumvention out of "recognition that different cases present different factual situations."[98] Instead, it granted Commerce "substantial discretion in interpreting the {} terms" of section 781(b) "so as to allow it flexibility to apply the provisions in an appropriate manner" in each case.[99] Commerce reasonably exercised this discretion and determined to make an affiliation comparison for its analysis for certain factors.

- The SAA explains that "Commerce will evaluate each of {the statutory} factors as they exist either in the United States or a third country, depending on the particular circumvention scenario."[100] This guidance has been adopted in various circumvention cases cited by Auxin, including *Pet Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia)*, *HFCs from China (India)*, *OCTG from China (Philippines and Brunei)*.[101]

- In reviewing its circumvention methodology, Commerce rejected a proposal to "provide more definitive guidance on what constitutes circumvention."[102] Commerce reasoned, "we believe that the wide variety of products and processes encountered in AD/CVD proceedings makes the adoption of any more specific standards inadvisable at this time."[103] Commerce has repeatedly stated that its analysis must be tailored to the particular facts of the case,[104] based on the "factors as they exist in the third country,

---

[93] *See* NextEra's May 5, 2023 Rebuttal Brief (citing *CORE from China (Vietnam)* IDM at 7).
[94] *Id.* (citing *Al Ghurair CAFC 2023,* 65 F.4th at 1351).
[95] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368*)*
[96] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368 (citing *Timken Co.*, 968 F. Supp. 2d at 1286 n.7, *aff'd* 589 F. App'x 995 (Fed. Cir. 2015))).
[97] *See* Jinko's May 5, 2023 Rebuttal Brief (citing *DAK Americas*, 517 F. Supp. 3d at 1360; *see also Huvis*, 570 F.3d at 1356).
[98] *See* Risen's May 5, 2023 Rebuttal Brief (citing *Senate Report 100-71* at 100).
[99] *Id.* (citing *Senate Report 100-71* at 100; and *Ausimont*, 882 F. Supp. at 1098).
[100] *See* NextEra's May 5, 2023 Rebuttal Brief (citing SAA at 893)
[101] *Id.* (citing *Pet Film from the UAE (Bahrain) Preliminary* PDM at 5; *CRS from China (Vietnam)* IDM at comment 5; *CORE from Taiwan (Malaysia)* IDM at 19-20; *HFCs from China (India) Preliminary* PDM at 17; *OCTG from China (Philippines and Brunei) Preliminary* PDM at 9).
[102] *See* Jinko's May 5, 2023 Rebuttal Brief (citing *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR at 27329).
[103] *Id.*
[104] *See* NextEra's May 5, 2023 Rebuttal Brief (citing *Pet Film from the UAE (Bahrain) Preliminary* PDM at 5; *CORE from China (Vietnam)* IDM at 7).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  From Malaysia 2022

depending on the totality of the circumstances of the particular anti-circumvention inquiry."[105]

- As such, Auxin is incorrect that its "merchandise-centric" analysis is appropriate because it is product and industry neutral.  Instead, Commerce's analysis must be tailored to the specific facts of the circumvention inquiries.

*Commerce's Reliance on Affiliation Accurately Represents Auxin's Request*

- Commerce's affiliate-centric approach is consistent with Auxin's original request for circumvention and record evidence.  Auxin's circumvention request defined the alleged circumventing activity as "assemblers of CSPV cells and modules … that use affiliated Chinese input suppliers and a fully integrated Chinese supply chain to circumvent the existing Orders."[106]  Moreover, Auxin clarified that its allegations "rely heavily upon the relationships between certain Chinese input suppliers and their affiliates in the targeted third countries," and claimed that the affiliation relationships " narrow{} the alleged circumvention activity in this petition to major Chinese companies that use other countries as export platforms."[107]  Auxin specifically framed its circumvention request around assemblers in the third countries "that use affiliated Chinese input suppliers and a fully integrated Chinese supply chain to circumvent the existing Orders."[108]

*Chinese Solar Producers are not Integrated with Polysilicon Producers*

- Information on the record, such as a report from the DOE placed on the record by Auxin, confirms that any integration in the solar industry occurs at the later stages of the solar cell and module production process (*i.e.*, from wafers through module production).[109] This demonstrates that solar cell and module production is not fully integrated in China back to the polysilicon refinement stage of production.
- Auxin identified only one company in China with investments in progress for production of polysilicon, ingot, wafers, cells, and modules; and most companies Auxin identified produce at only one or two of these production stages.[110]
- Thus, including the polysilicon stage as part of Commerce's consideration of the Chinese solar industry would unfairly distort the analysis and ignore the reality of the industry subject to the inquiry.
- The fact that polysilicon is sourced from China has nothing to do with whether Chinese-owned companies have circumvented the AD/CVD orders by establishing production facilities in the third country.

---

[105] *Id.* (citing *CORE from China (Vietnam)* IDM at 7; *CRS from China (Vietnam)* IDM at comment 5;  *HFCs from China (India) Preliminary* PDM at 11-12, 17; *CORE from Taiwan (Malaysia)* IDM at 8; *OCTG from China (Philippines and Brunei) Preliminary* PDM at 6; *SSSS from China (Vietnam)* IDM at 15; *Pipe and Tube from India (UAE and Oman)* IDM at 8, 12).
[106] *Id.* (citing Circumvention Request at 1-2).
[107] *Id.* (citing Circumvention Request at 87).
[108] *See* Risen's May 5, 2023 Rebuttal Brief (citing Circumvention Request at 1-2).
[109] *See* NextEra's May 5, 2023 Rebuttal Brief *(*citing Auxin's May 16, 2022 Comments at Exhibit 5).
[110] *Id.* (citing Auxin's Investment and R&D Information at Excel Attachment).

- In steel cases Commerce has compared final processing steps in the third country to the operations of integrated steel mills in the country subject to the order.[111]  The linchpin of all of these decisions is that inputs are sourced from an integrated production facility in the country subject to the order.[112]  In the solar industry, integrated production begins at the ingot making stage.
- In steel decisions like *OCTG from China (Brunei and Philippines)* and *CORE from China (UAE)*, Commerce limits the comparison to costs, investment, and processing at integrated steel mills.  These integrated steel mills do not perform the initial stage of steel production—extraction and production of iron ore, the primary raw material used to make steel.[113]
- As Commerce does not include iron ore production/investment/facilities in its steel circumvention analysis, it should not include polysilicon production in its solar circumvention analysis.

*Auxin's Suggested Remedies are Unreasonable*
- In the numerous cases cited by Auxin, it never provides a case, as it argues Commerce should do here, where Commerce calculated an absolute investment figure by averaging the investments of various producers at different stages of the supply chain and summing them to create an estimate of the cost of a hypothetical fully integrated facility.  For the solar industry, doing so would not represent the actual structure of the industry and, thus, would be an inappropriate basis for Commerce's comparison.
- Commerce cannot blindly apply the methodology used in circumvention inquiries on CORE steel products to solar products.  Commerce's statutory mandate is to ensure that an affirmative finding of circumvention does "not deter legitimate investment characterized by the addition of substantial value."[114]
- The investment data that Auxin argues should be relied upon under a merchandise-specific approach conflates projected investments with actual investments, often citing companies' announcements of long-term investment plans with projected capacity over the next five to ten years.[115]  Many of the investment and capacity figures used by Auxin do not represent the initial start-up investment required to construct a facility in China, and the figures also include anticipated investments that have not yet been made in China.
- A direct comparison between Auxin's investment data and the mandatory respondents' investment data would lead to inaccurate and misleading results by comparing projected investments in China to third country investments.

---

[111] *See* Jinko's May 5, 2023 Rebuttal Brief (citing *LWR from Taiwan (Vietnam) Preliminary*, 88 FR 21980; *Circular Welded Carbon-Quality Steel Pipe from China (Vietnam)*, 88 FR 21975; *SSSS from China (Vietnam) Preliminary*, 87 FR 56626; *OCTG from China (Brunei and Philippines)*, 86 FR 67443; *CORE from Taiwan (Malaysia)*, 86 FR 30257; *CORE from China (Malaysia) Preliminary*, 85 FR 8823; CORE from Korea (Vietnam), 84 FR 70934; *CRS from Korea (Vietnam)*, 84 FR 70948; *CRS from China (Vietnam)*, 83 FR 23891 (May 23, 2018)).
[112] *Id.* (citing *Brass Sheet and Strip from Canada* IDM at Comment 2).
[113] *Id.* (citing *OCTG from China (Brunei and Philippines)* IDM; and *CORE from China (UAE) Preliminary* PDM).
[114] *Id.* (citing SAA).
[115] *See* NextEra's May 5, 2023 Rebuttal Brief (citing Auxin's Investment and R&D Submission at Excel Attachment and Exhibit P-7b).

23

*Commerce has Considered Affiliation in Performing Its Analysis under 782(b)(2)*

- Contrary to Auxin's claims, Commerce has focused on comparisons with affiliates in prior circumvention inquiries.  In *PET Film from the UAE (Bahrain)*, Commerce collected data from a third-country manufacturer in Bahrain and its affiliate in the UAE to conduct its comparative analysis, making the same comparison between affiliates' investments and operation that Auxin asserts is not appropriate here.[116]  In *CRS from Korea (Vietnam)* and *Diamond Sawblades Thailand,* Commerce had data on the record from affiliated parties and opted to make a direct comparison between the respondents' investments and the operations of its affiliate in the country subject to the order.[117]

- Auxin ignores the significant portion of Commerce's analysis that did not consider affiliation at all.  When analyzing the factors under section 781(b)(2) of the Act, Commerce did not consider affiliation when evaluating section 781(b)(2)(C) and 781(b)(2)(E) of the Act.

*Auxin Admits that it is Appropriate to Consider Affiliation*

- Auxin claims that "because of the unique facts of {Hanwha's} production in Malaysia, it is appropriate for Commerce to apply its affiliate-centric approach to {Hanwha's} processing activities,"[118] acknowledging this would result in a negative determination for Hanwha.[119]  In its case brief, Auxin admits that Hanwha's lack of affiliation with Chinese producers is a relevant consideration for Commerce in making its comparative analysis.[120]  It is nonsensical that Commerce should now adopt an arbitrary criterion proposed by Auxin, which would result in two separate methodologies under section 781(b)(2) of the Act.

- Auxin claims that under Commerce's analysis, "{i}f a respondent is not affiliated with {an upstream} producer its operations will always be found to be 'minor or insignificant' no matter the size and significance of those operations because there will be no benchmark to compare the third-country operations against."[121]  This is contrary to Auxin's acceptance of the negative circumvention determination for Hanwha, a company with no affiliated Chinese suppliers.[122]

**Commerce's Position:**  We disagree with Auxin that Commerce should revise its application of the "minor or insignificant" factors, as enumerated in section 781(b)(2) of the Act.[123]  The statute and the SAA grant Commerce discretion in evaluating the five minor or insignificant factors. The statute only provides that Commerce "shall take into account" the five factors, without

---

[116] *Id.* (citing *PET Film from the UAE Preliminary Determination* PDM at 5-6, unchanged in *PET Film from the UAE (Bahrain)*).

[117] *Id.* (citing *CRS from Korea (Vietnam) Preliminary* PDM at 14-17, unchanged in *CRS from Korea (Vietnam)*; and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*).

[118] *Id.* (citing Auxin's April 24, 2023 Case Brief).

[119] *Id.*

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] The five factors listed under section 781(b)(2) of the Act:  (A) level of investment in the foreign country; (B) level of research and development in the foreign country; (C) nature of the production process in the foreign country; (D) extent of production facilities in the foreign country; and (E) value of processing performed in the foreign country.

further instruction. According to the SAA, Commerce will evaluate the five factors under section 781(b)(2) of the Act "as they exist either in the United States or a third country, depending on the *particular circumvention scenario*," and that "{n}o single factor will be controlling."[124]  Thus Commerce must tailor its analysis to the facts on the record. Here, we place particular emphasis on affiliation, aided by the circumvention request itself, because the 'circumvention scenario' alleged by Auxin is unique and distinguishable from most of those examined in our previous circumvention inquiries.

In this circumvention inquiry, the particular circumvention scenario, per Auxin's request, is centered around third country companies using "affiliated Chinese input suppliers and a fully integrated supply chain to circumvent the existing *Orders*."[125]  Auxin notes that "{t}he circumvention allegations contained herein rely heavily upon the relationships between certain Chinese input suppliers and their affiliates in the targeted third countries, a factor that Commerce must consider."[126]  Again, Auxin describes that the "fact pattern significantly narrows the alleged circumventing activity in this petition to major Chinese companies that use other countries as export platforms to continue selling cheap CSPV cells and modules to the United States."[127]  In accordance with the SAA's language instructing Commerce to "evaluate the factors … depending on the particular circumvention scenario," we applied our minor and insignificant analysis, with respect to the respondents' level of investment, level of research and development, and extent of production facilities, using a comparative approach that accounts for the production activities of the upstream affiliates of the third country producers, mirroring Auxin's request.

Auxin's circumvention request is why we also disagree with Auxin's arguments that we should adopt a "merchandise-centric" comparative approach for the final determination and include solar-grade polysilicon in our 781(b)(2) analysis. Auxin focuses on the language in *SDGE from China (UK)* stating that the purpose of the analysis under section 781(b)(1)(C) of the Act is to "evaluate whether a process is minor or insignificant within the context of the totality of the production of subject merchandise" such that Commerce's analysis addresses "the relative size and significance of the processing provided by {the respondent} in comparison to the processing necessary to produce the overall finished product."[128]  Again, Congress and our past practice require us to consider the unique facts and circumstances of each specific case. In *Al Ghurair CAFC 2023*, the CAFC noted that Commerce "is not bound by its prior determinations" and should there be a reason to deviate from its past practice, Commerce may explain why it is appropriate to do so.[129]  In the underlying CIT decision, the CIT noted that Commerce has the discretion to decide its own analysis to determine the level of investment as section 781(b)(2) of the Act does not outline a specific methodology."[130]  In accordance with *Timken Co.*, the CIT provided Commerce the discretion "to adapt to different factual circumstances to address circumvention."[131]  In *CRS from China (Vietnam)*, Commerce applied a similar logic where it

---

[124] *See* SAA at 893 (emphasis added).
[125] *See* Circumvention Request at 1-2.
[126] *Id.* at 87.
[127] *Id.*
[128] *See SDGE from China (UK)*, 77 FR at 47599.
[129] *See Al Ghurair CAFC 2023*, 65 F.4th at 1360 (citing *Hyundai Electricity CAFC*, 15 F.4th at 1089).
[130] *See Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368 (citing *Timken Co.*, 968 F. Supp. 2d at 1286 n.7, aff'd, 589 F. App'x 995 (Fed. Cir. 2015)).
[131] *Id.*

25

stated that the statute does not instruct Commerce to apply a particular analysis, and therefore, "Commerce may determine an appropriate analysis to apply."[132]  Again, Congress and our past practice require us to consider the unique facts and circumstances of each specific case.  In accordance with the recognized discretion granted to Commerce in circumvention inquiries, for this inquiry, Commerce utilized an approach which is specific to the upstream affiliates of each respondent.  Because none of the respondents to this inquiry were affiliated with upstream producers of polysilicon, we did not consider Chinese polysilicon production as part of our comparative analysis of the 'minor or insignificant' factors.

Auxin's circumvention request alleges a circumvention fact pattern that involves integrated Chinese solar producers spinning off the last steps of production (*i.e.*, solar cell and solar module production) to the inquiry countries to undermine the existing *Orders* and avoid AD/CVD duties. With that fact pattern in mind, after selecting the largest producers/exporters of solar cells and/or solar modules in the third countries, we requested a litany of information related to the corporatestructure and operations of the respondents, examining any affiliation links to producers involved in the production of solar cells and modules in China.  After examining the information placed on the record by the respondents, the facts indicated that:  (1) none of our respondents' affiliates in China had fully integrated production back to the mining and refining of solar-grade polysilicon during the period of inquiry; and (2) there is no substantial record evidence of fully integrated production in China during the period of inquiry.[133]  Jinko provided information showcasing that its upstream affiliates in China started at the ingot stage of production, thus we decided it was appropriate to directly compare Jinko's Malaysian facilities to that of its upstream affiliates in China, starting from the ingot stage of production when examining sections 781(b)(2)(A), (B), and (D) of the Act.[134]  Whereas in Hanwha's case, the company did not have any upstream input affiliates in China, thus we found it appropriate to not compare the level of investment, R&D, and extent of production facilities in Malaysia to facilities in China.[135]  Such facts, on the respondent-specific level, were subsequently authenticated by us when conducting the verifications of Hanwha and Jinko.

Based on the facts above, we disagree with Auxin's insistence that Commerce include in its comparison to the order country the first stage of production of solar cells and modules, *i.e.*, the mining and refining of solar-grade polysilicon.  The pre-URAA cases Auxin relies on in support of starting the comparative analysis at the first stage of the production process, *Granular PTFE Resin from Italy* and *Brass Sheet and Strip from Canada,* are cases where Commerce compared third country operations to fully integrated producers in the country subject to the order.[136] Moreover, other post-URAA cases cited by Auxin, *CORE from China (Vietnam)*, *CRS from China (Vietnam)*, and *SSSS from China (Vietnam)*, are cases where Commerce used the facts on the record to compare fully integrated steel producers in China to the operations conducted in the third country.  These cases are not comparable to the present circumvention inquiry as our record

---

[132] *See CRS from China (Vietnam) Final* IDM at Comment 5; *CORE from China (Vietnam) Final IDM at 34*; *OCTG from China (Brunei and the Philippines) Final* IDM at 7.
[133] *See* Hanwha Preliminary Analysis Memorandum at 2; *see also* Jinko Preliminary Analysis Memorandum at 2.
[134] *See* PDM at 15.
[135] *Id.*
[136] *See Granular PTFE Resin from Italy* IDM at 12-13, n.16 (citing *Brass Sheet and Strip from Canada*, 58 FR at 33613 ("compar{ing} {respondents' rerolling} activities to that of *vertically integrated producers*, such as brass mills, which cast, roll, and finish the product") (emphasis added)).

demonstrates that fully integrated production (*i.e.*, production facilities that manufacture polysilicon, wafers, ingots, solar cells, and solar modules) is not typical of the solar industry in China. Auxin's argument that Commerce should compare the level of production in the third country to a fully integrated producer in China, as it did in prior circumvention inquiries, is therefore inapposite. Even if Commerce were to determine that such an approach was appropriate to evaluate the circumvention scenario alleged by Auxin, the record lacks evidence of a 'fully integrated' solar cell and module producer comparable to the fully integrated steel mills which has been used as a basis for comparison in other cases.

The solar industry is distinguishable from the industries involved in the cases cited by Auxin, and therefore warrants a different methodological approach, when considering the 'minor or insignificant' factors, to that applied in past cases. In the steel industry, producers in the order country typically are fully integrated starting at the first stage of production.[137] We do not have a similar fact pattern on this record. Prior to the *Preliminary Determination,* we provided all parties, including Auxin, an opportunity to place investment and R&D information on the record of the proceeding. However, no party provided substantial record evidence of fully integrated production in China during the period of inquiry. Regarding the Chinese solar industry as a whole, Auxin, in its July 29, 2022 Investment and R&D submission, identified only one company in China with in-progress investments in all stages of production, *i.e.*, solar-grade polysilicon, ingot, wafers, solar cells, and solar modules.[138] An interested party, NextEra, placed information on the record indicating that the solar industry is not composed of fully integrated producers starting with mining or refining solar-grade polysilicon.[139] In fact, a report Auxin itself placed on the record, and cited in its April 24, 2023 Case Brief, confirms that integration in the Chinese solar industry does not begin at the mining and refining of solar-grade polysilicon stage of production, and instead involves the later stages of the solar cell and module production process (*i.e.*, wafer through module production).[140] Auxin argues that we should use its July 29, 2022 Investment and R&D submission to extrapolate an estimate of the investment and R&D needed for one fully integrated solar cell and module producer in China from a number of different companies that operate in different stages of the production process and use those estimates as the basis for our comparison to the order country. Given the fragmented nature of the solar industry in China, we find a comparison to a fully integrated producer in China, in accordance with Auxin's proposed "merchandise-centric" approach to be inappropriate.

The solar industry is also unique in other respects. First, solar cell production is more technically complex and dependent on skilled labor to a greater degree than most other products that Commerce has examined in prior circumvention inquiries.[141] For this reason, we placed

---

[137] *See CORE from China (Vietnam) Preliminary* PDM at 18, n. 82.
[138] *See* Auxin's Investment and R&D Information at Excel Attachment. Auxin did not provide information establishing that this company had actually commenced production of solar cells and modules.
[139] *See* NextEra's May 2, 2022 Comments at Att. 2 and at 9 ("Of the leading global polysilicon producers by capacity in 2021, only two, the Chinese companies GCL and Tongwei, participate in supply chain stages other than polysilicon. Of these two companies, GCL is a significant wafer producer, and Tongwei is a leading CSPV cell producer. All other polysilicon producers . . . operate exclusively in the polysilicon stage of the CSPV manufacturing supply chain.").
[140] *See* Auxin's May 16, 2022 Comments at Exhibit 5.
[141] *See ITC Solar Final* at I-15 (solar cell production is "a highly automated, capital intensive, and technologically sophisticated process, requiring skilled technicians and employees with advanced degrees.").

27

particular emphasis on the "level of research and development" factor when evaluating whether the production in the third country was minor or insignificant.  However, the nature of research and development is such that, once carried out, it is easily transmissible across national borders.  Further, solar cells and modules are unique products insofar as one country, here China, accounts for almost one hundred percent of the global production of a primary upstream input, *i.e.*, solar wafers.[142]  These factors, when taken into consideration together, contribute to a circumvention scenario in which large solar conglomerates are incentivized to 'spin off' production of solar cells into third countries, and in which third country producers are left with little choice but to source solar wafers from China.  Our comparative analysis of the 'minor or insignificant' factors, in which we compare respondents' level of investment, level of research and development, and extent of production facilities to those of their affiliated Chinese input suppliers, is the most appropriate manner in which to account for *these particular facts*, which again are unique to the solar industry.

Further, contrary to the language Auxin cites from *SDGE from China (UK)*, there is precedent for Commerce to not examine whether the process of assembly in the third country is minor or insignificant in comparison to the entirety of the production process in the order country.  This was the case in *PET Film from the UAE Preliminary Determination,* where Commerce found it appropriate to compare PET film facilities in the third country, Bahrain, to PET film facilities in the order country, and did not include all production stages in the comparative analysis.[143]  This was also the case in *SSSS from China (Vietnam), Pipe and Tube from India (UAE and Oman), CORE from China (UAE),* and *OCTG from China (Brunei and the Philippines)* where similar to this circumvention inquiry, for the factors under section 781(b)(2) of the Act, Commerce compared upstream production in the order country to downstream production in the third country.[144]

Citing *Ferrovanadium from Russia Final Determination* and *Hot-Rolled Lead and Bismuth*, cases where Commerce decided against conducting a comparative analysis under section 781(a)(2) of the Act, Auxin argues that the absence of a comparative analysis under 781(a)(2) is only appropriate where there is "no affiliation between the relevant parties **and** third country (or U.S.) operations pre-existed the relevant order"[145]  Although these two cases were circumvention inquiries conducted under section 781(a) of the Act, similar statutory language applies to sections 781(a)(2) and 781(b)(2).  While we agree with Auxin that these are two important aspects to consider, in this specific case, we also consider Auxin's circumvention request, which focused heavily on upstream solar input producers working in tandem with affiliated third country solar cell and solar module producers to circumvent the existing *Orders,* an important distinction that must be considered.  Auxin's proposed standard, which aims to compare third country producers to the entire solar cell and module production process in the order country, fails to account for the rapid growth of the solar cell industry in the years following the issuance of the *Orders*, and

---

[142] *See* Circumvention Request at 28-30 (citing Bloomberg NEF Report at 1, 9).

[143] *See PET Film from the UAE Preliminary Determination* IDM at 5.

[144] *See CORE from China (UAE)* at Comment 1; *SSSS from China (Vietnam)* IDM at 18-19 "where Commerce compared the R&D activities of the upstream hot-rolling of stainless steel in China to the R&D activities of the further processor in the third country;" *Pipe and Tube from India (UAE and Oman)* IDM at Comment 6; and *OCTG from China (Brunei and the Philippines) Preliminary* PDM at 10, unchanged in *OCTG from China (Brunei and the Philippines)* IDM at Comment 1.

[145] *See* Auxin's April 24, 2023 Case Brief at 23.

may inappropriately target certain third country producers with no upstream affiliates in the order country.[146]  Therefore, for third country solar cell and module producers with no upstream input affiliates in the order country, we find a comparative analysis in the manner requested by Auxin for sections 781(b)(2)(A), (B), and (D) of the Act to be inappropriate.

Auxin also argues that we have gone against our practice by elevating affiliation to a mandatory criterion under section 781(b)(2) of the Act, therefore, making affiliation a prerequisite for finding circumvention.  However, this point by Auxin is a misrepresentation of our minor or insignificant analysis applied in the *Preliminary Determination.*  Although Auxin is correct that, in this specific case, for our evaluation of the level of investment, the level of research and development, and the extent of the production process, we centered our analysis around upstream input affiliates, Auxin incorrectly conflates our analysis with respect to sections 781(b)(2)(A), (B), and (D) to the entire determination made under section 781(b)(1)(C) of the Act and our circumvention finding writ-large.  In evaluating whether the process of assembly in the third country was minor, for the criterion under section 781(b)(2)(C) of the Act, nature of production process, we compared third country operations to the production of a silicon wafer in China, starting from the solar-grade polysilicon stage of production, regardless of affiliation.  Specifically, in the *Preliminary Determination*, we found that the nature of the production process, as examined under section 781(b)(2)(C) of the Act, is "not minor or insignificant compared to either ***processing polysilicon into wafers***, or ingots into wafers, in China, which does not weigh in favor of finding circumvention."[147]  Similarly, when examining the criteria under section 781(b)(2)(E) of the Act, value of processing, in the *Preliminary Determination* we again did not factor in affiliation and note that the silicon wafer is naturally inclusive of the polysilicon that went into it.[148]  As such, Auxin's reliance on *Butt-Weld Pipe Fittings from China (Thailand)* and *CORE from China (Vietnam*), cases where Commerce noted that affiliation does not have to be present for circumvention to occur, is misplaced as we did not, in this case, elevate affiliation to a mandatory criterion under section 781(b)(2) of the Act or consider affiliation a prerequisite to finding circumvention.  For similar reasons, Auxin's dependence on *SDGE from China (UK)*, affirmed in *U.K. Carbon & Graphite, CORE from Vietnam (China), Retail Carrier Bags from Taiwan Final Determination, CRS from China (Vietnam), Tissue Paper from China (India), SDGE from China (UK),* and *HFC from China (India), i.e.*, prior circumvention cases where the process of assembly was found minor even for respondents that did not have affiliates in the order country, adds no value within the context of this proceeding as the methodology applied in the *Preliminary Determination* does not preclude a company with no affiliates in the order country from being found to be circumventing an order.

We note that Commerce, in the cases cited by Auxin, has opted to conduct a direct comparison under section 781(b)(2) of the Act between a respondent's third country operations and the operations of its affiliate in the country subject to an AD/CVD order.  For example, *PET Film from the UAE (Bahrain), CORE from Taiwan (Malaysia), CRS from Korea (Vietnam),* and *Diamond Saw Blades from China (Thailand)* are examples of prior circumvention cases where

---

[146] *See* Circumvention Request at 57-58, n. 231.

[147] *See* PDM at 19.  Our approach with respect to 781(b)(2)(C), nature of the production process in the foreign country, remains unchanged in this final determination.

[148] *Id.* at 19-20.  Our approach with respect to 781(b)(2)(E), value of processing in the foreign country, remains unchanged in this final determination.

29

Commerce conducted a direct comparison between the respondents and their affiliates in the country subject to the order when examining the criteria under 781(b)(2)(A), level of investment, 781(b)(2)(B), R&D, 781(b)(2)(C), nature of production process, and 781(b)(2)(D), extent of production facilities.[149]  In line with *PET Film from the UAE (Bahrain), CORE from Taiwan (Malaysia), CRS from Korea (Vietnam),* and *Diamond Saw Blades from China (Thailand),* when examining 781(b)(2)(A), level of investment, 781(b)(2)(B), R&D, and 781(b)(2)(D), extent of production facilities, we reasonably opted to make a direct comparison between a respondent's operations in the third country and its upstream affiliates in the country subject to an AD/CVD order.

Therefore, the assumption by Auxin that unaffiliated suppliers will get a free path to circumvent the existing *Orders* is false.  Rather, in accordance with the SAA, our finding as to whether the extent of processing was minor or insignificant was supported by our evaluation of all five factors listed in section 781(b)(2) of the Act, including the nature of the production process and the value added in the third country, which Commerce evaluated without comparison to respondents' upstream affiliates.

Therefore, our minor or insignificant determination, under section 781(b)(1)(C) of the Act was a "multi-factor"[150] analysis and did not rely merely on affiliation or the exclusion of a stage of production as the linchpins of our circumvention findings.  For these reasons, for the final determination, we will not depart from the minor or insignificant analysis applied in the *Preliminary Determination*.

**Comment 5.    Whether the Nature of Third-Country Processing Indicates the Processing is Minor or Insignificant Under Section 781(b)(2)(C) of the Act**

*Auxin*[151]
- Commerce incorrectly determined, based on the nature of third-country processing, that the processing is not minor or insignificant.[152]  In making that decision, Commerce failed to properly weigh:  (1) capital requirements; (2) costs associated with building; (3) the time required to build, the manufacturing facility; (4) technical hurdles associated with starting up operations; (5) energy to require to produce the product; (6) labor demands; (7) number of stages of production; and (8) number of inputs used to produce the product.[153]  Each of these items are addressed below.
- Commerce based its finding that solar cell production is the most capital intensive part of the manufacturing process on outdated data from 2009 to 2012.[154]  Recent data from IEA's 2021 report, show that "polysilicon and ingots/wafers together account for almost 70% of all investment in solar PV manufacturing due to their high capital

---

[149] *See PET Film from the UAE (Bahrain) Preliminary* PDM at 5-6, unchanged in *PET Film from the UAE (Bahrain)*; *CORE from Taiwan Preliminary Determination* PDM at 14-17, unchanged in *CORE from Taiwan Final*; and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*.
[150] *See Al Ghurair CAFC 2023,* 65 F.4th at 1363.
[151] *See* Auxin's April 24, 2023 Case Brief  at 40-41, 45-58
[152] *Id.* (citing *Malaysia* PDM at 19).
[153] *Id.* (citing *Malaysia* PDM at 16-19).
[154] *Id.* (citing *Malaysia* PDM at 18).

requirements"[155] and "polysilicon plants and ingot and wafer factories are significantly more CAPEX-heavy than cell- and module-manufacturing facilities."[156]

- The IEA reported that "… polysilicon and ingots/wafers together account for almost 70% of all investment in solar PV manufacturing …" while cells and modules have low minimum investment requirements.[157]

- The BloombergNEF Report indicated that polysilicon and wafer facilities "take the longest to construct"[158] (12-40 months for polysilicon plants but only 3-12 months for cell and module facilities according to IEA; 3-4 years for polysilicon plants but only 1-3 years for ingot, wafer, solar cell and module facilities according to DOE).[159]

- The BloombergNEF Report concluded that "{t}echnical hurdles are highest for plants that make polysilicon and wafers";[160] thus, "{g}iven low technical and financial barriers, it is also easier for module companies to open shop in other countries in response to tariffs or other policy developments."[161]  The DOE noted that "the module production process … does not require the same level of technical skill …"[162]

- According to the IEA, "{p}olysilicon production accounts for 40% of all energy consumed to manufacture solar PV modules, the largest {energy consumption} of all supply chain segments" followed by ingot and wafer production."[163]  Less than one third of energy consumption is for the production of solar cells and solar modules.

- The DOE found ingot and wafer production to be the most labor-intensive stages of solar cell production.  Although there are lower labor requirements for polysilicon production, it "requires highly skilled labor to operate a plant."[164]

- Based on information from the ITC and the DOE, there are 21-24 discrete steps to produce polysilicon, ingots, and wafers (seven steps to produce polysilicon and 14 to 17 steps to produce wafers depending on the type of wafer produced) but only 17-19 steps to produce solar cells and modules.

- Although more inputs are used to produce solar cells and modules than polysilicon, ingots, and wafers, the greater time and costs to start up, the significant energy required to run, and the higher technical hurdles associated with, polysilicon, ingot, and wafer facilities compared to solar cells and module facilities, and the fact that most inputs used to the produce solar cells and modules in the inquiry country are sourced from China, support finding solar cell and module production in the inquiry country to be minor or insignificant.

---

[155] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47)).

[156] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 85)).

[157] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47 and 86)).

[158] *See* Auxin's April 24, 2023 Case Brief (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 1)).

[159] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 65); Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 12)).

[160] *Id.* (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 1)).

[161] *Id.* (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 3.4)).

[162] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 45)).

[163] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 36-37)).

[164] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 25)).

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  From Malaysia 2022

*NextEra*[165]

- Record evidence indicates that the nature of production in the inquiry country is not minor, but is a multi-step process that involves sophisticated machinery and is labor intensive compared to the production of polysilicon, ingots, and wafers in China.

- FTI Consulting, Inc. and the ITC described solar cell production as a multi-step process requiring uniquely designed and calibrated machines and a skilled force.[166]

- Auxin stated that "the production of cells and modules requires capital, technological sophistication, and R&D and Auxin does not dispute this unmarkable point."[167]

- Auxin certified before the ITC that "{m}anufacturing CSPV products is capital intensive and technologically sophisticated"[168] and that "CSPV manufacturers also must invest in cutting edge equipment and continued R&D."[169]  In contrast, record evidence shows that the technology used to produce wafers has stayed the same since it was originally created.[170]

- The *IEA Report* indicates that producing solar cells and modules requires more sophisticated equipment and is more labor-intensive than producing polysilicon, ingots, and wafers.[171]

- The CEA report indicates that cell production is the most capital-intensive part of the production process and requires the highest capital expenditure of any of the CSPV production stages.[172]

- Processing in the inquiry country creates the p/n junction which forms the solar cell and it is "where the essence of a solar module is realized."[173]  As the petitioner in the underlying investigation noted, a wafer's " … only notable characteristics are its crystal structure and positive potential orientation."[174]  Thus, transformation of the wafer into a solar cell and module is clearly "significant."

- According to the *FTI Report, Denis De Ceuster Report*, *Auxin's ITC Posthearing Brief,* and *Auxin's ITC Prehearing Brief*, producing wafers from polysilicon is less extensive than producing solar modules from wafers.[175]  Auxin failed to address record information about the transformative nature of production in the inquiry country, ignored information regarding the production equipment used, and relied on irrelevant facts regarding energy consumption and lead times in its analysis.

---

[165] *See* NextEra's May 5, 2023 Rebuttal Brief at 19-27.

[166] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 3 (citing *FTI Report* at 11) and Attachment 37-A (citing *ITC Solar Safeguard Proceeding 2017* at I-22 - I-23).

[167] *Id.* (citing Auxin March 7, 2022 Comments at 10).

[168] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 4 (citing *Auxin's ITC Posthearing Brief* at II-24)).

[169] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 19 (citing *Auxin's ITC Prehearing Brief* at 20)).

[170] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 3 (citing *FTI Report* at 11) and Attachment 19 (citing *Auxin's ITC Prehearing Brief* at 20)).

[171] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 35-36, 45)).

[172] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 2 (citing *CEA Report* at 11-12)).

[173] *Id.* (citing *Preliminary Determination* Thailand PDM at 18).

[174] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 18).

[175] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 1 (*Denis De Ceuster Report* at 8), Attachment 3 (citing *FTI Report* at 12), Attachment 4 (citing *Auxin's ITC Posthearing Brief* at 20), and Attachment 19 (citing *Auxin's ITC Prehearing Brief* at 20)).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

- Although Auxin claimed that the ITC's findings on which Commerce relied are outdated, the ITC has reaffirmed its earlier findings that "CSPV cell production is capital intensive and requires a skilled workforce."[176]
- In sum, solar cell and solar module production in the inquiry country requires substantial initial and ongoing investments, extensive production facilities, sophisticated and highly technical equipment, and skilled laborers with specialized training.

*Jinko*[177]

- While Auxin claimed that Commerce relied on outdated data in its nature of production analysis, there is substantial record evidence regarding Jinko's production process which Commerce verified.
- Commerce should disregard Auxin's argument regarding the number of processing steps, required to produce solar cells and modules because:  (1) Auxin failed to consider Jinko's production information and (2) a determination about whether processing is minor or insignificant should not depend on the number of processing steps.

**Commerce's Position:**  We continue to find that the nature of the production process in the inquiry country is not minor or insignificant.

As an initial matter, it is useful to repeat here our description of the production process from the *Preliminary Determination,* which is not specific to any one respondent but encompasses the essence of the manufacturing performed by all the respondents.  As described in the *Preliminary Determination*:

> According to the ITC, to produce ingots, polysilicon rocks are placed into a quartz crucible along with a small amount of boron, which is used to provide a positive electric orientation.  The crucible is then heated in a furnace to approximately 2,500 degrees Fahrenheit to produce monocrystalline silicon, currently the most common form of polysilicon used in producing solar cells.  Once the polysilicon is melted, a seed crystal is lowered into the material and rotated, with the crucible rotated in the opposite direction.  The melt starts to solidify on the seed and the seed is slowly raised out of the melt—creating a single long crystal.  The crystal is then cooled before it is moved onto the next step.  The process of growing the crystal takes approximately 2.5 days.[178]

> To produce wafers, the top and tail of the ingot are cut off and the remaining portion is cut into equal length pieces and then squared.  A wire saw is used to slice the ingots into wafers.  Typically, diamond wire saws are used for monocrystalline wafer slicing.  The wafers are then cleaned, dried, and inspected.[179]

---

[176] *See* NextEra's May 5, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 37-C (citing *ITC Solar Safeguard Proceeding 2017* at I-22)).
[177] *See* Jinko's May 5, 2023 Rebuttal Briefs at 35-38.
[178] *See Malaysia* PDM at 16 (citing *ITC Solar Monitoring* at I-62).
[179] *Id.* at 17 (citing *ITC Solar Monitoring* at I-64).

33

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry  - From Malaysia 2022

Solar cell production typically involves phosphorus being diffused into a thin layer on the wafer surface at high heat, which gives the surface of the wafer its negative potential electrical orientation.  The combination of that layer, and a boron-doped layer below, creates the positive-negative (p/n), junction.  A thin layer of silicon is removed from the edge of the solar cell to separate the positive and negative layers.  A silicon nitride antireflective coating is then added to the solar cell to increase the absorption of sunlight and metals are printed on the solar cell to collect electricity.  Aluminum and silver layers are applied, and then the solar cell is placed in a furnace, where the high temperature causes the silver paste to become imbedded in the surface of the silicon layer, forming a reliable electrical contact.  The final step in the process is testing and sorting the solar cells based on their characteristics and efficiency.[180]

To assemble solar cells into solar modules, a piece of glass is placed on the production line, and EVA or another encapsulant is placed on top of the glass.  Then a group of solar cells is placed in a line and soldered together, creating a string.  The strings are then placed on top of the encapsulant, and the string interconnections are soldered together.  After this, another layer of EVA and a backsheet are added, and the product is laminated and cured.  Usually a frame is added, and a junction box is attached to the back of the module.[181]

As explained in Comment 4, we did not consider the production of polysilicon in our analysis because none of the respondents' affiliates in China produced polysilicon, and there is no substantial evidence on the record to support finding that the Chinese solar industry is vertically integrated from the production of polysilicon to the production of solar modules.

We examined the nature of the production process by comparing the production of solar cells and solar modules in the inquiry country to the production of ingots and/or wafers in China, depending on whether the respondents' affiliates in China produced ingots and/or wafers.

Because Auxin claims that Commerce failed to properly weigh certain factors in its analysis of the nature of third-country processing (*i.e.*, capital requirements, building costs and time, technical hurdles, energy consumed in production, labor demands, number of production stages, and number of inputs used) we have addressed each of Auxin's factors below.  While we have addressed each of the factors relied upon by Auxin, it is important to note that Commerce has not established these factors as criteria for analyzing the nature of the production process in the foreign country, but examines the nature of that production process on a case-by-case basis.

For the final determination, we have not considered capital expenditures/requirements or the cost associated with building production facilities in our analysis of the nature of production because we analyzed the level of investment in the production facilities under section 781(b)(2)(A) of the Act.  Thus, Auxin's comments regarding capital requirements and the cost to build manufacturing facilities are moot.

---

[180] *Id.* at 17 (citing *ITC Solar Monitoring* at I-65 to I-66).
[181] *Id.* at 17 (citing *ITC Solar Monitoring* at I-67).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry - From Malaysia 2022

With respect to the time required to construct each type of production facility, according to the *DOE Solar Deep Dive*, ingot and wafer facilities, solar cell facilities, and solar module facilities require one to three years to build.[182] Thus, this factor does not indicate that the nature of solar cell and solar module production in the inquiry country differs from the production of ingots and wafers in China.

With respect to technical hurdles, the *Bloomberg Report notes that* wafer factories "bear many technical hurdles, which makes it difficult for new factories to be built outside of China,"[183] whereas "{c}ell manufacturing … compared to wafers and polysilicon … has lower technical hurdles"[184] and "{b}uilding a new module factory has low technical hurdles compared with wafer and polysilicon."[185] Nonetheless, record evidence indicates that there are significant technical requirements that must be met for, and changing technologies with respect to, producing solar cells.

According to the *FTI report*, "the equipment and technology, as well as the number of processing steps required to produce a {solar} cell are far more technically sophisticated than those of the polysilicon or wafer manufacturing operations. … Cell manufacturing alone requires a fully integrated, multi-step manufacturing line with equipment to perform {multiple} processes … . Each of these processes requires one or more uniquely designed and calibrated machines to advance the wafer from a commodity product to a finished cell …"[186]

Moreover, while the technology required to produce ingots has not significantly changed since it was created,[187] the same is not true for solar cells. "Technology improvements in the wafer-to-cell process are responsible for most of the performance improvements of solar panels."[188] Because of technological improvements to solar cells, module makers must regularly upgrade their production lines to avoid becoming obsolete.[189] Hence, there are also meaningful technological requirements that must be met before producing solar cells.

Regarding energy, according to the *IEA Report* ingot and wafer production consumes higher amounts of energy when compared to the solar cell and solar module production, which "require less heat and lower temperatures for drying and cooling, and most of the electricity is used for automated mechanical work."[190] However, it is not clear that energy consumption is necessarily informative when examining whether the nature of the production process is minor or insignificant. Energy consumption may have more to do with the type of processing required than the scale or extent of the processing. Therefore, the record does not support a finding that the lower energy consumption required to produce solar cells and modules contributes in a meaningful way to our evaluation of the nature of the production process.

---

[182] *See DOE Solar Deep Dive* at 12.
[183] *See Bloomberg Report* at 3.2.
[184] *Id.* at 3.3.
[185] *Id.* at 3.4.
[186] *See FTI Report at 11.*
[187] *See Denis De Ceuster Report* at 9.
[188] *Id.* at 1.
[189] *See Bloomberg Report* at 3.4.
[190] *See IEA Report* at 37.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

With respect to labor, according to the *DOE Solar Report* 0.40 - 0.80 direct employees are required per MW of ingot and wafer production, while 0.15-0.45 and 0.50-0.70 direct employees are required per MW of solar cell and solar module production, respectively.[191]  This means that a one GW ingot and wafer production facility requires 400-800 direct manufacturing workers, while one GW solar cell and solar module production facilities require 150-450 direct manufacturing workers and 500-700 direct manufacturing workers, respectively.[192]  Based on this information, the labor requirements for a solar cell and solar module facility are greater than the labor requirements for an ingot and wafer production facility.

With respect to the skill level, the ITC reported that processing wafers into solar cells involves sophisticated machinery, which requires "skilled technicians and employees with advanced degrees."[193]  There is no information on the record that indicates that the production of ingots and wafers require skilled workers.

According to the *DOE Solar Deep Dive,* producing ingots and wafers requires 14 or 17 steps (depending on the type of wafer produced, *i.e.*, monocrystalline or multicrystalline), producing solar cells requires seven or 11 steps (depending on whether a full-area AI-BSF cell or full-area PERC cell is being produced), and producing solar modules requires nine steps.[194]  Thus, it requires fewer steps to produce ingots and wafers in China, than to produce solar cells and solar modules in the inquiry country.

More significant, however, is the nature of the production performed in each production step. The *IEA Report* specifies that while each segment of the manufacturing processes require various types of special equipment, solar cell production requires sophisticated, precise and advanced automation equipment, and solar module production requires "highly automated machinery and accurate quality-testing equipment at multiple stages."[195]  Meanwhile, the IEA Report indicates that ingot production uses "simpler, more conventional equipment …"[196]  Therefore, producing solar cells and solar modules in the inquiry country involves a multi-step production process that requires more precise and sophisticated equipment at multiple stages compared to producing ingots and wafers in China.

Regarding inputs, solar cell and solar module production requires approximately 100 different inputs, whereas converting polysilicon into wafers only involves a handful of inputs.[197]

More importantly, producing wafers from polysilicon in China is less extensive of a transformation of the input than producing solar cells and solar modules from wafers in the inquiry country.  The essence of the solar module is realized in solar cell production.  In the *Preliminary Determination,* we noted that:

---

[191] *See DOE Solar Report* at 11.
[192] *Id.* at 11.
[193] *See ITC Solar Final* at I-18; *see also ITC Solar Safeguard Proceeding 2017* at I-22 – I-23.
[194] *See DOE Solar Deep Dive* at 30-31, 35-36, and 44.
[195] *See IEA Report* at 35.
[196] *Id.* at 3.
[197] *See Malaysia* PDM at 18.

once a wafer is doped and an opposite electrical orientation is imparted on the surface, it results in the creation of a p/n junction. When sunlight strikes the cell, the positive and negative charge carriers are released, causing electrical current to flow. It is at this point that the cell is capable of generating electricity from sunlight.[198]

Therefore, Commerce has determined that it is only when the p/n junction is created that a wafer is no longer just a wafer, but is a solar cell that is subject to *the Orders*.[199]

In sum, the production of solar cells and solar modules in the inquiry countries has greater labor demands, more steps, and requires more inputs than ingot and wafer production in China. Moreover, the multi-step solar cell and solar module production process requires sophisticated, precise, and technologically advanced equipment, and a skilled workforce. Production of solar cells and wafers involves more than attaching Chinese components together. Solar cell and solar modules production involve exacting processes (*e.g.*, molecular-level impregnation of phosphorus into the wafer at a high heat,[200] printing solar cells (metals, such as silver paste, are printed onto the solar cell to collect electricity[201])) and treatments to, and preparation of, inputs used in production (such as lamination and curing of EVA, solar cells, and the backsheet).[202]

Importantly, the essential nature of the final product is imparted and realized through production in the inquiry country when the p/n junction is formed in the wafer. The p/n junction "… results in the creation of solar cells—albeit unfished solar cells—capable of converting sunlight into electricity via the photovoltaic effect."[203] Moreover, other components in the solar cell and solar module are important to its ability to function because they channel the electricity out of the cell so that the product can be used as intended. We do not believe that the technical hurdles associated with ingot and wafer production outweigh the above facts when comparing the nature of producing ingots and wafers to the nature of producing solar cells and solar modules.

Based on the foregoing, we continue to find that the nature of the production process in the inquiry country performed by the mandatory respondent(s) does not support finding the process of assembly or completion in the inquiry country to be minor or insignificant.

**Comment 6.   Whether Material Costs Should Be Included in the Value of Third-Country Processing**

*Auxin*[204]

- When applying section 781(b)(2)(E) of the Act (*i.e.*, determining whether the value of the processing performed in the third country represents a small proportion of the value of the merchandise imported into the United States), Commerce must exclude the value of

---

[198] *Id.* (citing Solaria Scope Ruling at 10-11).
[199] *Id.* at 19 (citing SunSpark Scope Ruling at 6).
[200] *See* Circumvention Request at 20.
[201] *Id.* at 20.
[202] *Id.* at 21.
[203] *See* ET Solar Scope Ruling at 7.
[204] *See* Auxin's April 24, 2023 Case Brief at 33-38.

37

material inputs in the value of the processing.  By using the phrase "processing performed," the Act focused on the processing operations in the third country, not the value of the material inputs used in those processing operations.

- This interpretation is consistent with *HFCs from China (India)* where Commerce determined that "when the Act is referring to the value of the processing, it is referring to the process of completion or assembly of the parts or components, not the process to manufacture the parts or components."[205]

- In *HFCs from China (India)*, Commerce noted that "Congress acknowledged in {certain} passages of the SAA that, under the previous statutory criteria, the inclusion of the parts or components from a third country proved to be problematic.  Therefore, Congress enacted the revisions to section 781(b) of the Act, which allowed Commerce to focus on whether the process of assembly or completion is minor or insignificant pursuant to section 781(b)(2) of the Act." [206]

- Rather, material inputs used in third-country processing should be considered when determining the total value of the exported merchandise under section 781(b)(1)(D) of the Act (where Commerce must determine whether the portion of the product produced in the order country is a significant portion of the total value of the product exported to the United States) and sections 781(b)(2)(A) (level of investment in the third country), (C) (nature of the production process in the third country), and (D) (extent of the production facilities in the third country) of the Act.[207]

*Jinko*[208] *NextEra*[209]

- Commerce has a longstanding practice of including the value of material inputs used in third-country processing in the value of that processing under section 781(b)(2)(E) of the Act and should not depart from that practice here.[210]

- Auxin did not explain why here Commerce should depart from its overwhelming prior practice based on a single instance (*HFCs from China (India)*), where it excluded the value of material inputs used in third-country processing from the value of that processing.[211]

- Commerce emphasized that its HFC blends decision did not necessarily have precedential value for other decisions.  In *HFCs from China (India)*, Commerce determined that material costs should not be part of third-country processing costs because the processing in the third-country only involved blending together materials from India and China to form the product that was imported into the United States.  In contrast, the instant case involves complex processing and assembly that requires the addition of multiple parts and materials, not a simple matter of blending.[212]

---

[205] *Id.* (citing *HFCs from China (India)* IDM at 17).

[206] *Id.*

[207] *Id.*

[208] *See* Jinko's May 5, 2023 Rebuttal Brief at 25-28.

[209] *See* NextEra's May 5, 2023 Rebuttal Brief at 37-39.

[210] *See CORE from China (UAE)* IDM at 20; *CRS from Korea (Vietnam) Preliminary* PDM at 17, unchanged in *CRS from Korea (Vietnam)*; and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*.

[211] *See* NextEra's May 5, 2023 Rebuttal Brief at 38-39.

[212] *See* Jinko's May 5, 2023 Rebuttal Brief at 26.

- Even if Commerce were to calculate processing as argued by Auxin, Jinko's processing of solar cells and modules cannot reasonably be considered as a small proportion of the value of imported merchandise.

**Commerce's Position:**  We disagree with Auxin's position that in this circumvention inquiry, Commerce should exclude material costs from the value of processing for purposes of section 781(b)(2)(E) of the Act.

Section 781(b)(2)(E) of the Act directs Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."  Although Auxin claims that the phrase "the value of the processing performed" means the value of the processing operations performed in the third country, not the value of the material inputs used in those processing operations, the phrase "processing operations" is not further defined in the Act, and the individual items to be included in, or excluded from, the value of processing are not identified in the Act.  Moreover, Auxin did not cite any accounting authority or other authority showing that a manufacturer's processing costs do not include material costs.

Processing generally entails subjecting something to a series of actions in order to achieve a particular result or the act of taking something through a set of prescribed procedures.  For example, the Executive Summary and portions of the narrative in the *Bloomberg Report*, which is a report that Auxin relied on in its Circumvention Request, indicate that processing refers to the entire manufacturing activity[213] and processing costs refer to the total cost of a certain stage of production.[214]  In contrast, a graph in the *Bloomberg Report* indicates that processing costs include depreciation and fixed overhead costs.[215]  Therefore, it appears that the word "processing" is not consistently used to refer to the same types of costs.  Thus, the plain meaning of "processing," as used in section 781(b)(2)(E) of the Act, does not answer the question of whether the value of processing includes material costs.

Auxin primarily rests its argument on Commerce's decision in *HFCs from China (India)* and Commerce's discussion of the SAA in that case.  When Commerce calculated the value of processing for purposes of section 781(b)(2)(E) of the Act in *HFCs from China (India)*, it did not include the processing and material costs that the respondent incurred in the third country to produce the HFC component (R-125) that the respondent blended with the Chinese HFC component (R-32) to form the hydrofluorocarbon blend (R-410A) sold in the United States.  Commerce explained that "when the Act is referring to the value of the processing, it is referring to the process of completion or assembly of the parts or components, *not the process to manufacture the parts or components*.  This interpretation of the language in the Act is consistent with Congress' intent towards this portion of the statute" (emphasis added).[216]

Thus, the issue in *HFCs from China (India)* involved the material costs that the respondent incurred to self-produce a product that it used to "complete" the Chinese product, and not the

---

[213] *See Bloomberg Report* at the Executive Summary at PDF page 5, item 5.
[214] *Id.* PDF page 15.
[215] *Id.* at Figure 9.
[216] *See HFCs from China (India)* PDM at Comment 3.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

question of whether the cost of materials and supplies used when assembling and completing the Chinese product in the third-country should be included in the value of processing for purposes of section 781(b)(2)(E) of the Act.  In fact, in *HFCs from China (India)*, the respondent did not use any materials in its "completion" of the Chinese R-32, it merely blended the self-produced R-125 with the Chinese R-32 to form the hydrofluorocarbon blend (R-410A) sold in the United States.[217]  Hence, we do not find Commerce's decision in *HFCs from China (India)*, to be directly applicable in this case.

Moreover, the decision in *HFCs from China (India)*, which Commerce described as "consistent with Congress' intent towards this portion of the statute,"[218] was to focus on the process of completing the Chinese components in the third country, as opposed to the process of manufacturing parts that were used to finish the Chinese components in the third country. Commerce's decision in *HFCs from China (India)* was to not focus on the processing that had nothing to do with the assembly or completion of the merchandise imported from the order country (China).  Thus, this decision was entirely consistent with Congress' revisions to Section 781(b) which directed "Commerce to focus on whether the process of assembly or completion {in the third-country} is minor or insignificant pursuant to section 781(b)(2) of the Act."[219] Additionally, Commerce's decision in *HFCs from China (India)* was fact specific and did not necessarily establish a broader practice regarding which costs should be included in the value of processing being performed in the foreign country for purposes of section 781(b)(2)(E) of the Act.

Auxin's argument is based, in part, on Commerce's citation in *HFCs from China (India)* to the SAA's discussion of a "third-country parts" problem that existed in the pre-URAA version of the Act, which required that the difference between the value of the order country product that was processed in the third country and the final product imported into the United States be small to find circumvention.  Congress found this provision was ineffective in identifying circumvention because in some cases only minor assembly was performed in the third country, yet the difference in value was not small (*e.g.*, a "screwdriver" operation in the third country where high value third-country electronic components were simply connected together with electronic components from the order country into a finished product).  Therefore, Congress revised the Act by removing the "difference in value" provision and adding, among other things, section 781(b)(2)(E) of the Act (whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States).[220]

However, after discussing the third-country parts problem, the SAA simply explains that new section 781(b)(2)(E) of the Act requires that Commerce determine whether the value of the third-country processing is small and notes that this requirement is consistent with the overall focus of revisions to the Act, which is to determine whether the process of assembly or completion in the third country is minor or insignificant.  The SAA never indicated that the cost of all the materials

---

[217] *Id*. ("… we valued only the respondents' direct labor, manufacturing overhead, SG&A expenses, and net interest expenses in valuing the production process as these are the *only* expenses incurred by GFL … in performing the processing on the components to make HFC blends" (emphasis added)).

[218] *Id*.

[219] *Id*.

[220] *See* SAA at 892-94.

40

used in third country processing should be excluded from the value of that processing for purposes of section 781(b)(2)(E) of the Act, and Commerce has not taken that position in numerous prior circumvention cases.[221]

A discussion of this matter is in Commerce's summary of the comments that it received on its revisions to the regulations that it proposed pursuant to the URAA. Specifically, one party "argued that because the emphasis in anticircumvention inquiries concerning completion or assembly in … a third country is now on whether that process is minor or insignificant, any parts or components sourced from third countries should not be included in making that judgement."[222] Commerce replied to that comment by stating that "we have not adopted this suggestion."[223] While Commerce went on to explain that third-country parts and components must still be considered under section 781(b)(1)(D) of the Act, the issue raised by the commenter was clearly focused on the issue at hand here, namely how third-country parts should be treated in determining whether completion or assembly in a third country was minor.[224] Yet, Commerce did not indicate, at that time, that its policy would be to exclude the cost of materials from the value of the processing in all circumvention inquiries, as suggested by Auxin.

Moreover, Commerce's regulations under 19 CFR 351.226(i) specify that "{i}n determining the value of … processing performed … under section 781(b)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(e) of the Act—or, in the case of nonmarket economies, on the basis of section 773(c) of the Act." Thus, Commerce's regulations discuss valuing parts or components when determining the value of processing under section 781(b)(2)(E) of the Act.

Similarly, we do not find it appropriate to exclude the cost of processing materials from the value of third-country processing in this circumvention inquiry. Here, we are not facing the situation described in the SAA, where a few high value third-country components are being connected together with components from the order country into a finished product. Auxin itself claimed that "{t}he total cost components from China represent a significant portion of the total value of the merchandise ultimately exported to the United States."[225] Moreover, the process of completing certain of the Chinese components in the third country involves more than simply attaching Chinese and third-country components together. Some third-country materials are applied to, or infused into, the Chinese components to modify their properties (*e.g.*, phosphorus is diffused into wafers to effect a molecular-level impregnation that changes the electrical properties of the wafer).[226] As a result, the processing involves more than just the activities performed on the components; it includes third-county materials interacting with the Chinese components to change the properties of the component. It is not clear, in this case, that all third-country materials should be excluded from the value of third-country processing, even the materials that form the nature of the processing.

---

[221] *Id.*
[222] *See Antidumping Duties; Countervailing Duties*, 62 FR at 27329.
[223] *Id.*
[224] *Id.*
[225] *See* Circumvention Request at 78.
[226] *Id.* at 20.

41

Moreover, we do not find it reasonable to apply Auxin's interpretation of the SAA in this case, given the cost structure of solar cells and solar modules. Record evidence indicates that non-material costs account for significantly less than half the price for solar modules. The ITC noted that "{r}aw material costs for the production of solar modules (much of which are the cost of the cells) accounted for 81.5 percent of U.S. producers' total cost of goods sold."[227] The *Bloomberg Report* (2021), indicates that material inputs account for 67 percent of the cost of converting a solar cell into a solar module while other processing costs account for 13 percent and labor and electricity costs accounted for 20 percent of total costs.[228] Given that the total non-material costs incurred to produce solar cells and solar modules, even in China, are limited, we do not find that Auxin's proposal to only consider non-material costs when calculating the value of third-country processing would provide a meaningful measure of the significance of the assembly or completion in the third-country. Therefore, in order to calculate a meaningful measure of third-country processing of solar cells and solar modules under section 781(b)(2)(E) of the Act, and for the other reasons explained above, we have continued to include material costs in the value of processing performed in the foreign country for purposes of 781(b)(2)(E) of the Act.

**Country-Specific Issues**

**Comment 7.    Whether Commerce Should Correct Certain Ministerial Errors and Minor Verification Corrections**

*Jinko*[229]
- Commerce should correct certain ministerial errors and make minor corrections accepted by Commerce at verification in its final analysis of Jinko's investments.
- In its *Preliminary Determination*, Commerce made three errors in the database formula links for Jinko's module investments: (1) the reported capacity for Jinko Malaysia; (2) the reported facility square footage for both Jinko Malaysia and Jinko Technology; and (3) the reported number of production workers for Jinko Malaysia and Jinko Technology.[230]
- Commerce correctly stated that Le Shan Jinko is one of Jinko's wafer producers, however, information for this company is missing from the summary investment table.
- At verification, Jinko submitted, and Commerce accepted two minor corrections regarding investments.[231] Commerce should revise its analysis accordingly.
- The two corrections were: (1) Jinko Technology and Jinko Malaysia erred in the allocation of reported investment costs to construct their respective cell and module facilities; and (2) Jinko Technology made a clerical error in the reported square footage for certain facilities.

No other interested party commented on this issue.

**Commerce's Position:** Commerce finds it appropriate to correct the minor errors regarding Jinko's investment figures and to revise Jinko's investments with the corrections submitted at verification. Accordingly, Commerce will analyze Jinko's investments, pursuant to section

---

[227] *See USITC Solar Investigation Final* at V-1.
[228] *See Bloomberg Report* at PDF pages 18 (Figure 12) and 22 (Figure 18).
[229] *See* Jinko's April 24, 2023 Case Brief at 5-10.
[230] *Id.* (citing Jinko Preliminary Analysis Memorandum).
[231] *Id.* (citing Jinko Verification Report at 2-3).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

781(b)(2)(A) of the Act, using the revised and corrected investment figures.  For additional information, *see* Jinko's Final Analysis Memorandum.

**Comment 8.   Whether Jinko's Cell and Module Manufacturing is Minor or Insignificant Under Section 781(b)(1)(C)**

*Section 781(b)(2)(A) of the Act:  Level Of Investment*

*Auxin*[232]

- In its *Preliminary Determination*, Commerce stated that Jinko's investment figure is not a minor or insignificant amount, and therefore found Jinko's investment in solar cells and modules facilities in Malaysia to not support a finding of circumvention.[233]
- The appropriate analysis is whether the investments required to produce subject merchandise in China are larger than the investments made by the respondents in Malaysia to assemble solar cells and modules.  This is consistent with Commerce's longstanding merchandise-centric comparative analysis.
- Publicly available evidence indicates that the average investment required to produce subject merchandise in China is USD $4,700,000,000.  Thus, the record compels a finding that Jinko's total investments in Malaysia are minor or insignificant when compared against the investment required in China.
- In response to a Commerce request, Auxin filed information regarding solar investments in China, demonstrating that Chinese companies, with the support of the government of China, have invested heavily in all five stages of the solar production process to capitalize on economies of scale and to ensure their global dominance.[234]
- Consistent with Commerce practice, this is the appropriate benchmark against which Commerce should compare Jinko's investments for cell fabrication and module assembly in Malaysia.

*Jinko*[235]

- Auxin argues that Commerce's conclusion regarding Jinko's investments in Malaysia supported a negative determination was nonsensical.  Auxin's argument is without merit.
- In both absolute terms and when compared to investment in China, Jinko's Malaysian investment cannot reasonably be defined as minor or insignificant.  Commerce's *Preliminary Determination* conclusion is supported by evidence on the record.
- Rather than strictly define the minor or insignificant test, Congress provided Commerce the discretion to adopt a test which supported the purpose of U.S. law to prevent operations in third countries from avoiding ADs/CVDs, while not impeding legitimate third country investment, and to move away from a quantitative calculation of value added to a more qualitative evaluation of the nature of the production process.
- Auxin's claim that Commerce's investment conclusion is nonsensical is based on an error in arithmetic.

---

[232] *See* Auxin's April 24, 2023 Case Brief at 25-33.
[233] *Id*. (citing Jinko Preliminary Analysis Memorandum).
[234] *Id*. (citing Auxin's July 29, 2022 Comments).
[235] *See* Jinko's May 5, 2023 Rebuttal Brief at 5-9 and 17-21.

43

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  From Malaysia 2022

- As noted elsewhere in Jinko's case brief, Commerce made certain ministerial errors in its analysis of Jinko's investments, which when accounted for along with verification corrections, would yield a different overall amount of investment.
- On a per-unit basis, investments in Malaysia are greater than the investments in China.
- Average investments in Malaysia are not relevant to Commerce's negative determination for Jinko.  The data supports a country-wide negative determination.
- Auxin's conclusion that China-wide data supports an affirmative determination is fundamentally flawed.  Commerce should reject Auxin's suggestion to compare Jinko's investment for cell fabrication and module assembly in Malaysia against a benchmark provided in Auxin's brief.
- Jinko filed extensive documentation on its investments in China and Malaysia, and Commerce conducted an on-site verification.  Commerce's determination for Jinko is based on verified data.

*NextEra*[236]

- Commerce correctly concluded that the level of investment in Malaysia by both mandatory respondents weighs against a finding of circumvention, a conclusion that is fully supported by evidence on the record.
- Auxin makes a false assertion regarding Jinko's overall total investment in Malaysia compared to China.
- Jinko reported, and Commerce verified, substantial investments in cell and module production in Malaysia.  Commerce noted no discrepancies for Jinko's data, rendering it far more reliable than the investment data placed on the record by Auxin.[237]
- The record demonstrates that Jinko's investments are not minor or insignificant, in absolute or per-unit terms.  Any comparison of investments in Malaysia and China must take into relative capacity to determine whether investments in Malaysia are minor or insignificant.

*Auxin*[238]

- Evidence on the record supports a finding that Jinko's investment in Malaysia remains minor or insignificant regardless of how it is analyzed.
- As stated in Auxin's case brief, Commerce must assess the level of investment within the context of the investment in the subject country.  The absolute size of the investment is not outcome determinative.
- Consistent with its comparative analysis, the record here compels a finding that Jinko's investment in Malaysia is minor or insignificant as compared to its affiliates' investments in China.

---

[236] *See* NextEra's May 5, 2023 Rebuttal Brief at 32-36.
[237] *Id.* (citing Jinko Verification Report at 17-22).
[238] *See* Auxin's May 5, 2023 Rebuttal Brief at 9-12.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

*Section 781(b)(2)(B):  Research and Development*

*Auxin*[239]
- In its *Preliminary Determination*, Commerce found that the R&D done in China for the production of ingots and wafers is greater than the R&D done in Malaysia for the production of solar cells and solar modules, and therefore, concluded that Jinko's R&D in Malaysia is not minor or insignificant.[240]
- Commerce undermined its own conclusion when it found that Jinko's R&D related activities in Malaysia are not R&D, but rather labor expenses and investments in production equipment.
- Commerce's findings compel a finding that Jinko's R&D expenses in Malaysia are minor or insignificant when compared against its China R&D.
- Commerce should correct its analysis and conduct its merchandise-centric approach.  The R&D performed in Malaysia will be even more minor or insignificant.

*Jinko*[241]
- Auxin's claim that Commerce erred in its R&D analysis for Jinko is similar to its claim with respect to Jinko's investment.  Auxin's suggestion of the difference between Jinko's Malaysia and China R&D is as erroneous as its investment comparison.  Commerce's conclusion for Jinko's R&D is supported by evidence on the record.
- Auxin would like Commerce to create a bright-line 50 percent test to determine whether investment, R&D and value added are minor or insignificant.  This is not only not the law, but is also contrary to Congressional intent and administrative practice.
- Jinko Solar Co., Ltd.'s R&D can be reconciled to the Audited Report.  Hence, the amounts of 2019 and 2020 R&D as reported were the total R&D incurred by Jinko Solar Co., Ltd. for all production stages, and not specifically for ingot or wafer production stage.
- When R&D expenses are analyzed on a per-unit basis, it shows that the R&D expenses in USD/MW in Malaysia is greater than that in China.
- Commerce should reject Auxin's suggestion that Jinko's Malaysia R&D is not really R&D.  Commerce toured Jinko's R&D facility at its on-site verification and described the activities performed in Malaysia in its verification report.[242]
- Jinko provided a list of wafer and module related R&D activities, expressly identifying Jinko's specific R&D initiative and conclusively establishes that actual R&D was performed.[243]

*NextEra*[244]
- Commerce correctly found that the level of R&D in Malaysia by Jinko is not minor.

---

[239] *See* Auxin's April 24, 2023 Case Brief at 25-33.
[240] *Id*. (citing Jinko Preliminary Analysis Memorandum).
[241] *See* Jinko's May 5, 2023 Rebuttal Brief at 5-9 and 21-25.
[242] *Id*. (citing Jinko Verification Report at 22-24).
[243] *Id*.
[244] *See* NextEra's May 5, 2023 Rebuttal Brief at 32-36.

- Auxin grossly mischaracterizes the difference in levels of R&D expenditures in Malaysia and China for Jinko, relying on a meaningless ratio to make its conclusion.  Commerce verified Jinko's R&D expenditure.

*Section 781(b)(2)(C):  Nature of the Production Process*

*NextEra*[245] and *Jinko*[246]
- Commerce should maintain its findings that the production of process in Malaysia is not minor or insignificant compared to the production of polysilicon, ingots and wafers in China.
- Commerce officials toured Jinko's extensive solar cell and solar module production facilities in Malaysia, witnessing firsthand Jinko's sophisticated and technologically advanced operations.
- The p/n junction is a key transformative step that Commerce has already acknowledge imparts the "essential" character of a solar cell – which occurs in Malaysia.
- The nature of Jinko's production process in Malaysia compel a negative determination.

*Silfab*[247]
- Commerce's finding that the nature of production performed by the respondents in the inquiry country is not minor or insignificant strongly supports a negative circumvention determination.
- Commerce appears to have never previously reached an affirmative circumvention determination while also concluding that the nature of the production process in the third country was not minor or insignificant.
- Commerce found the solar cells and solar module production process in the inquiry country significant activities to be multi-step, highly-technical, technically sophisticated, capital intensive, requiring highly skilled workers and skilled technicians and employees with advance degrees, thus making the process not minor or insignificant when compared to the production of polysilicon, ingots and wafers.

*Section 781(b)(2)(D):  Extent of Production Facilities*

*Jinko*[248]
- Jinko's ingot and wafer capacity in China is dedicated to the production of cells and modules destined not only for the United States, but also the home and third country markets.  Thus, in order to properly take production capacity into account, Commerce's extent of production facilities analysis should be on a per-unit basis, and not an absolute comparison.
- Commerce erred by relying too narrowly on square footage, capacity, and number of employees to evaluate the extent of Jinko's production facilities, rather than conducting a

---

[245] *See* NextEra's Tranche 2 Case Brief at 3-8.
[246] *See* Jinko's Tranche 2 Case Brief at 4-5.
[247] *See* Silfab's Tranche 2 Case Brief at 17-20.
[248] *See* Jinko's April 24, 2023 Case Brief at 2-5.

qualitative assessment of its facilities in conjunction with the level of investment and nature of the production process, as that is Commerce practice.[249]

- Commerce concluded that the nature of cell production is the most capital intensive part of the manufacturing process, requiring skilled technicians and sophisticated technology.[250]  By comparison, wafer production is a relatively simple process.  Evidence on the record submitted by Jinko supports this assessment.[251]

*Auxin*[252]

- Although Auxin maintains that for its final determination, Commerce should apply its "merchandise-centric" approach, Commerce's preliminary analysis nonetheless confirms that the extent of Jinko's Malaysian facilities is minor or insignificant.

- Consistent with its practice, Commerce should not account for the possible end markets of the inputs being produced in the subject country, and should not conflate statutory factors under section 781(b)(2) of the Act by considering the extent of production facilities in the foreign country in conjunction with the level of investment and nature of the production process.

- Interested parties overlook the fact that Commerce has already considered capacity under its analysis of Jinko's production facilities.

- The respondents have failed to show how Commerce's preliminary finding was not a reasonable conclusion.  Where a respondent failed to overcome Commerce's reasonable finding by not providing information on the record to support only one conclusion, the CIT has upheld Commerce's finding that a respondent's production facility was not extensive.[253]

- Commerce's finding that the extent of Jinko's production facilities in Malaysia are minor or insignificant is reasonable, and parties have failed to establish any basis to reverse Commerce's *Preliminary Determination*.

*NextEra*[254]

- Comparing facilities in China to facilities in Malaysia on an absolute basis would result in an overly simplistic and distortive comparison to facilities that supply a substantial volume of product to markets outside the United States.  On a per-unit basis, Jinko's facilities in Malaysia are clearly significant and not minor in relation to its affiliates' facilities in China.

- Commerce improperly relied solely on square footage, capacity, and number of employees to evaluate the extent of production facilities.  Instead, Commerce has often engaged in a qualitative assessment of facilities in conjunction with the nature of the production process.[255]

---

[249] *Id.* (citing *CORE from China (Vietnam)*; *Diamond Sawblades (Thailand)*; and *Tissue Paper from China (India) Preliminary Determination*).
[250] *See Malaysia* PDM at 17.
[251] *See* Jinko IQR Part I at Exhibit 17.
[252] *See* Auxin's May 5, 2023 Rebuttal Brief at 5-8.
[253] *Id.* (citing *Macao CIT*).
[254] *See* NextEra's April 24, 2023 Case Brief at 3-8.
[255] *Id.* (citing *CORE from China (Vietnam)*; *Diamond Sawblades (Thailand)*; and *Tissue Paper from China (India) Preliminary Determination*).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

- It is illogical to find that the nature of the production process in Malaysia is not minor or insignificant, but that the facilities are. The record therefore demonstrates that quantitatively and qualitatively the extent of Jinko's production facilities in Malaysia is not minor or insignificant.

*Section 781(b)(2)(E): Value of Processing*

*Auxin*[256]

- Commerce should correct Jinko's reported labor and overhead in its final determinations. Commerce relied on an inflated labor amount to calculate Jinko's value of processing in its *Preliminary Determination*, an inflated amount that is unsupported by the record.
- Given Jinko Technology's unreasonably high labor reporting, Commerce should adjust Jinko Technology's labor reporting as provided in Exhibit 3A of Auxin's October 20, 2023 Pre-Preliminary Comments. Jinko Technology has not provided a reconciliation between its plant cost reporting and its financial statement.
- Jinko Solar's labor reporting suffers from the same deficiency and should be adjusted accordingly.
- Commerce used an amount for variable and fixed overhead in its *Preliminary Determination* that included various extraneous expenses. The variable and fixed overhead amounts reported by Jinko included non-overhead expenses.[257]
- Commerce should limit the amount for variable and fixed overhead to only those costs associated with variable and fixed overhead. Commerce should use the revised figures provided by Auxin in its pre-preliminary comments.[258]

*Jinko*[259]

- Commerce's conclusion that the value of Jinko's processing in Malaysia was not a small proportion of the value of the merchandise imported in the United States was based on an analysis of the comprehensive data placed on the record by Jinko.
- Jinko provided a detailed explanation of its labor reporting methodology during verification, and provided SAP screenshots as supporting documentation. Commerce also reconciled the total staff costs reported in the 2021 financial statements with screenshots from Jinko Technology's SAP system.[260]
- The total labor costs specified by Auxin was based on a cost database that Jinko Technology has since revised in a subsequent supplemental, and included upstream labor costs that should not be used in the analysis as this yields distortive results.
- Jinko Technology and Jinko Solar have already provided a reconciliation between Jinko's plant cost reporting and its financial statement, and Commerce reconciled these worksheets during the on-site verification.[261]

---

[256] *See* Auxin's April 24, 2023 Case Brief at 38-40.
[257] *Id*. (citing Jinko Preliminary Analysis Memorandum).
[258] *Id*. (citing Auxin's October 20, 2023 Pre-Preliminary Comments).
[259] *See* Jinko's May 5, 2023 Rebuttal Brief at 5-9 and 38-40.
[260] *Id*. (citing Jinko Verification Report at 31-34).
[261] *Id*.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

- The reported variable and fixed overhead can be reconciled to the cost reconciliation worksheet submitted at Exhibits SQ4-9A and 9B.  Commerce has verified these worksheets during the on-site verification.[262]
- Auxin's claim to limit the amount of variable and fixed overhead to only those costs associated with variable and fixed overhead is baseless and should be rejected by Commerce.

**Commerce's Position:**  Commerce continues to apply the minor or insignificant analysis from the *Preliminary Determination*, as enumerated in section 781(b)(2) of the Act.  For additional discussion regarding this issue, *see* Comment 4.

*Section 781(b)(2)(A):  Level of Investment*

For this final determination, Commerce continues to find its methodology for analyzing the factors under section 781(b)(2) of the Act to be the appropriate comparison methodology.  Therefore, pursuant to section 781(b)(2)(A) of the Act, Commerce continues to analyze Jinko's investments related to the production of inquiry merchandise in Malaysia to the reported investments made by Jinko's affiliates in China.  We find that Jinko's investments in Malaysia are not minor or insignificant, and thus, weigh against a finding of circumvention.  For a complete analysis of Jinko's level of investments, *see* the Jinko Final Analysis Memorandum.  For a complete discussion of Commerce's section 781(b)(2) methodology, *see* Comment 4.

*Section 781(b)(2)(B):  Research & Development*

For the final determination, Commerce will continue to use Jinko's reported R&D in its analysis under section 781(b)(2)(B) of the Act.  In its questionnaire responses, Jinko provided Commerce with a detailed description of its R&D reporting methodology, as well as a reconciliation of the information with Jinko's books and records.[263]  Additionally, Commerce verified and reconciled the reported R&D expenses with Jinko's financial statements and accounting system during the on-site verification.  We noted no discrepancies.[264]  Therefore, we continue to find Jinko's reported R&D to be reliable and appropriate for Commerce's analysis.  As such, we continue to find that the level of R&D carried out by Jinko in Malaysia is not minor or insignificant in comparison to Jinko's Chinese affiliate, and that this factor weighs against circumvention.

We disagree with Jinko that Commerce should analyze R&D expenses on a per-unit basis.  For additional discussion, *see* Comment 3.  Commerce has stated that it has the discretion under the circumvention statute to determine the appropriate minor or insignificant analysis under section 781(b)(2) of the Act, as Congress and our past practice require us to consider the unique facts and circumstances of each case.  As such, Commerce rejects the creation of a standard 50 percent test, as Auxin proposes, to determine whether investment, R&D and value added are minor or insignificant.  For additional discussion related to Commerce's section 781(b) methodology, *see* Comment 4.

---

[262] *Id.*
[263] *See* Jinko's November 2, 2022 SQR.
[264] *See* Jinko Verification Report at 22-24.

49

*Section 781(b)(2)(C):  Nature of the Production Process*

For the final determination, Commerce continues to find the nature of the production process in Malaysia to be not minor or insignificant, and thus, not weighing in favor of circumvention.  *See* Comment 5.

*Section 781(b)(2)(D):  Extent of Production Facilities*

For the final determination, we continue to find the extent of Jinko's Malaysian production facilities to be minor or insignificant when compared to the extent of Jinko's affiliates' production facilities in China, and thus, weighs in favor of finding circumvention.  NextEra and Jinko contend that Commerce focused too narrowly on square footage, capacity, and number of production workers when evaluating the extent of Jinko's production facilities, rather than conducting a qualitative assessment of its facilities by taking into account the nature of production process.  We disagree.  In supporting its argument, NextEra and Jinko cite *Diamond Saw Blades from China (Thailand)*, *CORE from China (Vietnam)*, and *Tissue Paper from China (India) Preliminary Determination*, stating that our approach in the *Preliminary Determination* deviates from past practice where Commerce examined both qualitative and quantitative factors when considering the nature of the production process and extent of production facilities.

Further, NextEra states that it is illogical for us to find the nature of the production process in Malaysia to be significant while finding the facilities to be insignificant.  However, unlike *Diamond Saw Blades from China (Thailand)* and *CORE from China (Vietnam)*, we did not combine 781(b)(2)(C), nature of the production process, and 781(b)(2)(D), extent of the production facilities, when conducting our analysis under section 781(b)(2) of the Act.  Thus, the facts of that case are not analogous to this current proceeding.  Instead, we analyzed such factors separately, analyzing the nature of the production process via qualitative factors and viewing extent of production facilities as a quantitative scale-based analysis.  With such an approach in mind, we decided that quantitative factors (*i.e.*, square footage, capacity, and number of employees) were an appropriate lens to gauge the extent of the production facilities in Malaysia.

However, we note that Commerce did take certain qualitative factors into consideration for our analysis.  Over the course of the inquiry, Commerce requested, and respondents submitted, considerable information regarding the cost of the land, equipment, and buildings of, the square footage of, the number of production workers employed in, and the capacity of, their Malaysian solar cell and module production facilities, and those of their affiliated producers in China.[265]  Included in their submissions, respondents provided information regarding the sophistication of the equipment, the training and education required for operating the machines, and the complexity of the production process.[266]  Commerce considered these factors, as well as the quantitative factors such as production capacity and size of production facilities in its determination with regards to the extent of Jinko's production facilities in Malaysia.[267]  Additionally, during the on-site verification, Commerce toured Jinko's facility, examined its production and R&D capabilities, and inquired about the training necessary to operate the

---

[265] *See Malaysia* PDM at 19.
[266] *See* Jinko IQR Part I at Exhibit 17.
[267] *See Malaysia* PDM at 19; and Jinko Preliminary Analysis Memorandum.

50

production line.  Nothing from verification warrants a change to our determination.  Commerce considered similar quantitative and qualitative factors in *Tissue Paper from China (India)*.  In that case, Commerce evaluated factors such as the sophistication of the production facility and equipment, as well as the number of production workers, in its 781(b)(2)(D) analysis.  Therefore, we find our analysis for the Jinko's extent of production facilities in Malaysia to be consistent with Commerce's practice.

NextEra and Jinko additionally argue that Jinko's ingot and wafer capacity in China is dedicated to the production of cells and modules destined for not only the United States, but also the Chinese home market and other markets.  Thus, in order to take production capacity into account, Commerce's extent of production facilities analysis should be based on a per-unit basis, and not an absolute comparison.  We find insufficient reasoning to change our comparison methodology from the *Preliminary Determination*, as Commerce already considers production capacity under its current methodology, and has determined Jinko's production capacity in Malaysia to be minor or insignificant.  Additionally, Commerce has addressed Jinko and NextEra's per-unit argument at Comment 3.

Based on the analysis above, we continue to find Jinko's extent of production facilities in Malaysia to be minor or insignificant, and thus, weighs in favor of finding circumvention.  Commerce also finds it appropriate to correct minor errors made in the *Preliminary Determination*, as well as corrections submitted at verification.  Accordingly, Commerce will analyze Jinko's extent of production facilities, pursuant to section 781(b)(2)(D) of the Act, using the revised and corrected figures.  *See* Jinko's Final Analysis Memorandum.

*Section 781(b)(2)(E):  Value of Processing*

For the final determination, Commerce will continue to use Jinko's reported labor and overhead in its calculations of the value of processing in the foreign country.  In its questionnaire responses, Jinko provided Commerce with a detailed description of its labor and overhead reporting methodology, as well as a reconciliation of the information with Jinko's books and records.[268]  Additionally, Commerce verified and reconciled the reported labor and overhead expenses with Jinko's financial statements and accounting system during the on-site verification.  We noted no discrepancies.[269]  Therefore, we continue to find Jinko's reported labor and overhead to be reliable, and suitable for Commerce's calculations pursuant to section 781(b)(2)(E) of the Act.

**Comment 9.   Control Number 43 and 44:  Whether Hanwha's Cell and Module Manufacturing is Minor or Insignificant under section 781(b)(1)(C)**

*Auxin*[270]
- Auxin urges Commerce to compare the third country processing to the complete production process of subject merchandise in China.  However, even under Commerce's

---

[268] *See* Jinko's November 2, 2022 SQR.
[269] *See* Jinko Verification Report at 31-34.
[270] *See* Auxin's April 24, 2023 Case Brief at 25-33.

limited preliminary analysis, the record shows that the level of investment in Malaysia is minor or insignificant compared with the investment in China.

- In its final determination, Commerce should conduct its comparative minor or insignificant analysis for Hanwha despite Hanwha's lack of affiliation with Chinese input suppliers.
- Commerce has previously relied on the data of a single Chinese producer when in conjunction with the set of information placed on the record by domestic parties to make findings attributable to interested parties generally.[271]  Commerce could reasonably attribute its findings based on the information submitted by Jinko and Auxin to Hanwha, despite a lack of affiliated Chinese input producers.

*Hanwha*[272]

- Commerce's findings regarding Hanwha on each of the five criteria under section 781(b)(2) of the Act are legally sound and supported by record evidence that was verified.
- Auxin's labels of an affiliate-centric versus merchandise-centric approach in this proceeding do not change the nature of Commerce's analysis.  Commerce should confirm its findings for the final determinations and reject Auxin's proposal to attribute Hanwha's findings based on Jinko's information.
- There is no basis for Commerce to ignore record information provided by Hanwha and use another respondents' information instead.[273]

*Section 781(b)(2)(A):  Level of Investment*

*Hanwha*[274]

- In the *Preliminary Determination*, Commerce correctly found that Hanwha's level of investment was not minor or insignificant, and thus, weighed against a finding of circumvention.
- Commerce verified Hanwha's level of investment during its on-site verification, and found no discrepancies.[275]
- Commerce should account for all of Hanwha's investments to produce solar cells and modules in Malaysia, including its investments to produce wafers during the relevant period.  A proper accounting of all of Hanwha's investments would further support Commerce's negative determination.
- Commerce officials reviewed and accepted minor corrections regarding the land area used by Hanwha's production buildings, a relevant correction for Commerce's analysis under section 781(b)(2)(D) of the Act.
- Commerce should utilize the corrected square footage of Hanwha's production facility.  This further supports Commerce's assessment under section 781(b)(2)(D) of the Act and the overall negative determination for Hanwha.

---

[271] *Id*. (citing *CRS from China (Vietnam)*).
[272] *See* Hanwha's May 5, 2023 Rebuttal Brief at 9-17.
[273] *Id*. (citing *Dillinger France*).
[274] *See* Hanwha's April 24, 2023 Case Brief at 3-5.
[275] *Id*. (citing Hanwha Verification Report at 15-16).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry - From Malaysia 2022

*Hanwha*[276]
- Hanwha's investment in Malaysia is extremely high, going beyond cell and module production as the company also invested in wafer manufacturing technologies in 2018 to 2019. On a per-unit basis, Hanwha's investments are on par or exceed investment amounts of virtually any integrated solar manufacturing facility, including those suggested by Auxin.[277]
- Commerce should analyze the detailed investment information provided by Hanwha. Commerce should not analyze Hanwha's investments based on information submitted by Jinko and Auxin, and doing so would be inappropriate and unnecessary.
- Hanwha's overall investment, from the beginning of operations and throughout its history, represents a long-term investment of capital, corporate planning, and a long-term business commitment in Malaysia that is incompatible with a circumvention scenario.
- Auxin's proffered investment figure is based on a hypothetical integrated facility, constructed from separate press announcements made by various Chinese producers at different levels of integration, none of which actually reflects the entire production chain at one company.
- Hanwha's affiliate in China does not have its own polysilicon production, and therefore, including investments in polysilicon production for the purposes of comparing the level of investment at Hanwha to the investment of an integrated facility in China overstates the investment in China and is thus distortive.
- Hanwha's investments in a plant producing cells and modules cannot be considered minor or insignificant compared to the level of investment required to produce cells and modules in China regardless of the method of comparison.

*NextEra*[278]
- Commerce correctly concluded that the level of investment in Malaysia by Hanwha weighs against a finding of circumvention, a conclusion that is fully supported by evidence on the record. Auxin did not take issue with the data reported by Hanwha.
- Hanwha seeks to bolster Commerce's preliminary finding for this factor, by arguing that Commerce should take into account all investments to produce solar cells and modules, including investments in wafer production.
- Commerce has verified Hanwha's investments into cell and module production capacity in Malaysia, noting no discrepancies, rendering the questionnaire data far more reliable than the investment data placed on the record by Auxin.[279]
- Any comparison of investments in Malaysia and China must take relative capacity into account to determine whether investments in Malaysia are minor or insignificant.

---

[276] *See* Hanwha's May 5, 2023 Rebuttal Brief at 11-17.
[277] *Id.* (citing Auxin's Investment and R&D Information).
[278] *See* NextEra's May 5, 2023 Rebuttal Brief at 32-36.
[279] *Id.* (citing Hanwha Verification Report at 15-16).

53

*Section 781(b)(2)(B): Research & Development*

*Hanwha*[280]
- Hanwha's R&D activities in Malaysia and its investments to conduct such R&D activities are extensive. The innovations incorporated in Hanwha's products are not imported from China but developed in-house at Hanwha's R&D facilities in Germany and Malaysia.
- Commerce verified the R&D activities of Hanwha in Malaysia, noting the R&D activities of the global R&D center in Germany and the local R&D team in Malaysia.[281]

*NextEra*[282]
- Commerce correctly found that the level of R&D in Malaysia by Hanwha is not minor.
- Auxin did not challenge Commerce's analysis of Hanwha's reported data, which plainly support Commerce's findings.

*Section 781(b)(2)(C): Nature of the Production Process*

*Silfab*[283]
- Commerce's finding that the nature of production performed by the respondents in the inquiry country is not minor or insignificant strongly supports a negative circumvention determination.
- Commerce appears to have never previously reached an affirmative circumvention determination while also concluding that the nature of the production process in the third country was not minor or insignificant.
- Commerce found the solar cells and solar module production process in the inquiry country significant activities to be multi-step, highly-technical, technically sophisticated, capital intensive, requiring highly skilled workers and skilled technicians and employees with advance degrees, thus making the process not minor or insignificant when compared to the production of polysilicon, ingots and wafers.

*Section 781(b)(2)(D): Extent of Production Facilities*

*Hanwha*[284]
- Commerce officials reviewed and accepted minor corrections at verification regarding the land area used by Hanwha's production buildings, a relevant correction for Commerce's analysis under section 781(b)(2)(D) of the Act.
- Commerce should utilize the corrected square footage of Hanwha's production facility. This further supports Commerce's assessment under section 781(b)(2)(D) of the Act and the overall negative determination for Hanwha.

---

[280] *See* Hanwha's May 5, 2023 Rebuttal Brief at 13-14.
[281] *Id.* (citing Hanwha Verification Report at 16-17).
[282] *See* NextEra's May 5, 2023 Rebuttal Brief at 32-36.
[283] *See* Silfab's Tranche 2 Case Brief at 17-20.
[284] *See* Hanwha's April 24, 2023 Case Brief at 3-5.

*Section 781(b)(2)(E):  Value of Processing*

*Auxin*[285]
- Cost of sales is an inappropriate basis for Hanwha's G&A and interest ratios, as such Commerce should revise its calculations to use cost of manufacturing as the denominator for Hanwha's G&A and interest ratios.

*Hanwha*[286]
- Commerce correctly found that the value of processing performed in Malaysia by Hanwha is not minor or insignificant, pursuant to section 781(b)(2)(E) of the Act, and thus weighs against finding circumvention.
- It is Commerce's practice to use cost of sales as the denominator for G&A and interest ratio calculations, and thus, Commerce should continue to apply that same methodology here as there is no reason for Commerce to depart from its normal practice.[287]
- Hanwha reported a minor correction during verification with respect to its G&A and interest ratio calculations, which Commerce reviewed and accepted.  These minor corrections further support Commerce's finding that processing performed in Malaysia is not minor or insignificant.

**Commerce's Position:**  Commerce continues to apply our minor or insignificant analysis as applied in the *Preliminary Determination*, as enumerated in section 781(b)(2) of the Act.  For additional discussion regarding this issue, *see* Comment 4.

With respect to Hanwha, Commerce continues to find its comparative minor or insignificant analysis conducted in the *Preliminary Determination* to be appropriate and in accordance with the Act.  In the *Preliminary Determination*, Hanwha reported that it had sourced inputs solely from unaffiliated suppliers, and had no affiliates who made investments or incurred R&D expenses in China related to the inquiry merchandise.  As such, Commerce found it appropriate to evaluate the level of investment, R&D, and extent of production facilities in Malaysia without reference to an upstream input supplier in China.  Therefore, Commerce found that Hanwha's investments and R&D were not minor or insignificant, which weighs against a finding of circumvention.  However, Auxin contends that Commerce should compare the processing in Malaysia to the complete production process of subject merchandise in China, and that, despite a lack of affiliated Chinese input producers, Commerce could reasonably substitute information submitted by Jinko or Auxin in Commerce's comparative analysis for Hanwha.  We disagree with Auxin that this would be an appropriate comparison.  We have already addressed Auxin's proposed comparative methodology, and the proposed figures submitted by Auxin at Comment 4.  Additionally, we do not find it appropriate to substitute Hanwha's information on the record and replace it with that of another respondent.  Hanwha's reported information has been verified by Commerce during an on-site verification and is, therefore, reliable record evidence.  Commerce finds no basis to ignore existing information on the record.

---

[285] *See* Auxin's April 24, 2023 Case Brief at 40.
[286] *See* Hanwha's May 5, 2023 Rebuttal Brief at 17-18.
[287] *Id.* (citing *Hot-Rolled Steel from Korea AD*; and *Steel Flanges from Spain AD*).

Based on the analysis above, pursuant to section 781(b)(2)(A) and (B) of the Act, we continue to find that Hanwha's investments and R&D in Malaysia are not minor or insignificant, and thus, weigh against a finding of circumvention.

*Section 781(b)(2)(A):  Level of Investment*

We find that an evaluation of Hanwha's Malaysian investments in wafer production would be inappropriate.  Commerce conducted its level of investment analysis by comparing the initial start-up investment required to construct a facility in Malaysia for the production of solar cells and modules, with the initial start-up investment required to construct a facility in China for the production of ingots and wafers.  Therefore, in the *Preliminary Determination*, Commerce did not consider Hanwha's investments in wafer production in Malaysia.  For the final determination, Commerce has continued to evaluate Hanwha's level of investment in Malaysia accordingly, and exclude Hanwha's reported investments in wafer production.  For a complete discussion on Commerce's section 781(b)(2) methodology, *see* Comment 4.

*Section 781(b)(2)(B):  Research & Development*

For the final determination, Commerce will continue to use Hanwha's reported R&D in its analysis under section 781(b)(2)(B) of the Act.  In its initial questionnaire response, Hanwha provided Commerce with a detailed description of its R&D reporting methodology, as well as a reconciliation of the information with its books and records.[288]  Additionally, Commerce verified and reconciled the reported R&D expenses with Hanwha's financial statements and accounting system during the on-site verification.  We noted no discrepancies.[289]  Therefore, we continue to find Hanwha's reported R&D to be reliable and appropriate for Commerce's analysis.  As such, we continue to find this factor to weigh against circumvention.

*Section 781(b)(2)(C):  Nature of the Production Process*

For the final determination, Commerce will continue to find the nature of the production process in Malaysia to be not minor or insignificant, and thus, not weighing in favor of circumvention. *See* Comment 5.

*Section 781(b)(2)(D):  Extent of Production Facilities*

Commerce finds it appropriate to revise Hanwha's reported square footage of its production facilities with the corrections submitted to and accepted by Commerce during its on-site verification.  Specifically, Hanwha stated that it had incorrectly reported the total land square footage in its questionnaire responses.  Accordingly, Commerce will analyze the extent of Hanwha's production facilities, pursuant to section 781(b)(2)(D) of the Act, using the corrected square footage.  For additional information, *see* Hanwha's Final Analysis Memorandum.

---

[288] *See* Hanwha August 9, 2022 SQR at 4-6 and Exhibit S-9.
[289] *See* Hanwha Verification Report at 16-17.

*Section 781(b)(2)(E):  Value of Processing*

For the *Final determination*, Commerce will continue to use Hanwha's reported G&A and interest ratios in its calculations of the value of processing in the foreign country.  The statute and the SAA grant Commerce discretion in evaluating the five minor or insignificant factors.  The statute only provides that Commerce "shall take into account" the five factors, without further instruction.  We disagree with Auxin that it is inappropriate to use cost of manufacturing as the denominator in Hanwa's G&A expense ratio.  It is Commerce's practice to calculate the G&A expense ratio using the cost of sales as the denominator.[290]  In its questionnaire responses, Hanwha provided Commerce with a detailed description of its G&A and interest ratio reporting methodology, as well as a reconciliation of the information with Hanwha's books and records.[291]  Commerce also verified and reconciled the reported G&A and interest ratios with Hanwha's financial statements and accounting system during the on-site verification.  We noted no discrepancies.[292]  Therefore, we continue to find Hanwha's reported G&A and interest ratios to be reliable, and suitable for Commerce's calculations pursuant to section 781(b)(2)(E) of the Act.

Additionally, Commerce finds it appropriate to revise Hanwha's cost of production database with corrections submitted to and accepted by Commerce during its on-site verification.  Specifically, Hanwha stated that it had inadvertently applied its G&A and net interest expense ratios to the cost of manufacture excluding direct material costs allocated to China for certain SEQ numbers.  Accordingly, Commerce will analyze Hanwha's value of processing performed in Malaysia, pursuant to section 781(b)(2)(E) of the Act, with corrections to Hanwha's cost of production database.  For additional information, *see* Hanwha's Final Analysis Memorandum.

## Comment 10. Whether Hanwha's Shipments of Chinese Inputs Weighs in Favor of Circumvention Under Section 781(b)(3)(C)

*Hanwha*[293]

- Commerce determined that Hanwha's pattern of trade does not weigh in favor of finding circumvention pursuant to section 781(b)(3)(A) of the Act.  Commerce should also consider its analysis under this section when evaluation section 781(b)(3)(C).
- Hanwha's increase in imports of Chinese components is due to Hanwha's business growth in all markets, which resulted in an increase in purchases of inputs to satisfy growing customer demand.
- However, Commerce reviewed Hanwha's import and purchasing data in absolute terms without taking into consideration global supply chain constraints and Hanwha's own commercial practices in other export markets.
- In *CORE from Taiwan (Malaysia)*, Commerce examined the company's imports of HRS and CRS from Taiwan into Malaysia.  Commerce found that the increase in imports of HRS from Taiwanese sources as a percentage of HRS purchased from all sources, along with information that the company's imports of HRS and CRS from Taiwan into Malaysia grew in between the comparison and base period in absolute terms, support an

---

[290] *See Lined Paper Products from India* IDM at Comment 3.
[291] *See* Hanwha IQR Part II at 72 and Exhibit COST-1-COST-6.
[292] *See* Hanwha Verification Report at 29-30.
[293] *See* Hanwha's April 24, 2023 Case Brief at 5-10.

affirmative finding.[294]  However, the facts of this case are unlike those of *CORE from Taiwan (Malaysia)*.  Here, Hanwha's imports of inputs did not increase, thus Commerce should find this factor does not support a finding of circumvention.

- In *Pipe and Tube from India (Oman and UAE)*, in determining whether shipments of HRS from India to Oman and the UAE increased, Commerce found no clear connection between the increase in shipments of Indian HRS to Oman and the UAE and circumvention of the order because global Indian HRS exports increased substantially during the same period and the HRS and CRS can be consumed for the production of multiple downstream steel products.[295]

- The increase in Hanwha's purchases of inputs from China was overwhelmingly dedicated to  domestic and third-country sales rather than exports to the United States.

*Auxin*[296]

- Interested parties argue for Commerce to consider pattern of trade (781(b)(3)(A)) in its increased import analysis (781(b)(3)(C)).  They are conflating two discrete statutory factors in contravention of the plain language of the Act.

- As confirmed by the CAFC, Commerce enjoys broad discretion under the analysis under section 781(b)(3) of the Act.[297]

- Hanwha relies on *CORE from Taiwan (Malaysia)* and *Pipe and Tube from India (Oman and UAE)* to support its claims for Commerce to broaden its analysis under section 781(b)(3)(C) of the Act.  However, these cases are inapposite.

- Hanwha took issue with Commerce's consideration of its import data in absolute terms, but cites to *CORE from Taiwan (Malaysia)*, a case where Commerce found imports of substrate from Taiwan to Malaysia grew in absolute terms and, thus, supported a finding of circumvention.[298]

- The reasoning behind *Pipe and Tube from India (Oman and UAE)* is not applicable to this record as cell and module inputs are not suitable for use in the production of merchandise other than cell and modules in Malaysia.[299]

**Commerce's Position:**  Commerce continues to find, in accordance with section 781(b)(3)(C) of the Act, that the level of imports of Chinese inputs into Malaysia increased after the initiation of the investigation and that this fact supports a finding of circumvention.

In the *Preliminary Determinations*, Commerce considered shipments of inputs from China into Malaysia since the initiation of the investigation.  Since Hanwha began operations in 2009, it has purchased inputs from China.  Based on Hanwha's reported purchases from China, we preliminarily found that imports of Chinese inputs into Malaysia increased following the year of initiation of the investigation.[300]

---

[294] *Id.* (citing *CORE from Taiwan (Malaysia)* IDM at 8-13).
[295] *Id.* (citing *Pipe and Tube from India (Oman and UAE)* IDM).
[296] *See* Auxin's May 5, 2023 Rebuttal Brief at 22-24.
[297] *Id.* (citing *Al Ghurair CAFC 2023*, 65 F.4th at 1351).
[298] *Id.* (citing *CORE from Taiwan (Malaysia)*).
[299] *Id.* (citing *Pipe and Tube from India (Oman and UAE)*).
[300] *See* Hanwha Preliminary Analysis Memorandum.

We agree with Auxin that Hanwha is conflating two discrete statutory factors when it argues that Commerce overlooked relevant facts from its pattern of trade analysis under section 781(b)(3)(A) of the Act in its analysis under section 781(b)(3)(C) of the Act. The plain language of the Act identifies three factors for Commerce to take into account and does not indicate whether these three factors should be considered in conjunction with each other. Thus, under a plain reading of section 781(b)(3) of the Act, these three factors may be taken into account as discrete factors.

Commerce also agrees with Auxin that Commerce's determination that the increased purchases of inputs from China used to assemble solar cells and modules in Malaysia following the initiation of the investigation supports a finding of circumvention is consistent with prior circumvention investigations.[301] Hanwha argues that, in *CORE from Taiwan (Malaysia)*, Commerce examined the company's imports of HRS and CRS from Taiwan into Malaysia and that Commerce found that imports of HRS and CRS from Taiwan into Malaysia increased between the comparison and base periods in absolute terms, supporting a finding of circumvention. Hanwha contends that the facts of this case are unlike those of *CORE from Taiwan (Malaysia)*, as Hanwha's imports of inputs from China into Malaysia decreased, rather than increased. As such, Commerce should find the evidence on the record weighs against circumvention. However, after further examination of Hanwha's purchases of Chinese-produced inputs, we continue to find that Hanwha's purchases of Chinese inputs have increased since the year of the initiation of the investigation. Therefore, we find *CORE from Taiwan (Malaysia)* to support what was done in this inquiry. While Hanwha attempts to distinguish *CORE from Taiwan (Malaysia)*, we find that such a distinction is inapposite. *See* the Hanwha Final Analysis Memorandum.

Last, Hanwha cited *Pipe and Tube from India (Oman and UAE)*, where Commerce found that shipments of HRS from India to Oman and the UAE had increased but found no clear connection between the increase in HRS shipments and circumvention because global HRS exports from India increased and HRS is used in the production of multiple downstream products, not just subject merchandise. Hanwha contends that, similar to the facts of *Pipe and Tube from India (Oman and UAE)*, the increase in Hanwha's purchases of inputs from China was overwhelmingly dedicated to its domestic and third-country sales and, thus, does not indicate circumvention. Commerce did not find a clear connection between the increase in purchases of Chinese inputs and Hanwha's sales in the domestic and third country markets. Additionally, Hanwha failed to provide adequate supporting information demonstrating whether shipments of Chinese inputs for solar cells and modules have increased globally or what other products solar inputs could be used to produce. Therefore, the facts of *Pipe and Tube from India (Oman and UAE)* are not relevant to this circumvention inquiry with respect to Hanwha. For further discussion, please see Hanwha's Final Analysis Memorandum. Based on the above analysis, we conclude that Hanwha's imports of Chinese inputs into Malaysia have increased since the year of initiation of *the Orders*, and this factor weighs in favor of finding circumvention.

---

[301] *See CRS from China (Vietnam)*; *see also CORE from China (Vietnam)*.

**Overall Determination**

**Comment 11. Whether Commerce's Country-wide Affirmative Circumvention
                Determination Was Appropriate**

*NextEra*[302] and *Silfab*[303]

- Commerce cannot find that country-wide circumvention exists in Malaysia based on the fact that five Malaysian companies did not respond to its Q&V questionnaire when it found that neither of the two mandatory respondents were circumventing the *Orders*.[304]

- Under 19 CFR 351.226(m)(1), Commerce may apply a circumvention "determination on a country-wide basis to all products from the same country as the product at issue" with the same physical characteristics.  Because Commerce selected two companies as mandatory respondents that sold the largest quantity of inquiry merchandise to the United States during the inquiry period and considered these companies to be representative of all other producers in Malaysia, it should apply its negative circumvention determinations for those two respondents to the rest of the country.[305]

- Commerce cannot consider the mandatory respondents to be representative of producers in the entire country and then ignore the results of its examination of the mandatory respondents.[306]

- Issuing a country-wide negative circumvention determination here is consistent with Commerce's approach in other circumvention inquiries where it reached a country-wide negative circumvention determination when it found that individually examined respondents in the country were not circumventing the relevant order.[307]

- Commerce's referred to its determination as a "preliminary countrywide affirmative determination of circumvention and company-specific preliminary negative determinations of circumvention"[308] which is not a remedy contemplated under 19 CFR 351.226(m)(1).

- Furthermore, Commerce never explained how circumvention in Malaysia could be "widespread" if it expressly found that the two largest producers and exporters of solar cells and modules in Malaysia were not circumventing the *Orders*.

- Commerce's countrywide affirmative determination of circumvention is effectively an AFA determination that it has applied to the 15 fully cooperative companies that responded to is Q&V questionnaire.  However, the Act does not permit,[309] and the Courts

---

[302] *See* NextEra's April 24, 2023 Case Brief at 11 (citing Malaysia PDM at 24).

[303] *See* Silfab's April 24, 2023 Case Brief at 20-25.

[304] *Id.* at 20-21.

[305] *See* NextEra's April 24, 2023 Case Brief at 12-13.

[306] *See* Silfab's April 24, 2023 Case Brief at 24.

[307] *See* NextEra's April 24, 2023 Case Brief at 14; and Silfab's April 24, 2023 Case Brief at 24 (citing *CORE from China (Guatemala) Preliminary* PDM at 8-10, unchanged in *CORE from China (Guatemala)*; and *CORE from China (South Africa) Preliminary* PDM at 2-4, 10-11, unchanged in *CORE from China (South Africa)*).

[308] *Id.* at 11 (citing the *Malaysia* PDM at 25).

[309] *Id.* at 16-17 (citing section 776(b) of Act, which provides that if "an interested party has failed to cooperate … "Commerce may apply "an inference that is adverse to the interests of *that party*" emphasis added).

60

have not allowed Commerce to apply an AFA determination to fully cooperative companies.[310]

- Moreover, there is no need to resort to facts available because the necessary facts have been provided on the record by the mandatory respondents and other interested parties.

- Because record evidence shows that the mandatory respondents, and not the five unresponsive companies, account for a significant portion of exports of solar cells and modules from Malaysia to the United States during the inquiry period, Commerce cannot extend its affirmative circumvention determination for these five companies to a country-wide determination but must extend its negative circumvention determination for the two mandatory respondents to a country-wide determination.

- The Act permits Commerce to include imported merchandise within the scope of an order if it determines that such action is appropriate. If Commerce continues to issue a country-wide affirmative circumvention determination, in the alternative it should exercise its discretion and reach a negative determination for all cooperative companies. Doing otherwise would undermine efforts to fight climate change and would harm the American solar energy industry.

*Auxin*[311]

- Country-wide circumvention inquiries are not reliant on the experiences of discrete companies but are broader inquiries. As the CAFC observed, "Commerce's determination was country-wide, so its analysis of {the mandatory respondent's} data was only one part of the broader inquiry."[312]

- In this inquiry, Commerce determined that five companies that failed to cooperate in the inquiry were circumventing the *Orders*. Because these companies did not respond to the Q&V questionnaire, the volume of their solar cells and module exports to the United States are unknown. Due to the missing information and lack of cooperation, Commerce reasonably concluded that "{t}hese companies account for a significant amount of Malaysian solar cells and modules exported to the United States."[313] Thus, there are ample grounds to reach a final country-wide affirmative circumvention determination particularly since Commerce must also consider the risk of potential future circumvention in its inquiries.

- Parties' arguments that a country-wide affirmative circumvention determination amounts to AFA are misplaced. As Commerce noted in another circumvention inquiry, its "application of a country-wide finding … is not based on AFA."[314] *Yangzhou Bestpak* is not relevant because it involved selection of an AFA rate,[315] but Commerce does not determine AD or CVD rates in circumvention inquiries.[316]

---

[310] *See* NextEra's April 24, 2023 Case Brief at 17 (citing Y*angzhou CAFC* and *Yangtai CIT* (not permitting Commerce to calculate dumping margins for cooperative companies by averaging dumping margins that included an AFA rate), and *SKF CIT* (remanding application of AFA against a cooperative respondent based on noncooperation by an unaffiliated supplier because "{t}he court cannot accept a construction of {772(b)} under which the party who suffers the effect of the adverse inference is not the party who failed to cooperate").

[311] *See* Auxin's May 5, 2023 Rebuttal Brief at 24-30.

[312] *Id.* at 27 (citing *Al Ghurair CAFC 2023* 65 F.4th at 1351).

[313] *Id.* at 29 (citing Malaysia PDM at 24).

[314] *Id.* at 30 (citing *Aluminum Extrusions from (Vietnam) China* IDM at Comment 2).

[315] *Id.* (citing *Yangzhou CAFC*, 716 F.3d at 1374).

[316] *Id.* (citing *Tissue Paper from China (Vietnam)* IDM at Comment 5).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

- Moreover, cooperative parties are not subject to an adverse decision here because any cooperative party not circumventing the *Orders* may file the appropriate certification and avoid liability for ADs and CVDs.

**Commerce's Position:**  We disagree with NextEra and Silfab.  As an initial matter it is important to note that while NextEra and Silfab stated that Commerce issued preliminary negative circumvention determinations for the two mandatory respondents, Commerce's preliminary negative circumvention determinations only applied to the mandatory respondents' exports of inquiry merchandise produced with wafers exported by the specific parties reported in their questionnaire responses.  Thus, U.S. entries of inquiry merchandise from the two mandatory respondents could still be covered by Commerce's country-wide affirmative circumvention determination if those respondents use different wafer exporters from the ones that they reported in the period of inquiry.

Regardless of that fact, while Commerce reached negative wafer-exporter specific circumvention determinations with respect to the two mandatory respondents, it found, based on AFA, that multiple other companies which, contrary to NextEra's claim, accounted for a significant volume of Malaysian solar cells and modules exported to the United States during the inquiry period, were circumventing the *Orders*.[317]  Legislative history, Commerce's practice, and Court rulings support Commerce's broad authority to address circumvention of AD/CVD orders and to apply circumvention determinations on a country-wide basis, in particular when multiple firms circumvent the underlying AD/CVD order(s) using the same general approach.[318]  Here, as AFA, Commerce determined that multiple firms are circumventing the *Orders* and the Circumvention Request for this circumvention inquiry contained evidence demonstrating that companies in Malaysia are using the same general approach to such circumvention (*i.e.*, assembling Chinese wafers into solar cells and modules in the inquiry countries "using additional and substantial Chinese-origin components.")[319]

It would not be appropriate to apply the narrow negative wafer-exporter specific circumvention determinations for the two mandatory respondents to other companies that Commerce specifically determined were circumventing the *Orders* or to assume that the negative wafer-exporter specific circumvention determinations for the two mandatory respondents apply to all companies in Malaysia given that Commerce made affirmative circumvention determinations for multiple companies in Malaysia.  Although Commerce may limit its examination to individual respondents in a country-wide circumvention inquiry, it cannot limit its decision solely to the results of its analysis of the individually examined respondents but must consider the entire results of its inquiry.  The results of this inquiry show that multiple firms in Malaysia are circumventing the *Orders*.  Therefore, we have continued to reach a country-wide affirmative circumvention determination.

---

[317] *See Malaysia* PDM at 24.
[318] *See CORE from China (Vietnam) Preliminary* PDM at Comment 3; *Butt-Weld Pipe Fittings from China (Malaysia)* IDM at Comment 1; *see also Aluminum Extrusions from China Minor Alterations Circumvention* IDM at Comment 4.
[319] *See* Circumvention Request at 27.

62

Our approach here is consistent with Commerce's prior decisions involving AFA. For example, in the *Uncoated Paper from China Final Determination*, Commerce issued a country-wide affirmative circumvention determination based solely on AFA.[320] In *PSF from Taiwan and PSF from Korea*, Commerce issued AD orders based on its AFA determinations for one or more uncooperative mandatory respondents even though it calculated a zero percent dumping margin for the only cooperative mandatory respondent.[321] Similarly, here, Commerce issued a country-wide affirmative circumvention determination based on its AFA decision with respect to certain uncooperative companies even though it issued a negative circumvention determination for the cooperative mandatory respondents when they used certain wafer exporters. The cases cited by NextEra and Silfab to support their positions are inapposite because, in those cases, all parties responded to Commerce's Q&V questionnaire, and Commerce did not find that any companies were circumventing the relevant order.[322]

We disagree with the assertion that there is no need to resort to facts available because the necessary facts have been provided on the record. Commerce considers the quantity and value information that it requested to be necessary facts for purposes of respondent selection. Because certain companies did not timely submit their response to Commerce's Q&V questionnaire, those necessary facts are not on the record. Because that information was withheld, Commerce properly resorted to AFA with respect to the uncooperative companies pursuant to section 776(b) of the Act. It would not be appropriate to make a determination with respect to the uncooperative companies based on information that has been provided by cooperative companies or based on Commerce's decisions regarding whether the process of assembling and completing Chinese components into solar cells and modules in Malaysia is, or is not, minor or insignificant. Such an approach would contradict the AFA provision that was intended to induce cooperation by ensuring that uncooperative parties do not benefit from their lack of cooperation. It would also undermine Commerce's authority to conduct circumvention inquiries, because large third-country producers could refuse to cooperate with Commerce's requests for information and nonetheless benefit from a negative country-wide determination.

Moreover, we disagree with NextEra and Silfab that we applied AFA to cooperative companies by issuing a country-wide affirmative circumvention determination. We did not use adverse inferences against cooperating companies based on the noncooperation of other unaffiliated companies. Rather, we specifically limited our AFA determination to the uncooperative companies. Specifically, Commerce stated that "{a}s AFA, we preliminarily find that the non-responsive companies produced and/or exported solar cells and modules subject to these inquiries and … that the criteria for finding circumvention with respect to these companies have been met."[323] Furthermore, our determination placed the cooperative companies in a different position than companies that failed to cooperate by not responding to Commerce's requests for information in this inquiry. In particular, unlike the uncooperative companies, the cooperative companies may fully participate in the certification regime established in this circumvention

---

[320] *See Uncoated Paper from China Preliminary Determination*, unchanged in *Uncoated Paper from China Final Determination*.
[321] *See PSF from Taiwan*; and *PSF from Korea*.
[322] *See CORE from China (Guatemala) Preliminary* PDM; *see also CORE from China (South Africa) Preliminary* PDM.
[323] *See Malaysia* PDM at 11.

63

inquiry and, if the company meets the certification requirements, entries of its inquiry merchandise will not be subject to ADs or CVDs.[324]

The cases that NextEra and Silfab cited to demonstrate that Commerce may not base a cooperative party's dumping margin, even in part, on AFA are factually distinguishable from this inquiry. Specifically, the cases cited by the respondents – *Yangzhou CAFC*, *Yangtai CIT*, and *SKF CIT* – concern the calculation of dumping margins for cooperative companies based, at least in part, on AFA. Commerce did not assign dumping margins based, even in part, on AFA to the cooperative companies in this inquiry because Commerce does not determine dumping margins in circumvention inquiries. Rather, pursuant to Commerce's affirmative circumvention determination, importers may use a cooperative exporter/producer's cash deposit rate, or that of its wafer exporter, under the existing order if either of them has a rate. If neither the cooperative company, nor its wafer exporter, has a cash deposit rate, the import and exporter of the cooperative company's merchandise may complete any of the applicable certifications so that no cash deposit will be required.

If the exporter, or its wafer exporter, does not have a separate rate and the importer and exporter do not complete the applicable certification for an entry, cash deposits equal to the China-wide AD rate and the all others CVD rate will be required. While the respondents argued that being subject to the China-wide AD rate is effectively an AFA determination, it is not application of AFA but application of Commerce's separate rates policy. Exporters that do not have a separate rate are part of the China-wide entity. The courts have recognized this fact. For example, in *Advanced Technology*, the CIT stated:

> Commerce did not apply adverse facts available to {respondent}, Commerce rather found that {respondent} had not rebutted the presumption of state control and assigned it the {China}-wide rate. These are two distinct legal concepts: a separate AFA rate applies to a respondent who has received a separate rate but has otherwise failed to cooperate to the best of its ability whereas the {China}-wide rate applies to a respondent who has not received a separate rate. [325]

Thus, we do not find the present facts equivalent to the facts in the cases relied upon by the respondents, nor do we find that Commerce's affirmative circumvention determination means that Commerce applied AFA under section 776(b) of the Act to the cooperative companies in this inquiry.

Rather, we find that the present facts are similar to the case where Commerce issues an AD or CVD order on a country solely based on an AFA determination for one or more uncooperative companies (such as in *PSF from Taiwan* and *PSF from Korea,* referenced above).[326] In such a situation, the order applies to the entire country, and companies in that country are subject to the order even if Commerce did not request any information from the company or find it uncooperative. Such an order was not issued to apply AFA to cooperative companies, but was

---

[324] *Id.*, 77 FR at 75221, 75224-75225 and PDM at 11-12 and 25.
[325] *See Advanced Technology*, 938 F. Supp. 2d at 1351 (citing *Watanabe Group*, 34 CIT 1545, Slip Op. 10-139 at 9, n. 8).
[326] *See PSF from Taiwan*; and *PSF from Korea*.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

issued because Commerce found sufficient statutory grounds to issue the order. Here, Commerce initiated a country-wide circumvention inquiry and found sufficient statutory grounds to make an affirmative circumvention determination. It is on that basis, rather than as AFA, that Commerce is subjecting the cooperative companies to the existing *Orders*.

We also disagree with NextEra's claim that a country-wide affirmative determination of circumvention together with company-specific negative determinations of circumvention is not appropriate because it is not a remedy contemplated under 19 CFR 351.226(m)(1). While the instant determination is not one of the remedies listed under 19 CFR 351.226(m)(1), in the Preamble to those regulations Commerce explained that "{t}here may be other options for remedies, as well, so it is important to emphasize that this list is not exhaustive. ... the most important factor is that Commerce has the flexibility to apply a remedy in accordance with a circumvention determination on a case-by-case basis that it finds to be appropriate given the facts on the record and its policies and practices."[327] As Commerce noted in the Preamble, it "has a certain amount of discretion {to act} ... with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law."[328] Moreover, issuing a negative country-wide determination that would apply to certain parties that failed to cooperate with Commerce's requests for information, would frustrate the purpose of Commerce's circumvention inquiries. Accordingly, we find that the remedy applied here is appropriate.

While we acknowledge NextEra's concerns regarding climate change, Commerce has "a clear duty to properly administer the law in order "{t}o protect domestic industries from unfair competition by imported products"[329] and "an obligation to administer the law in a manner that prevents evasion of" orders.[330] Consistent with that obligation, we have continued to reach a country-wide affirmative circumvention determination.

## Comment 12. Affirmative Circumvention Determinations Would not Be Appropriate Under Section 781(b)(1)(E) of the Act

*NextEra*[331]
- Commerce can reach a negative final determination under section 781(b)(1)(E) of the Act which states that Commerce "may" (not "shall" or "must") include products completed in third countries within the scope of an order.
- Including solar cells and modules produced in Cambodia, Malaysia, Thailand, and Vietnam within the scope of the *Orders* is not appropriate since there is no evasion to prevent when the processing that occurs in the third country is so significant.
- AD/CVD proceedings are not exempt from the directive to integrate climate considerations into its policies, strategic planning, and programs.[332]

---

[327] *See 2021 Regulations Final Rule*, 86 FR at 52352, 52353.

[328] *Id.*, 86 FR at 52353.

[329] *See Diamond Sawblades Coalition CIT*, 816 F. Supp. 2d at 1357.

[330] *See Max Fortune Indu Co.*, Slip Op. 13-52 at 20.

[331] *See* NextEra's April 24, 2023 Case Brief at 21-22.

[332] *Id.* (citing NextEra's May 2, 2022 Comments at Att. 12 (U.S. Department of Commerce, Department Administrative Order 216-22, Addressing the Climate Crisis).

*Silfab*[333]

- The final determinations must address whether expanding the scope of the Orders to encompass cells manufactured in third countries (and the modules produced using those cells) would be appropriate under section 781(b)(1)(E) of the Act.
- Auxin and Commerce have not met the requirements for appropriateness because: (1) no other U.S. producers support Auxin's petitions before Commerce; (2) an unwarranted expansion of the existing Orders would cause substantial harm to the U.S. solar industry; and (3) the requested relief would further impede the development of the U.S. solar industry, making it impossible to achieve the Biden administration's green energy initiatives.
- U.S. manufacturers have been denied due process in the form of procedural safeguards and eligibility requirements governing AD/CVD relief under U.S. law and Commerce's regulations. Put simply, Auxin unlawfully made an end-run around the strict procedures and eligibility requirements governing AD/CVD relief under U.S. law, sections 701 and 703 of the Act and 19 CFR 351.203.
- U.S. manufacturers sourced cells from locations outside of China to enable U.S. manufacturing of solar modules in good-faith recognition of existing AD/CVD orders as they had been administered by Commerce and CBP for a decade.
- U.S. manufacturers were never given any notice that such cells could be circumventing the *Orders*. In fact, as explained above, Commerce's administration of the *Orders* throughout this period consistently confirmed that such merchandise was not subject to the *Orders*. Accordingly, affirmative final determinations would, without notice, potentially penalize Silfab for its good-faith efforts to comply with U.S. law and grow U.S. module manufacturing.
- Affirmative final determinations would contradict the emergency declared in *Proclamation 10414*.

*Auxin*[334]

- Commerce appropriately determined that a circumvention inquiry for the Orders is appropriate under section 781(b)(1)(E) of the Act.
- The arguments put forth by several interested parties that Commerce's actions are not "appropriate" notwithstanding Commerce's affirmative finding of circumvention are false.
- Commerce followed its practice in determining that action is appropriate to address circumvention pursuant to section 781(b)(1)(E) of the Act in the *Preliminary Determinations*.[335]
- Commerce and the CIT have held as a matter of statutory interpretation that Commerce's evaluation of whether action is appropriate to prevent evasion pursuant to section 781(b)(1)(E) of the Act is tied to consideration of the factors outlined in section 781(b)(3) of the Act.[336]

---

[333] *See* Silfab's March 6, 2023 Case Brief at 4 and Silfab's April 24, 2023 Malaysia Case Brief at 5-12.

[334] *See* Auxin's March 17, 2023 Rebuttal Brief at 28-30 and Auxin's May 5, 2023 Rebuttal Brief at 31-41.

[335] *See* Auxin's May 5, 2023 Rebuttal Brief (citing, *e.g.*, the *Vietnam* PDM at 23-26; Boviet Preliminary Analysis Memorandum at 4-7; and Vina Solar Preliminary Analysis Memorandum at 4-7).

[336] *Id.* (citing *CORE from China (Vietnam)* IDM at 11; *CORE from China (Vietnam)* IDM; *Tung Mung CIT*, 219 F. Supp. 3d 1333, 1343; and *Peer Bearing Co.*, 36 CIT 1700, 1707.

66

- Commerce did not address circumvention in the underlying investigation of the Orders because its substantial transformation analysis at that time was limited to comparing cell fabrication to module assembly and not comparing cell fabrication to module assembly to prior stages of solar cell production, which is the analysis Commerce is conducting now pursuant to 781(b)(1) of the Act.[337]

- Commerce stated in the *Solar Cells from China Investigation* that the "{p}etitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country" which does not indicate that Commerce meant that future circumvention inquiries regarding solar cells would not be warranted.[338]

- The CAFC stated in *Bell Supply CAFC* that "if Commerce applies the substantial transformation test and concludes that the imported article has a country of origin different from the country identified in an AD or CVD order, then Commerce can include such merchandise within the scope of an AD or CVD order only if it finds circumvention under" section 781 of the Act.[339]

- Auxin is an interested party as defined by section 771(9)(C) of the Act and was, and is, well within its rights to request that Commerce initiate and conduct these circumvention inquiries.

- Congress rejected a standing requirement for circumvention inquiries when it enacted section 781(b) of the Act, which allows any interested party, including small and medium-size businesses like Auxin, to enforce U.S. trade laws.[340]

- Commerce does not have discretion under the statute to disregard circumventing behavior based on a concern that such a finding would impede other government policy objectives, or any other factor not explicitly provided for in the statute.

- Commerce previously rejected arguments that an affirmative final determination is not appropriate and would impose economic costs by stating that comments regarding economic impact address issues outside the purview of the analysis prescribed by section {781(b)} of the Act.[341]

- This circumvention inquiry does not threaten growth of U.S. solar deployment or hinder efforts to address climate change because as noted by the DOE there has been a steady increase in installed PV capacity from 2010-2020 in spite of the *Orders* and temporary safeguard measures.[342]

- The DOE confirmed that rehabilitating U.S. solar manufacturing by effectively enforcing U.S. trade laws and combatting climate change are not mutually exclusive.[343]

- Auxin's analysis of the solar cell production process is consistent with analyses from the DOE and the IEA, and was ultimately vindicated by Commerce's preliminary affirmative findings of circumvention.

- Silfab's argument that these circumvention queries violate its due process are unfounded since Congress enacted the circumvention section of the Act in 1988 in order to prevent

---

[337] *Id.* (citing *Solar Cells from China Investigation* IDM at Comment 1).

[338] *Id.* (citing *Solar Cells from China Investigation* IDM at Comment 1).

[339] *Id.* (citing *Bell Supply CAFC*, 888 F.3d 1222, 1230; and *Diamond Sawblades (Thailand)* IDM at Comment 3).

[340] *Id.* (citing 19 CFR 351.226(c)).

[341] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 4).

[342] *Id.*(citing Auxin's May 16, 2023 Comments at Exhibit 5 (DOE Solar Deep Dive at 2)).

[343] *Id.* (citing Auxin's May 16, 2023 Comments at Exhibit 5 (DOE Solar Deep Dive at iv)).

evasion and circumvention of AD/CVD orders and did not establish an industry support requirement.

- Silfab's argument that its due process rights have been violated is belied by the fact that it has been allowed to participate in this inquiry from the very start.344
- Silfab USA's contention that affirmative final determinations would contradict the emergency declared in *Presidential Proclamation 10414* is similarly without merit because although the proclamation effectively eliminates the remedy that Auxin is entitled to by law, nothing in *Presidential Proclamation 10414* is inconsistent with an affirmative final determination in these inquiries.

**Commerce Position:**  We disagree with NextEra's and Silfab's assertions that we did not determine the appropriateness of the instant circumvention inquiries pursuant to section 781(b)(1)(E) of the Act.  As an initial matter, we conducted a full analysis pursuant to section 781(b) of the Act in order to determine if the merchandise assembled or completed in a foreign country is within the scope of the *Orders*.345  Section 781(b)(1)(E) of the Act authorizes Commerce to include merchandise alleged to be circumventing in the scope of an order if Commerce "determines that action is appropriate … to prevent evasion of such order or finding."  Commerce found that the criteria for a finding circumvention of the *Orders* was met, and further that the factors listed in 781(b)(3) indicated that circumvention of the *Orders* was occurring.  The statute does direct Commerce to consider factors other than whether action under the circumvention statute is appropriate to prevent evasion of the *Orders*.  Here, because:  we have found that the criteria for finding circumvention were met, and the factors under section 781(b)(3) of the Act further evinced the existence of circumventing behavior, and because no information on the record suggested that circumvention would cease absent inclusion of inquiry merchandise in the scope of the *Orders*, we find that action is appropriate under section 781(b)(1)(E) of the Act.

With respect to Auxin's standing to request a circumvention inquiry, there is no stipulation in the regulations regarding who can and cannot bring a circumvention inquiry beyond that it be an interested party.  Pursuant to 19 CFR 351.226(c), an interested party may submit a circumvention inquiry request as long as it follows the proper procedures and include the requisite product information necessary for Commerce to make an initiation determination.  In the instant case, we examined Auxin's circumvention requests and determined that it satisfied the criteria under 19 CFR 351.226(c), thus, giving it standing to proceed.346

We also disagree with the arguments raised by NextEra and Silfab that Commerce precluded future circumvention inquiries on the inquiry merchandise in the language of the investigation.  In the investigation, we stated that there was the option for bringing additional petitions regarding assembly of solar cells and modules in a third country,347 but did not prelude circumvention inquiries, which are requested in response to specific trade pattern and activities that may constitute circumvention as defined in the Act.  As noted above, Auxin followed

---

344 *Id.* (citing *Techsnabexport, Ltd.*, 16 CIT 420, 427 (noting the "essential elements of due process are notice and the opportunity to be heard"))
345 *See Malaysia* PDM at the section, "Summary of Statutory Analysis."
346 *See Initiation Notice*, 87 FR at 19071, 19072.
347 *See Solar Cells from China Investigation* IDM at Comment 1.

Commerce's requisite procedures for requesting a circumvention inquiry and thus we proceeded accordingly.

We also disagree with Silfab's claim that it and other U.S. cell and module producers have been denied due process in the instant proceeding. Silfab claims that because U.S. manufacturers were never given any notice that their cells could be circumventing the *Orders,* their rights to due process were violated. The Act and Commerce's regulations provide for ample notification and comment on Commerce's *Preliminary Determinations* by interested parties. In accordance with the CIT's ruling in *Techsnabexport, Ltd.*, the "essential elements of due process are notice and the opportunity to be heard."[348] As evidenced by the case record of the instant circumvention inquiries Silfab as well as both domestic and foreign solar cell producers have had ample opportunity to file comments and thus be heard throughout this proceeding.

Finally, we disagree with NextEra's and Silfab's contention that these circumvention inquiries contradict *Presidential Proclamation 10414*. Nothing in the proclamation states that Commerce cannot conduct circumvention inquiries with respect to solar cells and modules. In fact, in response to *Presidential Proclamation 10414*, Commerce added Part 362 to its regulations to implement the Proclamation and these regulations, as well as CBP instructions issued by Commerce, specify that no ADs/CVDs will be collected on solar cells and modules entering the United States to which *Presidential Proclamation 10414* applies.[349] Thus, Commerce's affirmative circumvention findings cannot be implemented until the provisions of the *Presidential Proclamation 10414* expires.

**Certification Issues**

**Comment 13. Whether Commerce Should Allow AFA Companies to Certify**

*Auxin*[350]
- Commerce should preclude all non-cooperative parties in this inquiry from participating in any certification regime resulting from an affirmative determination of circumvention based on the recent precedents in *Ferrostaal Metals GmbH and CRS from Korea (Vietnam)*.
- The Court explained that the SAA makes clear that "application of AFA is a tool given to Commerce 'to ensure that {a} party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'"[351]
- *In Ferrostaal Metals GmbH*, the CIT found that Commerce acted reasonably by applying AFA to the respondent, barring them from participating in the certification regime, and determining that the respondent circumvented the *Orders*.[352]

---

[348] *See Techsnabexport, Ltd.* at 427.
[349] *See Malaysia* PDM at the section, "Certification Process and Country-Wide Affirmative Determination of Circumvention" and *Appendix IV-Certification for "Applicable Entries".*
[350] *See* Auxin's March 17, 2023 Rebuttal Brief at 23-26.
[351] *Id.* (citing *Ferrostaal Metals GmbH*, 518 F. Supp. 3d at 1374-75 (citing SAA at 870).
[352] *Id.* (citing *Ferrostaal Metals GmbH*, 518 F. Supp. 3d 1357, 1376).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

- The CIT stated that the SAA makes clear that "application of AFA is a tool given to Commerce 'to ensure that {a}party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'"[353]
- The CIT also noted that in prior circumvention inquiries in which Commerce allowed non-responsive companies to participate in the certification process, there was a lack of responses to issued Q&Vs.[354]
- Commerce's initial Q&V warned recipients that a failure to respond to the questionnaire would result in the use of an inference in selecting from the facts otherwise available, in accordance with section 776(b) of the Act.[355]
- Accordingly, Commerce should follow its longstanding, court-affirmed practice of precluding non-cooperative companies (either by not responding to the Q&V questionnaires or cancelling verification) from participation in any certification regime.

No other interested party commented on this issue.

**Commerce's Position:**  Commerce's decision to bar uncooperative respondents from the certification process is an agency practice affirmed by the CIT, is not impermissibly punitive, and minimizes the impact of AFA findings on parties not found circumventing, while ensuring that Commerce's AFA finding induces cooperation, consistent with Commerce's established practice.  As noted by Auxin, Commerce has the authority to and the discretion to determine the eligibility of parties to participate in the certification regime.[356]

Commerce notified interested parties that it was initiating the circumvention inquiry on a country-wide basis (*i.e.*, not exclusive to the producers mentioned) and would solicit information from certain Cambodian, Malaysian, Thai, and Vietnamese companies concerning their production and shipment of solar cells and modules to the United States.[357]  Commerce also stated in the *Initiation Notice* that a company's failure to completely respond to our request for information may result in the application of partial or total facts available which may include adverse inferences.[358]  In conducting a country-wide circumvention inquiry, Commerce must evaluate a representative selection of companies to determine whether merchandise has been completed or assembled in the third country, and must take necessary action to prevent evasion.[359]  Commerce is not required by the Act or regulations to impose a certification regime in instances where such a regime is inconsistent with preventing evasion and permits uncooperative parties to benefit from their lack of cooperation.  Commerce's previous findings that foreign producers' ability to "trace the country of origin of its shipments and identify which shipments to the United States are of Chinese origin on a transaction-specific basis," is crucial to administration of affirmative anti-circumvention findings.[360] Commerce is not obligated to permit a previously uncooperative party to certify if that party has, by its unwillingness to

---

[353] *Id.* (citing *Ferrostaal Metals GmbH*, 518 F. Supp. 3d 1357, 1374-75 (citing SAA at 870)).

[354] *Id.* (citing *Ferrostaal Metals GmbH*, 518 F. Supp. 3d 1357, 1375).

[355] *Id.* (citing the Q&V Questionnaire at 1).

[356] *See Cold-Rolled Steel from Korea* IDM at Comment 6.

[357] *See Initiation Notice*, 87 FR at 19072.

[358] *Id.*

[359] *See* Malaysia RSM at "Selection of Respondents."

[360] *See Butt-Weld Pipe Fittings from China (Malaysia)* IDM at Comment 3; *Hangers from China (Vietnam)* IDM at Comment 4; and *Tissue Paper from China (India) Final Determination* IDM at Comment 2.

cooperate, prevented Commerce from using that party's information to conduct its analysis, or to assess and verify such party's ability to trace its inputs to particular U.S. sales. Rather, Commerce's establishment of a certification process in which non-cooperative respondents may not participate is consistent with our obligation to administer the law in a manner that prevents evasion of the *Orders*.[361]

As noted by Auxin, the CIT in *Ferrostaal Metals GmbH* sustained Commerce's determination to "bar {non-cooperative respondent} from participating in the certification program and determine that { non-cooperative respondent} was circumventing the orders."[362]

Commerce is authorized under 19 CFR 351.226(m)(1) to take the appropriate remedy to address circumvention, including the application of the determination on a country-wide basis to all products from the same country as the product at issue. Commerce has repeatedly applied certification requirements in other circumvention inquiries which were subject to an affirmative country-wide decision.[363] Therefore, in a case where the affirmative circumvention determination is made entirely on record evidence, uncooperative respondents would be able to benefit from their failure to cooperate (*e.g.*, not filing timely Q&Vs or not participating in verification) merely by the fact that they avoided the inconvenience and expense of participating, including being selected as a mandatory (complete questionnaire) respondent, knowing that their lack of participation might not (or would not) alter Commerce's finding of circumvention. Such non-cooperation could also frustrate Commerce's ability to conduct a circumvention inquiry, should the largest third-country producers fail to provide Q&V responses. Finally, an uncooperative respondent retains the right to participate in a future review, and thus remedy its uncooperative status and potentially gain the opportunity to participate in a certification regime. For these reasons, Commerce's decision to preclude non-cooperating respondents from the certification regime is legitimately based on the need to induce cooperation and is not punitive.

## Comment 14. Certification Requirements and Corrections

*BYD HK*[364]
- Commerce should simplify its certifications by replacing them with declarations from only importers that the entry(ies) meet the requirements for duty-free treatment based on the *Presidential Proclamation 10104* (*i.e.*, the entry is an "Applicable Entry") or Commerce's determinations in these circumvention inquiries (*i.e.*, either Commerce's negative circumvention determination applies to the entry or the merchandise that was entered into the United States meets the non-Chinese content requirements identified by Commerce).
- CBP already enforces other duty exemptions using simplified certifications and requiring anything more than simple declarations will impede the flow of goods into the United States.

---

[361] *See Butt-Weld Pipe Fittings from China (Malaysia) Preliminary* PDM at 12-13 and 22, unchanged in *Butt-Weld Pipe Fittings from China (Malaysia)*.
[362] *See Ferrostaal Metals GmbH*, 518 F. Supp. 3d at 1375-1376.
[363] *See Butt-Weld Pipe Fittings from China (Malaysia)*; *CRS from China (Vietnam)*; *CORE from China (Vietnam)*; and *CORE from China (UAE)*.
[364] *See* BYD HK's March 6, 2023 Case Brief at 2-3.

- Commerce should provide importers 60 days to provide simplified declarations for entries that have already been made.

*Jinko*[365]
- To avoid CBP requiring AD/CVD cash deposits on entries with deficient certifications: (1) an importer should be allowed to appeal CBP's decision that a certification is deficient to Commerce and submit a corrected certification, if necessary; (2) an importer should be allowed to submit corrected certifications in the absence of gross negligence or fraudulent intent; and (3) the documentation required to be maintained in connection with the certification should be limited to documents that demonstrate that the entry is an "Applicable Entry" (*i.e.*, the p/n junction in the solar cells was not formed in China) or not an entry of inquiry merchandise (*i.e.*, the solar cells do not contain wafers produced in China).

*Auxin*[366]
- Commerce should continue to require exporters to complete the requisite certifications because: (1) Commerce's preliminary affirmative country-wide circumvention determination applies to all exporters in the inquiry countries; (2) exporters possess certain information necessary for completing the certifications that imports may not have; and (3) BYD HK never explained why requiring certifications from exporters would be burdensome.
- Contrary to BYD HK's claim that "there is no legitimate need or purpose for Commerce to require certifications from exporters or to require the level of factual detail specified in the current certifications," Commerce has specifically stated that the "addition of the certification requirements … strengthens the administration and enforcement of the AD and CVD orders by reducing the possibility that entries may be inaccurately classified by importers."[367]

**Commerce's Position:**  We have decided not to revise the certifications as suggested by BYD HK because requiring exporters to complete the certifications is consistent with Commerce's practice and is necessary, and because BYD HK never explicitly identified which parts of the certifications are too burdensome.  Commerce has a history of requiring both importers and exporters of goods that are entered into the United States to complete and maintain certifications in certain proceedings or proceeding segments, including as a result of circumvention inquiries.[368]  Certifications from exporters are particularly important for implementing the results of this circumvention inquiry because whether merchandise is inquiry merchandise is based on the country where the merchandise was produced and whether certain inputs into that merchandise were produced in China.[369]  Neither of these characteristics can be determined through a physical inspection of the merchandise at the border.  Moreover, entry documents that are typically available to the importer may not be helpful in identifying where certain inputs in

---

[365] *See* Jinko's March 6, 2023 Case Brief at 1-5.
[366] *See* Auxin's March 17, 2023 Rebuttal Brief at 26-28.
[367] *Id.* at 27 (citing *Core from China (Vietnam)* IDM at Comment 4).
[368] *See CORE from China (UAE)*; *see also Aluminum Extrusions from China Minor Alterations Circumvention Final*, 82 FR at 34631-32.
[369] *See Preliminary Determination* at Appendix IV.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

the imported merchandise were produced, as the source of such inputs may not be apparent from invoices, bills of lading, *etc.*, especially where the input passed through multiple parties (producer, exporter, trading company).  As Commerce noted in the Preamble to its regulations:

> Given the complex supply chains that may be involved with certain types of subject merchandise (which may involve input producers, intermediate processors, producers, exporters, trading companies, importers, *etc.*), certifications provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order.[370] "

Requiring exporters to complete and maintain certifications provides the added assurance that adequate information was obtained to accurately certify to the facts listed in the certifications.  Moreover, simply requiring "declarations" from importers that an entry qualifies as an "Applicable Entry" or meets the non-Chinese content requirements does not provide the same level of assurance that the entry meets those requirements as the certifications that Commerce developed for this circumvention inquiry.  Commerce's certifications contain a list of each requirement that must be met to make clear that the importer and exporter have been informed of each requirement by way of the certification and both have specifically certified that each and every requirement has been met.

Furthermore, we disagree that it is inappropriate for Commerce to "require the level of factual detail specified in the current certifications" as argued by BYD HK.[371]  "As a general matter, importers are expected to perform their due diligence and exercise reasonable care {when completing entry documents} … . {A} reasonable importer may be expected to know, at a minimum, the identity of certain parties in the transaction chain, understand the imported product, including where it was made, how it was made, and the components of the product (and, in some instances, the source of those components)."[372]  Commerce's certifications do not go beyond these already existing expectations for importers.  Hence, we have not revised the certifications as suggested or waived the certification requirement with respect to exporters.

We now turn to the comments regarding deficient or incorrect certifications and the documentation that must be maintained in connection with the certifications.  If CBP determines that an importer or exporter's certification does not conform to Commerce's requirements, such that the entry is subject to the *Orders*, the importer or exporter can request an administrative review of that entry wherein Commerce will determine the appropriate AD/CVD duty assessment for the entry.  Regarding corrections to certifications, CBP already has provisions in place for importers to correct entry summary information, including certification information, through such means as a post summary correction or a prior disclosure.

With respect to documentation requirements, parties who complete the "Applicable Entries" certification must certify to more than the fact that the solar cells or solar modules were not already subject to the *Orders*; or the AD order on certain crystalline silicon photovoltaic products

---

[370] *See 2021 Regulations Final Rule*, 87 FR at 52364.
[371] *See* BYD HK's March 6, 2023 Case Brief at 3.
[372] *See 2021 Regulations Final Rule*, 87 FR at 52347-52348.

from Taiwan (certain existing solar orders). For example, such parties must certify that the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated.

Similarly, parties who complete the "Chinese Component" certification must certify to more than the fact that the solar cells or solar modules do not contain wafers produced in China. For example, such parties must certify that the solar cells and/or solar modules were not already subject to the *Orders*.

Consequently, it would not be appropriate to limit the documentation requirements as suggested by Jinko. Commerce noted in the certifications that the certifying party "is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, etc.)."[373] This means that the certifying party must maintain sufficient documentation to support the certification in its entirety. Therefore, we have not limited the documentation requirement as requested by Jinko.

### Comment 15. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*

*NE Solar*[374]
- Commerce cannot require exporters of solar cells or solar modules that were not manufactured using Chinese wafers to certify to that fact because such merchandise is not subject to the circumvention inquiry. Commerce cannot change the language of the *Orders* or interpreted that language "in a way contrary to {its} terms.[375]
- Thus, Commerce should revise its certifications to remove references to merchandise that is outside the scope of the circumvention inquiries and that is not subject to the underlying *Orders* (*i.e.*, language in the certification that the imported or exported solar cells and solar modules were not manufactured using wafers produced in China).

No other interested party commented on this issue.

**Commerce's Position:** We disagree with NE Solar's claim that Commerce cannot place certification requirements on interested parties who exported solar cells and/or solar modules to the United States that were produced in the countries under consideration that do not meet the definition of inquiry merchandise. Commerce's regulations at 19 CFR 351.226(m)(1)(iv), provide that "{i}n conducting a circumvention inquiry under this section, the Secretary shall consider, based on the available record evidence, the appropriate remedy to address circumvention and to prevent evasion of the order. Such remedies may include … {t}he implementation of a certification requirement under 19 CFR 351.228." Under 19 CFR 351.228,

---

[373] *See Preliminary Determinations*, 87 FR at Appendix VI.
[374] *See* NE Solar's March 6, 2023 Case Brief at 5-8.
[375] *Id*. at 5-7 (citing *Wheatland*, 161 F.3d at 1370 (quoting *Smith Corona*, 915 F.2d at 686; and *Ericsson*, 60 F.3d at 782.

Commerce may require "an importer or other interested party" to "{m}aintain a certification for entries of merchandise into the customs territory of the United States" and that if such certificate is not maintained or is false, Commerce "may instruct the Customs Service to suspend liquidation of entries of the importer or entries associated with the other interested party and require a cash deposit of estimated duties at the applicable rate …"

Thus, the certification described in 19 CFR 351.228 relates to an entry that was not declared as subject to ADs or CVDs, such as the entries described by NE Solar, since only if the certification was not maintained or was found to be false would such duties be imposed.  This interpretation is consistent with Commerce's statement in the Preamble to the regulations that "Commerce uses the certification program, as described in {section} 351.228 of these regulations, to allow parties who have not engaged in the practices which Commerce determined were circumventing an order to certify that they did not participate in such conduct."  Therefore, requiring importers and exporters to certify that the imported/exported solar cells or solar modules produced in the countries under consideration were not manufactured using wafers produced in China is entirely consistent with Commerce's regulations and its authority to administer the Act in a manner that prevents evasion of its determinations, including developing certifications that it finds will be effective in preventing such evasion.  As the CIT noted, "Commerce has a certain amount of discretion to act in order to 'prevent {} the intentional evasion or circumvention' of the Act…To that end, Commerce may impose measures such as mandatory certification programs where it believes they will be effective in preventing future circumvention of its orders."[376]

Such certifications are particularly important in this circumvention inquiry because inquiry merchandise is not physically distinguishable from non-inquiry merchandise (inquiry and non-inquiry merchandise only differ with respect to the countries where certain materials in the merchandise were produced).  As Commerce noted in the Preamble to its regulations:

> We note that Commerce frequently imposes certifications in instances in which CBP may not be able to ascertain certain identifying details relevant to the product's classification as either subject to, or not subject to, an AD and/or CVD proceeding through physical inspection or the relevant sales documentation accompanying the entry summary, and, thus, could not confirm through these means alone whether a particular entry has been properly designated as {subject to antidumping or countervailing duties}. In such instances, both CBP and Commerce would rely on the certifications as an additional tool to ascertain whether the entry correctly was filed as an entry type not subject to an AD and/or CVD proceeding.[377]

---

[376] See Appleton Papers Inc., 929 F. Supp. 2d at 1337 (citing Tissue Paper from China (Vietnam) Final Determination IDM at 9-12); Solar Cells from China Investigation IDM at 80-81 (finding that a certification regime is necessary and appropriate to prevent evasion of the antidumping and countervailing duty orders on solar cells); CORE from China (UAE), 85 FR 41957, 41958.
[377] See Adoption of CFR 351.228 at 52364.

75

Commerce went on to note in the Preamble that:

> … enforcement of the AD/CVD laws, including taking steps to prevent evasion and circumvention of AD and CVD orders by producers, exporters, and importers, is well within Commerce's authority and is of paramount importance to Commerce.  The addition of a certification requirement, where necessary based on a given case, strengthens the administration and enforcement of the AD and CVD orders by reducing the possibility that entries may be inaccurately filed by importers.  Given the complex supply chains that may be involved … certifications provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order.[378]

Revising the certification as suggested by NE Solar by removing statements that the imported/exported merchandise was not manufactured using wafers, and/or certain other materials, produced in China would contravene the purpose of the certification at issue which is to "provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order."[379]

Lastly, Commerce's certifications do not redefine the scope of the *Orders* or inquiry merchandise.  Rather, the certifications are tools used to enforce the *Orders* and the circumvention determination in this proceeding so as to prevent evasion of such determinations.

### Comment 16. Whether Exporters and Importers Should be Permitted to Submit Multiple Certifications, as Applicable

*BYD HK*[380] and *CSIL*[381]
- Commerce should clarify that exporters and importers eligible to complete both the Appendix IV "Certification for 'Applicable Entries' Under 19 CFR Part 362 Importer Certification" and Appendix VI "Certification Regarding Chinese Components Importer Certification" certifications may file both certifications.
- Commerce's clarification would provide certainty to importers whose imports comply with the conditions of both certifications should *Presidential Proclamation 10414* and/or Commerce's related September 16, 2022 Final Rule be amended or terminated.[382]
- There is no principled basis for Commerce to preclude parties from filing two certifications and clarifying an importer's ability to submit more than one certification would assist in Commerce's administration of the final determination in these inquiries.
- Commerce should amend its certifications and related appendices to allow importers to submit both the Appendix IV "Certification for 'Applicable Entries' Under 19 CFR Part

---

[378] *Id.*
[379] *Id.*
[380] *See* BYD HK's March 6, 2023 Case Brief at 4-6.
[381] *See* CSIL's March 6, 2023 Case Brief at 3-4.
[382] *See* BYD HK's March 6, 2023 Case Brief (citing *Presidential Proclamation 10414 Final Rule Preamble* at 56868).

362 Importer Certification" and Appendix VI "Certification Regarding Chinese Components Importer Certification" certifications to clarify the certification regime, and in turn, promote its administrability.

No other interested party commented on this issue.

**Commerce's Position:**  We confirm that importers and exporters may complete certifications under ***both*** Appendix IV and Appendix VI of the *Preliminary Determination.*  Following the release of the *Preliminary Determinations,* Commerce informed interested parties of the certification requirement[383] and established the following types of certifications to administer *Presidential Proclamation 10414* and the findings from the *Preliminary Determinations*:  (1) importer and exporter certifications that specific entries meet the regulatory definition of "Applicable Entries"; (2) importer and exporter certifications that specific entries are not subject to suspension of liquidation or the collection of cash deposits based on the preliminary negative circumvention determinations (in combination with certain of its wafer exporters); and (3) importer and exporter certifications that specific entries of inquiry merchandise are not subject to suspension of liquidation or the collection of cash deposits pursuant to this preliminary country-wide affirmative determination of circumvention because the merchandise was not manufactured using certain components produced in China.[384]  Copies of the certifications and information regarding the certification requirements were provided in the Appendices to the *Preliminary Determination.*[385]  Appendix IV of the *Preliminary Determination* related to the certification for "Applicable Entries" under 19 CFR Part 362 whereas Appendix VI relates to the certification regarding Chinese components.  We acknowledge that exporters/importers shipping inquiry merchandise from the four countries subject to the circumvention inquiry (*i.e.*, Cambodia, Malaysia, Thailand, and Vietnam) may qualify under the "Applicable Entries" Appendix IV certification related to the *Presidential Proclamation 10414* and the Chinese components Appendix VI certification.  Thus, exporters/importers may elect to complete both the Appendix IV and Appendix VI certifications.

**Comment 17. Whether or Not Companies Found Not to be Circumventing Should be Required to Certify and to Identify Their Wafer Suppliers**

*Hanwha*[386]

*Commerce Should Not Request Certifications for Companies Found Not to Be Circumventing the Orders*

- The significance of a negative determination of circumvention is that merchandise exported by a respondent found not to be circumventing the orders is not within the scope of the relevant AD/CVD orders.[387]  Yet, contrary to law, Commerce has imposed a certification regime on Hanwha's entries.

---

[383] *See Preliminary Determination* at 75225.
[384] *See Malaysia* PDM at 25.
[385] *See Preliminary Determination* at 75227-75231.
[386] *See* Hanwha's March 6, 2023 Case Brief at 2-15.
[387] *Id.* (citing 19 CFR 351.226(g)(2)).

77

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  From Malaysia 2022

- Commerce has the discretion to act to prevent the evasion or circumvention of antidumping duty law.[388]  Commerce may impose measures such as a certification regime if they believe it will be effective in the prevention of future circumvention.[389]

- Hanwha was found not to be circumventing and, thus, Commerce should not require any certification on exports of solar cells and modules produced by Hanwha because they are not subject merchandise.

- Commerce's stated objective is to craft certification language that targets as closely as possible the merchandise that is circumventing the *Orders*.  Imposing a certification requirement on merchandise exported by Hanwha is contrary to this principle.

- Commerce should take reasonable steps to ensure that merchandise from an exporter found not to be circumventing the orders is not subject to suspension of liquidation and ADs/CVDs.[390]

- In prior negative circumvention determinations, Commerce has consistently not adopted any certification requirements.[391]  Therefore, companies for which Commerce reaches a negative determination should be exempt from a certification requirement.

- Commerce may implement a certification requirement under 19 CFR 351.228 if Commerce finds the merchandise subject to the inquiry pursuant to 19 CFR 351.226(m)(1)(iv).  However, neither the statue nor Commerce's regulations require a certification requirement in the event of a negative circumvention determination.

- If Commerce makes a negative determination, it is required to terminate the proceeding and terminate the suspension of liquidation with a refund of any cash deposit.[392]  Therefore, if Commerce makes a negative final circumvention determination, that merchandise must not be included in the *Orders* or subject to duties.

- Because Hanwha is not disclosing its wafer suppliers it is unfairly placed in the same position as the respondents for which Commerce made an affirmative circumvention finding.  This is inconsistent with the statute and Commerce's own regulations, which requires Commerce to terminate the suspension of liquidation in the event of a negative determination in an antidumping investigation.

*Commerce Has Requested Certifications Where Exporters Reported No Shipments but that Situation is Not Analogous to a Negative Determination*

- Commerce has previously imposed certification requirements on companies found to have no shipments in affirmative circumvention determinations.  Those scenarios are not the same as a negative circumvention determination.[393]

- In these cases, Commerce found the companies to have no shipments, finding that there are no reviewable entries or no reviewable shipments and not investigating a company's books and records to determine if it is circumventing pursuant to section 781(b) of the Act.

---

[388] *Id.* (citing *Tung Mung CIT*).
[389] *Id.* (citing *Butt-Weld Pipe Fittings from China (Malaysia)*).
[390] *Id.* (citing *Mitsubishi Heavy Industries*).
[391] *Id.* (citing *CORE from China (Guatemala)*; *CORE from China (South Africa)*; *PET Film, Sheet, and Strip from UAE (Bahrain)*; and *Pipe and Tube from India (Oman and UAE)*).
[392] *Id.* (citing Section 731(c)(3) of the Act).
[393] *Id.* (citing *Butt-Weld Pipe Fittings from China (Malaysia) CORE from China (UAE)*).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

- Conversely, a negative circumvention determination is made after Commerce has analyzed a respondent's information. Hanwha has provided multiple questionnaire responses, thousands of pages of confidential information, and conducted verification of all information needed.
- In *Pipe and Tube from India (Oman and UAE)*, Commerce reached a negative country-wide determination and did not impose any certification requirements.[394] Similar to this, Hanwha was found not to be circumventing, a certification is not required and requiring one is contrary to law.

*If Commerce Continues to Require Certifications for Companies Found Not to be Circumventing, Commerce Should Modify the Appendix V Certification Requirement and Allow Hanwha to Certify Without Disclosing the Identity of its Wafer Exporters*[395]

- Hanwha objects to the requirement of publicly disclosing the names of its wafer exporters in order to use the certification regime imposed in the *Preliminary Determination*, as it is contrary to Commerce's APO practice and imposes significant harm to Hanwha's business relationships.
- Specifically, 19 CFR 351.105(c)(6) states that Commerce will normally consider the names of particular customers, distributors or suppliers as BPI if so designated by the submitter. Hanwha has properly requested BPI treatment of the names of its unaffiliated suppliers.
- Requiring Hanwha to disclose the identity of its wafer exporters is therefore inconsistent with the APO, and also seems to violate the spirit of the Trade Secrets Act.
- The identity of wafer exporters/suppliers is extremely sensitive for a variety of commercial reasons, making it virtually impossible for Hanwha to comply.
- None of the five statutory factors under section 781(b)(1)(C) of the Act required an examination of the identity of Hanwha's wafer exporters/suppliers, beyond the fact that the wafers were of Chinese origin.
- Commerce should allow Hanwha to certify that the solar cells and modules are produced in the same general manner as examined in the investigation, without requiring it to trace such exports to a specific wafer supplier.
- The identity of the wafer exporters/suppliers also has no bearing on Commerce's analysis with respect to section 781(b)(1)(D) of the Act.
- In past cases where Commerce has established certification requirements, such as in *CORE from China (UAE)*, respondents were not required to provide the names of their substrate providers. The respondents were simply required to certify that the substrate was not Chinese.
- The identity of an input supplier has never been part of any certification regime in a circumvention inquiry.
- The proposed certification regime does not take into account that Hanwha and others may qualify new wafer suppliers. Hanwha seeks confirmation that it will not be barred from

---

[394] *Id.* (citing *Pipe and Tube from India (Oman and UAE)*).
[395] Hanwha refers to the wafer exporters (the companies that ship the wafers from China to Malaysia) as wafer suppliers. For our analysis these terms are interchangeable. We note that the Appendix V certification asks for companies to confirm their wafer "exporter."

using new wafer suppliers for future shipments, should Commerce continue to require the identification of wafer suppliers.

- If Commerce believes a certification regime is necessary, Commerce should modify the certification language and allow a company who received a negative determination to certify that the subject merchandise was produced by that company using a substantially similar production process, without having to publicly disclose the identity of its wafer suppliers.
- Companies found not to be circumventing should be allowed to certify that cells exported to the U.S. are for use in modules produced by affiliated parties in the U.S. Such a certification would be easy to enforce and administer by CBP and would not be detrimental to the U.S. industry in any way as the cells would be dedicated for consumption by an affiliated supplier to produce U.S. modules.
- While Hanwha's inability to use the Appendix V certification could be mitigated by using the Applicable Entries certification, it is inadequate for a company found not to be circumventing.

*Boviet*[396]

- The inclusion of a specific wafer supplier requirement is unnecessary to prevent circumvention, is unrelated to the reasoning underlying Commerce's negative determination, imposes an unnecessary burden on Boviet, and complicates administrability for CBP.
- Commerce reached a *Preliminary Determination* that Boviet is not circumventing, based on a number of factors, none of which has any connection to the identity of the Chinese exporter supplying Boviet wafers.
- Boviet's wafer supplier was not a part of Commerce's negative determination for Boviet, and as it is not related to Commerce's determination, Commerce should remove this aspect of the certification requirement.
- The wafer supplier restriction unnecessarily complicates Boviet's compliance with and CBP's administration of Commerce's certification. It hinders Boviet's ability to make normal commercial decisions regarding its supply of wafers.
- Boviet requests that Commerce modify the Appendix V certification to exclude the wafer exporter/supplier requirement for the importer in paragraph F(3) and for the exporter in paragraph D(3), if not remove the certification requirement altogether.

*Auxin*[397]

- Commerce should not weaken its certification regime by carving out certain solar producers, exporters, or importers, making certain requested changes, or delaying its implementation.
- Hanwha argues that Commerce should not impose a certification requirement for companies that received a negative circumvention determination, but because of Commerce's preliminary country-wide affirmative circumvention findings, such a certification regime is necessary to give full effect to Commerce's determination.

---

[396] *See* Boviet's March 6, 2023 Case Brief at 1-4.
[397] *See* Auxin's March 17, 2023 Rebuttal Brief at 17-21.

- Auxin's proposed certification regime as provided in section II of the rebuttal brief, should make certification easy for companies like Hanwha that have been found to not be circumventing.
- Allowing a producer temporary or permanent exemption from the affirmative ruling and its certification requirements because it is not currently relying on Chinese substrate creates the possibility of future circumvention by that producer.[398]
- With respect to *CORE from China (Guatemala), CORE from China (South Africa)*, *PET film from the UAE (Bahrain)*, and *Pipe and Tube from India (UAE)*, these were negative country-wide circumvention determinations, and therefore Commerce did not institute certification regimes.
- Where a certification requirement is imposed, it must be imposed on a country-wide basis to avoid evasion of the order and circumvention findings.
- Commerce should alter its certification regime by applying rules proposed by Auxin. Adopting these rules would obviate respondents' arguments regarding the need to publicly identify their wafer suppliers, provide flexibility to respondents in qualifying new wafer suppliers, allow respondents to make commercial decisions, and simplifies the records importers are required to maintain.
- Auxin's proposal is better because it: (1) avoids the need for respondents to publicly identify their wafer suppliers, (2) provides flexibility to respondents so they are not locked into certain wafer suppliers, (3) allows respondents to determine what is best for their commercial interests when securing Chinese inputs, and (4) simplifies the types of records needed to be maintained by importers.

**Commerce's Position:** We continue to find the certification requirements implemented in the *Preliminary Determinations* to be adequate and appropriate. For the final determinations, we have made slight modifications regarding the wafer exporter language included in the certifications at Appendix V.

Based on record information, Commerce initiated a country-wide circumvention inquiry to determine whether imports of solar cells and modules exported from, and produced in, Cambodia, Malaysia, Thailand, and Vietnam were circumventing the *Orders*.[399] On December 8, 2022, we preliminarily found that solar cells and modules from Cambodia, Malaysia, Thailand and Vietnam were circumventing the *Orders* on a country-wide basis. Under 19 CFR 351.226(m)(1), Commerce is authorized to take the appropriate remedy to address circumvention and prevent evasion of an order, including the application of a determination on a country-wide basis. Therefore, Commerce applied the affirmative determination of circumvention to all shipments of inquiry merchandise from all four countries on or after April 1, 2022, the date of publication of the *Initiation Notice.*

As stated in the *Preliminary Determination*, we determined that shipments of inquiry merchandise by Hanwha, in combination with certain wafer exporters, completed in Malaysia using certain parts and components manufactured in China are not circumventing the *Orders*. In order to administer the country-wide affirmative determination of circumvention, and the

---

[398] *Id.* (citing *CRS from China (Vietnam)*).
[399] *See Initiation Notice.*

81

company-specific negative determinations of circumvention, Commerce established the
certification regime. The certification regime was implemented to ensure that the merchandise
from Hanwha using the specific supply-chain that was found to be not circumventing the *Orders*,
is not improperly subject to the *Orders*.

Hanwha argues that companies found not to be circumventing the *Orders* should not be required
to certify, as the negative determination of circumvention means that the merchandise exported
by the respondent is not within the scope of the relevant order. In previous negative
circumvention determinations, Hanwha notes, Commerce has not adopted any certification
requirements.[400] Additionally, Hanwha contends that in accordance with section 735(c)(2) of the
Act, Commerce is required to terminate the proceeding following a negative determination, and
to terminate the suspension of liquidation. The CIT has held that Commerce is expected to take
reasonable steps to prevent the suspension of liquidation of non-subject merchandise. According
to Hanwha, based on past precedent where Commerce reached a negative determination,
Commerce has indicated that importers and exporters are no longer required to certify their
products, lifted the suspension of liquidation, and ordered CBP to refund any cash deposits.[401]

As stated above, Commerce is authorized under 19 CFR 351.226(m)(1) to take the appropriate
remedy to address circumvention, including the application of the determination on a country-
wide basis to all products from the same country as the product at issue. Accordingly,
Commerce initiated these circumvention inquiries on a country-wide basis and reached an
affirmative country-wide determination in its *Preliminary Determinations*. Therefore, we find
the facts of the cases cited by Hanwha not to be analogous to these proceedings. Commerce did
not require certifications in *CORE from China (Guatemala)*, *CORE from China (South Africa)*,
and *Pipe and Tube from India (UAE and Oman)* because these were negative country-wide
determinations. In *PET Film from UAE the (Bahrain)*, the proceeding was initiated on a specific
respondent, not on a country-wide basis. Commerce has repeatedly applied certification
requirements in other circumvention inquiries which were subject to an affirmative country-wide
decision.[402] Hanwha also asserted that the facts in *Butt-Weld Pipe Fittings from China
(Malaysia)* and *CORE from China (UAE)* were not relevant due to the respondents reporting no
shipments. However, we find these cases to be relevant as they were circumvention inquiries
initiated on a country-wide basis and found to be affirmative. The country-wide affirmative
decision was what resulted in the need for certifications for importers and exporters.

Given the affirmative country-wide determinations in the instant inquiries, there is no basis for
Commerce to terminate the proceedings, and instead, pursuant to section 781(b)(1)(E) of the Act
and 19 CFR 351(m)(1)(iv), Commerce deems a certification regime to be necessary and
appropriate administer the determinations and prevent evasion of the *Orders* in the future. The
certification regime allows companies found not to be circumventing the *Orders* opportunities to
avoid the application of ADs/CVDs. As such, we find the certification regime to be a reasonable
step to prevent the suspension of liquidation of non-subject merchandise. Thus, requiring

---

[400] *See* Hanwha's March 6, 2023 Case Brief (citing *CORE from China (Guatemala)*; *CORE from China (South
Africa); Pipe and Tube from India (UAE)*; and *PET Film from the UAE (Bahrain)*).
[401] *See* Hanwha's March 6, 2023 Case Brief (citing *Shelter Forest*).
[402] *See Butt-Weld Pipe Fittings from China (Malaysia)*, *CRS from China (Vietnam), CORE from China (Vietnam)* and
*CORE from China (UAE)*.

Hanwha to complete certification requirements is not equivalent to treating Hanwha as an affirmative company, but a measure to ensure that Hanwha can certify entries that are not subject to the *Orders* as a consequence of the negative determination regarding Hanwha, while also allowing for the continued administration and enforcement of *Orders*. If Hanwha and other parties are accurately filling out the certifications, they will not be subject to the *Orders*. The facts of this case do not resemble those of *Shelter Forest* as we reached an affirmative country-wide determination in this case. In *Shelter Forest*, Commerce made a negative determination and as a result, indicated that respondents no longer needed to certify, lifted the suspension of liquidation, and ordered CBP to refund any cash deposits.[403] Therefore, we find the facts of *Shelter Forest* to not be relevant.

Hanwha next argues that should Commerce continue to require companies found not to be circumventing, Commerce should modify the Appendix V certification and allow Hanwha to certify without disclosing the identity of its wafer suppliers/exporters. Specifically, Hanwha notes that requiring it to publicly disclose the names of its wafer suppliers/exporters is contrary to APO practice, and pursuant to 19 CFR 351.105(c)(6), a supplier's identity should be treated as BPI. Additionally, per Hanwha, the identity of specific wafer suppliers has no bearing on Commerce's analysis under sections 781(b)(1)(C) and 781(b)(1)(D) of the Act. Boviet further contends that the inclusion of a specific wafer supplier is unnecessary and is unrelated to the reasoning underlying Commerce's determination.

Commerce finds the request to treat the names of wafer exporters/suppliers as BPI within the Appendix V certification to be appropriate and has modified the certification accordingly. 19 CFR 351.105(c)(6) states that Commerce will normally consider the names of particular customers, distributors, or suppliers to be BPI, if so designated by the submitter. As Hanwha has requested the business proprietary treatment of its unaffiliated wafer suppliers, the regulations state that Commerce will normally treat it as BPI. Therefore, Commerce has modified the certification under Appendix V to allow the business proprietary treatment of wafer exporters for all respondents found not to be circumventing. Certifications submitted to CBP as part of an entry package are not made publicly available, and such information will not be publicly disclosed.

With respect to arguments related to the inclusion of specific wafer exporters in the certification, we continue to find it necessary for the names of specific wafer exporters to still be required on the certification under Appendix V, with the modification for BPI treatment described above. In the *Preliminary Determinations*, and as affirmed in this final determination, we performed an analysis based on the particular supply chains of each mandatory respondent. The *Preliminary Determination* specifically states that we determined that Hanwha's exports of inquiry merchandise produced with wafers exported by the specific parties reported in their questionnaire responses are not subject to the *Orders*. Therefore, the certification under Appendix V is established to provide companies found not to be circumventing on a company-specific basis to certify that their specific supply chain is not subject to the *Orders*. As a result, Commerce continues to require respondents found not to be circumventing to include the names of its wafer exporters in the certification. Our analysis under section 781(b)(2) of the Act is done at an exporter-specific level and the country of origin of the wafer is a critical aspect of our

---

[403] *See Shelter Forest.*

analysis.  Because we are permitting parties to certify shipments as not circumventing only if the shipment utilizes the supply chain examined in this inquiry and we are requiring both the exporter and importer to certify this, the exporter may need to disclose their wafer supplier to their importer.  Should respondents wish to use new wafer suppliers for future shipments, the certifications under Appendix IV and Appendix VI remain available to all companies found not to be circumventing.

Lastly, Auxin commented that Commerce should alter its certification regime by adopting the rules it proposed.  Doing so, according to Auxin, would obviate the need for respondents to publicly identify their wafer suppliers, provide flexibility to respondents in qualifying new wafer suppliers, allow respondents to make commercial decisions, and simplifies the records importers are required to maintain.  Commerce has addressed this proposed certification under Comment 21.

Based on the analysis above, Commerce finds the certification regime established at the *Preliminary Determinations* to be appropriate.  With respect to the certification listed under Appendix V, Commerce continues to require the names of specific wafer exporters but will allow respondents to treat them as BPI.

## Comment 18. Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews

*Vina/LONGi*[404]
- A changed circumstances review is preferable to an administrative review as a proceeding segment in which Commerce could reconsider a company's eligibility to participate in the solar circumvention certification regime.
- The Act and Commerce's regulations indicate that administrative reviews are used to determine final liabilities for ADs and CVDs, not to address matters related to circumvention inquiries.[405]
- It would take too long for a company to gain access to the solar circumvention certification regime through an administrative review and the company would need to participate in multiple administrative reviews.
- For example, under *Presidential Proclamation 10414* and Commerce's implementing regulations (which provide that Commerce will instruct CBP to discontinue suspension of liquidation and the collection of cash deposits on "Applicable Entries" of inquiry merchandise on or before June 6, 2024, (the current Date of Termination of *Presidential Proclamation 10414*)), unless a company incorrectly declared that it had a reviewable suspended entry before June 6, 2024, it will not have any reviewable entries until the 12th administrative review of the *AD Order* (which covers the period December 1, 2023, through November 30, 2024).  The final results of 2023-2024 AD review may not be issued until as late as June 2026.  Meanwhile, the company would not be able to use solar circumvention certifications during the POR of the thirteenth administrative review of the *AD Order* (covering the period December 1, 2024, through November 30, 2025) and

---

[404] *See* Vina/LONGi's March 6, 2023 Case Brief at 3-6.
[405] *Id.* (citing section 751(a)(A)-(B) of the Act).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

would need to request that its shipments/entries during the 2024-2025 POR be reviewed. The final results of that review may not be issued until as late as June 2027.

- Moreover, if a company in an inquiry country requested an administrative review and was selected as a mandatory respondent, it would be a waste of resources to conduct a complete analysis of the company's exports/entries when the reason the company requested the review was to establish its eligibility to certify that its solar cells and/or solar modules are not inquiry merchandise subject to review.

- In contrast, in changed circumstances reviews Commerce does not need to issue a questionnaire,[406] or conduct the full analysis performed for mandatory respondents but may focus on the precise reason the company was determined to be ineligible to participate in the solar circumvention certification regime.

- In a changed circumstances review a company could be given the opportunity to establish its eligibility to participate in the solar circumvention certification regime by demonstrating that it is able to trace the components in solar cells or modules to the country in which the wafer and other significant material inputs were produced and thus satisfy the certification requirements.

- Thus, Commerce can address a "change" in its determination that a company was not eligible to participate in the solar circumvention certification regime in a changed circumstances review.  Commerce followed this approach in *OCTG from China CCR*.[407]

- Commerce should consider examining certification eligibility in changed circumstances reviews as an alternative to reviewing such eligibility in administrative reviews.

No other interested party commented on this issue.

**Commerce's Position:**  We disagree with Vina/LONGi's position that Commerce should reconsider a company's ineligibility to participate in the solar circumvention certification regime in changed circumstances reviews.  Rather, Commerce will consider requests for eligibility to participate in the solar circumvention certification regime in administrative reviews.

Section 751(b)(1) of the Act provides that "{w}henever {Commerce} receives information concerning, or a request from an interested party for a review of {a final determination, suspension agreement, or continued investigation} which shows changed circumstances sufficient to warrant a review of such determination or agreement, {Commerce} shall conduct a review of the determination or agreement …"  The phrase "changed circumstances" is not defined in the Act, the SAA, or Commerce's regulations and none of those primary and secondary sources contain an explanation of what aspects of a determination may be reconsidered in light of changed circumstances.  While Commerce has broad discretion in determining whether to initiate a changed circumstances review and in deciding the range of matters that can be considered in such a proceeding, its discretion is limited by the statutory requirement that there be "changed circumstances sufficient to warrant a review" of the antidumping order.[408]  In practice, Commerce has conducted changed circumstances reviews to address a wide variety of issues, some of which could also be addressed in the context of an

---

[406] *Id.* at 5 (citing 19 CFR 351.221(c)(3)(iii)).

[407] *Id.* at (citing *OCTG from China CCR*, 87 FR at 15915).

[408] *See* 751(b)(1) of the Act.

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry - From Malaysia 2022

administrative review.[409]  Commerce's practice is to determine, on a case-by-case basis, whether changed circumstances sufficient to warrant a review exist.[410]

Here, Vina/LONGi failed to identify any circumstance that has changed.  Rather, Vina/LONGi argued that "… a changed circumstances review can address a "change" in Commerce's determination that a company was not eligible to participate in its certification program." However, the circumstance that led Commerce to prohibit importers/exporters from certifying as to the non-Chinese content in inquiry merchandise from certain companies[411] is the fact that those companies did not cooperate in the circumvention inquiry (they either failed to respond to Commerce's quantity and value questionnaire or failed to permit Commerce to verify their questionnaire responses).  The fact that these companies did not cooperate in the inquiry has not changed.  Without any changed circumstances, we find no basis for conducting a changed circumstances review.

In contrast, in *OCTG from China CCR*, the case cited by Vina/LONGi to support its position, there was a change in the facts underlying Commerce's determination.  Specifically, in the underlying circumvention inquiry, Commerce did not implement certifications "because the HLD companies were "unable to track welded OCTG to the country of origin of inputs used in the production of welded OCTG …""[412]  In the related changed circumstances review Commerce found that there was a change in circumstances because "the HLD companies are now able to identify and effectively segregate welded OCTG produced by either HLDS (B) in Brunei or HLD Clark in the Philippines using non-Chinese hot-rolled steel from other OCTG produced at their facilities."[413]  We do not have this fact pattern in this circumvention inquiry, and *OCTG from China CCR* did not involve or address companies that failed to cooperate in the earlier circumvention inquiry.

Our approach is consistent with *Plywood from China (Vietnam)* where Commerce stated that "we decline to reconsider eligibility for the certification programs established by these circumvention inquiries in the context of a CCR and instead, determine that the appropriate mechanism by which to assess previously ineligible exporters' eligibility for the certification programs for purposes of this proceeding is in the ongoing ARs of the *Orders*.[414]  In that case Commerce explained that in contrast to other cases where companies subsequently claimed that they had changed the methods by which they tracked their raw materials, and Commerce conducted CCRs to verify these new facts, "companies always had the ability to participate or to provide accurate data, and we do not see this as a change in the future."[415]

---

[409] *See, e.g.*, *Aluminum Extrusions from China Preliminary CCR*, 83 FR 34548 (finding sufficient information to initiate a changed circumstances review to recalculate certain cash deposit rates); *see also Nails from Malaysia CCR Initiation*, 80 FR 71772 (finding sufficient information and "good cause" to initiate a changed circumstances review to evaluate whether a company was properly utilizing the correct cash deposit rate); and *Pure Magnesium from Canada CCR Initiation*, 57 FR 41473 (finding sufficient information and "good cause" to initiate a changed circumstances review to evaluate changes to the major subsidy program at issue in the underlying investigation).
[410] *See Tapered Roller Bearings from China*, 67 FR 10665.
[411] Commerce did not prohibit exporters or importers from certifying that an entry was an "Applicable Entry" under 19 CFR 362.102.
[412] *See OCTG from China CCR*, 87 FR at 15915.
[413] *Id.*, 87 FR at 15916.
[414] *See Plywood from China (Vietnam) Final* IDM at Comment 13.
[415] *Id.*

Vina/LONGi contends that it is preferable for Commerce to consider a company's eligibility to participate in the solar circumvention certification regime in a changed circumstance review, rather than an administrative review for a number of reasons. Specifically, Vina/LONGi contends that the purpose of an administrative review is to determine final liabilities for antidumping and countervailing duties, not to address matters related to circumvention inquiries. Moreover, Vina/LONGi maintains that it would take too long and require multiple reviews to gain access to the certification regime, and it could lead to significant and unnecessary work and analysis (*e.g.*, a party simply seeking access to the certification regime may have to file a separate rate application and could be selected as a mandatory respondent). We have responded to those concerns below.

First, Commerce must determine if entries of solar cells or modules are inquiry merchandise or not, and how to assess duties on merchandise deemed subject to these circumvention inquiries. Certifications are relevant to that decision because whether or not importers and exporters have met the certification requirements affects whether or not AD/CVDs will be assessed on the entries. Because the Act directs Commerce to determine final assessment rates in administrative reviews, we find that considering certification eligibility in administrative reviews is consistent with the purpose of that proceeding segment as provided in the Act.

Second, we do not find that our decision to reconsider certification eligibility in an administrative review places importers or exporters of inquiry merchandise from AFA companies in a different position, in terms of timing or requesting multiple reviews, than if they were to import or export subject merchandise from a company that currently has a dumping margin based on AFA. In both cases, parties would need to wait until the anniversary month of the AD/CVD order to request an administrative review and then would need to wait until the final results of that review were published before, depending on the outcome of the review, entries may no longer be subject to an AFA rate. Exporters/producers seeking reconsideration with respect to certification eligibility would face a similar timeline before certifications could be used.

Moreover, Commerce did not prohibit importers/exporters from certifying that entries of inquiry merchandise from AFA companies are "Applicable Entries" under 19 CFR 362.102.[416] Thus, importers and exporters of inquiry merchandise from AFA companies may currently participate in that part of the certification regime and do not need to wait for an administrative review. Furthermore, in the *Preliminary Determination*, which was issued on December 1, 2022, Commerce noted that:

> If it is determined that an importer and/or exporter has not met the certification and/or related documentation requirements for certain entries, Commerce intends to instruct CBP to suspend, pursuant to these preliminary country-wide affirmative determinations of circumvention and the *Orders*, all unliquidated

---

[416] *See Preliminary Determinations*, 87 FR 75221, 75223. "Applicable Entries" are not subject to suspension of liquidation or the collection of ADs or CVDs.

entries for which these requirements were not met and require the importer to post applicable AD and CVD cash deposits equal to the rates noted above.[417]

Interested parties that wish to have their suspended non-"Applicable Entries," if any, reviewed, and their ineligibility for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders* (*i.e.*, December 2022 for the *Solar Cells AD Order* and December 2023 for the *Solar Cells CVD Order*).[418]

As indicated above, Vina/LONGi claims that unless a company incorrectly declared that it had a reviewable suspended entry before June 6, 2024, it will not have any reviewable suspended entries until the twelfth administrative review of the *AD Order* (which covers the period December 1, 2023, through November 30, 2024) and could not request an administrative review until December 2024. Under section 751(a) of the Act, Commerce does not conduct an administrative review of an exporter/producer absent a suspended entry of subject merchandise from that exporter/producer.[419] However, a U.S. entry of inquiry merchandise made prior to the date of termination of the Proclamation (currently June 6, 2024), that does not meet the "Applicable Entries" certification requirements, could be suspended by CBP. Specifically, 19 CFR 362.103(b)(iii) provides that "{i}n the event of an affirmative preliminary or final determination of circumvention in the Solar Circumvention Inquiries, the Secretary will direct CBP to suspend liquidation of entries of, and collect cash deposits of estimated duties on, imports of Southeast Asian-Completed Cells and Modules that are not Applicable Entries." Commerce has so directed CBP.[420] Therefore, an AFA company could have a reviewable suspended entry before the AD administrative review covering the period December 1, 2023, through November 30, 2024.

Furthermore, as explained above, if such a company's inquiry merchandise was entered into the United States as an "Applicable Entry" before the date of termination of the Proclamation, such an entry will not be subject to ADs or CVDs. In other words, "Applicable Entries" of Vina/LONGi's inquiry merchandise prior to June 2024 are not treated any differently in a substantive way than if the company had been able to participate in the components portion of the certification program.

Last, as noted above, Vina/LONGi expressed concerns that if a party requests an administrative review of an AFA company for Commerce to reconsider certification ineligibility, the AFA company could be selected as a mandatory respondent or need to unnecessarily complete a separate rate application. In such cases, the requestor should note in the request for an administrative review that it believes that all the imported merchandise from the AFA company would meet the certification requirements and it is seeking a review in order for Commerce to reconsider the exporters/producer's eligibility to certify to that fact. Commerce could then establish segment-specific procedures in the administrative review for addressing such situations.

---

[417] *See Preliminary Determinations*, 87 FR 75221, 75225.

[418] *Id.*, 87 FR at 75223.

[419] *See Shanghai Sunbeauty Trading Co.*, 380 F. Supp. 3d. 1328 (CIT 2019) (affirming Commerce's decision not to conduct a review absent a suspended entry).

[420] *See* CBP Messages Memorandum at message no. 3041408 at paragraphs 5, 9, and 12b.

In sum, neither the facts in this case, nor Vina/LONGi's arguments, provide a basis for reconsidering certification ineligibility for AFA companies in a changed circumstances review. As noted in the *Preliminary Determination*, "{i}nterested parties that wish to have their … ineligibility for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders*."[421]

## Comment 19. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements

*First Solar Malaysia*[422] and *First Solar Vietnam*[423]

- Commerce did not include CdTe thin film photovoltaic products in its definition of inquiry merchandise.
- Because CdTe thin film photovoltaic products were excluded from the definition of inquiry merchandise and are explicitly excluded from the *Orders* scope language, the circumvention inquiries do not cover CdTe thin film photovoltaic products.
- The ITC intentionally excluded CdTe thin film products from its injury analysis in the underlying affirmative final material injury determinations.[424]
- Given the ITC's intentional exclusion of CdTe products, Commerce cannot lawfully include CdTe thin film products in its circumvention inquiries.[425]
- Auxin limited its request for circumvention inquiries to CSPV products and Commerce initiated on that request stating that the class or kind of circumventing merchandise is identical to the CSPV products completed in China that are subject to the *Orders*.[426]
- The *Preliminary Determination's* certification requirements do not apply to CdTe thin film products.  The three certifications created by Commerce are instead meant to cover CSPV cells or modules.
- The *Preliminary Determination* and its certification requirements do not pertain to CdTe thin film products.  However, given the language of the certifications, it is possible for mistakes to occur, such as a misinterpretation of the term "solar cells and/or solar modules."
- Commerce should take steps to minimize the risk that any affirmative final determination and related certification requirements would be misinterpreted to extend beyond certain CSPV products.
- Should Commerce continue using terms such as "solar cells and modules" or "solar cells and/or solar modules", Commerce should clearly define such terms upon first use to indicate that the terms only pertain to CSPV products.[427]

No other interested party commented on this issue.

---

[421] *See Preliminary Determinations*, 87 FR 75221, 75223.
[422] *See* First Solar Malaysia's March 6, 2023 Case Brief at 2-6.
[423] *See* First Solar Vietnam's March 6, 2023 Case Brief at 2-6.
[424] *See* First Solar Malaysia's March 6, 2023 Case Brief at 3 (citing *ITC Solar Final* at Attachment 37-A.).
[425] *Id.* (citing *Wheatland*, 161 F.3d at 1371).
[426] *Id.* (citing Initiation Memorandum at 6).
[427] *See* First Solar Malaysia's March 6, 2023 Case Brief at 6.

89

**Commerce's Position:**  We confirm that the final affirmative determinations and the related certification requirements apply only to CSPV cells and modules but disagree with First Solar Malaysia and First Solar Vietnam that an affirmative determination of circumvention could be inadvertently applied to non-CSPV products.  As described in the *Preliminary Determinations*, the scope of the *Orders* explicitly exclude "thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide."[428] When discussing the merchandise subject to the circumvention inquiry, the PDM and FR described that "{t}his circumvention inquiry covers, "crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the underlying AD/CVD orders, subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in {Cambodia, Malaysia, Thailand, and Vietnam} from wafers produced in China."[429]  Therefore, CdTe thin film solar products are not covered by the final affirmative determinations and the related certification requirements.  Given the exclusionary language referenced within the scope of the *Orders*, we find it unnecessary to update the language included in the certifications.

**Comment 20. Clarification and Enforcement of the Utilization Requirement**

To qualify to enter inquiry merchandise under *Presidential Proclamation 10414* without regard to ADs and CVDs inquiry merchandise imported into the United States after November 15, 2022, but on or before the Date of Termination of the proclamation, must be used or installed in the United States by no later than 180 days after the Date of Termination of the proclamation (the Utilization Expiration Date).[430]

*Auxin*[431]
- Commerce and CBP cannot administer or enforce the use provision in Part 362 of the regulations because:  (1) the Utilization Expiration Date is unknown at the time of importation (the *Presidential Proclamation 10414* can be terminated before the stipulated June 6, 2024, date); (2) the definition of "utilization and utilized" is too vague; and (3) no enforcement mechanism has been provided (CBP possesses limited means to track how inquiry merchandise is used once it is entered into the United States).  These deficiencies in the regulation create an enormous loophole through which parties can enter inquiry merchandise without regard to AD and CVDs.[432]
- Commerce could redress these deficiencies by implementing the provisions under 19 CFR 358, which include, among other things, use of importer- or exporter-specific duty waiver requests that contain detailed information related to intended uses of the imported product and other relevant information.  19 CFR 358 also includes an enforcement mechanism to address abuses and violations that could include seizures and other penalties.[433]

---

[428] *See Malaysia* PDM at 4.
[429] *Id.* at 6.
[430] *See* 19 CFR 362.102.
[431] *See* Auxin's March 6, 2023 Case Brief at 24-26; *see also* Auxin's March 17, 2023 Rebuttal Brief at 31.
[432] *Id.* (citing CBP Messages Memo at msg. no. 3041408).
[433] *See* Auxin's March 6, 2023 Case Brief at 25-26 (citing *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 FR 63230).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

- Commerce should not consider the resale of inquiry merchandise to an unaffiliated U.S. customer who commits to use the merchandise within 180 days of the Date of Termination of the *Presidential Proclamation 10414*, as use. Commerce specifically stated in 19 CFR 362.102 that resales do not constitute use for this provision. Also, it is not clear how Commerce or CBP could confirm that the purchaser honored its commitment.[434]

*TTL*[435]
- Commerce must provide guidance on how to comply with the use requirement in 19 CFR 362 because the requirement could be interpreted in multiple ways.
- Principally, Commerce must confirm that reselling inquiry merchandise to another party does not automatically mean that the use requirement is not met. Because most importers of solar modules do not use the solar modules but sell them to other parties, this interpretation must be correct because to interpret the use requirement otherwise would mean that the requirement limits the precise activity that *Presidential Proclamation 10414* was intended to permit (it was intended to allow sufficient U.S. imports of solar modules from the inquiry countries).
- Even if U.S. resale is permissible, but just not enough to demonstrate use, under 19 CFR 362, further clarification is required regarding how parties engaged in resales can comply with the use requirement.
- The majority of parties who import solar modules do not install the solar modules that they import, but resell them directly, or indirectly, to other parties in diverse distribution networks that include utility developers, distributors, contractors, subcontractors, and residential and commercial installers. It is unreasonable, and would be an unprecedented burden, to require the companies, most of which do not have access to entry documents, to maintain records for at least five years that allow them to track the installation dates for specific solar modules and link those dates to specific entries of solar modules. This is an unnecessary burden and cost, especially considering the limited possibility that distributors and contractors would stockpile solar modules.
- Thus, Commerce must clarify that the use requirement in 19 CFR 362 is met if evidence is maintained that shows: (1) solar modules sold to utility developers were sold for a specific project; (2) the unaffiliated purchaser committed, either by contract or certification, to install the purchased solar modules within 180 days after the Date of Termination of the *Presidential Proclamation 10414*; or (3) imported solar cells were incorporated in a solar module in the United States within 180 days after the Date of Termination.

*BYD HK*[436]
- Commerce must clarify that the use requirement of 19 CFR 362 is met if the inquiry merchandise is used or installed in the United States within 180 days after the Date of Termination of *Presidential Proclamation 10414*, even if another entity takes ownership of the merchandise and is responsible for its use or installation.

---

[434] *See* Auxin's March 17, 2023 Rebuttal Brief at 32 (citing *Preliminary Determinations*, 87 FR 75223).
[435] *See* TTL's March 6, 2023 Case Brief at 8-13.
[436] *See* BYD HK's March 6, 2023 Case Brief at 4.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

*NextEra*[437]
- Auxin's arguments regarding administration of the use requirement in 19 CFR 362 are unpersuasive.
- Contrary to Auxin's claim, the Utilization Expiration Date is known because it is specified in 19 CFR 362 as 180 days after the Date of Termination of *Presidential Proclamation 10414*. In the unlikely event that *Presidential Proclamation 10414* is terminated before the currently specified termination date, provisions could be made at the time to address Auxin's concerns.
- While Auxin claims that the definition of "utilization and utilized" is too vague, those terms are clearly defined in 19 CFR 362 as "used or installed in the United States." However, Commerce should clarify that "used" includes solar modules that are dedicated to a particular project or delivered to a project site by the utilization expiration date.
- Although Auxin contends that Commerce did not provide any mechanism for enforcing the provisions of 19 CFR 362, Commerce followed its practice by requiring certifications for entries that purportedly qualify for duty free treatment under *Presidential Proclamation 10414*. In those certifications, importers and exporters must certify to various facts regarding the relevant entries and acknowledge that they are "aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government."[438] This passage provides an adequate deterrence against parties submitting fraudulent certifications.
- Part 358 of the regulations contains nothing to improve enforcement of *Presidential Proclamation 10414* and Commerce specifically noted in 19 CFR 362.103(a) that "Part 358 of this chapter shall not apply to {duty free imports under Part 362}."[439]

**Commerce's Position:** Interested parties have raised concerns and some questions regarding the use requirement in 19 CFR Part 362. We have addressed those concerns and questions below.

The waiver of antidumping and countervailing duties and estimated duties pursuant to 19 CFR Part 362 only applies to certain Southeast Asian-Completed solar cells and modules that are entered into the United States, or withdrawn from warehouse, for consumption before the termination of *Presidential Proclamation 10414*, and, for entries after November 15, 2022, are used in the United States by no later than 180 days after termination of the emergency described in *Presidential Proclamation 10414* (the Utilization Expiration Date). In the Preamble to 19 CFR Part 362, Commerce also used the word "utilized" when it noted that the duty waiver provided by this part of the regulations applies only to Southeast Asian-Completed solar cells and modules entered into the United States after November 15, 2022, "that are utilized in the United States by the Utilization Expiration Date." Under 19 CFR 362.102, Commerce defines "utilized and "utilization" as follows:

> Utilization and utilized means the Southeast Asian-Completed Cells and Modules will be used or installed in the United States. Merchandise which remains in inventory or a warehouse in the United States, is resold to another party, is

---

[437] *See* NextEra's March 17, 2023 Rebuttal Brief at 19-23.
[438] *See* NextEra's March 17, 2023 Rebuttal Brief at 22 (citing *Preliminary Determinations*, 87 FR 75228-29).
[439] *Id.* at 20.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions.

"Used" means the solar cells or solar modules are in operation or functioning in the United States by the Utilization Expiration Date.  "Installed" means the solar cells or solar modules have been affixed to the structure or in the system in the United States on which, or in which, they will operate by the Utilization Expiration Date, but they are not in operation by that date.  The mere sale of solar modules to a party for a specific project, incorporating solar cells into a solar module in the United States, dedicating solar cells or solar modules to a particular project, or delivering solar cells or solar modules to a project site do not constitute being "used" or "installed."  Additionally, as noted in 19 CFR 362.102, "{m}erchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions."

The use requirement in 19 CFR Part 362 was added because this part of the regulations was "not intended to benefit those who would stockpile {Southeast Asian}-Completed Cells and Modules for an extended period of time … .  It is not Commerce's goal to have merchandise that enters before the Date of Termination be used in projects long into the future, as the emergency declared by the President exists at this very moment."[440]

The act of reselling solar cells or solar modules to another party who will use or install the merchandise does not, in itself, mean that the use requirement in 19 CFR Part 362 cannot be met.  However, in order for an importer who sells the solar cells or solar modules that it imported to accurately certify that the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated, the importer must have knowledge of, and documentation supporting, this fact.  TTL has argued that a commitment by a purchaser, either by contract or certification, to install the purchased solar modules within 180 days after the Date of Termination of the *Presidential Proclamation 10414*, should satisfy this documentation requirement.  However, the documentation that must be maintained is documentation that supports the actual use or installation of the solar cells or solar module by the Date of Termination and that will allow the party completing the certification to certify to the use or installation by that date.  Parties that falsify such certifications will be in violation of U.S. law (including, but not limited to, 18 USC section 1001) that imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.  Given the range of companies that could be involved in the transaction chain between the importer of the solar cells and solar modules and the ultimate end-user of those solar cells and solar modules and the potential complexity of the supply chain, we find that it is not feasible for Commerce to list specific types of supporting documentation.

We disagree with Auxin's claim that the use provision in Part 362 of the regulations cannot be administered because the Date of Termination of *Presidential Proclamation 10414* could change and thus the Utilization Expiration Date is unknown at the time of importation.  The Date of Termination is not a constantly changing date but is presently a fixed date, June 6, 2024, that has

---

[440] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR 56879.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

been publicly announced and thus is known to importers.  In the Preamble to Part 362 of the regulations, Commerce noted that in setting a suspension of liquidation and collection of cash deposit date upon early termination of the Presidential Proclamation, it would "consider the implementation and direction of the President in terminating the emergency."[441]  Similarly, if *Presidential Proclamation 10414* is terminated early, at that time, Commerce will "consider the implementation and direction of the President in terminating the emergency" when determining what additional guidance, if any, should be provided regarding the impact of such an early termination on other provisions and requirements in Part 362 of the regulations.

We also disagree with Auxin's claim that no enforcement mechanism has been provided with respect to the use requirement.  U.S. law (including, but not limited to, 18 U.S.C. section 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government, including fines and imprisonment for not more than 5 years. Moreover, 19 U.S.C. section 1592 provides civil penalties for fraud, gross negligence, and negligence.  Thus, there are enforcement mechanisms in place and significant consequences for parties who falsely certify that the use requirement will be met.

Additionally, Commerce informed certifying parties that they must maintain sufficient documentation supporting the facts to which the party certified for the later of five years after the last entry covered by the certification or three years after the conclusion of any litigation in United States courts regarding such entries.[442]  Commerce also informed certifying parties that they are required to provide CBP and/or Commerce with any documents supporting the certification upon the request of either agency and that the claims made in the certification are subject to verification by CBP and/or Commerce.[443] In addition, Commerce informed certifying parties that failure to maintain the required certifications and supporting documentation, failure to substantiate the claims made in the certifications, or not allowing CBP and/or Commerce to verify the claims made in the certifications, may result in suspension of liquidation of all unliquidated entries for which the requirements were not met, the importer being required to post antidumping duty and countervailing duty cash deposits on those entries, and the importer being precluded from participating in the certification process.[444]  These certification provisions mirror Commerce's regulations at 19 CFR 351.228, which provide that Commerce may instruct CBP to suspend liquidation of entries and required cash deposits of estimated ADs or CVDs where, among other things, "the certification contained materially false, fictitious or fraudulent statements or representations, or contained material omissions."  Therefore, contrary to Auxin's claim, Commerce clearly explained the requirements that must be fulfilled to ensure compliance with the certification regime, including the end use provision, and the consequences of not meeting those requirements.  Hence, Commerce has instituted enforcement mechanisms with respect to the certifications.

While Auxin contends that CBP possesses limited means to track how inquiry merchandise is used once it is entered into the United States, it is incumbent on importers and exporters to maintain sufficient documentation to substantiate their claims in the certifications, including their

---

[441] *Id.*, 87 FR at 56880.
[442] *See Preliminary Determinations*, 87 FR at, *e.g.*, Appendix VI.
[443] *Id.*
[444] *Id.*

claims regarding the use requirement.  Moreover, CBP has experience administering similar certifications, namely end-use certifications, in other proceedings,[445] and experience in this proceeding where importers and exporters must track the source of the solar cells used in solar modules imported into the United States in order to certify that the solar cells were not produced in China.

Finally, we disagree with Auxin that provisions in 19 CFR Part 358 should be applied here.  As an initial matter, according to 19 CFR 362.103(a), "Part 358 of this chapter shall not apply to {the importation of Applicable Entries}."  In addition, as Commerce explained in the Preamble to Part 362 of its regulations, "{t}he purpose of the {Presidential} Proclamation is to increase the supply of United States solar energy for electricity generation purposes… and "to allow for more imports …"[446] Part 358 of the regulations, which covers the importation of supplies used for emergency relief work free of AD/CVDs, requires that a party mail an advance request, in triplicate, to the Secretary of Commerce in which the party asks for approval to import the merchandise free of AD/CVDs, and supplies detailed information about the shipment such as the price, quantity, proposed date of entry, mode used to transport, the destination, and the intended uses of, the imported merchandise and other relevant information, much of which does not relate to the date of use.  Part 358 of the regulations also includes an enforcement mechanism to address abuses and violations of Section 318(a) of the Act that could include seizures and other penalties.[447]  Requirements such as these, including the need for Commerce to specifically approve the importation of solar cells/solar modules free of AD/CVDs for each and every entry, could reduce, rather than increase, the supply of United States solar energy for electricity generation purposes and thus is not in keeping with the purpose of *Presidential Proclamation 10414* .  Moreover, Commerce typically requires CBP to suspend liquidation and collect AD/CVD cash deposits for entries where the certification requirement was not met, rather than seizing the imported merchandise.  Therefore, we have not implemented the requirements of Part 358 of the regulations in this case.

**Comment 21. Whether the "Wafer Plus Three" Requirement is Appropriate**

In the *Preliminary Determination*, Commerce stated that a solar module produced in one of the inquiry countries would be subject to its affirmative circumvention determination only if the solar module contains solar cells produced from Chinese-produced wafers and three or more of the following components in the module were produced in China:  (1) silver paste; (2) aluminum frames; (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes.  Below we have referred to this prerequisite as the "Wafer-Plus-Three" requirement.

---

[445] *See Wire Rod from Korea and United Kingdom CCR*, 84 FR at 13888*:* ("Consequently, we are changing the scope of the orders on wire rod from Korea and the United Kingdom by adding exclusion language related to grade 1078 and higher tire cord quality wire rod and requiring that a certification of end-use be filed with CBP at the time of the filing of the Entry Summary with CBP as provided in the Attachment to this notice.")
[446] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56878.
[447] *See generally* 19 CFR 358.103.

95

*Auxin*[448]

- Commerce's "Wafer-Plus-Three" requirement is arbitrary, inconsistent with how it has applied the *Orders* in the past, and allows companies to use a high percentage of Chinese components and not be covered by Commerce's affirmative circumvention determination.

- Commerce arbitrarily selected the six components used and the four non-Chinese component rule in its requirement without any explanation.

- Commerce previously determined that if a solar module contains subject solar cells, it is subject to the *Orders*, regardless of the country where the solar module was produced. Commerce should follow that rule here. Because Commerce reached an affirmative circumvention determination that solar cells produced in Cambodia, Malaysia, Thailand, or Vietnam from Chinese-produced wafers are covered by the scope of the *Orders*, solar modules produced from those solar cells must be subject to the *Orders* irrespective of Commerce's "Wafer-Plus-Three" requirement.

- The "Wafer-Plus-Three" requirement provides an inexpensive path for companies to continue to evade the *Orders* by continuing to heavily rely on Chinese-produced components while sourcing the four least expensive components outside of China.[449]

- Commerce should discard its "Wafer-Plus-Three" requirement and determine that a solar module produced in a third country that contains in-scope solar cells is also in scope. Alternatively, Commerce should determine that only solar modules where at least 50 percent of the value of the solar module comes from components produced outside of China are not subject to Commerce's affirmative circumvention determination.

- A percentage of value test is administrable (companies maintain the records required by CBP) and has been used before (*e.g.*, the United States-Mexico-Canada Agreement).

- Moreover, a percentage of value test benefits exporters/producers because: (1) there is no need for them to use certain wafer suppliers or publicly identify their wafer supplier; (2) it provides them with the flexibility to determine which inputs they will obtain from inside, or outside, of China; and (3) it simplifies the types of records that importers must maintain.

*BYD HK*,[450] *CSIL*,[451] *Jinko*,[452] *NextEra*,[453] *Risen*,[454] and *TTL*[455]

- Contrary to Auxin's claim, Commerce did not arbitrarily select the six components that it used in the "Wafer-Plus-Three" requirement. Rather, Commerce selected these components because it knows, based on information in this segment of the proceeding (including Auxin identifying these components as the "most important and significant" factors of production) and its experience in other segments of the proceeding, that these are the most significant components used to produce solar modules.[456]

---

[448] *See* Auxin's March 6, 2023 Case Brief at 9-17; *see also* Auxin's March 17, 2023 Rebuttal Brief at 5-6.
[449] *Id.* at 15 (citing the *Preliminary Determination* calculations for all four determinations).
[450] *See* BYD HK's March 17, 2023 Rebuttal Brief at 7-13.
[451] *See* CSIL's March 17, 2023 Rebuttal Brief at 10-14.
[452] *See* Jinko's March 17, 2023 Rebuttal Brief at 5-13.
[453] *See* NextEra's March 17, 2023 Rebuttal Brief at 6-11.
[454] *See* Risen's March 17, 2023 Rebuttal Brief at 2-3.
[455] *See* TTL's March 17, 2023 Rebuttal Brief at 6-10.
[456] *See* Risen's March 17, 2023 Rebuttal Brief at 2; *see also* NextEra's March 17, 2023 Rebuttal Brief at 8-9.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

- By requiring at least four of the six components to be sourced from outside China, Commerce's "Wafer-Plus-Three" requirement ensures that a substantial portion of value of the module is added in the inquiry country.

- Based on the scope of the *Orders*, modules produced in a third-country from solar cells produced in China (subject solar cells) are covered by the *Orders* (*i.e.*, solar modules with subject solar cells are covered by the *Orders*). Meanwhile solar modules not containing subject solar cells are not covered by the *Orders*. Commerce's "Wafer-Plus-Three" requirement is consistent with this principle because Commerce indicated that the solar cells in a solar module that meets the "Wafer-Plus-Three" requirement are not covered by the circumvention inquiry and the solar module is also not covered by the circumvention inquiry (the solar cells are not in-scope merchandise and the solar module is not in-scope merchandise).

- Auxin has made contradictory arguments. On the one hand, Auxin requested a circumvention inquiry, which resulted in Commerce ignoring the scope of the *Orders* that requires subject solar modules to contain Chinese produced subject solar cells (subject solar cells). Subsequent to Commerce's finding found that solar cells produced in Southeast Asian countries from Chinese wafers are "subject solar cells," Auxin argues that Commerce must return to the "subject solar cell requirement" in the scope of the *Orders* and find that all modules, irrespective of where they are manufactured and the other components that they contain, are subject merchandise if they contain Southeast Asian produced "subject solar cells."

- Auxin's argument that solar modules containing solar cells with Chinese-produced wafers should be subject to Commerce's affirmative circumvention determination, regardless of the other components that they contain, contradicts its own allegation that companies are circumventing the *Orders* by using various Chinese components to produce solar modules in the inquiry countries. Moreover, Auxin's argument is inconsistent with Commerce's approach in this inquiry of examining the module production process to determine whether parties selling modules to the United States that were produced in an inquiry county are circumventing the *Orders*, rather than making that determination based on the solar cells in the solar module.[457]

- Auxin's percentage of value test should be rejected because Auxin arbitrarily determined the 50 percent requirement.[458] There is no precedent, or basis in the Act or Commerce's regulations, for using such a test, which would require Commerce to speculate as to future values of solar module components and use a yet undetermined certification.[459]

- Moreover, Auxin failed to consider that significant swings in market prices could skew the test and dramatic changes in surrogate values may mean that the actual value added in the third country is not properly reflected by the test.[460]

- Auxin's percentage of value test is also contrary to Commerce's practice of conducting a qualitative, rather than a quantitative (*e.g.*, a value added) analysis of third-country processing.[461]

---

[457] *See* NextEra's March 17, 2023 Rebuttal Brief at 7-8.
[458] *See* NextEra's March 17, 2023 Rebuttal Brief at 10.
[459] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9.
[460] *See* Jinko's March 17, 2023 Rebuttal Brief at 8-10.
[461] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9-10 (citing *Pasta from Italy Circumvention*); *see also* Jinko's March 17, 2023 Rebuttal Brief at 10-12; and CSIL's March 17, 2023 Rebuttal Brief at 12.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

- Auxin's percentage of value test means that even if as much as 49.99 percent of the value of the solar module was added outside of China (such as in an inquiry country), the module would be covered by Commerce's affirmative circumvention determination, thus, indicating that the third-country processing of the module was "minor or insignificant." This is illogical.[462]

- Furthermore, Auxin failed to adequately support its argument that the "Wafer-Plus-Three" requirement allows a significant proportion of Chinese components to be used if the four least expensive components out of the six components in that requirement are sourced from outside of China. Auxin's argument is based on erroneous calculations and incorrect figures.[463]  Additionally, expenses, such as conversion costs[464] and G&A expenses, are missing from Auxin's calculations, and the source of certain figures that Auxin used in its calculations is unclear.[465]  Auxin's argument also ignores its claim that these six inputs are the "principal" and some of the "most important and significant" factors of production.[466]  It is commercially unrealistic to conclude that companies in the inquiry countries would suddenly source all their raw materials from China.[467]

- Because China is an NME country, Commerce uses surrogate values to determine the cost of material inputs from China. Auxin's percentage of value test is not administrable because Commerce/CBP would need to verify the prices of, and surrogate values for, solar module components. CBP is not structured to handle certifications based on value[468] and, because it has no experience selecting and applying surrogate values, it would not be able to verify the accuracy of such value-added based certifications.[469]

- Additionally, no parties, including Commerce and CBP, would know the appropriate surrogate values for solar module components when the solar module was exported to, or imported into, the United States. This information is needed to determine the Chinese and non-Chinese content percentages required for Auxin's test.[470]  Alternatively, Commerce would have to use actual costs in China to implement Auxin's percentage of value test, which is contrary to its practice.[471]

- Auxin's claim that its percentage of value test is administrable based on the procedures that CBP uses for the United States-Mexico-Canada Agreement is misplaced. CBP evaluates regional value content under the United States-Mexico-Canada Agreement, but this is not certified on an entry-by-entry basis.[472]  Confirming the sources of materials is less burdensome than establishing valuation.[473]

---

[462] *See* BYD HK's March 17, 2023 Rebuttal Brief at 10.
[463] *Id.* at 11-12 and Exhibit 1 (citing Auxin's March 6, 2023 Case Brief at 13-17).
[464] *See* Risen's March 17, 2023 Rebuttal Brief at 2.
[465] *See* BYD HK's March 17, 2023 Rebuttal Brief at 11-12; *see also* CSIL's March 17, 2023 Rebuttal Brief at 13; and TTL's March 17, 2023 Rebuttal Brief at 8-9.
[466] *See* NextEra's March 17, 2023 Rebuttal Brief at 9-10.
[467] *See* Risen's March 17, 2023 Rebuttal Brief at 2-3.
[468] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9-13; *see also* TTL's March 17, 2023 Rebuttal Brief at 9.
[469] *See* Risen's March 17, 2023 Rebuttal Brief at 11.
[470] *See* Jinko's March 17, 2023 Rebuttal Brief at 12 and NextEra's March 17, 2023 Rebuttal Brief at 11.
[471] *See* NextEra's March 17, 2023 Rebuttal Brief at 11.
[472] *See* TTL's March 17, 2023 Rebuttal Brief at 9.
[473] *Id.*

**Commerce's Position:**  We disagree with Auxin's contention that, based on Commerce's affirmative circumvention determination, solar modules produced in the inquiry countries, or any country, using solar cells from the inquiry countries made from Chinese-produced wafers are automatically covered by the *Orders*.  Auxin based its argument on a mischaracterization and misapplication of Commerce's country-of-origin determination from the investigations underlying these *Orders*.  In the underlying investigations, Commerce conducted a substantial transformation analysis and determined "that where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced."[474]

The purpose of a substantial transformation analysis is to determine whether merchandise that is further processed outside the order country remains the product of the order country, and thus subject merchandise.  The purpose of the analysis conducted under section 781(b) of the Act is to determine whether minor assembly or completion of merchandise from the order country in a third-country was used to circumvent the order.  As Commerce noted in the Preamble to its regulations "Commerce's substantial transformation analysis under {19 CFR} 351.225(j) and the test for determining whether a product was completed or assembled in other foreign countries under {19 CFR} 351.226(i) (and section 781(b) of the Act) are two distinct analyses used for different purposes … "[475]

Nowhere in the Act or Commerce's regulations is there a provision to use a substantial transformation analysis to identify circumvention.  To determine whether solar modules are covered by this affirmative circumvention determination based on Commerce's country-of-origin rule from the underlying investigations ignores the criterion in section 781(b) of the Act, including determining whether the value of the order country merchandise that is assembled in the third country is a significant portion of, and the value of the third-country processing is a small proportion of, the total value of the solar module.  Moreover, in applying Commerce's country-of-origin rule to identify solar modules covered by the affirmative circumvention determination, Auxin has ignored the Chinese content of the solar module.  Auxin's approach is inconsistent with how Commerce has analyzed circumvention in other circumvention inquiries (*i.e.,* Commerce applies the circumvention criteria to the merchandise entering the United States, in this case the solar module,, and not a component within the imported product, the solar cell, and determines whether the order country input(s) is a significant share, and the processing in the third country is a minor or insignificant share, of the value of the merchandise entering the United States)[476] and disregards the very nature of the alleged circumvention that Auxin

---

[474] *See* Trina's May 2, 2022 Comments at Attachment 8, page 8.

[475] *See 2021 Regulations Final Rule*, 86 FR at 52342.

[476] *See, e.g., CORE from China (UAE) Preliminary* PDM at 1 and 27-28 (unchanged in *CORE from China (UAE)*) where we determined whether exporters of CORE from the UAE to the United States must pay AD duties based on whether the CORE contains Chinese hot-or cold-rolled steel.  The certification requirement in that case was based on a determination that "the value of hot-or cold-rolled steel represents a significant portion of the total value of the {CORE} exported to the United States."  *See CORE from China (UAE) Preliminary* PDM at 23.  However, the solar cells that Auxin argues we should solely consider when determining whether the solar module containing such solar cells is covered by the circumvention determination, are not entirely made in China (as opposed to the hot-or cold-rolled steel  in *CORE from China (UAE)*) and Auxin has not explained to what extent the solar cell should contain Chinese inputs to be considered covered by the *Orders.*  Auxin has additionally failed to explain, contrary to Commerce determinations in *CORE from China (UAE)* and other circumvention proceedings, why such solar cell content is a sufficient basis for determining that the solar module should be covered by the *Orders.*

requested that Commerce investigate.  Specifically, Auxin requested "that Commerce promptly initiate an anti-circumvention inquiry concerning {solar} cells and modules assembled and completed in Malaysia, Thailand, Vietnam, and Cambodia using Chinese-produced inputs."[477]  In contrast to Auxin's approach of focusing on the solar cell, Commerce's "Wafer-Plus-Three" requirement focuses on the Chinese content of the solar module and reflects the nature of the production in the third-country.  Furthermore, the "Wafer-Plus-Three" requirement is consistent with section 781(b)(1) of the Act, which requires Commerce's circumvention determination to be made with respect to the "merchandise imported into the United States."  Hence, when a solar module is the merchandise that is imported into the United States, Commerce must examine the components of that solar module, not the solar cells alone.

In its Circumvention Request, Auxin simply described inquiry merchandise as solar modules assembled and completed in one of the inquiry countries using Chinese-produced inputs.[478] This broad description of inquiry merchandise could have the unintended consequence of including solar modules with miniscule Chinese content (such as a bolt and a screw) as inquiry merchandise.  Therefore, Commerce found it necessary to define the relevant Chinese content to consider a solar module as inquiry merchandise.[479] As explained in more detail below, we find that it is reasonable, and consistent with Auxin's Circumvention Request, to use the "Wafer-Plus-Three" requirement to define solar modules as inquiry merchandise where the wafer and at least three of the other primary materials in the solar module were produced in China.

We did not arbitrarily select the seven material inputs used in the "Wafer-Plus-Three" requirement, but based our selection on record evidence, including data provided by the respondents and solar industry surveys in which wafers and the six material inputs used in the "Wafer-Plus-Three" requirement are identified as major solar cell/module inputs.[480]  Auxin itself identified the primary materials from the order country that it claims were being assembled and completed in the inquiry countries to circumvent the *Orders*.  Specifically, Auxin stated that "reasonably available evidence indicates that the primary direct material inputs used to complete {solar} cells in the subject third countries, *i.e.*, wafers, silane, phosphorus oxychloride (POC13), aluminum and/or silver paste, and the additional components used to assemble the {solar} cells into modules, *i.e.*, solar glass, EVA, backsheet, aluminum frames, and junction boxes, were

---

[477] *See* Circumvention Request at 88.

[478] *Id*.

[479] *See Preliminary Determinations*, 87 FR at 75221, 75222.

[480] *See*, *e.g.*, the *Bloomberg Report* below Figure 17 (identifying aluminum frames, glass; backsheets, ethylene vinyl acetate sheets, and junction boxes as the most important solar module inputs) and above Figure 12 (identifying silver as the costliest input added at the cell processing stage).  The *Bloomberg Report* also emphasizes the importance of wafers and indicates the importance of these aforementioned seven inputs in making solar modules; *see also* the *NREL 2018 Report* at 37 (identifying wafers, metallization pastes (silver), glass, backsheets and junction boxes as the costliest items to produce solar modules) and 33 (identifying the principal solar module input materials as cell stringing and tabbing ribbons, front glass, backsheet, ethylene-vinyl acetate (EVA), encapsulant (2 sheets), AI (aluminum) frame and edge sealant, junction box, junction box potting agent and tape, and coded module sticker label), and the *DOE Solar Deep Dive* at iii ({s}ilicon wafers are processed to make the solar cells that are interconnected and sandwiched between glass and plastic sheets to make c-Si modules"), 36 ("{s}ilver paste is an important component in c-Si solar cells"), and 44 (identifying the aluminum frame, glass, backsheet, encapsulant ("the predominant resins used to make encapsulant are ethylene vinyl acetate (EVA) …" (*see* page 19)), and the junction box as the components of a solar module).

100

sourced from China, the country subject to *the Orders*."[481]  We did not include silane and phosphorus oxychloride (POC13) in the "Wafer-Plus-Three" requirement because, as opposed to wafers and the six other inputs identified in the "Wafer-Plus-Three" requirement, they were not identified as major inputs in the majority of the solar industry reports/surveys that are on the record and no parties argued that other material inputs should be included in the requirement or that some of the material inputs should be removed from the requirement.

We determine that the "Wafer-Plus-Three" requirement is appropriate on a qualitative basis.  The circumvention activity alleged by Auxin involves Chinese-produced wafers being converted into solar cells and solar modules in a third country using additional and substantial Chinese-origin components.  Commerce's "Wafer-Plus-Three" requirement directly addresses the situation described by Auxin in its Circumvention Request because it requires producers in the inquiry countries to either no longer use Chinese wafers, which are the products that are being assembled and completed in the inquiry country, or to source less than half of the other major components that are required to convert the wafers into solar cells/modules from China.  We have determined that this qualitative approach to defining inquiry merchandise is reasonable because it focuses on the number of major components sourced from China.  This approach is also consistent with the concerns described by Auxin that led it to request the circumvention inquiries, namely its claim that "the vast majority — if not all — of the other materials used to convert the Chinese wafers to cells and then assemble the cells into modules in Malaysia, Thailand, Vietnam, and Cambodia are obtained from China."[482]  Under the "Wafer-Plus-Three" requirement, where the majority of the major inputs used to convert the Chinese wafers to cells and then assemble the cells into modules were obtained from (produced in) China, the module is inquiry merchandise and will be subject to Commerce's affirmative circumvention determination.

Further, Auxin itself noted that where:

> the primary direct material inputs used to complete {solar} cells in the subject third countries, *i.e.*, wafers, silane, phosphorus oxychloride (POCI3), aluminum and/or silver paste, and the additional components used to assemble the {solar} cells into modules, *i.e.*, solar glass, EVA, backsheet, aluminum frames, and junction boxes, were sourced from China … a qualitative analysis itself would be sufficient to conclude that the value of processing in {the inquiry countries}" would represent " a small proportion of the value of the merchandise imported to the United States.[483]

Thus, by limiting the amount of Chinese content in the solar module, the "Wafer-Plus-Three" requirement addresses, on a qualitative basis, Auxin's concern and increases the non-Chinese portion of the value of the merchandise.

We also determine that the "Wafer-Plus-Three" requirement is appropriate on a quantitative basis.  Under the "W Wafer-Plus-Three" requirement, a solar module is not inquiry merchandise if it has no Chinese-produced wafers, or where four of its six major inputs, other than the wafer,

---

[481] *See* Circumvention Request at 73.
[482] *Id.* at 30.
[483] *Id.* at 73.

were not produced in China.  Based on record evidence regarding the value of wafers and conversion costs in a solar module,[484] and the statement in the *Bloomberg Report* that "Southeast Asian nations account for just 27% of the value of a typical {solar} module exported to the U.S."[485] we find that the "Wafer-Plus-Three" requirement would not result in a small value of inputs from outside of China as contended by Auxin.[486]

Moreover, we find there are flaws with the analysis that Auxin provided to support its claim that the "Wafer-Plus-Three" requirement would continue to allow a solar module to contain a significant proportion of Chinese inputs and not be subject to Commerce's affirmative circumvention determination.  Specifically, Auxin provided a table of per-unit costs for the inputs identified in the "Wafer-Plus-Three" requirement showing that a solar module could contain Chinese components that represent a high percentage of the total per-unit direct material cost of a solar module and yet, under the "Wafer-Plus-Three" requirement, the solar module would not be considered inquiry merchandise.[487]  Besides the questions raised by certain respondents regarding the source of Auxin's per-unit costs, we find that Auxin failed to account for other material costs and conversion costs incurred in the inquiry countries in its analysis.  Further, if one accounts for these additional material and conversion costs, even relying on Auxin's per-unit costs, non-Chinese inputs would comprise much more than the "small" percentage of total value claimed by Auxin.[488]

Thus, we find that Auxin's analysis does not provide the proper measure of the extent to which companies in an inquiry country are using Chinese-produced inputs to convert wafers into solar modules.  In contrast, by defining solar modules subject to the inquiry as solar modules where the wafer and at least three of the other major inputs were produced in China, Commerce has addressed Auxin's concern that "major Chinese companies have set up minor assembly operations in Southeast Asia — using their existing dedicated supply base in China for almost the entirety of the bill of materials — to circumvent the Orders …"[489]  Also the "Wafer-Plus-Three" requirement is consistent with Congressional direction away from a rigid numerical approach.[490]  This approach is also consistent with how Commerce has identified inquiry merchandise in other circumvention inquiries, namely based on whether certain content in the merchandise came from the order country.[491]

We also find that Auxin's percentage of value test is not administrable.  Because the *Orders* apply to China, an NME country, Chinese-produced components are valued based on surrogate values.[492]  However, Auxin never explained how Commerce's NME methodology would be used

---

[484] *See* our summary of the data in the *DOE Solar Deep Dive, IEA Report*, and Bloomberg Report, as well as our calculations based on these reports showing the costs of the wafers and other six inputs in the Solar Survey Analysis Memorandum.
[485] *See* the *Bloomberg Report* at the narrative below Figure 22. that "Southeast Asian nations account for just 27% of the value of a typical PV module exported to the U.S."
[486] *See* Auxin's March 6, 2023 Case Brief at 15 and Solar Survey Analysis Memorandum.
[487] *Id.*
[488] *Id.*
[489] *See* Circumvention Request at 32.
[490] *See* SAA at 893-94.
[491] *See e.g.*, *CORE from China (UAE) Preliminary* PDM at 1, 23, and 27-28 (unchanged in *CORE from China (UAE)*).
[492] *See* section 773(c) of the Act.

102

in its proposed percentage of value test.  For example, Auxin never explained, under its proposal, whether surrogate values would be used to determine total value and, if so, how importers and exporters would properly select any surrogate values used.  Commerce normally selects surrogate values in a proceeding segment after considering record evidence and comments provided by interested parties.[493]  However, Auxin never explained how Commerce would evaluate any surrogate values used in the percentage of value test, or the type proceeding in which Commerce would conduct such an evaluation.  Furthermore, it is not feasible for Commerce to evaluate and examine potentially numerous surrogate value calculations that could change from entry to entry.

Auxin claimed that "{g}iven the records kept and maintained by the foreign producers, these data can be supplied to CBP to validate the value-added calculation."[494]  However, applying Commerce's NME methodology to the percentage of value test would require the use of surrogate values.  CBP is not charged with evaluating surrogate value selections, and it cannot be expected to validate a value-added test based on surrogate values.  Additionally, we find it would not be feasible for exporters and importers that are unfamiliar with Commerce's NME methodology to select the appropriate surrogate values to determine the percentage of a solar module's total value represented by Chinese components.  Thus, we find that it is unclear how Auxin's proposed percentage of value test would be implemented in light of Commerce's NME methodology.

Lastly, Auxin maintains that its proposed percentage of value test benefits exporters/producers because there is no need for them to publicly identify their wafer supplier and simplifies the types of records that importers must maintain.  Neither claim is valid.  Exporters do not need to publicly identify their wafer supplier(s) under Commerce's "Certification Regarding Chinese Components."[495]  Thus, in this regard, Auxin's proposed percentage of value test, in which exporters would not need to publicly identify their wafer supplier(s), does not provide any benefit to exporters that is not already in place.  Further, it is unclear how Auxin's proposed percentage of value test would simplify record keeping when solar modules can have hundreds of inputs and exporters/producers would need to maintain records to determine whether each input was produced in China or outside of China and to calculate the value of the non-Chinese and/or Chinese inputs in the solar module.  Moreover, under Auxin's proposed approach, a number of records, such as surrogate value information, that are generally not kept in the ordinary course of business would need to be maintained.  In contrast, when using the "Certification Regarding Chinese Components" parties need to maintain records to determine where only the seven inputs listed in Commerce's "Wafer-Plus-Three" requirement were produced.

---

[493] *See Malaysia* PDM at 4-5 and 8-9.
[494] *See* Auxin's March 6, 2023 Case Brief at 16.
[495] *See Preliminary Determinations*, 87 FR at Appendix VI.

## Other Issues

### Comment 22. Whether Commerce Properly Placed *Ex Parte* Memoranda on the Record That Concerned the Circumvention Inquiries

*Auxin*[496]

- Commerce unlawfully omitted communication related to the issuance of *Presidential Proclamation 10414* and Commerce's final rule implementing aspects of that proclamation.[497]
- Commerce's omission resulted in an incomplete administrative record for the circumvention inquiries.

No other interested party commented on this issue.

**Commerce's Position:**  We disagree.  By statute, Commerce shall maintain a record of any *ex parte* meeting between interested parties or other persons providing factual information in connection with an AD/CVD proceeding and the person charged with making the determination if information relating to that AD/CVD proceeding was presented or discussed at such meeting.[498]  Throughout the course of the circumvention inquiries, Commerce consistently placed summaries of *ex parte* contacts concerning the circumvention inquiries on the administrative record.[499]  Commerce was not required to memorialize for the record communications on matters distinct from the AD/CVD proceedings at hand, including *Presidential Proclamation 10414* or the rulemaking resulting from that Proclamation.[500]

### Comment 23. Whether Commerce's Determination to Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law

*Auxin*[501]

- Commerce unlawfully retroactively applied regulations developed pursuant to the declaration of emergency announced in *Presidential Proclamation 10414*.  Specifically, Commerce waived application of affirmative circumvention findings to all entries of

---

[496] *See* Auxin's March 24, 2023 Case Brief at 43; Auxin's April 19, 2023 Case Brief at 80; Auxin's April 24, 2023 Case Brief at 58-59; and Auxin's April 26, 2023 Case Brief at 79.

[497] *See* Auxin's March 24, 2023 Case Brief; Auxin's April 19, 2023 Case Brief; Auxin's April 24, 2023 Case Brief; and Auxin's April 26, 2023 Case Brief (citing *Presidential Proclamation 10414*, 87 FR 35067; and *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR 56868).

[498] *See* section 777(a)(3) of the Act "{AD/CVD} proceedings are investigatory rather than adjudicatory in nature, and {the ex parte} provision is intended to ensure that all parties to the preceeding {*sic*} are more fully aware of the presentation of factual information to the administering authority or the ITC;"  S. Rep. No. 96-249, at 99-100 (1979); *see also F Lli De Cecco*, 980 F. Supp 485.

[499] *See*, *e.g.*, Memoranda, "Meeting with Counsel for Auxin," dated November 14, 2022, and NE Solar January 29, 2023 *Ex Parte* Memorandum.

[500] *See Baker Hostetler*, 473 F.3d 312 (conversations focused on matters other than AD/CVD proceedings do not fall under the section 777(a)(3) *ex parte* provision).

[501] *See* Auxin's March 6, 2023 Case Brief at 17-24.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

inquiry merchandise after initiation of these inquiries on April 1, 2022, but before the Presidential Proclamation was issued on June 6, 2022.[502]

- The retroactive application of *Presidential Proclamation 10414* is: "(a) *ultra vires* because Commerce possesses no independent legal authority to issue an emergency declaration; (b) is contrary to the explicit wording of *Presidential Proclamation 10414*; (c) is unlawful under the statutory authority under which the proclamation was issued, and (d) is otherwise inconsistent with Commerce's circumvention regulations, which require Commerce to issue suspension of liquidation and cash deposit instructions to CBP in the event of an affirmative finding of circumvention."[503]

- Commerce should "follow its regulations and request that CBP suspend liquidation and collect cash deposits on all entries after April 1, 2022, until June 6, 2022."[504]

- In the *Preliminary Determinations*, Commerce stated that entries prior to the Date of Termination that have met the certification requirements will not be subject to suspension of liquidation, or the cash deposit requirements described above.[505] Commerce justified this departure from its practice and regulations by citing 19 CFR Part 362.

- Commerce specifically stated that pursuant to 19 CFR 362.103(b)(1)(i), "Commerce will direct U.S. Customs and Border Protection (CBP) to discontinue the suspension of liquidation and collection of cash deposits that were ordered based on Commerce's initiation of these circumvention inquiries. In addition, pursuant to 19 CFR 362.103(b)(1)(ii) and (iii), Commerce will not direct CBP to suspend liquidation, and require cash deposits, of estimated ADs and CVDs based on these affirmative preliminary determinations of circumvention on, any 'Applicable Entries.'"[506]

- Commerce confirmed that "suspension of liquidation procedures would only apply to 'imports of Southeast Asian-Completed solar cells and modules that are not 'Applicable Entries' that were entered, or withdrawn from warehouse, for consumption on or after April 1, 2022."[507]

- First, Commerce possesses no legal authority to declare a national emergency and does not cite any such authority in its *Preliminary Determination*. Commerce explicitly expanding the scope of *Presidential Proclamation 10414* by applying it to entries of inquiry merchandise that entered the United States prior to the identification of the emergency while lacking such legal authority renders the decision *ultra vires*.[508]

- Second, Commerce's retroactive actions are not consistent with the authority relied upon for adoption of Part 362 of its regulations: *Presidential Proclamation 10414*. The

---

[502] *Id.* at 17-18 and n. 41. "In making this argument and stating that June 6, 2022, is the operable date for lifting of suspension and collection of cash deposits, Auxin is not suggesting in any way that Presidential Proclamation 10414 and/or Commerce's implementing regulations are lawful. Indeed, Auxin has explained in detail in previous submissions on this record and in response to Commerce's request for comments why Presidential Proclamation 10414 and Commerce's regulations were devoid of any factual underpinnings to support the purported emergency and that Commerce superseded existing regulations to implement the proclamation."

[503] *Id.* (citing 19 CFR 351.226(l)(2)(ii) and (iii)).

[504] *Id.*

[505] *Id.* (citing *Preliminary Determinations*, 87 FR at 75224).

[506] *Id.* (citing *Preliminary Determinations*, 87 FR at 75223).

[507] *Id.* (citing *Clarification of Product Coverage Memorandum* at 2).

[508] *Id.* (citing *Cf. Stark v. Wickard*, 321 U.S at 288; *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. at 1679).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

Proclamation does not authorize retroactive effect of the national emergency declared on June 6, 2022.[509]

- *Presidential Proclamation 10414* specifically states that any actions taken by Commerce to permit duty-free entries of solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam last "until 24 months *after* the date of this proclamation or until the emergency declared herein has terminated, whichever occurs first."[510]

- *Presidential Proclamation 10414* does not authorize any actions for entries before the June 6, 2022, date. Thus, *Presidential Proclamation 10414* does not authorize Commerce to take any action affecting entries before June 6, 2022.

- Third, section 318(a) of the Act, the statutory authority under which *Presidential Proclamation 10414* was issued, does not allow action before the declaration of an emergency, and only authorizes action "*during* the continuance of" an emergency "declare{d}" by presidential proclamation.[511] No emergency was declared prior to June 6, 2022.

- Last, the *Preliminary Determination* is inconsistent with the statute and regulations as Commerce's circumvention regulations state that following an affirmative preliminary determination:  (1) the Secretary will direct the Customs service to continue the suspension of liquidation and apply the applicable cash deposit rate; and (2) direct the Customs service to begin the suspension of liquidation and require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry on or after the date of publication of the notice of initiation of the inquiry.[512]

- In the *Initiation Notice*, Commerce notified all interested parties of the initiation of circumvention inquiries, including a description of the products subject to the inquiries and an explanation of the reasons for Commerce's decision to initiate such inquiries.[513]

- With respect to suspension of liquidation, Commerce explained that it would follow 19 CFR 351.226(l)(1), notifying CBP of its initiation and direct CBP to continue suspension of liquidation and apply the cash deposit rate that would be applicable if the products were determined to be covered by the scope of *the Orders.*  Commerce also mentioned that it would follow the suspension of liquidation rules under 19 CFR 351.226(l)(2)-(4) should it issue preliminary or final circumvention determinations.[514]

- Thus, Commerce provided all interested parties with notice of initiation, the reasons for initiation, and Commerce's intention to suspend liquidation for merchandise that entered after the date of initiation, April 1, 2022, consistent with Commerce's regulations.  As such, suspension of liquidation retroactive to the date of initiation was appropriate and lawful.[515]

- Commerce's failure to suspend liquidation and collect cash deposits from April 1, 2022, through June 6, 2022, is unlawful for many reasons and should be reversed in the final determination.

---

[509] *Id.* (citing *Presidential Proclamation 10414*, 87 FR at 35067-69).

[510] *Id.* (citing *Presidential Proclamation 10414*, 87 FR at 35068).

[511] *Id.* (citing section 318(a) of the Act).

[512] *Id.* (citing 19 CFR 351.226(1)(2)(i)-(ii)).

[513] *Id.* (citing *Initiation Notice*, 87 FR at 19072).

[514] *Id.*

[515] *Id.* (citing *Aluminum (Taishan) Co.,* 983 F.3d 487).

*NextEra*,[516] *BYD HK*,[517] *CSIL*,[518] *TTL*,[519] *Silfab*,[520] and *Risen*[521]

- Auxin's argument that Commerce "unlawfully retroactively applied" its regulations in 19 CFR Part 362 has no place in these circumvention inquiries, which are meant to examine whether circumvention has taken place under the relevant statute and regulations, and not to assess whether Commerce's regulations are proper.

- Commerce has no basis to disregard the 19 CFR Part 362 regulations that exempt entries between April 1, 2022, and June 6, 2022 (and certain entries made after June 6, 2022) from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from these inquiries, without engaging in a new notice-and-comment procedure separate from this circumvention inquiry.

- Although Auxin urges Commerce to suspend liquidation and collect cash deposits on merchandise entered between April 1 and June 6, 2022, it is unlawful for Commerce to do so as "Commerce, like other agencies, must follow its own regulations."[522]

- Pursuant to 19 CFR Part 362, entries between April 1, 2022, and June 6, 2022, are exempt from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from this circumvention inquiry.  Specifically, 19 CFR 362.103 exempts "Applicable Entries" from those obligations.  19 CFR 362.102 defines "Applicable Entries" as "entries of Southeast Asian-Completed Cells and Modules that are entered into the United States, or withdrawn from warehouse, for consumption before the Date of Termination."[523]

- Commerce's regulations apply to all entries made prior to the "Date of Termination," and there is no basis to limit application of the exemptions to entries made after June 6, 2022. Moreover, the *Presidential Proclamation 10414 Final Rule Preamble* confirms that the 19 CFR Part 362 regulations are intended to apply to entries made between April 1, 2022, and June 6, 2022.[524]

- Given that "agency regulations are to be interpreted in a similar manner to statutes, which includes a consideration of the text, history, and purpose of a regulation, 19 CFR Part 362 clearly requires Commerce to exempt entries between April 1, 2022, and June 6, 2022, from any suspension of liquidation, cash deposits, or final duties resulting from these inquiries."[525]

---

[516] *See* Next Era's March 17, 2023 Case Brief at 11-18.

[517] *See* BYD HK's March 17, 2023 Rebuttal Brief at 13-18.

[518] *See* CSIL's March 17, 2023 Rebuttal Brief at 14-20.

[519] *See* TTL's March 17, 2023 Rebuttal Brief at 10-11.

[520] *See* Silfab's March 17, 2023 Rebuttal Brief at 8-13.

[521] *See* Risen's March 17, 2023 Rebuttal Brief at 3-4.

[522] *See* NextEra's March 17, 2023 Rebuttal Brief (citing *See Torrington*, 82 F.3d at 1049; *see also, e.g.*, *Fort Stewart*, 495 U.S. at 654 ("It is a familiar rule of administrative law that an agency must abide by its own regulations."); and *Saddler*, 68 F.3d at 1358 (finding that agency "must abide by its own regulation")).

[523] *Id.*  "Date of Termination" in turn is defined as "June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* has been terminated, whichever occurs first.  *See also* 19 CFR 362.102.

[524] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877).

[525] *Id.* (citing *Kisor*, 139 S. Ct. at 2423-24).

107

- Commerce "promulgated the Part 362 regulations through notice-and-comment rulemaking.[526]  The APA requires notice-and-comment procedures to be followed not only when rules are formulated, but also when they are amended or repealed."[527]
- Commerce cannot amend and implement regulations without a new informal rulemaking process under the APA.[528]
- The Supreme Court has explained that the APA requires agencies to "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."[529]
- Commerce may not repeal or amend the portions of 19 CFR Part 362 exempting entries between April 1, 2022, and June 6, 2022, from duties as part of its final determination in this circumvention inquiry.  Instead, Commerce would be required to publish a notice of proposed rulemaking informing the public that it is considering a change to 19 CFR Part 362 of its regulations, allow an opportunity for comment, and then publish a final rule responding to such comments.[530]  There is no basis for Commerce to depart from 19 CFR Part 362 in the final determination until Commerce does so.
- Although Auxin claims that Commerce has no legal authority to declare a national emergency and expanded the scope of *Presidential Proclamation 10414* or acted inconsistently with *Presidential Proclamation 10414* by extending the duty waiver to entries made between April 1, 2022, and June 6, 2022, Commerce did not declare a national emergency.  Instead, it was the President that made the declaration in *Presidential Proclamation 10414*, as allowed by section 318(a) of the Act.
- Commerce addressed the arguments regarding the consistency of 19 CFR Part 362 with *Presidential Proclamation 10414* when it promulgated the regulation.  Commerce is "taking action now (*i.e.*, during the period of the emergency) to extend the period before it directs CBP to suspend liquidation and collect cash deposits and to waive any AD/CVD estimated duties and duties for these unliquidated goods."[531]
- Commerce's Part 362 regulations are prospective in application because "Commerce's regulation stated prior to the imposition of duties that there would be no such duties, and because Commerce was extending the deadline for actions that it had not yet taken."[532]
- Commerce also explained that the *Presidential Proclamation 10414's* authorization to waive duties "until 24 months after the date of this proclamation or until the emergency declared herein has terminated" specified only the end date for duty-free treatment,

---

[526] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble;* and *Presidential Proclamation 10414 Proposed Rule*).

[527] *See* BYD HK's March 17, 2023 Rebuttal Brief (citing 5 USC 551(5); and 5 USC 553).

[528] *Id.* (citing *Alaska*, 177 F.3d at 1033-34, 1036:  In clarifying this requirement, the Supreme Court has interpreted the APA to require the same procedures when an agency amends or repeals a rule as to when the agency issued that rule)).

[529] *Id.* (citing *Perez*, 575 U.S. at 101; *see also Ass'n of Priv. Sector*, 681 F.3d at 462-63 (finding that agency violates the APA when it does not give notice of proposed rule and opportunity to affected parties to comment); *Invenergy*, 422 F. Supp. 3d at 1285 ("The court concludes that the Exclusion constituted agency rulemaking. Repealing the rule, therefore, also requires rulemaking subject to APA notice and comment.")).

[530] *Id.* (citing 5 USC 553).

[531] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877).

[532] *Id.*

without specifying a start date or limiting application of the waiver to entries made after the *Presidential Proclamation 10414*.[533]

- Commerce recognized that providing duty-free treatment to entries made prior to June 6, 2022, furthers the emergency relief goals reflected in *Presidential Proclamation 10414* (specifically, the market uncertainty caused by the initiation of these circumvention inquiries).[534]

- Subjecting entries made prior to June 6, 2022, to AD/CVD cash deposit rates that were unknown at the time of entry and to assessment rates that would not be determined until many months or even years in the future would have increased, not decreased, the market uncertainty the *Presidential Proclamation 10414* and Commerce's Part 362 were seeking to address.[535]  Such an application would limit the capital available to complete solar projects and otherwise build capacity.[536]

- Auxin's arguments regarding the scope of authority provided in section 318(a) are also meritless as Auxin reads far too much into the following statutory language:  the President "may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act."[537]  At most this provision of the statute prevents extension of deadlines after the emergency subsided.

- The provision noted by Auxin does not prohibit the application of the statute to entries that remain unliquidated at the time of the emergency declaration and Commerce's extension of deadlines for ordering cash deposits and assessment of duties occurred after the emergency was declared.

- Section 318(a) contains two separate grammatical clauses stating what the President may authorize the Secretary to do:  (1) the President "may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act;" and (2) the President "may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work."  The use of the word "authorize" a second time in a separate clause indicates that the authority in the second clause is distinct from the first.

- The language "during the continuance of such emergency" qualifies only the authority in the first clause (the authority to extend deadlines), not the second (the separate authority to waive duties).  Therefore, the authority to permit the duty-free importation of supplies for emergency relief work is less constrained than the authority to extend deadlines under the Act.[538]

- Commerce explained in the *Presidential Proclamation 10414 Final Rule Preamble* that applying the waiver to entries that remained unliquidated at the time of the President's Proclamation harmonizes the authority provided under section 318(a) of the Act with the retrospective AD/CVD system, which is also part of the Act.

---

[533] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877 and 56878).

[534] *See* NextEra's March 17, 2023 Rebuttal Brief (citing *Presidential Proclamation 10414 Proposed Rule*, 87 FR at 39430; *see also Presidential Proclamation 10414 Final Rule Preamble,* 87 FR at 56872, 56875-77).

[535] *Id.* (citing *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56875-78).

[536] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56878).

[537] *Id.* (citing Auxin March 17, 2023 Case Brief at 20).

[538] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877-78).

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry - From Malaysia 2022

- Even if Commerce did not have authority under section 318(a) to waive duties on entries made prior to *Presidential Proclamation 10414*, Commerce possesses separate authority to exempt such entries from ADs/CVDs.

- Commerce invoked its authority to issue regulations pertaining to section 781 of the Act when it promulgated 19 CFR Part 362 of its regulations.[539]  Section 781 of the Act states that Commerce "may include within the scope" merchandise completed or assembled in other foreign countries if certain criteria are met.[540]  Thus, even if the criteria for an affirmative circumvention determination are found, section 781 provides Commerce with the discretion to determine whether to include merchandise within the scope of an AD/CVD order.

- Section 781 of the Act is silent on when an order will be applied after Commerce determines to extend the order to cover merchandise completed or assembled in other foreign countries.  Commerce exercised its gap-filling authority regarding the administration of section 781 of the Act by issuing 19 CFR 351.226.  However, nothing in the statute mandates the particular procedures that Commerce adopted in 19 CFR 351.226 and that Auxin would like Commerce to apply.

- Commerce is free to adopt additional regulations through notice-and-comment rule making that supersede the provisions in 19 CFR 351.226 in order to address the policy issues raised by this case.  Commerce recognized this in the *Presidential Proclamation Final Rule 10414 Preamble*.[541]

- It was reasonable for Commerce to exempt merchandise entered prior to June 6, 2022, from duties when that merchandise was outside of the scope of the *Orders* as a matter of law at the time of entry and the nature of the cell and/or module production process occurring in Southeast Asia is significant.

- Auxin does not cite any language from the AD/CVD statute or section 318(a) requiring Commerce to apply ADs/CVDs to pre-*Presidential Proclamation 10414* entries.  Additionally, Auxin does not cite any authority that would require Commerce to suspend liquidation, apply cash deposit, and duty assessment provisions in 19 CFR 351.226(1) instead of the exception to those rules found in Part 362.

- 19 CFR Part 362 regulations were adopted following notice-and-comment rulemaking to address the situation presented in these circumvention inquiries and should prevail over general provisions in 19 CFR 351.226(1).[542]  Moreover, the 19 CFR Part 362 regulations make it clear that they are intended to be employed as an exception to any otherwise applicable rules found within 19 CFR 351.226 through the language "notwithstanding § 351.226(l) of this chapter."

- Given that 19 CFR Part 362 is explicitly identified as an exception to 19 CFR 351.226(l), Auxin's argument that Commerce was required to follow 19 CFR 351.226(l) is incorrect.

- *Presidential Proclamation 10414, Presidential Proclamation 10414 Final Rule Preamble,* Commerce's affirmative circumvention determinations, and the accompanying

---

[539] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877-78; and *Presidential Proclamation 10414 Proposed Rule*, 87 FR at 39429).

[540] *Id.* (citing 19 CFR 351.226(b)(1)).

[541] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56876-78).

[542] *Id.* (citing *Romani*, 523 U.S. at 532 (later, more specific statute governs); *Fourco Glass Co.*, 353 U.S. at 228 ("However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment.")).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

instructions issued to CBP by Commerce, clearly state that merchandise entered for consumption between April 1, 2022, and June 6, 2022, are not subject to AD/CVD liability.[543]

- Auxin's argument that Commerce unlawfully retroactively applied regulations promulgated pursuant to the declaration of emergency announced in *Presidential Proclamation 10414* is not made in the proper forum.  Commerce is bound by law to follow the requirements of *Presidential Proclamation 10414* and 19 CFR Part 362 of its regulations.

- This policy, combined with the meaning of 19 CFR Part 362, means that Commerce cannot retroactively impose duties on imports designated as "Applicable Entries" in the final determinations, especially given the general presumption against retroactive applications of law.[544]

- Amending or repealing 19 CFR Part 362 in the context of these circumvention inquiries would create unfair surprise and deprive parties of a meaningful opportunity to comment on a significant change in Commerce's regulations.[545]

- Commerce should continue to exempt entries made between April 1, 2022, and June 6, 2022, from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from these circumvention inquiries.

**Commerce's Position:**  Commerce disagrees with Auxin that the regulations promulgated under *Presidential Proclamation 10414* are unlawfully retroactive.  Auxin makes four primary claims that the regulations are unlawful, none of which we find to be persuasive or sufficient to change our reasoning with respect to this circumvention inquiry.

First, Auxin claims that Commerce possesses no legal authority to declare a national emergency, yet "explicitly expanded the scope" of *Presidential Proclamation 10414 ultra vires* by applying it to inquiry merchandise that entered the United States "prior to the identification of the emergency."[546]  However, as Auxin notes, Commerce has already addressed the legality of its authority to issue the regulations under *Presidential Proclamation 10414 Final Rule Preamble*, itself.[547]  That rule, which was issued pursuant to lawful notice and comment process, confirms that "Commerce is taking action now (*i.e.*, during the period of the emergency) to extend the period before it directs CBP to suspend liquidation and collect cash deposits and to waive any AD/CVD estimated duties and duties for these unliquidated goods."[548]  "In other words, the final rule stated, ahead of any imposition of such duties, that there will be no such duties."[549]  Such a statement is not expanding the scope of the emergency retroactively; rather, "such a decision is prospective in its application"[550] because it concerns the establishment of duties that have not yet been determined but may be determined during the course of the emergency.

---

[543] *See* BYD HK's March 17, 2023 Rebuttal Brief (citing CBP MSGs Memorandum at Message No. 3047409).

[544] *Id.* (citing *Bowen*, 488 U.S. at 208*;* and *I.N.S., 533 U.S. at 316.*

[545] *Id. (*citing *Kisor*, 139 S Ct. at 2418-2419); *see also* CSIL's March 17, 2023 Rebuttal Brief (citing *Skidmore,* 323 U.S. at 140 (1944); and *Cathedral Candle*, 400 F.3d at 1366).

[546] *See* Auxin's March 6, 2023 Case Brief at 17-18.

[547] *Id.*

[548] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.

[549] *Id.*, 87 FR at 56877.

[550] *Id.*

111

Second, Auxin argues that the retroactive application of *Presidential Proclamation 10414* is contrary to the explicit wording of the proclamation itself, because it only authorizes Commerce to take actions to permit duty-free entries of solar cells "until 24 months after the date of this proclamation."[551]  Auxin argues that because the *Presidential Proclamation 10414* only authorizes Commerce to take action *after* the date of *Presidential Proclamation 10414*, Commerce is precluded from taking action with respect to entries prior to June 6, 2022.[552] Commerce addressed this argument in the notice and comment period, as discussed in the *Presidential Proclamation 10414 Final Rule Preamble*.[553]  While the *Presidential Proclamation 10414* does declare an end date to the time period of duty-free treatment, it did not specify a start date, nor did it limit the application of the waiver to only entries made after *Presidential Proclamation 10414*.[554]  Additionally, the goods that entered the country prior to *Presidential Proclamation 10414* remain unliquidated, and have yet to have a final decision with respect to applicable duties.  By taking action with respect to those goods, in accordance with the regulations promulgated in *Presidential Proclamation 10414 Final Rule*, Commerce is not acting retroactively:  before any duties were determined to be applicable to these entries, the regulations stated that there would be no duties imposed on these entries.[555]  We also agree with the respondents that the actions taken by Commerce in enacting this rule to provide duty-free treatment to entries prior to June 6, 2022, furthers the relief goals for the national emergency declared in *Presidential Proclamation 10414*, and subjecting entries made prior to June 6, 2022, to duties would increase uncertainty in the market for solar cells and run contrary to the intent of *Presidential Proclamation 10414*.[556]

Third, Auxin argues that the *Presidential Proclamation 10414 Final Rule* is inconsistent with *Presidential Proclamation 10414* and the authority under which it was issued (*i.e.*, section 318(a) of the Act), which provides for action to be taken "during" an emergency.  Auxin states that there was no emergency declared prior to June 6, 2022; therefore, the Act does not allow Commerce act before that date.[557]  We disagree with this interpretation.  Section 318(a) of the Act states "{w}henever the President shall by proclamation declare an emergency to exist … he may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act, and may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work."[558]  This provision contains two distinct clauses:  (1) authorizing the Secretary to "extend during the continuance of such emergency the time … for the performance of any act," and (2) authorizing the Secretary to "permit … the importation free of duty of food, clothing, and medical, surgical, and other supplies."[559]  We agree with respondents' argument that the grammatical construction of the statute, in particular using the word "authorize" in each of the two clauses, indicates that the authority in the second clause is independent from the

---

[551] *See* Auxin's March 6, 2023 Case Brief (quoting *Presidential Proclamation 10414*, 87 FR at 35068).
[552] *Id.* at 20.
[553] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.
[554] *Id.*, 87 FR at 56877-78.
[555] *Id.*, 87 FR at 56877.
[556] *Id.*, 87 FR at 56875-78.
[557] *See* Auxin's March 6, 2023 Case Brief at 20.
[558] *See* section 318(a) of the Act.
[559] *Id.*

112

authority in the first.  Accordingly, the President may authorize individually each of these two actions, or both, and the actions are not necessarily required to be implemented in unison or otherwise qualify each other.  In any event, Auxin's interpretation of the phrase "during the continuance of such emergency" is misleading.  Because these two clauses are independent, the phrase "during the continuance of such emergency" applies only to the first clause and does not limit the second clause concerning the waiver of duties.  And while it is true that the entries in question entered the country prior to June 6, 2022, Commerce's *taking action* with respect to setting a definitive amount of duties for those entries (which were unliquidated at the time of the rule, with no final amount of duties set) is not retroactive in nature as it is occurring during the continuance of the emergency as declared by the President.[560]

We also disagree with Auxin's reading of section 318 of the Act as prohibiting the retrospective application of duties (or lack thereof) to unliquidated merchandise because the general operation of the AD/CVD system in the United States is a retrospective one.  The "final liability for duties is determined after the merchandise is imported," and under this system entries are suspended and cash deposits are collected in order to wait for the final ascertainment of duties at a later time.[561]  That is the same situation of "retrospective" application of duties that Auxin is concerned about here; that merchandise entered the country and remains unliquidated while awaiting the final amount of duties owed.  To argue that section 318 of the Act prohibits this type of action is to ignore the fact that the passage by Congress of these provisions underpinning the AD/CVD system in the same Act supports reading them in harmony.[562]

Fourth, Auxin argues that the regulations promulgated under the *Presidential Proclamation 10414* are inconsistent with Commerce's circumvention regulations, which require Commerce to issue suspension of liquidation and cash deposit instructions to CBP in the event of an affirmative finding of circumvention.[563]  Auxin also states that this language was also included in Commerce's *Initiation Notice* and *Preliminary Determination*, which supposedly means that any failure to suspend liquidation and collect cash deposits from April 1, 2022, to June 6, 2022 is unlawful and should be reversed in the final determination.[564]  We disagree that Commerce must continue to follow the liquidation and cash deposit rules provided for in 19 CFR 351.226 in this specific case.  The 19 CFR Part 362 regulations carve out an exception to otherwise applicable rules (*i.e.*, those found in 19 CFR 351.226).[565]  Specifically, the 19 CFR Part 362 regulations state that "notwithstanding 351.226(l) … the Secretary shall instruct CBP to discontinue the suspension of liquidation of entries and collection of cash deposits for any Southeast-Asian-Completed Cells and Modules that were suspended pursuant to § 351.226(l) of this chapter."[566]  If Commerce were to follow the liquidation and cash deposit rules provided for in 19 CFR

---

[560] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.

[561] *Id.*, 87 FR at 56877 (citing 19 CFR 351.212(a) and sections 703(d), 705(c), 706, 733(d), 735(c), and 736 of the Act).

[562] *Id.*, 87 FR at 56877 (citing *FDA v. Brown & Williamson*, 529 U.S. at 132-133 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme … .  A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme … and fit, if possible, all parts into an harmonious whole."))

[563] *See* Auxin's March 6, 2023 Case Brief at 18 (citing 19 CFR 351.226(l)(2)(ii) and (iii)).

[564] *Id.* at 20-21.

[565] *See* 19 CFR 362.103(b)(1).

[566] *See* 19 CFR 362.103(b)(1)(i).

341.226, it would be acting contrary to the explicit language of the 19 CFR Part 362 regulations. Furthermore, in situations in which a regulation is adopted following a notice and comment process and is more specific than an existing regulation, the more specific regulation prevails.[567] Therefore, if a conflict arises between 19 CFR 362 and 19 CFR 351.226, the stipulations of 19 CFR 362 prevail.

**Comment 24. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate**

*NextEra*[568]

- If Commerce reaches a country-wide affirmative circumvention determination, it should permit third-country exporters that neither have their own AD cash deposit rate, nor use a wafer exporter in China with its own AD cash deposit rate, to deposit ADs based on the separate rate determined in the China AD solar cells proceeding, rather than deposit ADs at the cash deposit rate of the China-wide entity.
- In *CORE from China (Vietnam)*, Commerce applied the AD cash deposit rate of Chinese companies granted a separate rate in the China AD investigation to imports of CORE produced in Vietnam using Chinese substrate."[569]
- Commerce cannot assume that companies in a third-country are part of the China-wide entity like it does for companies in China that cannot demonstrate their independence from the Chinese government. Moreover, Commerce should not apply its non-market economy methodology to companies in Cambodia, Malaysia, or Thailand, which are independent market economy countries.
- Commerce clearly explained in the *AD Order* that the China-wide AD rate is based on AFA. The purpose of the statutory AFA provision is to encourage respondents' cooperation and ensure that they do not obtain a more favorable result by failing to cooperate than if they had cooperated.[570] The third-country exporters fully cooperated with Commerce's requests for information in the circumvention inquires, and thus, there is no reason to apply an AFA rate, *i.e.*, the China-wide rate, to these exporters.
- Secretary Raimondo testified before Congress that a tariff rate in the range of 200 percent is "excessive" and "exceedingly unlikely."[571] The China-wide AD cash deposit rate is 238.95 percent. To avoid uncertainty and limit the damage to solar deployment in the United States, Commerce should permit third-country companies without their own AD rate, or without a Chinese wafer exporter with its own AD rate, to deposit ADs at the cash deposit rate of companies granted a separate rate in the China AD solar cells proceeding.
- Alternatively, Commerce should establish a procedure for companies to obtain separate rate status either by submitting separate rate applications in this inquiry, submitting separate rate applications in the ongoing AD administrative review in this proceeding,

---

[567] *See Romani*, 523 U.S. at 532 (discussing the statutory canon that a later, more specific statute governs in the case of conflict); *Fourco Glass Co.*, 353 U.S. at 228 (holding that the general language of a statute "will not be held to apply to a matter specifically dealt with in another part of the same enactment."); *see also Roberto*, 440 F.3d at 1350 ("{t}he rules of statutory construction apply when interpreting an agency regulation.").
[568] *See* NextEra's March 6, 2023 Case Brief at 4-8.
[569] *Id.* (citing *CORE from China (Vietnam)* IDM at Comment 3).
[570] *Id.* (citing SAA at 200; *Changzhou Wujin Fine Chem*, 701 F.3d at 1378).
[571] *Id.* (citing NextEra's May 19, 2022 Comments at Attachment 3).

114

even if the exporter is not under review, or requesting a changed circumstances review to establish separate rate status on an expedited basis.

*Auxin*[572]

- Consistent with its long-standing practice, Commerce should continue to assign exporters without an individual AD rate or without a separate AD rate, the China-wide AD rate.[573]
- Commerce applied that practice in *CRS from China (Vietnam)*,[574] and contrary to NextEra's claim, in *CORE from China (Vietnam)*.[575]
- The purpose of a circumvention inquiry is to determine whether circumvention of an order has occurred, not conduct a separate rates analysis. If Commerce reaches an affirmative circumvention determination, then it will order the suspension of liquidation of entries of inquiry merchandise and the collection of AD/CVD cash deposits pending conduct of an administrative review where Commerce will, among other things, determine the appropriate cash deposit rates and conduct separate rate analyses.[576]

**Commerce's Position:** We disagree with NextEra. Pursuant to Commerce's affirmative country-wide circumvention determinations, duties under the *Orders* will apply to U.S. entries of inquiry merchandise from Cambodia, Malaysia, Thailand, and Vietnam unless at least one of the certification requirements is met. Because the applicable *Orders* are on China, in this circumvention inquiry Commerce followed the methodology that it employs in AD proceedings involving China to determine the appropriate AD cash deposit rate for U.S. entries of inquiry merchandise. Commerce considers China to be an NME country.[577] In proceedings involving NME countries, Commerce maintains a rebuttable presumption that all exporters are subject to government control and, thus, should be assigned a single antidumping duty deposit rate. It is Commerce's policy to assign all exporters of subject merchandise this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate.[578] Therefore, as we explained in the *Preliminary Determination*, entries from Cambodia, Malaysia, Thailand, and Vietnam will be assessed at the China-wide entity rate unless either: (1) the relevant cell or module exporter from Cambodia, Malaysia, Thailand, or Vietnam has its own company-specific AD and/or CVD rate under the *Orders* or; (2) if it does not, the Chinese company that exported the wafers to that third-country cell/module exporter has its own company-specific AD and/or CVD rate under the *Orders*.[579]

Although NextEra asserts that Commerce cannot assume that companies in a third-country are part of the China-wide entity, Commerce's position in AD proceedings involving China is clear - " 'the {China}-wide rate applies to all entries of subject merchandise' unless Commerce has determined a firm is eligible for a separate rate ….If a third-country exporter of subject

---

[572] *See* Auxin's March 17, 2023 Rebuttal Brief at 13-16.
[573] *Id.* (citing *Preliminary Determinations*, 87 FR at 75224; and Policy Bulletin 05.1).
[574] *Id.* (citing *CRS from China (Vietnam)*, 83 FR at 23892).
[575] *Id.* (citing *CORE from China AD Investigation*, 81 FR at 35318).
[576] *Id.* (citing *Tissue Paper from China (Vietnam) Final Determination* IDM at Comment 5; and *Hangers from China (Vietnam)* IDM at Comment 5).
[577] *See Aluminum Foil* PDM at the section, "China's Status as a Non-Market Economy."
[578] *See Sparklers from China*, 56 FR 20588; s*ee also Silicon Carbide from China*, 59 FR 22585; and 19 CFR 351.107(d).
[579] *See Preliminary Determinations*, 87 FR at 75224.

115

merchandise wishes to have its own rate, it is incumbent upon that exporter to request a review."[580]

While exporters that are wholly-foreign owned do not need to demonstrate *de jure* and *de facto* independence from government control to receive a separate rate, they must nonetheless demonstrate that they are wholly owned by entities located in market-economy countries and that their ultimate owners are located in market-economy countries to receive a separate rate.[581] Such entities must demonstrate this by completing the relevant portions of Commerce's separate rate application.[582] As the CIT explained, while "… Commerce recognizes that companies organized outside of China are *per se* independent from the control of the {China} government" it is only "{o}nce a party demonstrates that it is foreign owned, {that} Commerce accords that company a rate separate from the {China}-wide rate."[583] Thus, Commerce's practice in NME cases is to require exporters inside and outside the NME country to demonstrate that they are not part of the NME-wide entity in order to obtain separate rate status.

There is no basis in this circumvention inquiry to grant separate rate status to companies that currently do not have a separate rate, or whose wafer suppliers do not have a separate rate. Commerce does not conduct a separate rates analysis in circumvention inquiries and did not do so here. The purpose of the circumvention statute is to give Commerce the authority, and the criteria to follow, to administer "AD and {CVD} orders in such a way as to prevent circumvention and diversion of U.S. law."[584] Therefore, Commerce focused its analysis in the circumvention inquiry on applying the relevant methodology in section 781 of the Act to determine whether circumvention was occurring and did not conduct a separate rates analysis. Commerce conducts separate rates analyses in administrative reviews.[585] Commerce conducts administrative reviews to determine "the amount of any antidumping duty,"[586] and a separate rates analysis is integral to this. Separately, Commerce conducts circumvention inquiries to establish whether certain goods must be subject to an order,[587] not to establish the duty rates for those goods. Further, Commerce's application of the China-wide entity AD rate to exporters that do not have their own separate rate, or whose wafer suppliers do not have a separate rate, in this circumvention inquiry is consistent with its practice in other circumvention inquiries involving

---

[580] *See Xanthan Gum from China 2016-2017* IDM at Comment 1.

[581] *See Chlorinated Isocyanurates from China 2019-2020 Preliminary Results* PDM ("{t}o establish whether a company is sufficiently independent to be eligible for a separate, company-specific rate, Commerce analyzes each exporting entity in an NME country under the test established in *Sparklers* as amplified in *Silicon Carbide*, and further refined by *Diamond Sawblades*. However, if Commerce determines that a company is wholly foreign-owned or located in a market economy (ME) country, then a separate-rate analysis is not necessary to determine whether it is independent from government control."); unchanged in *Chlorinated Isocyanurates from China 2019-2020 Final Results.*

[582] *See* https://enforcement.trade.gov/nme/nme-sep-rate.html.

[583] *See Decca Hospitality Furnishings*, 391 F. Supp. 2d at 1300.

[584] *See* Senate Report 100-71 at 101; *see also Tissue Paper from China (Vietnam) Final Determination* at Comment 1 ("The overall purpose of an anti-circumvention inquiry is to prevent the evasion of an AD order").

[585] *See Tissue Paper from China (Vietnam) Final Determination* IDM at Comment 5 ("{c}ontrary to MFVN's suggestion, in conducting this inquiry, the Department has not determined a cash deposit rate, conducted a separate rate analysis, or calculated an individual margin of dumping for MFVN, which is done during an administrative review.").

[586] *See* section 751(a)(1)(B) of the Act.

[587] *See* section 781(b) of the Act; *see also Bell Supply CAFC.*

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

China including, contrary to NextEra's claim, *CORE from China (Vietnam)* in which Commerce stated that it "will instruct CBP to require AD cash deposits equal to the rate established for the China-wide entity (199.43 percent) …"[588]

We disagree with NextEra's claim that Commerce reached a determination based on adverse facts available with respect to certain cooperative third-country exporters that do not have a separate rate by requiring cash deposits equal to the China-wide rate on U.S. entries of their inquiry merchandise.  Commerce made determinations based on adverse facts available only with respect to uncooperative companies.  As adverse facts available, Commerce determined that the uncooperative companies "exported inquiry merchandise and that U.S. entries of that merchandise are circumventing the *Orders*."[589]  Additionally, Commerce prohibited importers and exporters from using certain certifications with respect to U.S. entries of inquiry merchandise from the uncooperative companies.[590]  Commerce did not require a cash deposit equal to the China-wide rate on U.S. entries of inquiry merchandise from any company as part of an adverse facts available determination.  Rather, Commerce required that importers deposit ADs equal to the China-wide rate on entries of inquiry merchandise from cooperative third-country exporters only where the third-country exporters or their Chinese wafer supplier(s) do not have a separate rate.  In fact, a company that is barred from certifying that its exports contain no Chinese wafers or module components may still receive a company-specific rate if it already has such a rate under the *Orders* or if its Chinese wafer exporter has its own rate under the *Orders*.[591]

Both the CIT and the CAFC recognized that even if Commerce based the China-wide entity's dumping margin on adverse facts available, that "does not change its applicability to an NME entity that cooperated, but ultimately failed to qualify for a separate rate."[592]  For example, in *Advanced Technology*, the CIT stated:

> Commerce did not apply adverse facts available to {respondent}, Commerce rather found that {respondent} had not rebutted the presumption of state control and assigned it the {China}-wide rate.  These are two distinct legal concepts:  a separate AFA rate applies to a respondent who has received a separate rate but has otherwise failed to cooperate to the best of its ability whereas the {China}-wide rate applies to a respondent who has not received a separate rate.[593]

---

[588] *See CORE from China (Vietnam)*, 83 FR at 23896; *see also CORE from China AD Investigation*, 81 FR at 35318; *Tissue Paper from China (India) Final Determination* IDM at 15; *Aluminum Extrusions from China (Vietnam),* 84 FR at 39806*; Butt-Weld Pipe Fittings from China (Malaysia)*, 84 FR at 29165*;* and *SDGE from China (UK)* IDM at Comment 5.

[589] *See Preliminary Determinations*, 87 FR 75221, 75223.

[590] *Id.*

[591] *See Preliminary Determinations*, 87 FR at 75224; *see also* the section "Entries on or After Termination of the Proclamation" in the final determination notice dated concurrently with this memorandum.

[592] *See Walk-Behind Lawn Mowers from China* IDM at Comment 9 (citing *Diamond Sawblades Coalition*, 866 F.3d at 1313).

[593] *Id.* at Comment 9 (citing *Advanced Technology*, 938 F. Supp. 2d  at 1351 (citing *Watanabe Group*, 34 CIT 1545, Slip Op. 10-139 at 9, n. 8)).

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  From Malaysia 2022

Consequently, we will continue to instruct CBP to require a cash deposit equal to the China-wide rate on U.S. entries of inquiry merchandise from any company that neither has its own AD cash deposit rate, nor uses a wafer exporter in China with its own AD cash deposit rate.

## VIII.  RECOMMENDATION

Based on our analysis of the comments received and our findings at verification, we recommend adopting the above positions.  We recommend finding, based on the analysis and findings detailed above and in the *Preliminary Determination*, that imports of solar cells and modules, completed in Malaysia using certain parts and components manufactured in China, are circumventing the *Orders*, except for shipments complying with the certification requirements described in the *Federal Register* notice.

If this recommendation is accepted, we will publish the final determination in these inquiries in the *Federal Register*.

☒                              ☐
_____          _____
Agree                    Disagree

8/17/2023

X   *Lisa W. Wang*
_____

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:43 AM, Submission Status: Approved

**Appendix I - Acronyms/Abbreviations**

| Acronym/Abbreviation | Complete Name |
| --- | --- |
| $ | United States Dollars |
| ACCESS | Antidumping and Countervailing Duty Centralized Electronic Service System |
| AD | Antidumping Duty |
| AFA | Adverse Facts Available |
| APA | Administrative Procedure Act |
| APO | Administrative Protective Order |
| AR | Administrative Review |
| Auxin | Auxin Solar Inc. |
| bn | Billion |
| Boviet | Boviet Solar Technology Co., Ltd. |
| BPI | Business Proprietary Information |
| BYD HK | BYD (H.K.) Co., Ltd. |
| Shangluo BYD | BYD (Shangluo) Industrial Co., Ltd. |
| CAFC | U.S. Court of Appeals for the Federal Circuit |
| Cambodia | Kingdom of Cambodia |
| Canadian Solar or the Canadian Solar Group | Canadian Solar International Limited; Canadian Solar Manufacturing (Changshu) Inc.; Canadian Solar Manufacturing (Luoyang) Inc.; CSI Cells Co., Ltd.; CSI Solar Co., Ltd.; CSI Manufacturing (Fu Ning) Co., Ltd.; Canadian Solar Manufacturing (Thailand) Co., Ltd.; and Canadian Solar Manufacturing Vietnam Co., Ltd. |
| CBP | U.S. Customs and Border Protection |
| CCR | Changed Circumstances Review |
| CdTe | Cadmium Telluride |
| CEA | Clean Energy Associates, LLC |
| China | The People's Republic of China |
| CIT | U.S. Court of International Trade |
| COM | Cost of manufacturing |
| Commerce | The U.S. Department of Commerce |
| CORE | Certain Corrosion-Resistant Steel Products |
| CRS | Certain Cold-Rolled Steel Flat Products |
| CSIL | Canadian Solar International Limited |
| CSIL | Canadian Solar International Limited.  Also, any reference to the author of case briefs and rebuttals submitted by CSIL and any member of the Canadian Solar Group. |

| CSPV | Crystalline Silicon Photovoltaic |
| CVD | Countervailing Duty |
| Date of Termination | Date of termination of Presidential Proclamation 10414 |
| DOE | United States Department of Energy |
| EPCG | Export Promotion Capital Goods |
| ET | Eastern Time |
| EVA | Ethylene Vinyl Acetate |
| FA | Facts Available |
| First Solar Malaysia | First Solar Malaysia Sdn. Bhd. |
| First Solar Vietnam | First Solar Vietnam Manufacturing Co., Ltd. |
| FY | Fiscal Year |
| GW | Gigawatt |
| G&A | General and Administrative Expenses |
| Hanwha | Hanwha Q Cells Malaysia Sdn. Bdh. |
| HFC | Hydrofluorocarbon |
| HRS | Hot Rolled Steel |
| HTS | Harmonized Tariff Schedule |
| IDM | Issues and Decision Memorandum |
| IEA | International Energy Agency |
| Inquiry Countries | Cambodia, Malaysia, Thailand and Vietnam |
| ITC | U.S. International Trade Commission |
| Jinko | Jinko Solar Technology Sdn. Bhd./ Jinko Solar (Malaysia) Sdn. Bhd. |
| Le Shan Jinko | Jinko Solar (Le Shan) Co., Ltd |
| KHR | Cambodian Riel |
| LONGi | LONGi (H.K) Trading Limited in the Vietnam segment, and LONGi (Kuching) Sdn. Bhd. and LONGi Technology (Kuching) Sdn. Bhd. in the Malaysia segment |
| LWRPT | Light-Walled Rectangular Pipe and Tube |
| Maxeon | Maxeon Solar Technologies, Ltd. |
| mn | Million |
| MW | Megawatts |
| MYR | Malaysian Ringgit |
| NE Solar | New East Solar Energy (Cambodia) Co., Ltd. |
| NextEra | NextEra Energy Constructors, LLC |
| Ningbo Kyanite | Ningbo Kyanite International Trade Co., Ltd |
| NME | non-market economy |

| OCTG | Oil Country Tubular Goods |
|---|---|
| p/n | Positive/Negative |
| PDM | Preliminary Decision Memorandum |
| PERC | Passivated Emitter and Rear Contact |
| PET Film | Polyethylene Terephthalate Film, Sheet, and Strip |
| PLI | Product-Linked Incentive |
| POR | Period of Review |
| Q&V | Quantity and Value |
| R&D | Research and Development |
| Red Sun | Red Sun Energy Long An Company Limited |
| Risen | Risen Solar Technology Sdn. Bhd |
| RMB | Renminbi |
| Silfab | Silfab Solar WA Inc. |
| solar cells and modules | certain crystalline silicon photovoltaic cells, whether or not assembled into modules |
| Sonali | Sonali Energees USA LLC |
| Tata Power | Tata Power Solar System Limited |
| TBH | Thai Bhat |
| Thailand | Kingdom of Thailand |
| the Act | Tariff Act of 1930, as amended |
| The LONGi Group | LONGi (Kuching) Sdn. Bhd., LONGi Technology (Kuching) Sdn. Bhd. , LONGi (H.K.) Trading Limited, LONGi Solar Technology (H.K.) Limited, LONGi Solar Technology (U.S.) Inc. |
| THSM | Canadian Solar Manufacturing (Thailand) Co., Ltd. |
| Trina or the Trina Group | Trina Solar (Vietnam) Science & Technology Co., Ltd, Trina Solar Energy Development Company Limited, and Trina Solar Co., Ltd. in Vietnam segment and Trina Solar Science & Technology (Thailand) Ltd. in Thailand segment |
| TTL | Trina Solar Science & Technology (Thailand) Ltd. |
| TTL | Trina Solar Science & Technology (Thailand) Ltd. Also, any reference to the author of case briefs and rebuttals submitted by TTL and any member of the Trina Group. |
| TSSD | Trina Solar (Singapore) Science & Technology Pte. Ltd. |

| | |
|---|---|
| TCZ | Trina Solar Co., Ltd. |
| URAA | Uruguay Round Agreements Act |
| Vietnam | Socialist Republic of Vietnam |
| Vina | Vina Solar Technology Company Limited |
| Vina Cell | Vina Cell Technology Company Limited |
| VND | Vietnamese Dong |
| VSUN | Vietnam Sunergy Joint Stock Company |
| Websol Energy | Websol Energy System Limited |

### Appendix II - Court and Case Citation Table
### This Section is Sorted by Short Citation

| Short Citation | Administrative Case Determinations |
|---|---|
| *2003 Policy Bulletin* | *Proposed Policies Regarding the Conduct of Changed Circumstance Reviews of the Countervailing Duty Order on Softwood Lumber from Canada (C 122 839)*, 68 FR 37456 (June 24, 2003) |
| *2021 Regulations Final Rule* | *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021) |
| *Activated Carbon from China* | *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 53214 (October 22, 2018), and accompanying IDM |
| *Orders* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order*, 77 FR 73017 (December 7, 2012) |
| *AD Order* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012) |
| *Adoption of CFR 351.228* | *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021) |
| *Advanced Technology* | *Advanced Technology & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1351 (CIT 2013) (citing Watanabe Group v. United States, 34 CIT 1545 (CIT 2010), Slip Op. 10-139 |
| *Ajmal Steel* | *Ajmal Steel Tubes & Pipes Indus. LLC v. United States*, Slip Op. 22-121 (CIT October 28, 2022) |
| *AK Steel Corp.* | *AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) |
| *Al Ghurair CAFC 2023* | *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351 (Fed. Cir. 2023) |
| *Al Ghurair CIT 2021* | *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (CIT 2021) |

| | |
|---|---|
| *Alaska* | *Alaska Pro. Hunters Ass'n v. FAA*, 177 F.3d 1030, 1033-34, 1036 (D.C. Cir. 1999) |
| *Albemarle Corp.* | *Albemarle Corp. & Subsidiaries v. United States*, 8*21 F.3d 1345 (Fed. Cir. 2016)* |
| *Allegheny v. U.S.* | *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368 (Fed. Cir. 2003) |
| *Aluminum (Taishan) Co.* | *Aluminum (Taishan) Co. v. United States,* 983 F.3d 487 (Fed. Cir. 2020) |
| *Aluminum Extrusions from China* | *Aluminum Extrusions from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 FR 18524 (April 4, 2011) |
| *Aluminum Extrusions from China (Vietnam)* | *Aluminum Extrusions from the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders, and Partial Rescission*, 84 FR 39805 (August 12, 2019) |
| *Aluminum Extrusions from China Minor Alterations Circumvention Final* | *Aluminum Extrusions from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders and Rescission of Minor Alterations Anti-Circumvention Inquiry*, 82 FR 34630 (July 26, 2017), and accompanying IDM |
| *Aluminum Extrusions from China Preliminary CCR* | *Aluminum Extrusions from the People's Republic of China: Initiation and Preliminary Results of Expedited Changed Circumstances Review*, 83 FR 34548 (July 20, 2018) |
| *Aluminum Foil from China* | *Certain Aluminum Foil from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 83 FR 9282 (March 5, 2018) |
| *Aluminum Foil from China (Korea and Thailand)* | *Antidumping and Countervailing Duty Orders on Certain Aluminum Foil from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to the Republic of Korea and the Kingdom of Thailand,* 88 FR 17177 (March 22, 2023) |
| *Aluminum Foil from China (Korea and Thailand) Preliminary* | *Antidumping and Countervailing Duty Orders on Certain Aluminum Foil from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to the Republic of Korea and the Kingdom of Thailand*, 88 FR 17177 (March 22, 2023), and accompanying PDM |
| *Aluminum Foil from Oman* | *Certain Aluminum Foil from the Sultanate of Oman: Final Affirmative Countervailing Duty Determination*, 86 FR 52888 (September 23, 2021) |

| | |
|---|---|
| Aluminum Foil PDM | *Antidumping Duty Investigation of Certain Aluminum Foil from the People's Republic of China:  Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination*, 82 FR 50858, 50861 (November 2, 2017), and accompanying PDM (citing Memorandum, "China's Status as a Non-Market Economy," dated October 26, 2017) |
| Aluminum Sheet from Bahrain | *Common Alloy Aluminum Sheet from Bahrain:  Final Affirmative Countervailing Duty Determination*, 86 FR 13333 (March 8, 2021) |
| Amanda Foods CIT | *Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d at 1381 |
| Antidumping and Countervailing Duties FR | *Antidumping Duties; Countervailing Duties*, 61 FR 7308 (February 27, 1996) |
| Antidumping Duties; Countervailing Duties; Final Rule | *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27340 (May 19, 1997) |
| API v. U.S. | *API v. United States EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) |
| Appelton Papers Inc. | *Appelton Papers Inc. v. United States*,  37 CIT 1034 Slip Op.13-87 (July 2013) |
| Archer Daniels | *Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1279 (CIT 2014) |
| Ass'n of Priv. Sector | *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462-63 (D.C. Cir. 2012) |
| Ausimont | *Ausimont United States v. United States*, 882 F. Supp. 1087, 1098 (CIT 1995) |
| B.F. Goodrich v. U.S. | *B.F. Goodrich Co. v. United States*, 794 F. Supp. 1148 (CIT 1992) |
| Baker Hostetler | *Baker Hostetler v. United States*, 473 F.3d 312 (D.C. Cir. 2006) |
| Ball Bearings from Thailand | *Final Affirmative Countervailing Duty Determination and Partial Countervailing Duty Order:  Ball Bearings and Parts Thereof from Thailand; Final Negative Countervailing Duty Determinations:  Antifriction Bearings (Other Than Ball or Tapered Roller Bearings) and Parts Thereof from Thailand*, 54 FR 19130 (May 3, 1989) |
| Beijing Tianhai | *Beijing Tianhai Industry Co. v. United States*, 52 F. Supp. 3d 1351 (CIT 2015) |
| Bell Supply CAFC | *Bell Supply Co., LLC v. United States*, 888 F.3d 1222 (Fed. Cir. 2018) |

| | |
|---|---|
| *Bethlehem Steel v. U.S.* | *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (CIT 2001) |
| *Bloomberg Report* | BloombergNEF, Solar PV Trade and Manufacturing: A Deep Dive (2021) |
| *BMW of N. Am. LLC* | *BMW of N. Am. LLC v. United States*, 926 F.3d 1291 (Fed. Cir. 2019) |
| *Bomont Indus.* | *Bomont Indus. v. United States*, 733 F. Supp. 1507 (CIT 1990) |
| *Borusan v. American Cast Iron Pipe* | *Borusan Mannesmann Boru Sanayi v. American Cast Iron Pipe Co.*, Ct. No. 20-2014 2021 U.S. App. (Fed. Cir. 2021) |
| *Borusan  2015* | *Borusan Mannesmann Boru Sanayi v Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (CIT 2015) |
| *Borusan  2017* | *Borusan Mannesmann Boru Sanayi v Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1327-30, *aff'd* 857 F.3d 1353 (Fed. Cir. 2017) |
| *Bowen* | *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) |
| *Brass Sheet and Strip from Canada* | *Brass Sheet and Strip from Canada:  Final Affirmative Determination of Circumvention of Antidumping Duty Order,* 58 FR 33610 (June 18, 1993), and accompanying IDM |
| *Building Sys. De Mex.* | *Building Sys. De Mex., S.A. de C.V. v. United States*, 567 F. Supp. 3d 1306, 1316 (CIT 2022) |
| *Butt-Weld Pipe Fittings from China (Malaysia)* | *Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 84 FR 29164 (June 21, 2019) |
| *Butt-Weld Pipe Fittings from China (Thailand)* | *See Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 59 FR 15155 (March 31, 1994) |
| *Canada – Feed-In Tariff Program* | *Canada – Measures Relating to the Feed-In Tariff Program, (WT/DS426/AB/R)*, adopted May 6, 2013 |
| *Canadian Solar CAFC* | *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 919 (Fed. Cir. 2019) |
| *Carbon and Alloy Steel Wire Rod from Italy* | *Countervailing Duty Investigation of Carbon and Alloy Steel Wire Rod from Italy:  Final Affirmative Determination*, 83 FR 13242 (March 28, 2018) |
| *Carbon Steel Flanges from Italy* | *Finished Carbon Steel Flanges from Italy:  Final Determination of Sales at Less Than Fair Value,*  82 FR 29481 (June 29, 2017), and accompanying IDM |

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  From Malaysia 2022

| | |
|---|---|
| *Carlisle Tire & Rubber v. U.S.* | *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (CIT 1983) |
| *Cathedral Candle* | *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1366 (Fed. Cir. 2005) |
| *Celik Halat* | *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348 (CIT 2022) |
| *Ceramica Regiomontana* | *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (CIT 1986) |
| *Certain Pasta from Italy AR11* | *Certain Pasta from Italy:  Final Results of the Eleventh (2006) Countervailing Duty Administrative Review*, 74 FR 5922 (February 3, 2009) |
| *Certain Pasta from Italy AR7* | *Certain Pasta from Italy:  Final Results of the Seventh Countervailing Duty Administrative Review*, 69 FR 70657 (December 7, 2004) |
| *Certain Steel Products from Korea* | *Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations:  Certain Steel Products from Korea*, 58 FR 37338 (July 9, 1993) |
| *Certain Wheat from Canada* | *Final Affirmative Countervailing Duty Determinations: Certain Durum Wheat and Hard Red Spring Wheat from Canada*, 68 FR 52747 (September 5, 2003) |
| *Cf. Stark v. Wickard* | *Cf. Stark v. Wickard,* 321 U.S. 288 (1944) |
| *CFS from China* | *Coated Free Sheet Paper from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 72 FR 60645 (October 25, 2007) |
| *Changzhou Trina Solar Energy v. U.S. (2016)* | *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334 (CIT 2016) aff'd 264 F. Supp. 3d 1325, 1334 (CIT 2017) |
| *Changzhou Trina Solar Energy v. U.S. (2018)* | *Changzhou Trina Solar Energy Co. Ltd. v. United States*, 352 F. Supp. 3d 1316 (CIT 2018) |
| *Changzhou Trina Solar Energy v. U.S. (2020)* | *Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287 (CIT 2020) |
| *Changzhou Wujin Fine Chem* | *Changzhou Wujin Fine Chem. Factory Co. v. United States,* 701 F.3d 1367 (Fed. Cir. 2012) |
| *Chevron* | *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) |
| *Chlorinated Isocyanurates from China* | *Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review, and Partial Rescission of Countervailing Duty Administrative Review*, 82 FR 27466 (June 15, 2017) |

| | |
|---|---|
| *Chlorinated Isocyanurates from China 2019-2020 Final Results* | *Chlorinated Isocyanurates from the People's Republic of China:  Final Determination of No Shipments; 2019–2020 Administrative Review*, 86 FR 36253 (July 9, 2021) |
| *Chlorinated Isocyanurates from China 2019-2020 Preliminary Results* | *Chlorinated Isocyanurates from the People's Republic of China:  Preliminary Determination of No Shipments; 2019-2020*, 86 FR 13291 (March 8, 2021) |
| *Cinsa* | *Cinsa, S.A. de C.V. v. United States*, 966 F. Supp. 1230 (CIT 1997) |
| *Circular Welded Carbon-Quality Steel Pipe from China (Vietnam) Preliminary* | *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China:  Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 88 FR 21975 (April 12, 2023) |
| *Circular Welded Carbon-Quality Steel Pipe from Oman* | *Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman:  Final Affirmative Countervailing Duty Determination*, 77 FR 64473 (October 22, 2012) |
| *CITIC Trading Company, Ltd. Remand* | *Final Results of Redetermination Pursuant to Court Remand, CITIC Trading Company, Ltd. v. United States of America and ABC Coke, et al:  Final Results Pursuant to Remand*, Court No. 01-00901, Slip Op. 03-23 (CIT March 4, 2003), dated June 17, 2003, available at https://access.trade.gov/resources/remands/03-23.pdf |
| *Citric Acid from China* | *Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review*, 77 FR 72323 (December 5, 2012) |
| *COALITION I* | *Comm. Overseeing Action for Lumber Int'l Trade Investigations v. United States*, 483 F. Supp. 3d 1253 (CIT 2020) |
| *COALITION II* | *Comm. Overseeing Action for Lumber Int'l Trade Investigations v. United States*, 535 F. Supp. 3d 1336 (CIT 2021) |
| *Coated Paper from China* | *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 75 FR 59212 (September 27, 2010) |
| *Cold Rolled Steel from China (Vietnam) Preliminary* | *Certain Cold-Rolled Steel Flat Products from the People's Republic of China:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 82 FR 58178 (December 11, 2017) |

| | |
|---|---|
| *CORE from China (Guatemala)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Negative Final Determination of Circumvention Involving Guatemala,* 85 FR 41954 (July 13, 2020) |
| *CORE from China (Guatemala) Preliminary* | *Negative Preliminary Determination of Circumvention Involving Guatemala:  Certain Corrosion-Resistant Steel Products from the People's Republic of China*, 85 FR 8840 (February 18, 2020) |
| *CORE from China (Malaysia) Final* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention Involving Malaysia,* 86 FR 30263 (June 7, 2021) |
| *CORE from China (Malaysia) Preliminary* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention Involving Malaysia,* 85 FR 8823 (February 18, 2020) |
| *CORE from China (South Africa)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Negative Final Determination of Circumvention Involving South Africa, 86 FR 30253 (June 7, 2021), and accompanying IDM* |
| *CORE from China (South Africa) Preliminary* | *Negative Preliminary Determination of Circumvention Involving South Africa:  Certain Corrosion-Resistant Steel Products from the People's Republic of China,* 85 FR 8844 (February 18, 2020) |
| *CORE from China (UAE)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 FR 41957 (July 13, 2020) |
| *CORE from China (UAE) Preliminary* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention Involving the United Arab Emirates*, 85 FR 8841 (February 18, 2020) |
| *CORE from China (Vietnam)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders,* 83 FR 23895 (May 23, 2018) |

| | |
|---|---|
| CORE from China AD Investigation | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 35316 (June 2, 2016) |
| CORE from Korea (Vietnam) | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Final Determinations of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 84 FR 7034 (December 26, 2019) |
| CORE from Taiwan (Malaysia) | *Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Final Determination of Circumvention Involving Malaysia*, 86 FR 30257 (June 7, 2021) |
| CORE from Taiwan Final | *Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Final Determination of Circumvention Inquiry on the Antidumping Duty Order*, 84 FR 70937 (December 26, 2019) |
| CORE from Taiwan Preliminary Determination | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 32875 (July 10, 2019) |
| CRS from Brazil | *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from Brazil:  Final Affirmative Determination,* 81 FR 49940 (July 29, 2016), and accompanying IDM |
| CRS from China (Vietnam) | *Certain Cold-Rolled Steel Flat Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 FR 23891 (May 23, 2018) |
| CRS from Korea (Vietnam) | *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Affirmative Final Determinations of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 70948 (December 26, 2019) |
| CRS from Korea (Vietnam) Preliminary | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 32875 (July 10, 2019) |

| | |
|---|---|
| CVD Order | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order*, 77 FR 73017 (December 7, 2012) |
| CVP 23 from China | *Carbazole Violet Pigment 23 from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 75 FR 36630 (June 28, 2010) |
| CWCS from India (Oman and India) Final | *Certain Welded Carbon Steel Standard Pipes and Tubes from India: Final Negative Determinations of Circumvention of the Antidumping Duty Order*, 88 FR 12917 (March 1, 2023) |
| CWCS from India (Oman and India) Preliminary | *Preliminary Negative Determinations of Circumvention of the Antidumping Order: Certain Welded Carbon Steel Standard Pipes and Tubes from India*, 87 FR 52507 (August 26, 2022) |
| DAK Americas | *DAK Americas LLC v. United States*, 517 F. Supp. 3d 1349, 1360 (CIT 2021) |
| Decca Hospitality Furnishings | *Decca Hospitality Furnishings, LLC, et al. v. United States*, 391 F. Supp. 2d 1298 (August 2005) |
| Diamond Sawblades (Thailand) | *Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Determination of AntiCircumvention Inquiry*, 84 FR 33920 (July 16, 2019) |
| Diamond Sawblades (Thailand) Preliminary | *Diamond Sawblades and Parts Thereof from the People's Republic of China: Preliminary Affirmative Determination of Circumvention*, 83 FR 57425 (November 15, 2018) |
| Diamond Sawblades Coalition | *Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304, 1313 (Fed. Cir. 2017) |
| Diamond Sawblades Coalition CIT | *Diamond Sawblades Manufacturers Coalition v. United States*, 816 F. Supp. 2d 1342 (CIT January 2012) |
| Dillinger France | *Dillinger France S.A. v. United States,* 981 F.3d 1318, 1322 (Fed. Cir. 2020) |
| Dongtai Peak | *Dongtai Peak Honey Indus. v. United States,* 777 F.3d 1343 (Fed. Cir. 2015) |
| Encino Motorcars | *Encino Motorcars, LLC v. Navarro*, 570 U.S. 211 (2016) |
| Ericsson | *Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995) |
| Essar Steel | *Essar Steel Ltd. v. United States,* 678 F.3d 1268 (Fed. Cir. 2012) |

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  From Malaysia 2022

| | |
|---|---|
| *F Lli De Cecco* | *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 980 F. Supp 485 (CIT 1997) |
| *F Lli De Cecco Fed. Cir.* | *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) |
| *FDA v. Brown & Williamson* | *FDA v. Brown & Williamson Tobacco*, 529 U.S. 120 (2000) |
| *PSF from Korea* | *Fine Denier Polyester Staple Fiber from the Republic of Korea:  Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24743 (May 30, 2018) |
| *PSF from Taiwan* | *Fine Denier Polyester Staple Fiber from Taiwan: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24745 (May 30, 2018) |
| *Federal–Mogul Corp.* | Federal–Mogul Corp. v. United States, 63 F.3d 1572, 1575 (Fed. Cir. 1995) |
| *Ferrostaal Metals GmbH* | *Ferrostaal Metals GmbH v. United States*, 518 F. Supp. 3d 1357 (CIT 2021) |
| *Ferrovanadium from China Final Determination* | *Notice of Final Determination of Sales at Less Than Fair Value:  Ferrovanadium from the People's Republic of China*, 67 FR 71137 (November 29, 2002) |
| *Ferrovanadium from China Preliminary Determination* | *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Ferrovanadium from the People's Republic of China*, 67 FR 45088 (July 8, 2002) |
| *Ferrovanadium from Russia Final Determination* | *Ferrovanadium and Nitrided Vanadium from the Russian Federation:  Negative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 46712 (August 6, 2012) |
| *Ferrovanadium from Russia Preliminary Determination* | *Preliminary Negative Determination and Extension of Time Limit for Final Determination of Circumvention of the Antidumping Duty Order on Ferrovanadium and Nitrided Vanadium from the Russian Federation*, 77 FR 6537 (February 8, 2012) |
| *Fish Fillets from Vietnam* | *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and New Shipper; 2010-2011*, 78 FR 17350 (March 21, 2013), and accompanying IDM |

| | |
|---|---|
| *Fish Fillets from Vietnam (Cambodia)* | *Circumvention and Scope Inquiries on the Antidumping Duty Order on Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Partial Affirmative Final Determination of Circumvention of the Antidumping Duty Order, Partial Final Termination of Circumvention Inquiry and Final Rescission of Scope Inquiry*, 71 FR 38608 (July 7, 2006) |
| *Fort Stewart* | *Fort Stewart Schs. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990) |
| *Fource Glass Co.* | *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222 (1957) |
| *Gallant Ocean (Thai.) Co.* | *Gallant Ocean (Thai.) Co., v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) |
| *Glycine from China (India)* | *Glycine from the People's Republic of China:  Final Partial Affirmative Determination of Circumvention of the Antidumping Duty Order*, 77 Fed. Reg. 73,426 (December 10, 2012) |
| *Glycine from India CVD* | *Glycine from India:  Final Results of Countervailing Duty Administrative Review; 2020,* 87 FR 76611 (December 15, 2022) |
| *Granular PTFE Resin from Italy* | *Polytetrafluoroethylene Resin from Italy:  Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 58 FR 26100 (April 30, 1993) |
| *Graphite Electrodes from China (U.K.) Prelim* | *Small Diameter Graphic Electrodes from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 77 FR 33405, 33413 (June 6, 2012) |
| *Grobest* | *Grobest & I-Mei Industries (Vietnam) Co., Ltd. v. United States*, 815 F. Supp. 2d 1342 (CIT 2012) |
| *Hangers from China (Vietnam)* | *Steel Wire Garment Hangers from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order,* 76 FR 66895 (October 28, 2011), and accompanying IDM |
| *Hangers from China (Vietnam) Preliminary Determination* | *Steel Wire Garment Hangers from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Order and Extension of Final Determination*, 76 FR 27007 (May 10, 2011) |

| | |
|---|---|
| Hardwood Plywood from China | *Certain Hardwood Plywood Products from the People's Republic of China:  Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 FR 46470 (July 20, 2023) |
| HFCs from China (India) | *Hydrofluorocarbon Blends from the People's Republic of China:  Final Negative Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-401A Blend; Affirmative Final Determination of Circumvention of the Antidumping Duty Order by Indian Blends Containing Chinese Components*, 85 FR 61930 (October 1, 2020) |
| HFCs from China (India) Preliminary | *Hydrofluorocarbon Blends from the People's Republic of China:  Preliminary Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-410A Blend; Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Indian Blends Containing Chinese Components*, 85 FR 20244 (April 10, 2020) |
| Hot-Rolled Lead and Bismuth | *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom; Negative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders*, 64 FR 40336 (July 26, 1999) |
| Hot-Rolled Steel from Korea AD | *Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 32720 (July 9, 2019) |
| Huvis | *Huvis Corp. v. United States*, 570 F.3d 1347, 1356 (Fed. Cir. 2009) |
| Hyundai Electricity CAFC | *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078 (Fed. Cir. 2021) |
| Hyundai Electricity CIT | *Hyundai Electric & Energy Systems Co., Ltd v. United States*, 477 F. Supp.3d 1324, 132 (CIT 2020) |
| I.N.S. | *I.N.S. v. Enrico St. Cyr*, 533 U.S. 289, 316 (2001) |
| Initiation Notice Dated February 2, 2023 | *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 FR 7060, 71062 (February 2, 2023) |
| Inmax SDN | *Inmax SDN v. United States*, 277 F. Supp. 3d 1367 (CIT 2017) |
| Invenergy | Invenergy Renewables LLC v. United States, 422 F. Supp. 3d 1255, 1285 (CIT 2019) |
| Jiasheng | *Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States*, 28 F. Supp. 3d 1317 (CIT 2014) |
| Kisor | *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) |

| | |
|---|---|
| *KYD, Inc.* | *KYD, Inc. v. United States*, 607 F.3d 760, 767-68 (Fed. Cir. 2010) |
| *Lined Paper Products from India* | *Certain Lined Paper Products from India:  Notice of Final Results of the First Antidumping Duty Administrative Review*, 74 FR 17149 (April 14, 2009) |
| *LWR from China (Vietnam) Preliminary* | *Light-Walled Rectangular Pipe and Tube from the People's Republic of China:  Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 88 FR 21985 (April 12, 2023) |
| *LWR from Taiwan (Vietnam) Preliminary* | *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan:  Preliminary Affirmative Determination of Circumvention of the Antidumping Duty Order*, 88 FR 21980 (April 12, 2023) |
| *Macao CIT* | *Macao Commer. & Indus. Spring Mattress Mfr. v. United States,* 437 F. Supp. 3d 1324 (CIT 2020) |
| *Max Fortune Indus. Co.* | *Max Fortune Indus. Co. v. United States*, Slip Op. 13-52 (CIT 2013), 37 CIT 549, 560-62 (CIT 2013) |
| *Merck Sharp & Dohme Corp. v. Albrecht* | *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) |
| *Michigan* | *Michigan v. EPA*, 576 U.S. 743, 752 (2015) |
| *Mid Continent* | *Mid Continent Steel & Wire, Inc. v. United States*, Slip Op. 2023-45 (CIT 2023) |
| *Mitsubishi Elec. Corp.* | *Mitsubishi Elec. Corp. v. United States,* 700 F. Supp. 538, 555 (CIT 1988), *aff'd* 898 F. 2d 1577 (Fed. Cir. 1990) |
| *Mitsubishi Heavy Industries* | *Mitsubishi Heavy Industries v. United States,* 986 F. Supp. 1428 (CIT 1997) |
| *Mukund CIT* | *Mukand, Ltd. v. United States*, 37 CIT 443, 452 (CIT 2013) |
| *Mukund Fed. Cir.* | *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir. 2014) |
| *Nails from Malaysia CCR Initiation* | *Certain Steel Nails from Malaysia:  Initiation of Antidumping Duty Changed Circumstances Review*, 80 FR 71772 (November 17, 2015) |
| *Nails from Oman* | *Final Results of Antidumping Duty Administrative Review; 2021:  Certain Steel Nails from the Sultanate of Oman*, 87 FR 78639 (December 22, 2022) |
| *Nippon Steel* | *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) |

| | |
|---|---|
| *OCTG from China (Brunei and Philippines)* | *Oil Country Tubular Goods from the People's Republic of China:  Final Affirmative Determinations of Circumvention,* 86 FR 67443 (November 26, 2021) |
| *OCTG from China (Brunei and Philippines) Preliminary* | *Oil Country Tubular Goods from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention,* 86 FR 43627 (August 10, 2021) |
| *OCTG from China CCR* | *Oil Country Tubular Goods from the People's Republic of China:  Final Results of Antidumping and Countervailing Duty Changed Circumstances Reviews,* 87 FR 15915 (March 21, 2022) |
| *Off-the-Road Tires from China* | *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 40485 (July 15, 2008), and accompanying IDM |
| *Oman Fasteners* | *Oman Fasteners LLC v. United States,* Slip Op. 23-17 (February 22, 2023) |
| *Omnibus Trade & Competitiveness Act* | Conference Report to the 1988 Omnibus Trade & Competitiveness Act, H.R. Rep. No. 100-576, (1988), at 590, reprinted in 1988 U.S.C.C.A.N. 1547, 1623-24 |
| Omnibus Trade Act, Report of the Senate Finance Committee | Omnibus Trade Act, Report of the Senate Finance Committee, S. Rep. No. 71, 100th Cong., 1st Sess. 100 (1987) |
| *Paper from Brazil SII* | *Certain Uncoated Paper from Brazil:  Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Successor-in-Interest Determination; 2019-2020,* 86 FR 30000 (June 4, 2021), unchanged in *Certain Uncoated Paper from Brazil:  Final Results of Antidumping Duty Administrative Review; 2019-2020,* 86 FR 55820 (October 7, 2021) |
| *Pasta from Italy (U.S.) Circumvention* | *Certain Pasta from Italy:  Affirmative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders,* 68 FR 54888 (September 19, 2003) |
| *Pasta from Italy (U.S.) Circumvention Preliminary* | *Certain Pasta from Italy:  Affirmative Preliminary Determinations of Circumvention of Antidumping and Countervailing Duty Orders,* 68 FR 46571 (August 6, 2003) |
| *Pasta from Italy Circumvention Final* | *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order,* 63 FR 54672 (October 13, 1998) |

| | |
|---|---|
| *Pasta from Italy Circumvention Preliminary* | *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 63 FR 18364 (April 15, 1998) |
| *Peer Bearing Co.* | *Peer Bearing Co. v. United States*, 36 CIT 1700 (2012) |
| *Perez* | *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) or *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015) |
| *Pesquera Mares* | Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1380 (Fed. Cir. 2001) |
| *PET Film from India* | *Polyethylene Terephthalate Film, Sheet, and Strip from India:  Preliminary Results of Countervailing Duty Administrative Review, and Rescission, in Part; 2020,* 87 FR 48453 (August 9, 2022), and accompanying PDM |
| *PET Film from India Final* | *Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from India:  Final Results of Countervailing Duty Administrative Review; 2020,* 87 FR 76024 (December 12, 2022), and accompanying IDM |
| *PET Film from the UAE Preliminary Determination* | *Preliminary Negative Determination of Circumvention of the Antidumping Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, 80 FR 26229 (May 7, 2015) |
| *PET Film from the UAE (Bahrain)* | *Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates:  Negative Final Determination of Circumvention of the Antidumping Duty Order*, 80 FR 47463 (August 7, 2015) |
| *Pipe and Tube from India (Oman and UAE)* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India:  Final Negative Determinations of Circumvention of the Antidumping Order*, 88 FR 12917 (March 1, 2023) |
| *Pipe and Tube from India (Oman and UAE) Preliminary* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India:  Preliminary Negative Determinations of Circumvention of the Antidumping Order*, 87 FR 52507 (August 26, 2022) |
| *Plywood from China (Vietnam) Final* | *Certain Hardwood Plywood Products from the People's Republic of China:  Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders,* 88 FR 46740 (July 20, 2023), and accompanying IDM |

| | |
|---|---|
| *Plywood from China (Vietnam) Preliminary* | *Certain Hardwood Plywood Products from the People's Republic of China:  Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders,* 87 FR 45753 (July 29, 2022), and accompanying PDM |
| Policy Bulletin 05.1 | Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in Investigations involving Non-Market Economy Countries," (April 5, 2005), available on Commerce's website at https://www.trade.gov/policy-bulletin-051 |
| Policy Bulletin 94.1 | Enforcement and Compliance's Policy Bulletin No. 94.1, regarding, "Cost of Production - Standards for Initiation of Inquiry," (March 25, 1994), available on Commerce's website at https://www.trade.gov/policy-bulletin-941 |
| *Polyvinyl Alcohol from China Final Determination* | *Notice of Final Determination of Sales at Less Than Fair Value:  Polyvinyl Alcohol from the People's Republic of China,* 68 FR 47538 (August 11, 2003) |
| *Polyvinyl Alcohol from China Preliminary Determination* | *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Polyvinyl Alcohol from the People's Republic of China,* 68 FR 13674 (March 20, 2003) |
| *Preamble (Final Rule)* | *Antidumping Duties; Countervailing Duties,* 62 FR 27296 (May 19, 1997) |
| *Preserved Mushrooms from China* | *Certain Preserved Mushrooms from the People's Republic of China:  Final Results and Final Partial Rescission of the Sixth Administrative Review,* 71 FR 40477 (July 17, 2006) |
| *Presidential Proclamation 10414* | *Proclamation No. 10414, Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia,* 87 FR 35067 (June 9, 2022) |
| *Presidential Proclamation 10414 Final Rule Preamble* | *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414,* 87 FR 56868 (September 16, 2022) |
| *Presidential Proclamation 10414 Proposed Rule* | *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414:  Proposed Rule,* 87 FR 39426 (July 1, 2022) |

| | |
|---|---|
| *PrimeSource Bldg. Prods.* | *PrimeSource Bldg. Prods. v. United States*, 497 F. Supp. 3d 1333 (CIT 2021) (citing U.S. Const. art I, § 8, cl. 1 & cl. 3) |
| *Procedures for Importation of Supplies for Use in Emergency Relief Work* | *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 FR 63230 (October 30, 2006) |
| *Pure Magnesium from Canada CCR Initiation* | *Initiation of Changed Circumstances Countervailing Duty Administrative Reviews; Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 41473 (September 10, 1992) |
| *QSPs from China CCRs* | *Certain Quartz Surface Products from the People's Republic of China:  Initiation of Antidumping and Countervailing Duty Changed Circumstances Reviews; Global Stone,* 88 FR 41377 (June 26, 2023); and *Certain Quartz Surface Products from the People's Republic of China:  Initiation of Antidumping and Countervailing Duty Changed Circumstances Reviews; AM Stone,* 88 FR 41386 (June 26, 2023) |
| *Retail Carrier Bags from Taiwan Final Determination* | *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 79 FR 61056 (October 9, 2014)) |
| *Retail Carrier Bags from Taiwan Preliminary Determination* | *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 79 FR 31302 (June 2, 2014) |
| *Roberto* | *Roberto v. Dep't of Navy*, 440 F.3d 1341 (Fed. Cir. 2006) |
| *Romani* | *United States v. Est. of Romani*, 523 U.S. 517 (1998) |
| S. Rep. No. 103-412 | Joint Report of the Committee on Finance, Committee on Agriculture Nutrition and Forestry, Committee on Governmental Affairs of the United States Senatre to Accompany S. 2467, Uruguay Round Agreements Act |
| SAA | Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, Vol. I (1994) |
| *Saddler* | *Saddler v. Dep't of the Army*, 68 F.3d 1357, 1358 (Fed. Cir. 1995) |
| *Save Domestic Oil* | *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004) |
| *SDGE from China* | *Small Diameter Graphite Electrodes from the People's Republic of China:  Final Results of the First Administrative Review of the Antidumping Duty Order and Final Rescission of the Administrative Review, in Part*, 76 FR 56397 (September 13, 2011) |

| | |
|---|---|
| SDGE from China (UK) | *Small Diameter Graphite Electrodes from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 47596 (August 9, 2012) |
| Senate Report 100-71 | *U.S. Senate, Committee on Finance, Omnibus Trade Act of 1987*, S. Rep. No. 100-71, at 101 (1987) |
| Shakeproof Tool Works, Inc. | *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) |
| Shanghai Sunbeauty Trading Co. | *Shanghai Sunbeauty Trading Co. v. United States*, 380 F. Supp. 3d. 1328 (CIT 2019) |
| Shelter Forest CIT | *Shelter Forest Int'l Acquisition, Inc. v. United States*, Slip Op. 2021-90 (CIT 2021) |
| Shenzhen Xinboda | *Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 494 F. Supp. 3d 1347 (CIT 2021) |
| Shrimp from China | *Certain Frozen Warmwater Shrimp from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 85 FR 83891 (December 23, 2020), and accompanying IDM |
| Silicon Carbide from China | *Notice of Final Determination of Sales at Less Than Fair Value:  Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994), |
| Silicon Metal from Brazil | *Silicon Metal from Brazil:  Final Affirmative Countervailing Duty Determination*, 83 FR 9838 (March 8, 2018), and accompanying IDM |
| SKF CIT | *SKF USA Inc. v. United States*, 675 F. Supp. 2d 1264 (CIT 2009) |
| Skidmore | *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) |
| Smith Corona | *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Cir. 1990)) |
| Softwood Lumber from Canada | *Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017), and accompanying IDM |
| Solar Cells from China 2017-2018 AR | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 62275 (October 2, 2020), and accompanying IDM |
| Solar Cells from China Investigation | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Determination of Sales at Less Than* |

|  |  |
|---|---|
|  | *Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012) |
| Solar Products from China | *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Final Determination of Sales at less Than Fair Value*, 79 FR 76970 (December 23, 2014) |
| Solaria Scope Ruling | Memorandum, "The Solaria Corporation Scope Ruling," dated April 8, 2021 (placed on the record in NextEra's Letter, "Pre-Preliminary Determination Comments," dated October 20, 2022, at Attachment 22 |
| Sonali Scope Application | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Sonali Scope Application," dated January 25, 2023 |
| Sonali Scope Inquiry | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Sonali Scope Inquiry," dated January 20, 2023 |
| Soybean Meal from India AD | *Final Affirmative Determination of Sales at Less than Fair Value: Organic Soybean Meal from India*, 87 FR 16458 (March 23, 2022) |
| Soybean Meal from India CVD | *Final Affirmative Countervailing Duty Determination of Sales at Less than Fair Value: Organic Soybean Meal from India*, 87 FR 16453 (March 23, 2022) |
| Sparklers from China | *Notice of Final Determination of Sales at Less Than Fair Value: Sparklers from the People's Republic of China*, 56 FR 20588 (May 6, 1991) |
| SSF from India SII | *Stainless Steel Flanges from India: Preliminary Results of Antidumping Duty Administrative Review, Preliminary Successor-in-Interest Determination, and Partial Rescission; 2019-2020,* 86 FR 60792 (November 4, 2021), unchanged in *Stainless Steel Flanges from India: Final Results of Antidumping Duty Administrative Review; 2019–2020,* 87 FR 27568 (May 9, 2022) |
| SSSS from China (Vietnam) | *Stainless Steel Sheet and Strip from the People's Republic of China: Final Scop Ruling and Final Affirmative Determination of Circumvention for Exports from the Socialist Republic of Vietnam*, 88 FR 18521 (March 29, 2023) |
| SSSS from China (Vietnam) Preliminary | *Stainless Steel Sheet and Strip from the People's Republic of China: Scope Ruling and Preliminary Affirmative Determination of Circumvention for Exports from the Socialist Republic of Vietnam*, 87 FR 56626 (September 15, 2022) |

| | |
|---|---|
| Steel Flanges from India | *Finished Carbon Steel Flanges from India: Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86 FR 500032 (September 7, 2021), and accompanying PDM |
| Steel Flanges from India Final | *Finished Carbon Steel Flanges from India: Final Results of Countervailing Duty Administrative Review; 2019*, 86 FR 67909 (November 30, 2021), and accompanying IDM |
| Steel Flanges from Spain AD | *Finished Carbon Steel Flanges from Spain: Final Results of Antidumping Duty Administrative Review; 2017–2018*, 85 FR 7919 (February 12, 2020) |
| Steel Threaded Rod from Thailand Final | *Steel Threaded Rod from Thailand: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 79 FR 14476 (March 14, 2014) |
| Steel Threaded Rod from Thailand Preliminary | *Steel Threaded Rod from Thailand: Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 FR 79670 (December 31, 2013) |
| Steel Tubing from Taiwan Preliminary Results (Taiwan) | *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan*, 88 FR 21980 (April 12, 2023) |
| Tapered Roller Bearings from China | *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 FR 3987 (January 22, 2009) |
| Tapered Roller Bearings from China | *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of New Shipper Reviews*, 67 FR 10665 (March 8, 2002) |
| Techsnabexport, Ltd. | *Techsnabexport, Ltd. v. United States*, 795 F.Supp. 428 (CIT 1992) |
| Timken Co. | *Timken Co. v. United States*, 968 F. Supp. 2d 1279 (2014), *aff'd* 589 F. App'x 995 (Fed. Cir. 2015) |
| Tissue Paper from China (India) Final Determination | *Certain Tissue Paper Products from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 83 FR 40101 (July 3, 2013) |
| Tissue Paper from China (India) Preliminary Determination | *Certain Tissue Paper Products from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 78 FR 14514 (March 6, 2013), and accompanying IDM |
| Tissue Paper from China (Thailand) Final Determination | *Certain Tissue Paper Products from the People's Republic of China: Affirmative Final Determination of* |

| | |
|---|---|
| | *Circumvention of the Antidumping Duty Order*, 74 FR 29172 (June 19, 2009) |
| *Tissue Paper from China (Vietnam) Final Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 73 FR 57591 (October 3, 2008) |
| *Tissue Paper from China (Vietnam) Preliminary Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 73 FR 21580 (April 22, 2008) |
| *Torrington* | U.S. Senate, Committee on Finance, Omnibus Trade Act of 1987, S. Rep. No. 100-71, at 101 (1987) |
| *TPP from China (Thailand)* | *Affirmative Final Determinations of Circumvention of the Antidumping Order:  Certain Tissue Paper Products from the People's Republic of China*, 73 FR 57591 (October 3, 2008) |
| *Tung Mung CIT* | *Tung Mung Dev. Co. v. United States*, 219 F. Supp. 3d 1333, 1343 (CIT 2002) |
| *U.K. Carbon and Graphite* | *U.K. Carbon and Graphite Co., Ltd. v United States*, 931 F. Supp. 2d 1322 (CIT 2013) |
| *Uncoated Paper from China Final Determination* | *Certain Uncoated Paper from Brazil, the People's Republic of China, and Indonesia:  Affirmative Final Determinations of Circumvention of the Antidumping Duty Orders and Countervailing Duty Orders for Certain Uncoated Paper Rolls*, 86 FR 71025 (December 14, 2021) |
| *Uncoated Paper from China Preliminary Determination* | *Certain Uncoated Paper from the People's Republic of China:  Affirmative Preliminary Determinations of Circumvention of the Antidumping and Countervailing Duty Orders for Uncoated Paper Rolls*, 85 FR 72624 (November 13, 2020) |
| *Uncovered Innerspring Units from China (Malaysia) Final Determination* | *Uncovered Innerspring Units from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 80 FR 74758 (November 30, 2015) |
| *Uncovered Innerspring Units from China (Malaysia) Preliminary Determination* | *Uncovered Innerspring Units from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 80 FR 64392, 64393 (October 23, 2015) |
| *USITC Solar 2021 Determination* | *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. No. TA-201-75 (Extension), USITC Pub. 5266 (December 2021) |

| | |
|---|---|
| *USITC Solar Investigation Final* | *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. No. TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (November 2012) |
| *Uyghur Forced Labor Prevention Act:  U.S. Customs and Border Protection Operational Guidance for Importers* | *Uyghur Forced Labor Prevention Act:  U.S. Customs and Border Protection Operational Guidance for Importers June 13, 2022*, CBP Publication No. 1793-0522 |
| *Vietnam Finewood* | *Vietnam Finewood Company Limited, et.al v. United States*, 466 F. Supp. 3d 1273 (CIT 2023) |
| *Walk-Behind Lawn Mowers from China* | *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 27384 (May 20, 2021) |
| *Walk-Behind Lawn Mowers from China Circumvention Rescission* | *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China:  Notice of Intent to Rescind Circumvention Inquiry on the Antidumping and Countervailing Duty Orders*, 88 FR 13434 (March 3, 2023) |
| *Walgreen Co.* | *Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) |
| *Wantanabe Group* | *Watanabe Group v. United States*, 34 CIT 1545, Slip Op. 10-139 (CIT 2010) |
| *Wheatland* | *Wheatland Tube Co. v. United States* 161 F.3d 1365, 1371 (Fed. Cir. 1998) |
| *Wire Rod from Korea and United Kingdom CCR* | *Carbon and Alloy Steel Wire Rod from the Republic of Korea and the United Kingdom:  Notice of Final Results of Antidumping Duty Changed Circumstances Review*, 84 FR 13888 (April 8, 2019) |
| *Xanthan Gum from China 2016-2017* | *Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Discontinuation of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 65142 (December 19, 2018) |
| *Yangtai CIT* | *Yantai Oriental Juice Co. v. United States*, Slip Op. 03-33 (CIT March 21, 2003) |
| *Yangzhou CAFC* | *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) |
| *Youngstown Sheet & Tube Co.* | *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) |

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry  - From Malaysia 2022

**Appendix III -Documents on Record**
**This Section is Sorted by Short Citation**

| Short Citation | Document Title and Date |
|---|---|
| *Appendix IV-Certification for "Applicable Entries"* | *Preliminary Determination at Appendix IV; Certification for "Applicable Entries"* |
| *Appendix V-Certification for Non-Circumventing Companies* | *Preliminary Determination at Appendix IV; Certification for Entries of Inquiry Merchandise from Companies Preliminarily Found Not to Be Circumventing* |
| *Appendix VI-Certification Regarding Chinese Components* | *Preliminary Determination at Appendix IV; Certification Regarding Chinese Component* |
| Auxin November 9, 2022 *Ex Parte* Memorandum | Memorandum, "Meeting with Counsel for Auxin," dated November 14, 2022 |
| Auxin's April 26, 2023  Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)— Thailand," dated April 26, 2023 |
| Auxin's April 26, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)— Thailand," dated April 26, 2023 |
| Auxin's August 3, 2022 SV Rebuttal Comments | Auxin's Letter, "Rebuttal Surrogate Value Comments and Information," dated August 3, 2022 |
| Auxin's March 24, 2023 Case Brief | Auxin's Letter,  "Auxin's Case Brief (Tranche 2)," dated March 24, 2023 |
| Auxin's April 19, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche2)— Vietnam," dated April 19, 2023 |
| Auxin's April 24, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2) - Malaysia," dated April 24, 2023 |
| Auxin's April 27, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Case Brief (Tranche2)— Thailand," dated April 27, 2023 |
| Auxin's April 28, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)— Vietnam," dated April 28, 2023 |
| Auxin's April 3, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)," dated April 3, 2023 |
| Auxin's Hearing Request | Auxin's Letter, "Auxin Solar, Inc.'s Request for Public Hearing," dated December 29, 2022 |
| Auxin's Investment and R&D Information | Auxin's Letter, "Submission of Investment and Research and Development Information," dated July 29, 2022 |
| *Auxin's ITC Posthearing Brief* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products): Posthearing Brief on Behalf of Auxin Solar Inc.*, Inv. No. TA-201-75 (Safeguard Extension) (November 2021) |
| *Auxin's ITC Prehearing Brief* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products): Prehearing Brief on Behalf of Auxin Solar Inc.*, Inv. No. TA-201-75 (Safeguard Extension) (October 2021) |

| | |
|---|---|
| Auxin's July 27, 2022 SV Comments | Auxin's Letter, "Submission of Surrogate Value Information for Vietnamese Factors of Production," dated July 27, 2022 |
| Auxin's July 29, 2022 Comments | Auxin's Letter, "Submission of Investment and Research and Development Information," dated July 29, 2022 |
| Auxin's March 17, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 1)," dated March 17, 2023 |
| Auxin's March 24, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)," dated March 24, 2023 |
| Auxin's March 6, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 1)," dated March 6, 2023 |
| Auxin's March 7, 2022 Submission | Auxin's Letter, "Response to NextEra's Request to Reject Anti-Circumvention Ruling Requests," March 7, 2022 |
| Auxin's May 16, 2022 Comments | Auxin's Letter, "Auxin's Response to Rebuttal Comments and Factual Information," dated May 16, 2022 |
| Auxin's May 5, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2) - Malaysia," dated May 5, 2023 |
| Auxin's May 9, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)," dated May 9, 2023 |
| Auxin's October 20, 2023 Pre-Preliminary Comments | Auxin's Letter, "Pre-Preliminary Comments Concerning Jinko Solar Technology Sdn. Bhd. and Hanwha Q Cells Malaysia Sdn. Bhd.," dated October 20, 2022 |
| *Bloomberg Report* | BloombergNEF, *Solar PV Trade and Manufacturing:  A Deep Dive* (2021) |
| Boviet 1st SQR | Boviet's Letter, "Boviet First Supplemental Questionnaire Response," dated August 11, 2022 |
| Boviet 2nd SQR | Boviet's Letter, "Boviet Second Supplemental Questionnaire Response," dated August 12, 2022 |
| Boviet 3rd SQR | Boviet's Letter, "Boviet Third Supplemental Questionnaire Response," dated October 7, 2022 |
| Boviet 4th SQR | Boviet's Letter, "Boviet Fourth Supplemental Questionnaire Response," dated November 2, 2022 |
| Boviet Final Analysis Memorandum | Memorandum, "Final Analysis Memorandum for Boviet Solar Technology Co., Ltd.," dated concurrently with this memorandum |
| Boviet Preliminary Analysis Memorandum | Memorandum, "Preliminary Analysis Memorandum for Boviet Solar Technology Co., Ltd.," dated December 1, 2022 |
| Boviet's May 5, 2023 Rebuttal Brief | Boviet's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Second Tranche Rebuttal Brief," dated May 5, 2023 |

| | |
|---|---|
| Boviet's April 28, 2023 Rebuttal Brief | Boviet's Letter, "Boviet Rebuttal Brief re Tranche II," dated April 28, 2023 |
| Boviet's August 3, 2022 SV Rebuttal Comments | Boviet's Letter, "Boviet Rebuttal Surrogate Value Information," dated August 3, 2022 |
| Boviet's IQR Part I | Boviet's Letter, "Boviet Initial Circumvention Inquiry Questionnaire Response," dated June 3, 2022 |
| Boviet's IQR Part II | Boviet's Letter, "Boviet Circumvention Inquiry Questionnaire Response – Part II," dated June 23, 2022 |
| Boviet's July 27, 2020 SV Comments | Boviet's Letter, "Boviet Surrogate Value Information," dated July 27, 2022 |
| Boviet's March 17, 2023 Rebuttal Brief | Boviet's Letter, "Boviet's Letter in Lieu of Rebuttal Brief re Tranche 1," dated March 17, 2023 |
| Boviet's March 6, 2023 Case Brief | Boviet's Letter, "Boviet Case Brief re Tranche 1," dated March 6, 2023 |
| BYD HK Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Cambodia:  Final Analysis Memorandum for BYD (H.K.) Co., Ltd.," dated concurrently with this memorandum |
| BYD HK Hearing Request | BYD HK's Letter, "Request for Hearing," dated January 6, 2023 |
| BYD HK Initial QR Part I | BYD HK's Letter, "Response to Initial Questionnaire," dated June 7, 2022 |
| BYD HK Initial QR Part II | BYD HK's Letter, "Response to Second Circumvention Inquiry Questionnaire," dated June 23, 2022 |
| BYD HK 1st SQR | BYD HK's Letter, "Response to First Supplemental Questionnaire," dated August 9, 2022 |
| BYD HK 2nd SQR | BYD HK's Letter, "Response to Second Supplemental Questionnaire," dated August 19, 2022 |
| BYD HK 3rd SQR | BYD HK's Letter, "Response to Third Supplemental Questionnaire," dated October 12, 2022 |
| BYD HK Verification Exhibits | BYD HK's Letter, "Verification Exhibits of BYD (HK) Co., Ltd.," dated February 16, 2023 |
| BYD HK's Verification Report | Memorandum, "Verification of the Questionnaire Responses of BYD (H.K.) Co., Ltd. in the Circumvention Inquiry of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - with Respect to Cambodia," dated March 15, 2023 |
| BYD HK Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Cambodia:  Preliminary Analysis Memorandum for BYD (H.K.) Co., Ltd.," dated December 1, 2022 |
| BYD HK's April 3, 2023 Rebuttal Brief | BYD HK's Letter, "Second Tranche Rebuttal Brief of BYD HK," dated April 3, 2023 |

| BYD HK's March 17, 2023 Rebuttal Brief | BYD HK's Letter, "First Tranche Rebuttal Brief of BYD," dated March 17, 2023 |
|---|---|
| BYD HK's March 24, 2023 Case Brief | BYD HK's Letter, "Second Tranche Case Brief," dated March 24, 2023 |
| BYD HK's March 6, 2023 Case Brief | BYD HK's Letter, "First Tranche" Letter in Lieu of Case Brief of BYD," dated March 6, 2023 |
| *Cambodia* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia," dated December 1, 2022 |
| Cambodia RSM | Memorandum, "Circumvention Inquiry with Respect to Cambodia: Respondent Selection," dated May 12, 2022 |
| CBP Data Release Memorandum | Memorandum," Release of Customs and Border Protection Entry Data," dated March 29, 2022 |
| CBP Messages Memorandum | Memorandum, "Placement of Customs and Border Protection (CBP) Messages on Record of Proceedings," dated February 17, 2023 |
| *CEA Report* | Clean Energy Associates, *Crystalline Silicon PV - Sector Background* (2022) |
| Circumvention Questionnaires | Circumvention Inquiry Questionnaire," dated May 13 and 16, 2022 |
| Circumvention Request | Auxin's Letter, "Auxin Solar's Request for an Anti-Circumvention Ruling to Section 781(b) of the Tariff Act of 1930, As Amended," dated February 8, 2022 |
| Clarification of Product Coverage Memorandum | Memorandum, "Clarification of Product Coverage," dated December 19, 2022 |
| May 2, 2022 Memorandum | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Comments on Potential Certification Requirements," dated May 19, 2022 Circumvention Inquiries With Respect to Cambodia, Malaysia, Thailand, and Vietnam – Potential Certification Requirements," dated May 2, 2022 |
| Commerce's December 1, 2022 Rejection Letter | Commerce's Letter, "Rejection Letter of Red Sun's Q&V Questionnaire Response," dated December 1, 2022 |
| CSIL Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand: Final Analysis Memorandum for Canadian Solar International Limited," dated concurrently with this memorandum |
| CSIL's 1st SQR | CSIL's Letter, "Response to First Supplemental Questionnaire," dated August 8, 2022 |
| CSIL's 2nd SQR | CSIL's Letter, "Response to Second Supplemental Questionnaire," dated August 12, 2022 |
| CSIL's 3rd SQR | CSIL's Letter, "Response to Third Supplemental Questionnaire," dated October 7, 2022 |

| | |
|---|---|
| CSIL's 4th SQR | CSIL's Letter, "Response to Fourth Supplemental Questionnaire," dated November 2, 2022 |
| CSIL's April 19, 2023 Case Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 19, 2023 |
| CSIL's April 26, 2023 Rebuttal Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 26, 2023 |
| CSIL's April 27, 2023 Case Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 27, 2023 |
| CSIL's Hearing Request | CSIL's Letter, "Request for Hearing," dated January 6, 2023 |
| CSIL's IQR Part I | CSIL's Letter, "Response to Circumvention Inquiry Questionnaire," dated June 3, 2022 |
| CSIL's IQR Part II | CSIL's Letter, "Response to Second Circumvention Inquiry Questionnaire," dated June 23, 2022 |
| CSIL's March 17, 2023 Rebuttal Brief | CSIL's Letter, "First Tranche Rebuttal Brief," dated March 17, 2023 |
| CSIL's March 6, 2023 Case Brief | CSIL's Letter, "First Tranche Case Brief," dated March 6, 2023 |
| CSIL's May 9, 2023 Rebuttal Brief | CSIL's Letter, "Second Tranche Rebuttal Case Brief of Canadian Solar International Limited," dated May 9, 2023 |
| CSIL's October 20, 2022 Pre-Preliminary Comments | CSIL's Letter, "Comments in Advance of the Preliminary Determination," dated October 20, 2022 |
| CSIL Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand: Preliminary Analysis Memorandum for Canadian Solar International Limited," dated December 1, 2022 |
| CSIL's Verification Exhibits | CSIL's Letter, "Verification Exhibits," dated February 22, 2023 |
| CSIL's Verification Report | Memorandum, "Verification of the Information Reported by Canadian Solar International Limited," dated April 19, 2023 |
| *Denis De Ceuster Report* | Denis De Ceuster and DDC Solar LLC, *Crystalline Silicon Photovoltaic Supply Chain: from Polysilicon to Solar Panel* (2022) |
| DHS Order Re: Forced Labor in Xinjiang | The Department of Homeland Security Issues Withhold Release Order on Silica-Based Products Made by Forced Labor in Xinjiang," U.S CUSTOMS AND BORDER PROTECTION (June 24, 2021), available at https://www.cbp.gov/newsroom/national-media-release/departmenthomeland- security-issues-withhold-release-order-silica |

| | |
|---|---|
| *DOE Solar Deep Dive* | *U.S. Department of Energy Response to Executive Order 14017 "America's Supply Chains," Solar Photovoltaics: Supply Chain Deep Dive Assessment* (February 24, 2022) included in the memorandum, "Meeting with the Department of Energy," dated June 3, 2022 |
| ET Solar Scope Ruling | Memorandum, "Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China: ET Solar Inc.," dated June 15, 2021 |
| Factor Valuation Memorandum | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - Circumvention Inquiries with Respect to Cambodia, Malaysia and Thailand: Factor Valuation Memorandum," dated December 1, 2022 |
| First Solar Malaysia's April 24, 2023 Case Brief | First Solar Malaysia's Letter, "Letter in Lieu of Case Brief for Second Tranche of Issues," dated April 24, 2023 |
| First Solar Malaysia's Hearing Request | First Solar Malaysia's Letter, "Request to Participate at Hearing," dated January 6, 2023 |
| First Solar Malaysia's March 17, 2023 Rebuttal Brief | First Solar Malaysia's Letter, "Letter in Lieu of Rebuttal Brief for First Tranche of Issues," dated March 17, 2023 |
| First Solar Malaysia's March 6, 2023 Case Brief | First Solar Malaysia's Letter, "Case Brief for First Tranche of Issues," dated March 6, 2023 |
| First Solar Malaysia's May 5, 2023 Case Brief | First Solar Malaysia's Letter, "Letter in Lieu of Rebuttal Brief for Second Tranche of Issues," dated May 5, 2023 |
| First Solar Vietnam's April 28, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief for Second Tranche of Issues," dated April 28, 2023 |
| First Solar Vietnam's March 17, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief for First Tranche of Issues," dated March 17, 2023 |
| First Solar Vietnam's March 6, 2023 Case Brief | First Solar Vietnam's Letter, "Case Brief for First Tranche of Issues," dated March 6, 2023 |
| First Solar's April 28, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief of Second Tranche of Issues," dated April 28, 2023 |
| First Tranche Briefing Schedule | Memorandum, "Announcement of Briefing Schedule for First Tranche of Case and Rebuttal Briefs," dated February 22, 2023 |
| *FTI Report* | FTI Consulting, Inc., *The Photovoltaic Value Chain In Southeast Asia: Response to BloombergNEF's Solar PV Trade and Manufacturing: Deep Dive* (2021) |

| | |
|---|---|
| Hanwha Final Analysis Memorandum | Memorandum, "Hanwha Q CELLS Malaysia Sdn. Bhd. (Hanwha) – Final Analysis Memorandum," dated concurrently with this memorandum |
| Hanwha IQR Part I | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Response to Circumvention Inquiry Questionnaire (Part I)," dated June 3, 2022 |
| Hanwha IQR Part II | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Response to Circumvention Inquiry Questionnaire (Part II)," dated June 23, 2022 |
| Hanwha's 1st SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s First Supplemental Questionnaire Response," dated August 9, 2022 |
| Hanwha's 2nd SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Second Supplemental Questionnaire Response," dated August 19, 2022 |
| Hanwha's 3rd SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Fourth Supplemental Questionnaire Response," dated October 11, 2022 |
| Hanwha Preliminary Analysis Memorandum | Memorandum, "Hanwha Q CELLS Malaysia Sdn. Bhd. (Hanwha) – Preliminary Analysis Memorandum," dated December 1, 2022 |
| Hanwha's April 24, 2023 Case Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Case Brief Regarding Comments on Certification Issues (Second Tranche)," dated April 24, 2023 |
| Hanwha's December 14, 2022 Certification Comments | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd's Comments on Proposed Certification Process," dated December 14, 2022 |
| Hanwha's Hearing Request | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Hearing Request," dated January 6, 2023 |
| Hanwha's March 17, 2023 Rebuttal Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Rebuttal Brief Regarding Comments on Certification Issues (First Tranche)," dated March 17, 2023 |
| Hanwha's March 6, 2023 Case Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Case Brief Regarding Comments on Certification Issues (First Tranche)," dated March 6, 2023 |
| Hanwha's May 5, 2023 Rebuttal Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Rebuttal Brief (Second Tranche)," dated May 5, 2023 |
| Hearing Transcript | Hearing Transcript, "Solar Cells from China Circumvention Inquiries covering Cambodia, Malaysia, Thailand and Vietnam," dated July 25, 2023 |
| *IEA Report* | International Energy Agency, *Solar PV Global Supply Chains* (2022) |

| Initiation Memorandum | Memorandum, "Initiation of Circumvention Inquiries," dated March 25, 2022 |
|---|---|
| *Initiation Notice* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders*, 87 FR 19071 (April 1, 2022) |
| ITC Notification Letter | Commerce's Letter, "Notification of Affirmative Preliminary Determinations of Circumvention," dated May 30, 2023 |
| *ITC Solar Final* | *Crystalline Silicon Photovoltaic Cells and Modules from China,* Inv. No. 701-TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (November 2012) |
| *ITC Solar Monitoring* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled into Other Products: Monitoring Developments in the Domestic Industry,* Inv. No. TA-201-75 (Monitoring), USITC Pub. 5021 (February 2020) |
| *ITC Solar Safeguard Proceeding 2017* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products),* Inv. No. TA-201-75 (Safeguard), USITC Pub. 4739 (November 2017) |
| *ITC Solar Safeguard Proceeding 2019* | *Crystalline Silicon Photovoltaic Cells and Modules from China,* Inv. No. 701-TA-481 and 731-TA-1190 (Review), USITC Pub. 4874 (March 2019) |
| JA Solar, LONGi, VINA and VSUN's March 17, 2023 Rebuttal Brief | VSUN's Letter, "Letter in Lieu of Rebuttal Brief," dated March 17, 2023 |
| JA Solar's Hearing Request | JA Solar's Letter, "JA Solar's Request for Hearing," dated January 6, 2023 |
| JA Solar's May 2, 2022 Comments | JA Solar's Letter, "JA Solar Comments and Rebuttal Factual Information on Anti-Circumvention Inquiry Request," dated May 2, 2022 |
| Jinko Final Analysis Memorandum | Memorandum, "Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. – Final Analysis Memorandum," dated concurrently with this memorandum |
| Jinko IQR Part I | Jinko's Letter, "Jinko Initial Questionnaire Part I Questionnaire Response," dated June 6, 2022 |
| Jinko IQR Part II | Jinko's Letter, "Jinko Initial Questionnaire Part II Questionnaire Response," dated June 23, 2022 |
| Jinko's 1st SQR | Jinko's Letter, "Jinko First Supplemental Questionnaire Response," dated August 8, 2022 |

| | |
|---|---|
| Jinko's 2nd SQR | Jinko's Letter, "Jinko Second Supplemental Questionnaire Response," dated August 19, 2022 |
| Jinko's 3rd SQR | Jinko's Letter, "Jinko Third Supplemental Questionnaire Response," dated October 11, 2022 |
| Jinko's 4th SQR | Jinko's Letter, "Jinko Fourth Supplemental Questionnaire Response," dated November 2, 2022 |
| Jinko Preliminary Analysis Memorandum | Memorandum, "Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. – Preliminary Analysis Memorandum," dated December 1, 2022 |
| Jinko Verification Report | Memorandum, "Verification of the Questionnaire Responses of Jinko," dated April 12, 2023 |
| Jinko's April 24, 2023 Case Brief | Jinko's Letter, "Jinko Second Tranche Case Brief," dated April 24, 2023 |
| Jinko's Hearing Request | Jinko's Letter, "Jinko Request to Participate at Hearing," dated January 6, 2023 |
| Jinko's March 17, 2023 Rebuttal Brief | Jinko's Letter, "Jinko First Tranche Rebuttal," dated March 17, 2023 |
| Jinko's March 6, 2023 Case Brief | Jinko's Letter, "Jinko First Tranche Letter Concerning Certification Requirements," dated March 6, 2023 |
| Jinko's May 5, 2023 Rebuttal Brief | Jinko's Letter, "Jinko Second Tranche Rebuttal Brief," dated May 5, 2023 |
| *Malaysia* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to Malaysia," dated December 1, 2022 |
| Malaysia RSM | Memorandum, "Circumvention Inquiries With Respect to Malaysia:  Respondent Selection," dated May 12, 2022 |
| Maxeon's Hearing Request | Maxeon's Letter, "Request to Appear at Public Hearing," dated January 2, 2023 |
| Maxeon's March 17, 2023 Rebuttal Brief | Maxeon's Letter, "Maxeon's Rebuttal Brief," dated March 17, 2023 |
| Maxeon's March 6, 2023 Case Brief | Maxeon's Letter, "Maxeon's Case Brief," dated March 6, 2023 |
| NE Solar IQR Part I | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Initial Questionnaire Response," dated June 3, 2022 |
| NE Solar IQR Part II | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China;-Circumvention Inquiry Initial Questionnaire Response," dated June 23, 2022 |

| NE Solar Hearing Request | NE Solar's Letter, "New East Solar Energy's Request to Participate in Hearing," dated January 6, 2023 |
|---|---|
| NE Solar January 29, 2023 *Ex Parte* Memorandum | Memorandum, "Meeting with Counsel for New East Solar," dated January 29, 2023 |
| NE Solar Preliminary Analysis Memorandum | Memorandum, "Preliminary Analysis Memorandum for New East Solar (Cambodia) Co., Ltd.," dated December 1, 2022 |
| NE Solar's August 17, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Surrogate Value Questionnaire Response," dated August 17, 2022 |
| NE Solar's November 4, 2022 SQR | NE Solar's Letter, " Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire Response," dated November 4, 2022 |
| NE Solar's October 11, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire III Response," dated October 11, 2022 |
| NE Solar's August 8, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire I Response," dated August 8, 2022 |
| NE Solar's March 6, 2023 Case Brief | NE Solar's Letter, "New East Solar Energy's Case Brief," dated March 6, 2023 |
| Next Era March 17, 2023 Rebuttal Brief | Next Era's Letter, "First Tranche Rebuttal Brief," dated March 17, 2023 |
| Next Era March 6, 2023 Case Brief | Next Era's Letter, "Tranche 1 Case Brief," dated March 6, 2023 |
| NextEra's April 28, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 28, 2023 |
| NextEra's April 3, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 3, 2023 |
| NextEra's May 19, 2022 Comments | NextEra's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Comments on Potential Certification Requirements," dated May 19, 2022 |
| NextEra's May 9, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated May 9, 2023 |

| | |
|---|---|
| NextEra's April 19, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 19, 2023 |
| NextEra's April 24, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 24, 2023 |
| NextEra's April 26, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 26, 2023 |
| NextEra's April 28, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 28, 2023 |
| NextEra's Hearing Request | NextEra's Letter, "Request to Appear at Hearing," dated January 6, 2023 |
| NextEra's March 24, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated March 24, 2023 |
| NextEra's May 2, 2022 Comments | NextEra's letter, "NextEra Comments on Auxin's Circumvention Ruling Request," dated May 2, 2022 |
| NextEra's May 2, 2022 Submission | NextEra's Letter, "NextEra Comments on Auxin's Circumvention Ruling Request," dated May 2, 2022 |
| NextEra's May 5, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated May 5, 2023 |
| *NREL 2018 Report* | National Renewable Energy Laboratory, *Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing* (February 2020) at Attachment 24 of NextEra's 5.2.22 Submission |
| *NREL Report* | National Renewable Energy Laboratory, *Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing* (2020) |
| *Preliminary Determinations* | *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 FR 75221 (December 8, 2022) |
| Preliminary Determination Corrections | Memorandum, "Preliminary Determinations Corrections," dated January 24, 2023 |
| Q&V Questionnaire | Quantity and Value Questionnaire for Circumvention Inquiries With Respect to Cambodia, Malaysia, Thailand, and Vietnam, dated March 30, 2022 |
| Q&V Questionnaire Deadline Extension | Memorandum, "Extension of the Deadline to Respond to the Quantity and Value Questionnaire," dated April 20, 2022 |
| Red Sun's April 19, 2023 Case Brief | Red Sun's Letter, "Red Sun's Second Tranche Case Brief," dated April 19, 2023 |

| | |
|---|---|
| Red Sun's January 6, 2023 Request Letter | Red Sun's Letter, "Request to Supplement Rejection Memo and Place Correspondence with Red Sun on the Record," dated January 6, 2023 |
| Request for Comments on Surrogate Countries | Memorandum, "Request for Economic Development, Surrogate Country Comments and Information," dated May 13, 2022 |
| Risen's March 17, 2023 Rebuttal Brief | Risen's Letter, "Risen Solar Rebuttal Brief – Tranche 1," dated March 17, 2023 |
| Risen's March 6, 2023 Case Brief | Risen's Letter, "Risen Solar Case Brief – Tranche 1," dated March 6, 2023 |
| Risen's May 5, 2023 Rebuttal Brief | Risen's Letter, "Risen Solar Rebuttal brief - Tranche II," dated May 5, 2023 |
| Second Tranche Briefing Schedule for Cambodia | Memorandum, "Announcement of Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for Cambodia," dated March 15, 2023 |
| Second Tranche Briefing Schedule for Malaysia | Memorandum, "Announcement of Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for Malaysia," dated April 12, 2023 |
| Second Tranche Briefing Schedule for Thailand | Memorandum, "Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for the Circumvention Inquiry Covering the Kingdom of Thailand (Thailand)," dated April 19, 2023 |
| Second Tranche Briefing Schedule for Vietnam | Memorandum, "Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for the Circumvention Inquiry Covering the Socialist Republic of Vietnam (Vietnam)," dated April 12, 2023 |
| Silfab's April 19, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated April 19, 2023 |
| Silfab's April 24, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc., "dated April 24, 2023 |
| Silfab's April 26, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated April 26, 2023 |
| Silfab's Hearing Request | Memorandum, "Request for Hearing," dated January 6, 2023 |
| Silfab's March 17, 2023 Rebuttal Brief | Silfab's Letter, "Letter in Lieu of First Tranche Rebuttal Brief of Silfab Solar WA Inc.," dated March 17, 2023 |
| Silfab's March 24, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated March 24, 2023 |
| Silfab's March 6, 2023 Case Brief | Silfab's Letter, "First Tranche Letter in Lieu of Case Brief of Silfab Solar WA Inc.," dated March 6, 2023 |

| | |
|---|---|
| Silfab's May 2, 2022 Comments | Silfab's Letter, "Comments and Factual Information to Rebut, Clarify and Correct Factual Information Contained in Auxin's Request for a Circumvention Ruling, dated May 2, 2022 |
| *Solar CCR Excluding Certain Off-Grid Solar Products* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Changed Circumstances Reviews, and Revocation of Antidumping and Countervailing Duty Orders, in Part,* 86 FR 71616, 71617 (December 17, 2021) (excluding certain off-grid CSPV) |
| Solar Surveys Analysis Memorandum | Memorandum, "Analysis Memorandum Regarding Solar Industry Surveys," dated concurrent with this memorandum. |
| Solar Investigation Scope Clarification Memorandum | Memorandum, "Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, A-570-979, C-570-980," dated March 19, 2012. |
| Solaria Scope Ruling | Memorandum, "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China, and Certain Crystalline Silicon Photovoltaic Product from Taiwan: The Solar Corporation Scope Ruling," dated April 8, 2021 |
| SunSpark Scope Ruling | Memorandum, "SunSpark Technology Inc. Scope Ruling," dated October 23, 2020 |
| *Thailand* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Thailand," dated December 1, 2022 |
| Thailand RSM | Memoranda, "Circumvention Inquiry With Respect to Thailand: Respondent Selection," dated May 12, 2022 |
| Third Supplemental Questionnaire | Commerce's Letter, "Third Supplemental Questionnaire," dated September 23, 2022 |
| Trina's April 19, 2023 Case Brief | Trina's Letter, "Trina's Second Tranche Case Brief," dated April 19, 2023 |
| Trina's March 17, 2023 Rebuttal Brief | Trina's Letter, "Trina's First Tranche Rebuttal Brief," dated March 17, 2023 |
| Trina's March 6, 2023 Case Brief | Trina's Letter, "First Tranche Case Brief of Trina," dated March 6, 2023 |
| Trina's May 2, 2022 Comments | Trina's Letter, "Trina's Comments on Auxin's Circumvention Inquiry Request and Factual Information Submission to Rebut, Clarify, or Correct Facial Information Contained in Auxin's Request," dated May 2, 2022 |

| | |
|---|---|
| TTL Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand: Final Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd.," dated concurrently with this memorandum |
| TTL IQR Part II | TTL's Letter, "May 16, 2022 Anti-Circumvention Inquiry Initial Questionnaire Response," dated June 23, 2022 |
| TTL Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand: Preliminary Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd.," dated December 1, 2022 |
| TTL's May 9, 2023 Rebuttal Brief | TTL's Letter, "TTL's Second Tranche Rebuttal Brief," dated May 9, 2023 |
| TTL's 1st SQR | TTL's Letter, "First Supplemental Questionnaire," dated August 8, 2022 |
| TTL's 2nd SQR | TTL's Letter, "Second Supplemental Questionnaire," dated August 9, 2022 |
| TTL's 3rd SQR | TTL's Letter, "Third Supplemental Questionnaire," dated October 7, 2022 |
| TTL's 4th SQR | TTL's Letter, "Fourth Supplemental Questionnaire," dated November 2, 2022 |
| TTL's April 26, 2023 Case Brief | TTL's Letter, "TTL's Second Tranche Case Brief," dated April 26, 2023 |
| TTL's April 27, 2023 Rebuttal Brief | TTL's Letter, "Trina's First Tranche Rebuttal Brief," dated April 27, 2023 |
| TTL's Hearing Request | Memorandum, "Request for Public Hearing," dated January 6, 2023 |
| TTL's IQR Part I | TTL's Letter, "May 13, 2022 Anti-Circumvention Inquiry Initial Questionnaire Response," dated June 3, 2022 |
| TTL's May 19, 2022 Comments | TTL's Letter, "Trina's Comments on Potential Certification Requirements," dated May 19, 2022, Thailand. |
| TTL's Verification Report | Memorandum, "Verification of the Information Reported by Trina Solar Science & Technology (Thailand) Co. Ltd.," dated April 19, 2023 |
| Uyghur Forced Labor Prevention Act | Uyghur Forced Labor Prevention Act," U.S CUSTOMS AND BORDER PROTECTION, available at https://www.cbp.gov/trade/forced-labor/UFLPA |
| *Vietnam* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Socialist Republic of Vietnam," dated December 1, 2022 |
| Vietnam Preliminary SV Memo | Commerce's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not, Assembled Into Modules, from the People's Republic of China - Circumvention |

| | |
|---|---|
| | Inquiries with Respect to the Socialist Republic of Vietnam:  Factor Valuation Memorandum," dated December 1, 2022 |
| Vietnam RSM | Memoranda, "Circumvention Inquiry With Respect to the Socialist Republic of Vietnam:  Respondent Selection," dated May 12, 2022 |
| Vina Cell's Q&V Questionnaire | Commerce's Letter, "Vina Cell re:  Quantity and Value Questionnaire for Circumvention Inquiries with Respect to Cambodia, Malaysia, Thailand, and Vietnam," dated March 30, 2022 |
| Vina Cell's Q&V Response | Vina Cell's Letter, "Quantity and Value Questionnaire," dated April 21, 2022 |
| Vina Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Vietnam:  Preliminary Analysis Memorandum for Vina Solar Technology Company Limited," dated December 1, 2022 |
| Vina/LONGi's March 6, 2023 Case Brief | Vina/LONGi's Letter, "Case Brief on General Issues," dated March 6, 2023 |
| Vina's 1st SQR | Vina's Letter, "Vina Solar's Response to the Department's First Supplemental Questionnaire," dated August 10, 2022 |
| Vina's April 19, 2023 Case Brief | Vina's Letter, "Letter in Lieu of Case Brief on Additional Issues," dated April 19, 2023 |
| Vina's April 28, 2023 Rebuttal Brief | Vina's Letter, "Rebuttal Case Brief (Tranche 2) - Vietnam," dated April 28, 2023 |
| Vina's Initial Questionnaire | Commerce's Letter, "Vina Circumvention Inquiry Questionnaire," dated May 16, 2022 |
| Vina's IQR Part I | Vina's Letter, "Vina Solar's Response to Part 1 of the Department's Questionnaire," dated June 7, 2022 |
| Vina's IQR Part II | Vina's Letter, "Vina Solar's Response to Part 2 of the Department's Questionnaire," dated June 23, 2022 |
| Vina's Q&V Questionnaire | Commerce's Letter, "Vina Solar re:  Quantity and Value Questionnaire for Circumvention Inquiries with Respect to Cambodia, Malaysia, Thailand, and Vietnam," dated March 30, 2022 |
| Vina's Q&V Response | Vina's Letter, "Quantity and Value Questionnaire," dated April 21, 2022 |
| Vina's Verification Agenda | Commerce's Letter, "Verification of Vina Solar Technology Company Limited's Questionnaire Responses," dated February 2, 2023 |
| Vina's Verification Memorandum | Memorandum, "Verification of Vina Solar Technology Company Limited," dated April 12, 2023 |
| Vina's Verification Questionnaire | Commerce's Letter, "Verification Preparedness Questionnaire," dated October 12, 2022 |

Barcode:4419742-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  From Malaysia 2022

| VSUN's March 6, 2023 Case Brief | VSUN's Letter, "VSUN's Letter in Lieu of Case Brief," dated March 6, 2023 |
|---|---|

# EXHIBIT 4

Barcode:4419744-02 A-570-979 CIRC - Anti Circumvention Inquiry - from Thailand 2022

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-979/C-570-980
Circumvention Inquiry
Thailand 2022
**Public Document**
E&C/OIV: JDP/PAO

August 17, 2023

| | |
|---|---|
| **MEMORANDUM TO:** | Lisa W. Wang<br>Assistant Secretary<br>  for Enforcement and Compliance |
| **FROM:** | James Maeder<br>Deputy Assistant Secretary<br>  for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Thailand |

---

## I.    SUMMARY

We have analyzed the case and rebuttal briefs of the interested parties in the circumvention inquiries of the *Orders*.[1]  As a result of our analysis, we continue to find, consistent with the *Preliminary Determination*, that solar cells and modules completed in Thailand from parts and components manufactured in China, are circumventing the *Orders*.  With regard to CSIL and TTL, as well as for the eight companies that failed to timely respond to the Q&V questionnaire, we continue to find that they are circumventing the *Orders* and that a country-wide determination is most appropriate to prevent further circumvention of the *Orders* by non-examined producers of inquiry merchandise in Thailand.  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.  Based on our analysis of the comments received, we made certain changes to the language in the certification.  Below is the complete list of issues for which we received comments and rebuttal comments from interested parties:

## A.    Methodological Issues

Comment 1.    Whether Solar Cells With a p/n Junction Formed Outside of China Should Be Subject to Circumvention Inquiries

Comment 2.    Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China.

---

[1] Appendices I, II, and III attached to this memorandum identify the naming conventions, acronyms and abbreviations (Appendix I), court and case citations (Appendix II), and documents on record (Appendix III)

Comment 3.   Whether Commerce Should Analyze Investment Data on a Per-Unit Basis
Comment 4.   Whether to Depart from the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the *Preliminary Determination*s
Comment 5.   How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act
Comment 6.   Whether Material Costs Should Be Included in the Value of Third-Country Processing
Comment 7.   Whether Commerce Should Rely on Surrogates to Value Chinese Inputs Consumed in the Inquiry Country

**B.   Country-Specific Issues**

Comment 8.   Whether Third Country Processing was Minor-General

**C.   Overall Determinations**

Comment 9.   Whether the Factors Under 781(b)(3) of the Act Justify an Affirmative Final Determination
Comment 10.  Affirmative Circumvention Determinations Would not Be Appropriate Under Section 781(b)(1)(E) of the Act

**D.   Certification Issues**

Comment 11.  Whether Commerce Should Allow AFA Companies to Certify
Comment 12.  Certification Requirements and Corrections
Comment 13.  Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*
Comment 14.  Whether Exporters and Importers Should Be Permitted to Submit Multiple Certifications, as Applicable
Comment 15.  Whether or Not Companies Found Not to Be Circumventing Should Be Required to Certify and to Identify Their Wafer Suppliers
Comment 16.  Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews
Comment 17.  Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements
Comment 18.  Clarification and Enforcement of the Utilization Requirement
Comment 19.  Whether the "Wafer-Plus-Three" Requirement is Appropriate

**E.   Other Issues**

Comment 20.  Whether Commerce Properly Placed Ex Parte Memoranda on the Record That Concerned the Circumvention Inquiries
Comment 21.  Whether Commerce's Determination to Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law
Comment 22.  Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

## II.    BACKGROUND

On December 8, 2022, Commerce published the *Preliminary Determination*.  Between February 6 and 15, 2023, we conducted verification in Thailand.[2]  Pursuant to section 781(e) of the Act, on May 30, 2023, we notified the ITC of our affirmative preliminary determination of circumvention and informed the ITC of its ability to request consultations with Commerce regarding the possible inclusion of the products in question within the *Orders* pursuant to section 781(e)(2) of the Act.[3]  The ITC did not request consultations with Commerce.

In accordance with 19 CFR 351.309, we invited parties to comment on the *Preliminary Determination* and our verification findings.[4]  Between March 6 and May 9, 2023, parties submitted case and rebuttal briefs.[5]  Additionally, numerous parties requested a hearing.[6]  On July 18, 2023, Commerce held a public hearing.[7]

## III.    SCOPE OF THE *ORDERS*

The merchandise covered by the *Orders* is crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

The *Orders* cover crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

---

[2] *See* CSIL's Verification Report; and TTL's Verification Report.
[3] *See* ITC Notification Letter.
[4] *See* First Tranche Briefing Schedule and Second Tranche Briefing Schedule – Thailand.
[5] *See* Auxin's March 6, 2023 Case Brief; BYD HK's March 6, 2023 Case Brief; CSIL's March 6, 2023 Case Brief; First Solar Malaysia's March 6, 2023 Case Brief; First Solar Vietnam's March 6, 2023 Case Brief; Hanwha's March 6, 2023 Case Brief; Jinko's March 6, 2023 Case Brief; Maxeon's March 6, 2023 Case Brief; New East's March 6, 2023 Case Brief; NextEra's March 6, 2023 Case Brief; Risen's March 6, 2023 Case Brief; Silfab's March 6, 2023 Case Brief; TTL's March 6, 2023 Case Brief; Vina's March 6, 2023 Case Brief; VSUN's March 6, 2023 Case Brief; Auxin's March 17, 2023 Rebuttal Brief; Boviet's March 17, 2023 Rebuttal Brief; BYD HK's March 17, 2023 Rebuttal Case Brief; CSIL's March 17, 2023 Rebuttal Brief; First Solar Malaysia's March 17, 2023 Rebuttal Brief; First Solar Vietnam's March 17, 2023 Rebuttal Brief; JA Solar, LONGi, Vina and VSUN's March 17, 2023 Rebuttal Brief; Hanwha's March 17, 2023 Rebuttal Brief; Jinko's March 17, 2023 Rebuttal Brief; Maxeon's March 17, 2023 Rebuttal Brief; Next Era's March 17, 2023 Rebuttal Brief; Risen's March 17, 2023 Rebuttal Brief; Silfab's March 17, 2023 Rebuttal Brief; TTL's March 17, 2023 Rebuttal Brief; CSIL's April 26, 2023 Thailand Case Brief; Silfab's April 26, 2023 Thailand Case Brief; Auxin's April 26, 2023 Thailand Case Brief; TTL's April 26, 2023 Thailand Case Brief; TTL's April 26, 2023 Thailand Case Brief; Auxin's May 9, 2023 Thailand Rebuttal Brief; CSIL's May 9, 2023 Thailand Rebuttal Brief; NextEra's May 9, 2023 Thailand Rebuttal Brief; and TTL's May 9, 2023 Thailand Rebuttal Brief.
[6] *See* TTL's Hearing Request; CSIL's Hearing Request; Silfab's Hearing Request; and Auxin's Hearing Request.
[7] *See* Hearing Transcript.

3

Barcode:4419744-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Thailand 2022

Merchandise under consideration may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits.  Such parts that otherwise meet the definition of merchandise under consideration are included in the scope of the *Orders*.

Excluded from the scope of the *Orders* are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of the *Orders* are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell.  Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Additionally, excluded from the scope of the *Orders* are panels with surface area from 3,450 mm$^2$ to 33,782 mm$^2$ with one black wire and one red wire (each of type 22 AWG or 24 AWG not more than 206 mm in length when measured from panel extrusion), and not exceeding 2.9 volts, 1.1 amps, and 3.19 watts.  For the purposes of this exclusion, no panel shall contain an internal battery or external computer peripheral ports.

Also excluded from the scope of the *Orders* are:

1)      Off grid crystalline silicon photovoltaic cells (CSPV) panels in rigid form with a glass cover, with the following characteristics:

(A) A total power output of 100 watts or less per panel;
(B) a maximum surface area of 8,000 cm2 per panel;
(C) do not include a built-in inverter;
(D) must include a permanently connected wire that terminates in either an 8mm male barrel connector, or a two-port rectangular connector with two pins in square housings of different colors;
(E) must include visible parallel grid collector metallic wire lines every 1–4 millimeters across each solar cell; and
(F) must be in individual retail packaging (for purposes of this provision, retail packaging typically includes graphics, the product name, its description and/or features, and foam for transport); and

2)      Off grid CSPV panels without a glass cover, with the following characteristics:

(A) A total power output of 100 watts or less per panel;
(B) a maximum surface area of 8,000 cm2 per panel;
(C) do not include a built-in inverter;
(D) must include visible parallel grid collector metallic wire lines every 1–4 millimeters across each solar cell; and
(E) each panel is

4

    1. permanently integrated into a consumer good;
    2. encased in a laminated material without stitching, or
    3. has all of the following characteristics:  (i) the panel is encased in sewn fabric with visible stitching, (ii) includes a mesh zippered storage pocket, and (iii) includes a permanently attached wire that terminates in a female USB–A connector.

In addition, the following CSPV panels are excluded from the scope of the *Orders*:

1)    Off-grid CSPV panels in rigid form with a glass cover, with each of the following physical characteristics, whether or not assembled into a fully completed off-grid hydropanel whose function is conversion of water vapor into liquid water:
    (A) A total power output of no more than 80 watts per panel;
    (B) A surface area of less than 5,000 square centimeters (cm2) per panel;
    (C) Do not include a built-in inverter;
    (D) Do not have a frame around the edges of the panel;
    (E) Include a clear glass back panel; and
    (F) Must include a permanently connected wire that terminates in a two-port rectangular connector.

Additionally excluded from the scope of the Orders are off-grid small portable crystalline silicon photovoltaic panels, with or without a glass cover, with the following characteristics: (1) a total power output of 200 watts or less per panel; (2) a maximum surface area of 16,000 cm2 per panel; (3) no built-in inverter; (4) an integrated handle or a handle attached to the package for ease of carry; (5) one or more integrated kickstands for easy installation or angle adjustment; and (6) a wire of not less than 3 meters either permanently connected or attached to the package that terminates in an 8mm diameter male barrel connector.

Modules, laminates, and panels produced in a third country from cells produced in China are covered by the *Orders*; however, modules, laminates, and panels produced in China from cells produced in a third country are not covered by the *Orders*.

Merchandise covered by the *Orders* is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.71.0000, 8501.72.1000, 8501.72.2000, 8501.72.3000, 8501.72.9000, 8501.80.1000, 8501.80.2000, 8501.80.3000, 8501.80.9000, 8507.20.8010, 8507.20.8031, 8507.20.8041, 8507.20.8061, 8507.20.8091, 8541.42.0010, and 8541.43.0010.  These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of the *Orders* is dispositive.[8]

## IV.   SCOPE OF THE CIRCUMVENTION INQUIRY

This circumvention inquiry covers:  (A) crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the *Orders*, subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in Thailand from wafers produced in China; and (B) modules, laminates, and panels consisting of crystalline silicon photovoltaic cells, subject to the exclusions for certain panels in

---

[8] *See Orders*; *see also Solar CCR Excluding Certain Off-Grid Solar Products*.

the scope of the *Orders*, whether or not partially or fully assembled into other products, that were produced in Thailand from wafers produced in China and where more than two of the following components in the module/laminate/panel were produced in China:  (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes.  If modules, laminates, and panels consisting of crystalline silicon photovoltaic cells do not meet both of the conditions in item (B) above, then this circumvention inquiry does not cover the modules, laminates, and panels, or the crystalline silicon photovoltaic cells within the modules, laminates, and panels, even if those crystalline silicon photovoltaic cells were produced in Thailand from wafers produced in China.  Wafers produced outside of China with polysilicon sourced from China are not considered to be wafers produced in China for purposes of this circumvention inquiry.

## V.    PERIOD OF THE CIRCUMVENTION INQUIRY

The period of the inquiry is January 1, 2008, through December 31, 2021.

## VI.    CHANGES SINCE THE *PRELIMINARY DETERMINATION*

As detailed below, none of the minor changes to calculations had an impact on our *Preliminary Determination*.  For a complete description of our analysis, *see* the *Preliminary Determination* and for a complete description of the change to this analysis, *see* the Final Analysis Memoranda.[9]

## VII.    DISCUSSION OF THE ISSUES

**Methodological Issues**

**Comment 1.    Whether Solar Cells With a p/n Junction Formed Outside of China Should be Subject to the Circumvention Inquiries**

*CSIL*[10]
- Because Commerce has long held that solar cells and modules with a p/n junction formed outside of China are not subject to the *Orders*,[11] solar cells and modules with p/n junctions formed in the four inquiry countries should not be subject to these circumvention inquiries.

*Auxin*[12]
- Commerce's practice with respect to the p/n junction does not prevent it from issuing an affirmative circumvention finding that solar cells and modules with a country of origin other than China are covered by the scope of the *Orders*.[13]  Thus, solar cells and modules with a p/n junction formed outside of China should be subject to the circumvention inquiries.

---

[9] *See* CSIL Final Analysis Memorandum; and TTL Final Analysis Memorandum.
[10] *See* CSIL's March 6, 2023 Case Brief at 2-3.
[11] *Id.* at 2 (citing the *Orders*).
[12] *Id.* at 9-13; *see also* Auxin's March 17, 2023 Rebuttal Brief at 30-31.
[13] *See* Auxin's March 17, 2023 Rebuttal Brief at 30-31 (citing *Bell Supply CAFC*, 888 F.3d at 1229-31).

6

**Commerce's Position:**  We disagree with CSIL.  Commerce previously determined that it is the addition of a p/n junction that transforms a silicon wafer into a solar cell.[14]  Thus, the country where the p/n junction is formed is the country-of-origin of the solar cell.  While products with a country-of-origin other than the country subject to the order are not normally covered by the order, the Act expressly provides an exception to this rule under the circumvention provisions in section 781 of the Act.  Circumvention inquiries under section 781(b) of the Act can bring within the discipline of an order merchandise that would not be subject to the order under a country-of-origin analysis.[15]

The circumvention provisions in section 781(b)(1)(A) of the Act, only require that the merchandise imported into the United States be of the same class or kind as the merchandise produced in the country that is the subject of the order.  It does not require the merchandise to have the same country-of-origin as the merchandise that is the subject of the order.

In fact, "{c}ircumvention can only occur if the articles are from a country not covered by the relevant AD or CVD orders."[16]  To read section 781(b) of the Act as applying to a class or kind of merchandise that is covered by an AD and/or CVD order only when the country of origin of the merchandise is the order country would render section 781(b) of the Act moot.  Hence, there is no basis for not examining the solar cells and solar modules at issue (*i.e.*, solar cells and solar modules where the country-of-origin is Cambodia, Malaysia, Thailand, or Vietnam) in these circumvention inquiries.

**Comment 2.   Whether a Wafer Should be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China**

*Whether Wafers Sliced from Chinese Polysilicon Outside of China Should be Considered a Chinese Input*

Commerce preliminarily defined inquiry merchandise as solar cells produced in Cambodia, Malaysia, Thailand, or Vietnam, from wafers produced in China, and solar modules produced in Cambodia, Malaysia, Thailand, or Vietnam that contain such solar cells where three or more of the following components in the module/laminate/panel were produced in China:  (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes.  Commerce also preliminarily determined that wafers produced outside of China using polysilicon sourced from China are not Chinese wafers for purposes of the circumvention inquiries.

*Auxin*[17]
- Commerce should determine that wafers sliced from Chinese-origin polysilicon ingots outside of China are Chinese wafers for purposes of defining inquiry merchandise.

---

[14] *See* Solaria Scope Ruling.
[15] *See 2021 Regulations Final Rule*, 86 FR at 52342.
[16] *See Bell Supply CAFC*, 888 F.3d at 1229.
[17] *See* Auxin's March 6, 2023 Case Brief at 4-9; *see also* Auxin's March 17, 2023 Rebuttal Brief at 5-13.

- Commerce's decision to the contrary is arbitrary, inconsistent with record evidence, and undermines its affirmative findings of circumvention.
- Slicing Chinese-origin polysilicon ingots into wafers outside of China does not constitute substantial transformation of the ingot; thus, the wafers remain of Chinese-origin. Significant processing is required to produce polysilicon ingots used to make wafers (*i.e.,* several stages of melting and doping polysilicon, crystal growth, use of 70 percent of the total energy consumed in producing a wafer); whereas slicing the ingots into wafers is minor (*i.e.,* cutting the ingot, submerging it in a chemical bath, cleaning, and inspecting).[18]
- Commerce's decision allows parties to continue to exclusively rely on Chinese-origin materials to produce solar cells and modules and evade AD and CVDs by simply slicing polysilicon ingots into wafers outside of China. Commerce should not permit this.
- The CAFC held that Commerce has discretion to fashion a remedy in its proceedings that will prevent simple avoidance of AD/CVDs and that it should do so.[19]

*BYD HK,[20] CSIL,[21] Jinko,[22] NextEra,[23] TTL,[24] Silfab[25]*

- Granting Auxin's request would inappropriately expand the coverage of the circumvention inquiries which were initiated to examine cell and module assembly outside of China only where "all of the manufacturing process up through the production of wafers takes place in China."[26] Commerce should reject Auxin's *post hoc* attempts to expand the circumvention inquiries.
- Auxin's argument that the country of origin of the wafer should be based on the location of the polysilicon ingot production because of the significance of that production is undermined by its separate argument that Commerce should determine that any wafer produced from Chinese-origin polysilicon—regardless of where the ingot is produced, is a Chinese wafer for purposes of the circumvention inquiries.[27]
- Auxin's arguments about the polysilicon and wafer-making processes and substantial transformation are irrelevant because polysilicon and wafers are not subject merchandise.[28]
- Commerce should not examine whether a product is circumventing an AD/CVD order simply because an input into an input in that product comes from the order country. To do so here essentially means that solar cells produced anywhere in the world from Chinese polysilicon would be subject to the *Orders*, which would render the original scope of the *Orders*, *i.e.*, solar cells from China, meaningless.[29]

---

[18] *See* Auxin's March 6, 2023 Case Brief at 4-6 (citing Circumvention Request at 18-19; and the *NREL Report* in Exhibit 97).
[19] *Id.* at 7 (citing *Canadian Solar CAFC*, 918 F.3d at 919.
[20] *See* BYD HK's March 17, 2023 Rebuttal Brief at 3-7.
[21] *See* CSIL's March 6, 2023 Rebuttal Brief at 6-10.
[22] *See* Jinko's March 17, 2023 Rebuttal Brief at 1-5.
[23] *See* NextEra's March 17, 2023 Rebuttal Brief at 3-6.
[24] *See* TTL's March 17, 2023 Rebuttal Brief at 3-6.
[25] *See* Silfab's March 17, 2023 Rebuttal Brief at 7-8.
[26] *See* NextEra's March 6, 2023 Case Brief at 5 (citing Circumvention Request at 67).
[27] *See* NextEra's March 17, 2023 Rebuttal Brief at 5 (citing Auxin's March 6, 2023 Case Brief at 5-6).
[28] *See* Jinko's March 17, 2023 Rebuttal Brief at 3.
[29] *Id.* at 2.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

- Auxin failed to demonstrate how domestic producers of solar cells and modules are harmed by Commerce's decision that wafers produced outside of China using polysilicon sourced from China are not Chinese wafers for purposes of the circumvention inquiries.[30]
- Commerce should exercise its "substantial discretion in interpreting" the circumvention provisions in the Act and continue to find that solar cells made from wafers produced outside of China are not inquiry merchandise. [31]

*Whether Wafers Sliced from Non-Chinese Polysilicon Inside China Should be Considered a Chinese Input*

*TTL,[32] NextEra,[33] Maxeon,[34] Risen,[35] Jinko[36]*

- Inquiry merchandise should not include solar cells and modules assembled in an inquiry country using Chinese wafers made from non-Chinese polysilicon because Auxin did not request circumvention inquiries with respect to such merchandise. Rather, Auxin requested circumvention inquiries with respect to solar cells and modules produced in an inquiry country where, "all of the manufacturing process up through the production of wafers takes place in China."[37]
- Auxin explained that the examples of circumvention described in its request for circumvention inquiries "involve exporters {in Cambodia, Malaysia, Thailand, and Vietnam} that do not produce polysilicon ingots or wafers — the key upstream inputs in CSPV cells and modules — in those countries, but instead sourced these and other necessary materials and inputs *from China*" (emphasis added).[38] Thus, it is clear that Chinese-origin polysilicon is a key factor in the circumvention inquiries. As such, wafers produced from non-Chinese origin polysilicon should be excluded from the circumvention inquiries.[39]
- Commerce incongruently considers solar cells/modules made in the inquiry countries from non-Chinese wafers containing Chinese polysilicon to be outside the scope of these inquiries, while it considers solar cells/modules made in the inquiry countries from Chinese wafers containing non-Chinese polysilicon to be inquiry merchandise even though those cells and module contain much less Chinese content than the former solar cells/modules. Commerce should correct this inconsistency and find solar cells/modules made in the inquiry countries from Chinese wafers containing non-Chinese polysilicon are not inquiry merchandise.[40]
- It neither makes sense, nor comports with the law, to find solar cells that are assembled in the inquiry countries from non-Chinese polysilicon to be circumventing the *Orders* when

---

[30] *Id.* at 4.

[31] *Id.* at 3.

[32] *See* TTL's March 6, 2023 Case Brief at 3-7.  *see also* TTL's March 17, 2023 Rebuttal Brief at 5-6.

[33] *See* NextEra's March 6, 2023 Case Brief at 2-4.

[34] *See* Maxeon's March 6, 2023 Case Brief at 2-3; *see also* Maxeon's March 17, 2023 Rebuttal Brief at 2-3.

[35] *See* Risen's March 6, 2023 Case Brief at 1-5; *see also* Risen's March 17, 2023 Rebuttal Brief at 1-2.

[36] *See* Jinko's March 17, 2023 Rebuttal Brief at 1-5.

[37] *See, e.g.,* NextEra's March 6, 2023 Case Brief at 3 (citing Circumvention Request at 67).

[38] *See* Risen's March 6, 2023 Case Brief at 3.

[39] *Id.*

[40] *See* TTL's March 6, 2023 Case Brief at 6-7 (citing TTL's May 19, 2022, and JA Solar's May 2, 2022 Comments at Exhibit 2).

9

the value added in China for such solar cells may be less than 33 percent of the total value of the solar cell.[41]  A circumvention determination that is not properly targeted to provide relief only for cell assembly in a third country that is truly circumventing the *Orders* will exacerbate the solar cell shortages faced by module assemblers in the United States.[42]

- Moreover, because the value of the polysilicon in solar cells/modules is a significant portion of the total value of the solar cells/modules, if the wafers in those products were made from non-Chinese polysilicon it is less likely that the solar cells and modules would meet the criterion for finding circumvention under section 781(b)(1)(D) of the Act (*i.e.*, the value of the merchandise produced in the order country is a significant portion of the total value of the merchandise exported to the United States).[43]

- Under certain existing measures, CBP already requires U.S. importers to identify the origin of the polysilicon in imported solar modules.[44]  Thus, administration of a decision that solar cells/modules with wafers containing non-Chinese polysilicon are not inquiry merchandise would not be burdensome.

*Auxin*[45]

- Auxin's request for circumvention inquiries was not limited to solar cells and modules that contain Chinese-origin polysilicon; rather Auxin requested that Commerce initiate circumvention inquiries with respect to solar cells and modules assembled in the inquiry countries where "the vast majority of the materials and equipment … {were} sourced from China."[46]

- Auxin's description of inquiry merchandise as solar cells and modules produced in an inquiry country where, "all of the manufacturing process up through the production of wafers takes place in China," was simply a factual description of the nature of the circumvention that was occurring.[47]

- In order to find circumvention, the Act requires, among other things, that the merchandise imported into the United States be assembled in a foreign country from merchandise produced in the order country and that the value of the merchandise produced in the order country be a significant portion of the total value of the imported merchandise.  The Act does not require that every component assembled in the foreign country be sourced from the order country.

- Polysilicon accounts for less than 10 percent of the cost of a solar module.[48]  It makes no sense to exclude solar modules made with non-Chinese polysilicon from inquiry merchandise when all the other module components, representing over 90 percent of the value of the module, may have been sourced from China.

---

[41] *See* Maxeon's March 6, 2023 Case Brief at 2-3 (citing *NREL Report* included in NextEra May 2, 2022 Comments at Attachment 24; and *Thailand* PDM at 19-20).
[42] *Id.* at 3.
[43] *See* NextEra's March 6, 2023 Case Brief at 3 (citing the *NREL Report* in NextEra's May 2, 2022 Comments at Attachment 24).
[44] *See* Risen's March 6, 2023 Case Brief at 3; *see also* TTL's March 6, 2023 Case Brief at 7 (citing *DHS Order Re: Forced Labor in Xinjiang*; *see also* the Uyghur Forced Labor Prevention Act).
[45] *See* Auxin's March 17, 2023 Rebuttal Brief at 6-13.
[46] *Id.* at 11.
[47] *Id.* at 9.
[48] *Id.* at 12 (citing the *NREL Report* in NextEra's May 2, 2022 Comments at PDF 496).

10

**Commerce's Position:**  For purposes of this inquiry, we have continued to find that a wafer is produced in China if the ingot was sliced to form the wafer in China.  The circumvention provisions under section 781(b) of the Act involve merchandise imported into the United States that was completed or assembled in a foreign country from merchandise that was produced in the order country.  The phrase "produced in" is not further explained or defined in the Act.  We find the Senate Report concerning the Omnibus and Trade Competitiveness Act of 1988, and other sections of the circumvention provisions in the Act provide insights into how to properly apply the phrase "produced in" to the present facts.

When Congress passed the Omnibus and Trade Competitiveness Act in 1988, it explained that section 781 of the Act "addresses situations where 'parts and components … are *sent* from the country subject to the order to the third country for assembly and completion"[49] (emphasis added).  Additionally, section 781(b)(1)(c) of the Act provides that when determining whether an AD or CVD order should cover merchandise assembled or completed in a third-country, Commerce should examine whether third-country imports of the merchandise that was produced in the order country and assembled or completed in that third country increased after initiation of the investigation that led to the order.  These provisions, which indicate that the focus is on the part or component exported (sent) from the order country in the form ultimately used in the finished product in the third country, taken together with the "produced in" requirement, lead us to conclude that the "production" that must occur in the order country involves those production steps that transform the raw materials into the part or component that is sent to the third country for assembly into the finished product.  In other words, we have considered merchandise to be "produced in" the order country for purposes of section 781(b)(1)(B)(ii) of the Act if the final manufacturing step occurs there.

Auxin identified three stages of wafer production:  (1) refining polysilicon; (2) forming the refined polysilicon into an ingot; and (3) processing the ingot into wafers.[50]  Only the last stage of production results in the merchandise that was shipped from China to the inquiry countries for assembly and completion into solar cells and solar modules.  Neither of the intermediate products produced in this process (refined polysilicon and polysilicon ingots) is the merchandise that was shipped/exported to the third country for assembly into the final product.  Hence, wafers processed outside of China from ingots made of Chinese polysilicon do not satisfy the "produced in" the order country requirement of section 781(b)(1)(B)(ii) of the Act (the production step that resulted in the part or component that is used in completion or assembly in the third country (the wafer) did not occur in China).  Similarly, wafers processed in China from ingots made of non-Chinese polysilicon do satisfy the "produced in" the order country requirement of section 781(b)(1)(B)(ii) of the Act (the production step that resulted in the part or component (the wafer) that is used in completion or assembly in the third country occurred in China).

Auxin contends that Commerce should conduct a substantial transformation analysis and find that wafers processed outside of China from ingots made of Chinese polysilicon are "produced in" China for purposes of section 781(b)(1)(B)(ii) of the Act because minimal processing is

---

[49] *See Senate Report 100-71* at 101.
[50] *See, e.g.*, Circumvention Request at 15.

required to process an ingot into wafers.  However, we do not find that a substantial transformation analysis is the appropriate analysis here.

Commerce typically conducts a substantial transformation analysis to determine whether the country of origin of a product that is within the class or kind of merchandise covered by an AD/CVD order, is the country covered that order.  First, wafers are not in a class or kind of merchandise covered by any AD/CVD order.  Second, the only requirement in section 781(b)(1)(B)(ii) of the Act is that the merchandise be "produced in the foreign country with respect to which such order or finding applies" not that its country of origin is the country to which such order or finding applies.  Thus, we need only identify the country where the raw materials were transformed into the part or component that was used in assembly in the inquiry country.  There is no need to consider the substantial transformation criteria (*e.g.*, the class or kind of the upstream and downstream products, where the essential component of the product is substantially transformed, and the extent and value of the processing) to identify the country where the ingots are sliced into wafers, thus, forming the product that was used as an input.  Consequently, we have not used a substantial transformation analysis to determine whether wafers were "produced in" China for purposes of section 781(b)(1)(B)(ii) of the Act where the relevant production steps occurred in multiple countries.

While Auxin contends that Commerce's focus on the country where the ingot was sliced into wafers allows parties to evade AD and CVDs by simply slicing Chinese polysilicon ingots into wafers outside of China, Auxin did not point to anything in the Act or Commerce's practice in circumvention cases that compels Commerce to determine that a component was "produced in" the order country for purposes of section 781(b)(1)(B)(ii) of the Act based on where an input into that component was produced.  There is no mention in section 781(b)(1)(B)(ii) of the Act of inputs into components.  Rather, section 781(b)(1)(B)(ii) of the Act requires that the component that was assembled in the third country be produced in the order country.  Moreover, in prior circumvention inquiries involving merchandise completed or assembled in third countries, Commerce focused its analysis on where the component that was assembled into the finished product in the third country was produced, not where the materials that were used to produce the component were produced.  For example, in *CORE from China (UAE)*[51] which typically involved processing hot-rolled steel made in China into CORE in the UAE, Commerce did not consider where the iron ore or billets that were used to make the hot-rolled steel were sourced, but rather it considered where the hot-rolled steel was produced.

We find that the country in which the ingot is sliced to form the wafer is, pursuant to the language in section 781(b)(1)(B)(ii) of the Act, the most reasonable interpretation of where the wafer is produced.  To the extent that this raises evasion concerns, we do not find that such concerns are sufficient to warrant a deviation from our interpretation of the statute.  Indeed, Auxin's proposed alternative would potentially require Commerce to find circumvention based on wafers that, in our interpretation, are not "produced in" China.  While this alternative may address evasion concerns, it is contrary to the statute, and therefore, impermissible.

We also disagree with interested parties' arguments that Auxin's request for these circumvention inquiries established that inquiry merchandise must contain wafers made from Chinese-origin

---

[51] *See CORE from China (UAE) Final*, 85 FR at 41957.

12

polysilicon.  Although Auxin noted in its request that all the manufacturing processes for the merchandise subject to the inquiries, up through the production of wafers, takes place in China, Auxin appears to have been describing the existing situation that it viewed as constituting circumvention.  In fact, Auxin explained in its request that "{r}easonably available evidence establishes that certain companies may complete the production process through polysilicon refinement, ingot formation, and the production of the wafers in China, after which the wafers are converted to CSPV cells in the third country using additional and substantial Chinese-origin components."[52]  However, the circumvention inquiries that Auxin specifically requested, and on which Commerce initiated, cover solar cells and modules assembled and completed in Cambodia, Malaysia, Thailand, or Vietnam using Chinese-produced inputs, not necessarily Chinese-produced inputs where all the materials that were used to produce the input in China were also produced in China.

Interested parties that oppose finding circumvention also argued that it makes no sense to find solar cells and solar modules containing wafers made from non-Chinese polysilicon to be circumventing the *Orders*, because the wafers in those solar cells and modules have very little Chinese content.  However, those parties did not provide a basis in the Act, Commerce's regulations, or its practice, for interpreting the "produced in" the order country requirement in section 781(b)(1)(B)(ii) of the Act as a content percentage requirement.  Rather, the plain meaning of "produced" is to make from components or raw materials.  Thus, "produced in" the order country means the production steps that transformed the raw materials into the part or component that is sent to the third country for assembly into the finished product occurred in the order country.

Therefore, based on the foregoing, we consider wafers to be a product of China if the ingot was sliced to form the wafer in China.  As a result, we have not defined inquiry merchandise as solar cells and solar modules assembled in an inquiry country from wafers produced outside of China using Chinese polysilicon (as advocated by Auxin), and we have not excluded from our definition of inquiry merchandise solar cells and solar modules assembled in an inquiry country from wafers produced inside China using polysilicon produced outside of China (as advocated by parties opposed to finding circumvention).

Lastly, certain interested parties argued that determining whether wafers were produced in China based on the country-of-origin of the polysilicon in the wafer would not be administratively burdensome because under certain existing measures, CBP already requires U.S. importers to identify the origin of the polysilicon in imported solar modules.  Because we deem the country of origin of polysilicon to be irrelevant to the question of whether a wafer is produced in China, this argument is moot.  In any case, it is not clear that it is administratively feasible to uniformly apply "percentage-of-Chinese-content" or "source-of-component-inputs" definitions of the phrase "produced in" in section 781(b)(1)(B)(ii) of the Act to all the components that could be exported from China to the inquiry countries for assembly into solar cells and solar modules (such as aluminum frames, junction boxes, etc.).  Such a rule appears to be complicated and administratively burdensome given that there could be as many as 100 different inputs used to produce a solar module.

---

[52] *See* Circumvention Request at 27.

13

**Comment 3.   Whether Commerce Should Analyze Investment Data on a Per-Unit Basis**

*NextEra*[53]

- Commerce must consider the large upstream industry in China that supplies virtually all of the world's demand for wafers.  Failing to do so results in an overly simplistic and distortive comparison that does not properly account for differences in scale and market structure.

- Consistent with legislative history, Commerce's past practice, and congressional intent, an alternative approach is warranted in this case. Commerce has also acknowledged that there is no one-size-fits-all approach and that it may determine an appropriate analysis. Thus, Commerce should analyze investment on a per-unit basis for these final determinations.

- Commerce has the data needed to calculate the investment of mandatory respondents on a per-megawatt basis, which allows Commerce to account for differences in scale, market size, and demand, and thus more accurately compare the size of investments in the two countries.

*Auxin*[54]

- NextEra argues that a per-MW analysis is more appropriate because it accounts for differences in scale, market size, and demand, and thus more accurately compares the size of investments in the two countries.[55]

- However, it has been Commerce's practice under section 781(b)(2) of the Act to evaluate the absolute level of investment, as opposed to the per-unit level of investment, because it is a proper and relevant analysis for identifying the level of investment in the third country.[56]

- Commerce's practice is grounded in the recognition that per-unit levels of investment can be distortive, fail to reflect initial threshold levels of investment, and thus fail to capture circumventing activity.

- CSPV production facilities in China require significant threshold levels of investment to capitalize on economies of scale.  Commerce should therefore follow its practice and compare the absolute level of investment rather than the per-unit level of investment.

- In *CORE from China (Vietnam)*, Commerce rejected per-unit comparisons because comparing per-unit investment overlooks the relative requirements for establishing integrated production facilities in China, as compared with processing facilities in the third country, as they dilute the large necessary initial investments required by the volume of the facilities.[57]

- If Commerce were to utilize a per-unit comparison, it would delay closing the circumvention loophole because only when the circumventing company achieved scale would it achieve a per-unit investment figure that approaches the per-unit investment figure of a fully scaled production facility in the original country.

---

[53] *See* NextEra's March 24, 2023 Case Brief at 20-22.
[54] *See* Auxin's April 3, 2023 Rebuttal Brief at 36-41.
[55] *Id.* (citing NextEra's March 24, 2023 Case Brief at 20-22).
[56] *Id.* (citing *CORE from China (Vietnam)*; *CORE from China (UAE)*; and *CRS from China (Vietnam)*).
[57] *Id.* (citing *CORE from China (Vietnam)*).

14

- Benefiting from economies of scale is crucial to realize lower per-megawatt investment costs for polysilicon, ingot and wafer manufacturing.
- NextEra fails to recognize that Chinese over-investment in its CSPV production process has decimated the industry in the United States and allowed Chinese producers to realize lower per-unit costs.
- Commerce should continue to evaluate the level of investment on an absolute basis because such an analysis is consistent with Commerce's practice and ensures that China's industrial policy, heavy subsidies to its PV industry, and other non-market practices do not distort Commerce's overall analysis by failing to capture initial threshold levels of investment in China.

**Commerce's Position:**  We agree with Auxin that Commerce should evaluate investment on an absolute basis as opposed to a per-unit basis.  For these final determinations, we continue to find that the absolute level of investment is a proper and relevant analysis for evaluating the level of investment in Thailand under section 781(b)(2)(A) of the Act.

The statute does not instruct Commerce to employ a particular analysis when evaluating the level of investment in the foreign country for purposes of section 781(b)(2)(A) of the Act.  Given the statute's silence on the issue, Commerce may determine an appropriate analysis to apply.  We find that a comparison between the level of investment in the third country and the level of investment of respondents' Chinese affiliates, on an absolute as opposed to a per-megawatt basis, is a proper and relevant analysis for identifying "the level of investment in the third country" under the Act.  We disagree with NextEra's argument that we should compare the levels of investment on a per-unit basis because we find the proposed alternative of adjusting for per-unit production capacity to be inappropriate in this case.  Comparing per-unit investment overlooks the relative requirements of establishing ingot and wafer production facilities in China, as compared with the cell and module production facilities in Thailand, as this would dilute the large necessary initial investments required by the production volume of the facilities.

Accounting for the threshold level of investment in the Chinese facilities, therefore, captures the investment in the production process that would otherwise be ignored if we were to compare per-unit investment or that would otherwise not be representative if we adjusted for capacity.  Thus, the absolute level of investment of the finishing process relative to the production process of the respondents' affiliates is the appropriate comparison.

In addition to the high levels of investments and large manufacturing facilities required for ingot and wafer manufacturing, the size of China's solar industry can also have a direct impact on the economies of scale that can be realized, allowing ingot and wafer manufacturers to realize lower per-unit investment costs, and thus distorting our analysis.  China's dominance in the global ingot and wafer manufacturing capacity means Chinese ingot and wafer producers are able to benefit from economies of scale in order to achieve lower per-unit investment costs.  China currently accounts for 97 percent of global wafer manufacturing capacity, a feat achieved thanks to economies of scale, supply chain integration, and government support.[58]  China has a lower global manufacturing capacity for cells and modules, accounting for 80 percent and 70 percent of

---

[58] *See* Auxin's July 29, 2022 Comments at Exhibit 1 (citing IEA Report at 24).

the world's production capacity, respectively.[59]  China's ingot and wafer manufacturing industries have therefore been able to benefit heavily from economies of scale, they have been able to achieve steep drops in manufacturing costs at every step of the production process, thus diluting investment amounts in a per-unit figures analysis.[60]

As explained above, the much larger threshold levels of investment required to establish ingot and wafer manufacturing facilities and the resulting economies of scale distort the investment figures for a per-unit analysis.  Therefore, with respect to section 781(b)(2)(A) of the Act, we have continued to compare the investments of the cell and module production process in Thailand to investments of the ingot and wafer production process in China on an absolute basis.

**Comment 4.   Whether to Depart from the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the *Preliminary Determination*s**

*Auxin*[61]

*Commerce Arbitrarily Broke with its Longstanding Practice Without Explanation*
- Commerce departed from its longstanding merchandise-centric comparative methodology when conducting its "minor or insignificant" analysis under section 781(b)(1)(C) of the Act in favor of a new affiliate-centric approach without explanation.  Commerce is required to explain the reasons for a departure from its practice.  Its failure to do so here is arbitrary and unlawful.[62]
- Since 2012, Commerce has applied a consistent merchandise-centric comparative methodology, which follows the flow of goods, when conducting its "minor or insignificant" analysis under sections 781(b)(1)(C) and (b)(2) of the Act.  This approach has been applied by Commerce in circumvention cases involving a broad range of merchandise and industries.[63]

---

[59] *Id.* (citing IEA Report at 24-27).

[60] *Id.* (citing IEA Report at 17); *see also* Auxin's April 3, 2023 Rebuttal Brief at 39-41.

[61] *See* Auxin's April 26, 2023 Case Brief at 6-28, 31-33, and 53-61; and Auxin's May 9, 2023 Rebuttal Brief at 6-11.

[62] *See* Auxin's April 26, 2023 Case Brief (citing *Save Domestic Oil*, 357 F.3d at 1283; and *Encino Motorcars*, 579 U.S. at 212).

[63] In all of the following cases cited in Auxin's April 26, 2023 Case Brief, Commerce compares operations, R&D and investment in the third country to the order country with identifying affiliation as a consideration:  In *SDGE from China (UK),* Commerce explained that "the purpose of the analysis set out in sections 781(b)(1)(C) and (b)(2)(E) of the Act is to evaluate whether a process is minor or insignificant within the context of the totality of the production of subject merchandise.  That is, {Commerce's} analysis addresses the relative size and significance of the processing provided by {the respondent} in comparison to the processing necessary to produce the overall finished product."  *See SDGE from China (UK)*, 77 FR at 47599.  In *PET Film from the UAE (Bahrain),* Commerce repeated that under its 781(b) analysis, "{i}t is appropriate to compare the cost of the process and completion in the third-country facilities with the cost of the process and completion of the facilities needed to produce the subject merchandise in the home country."  *See PET Film from the UAE (Bahrain)* IDM at Issue 2; In *CORE from China (Vietnam),* Commerce again reiterated that its practice has been to "compare the total investment required (as well as, separately, the R&D, production process, and facilities) from the beginning of the production process in the country subject to an antidumping or countervailing duty order to the investment required (as well as, separately, the R&D, production process, and facilities) to finish the final product in a third country, rather than to compare the investments (as well as, separately, the R&D production process, and facilities) required to perform the same finishing steps in each country."  *See CRS from China (Vietnam)* IDM at Comment 5; *CORE from Taiwan*

- Commerce's approach has been affirmed by the CIT as a reasonable interpretation of the circumvention statue and consistent with its past practice in 781(b) cases. Specifically, the CIT explained that "a determination of the third country's portion of the total sum of investment is useful to gauge the level of investment in a third country. Comparative analysis helps also to ensure that larger companies with much smaller operations in a third country – operations that may appear significant in absolute terms given the size of the firm, but that comprise a small share of total operations – will not be able to elude an AD/CVD order simply on account of the firm's large overall size. Accordingly, a comparative analysis was reasonable."[64]

- The CIT affirmed Commerce's analysis, in part, because it was consistent with Commerce's longstanding practice. The CIT noted that Commerce had a longstanding practice of "us{ing} a similar type of comparative analysis and arrived at similar conclusions" and therefore Commerce's merchandise-centric comparative methodology "aligns with its past practice."[65]

- In recent cases Commerce has continued to apply its merchandise-centric comparative framework comparing the production steps taken by the mandatory respondents in those cases to the entire production process in the order country.[66]

- In *SDGE from China (UK)*, *CORE from China (Vietnam)*, *CRS from China (Vietnam),* and *HFC from China (India)*, Commerce found the process of completion in the third country to be minor or insignificant even when the respondents were not affiliated with producers or exporters in the country subject to the order.[67]

- Commerce's affiliate-centric methodology is inconsistent with the language and purpose of the statute as it raises affiliation to a mandatory criterion for finding circumvention.

- Sections 781(b)(1)(C) and 781(b)(2) of the Act do not instruct Commerce to consider affiliation when determining whether the process of assembly or completion is minor or insignificant. Under section 781(b) of the Act, only sub-paragraph (3) specifies affiliation as a consideration.

- Commerce's affiliate-centric methodology allows unaffiliated entities to circumvent AD/CVD orders with impunity, such that, many of Commerce's previous affirmative findings of circumvention since 2012 would now require a negative finding of circumvention under this framework. Not only is this requirement unnecessary, but it contradicts frequent Commerce determinations that affiliation is not a necessary condition for circumvention.[68]

---

*(Malaysia)* IDM at Comment 1; *OCTG from China* (*Brunei and the Philippines)* IDM at Comment 1; and *HFCs from China (India)* IDM at Comment 3.

[64] *See* Auxin's April 26, 2023 Case Brief (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368).

[65] *Id.*

[66] *Id.* (citing *SSSS from China (Vietnam) Preliminary PDM* at 20; *see also Pipe and Tube from India (UAE and Oman)* IDM at Comment 6).

[67] *Id.* (citing *SDGE from China (UK)* at 47600; *CORE from China (Vietnam)* at Comment 12; *CRS from China (Vietnam)* at Comment 12; *HFC from China (India) Preliminary PDM* at 22, unchanged in *HFC from China (India)*.

[68] *See* Auxin's April 26, 2023 Case Brief (citing *Butt-Weld Pipe Fittings from China (Thailand)* IDM at Comment 3, where Commerce explained that "a relationship between the Chinese manufacturer and Thai converter/exporter is not a necessary condition for finding circumvention" and "{i}t is possible for circumvention to occur between unrelated companies."; In *Brass Sheet and Strip from Canada* IDM at Comment 5 Commerce mentioned "{w}hile we have noted that it is 'more likely' for related parties to engage in circumvention activity, a relationship between

17

- Commerce's condition that it will only consider affiliated operations in the order country as a basis for comparison would allow a party to easily evade detection of circumvention by selling inputs through an unaffiliated trading company in the order country.

- When amending the circumvention statute as part of the implementation of the URAA, Congress codified the "minor or insignificant" standard Commerce had already been using, thereby endorsing the overall production process (*i.e.*, merchandise-centric) comparative framework.[69]

- In post-URAA cases, Commerce continued to adopt a merchandise-centric comparative framework to analyze third country assembly operations in the context of the totality of the production of subject merchandise.[70]

- In *Diamond Sawblades from China (Thailand)* and *Aluminum Extrusions from China (Vietnam)*, Commerce again described its practice of analyzing the significance of the assembly and completion process in the third country relative to the full production process for the subject merchandise, noting that it is consistent with prior practice.[71]

- In *Plywood from China (Vietnam) Preliminary,* Commerce compared third country assembly operations to the full production process of subject merchandise in the country subject to the order.[72]

- Commerce has continued up until this case to follow its practice of comparing third country assembly operations to the full production process of subject merchandise in the country subject to the order.[73]

- It is rare that Commerce has not conducted a minor or insignificant comparative analysis, and only when the record of a proceeding lacked sufficient data for such an analysis or when the third country operations being evaluated pre-dated the issuance of the relevant order.[74]

- In departing from its established practice in the *Preliminary Determinations*, Commerce did not conclude that the record lacked sufficient data or that the respondents' operations pre-dated the issuance of the order.

- In *Hot-Rolled Lead and Bismuth,* Commerce acknowledged that it was departing from comparing to a fully integrated producer explaining that "rolling mills which

---

the exporter and importer is not a necessary condition for finding circumvention.  While circumvention may be more likely to occur between related parties, it is also possible for circumvention to occur between unrelated companies;"; In *CORE from China (Vietnam)* IDM at Comment 12; and *CRS from China (Vietnam)* at Comment 12 Commerce once again reiterated recently that the "lack of affiliation does not constitute evidence that circumvention is not occurring.").

[69] *Id.* (citing *Granular PTFE Resin from Italy*).

[70] *Id.* (citing *Tissue Paper from China (Vietnam) Preliminary Determination*, 73 FR at 21584, unchanged in *Tissue Paper from China (Vietnam) Final Determination* IDM).

[71] *Id.* (citing *Diamond Sawblades (Thailand)* IDM at Comment 3; and *Aluminum Extrusions from China (Vietnam)* IDM at 9).

[72] *Id.* (citing *Plywood from China (Vietnam) Preliminary*, 87 FR at 45753).

[73] *Id.* (citing *LWR from China (Vietnam) Preliminary* PDM at 20; *LWR from Taiwan (Vietnam) Preliminary* PDM at 13; and *Circular Welded Carbon-Quality Steel Pipe from China (Vietnam) Preliminary* PDM at 18).

[74] *Id.* (citing *Uncovered Innerspring Units from China (Malaysia) Preliminary Determination,* 80 FR at 64393. ("Because Goldon failed to respond to the questionnaire, the record does not contain complete information regarding the factors set forth in section 781(b)"), unchanged in *Uncovered Innerspring Units from China (Malaysia) Final Determination*, 80 FR at 74758; *Tissue Paper from China (Thailand) Final Determination*, 74 FR at 29172 (applying AFA to the respondent for "refus{ing} to respond to the {Commerce's} questionnaire").

18

subsequently roll lead billets into hot-rolled lead bar predate the order and have always been considered a distinct part of the industry."[75]

- In *Ferrovanadium from Russia Final Determination*, Commerce rejected petitioner's "argument that {Commerce} should compare the U.S. vanadium pentoxide process to the overall ferrovanadium process" finding that such an analysis was "misplaced in this case."[76]  Commerce acknowledged the standard practice and explained that "{w}here the company completing the processing is unaffiliated to foreign producers/exporters and the processing activity … existed prior to the antidumping order, {Commerce} finds the analysis which it employed for the Preliminary Results of U.S. processing activity without comparison to overall production activities is the appropriate analysis."[77]

- For CSIL and TTL, there is no record evidence demonstrating that the company was established before the imposition of the *Order* and both companies are affiliated with Chinese producers and exporters of solar cells and modules, and other solar components.

*Commerce's Approach Results in It Ignoring the Most Important Stage of Production*

- Commerce's affiliate-centric approach results in its analysis ignoring the first stage of the production process:  the mining and refining of solar-grade polysilicon.[78]  As noted by the ITC, polysilicon is the "main underlying raw material input" for solar cells.[79]  Commerce has previously recognized that "{b}y any reasonable measurement, polysilicon is the most important input used in solar modules."[80]

- Producing and achieving the requisite level of purity for solar-grade polysilicon "requires large capital investments to build a plant, large corporate investment to learn and refine the production process, highly skilled labor to operate the plant, and low electricity costs due to the large amount of energy needed to produce polysilicon."[81]

- Auxin's circumvention request explicitly identified production of solar-grade polysilicon in China as the first stage of solar cell/module production.[82]

- The statute requires Commerce to "determine whether the difference between the value of the merchandise imported into a third country {for further processing} and the value of the completed merchandise exported to the United States is small."[83]  Consistent with the statutory language, Commerce began assessing third-country production "within the context of the overall production process."[84]  Commerce consistently adopted this approach in its pre- URAA circumvention inquiries.[85]

- Auxin uploaded information on the record showing that the average investment required to produce subject merchandise in China is $4.7 billion.  Should Commerce change its

---

[75] *Id.* (citing *Hot-Rolled Lead and Bismuth* IDM at Comment 5)

[76] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 1; *see also Ferrovanadium from Russia Preliminary Determination*, 77 FR at 6537.

[77] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 1).

[78] *Id.* (citing *Thailand* PDM at 17).

[79] *Id.* (citing *ITC Solar Monitoring* at I-60 and VI-1).

[80] *Id.* (citing *Solar Cells from China 2017-2018 AR* IDM at Comment 4).

[81] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5).

[82] *Id.* (citing Circumvention Request at 27).

[83] *Id.* (citing SAA at 893).

[84] *Id.* (citing *Granular PTFE Resin from Italy*, 58 FR at 26102).

[85] *Id.* (citing *Butt-Weld Pipe Fittings from China (Thailand)*, 59 FR at 15156; and *Brass Sheet and Strip from Canada* IDM at Comment 2).

19

analysis for the final to a "merchandise-centric approach" it should compare third country operations to the $4.7 billion.[86]

- IEA and DOE reports placed on the record by Auxin note that polysilicon, ingots, and wafers require a higher level of investment compared to solar cell and module production.[87]

*NextEra*,[88] *CSIL*,[89] and *TTL*[90]

*The Act Does Not Mandate a Specific Methodology Under Section 781(b)(2)*

- Commerce's analysis must "vary from case to case depending on the particular circumstances unique to each circumvention inquiry."[91]
- While section 781(b)(2) of the Act does not instruct Commerce to consider affiliation when determining whether the process of assembly or completion in a third country is minor or insignificant, the statute does not preclude Commerce from considering affiliation. Commerce has stated that it has the discretion under the circumvention statute to determine the appropriate minor or insignificant analysis under section 781(b)(2) "depending on the totality of the circumstances of the particular anti-circumvention inquiry."[92] Thus, Auxin reads a limitation into the statute where one does not exist.
- Although the CAFC may have upheld Commerce's merchandise-centric approach in *Al Ghurair CAFC 2023*, the CAFC noted in that case that "Commerce is not bound by its prior determinations" if there is reason to deviate from past practice.[93]
- In the CIT *Al Ghurair* determination that the CAFC affirmed in *Al Ghurair CAFC 2023*, the CIT prefaced its decision by stating that "the statute does not outline a specific methodology for Commerce to follow to determine the level of investment."[94] The CIT further explained that when there is an absence of a designated methodology, Commerce has the discretion on its own method of analysis.[95]
- The SAA explains that "Commerce will evaluate each of {the statutory} factors as they exist either in the United States or a third country, depending on the particular circumvention scenario."[96] This guidance has been adopted in various circumvention cases cited by Auxin, including *Pet Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia), HFCs from China (India), OCTG from China (Philippines and Brunei)*.[97]

---

[86] *Id.* (citing Auxin's July 29, 2022 Investment and R&D Information at Excel Attachment).

[87] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5; and Auxin's July 29, 2022 Investment and R&D submission at Exhibit 1).

[88] *See* NextEra's May 9, 2023 Rebuttal Brief at 4-18.

[89] *See* CSIL's May 9, 2023 Rebuttal Brief at 6-25.

[90] *See* TTL's May 9, 2023 Rebuttal Brief at 6-21.

[91] *Id.* (citing *PET Film from the UAE (Bahrain) Preliminary Determination* IDM at 5).

[92] *See* NextEra's May 9, 2023 Rebuttal Brief (citing *CORE from China (Vietnam)* IDM at 7).

[93] *Id.* (citing *Al Ghurair CAFC 2023*, 65 F.4th at 1351*).

[94] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368*)

[95] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368 (citing *Timken Co.*, 968 F. Supp. 2d at 1286 n.7, *aff'd* 589 F. App'x 995 (Fed. Cir. 2015))).

[96] *Id.* (citing SAA at 893)

[97] *Id.* (citing *PET Film from the UAE (Bahrain) Preliminary* PDM at 5; *CRS from China (Vietnam)* IDM at Comment 5; *CORE from Taiwan (Malaysia)* IDM at 19-20; *HFCs from China (India) Preliminary* PDM at 17; and *OCTG from China (Philippines and Brunei) Preliminary* PDM at 9).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

- In *SSSS from China (Vietnam), Pipe and Tube from India (UAE and Oman), CORE from China (UAE),* Commerce compared upstream production in the order country to downstream production in the third country.[98]
- Commerce has repeatedly stated that its analysis must be tailored to the particular facts of the case,[99] based on the "factors as they exist in the third country, depending on the totality of the circumstances of the particular anti-circumvention inquiry."[100]
- As such, Auxin is incorrect that its "merchandise-centric" analysis is appropriate because it is product and industry neutral.  Instead, Commerce's analysis must be tailored to the specific facts of the circumvention inquiries.

*Commerce's Reliance on Affiliation Accurately Represents Auxin's Request*

- Commerce's affiliate-centric approach is consistent with Auxin's original request for circumvention and record evidence.  Auxin's circumvention request defined the alleged circumventing activity as "assemblers of CSPV cells and modules … that use affiliated Chinese input suppliers and a fully integrated Chinese supply chain to circumvent the existing Orders."[101]  Moreover, Auxin clarified that its allegations "rely heavily upon the relationships between certain Chinese input suppliers and their affiliates in the targeted third countries," and claimed that the affiliation relationships " narrow{} the alleged circumvention activity in this petition to major Chinese companies that use other countries as export platforms."[102]  Auxin specifically framed its circumvention request around assemblers in the third countries "that use affiliated Chinese input suppliers and a fully integrated Chinese supply chain to circumvent the existing Orders."[103]

*Chinese Solar Producers Are Not Integrated with Polysilicon Producers*

- Information on the record, such as a report from the DOE placed on the record by Auxin, confirms that any integration in the solar industry occurs at the later stages of the solar cell and module production process (*i.e.*, from wafers through module production).[104]  This demonstrates that solar cell and module production is not fully integrated in China back to the polysilicon refinement stage of production.
- Auxin identified only one company in China with investments in progress for production of polysilicon, ingot, wafers, cells, and modules; and most companies Auxin identified produce at only one or two of these production stages.[105]

---

[98] *See* CSIL's May 9, 2023 Rebuttal Brief (citing *CORE from China (UAE)* at Comment 1; *SSSS from China (Vietnam)* at 18-19 "where Commerce compared the R&D activities of the upstream hot-rolling of stainless steel in China to the R&D activities of the further processor in the third country;" *Pipe and Tube from India (UAE and Oman)* at Comment 6; and *OCTG from China (Brunei and the Philippines) Preliminary* at 10, unchanged in *OCTG from China (Brunei and the Philippines)* at Comment 1.

[99] *See* NextEra's May 9, 2023 Rebuttal Brief (citing *PET Film from the UAE (Bahrain) Preliminary* PDM at 5; *CORE from China (Vietnam)* IDM at 7).

[100] *Id.* (citing *CORE from China (Vietnam)* IDM at 7; *CRS from China (Vietnam)* IDM at Comment 5; *HFCs from China (India) Preliminary* PDM at 11-12, 17; *CORE from Taiwan (Malaysia)* IDM at 8; *OCTG from China (Philippines and Brunei) Preliminary* PDM at 6; *SSSS from China (Vietnam)* IDM at 15; and *Pipe and Tube from India (UAE and Oman)* IDM at 8, 12).

[101] *Id.* (citing Circumvention Request at 1-2).

[102] *Id.* (citing Circumvention Request at 87).

[103] *Id.* (citing Circumvention Request at 1-2).

[104] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5).

[105] *Id.* (citing Auxin's Investment and R&D Information at Excel Attachment).

- In steel cases Commerce used the facts on the record to compare final processing steps in the third country to the operations of integrated steel mills in the country subject to the order.[106]  However, there is no such facts regarding integration in the solar industry.
- As Commerce does not include iron ore production/investment/facilities in its steel circumvention analysis, it should not include polysilicon production in its solar circumvention analysis.[107]
- Thus, including the polysilicon stage as part of Commerce's consideration of the Chinese solar industry would unfairly distort the analysis and ignore the reality of the industry subject to the inquiry.

*Auxin's Suggested Remedies are Unreasonable*
- In the numerous cases cited by Auxin, it never provides a case, as it argues Commerce should do here, where Commerce calculated an absolute investment figure by averaging the investments of various producers at different stages of the supply chain and summing them to create an estimate of the cost of a hypothetical fully integrated facility.  For the solar industry, doing so would not represent the actual structure of the industry and, thus, would be an inappropriate basis for Commerce's comparison.
- The investment data that Auxin argues should be relied upon under a merchandise-specific approach conflates projected investments with actual investments, often citing companies' announcements of long-term investment plans with projected capacity over the next five to ten years.[108]  Many of the investment and capacity figures used by Auxin do not represent the initial start-up investment required to construct a facility in China, and the figures also include anticipated investments that have not yet been made in China.
- In proposing these vague, estimated figures, Auxin omits any rationale for why Commerce should discard concrete data that was certified by company officials and counsel and verified by U.S. Government officials.[109]  This approach would run counter to Commerce's mission of fair and accurate administration of the trade laws.[110]
- A direct comparison between Auxin's investment data and the mandatory respondents' investment data would lead to inaccurate and misleading results by comparing projected investments in China to third country investments.

*Commerce has Considered Affiliation in Performing Its Analysis under 782(b)(2)*
- Contrary to Auxin's claims, Commerce has focused on comparisons with affiliates in prior circumvention inquiries.  In *PET Film from the UAE (Bahrain),* Commerce collected data from a third-country manufacturer in Bahrain and its affiliate in the UAE to conduct its comparative analysis, making the same comparison between affiliates' investments and operation that Auxin asserts is not appropriate here.[111]  In *CRS from*

---

[106] *Id.* (citing *CORE from China (Vietnam)*; *CRS from China (Vietnam)*; and *SSSS from China (Vietnam)*).

[107] *See* TTL's May 9, 2023 Rebuttal Brief (citing *Pipe and Tube from India (Oman and UAE)* IDM at Comment 6).

[108] *See* NextEra's May 5, 2023 Rebuttal Brief (citing Auxin's Investment and R&D Submission at Excel Attachment and Exhibit P-7b).

[109] *See* CSIL's May 9, 2023 Rebuttal Brief (citing *Yangzhou CAFC* at 1379; and *Gallant Ocean (Thai.) Co.* at 1323).

[110] *Id.* (citing *Albemarle Corp.*, 821 F.3d at 1355, 1357)

[111] *See* NextEra's May 9, 2023 Rebuttal Brief (citing *PET Film from the UAE Preliminary Determination* PDM at 5-6, unchanged in *PET Film from the UAE (Bahrain)*).

22

*Korea (Vietnam)* and *Diamond Sawblades Thailand*, Commerce had data on the record from affiliated parties and opted to make a direct comparison between the respondents' investments and the operations of its affiliate in the country subject to the order.[112]

- Auxin ignores the significant portion of Commerce's analysis that did not consider affiliation at all. When analyzing the factors under section 781(b)(2) of the Act, Commerce did not consider affiliation when evaluating section 781(b)(2)(C) and 781(b)(2)(E) of the Act.

**Commerce's Position:** We disagree with Auxin that Commerce should revise its application of the "minor or insignificant" factors, as enumerated in section 781(b)(2) of the Act.[113] The statute and the SAA grant Commerce discretion in evaluating the five minor or insignificant factors. The statute only provides that Commerce "shall take into account" the five factors, without further instruction. According to the SAA, Commerce will evaluate the five factors under section 781(b)(2) of the Act "as they exist either in the United States or a third country, depending on the *particular circumvention scenario*," and that "{n}o single factor will be controlling."[114] Thus Commerce must tailor its analysis to the facts on the record. Here, we place particular emphasis on affiliation, aided by the circumvention request itself, because the 'circumvention scenario' alleged by Auxin is unique and distinguishable from most of those examined in our previous circumvention inquiries.

In this circumvention inquiry, the particular circumvention scenario, per Auxin's request, is centered around third country companies using "affiliated Chinese input suppliers and a fully integrated supply chain to circumvent the existing *Orders*."[115] Auxin notes that "{t}he circumvention allegations contained herein rely heavily upon the relationships between certain Chinese input suppliers and their affiliates in the targeted third countries, a factor that Commerce must consider."[116] Again, Auxin describes that the "fact pattern significantly narrows the alleged circumventing activity in this petition to major Chinese companies that use other countries as export platforms to continue selling cheap CSPV cells and modules to the United States."[117] In accordance with the SAA's language instructing Commerce to "evaluate the factors … depending on the particular circumvention scenario," we applied our minor and insignificant analysis, with respect to the respondents' level of investment, level of research and development, and extent of production facilities, using a comparative approach that accounts for the production activities of the upstream affiliates of the third country producers, mirroring Auxin's request.

Auxin's circumvention request is why we also disagree with Auxin's arguments that we should adopt a "merchandise-centric" comparative approach for the final determination and include solar-grade polysilicon in our 781(b)(2) analysis. Auxin focuses on the language in *SDGE from*

---

[112] *Id.* (citing *CRS from Korea (Vietnam) Preliminary* PDM at 14-17, unchanged in *CRS from Korea (Vietnam)*; and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*).
[113] The five factors listed under section 781(b)(2) of the Act:  (A) level of investment in the foreign country; (B) level of research and development in the foreign country; (C) nature of the production process in the foreign country; (D) extent of production facilities in the foreign country; and (E) value of processing performed in the foreign country.
[114] *See* SAA at 893 (emphasis added).
[115] *See* Circumvention Request at 1-2.
[116] *Id.* at 87.
[117] *Id.*

23

*China (UK)* stating that the purpose of the analysis under section 781(b)(1)(C) of the Act is to "evaluate whether a process is minor or insignificant within the context of the totality of the production of subject merchandise" such that Commerce's analysis addresses "the relative size and significance of the processing provided by {the respondent} in comparison to the processing necessary to produce the overall finished product."[118]  Again, Congress and our past practice require us to consider the unique facts and circumstances of each specific case.  In *Al Ghurair CAFC 2023*, the CAFC noted that Commerce "is not bound by its prior determinations" and should there be a reason to deviate from its past practice, Commerce may explain why it is appropriate to do so.[119]  In the underlying CIT decision, the CIT noted that Commerce has the discretion to decide its own analysis to determine the level of investment as section 781(b)(2) of the Act does not outline a specific methodology."[120]  In accordance with *Timken Co.,* the CIT provided Commerce the discretion "to adapt to different factual circumstances to address circumvention."[121]  In *CRS from China (Vietnam),* Commerce applied a similar logic where it stated that the statute does not instruct Commerce to apply a particular analysis, and therefore, "Commerce may determine an appropriate analysis to apply."[122]  Again, Congress and our past practice require us to consider the unique facts and circumstances of each specific case.  In accordance with the recognized discretion granted to Commerce in circumvention inquiries, for this inquiry, Commerce utilized an approach which is specific to the upstream affiliates of each respondent.  Because none of the respondents to this inquiry were affiliated with upstream producers of polysilicon, we did not consider Chinese polysilicon production as part of our comparative analysis of the 'minor or insignificant' factors.

Auxin's circumvention request alleges a circumvention fact pattern that involves integrated Chinese solar producers spinning off the last steps of production (*i.e.*, solar cell and solar module production) to the inquiry countries to undermine the existing *Orders* and avoid AD/CVD duties. With that fact pattern in mind, after selecting the largest producers/exporters of solar cells and/or solar modules in the third countries, we requested a litany of information related to the corporate structure and operations of the respondents, examining any affiliation links to producers involved in the production of solar cells and modules in China.  After examining the information placed on the record by the respondents, the facts indicated that:  (1) none of our respondents' affiliates in China had fully integrated production back to the mining and refining of solar-grade polysilicon during the period of inquiry; and (2) there is no substantial record evidence of fully integrated production in China during the period of inquiry.[123]  CSIL provided information showcasing that its upstream affiliates in China started at the ingot stage of production, thus we decided it was appropriate to directly compare CSIL's Thai facilities to that of its upstream affiliates in China, starting from the ingot stage of production when examining sections 781(b)(2)(A), (B), and (D) of the Act.[124]  Whereas in TTL's case, it provided information showcasing that its upstream affiliates in China started at the wafer stage of production, thus, we

---

[118] *See SDGE from China (UK)*, 77 FR at 47599.

[119] *See Al Ghurair CAFC 2023*, 65 F.4th at 1360 (citing *Hyundai Electricity CAFC*, 15 F.4th at 1089.

[120] *See Al Ghurair CIT 2021* at 1368 (citing *Timken Co.*, 968 F. Supp. 2d at 1286 n.7, *aff'd* 589 F. App'x 995 (Fed. Cir. 2015)).

[121] *Id.*

[122] *See CRS from China (Vietnam) Final* IDM at Comment 5; *CORE from China (Vietnam) Final* IDM at 34; and *OCTG from China (Brunei and the Philippines) Final* IDM at 7.

[123] *See* CSIL Preliminary Analysis Memorandum at 2; *see also* TTL Preliminary Analysis Memorandum at 2.

[124] *See Thailand* PDM at 16.

24

Barcode:4419744-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Thailand 2022

decided it was appropriate to directly compare TTL's Thai facilities to that of its upstream affiliates in China, starting from the wafer stage of production when examining sections 781(b)(2)(A), (B), and (D) of the Act.[125]  Such facts, on the respondent-specific level, were subsequently authenticated by us when conducting the verifications of CSIL and TTL.

Based on the facts above, we disagree with Auxin's insistence that Commerce include in its comparison to the order country the first stage of production of solar cells and modules, the mining and refining of solar-grade polysilicon.  The pre-URAA cases Auxin relies on in support of starting the comparative analysis at the first stage of the production process, *Granular PTFE Resin from Italy* and *Brass Sheet and Strip from Canada,* are cases where Commerce compared third country operations to fully integrated producers in the country subject to the order.[126]  Moreover, other post-URAA cases cited by Auxin, *CORE from China (Vietnam)*, *CRS from China (Vietnam)*, and *SSSS from China (Vietnam)*, are cases where Commerce used the facts on the record to compare fully integrated steel producers in China to the operations conducted in the third country.  These cases are not comparable to the present circumvention proceeding as our record demonstrates that fully integrated production (*i.e.*, production facilities that manufacture polysilicon, wafers, ingots, solar cells, and solar modules) is not typical of the solar industry in China.  Auxin's argument that Commerce should compare the level of production in the third country to a fully integrated producer in China, as it did in prior circumvention inquiries, is therefore inapposite.  Even if Commerce were to determine that such an approach was appropriate to evaluate the circumvention scenario alleged by Auxin, the record lacks evidence of a 'fully integrated' solar cell and module producer comparable to the fully integrated steel mills which has been used as a basis for comparison in other cases.

The solar industry is distinguishable from the industries involved in the cases cited by Auxin, and therefore warrants a different methodological approach, when considering the 'minor or insignificant' factors, to that applied in past cases.  In the steel industry, producers in the order country typically are fully integrated starting at the first stage of production.[127]  We do not have a similar fact pattern on this record.  Prior to the *Preliminary Determination,* we provided all parties, including Auxin, an opportunity to place investment and R&D information on the record of the proceeding.  However, no party provided substantial record evidence of fully integrated production in China during the period of inquiry.  Regarding the Chinese solar industry as a whole, Auxin, in its July 29, 2022 Investment and R&D submission, identified only one company in China with in-progress investments in all stages of production, *i.e.*, solar-grade polysilicon, ingot, wafers, solar cells, and solar modules.[128]  An interested party, NextEra, placed information on the record indicating that the solar industry is not composed of fully integrated producers starting with mining or refining solar-grade polysilicon.[129]  In fact, a report Auxin

---

[125] *Id.* at 16.

[126] *See Granular PTFE Resin from Italy* IDM at 12-13 n.16 (citing *Brass Sheet and Strip from Canada*, 58 FR at 33613 ("compar{ing} {respondents' rerolling} activities to that of *vertically integrated producers*, such as brass mills, which cast, roll, and finish the product") (emphasis added)).

[127] *See CORE from China (Vietnam) Preliminary* PDM at 18, n. 82.

[128] *See* Auxin's Investment and R&D Information at Excel Attachment.  Auxin did not provide information establishing that this company had actually commenced production of solar cells and modules.

[129] *See* NextEra's May 2, 2022 Comments at Att. 2 and at 9 ("Of the leading global polysilicon producers by capacity in 2021, only two, the Chinese companies GCL and Tongwei, participate in supply chain stages other than

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

itself placed on the record, and cited in its April 26, 2023 Case Brief, confirms that integration in the Chinese solar industry does not begin at the mining and refining of solar-grade polysilicon stage of production, and instead involves the later stages of the solar cell and module production process (*i.e.*, wafer through module production).[130]  Auxin argues that we should use its July 29, 2022 Investment and R&D submission to extrapolate an estimate of the investment and R&D needed for one fully integrated solar cell and module producer in China from a number of different companies that operate in different stages of the production process and use those estimates as the basis for our comparison to the order country.  Given the fragmented nature of the solar industry in China, we find a comparison to a fully integrated producer in China, in accordance with Auxin's proposed "merchandise-centric" approach to be inappropriate.

The solar industry is also unique in other respects.  First, solar cell production is more technically complex and dependent on skilled labor to a greater degree than most other products that Commerce has examined in prior circumvention inquiries.[131]  For this reason, we placed particular emphasis on the "level of research and development" factor when evaluating whether the production in the third country was minor or insignificant.  *See* Comment 8.  However, the nature of research and development is such that, once carried out, it is easily transmissible across national borders.  Further, solar cells and modules are unique products insofar as one country, here China, accounts for almost one hundred percent of the global production of a primary upstream input, *i.e.*, solar wafers.[132]  These factors, when taken into consideration together, contribute to a circumvention scenario in which large solar conglomerates are incentivized to 'spin off' production of solar cells into third countries, and in which third country producers are left with little choice but to source solar wafers from China.  Our comparative analysis of the 'minor or insignificant' factors, in which we compare respondents' level of investment, level of research and development, and extent of production facilities to those of their affiliated Chinese input suppliers, is the most appropriate manner in which to account for *these particular facts*, which again are unique to the solar industry.

Further, contrary to the language Auxin cites from *SDGE from China (UK)*, there is precedent for Commerce to not examine whether the process of assembly in the third country is minor or insignificant in comparison to the entirety of the production process in the order country.  This was the case in *PET Film from the UAE Preliminary Determination*, where Commerce found it appropriate to compare PET film facilities in the third country, Bahrain, to PET Film facilities in the order country, and did not include all production stages in the comparative analysis.[133]  This was also the case in *SSSS from China (Vietnam)*, *Pipe and Tube from India (UAE and Oman)*, *CORE from China (UAE)*, and *OCTG from China (Brunei and the Philippines)* where similar to this circumvention inquiry, for the factors under section 781(b)(2) of the Act, Commerce

---

[130] *See* Auxin's May 16, 2022 Comments at Exhibit 5.
polysilicon. Of these two companies, GCL is a significant wafer producer, and Tongwei is a leading CSPV cell producer. All other polysilicon producers … operate exclusively in the polysilicon stage of the CSPV manufacturing supply chain.").
[130] *See* Auxin's May 16, 2022 Comments at Exhibit 5.
[131] *See ITC Solar Final* at I-15 (solar cell production is "a highly automated, capital intensive, and technologically sophisticated process, requiring skilled technicians and employees with advanced degrees.").
[132] *See* Circumvention Request at 28-30 (citing Bloomberg NEF Report at 1, 9).
[133] *See PET Film from the UAE Preliminary Determination* IDM at 5.

26

compared upstream production in the order country to downstream production in the third country.[134]

Citing *Ferrovanadium from Russia Final Determination* and *Hot-Rolled Lead and Bismuth*, cases where Commerce decided against conducting a comparative analysis under section 781(a)(2) of the Act, Auxin argues that the absence of a comparative analysis under 781(a)(2) is only appropriate where there is "no affiliation between the relevant parties **and** third country (or U.S.) operations pre-existed the relevant order."[135]  Although these two cases were circumvention inquiries conducted under section 781(a) of the Act, similar statutory language applies to sections 781(a)(2) and 781(b)(2).  While we agree with Auxin that these are two important aspects to consider, in this specific case, we also consider Auxin's circumvention request, which focused heavily on upstream solar input producers working in tandem with affiliated third country solar cell and solar module producers to circumvent the existing *Orders,* an important distinction that must be considered.  Auxin's proposed standard, which aims to compare third country producers to the entire solar cell and module production process in the order country, fails to account for the rapid growth of the solar cell industry in the years following the issuance of the *Orders*, and may inappropriately target certain third country producers with no upstream affiliates in the order country.[136]  Therefore, for third country solar cell and module producers with no upstream input affiliates in the order country, we find a comparative analysis in the manner requested by Auxin for sections 781(b)(2)(A), (B), and (D) of the Act to be inappropriate.

Auxin also argues that we have gone against our practice by elevating affiliation to a mandatory criterion under section 781(b)(2) of the Act, therefore, making affiliation a prerequisite for finding circumvention.  However, this point by Auxin is a misrepresentation of our minor or insignificant analysis applied in the *Preliminary Determination.*  Although Auxin is correct that, in this specific case, for our evaluation of the level of investment, the level of research and development, and the extent of the production process, we centered our analysis around upstream input affiliates, Auxin incorrectly conflates our analysis with respect to sections 781(b)(2)(A), (B), and (D) to the entire determination made under section 781(b)(1)(C) of the Act and our circumvention finding writ-large.  In evaluating whether the process of assembly in the third country was minor, for the criterion under section 781(b)(2)(C) of the Act, nature of production process, we compared third country operations to the production of a silicon wafer in China, starting from the solar-grade polysilicon stage of production, regardless of affiliation.  Specifically, in the *Preliminary Determination*, we found that the nature of the production process, as examined under section 781(b)(2)(C) of the Act, is "not minor or insignificant compared to either **processing polysilicon into wafers**, or ingots into wafers, in China, which does not weigh in favor of finding circumvention."[137]  Similarly, when examining the criteria

---

[134] *See CORE from China (UAE)* IDM at Comment 1; *SSSS from China (Vietnam)* IDM at 18-19 "where Commerce compared the R&D activities of the upstream hot-rolling of stainless steel in China to the R&D activities of the further processor in the third country"; *Pipe and Tube from India (UAE and Oman)* IDM at Comment 6; and *OCTG from China (Brunei and the Philippines) Preliminary* PDM at 10, unchanged in *OCTG from China (Brunei and the Philippines)* IDM at Comment 1.
[135] *See* Auxin's April 26, 2023 Case Brief at 23-26.
[136] *See* Circumvention Request at 57-58, n. 231.
[137] *See Thailand* PDM at 20.  Our approach with respect to 781(b)(2)(C), nature of the production process in the foreign country, remains unchanged in this final determination.

under section 781(b)(2)(E) of the Act, value of processing, in the *Preliminary Determination* we again did not factor in affiliation and note that the silicon wafer is naturally inclusive of the polysilicon that went into it.[138]  As such, Auxin's reliance on *Butt-Weld Pipe Fittings from China (Thailand)* and *CORE from China (Vietnam*), cases where Commerce noted that affiliation does not have to be present for circumvention to occur, is misplaced as we did not, in this case, elevate affiliation to a mandatory criterion under section 781(b)(2) of the Act or consider affiliation a prerequisite to finding circumvention.  For similar reasons, Auxin's dependence on *SDGE from China (UK),* affirmed in *U.K. Carbon & Graphite*, *CORE from Vietnam (China)*, *Retail Carrier Bags from Taiwan Final Determination*, *CRS from China (Vietnam)*, *Tissue Paper from China (India)*, *SDGE from China (UK),* and *HFC from China (India), i.e.*, prior circumvention cases where the process of assembly was found minor even for respondents that did not have affiliates in the order country, adds no value within the context of this proceeding as the methodology applied in the *Preliminary Determination* does not preclude a company with no affiliates in the order country from being found to be circumventing an order.

We note that Commerce, in the cases cited by Auxin, has opted to conduct a direct comparison under section 781(b)(2) of the Act between a respondent's third country operations and the operations of its affiliate in the country subject to an AD/CVD order.  For example, *PET Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia)*, *CRS from Korea (Vietnam)*, and *Diamond Saw Blades from China (Thailand)* are examples of prior circumvention cases where Commerce conducted a direct comparison between the respondents and their affiliates in the country subject to the order when examining the criteria under 781(b)(2)(A), level of investment, 781(b)(2)(B), R&D, 781(b)(2)(C), nature of production process, and 781(b)(2)(D), extent of production facilities.[139]  In line with *PET Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia)*, *CRS from Korea (Vietnam)*, and *Diamond Saw Blades from China (Thailand)*, when examining 781(b)(2)(A), level of investment, 781(b)(2)(B), R&D, and 781(b)(2)(D), extent of production facilities, we reasonably opted to make a direct comparison between a respondent's operations in the third country and its upstream affiliates in the country subject to an AD/CVD order.

Therefore, the assumption by Auxin that unaffiliated suppliers will get a free path to circumvent the existing *Orders* is false.  Rather, in accordance with the SAA, our finding as to whether the extent of processing was minor or insignificant was supported by our evaluation of all five factors listed in section 781(b)(2) of the Act, including the nature of the production process and the value added in the third country, which Commerce evaluated without comparison to respondents' upstream affiliates.

Therefore, our minor or insignificant determination, under section 781(b)(1)(C) of the Act was a "multi-factor"[140] analysis and did not rely merely on affiliation or the exclusion of a stage of production as the linchpins of our circumvention findings.  For these reasons, for the final

---

[138] *Id*.  Our approach with respect to section 781(b)(2)(E) of the Act, value of processing in the foreign country, remains unchanged in this final determination.
[139] *See PET Film from the UAE (Bahrain) Preliminary* PDM at 5-6, unchanged in *PET Film from the UAE (Bahrain)*; *CORE from Taiwan Preliminary Determination* PDM at 14-17, unchanged in *CORE from Taiwan Final*; and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*.
[140] *See Al Ghurair CAFC 2023*, 65 F.4th at 1363.

determination, we will not depart from the minor or insignificant analysis applied in the *Preliminary Determination*.

**Comment 5.   How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act**

*Auxin*[141]
- Section 781(b)(2)(E) of the Act requires Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."
- Commerce should base the value of the merchandise that is imported into the United States on the COM of that merchandise rather than U.S. sales price because U.S. sales prices could be transfer prices, prices that reflect dumping or subsidization, or prices below costs.
- Commerce has acknowledged that section 781 of the Act does not define "value," and it explained that in determining value under that section of the Act it considers the items that are being valued and the "availability and reliability of reported prices and costs."[142]
- In *Plywood from China (Vietnam) Preliminary*, Commerce valued the merchandise imported into the United States using COM where it noted that " … the U.S. price is insufficient to cover even the Chinese veneer content of the finished hardwood plywood."[143]
- This same logic should be applied in these circumvention inquiries where Commerce finds a similar fact pattern when comparing the cost of Chinese inputs used in the inquiry merchandise (based on surrogate values) to the sales value of the merchandise imported into the United States.

*NextEra*[144]
- Using COM to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act directly conflicts with Commerce's statutory mandate and is inconsistent with its practice.
- In *Glycine from China (India)*, Commerce explained that "although the statute does not specify a method for determining value {under section 781(b)(2)(E) of the Act}, it does clearly specify that this is a *value-based test,* and *not a cost-based test*."[145]
- In *PET Film from the UAE (Bahrain)*, Commerce confirmed that it must use "the value of the merchandise exported to the United States," not costs, in its calculations under section 781(b)(2)(E) of the Act, "consistent with use of the phrase 'value of processing performed'" in that section of the Act.[146]
- In *Plywood from China (Vietnam)*, Commerce was forced to base its calculations under section 781(b)(2)(E) of the Act on whatever facts were available since there were no

---

[141] *See* Auxin's April 26, 2023 Case Brief at 75-78.
[142] *Id.* (citing *SDGE from China (UK)* IDM at Comment 3).
[143] *Id.* (citing *Plywood from China (Vietnam) Preliminary*).
[144] *See* NextEra's May 9, 2023 Rebuttal Brief at 39-40.
[145] *Id.* (citing *Glycine from China (India)* IDM at 18).
[146] *Id.* (citing *PET Film, Sheet, and Strip from the UAE (Bahrain)* IDM at 5).

29

usable data from respondents on the record (Commerce applied total AFA).  The unique methodology used in that case is not relevant here.[147]

*TTL*[148]

- Under section 781(b)(2)(E) of the Act, Commerce is clearly directed to compare the value of processing in the third country to the "value of the merchandise imported into the United States."  Thus, Commerce should continue to use the value, not the cost, of merchandise imported into the United States in its calculations under section 781(b)(2)(E) of the Act.
- In *Glycine from China (India)*, Commerce explained that section 781(b)(2)(E) of the Act "does clearly specify that this is a *value-based test* and *not a cost-based test*."[149]
- *SDGE from China (UK)* does not support Auxin's proposal to use costs to value the merchandise imported into the United States, which is the denominator in the ratio of "value of processing to the value of the merchandise," because the issue in that case involved the numerator of the ratio.  Moreover, in *SDGE from China (UK)* Commerce based the value of the imported merchandise on sales value, not costs.[150]
- Auxin did not show that the U.S. sales prices reported by respondents are unreliable.  At verification Commerce found no discrepancies with respect to the U.S. sales prices reported by TTL.
- Auxin based its claim that TTL's U.S. sales prices are unreliable on a comparison between material costs, based on surrogate values, and U.S. sales prices.  However, this comparison is not relevant in circumvention inquiries.  Any claim that a company is selling solar cells or solar modules at less than fair value should be made in a antidumping duty petition.

**Commerce's Position:**  We disagree with Auxin's position that Commerce should use COM to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.  Although the word "value" is not defined in section 781(b)(2)(E) of the Act, Congress described this section of the Act as determining "whether the value of the processing performed in … the third country represents a small portion of the value of the merchandise sold in, or imported into, the United States."[151]  The phrase "value of the merchandise sold" indicates a sales value that generally reflects all costs incurred, not just the cost of materials, labor, and factory overhead (COM), as well as a profit.

Commerce has taken this position in other cases.  In *Glycine from China (India)* Commerce explained that "although the statute does not specify a method for determining value {in section 781(b)(2)(E) of the Act,} it does clearly specify that this is a value-based test, and not a cost-

---

[147] *Id.* (citing *Plywood from China (Vietnam) Preliminary* PDM at 15, 24).
[148] *See* TTL's May 9, 2023 Rebuttal Brief at 35 and 36.
[149] *Id.* (citing *Glycine from China (India)* IDM at 18).
[150] *Id.* (citing *SDGE from China (UK)* IDM at Comment 3).
[151] *See* S. Rep. No. 103-412 (1994), at 82.

30

based test."[152]  This plain reading of the statute is also consistent with Commerce's calculations in other circumvention inquiries.[153]

Neither *SDGE from China (UK)* nor *Plywood from China (Vietnam)* supports Auxin's position. The issue in *SDGE from China (UK)* involved how to value third-country processing (the numerator in the ratio of third-country processing divided by the value of the merchandise imported into the United States), not how to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.[154]

In *Plywood from China (Vietnam)*, Commerce did not have any usable data from Vietnamese producers or exporters of hardwood plywood to determine the relative value of the processing performed in Vietnam.  Consequently, Commerce used data that were provided by the requester of the circumvention inquiry and submitted in the Vietnam Finewood Scope Inquiry.  The requester in *Plywood from China (Vietnam)* argued that most of the production costs for hardwood plywood were incurred in China and, thus, Vietnamese processing is relatively minor. In the absence of data from Vietnamese producers or exporters of hardwood plywood, Commerce attempted to confirm the requester's allegation by examining the percentage of COM represented by core veneers from China and Vietnamese processing (*i.e.*, Commerce sought to confirm whether most costs were incurred in China).  Although Commerce applied AFA in its determination, it noted that it based its analysis on "the value associated with completing hardwood plywood using Chinese-origin core veneers (and potentially Chinese face and back veneers) in Vietnam is relatively insignificant in comparison to the primary stages of production that are completed in China."[155]  Thus, Commerce's cost-based approach in *Plywood from China (Vietnam)*, was unique to the facts of that case and should not necessarily stand as precedent for all circumvention inquiries.  In fact, in the final determination in *Plywood from China (Vietnam)*, Commerce explained that:

> Although the U.S. Importers and {Vietnamese} Exporters assert that the methodology relied on in other circumvention inquiries to calculate the value added in a third country differs from the methodology Commerce used in the Preliminary Determination, we continue to find that our determination relied on the best available information on our record. … Given the limited information available on the record, we have continued to apply our quantitative analysis from the Preliminary Determination.[156]

Lastly, we do not find Auxin's arguments that the reported U.S. prices are distorted to be persuasive.  Auxin based its arguments on a comparison of the total value, based on surrogate values, of Chinese inputs in a solar module, to the U.S. sales value of the module.  However,

---

[152] *See Glycine from China (India)* IDM at 18.
[153] *See, e.g.*, *CORE from China (UAE) Preliminary* PDM at 21, unchanged in *CORE from China (UAE)*; *Pipe and Tube from India (Oman and UAE)* IDM at 37; and *OCTG from China (Brunei and Philippines) Preliminary* PDM at 13, unchanged in *OCTG from China (Brunei and Philippines)*.
[154] *See SDGE from China (UK)* IDM at Comment 3 ("… UKCG requests that {Commerce} reconsider the methodology used to determine the numerator of the quantitative portion of the analysis of further processing … As discussed below, {Commerce} has indeed reconsidered its calculation of the value included in the numerator").
[155] *See Plywood from China (Vietnam) Preliminary* PDM at 10, 23, and 24.
[156] *See Plywood from China (Vietnam) Final* IDM at Comment 2.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

Commerce calculated the total value of Chinese inputs in a solar cell or solar module that Auxin used in its comparison for purposes of section 781(b)(1)(D) of the Act, not section 781(b)(2)(E) of the Act. Auxin never explains why it would be distortive to compare the cost of processing solar cells and modules in, for example, Cambodia, Malaysia, or Thailand, to the U.S. sales value of those solar cells and modules when presumably, the sales value would reflect the processing costs incurred in those countries. Moreover, it is not appropriate to find that inquiry merchandise is being dumped or unfairly subsidized in the context of a circumvention proceeding.

For the foregoing reasons, we have continued to use U.S. sales prices to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.

**Comment 6.   Whether Material Costs Should be Included in the Value of Third-Country Processing**

*Auxin*[157]
- When applying section 781(b)(2)(E) of the Act (*i.e.*, determining whether the value of the processing performed in the third country represents a small proportion of the value of the merchandise imported into the United States), Commerce must exclude the value of material inputs in the value of the processing. By using the phrase "processing performed," the Act focused on the processing operations in the third country, not the value of the material inputs used in those processing operations.
- This interpretation is consistent with *HFCs from China (India)* where Commerce determined that "when the Act is referring to the value of the processing, it is referring to the process of completion or assembly of the parts or components, not the process to manufacture the parts or components."[158]
- In *HFCs from China (India)*, Commerce noted that "Congress acknowledged in {certain} passages of the SAA that, under the previous statutory criteria, the inclusion of the parts or components from a third country proved to be problematic. Therefore, Congress enacted the revisions to section 781(b) of the Act, which allowed Commerce to focus on whether the process of assembly or completion is minor or insignificant pursuant to section 781(b)(2) of the Act." [159]
- Rather, material inputs used in third-country processing should be considered when determining the total value of the exported merchandise under section 781(b)(1)(D) of the Act (where Commerce must determine whether the portion of the product produced in the order country is a significant portion of the total value of the product exported to the United States) and sections 781(b)(2)(A) (level of investment in the third country), (C) (nature of the production process in the third country), and (D) (extent of the production facilities in the third country) of the Act.[160]

---

[157] *See* Auxin's April 26, 2023 Thailand Case Brief at 71-75.
[158] *Id.* (citing *HFCs from China (India)* IDM at 17).
[159] *Id.*
[160] *Id.*

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

*TTL*[161] and *NextEra*[162]

- The direct materials are an integral part of processing, and the exclusion of the non-Chinese material values would leave a gap in the assessment of the value of the processing in Thailand.
- Commerce has a longstanding practice of including the value of material inputs used in third-country processing in the value of that processing under section 781(b)(2)(E) of the Act and should not depart from that practice here.[163]
- Auxin did not explain why here Commerce should depart from its overwhelming prior practice based on a single instance (*HFCs from China (India)*), where it excluded the value of material inputs used in third-country processing from the value of that processing.[164]

**Commerce's Position:**  We disagree with Auxin's position that in this circumvention inquiry, Commerce should exclude material costs from the value of processing for purposes of section 781(b)(2)(E) of the Act.

Section 781(b)(2)(E) of the Act directs Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."  Although Auxin claims that the phrase "the value of the processing performed" means the value of the processing operations performed in the third country, not the value of the material inputs used in those processing operations, the phrase "processing operations" is not further defined in the Act, and the individual items to be included in, or excluded from, the value of processing are not identified in the Act.  Moreover, Auxin did not cite any accounting authority or other authority showing that a manufacturer's processing costs do not include material costs.

Processing generally entails subjecting something to a series of actions in order to achieve a particular result or the act of taking something through a set of prescribed procedures.  For example, the Executive Summary and portions of the narrative in the *Bloomberg Report*, which is a report that Auxin relied on in its Circumvention Request, indicate that processing refers to the entire manufacturing activity[165] and processing costs refer to the total cost of a certain stage of production.[166]  In contrast, a graph in the *Bloomberg Report* indicates that processing costs include depreciation and fixed overhead costs.[167]  Therefore, it appears that the word "processing" is not consistently used to refer to the same types of costs.  Thus, the plain meaning of "processing," as used in section 781(b)(2)(E) of the Act, does not answer the question of whether the value of processing includes material costs.

---

[161] *See* TTL's May 9, 2023 Rebuttal Brief at 31-34.

[162] *See* NextEra's May 9, 2023 Rebuttal Brief at 37-39.

[163] *See CORE from China (UAE)* IDM at 20; *CRS from Korea (Vietnam) Preliminary* PDM at 17, unchanged in *CRS from Korea (Vietnam)*; and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*.

[164] *See* NextEra's April 28, 2023 Vietnam Rebuttal Brief at 36-37

[165] *See Bloomberg Report* at the Executive Summary at PDF page 5, item 5.

[166] *Id.* at PDF page 15.

[167] *Id.* at Figure 9.

33

Barcode:4419744-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Thailand 2022

Auxin primarily rests its argument on Commerce's decision in *HFCs from China (India)* and Commerce's discussion of the SAA in that case. When Commerce calculated the value of processing for purposes of section 781(b)(2)(E) of the Act in *HFCs from China (India)*, it did not include the processing and material costs that the respondent incurred in the third country to produce the HFC component (R-125) that the respondent blended with the Chinese HFC component (R-32) to form the HFC blend (R-410A) sold in the United States. Commerce explained that "when the Act is referring to the value of the processing, it is referring to the process of completion or assembly of the parts or components, *not the process to manufacture the parts or components*. This interpretation of the language in the Act is consistent with Congress' intent towards this portion of the statute" (emphasis added).[168]

Thus, the issue in *HFCs from China (India)* involved the material costs that the respondent incurred to self-produce a product that it used to "complete" the Chinese product, and not the question of whether the cost of materials and supplies used when assembling and completing the Chinese product in the third-country should be included in the value of processing for purposes of section 781(b)(2)(E) of the Act. In fact, in *HFCs from China (India)*, the respondent did not use any materials in its "completion" of the Chinese R-32, it merely blended the self-produced R-125 with the Chinese R-32 to form the HFC blend (R-410A) sold in the United States.[169] Hence, we do not find Commerce's decision in *HFCs from China (India)*, to be directly applicable in this case.

Moreover, the decision in *HFCs from China (India)*, which Commerce described as "consistent with Congress' intent towards this portion of the statute,"[170] was to focus on the process of completing the Chinese components in the third country, as opposed to the process of manufacturing parts that were used to finish the Chinese components in the third country. Commerce's decision in *HFCs from China (India)* was to not focus on the processing that had nothing to do with the assembly or completion of the merchandise imported from the order country (China). Thus, this decision was entirely consistent with Congress' revisions to Section 781(b) which directed "Commerce to focus on whether the process of assembly or completion {in the third-country} is minor or insignificant pursuant to section 781(b)(2) of the Act."[171] Additionally, Commerce's decision in *HFCs from China (India)* was fact specific and did not necessarily establish a broader practice regarding which costs should be included in the value of processing being performed in the foreign country for purposes of section 781(b)(2)(E) of the Act.

Auxin's argument is based, in part, on Commerce's citation in *HFCs from China (India)* to the SAA's discussion of a "third-country parts" problem that existed in the pre-URAA version of the Act, which required that the difference between the value of the order country product that was processed in the third country and the final product imported into the United States be small to find circumvention. Congress found this provision was ineffective in identifying circumvention

---

[168] *See HFCs from China (India)* PDM at Comment 3.
[169] *Id*. ("… we valued only the respondents' direct labor, manufacturing overhead, SG&A expenses, and net interest expenses in valuing the production process as these are the *only* expenses incurred by GFL … in performing the processing on the components to make HFC blends" (emphasis added).
[170] *Id*.
[171] *Id*.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

because in some cases only minor assembly was performed in the third country, yet the difference in value was not small (*e.g.*, a "screwdriver" operation in the third country where high value third-country electronic components were simply connected together with electronic components from the order country into a finished product). Therefore, Congress revised the Act by removing the "difference in value" provision and adding, among other things, section 781(b)(2)(E) of the Act (whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States).[172]

However, after discussing the third-country parts problem, the SAA simply explains that new section 781(b)(2)(E) of the Act requires that Commerce determine whether the value of the third-country processing is small and notes that this requirement is consistent with the overall focus of revisions to the Act, which is to determine whether the process of assembly or completion in the third country is minor or insignificant. The SAA never indicated that the cost of all the materials used in third country processing should be excluded from the value of that processing for purposes of section 781(b)(2)(E) of the Act, and Commerce has not taken that position in numerous prior circumvention cases.[173]

A discussion of this matter is in Commerce's summary of the comments that it received on its revisions to the regulations that it proposed pursuant to the Uruguay Round Agreements Act. Specifically, one party "argued that because the emphasis in anticircumvention inquiries concerning completion or assembly in … a third country is now on whether that process is minor or insignificant, any parts or components sourced from third countries should not be included in making that judgement."[174] Commerce replied to that comment by stating that "we have not adopted this suggestion."[175] While Commerce went on to explain that third-country parts and components must still be considered under section 781(b)(1)(D) of the Act, the issue raised by the commenter was clearly focused on the issue at hand here, namely how third-country parts should be treated in determining whether completion or assembly in a third country was minor.[176] Yet, Commerce did not indicate, at that time, that its policy would be to exclude the cost of materials from the value of the processing in all circumvention inquiries, as suggested by Auxin.

Moreover, Commerce's regulations under 19 CFR 351.226(i) specify that "{i}n determining the value of … processing performed … under section 781(b)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(e) of the Act—or, in the case of nonmarket economies, on the basis of section 773(c) of the Act." Thus, Commerce's regulations discuss valuing parts or components when determining the value of processing under section 781(b)(2)(E) of the Act.

Similarly, we do not find it appropriate to exclude the cost of processing materials from the value of third-country processing in this circumvention inquiry. Here, we are not facing the situation described in the SAA, where a few high value third-country components are being connected

---

[172] *See* SAA at 892-94.
[173] *Id.*
[174] *See Antidumping Duties; Countervailing Duties*, 62 FR at 27329.
[175] *Id.*
[176] *Id.*

together with components from the order country into a finished product.  Auxin itself claimed that "{t}he total cost components from China represent a significant portion of the total value of the merchandise ultimately exported to the United States."[177]  Moreover, the process of completing some of the Chinese components in the third country involves more than simply attaching Chinese and third-country components together.  Some third-country materials are applied to, or infused into, the Chinese components to modify their properties (*e.g.*, phosphorus is diffused into wafers to effect a molecular-level impregnation that changes the electrical properties of the wafer).[178]  As a result, the processing involves more than just the activities performed on the components; it includes third-county materials interacting with the Chinese components to change the properties of the component.  It is not clear, in this case, that all third-country materials should be excluded from the value of third-country processing, even the materials that form the nature of the processing.

Moreover, we do not find it reasonable to apply Auxin's interpretation of the SAA in this case, given the cost structure of solar cells and solar modules.  Record evidence indicates that non-material costs account for significantly less than half the price for solar modules.  The ITC noted that "{r}aw material costs for the production of solar modules (much of which are the cost of the cells) accounted for 81.5 percent of U.S. producers' total cost of goods sold."[179]  The *Bloomberg Report* (2021), indicates that material inputs account for 67 percent of the cost of converting a solar cell into a solar module while other processing costs account for 13 percent and labor and electricity costs accounted for 20 percent of total costs.[180]  Given that the total non-material costs incurred to produce solar cells and solar modules, even in China, are limited, we do not find that Auxin's proposal to only consider non-material costs when calculating the value of third-country processing would provide a meaningful measure of the significance of the assembly or completion in the third-country.  Therefore, in order to calculate a meaningful measure of third-country processing of solar cells and solar modules under section 781(b)(2)(E) of the Act, and for the other reasons explained above, we have continued to include material costs in the value of processing performed in the foreign country for purposes of section 781(b)(2)(E) of the Act.

**Comment 7.  Whether Commerce Should Rely on Surrogates to Value Chinese Inputs Consumed in the Inquiry Country**

*CSIL*[181]
- Commerce should not value any inputs that were used to assemble modules in Thailand using surrogate values (which are used for NME countries) because Thailand is a market economy country.[182]  Where the producer purchased the input from a Thai supplier in Thailand and paid for the input in a market economy currency, the fact that the input was produced in China is irrelevant since the purchase occurred in a market economy.
- If Commerce continues to use surrogate values it should:  (1) apply the same surrogate value to the same type of input in each of the circumvention inquiries; and (2) value the

---

[177] *See* Circumvention Request at 78.
[178] *Id.* at 20.
[179] *See USITC Solar Investigation Final* at V-1.
[180] *See Bloomberg Report* at PDF page 18 and Figure 12 and PDF page 22 and Figure 18.
[181] *See* CSIL's April 26, 2023 Case Brief at 26-27.
[182] *Id.* at 26 (citing section 771(18) of the Act).

input using its purchase price, not a surrogate value, where a significant quantity of the input was not of Chinese origin.[183]

*Auxin*[184]

- Commerce should value the Chinese inputs that were used to assemble modules in Thailand based on surrogate values because assembly in a market-economy country does not undermine Commerce's authority to use surrogates to value inputs that were produced in an NME country (in this case China)[185] and the *Orders* under consideration are on an NME country.[186]

- Instead of applying the same surrogate value to the same type of input in each of the circumvention inquiries, Commerce should follow its practice and select surrogate values in each circumvention inquiry based on, among other factors, the quality, specificity, and contemporaneity of the available surrogate value data.[187]

- CSIL's suggestion to use purchase prices to value certain inputs where some of the input came from outside of China should be rejected because it is inconsistent with Commerce's NME methodology and a misapplication of 19 CFR 351.408(c)(1), which pertains to purchases of inputs from market economy countries, not the composition of those inputs.

**Commerce's Position:** We continue to find that it is appropriate to value Chinese-produced inputs that were used to produce solar cells and modules in the inquiry country based on surrogate values. When determining whether circumvention occurred, section 781(b)(1)(D) of the Act instructs Commerce to determine whether "the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the value of the merchandise that was exported to the United States." Neither the Act nor Commerce's regulations describe how it is to determine "value." In this case we have interpreted "value" to mean the cost of the input. While we are not determining the cost of production or constructed value here, we find section 773(f)(1) of the Act instructive in considering the issue before us. When calculating cost of production and constructed value, section 773(f)(1) notes that:

> {c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.

Use of the word "normally" indicates that there may be circumstances where it is inappropriate to use the respondent's records to determine costs. In such cases, Commerce has the discretion to determine costs by some other reasonable means.

---

[183] *Id.* at 27 (citing 19 CFR 351.408(c)(1)).
[184] *See* Auxin's May 9, 2023 Rebuttal Brief at 75-77.
[185] *Id.* (citing *U.K. Carbon and Graphite*, 931 F. Supp. 2d at 1322; *see also Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1377-78).
[186] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1376, 1377).
[187] Id. (citing *Off-the-Road Tires from China* IDM at Comment 9).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

Under the Act, the prices of goods produced in NME countries cannot generally be relied upon. The presence of government controls on various aspects of NMEs renders calculation of costs based on actual prices paid for NME inputs invalid under Commerce's normal methodologies. Because the respondent assembled solar modules in the inquiry country using inputs that were produced in China, and China is an NME country, we believe the prices paid by the respondent could be distorted by controls in the NME country. Given these facts, we find it would be inappropriate to use the respondent's records to determine the cost of the Chinese-produced inputs.

In such situations, Commerce must determine costs by some other reasonable means. Commerce's longstanding practice is to use surrogates to value inputs in an NME country. While the inquiry country is not an NME country, this inquiry concerns *Orders* on an NME country, China, and the inputs in question were produced in China. Thus, for the reasons noted above, and consistent with Commerce's practice of using surrogate values in circumvention inquiries involving NME countries,[188] we find it appropriate to use surrogates, rather than the respondent's purchase prices, to value Chinese-produced inputs that were used to produce solar cells and modules in the inquiry country.

We disagree with the respondent's position that purchase prices should be used to value the Chinese produced inputs because the inquiry country is a market economy country. We find the current situation similar to the one described in Policy Bulletin 94.1, where Commerce noted that "{i}n view of the economic distortion created by state control in NMEs, and the absence of market directed decisions on price and output, it is unrealistic to expect the prices of NME produced goods sold to third {country}resellers to be unaffected by that distortion."[189] Moreover, the CIT "has sustained Commerce's use of surrogate values in previous circumvention inquiries involving merchandise assembled in {a market economy} country, because the decision to do so reflects Commerce's reasonable construction of the statute.[190]

We assigned the same surrogate value to the same type of input in each of the circumvention inquiries, as suggested by CSIL, only where the facts supported doing so. Section 773(c)(1)(B) of the Act instructs Commerce to "use the best available information" on the record when selecting surrogate values. It is Commerce's practice to select surrogate values from a single market economy country that represent broad market average prices that are specific to the input being valued, net of taxes and import duties, contemporaneous with the period under consideration, publicly-available, and not aberrational.[191] Commerce must weigh the available surrogate value information on the record with respect to each input and make a product-specific and case-specific decision as to what the "best" available surrogate value is for each input.[192] We followed Commerce's methodology for selecting surrogate values in NME cases by using the best available information on the record of each circumvention inquiry to value the Chinese inputs used by the respondent(s) in that inquiry, rather than follow the rule proposed by CSIL.

---

[188] *See, e.g.*, *SDGE from China (UK)* IDM at Comment 2; *see also CORE from China (UAE)* IDM at Comment 2; *CORE from China (Vietnam)*; and *Hangers from China (Vietnam)*.

[189] *See* Policy Bulletin 94.1.

[190] *See Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1378 (citing *U.K. Carbon and Graphite*, 931 F. Supp. 2d at 1336).

[191] *See CVP 23 from China,* and accompanying IDM at Comment 4; *see also* 19 CFR 351.408(c)(2).

[192] *See, e.g.*, *Preserved Mushrooms from China* IDM at Comment 1.

While CSIL argued that Commerce should value an input using its market economy purchase price, not a surrogate value, where a significant quantity of the input was not of Chinese origin, 19 CFR 351.408(c)(1) establishes that Commerce will use a surrogate value unless "substantially all" of the input has been purchased from a market economy supplier, and provides that "substantially all" means that 85 percent or more of the total quantity of the input purchased must have been purchased from market economy suppliers. While the inquiry country is not an NME country, this inquiry concerns *Orders* on an NME country, China; thus, we followed our NME methodology of using the market economy purchase price when 85 percent or more of the total quantity of the input was purchased from market economy suppliers. Moreover, where a respondent purchased an input from China and one or more market economy countries, we accounted for the market prices paid for the input under section 781(b)(2)(E) of the Act, and only used surrogate values to value the Chinese portion of the input for purposes of section 781(b)(1)(D) of the Act.

**Country-Specific Issues**

**Comment 8.  Whether Third Country Processing was Minor-General**

**The Level of Investment in Thailand**

*Auxin*[193]

- The record contains information demonstrating that Chinese polysilicon producers' average absolute investment is $1,479,630,963,[194] or $0.07/watt, representing 31 percent of the total investment in solar facilities.[195] Chinese ingot producers' average absolute investment is $694,448,090,[196] or $0.05/watt, and 15 percent of the total investment in solar facilities.[197] Chinese wafer producers' average absolute investment is $1,198,355,500,[198] or $0.06/watt, representing 25 percent of the total investment in solar facilities.[199] Chinese cell producers' average absolute investment is $ 776,898,051,[200] or $0.09/watt, representing 16 percent of the total investment in solar facilities.[201] Chinese module producers' average absolute investment is $566,410,256,[202] or $0.07/watt, representing 12 percent of the total investment in solar facilities.[203] This overall average Chinese investment in all five stages of solar module production of $4.7bn dwarfs THSM and TTL's investment in its Thai solar cell and module production facilities.[204]

---

[193] *See* Auxin's Tranche 1 Rebuttal Brief at 28-31; Auxin's April 26, 2023 Case Brief at 30-47; and Auxin's April 26, 2023 Case Brief at 12, 41.

[194] *See* Auxin's April 26, 2023 Case Brief at 31 (citing Auxin's July 29, 2022 Comments at the Investment & R&D Excel Attachment, "Poly" tab).

[195] *Id.* (citing Auxin's July 29, 2022 Comments at the Investment & R&D Excel Attachment, "Poly" tab).

[196] *Id.* (citing Auxin's July 29, 2022 Comments at the Investment & R&D Excel Attachment, "Ingots" tab).

[197] *Id.*

[198] *Id.* (citing Auxin's July 29, 2022 Comments at the Investment & R&D Excel Attachment, "Wafers" tab).

[199] *Id.*

[200] *Id.* (citing Auxin's July 29, 2022 Comments at the Investment & R&D Excel Attachment, "Cells" tab).

[201] *Id.*

[202] *Id.* (citing Auxin's July 29, 2022 Comments at the Investment & R&D Excel Attachment, "Modules" tab).

[203] *Id.*

[204] *See* Auxin's April 26, 2023 Case Brief at 39 (citing Boviet Preliminary Analysis Memorandum at 2).

39

- Auxin's estimate of the average absolute investment for the fully integrated solar production process in China is consistent with the announcement by the China-based East Hope Group of its establishment of a fully integrated (*i.e.*, polysilicon production through module assembly) base in the Inner Mongolia Region of China for $4.6 billion.[205]

- In the *Preliminary Determination*, Commerce compared THSM and TTL's investments in their respective Thai solar cell and module facilities to their Chinese affiliates' ingot and/or wafer facilities.[206] This approach failed to follow its longstanding practice of comparing third country assembly operations to production of subject merchandise in the country subject to the order as a way to evaluate the relative significance of the third country assembly operation.[207] Based on the Chinese investment placed on the record cited above, THSM and TTL's investments in the solar cell and module factories are a small fraction of the overall Chinese investments.

- Commerce only compared the Thai investment to one of THSM or TTL's affiliate's solar wafer and/or one ingot producers, rather than to THSM and TTL's affiliate's ingot or wafer through solar module producers. If Commerce had conducted its comparison based on the full production performed by THSM and TTL's affiliates, the result would indicate the overall investments in the Thai facilities are less than that in China.[208] Such a comparison is conservative because it ignores the necessary investment in polysilicon production. Thus, THSM and TTL's investments in cell fabrication and module assembly in Thailand are minor or insignificant under both a merchandise-centric and affiliate-centric analysis.

- Record information indicates that TTL's Chinese affiliates have recently realized ingot[209] and polysilicon production.[210] Thus, Commerce should have compared the investment in TTL's Thai facilities to that in its affiliates' polysilicon through solar module production.

*CSIL*[211] and *NextEra*[212]

- Based on CSIL's submissions,[213] Commerce correctly found and verified[214] that the level of investment for THSM was not minor or insignificant. Commerce cannot find that solar cell production is a major, capital-intensive process, while at the same time determine that some producers have an insignificant level of investment for cell and module production or that the manufacturing facilities in the targeted countries are "minor and insignificant."

---

[205] *Id.* at 33 (citing Auxin's July 29, 2022 Comments at Exhibit PI-6).

[206] *See* Auxin's April 26, 2023 Case Brief at 34 (citing CSIL Preliminary Analysis Memorandum at 2; and TTL Preliminary Analysis Memorandum at 2).

[207] *Id.* at 34 (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1362 ("Commerce determined that the initial investment of approximately $272 million for facilities in the UAE was minor compared to the average investment of $3.6 billion for construction of integrated steel mills in China.")

[208] *Id.* Case Brief at 34 (citing CSIL Preliminary Analysis Memorandum at Excel Attachment II (Investment); and TTL Preliminary Analysis Memorandum at Excel Attachment II (Investment).

[209] *Id.* 3 (citing TTL's IQR Part I at 1).

[210] *Id.* (citing TTL's IQR Part I at Exhibit 9 (PDF pages 269, 319-20, and 345)).

[211] *See* CSIL's May 9, 2023 Rebuttal Brief at 39-40.

[212] *See* Next Era's May 9, 2023 Rebuttal Brief at 31-33.

[213] *See* CSIL's May 9, 2023 Rebuttal Brief at 40 (citing CSIL's IQR, Part I at Exhibit 15; *see also* CSIL's SQR1 at Exhibit S1-2).

[214] *Id.* (citing CSIL's Verification Exhibits at Exhibit VE-8).

- Auxin's reference to "Chinese companies, with the support of the Government of China"[215] in discussing investments is inapposite because CSIL and THSM's ultimate parent, Canadian Solar Inc., is a globally integrated solar company legally domiciled and incorporated in Canada.
- Auxin argues that based on its calculations any investment less than $4.7 billion amounts to circumvention.[216] Auxin's figures are, again, unverified estimates. Even if they were accurate, they would be inappropriate because they purport to represent the entirety of the production process, from the mining of silicon to solar module assembly.

*TTL*[217] and *NextEra*[218]

- Commerce correctly found that the level of investment for TTL was not minor or insignificant.
- Commerce's practice is to compare the investments in third country downstream operations to the upstream operations in the country of the AD/CVD order to determine whether third country assembly operations are "minor or insignificant.[219] Thus, a comparison of investments in downstream cell and module production in China, which Auxin argues to do, are both an irrelevant and inaccurate consideration for determining whether TTL's same downstream cell and module investments in Thailand are minor or insignificant.
- TTL's Chinese affiliate's investments in ingot and polysilicon facilities in China were not operational during 2021 and the Trina Group is only a minority shareholder in these ventures.[220] Further, Auxin itself admits that both facilities take years to construct.[221]
- While the investment estimates in future polysilicon and ingot joint venture operations are not a relevant comparison to TTL's inquiry period cell and module production, if Commerce is to use these estimates for a comparison, Commerce must use a per megawatt comparison due to the significant scale of Trina's domestic market that these future investments are servicing and the distinct nature of each of these production stages.
- When comparing the investment per megawatt for the different stages for investments made within the similar time periods, the cell stage shows higher investment per watt than the polysilicon, ingot, and wafer stages.[222]
- TTL's wafer consumption in 2021 included substantial amounts of non-Chinese wafers and the share of non-Chinese wafers increased substantially in 2022.[223]

**Commerce's Position:** We disagree with Auxin. With regard to arguments concerning Commerce's comparison methodology, as stated in Comment 4, we have continued to compare the investment in the inquiry countries to that of the cell/module producers' affiliates in China,

---

[215] *Id.* at 39 (citing Auxin's April 26, 2023 Case Brief at 34).
[216] *Id.* (citing Auxin's April 26, 2023 Case Brief at 34).
[217] *See* TTL's May 9, 2023 Rebuttal Brief at 18-25.
[218] *See* Next Era's May 9, 2023 Rebuttal Brief at 31-33.
[219] *See* TTL's May 9, 2023 Rebuttal Brief at 20 (citing, *e.g.*, *CORE from China (UAE)* IDM at Comment 1; *see also SSSS from China (Vietnam) Preliminary* PDM at 18-19 (where Commerce compared the R&D activities of the upstream hot-rolling of stainless steel in China to the R&D activities of the further processor in the third country).
[220] *Id.* at 23 (citing TTL's Verification Report at Exhibit V-5).
[221] *Id.* (citing Auxin's April 26, 2023 Case Brief at 61).
[222] *Id.* at 24 (citing TTL's 4th SQR at 3 and Exhibit 5).
[223] *See* TTL's May 9, 2023 Rebuttal Brief at 25 (citing TTL's IQR Part 2 at 35-36).

and so we have not considered Auxin's investment figures concerning companies unaffiliated with CSIL and TTL.  Additionally, as stated in Comment 3, we have not compared investment on a per-unit basis.  We further disagree with Auxin that we should compare the investment in the inquiry country to the investments in multiple factories producing the same output.  Doing so would prevent us from determining whether the investment in the inquiry country to produce a solar cell or module represents a minor or insignificant share of the overall investment undertaken in China to produce a solar cell or module, because it would overstate the investment in China required to do so.

With regard to Auxin's argument that we should compare the investment in the inquiry countries to the investment in the full production in China, rather than to only the stages of production not done in the inquiry countries, regardless of the approach, the result would be the same.  As we noted in the *Preliminary Determination*, a simple comparison of the investment in the THSM and TTL facilities to that of the factories performing the stages of production only done by their affiliates in China, demonstrates that both respondents' investments in Thailand are not minor or insignificant.[224]  However, even if we compared the investment by CSIL and TTL's Chinese affiliates' in all stages of solar production in China to the investment by THSM and TTL in Thailand, the investments in the THSM and TTL facilities represent a significant share of the investments by their affiliates in China.[225]

With regard to Auxin's argument that we should have compared TTL's investment to the investments in the Trina Group's investments in polysilicon and ingot production in China, there is no evidence on the record that investments by TTL's Chinese affiliates in ingot and polysilicon production have resulted in any production or even that they have broken ground in the planned facilities.[226]  Thus, we have not compared TTL's investments in Thailand to these unrealized investments by its affiliates.

**The Level of R&D in Thailand**

*CSIL*[227]
- Commerce's comparison of THSM's R&D expenses in Thailand to those of its affiliated Chinese ingot and wafer producers is flawed for three reasons.
- First, Commerce did not consider the important nature of THSM's R&D activities in Thailand which involve developing new technologies to optimize its production and improve product quality.[228]
- Second, Commerce did not consider that the number of THSM employees conducting R&D is a significant proportion of the total Canadian Solar workforce involved in R&D.
- Third, Commerce inappropriately compared total R&D expenses incurred by companies of radically different sizes which distorted its analysis.

---

[224] *See* the CSIL and TTL Preliminary Analysis Memoranda.
[225] *See* the CSIL and TTL Final Analysis Memoranda.
[226] *See* TTL's Verification Report at Exhibit V-5; *see also* Auxin's April 26, 2023 Case Brief at 61, noting the lengthy time required to realize polysilicon production.
[227] *See* CSIL's April 26, 2023 Case Brief at 16-21
[228] *Id.* at 19 (citing CSIL'S IQR Part I at 7-8).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

*Auxin*[229]

- While Commerce correctly found that CSIL's R&D expenses were minor or insignificant, it used an incorrect comparison to reach that conclusion.
- Instead of comparing THSM's R&D expenses in Thailand to those of its affiliated Chinese ingot and wafer producers (an affiliate-centric approach),[230] Commerce should have compared THSM's R&D expenses in Thailand to those of companies engaged in the stages required to produce the merchandise under consideration in the order country, China (a merchandise-centric approach). R&D expenses for every stage of solar cell and solar module production in China are substantial and confirm Commerce's conclusion.[231]
- Alternatively, Commerce should have compared THSM's R&D expenses in Thailand to those of all its affiliated Chinese solar producers, rather than comparing the Thai R&D expenses to the R&D expenses of only CSIL's affiliated Chinese ingot and wafer producers.
- In either case, THSM's R&D expenses for cell fabrication and module assembly in Thailand are minor or insignificant under both a merchandise-centric and an affiliate-centric analysis.

**Commerce's Position:** We disagree with Auxin, in part, and CSIL.[232] First, for the reasons explained in Comment 4, in this particular inquiry, we do not find it appropriate to compare CSIL's R&D expenses incurred in Thailand to those of unaffiliated Chinese producers engaged in the various stages required to produce the merchandise under consideration (a merchandise-centric approach). Hence, we do not find Auxin's comparisons of CSIL's Thai R&D expenses to those of unaffiliated Chinese producers engaged in various stages of solar related production to be persuasive.

Auxin contends that the R&D expenses of all CSIL's affiliated solar producers in China should have been considered in the affiliate-centric R&D expense comparison. In contrast, we compared the level of R&D expenses incurred in Thailand only to the R&D expenses incurred by CSIL's Chinese affiliates that performed the initial production steps related to the products assembled or completed in Thailand. Using that comparison, we believe we properly focused on the significance of the Thai R&D expenses in relation to all the R&D expenses incurred by entities engaged in manufacturing the product imported into the United States.

However, because R&D may be shared among affiliates such that the R&D of one company can benefit another affiliated company and save that company from needing to conduct its own R&D, we also compared the level of R&D expenses incurred in Thailand to the R&D expenses incurred by CSIL's other Chinese affiliates that were not directly involved in the production of the product imported into the United States. This comparison continues to show that THSM's

---

[229] *See* Auxin's April 26, 2023 Case Brief at 40-43; *see also* Auxin's May 9, 2023 Rebuttal Brief at 22-26.
[230] *See* CSIL Preliminary Analysis Memorandum.
[231] *See* Auxin's April 26, 2023 Case Brief at 40 (citing Auxin's July 29, 2022 Comments at Exhibits RD-1, RD-2, and RD-4 and the Excel Attachment at "R&D").
[232] Except for its comments regarding verification (*see* TTL's April 26, 2023 Case Brief at 10-12), TTL did not dispute Commerce's preliminary determination that the level of its R&D in Thailand was minor and insignificant relative to that of its affiliates in China.

43

R&D expenses are not comparable to those of its affiliates in China and supports our preliminary decision.[233]

While Auxin believes that Commerce erred by not considering the important nature of THSM's R&D activities in Thailand and the number of employees engaged in those R&D activities, section 781(b)(2)(B) of the Act instructs Commerce to consider the "level of research and development in the {inquiry country}." We believe that an important gauge of the level of R&D is the amount spent on R&D. Based on the difference in R&D expenses that we observed in our comparison, we do not find that the nature of the Thai R&D activities or the number of employees engaged in those R&D activities outweigh the difference that we observed such that Commerce should reverse its decision.[234] Moreover, while CSIL claimed that THSM's Thai R&D activities were important in nature, Commerce normally compares the level of R&D in the inquiry country to that in the order country. CSIL never compared the level of importance of the Thai R&D activities to the level of importance of the R&D activities of its affiliates in China to support it position.

Lastly, we disagree with CSIL's claim that our R&D expense analysis is distorted because we compared aggregate, rather than per-unit, R&D expenses of two companies "without regard to production scale and capacity …"[235] R&D expenses are expenditures that generally relate to a company's efforts to develop and improve products. R&D expenses are typically considered to be fixed expenses which do not vary, at least in the short term, based on the level of production. Therefore, larger production volumes and capacity do not necessarily translate into more R&D expenses. Hence, it is not clear that comparing R&D expenses of companies with different production capacities necessarily distorts the comparison.

Furthermore, the R&D of one company is not necessarily compartmentalized when it comes to its affiliates. Affiliated companies may share R&D. Therefore, calculating per-unit R&D expenses for each affiliated company based on that company's production volume or capacity, as CSIL suggests, may not be meaningful when one company's R&D may benefit the production of not only that company but other affiliated companies. We believe the more meaningful metric in this situation is the total R&D expense incurred by the company. This figure represents the total level of R&D that the company has contributed compared to the total level of R&D that other companies in its group of affiliates has contributed. We find this is a better gauge of the level of R&D provided in Thailand and in China by CSIL affiliated companies.

**Nature of Production**

*Auxin*[236]
- Commerce's incorrectly determined, based on the nature of third-country processing, that the processing is not minor or insignificant[237] In making that decision, Commerce failed to properly weigh: (1) capital requirements; (2) costs associated with building; (3) the

---

[233] *See* CSIL Preliminary Analysis Memorandum.
[234] *Id.*
[235] *See* CSIL's May 9, 2023 Rebuttal Brief at 37; *see also* CSIL's April 26, 2023 Case Brief at 20.
[236] *See* Auxin's April 26, 2023 Case Brief at 53, 57-71.
[237] *See* Auxin's April 26, 2023 Case Brief (citing *Thailand* PDM at 20).

time required to build, the manufacturing facility; (4) technical hurdles associated with starting up operations; (5) energy to require to produce the product; (6) labor demands; (7) number of stages of production; and (8) number of inputs used to produce the product.[238]  Each of these items are addressed below.

- Commerce based its finding that solar cell production is the most capital intensive part of the manufacturing process on outdated data from 2009 to 2012.[239]  Recent data from IEA's 2021 report, show that "polysilicon and ingots/wafers together account for almost 70% of all investment in solar PV manufacturing due to their high capital requirements"[240] and "polysilicon plants and ingot and wafer factories are significantly more CAPEX-heavy than cell- and module-manufacturing facilities."[241]

- The IEA reported that "… polysilicon and ingots/wafers together account for almost 70% of all investment in solar PV manufacturing …" while cells and modules have low minimum investment requirements.[242]

- The BloombergNEF Report indicated that polysilicon and wafer facilities "take the longest to construct"[243] (12-40 months for polysilicon plants but only 3-12 months for cell and module facilities according to IEA; 3-4 years for polysilicon plants but only 1-3 years for ingot, wafer, solar cell and module facilities according to DOE).[244]

- The BloombergNEF Report concluded that "{t}echnical hurdles are highest for plants that make polysilicon and wafers;"[245] thus, "{g}iven low technical and financial barriers, it is also easier for module companies to open shop in other countries in response to tariffs or other policy developments."[246]  The DOE noted that "the module production process … does not require the same level of technical skill …"[247]

- According to the IEA, "{p}olysilicon production accounts for 40% of all energy consumed to manufacture solar PV modules, the largest {energy consumption} of all supply chain segments" followed by ingot and wafer production."[248]  Less than one-third of energy consumption is for the production of solar cells and solar modules.

---

[238] See Auxin's April 26, 2023 Case Brief (citing *Preliminary Determination* PDM at 17-20).

[239] See Auxin's April 26, 2023 Case Brief (citing *Preliminary Determination* PDM at 20).

[240] See Auxin's April 26, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47)).

[241] See Auxin's April 26, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 85)).

[242] See Auxin's April 26, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47 and 86)).

[243] See Auxin's April 26, 2023 Case Brief (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 1)).

[244] See Auxin's April 26, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 65; Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 12)).

[245] See Auxin's April 26, 2023 Case Brief (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 1)).

[246] See Auxin's April 26, 2023 Case Brief (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 3.4)).

[247] See Auxin's April 26, 2023 Case Brief (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 45)).

[248] See Auxin's April 26, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 36-37)).

- The DOE found ingot and wafer production to be the most labor-intensive stages of solar cell production.  Although there are lower labor requirements for polysilicon production, it "requires highly skilled labor to operate a plant."[249]
- Based on information from the ITC and the DOE, there are 21-24 discrete steps to produce polysilicon, ingots, and wafers (seven steps to produce polysilicon and 14 to 17 steps to produce wafers depending on the type of wafer produced) but only 17-19 steps to produce solar cells and modules.
- Although more inputs are used to produce solar cells and modules than polysilicon, ingots, and wafers, the greater time and costs to start up, the significant energy required to run, and the higher technical hurdles associated with, polysilicon, ingot, and wafer facilities compared to solar cells and module facilities, and the fact that most inputs used to the produce solar cells and modules in the inquiry country are sourced from China, support finding solar cell and module production in the inquiry country to be minor or insignificant.

*NextEra*[250]
- Record evidence indicates that the nature of production in the inquiry country is not minor, but is a multi-step process that involves sophisticated machinery and is labor intensive compared to the production of polysilicon, ingots, and wafers in China.
- FTI Consulting, Inc. and the ITC described solar cell production as a multi-step process requiring uniquely designed and calibrated machines and a skilled force.[251]
- Auxin stated that "the production of cells and modules requires capital, technological sophistication, and R&D and Auxin does not dispute this unmarkable point."[252]
- Auxin certified before the ITC that "{m}anufacturing CSPV products is capital intensive and technologically sophisticated"[253] and that "CSPV manufacturers also must invest in cutting edge equipment and continued R&D."[254]  In contrast, record evidence shows that the technology used to produce wafers has stayed the same since it was originally created.[255]
- The *IEA Report* indicates that producing solar cells and modules requires more sophisticated equipment and is more labor-intensive than producing polysilicon, ingots, and wafers.[256]

---

[249] *See* Auxin's April 26, 2023 Case Brief (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 25)).

[250] *See* NextEra's May 9, 2023 Rebuttal Brief at 20-29.

[251] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 3 (citing *FTI Report* at 11) and Attachment 37-A (citing *ITC Solar Safeguard Proceeding 2017* at I-22 – I-23).

[252] *See* NextEra's May 9, 2023 Rebuttal Brief (citing Auxin March 7, 2022 Comments at 10).

[253] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 4 (citing *Auxin's ITC Posthearing Brief* at II-24)).

[254] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 19 (citing *Auxin's ITC Prehearing Brief* at 20)).

[255] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 3 (citing *FTI Report* at 11) and Attachment 19 (citing *Auxin's ITC Prehearing Brief* at 20)).

[256] *See* NextEra's May 9, 2023 Rebuttal Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 35-36, 45)).

- The CEA report indicates that cell production is the most capital-intensive part of the production process and requires the highest capital expenditure of any of the CSPV production stages.[257]

- Processing in the inquiry country creates the p/n junction which forms the solar cell and it is "where the essence of a solar module is realized."[258]  As the petitioner in the underlying investigation noted, a wafer's " … only notable characteristics are its crystal structure and positive potential orientation."[259]  Thus, transformation of the wafer into a solar cell and module is clearly "significant."

- According to the *FTI Report*, *Denis De Ceuster Report*, *Auxin's ITC Posthearing Brief*, and *Auxin's ITC Prehearing Brief*, producing wafers from polysilicon is less extensive than producing solar modules from wafers.[260]  Auxin failed to address record information about the transformative nature of production in the inquiry country, ignored information regarding the production equipment used, and relied on irrelevant facts regarding energy consumption and lead times in its analysis.

- Although Auxin claimed that the ITC's findings on which Commerce relied are outdated, the ITC has reaffirmed its earlier findings that "CSPV cell production is capital intensive and requires a skilled workforce."[261]

- In sum, solar cell and solar module production in the inquiry country requires substantial initial and ongoing investments, extensive production facilities, sophisticated and highly technical equipment, and skilled laborers with specialized training.

*TTL*[262]

- Commerce should reject Auxin's eight-part framework for evaluating the nature of production, which overlaps with other circumvention criterion, (*e.g.*, level of investment and extent of production facilities) and has no bearing on a nature of production analysis, and continue to find that solar cell and solar module production in Thailand is not minor or insignificant.

- Commerce relied on detailed qualitative and quantitative information from reputable sources to evaluate the nature of production.  Auxin failed to explain how Commerce's analysis is deficient.

- The *IEA Report* indicates that "{t}he sophistication, precision and advanced automation entailed in manufacturing solar cells imply more expensive equipment" while " … polysilicon and ingot production processes use simpler, more conventional equipment …"[263]

---

[257] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 2 (citing *CEA Report* at 11-12)).

[258] *See* NextEra's May 9, 2023 Rebuttal Brief (citing *Preliminary Determination* PDM at 20).

[259] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 18).

[260] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 1 (*Denis De Ceuster Report* at 8), Attachment 3 (citing *FTI Report* at 12), Attachment 4 (citing *Auxin's ITC Posthearing Brief* at 20), and Attachment 19 (citing *Auxin's ITC Prehearing Brief* at 20)).

[261] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 37-C (citing *ITC Solar Safeguard Proceeding 2017* at I-22)).

[262] *See* TTL's May 9, 2023 Rebuttal Brief at 28-31.

[263] *Id.* at 30 (citing Auxin's July 29, 2021 Comments at Exhibit 1 (citing *IEA Report* at 35-36)).

47

- Solar cell and solar module production in the inquiry country cannot be minor or insignificant when the p/n junction, which imparts the essential character of solar cells, is formed in that production.
- Even if Commerce inappropriately includes polysilicon mining and refining in its nature of production analysis, as advocated by Auxin, it does not undermine Commerce's finding that solar cell and module production involves a greater number of stages, requires a high level of technological sophistication, is expensive, and requires high-technological machinery and workers with strong technological knowledge.
- Auxin ignored the ITC's extensive analysis on solar cell and module production and instead claimed that the ITC's report is outdated based on selected vague statements about general costs. Auxin's claim is not supported by a detailed quantitative and qualitative examination of the production process.

*CSIL*[264]

- Commerce correctly determined, based on the nature of the production process undertaken in Thailand, that the production is neither minor nor insignificant.
- Commerce has consistently determined that formation of the p/n junction, which occurred in Thailand, is a critical, transformative, complicated, and technical step that creates a solar cell and is the most significant aspect of overall production. Commerce, the ITC, and CBP have recognized that the p/n junction imparts the "essential" character of the solar cell.
- It would be nonsensical for Commerce to conclude that formation of the p/n junction results in "substantial transformation," which it has determined in the past,[265] but also determine that it is insignificant in its nature.
- The ITC reaffirmed its findings that "CSPV cell production is capital intensive and requires a skilled workforce."[266]
- Auxin's multi-factor nature of production analysis[267] is not grounded in the governing statute, Commerce's regulations, or Commerce's prior practice. In its analysis, Auxin illogically compares the number of steps required to produce polysilicon, ingots, and wafers to the number of steps required to produce solar cells and modules instead of examining the *nature* of these steps (*e.g.*, complexity and significance).
- Auxin's claim that the solar industry now prioritizes costs associated with polysilicon, ingots, and wafers, rather than the p/n junction, and that the ITC's findings regarding the solar industry are outdated, does not overcome record information demonstrating the significance of solar cell and module production.[268]
- Auxin failed to demonstrate that the nature of producing solar cells and modules is minor.

---

[264] *See* CSIL's May 9, 2023 Rebuttal Brief at 28-35.

[265] *Id.* at 29-30 (citing TTL's May 2, 2022 Comments at Attachment 8 (citing Solar Investigation Scope Clarification Memorandum at 9)).

[266] *Id.* at 34 (citing Circumvention Request at Exhibit 5 (citing *ITC Solar Safeguard Proceeding 2019* at I-47)).

[267] (1) capital intensity; (2) time to build the production facilities; (3) cost to build the facilities; (4) technical hurdles associated with startup; (5) energy required for production; (6) number of production stages; (7) labor demand; (8) significance of the p/n junction versus significance of solar-grade polysilicon; and (9) number of inputs used for production.

[268] *See* CSIL's May 9, 2023 Rebuttal Brief at 32-33 (citing CSIL's October 20, 2022 Pre-Preliminary Comments at 9).

48

**Commerce's Position:**  We continue to find that the nature of the production process in the inquiry country is not minor or insignificant.

As an initial matter, it is useful to repeat here our description of the production process from the *Preliminary Determination,* which is not specific to any one respondent but encompasses the essence of the manufacturing performed by all the respondents.  As described in the *Preliminary Determination*:

> According to the ITC, to produce ingots, polysilicon rocks are placed into a quartz crucible along with a small amount of boron, which is used to provide a positive electric orientation.  The crucible is then heated in a furnace to approximately 2,500 degrees Fahrenheit to produce monocrystalline silicon, currently the most common form of polysilicon used in producing solar cells.  Once the polysilicon is melted, a seed crystal is lowered into the material and rotated, with the crucible rotated in the opposite direction.  The melt starts to solidify on the seed and the seed is slowly raised out of the melt—creating a single long crystal.  The crystal is then cooled before it is moved onto the next step.  The process of growing the crystal takes approximately 2.5 days.[269]

> To produce wafers, the top and tail of the ingot are cut off and the remaining portion is cut into equal length pieces and then squared.  A wire saw is used to slice the ingots into wafers.  Typically, diamond wire saws are used for monocrystalline wafer slicing.  The wafers are then cleaned, dried, and inspected.[270]

> Solar cell production typically involves phosphorus being diffused into a thin layer on the wafer surface at high heat, which gives the surface of the wafer its negative potential electrical orientation.  The combination of that layer, and a boron-doped layer below, creates the positive-negative (p/n), junction.  A thin layer of silicon is removed from the edge of the solar cell to separate the positive and negative layers.  A silicon nitride antireflective coating is then added to the solar cell to increase the absorption of sunlight and metals are printed on the solar cell to collect electricity.  Aluminum and silver layers are applied, and then the solar cell is placed in a furnace, where the high temperature causes the silver paste to become imbedded in the surface of the silicon layer, forming a reliable electrical contact.  The final step in the process is testing and sorting the solar cells based on their characteristics and efficiency.[271]

> To assemble solar cells into solar modules, a piece of glass is placed on the production line, and EVA or another encapsulant is placed on top of the glass.  Then a group of solar cells is placed in a line and soldered together, creating a string.  The strings are then placed on top of the encapsulant, and the string interconnections are soldered together.  After this, another layer of EVA and a

---

[269] *See Thailand* PDM at 17 (citing *ITC Solar Monitoring* at I-62).

[270] *Id.* at 17 (citing *ITC Solar Monitoring* at I-64).

[271] *Id.* at 17 (citing *ITC Solar Monitoring* at I-65 to I-66).

49

backsheet are added, and the product is laminated and cured.  Usually a frame is added, and a junction box is attached to the back of the module.[272]

As explained in Comment 4, we did not consider the production of polysilicon in our analysis because none of the respondents' affiliates in China produced polysilicon, and there is no substantial evidence on the record to support finding that the Chinese solar industry is vertically integrated from the production of polysilicon to the production of solar modules.

We examined the nature of the production process by comparing the production of solar cells and solar modules in the inquiry country to the production of ingots and/or wafers in China, depending on whether the respondents' affiliates in China produced ingots and/or wafers.

Because Auxin claims that Commerce failed to properly weigh certain factors in its analysis of the nature of third-country processing (*i.e.*, capital requirements, building costs and time, technical hurdles, energy consumed in production, labor demands, number of production stages, and number of inputs used) we have addressed each of Auxin's factors below.  While we have addressed each of the factors relied upon by Auxin, it is important to note that Commerce has not established these factors as criteria for analyzing the nature of the production process in the foreign country, but examines the nature of that production process on a case-by-case basis.

For the final determination, we have not considered capital expenditures/requirements or the cost associated with building production facilities in our analysis of the nature of production because we analyzed the level of investment in the production facilities under section 781(b)(2)(A) of the Act.  Thus, Auxin's comments regarding capital requirements and the cost to build manufacturing facilities are moot.

With respect to the time required to construct each type of production facility, according to the *DOE Solar Deep Dive*, ingot and wafer facilities, solar cell facilities, and solar module facilities require one to three years to build.[273]  Thus, this factor does not indicate that the nature of solar cell and solar module production in the inquiry country differs from the production of ingots and wafers in China.

With respect to technical hurdles, the *Bloomberg Report* notes that wafer factories "bear many technical hurdles, which makes it difficult for new factories to be built outside of China,"[274] whereas "{c}ell manufacturing … compared to wafers and polysilicon … has lower technical hurdles"[275]  and "{b}uilding a new module factory has low technical hurdles compared with wafer and polysilicon."[276] Nonetheless, record evidence indicates that there are significant technical requirements that must be met for, and changing technologies with respect to, producing solar cells.

---

[272] *Id.* at 17 (citing *ITC Solar Monitoring* at I-67).
[273] *See DOE Solar Deep Dive* at 12.
[274] *See Bloomberg Report* at 3.2.
[275] *Id.* at 3.3.
[276] *Id.* at 3.4.

50

According to the *FTI report*, "the equipment and technology, as well as the number of processing steps required to produce a {solar} cell are far more technically sophisticated than those of the polysilicon or wafer manufacturing operations. … Cell manufacturing alone requires a fully integrated, multi-step manufacturing line with equipment to perform {multiple} processes … . Each of these processes requires one or more uniquely designed and calibrated machines to advance the wafer from a commodity product to a finished cell …"[277]

Moreover, while the technology required to produce ingots has not significantly changed since it was created,[278] the same is not true for solar cells. "Technology improvements in the wafer-to-cell process are responsible for most of the performance improvements of solar panels."[279] Because of technological improvements to solar cells, module makers must regularly upgrade their production lines to avoid becoming obsolete.[280] Hence, there are also meaningful technological requirements that must be met before producing solar cells.

Regarding energy, according to the *IEA Report* ingot and wafer production consumes higher amounts of energy when compared to the solar cell and solar module production, which "require less heat and lower temperatures for drying and cooling, and most of the electricity is used for automated mechanical work."[281] However, it is not clear that energy consumption is necessarily informative when examining whether the nature of the production process is minor or insignificant. Energy consumption may have more to do with the type of processing required than the scale or extent of the processing. Therefore, the record does not support a finding that the lower energy consumption required to produce solar cells and modules contributes in a meaningful way to our evaluation of the nature of the production process.

With respect to labor, according to the *DOE Solar Report* 0.40 - 0.80 direct employees are required per MW of ingot and wafer production, while 0.15-0.45 and 0.50-0.70 direct employees are required per MW of solar cell and solar module production, respectively.[282] This means that a one GW ingot and wafer production facility requires 400-800 direct manufacturing workers, while one GW solar cell and solar module production facilities require 150-450 direct manufacturing workers and 500-700 direct manufacturing workers, respectively.[283] Based on this information, the labor requirements for a solar cell and solar module facility are greater than the labor requirements for an ingot and wafer production facility.

With respect to the skill level, the ITC reported that processing wafers into solar cells involves sophisticated machinery, which requires "skilled technicians and employees with advanced degrees."[284] There is no information on the record that indicates that the production of ingots and wafers require skilled workers.

---

[277] *See FTI Report* at 11.
[278] *See Denis De Ceuster Report* at 9.
[279] *Id.* at 1.
[280] *See Bloomberg Report* at 3.4.
[281] *See IEA Report* at 37.
[282] *See DOE Solar Report* at 11.
[283] *Id.* at 11.
[284] *See ITC Solar Final* at I-18; *see also ITC Solar Safeguard Proceeding 2017* at I-22 to I-23.

According to the *DOE Solar Deep Dive,* producing ingots and wafers requires 14 or 17 steps (depending on the type of wafer produced, *i.e.*, monocrystalline or multicrystalline), producing solar cells requires seven or 11 steps (depending on whether a full-area AI-BSF cell or full-area PERC cell is being produced), and producing solar modules requires nine steps.[285]  Thus, it requires fewer steps to produce ingots and wafers in China, than to produce solar cells and solar modules in the inquiry country.

More significant, however, is the nature of the production performed in each production step. The *IEA Report* specifies that while each segment of the manufacturing processes require various types of special equipment, solar cell production requires sophisticated, precise and advanced automation equipment, and solar module production requires "highly automated machinery and accurate quality-testing equipment at multiple stages."[286]  Meanwhile, the *IEA Report* indicates that ingot production uses "simpler, more conventional equipment…"[287]  Therefore, producing solar cells and solar modules in the inquiry country involves a multi-step production process that requires more precise and sophisticated equipment at multiple stages compared to producing ingots and wafers in China.

Regarding inputs, solar cell and solar module production requires approximately 100 different inputs, whereas converting polysilicon into wafers only involves a handful of inputs.[288]

More importantly, producing wafers from polysilicon in China is less extensive of a transformation of the input than producing solar cells and solar modules from wafers in the inquiry country.  The essence of the solar module is realized in solar cell production.  In the *Preliminary Determination,* we noted that:

> once a wafer is doped and an opposite electrical orientation is imparted on the surface, it results in the creation of a p/n junction.  When sunlight strikes the cell, the positive and negative charge carriers are released, causing electrical current to flow.  It is at this point that the cell is capable of generating electricity from sunlight.[289]

> Therefore, Commerce has determined that it is only when the p/n junction is created that a wafer is no longer just a wafer, but is a solar cell that is subject to *the Orders*.[290]

In sum, the production of solar cells and solar modules in the inquiry countries has greater labor demands, more steps, and requires more inputs than ingot and wafer production in China. Moreover, the multi-step solar cell and solar module production process requires sophisticated, precise, and technologically advanced equipment, and a skilled workforce.  Production of solar cells and wafers involves more than attaching Chinese components together.  Solar cell and solar

---

[285] *See DOE Solar Deep Dive* at 30-31, 35-36, and 44.
[286] *See IEA Report* at 35.
[287] *Id.* at 3.
[288] *See Thailand* PDM at 19.
[289] *Id.* at 19 (citing Solaria Scope Ruling at 10-11).
[290] *Id.* (citing SunSpark Scope Ruling at 6).

modules production involve exacting processes (*e.g.*, molecular-level impregnation of phosphorus into the wafer at a high heat,[291] printing solar cells (metals, such as silver paste, are printed onto the solar cell to collect electricity[292])) and treatments to, and preparation of, inputs used in production (such as lamination and curing of EVA, solar cells, and the backsheet).[293]

Importantly, the essential nature of the final product is imparted and realized through production in the inquiry country when the p/n junction is formed in the wafer.  The p/n junction "… results in the creation of solar cells—albeit unfished solar cells—capable of converting sunlight into electricity via the photovoltaic effect."[294]  Moreover, other components in the solar cell and solar module are important to its ability to function because they channel the electricity out of the cell so that the product can be used as intended.  We do not believe that the technical hurdles associated with ingot and wafer production outweigh the above facts when comparing the nature of producing ingots and wafers to the nature of producing solar cells and solar modules.

Based on the foregoing, we continue to find that the nature of the production process in the inquiry country performed by the mandatory respondent(s) does not support finding the process of assembly or completion in the inquiry country to be minor or insignificant.

**Extent of the Production**

*Auxin*[295]

- Commerce's analysis of the extent of production facilities in the inquiry country is flawed.
- Commerce failed to follow its longstanding practice of comparing assembly facilities in the inquiry country to facilities for all the stages required to produce the merchandise under consideration (a merchandise-centric approach).  Instead, Commerce compared assembly facilities in the inquiry country to facilities of the respondents' affiliates in China that only performed some of the steps required to produce the merchandise under consideration (an affiliate-centric approach).
- Record evidence demonstrates that the production facilities of companies in China that perform all the steps required to produce subject merchandise are more extensive in terms of square footage and capacity than CSIL and TTL's production facilities in Thailand.[296]
- Even under Commerce's affiliate-centric approach, and using the subset of CSIL's affiliated Chinese solar producers that Commerce used in its comparison, the evidence shows that CSIL's assembly facilities in Thailand are smaller in terms of size and capacity than its affiliates' solar production facilities in China.[297]  If all of CSIL's affiliated solar producers in China are considered in the affiliate-centric comparison,

---

[291] *See* Circumvention Request at 20.
[292] *Id.*
[293] *Id.* at 21.
[294] *See* ET Solar Scope Ruling at 7.
[295] *See* Auxin's April 26, 2023 Case Brief at 44-52.
[296] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibits 1 (*IEA Report* at 27 and 85) and P-2; and Circumvention Request at 69-70 and Exhibits 14 and 96).
[297] *See* Auxin's April 26, 2023 Case Brief at 49-50.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

which Commerce should have done, CSIL's assembly facilities in Thailand are even smaller than indicated in Commerce's comparison.[298]

- Similarly, Commerce inexplicably limited its affiliate-centric facility comparison for TTL to a small subset of its affiliated Chinese solar producers. If additional Chinese solar producers that are affiliated with TTL are considered in the comparison, TTL's inquiry country assembly facilities are minor or insignificant by any reasonable metric.[299]

*TTL*[300]

- Commerce's facility comparisons are reasonable and consistent with its practice of comparing the third-country facilities used to produce the downstream product to the order country facilities used to produce the upstream product.[301]
- Auxin's proposed comparisons are unclear, not supported by the facts, and inconsistent with Commerce's practice.
- While Auxin cites figures to demonstrate the "enormous" size of certain Chinese solar production facilities and the Chinese solar industry, it is not clear that the overall size of the solar industry in China is relevant, nor is it clear what specific comparison Auxin is proposing.
- The facts do not support including the size and capacity figures that Auxin used in its comparison because TTL does not have affiliates in China with integrated facilities for production prior to the wafer stage.
- Auxin also inappropriately included Chinese facilities that are used to produce solar cells and solar modules in its comparison which conflicts with Commerce's practice.[302]

*CSIL*[303]

- In its analysis, Auxin inappropriately compared the extend of CSIL's affiliated producer's (THSM) facilities in Thailand to production facilities for the entire, upstream supply chain.
- In contrast to Auxin's comparison, Commerce officials verified and reviewed extensive documentation, including payroll records and land purchase agreements, that confirmed the extensive production facilities managed by THSM in Thailand.

*NextEra*[304]

- Commerce correctly compared production facilities in Thailand to upstream production facilities in China.
- Based on this comparison, record evidence shows that TTL's facilities in Thailand are significant in terms of size and number of workers compared to the facility of its affiliated upstream Chinese producer.

---

[298] *Id.* at 49-50.
[299] *Id.* at 50-52.
[300] *See* TTL's May 9, 2023 Rebuttal Brief at 26-28.
[301] *Id.* (citing *Pipe and Tube from India (Oman and UAE)* IDM at Comment 6).
[302] *Id.* (citing *CORE from China (UAE)* IDM at Comment 1; *SSSS from China (Vietnam) Preliminary* PDM at 18-19).
[303] *See* CSIL's May 9, 2023 Rebuttal Brief at 40-41.
[304] *See* NextEra's May 9, 2023 Rebuttal Brief at 33-36.

54

- Commerce correctly excluded from its comparison the data on Chinese production facilities reported by TTL that Auxin used in its comparison. For a number of reasons, which involve business proprietary information, these data were not relevant to the inquiry period.
- While Auxin argued that THSM's Thai facilities are smaller than its affiliates' solar production facilities in China, the determination that Commerce must make is not whether the facilities in the inquiry country are smaller, but whether the extent of those facilities indicates that assembly and completion in the inquiry country is minor or insignificant. Here, the extent of THSM's Thai facilities do not indicate that assembly and completion in the inquiry country is minor or insignificant.
- Moreover, Auxin's capacity analysis of THSM's Thai facilities, which suggests that the extent of the production facilities indicates minor or insignificant production, is contradicted by a comparison of the size of the facilities and the number of workers at the facilities.
- Commerce's determination that CSIL's and TTL's production facilities in Thailand are not minor or insignificant is thus fully supported by record evidence.

**Commerce's Position:** We disagree with Auxin. First, for the reasons explained in Comment 4, in this particular inquiry, we do not find it appropriate to compare the extent of CSIL and TTL's production facilities in Thailand to facilities of unaffiliated Chinese producers for each stage required to produce the merchandise under consideration. Additionally, as explained in Comment 4, we do not find it appropriate to consider facilities for the production of polysilicon in our facilities analysis. We have not done so because none of the mandatory respondents have affiliates that produce polysilicon, and there is no substantial evidence on the record that the Chinese solar industry is vertically integrated from polysilicon production to solar module production. Hence, we do not find Auxin's square footage and capacity comparisons between the respondents and unaffiliated Chinese solar producers to be persuasive.

Auxin also argues that CSIL's assembly facilities in Thailand are smaller in terms of size and capacity than its affiliates' solar production facilities in China. However, Commerce's analysis of the extent of production facilities is not necessarily a binary question of whether the facility is smaller or larger than another facility but an examination of the degree of size differences. When we considered the size and capacity differences in our analysis of CSIL's facilities (which is business proprietary information), in addition to the number of workers employed in those facilities, we found that the majority of the metrics weighed in favor of finding the Thai facilities were not minor or insignificant.[305]

In addition, while Auxin contends that the production facilities of all CSIL's affiliated solar producers in China should have been considered in the affiliate-centric facility comparison, we find it is appropriate to measure the extent of the Thai production facilities by comparing them only to the facilities of CSIL's Chinese affiliates that performed the initial production steps related to the products assembled and completed in Thailand. Using that comparison, we can gauge the significance of the Thai production facilities in relation to all the CSIL's production

---

[305] *See Thailand* PDM at 20. Due to the business proprietary nature of the information provided, Commerce provided a complete analysis of the extent of the production facilities in the CSIL and TTL Preliminary Analysis Memoranda.

facilities engaged in manufacturing the product imported into the United States. Commerce has followed a similar approach in other circumvention inquiries where it compared the production facilities in the inquiry country to those in the order country that were used to perform the earlier stages of production that were required to produce the inputs that were assembled and completed in the inquiry country.[306] In *Al Ghurair CIT 2021*, the CIT upheld a similar comparative methodology and noted "that even if {the respondent's} production process and facilities in the UAE appear significant, they are minor as compared to the production process and facilities in China."[307]

Auxin did not contest the conclusion that Commerce reached based on its facility comparison for TTL, but it claimed that Commerce inexplicably excluded certain Chinese solar producers that are affiliated with TTL from its comparison. However, the companies that Auxin seeks to add to the comparison are, which we cannot identify in this memorandum because their names are business proprietary, not relevant to the inquiry period.[308] Therefore, we did not consider any information related to these companies in our analysis of TTL's facilities.

Consequently, we continue to find that the extent of THSM and TTL's production facilities in Thailand, do not support finding their assembly or completion in those facilities to be minor or insignificant.

**The Value of the Processing in Thailand**

*CSIL*[309] and *NextEra*[310]

- Commerce based its value analysis on a percentage that it calculated by dividing the value of processing performed by CSIL in Thailand by the value of the inquiry merchandise imported into the United States.
- This analysis is wrongly centered on a quantitative measure, without considering the nature of the production process, even though "Congress has directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the parts and components imported into the processing country."[311]
- At verification, Commerce found that THSM in Thailand engaged in "multi-stage," "highly-technical," "technologically sophisticated," "capital intensive," processes, requiring "highly-skilled workers" and "skilled technicians and employees with advanced degrees"—and thus ***not*** "minor or insignificant" processes.[312] Moreover, Commerce

---

[306] *See, e.g.*, *CORE from China (UAE)* IDM at Comment 1 (where Commerce compared the CORE production facilities in the inquiry country to HRS and CRS production facilities in the order country); *see also Pipe and Tube from India (Oman and UAE)* IDM at Comment 6 (where Commerce compared the pipe and tube production facilities in the inquiry countries to the beginning stages of production in the order country).
[307] *See Al Ghurair CIT 2021*, 536 F. Supp. 3d 1371-73.
[308] *See* TTL's ay 9 2023 at 23; *see also* TTL's 4th SQR at 3 and Exhibit 5.
[309] *See* CSIL's April 26, 2023 Case Brief at 21-27.
[310] *See* NextEra's April 26, 2023 Case Brief at 11-15.
[311] *See* CSIL's April 26, 2023 Case Brief at 22 (citing *PET Film from the UAE Preliminary Determination* PDM at 7).
[312] *Id.* at 23 (citing CSIL Verification Report at 18-19).

previously noted that cell production, which occurs in Thailand, is where the essence of a solar module is realized.

- Thus, Commerce conclusively found that the nature of THSM's production process in Thailand is extensive and significant, showing that, qualitatively, the value added through cell and module production in Thailand is significant. Yet, Commerce inexplicably and inconsistently found that the value of these same "significant" processes constituted a minor portion of the value of the inquiry merchandise.

- In addition, Commerce incorrectly found that the processing value percentage that it calculated supported an affirmative circumvention determination when in other cases it found significantly lower percentages (*e.g.*, 12 to 26 percent) did not support an affirmative circumvention determination.[313]

*Auxin*[314]

- Commerce found processing value percentages as high as one-third of the total value of the merchandise to be a small proportion of that value for purposes of section 781(b)(2)(E) of the Act.[315]

- The processing value percentages of 12 to 26 percent in *Ferrovanadium from Russia Final Determination* are not informative because these are publicly ranged percentages;[316] thus, the actual upper percentage is likely much higher.

**Commerce's Position:** We disagree with the respondents. Section 781(b)(2)(E) of the Act directs Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States." We find that in the context of section 781(b)(2)(E) of the Act, the word "value" denotes monetary value. Consequently, section 781(b)(2)(E) of the Act directs Commerce to perform a quantitative, rather than a qualitative, evaluation of the value of third-country processing.

This interpretation is supported by 19 CFR 351.226(i), which provides that "{i}n determining the value of … processing performed … under section 781(b)(2)(E) of the Act, {Commerce} may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(e) of the Act—or, in the case of nonmarket economies, on the basis of section 773(c) of the Act." Costs are measured numerically, as is the value of merchandise. Therefore, section 781(b)(2)(E) of the Act describes a quantitative measurement of the value of third-country processing. This interpretation is reinforced by Congresses' discussion of value

---

[313] *Id.* at 26 (citing *Ferrovanadium from Russia Preliminary Determination*, 77 FR at 6539; Commerce rendered a negative final determination in *Ferrovanadium from Russia Final Determination*).

[314] *See* Auxin's May 9, 2023 Rebuttal Brief at 35-43; Auxin's April 26, 2023 Case Brief at 30-47;

[315] In the *Preamble (Final Rule)*, 62 FR at 27329 Commerce explicitly rejected setting a bright line of 35 percent as determining whether the value of processing implicated circumvention explaining: "to establish a 'safe harbor' or specific guidelines might result in the incorrect classification of substantial production operations as 'insignificant' and 'screwdriver' operations as 'significant." In *CORE from China (Malaysia)* Commerce noted that record evidence demonstrated "the value-added by CORE producers, such as those in the third countries, is approximately 10 percent to 31 percent … {which} support{ed} a finding that the completion process performed in Malaysia represents a small proportion of the merchandise exported to the United States" under section 781(b)(2)(E) of the Act. *See CORE from China (Malaysia) Preliminary*, 85 FR at 8823, unchanged in *CORE from China (Malaysia) Final*.

[316] *See Ferrovanadium from Russia Preliminary Determination*, 77 FR at 6539; unchanged in *Ferrovanadium from Russia Final Determination* IDM at Comment 1.

under section 781(b)(1)(D) of the Act (determining whether the value of merchandise produced in the order country is a significant portion of the total value of the merchandise exported to the United States) when Congress noted that the statue did:

> not to establish a rigid numerical standard for determining "significance" nor does the Committee expect Commerce to establish a specific numerical test. The determination of whether the value of the parts or components is a significant portion of the total value of the merchandise should be made on a case-by-case basis, looking at the totality of the circumstances. However, where the proportion of the value is relatively high (*e.g.*, the value of a television tube in relation to a finished television set), the conclusion should be clear.[317]

In addition, Commerce's statement that Congress directed it to focus more on the nature of the production process and less on differences in value, concerned the overall decision of whether third-country processing was minor or insignificant rather than the value calculation described under section 781(b)(2)(E) of the Act. When Commerce stated in *PET Film from the UAE Preliminary Determination*[318] that Congress directed it to focus more on the nature of the production process and less on differences in value, it referenced *Hangers from China (Vietnam)*[319]*,* which referred to *Certain Pasta from Italy (U.S.) Circumvention*[320] and *Hot-Rolled Lead and Bismuth*.[321]

In *Certain Pasta from Italy (U.S.) Circumvention* Commerce stated:

> While some of the statutory factors are inconclusive, the information on the record tends to show that the repackaging operation in the United States *is minor and insignificant*. … Congress directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the imported parts or components. *See S. Rep. No. 103-412*, at 81-82 (1994). Thus, we believe that it is appropriate to place more weight on the nature of the production and packaging process (the latter of which merely involves removing pasta from larger bags and placing it in smaller packages) rather than attempt to establish a numerical standard, which would be contrary to the intentions of Congress.[322]

In *Hot-Rolled Lead and Bismuth* Commerce stated:

> The legislative history to section 781(a) {of the Act} establishes that Congress intended {Commerce} *to make determinations regarding circumvention* on a case-by-case basis in recognition that the facts of individual cases and the nature

---

[317] *See* S. Rep. No. 103-412 at 82.
[318] *See PET Film from the UAE Preliminary Determination* PDM at 7.
[319] *See Hangers from China (Vietnam) Preliminary Determination*, 76 FR at 27011-27013, unchanged in *Hangers from China (Vietnam)*, 76 FR at 66895.
[320] *See Pasta from Italy (U.S.) Circumvention Preliminary*, 68 FR at 46575, unchanged in *Pasta from Italy (U.S.) Circumvention*, 68 FR at 54888.
[321] *See Hot-Rolled Lead and Bismuth*, 64 FR at 40347.
[322] *See Pasta from Italy (U.S.) Circumvention Preliminary*, 68 FR at 46575 (emphasis added).

58

of specific industries vary widely.  In particular, Congress directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the imported parts or components. (*See S. Rep. No. 103-412*, 81-82 (1994)).  Thus, we believe that any attempt to establish a numerical standard would be contrary to the intentions of Congress.

The URAA, which became effective on January 1, 1995, redirected the focus of a circumvention inquiry away from a numerical calculation of value-added towards a more qualitative focus on the nature of the production process.  Under the URAA, which provides the current statutory language for section 781 of the Act, the numerical calculation of value-added is just one of five factors {Commerce} is to examine in {its} determination of whether the processing undertaken in the United States is minor or insignificant.[323]

In these cases, Commerce applied Congress's direction to focus more on the nature of the production process and less on value with respect to the overall decision of whether processing is minor or insignificant or the overall determination of whether circumvention is occurring and not its determination under section 781(b)(2)(E) of the Act.

This is consistent with the explanation in *S. Rep. No. 103-412* cited in these cases.  In *S. Rep. No. 103-412*, Congress noted that the provision in section 781(b)(1)(C) of the pre-URAA Act (*i.e.*, that there is a small difference between the value of the order country parts that were assembled in the inquiry country and the value of the finished merchandise imported into the United States) "has not proved effective in curbing the circumvention of antidumping and countervailing duty orders."[324]  Congress then explained that it was amending "sections 781(a) and (b) to shift the *focus of the anticircumvention inquiry* away from a test of the difference in value between the subject merchandise and the imported parts or components toward the nature of the process performed in the United States or a third country"[325] (emphasis added).  Thus, the shift in focus related to the overall circumvention inquiry.

Moreover, the shift away from a difference in value analysis toward a nature of the production process analysis was directed toward section 781(b)(1)(C) of the pre-URAA Act, not section 781(b)(2)(E) of the current version of the Act.  In fact, section 781(b)(2) of the Act, including the numeric value determination under section 781(b)(2)(E) of the Act, were added "to focus the anticircumvention inquiry on the question of whether minor or insignificant assembly or completion is taking place,"[326] which is a consideration of the nature of the third-country processing.  Hence, we disagree with the respondents' claim that Commerce's analysis under section 781(b)(2)(E) of the Act wrongly centered on a quantitative measure, without considering the nature of the production process.

CSIL contends that Commerce incorrectly found that the value of its inquiry country processing, as a percentage of the merchandise value, supported an affirmative circumvention determination,

---

[323] *See Hot-Rolled Lead and Bismuth*, 64 FR 40348 (emphasis added).
[324] *See* S. Rep. No. 103-412, 81 (1994)).
[325] *See* S. Rep. No. 103-412, 81-82 (1994)).
[326] *See* SAA at 894.

when in other cases Commerce found that smaller processing percentages did not support an affirmative circumvention determination. However, Commerce has found processing percentages consistent with CSIL's to be small percentages.[327]  Moreover, while CSIL cited the processing percentages of 12 to 26 percent in the *Ferrovanadium from Russia Final Determination* to support its argument, in that case Commerce "acknowledged … that the value of U.S. processing of vanadium pentoxide into ferrovanadium, as calculated by {Commerce}, fell within the range of value-added percentages that {Commerce} has found to be "small" in previous cases …"[328]  Thus, we do not find that our assessment of whether the value of CSIL's inquiry country processing is a small proportion of the value of the inquiry merchandise imported into the United States is necessarily inconsistent with some of the "small" percentages found in *Ferrovanadium from Russia Final Determination*. While Commerce ultimately determined in *Ferrovanadium from Russia Final Determination* that the value percentages were not small based on the extensive and substantial processing that occurred, as explained above we find it is appropriate to consider the nature of processing in the overall circumvention decision rather than in assessing the percentage calculated under section 781(b)(2)(E) of the Act.

In the discussion of changes to the Act, the SAA noted that "{t}hese new provisions do not establish rigid numerical standards for determining the significance of the assembly (or completion) activities …"[329]  Here, we determined that the limited value percentage that we calculated for CSIL's inquiry country processing is a small proportion of the value of the merchandise imported into the United States.[330]  Where the value of the processing performed in the inquiry country is a small proportion of the value of the inquiry merchandise imported into the United States, this factor weighs in favor of finding circumvention.

Finally, CSIL contends that Commerce inexplicably and inconsistently found that its nature of production in the inquiry country was "significant" but that the value of that processing constituted a minor portion of the value of the inquiry merchandise. Our finding is not inconsistent given that we did not include the value of Chinese-produced inputs that were considered in the nature of production analysis in our calculation of the value of that processing.

**Overall Determination of Section 781(b)(1)(C)**

*CSIL*,[331] *NextEra*,[332] *Silfab*,[333] and *TTL*[334]
  - Of the five factors for determining whether the process of assembly or completion is minor or insignificant under section 781(b)(1)(C) of the Act, for TTL, Commerce only found that R&D indicated circumvention, and for CSIL, R&D and a small value added in the inquiry country indicated circumvention. Thus, despite the majority of the five

---

[327] *See CORE from China (Malaysia) Preliminary*, 85 FR at 8823, unchanged in *CORE from China (Malaysia) Final*.
[328] *Id.*
[329] *See* SAA at 894.
[330] *See* CSIL's Final Analysis Memorandum where we calculated a ratio similar to the *Preliminary Determination*.
[331] *See* CSIL's April 26, 2023 Case Brief at 4-12.
[332] *See* NextEra's April 26, 2023 Case Brief at 5-14.
[333] *See* Silfab's Tranche 1 Case Brief at 3-4; *see also* Silfab's April 26, 2023 Case Brief at 13-20.
[334] *See* TTL's April 26, 2023 Case Brief at 4-9.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

factors supporting a negative determination, Commerce determined that both respondents circumvented the *Orders*.

- Commerce's decisions were unlawful. Congress has required that Commerce consider the totality of the evidence presented regarding processing undertaken in the inquiry countries, and that Commerce must make its determinations "on a case-by-case basis, in recognition that the facts of individual cases and the nature of specific industries are widely variable."[335] Commerce acknowledges in the *Preliminary Determination* that "{n}o single factor {under section 781(b)(2) of the Act}, by itself, controls Commerce's determination of whether the process of assembly or completion in a third country is minor or insignificant. Commerce's approach is contrary to the statute, which requires a holistic assessment.[336]

- Commerce's emphasis on R&D is inconsistent across circumvention cases, and in its own words, not informative to its circumvention analysis. In *CWCS from India (Oman and India) Final*, Commerce found that "lack of research and development expenses does not necessarily mean that circumvention exists."[337] Similarly, in the recent circumvention inquiries of Vietnam in several pipe and tube cases, Commerce determined that "the lack of significant research and development expenses for the production of LWRPT in Vietnam is not informative in determining whether the processing in Vietnam is minor or significant."[338]

- Commerce has repeatedly indicated that the level of R&D is *less* informative in determining whether third-country processing is minor or insignificant than the other statutory factors under section 781(b)(2) of the Act.[339]

- Commerce only gave a cursory, incongruous explanation for the disproportionate importance placed on R&D expenditures: "{g}iven the uniquely complex nature of solar cell and module production, we give particular importance to the level of THSM and TTL's R&D in Thailand."[340] Commerce fails to explain why the "uniquely complex" nature of cell and module production elevates the level of R&D above any, much less all, of the other statutory factors under section 781(b)(2) of the Act.

- It is incongruous and fundamentally contradictory for Commerce to find that the nature of the production process is not minor or insignificant, and yet reach a conclusion that the process of assembly or completion in the targeted countries is nonetheless minor or insignificant. While the nature of production is not the sole factor under 781(b)(1)(c) of the Act determining whether the third country processing is minor or insignificant,

---

[335] *See* CSIL's April 26, 2023 Case Brief at 16 (citing *Thailand* PDM at note 34; *see also*, *e.g.*, *HFC Blends from China* at 20.)

[336] *See* CSIL's April 26, 2023 Case Brief at 17 (citing SAA at 893 ("… no single factor listed in section 781(b)(2) of the Act will be controlling. … the importance of any one of the factors listed under section 781(b)(2) of the Act can vary from case to case depending on the particular circumstances unique to each circumvention inquiry.")).

[337] *See* NextEra's April 26, 2023 Case Brief (citing *Certain Welded Carbon Steel Standard Pipes and Tubes from India* IDM at 14)

[338] *See* TTL's April 26, 2023 Case Brief at 11 (citing *LWR from China (Vietnam) Preliminary* PDM at 20-21).

[339] *See* CSIL's April 26, 2023 Case Brief at 17 (citing *Aluminum Foil from China (Korea and Thailand) Preliminary* PDM at 14)

[340] *See* CSIL's April 26, 2023 Case Brief at 17 (citing *Thailand* PDM at 15).

61

relying heavily on the nature of the production process in reaching a circumvention determination is consistent with past practice, the statute, and legislative history.[341]

- Commerce appears to have never previously reached an affirmative circumvention determination while also concluding that the nature of the production process in the third country was not minor or insignificant.

- The SAA repeatedly refers to circumventing activity as the establishment of a "screwdriver operation" in the United States or third country, and also notes that it would be "relatively easy" for a foreign exporter to circumvent orders by establishing such screwdriver operations.[342]  The solar cell and module production in the targeted countries is clearly not a simple and small-scale "screwdriver operation" as described in the URAA.

- Commerce's decade-long administration of the *Orders* and in particular, its scope rulings regarding solar cells and panels, indicates that the processing conducted in the inquiry countries is not "minor or insignificant."  In response to proposed scope language submitted by the petitioner in the underlying investigations stating that the scope of the *Orders* includes modules produced in China from cells manufactured in any third-country, Commerce found that modules produced in China from cells produced in a third-country are not covered by the scope of the *Orders*.[343]  When making this determination, Commerce concluded that solar cell production was not minor processing, and did so while taking into account whether the processing of Chinese wafers occurred outside of China

- Relying on findings by the ITC, Commerce described cell production as the "most capital intensive part of the manufacturing process" and "a highly automated, capital intensive, and technologically sophisticated process, requiring skilled technicians and employees with advanced degrees," and that "module production also involves a large number of varied inputs consumed in a complex, multistep production process that requires precision, highly skilled workers, and accurate quality testing equipment at multiple stages.[344]

- Commerce specifically considered the possibility of circumvention in its original scope determination and stated:

> the factors we consider for making country-of-origin determinations inherently reflect the agency's concern that the relief afforded by AD/CVD orders not be eviscerated by moving minor processing outside of the country covered by the order.  Thus, circumvention concerns are reflected in the country-of-origin determination.[345]

- The question of whether cells production is minor processing has been asked and answered.  Commerce refused to grant the petitioner in the underlying investigations such a wide-sweeping remedy stating that if petitioner had concerns regarding "solar

---

[341] *See* NextEra's April 26, 2023 Case Brief (citing *Aluminum Foil from China Circumvention Preliminary Determination (Korea)* PDM at 15).
[342] *Id.* (citing SAA at 893-94).
[343] *Id.* (citing Solar Investigation Scope Clarification Memorandum).
[344] *See* NextEra's April 26, 2023 Case Brief (citing *Thailand* PDM).
[345] *See* TTL's Tranche 1 Case Brief at 4 (citing Solar Investigation Scope Clarification Memorandum).

modules/panels assembled from solar cells produced in a third country," it "has the option of bringing additional petitions to address" such concerns.[346]

- The Circumvention Request mischaracterizes the manufacturing operations required to transform a raw polysilicon wafer into a functional solar cell as "minor and insignificant. Record evidence gathered by Commerce demonstrates that the processing required to create solar cells and modules from a wafer is extensive, complicated, and a high-value generating operation that is not minor. However, Commerce has incorrectly relied on Auxin's mischaracterization in reaching its *Preliminary Determination* that found circumvention in the targeted countries.

*Auxin*[347]

- The Act, as interpreted by Congress, does not require Commerce to weigh any factor more heavily than another and does not require any particular number of factors be satisfied in order to find assembly operations to be minor or insignificant pursuant to section 781(b)(1)(C) of the Act. Rather, "the five factors are to be separately taken into consideration, as appropriate, and their totality weighed."[348]
- TTL is incorrect that "Commerce has only found circumvention through minor or insignificant processing when no fewer than four of the five criteria {outlined in section 781(b)(2) of the Act} weighed in favor of finding that the process was minor."[349] In *HFC Blends from China (India)*, Commerce found the level of investment and the extent of production facilities in India (*i.e.*, the third country) were comparable to the level of investment and the extent of production facilities in China (*i.e.*, the country subject to the order) and thus were not "minor or insignificant."[350] Nevertheless, Commerce found these two factors were outweighed by the remaining three factors based on "the circumstances of this case" and reached an affirmative finding circumvention.[351]
- In *Al Ghurair*, the CAFC found Commerce had failed to adequately address respondents' arguments concerning the value of processing pursuant to section 781(b)(2)(E) of the Act. The CAFC continued, however, that insofar as "Commerce's findings of circumvention involved a multi-factor test" and other record evidence supported an affirmative finding of circumvention, Commerce's failure to adequately address value added in the third country was a "harmless error."[352] In other words, even if Commerce found the value added in the third country was significant pursuant to section 781(b)(2)(E) of the Act, that would not undermine its overall "minor or insignificant" analysis under section 781(b)(2) of the Act.[353]
- Commerce's determination that a minority of the factors outlined in section 781(b)(2) of the Act, when viewed in totality with the other factors, supports a determination that

[346] *Id.* at 4 (citing Solar Investigation Scope Clarification Memorandum).
[347] *See* Auxin's Tranche 1 Rebuttal Brief at 28-31; and Auxin's April 26, 2023 Case Brief at 30-47.
[348] *See U.K. Carbon and Graphite* at 1310.
[349] *See* Auxin's May 9, 2023 Rebuttal Brief at 17 (citing TTL's April 26, 2023 Case Brief at 2).
[350] *Id.* at 18 (citing *HFC Blends from China (India) Preliminary* PDM at 18-20, unchanged in *HFC Blends from China (India) Final*).
[351] *Id.* (citing *HFC Blends from China (India) Preliminary* PDM at 18-20, unchanged in *HFC Blends from China (India) Final*).
[352] *Id.* at 18 (citing *Al Ghurair CAFC 2023*,, 65 F.4th at 1351)
[353] *Id.* at 19 (citing *Al Ghurair CAFC 2023*, 65 F.4th at 1351)

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

CSIL's and TTL's assembly operations in Thailand are minor or insignificant pursuant to sections 781(b)(1)(C) and (b)(2) of the Act is in accordance with law.

- Commerce's determination that the level of R&D is particularly important in this case given the importance of R&D in the solar industry is supported by substantial record evidence. As the IEA explains:

> {i}nnovation is key for technological advances across and along clean energy supply chains. Technological innovation throughout the solar PV supply chain has increased the conversion efficiency of solar cells, reduced material usage and improved energy efficiency per module. Since 2010, solar PV cells have become nearly 60% more efficient and generation costs have fallen almost 80%. Without public and private investments in R&D all along the supply chain, solar PV would not be the most affordable electricity generation technology in many parts of the globe.[354]

- Chinese solar producers have engaged in substantial investments in R&D across the solar supply chain to ensure their global dominance. An example is the Chinese solar conglomerate LONGi stating that by the end of 2020 it "had obtained a total of 1,001 issued patents and invested RMB 2.592 billion in R&D, accounting for 4.75% of its operating revenue."[355]

- Similarly, GCL-Poly has recently noted that it has "filed more than 1,100 invention and utility model patents, including more than 650 granted patents" related to all aspects of polysilicon, ingot, and wafer production.[356]

- The fact that Commerce has found R&D to be relatively unimportant in other circumvention cases does not undermine its finding in this case that R&D is uniquely significant in the solar industry. As Commerce has previously explained, the "importance of any one of {the section 781(b)(2)} criteria 'can vary from case to case depending on the particular circumstances unique to each circumvention inquiry.'"[357] Accordingly, although "R&D might be a significant factor in some industries, it is not in others … the significance of its presence or absence depends on the industry and product under investigation."[358]

- Silfab's contention that Auxin mischaracterized the solar cell production process, or that Commerce and Auxin ignored section 781(b)(1)(E), is without record support. Auxin outlined Commerce's longstanding practice of employing a comparative methodology when evaluating whether completion or assembly in a third country is minor or insignificant. Employing this framework, Auxin demonstrated that the process of completing or assembling solar cells from Chinese-origin wafers, and completing or assembling solar modules from solar cells, was "minor or insignificant" under Commerce practice. Auxin's analysis is consistent with the DOE and the IEA's own analysis of the solar production process.

---

[354] *Id.* at 20 (citing Auxin's July 29, 2022 Comments at Exhibit 1 (*IEA Report* at 121)).
[355] *Id.* (citing Circumvention Request at PDF page 1612).
[356] *Id.* at 21 (citing Circumvention Request at PDF page 1795).
[357] *Id.* at 21-22 (citing *Diamond Sawblades from China (Thailand)* IDM at Comment 5).
[358] *Id.* at 22 (citing *Hot-Rolled Lead and Bismuth* IDM at Comment 8).

**Commerce's Position:**  We disagree with the respondents and continue to find that based on the totality of evidence gathered pursuant to the factors specified under section 781(b)(2) of the Act that THSM and TTL's process of assembly or completion in the inquiry country of the solar modules they ship to the United States is minor.

As an initial matter, we do not find the fact that Commerce has viewed R&D less importantly in other circumvention inquiries than we have viewed it here as undermining our overall finding. Commerce has explained that the "importance of any one of {the section 781(b)(2)} criteria 'can vary from case to case depending on the particular circumstances unique to each circumvention inquiry.'"[359]  Accordingly, although "R&D might be a significant factor in some industries, it is not in others … the significance of its presence or absence depends on the industry and product under investigation."[360]  Similarly, the Act does not require Commerce to weigh any factor more heavily than another and does not require any particular number of factors be satisfied in order to find assembly operations to be minor or insignificant pursuant to section 781(b)(1)(C) of the Act. Rather, as determined by the CIT, "the five factors are to be separately taken into consideration, as appropriate, and their totality weighed."[361]  Thus, there is nothing incongruent with our emphasis on R&D in determining section 781(b)(1)(C) of the Act and the decision-making criteria specified by the Act.  While our decision weighed R&D heavily, it also took into consideration the other four factors under section 781(b)(2) of the Act.

The main reason R&D weighs heavily in the overall decision pursuant to section 781(b)(1)(C) of the Act is its preeminent importance in the solar industry.  This fact is made evident by the Trina Group investing $150mn in R&D expenses in 2021 alone,[362] while the Canadian Solar Group reported $58mn in R&D expenses.[363]  Moreover, these investments are only those listed in the holding companies' financial statements.  Investments by the Trina and Canadian Solar Groups in R&D may actually be even higher.  LONGi, a leading Chinese solar producer and competitor reported investing over $400mn in R&D and reported incurring R&D costs of nearly 5 percent of its revenue in 2020.[364]  Production efficiency in the solar industry is an important measurement of a producer's success, as a solar producer's goal is to be more and more efficient at converting sunlight into energy.  The *Bloomberg Report* noted that "{l}arge module makers have been regularly upgrading their production lines to adjust for new cell structures and other technological needs.  Factories that lack the most modern equipment can become obsolete quickly in the current competitive market environment."[365]

With regard to individual stages of production, the stages of production less demanding of R&D are those that the respondents have opened overseas.  Meanwhile, the production of the wafer, which is the most technically demanding, is undertaken in China.  The *Bloomberg Report* stated that "{v}ertical integration, high factory capex and technical hurdles have made the wafer market the most consolidated segment of the PV value chain." and that "{w}afer factories require high

---

[359] *See Diamond Sawblades from China (Thailand)* IDM at Comment 5.
[360] *See Hot-Rolled Lead and Bismuth* IDM at Comment 8.
[361] *See U.K. Carbon and Graphite*, 931 F. Supp. 2d at 1310.
[362] *See* TTL's IQR at Exhibit 9.
[363] *See* CSIL's August 8, 2022 Submission at Exhibit 1-A, page F-5.
[364] *See* Circumvention Request at Exhibit 25 (LONGi Group 2020 Annual Report at 17 and 33).
[365] *Id.* at Exhibit 4.

upfront capital expenditure and bear many technical hurdles.[366]  The *Bloomberg Report* also finds that "{c}ell manufacturing is more versatile compared to wafers and polysilicon and has lower technical Hurdles," [367] and that "{b}uilding a new module factory has low technical hurdles compared with wafer and polysilicon." [368]  Thus, not only is R&D of preeminent importance to solar makers, but R&D is most important to wafer production that is exclusively performed by the Chinese affiliates of the respondents and not performed in any inquiry country. This is important as it mirrors the definition of circumvention where the most important stages of production are performed in the order country while the minor or insignificant production that is more easily relocated is moved overseas in order to avoid AD and CVDs.

Further, as opposed to production facilities, R&D only needs to be done once and can be done at any location.  Thus, as opposed to the production facilities in Thailand, CSIL, and TTL did not have to create new facilities in Thailand in order to incorporate R&D already performed by its affiliates in China.  The preeminent importance of R&D and the fact that it need not be done in the inquiry country is demonstrated by the large disparity noted above between the amount of R&D done by THSM and TTL in Thailand and the amount done by their affiliates in China.[369] Again, this pattern mirrors the typical pattern of circumvention where everything of importance remains in the order country, while only minor processing is done outside the country.

While four of the five factors in the case of TTL and three of the five factors in the case of THSM do not support circumvention, these factors still are all a function of the activities of TTL and THSM's affiliates in China.  The financial statements of both respondents indicate that their major or ultimate decisions are made in their headquarters located in China.[370]  Further, for both CSIL and TTL we find that nearly all or all of the investment[371] necessary to operate the factories was arranged by and was a function of actions by their affiliates in China.[372]  While

---

[366] *Id.*

[367] *Id.*

[368] *Id.*

[369] Further, CSIL states that it "follows the product and production standards of the Canadian Solar Group."  *See* CSIL's IQR Part 1 at 22.

[370] *See* the Canadian Group's financial statements at CSIL's IQR Part 1 at Exhibit 1-A, which state at 134 that "{m}ost of our management are currently based in China and may remain in China in the future.  Further, this Exhibit states that the Group's audit was done in China.  For TTL, *see* its response to our request to identify all business or operational relationships affecting the development, production, sale and/or distribution of the inquiry merchandise which your company has, or had, with the parent company where TTL stated that "{a}s the parent company of Trina group, TCZ is ultimately responsible for undertaking activities to innovate and introduce new products and services."  *See* TTL's IQR Part 1 at 3.

[371] *See* the Canadian Group's financial statements at CSIL's IQR Part 1 at Exhibit 1-A, which describes all Canadian Solar group investment being having to abide by Chinese financial laws and that "a significant portion of {the Canadian Solar Group's} borrowings come from Chinese banks, {the Canadian Solar Group is} exposed to lending policy changes by the Chinese banks.  CSIL and THSM are ultimately entirely controlled by the Canadian Solar Group in China.  *See* CSIL's IQR Part 1 at Exhibit 1-A.

[372] *See* the Canadian Group's financial statements at CSIL's IQR Part 1 at Exhibit 1-A, which describes all Canadian Solar group investment being having to abide by Chinese financial laws and that "a significant portion of {the Canadian Solar Group's} borrowings come from Chinese banks, {the Canadian Solar Group is} exposed to lending policy changes by the Chinese banks.  CSIL and THSM are ultimately entirely controlled by the Canadian Solar Group in China.  *See* CSIL's IQR Part 1 at Exhibit 1-A.  TTL is ultimately completely owned by the Trina Group and TTL states that its capital investments are contributed by its majority shareholder, TSSD, which is a holding company.  TCZ, the parent company of the Trina Group is located in China.  *See* TTL's IQR Part 1 at 2 and 5.

many of the parts included in the value of processing done in the inquiry countries were sourced locally, as noted above, all or nearly all of the key high tech inputs of wafers and the other six most important inputs were produced in China.[373]  Meanwhile, the sales of solar modules in the United States are made by the Canadian Solar and Trina Groups' U.S. sales affiliates selling solar modules in the United States.[374]  With regard to the nature and extent of production, the country origin of the machinery used by THSM and TTL in the production of solar cells and modules also impacts our overall decision.[375]

In the SAA, Congress described the stereotypical circumvention a screwdriver manufacturer set-up in a third country in which the third-country firm is sent all of the parts that it merely snaps together in an effort to avoid AD and CVDs.[376]  Congress' rewriting of certain sections of the circumvention laws was its effort to prevent this situation from continuing and it is this very scenario that have been realized by the Canadian Solar and Trina Groups' actions with regard to Thailand.  Aside from the operations necessitating a physical presence in Thailand as realized at THSM and TTL, everything is either done in China or is a result of actions done by the Canadian Solar and Trina Groups' headquarters in China.  Nearly all of the technology, financial arrangements, decision making, and all the key inputs can ultimately be traced back to their affiliates in China.  Further, despite moving the solar cell and module factories to China, for CSIL, the majority of processing is still done in China, not Thailand.  Thus, it is not only that the operations of THSM and TTL rely on their Chinese owners for R&D, which is the driver of the solar industry, but even the physical production facilities were created, maintained, and led ultimately by the actions, decisions, financial arrangements, and supply of key inputs provided by their Chinese affiliates.  The extent to which the machinery in the inquiry countries comes from China also impacts our decision.  In consideration of all factors, we find that the preponderance of record information demonstrates that the process of completion by both THSM and TTL is minor or insignificant under section 781(b)(1)(C) of the Act.

With regard to other sections of the Act, no party has commented on our *Preliminary Determination* under sections 781(b)(1)(A) and (B) of the Act that the inquiry merchandise imported into the United States is within the same class or kind of merchandise as the class or kind of merchandise subject to the *Orders* and that this merchandise is being completed and assembled, in part, from parts and components produced in China, the country with respect to which the applicable *Orders* apply.  We continue to find that the conditions under sections 781(b)(1)(A) and (B) of the Act have been met.

Aside from comments that we should not rely on surrogate values for valuing Chinese inputs, which we have rejected for the reasons explained under Comment 7, no party has commented on our *Preliminary Determination* that, pursuant to section 781(b)(1)(D) of the Act, the value of the merchandise produced in China that was used to produce inquiry merchandise is a significant portion of the total value of the merchandise exported from Thailand to the United States for

---

[373] For the exact major inputs THSM and TTL imported from China, *see* the CSIL and TTL Preliminary Analysis Memoranda.
[374] *See* the Canadian Group's financial statements at CSIL's IQR Part 1 at Exhibit 1-A at F-70, identifying Canadian Solar (USA) Inc. as the Group's only U.S. sales entity.
[375] *See* CSIL's 4th SQR at Exhibit S4-1; *see also* TTL's 4th SQR at Exhibit 2.  Both sources reference proprietary information that cannot be disclosed in this memorandum.
[376] *See* the SAA at 893.

67

CSIL and TTL, and, based on AFA, the non-responsive companies listed in Appendix II of the notice of final determination.

Accordingly, we continue to find that the conditions under section 781(b)(1)(D) of the Act have been met for CSIL and TTL, and the non-responsive companies.  Furthermore, as detailed in Comment 10, we also determine that action is warranted to prevent evasion of the *Orders* pursuant to section 781(b)(1)(E) of the Act.

Concerning the three factors under section 781(b)(3) of the Act (*i.e.*, pattern of trade and sourcing, affiliations, and whether imports of parts and components from China increased), as addressed in Comment 9, Commerce finds that each of these factors supports an affirmative determination of circumvention for CSIL and TTL, and based on AFA, the non-responsive companies listed in Appendix II of the *Federal Register* notice that accompanies this memorandum.

Based on an analysis of the totality of the information on the record of these circumvention inquiries related to CSIL and TTL, we find that CSIL and TTL are circumventing the *Orders* in accordance with section 781(b) of the Act.  Additionally, based on AFA, we find that the non-responsive firms listed Appendix II of the accompanying *Federal Register* notice are circumventing the *Orders* in accordance with section 781(b) of the Act.

Because Commerce was unable to examine all Thai producers of solar cells and modules, Commerce determines that a country-wide determination is most appropriate to prevent further circumvention of the orders by non-examined producers of inquiry merchandise in Thailand. Therefore, Commerce is applying this affirmative determination of circumvention to all shipments of inquiry merchandise from Thailand on or after April 1, 2022, the date of publication of the *Preliminary Determination*.

**Overall Determinations**

**Comment 9.   Whether the Factors Under 781(b)(3) of the Act Justify an Affirmative Final Determination**

*NextEra*[377]
- Section 781(b)(3) of the Act directs Commerce to take into account three factors in determining whether the merchandise produced in a foreign country is within the scope of an order, but the record does not support an affirmative determination based on these factors.
- None of the factors under section 781(b)(3) are dispositive and should not override a finding that the processing in Thailand is not minor or insignificant.
- Pursuant to section 781(b)(3)(A) of the Act, Commerce analyzed U.S. import statistics and the mandatory respondent's data to find that import volumes from Thailand have increased since the *Orders* were imposed, while imports from China declined.[378]
- Imports from Thailand increased in response to growing U.S. demand.

---

[377] *See* NextEra's April 26, 2023 Case Brief.
[378] *Id.* (citing *Thailand* PDM at 21).

68

- The U.S. installed significantly more solar energy capacity in 2021 than it did in 2011. Thus, the patterns of trade reflect a growing domestic market and weighs against finding circumvention.
- Under section 781(b)(3)(C) of the Act, Commerce examined the mandatory respondents' purchases of Chinese-produced inputs from 2008 to 2021 to determine whether shipments of inputs from China to Thailand has increased.[379]
- Cell and module production in Thailand is developed based on the industry's understanding of Commerce's interpretation of the *Orders* regarding the production stage in which the wafer is substantially transformed into a cell and, therefore, subject to the *Orders*.
- An affirmative determination would undermine this understanding. Commerce should therefore not rely on section 781(b)(3) of the Act to find circumvention.
- If Commerce concludes that any of the factors in section 781(b)(3) of the Act weigh in favor of finding circumvention, Commerce should not base an affirmative determination solely on section 781(b)(3) of the Act.
- A negative determination is required, in accordance with the statute and Commerce practice, because processing in Thailand, per NextEra's arguments, is not minor or insignificant, and therefore not all of the mandatory criteria in section 781(b)(1) are met.
- Section 781(b)(1) of the Act lists five criteria that must be met before imports from a third country may be included within an existing order. In contrast, section 781(b)(3) of the Act references three factors that Commerce shall take into account.
- The phrase "take into account" is plainly different from the mandatory language in section 781(b)(1) of the Act, and thus, the section 781(b)(3) factors are clearly not dispositive.
- If processing in the third country is not minor or insignificant, then the factors listed under section 781(b)(3) of the Act are not relevant because not all of the mandatory statutory criteria have been met.
- Commerce has previously emphasized that circumvention determinations are based on the totality of circumstances and the facts of each case.[380]

*Auxin*[381]
- NextEra asserts that Commerce evaluated the factors under section 781(b)(3) of the Act in isolation without taking due consideration of various market conditions. Therefore, Commerce incorrectly found these factors to weigh in favor of finding circumvention.
- In 2021, U.S.-bound solar cell and module shipments from Thailand exceeded U.S.-bound solar cell and module shipments from China. This represents a dramatic shift in the pattern of trade.
- Nonetheless, NextEra asserts that the changes in the pattern of trade simply reflect a growing domestic market. However, Chinese direct shipments have forgone this burgeoning market, and NextEra's assertion reflects a blindness to the deterioration of the U.S. solar industry precipitated by the Chinese government.

---

[379] *Id.* (citing *Thailand* PDM at 23).
[380] *Id.* (citing *Pipe and Tube from India (Oman and UAE)*).
[381] *See* Auxin's May 9, 2023 Rebuttal Brief.

- Accordingly, the extraordinary shifts in the pattern of trade and sourcing patterns strongly support an affirmative determination.
- With respect to section 781(b)(3)(C) of the Act, NextEra found Commerce's finding to be improper because solar cell and module production in Thailand developed based on the shared understanding of the industry from Commerce's interpretation and administration of the *Orders* regarding the stage in the production cycle that renders a product subject to the *Orders*. NextEra has failed to grasp the distinction between a substantial transformation finding and section 781(b) of the Act.
- Additionally, NextEra's admission that parties were searching for export platforms to imbue silicon wafers with a p/n junction admits to circumvention.

**Commerce's Position:** We conclude that the evidence on the record in the Thailand segments regarding section 781(b)(3) of the Act supports Commerce's affirmative circumvention determinations. Therefore, Commerce appropriately issued affirmative determinations of circumvention in Thailand based, in part, on consideration of the factors enumerated in section 781(b)(3) of the Act.

Section 781(b)(3) of the Act provides that, in determining whether to include merchandise assembled or completed in a third country in an AD/CVD order, Commerce shall consider the following additional factors: (A) the pattern of trade, including sourcing patterns; (B) whether the manufacturer or exporter of the merchandise is affiliated with the person who, in the third country, uses the merchandise to complete or assemble the merchandise which is subsequently imported into the United States; and (C) whether or not imports of the merchandise into the third country have increased after the initiation of the AD and/or CVD investigation that resulted in the issuance of an order.

In the *Preliminary Determinations*, Commerce analyzed section 781(b)(3)(A) of the Act by examining the pattern of trade by each mandatory respondent and its Chinese affiliates since the initiation of the underlying investigation.[382] Commerce additionally examined the trade patterns of Chinese shipments of subject merchandise into the U.S. and Thai shipments of subject merchandise into the United States. Commerce concluded that import volumes from Thailand increased since the *Order* was imposed, while imports from China declined, and thus, this pattern weighed in favor of circumvention.[383] NextEra contends that Commerce must not evaluate the patterns of trade within a vacuum and must consider the context of the global market. Notably, U.S. domestic demand has grown significantly since the imposition of the *Order*, as a result of multiple factors, including the Administration's focus on the development of renewable energy. As NextEra stated, deployment of solar energy capacity has grown significantly, and therefore imports from Thailand have become increasingly important to fulfill U.S. demand. Therefore, Commerce must consider the growing U.S. domestic market within its analysis of trade patterns.

The plain language of the Act under section 781(b)(3)(A) of the Act directs Commerce to consider the pattern of trade since the initiation of the investigation of solar cells and modules. The evidence on the record for each mandatory respondent showed extraordinary shifts in the pattern of trade from China to Thailand. U.S.-bound solar cell and module shipments from

---

[382] *See Thailand* PDM at 21.
[383] *See* TTL Preliminary Analysis Memorandum; and CSIL Preliminary Analysis Memorandum.

Thailand replaced and exceeded U.S.-bound solar cell and module shipments from China.[384] Additionally, pursuant to section 781(b)(3)(A) of the Act, Commerce evaluated the specific sourcing patterns of the mandatory respondents in Thailand. Evidence on the record further supported a shift in the pattern of trade from China to Thailand.[385] Thus, the pattern of trade since the initiation of the investigation shows that this factor weighs in favor of finding circumvention.

Commerce analyzed section 781(b)(3)(C) of the Act by taking into consideration whether the shipments of Chinese inputs that were used to complete or assemble the final product in Thailand increased.[386] NextEra alleges that Commerce improperly found that this factor weighs in favor of circumvention, and that an affirmative determination would undermine the clear understanding of Commerce's interpretation regarding the stage in the production cycle that renders a product subject to the *Orders*. The plain language of the Act under section 781(b)(3)(C) instructs Commerce to examine whether imports of Chinese inputs into Thailand used for the production of subject merchandise have increased after the initiation of the underlying investigation. Evidence on the record clearly shows that imports of Chinese inputs for all companies into Thailand have increased since the year of the initiation of the investigation. Therefore, this factor weighs in favor of finding circumvention. Additionally, we agree with domestic parties that there is a clear distinction between a substantial transformation finding and section 781(b) of the Act. Although substantial transformation and circumvention inquiries may be similar, they are conducted pursuant to different regulatory standards and serve different purposes.[387] The purpose of a substantial transformation analysis is to determine a product's country of origin, while the purpose of a circumvention analysis is to counteract evasion of AD/CVD orders. Commerce may find a product that was substantially transformed to still be subject to an AD/CVD order after conducting a circumvention inquiry. Therefore, given the fact that Chinese inputs into Thailand have increased since the year of the initiation of the *Orders*, we continue to find this factor to weigh in favor of circumvention.

NextEra additionally argues that Commerce cannot base an affirmative determination solely on section 781(b)(3) of the Act, and that a final negative determination is required because the processing in Thailand is not minor or insignificant and, therefore, not all of the mandatory criteria in section 781(b)(1) of the Act have been met. Contrary to NextEra's arguments, we continue to find the process of assembly in Thailand to be minor or insignificant for all mandatory respondents, and therefore, all mandatory criteria in section 781(b)(1) of the Act have been met. For additional information, *see* Comment 8.

For Commerce to make an affirmative determination of circumvention, all elements under section 781(b)(1) of the Act must be satisfied, including the minor or insignificant criteria listed in section 781(b)(2) of the Act. In contrast, section 781(b)(3) of the Act references three factors for Commerce to "take into account," a phrase plainly different from the mandatory language in section 781(b)(1). These factors are relevant to Commerce's holistic analysis but are not dispositive of whether circumvention is occurring. Consistent with past practice, Commerce

---

[384] *Id*.
[385] *Id*.
[386] *See Thailand* PDM.
[387] *See Bell Supply CAFC*; *see also* 19 CFR 351.225(j).

71

reaches its determination regarding circumvention based on the totality of the evidence for all factors, including those listed under section 781(b)(3).[388]  Commerce agrees with NextEra that section 781(b)(3) does not overturn a negative determination under 781(b)(1) if the process of assembly or completion in the third country is found to be not minor or insignificant under section 781(b)(2).  Here, we have determined the process of assembly or completion in Thailand to be minor or insignificant, and therefore a finding that solar cells and modules produced in Thailand are circumventing the *Orders* is appropriate.

Based on the above analysis, we conclude that Commerce has correctly determined that the factors under section 781(b)(3) of the Act weigh in favor of circumvention and that Commerce appropriately issued an affirmative determination of circumvention in Thailand based on a totality of the factors, including section 781(b)(3) and the determination that the process of assembly or completion in Thailand is minor or insignificant.

## Comment 10. Affirmative Circumvention Determinations Would Not be Appropriate Under Section 781(b)(1)(E) of the Act

*CSIL*[389]

- Commerce did not provide any discussion regarding the appropriateness of the action, as required by section 781(b)(1)(E) of the Act.
- The CAFC instructed that Commerce must consider each factor enumerated in section 781(b) of the Act.[390]
- Neither the Act nor the SAA provides a specific definition of "appropriate" to be applied in the circumvention context; however, the U.S. Supreme Court has explained that the determination of whether a federal agency's actions are "appropriate" hinges on whether the agency has demonstrated its consideration of "all the relevant factors," and pays "at least some attention to cost."[391]
- The Supreme Court has further indicated that "{n}o regulation is 'appropriate' if it does significantly more harm than good."[392]
- Affirmative final determinations by Commerce in these inquiries to expand the scope of the *Orders* to cover solar cells and/or modules completed in Malaysia, Thailand, Vietnam, and Cambodia using Chinese-origin components would be inappropriate and contradict the definition of "appropriateness" provided by the Supreme Court.[393]
- Commerce has previously confirmed that it is it inappropriate to conduct a circumvention inquiry where merchandise was "expressly and intentionally excluded from the scope of the Orders," as is the case here.[394]

---

[388] *See Pipe and Tube from India (Oman and UAE).*
[389] *See* CSIL's April 26, 2023 Case Brief at 27-31.
[390] *Id.* (citing *Al Ghurair CAFC 2023*, 65 F.4th at 1351).
[391] *Id.* (citing *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR at 27296, 27327-30 and *Michigan*, 576 U.S. 743, 752).
[392] *Id.* (citing *Michigan*, 576 U.S. 743, 752 (citation omitted)).
[393] *Id.* (citing *Michigan*, 576 U.S. 743, 752).
[394] *Id.* (citing *Walk-Behind Lawn Mowers from China Circumvention Rescission*, 88 FR at 13434 (notice of intent to rescind circumvention inquiry on the AD/CVD orders) ("We find that the inquiry merchandise is excluded from the scope of the orders … .  We also find that it is *not appropriate* to conduct a circumvention inquiry on such excluded merchandise." (emphasis added)).

72

- Commerce itself indicated in its original investigation that converting Chinese-origin wafers into solar cells in a third country would not warrant circumvention inquiries.[395]
- Pursuant to *Proclamation 10414*, the President made clear that duties on imports within the scope of these circumvention inquiries are inappropriate due to the current energy emergency instructed Commerce to waive new duties on solar modules from Thailand, Vietnam, Malaysia, and Cambodia for two years.[396]
- Affirmative determinations would run contrary to the goals of the President's directive and to Commerce's regulations,[397] thus, unnecessarily sowing doubt in the very solar supply chain to which the President sought to restore calm and certainty.
- Commerce's approach in the *Preliminary Determination* is contrary to its own recently promulgated circumvention regulations, which state that "the purpose of the proposed modifications is not to penalize companies acting in good faith, but to ensure that circumvention determinations are properly applied to merchandise found to be circumventing an order."[398]
- Commerce should issue negative final determinations because affirmative determinations in these inquiries act to expand the scope of the *Orders* while ignoring and contradicting Commerce's longstanding precedents regarding the nature and significance of certain vital processes in the production of solar cells and modules.

*NextEra*[399]
- Commerce can reach a negative final determination under section 781(b)(1)(E) of the Act which states that Commerce "may" (not "shall" or "must") include products completed in third countries within the scope of an order.
- Including solar cells and modules produced in Cambodia, Malaysia, Thailand, and Vietnam within the scope of the *Orders* is not appropriate since there is no evasion to prevent when the processing that occurs in the third country is so significant.
- AD/CVD proceedings are not exempt from the directive to integrate climate considerations into its policies, strategic planning, and programs.[400]

*Silfab*[401]
- The final determinations must address whether expanding the scope of the *Orders* to encompass cells manufactured in third countries (and the modules produced using those cells) would be appropriate under section 781(b)(1)(E) of the Act.
- Auxin and Commerce have not met the requirements for appropriateness because: (1) no other U.S. producers support Auxin's petitions before Commerce; (2) an unwarranted expansion of the existing *Orders* would cause substantial harm to the U.S. solar industry; and (3) the requested relief would further impede the development of the U.S. solar

---

[395] *Id.* (citing *Orders*, 77 FR at 73018).
[396] *Id.* (citing *Presidential Proclamation 10414*, 87 FR 35067).
[397] *Id.* (citing *2021 Regulations Final Rule* at 86 FR 52300).
[398] *Id.* (citing *2021 Regulations Final Rule* at 86 FR at 52300, 52338).
[399] *See* NextEra's April 26, 2023 Case Brief at 20-21.
[400] *Id.* (citing NextEra's May 2, 2022 Comments at Att. 12 (U.S. Department of Commerce, Department Administrative Order 216-22, Addressing the Climate Crisis).
[401] *See* Silfab's March 6, 2023 Case Brief at 4 and Silfab's April 26, 2023 Thailand Case Brief at 5-13.

73

industry, making it impossible to achieve the Biden administration's green energy initiatives.

- U.S. manufacturers have been denied due process in the form of procedural safeguards and eligibility requirements governing AD/CVD relief under U.S. law and Commerce's regulations.  Put simply, Auxin unlawfully made an end-run around the strict procedures and eligibility requirements governing AD/CVD relief under U.S. law, sections 701 and 703 of the Act and 19 CFR 351.203.

- U.S. manufacturers sourced cells from locations outside of China to enable U.S. manufacturing of solar modules in good-faith recognition of existing AD/CVD orders as they had been administered by Commerce and CBP for a decade.

- U.S. manufacturers were never given any notice that such cells could be circumventing the *Orders*.  In fact, as explained above, Commerce's administration of the *Orders* throughout this period consistently confirmed that such merchandise was not subject to the *Orders*.  Accordingly, affirmative final determinations would, without notice, potentially penalize Silfab for its good-faith efforts to comply with U.S. law and grow U.S. module manufacturing.

- Affirmative final determinations would contradict the emergency declared in *Proclamation 10414*.

*Trina*[402]

- Commerce must make a determination that action is appropriate to prevent evasion under section 781(b)(1)(E) of the Act before making an affirmative finding of circumvention.

- After Auxin filed its circumvention allegation, numerous interested parties explained why there is no appropriate reason to implement a circumvention inquiry of the *Orders*.

- Because Commerce has determined that the p/n junction formation determines country-of-origin for purposes of the *Orders*, Commerce has already foreclosed the possibility that p/n junction formation could be minor processing.

- Commerce stated in its original scope determination:  the factors we consider for making country-of-origin determinations inherently reflect the agency's concern that the relief afforded by AD/CVD orders not be eviscerated by moving minor processing outside of the country covered by the order.  Thus, circumvention concerns are reflected in the country-of-origin determination.[403]

- Auxin has no standing because prior to initiation, Commerce received dozens of letters from members of the U.S. solar industry who expressed deep concern for Auxin's circumvention allegation.

- By allowing a small company like Auxin to circumvent standing requirements for AD/CVD petitions, Commerce is inviting future frivolous claims which may result in multi-million-dollar market impacts.[404]

---

[402] *See* TTL's April 26, 2023 Case Brief at 13-20.

[403] *Id.* (citing Solar Investigation Scope Clarification Memorandum at 1).

[404] *Id.* (citing American Clean Power Letter (noting that Auxin's allegation creates a precedent to "misuse. . . trade laws for the benefit of a single company rather than an entire domestic industry.").

Barcode:4419744-02 A-570-979 CIRC - Anti Circumvention Inquiry - from Thailand 2022

*Auxin*[405]

- Commerce appropriately determined that a circumvention inquiry for the *Orders* is appropriate under section 781(b)(1)(E) of the Act.

- The arguments put forth by several interested parties that Commerce's actions are not "appropriate" notwithstanding Commerce's affirmative finding of circumvention are false.

- Commerce followed its practice in determining that action is appropriate to address circumvention pursuant to section 781(b)(1)(E) of the Act in the *Preliminary Determinations*.[406]

- Commerce and the CIT have held as a matter of statutory interpretation that Commerce's evaluation of whether action is appropriate to prevent evasion pursuant to section 781(b)(1)(E) of the Act is tied to consideration of the factors outlined in section 781(b)(3) of the Act.[407]

- Commerce did not address circumvention in the underlying investigation of the *Orders* because its substantial transformation analysis at that time was limited to comparing cell fabrication to module assembly and not comparing cell fabrication to module assembly to prior stages of solar cell production, which is the analysis Commerce is conducting now pursuant to 781(b)(1) of the Act.[408]

- Commerce stated in the *Solar Cells from China Investigation* that "{p}etitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country" which does not indicate that Commerce meant that future circumvention inquiries regarding solar cells would not be warranted.[409]

- The CAFC stated in *Bell Supply CAFC* that "if Commerce applies the substantial transformation test and concludes that the imported article has a country of origin different from the country identified in an AD or CVD order, then Commerce can include such merchandise within the scope of an AD or CVD order only if it finds circumvention under" section 781 of the Act.[410]

- Auxin is an interested party as defined by section 771(9)(C) of the Act and was, and is, well within its rights to request that Commerce initiate and conduct these circumvention inquiries.

- Congress rejected a standing requirement for circumvention inquiries when it enacted section 781(b) of the Act, which allows any interested party, including small and medium-size businesses like Auxin, to enforce U.S. trade laws.[411]

- Commerce does not have discretion under the statute to disregard circumventing behavior based on a concern that such a finding would impede other government policy objectives, or any other factor not explicitly provided for in the statute.

---

[405] *See* Auxin's March 17, 2023 Rebuttal Brief at 28-30 and Auxin's May 9, 2023 Rebuttal Brief at 43-64.

[406] *See* Auxin's May 9, 2023 Rebuttal Brief (citing, *e.g.*, the *Thailand* PDM at 23-26).

[407] *Id.* (citing *CORE from China (Vietnam)* IDM at 11; *CORE from China (Vietnam)* IDM; *Tung Mung CIT*, 219 F. Supp. 3d 1333, 1343; and *Peer Bearing Co.*, 36 CIT 1700, 1707; and Auxin's May 5, 2023 Rebuttal Brief (citing *CWCS from India (Oman and India)* Final IDM at Comment 1)).

[408] *Id.* (citing *Solar Cells from China Investigation* IDM at Comment 1).

[409] *Id.* (citing *Solar Cells from China Investigation* IDM at Comment 1).

[410] *Id.* (citing *Bell Supply CAFC*, 888 F.3d 1222, 1230 and *Diamond Sawblades (Thailand)* IDM at Comment 3).

[411] *Id.* (citing 19 CFR 351.226(c)).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

- Commerce previously rejected arguments that an affirmative final determination is not appropriate and would impose economic costs by stating that comments regarding economic impact address issues outside the purview of the analysis prescribed by section {781(b)} of the Act.[412]
- This circumvention inquiry does not threaten growth of U.S. solar deployment or hinder efforts to address climate change because as noted by the DOE there has been a steady increase in installed PV capacity from 2010-2020 in spite of the *Orders* and temporary safeguard measures.[413]
- The DOE confirmed that rehabilitating U.S. solar manufacturing by effectively enforcing U.S. trade laws and combatting climate change are not mutually exclusive.[414]
- Auxin's analysis of the solar cell production process is consistent with analyses from the DOE and the IEA, and was ultimately vindicated by Commerce's preliminary affirmative findings of circumvention.
- Silfab's argument that these circumvention queries violate its due process are unfounded since Congress enacted the circumvention section of the Act in 1988 in order to prevent evasion and circumvention of AD/CVD orders and did not establish an industry support requirement.
- Silfab's argument that its due process rights have been violated is belied by the fact that it has been allowed to participate in this inquiry from the very start.[415]
- Silfab USA's contention that affirmative final determinations would contradict the emergency declared in *Proclamation 10414* is similarly without merit because although the proclamation effectively eliminates the remedy that Auxin is entitled to by law, nothing in *Proclamation 10414* is inconsistent with affirmative final determinations in these inquiries.

**Commerce Position:**  We disagree with CSIL, NextEra, Silfab, and Trina's assertions that we did not determine the appropriateness of the instant circumvention inquiries pursuant to section 781(b)(1)(E) of the Act.  As an initial matter, we conducted a full analysis pursuant to section 781(b) of the Act in order to determine if the merchandise assembled or completed in a foreign country is within the scope of the *Orders*.[416]  Section 781(b)(1)(E) of the Act authorizes Commerce to include merchandise alleged to be circumventing in the scope of an order if Commerce "determines that action is appropriate … to prevent evasion of such order or finding."  Commerce found that the criteria for a finding circumvention of the *Orders* was met, and further that the factors listed in 781(b)(3) indicated that circumvention of the *Orders* was occurring.  The statute does direct Commerce to consider factors other than whether action under the circumvention statute is appropriate to prevent evasion of the *Orders*.  Here, because we have found that the criteria for finding circumvention were met, and the factors under 781(b)(3) further evinced the existence of circumventing behavior, and because no information on the record suggested that circumvention would cease absent inclusion of inquiry merchandise in the scope of the *Orders*, we find that action is appropriate under 781(b)(1)(E) of the Act.

---

[412] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 4).
[413] *Id.* (citing Auxin's May 16, 2023 Comments at Exhibit 5 (DOE Solar Deep Dive at 2)).
[414] *Id.* (citing Auxin's May 16, 2023 Comments at Exhibit 5 (DOE Solar Deep Dive at iv)).
[415] *See* Auxin's May 5, 2023 Rebuttal Brief (citing *Techsnabexport, Ltd.*, 795 F. Supp. 428 (noting the "essential elements of due process are notice and the opportunity to be heard")).
[416] *See Thailand* PDM at "Summary of Statutory Analysis."

76

Barcode:4419744-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Thailand 2022

With respect to Auxin's standing to request a circumvention inquiry, there is no stipulation in the regulations regarding who can and cannot bring a circumvention inquiry beyond that it be an interested party.  Pursuant to 19 CFR 351.226(c), an interested party may submit a circumvention inquiry request as long as it follows the proper procedures and include the requisite product information necessary for Commerce to make an initiation determination.  In the instant case, we examined Auxin's circumvention requests and determined that it satisfied the criteria under 19 CFR 351.226(c), thus, giving it standing to proceed.[417]

We also disagree with the arguments raised by CSIL, NextEra, Silfab, and Trina that Commerce precluded future circumvention inquiries on the inquiry merchandise in the language of the investigation.  In the investigation, we stated that there was the option for bringing additional petitions regarding assembly of solar cells and modules in a third country,[418] but did not prelude circumvention inquiries, which are requested in response to specific trade pattern and activities that may constitute circumvention as defined in the Act.  As noted above, Auxin followed Commerce's requisite procedures for requesting a circumvention inquiry and thus we proceeded accordingly.

Further, we disagree with Silfab's claim that it and other U.S. cell and module producers have been denied due process in the instant inquiry.  Silfab claims that because U.S. manufacturers were never given any notice that their cells could be circumventing the *Orders*, its rights to due process were violated.  The Act and Commerce's regulations provide for ample notification and comment on Commerce's *Preliminary Determinations* by interested parties.  In accordance with the CIT's ruling in *Techsnabexport, Ltd.*, the "essential elements of due process are notice and the opportunity to be heard."[419]  As evidenced by the case record of the instant circumvention inquiries Silfab as well as both domestic and foreign solar cell producers have had ample opportunity to file comments, and thus, be heard throughout these inquiries.

Finally, we disagree with CSIL, NextEra, Silfab, and Trina's contention that these circumvention inquiries contradict *Proclamation 10414*.  Nothing in the proclamation states that Commerce cannot conduct circumvention inquiries with respect to solar cells and modules.  In fact, in response to *Proclamation 10414*, Commerce added Part 362 to its regulations to implement the Proclamation and these regulations, as well as CBP instructions issued by Commerce, specify that no ADs/CVDs will be collected on solar cells and modules entering the United States to which *Proclamation 10414* applies.[420]  Thus, Commerce's affirmative circumvention findings cannot be implemented until the provisions of the *Proclamation 10414* expires.

---

[417] *See Initiation Notice*, 87 FR at 19071-72.
[418] *See Solar Cells from China Investigation* IDM at Comment 1.
[419] *See Techsnabexport, Ltd.*, 795 F. Supp at 428.
[420] *See Thailand* PDM at the section, "Certification Process and Country-Wide Affirmative Determination of Circumvention" and *Appendix IV-Certification for "Applicable Entries"*.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

**Certification Issues**

**Comment 11. Whether Commerce Should Allow AFA Companies to Certify**

*Auxin*[421]
- Commerce should preclude all non-cooperative parties in this inquiry from participating in any certification regime resulting from an affirmative determination of circumvention based on the recent precedents in *Ferrostaal Metals GmbH* and *CRS from Korea (Vietnam)*.
- The CIT explained that the SAA makes clear that "application of AFA is a tool given to Commerce 'to ensure that {a} party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'"[422]
- *In Ferrostaal Metals GmbH*, the CIT found that Commerce acted reasonably by applying AFA to the respondent, barring them from participating in the certification regime, and determining that the respondent circumvented the *Orders*.[423]
- The CIT stated that the SAA makes clear that "application of AFA is a tool given to Commerce 'to ensure that {a}party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'"[424]
- The CIT also noted that in prior circumvention inquiries in which Commerce allowed non-responsive companies to participate in the certification process, there was a lack of responses to issued Q&Vs.[425]
- Commerce's initial Q&V warned recipients that a failure to respond to the questionnaire would result in the use of an inference in selecting from the facts otherwise available, in accordance with section 776(b) of the Act.[426]
- Accordingly, Commerce should follow its longstanding, court-affirmed practice of precluding non-cooperative companies (either by not responding to the Q&V questionnaires or cancelling verification) from participation in any certification regime.

No other interested party commented on this issue.

**Commerce's Position:**  Commerce's decision to bar uncooperative respondents from the certification process is an agency practice affirmed by the CIT, is not impermissibly punitive, and minimizes the impact of AFA findings on parties not found circumventing, while ensuring that Commerce's AFA finding induces cooperation, consistent with Commerce's established practice.  As noted by Auxin, Commerce has the authority to and the discretion to determine the eligibility of parties to participate in the certification regime.[427]

---

[421] *See* Auxin's March 17, 2023 Rebuttal Brief at 23-26.
[422] *Id.* (citing *Ferrostaal Metals*, 518 F. Supp. 3d at 1374-75 (citing SAA at 870).
[423] *Id*.
[424] *Id*. 1357, 1374-75 (citing SAA at 870)).
[425] *Id.* (citing *Ferrostaal Metals GmbH*, 518 F. Supp. 3d 1357, 1375).
[426] *Id.* (citing the Q&V Questionnaire at 1).
[427] *See Cold-Rolled Steel from Korea* IDM at Comment 6.

Commerce notified interested parties that it was initiating the circumvention inquiry on a country-wide basis (*i.e.*, not exclusive to the producers mentioned) and would solicit information from certain Cambodian, Malaysian, Thai, and Vietnamese companies concerning their production and shipment of solar cells and modules to the United States.[428]  Commerce also stated in the *Initiation Notice* that a company's failure to completely respond to our request for information may result in the application of partial or total facts available which may include adverse inferences.[429]  In conducting a country-wide circumvention inquiry, Commerce must evaluate a representative selection of companies to determine whether merchandise has been completed or assembled in the third country, and must take necessary action to prevent evasion.[430]  Commerce is not required by the Act or regulations to impose a certification regime in instances where such a regime is inconsistent with preventing evasion and permits uncooperative parties to benefit from their lack of cooperation.  Commerce's previous findings that foreign producers' ability to "trace the country of origin of its shipments and identify which shipments to the United States are of Chinese origin on a transaction-specific basis," is crucial to administration of affirmative anti-circumvention findings.[431]  Commerce is not obligated to permit a previously uncooperative party to certify if that party has, by its unwillingness to cooperate, prevented Commerce from using that party's information to conduct its analysis, or to assess and verify such party's ability to trace its inputs to particular U.S. sales.  Rather, Commerce's establishment of a certification process in which non-cooperative respondents may not participate is consistent with our obligation to administer the law in a manner that prevents evasion of the *Orders*.[432]

As noted by Auxin, the CIT in *Ferrostaal Metals GmbH* sustained Commerce's determination to "bar {non-cooperative respondent} from participating in the certification program and determine that { non-cooperative respondent} was circumventing the orders."[433]

Commerce is authorized under 19 CFR 351.226(m)(1) to take the appropriate remedy to address circumvention, including the application of the determination on a country-wide basis to all products from the same country as the product at issue.  Commerce has repeatedly applied certification requirements in other circumvention inquiries which were subject to an affirmative country-wide decision.[434]  Therefore, in a case where the affirmative circumvention determination is made entirely on record evidence, uncooperative respondents would be able to benefit from their failure to cooperate (*e.g.*, not filing timely Q&Vs or not participating in verification) merely by the fact that they avoided the inconvenience and expense of participating, including being selected as a mandatory (complete questionnaire) respondent, knowing that their lack of participation might not (or would not) alter Commerce's finding of circumvention.  Such non-cooperation could also frustrate Commerce's ability to conduct a circumvention inquiry,

---

[428] *See Initiation Notice*, 87 FR at 19072.

[429] *Id.*.

[430] *See* Thailand RSM at "Selection of Respondents."

[431] *See Butt-Weld Pipe Fittings from China (Malaysia)* IDM at Comment 3; *Hangers from China (Vietnam)* IDM at Comment 4; and *Tissue Paper from China (India) Final Determination* IDM at Comment 2.

[432] *See Butt-Weld Pipe Fittings from China (Malaysia) Preliminary* PDM at 12-13 and 22, unchanged in *Butt-Weld Pipe Fittings from China (Malaysia)*.

[433] *See Ferrostaal Metals GmbH*, 518 F. Supp. 3d at 1375-1376.

[434] *See Butt-Weld Pipe Fittings from China (Malaysia)*; *CRS from China (Vietnam)*; *CORE from China (Vietnam)*; and *CORE from China (UAE)*.

should the largest third-country producers fail to provide Q&V responses.  Finally, an uncooperative respondent retains the right to participate in a future review, and thus remedy its uncooperative status and potentially gain the opportunity to participate in a certification regime. For these reasons, Commerce's decision to preclude non-cooperating respondents from the certification regime is legitimately based on the need to induce cooperation and is not punitive.

## Comment 12. Certification Requirements and Corrections

*BYD HK*[435]
- Commerce should simplify its certifications by replacing them with declarations from only importers that the entry(ies) meet the requirements for duty-free treatment based on the *Presidential Proclamation 10404* (*i.e.*, the entry is an "Applicable Entry") or Commerce's determinations in these circumvention inquiries (*i.e.*, either Commerce's negative circumvention determination applies to the entry or the merchandise that was entered into the United States meets the non-Chinese content requirements identified by Commerce).
- CBP already enforces other duty exemptions using simplified certifications and requiring anything more than simple declarations will impede the flow of goods into the United States.
- Commerce should provide importers 60 days to provide simplified declarations for entries that have already been made.

*Jinko*[436]
- To avoid CBP requiring AD/CVD cash deposits on entries with deficient certifications: (1) an importer should be allowed to appeal CBP's decision that a certification is deficient to Commerce and submit a corrected certification, if necessary; (2) an importer should be allowed to submit corrected certifications in the absence of gross negligence or fraudulent intent; and (3) the documentation required to be maintained in connection with the certification should be limited to documents that demonstrate that the entry is an "Applicable Entry" (*i.e.*, the p/n junction in the solar cells was not formed in China) or not an entry of inquiry merchandise (*i.e.*, the solar cells do not contain wafers produced in China).

*Auxin*[437]
- Commerce should continue to require exporters to complete the requisite certifications because:  (1) Commerce's preliminary affirmative country-wide circumvention determination applies to all exporters in the inquiry countries; (2) exporters possess certain information necessary for completing the certifications that imports may not have; and (3) BYD HK never explained why requiring certifications from exporters would be burdensome.
- Contrary to BYD HK's claim that "there is no legitimate need or purpose for Commerce to require certifications from exporters or to require the level of factual detail specified in the current certifications," Commerce has specifically stated that the "addition of the

---

[435] *See* BYD HK's March 6, 2023 Case Brief at 2-3.
[436] *See* Jinko's March 6, 2023 Case Brief at 1-5.
[437] *See* Auxin's March 17, 2023 Rebuttal Brief at 26-28.

certification requirements…strengthens the administration and enforcement of the AD and CVD orders by reducing the possibility that entries may be inaccurately classified by importers."[438]

**Commerce's Position:**  We have decided not to revise the certifications as suggested by BYD HK because:  (1) requiring exporters to complete the certifications is consistent with Commerce's practice and is necessary; and (2) BYD HK never explicitly identified which parts of the certifications are too burdensome.  Commerce has a history of requiring both importers and exporters of goods that are entered into the United States to complete and maintain certifications in certain proceedings or proceeding segments, including as a result of circumvention inquiries.[439]  Certifications from exporters are particularly important for implementing the results of this circumvention inquiry because whether merchandise is inquiry merchandise is based on the country where the merchandise was produced and whether certain inputs into that merchandise were produced in China.[440]  Neither of these characteristics can be determined through a physical inspection of the merchandise at the border.  Moreover, entry documents that are typically available to the importer may not be helpful in identifying where certain inputs in the imported merchandise were produced, as the source of such inputs may not be apparent from invoices, bills of lading, *etc.*, especially where the input passed through multiple parties (producer, exporter, trading company).  As Commerce noted in the Preamble to its regulations:

> Given the complex supply chains that may be involved with certain types of subject merchandise (which may involve input producers, intermediate processors, producers, exporters, trading companies, importers, *etc.*), certifications provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order.[441]

Requiring exporters to complete and maintain certifications provides the added assurance that adequate information was obtained to accurately certify to the facts listed in the certifications.  Moreover, simply requiring "declarations" from importers that an entry qualifies as an "Applicable Entry" or meets the non-Chinese content requirements does not provide the same level of assurance that the entry meets those requirements as the certifications that Commerce developed for this circumvention inquiry.  Commerce's certifications contain a list of each requirement that must be met to make clear that the importer and exporter have been informed of each requirement by way of the certification and both have specifically certified that each and every requirement has been met.

Furthermore, we disagree that it is inappropriate for Commerce to "require the level of factual detail specified in the current certifications" as argued by BYD HK.[442]  "As a general matter,

---

[438] *See* Auxin's March 17, 2023 Rebuttal Brief at 27 (citing *Core from China (Vietnam)* IDM at Comment 4).
[439] *See* CORE *from China (UAE)*; *see also Aluminum Extrusions from China Minor Alterations Circumvention Final*, 82 FR at 34631-32.
[440] *See Preliminary Determination* at Appendix IV.
[441] *See 2021 Regulations Final Rule*, 87 FR at 52364.
[442] *See* BYD HK's March 6, 2023 Case Brief at 3.

81

importers are expected to perform their due diligence and exercise reasonable care {when completing entry documents} … . {A} reasonable importer may be expected to know, at a minimum, the identity of certain parties in the transaction chain, understand the imported product, including where it was made, how it was made, and the components of the product (and, in some instances, the source of those components)."[443]  Commerce's certifications do not go beyond these already existing expectations for importers.  Hence, we have not revised the certifications as suggested or waived the certification requirement with respect to exporters.

We now turn to the comments regarding deficient or incorrect certifications and the documentation that must be maintained in connection with the certifications.  If CBP determines that an importer or exporter's certification does not conform to Commerce's requirements, such that the entry is subject to the *Orders*, the importer or exporter can request an administrative review of that entry wherein Commerce will determine the appropriate AD/CVD duty assessment for the entry.  Regarding corrections to certifications, CBP already has provisions in place for importers to correct entry summary information, including certification information, through such means as a post summary correction or a prior disclosure.

With respect to documentation requirements, parties who complete the "Applicable Entries" certification must certify to more than the fact that the solar cells or solar modules were not already subject to the *Orders*; or the AD order on certain crystalline silicon photovoltaic products from Taiwan (certain existing solar orders).  For example, such parties must certify that the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated.

Similarly, parties who complete the "Chinese Component" certification must certify to more than the fact that the solar cells or solar modules do not contain wafers produced in China.  For example, such parties must certify that the solar cells and/or solar modules were not already subject to the *Orders*.

Consequently, it would not be appropriate to limit the documentation requirements as suggested by Jinko.  Commerce noted in the certifications that the certifying party "is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, etc.)."[444]  This means that the certifying party must maintain sufficient documentation to support the certification in its entirety.  Therefore, we have not limited the documentation requirement as requested by Jinko.

---

[443] *See 2021 Regulations Final Rule*, 87 FR at 52347-48.
[444] *See Preliminary Determination*, 77 FR at Appendix VI.

**Comment 13. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders***

*NE Solar*[445]

- Commerce cannot require exporters of solar cells or solar modules that were not manufactured using Chinese wafers to certify to that fact because such merchandise is not subject to the circumvention inquiry. Commerce cannot change the language of the *Orders* or interpreted that language "in a way contrary to {its} terms.[446]
- Thus, Commerce should revise its certifications to remove references to merchandise that is outside the scope of the circumvention inquiries and that is not subject to the underlying *Orders* (*i.e.*, language in the certification that the imported or exported solar cells and solar modules were not manufactured using wafers produced in China).

No other interested party commented on this issue.

**Commerce's Position:** We disagree with NE Solar's claim that Commerce cannot place certification requirements on interested parties who exported solar cells and/or solar modules to the United States that were produced in the countries under consideration that do not meet the definition of inquiry merchandise. Commerce's regulations at 19 CFR 351.226(m)(1)(iv), provide that "{i}n conducting a circumvention inquiry under this section, the Secretary shall consider, based on the available record evidence, the appropriate remedy to address circumvention and to prevent evasion of the order. Such remedies may include … {t}he implementation of a certification requirement under 19 CFR 351.228." Under 19 CFR 351.228, Commerce may require "an importer or other interested party" to "{m}aintain a certification for entries of merchandise into the customs territory of the United States" and that if such certificate is not maintained or is false, Commerce "may instruct the Customs Service to suspend liquidation of entries of the importer or entries associated with the other interested party and require a cash deposit of estimated duties at the applicable rate …"

Thus, the certification described in 19 CFR 351.228 relates to an entry that was not declared as subject to ADs or CVDs, such as the entries described by NE Solar, since only if the certification was not maintained or was found to be false would such duties be imposed. This interpretation is consistent with Commerce's statement in the Preamble to the regulations that "Commerce uses the certification program, as described in {section} 351.228 of these regulations, to allow parties who have not engaged in the practices which Commerce determined were circumventing an order to certify that they did not participate in such conduct." Therefore, requiring importers and exporters to certify that the imported/exported solar cells or solar modules produced in the countries under consideration were not manufactured using wafers produced in China is entirely consistent with Commerce's regulations and its authority to administer the Act in a manner that prevents evasion of its determinations, including developing certifications that it finds will be effective in preventing such evasion. As the CIT noted, "Commerce has a certain amount of discretion to act in order to 'prevent {} the intentional evasion or circumvention' of the Act … .

---

[445] *See* NE Solar's March 6, 2023 Case Brief at 5-8.
[446] *Id*. at 5-7 (citing *Wheatland*, 161 F.3d at 1370 (quoting *Smith Corona*, 915 F.2d at 686; and *Ericsson*, 60 F.3d at 782).

To that end, Commerce may impose measures such as mandatory certification programs where it believes they will be effective in preventing future circumvention of its orders."[447]

Such certifications are particularly important in this circumvention inquiry because inquiry merchandise is not physically distinguishable from non-inquiry merchandise (inquiry and non-inquiry merchandise only differ with respect to the countries where certain materials in the merchandise were produced). As Commerce noted in the Preamble to its regulations:

> We note that Commerce frequently imposes certifications in instances in which CBP may not be able to ascertain certain identifying details relevant to the product's classification as either subject to, or not subject to, an AD and/or CVD proceeding through physical inspection or the relevant sales documentation accompanying the entry summary, and, thus, could not confirm through these means alone whether a particular entry has been properly designated as {subject to antidumping or countervailing duties}. In such instances, both CBP and Commerce would rely on the certifications as an additional tool to ascertain whether the entry correctly was filed as an entry type not subject to an AD and/or CVD proceeding.[448]

Commerce went on to note in the Preamble that:

> … enforcement of the AD/CVD laws, including taking steps to prevent evasion and circumvention of AD and CVD orders by producers, exporters, and importers, is well within Commerce's authority and is of paramount importance to Commerce. The addition of a certification requirement, where necessary based on a given case, strengthens the administration and enforcement of the AD and CVD orders by reducing the possibility that entries may be inaccurately filed by importers. Given the complex supply chains that may be involved … certifications provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order.[449]

Revising the certification as suggested by NE Solar by removing statements that the imported/exported merchandise was not manufactured using wafers, and/or certain other materials, produced in China would contravene the purpose of the certification at issue which is to "provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order."[450]

---

[447] *See Appleton Papers Inc.*, 929 F. Supp. 2d at 1337 (citing *Tissue Paper from China (Vietnam) Final Determination* IDM at 9-12); `Solar Cells from China Investigation` IDM at 80-81 (finding that a certification regime is necessary and appropriate to prevent evasion of the AD/CVD orders on solar cells); *CORE from China (UAE)*, 85 FR 41957, 41958.
[448] *See Adoption of CFR 351.228*, 86 FR at 52364.
[449] *Id.*
[450] *Id.*

Lastly, Commerce's certifications do not redefine the scope of the *Orders* or inquiry merchandise. Rather, the certifications are tools used to enforce the *Orders* and the circumvention determination in this proceeding so as to prevent evasion of such determinations.

**Comment 14. Whether Exporters and Importers Should be Permitted to Submit Multiple Certifications, as Applicable**

*BYD HK*[451] and *CSIL*[452]
- Commerce should clarify that exporters and importers eligible to complete both the Appendix IV "Certification for 'Applicable Entries' Under 19 CFR Part 362 Importer Certification" and Appendix VI "Certification Regarding Chinese Components Importer Certification" certifications may file both certifications.
- Commerce's clarification would provide certainty to importers whose imports comply with the conditions of both certifications should *Presidential Proclamation 10414* and/or Commerce's related September 16, 2022 Final Rule be amended or terminated.[453]
- There is no principled basis for Commerce to preclude parties from filing two certifications and clarifying an importer's ability to submit more than one certification would assist in Commerce's administration of the final determination in these inquiries.
- Commerce should amend its certifications and related appendices to allow importers to submit both the Appendix IV "Certification for 'Applicable Entries' Under 19 CFR Part 362 Importer Certification" and Appendix VI "Certification Regarding Chinese Components Importer Certification" certifications to clarify the certification regime, and in turn, promote its administrability.

No other interested party commented on this issue.

**Commerce's Position:**  We confirm that importers and exporters may complete certifications under ***both*** Appendix IV and Appendix VI of the *Preliminary Determinations.*  Following the release of the *Preliminary Determinations*, Commerce informed interested parties of the certification requirement[454] and established the following types of certifications to administer *Presidential Proclamation 10414* and the findings from the *Preliminary Determinations*:  (1) importer and exporter certifications that specific entries meet the regulatory definition of "Applicable Entries"; (2) importer and exporter certifications that specific entries are not subject to suspension of liquidation or the collection of cash deposits based on the preliminary negative circumvention determinations (in combination with certain of its wafer exporters); and (3) importer and exporter certifications that specific entries of inquiry merchandise are not subject to suspension of liquidation or the collection of cash deposits pursuant to this preliminary country-wide affirmative determination of circumvention because the merchandise was not manufactured using certain components produced in China.[455]  Copies of the certifications and information regarding the certification requirements were provided in the Appendices to the *Preliminary*

---

[451] *See* BYD HK's March 6, 2023 Case Brief at 4-6.
[452] *See* CSIL's March 6, 2023 Case Brief at 3-4.
[453] *See* BYD HK's March 6, 2023 Case Brief (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56868).
[454] *See Preliminary Determinations*, 87 FR at 75225.
[455] *See Thailand* PDM at 23-24.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

*Determination.*[456]  Appendix IV of the *Preliminary Determination* related to the certification for "Applicable Entries" under 19 CFR Part 362 whereas Appendix VI relates to the certification regarding Chinese components.  We acknowledge that exporters/importers shipping inquiry merchandise from the four countries subject to the circumvention inquiry (*i.e.*, Cambodia, Malaysia, Thailand, and Vietnam) may qualify under the "Applicable Entries" Appendix IV certification related to the *Presidential Proclamation 10414* and the Chinese components Appendix VI certification.  Thus, exporters/importers may elect to complete both the Appendix IV and Appendix VI certifications.

## Comment 15. Whether or Not Companies Found Not to be Circumventing Should be Required to Certify and to Identify Their Wafer Suppliers

*Hanwha*[457]

*Commerce Should Not Request Certifications for Companies Found Not to Be Circumventing the Orders*

- The significance of a negative determination of circumvention is that merchandise exported by a respondent found not to be circumventing the orders is not within the scope of the relevant AD/CVD orders.[458]  Yet, contrary to law, Commerce has imposed a certification regime on Hanwha's entries.
- Commerce has the discretion to act to prevent the evasion or circumvention of AD law.[459]  Commerce may impose measures such as a certification regime if they believe it will be effective in the prevention of future circumvention.[460]
- Hanwha was found not to be circumventing and, thus, Commerce should not require any certification on exports of solar cells and modules produced by Hanwha because they are not subject merchandise.
- Commerce's stated objective is to craft certification language that targets as closely as possible the merchandise that is circumventing the orders.  Imposing a certification requirement on merchandise exported by Hanwha is contrary to this principle.
- Commerce should take reasonable steps to ensure that merchandise from an exporter found not to be circumventing the orders is not subject to suspension of liquidation and ADs/CVDs.[461]
- In prior negative circumvention determinations, Commerce has consistently not adopted any certification requirements.[462]  Therefore, companies for which Commerce reaches a negative determination should be exempt from a certification requirement.
- Commerce may implement a certification requirement under 19 CFR 351.228 if Commerce finds the merchandise subject to the inquiry pursuant to 19 CFR

---

[456] *See Preliminary Determinations*, 87 FR at 75227-31.
[457] *See* Hanwha's March 6, 2023 Case Brief at 2-15.
[458] *Id.* (citing 19 CFR 351.226(g)(2)).
[459] *Id.* (citing *Tung Mung CIT*).
[460] *Id.* (citing *Butt-Weld Pipe Fittings from China (Malaysia)*).
[461] *Id.* (citing *Mitsubishi Heavy Industries*).
[462] *Id.* (citing *CORE from China (Guatemala)*; *CORE from China (South Africa)*; *PET Film from the UAE (Bahrain)*; and *Pipe and Tube from India (Oman and UAE)*).

86

351.226(m)(1)(iv).  However, neither the statue nor Commerce's regulations require a certification requirement in the event of a negative circumvention determination.

- If Commerce makes a negative determination, it is required to terminate the proceeding and terminate the suspension of liquidation with a refund of any cash deposit.[463] Therefore, if Commerce makes a negative final circumvention determination, that merchandise must not be included in the *Orders* or subject to duties.

- Because Hanwha is not disclosing its wafer suppliers it is unfairly placed in the same position as the respondents for which Commerce made an affirmative circumvention finding.  This is inconsistent with the statute and Commerce's own regulations, which requires Commerce to terminate the suspension of liquidation in the event of a negative determination in an AD investigation.

*Commerce Has Requested Certifications Where Exporters Reported No Shipments but that Situation is Not Analogous to a Negative Determination*

- Commerce has previously imposed certification requirements on companies found to have no shipments in affirmative circumvention determinations.  Those scenarios are not the same as a negative circumvention determination.[464]

- In these cases, Commerce found the companies to have no shipments, finding that there are no reviewable entries or no reviewable shipments and not investigating a company's books and records to determine if it is circumventing pursuant to section 781(b) of the Act.

- Conversely, a negative circumvention determination is made after Commerce has analyzed a respondent's information.  Hanwha has provided multiple questionnaire responses, thousands of pages of confidential information, and conducted verification of all information needed.

- In *Pipe and Tube from India (Oman and UAE)*, Commerce reached a negative country-wide determination and did not impose any certification requirements.[465]  Similar to this, Hanwha was found not to be circumventing, a certification is not required and requiring one is contrary to law.

*If Commerce Continues to Require Certifications for Companies Found Not to be Circumventing, Commerce Should Modify the Appendix V Certification Requirement and Allow Hanwha to Certify Without Disclosing the Identity of its Wafer Exporters[466]*

- Hanwha objects to the requirement of publicly disclosing the names of its wafer exporters in order to use the certification regime imposed in the *Preliminary Determination*, as it is contrary to Commerce's APO practice and imposes significant harm to Hanwha's business relationships.

- Specifically, 19 CFR 351.105(c)(6) states that Commerce will normally consider the names of particular customers, distributors or suppliers as BPI if so designated by the

---

[463] *Id*. (citing section 731(c)(3) of the Act).

[464] *Id.* (citing *Butt-Weld Pipe Fittings from China (Malaysia)*; and *CORE from China (UAE)*).

[465] *Id.* (citing *Pipe and Tube from India (Oman and UAE)*).

[466] Hanwha refers to the wafer exporters (the companies that ship the wafers from China to Malaysia) as wafer suppliers.  For our analysis these terms are interchangeable.  We note that the Appendix V certification asks for companies to confirm their wafer "exporter."

87

submitter.  Hanwha has properly requested BPI treatment of the names of its unaffiliated suppliers.

- Requiring Hanwha to disclose the identity of its wafer exporters is therefore inconsistent with the APO, and also seems to violate the spirit of the Trade Secrets Act.
- The identity of wafer exporters/suppliers is extremely sensitive for a variety of commercial reasons, making it virtually impossible for Hanwha to comply.
- None of the five statutory factors under section 781(b)(1)(C) of the Act required an examination of the identity of Hanwha's wafer exporters/suppliers, beyond the fact that the wafers were of Chinese origin.
- Commerce should allow Hanwha to certify that the solar cells and modules are produced in the same general manner as examined in the investigation, without requiring it to trace such exports to a specific wafer supplier.
- The identity of the wafer exporters/suppliers also has no bearing on Commerce's analysis with respect to section 781(b)(1)(D) of the Act.
- In past cases where Commerce has established certification requirements, such as in *CORE from China (UAE)*, respondents were not required to provide the names of their substrate providers.  The respondents were simply required to certify that the substrate was not Chinese.
- The identity of an input supplier has never been part of any certification regime in a circumvention inquiry.
- The proposed certification regime does not take into account that Hanwha and others may qualify new wafer suppliers.  Hanwha seeks confirmation that it will not be barred from using new wafer suppliers for future shipments, should Commerce continue to require the identification of wafer suppliers.
- If Commerce believes a certification regime is necessary, Commerce should modify the certification language and allow a company who received a negative determination to certify that the subject merchandise was produced by that company using a substantially similar production process, without having to publicly disclose the identity of its wafer suppliers.
- Companies found not to be circumventing should be allowed to certify that cells exported to the U.S. are for use in modules produced by affiliated parties in the United States.  Such a certification would be easy to enforce and administer by CBP and would not be detrimental to the U.S. industry in any way as the cells would be dedicated for consumption by an affiliated supplier to produce U.S. modules.
- While Hanwha's inability to use the Appendix V certification could be mitigated by using the Applicable Entries certification, it is inadequate for a company found not to be circumventing.

*Boviet*[467]

- The inclusion of a specific wafer supplier requirement is unnecessary to prevent circumvention, is unrelated to the reasoning underlying Commerce's negative determination, imposes an unnecessary burden on Boviet, and complicates administrability for CBP.

---

[467] *See* Boviet's March 6, 2023 Case Brief at 1-4.

88

- Commerce reached a *Preliminary Determination* that Boviet is not circumventing, based on a number of factors, none of which has any connection to the identity of the Chinese exporter supplying Boviet wafers.
- Boviet's wafer supplier was not a part of Commerce's negative determination for Boviet, and as it is not related to Commerce's determination, Commerce should remove this aspect of the certification requirement.
- The wafer supplier restriction unnecessarily complicates Boviet's compliance with and CBP's administration of Commerce's certification. It hinders Boviet's ability to make normal commercial decisions regarding its supply of wafers.
- Boviet requests that Commerce modify the Appendix V certification to exclude the wafer exporter/supplier requirement for the importer in paragraph F(3) and for the exporter in paragraph D(3), if not remove the certification requirement altogether.

*Auxin*[468]

- Commerce should not weaken its certification regime by carving out certain solar producers, exporters, or importers, making certain requested changes, or delaying its implementation.
- Hanwha argues that Commerce should not impose a certification requirement for companies that received a negative circumvention determination, but because of Commerce's preliminary country-wide affirmative circumvention findings, such a certification regime is necessary to give full effect to Commerce's determination.
- Auxin's proposed certification regime as provided in section II of the rebuttal brief, should make certification easy for companies like Hanwha that have been found to not be circumventing.
- Allowing a producer temporary or permanent exemption from the affirmative ruling and its certification requirements because it is not currently relying on Chinese substrate creates the possibility of future circumvention by that producer.[469]
- With respect to *CORE from China (Guatemala)*, *CORE from China (South Africa)*, *PET film from the UAE (Bahrain)*, and *Pipe and Tube from India (UAE)*, these were negative country-wide circumvention determinations, and therefore, Commerce did not institute certification regimes.
- Where a certification requirement is imposed, it must be imposed on a country-wide basis to avoid evasion of the order and circumvention findings.
- Commerce should alter its certification regime by applying rules proposed by Auxin. Adopting these rules would obviate respondents' arguments regarding the need to publicly identify their wafer suppliers, provide flexibility to respondents in qualifying new wafer suppliers, allow respondents to make commercial decisions, and simplifies the records importers are required to maintain.
- Auxin's proposal is better because it:  (1) avoids the need for respondents to publicly identify their wafer suppliers; (2) provides flexibility to respondents so they are not locked into certain wafer suppliers; (3) allows respondents to determine what is best for their commercial interests when securing Chinese inputs; and (4) simplifies the types of records needed to be maintained by importers.

---

[468] *See* Auxin's March 17, 2023 Rebuttal Brief at 17-21.
[469] *Id.* (citing *CRS from China (Vietnam)*).

**Commerce's Position:**  We continue to find the certification requirements implemented in the *Preliminary Determinations* to be adequate and appropriate.  For the final determinations, we have made slight modifications regarding the wafer exporter language included in the certifications at Appendix V.

Based on record information, Commerce initiated a country-wide circumvention inquiry to determine whether imports of solar cells and modules exported from, and produced in, Cambodia, Malaysia, Thailand, and Vietnam were circumventing the *Orders*.[470]  On December 8, 2022, we preliminarily found that solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam were circumventing the *Orders* on a country-wide basis.  Under 19 CFR 351.226(m)(1), Commerce is authorized to take the appropriate remedy to address circumvention and prevent evasion of an order, including the application of a determination on a country-wide basis.  Therefore, Commerce applied the affirmative determination of circumvention to all shipments of inquiry merchandise from all four countries on or after April 1, 2022, the date of publication of the *Initiation Notice.*

As stated in the *Preliminary Determinations*, we determined that shipments of inquiry merchandise by Hanwha, in combination with certain wafer exporters, completed in Malaysia using certain parts and components manufactured in China are not circumventing the *Orders*.  In order to administer the country-wide affirmative determination of circumvention, and the company-specific negative determinations of circumvention, Commerce established the certification regime.  The certification regime was implemented to ensure that the merchandise from Hanwha using the specific supply-chain that was found to be not circumventing the *Orders*, is not improperly subject to the *Orders*.

Hanwha argues that companies found not to be circumventing the *Orders* should not be required to certify, as the negative determination of circumvention means that the merchandise exported by the respondent is not within the scope of the relevant order.  In previous negative circumvention determinations, Hanwha notes, Commerce has not adopted any certification requirements.[471]  Additionally, Hanwha contends that in accordance with section 735(c)(2) of the Act, Commerce is required to terminate the proceeding following a negative determination, and to terminate the suspension of liquidation.  The CIT has held that Commerce is expected to take reasonable steps to prevent the suspension of liquidation of non-subject merchandise.  According to Hanwha, based on past precedent where Commerce reached a negative determination, Commerce has indicated that importers and exporters are no longer required to certify their products, lifted the suspension of liquidation, and ordered CBP to refund any cash deposits.[472]

As stated above, Commerce is authorized under 19 CFR 351.226(m)(1) to take the appropriate remedy to address circumvention, including the application of the determination on a country-wide basis to all products from the same country as the product at issue.  Accordingly, Commerce initiated these circumvention inquiries on a country-wide basis and reached an affirmative country-wide determination in its *Preliminary Determinations*.  Therefore, we find the facts of the cases cited by Hanwha not to be analogous to these inquiries.  Commerce did not

---

[470] *See Initiation Notice.*
[471] *See* Hanwha's March 6, 2023 Case Brief (citing *CORE from China (Guatemala)*; *CORE from China (South Africa)*; *Pipe and Tube from India (UAE)*; and *PET Film from the UAE (Bahrain)*).
[472] *See* Hanwha's March 6, 2023 Case Brief (citing *Shelter Forest*).

require certifications in *CORE from China (Guatemala)*, *CORE from China (South Africa)*, and *Pipe and Tube from India (UAE and Oman)* because these were negative country-wide determinations. In *PET Film from the UAE (Bahrain)*, the proceeding was initiated on a specific respondent, not on a country-wide basis. Commerce has repeatedly applied certification requirements in other circumvention inquiries which were subject to an affirmative country-wide decision.[473] Hanwha also asserted that the facts in *Butt-Weld Pipe Fittings from China (Malaysia)* and *CORE from China (UAE)* were not relevant due to the respondents reporting no shipments. However, we find these cases to be relevant as they were circumvention inquiries initiated on a country-wide basis and found to be affirmative. The country-wide affirmative decision was what resulted in the need for certifications for importers and exporters.

Given the affirmative country-wide determinations in the instant inquiries, there is no basis for Commerce to terminate the inquiries, and instead, pursuant to section 781(b)(1)(E) of the Act and 19 CFR 351(m)(1)(iv), Commerce deems a certification regime to be necessary and appropriate administer the determinations and prevent evasion of the *Orders* in the future. The certification regime allows companies found not to be circumventing the *Orders* opportunities to avoid the application of ADs/CVDs. As such, we find the certification regime to be a reasonable step to prevent the suspension of liquidation of non-subject merchandise. Thus, requiring Hanwha to complete certification requirements is not equivalent to treating Hanwha as an affirmative company, but a measure to ensure that Hanwha can certify entries that are not subject to the *Orders* as a consequence of the negative determination regarding Hanwha, while also allowing for the continued administration and enforcement of *Orders*. If Hanwha and other parties are accurately filling out the certifications, they will not be subject to the *Orders*. The facts of this case do not resemble those of *Shelter Forest* as we reached an affirmative country-wide determination in this case. In *Shelter Forest*, Commerce made a negative determination and as a result, indicated that respondents no longer needed to certify, lifted the suspension of liquidation, and ordered CBP to refund any cash deposits.[474] Therefore, we find the facts of *Shelter Forest* to not be relevant.

Hanwha next argues that should Commerce continue to require companies found not to be circumventing, Commerce should modify the Appendix V certification and allow Hanwha to certify without disclosing the identity of its wafer suppliers/exporters. Specifically, Hanwha notes that requiring it to publicly disclose the names of its wafer suppliers/exporters is contrary to APO practice, and pursuant to 19 CFR 351.105(c)(6), a supplier's identity should be treated as BPI. Additionally, per Hanwha, the identity of specific wafer suppliers has no bearing on Commerce's analysis under sections 781(b)(1)(C) and 781(b)(1)(D) of the Act. Boviet further contends that the inclusion of a specific wafer supplier is unnecessary and is unrelated to the reasoning underlying Commerce's determination.

Commerce finds the request to treat the names of wafer exporters/suppliers as BPI within the Appendix V certification to be appropriate and has modified the certification accordingly. Section 351.105(c)(6) of Commerce's regulations states that Commerce will normally consider the names of particular customers, distributors, or suppliers to be BPI, if so designated by the

---

[473] *See Butt-Weld Pipe Fittings from China (Malaysia)*; *CRS from China (Vietnam)*; *CORE from China (Vietnam)*; and *CORE from China (UAE)*.
[474] *See Shelter Forest*.

91

submitter.  As Hanwha has requested the business proprietary treatment of its unaffiliated wafer suppliers, the regulations state that Commerce will normally treat it as BPI.  Therefore, Commerce has modified the certification under Appendix V to allow the business proprietary treatment of wafer exporters for all respondents found not to be circumventing.  Certifications submitted to CBP as part of an entry package are not made publicly available, and such information will not be publicly disclosed.

With respect to arguments related to the inclusion of specific wafer exporters in the certification, we continue to find it necessary for the names of specific wafer exporters to be required on the certification under Appendix V, with the modification for BPI treatment described above.  In the *Preliminary Determinations*, and as affirmed in this final determination, we performed an analysis based on the particular supply chains of each mandatory respondent.  The *Preliminary Determination* specifically states that we determined that Hanwha's exports of inquiry merchandise produced with wafers exported by the specific parties reported in their questionnaire responses are not subject to the *Orders*.  Therefore, the certification under Appendix V is established to provide companies found not to be circumventing on a company-specific basis to certify that their specific supply chain is not subject to the *Orders*.  As a result, Commerce continues to require respondents found not to be circumventing to include the names of its wafer exporters in the certification.  Our analysis under section 781(b)(2) of the Act is done at an exporter-specific level and the country of origin of the wafer is a critical aspect of our analysis.  Because we are permitting parties to certify shipments as not circumventing only if the shipment utilizes the supply chain examined in this inquiry and we are requiring both the exporter and importer to certify this, the exporter may need to disclose their wafer supplier to their importer.  Should respondents wish to use new wafer suppliers for future shipments, the certifications under Appendix IV and Appendix VI remain available to all companies found not to be circumventing.

Lastly, Auxin commented that Commerce should alter its certification regime by adopting the rules it proposed.  Doing so, according to Auxin, would obviate the need for respondents to publicly identify their wafer suppliers, provide flexibility to respondents in qualifying new wafer suppliers, allow respondents to make commercial decisions, and simplifies the records importers are required to maintain.  Commerce has addressed Auxin's proposal under Comment 19.

Based on the analysis above, Commerce finds the certification regime established at the *Preliminary Determinations* to be appropriate.  With respect to the certification listed under Appendix V, Commerce continues to require the names of specific wafer exporters but will allow respondents to treat them as BPI.

### Comment 16. Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews

*Vina/LONGi*[475]
- A changed circumstances review is preferable to an administrative review as a proceeding segment in which Commerce could reconsider a company's eligibility to participate in the solar circumvention certification regime.

---

[475] *See* Vina/LONGi's March 6, 2023 Case Brief at 3-6.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

- The Act and Commerce's regulations indicate that administrative reviews are used to determine final liabilities for ADs/CVDs, not to address matters related to circumvention inquiries.[476]
- It would take too long for a company to gain access to the solar circumvention certification regime through an administrative review and the company would need to participate in multiple administrative reviews.
- For example, under *Presidential Proclamation 10414* and Commerce's implementing regulations (which provide that Commerce will instruct CBP to discontinue suspension of liquidation and the collection of cash deposits on "Applicable Entries" of inquiry merchandise on or before June 6, 2024, (the current Date of Termination of *Presidential Proclamation 10414*)), unless a company incorrectly declared that it had a reviewable suspended entry before June 6, 2024, it will not have any reviewable entries until the twelfth administrative review of the *AD Order* (which covers the period December 1, 2023, through November 30, 2024). The final results of 2023-2024 AD review may not be issued until as late as June 2026. Meanwhile, the company would not be able to use solar circumvention certifications during the POR of the thirteenth administrative review of the *AD Order* (covering the period December 1, 2024, through November 30, 2025) and would need to request that its shipments/entries during the 2024-2025 POR be reviewed. The final results of that review may not be issued until as late as June 2027.
- Moreover, if a company in an inquiry country requested an administrative review and was selected as a mandatory respondent, it would be a waste of resources to conduct a complete analysis of the company's exports/entries when the reason the company requested the review was to establish its eligibility to certify that its solar cells and/or solar modules are not inquiry merchandise subject to review.
- In contrast, in changed circumstances reviews Commerce does not need to issue a questionnaire,[477] or conduct the full analysis performed for mandatory respondents but may focus on the precise reason the company was determined to be ineligible to participate in the solar circumvention certification regime.
- In a changed circumstances review a company could be given the opportunity to establish its eligibility to participate in the solar circumvention certification regime by demonstrating that it is able to trace the components in solar cells or modules to the country in which the wafer and other significant material inputs were produced and thus satisfy the certification requirements.
- Thus, Commerce can address a "change" in its determination that a company was not eligible to participate in the solar circumvention certification regime in a changed circumstances review. Commerce followed this approach in *OCTG from China CCR*.[478]
- Commerce should consider examining certification eligibility in changed circumstances reviews as an alternative to reviewing such eligibility in administrative reviews.

No other interested party commented on this issue.

---

[476] *Id.* (citing section 751(a)(A)-(B) of the Act).

[477] *Id.* at 5 (citing 19 CFR 351.221(c)(3)(iii)).

[478] *Id.* at (citing *OCTG from China CCR*, 87 FR at 15915).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

**Commerce's Position:**  We disagree with Vina/LONGi's position that Commerce should reconsider a company's ineligibility to participate in the solar circumvention certification regime in changed circumstances reviews.  Rather, Commerce will consider requests for eligibility to participate in the solar circumvention certification regime in administrative reviews.

Section 751(b)(1) of the Act provides that "{w}henever {Commerce} receives information concerning, or a request from an interested party for a review of {a final determination, suspension agreement, or continued investigation} which shows changed circumstances sufficient to warrant a review of such determination or agreement, {Commerce} shall conduct a review of the determination or agreement …"  The phrase "changed circumstances" is not defined in the Act, the SAA, or Commerce's regulations and none of those primary and secondary sources contain an explanation of what aspects of a determination may be reconsidered in light of changed circumstances.  While Commerce has broad discretion in determining whether to initiate a changed circumstances review and in deciding the range of matters that can be considered in such a proceeding, its discretion is limited by the statutory requirement that there be "changed circumstances sufficient to warrant a review" of the antidumping order.[479]  In practice, Commerce has conducted changed circumstances reviews to address a wide variety of issues, some of which could also be addressed in the context of an administrative review.[480]  Commerce's practice is to determine, on a case-by-case basis, whether changed circumstances sufficient to warrant a review exist.[481]

Here, Vina/LONGi failed to identify any circumstance that has changed.  Rather, Vina/LONGi argued that "… a changed circumstances review can address a "change" in Commerce's determination that a company was not eligible to participate in its certification program." However, the circumstance that led Commerce to prohibit importers/exporters from certifying as to the non-Chinese content in inquiry merchandise from certain companies[482] is the fact that those companies did not cooperate in the circumvention inquiry (they either failed to respond to Commerce's quantity and value questionnaire or failed to permit Commerce to verify their questionnaire responses).  The fact that these companies did not cooperate in the inquiry has not changed.  Without any changed circumstances, we find no basis for conducting a changed circumstances review.

In contrast, in *OCTG from China CCR*, the case cited by Vina/LONGi to support its position, there was a change in the facts underlying Commerce's determination.  Specifically, in the underlying circumvention inquiry, Commerce did not implement certifications "because the HLD companies were "unable to track welded OCTG to the country of origin of inputs used in

---

[479] *See* section 751(b)(1) of the Act.
[480] *See, e.g., Aluminum Extrusions from China Preliminary CCR*, 83 FR at 34548 (finding sufficient information to initiate a changed circumstances review to recalculate certain cash deposit rates); *see also Nails from Malaysia CCR Initiation*, 80 FR at 71772 (finding sufficient information and "good cause" to initiate a changed circumstances review to evaluate whether a company was properly utilizing the correct cash deposit rate); and *Pure Magnesium from Canada CCR Initiation*, 57 FR at 41473 (finding sufficient information and "good cause" to initiate a changed circumstances review to evaluate changes to the major subsidy program at issue in the underlying investigation).
[481] *See Tapered Roller Bearings from China*, 67 FR at 10665.
[482] Commerce did not prohibit exporters or importers from certifying that an entry was an "Applicable Entry" under 19 CFR 362.102.

94

the production of welded OCTG …"[483]  In the related changed circumstances review Commerce found that there was a change in circumstances because "the HLD companies are now able to identify and effectively segregate welded OCTG produced by either HLDS (B) in Brunei or HLD Clark in the Philippines using non-Chinese hot-rolled steel from other OCTG produced at their facilities."[484]  We do not have this fact pattern in this circumvention inquiry, and *OCTG from China CCR* did not involve or address companies that failed to cooperate in the earlier circumvention inquiry.

Our approach is consistent with *Plywood from China (Vietnam)* wherein Commerce stated that "we decline to reconsider eligibility for the certification programs established by these circumvention inquiries in the context of a CCR and instead, determine that the appropriate mechanism by which to assess previously ineligible exporters' eligibility for the certification programs for purposes of this proceeding is in the ongoing ARs of the *Orders*."[485]  In that case Commerce explained that in contrast to other cases where companies subsequently claimed that they had changed the methods by which they tracked their raw materials, and Commerce conducted CCRs to verify these new facts, "companies always had the ability to participate or to provide accurate data, and we do not see this as a change in the future."[486]

Vina/LONGi contends that it is preferable for Commerce to consider a company's eligibility to participate in the solar circumvention certification regime in a changed circumstance review, rather than an administrative review for a number of reasons.  Specifically, Vina/LONGi contends that the purpose of an administrative review is to determine final liabilities for ADs and CVDs, not to address matters related to circumvention inquiries.  Moreover, Vina/LONGi maintains that it would take too long and require multiple reviews to gain access to the certification regime, and it could lead to significant and unnecessary work and analysis (*e.g.*, a party simply seeking access to the certification regime may have to file a separate rate application and could be selected as a mandatory respondent).  We have responded to those concerns below.

First, Commerce must determine if entries of solar cells or modules are inquiry merchandise or not, and how to assess duties on merchandise deemed subject to these circumvention inquiries. Certifications are relevant to that decision because whether or not importers and exporters have met the certification requirements affects whether or not AD/CVDs will be assessed on the entries.  Because the Act directs Commerce to determine final assessment rates in administrative reviews, we find that considering certification eligibility in administrative reviews is consistent with the purpose of that proceeding segment as provided in the Act.

Second, we do not find that our decision to reconsider certification eligibility in an administrative review places importers or exporters of inquiry merchandise from AFA companies in a different position, in terms of timing or requesting multiple reviews, than if they were to import or export subject merchandise from a company that currently has a dumping margin based on AFA.  In both cases, parties would need to wait until the anniversary month of the

---

[483] *See OCTG from China CCR*, 87 FR at 15915.
[484] *Id.*, 87 FR at 15916.
[485] *See Plywood from China (Vietnam) Final* IDM at Comment 13.
[486] *Id*.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

AD/CVD order to request an administrative review and then would need to wait until the final results of that review were published before, depending on the outcome of the review, entries may no longer be subject to an AFA rate. Exporters/producers seeking reconsideration with respect to certification eligibility would face a similar timeline before certifications could be used.

Moreover, Commerce did not prohibit importers/exporters from certifying that entries of inquiry merchandise from AFA companies are "Applicable Entries" under 19 CFR 362.102.[487] Thus, importers and exporters of inquiry merchandise from AFA companies may currently participate in that part of the certification regime and do not need to wait for an administrative review. Furthermore, in the *Preliminary Determination*, which was issued on December 1, 2022, Commerce noted that:

> If it is determined that an importer and/or exporter has not met the certification and/or related documentation requirements for certain entries, Commerce intends to instruct CBP to suspend, pursuant to these preliminary country-wide affirmative determinations of circumvention and the *Orders*, all unliquidated entries for which these requirements were not met and require the importer to post applicable AD and CVD cash deposits equal to the rates noted above.[488]

> Interested parties that wish to have their suspended non-"Applicable Entries," if any, reviewed, and their ineligibility for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders* (*i.e.*, December 2022 for the *Solar Cells AD Order* and December 2023 for the *Solar Cells CVD Order*).[489]

As indicated above, Vina/LONGi claims that unless a company incorrectly declared that it had a reviewable suspended entry before June 6, 2024, it will not have any reviewable suspended entries until the twelfth administrative review of the *AD Order* (which covers the period December 1, 2023, through November 30, 2024) and could not request an administrative review until December 2024. Under section 751(a) of the Act, Commerce does not conduct an administrative review of an exporter/producer absent a suspended entry of subject merchandise from that exporter/producer.[490] However, a U.S. entry of inquiry merchandise made prior to the date of termination of the Proclamation (currently June 6, 2024), that does not meet the "Applicable Entries" certification requirements, could be suspended by CBP. Specifically, 19 CFR 362.103(b)(iii) provides that "{i}n the event of an affirmative preliminary or final determination of circumvention in the Solar Circumvention Inquiries, the Secretary will direct CBP to suspend liquidation of entries of, and collect cash deposits of estimated duties on, imports of Southeast Asian-Completed Cells and Modules that are not Applicable Entries." Commerce has so directed CBP.[491] Therefore, an AFA company could have a reviewable

---

[487] *See Preliminary Determinations*, 87 FR at 75221, 75223. "Applicable Entries" are not subject to suspension of liquidation or the collection of AD or CVDs.
[488] *See Preliminary Determinations*, 87 FR at 75221, 75225.
[489] *Id*., 87 FR at 75223.
[490] *See Shanghai Sunbeauty Trading Co.*,380 F. Supp. 3d. 1328 (CIT 2019) (affirming Commerce's decision not to conduct a review absent a suspended entry).
[491] *See* CBP Messages Memorandum at msg. no.3041408 at paragraphs 5, 9, and 12b.

suspended entry before the AD AR covering the period December 1, 2023, through November 30, 2024.

Furthermore, as explained above, if such a company's inquiry merchandise was entered into the United States as an "Applicable Entry" before the date of termination of the Proclamation, such an entry will not be subject to ADs or CVDs.  In other words, "Applicable Entries" of Vina/LONGi's inquiry merchandise prior to June 2024 are not treated any differently in a substantive way than if the company had been able to participate in the components portion of the certification program.

Lastly, as noted above, Vina/LONGi expressed concerns that if a party requests an administrative review of an AFA company for Commerce to reconsider certification ineligibility, the AFA company could be selected as a mandatory respondent or need to unnecessarily complete a separate rate application.  In such cases, the requestor should note in the request for an administrative review that it believes that all the imported merchandise from the AFA company would meet the certification requirements and it is seeking a review in order for Commerce to reconsider the exporters/producer's eligibility to certify to that fact.  Commerce could then establish segment-specific procedures in the administrative review for addressing such situations.

In sum, neither the facts in this case, nor Vina/LONGi's arguments, provide a basis for reconsidering certification ineligibility for AFA companies in a changed circumstances review.  As noted in the *Preliminary Determination*, "{i}nterested parties that wish to have their … ineligibility for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders*."[492]

### Comment 17. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements

*First Solar Malaysia*[493] and *First Solar Vietnam*[494]
- Commerce did not include CdTe thin film photovoltaic products in its definition of inquiry merchandise.
- Because CdTe thin film photovoltaic products were excluded from the definition of inquiry merchandise and are explicitly excluded from the *Orders* scope language, the circumvention inquiries do not cover CdTe thin film photovoltaic products.
- The ITC intentionally excluded CdTe thin film products from its injury analysis in the underlying affirmative final material injury determinations.[495]
- Given the ITC's intentional exclusion of CdTe products, Commerce cannot lawfully include CdTe thin film products in its circumvention inquiries.[496]

---

[492] *See Preliminary Determinations*, 87 FR at 75221, 75223.
[493] *See* First Solar Malaysia's March 6, 2023 Case Brief at 2-6.
[494] *See* First Solar Vietnam's March 6, 2023 Case Brief at 2-6.
[495] *See* First Solar Malaysia's March 6, 2023 Case Brief at 3 (citing *ITC Solar Final* at Attachment 37-A.).
[496] *Id.* (citing *Wheatland*, 161 F.3d at 1371).

97

- Auxin limited its request for circumvention inquiries to CSPV products and Commerce initiated on that request stating that the class or kind of circumventing merchandise is identical to the CSPV products completed in China that are subject to the *Orders*.[497]
- The certification requirements in the *Preliminary Determination* do not apply to CdTe thin film products.  The three certifications created by Commerce are instead meant to cover CSPV cells or modules.
- The *Preliminary Determination* and its certification requirements do not pertain to CdTe thin film products.  However, given the language of the certifications, it is possible for mistakes to occur, such as a misinterpretation of the term "solar cells and/or solar modules."
- Commerce should take steps to minimize the risk that any affirmative final determination and related certification requirements would be misinterpreted to extend beyond certain CSPV products.
- Should Commerce continue using terms such as "solar cells and modules" or "solar cells and/or solar modules," Commerce should clearly define such terms upon first use to indicate that the terms only pertain to CSPV products.[498]

No other interested party commented on this issue.

**Commerce's Position:**  We confirm that the final affirmative determinations and the related certification requirements apply only to CSPV cells and modules but disagree with First Solar Malaysia and First Solar Vietnam that an affirmative determination of circumvention could be inadvertently applied to non-CSPV products.  As described in the *Preliminary Determinations*, the scope of the *Orders* explicitly exclude "thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide."[499] When discussing the merchandise subject to the circumvention inquiry, the *Thailand* PDM and *Federal Register* notice described that "{t}his circumvention inquiry covers, "crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the underlying AD/CVD orders, subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in {Cambodia, Malaysia, Thailand, and Vietnam} from wafers produced in China."[500]  Therefore, CdTe thin film solar products are not covered by the final affirmative determinations and the related certification requirements.  Given the exclusionary language referenced within the scope of the *Orders*, we find it unnecessary to update the language included in the certifications.

**Comment 18. Clarification and Enforcement of the Utilization Requirement**

To qualify to enter inquiry merchandise under *Presidential Proclamation 10414* without regard to ADs and CVDs inquiry merchandise imported into the United States after November 15, 2022, but on or before the Date of Termination of the proclamation, must be used or installed in the

---

[497] *Id. (*citing Initiation Memorandum at 6).
[498] *See* First Solar Malaysia's March 6, 2023 Case Brief at 6.
[499] *See Thailand* PDM at 5.
[500] *Id.* at 7.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

United States by no later than 180 days after the Date of Termination of the proclamation (the Utilization Expiration Date).[501]

*Auxin*[502]

- Commerce and CBP cannot administer or enforce the use provision in Part 362 of the regulations because:  (1) the Utilization Expiration Date is unknown at the time of importation (the *Presidential Proclamation 10414* can be terminated before the stipulated June 6, 2024, date); (2) the definition of "utilization and utilized" is too vague; and (3) no enforcement mechanism has been provided (CBP possesses limited means to track how inquiry merchandise is used once it is entered into the United States).  These deficiencies in the regulation create an enormous loophole through which parties can enter inquiry merchandise without regard to AD and CVDs.[503]

- Commerce could redress these deficiencies by implementing the provisions under 19 CFR 358, which include, among other things, use of importer- or exporter-specific duty waiver requests that contain detailed information related to intended uses of the imported product and other relevant information.  19 CFR 358 also includes an enforcement mechanism to address abuses and violations that could include seizures and other penalties.[504]

- Commerce should not consider the resale of inquiry merchandise to an unaffiliated U.S. customer who commits to use the merchandise within 180 days of the Date of Termination of the *Presidential Proclamation 10414*, as use.  Commerce specifically stated in 19 CFR 362.102 that resales do not constitute use for this provision.  Additionally, it is not clear how Commerce or CBP could confirm that the purchaser honored its commitment.[505]

*TTL*[506]

- Commerce must provide guidance on how to comply with the use requirement in 19 CFR 362 because the requirement could be interpreted in multiple ways.

- Principally, Commerce must confirm that reselling inquiry merchandise to another party does not automatically mean that the use requirement is not met.  Because most importers of solar modules do not use the solar modules but sell them to other parties, this interpretation must be correct because to interpret the use requirement otherwise would mean that the requirement limits the precise activity that *Presidential Proclamation 10414* was intended to permit (it was intended to allow sufficient U.S. imports of solar modules from the inquiry countries).

- Even if U.S. resale is permissible, but insufficient to demonstrate use, under 19 CFR 362, further clarification is required regarding how parties engaged in resales can comply with the use requirement.

---

[501] *See* 19 CFR 362.102.
[502] *See* Auxin's March 6, 2023 Case Brief at 24-26; *see also* Auxin's March 17, 2023 Rebuttal Brief at 31.
[503] *Id.* (citing CBP Messages Memorandum at msg. no. 3041408).
[504] *See* Auxin's March 6, 2023 Case Brief at 25-26 (citing *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 FR at 63230).
[505] *See* Auxin's March 17, 2023 Rebuttal Brief at 32 (citing *Preliminary Determinations*, 87 FR at 75223).
[506] *See* TTL's March 6, 2023 Case Brief at 8-13.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

Barcode:4419744-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Thailand 2022

- The majority of parties that import solar modules do not install the solar modules that they import, but resell them directly, or indirectly, to other parties in diverse distribution networks that include utility developers, distributors, contractors, subcontractors, and residential and commercial installers.  It is unreasonable, and would be an unprecedented burden, to require the companies, most of which do not have access to entry documents, to maintain records for at least five years that allow them to track the installation dates for specific solar modules and link those dates to specific entries of solar modules.  This is an unnecessary burden and cost, especially considering the limited possibility that distributors and contractors would stockpile solar modules.

- Thus, Commerce must clarify that the use requirement in 19 CFR 362 is met if evidence is maintained that shows:  (1) solar modules sold to utility developers were sold for a specific project; (2) the unaffiliated purchaser committed, either by contract or certification, to install the purchased solar modules within 180 days after the Date of Termination of the *Presidential Proclamation 10414*; or (3) imported solar cells were incorporated in a solar module in the United States within 180 days after the Date of Termination.

*BYD HK*[507]

- Commerce must clarify that the use requirement of 19 CFR 362 is met if the inquiry merchandise is used or installed in the United States within 180 days after the Date of Termination of *Presidential Proclamation 10414*, even if another entity takes ownership of the merchandise and is responsible for its use or installation.

*NextEra*[508]

- Auxin's arguments regarding administration of the use requirement in 19 CFR 362 are unpersuasive.

- Contrary to Auxin's claim, the Utilization Expiration Date is known because it is specified in 19 CFR 362 as 180 days after the Date of Termination of *Presidential Proclamation 10414*.  In the unlikely event that *Presidential Proclamation 10414* is terminated before the currently specified termination date, provisions could be made at the time to address Auxin's concerns.

- While Auxin claims that the definition of "utilization and utilized" is too vague, those terms are clearly defined in 19 CFR 362 as "used or installed in the United States." However, Commerce should clarify that "used" includes solar modules that are dedicated to a particular project or delivered to a project site by the utilization expiration date.

- Although Auxin contends that Commerce did not provide any mechanism for enforcing the provisions of 19 CFR 362, Commerce followed its practice by requiring certifications for entries that purportedly qualify for duty free treatment under *Presidential Proclamation 10414*.  In those certifications, importers and exporters must certify to various facts regarding the relevant entries and acknowledge that they are "aware that U.S. law (including, but not limited to, 18 USC 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S.

---

[507] *See* BYD HK's March 6, 2023 Case Brief at 4.
[508] *See* NextEra's March 17, 2023 Rebuttal Brief at 19-23.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

government."[509]  This passage provides an adequate deterrence against parties submitting fraudulent certifications.

- Part 358 of the regulations contains nothing to improve enforcement of *Presidential Proclamation 10414* and Commerce specifically noted in 19 CFR 362.103(a) that "Part 358 of this chapter shall not apply to {duty free imports under Part 362}."[510]

**Commerce's Position:**  Interested parties have raised concerns and some questions regarding the use requirement in 19 CFR Part 362.  We have addressed those concerns and questions below.

The waiver of ADs and CVDs and estimated duties pursuant to 19 CFR Part 362 only applies to certain Southeast Asian-completed solar cells and modules that are entered into the United States, or withdrawn from warehouse, for consumption before the termination of *Presidential Proclamation 10414*, and, for entries after November 15, 2022, are used in the United States by no later than 180 days after termination of the emergency described in *Presidential Proclamation 10414* (the Utilization Expiration Date).  In the Preamble to 19 CFR Part 362, Commerce also used the word "utilized" when it noted that the duty waiver provided by this part of the regulations applies only to Southeast Asian-Completed solar cells and modules entered into the United States after November 15, 2022, "that are utilized in the United States by the Utilization Expiration Date."  Under 19 CFR 362.102, Commerce defines "utilized and "utilization" as follows:

> Utilization and utilized means the Southeast Asian-Completed Cells and Modules will be used or installed in the United States. Merchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions.

"Used" means the solar cells or solar modules are in operation or functioning in the United States by the Utilization Expiration Date.  "Installed" means the solar cells or solar modules have been affixed to the structure or in the system in the United States on which, or in which, they will operate by the Utilization Expiration Date, but they are not in operation by that date.  The mere sale of solar modules to a party for a specific project, incorporating solar cells into a solar module in the United States, dedicating solar cells or solar modules to a particular project, or delivering solar cells or solar modules to a project site do not constitute being "used" or "installed."  Additionally, as noted in 19 CFR 362.102, "{m}erchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions."

The use requirement in 19 CFR Part 362 was added because this part of the regulations was "not intended to benefit those who would stockpile {Southeast Asian}-Completed Cells and Modules for an extended period of time … .  It is not Commerce's goal to have merchandise that enters

---

[509] *See* NextEra's March 17, 2023 Rebuttal Brief at 22 (citing *Preliminary Determinations*, 87 FR at 75228-29).
[510] *Id.* at 20.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

before the Date of Termination be used in projects long into the future, as the emergency declared by the President exists at this very moment."[511]

The act of reselling solar cells or solar modules to another party who will use or install the merchandise does not, in itself, mean that the use requirement in 19 CFR Part 362 cannot be met. However, in order for an importer who sells the solar cells or solar modules that it imported to accurately certify that the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated, the importer must have knowledge of, and documentation supporting, this fact. TTL has argued that a commitment by a purchaser, either by contract or certification, to install the purchased solar modules within 180 days after the Date of Termination of the *Presidential Proclamation 10414*, should satisfy this documentation requirement. However, the documentation that must be maintained is documentation that supports the actual use or installation of the solar cells or solar module by the Date of Termination and that will allow the party completing the certification to certify to the use or installation by that date. Parties that falsify such certifications will be in violation of U.S. law (including, but not limited to, 18 USC section 1001) that imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government. Given the range of companies that could be involved in the transaction chain between the importer of the solar cells and solar modules and the ultimate end-user of those solar cells and solar modules and the potential complexity of the supply chain, we find that it is not feasible for Commerce to list specific types of supporting documentation.

We disagree with Auxin's claim that the use provision in Part 362 of the regulations cannot be administered because the Date of Termination of *Presidential Proclamation 10414* could change and thus the Utilization Expiration Date is unknown at the time of importation. The Date of Termination is not a constantly changing date but is presently a fixed date, June 6, 2024, that has been publicly announced and, thus, is known to importers. In the Preamble to Part 362 of the regulations, Commerce noted that in setting a suspension of liquidation and collection of cash deposit date upon early termination of the Presidential Proclamation, it would "consider the implementation and direction of the President in terminating the emergency."[512] Similarly, if *Presidential Proclamation 10414* is terminated early, at that time, Commerce will "consider the implementation and direction of the President in terminating the emergency" when determining what additional guidance, if any, should be provided regarding the impact of such an early termination on other provisions and requirements in Part 362 of the regulations.

We also disagree with Auxin's claim that no enforcement mechanism has been provided with respect to the use requirement. U.S. law (including, but not limited to, 18 USC section 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government, including fines and imprisonment for not more than 5 years. Moreover, 19 USC section 1592 provides civil penalties for fraud, gross negligence, and negligence. Thus, there are enforcement mechanisms in place and significant consequences for parties who falsely certify that the use requirement will be met.

---

[511] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56879.
[512] *Id*, 87 FR at 56880.

Barcode:4419744-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Thailand 2022

Additionally, Commerce informed certifying parties that they must maintain sufficient documentation supporting the facts to which the party certified for the later of five years after the last entry covered by the certification or three years after the conclusion of any litigation in United States courts regarding such entries.[513]  Commerce also informed certifying parties that they are required to provide CBP and/or Commerce with any documents supporting the certification upon the request of either agency and that the claims made in the certification are subject to verification by CBP and/or Commerce.[514]  In addition, Commerce informed certifying parties that failure to maintain the required certifications and supporting documentation, failure to substantiate the claims made in the certifications, or not allowing CBP and/or Commerce to verify the claims made in the certifications, may result in suspension of liquidation of all unliquidated entries for which the requirements were not met, the importer being required to post antidumping duty and countervailing duty cash deposits on those entries, and the importer being precluded from participating in the certification process.[515]  These certification provisions mirror Commerce's regulations at 19 CFR 351.228, which provide that Commerce may instruct CBP to suspend liquidation of entries and required cash deposits of estimated ADs or CVDs where, among other things, "the certification contained materially false, fictitious or fraudulent statements or representations, or contained material omissions."  Therefore, contrary to Auxin's claim, Commerce clearly explained the requirements that must be fulfilled to ensure compliance with the certification regime, including the end use provision, and the consequences of not meeting those requirements.  Hence, Commerce has instituted enforcement mechanisms with respect to the certifications.

While Auxin contends that CBP possesses limited means to track how inquiry merchandise is used once it is entered into the United States, it is incumbent on importers and exporters to maintain sufficient documentation to substantiate their claims in the certifications, including their claims regarding the use requirement.  Moreover, CBP has experience administering similar certifications, namely end-use certifications, in other inquiries,[516] and experience in this proceeding where importers and exporters must track the source of the solar cells used in solar modules imported into the United States in order to certify that the solar cells were not produced in China.

Finally, we disagree with Auxin that provisions in 19 CFR Part 358 should be applied here.  As an initial matter, according to 19 CFR 362.103(a), "Part 358 of this chapter shall not apply to {the importation of Applicable Entries}."  In addition, as Commerce explained in the Preamble to Part 362 of its regulations, "{t}he purpose of the {Presidential} Proclamation is to increase the supply of United States solar energy for electricity generation purposes … and "to allow for more imports …"[517] Part 358 of the regulations, which covers the importation of supplies used for  emergency relief work free of AD/CVDs, requires that a party mail an advance request, in triplicate, to the Secretary of Commerce in which the party asks for approval to import the

---

[513] *See Preliminary Determinations*, 87 FR at, *e.g.*, Appendix VI.
[514] *Id.*
[515] *Id.*
[516] *See Wire Rod from Korea and United Kingdom CCR*, 84 FR at 13888*:* ("Consequently, we are changing the scope of the orders on wire rod from Korea and the United Kingdom by adding exclusion language related to grade 1078 and higher tire cord quality wire rod and requiring that a certification of end-use be filed with CBP at the time of the filing of the Entry Summary with CBP as provided in the Attachment to this notice.")
[517] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56878.

merchandise free of AD/CVDs, and supplies detailed information about the shipment such as the price, quantity, proposed date of entry, mode used to transport, the destination, and the intended uses of, the imported merchandise and other relevant information, much of which does not relate to the date of use. Part 358 of the regulations also includes an enforcement mechanism to address abuses and violations of Section 318(a) of the Act that could include seizures and other penalties.[518] Requirements such as these, including the need for Commerce to specifically approve the importation of solar cells/solar modules free of AD/CVDs for each and every entry, could reduce, rather than increase, the supply of United States solar energy for electricity generation purposes and thus is not in keeping with the purpose of *Presidential Proclamation 10414*. Moreover, Commerce typically requires CBP to suspend liquidation and collect AD/CVD cash deposits for entries where the certification requirement was not met, rather than seizing the imported merchandise. Therefore, we have not implemented the requirements of Part 358 of the regulations in this case.

In the *Preliminary Determination*, Commerce stated that a solar module produced in one of the inquiry countries would be subject to its affirmative circumvention determination only if the solar module contains solar cells produced from Chinese-produced wafers and three or more of the following components in the module were produced in China: (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes. Below we have referred to this prerequisite as the "Wafer-Plus-Three" requirement.

## Comment 19. Whether the "Wafer-Plus-Three" Requirement is Appropriate

In the *Preliminary Determination*, Commerce stated that a solar module produced in one of the inquiry countries would be subject to its affirmative circumvention determination only if the solar module contains solar cells produced from Chinese-produced wafers and three or more of the following components in the module were produced in China: (1) silver paste; (2) aluminum frames; (3) glass; (4) backsheets; (5) EVA sheets; and (6) junction boxes. Below we have referred to this prerequisite as the "Wafer-Plus-Three" requirement.

*Auxin*[519]
- Commerce's "Wafer-Plus-Three" requirement is arbitrary, inconsistent with how it has applied the *Orders* in the past, and allows companies to use a high percentage of Chinese components and not be covered by Commerce's affirmative circumvention determination.
- Commerce arbitrarily selected the six components used and the four non-Chinese component rule in its requirement without any explanation.
- Commerce previously determined that if a solar module contains subject solar cells, it is subject to the *Orders*, regardless of the country where the solar module was produced. Commerce should follow that rule here. Because Commerce reached an affirmative circumvention determination that solar cells produced in Cambodia, Malaysia, Thailand, or Vietnam from Chinese-produced wafers are covered by the scope of the *Orders*, solar modules produced from those solar cells must be subject to the *Orders* irrespective of Commerce's "Wafer-Plus-Three" requirement.

---

[518] *See* generally 19 CFR 358.103.
[519] *See* Auxin's March 6, 2023 Case Brief at 9-17; *see also* Auxin's March 17, 2023 Rebuttal Brief at 5-6.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

- The "Wafer-Plus-Three" requirement provides an inexpensive path for companies to continue to evade the *Orders* by continuing to heavily rely on Chinese-produced components while sourcing the four least expensive components outside of China.[520]
- Commerce should discard its "Wafer-Plus-Three" requirement and determine that a solar module produced in a third country that contains in-scope solar cells is also in scope. Alternatively, Commerce should determine that only solar modules where at least 50 percent of the value of the solar module comes from components produced outside of China are not subject to Commerce's affirmative circumvention determination.
- A percentage of value test is administrable (companies maintain the records required by CBP) and has been used before (*e.g.*, the United States-Mexico-Canada Agreement).
- Moreover, a percentage of value test benefits exporters/producers because: (1) there is no need for them to use certain wafer suppliers or publicly identify their wafer supplier; (2) it provides them with the flexibility to determine which inputs they will obtain from inside, or outside, of China; and (3) it simplifies the types of records that importers must maintain.
- Moreover, a percentage of value test benefits exporters/producers because: (1) there is no need for them to use certain wafer suppliers or publicly identify their wafer supplier; (2) it provides them with the flexibility to determine which inputs they will obtain from inside, or outside, of China; and (3) it simplifies the types of records that importers must maintain.

*BYD HK*,[521] *CSIL*,[522] *Jinko*,[523] *NextEra*,[524] *Risen*,[525] and *TTL*[526]

- Contrary to Auxin's claim, Commerce did not arbitrarily select the six components that it used in the "Wafer-Plus-Three" requirement. Rather, Commerce selected these components because it knows, based on information in this segment of the proceeding (including Auxin identifying these components as the "most important and significant" factors of production) and its experience in other segments of the proceeding, that these are the most significant components used to produce solar modules.[527]
- By requiring at least four of the six components to be sourced from outside China, Commerce's "Wafer-Plus-Three" requirement ensures that a substantial portion of value of the module is added in the inquiry country.
- Based on the scope of the *Orders*, modules produced in a third-country from solar cells produced in China (subject solar cells) are covered by the *Orders* (*i.e.*, solar modules with subject solar cells are covered by the *Orders*). Meanwhile solar modules not containing subject solar cells are not covered by the *Orders*. Commerce's "Wafer-Plus-Three" requirement is consistent with this principle because Commerce indicated that the solar cells in a solar module that meets the "Wafer-Plus-Three" requirement are not covered by

---

[520] *Id.* at 15 (citing the *Preliminary Determination* calculations for all four determinations).
[521] *See* BYD HK's March 17, 2023 Rebuttal Brief at 7-13.
[522] *See* CSIL's March 17, 2023 Rebuttal Brief at 10-14.
[523] *See* Jinko's March 17, 2023 Rebuttal Brief at 5-13.
[524] *See* NextEra's March 17, 2023 Rebuttal Brief at 6-11.
[525] *See* Risen's March 17, 2023 Rebuttal Brief at 2-3.
[526] *See* TTL's March 17, 2023 Rebuttal Brief at 6-10.
[527]
*See* Risen's March 17, 2023 Rebuttal Brief at 2; *see also* NextEra's March 17, 2023 Rebuttal Brief at 8-9.

the circumvention inquiry and the solar module is also not covered by the circumvention inquiry (the solar cells are not in-scope merchandise and the solar module is not in-scope merchandise).

- Auxin has made contradictory arguments.  On the one hand, Auxin requested a circumvention inquiry, which resulted in Commerce ignoring the scope of the *Orders* that requires subject solar modules to contain Chinese produced subject solar cells (subject solar cells).  Subsequent to Commerce's finding that solar cells produced in Southeast Asian countries from Chinese wafers are "subject solar cells," Auxin argues that Commerce must return to the "subject solar cell requirement" in the scope of the *Orders* and find that all modules, irrespective of where they are manufactured and the other components that they contain, are subject merchandise if they contain Southeast Asian produced "subject solar cells."

- Auxin's argument that solar modules containing solar cells with Chinese-produced wafers should be subject to Commerce's affirmative circumvention determination, regardless of the other components that they contain, contradicts its own allegation that companies are circumventing the *Orders* by using various Chinese components to produce solar modules in the inquiry countries.  Moreover, Auxin's argument is inconsistent with Commerce's approach in this inquiry of examining the module production process to determine whether parties selling modules to the United States that were produced in an inquiry county are circumventing the *Orders*, rather than making that determination based on the solar cells in the solar module.[528]

- Auxin's percentage of value test should be rejected because Auxin arbitrarily determined the 50 percent requirement.[529]  There is no precedent, or basis in the Act or Commerce's regulations, for using such a test, which would require Commerce to speculate as to future values of solar module components and use a yet undetermined certification.[530]

- Moreover, Auxin failed to consider that significant swings in market prices could skew the test and dramatic changes in surrogate values may mean that the actual value added in the third country is not properly reflected by the test.[531]

- Auxin's percentage of value test is also contrary to Commerce's practice of conducting a qualitative, rather than a quantitative (*e.g.*, a value added) analysis of third-country processing.[532]

- Auxin's percentage of value test means that even if as much as 49.99 percent of the value of the solar module was added outside of China (such as in an inquiry country), the module would be covered by Commerce's affirmative circumvention determination, thus, indicating that the third-country processing of the module was "minor or insignificant." This is illogical.[533]

- Furthermore, Auxin failed to adequately support its argument that the "Wafer-Plus-Three" requirement allows a significant proportion of Chinese components to be used if the four least expensive components out of the six components in that requirement are

---

[528] *See* NextEra's March 17, 2023 Rebuttal Brief at 7-8.
[529] *See* NextEra's March 17, 2023 Rebuttal Brief at 10.
[530] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9.
[531] *See* Jinko's March 17, 2023 Rebuttal Brief at 8-10.
[532] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9-10 (citing *Pasta from Italy Circumvention*); *see also* Jinko's March 17, 2023 Rebuttal Brief at 10-12; and CSIL's March 17, 2023 Rebuttal Brief at 12.
[533] *See* BYD HK's March 17, 2023 Rebuttal Brief at 10.

sourced from outside of China. Auxin's argument is based on erroneous calculations and incorrect figures.[534] Additionally, expenses, such as conversion costs[535] and G&A expenses, are missing from Auxin's calculations, and the source of certain figures that Auxin used in its calculations is unclear.[536] Auxin's argument also ignores its claim that these six inputs are the "principal" and some of the "most important and significant" factors of production.[537] It is commercially unrealistic to conclude that companies in the inquiry countries would suddenly source all their raw materials from China.[538]

- Because China is an NME country, Commerce uses surrogate values to determine the cost of material inputs from China. Auxin's percentage of value test is not administrable because Commerce/CBP would need to verify the prices of, and surrogate values for, solar module components. CBP is not structured to handle certifications based on value[539] and, because it has no experience selecting and applying surrogate values, it would not be able to verify the accuracy of such value-added based certifications.[540]

- Additionally, no parties, including Commerce and CBP, would know the appropriate surrogate values for solar module components when the solar module was exported to, or imported into, the United States. This information is needed to determine the Chinese and non-Chinese content percentages required for Auxin's test.[541] Alternatively, Commerce would have to use actual costs in China to implement Auxin's percentage of value test, which is contrary to its practice.[542]

- Auxin's claim that its percentage of value test is administrable based on the procedures that CBP uses for the United States-Mexico-Canada Agreement is misplaced. CBP evaluates regional value content under the United States-Mexico-Canada Agreement, but this is not certified on an entry-by-entry basis.[543] Confirming the sources of materials is less burdensome than establishing valuation.[544]

**Commerce's Position:**  We disagree with Auxin's contention that, based on Commerce's affirmative circumvention determination, solar modules produced in the inquiry countries, or any country, using solar cells from the inquiry countries made from Chinese-produced wafers are automatically covered by the *Orders*. Auxin based its argument on a mischaracterization and misapplication of Commerce's country-of-origin determination from the investigations underlying these *Orders*. In the underlying investigations, Commerce conducted a substantial transformation analysis and determined "that where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced."[545]

---

[534] *Id.* at 11-12 and Exhibit 1 (citing Auxin's March 6, 2023 Case Brief at 13-17).
[535] *See* Risen's March 17, 2023 Rebuttal Brief at 2.
[536] *See* BYD HK's March 17, 2023 Rebuttal Brief at 11-12; *see also* CSIL's March 17, 2023 Rebuttal Brief at 13; and TTL's March 17, 2023 Rebuttal Brief at 8-9.
[537] *See* NextEra's March 17, 2023 Rebuttal Brief at 9-10.
[538] *See* Risen's March 17, 2023 Rebuttal Brief at 2-3.
[539] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9-13; *see also* TTL's March 17, 2023 Rebuttal Brief at 9.
[540] *See* NextEra's March 17, 2023 Rebuttal Brief at 11.
[541] *See* Jinko's March 17, 2023 Rebuttal Brief at 12 and NextEra's March 17, 2023 Rebuttal Brief at 11.
[542] *See* NextEra's March 17, 2023 Rebuttal Brief at 11.
[543] *See* TTL's March 17, 2023 Rebuttal Brief at 9.
[544] *Id.*
[545] *See* Trina's May 2, 2022 Comments at Attachment 8, page 8.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

The purpose of a substantial transformation analysis is to determine whether merchandise that is further processed outside the order country remains the product of the order country, and thus subject merchandise.  The purpose of the analysis conducted under section 781(b) of the Act is to determine whether minor assembly or completion of merchandise from the order country in a third-country was used to circumvent the order.  As Commerce noted in the Preamble to its regulations "Commerce's substantial transformation analysis under {19 CFR} 351.225(j) and the test for determining whether a product was completed or assembled in other foreign countries under {19 CFR} 351.226(i) (and section 781(b) of the Act) are two distinct analyses used for different purposes … "[546]

Nowhere in the Act or Commerce's regulations is there a provision to use a substantial transformation analysis to identify circumvention.  To determine whether solar modules are covered by this affirmative circumvention determination based on Commerce's country-of-origin rule from the underlying investigations ignores the criterion in section 781(b) of the Act, including determining whether the value of the order country merchandise that is assembled in the third country is a significant portion of, and the value of the third-country processing is a small proportion of, the total value of the solar module.  Auxin's approach is inconsistent with how Commerce has analyzed circumvention in other circumvention inquiries (*i.e.,* Commerce applies the circumvention criteria to the merchandise entering the United States, in this case the solar module,, and not a component within the imported product, the solar cell, and determines whether the order country input(s) is a significant share, and the processing in the third country is a minor or insignificant share, of the value of the merchandise entering the United States)[547] and disregards the very nature of the alleged circumvention that Auxin requested that Commerce investigate.  Specifically, Auxin requested "that Commerce promptly initiate an anti-circumvention inquiry concerning {solar} cells and modules assembled and completed in Malaysia, Thailand, Vietnam, and Cambodia using Chinese-produced inputs."[548]  In contrast to Auxin's approach of focusing on the solar cell, Commerce's "Wafer-Plus-Three" requirement focuses on the Chinese content of the solar module and reflects the nature of the production in the third-country.  Furthermore, the "Wafer-Plus-Three" requirement is consistent with section 781(b)(1) of the Act, which requires Commerce's circumvention determination to be made with respect to the "merchandise imported into the United States."  Hence, when a solar module is the merchandise that is imported into the United States, Commerce must examine the components of that solar module, not the solar cells alone.

---

[546] *See 2021 Regulations Final Rule*, 86 FR at 52342.
[547] *See e.g., CORE from China (UAE) Preliminary* PDM at 1 and 27-28 (unchanged in *CORE from China (UAE)*) where we determined whether exporters of CORE from the UAE to the United States must pay AD duties based on whether the CORE contains Chinese hot-or cold-rolled steel.  The certification requirement in that case was based on a determination that "the value of hot-or cold-rolled steel represents a significant portion of the total value of the {CORE} exported to the United States." *See CORE from China (UAE) Preliminary* PDM at 23.  However, the solar cells that Auxin argues we should solely consider when determining whether the solar module containing such solar cells is covered by the circumvention determination, are not entirely made in China (as opposed to the hot-or cold-rolled steel  in *CORE from China (UAE)*) and Auxin has not explained to what extent the solar cell should contain Chinese inputs to be considered covered by the *Orders*.  Auxin has additionally failed to explain, contrary to Commerce determinations in *CORE from China (UAE)* and other circumvention proceedings, why such solar cell content is a sufficient basis for determining that the solar module should be covered by the *Orders*.
[548] *See* Circumvention Request at 88.

In its Circumvention Request, Auxin simply described inquiry merchandise as solar modules assembled and completed in one of the inquiry countries using Chinese-produced inputs.[549] This broad description of inquiry merchandise could have the unintended consequence of including solar modules with miniscule Chinese content (such as a bolt and a screw) as inquiry merchandise. Therefore, Commerce found it necessary to define the relevant Chinese content to consider a solar module as inquiry merchandise.[550] As explained in more detail below, we find that it is reasonable, and consistent with Auxin's Circumvention Request, to use the "Wafer-Plus-Three" requirement to define solar modules as inquiry merchandise where the wafer and at least three of the other primary materials in the solar module were produced in China.

We did not arbitrarily select the seven material inputs used in the "Wafer-Plus-Three" requirement, but based our selection on record evidence, including data provided by the respondents and solar industry surveys in which wafers and the six material inputs used in the "Wafer-Plus-Three" requirement are identified as major solar cell/module inputs.[551] Auxin itself identified the primary materials from the order country that it claims were being assembled and completed in the inquiry countries to circumvent the *Orders*. Specifically, Auxin stated that "reasonably available evidence indicates that the primary direct material inputs used to complete {solar} cells in the subject third countries, *i.e.*, wafers, silane, phosphorus oxychloride (POC13), aluminum and/or silver paste, and the additional components used to assemble the {solar} cells into modules, *i.e.*, solar glass, EVA, backsheet, aluminum frames, and junction boxes, were sourced from China, the country subject to *the Orders*."[552] We did not include silane and phosphorus oxychloride (POC13) in the "Wafer-Plus-Three" requirement because, as opposed to wafers and the six other inputs identified in the "Wafer-Plus-Three" requirement, they were not identified as major inputs in the majority of the solar industry reports/surveys that are on the record and no parties argued that other material inputs should be included in the requirement or that some of the material inputs should be removed from the requirement.

We determine that the "Wafer-Plus-Three" requirement is appropriate on a qualitative basis. The circumvention activity alleged by Auxin involves Chinese-produced wafers being converted into solar cells and solar modules in a third country using additional and substantial Chinese-origin components. Commerce's "Wafer-Plus-Three" requirement directly addresses the situation described by Auxin in its Circumvention Request because it requires producers in the inquiry

---

[549] *Id.*

[550] *See Preliminary Determinations*, 87 FR at 75221, 75222.

[551] *See, e.g.*, the *Bloomberg Report* below Figure 17 (identifying aluminum frames, glass; backsheets, ethylene vinyl acetate sheets, and junction boxes as the most important solar module inputs) and above Figure 12 (identifying silver as the costliest input added at the cell processing stage). The *Bloomberg Report* also emphasizes the importance of wafers and indicates the importance of these aforementioned seven inputs in making solar modules; *see also* the *NREL 2018 Report* at 37 (identifying wafers, metallization pastes (silver), glass, backsheets and junction boxes as the costliest items to produce solar modules) and 33 (identifying the principal solar module input materials as cell stringing and tabbing ribbons, front glass, backsheet, ethylene-vinyl acetate (EVA), encapsulant (2 sheets), AI (aluminum) frame and edge sealant, junction box, junction box potting agent and tape, and coded module sticker label), and the *DOE Solar Deep Dive* at iii ({s}ilicon wafers are processed to make the solar cells that are interconnected and sandwiched between glass and plastic sheets to make c-Si modules"), 36 ("{s}ilver paste is an important component in c-Si solar cells") and 44 (identifying the aluminum frame, glass, backsheet, encapsulant ("the predominant resins used to make encapsulant are ethylene vinyl acetate (EVA) …" (*see* page 19)), and the junction box as the components of a solar module).

[552] *See* Circumvention Request at 73.

109

countries to either no longer use Chinese wafers, which are the products that are being assembled and completed in the inquiry country, or to source less than half of the other major components that are required to convert the wafers into solar cells/modules from China. We have determined that this qualitative approach to defining inquiry merchandise is reasonable because it focuses on the number of major components sourced from China. This approach is also consistent with the concerns described by Auxin that led it to request the circumvention inquiries, namely its claim that "the vast majority — if not all — of the other materials used to convert the Chinese wafers to cells and then assemble the cells into modules in Malaysia, Thailand, Vietnam, and Cambodia are obtained from China."[553] Under the "Wafer-Plus-Three" requirement, where the majority of the major inputs used to convert the Chinese wafers to cells and then assemble the cells into modules were obtained from (produced in) China, the module is inquiry merchandise and will be subject to Commerce's affirmative circumvention determination.

Further, Auxin itself noted that where:

> the primary direct material inputs used to complete {solar} cells in the subject third countries, *i.e.*, wafers, silane, phosphorus oxychloride (POCl3), aluminum and/or silver paste, and the additional components used to assemble the {solar} cells into modules, *i.e.*, solar glass, EVA, backsheet, aluminum frames, and junction boxes, were sourced from China … a qualitative analysis itself would be sufficient to conclude that the value of processing in {the inquiry countries}" would represent "a small proportion of the value of the merchandise imported to the United States.[554]

Thus, by limiting the amount of Chinese content in the solar module, the "Wafer-Plus-Three" requirement addresses, on a qualitative basis, Auxin's concern and increases the non-Chinese portion of the value of the merchandise.

We also determine that the "Wafer-Plus-Three" requirement is appropriate on a quantitative basis. Under the "Wafer-Plus-Three" requirement, a solar module is not inquiry merchandise if it has no Chinese-produced wafers, or where four of its six major inputs, other than the wafer, were not produced in China. Based on record evidence regarding the value of wafers and conversion costs in a solar module,[555] and the statement in the *Bloomberg Report* that "Southeast Asian nations account for just 27% of the value of a typical {solar} module exported to the U.S."[556] we find that the "Wafer-Plus-Three" requirement would not result in a small value of inputs from outside of China as contended by Auxin.[557]

Moreover, we find there are flaws with the analysis that Auxin provided to support its claim that the "Wafer-Plus-Three" requirement would continue to allow a solar module to contain a

---

[553] *Id.* at 30.

[554] *Id.* at 73.

[555] *See* our summary of the data in the *DOE Solar Deep Dive*, *IEA Report*, and Bloomberg Report, as well as our calculations based on these reports showing the costs of the wafers and other six inputs in the Solar Survey Analysis Memorandum.

[556] *See* the *Bloomberg Report* at the narrative below Figure 22. that "Southeast Asian nations account for just 27% of the value of a typical PV module exported to the U.S."

[557] *See* Auxin's March 6, 2023 Case Brief at 15 and Solar Survey Analysis Memorandum.

significant proportion of Chinese inputs and not be subject to Commerce's affirmative circumvention determination.  Specifically, Auxin provided a table of per-unit costs for the inputs identified in the "Wafer-Plus-Three" requirement showing that a solar module could contain Chinese components that represent a high percentage of the total per-unit direct material cost of a solar module and yet, under the "Wafer-Plus-Three" requirement, the solar module would not be considered inquiry merchandise.[558]  Besides the questions raised by certain respondents regarding the source of Auxin's per-unit costs, we find that Auxin failed to account for other material costs and conversion costs incurred in the inquiry countries in its analysis.  Further, if one accounts for these additional material and conversion costs, even relying on Auxin's per-unit costs, non-Chinese inputs would comprise much more than the "small" percentage of total value claimed by Auxin.[559]

Thus, we find that Auxin's analysis does not provide the proper measure of the extent to which companies in an inquiry country are using Chinese-produced inputs to convert wafers into solar modules.  In contrast, by defining solar modules subject to the inquiry as solar modules where the wafer and at least three of the other major inputs were produced in China, Commerce has addressed Auxin's concern that "major Chinese companies have set up minor assembly operations in Southeast Asia — using their existing dedicated supply base in China for almost the entirety of the bill of materials — to circumvent the Orders …"[560]  Additionally, the "Wafer-Plus-Three" requirement is consistent with Congressional direction away from a rigid numerical approach.[561]  This approach is also consistent with how Commerce has identified inquiry merchandise in other circumvention inquiries, namely based on whether certain content in the merchandise came from the order country.[562]

We also find that Auxin's percentage of value test is not administrable.  Because the *Orders* apply to China, an NME country, Chinese-produced components are valued based on surrogate values.[563]  However, Auxin never explained how Commerce's NME methodology would be used in its proposed percentage of value test.  For example, Auxin never explained, under its proposal, whether surrogate values would be used to determine total value and, if so, how importers and exporters would properly select any surrogate values used.  Commerce normally selects surrogate values in a proceeding segment after considering record evidence and comments provided by interested parties.[564]  However, Auxin never explained how Commerce would evaluate any surrogate values used in the percentage of value test, or the type proceeding in which Commerce would conduct such an evaluation.  Furthermore, it is not feasible for Commerce to evaluate and examine potentially numerous surrogate value calculations that could change from entry to entry.

---

[558] *Id.*
[559] *Id.*
[560] *See* Circumvention Request at 32.
[561] *See* SAA at 893-94.
[562] *See, e.g.*, *CORE from China (UAE) Preliminary* PDM at 1, 23, and 27-28, unchanged in *CORE from China (UAE)*.
[563] *See* section 773(c) of the Act.
[564] *See Thailand* PDM at 4-5 and 8-9.

Auxin claimed that "{g}iven the records kept and maintained by the foreign producers, these data can be supplied to CBP to validate the value-added calculation."[565]  However, applying Commerce's NME methodology to the percentage of value test would require the use of surrogate values.  CBP is not charged with evaluating surrogate value selections, and it cannot be expected to validate a value-added test based on surrogate values.  Additionally, we find it would not be feasible for exporters and importers that are unfamiliar with Commerce's NME methodology to select the appropriate surrogate values to determine the percentage of a solar module's total value represented by Chinese components.  Thus, we find that it is unclear how Auxin's proposed percentage of value test would be implemented in light of Commerce's NME methodology.

Lastly, Auxin maintains that its proposed percentage of value test benefits exporters/producers because there is no need for them to publicly identify their wafer supplier and simplifies the types of records that importers must maintain.  Neither claim is valid.  Exporters do not need to publicly identify their wafer supplier(s) under Commerce's "Certification Regarding Chinese Components."[566]  Thus, in this regard, Auxin's proposed percentage of value test, in which exporters would not need to publicly identify their wafer supplier(s), does not provide any benefit to exporters that is not already in place.  Further, it is unclear how Auxin's proposed percentage of value test would simplify record keeping when solar modules can have hundreds of inputs and exporters/producers would need to maintain records to determine whether each input was produced in China or outside of China and to calculate the value of the non-Chinese and/or Chinese inputs in the solar module.  Moreover, under Auxin's proposed approach, a number of records, such as surrogate value information, that are generally not kept in the ordinary course of business would need to be maintained.  In contrast, when using the "Certification Regarding Chinese Components" parties need to maintain records to determine where only the seven inputs listed in Commerce's "Wafer-Plus-Three" requirement were produced.

**Other Issues**

**Comment 20. Whether Commerce Properly Placed *Ex Parte* Memoranda on the Record That Concerned the Circumvention Inquiries**

*Auxin*[567]
- Commerce unlawfully omitted communication related to the issuance of *Proclamation 10414* and Commerce's final rule implementing aspects of that proclamation.[568]
- Commerce's omission resulted in an incomplete administrative record for the circumvention inquiries.

No other interested party commented on this issue.

---

[565] *See* Auxin's March 6, 2023 Case Brief at 16.
[566] *See Preliminary Determinations*, 87 FR at Appendix VI.
[567] *See* Auxin's April 26, 2023 Case Brief at 79.
[568] *See* Auxin's April 26, 2023 Case Brief (citing *Presidential Proclamation 10414*, 87 FR at 35067; and *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56868).

**Commerce's Position:**  We disagree.  By statute, Commerce shall maintain a record of any *ex parte* meeting between interested parties or other persons providing factual information in connection with a segment of an AD/CVD proceeding and the person charged with making the determination if information relating to that AD/CVD proceeding was presented or discussed at such meeting.[569] Throughout the course of the circumvention inquiries, Commerce consistently placed summaries of *ex parte* contacts concerning the circumvention inquiries on the administrative record.[570]  Commerce was not required to memorialize for the record communications on matters distinct from the AD/CVD inquiries at hand, including Presidential *Proclamation 10414* or the rulemaking resulting from that Proclamation.[571]

### Comment 21. Whether Commerce's Determination to Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law

*Auxin*[572]

- Commerce unlawfully retroactively applied regulations developed pursuant to the declaration of emergency announced in *Presidential Proclamation 10414*.  Specifically, Commerce waived application of affirmative circumvention findings to all entries of inquiry merchandise after initiation of these inquiries on April 1, 2022, but before the Presidential Proclamation was issued on June 6, 2022.[573]
- The retroactive application of *Presidential Proclamation 10414* is:  "(a) *ultra vires* because Commerce possesses no independent legal authority to issue an emergency declaration; (b) is contrary to the explicit wording of *Presidential Proclamation 10404*; (c) is unlawful under the statutory authority under which the proclamation was issued, and (d) is otherwise inconsistent with Commerce's circumvention regulations, which require Commerce to issue suspension of liquidation and cash deposit instructions to CBP in the event of an affirmative finding of circumvention."[574]
- Commerce should "follow its regulations and request that CBP suspend liquidation and collect cash deposits on all entries after April 1, 2022, until June 6, 2022."[575]
- In the *Preliminary Determinations,* Commerce stated that entries prior to the Date of Termination that have met the certification requirements will not be subject to suspension

---

[569] *See* section 777(a)(3) of the Act ("{AD/CVD} proceedings are investigatory rather than adjudicatory in nature, and {the ex parte} provision is intended to ensure that all parties to the preceeding {*sic*} are more fully aware of the presentation of factual information to the administering authority or the ITC"); and S. Rep. No. 96-249, at 99-100 (1979); *F Lli De Cecco,* 980 F. Supp 485.
[570] *See, e.g.*, Memoranda, "Meeting with Counsel for Auxin," dated November 14, 2022, and NE Solar January 29, 2023 *Ex Parte* Memorandum.
[571] *See Baker Hostetler*, 473 F.3d 312 (conversations focused on matters other than AD/CVD proceedings do not fall under the section 777(a)(3) of the Act *ex parte* provision).
[572] *See* Auxin's March 6, 2023 Case Brief at 17-24.
[573] *Id.* at 17-18 and n. 41.  "In making this argument and stating that June 6, 2022, is the operable date for lifting of suspension and collection of cash deposits, Auxin is not suggesting in any way that *Presidential Proclamation 10414* and/or Commerce's implementing regulations are lawful. Indeed, Auxin has explained in detail in previous submissions on this record and in response to Commerce's request for comments why *Presidential Proclamation 10414* and Commerce's regulations were devoid of any factual underpinnings to support the purported emergency and that Commerce superseded existing regulations to implement the proclamation."
[574] *Id.* (citing 19 CFR 351.226(l)(2)(ii) and (iii)).
[575] *Id.*

of liquidation, or the cash deposit requirements described above.[576]  Commerce justified this departure from its practice and regulations by citing 19 CFR Part 362.

- Commerce specifically stated that pursuant to 19 CFR 362.103(b)(1)(i), "Commerce will direct U.S. Customs and Border Protection (CBP) to discontinue the suspension of liquidation and collection of cash deposits that were ordered based on Commerce's initiation of these circumvention inquiries.  In addition, pursuant to 19 CFR 362.103(b)(1)(ii) and (iii), Commerce will not direct CBP to suspend liquidation, and require cash deposits, of estimated ADs and CVDs based on these affirmative preliminary determinations of circumvention on, any 'Applicable Entries.'"[577]

- Commerce confirmed that "suspension of liquidation procedures would only apply to 'imports of Southeast Asian-Completed solar cells and modules that are not 'Applicable Entries' that were entered, or withdrawn from warehouse, for consumption on or after April 1, 2022."[578]

- First, Commerce possesses no legal authority to declare a national emergency and does not cite any such authority in its *Preliminary Determination*.  Commerce explicitly expanding the scope of *Presidential Proclamation 10414* by applying it to entries of inquiry merchandise that entered the United States prior to the identification of the emergency while lacking such legal authority renders the decision *ultra vires*.[579]

- Second, Commerce's retroactive actions are not consistent with the authority relied upon for adoption of Part 362 of its regulations:  *Presidential Proclamation 10414*.  The Proclamation does not authorize retroactive effect of the national emergency declared on June 6, 2022.[580]

- *Presidential Proclamation 10414* specifically states that any actions taken by Commerce to permit duty-free entries of solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam last "until 24 months *after* the date of this proclamation or until the emergency declared herein has terminated, whichever occurs first."[581]

- *Presidential Proclamation 10414* does not authorize any actions for entries before the June 6, 2022, date.  Thus, *Presidential Proclamation 10414* does not authorize Commerce to take any action affecting entries before June 6, 2022.

- Third, section 318(a) of the Act, the statutory authority under which *Presidential Proclamation 10414* was issued, does not allow action before the declaration of an emergency, and only authorizes action "*during* the continuance of" an emergency "declare{d}" by presidential proclamation.[582]  No emergency was declared prior to June 6, 2022.

- The *Preliminary Determination* is inconsistent with the statute and regulations as Commerce's circumvention regulations state that following an affirmative preliminary determination:  (1) the Secretary will direct the Customs service to continue the suspension of liquidation and apply the applicable cash deposit rate; and (2) direct the Customs service to begin the suspension of liquidation and require a cash deposit of

---

[576] *Id.* (citing *Preliminary Determinations*, 87 FR at 75224).

[577] *Id.* (citing *Preliminary Determinations*, 87 FR at 75223).

[578] *Id.* (citing *Clarification of Product Coverage Memorandum* at 2).

[579] *Id.* (citing *Cf. Stark v. Wickard*, 321 U.S at 288; *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. at 1679).

[580] *Id.* (citing *Presidential Proclamation 10414*, 87 FR at 35067-69).

[581] *Id.* (citing *Presidential Proclamation 10414*, 87 FR at 35068).

[582] *Id.* (citing section 318(a) of the Act).

estimated duties, at the applicable rate, for each unliquidated entry on or after the date of publication of the notice of initiation of the inquiry.[583]

- In the *Initiation Notice,* Commerce notified all interested parties of the initiation of circumvention inquiries, including a description of the products subject to the inquiries and an explanation of the reasons for Commerce's decision to initiate such inquiries.[584]

- With respect to suspension of liquidation, Commerce explained that it would follow 19 CFR 351.226(l)(1), notifying CBP of its initiation and direct CBP to continue suspension of liquidation and apply the cash deposit rate that would be applicable if the products were determined to be covered by the scope of *the Orders.*  Commerce also mentioned that it would follow the suspension of liquidation rules under 19 CFR 351.226(l)(2)-(4) should it issue preliminary or final circumvention determinations.[585]

- Thus, Commerce provided all interested parties with notice of initiation, the reasons for initiation, and Commerce's intention to suspend liquidation for merchandise that entered after the date of initiation, April 1, 2022, consistent with Commerce's regulations.  As such, suspension of liquidation retroactive to the date of initiation was appropriate and lawful.[586]

- Commerce's failure to suspend liquidation and collect cash deposits from April 1, 2022, through June 6, 2022, is unlawful for many reasons and should be reversed in the final determination.

*NextEra,*[587] *BYD HK,*[588] *CSIL,*[589] *TTL,*[590] *Silfab,*[591] and *Risen*[592]

- Auxin's argument that Commerce "unlawfully retroactively applied" its regulations in 19 CFR Part 362 has no place in these circumvention inquiries, which are meant to examine whether circumvention has taken place under the relevant statute and regulations, and not to assess whether Commerce's regulations are proper.

- Commerce has no basis to disregard the 19 CFR Part 362 regulations that exempt entries between April 1, 2022, and June 6, 2022 (and certain entries made after June 6, 2022) from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from these inquiries, without engaging in a new notice-and-comment procedure separate from this circumvention inquiry.

- Although Auxin urges Commerce to suspend liquidation and collect cash deposits on merchandise entered between April 1, 2022 and June 6, 2022, it is unlawful for Commerce to do so as "Commerce, like other agencies, must follow its own regulations."[593]

---

[583] *Id.* (citing 19 CFR 351.226(1)(2)(i)-(ii)).
[584] *Id.* (citing *Initiation Notice*, 87 FR at 19072).
[585] *Id.*
[586] *Id.* (citing *Aluminum (Taishan) Co.*, 983 F.3d 487).
[587] *See* Next Era's March 17, 2023 Case Brief at 11-18.
[588] *See* BYD HK's March 17, 2023 Rebuttal Brief at 13-18.
[589] *See* CSIL's March 17, 2023 Rebuttal Brief at 14-20.
[590] *See* TTL's March 17, 2023 Rebuttal Brief at 10-11.
[591] *See* Silfab's March 17, 2023 Rebuttal Brief at 8-13.
[592] *See* Risen's March 17, 2023 Rebuttal Brief  at 3-4.
[593] *See* NextEra's March 17, 2023 Rebuttal Brief (citing *See Torrington*, 82 F.3d at 1049; *see also, e.g., Fort Stewart*, 495 U.S. at 654 ("It is a familiar rule of administrative law that an agency must abide by its own regulations."); and *Saddler*, 68 F.3d at 1358 (finding that agency "must abide by its own regulation")).

115

- Pursuant to 19 CFR Part 362, entries between April 1, 2022, and June 6, 2022, are exempt from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from this circumvention inquiry.  Specifically, 19 CFR 362.103 exempts "Applicable Entries" from those obligations.  19 CFR 362.102 defines "Applicable Entries" as "entries of Southeast Asian-Completed Cells and Modules that are entered into the United States, or withdrawn from warehouse, for consumption before the Date of Termination."[594]

- Commerce's regulations apply to all entries made prior to the "Date of Termination," and there is no basis to limit application of the exemptions to entries made after June 6, 2022.  Moreover, the *Presidential Proclamation 10414 Final Rule Preamble* confirms that the 19 CFR Part 362 regulations are intended to apply to entries made between April 1, 2022, and June 6, 2022.[595]

- Given that "agency regulations are to be interpreted in a similar manner to statutes, which includes a consideration of the text, history, and purpose of a regulation, 19 CFR Part 362 clearly requires Commerce to exempt entries between April 1, 2022, and June 6, 2022, from any suspension of liquidation, cash deposits, or final duties resulting from these inquiries."[596]

- Commerce "promulgated the Part 362 regulations through notice-and-comment rulemaking.[597]  The APA requires notice-and-comment procedures to be followed not only when rules are formulated, but also when they are amended or repealed."[598]

- Commerce cannot amend and implement regulations without a new informal rulemaking process under the APA.[599]

- The Supreme Court has explained that the APA requires agencies to "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."[600]

- Commerce may not repeal or amend the portions of 19 CFR Part 362 exempting entries between April 1, 2022, and June 6, 2022, from duties as part of its final determination in this circumvention inquiry.  Instead, Commerce would be required to publish a notice of proposed rulemaking informing the public that it is considering a change to 19 CFR Part 362 of its regulations, allow an opportunity for comment, and then publish a final rule responding to such comments.[601]  There is no basis for Commerce to depart from 19 CFR Part 362 in the final determination until Commerce does so.

---

[594] *Id.*  "Date of Termination" in turn is defined as "June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* has been terminated, whichever occurs first." *See also* 19 CFR 362.102.

[595] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877).

[596] *Id.* (citing *Kisor*, 139 S. Ct. at 2423-24).

[597] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble;* and *Presidential Proclamation 10414 Proposed Rule*).

[598] *See* BYD HK's March 17, 2023 Rebuttal Brief (citing 5 USC 551(5); and 5 USC 553).

[599] *Id.* (citing *Alaska*, 177 F.3d at 1033-34, 1036:  In clarifying this requirement, the Supreme Court has interpreted the APA to require the same procedures when an agency amends or repeals a rule as to when the agency issued that rule)).

[600] *Id.* (citing *Perez*, 575 U.S. at 101; *see also Ass'n of Priv. Sector*, 681 F.3d at 462-63 (finding that agency violates the APA when it does not give notice of proposed rule and opportunity to affected parties to comment); *Invenergy*, 422 F. Supp. 3d at 1285 ("The court concludes that the Exclusion constituted agency rulemaking. Repealing the rule, therefore, also requires rulemaking subject to APA notice and comment.")).

[601] *Id.* (citing 5 USC 553).

116

- Although Auxin claims that Commerce has no legal authority to declare a national emergency and expanded the scope of *Presidential Proclamation 10414* or acted inconsistently with *Presidential Proclamation 10414* by extending the duty waiver to entries made between April 1, 2022, and June 6, 2022, Commerce did not declare a national emergency.  Instead, it was the President that made the declaration in *Presidential Proclamation 10414*, as allowed by section 318(a) of the Act.

- Commerce addressed the arguments regarding the consistency of 19 CFR Part 362 with *Presidential Proclamation 10414* when it promulgated the regulation.  Commerce is "taking action now (*i.e.*, during the period of the emergency) to extend the period before it directs CBP to suspend liquidation and collect cash deposits and to waive any AD/CVD estimated duties and duties for these unliquidated goods."[602]

- Commerce's Part 362 regulations are prospective in application because "Commerce's regulation stated prior to the imposition of duties that there would be no such duties, and because Commerce was extending the deadline for actions that it had not yet taken."[603]

- Commerce also explained that the authorization to waive duties under *Presidential Proclamation 10414* "until 24 months after the date of this proclamation or until the emergency declared herein has terminated" specified only the end date for duty-free treatment, without specifying a start date or limiting application of the waiver to entries made after the *Presidential Proclamation 10414*.[604]

- Commerce recognized that providing duty-free treatment to entries made prior to June 6, 2022, furthers the emergency relief goals reflected in *Presidential Proclamation 10414* (specifically, the market uncertainty caused by the initiation of these circumvention inquiries).[605]

- Subjecting entries made prior to June 6, 2022, to AD/CVD cash deposit rates that were unknown at the time of entry and to assessment rates that would not be determined until many months or even years in the future would have increased, not decreased, the market uncertainty the *Presidential Proclamation 10414* and Commerce's Part 362 were seeking to address.[606]  Such an application would limit the capital available to complete solar projects and otherwise build capacity.[607]

- Auxin's arguments regarding the scope of authority provided in section 318(a) of the Act are also meritless as Auxin reads far too much into the following statutory language:  the President "may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act."[608]  At most this provision of the statute prevents extension of deadlines after the emergency subsided.

- The provision noted by Auxin does not prohibit the application of the statute to entries that remain unliquidated at the time of the emergency declaration and Commerce's extension of deadlines for ordering cash deposits and assessment of duties occurred after the emergency was declared.

---

[602] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877).
[603] *Id.*
[604] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877 and 56878).
[605] *See* NextEra's March 17, 2023 Rebuttal Brief (citing *Presidential Proclamation 10414 Proposed Rule*, 87 FR at 39430; *see also Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56872, 56875-77).
[606] *Id.* (citing *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56875-78).
[607] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56878).
[608] *Id.* (citing Auxin March 17, 2023 Case Brief at 20).

- Section 318(a) of the Act contains two separate grammatical clauses stating what the President may authorize the Secretary to do: (1) the President "may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act"; and (2) the President "may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work." The use of the word "authorize" a second time in a separate clause indicates that the authority in the second clause is distinct from the first.

- The language "during the continuance of such emergency" qualifies only the authority in the first clause (the authority to extend deadlines), not the second (the separate authority to waive duties). Therefore, the authority to permit the duty-free importation of supplies for emergency relief work is less constrained than the authority to extend deadlines under the Act.[609]

- Commerce explained in the *Presidential Proclamation 10414 Final Rule Preamble* that applying the waiver to entries that remained unliquidated at the time of the President's Proclamation harmonizes the authority provided under section 318(a) of the Act with the retrospective AD/CVD system, which is also part of the Act.

- Even if Commerce did not have authority under section 318(a) to waive duties on entries made prior to *Presidential Proclamation 10414*, Commerce possesses separate authority to exempt such entries from ADs/CVDs.

- Commerce invoked its authority to issue regulations pertaining to section 781 of the Act when it promulgated 19 CFR Part 362 of its regulations.[610] Section 781 of the Act states that Commerce "may include within the scope" merchandise completed or assembled in other foreign countries if certain criteria are met.[611] Thus, even if the criteria for an affirmative circumvention determination are found, section 781 provides Commerce with the discretion to determine whether to include merchandise within the scope of an AD/CVD order.

- Section 781 of the Act is silent on when an order will be applied after Commerce determines to extend the order to cover merchandise completed or assembled in other foreign countries. Commerce exercised its gap-filling authority regarding the administration of section 781 of the Act by issuing 19 CFR 351.226. However, nothing in the statute mandates the particular procedures that Commerce adopted in 19 CFR 351.226 and that Auxin would like Commerce to apply.

- Commerce is free to adopt additional regulations through notice-and-comment rule making that supersede the provisions in 19 CFR 351.226 in order to address the policy issues raised by this case. Commerce recognized this in the *Presidential Proclamation Final Rule 10414 Preamble*.[612]

- It was reasonable for Commerce to exempt merchandise entered prior to June 6, 2022, from duties when that merchandise was outside of the scope of the *Orders* as a matter of

---

[609] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877-78).

[610] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877-78; and *Presidential Proclamation 10414 Proposed Rule*, 87 FR at 39429).

[611] *Id.* (citing 19 CFR 351.226(b)(1)).

[612] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56876-78).

118

law at the time of entry and the nature of the cell and/or module production process occurring in Southeast Asia is significant.

- Auxin does not cite any language from the AD/CVD statute or section 318(a) requiring Commerce to apply ADs/CVDs to pre-*Presidential Proclamation 10414* entries. Additionally, Auxin does not cite any authority that would require Commerce to suspend liquidation, apply cash deposit, and duty assessment provisions in 19 CFR 351.226(1) instead of the exception to those rules found in Part 362.

- 19 CFR Part 362 regulations were adopted following notice-and-comment rulemaking to address the situation presented in these circumvention inquiries and should prevail over general provisions in 19 CFR 351.226(1).[613]  Moreover, the 19 CFR Part 362 regulations make it clear that they are intended to be employed as an exception to any otherwise applicable rules found within 19 CFR 351.226 through the language "notwithstanding {section} 351.226(l) of this chapter."

- Given that 19 CFR Part 362 is explicitly identified as an exception to 19 CFR 351.226(l), Auxin's argument that Commerce was required to follow 19 CFR 351.226(l) is incorrect.

- *Presidential Proclamation 10414, Presidential Proclamation 10414 Final Rule Preamble*, Commerce's affirmative circumvention determinations, and the accompanying instructions issued to CBP by Commerce, clearly state that merchandise entered for consumption between April 1, 2022, and June 6, 2022, are not subject to AD/CVD liability.[614]

- Auxin's argument that Commerce unlawfully retroactively applied regulations promulgated pursuant to the declaration of emergency announced in *Presidential Proclamation 10414* is not made in the proper forum.  Commerce is bound by law to follow the requirements of *Presidential Proclamation 10414* and 19 CFR Part 362 of its regulations.

- This policy, combined with the meaning of 19 CFR Part 362, means that Commerce cannot retroactively impose duties on imports designated as "Applicable Entries" in the final determinations, especially given the general presumption against retroactive applications of law.[615]

- Amending or repealing 19 CFR Part 362 in the context of these circumvention inquiries would create unfair surprise and deprive parties of a meaningful opportunity to comment on a significant change in Commerce's regulations.[616]

- Commerce should continue to exempt entries made between April 1, 2022, and June 6, 2022, from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from these circumvention inquiries.

**Commerce's Position:**  Commerce disagrees with Auxin that the regulations promulgated under *Presidential Proclamation 10414* are unlawfully retroactive.  Auxin makes four primary claims

---

[613] *Id.* (citing *Romani*, 523 U.S. at 532 (later, more specific statute governs); *Fourco Glass Co.*, 353 U.S. at 228 ("However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment.")).

[614] *See* BYD HK's March 17, 2023 Rebuttal Brief (citing CBP MSGs Memorandum at Message No. 3047409).

[615] *Id.* (citing *Bowen*, 488 U.S. at 208*;* and *I.N.S.*, 533 U.S. at 316.

[616] *Id. (*citing *Kisor*, 139 S Ct. at 2418-2419); *see also* CSIL's March 17, 2023 Rebuttal Brief (citing *Skidmore,* , 323 U.S. at 140 (1944)*;* and *Cathedral Candle*, 400 F.3d at 1366).

119

that the regulations are unlawful, none of which we find to be persuasive or sufficient to change our reasoning with respect to this circumvention inquiry.

First, Auxin claims that Commerce possesses no legal authority to declare a national emergency, yet "explicitly expanded the scope" of *Presidential Proclamation 10414 ultra vires* by applying it to inquiry merchandise that entered the United States "prior to the identification of the emergency."[617]  However, as Auxin notes, Commerce has already addressed the legality of its authority to issue the regulations under *Presidential Proclamation 10414 Final Rule Preamble*, itself.[618]  That rule, which was issued pursuant to lawful notice and comment process, confirms that "Commerce is taking action now (*i.e.*, during the period of the emergency) to extend the period before it directs CBP to suspend liquidation and collect cash deposits and to waive any AD/CVD estimated duties and duties for these unliquidated goods."[619]  "In other words, the final rule stated, ahead of any imposition of such duties, that there will be no such duties."[620]  Such a statement is not expanding the scope of the emergency retroactively; rather, "such a decision is prospective in its application"[621] because it concerns the establishment of duties that have not yet been determined but may be determined during the course of the emergency.

Second, Auxin argues that the retroactive application of *Presidential Proclamation 10414* is contrary to the explicit wording of the proclamation itself, because it only authorizes Commerce to take actions to permit duty-free entries of solar cells "until 24 months after the date of this proclamation."[622]  Auxin argues that because the *Presidential Proclamation 10414* only authorizes Commerce to take action *after* the date of *Presidential Proclamation 10414*, Commerce is precluded from taking action with respect to entries prior to June 6, 2022.[623]  Commerce addressed this argument in the notice and comment period, as discussed in the *Presidential Proclamation 10414 Final Rule Preamble*.[624]  While the *Presidential Proclamation 10414* does declare an end date to the time period of duty-free treatment, it did not specify a start date, nor did it limit the application of the waiver to only entries made after *Presidential Proclamation 10414*.[625]  Additionally, the goods that entered the country prior to *Presidential Proclamation 10414* remain unliquidated, and have yet to have a final decision with respect to applicable duties.  By taking action with respect to those goods, in accordance with the regulations promulgated in *Presidential Proclamation 10414 Final Rule*, Commerce is not acting retroactively:  before any duties were determined to be applicable to these entries, the regulations stated that there would be no duties imposed on these entries.[626]  We also agree with the respondents that the actions taken by Commerce in enacting this rule to provide duty-free treatment to entries prior to June 6, 2022, furthers the relief goals for the national emergency declared in *Presidential Proclamation 10414*, and subjecting entries made prior to June 6, 2022,

---

[617] *See* Auxin's March 6, 2023 Case Brief at 17-18.

[618] *Id.*

[619] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.

[620] *Id.*, 87 FR at 56877-78.

[621] *Id.*, 87 FR at 56877.

[622] *See* Auxin's March 6, 2023 Case Brief (quoting *Presidential Proclamation 10414*, 87 FR at 35068).

[623] *Id.* at 20.

[624] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.

[625] *Id.*, 87 FR at 56877-78.

[626] *Id.*, 87 FR at 56877.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

to duties would increase uncertainty in the market for solar cells and run contrary to the intent of *Presidential Proclamation 10414*.[627]

Third, Auxin argues that the *Presidential Proclamation 10414 Final Rule* is inconsistent with *Presidential Proclamation 10414* and the authority under which it was issued (*i.e.*, section 318(a) of the Act), which provides for action to be taken "during" an emergency. Auxin states that there was no emergency declared prior to June 6, 2022; therefore, the Act does not allow Commerce act before that date.[628] We disagree with this interpretation. Section 318(a) of the Act states "{w}henever the President shall by proclamation declare an emergency to exist … he may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act, and may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work."[629] This provision contains two distinct clauses: (1) authorizing the Secretary to "extend during the continuance of such emergency the time … for the performance of any act," and (2) authorizing the Secretary to "permit … the importation free of duty of food, clothing, and medical, surgical, and other supplies."[630] We agree with respondents' argument that the grammatical construction of the statute, in particular using the word "authorize" in each of the two clauses, indicates that the authority in the second clause is independent from the authority in the first. Accordingly, the President may authorize individually each of these two actions, or both, and the actions are not necessarily required to be implemented in unison or otherwise qualify each other. In any event, Auxin's interpretation of the phrase "during the continuance of such emergency" is misleading. Because these two clauses are independent, the phrase "during the continuance of such emergency" applies only to the first clause and does not limit the second clause concerning the waiver of duties. Additionally, while it is true that the entries in question entered the country prior to June 6, 2022, Commerce's *taking action* with respect to setting a definitive amount of duties for those entries (which were unliquidated at the time of the rule, with no final amount of duties set) is not retroactive in nature as it is occurring during the continuance of the emergency as declared by the President.[631]

We also disagree with Auxin's reading of section 318 of the Act as prohibiting the retrospective application of duties (or lack thereof) to unliquidated merchandise because the general operation of the AD/CVD system in the United States is a retrospective one. The "final liability for duties is determined after the merchandise is imported," and under this system entries are suspended and cash deposits are collected in order to wait for the final ascertainment of duties at a later time.[632] That is the same situation of "retrospective" application of duties that Auxin is concerned about here; that merchandise entered the country and remains unliquidated while awaiting the final amount of duties owed. To argue that section 318 of the Act prohibits this type

---

[627] *Id.*, 87 FR at 56875-78.

[628] *See* Auxin's March 6, 2023 Case Brief at 20.

[629] *See* section 318(a) of the Act.

[630] *Id.*

[631] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.

[632] *Id.* at 56877 (citing 19 CFR 351.212(a); and sections 703(d), 705(c), 706, 733(d), 735(c), and 736 of the Act).

of action is to ignore the fact that the passage by Congress of these provisions underpinning the AD/CVD system in the same Act supports reading them in harmony.[633]

Fourth, Auxin argues that the regulations promulgated under the *Presidential Proclamation 10414* are inconsistent with Commerce's circumvention regulations, which require Commerce to issue suspension of liquidation and cash deposit instructions to CBP in the event of an affirmative finding of circumvention.[634]  Auxin also states that this language was also included in Commerce's *Initiation Notice* and *Preliminary Determination*, which supposedly means that any failure to suspend liquidation and collect cash deposits from April 1, 2022, to June 6, 2022 is unlawful and should be reversed in the final determination.[635]  We disagree that Commerce must continue to follow the liquidation and cash deposit rules provided for in 19 CFR 351.226 in this specific case.  The 19 CFR Part 362 regulations carve out an exception to otherwise applicable rules (*i.e.*, those found in 19 CFR 351.226).[636]  Specifically, the 19 CFR Part 362 regulations state that "notwithstanding 351.226(l) … the Secretary shall instruct CBP to discontinue the suspension of liquidation of entries and collection of cash deposits for any Southeast-Asian-Completed Cells and Modules that were suspended pursuant to {section}351.226(l) of this chapter."[637]  If Commerce were to follow the liquidation and cash deposit rules provided for in 19 CFR 341.226, it would be acting contrary to the explicit language of the 19 CFR Part 362 regulations.  Furthermore, in situations in which a regulation is adopted following a notice and comment process and is more specific than an existing regulation, the more specific regulation prevails.[638]  Therefore, if a conflict arises between 19 CFR 362 and 19 CFR 351.226, the stipulations of 19 CFR 362 prevail.

## Comment 22. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

*NextEra*[639]

- If Commerce reaches a country-wide affirmative circumvention determination, it should permit third-country exporters that neither have their own AD cash deposit rate, nor use a wafer exporter in China with its own AD cash deposit rate, to deposit ADs based on the separate rate determined in the China AD solar cells proceeding, rather than deposit ADs at the cash deposit rate of the China-wide entity.

---

[633] *Id.*, 87 FR at 56877 (citing *FDA v. Brown & Williamson*, 529 U.S. at 132-33 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme … .  A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme … and fit, if possible, all parts into an harmonious whole."))

[634] *See* Auxin's March 6, 2023 Case Brief at 18 (citing 19 CFR 351.226(l)(2)(ii) and (iii)).

[635] *Id.* at 20-21.

[636] *See* 19 CFR 362.103(b)(1).

[637] *See* 19 CFR 362.103(b)(1)(i).

[638] *See Romani*, 523 U.S. at 532 (discussing the statutory canon that a later, more specific statute governs in the case of conflict); *Fourco Glass Co.*, 353 U.S. at 228 (holding that the general language of a statute "will not be held to apply to a matter specifically dealt with in another part of the same enactment."; *see also Roberto*, 440 F.3d at 1350 ("{t}he rules of statutory construction apply when interpreting an agency regulation.").

[639] *See* NextEra's March 6, 2023 Case Brief at 4-8.

Barcode:4419744-02 A-570-979 CIRC - Anti Circumvention Inquiry - from Thailand 2022

- In *CORE from China (Vietnam)*, Commerce applied the AD cash deposit rate of Chinese companies granted a separate rate in the China AD investigation to imports of CORE produced in Vietnam using Chinese substrate." [640]

- Commerce cannot assume that companies in a third-country are part of the China-wide entity like it does for companies in China that cannot demonstrate their independence from the Chinese government. Moreover, Commerce should not apply its NME methodology to companies in Cambodia, Malaysia, or Thailand, which are independent market economy countries.

- Commerce clearly explained in the *AD Order* that the China-wide AD rate is based on AFA. The purpose of the statutory AFA provision is to encourage respondents' cooperation and ensure that they do not obtain a more favorable result by failing to cooperate than if they had cooperated.[641] The third-country exporters fully cooperated with Commerce's requests for information in the circumvention inquires, and thus, there is no reason to apply an AFA rate, *i.e.*, the China-wide rate, to these exporters.

- Secretary Raimondo testified before Congress that a tariff rate in the range of 200 percent is "excessive" and "exceedingly unlikely."[642] The China-wide AD cash deposit rate is 238.95 percent. To avoid uncertainty and limit the damage to solar deployment in the United States, Commerce should permit third-country companies without their own AD rate, or without a Chinese wafer exporter with its own AD rate, to deposit ADs at the cash deposit rate of companies granted a separate rate in the China AD solar cells proceeding.

- Alternatively, Commerce should establish a procedure for companies to obtain separate rate status either by submitting separate rate applications in this inquiry, submitting separate rate applications in the ongoing AD administrative review in this proceeding, even if the exporter is not under review, or requesting a changed circumstances review to establish separate rate status on an expedited basis.

*Auxin*[643]

- Consistent with its long-standing practice, Commerce should continue to assign exporters without an individual AD rate or without a separate AD rate, the China-wide AD rate.[644]

- Commerce applied that practice in *CRS from China (Vietnam)*,[645] and contrary to NextEra's claim, in *CORE from China (Vietnam)*.[646]

- The purpose of a circumvention inquiry is to determine whether circumvention of an order has occurred, not conduct a separate rates analysis. If Commerce reaches an affirmative circumvention determination, then it will order the suspension of liquidation of entries of inquiry merchandise and the collection of AD/CVD cash deposits pending conduct of an administrative review where Commerce will, among other things, determine the appropriate cash deposit rates and conduct separate rate analyses.[647]

---

[640] *Id.* (citing *CORE from China (Vietnam)* IDM at Comment 3).

[641] *Id.* (citing SAA at 200; and *Changzhou Wujin Fine Chem*, 701 F.3d at 1378).

[642] *Id.* (citing NextEra's May 19, 2022 Comments at Attachment 3).

[643] *See* Auxin's March 17, 2023 Rebuttal Brief at 13-16.

[644] *Id.* (citing *Preliminary Determinations*, 87 FR at 75224; Policy Bulletin 05.1).

[645] *Id.* (citing *CRS from China (Vietnam)*, 83 FR at 23892).

[646] *Id.* (citing *CORE from China AD Investigation*, 81 FR at 35318).

[647] *Id.* (citing *Tissue Paper from China (Vietnam) Final Determination* IDM at Comment 5; and *Hangers from China (Vietnam)* IDM at Comment 5).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

**Commerce's Position:**  We disagree with NextEra.  Pursuant to Commerce's affirmative country-wide circumvention determinations, duties under the *Orders* will apply to U.S. entries of inquiry merchandise from Cambodia, Malaysia, Thailand, and Vietnam unless at least one of the certification requirements is met.  Because the applicable *Orders* are on China, in this circumvention inquiry Commerce followed the methodology that it employs in AD proceedings involving China to determine the appropriate AD cash deposit rate for U.S. entries of inquiry merchandise.  Commerce considers China to be an NME country.[648]  In proceedings involving NME countries, Commerce maintains a rebuttable presumption that all exporters are subject to government control and, thus, should be assigned a single antidumping duty deposit rate. It is Commerce's policy to assign all exporters of subject merchandise this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate.[649]  Therefore, as we explained in the *Preliminary Determinations*, entries from Cambodia, Malaysia, Thailand, and Vietnam will be assessed at the China-wide entity rate unless either:  (1) the relevant cell or module exporter from Cambodia, Malaysia, Thailand, or Vietnam has its own company-specific AD and/or CVD rate under the *Orders* or; (2) if it does not, the Chinese company that exported the wafers to that third-country cell/module exporter has its own company-specific AD and/or CVD rate under the *Orders*.[650]

Although NextEra asserts that Commerce cannot assume that companies in a third-country are part of the China-wide entity, Commerce's position in AD proceedings involving China is clear - " 'the {China}-wide rate applies to all entries of subject merchandise' unless Commerce has determined a firm is eligible for a separate rate … .  If a third-country exporter of subject merchandise wishes to have its own rate, it is incumbent upon that exporter to request a review."[651]

While exporters that are wholly-foreign owned do not need to demonstrate *de jure* and *de facto* independence from government control to receive a separate rate, they must nonetheless demonstrate that they are wholly owned by entities located in market-economy countries and that their ultimate owners are located in market-economy countries to receive a separate rate.[652]  Such entities must demonstrate this by completing the relevant portions of Commerce's separate rate application.[653]  As the CIT explained, while "… Commerce recognizes that companies organized outside of China are *per se* independent from the control of the {Chinese} government" it is only "{o}nce a party demonstrates that it is foreign owned, {that} Commerce accords that company a

---

[648] *See Aluminum Foil* PDM at the section, "China's Status as a Non-Market Economy."
[649] *See Sparklers from China*, 56 FR at 20588; *see also Silicon Carbide from China*, 59 FR at 22585;, and 19 CFR 351.107(d).
[650] *See Preliminary Determinations*, 87 FR at 75224.
[651] *See Xanthan Gum from China 2016-2017* IDM at Comment 1.
[652] *See Chlorinated Isocyanurates from China 2019-2020 Preliminary Results* PDM ("{t}o establish whether a company is sufficiently independent to be eligible for a separate, company-specific rate, Commerce analyzes each exporting entity in an NME country under the test established in *Sparklers* as amplified in *Silicon Carbide*, and further refined by *Diamond Sawblades*.  However, if Commerce determines that a company is wholly foreign-owned or located in a market economy (ME) country, then a separate-rate analysis is not necessary to determine whether it is independent from government control."), unchanged in *Chlorinated Isocyanurates from China 2019-2020 Final Results.*
[653] *See* https://enforcement.trade.gov/nme/nme-sep-rate.html.

rate separate from the {China}-wide rate."[654]  Thus, Commerce's practice in NME cases is to require exporters inside and outside the NME country to demonstrate that they are not part of the NME-wide entity in order to obtain separate rate status.

There is no basis in this circumvention inquiry to grant separate rate status to companies that currently do not have a separate rate, or whose wafer suppliers do not have a separate rate. Commerce does not conduct a separate rates analysis in circumvention inquiries and did not do so here.  The purpose of the circumvention statute is to give Commerce the authority, and the criteria to follow, to administer "AD and {CVD} orders in such a way as to prevent circumvention and diversion of U.S. law."[655]  Therefore, Commerce focused its analysis in the circumvention inquiry on applying the relevant methodology in section 781 of the Act to determine whether circumvention was occurring and did not conduct a separate rates analysis. Commerce conducts separate rates analyses in administrative reviews.[656]  Commerce conducts administrative reviews to determine "the amount of any antidumping duty,"[657] and a separate rates analysis is integral to this.  Separately, Commerce conducts circumvention inquiries to establish whether certain goods must be subject to an order,[658] not to establish the duty rates for those goods.  Further, Commerce's application of the China-wide entity AD rate to exporters that do not have their own separate rate, or whose wafer suppliers do not have a separate rate, in this circumvention inquiry is consistent with its practice in other circumvention inquiries involving China including, contrary to NextEra's claim, *CORE from China (Vietnam)* in which Commerce stated that it "will instruct CBP to require AD cash deposits equal to the rate established for the China-wide entity (199.43 percent) …"[659]

We disagree with NextEra's claim that Commerce reached a determination based on adverse facts available with respect to certain cooperative third-country exporters that do not have a separate rate by requiring cash deposits equal to the China-wide rate on U.S. entries of their inquiry merchandise.  Commerce made determinations based on adverse facts available only with respect to uncooperative companies.  As adverse facts available, Commerce determined that the uncooperative companies "exported inquiry merchandise and that U.S. entries of that merchandise are circumventing the *Orders*."[660]  Additionally, Commerce prohibited importers and exporters from using certain certifications with respect to U.S. entries of inquiry merchandise from the uncooperative companies.[661]  Commerce did not require a cash deposit equal to the China-wide rate on U.S. entries of inquiry merchandise from any company as part of

---

[654] *See Decca Hospitality Furnishings*, 391 F.Supp.2d at 1300.

[655] *See Senate Report 100-71* at 101; *see also Tissue Paper from China (Vietnam) Final Determination* at Comment 1 ("The overall purpose of an anti-circumvention inquiry is to prevent the evasion of an AD order").

[656] *See Tissue Paper from China (Vietnam) Final Determination* IDM at Comment 5 ("{c}ontrary to MFVN's suggestion, in conducting this inquiry, {Commerce} has not determined a cash deposit rate, conducted a separate rate analysis, or calculated an individual margin of dumping for MFVN, which is done during an administrative review.").

[657] *See* section 751(a)(1)(B) of the Act.

[658] *See* section 781(b) of the Act; *see also Bell Supply CAFC.*

[659] *See CORE from China (Vietnam)*, 83 FR at 23896; *see also CORE from China AD Investigation*, 81 FR at 35318; *Tissue Paper from China (India) Final Determination* IDM at 15; *Aluminum Extrusions from China (Vietnam),* 84 FR at 39806; *Butt-Weld Pipe Fittings from China (Malaysia),* 84 FR at 29165; and *SDGE from China (UK)* IDM at Comment 5.

[660] *See Preliminary Determinations*, 87 FR at 75221, 75223.

[661] *Id.*

an adverse facts available determination.  Rather, Commerce required that importers deposit ADs equal to the China-wide rate on entries of inquiry merchandise from cooperative third-country exporters only where the third-country exporters or their Chinese wafer supplier(s) do not have a separate rate.  In fact, a company that is barred from certifying that its exports contain no Chinese wafers or module components may still receive a company-specific rate if it already has such a rate under the *Orders* or if its Chinese wafer exporter has its own rate under the *Orders*.[662]

Both the CIT and the CAFC recognized that even if Commerce based the China-wide entity's dumping margin on adverse facts available, that "does not change its applicability to an NME entity that cooperated, but ultimately failed to qualify for a separate rate."[663]  For example, in *Advanced Technology*, the CIT stated:

> Commerce did not apply adverse facts available to {respondent}, Commerce rather found that {respondent} had not rebutted the presumption of state control and assigned it the {China}-wide rate.  These are two distinct legal concepts:  a separate AFA rate applies to a respondent who has received a separate rate but has otherwise failed to cooperate to the best of its ability whereas the {China}-wide rate applies to a respondent who has not received a separate rate. [664]

Consequently, we will continue to instruct CBP to require a cash deposit equal to the China-wide rate on U.S. entries of inquiry merchandise from any company that neither has its own AD cash deposit rate, nor uses a wafer exporter in China with its own AD cash deposit rate.

## VIII.   RECOMMENDATION

Based on our analysis of the comments received and our findings at verification, we recommend adopting the above positions.  We recommend finding, based on the analysis and findings detailed above and in the *Preliminary Determination*, that imports of solar cells and modules, completed in Thailand using certain parts and components manufactured in China, are circumventing the *Orders*, except for shipments complying with the certification requirements described in the *Federal Register* notice.

---

[662] *See Preliminary Determinations*, 87 FR at 75224; *see also* the section,  "Entries on or After Termination of the Proclamation" in the *Federal Register* notice accompanying this memorandum.
[663] *See Walk-Behind Lawn Mowers from China* IDM at Comment 9 (citing *Diamond Sawblades Coalition*, 866 F.3d at 1313).
[664] *Id.* at Comment 9 (citing *Advanced Technology*, 938 F. Supp. 2d  at 1351 (citing *Watanabe Group,* 34 CIT 1545, Slip Op. 10-139 at 9, n. 8)).

If this recommendation is accepted, we will publish the final determination in these inquiries in the *Federal Register*.

☒                         ☐
_____         _____
Agree                    Disagree

8/17/2023

X   *Lisa W. Wang*   _____

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

127

**Appendix I - Acronyms/Abbreviations**

| Acronym/Abbreviation | Complete Name |
|---|---|
| $ | United States Dollars |
| ACCESS | Antidumping and Countervailing Duty Centralized Electronic Service System |
| AD | Antidumping Duty |
| AFA | Adverse Facts Available |
| APA | Administrative Procedure Act |
| APO | Administrative Protective Order |
| AR | Administrative Review |
| Auxin | Auxin Solar Inc. |
| bn | Billion |
| Boviet | Boviet Solar Technology Co., Ltd. |
| BPI | Business Proprietary Information |
| BYD HK | BYD (H.K.) Co., Ltd. |
| Shangluo BYD | BYD (Shangluo) Industrial Co., Ltd. |
| CAFC | U.S. Court of Appeals for the Federal Circuit |
| Cambodia | Kingdom of Cambodia |
| Canadian Solar or the Canadian Solar Group | Canadian Solar International Limited; Canadian Solar Manufacturing (Changshu) Inc.; Canadian Solar Manufacturing (Luoyang) Inc.; CSI Cells Co., Ltd.; CSI Solar Co., Ltd.; CSI Manufacturing (Fu Ning) Co., Ltd.; Canadian Solar Manufacturing (Thailand) Co., Ltd.; and Canadian Solar Manufacturing Vietnam Co., Ltd. |
| CBP | U.S. Customs and Border Protection |
| CCR | Changed Circumstances Review |
| CdTe | Cadmium Telluride |
| CEA | Clean Energy Associates, LLC |
| China | The People's Republic of China |
| CIT | U.S. Court of International Trade |
| COM | Cost of manufacturing |
| Commerce | The U.S. Department of Commerce |
| CORE | Certain Corrosion-Resistant Steel Products |
| CRS | Certain Cold-Rolled Steel Flat Products |
| CSIL | Canadian Solar International Limited |
| CSIL | Canadian Solar International Limited.  Also, any reference to the author of case briefs and rebuttals submitted by CSIL and any member of the Canadian Solar Group. |

| | |
|---|---|
| CSPV | Crystalline Silicon Photovoltaic |
| CVD | Countervailing Duty |
| Date of Termination | Date of termination of Presidential Proclamation 10414 |
| DOE | United States Department of Energy |
| EPCG | Export Promotion Capital Goods |
| ET | Eastern Time |
| EVA | Ethylene Vinyl Acetate |
| FA | Facts Available |
| First Solar Malaysia | First Solar Malaysia Sdn. Bhd. |
| First Solar Vietnam | First Solar Vietnam Manufacturing Co., Ltd. |
| FY | Fiscal Year |
| GW | Gigawatt |
| G&A | General and Administrative Expenses |
| Hanwha | Hanwha Q Cells Malaysia Sdn. Bdh. |
| HFC | Hydrofluorocarbon |
| HRS | Hot Rolled Steel |
| HTS | Harmonized Tariff Schedule |
| IDM | Issues and Decision Memorandum |
| IEA | International Energy Agency |
| Inquiry Countries | Cambodia, Malaysia, Thailand and Vietnam |
| ITC | U.S. International Trade Commission |
| Jinko | Jinko Solar Technology Sdn. Bhd./ Jinko Solar (Malaysia) Sdn. Bhd. |
| Le Shan Jinko | Jinko Solar (Le Shan) Co., Ltd |
| KHR | Cambodian Riel |
| LONGi | LONGi (H.K) Trading Limited in the Vietnam segment, and LONGi (Kuching) Sdn. Bhd. and LONGi Technology (Kuching) Sdn. Bhd. in the Malaysia segment |
| LWRPT | Light-Walled Rectangular Pipe and Tube |
| Maxeon | Maxeon Solar Technologies, Ltd. |
| mn | Million |
| MW | Megawatts |
| MYR | Malaysian Ringgit |
| NE Solar | New East Solar Energy (Cambodia) Co., Ltd. |
| NextEra | NextEra Energy Constructors, LLC |
| Ningbo Kyanite | Ningbo Kyanite International Trade Co., Ltd |
| NME | non-market economy |

| OCTG | Oil Country Tubular Goods |
|---|---|
| p/n | Positive/Negative |
| PDM | Preliminary Decision Memorandum |
| PERC | Passivated Emitter and Rear Contact |
| PET Film | Polyethylene Terephthalate Film, Sheet, and Strip |
| PLI | Product-Linked Incentive |
| POR | Period of Review |
| Q&V | Quantity and Value |
| R&D | Research and Development |
| Red Sun | Red Sun Energy Long An Company Limited |
| Risen | Risen Solar Technology Sdn. Bhd |
| RMB | Renminbi |
| Silfab | Silfab Solar WA Inc. |
| solar cells and modules | certain crystalline silicon photovoltaic cells, whether or not assembled into modules |
| Sonali | Sonali Energees USA LLC |
| Tata Power | Tata Power Solar System Limited |
| TBH | Thai Bhat |
| Thailand | Kingdom of Thailand |
| the Act | Tariff Act of 1930, as amended |
| The LONGi Group | LONGi (Kuching) Sdn. Bhd., LONGi Technology (Kuching) Sdn. Bhd. , LONGi (H.K.) Trading Limited, LONGi Solar Technology (H.K.) Limited, LONGi Solar Technology (U.S.) Inc. |
| THSM | Canadian Solar Manufacturing (Thailand) Co., Ltd. |
| Trina or the Trina Group | Trina Solar (Vietnam) Science & Technology Co., Ltd, Trina Solar Energy Development Company Limited, and Trina Solar Co., Ltd. in Vietnam segment and Trina Solar Science & Technology (Thailand) Ltd. in Thailand segment |
| TTL | Trina Solar Science & Technology (Thailand) Ltd. |
| TTL | Trina Solar Science & Technology (Thailand) Ltd. Also, any reference to the author of case briefs and rebuttals submitted by TTL and any member of the Trina Group. |
| TSSD | Trina Solar (Singapore) Science & Technology Pte. Ltd. |

| | |
|---|---|
| TCZ | Trina Solar Co., Ltd. |
| URAA | Uruguay Round Agreements Act |
| Vietnam | Socialist Republic of Vietnam |
| Vina | Vina Solar Technology Company Limited |
| Vina Cell | Vina Cell Technology Company Limited |
| VND | Vietnamese Dong |
| VSUN | Vietnam Sunergy Joint Stock Company |
| Websol Energy | Websol Energy System Limited |

## Appendix II - Court and Case Citation Table
## This Section is Sorted by Short Citation

| Short Citation | Administrative Case Determinations |
|---|---|
| *2003 Policy Bulletin* | *Proposed Policies Regarding the Conduct of Changed Circumstance Reviews of the Countervailing Duty Order on Softwood Lumber from Canada (C 122 839)*, 68 FR 37456 (June 24, 2003) |
| *2021 Regulations Final Rule* | *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021) |
| *Activated Carbon from China* | *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2016-2017,* 83 FR 53214 (October 22, 2018), and accompanying IDM |
| *Orders* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order*, 77 FR 73017 (December 7, 2012) |
| *AD Order* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012) |
| *Adoption of CFR 351.228* | *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021) |
| *Advanced Technology* | *Advanced Technology & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1351 (CIT 2013) (citing Watanabe Group v. United States, 34 CIT 1545 (CIT 2010), Slip Op. 10-139 |
| *Ajmal Steel* | *Ajmal Steel Tubes & Pipes Indus. LLC v. United States*, Slip Op. 22-121 (CIT October 28, 2022) |
| *AK Steel Corp.* | *AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) |
| *Al Ghurair CAFC 2023* | *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351 (Fed. Cir. 2023) |
| *Al Ghurair CIT 2021* | *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (CIT 2021) |

| | |
|---|---|
| *Alaska* | *Alaska Pro. Hunters Ass'n v. FAA*, 177 F.3d 1030, 1033-34, 1036 (D.C. Cir. 1999) |
| *Albemarle Corp.* | *Albemarle Corp. & Subsidiaries v. United States, 8*21 *F.3d 1345 (Fed. Cir. 2016)* |
| *Allegheny v. U.S.* | *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368 (Fed. Cir. 2003) |
| *Aluminum (Taishan) Co.* | *Aluminum (Taishan) Co. v. United States,* 983 F.3d 487 (Fed. Cir. 2020) |
| *Aluminum Extrusions from China* | *Aluminum Extrusions from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 FR 18524 (April 4, 2011) |
| *Aluminum Extrusions from China (Vietnam)* | *Aluminum Extrusions from the People's Republic of China:  Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders, and Partial Rescission*, 84 FR 39805 (August 12, 2019) |
| *Aluminum Extrusions from China Minor Alterations Circumvention Final* | *Aluminum Extrusions from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders and Rescission of Minor Alterations Anti-Circumvention Inquiry*, 82 FR 34630 (July 26, 2017), and accompanying IDM |
| *Aluminum Extrusions from China Preliminary CCR* | *Aluminum Extrusions from the People's Republic of China:  Initiation and Preliminary Results of Expedited Changed Circumstances Review*, 83 FR 34548 (July 20, 2018) |
| *Aluminum Foil from China* | *Certain Aluminum Foil from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 83 FR 9282 (March 5, 2018) |
| *Aluminum Foil from China (Korea and Thailand)* | *Antidumping and Countervailing Duty Orders on Certain Aluminum Foil from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to the Republic of Korea and the Kingdom of Thailand,* 88 FR 17177 (March 22, 2023) |
| *Aluminum Foil from China (Korea and Thailand) Preliminary* | *Antidumping and Countervailing Duty Orders on Certain Aluminum Foil from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to the Republic of Korea and the Kingdom of Thailand*, 88 FR 17177 (March 22, 2023), and accompanying PDM |
| *Aluminum Foil from Oman* | *Certain Aluminum Foil from the Sultanate of Oman: Final Affirmative Countervailing Duty Determination*, 86 FR 52888 (September 23, 2021) |

| | |
|---|---|
| *Aluminum Foil PDM* | *Antidumping Duty Investigation of Certain Aluminum Foil from the People's Republic of China:  Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination*, 82 FR 50858, 50861 (November 2, 2017), and accompanying PDM (citing Memorandum, "China's Status as a Non-Market Economy," dated October 26, 2017) |
| *Aluminum Sheet from Bahrain* | *Common Alloy Aluminum Sheet from Bahrain:  Final Affirmative Countervailing Duty Determination*, 86 FR 13333 (March 8, 2021) |
| *Amanda Foods CIT* | *Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d at 1381 |
| *Antidumping and Countervailing Duties FR* | *Antidumping Duties; Countervailing Duties*, 61 FR 7308 (February 27, 1996) |
| *Antidumping Duties; Countervailing Duties; Final Rule* | *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27340 (May 19, 1997) |
| *API v. U.S.* | *API v. United States EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) |
| *Appelton Papers Inc.* | *Appelton Papers Inc. v. United States*,  37 CIT 1034 Slip Op.13-87 (July 2013) |
| *Archer Daniels* | *Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1279 (CIT 2014) |
| *Ass'n of Priv. Sector* | *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462-63 (D.C. Cir. 2012) |
| *Ausimont* | *Ausimont United States v. United States*, 882 F. Supp. 1087, 1098 (CIT 1995) |
| *B.F. Goodrich v. U.S.* | *B.F. Goodrich Co. v. United States*, 794 F. Supp. 1148 (CIT 1992) |
| *Baker Hostetler* | *Baker Hostetler v. United States*, 473 F.3d 312 (D.C. Cir. 2006) |
| *Ball Bearings from Thailand* | *Final Affirmative Countervailing Duty Determination and Partial Countervailing Duty Order:  Ball Bearings and Parts Thereof from Thailand; Final Negative Countervailing Duty Determinations:  Antifriction Bearings (Other Than Ball or Tapered Roller Bearings) and Parts Thereof from Thailand*, 54 FR 19130 (May 3, 1989) |
| *Beijing Tianhai* | *Beijing Tianhai Industry Co. v. United States*, 52 F. Supp. 3d 1351 (CIT 2015) |
| *Bell Supply CAFC* | *Bell Supply Co., LLC v. United States*, 888 F.3d 1222 (Fed. Cir. 2018) |

| | |
|---|---|
| *Bethlehem Steel v. U.S.* | *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (CIT 2001) |
| *Bloomberg Report* | BloombergNEF, Solar PV Trade and Manufacturing: A Deep Dive (2021) |
| *BMW of N. Am. LLC* | *BMW of N. Am. LLC v. United States*, 926 F.3d 1291 (Fed. Cir. 2019) |
| *Bomont Indus.* | *Bomont Indus. v. United States*, 733 F. Supp. 1507 (CIT 1990) |
| *Borusan v. American Cast Iron Pipe* | *Borusan Mannesmann Boru Sanayi v. American Cast Iron Pipe Co.*, Ct. No. 20-2014 2021 U.S. App. (Fed. Cir. 2021) |
| *Borusan 2015* | *Borusan Mannesmann Boru Sanayi v Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (CIT 2015) |
| *Borusan 2017* | *Borusan Mannesmann Boru Sanayi v Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1327-30, *aff'd* 857 F.3d 1353 (Fed. Cir. 2017) |
| *Bowen* | *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) |
| *Brass Sheet and Strip from Canada* | *Brass Sheet and Strip from Canada: Final Affirmative Determination of Circumvention of Antidumping Duty Order,* 58 FR 33610 (June 18, 1993), and accompanying IDM |
| *Building Sys. De Mex.* | *Building Sys. De Mex., S.A. de C.V. v. United States*, 567 F. Supp. 3d 1306, 1316 (CIT 2022) |
| *Butt-Weld Pipe Fittings from China (Malaysia)* | *Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 84 FR 29164 (June 21, 2019) |
| *Butt-Weld Pipe Fittings from China (Thailand)* | *See Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 59 FR 15155 (March 31, 1994) |
| *Canada – Feed-In Tariff Program* | *Canada – Measures Relating to the Feed-In Tariff Program, (WT/DS426/AB/R)*, adopted May 6, 2013 |
| *Canadian Solar CAFC* | *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 919 (Fed. Cir. 2019) |
| *Carbon and Alloy Steel Wire Rod from Italy* | *Countervailing Duty Investigation of Carbon and Alloy Steel Wire Rod from Italy: Final Affirmative Determination*, 83 FR 13242 (March 28, 2018) |
| *Carbon Steel Flanges from Italy* | *Finished Carbon Steel Flanges from Italy: Final Determination of Sales at Less Than Fair Value,* 82 FR 29481 (June 29, 2017), and accompanying IDM |

Barcode:4419744-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Thailand 2022

| | |
|---|---|
| *Carlisle Tire & Rubber v. U.S.* | *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (CIT 1983) |
| *Cathedral Candle* | *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1366 (Fed. Cir. 2005) |
| *Celik Halat* | *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348 (CIT 2022) |
| *Ceramica Regiomontana* | *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (CIT 1986) |
| *Certain Pasta from Italy AR11* | *Certain Pasta from Italy:  Final Results of the Eleventh (2006) Countervailing Duty Administrative Review*, 74 FR 5922 (February 3, 2009) |
| *Certain Pasta from Italy AR7* | *Certain Pasta from Italy:  Final Results of the Seventh Countervailing Duty Administrative Review*, 69 FR 70657 (December 7, 2004) |
| *Certain Steel Products from Korea* | *Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations:  Certain Steel Products from Korea*, 58 FR 37338 (July 9, 1993) |
| *Certain Wheat from Canada* | *Final Affirmative Countervailing Duty Determinations: Certain Durum Wheat and Hard Red Spring Wheat from Canada*, 68 FR 52747 (September 5, 2003) |
| *Cf. Stark v. Wickard* | *Cf. Stark v. Wickard*, 321 U.S. 288 (1944) |
| *CFS from China* | *Coated Free Sheet Paper from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 72 FR 60645 (October 25, 2007) |
| *Changzhou Trina Solar Energy v. U.S. (2016)* | *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334 (CIT 2016) aff'd 264 F. Supp. 3d 1325, 1334 (CIT 2017) |
| *Changzhou Trina Solar Energy v. U.S. (2018)* | *Changzhou Trina Solar Energy Co. Ltd. v. United States*, 352 F. Supp. 3d 1316 (CIT 2018) |
| *Changzhou Trina Solar Energy v. U.S. (2020)* | *Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287 (CIT 2020) |
| *Changzhou Wujin Fine Chem* | *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) |
| *Chevron* | *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) |
| *Chlorinated Isocyanurates from China* | *Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review, and Partial Rescission of Countervailing Duty Administrative Review*, 82 FR 27466 (June 15, 2017) |

| | |
|---|---|
| *Chlorinated Isocyanurates from China 2019-2020 Final Results* | *Chlorinated Isocyanurates from the People's Republic of China:  Final Determination of No Shipments; 2019–2020 Administrative Review*, 86 FR 36253 (July 9, 2021) |
| *Chlorinated Isocyanurates from China 2019-2020 Preliminary Results* | *Chlorinated Isocyanurates from the People's Republic of China:  Preliminary Determination of No Shipments; 2019-2020*, 86 FR 13291 (March 8, 2021) |
| *Cinsa* | *Cinsa, S.A. de C.V. v. United States*, 966 F. Supp. 1230 (CIT 1997) |
| *Circular Welded Carbon-Quality Steel Pipe from China (Vietnam) Preliminary* | *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China:  Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 88 FR 21975 (April 12, 2023) |
| *Circular Welded Carbon-Quality Steel Pipe from Oman* | *Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman:  Final Affirmative Countervailing Duty Determination*, 77 FR 64473 (October 22, 2012) |
| *CITIC Trading Company, Ltd. Remand* | *Final Results of Redetermination Pursuant to Court Remand, CITIC Trading Company, Ltd. v. United States of America and ABC Coke, et al:  Final Results Pursuant to Remand*, Court No. 01-00901, Slip Op. 03-23 (CIT March 4, 2003), dated June 17, 2003, available at https://access.trade.gov/resources/remands/03-23.pdf |
| *Citric Acid from China* | *Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review*, 77 FR 72323 (December 5, 2012) |
| *COALITION I* | *Comm. Overseeing Action for Lumber Int'l Trade Investigations v. United States*, 483 F. Supp. 3d 1253 (CIT 2020) |
| *COALITION II* | *Comm. Overseeing Action for Lumber Int'l Trade Investigations v. United States*, 535 F. Supp. 3d 1336 (CIT 2021) |
| *Coated Paper from China* | *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 75 FR 59212 (September 27, 2010) |
| *Cold Rolled Steel from China (Vietnam) Preliminary* | *Certain Cold-Rolled Steel Flat Products from the People's Republic of China:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 82 FR 58178 (December 11, 2017) |

| | |
|---|---|
| CORE from China (Guatemala) | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Negative Final Determination of Circumvention Involving Guatemala,* 85 FR 41954 (July 13, 2020) |
| CORE from China (Guatemala) Preliminary | *Negative Preliminary Determination of Circumvention Involving Guatemala:  Certain Corrosion-Resistant Steel Products from the People's Republic of China*, 85 FR 8840 (February 18, 2020) |
| CORE from China (Malaysia) Final | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention Involving Malaysia,* 86 FR 30263 (June 7, 2021) |
| CORE from China (Malaysia) Preliminary | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention Involving Malaysia,* 85 FR 8823 (February 18, 2020) |
| CORE from China (South Africa) | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Negative Final Determination of Circumvention Involving South Africa,* 86 FR 30253 (June 7, 2021), and accompanying IDM |
| CORE from China (South Africa) Preliminary | *Negative Preliminary Determination of Circumvention Involving South Africa:  Certain Corrosion-Resistant Steel Products from the People's Republic of China,* 85 FR 8844 (February 18, 2020) |
| CORE from China (UAE) | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention Involving the United Arab Emirates,* 85 FR 41957 (July 13, 2020) |
| CORE from China (UAE) Preliminary | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention Involving the United Arab Emirates,* 85 FR 8841 (February 18, 2020) |
| CORE from China (Vietnam) | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders,* 83 FR 23895 (May 23, 2018) |

| | |
|---|---|
| CORE from China AD Investigation | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 35316 (June 2, 2016) |
| CORE from Korea (Vietnam) | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Final Determinations of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 84 FR 7034 (December 26, 2019) |
| CORE from Taiwan (Malaysia) | *Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Final Determination of Circumvention Involving Malaysia*, 86 FR 30257 (June 7, 2021) |
| CORE from Taiwan Final | *Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Final Determination of Circumvention Inquiry on the Antidumping Duty Order*, 84 FR 70937 (December 26, 2019) |
| CORE from Taiwan Preliminary Determination | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 32875 (July 10, 2019) |
| CRS from Brazil | *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from Brazil:  Final Affirmative Determination,* 81 FR 49940 (July 29, 2016), and accompanying IDM |
| CRS from China (Vietnam) | *Certain Cold-Rolled Steel Flat Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 FR 23891 (May 23, 2018) |
| CRS from Korea (Vietnam) | *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Affirmative Final Determinations of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 70948 (December 26, 2019) |
| CRS from Korea (Vietnam) Preliminary | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 32875 (July 10, 2019) |

| | |
|---|---|
| CVD Order | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Countervailing Duty Order*, 77 FR 73017 (December 7, 2012) |
| CVP 23 from China | *Carbazole Violet Pigment 23 from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 75 FR 36630 (June 28, 2010) |
| CWCS from India (Oman and India) Final | *Certain Welded Carbon Steel Standard Pipes and Tubes from India:  Final Negative Determinations of Circumvention of the Antidumping Duty Order*, 88 FR 12917 (March 1, 2023) |
| CWCS from India (Oman and India) Preliminary | *Preliminary Negative Determinations of Circumvention of the Antidumping Order:  Certain Welded Carbon Steel Standard Pipes and Tubes from India*, 87 FR 52507 (August 26, 2022) |
| DAK Americas | *DAK Americas LLC v. United States*, 517 F. Supp. 3d 1349, 1360 (CIT 2021) |
| Decca Hospitality Furnishings | *Decca Hospitality Furnishings, LLC, et al. v. United States*, 391 F. Supp. 2d 1298 (August 2005) |
| Diamond Sawblades (Thailand) | *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Determination of AntiCircumvention Inquiry*, 84 FR 33920 (July 16, 2019) |
| Diamond Sawblades (Thailand) Preliminary | *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Circumvention*, 83 FR 57425 (November 15, 2018) |
| Diamond Sawblades Coalition | *Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304, 1313 (Fed. Cir. 2017) |
| Diamond Sawblades Coalition CIT | *Diamond Sawblades Manufacturers Coalition v. United States*, 816 F. Supp. 2d 1342 (CIT January 2012) |
| Dillinger France | *Dillinger France S.A. v. United States,* 981 F.3d 1318, 1322 (Fed. Cir. 2020) |
| Dongtai Peak | *Dongtai Peak Honey Indus. v. United States,* 777 F.3d 1343 (Fed. Cir. 2015) |
| Encino Motorcars | *Encino Motorcars, LLC v. Navarro*, 570 U.S. 211 (2016) |
| Ericsson | *Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995) |
| Essar Steel | *Essar Steel Ltd. v. United States,* 678 F.3d 1268 (Fed. Cir. 2012) |

| | |
|---|---|
| *F Lli De Cecco* | *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 980 F. Supp 485 (CIT 1997) |
| *F Lli De Cecco Fed. Cir.* | *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) |
| *FDA v. Brown & Williamson* | *FDA v. Brown & Williamson Tobacco*, 529 U.S. 120 (2000) |
| *PSF from Korea* | *Fine Denier Polyester Staple Fiber from the Republic of Korea:  Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24743 (May 30, 2018) |
| *PSF from Taiwan* | *Fine Denier Polyester Staple Fiber from Taiwan: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24745 (May 30, 2018) |
| *Federal–Mogul Corp.* | Federal–Mogul Corp. v. United States, 63 F.3d 1572, 1575 (Fed. Cir. 1995) |
| *Ferrostaal Metals GmbH* | *Ferrostaal Metals GmbH v. United States*, 518 F. Supp. 3d 1357 (CIT 2021) |
| *Ferrovanadium from China Final Determination* | *Notice of Final Determination of Sales at Less Than Fair Value:  Ferrovanadium from the People's Republic of China*, 67 FR 71137 (November 29, 2002) |
| *Ferrovanadium from China Preliminary Determination* | *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Ferrovanadium from the People's Republic of China*, 67 FR 45088 (July 8, 2002) |
| *Ferrovanadium from Russia Final Determination* | *Ferrovanadium and Nitrided Vanadium from the Russian Federation:  Negative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 46712 (August 6, 2012) |
| *Ferrovanadium from Russia Preliminary Determination* | *Preliminary Negative Determination and Extension of Time Limit for Final Determination of Circumvention of the Antidumping Duty Order on Ferrovanadium and Nitrided Vanadium from the Russian Federation*, 77 FR 6537 (February 8, 2012) |
| *Fish Fillets from Vietnam* | *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and New Shipper; 2010-2011*, 78 FR 17350 (March 21, 2013), and accompanying IDM |

| | |
|---|---|
| *Fish Fillets from Vietnam (Cambodia)* | *Circumvention and Scope Inquiries on the Antidumping Duty Order on Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Partial Affirmative Final Determination of Circumvention of the Antidumping Duty Order, Partial Final Termination of Circumvention Inquiry and Final Rescission of Scope Inquiry*, 71 FR 38608 (July 7, 2006) |
| *Fort Stewart* | *Fort Stewart Schs. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990) |
| *Fource Glass Co.* | *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222 (1957) |
| *Gallant Ocean (Thai.) Co.* | *Gallant Ocean (Thai.) Co., v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) |
| *Glycine from China (India)* | *Glycine from the People's Republic of China:  Final Partial Affirmative Determination of Circumvention of the Antidumping Duty Order*, 77 Fed. Reg. 73,426 (December 10, 2012) |
| *Glycine from India CVD* | *Glycine from India:  Final Results of Countervailing Duty Administrative Review; 2020,* 87 FR 76611 (December 15, 2022) |
| *Granular PTFE Resin from Italy* | *Polytetrafluoroethylene Resin from Italy:  Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 58 FR 26100 (April 30, 1993) |
| *Graphite Electrodes from China (U.K.) Prelim* | *Small Diameter Graphic Electrodes from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 77 FR 33405, 33413 (June 6, 2012) |
| *Grobest* | *Grobest & I-Mei Industries (Vietnam) Co., Ltd. v. United States*, 815 F. Supp. 2d 1342 (CIT 2012) |
| *Hangers from China (Vietnam)* | *Steel Wire Garment Hangers from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order, 76 FR 66895 (October 28, 2011), and accompanying IDM* |
| *Hangers from China (Vietnam) Preliminary Determination* | *Steel Wire Garment Hangers from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Order and Extension of Final Determination*, 76 FR 27007 (May 10, 2011) |

| | |
|---|---|
| Hardwood Plywood from China | *Certain Hardwood Plywood Products from the People's Republic of China:  Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 FR 46470 (July 20, 2023) |
| HFCs from China (India) | *Hydrofluorocarbon Blends from the People's Republic of China:  Final Negative Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-401A Blend; Affirmative Final Determination of Circumvention of the Antidumping Duty Order by Indian Blends Containing Chinese Components*, 85 FR 61930 (October 1, 2020) |
| HFCs from China (India) Preliminary | *Hydrofluorocarbon Blends from the People's Republic of China:  Preliminary Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-410A Blend; Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Indian Blends Containing Chinese Components*, 85 FR 20244 (April 10, 2020) |
| Hot-Rolled Lead and Bismuth | *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom; Negative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders*, 64 FR 40336 (July 26, 1999) |
| Hot-Rolled Steel from Korea AD | *Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 32720 (July 9, 2019) |
| Huvis | *Huvis Corp. v. United States*, 570 F.3d 1347, 1356 (Fed. Cir. 2009) |
| Hyundai Electricity CAFC | *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078 (Fed. Cir. 2021) |
| Hyundai Electricity CIT | *Hyundai Electric & Energy Systems Co., Ltd v. United States*, 477 F. Supp.3d 1324, 132 (CIT 2020) |
| I.N.S. | *I.N.S. v. Enrico St. Cyr*, 533 U.S. 289, 316 (2001) |
| Initiation Notice Dated February 2, 2023 | *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 FR 7060, 71062 (February 2, 2023) |
| Inmax SDN | *Inmax SDN v. United States,* 277 F. Supp. 3d 1367 (CIT 2017) |
| Invenergy | Invenergy Renewables LLC v. United States, 422 F. Supp. 3d 1255, 1285 (CIT 2019) |
| Jiasheng | *Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States,* 28 F. Supp. 3d 1317 (CIT 2014) |
| Kisor | *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) |

| | |
|---|---|
| *KYD, Inc.* | *KYD, Inc. v. United States*, 607 F.3d 760, 767-68 (Fed. Cir. 2010) |
| *Lined Paper Products from India* | *Certain Lined Paper Products from India:  Notice of Final Results of the First Antidumping Duty Administrative Review*, 74 FR 17149 (April 14, 2009) |
| *LWR from China (Vietnam) Preliminary* | *Light-Walled Rectangular Pipe and Tube from the People's Republic of China:  Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 88 FR 21985 (April 12, 2023) |
| *LWR from Taiwan (Vietnam) Preliminary* | *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan:  Preliminary Affirmative Determination of Circumvention of the Antidumping Duty Order*, 88 FR 21980 (April 12, 2023) |
| *Macao CIT* | *Macao Commer. & Indus. Spring Mattress Mfr. v. United States,* 437 F. Supp. 3d 1324 (CIT 2020) |
| *Max Fortune Indus. Co.* | *Max Fortune Indus. Co. v. United States*, Slip Op. 13-52 (CIT 2013), 37 CIT 549, 560-62 (CIT 2013) |
| *Merck Sharp & Dohme Corp. v. Albrecht* | *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) |
| *Michigan* | *Michigan v. EPA*, 576 U.S. 743, 752 (2015) |
| *Mid Continent* | *Mid Continent Steel & Wire, Inc. v. United States*, Slip Op. 2023-45 (CIT 2023) |
| *Mitsubishi Elec. Corp.* | *Mitsubishi Elec. Corp. v. United States,* 700 F. Supp. 538, 555 (CIT 1988), *aff'd* 898 F. 2d 1577 (Fed. Cir. 1990) |
| *Mitsubishi Heavy Industries* | *Mitsubishi Heavy Industries v. United States,* 986 F. Supp. 1428 (CIT 1997) |
| *Mukund CIT* | *Mukand, Ltd. v. United States*, 37 CIT 443, 452 (CIT 2013) |
| *Mukund Fed. Cir.* | *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir. 2014) |
| *Nails from Malaysia CCR Initiation* | *Certain Steel Nails from Malaysia:  Initiation of Antidumping Duty Changed Circumstances Review*, 80 FR 71772 (November 17, 2015) |
| *Nails from Oman* | *Final Results of Antidumping Duty Administrative Review; 2021:  Certain Steel Nails from the Sultanate of Oman*, 87 FR 78639 (December 22, 2022) |
| *Nippon Steel* | *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) |

| | |
|---|---|
| *OCTG from China (Brunei and Philippines)* | *Oil Country Tubular Goods from the People's Republic of China:  Final Affirmative Determinations of Circumvention,* 86 FR 67443 (November 26, 2021) |
| *OCTG from China (Brunei and Philippines) Preliminary* | *Oil Country Tubular Goods from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention,* 86 FR 43627 (August 10, 2021) |
| *OCTG from China CCR* | *Oil Country Tubular Goods from the People's Republic of China:  Final Results of Antidumping and Countervailing Duty Changed Circumstances Reviews,* 87 FR 15915 (March 21, 2022) |
| *Off-the-Road Tires from China* | *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 40485 (July 15, 2008), and accompanying IDM |
| *Oman Fasteners* | *Oman Fasteners LLC v. United States,* Slip Op. 23-17 (February 22, 2023) |
| *Omnibus Trade & Competitiveness Act* | Conference Report to the 1988 Omnibus Trade & Competitiveness Act, H.R. Rep. No. 100-576, (1988), at 590, reprinted in 1988 U.S.C.C.A.N. 1547, 1623-24 |
| Omnibus Trade Act, Report of the Senate Finance Committee | Omnibus Trade Act, Report of the Senate Finance Committee, S. Rep. No. 71, 100th Cong., 1st Sess. 100 (1987) |
| *Paper from Brazil SII* | *Certain Uncoated Paper from Brazil:  Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Successor-in-Interest Determination; 2019-2020,* 86 FR 30000 (June 4, 2021), unchanged in *Certain Uncoated Paper from Brazil:  Final Results of Antidumping Duty Administrative Review; 2019-2020,* 86 FR 55820 (October 7, 2021) |
| *Pasta from Italy (U.S.) Circumvention* | *Certain Pasta from Italy:  Affirmative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders,* 68 FR 54888 (September 19, 2003) |
| *Pasta from Italy (U.S.) Circumvention Preliminary* | *Certain Pasta from Italy:  Affirmative Preliminary Determinations of Circumvention of Antidumping and Countervailing Duty Orders,* 68 FR 46571 (August 6, 2003) |
| *Pasta from Italy Circumvention Final* | *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order,* 63 FR 54672 (October 13, 1998) |

| | |
|---|---|
| *Pasta from Italy Circumvention Preliminary* | *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 63 FR 18364 (April 15, 1998) |
| *Peer Bearing Co.* | *Peer Bearing Co. v. United States*, 36 CIT 1700 (2012) |
| *Perez* | *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) or *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015) |
| *Pesquera Mares* | Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1380 (Fed. Cir. 2001) |
| *PET Film from India* | *Polyethylene Terephthalate Film, Sheet, and Strip from India:  Preliminary Results of Countervailing Duty Administrative Review, and Rescission, in Part; 2020,* 87 FR 48453 (August 9, 2022), and accompanying PDM |
| *PET Film from India Final* | *Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from India:  Final Results of Countervailing Duty Administrative Review; 2020,* 87 FR 76024 (December 12, 2022), and accompanying IDM |
| *PET Film from the UAE Preliminary Determination* | *Preliminary Negative Determination of Circumvention of the Antidumping Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, 80 FR 26229 (May 7, 2015) |
| *PET Film from the UAE (Bahrain)* | *Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates:  Negative Final Determination of Circumvention of the Antidumping Duty Order*, 80 FR 47463 (August 7, 2015) |
| *Pipe and Tube from India (Oman and UAE)* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India:  Final Negative Determinations of Circumvention of the Antidumping Order*, 88 FR 12917 (March 1, 2023) |
| *Pipe and Tube from India (Oman and UAE) Preliminary* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India:  Preliminary Negative Determinations of Circumvention of the Antidumping Order*, 87 FR 52507 (August 26, 2022) |
| *Plywood from China (Vietnam) Final* | *Certain Hardwood Plywood Products from the People's Republic of China:  Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders,* 88 FR 46740 (July 20, 2023), and accompanying IDM |

| | |
|---|---|
| *Plywood from China (Vietnam) Preliminary* | *Certain Hardwood Plywood Products from the People's Republic of China:  Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders,* 87 FR 45753 (July 29, 2022), and accompanying PDM |
| Policy Bulletin 05.1 | Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in Investigations involving Non-Market Economy Countries," (April 5, 2005), available on Commerce's website at https://www.trade.gov/policy-bulletin-051 |
| Policy Bulletin 94.1 | Enforcement and Compliance's Policy Bulletin No. 94.1, regarding, "Cost of Production - Standards for Initiation of Inquiry," (March 25, 1994), available on Commerce's website at https://www.trade.gov/policy-bulletin-941 |
| *Polyvinyl Alcohol from China Final Determination* | *Notice of Final Determination of Sales at Less Than Fair Value:  Polyvinyl Alcohol from the People's Republic of China,* 68 FR 47538 (August 11, 2003) |
| *Polyvinyl Alcohol from China Preliminary Determination* | *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Polyvinyl Alcohol from the People's Republic of China,* 68 FR 13674 (March 20, 2003) |
| *Preamble (Final Rule)* | *Antidumping Duties; Countervailing Duties,* 62 FR 27296 (May 19, 1997) |
| *Preserved Mushrooms from China* | *Certain Preserved Mushrooms from the People's Republic of China:  Final Results and Final Partial Rescission of the Sixth Administrative Review,* 71 FR 40477 (July 17, 2006) |
| *Presidential Proclamation 10414* | *Proclamation No. 10414, Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia,* 87 FR 35067 (June 9, 2022) |
| *Presidential Proclamation 10414 Final Rule Preamble* | *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414,* 87 FR 56868 (September 16, 2022) |
| *Presidential Proclamation 10414 Proposed Rule* | *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414:  Proposed Rule,* 87 FR 39426 (July 1, 2022) |

| | |
|---|---|
| *PrimeSource Bldg. Prods.* | *PrimeSource Bldg. Prods. v. United States*, 497 F. Supp. 3d 1333 (CIT 2021) (citing U.S. Const. art I, § 8, cl. 1 & cl. 3) |
| *Procedures for Importation of Supplies for Use in Emergency Relief Work* | *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 FR 63230 (October 30, 2006) |
| *Pure Magnesium from Canada CCR Initiation* | *Initiation of Changed Circumstances Countervailing Duty Administrative Reviews; Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 41473 (September 10, 1992) |
| *QSPs from China CCRs* | *Certain Quartz Surface Products from the People's Republic of China:  Initiation of Antidumping and Countervailing Duty Changed Circumstances Reviews; Global Stone,* 88 FR 41377 (June 26, 2023); and *Certain Quartz Surface Products from the People's Republic of China:  Initiation of Antidumping and Countervailing Duty Changed Circumstances Reviews; AM Stone,* 88 FR 41386 (June 26, 2023) |
| *Retail Carrier Bags from Taiwan Final Determination* | *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 79 FR 61056 (October 9, 2014)) |
| *Retail Carrier Bags from Taiwan Preliminary Determination* | *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 79 FR 31302 (June 2, 2014) |
| *Roberto* | *Roberto v. Dep't of Navy*, 440 F.3d 1341 (Fed. Cir. 2006) |
| *Romani* | *United States v. Est. of Romani*, 523 U.S. 517 (1998) |
| S. Rep. No. 103-412 | Joint Report of the Committee on Finance, Committee on Agriculture Nutrition and Forestry, Committee on Governmental Affairs of the United States Senatre to Accompany S. 2467, Uruguay Round Agreements Act |
| SAA | Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, Vol. I (1994) |
| *Saddler* | *Saddler v. Dep't of the Army*, 68 F.3d 1357, 1358 (Fed. Cir. 1995) |
| *Save Domestic Oil* | *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004) |
| *SDGE from China* | *Small Diameter Graphite Electrodes from the People's Republic of China:  Final Results of the First Administrative Review of the Antidumping Duty Order and Final Rescission of the Administrative Review, in Part*, 76 FR 56397 (September 13, 2011) |

| | |
|---|---|
| *SDGE from China (UK)* | *Small Diameter Graphite Electrodes from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 47596 (August 9, 2012) |
| *Senate Report 100-71* | *U.S. Senate, Committee on Finance, Omnibus Trade Act of 1987*, S. Rep. No. 100-71, at 101 (1987) |
| *Shakeproof Tool Works, Inc.* | *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) |
| *Shanghai Sunbeauty Trading Co.* | *Shanghai Sunbeauty Trading Co. v. United States*, 380 F. Supp. 3d. 1328 (CIT 2019) |
| *Shelter Forest CIT* | *Shelter Forest Int'l Acquisition, Inc. v. United States*, Slip Op. 2021-90 (CIT 2021) |
| *Shenzhen Xinboda* | *Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 494 F. Supp. 3d 1347 (CIT 2021) |
| *Shrimp from China* | *Certain Frozen Warmwater Shrimp from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 85 FR 83891 (December 23, 2020), and accompanying IDM |
| *Silicon Carbide from China* | *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994), |
| *Silicon Metal from Brazil* | *Silicon Metal from Brazil: Final Affirmative Countervailing Duty Determination*, 83 FR 9838 (March 8, 2018), and accompanying IDM |
| *SKF CIT* | *SKF USA Inc. v. United States*, 675 F. Supp. 2d 1264 (CIT 2009) |
| *Skidmore* | *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) |
| *Smith Corona* | *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Cir. 1990)) |
| *Softwood Lumber from Canada* | *Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017), and accompanying IDM |
| *Solar Cells from China 2017-2018 AR* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 62275 (October 2, 2020), and accompanying IDM |
| *Solar Cells from China Investigation* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Determination of Sales at Less Than* |

| | |
|---|---|
| | *Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012) |
| Solar Products from China | *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China:  Final Determination of Sales at less Than Fair Value*, 79 FR 76970 (December 23, 2014) |
| Solaria Scope Ruling | Memorandum, "The Solaria Corporation Scope Ruling," dated April 8, 2021 (placed on the record in NextEra's Letter, "Pre-Preliminary Determination Comments," dated October 20, 2022, at Attachment 22 |
| Sonali Scope Application | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Sonali Scope Application," dated January 25, 2023 |
| Sonali Scope Inquiry | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Sonali Scope Inquiry," dated January 20, 2023 |
| Soybean Meal from India AD | *Final Affirmative Determination of Sales at Less than Fair Value:  Organic Soybean Meal from India*, 87 FR 16458 (March 23, 2022) |
| Soybean Meal from India CVD | *Final Affirmative Countervailing Duty Determination of Sales at Less than Fair Value:  Organic Soybean Meal from India*, 87 FR 16453 (March 23, 2022) |
| Sparklers from China | *Notice of Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588 (May 6, 1991) |
| SSF from India SII | *Stainless Steel Flanges from India:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Successor-in-Interest Determination, and Partial Rescission; 2019-2020,* 86 FR 60792 (November 4, 2021), unchanged in *Stainless Steel Flanges from India:  Final Results of Antidumping Duty Administrative Review; 2019–2020*, 87 FR 27568 (May 9, 2022) |
| SSSS from China (Vietnam) | *Stainless Steel Sheet and Strip from the People's Republic of China:  Final Scop Ruling and Final Affirmative Determination of Circumvention for Exports from the Socialist Republic of Vietnam*, 88 FR 18521 (March 29, 2023) |
| SSSS from China (Vietnam) Preliminary | *Stainless Steel Sheet and Strip from the People's Republic of China:  Scope Ruling and Preliminary Affirmative Determination of Circumvention for Exports from the Socialist Republic of Vietnam*, 87 FR 56626 (September 15, 2022) |

| | |
|---|---|
| Steel Flanges from India | *Finished Carbon Steel Flanges from India: Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86 FR 500032 (September 7, 2021), and accompanying PDM |
| Steel Flanges from India Final | *Finished Carbon Steel Flanges from India:  Final Results of Countervailing Duty Administrative Review; 2019*, 86 FR 67909 (November 30, 2021), and accompanying IDM |
| Steel Flanges from Spain AD | *Finished Carbon Steel Flanges from Spain:  Final Results of Antidumping Duty Administrative Review; 2017–2018*, 85 FR 7919 (February 12, 2020) |
| Steel Threaded Rod from Thailand Final | *Steel Threaded Rod from Thailand:  Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 79 FR 14476 (March 14, 2014) |
| Steel Threaded Rod from Thailand Preliminary | *Steel Threaded Rod from Thailand:  Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 FR 79670 (December 31, 2013) |
| Steel Tubing from Taiwan Preliminary Results (Taiwan) | *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan*, 88 FR 21980 (April 12, 2023) |
| Tapered Roller Bearings from China | *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 FR 3987 (January 22, 2009) |
| Tapered Roller Bearings from China | *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of New Shipper Reviews*, 67 FR 10665 (March 8, 2002) |
| Techsnabexport, Ltd. | *Techsnabexport, Ltd. v. United States*, 795 F.Supp. 428 (CIT 1992) |
| Timken Co. | *Timken Co. v. United States*, 968 F. Supp. 2d 1279 (2014), *aff'd* 589 F. App'x 995 (Fed. Cir. 2015) |
| Tissue Paper from China (India) Final Determination | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 83 FR 40101 (July 3, 2013) |
| Tissue Paper from China (India) Preliminary Determination | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 78 FR 14514 (March 6, 2013), and accompanying IDM |
| Tissue Paper from China (Thailand) Final Determination | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Final Determination of* |

| | |
|---|---|
| | *Circumvention of the Antidumping Duty Order*, 74 FR 29172 (June 19, 2009) |
| *Tissue Paper from China (Vietnam) Final Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 73 FR 57591 (October 3, 2008) |
| *Tissue Paper from China (Vietnam) Preliminary Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 73 FR 21580 (April 22, 2008) |
| *Torrington* | U.S. Senate, Committee on Finance, Omnibus Trade Act of 1987, S. Rep. No. 100-71, at 101 (1987) |
| *TPP from China (Thailand)* | *Affirmative Final Determinations of Circumvention of the Antidumping Order:  Certain Tissue Paper Products from the People's Republic of China*, 73 FR 57591 (October 3, 2008) |
| *Tung Mung CIT* | *Tung Mung Dev. Co. v. United States*, 219 F. Supp. 3d 1333, 1343 (CIT 2002) |
| *U.K. Carbon and Graphite* | *U.K. Carbon and Graphite Co., Ltd. v United States*, 931 F. Supp. 2d 1322 (CIT 2013) |
| *Uncoated Paper from China Final Determination* | *Certain Uncoated Paper from Brazil, the People's Republic of China, and Indonesia:  Affirmative Final Determinations of Circumvention of the Antidumping Duty Orders and Countervailing Duty Orders for Certain Uncoated Paper Rolls*, 86 FR 71025 (December 14, 2021) |
| *Uncoated Paper from China Preliminary Determination* | *Certain Uncoated Paper from the People's Republic of China:  Affirmative Preliminary Determinations of Circumvention of the Antidumping and Countervailing Duty Orders for Uncoated Paper Rolls*, 85 FR 72624 (November 13, 2020) |
| *Uncovered Innerspring Units from China (Malaysia) Final Determination* | *Uncovered Innerspring Units from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 80 FR 74758 (November 30, 2015) |
| *Uncovered Innerspring Units from China (Malaysia) Preliminary Determination* | *Uncovered Innerspring Units from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 80 FR 64392, 64393 (October 23, 2015) |
| *USITC Solar 2021 Determination* | *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. No. TA-201-75 (Extension), USITC Pub. 5266 (December 2021) |

| | |
|---|---|
| *USITC Solar Investigation Final* | *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. No. TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (November 2012) |
| *Uyghur Forced Labor Prevention Act: U.S. Customs and Border Protection Operational Guidance for Importers* | *Uyghur Forced Labor Prevention Act: U.S. Customs and Border Protection Operational Guidance for Importers June 13, 2022*, CBP Publication No. 1793-0522 |
| *Vietnam Finewood* | *Vietnam Finewood Company Limited, et.al v. United States*, 466 F. Supp. 3d 1273 (CIT 2023) |
| *Walk-Behind Lawn Mowers from China* | *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 27384 (May 20, 2021) |
| *Walk-Behind Lawn Mowers from China Circumvention Rescission* | *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China: Notice of Intent to Rescind Circumvention Inquiry on the Antidumping and Countervailing Duty Orders*, 88 FR 13434 (March 3, 2023) |
| *Walgreen Co.* | *Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) |
| *Wantanabe Group* | *Watanabe Group v. United States*, 34 CIT 1545, Slip Op. 10-139 (CIT 2010) |
| *Wheatland* | *Wheatland Tube Co. v. United States* 161 F.3d 1365, 1371 (Fed. Cir. 1998) |
| *Wire Rod from Korea and United Kingdom CCR* | *Carbon and Alloy Steel Wire Rod from the Republic of Korea and the United Kingdom: Notice of Final Results of Antidumping Duty Changed Circumstances Review*, 84 FR 13888 (April 8, 2019) |
| *Xanthan Gum from China 2016-2017* | *Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Discontinuation of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 65142 (December 19, 2018) |
| *Yangtai CIT* | *Yantai Oriental Juice Co. v. United States*, Slip Op. 03-33 (CIT March 21, 2003) |
| *Yangzhou CAFC* | *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) |
| *Youngstown Sheet & Tube Co.* | *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) |

**Appendix III -Documents on Record**
**This Section is Sorted by Short Citation**

| Short Citation | Document Title and Date |
|---|---|
| *Appendix IV-Certification for "Applicable Entries"* | *Preliminary Determination at Appendix IV; Certification for "Applicable Entries"* |
| *Appendix V-Certification for Non-Circumventing Companies* | *Preliminary Determination at Appendix IV; Certification for Entries of Inquiry Merchandise from Companies Preliminarily Found Not to Be Circumventing* |
| *Appendix VI-Certification Regarding Chinese Components* | *Preliminary Determination at Appendix IV; Certification Regarding Chinese Component* |
| Auxin November 9, 2022 *Ex Parte* Memorandum | Memorandum, "Meeting with Counsel for Auxin," dated November 14, 2022 |
| Auxin's April 26, 2023  Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)—Thailand," dated April 26, 2023 |
| Auxin's April 26, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)—Thailand," dated April 26, 2023 |
| Auxin's August 3, 2022 SV Rebuttal Comments | Auxin's Letter, "Rebuttal Surrogate Value Comments and Information," dated August 3, 2022 |
| Auxin's March 24, 2023 Case Brief | Auxin's Letter,  "Auxin's Case Brief (Tranche 2)," dated March 24, 2023 |
| Auxin's April 19, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche2)—Vietnam," dated April 19, 2023 |
| Auxin's April 24, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2) - Malaysia," dated April 24, 2023 |
| Auxin's April 27, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Case Brief (Tranche2)—Thailand," dated April 27, 2023 |
| Auxin's April 28, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)—Vietnam," dated April 28, 2023 |
| Auxin's April 3, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)," dated April 3, 2023 |
| Auxin's Hearing Request | Auxin's Letter, "Auxin Solar, Inc.'s Request for Public Hearing," dated December 29, 2022 |
| Auxin's Investment and R&D Information | Auxin's Letter, "Submission of Investment and Research and Development Information," dated July 29, 2022 |
| *Auxin's ITC Posthearing Brief* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products): Posthearing Brief on Behalf of Auxin Solar Inc.*, Inv. No. TA-201-75 (Safeguard Extension) (November 2021) |
| *Auxin's ITC Prehearing Brief* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products): Prehearing Brief on Behalf of Auxin Solar Inc.*, Inv. No. TA-201-75 (Safeguard Extension) (October 2021) |

| | |
|---|---|
| Auxin's July 27, 2022 SV Comments | Auxin's Letter, "Submission of Surrogate Value Information for Vietnamese Factors of Production," dated July 27, 2022 |
| Auxin's July 29, 2022 Comments | Auxin's Letter, "Submission of Investment and Research and Development Information," dated July 29, 2022 |
| Auxin's March 17, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 1)," dated March 17, 2023 |
| Auxin's March 24, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)," dated March 24, 2023 |
| Auxin's March 6, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 1)," dated March 6, 2023 |
| Auxin's March 7, 2022 Submission | Auxin's Letter, "Response to NextEra's Request to Reject Anti-Circumvention Ruling Requests," March 7, 2022 |
| Auxin's May 16, 2022 Comments | Auxin's Letter, "Auxin's Response to Rebuttal Comments and Factual Information," dated May 16, 2022 |
| Auxin's May 5, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2) - Malaysia," dated May 5, 2023 |
| Auxin's May 9, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)," dated May 9, 2023 |
| Auxin's October 20, 2023 Pre-Preliminary Comments | Auxin's Letter, "Pre-Preliminary Comments Concerning Jinko Solar Technology Sdn. Bhd. and Hanwha Q Cells Malaysia Sdn. Bhd.," dated October 20, 2022 |
| *Bloomberg Report* | BloombergNEF, *Solar PV Trade and Manufacturing: A Deep Dive* (2021) |
| Boviet 1st SQR | Boviet's Letter, "Boviet First Supplemental Questionnaire Response," dated August 11, 2022 |
| Boviet 2nd SQR | Boviet's Letter, "Boviet Second Supplemental Questionnaire Response," dated August 12, 2022 |
| Boviet 3rd SQR | Boviet's Letter, "Boviet Third Supplemental Questionnaire Response," dated October 7, 2022 |
| Boviet 4th SQR | Boviet's Letter, "Boviet Fourth Supplemental Questionnaire Response," dated November 2, 2022 |
| Boviet Final Analysis Memorandum | Memorandum, "Final Analysis Memorandum for Boviet Solar Technology Co., Ltd.," dated concurrently with this memorandum |
| Boviet Preliminary Analysis Memorandum | Memorandum, "Preliminary Analysis Memorandum for Boviet Solar Technology Co., Ltd.," dated December 1, 2022 |
| Boviet's May 5, 2023 Rebuttal Brief | Boviet's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Second Tranche Rebuttal Brief," dated May 5, 2023 |

| | |
|---|---|
| Boviet's April 28, 2023 Rebuttal Brief | Boviet's Letter, "Boviet Rebuttal Brief re Tranche II," dated April 28, 2023 |
| Boviet's August 3, 2022 SV Rebuttal Comments | Boviet's Letter, "Boviet Rebuttal Surrogate Value Information," dated August 3, 2022 |
| Boviet's IQR Part I | Boviet's Letter, "Boviet Initial Circumvention Inquiry Questionnaire Response," dated June 3, 2022 |
| Boviet's IQR Part II | Boviet's Letter, "Boviet Circumvention Inquiry Questionnaire Response – Part II," dated June 23, 2022 |
| Boviet's July 27, 2020 SV Comments | Boviet's Letter, "Boviet Surrogate Value Information," dated July 27, 2022 |
| Boviet's March 17, 2023 Rebuttal Brief | Boviet's Letter, "Boviet's Letter in Lieu of Rebuttal Brief re Tranche 1," dated March 17, 2023 |
| Boviet's March 6, 2023 Case Brief | Boviet's Letter, "Boviet Case Brief re Tranche 1," dated March 6, 2023 |
| BYD HK Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Cambodia:  Final Analysis Memorandum for BYD (H.K.) Co., Ltd.," dated concurrently with this memorandum |
| BYD HK Hearing Request | BYD HK's Letter, "Request for Hearing," dated January 6, 2023 |
| BYD HK Initial QR Part I | BYD HK's Letter, "Response to Initial Questionnaire," dated June 7, 2022 |
| BYD HK Initial QR Part II | BYD HK's Letter, "Response to Second Circumvention Inquiry Questionnaire," dated June 23, 2022 |
| BYD HK 1st SQR | BYD HK's Letter, "Response to First Supplemental Questionnaire," dated August 9, 2022 |
| BYD HK 2nd SQR | BYD HK's Letter, "Response to Second Supplemental Questionnaire," dated August 19, 2022 |
| BYD HK 3rd SQR | BYD HK's Letter, "Response to Third Supplemental Questionnaire," dated October 12, 2022 |
| BYD HK Verification Exhibits | BYD HK's Letter, "Verification Exhibits of BYD (HK) Co., Ltd.," dated February 16, 2023 |
| BYD HK's Verification Report | Memorandum, "Verification of the Questionnaire Responses of BYD (H.K.) Co., Ltd. in the Circumvention Inquiry of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - with Respect to Cambodia," dated March 15, 2023 |
| BYD HK Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Cambodia:  Preliminary Analysis Memorandum for BYD (H.K.) Co., Ltd.," dated December 1, 2022 |
| BYD HK's April 3, 2023 Rebuttal Brief | BYD HK's Letter, "Second Tranche Rebuttal Brief of BYD HK," dated April 3, 2023 |

| | |
|---|---|
| BYD HK's March 17, 2023 Rebuttal Brief | BYD HK's Letter, "First Tranche Rebuttal Brief of BYD," dated March 17, 2023 |
| BYD HK's March 24, 2023 Case Brief | BYD HK's Letter, "Second Tranche Case Brief," dated March 24, 2023 |
| BYD HK's March 6, 2023 Case Brief | BYD HK's Letter, "First Tranche" Letter in Lieu of Case Brief of BYD," dated March 6, 2023 |
| *Cambodia* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia," dated December 1, 2022 |
| Cambodia RSM | Memorandum, "Circumvention Inquiry with Respect to Cambodia:  Respondent Selection," dated May 12, 2022 |
| CBP Data Release Memorandum | Memorandum," Release of Customs and Border Protection Entry Data," dated March 29, 2022 |
| CBP Messages Memorandum | Memorandum, "Placement of Customs and Border Protection (CBP) Messages on Record of Proceedings," dated February 17, 2023 |
| *CEA Report* | Clean Energy Associates, *Crystalline Silicon PV - Sector Background* (2022) |
| Circumvention Questionnaires | Circumvention Inquiry Questionnaire," dated May 13 and 16, 2022 |
| Circumvention Request | Auxin's Letter, "Auxin Solar's Request for an Anti-Circumvention Ruling to Section 781(b) of the Tariff Act of 1930, As Amended," dated February 8, 2022 |
| Clarification of Product Coverage Memorandum | Memorandum, "Clarification of Product Coverage," dated December 19, 2022 |
| May 2, 2022 Memorandum | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Comments on Potential Certification Requirements," dated May 19, 2022 Circumvention Inquiries With Respect to Cambodia, Malaysia,  Thailand, and Vietnam – Potential Certification Requirements," dated May 2, 2022 |
| Commerce's December 1, 2022 Rejection Letter | Commerce's Letter, "Rejection Letter of Red Sun's Q&V Questionnaire Response," dated December 1, 2022 |
| CSIL Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand:  Final Analysis Memorandum for Canadian Solar International Limited," dated concurrently with this memorandum |
| CSIL's 1st SQR | CSIL's Letter, "Response to First Supplemental Questionnaire," dated August 8, 2022 |
| CSIL's 2nd SQR | CSIL's Letter, "Response to Second Supplemental Questionnaire," dated August 12, 2022 |
| CSIL's 3rd SQR | CSIL's Letter, "Response to Third Supplemental Questionnaire," dated October 7, 2022 |

| | |
|---|---|
| CSIL's 4th SQR | CSIL's Letter, "Response to Fourth Supplemental Questionnaire," dated November 2, 2022 |
| CSIL's April 19, 2023 Case Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 19, 2023 |
| CSIL's April 26, 2023 Rebuttal Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 26, 2023 |
| CSIL's April 27, 2023 Case Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 27, 2023 |
| CSIL's Hearing Request | CSIL's Letter, "Request for Hearing," dated January 6, 2023 |
| CSIL's IQR Part I | CSIL's Letter, "Response to Circumvention Inquiry Questionnaire," dated June 3, 2022 |
| CSIL's IQR Part II | CSIL's Letter, "Response to Second Circumvention Inquiry Questionnaire," dated June 23, 2022 |
| CSIL's March 17, 2023 Rebuttal Brief | CSIL's Letter, "First Tranche Rebuttal Brief," dated March 17, 2023 |
| CSIL's March 6, 2023 Case Brief | CSIL's Letter, "First Tranche Case Brief," dated March 6, 2023 |
| CSIL's May 9, 2023 Rebuttal Brief | CSIL's Letter, "Second Tranche Rebuttal Case Brief of Canadian Solar International Limited," dated May 9, 2023 |
| CSIL's October 20, 2022 Pre-Preliminary Comments | CSIL's Letter, "Comments in Advance of the Preliminary Determination," dated October 20, 2022 |
| CSIL Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand:  Preliminary Analysis Memorandum for Canadian Solar International Limited," dated December 1, 2022 |
| CSIL's Verification Exhibits | CSIL's Letter, "Verification Exhibits," dated February 22, 2023 |
| CSIL's Verification Report | Memorandum, "Verification of the Information Reported by Canadian Solar International Limited," dated April 19, 2023 |
| *Denis De Ceuster Report* | Denis De Ceuster and DDC Solar LLC, *Crystalline Silicon Photovoltaic Supply Chain:  from Polysilicon to Solar Panel* (2022) |
| DHS Order Re:  Forced Labor in Xinjiang | The Department of Homeland Security Issues Withhold Release Order on Silica-Based Products Made by Forced Labor in Xinjiang," U.S CUSTOMS AND BORDER PROTECTION (June 24, 2021), available at https://www.cbp.gov/newsroom/national-media-release/departmenthomeland- security-issues-withhold-release-order-silica |

| | |
|---|---|
| *DOE Solar Deep Dive* | *U.S. Department of Energy Response to Executive Order 14017 "America's Supply Chains," Solar Photovoltaics: Supply Chain Deep Dive Assessment* (February 24, 2022) included in the memorandum, "Meeting with the Department of Energy," dated June 3, 2022 |
| ET Solar Scope Ruling | Memorandum, "Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China: ET Solar Inc.," dated June 15, 2021 |
| Factor Valuation Memorandum | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - Circumvention Inquiries with Respect to Cambodia, Malaysia and Thailand: Factor Valuation Memorandum," dated December 1, 2022 |
| First Solar Malaysia's April 24, 2023 Case Brief | First Solar Malaysia's Letter, "Letter in Lieu of Case Brief for Second Tranche of Issues," dated April 24, 2023 |
| First Solar Malaysia's Hearing Request | First Solar Malaysia's Letter, "Request to Participate at Hearing," dated January 6, 2023 |
| First Solar Malaysia's March 17, 2023 Rebuttal Brief | First Solar Malaysia's Letter, "Letter in Lieu of Rebuttal Brief for First Tranche of Issues," dated March 17, 2023 |
| First Solar Malaysia's March 6, 2023 Case Brief | First Solar Malaysia's Letter, "Case Brief for First Tranche of Issues," dated March 6, 2023 |
| First Solar Malaysia's May 5, 2023 Case Brief | First Solar Malaysia's Letter, "Letter in Lieu of Rebuttal Brief for Second Tranche of Issues," dated May 5, 2023 |
| First Solar Vietnam's April 28, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief for Second Tranche of Issues," dated April 28, 2023 |
| First Solar Vietnam's March 17, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief for First Tranche of Issues," dated March 17, 2023 |
| First Solar Vietnam's March 6, 2023 Case Brief | First Solar Vietnam's Letter, "Case Brief for First Tranche of Issues," dated March 6, 2023 |
| First Solar's April 28, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief of Second Tranche of Issues," dated April 28, 2023 |
| First Tranche Briefing Schedule | Memorandum, "Announcement of Briefing Schedule for First Tranche of Case and Rebuttal Briefs," dated February 22, 2023 |
| *FTI Report* | FTI Consulting, Inc., *The Photovoltaic Value Chain In Southeast Asia:  Response to BloombergNEF's Solar PV Trade and Manufacturing:  Deep Dive* (2021) |

| | |
|---|---|
| Hanwha Final Analysis Memorandum | Memorandum, "Hanwha Q CELLS Malaysia Sdn. Bhd. (Hanwha) – Final Analysis Memorandum," dated concurrently with this memorandum |
| Hanwha IQR Part I | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Response to Circumvention Inquiry Questionnaire (Part I)," dated June 3, 2022 |
| Hanwha IQR Part II | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Response to Circumvention Inquiry Questionnaire (Part II)," dated June 23, 2022 |
| Hanwha's 1st SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s First Supplemental Questionnaire Response," dated August 9, 2022 |
| Hanwha's 2nd SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Second Supplemental Questionnaire Response," dated August 19, 2022 |
| Hanwha's 3rd SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Fourth Supplemental Questionnaire Response," dated October 11, 2022 |
| Hanwha Preliminary Analysis Memorandum | Memorandum, "Hanwha Q CELLS Malaysia Sdn. Bhd. (Hanwha) – Preliminary Analysis Memorandum," dated December 1, 2022 |
| Hanwha's April 24, 2023 Case Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Case Brief Regarding Comments on Certification Issues (Second Tranche)," dated April 24, 2023 |
| Hanwha's December 14, 2022 Certification Comments | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd's Comments on Proposed Certification Process," dated December 14, 2022 |
| Hanwha's Hearing Request | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Hearing Request," dated January 6, 2023 |
| Hanwha's March 17, 2023 Rebuttal Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Rebuttal Brief Regarding Comments on Certification Issues (First Tranche)," dated March 17, 2023 |
| Hanwha's March 6, 2023 Case Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Case Brief Regarding Comments on Certification Issues (First Tranche)," dated March 6, 2023 |
| Hanwha's May 5, 2023 Rebuttal Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Rebuttal Brief (Second Tranche)," dated May 5, 2023 |
| Hearing Transcript | Hearing Transcript, "Solar Cells from China Circumvention Inquiries covering Cambodia, Malaysia, Thailand and Vietnam," dated July 25, 2023 |
| *IEA Report* | International Energy Agency, *Solar PV Global Supply Chains* (2022) |

| | |
|---|---|
| Initiation Memorandum | Memorandum, "Initiation of Circumvention Inquiries," dated March 25, 2022 |
| *Initiation Notice* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders*, 87 FR 19071 (April 1, 2022) |
| ITC Notification Letter | Commerce's Letter, "Notification of Affirmative Preliminary Determinations of Circumvention," dated May 30, 2023 |
| *ITC Solar Final* | *Crystalline Silicon Photovoltaic Cells and Modules from China,* Inv. No. 701-TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (November 2012) |
| *ITC Solar Monitoring* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled into Other Products: Monitoring Developments in the Domestic Industry,* Inv. No. TA-201-75 (Monitoring), USITC Pub. 5021 (February 2020) |
| *ITC Solar Safeguard Proceeding 2017* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products),* Inv. No. TA-201-75 (Safeguard), USITC Pub. 4739 (November 2017) |
| *ITC Solar Safeguard Proceeding 2019* | *Crystalline Silicon Photovoltaic Cells and Modules from China,* Inv. No. 701-TA-481 and 731-TA-1190 (Review), USITC Pub. 4874 (March 2019) |
| JA Solar, LONGi, VINA and VSUN's March 17, 2023 Rebuttal Brief | VSUN's Letter, "Letter in Lieu of Rebuttal Brief," dated March 17, 2023 |
| JA Solar's Hearing Request | JA Solar's Letter, "JA Solar's Request for Hearing," dated January 6, 2023 |
| JA Solar's May 2, 2022 Comments | JA Solar's Letter, "JA Solar Comments and Rebuttal Factual Information on Anti-Circumvention Inquiry Request," dated May 2, 2022 |
| Jinko Final Analysis Memorandum | Memorandum, "Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. – Final Analysis Memorandum," dated concurrently with this memorandum |
| Jinko IQR Part I | Jinko's Letter, "Jinko Initial Questionnaire Part I Questionnaire Response," dated June 6, 2022 |
| Jinko IQR Part II | Jinko's Letter, "Jinko Initial Questionnaire Part II Questionnaire Response," dated June 23, 2022 |
| Jinko's 1st SQR | Jinko's Letter, "Jinko First Supplemental Questionnaire Response," dated August 8, 2022 |

| Jinko's 2nd SQR | Jinko's Letter, "Jinko Second Supplemental Questionnaire Response," dated August 19, 2022 |
| Jinko's 3rd SQR | Jinko's Letter, "Jinko Third Supplemental Questionnaire Response," dated October 11, 2022 |
| Jinko's 4th SQR | Jinko's Letter, "Jinko Fourth Supplemental Questionnaire Response," dated November 2, 2022 |
| Jinko Preliminary Analysis Memorandum | Memorandum, "Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. – Preliminary Analysis Memorandum," dated December 1, 2022 |
| Jinko Verification Report | Memorandum, "Verification of the Questionnaire Responses of Jinko," dated April 12, 2023 |
| Jinko's April 24, 2023 Case Brief | Jinko's Letter, "Jinko Second Tranche Case Brief," dated April 24, 2023 |
| Jinko's Hearing Request | Jinko's Letter, "Jinko Request to Participate at Hearing," dated January 6, 2023 |
| Jinko's March 17, 2023 Rebuttal Brief | Jinko's Letter, "Jinko First Tranche Rebuttal," dated March 17, 2023 |
| Jinko's March 6, 2023 Case Brief | Jinko's Letter, "Jinko First Tranche Letter Concerning Certification Requirements," dated March 6, 2023 |
| Jinko's May 5, 2023 Rebuttal Brief | Jinko's Letter, "Jinko Second Tranche Rebuttal Brief," dated May 5, 2023 |
| *Malaysia* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to Malaysia," dated December 1, 2022 |
| Malaysia RSM | Memorandum, "Circumvention Inquiries With Respect to Malaysia: Respondent Selection," dated May 12, 2022 |
| Maxeon's Hearing Request | Maxeon's Letter, "Request to Appear at Public Hearing," dated January 2, 2023 |
| Maxeon's March 17, 2023 Rebuttal Brief | Maxeon's Letter, "Maxeon's Rebuttal Brief," dated March 17, 2023 |
| Maxeon's March 6, 2023 Case Brief | Maxeon's Letter, "Maxeon's Case Brief," dated March 6, 2023 |
| NE Solar IQR Part I | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Initial Questionnaire Response," dated June 3, 2022 |
| NE Solar IQR Part II | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China;-Circumvention Inquiry Initial Questionnaire Response," dated June 23, 2022 |

| | |
|---|---|
| NE Solar Hearing Request | NE Solar's Letter, "New East Solar Energy's Request to Participate in Hearing," dated January 6, 2023 |
| NE Solar January 29, 2023 *Ex Parte* Memorandum | Memorandum, "Meeting with Counsel for New East Solar," dated January 29, 2023 |
| NE Solar Preliminary Analysis Memorandum | Memorandum, "Preliminary Analysis Memorandum for New East Solar (Cambodia) Co., Ltd.," dated December 1, 2022 |
| NE Solar's August 17, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Surrogate Value Questionnaire Response," dated August 17, 2022 |
| NE Solar's November 4, 2022 SQR | NE Solar's Letter, " Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire Response," dated November 4, 2022 |
| NE Solar's October 11, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire III Response," dated October 11, 2022 |
| NE Solar's August 8, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire I Response," dated August 8, 2022 |
| NE Solar's March 6, 2023 Case Brief | NE Solar's Letter, "New East Solar Energy's Case Brief," dated March 6, 2023 |
| Next Era's March 17, 2023 Rebuttal Brief | Next Era's Letter, "First Tranche Rebuttal Brief," dated March 17, 2023 |
| Next Era's March 6, 2023 Case Brief | Next Era's Letter, "Tranche 1 Case Brief," dated March 6, 2023 |
| NextEra's April 28, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 28, 2023 |
| NextEra's April 3, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 3, 2023 |
| NextEra's May 19, 2022 Comments | NextEra's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Comments on Potential Certification Requirements," dated May 19, 2022 |
| NextEra's May 9, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated May 9, 2023 |

| NextEra's April 19, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 19, 2023 |
|---|---|
| NextEra's April 24, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 24, 2023 |
| NextEra's April 26, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 26, 2023 |
| NextEra's April 28, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 28, 2023 |
| NextEra's Hearing Request | NextEra's Letter, "Request to Appear at Hearing," dated January 6, 2023 |
| NextEra's March 24, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated March 24, 2023 |
| NextEra's May 2, 2022 Comments | NextEra's letter, "NextEra Comments on Auxin's Circumvention Ruling Request," dated May 2, 2022 |
| NextEra's May 2, 2022 Submission | NextEra's Letter, "NextEra Comments on Auxin's Circumvention Ruling Request," dated May 2, 2022 |
| NextEra's May 5, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated May 5, 2023 |
| NREL 2018 Report | National Renewable Energy Laboratory, *Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing* (February 2020) at Attachment 24 of NextEra's 5.2.22 Submission |
| NREL Report | National Renewable Energy Laboratory, *Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing* (2020) |
| Preliminary Determinations | *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to  Cambodia, Malaysia, Thailand, and Vietnam*, 87 FR 75221 (December 8, 2022) |
| Preliminary Determination Corrections | Memorandum, "Preliminary Determinations Corrections," dated January 24, 2023 |
| Q&V Questionnaire | Quantity and Value Questionnaire for Circumvention Inquiries With Respect to Cambodia, Malaysia, Thailand, and Vietnam, dated March 30, 2022 |
| Q&V Questionnaire Deadline Extension | Memorandum, "Extension of the Deadline to Respond to the Quantity and Value Questionnaire," dated April 20, 2022 |
| Red Sun's April 19, 2023 Case Brief | Red Sun's Letter, "Red Sun's Second Tranche Case Brief," dated April 19, 2023 |

| | |
|---|---|
| Red Sun's January 6, 2023 Request Letter | Red Sun's Letter, "Request to Supplement Rejection Memo and Place Correspondence with Red Sun on the Record," dated January 6, 2023 |
| Request for Comments on Surrogate Countries | Memorandum, "Request for Economic Development, Surrogate Country Comments and Information," dated May 13, 2022 |
| Risen's March 17, 2023 Rebuttal Brief | Risen's Letter, "Risen Solar Rebuttal Brief – Tranche 1," dated March 17, 2023 |
| Risen's March 6, 2023 Case Brief | Risen's Letter, "Risen Solar Case Brief – Tranche 1," dated March 6, 2023 |
| Risen's May 5, 2023 Rebuttal Brief | Risen's Letter, "Risen Solar Rebuttal brief - Tranche II," dated May 5, 2023 |
| Second Tranche Briefing Schedule for Cambodia | Memorandum, "Announcement of Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for Cambodia," dated March 15, 2023 |
| Second Tranche Briefing Schedule for Malaysia | Memorandum, "Announcement of Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for Malaysia," dated April 12, 2023 |
| Second Tranche Briefing Schedule for Thailand | Memorandum, "Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for the Circumvention Inquiry Covering the Kingdom of Thailand (Thailand)," dated April 19, 2023 |
| Second Tranche Briefing Schedule for Vietnam | Memorandum, "Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for the Circumvention Inquiry Covering the Socialist Republic of Vietnam (Vietnam)," dated April 12, 2023 |
| Silfab's April 19, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated April 19, 2023 |
| Silfab's April 24, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc., "dated April 24, 2023 |
| Silfab's April 26, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated April 26, 2023 |
| Silfab's Hearing Request | Memorandum, "Request for Hearing," dated January 6, 2023 |
| Silfab's March 17, 2023 Rebuttal Brief | Silfab's Letter, "Letter in Lieu of First Tranche Rebuttal Brief of Silfab Solar WA Inc.," dated March 17, 2023 |
| Silfab's March 24, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated March 24, 2023 |
| Silfab's March 6, 2023 Case Brief | Silfab's Letter, "First Tranche Letter in Lieu of Case Brief of Silfab Solar WA Inc.," dated March 6, 2023 |

| | |
|---|---|
| Silfab's May 2, 2022 Comments | Silfab's Letter, "Comments and Factual Information to Rebut, Clarify and Correct Factual Information Contained in Auxin's Request for a Circumvention Ruling, dated May 2, 2022 |
| *Solar CCR Excluding Certain Off-Grid Solar Products* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Changed Circumstances Reviews, and Revocation of Antidumping and Countervailing Duty Orders, in Part*, 86 FR 71616, 71617 (December 17, 2021) (excluding certain off-grid CSPV) |
| Solar Surveys Analysis Memorandum | Memorandum, "Analysis Memorandum Regarding Solar Industry Surveys," dated concurrent with this memorandum. |
| Solar Investigation Scope Clarification Memorandum | Memorandum, "Scope Clarification:  Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, A-570-979, C-570-980," dated March 19, 2012. |
| Solaria Scope Ruling | Memorandum, "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China, and Certain Crystalline Silicon Photovoltaic Product from Taiwan:  The Solar Corporation Scope Ruling," dated April 8, 2021 |
| SunSpark Scope Ruling | Memorandum, "SunSpark Technology Inc. Scope Ruling," dated October 23, 2020 |
| *Thailand* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Thailand," dated December 1, 2022 |
| Thailand RSM | Memoranda, "Circumvention Inquiry With Respect to Thailand:  Respondent Selection," dated May 12, 2022 |
| Third Supplemental Questionnaire | Commerce's Letter, "Third Supplemental Questionnaire," dated September 23, 2022 |
| Trina's April 19, 2023 Case Brief | Trina's Letter, "Trina's Second Tranche Case Brief," dated April 19, 2023 |
| Trina's March 17, 2023 Rebuttal Brief | Trina's Letter, "Trina's First Tranche Rebuttal Brief," dated March 17, 2023 |
| Trina's March 6, 2023 Case Brief | Trina's Letter, "First Tranche Case Brief of Trina," dated March 6, 2023 |
| Trina's May 2, 2022 Comments | Trina's Letter, "Trina's Comments on Auxin's Circumvention Inquiry Request and Factual Information Submission to Rebut, Clarify, or Correct Facial Information Contained in Auxin's Request," dated May 2, 2022 |

| | |
|---|---|
| TTL Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand:  Final Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd.," dated concurrently with this memorandum |
| TTL IQR Part II | TTL's Letter, "May 16, 2022 Anti-Circumvention Inquiry Initial Questionnaire Response," dated June 23, 2022 |
| TTL Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand:  Preliminary Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd.," dated December 1, 2022 |
| TTL's May 9, 2023 Rebuttal Brief | TTL's Letter, "TTL's Second Tranche Rebuttal Brief," dated May 9, 2023 |
| TTL's 1st SQR | TTL's Letter, "First Supplemental Questionnaire," dated August 8, 2022 |
| TTL's 2nd SQR | TTL's Letter, "Second Supplemental Questionnaire," dated August 9, 2022 |
| TTL's 3rd SQR | TTL's Letter, "Third Supplemental Questionnaire," dated October 7, 2022 |
| TTL's 4th SQR | TTL's Letter, "Fourth Supplemental Questionnaire," dated November 2, 2022 |
| TTL's April 26, 2023 Case Brief | TTL's Letter, "TTL's Second Tranche Case Brief," dated April 26, 2023 |
| TTL's April 27, 2023 Rebuttal Brief | TTL's Letter, "Trina's First Tranche Rebuttal Brief," dated April 27, 2023 |
| TTL's Hearing Request | Memorandum, "Request for Public Hearing," dated January 6, 2023 |
| TTL's IQR Part I | TTL's Letter, "May 13, 2022 Anti-Circumvention Inquiry Initial Questionnaire Response," dated June 3, 2022 |
| TTL's May 19, 2022 Comments | TTL's Letter, "Trina's Comments on Potential Certification Requirements," dated May 19, 2022, Thailand. |
| TTL's Verification Report | Memorandum, "Verification of the Information Reported by Trina Solar Science & Technology (Thailand) Co. Ltd.," dated April 19, 2023 |
| Uyghur Forced Labor Prevention Act | Uyghur Forced Labor Prevention Act," U.S CUSTOMS AND BORDER PROTECTION, available at https://www.cbp.gov/trade/forced-labor/UFLPA |
| *Vietnam* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Socialist Republic of Vietnam," dated December 1, 2022 |
| Vietnam Preliminary SV Memo | Commerce's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not, Assembled Into Modules, from the People's Republic of China - Circumvention |

| | |
|---|---|
| | Inquiries with Respect to the Socialist Republic of Vietnam:  Factor Valuation Memorandum," dated December 1, 2022 |
| Vietnam RSM | Memoranda, "Circumvention Inquiry With Respect to the Socialist Republic of Vietnam:  Respondent Selection," dated May 12, 2022 |
| Vina Cell's Q&V Questionnaire | Commerce's Letter, "Vina Cell re:  Quantity and Value Questionnaire for Circumvention Inquiries with Respect to Cambodia, Malaysia, Thailand, and Vietnam," dated March 30, 2022 |
| Vina Cell's Q&V Response | Vina Cell's Letter, "Quantity and Value Questionnaire," dated April 21, 2022 |
| Vina Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Vietnam:  Preliminary Analysis Memorandum for Vina Solar Technology Company Limited," dated December 1, 2022 |
| Vina/LONGi's March 6, 2023 Case Brief | Vina/LONGi's Letter, "Case Brief on General Issues," dated March 6, 2023 |
| Vina's 1st SQR | Vina's Letter, "Vina Solar's Response to the Department's First Supplemental Questionnaire," dated August 10, 2022 |
| Vina's April 19, 2023 Case Brief | Vina's Letter, "Letter in Lieu of Case Brief on Additional Issues," dated April 19, 2023 |
| Vina's April 28, 2023 Rebuttal Brief | Vina's Letter, "Rebuttal Case Brief (Tranche 2) - Vietnam," dated April 28, 2023 |
| Vina's Initial Questionnaire | Commerce's Letter, "Vina Circumvention Inquiry Questionnaire," dated May 16, 2022 |
| Vina's IQR Part I | Vina's Letter, "Vina Solar's Response to Part 1 of the Department's Questionnaire," dated June 7, 2022 |
| Vina's IQR Part II | Vina's Letter, "Vina Solar's Response to Part 2 of the Department's Questionnaire," dated June 23, 2022 |
| Vina's Q&V Questionnaire | Commerce's Letter, "Vina Solar re:  Quantity and Value Questionnaire for Circumvention Inquiries with Respect to Cambodia, Malaysia, Thailand, and Vietnam," dated March 30, 2022 |
| Vina's Q&V Response | Vina's Letter, "Quantity and Value Questionnaire," dated April 21, 2022 |
| Vina's Verification Agenda | Commerce's Letter, "Verification of Vina Solar Technology Company Limited's Questionnaire Responses," dated February 2, 2023 |
| Vina's Verification Memorandum | Memorandum, "Verification of Vina Solar Technology Company Limited," dated April 12, 2023 |
| Vina's Verification Questionnaire | Commerce's Letter, "Verification Preparedness Questionnaire," dated October 12, 2022 |

Barcode:4419744-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Thailand 2022

| VSUN's March 6, 2023 Case Brief | VSUN's Letter, "VSUN's Letter in Lieu of Case Brief," dated March 6, 2023 |
|---|---|

# EXHIBIT 5

Barcode:4419747-02 A-570-979 CIRC - Anti Circumvention Inquiry From Vietnam 2022

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-979/C-570-980
Circumvention Inquiry
Vietnam 2022
**Public Document**
E&C/OIV: JDP/PAO

August 17, 2023

**MEMORANDUM TO:**     Lisa W. Wang
                       Assistant Secretary
                        for Enforcement and Compliance

**FROM:**              James Maeder
                       Deputy Assistant Secretary
                        for Antidumping and Countervailing Duty Operations

**SUBJECT:**           Antidumping and Countervailing Duty Orders on Crystalline
                       Silicon Photovoltaic Cells, Whether or Not Assembled Into
                       Modules, from the People's Republic of China: Issues and
                       Decision Memorandum for the Circumvention Inquiry With
                       Respect to the Socialist Republic of Vietnam

---

# I.    SUMMARY

We have analyzed the case and rebuttal briefs of the interested parties in the circumvention inquiries of the *Orders*.[1]  As a result of our analysis, we continue to find, consistent with the *Preliminary Determination*, that solar cells and modules completed in Vietnam from parts and components manufactured in China, are circumventing the *Orders*.  With regard to Vina, as well as for the eight companies that failed to timely respond to the Q&V questionnaire, we continue to find that they are circumventing the *Orders* and that a country-wide determination is most appropriate to prevent further circumvention of the *Orders* by non-examined producers of inquiry merchandise in Vietnam.  With regard to Boviet, we continue to find that it is not circumventing the *Orders*.  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.  Based on our analysis of the comments received, we made certain changes to the language in the certification.  Below is the complete list of issues for which we received comments and rebuttal comments from interested parties:

## A.    Methodological Issues

Comment 1.    Whether Solar Cells With a p/n Junction Formed Outside of China Should Be
              Subject to Circumvention Inquiries
Comment 2.    Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer
              or the Polysilicon in the Wafer was Produced Outside of China

---

[1] Appendices I, II, and III attached to this memorandum identify  the naming conventions, acronyms and abbreviations (Appendix I), court and case citations (Appendix II), and documents on record (Appendix III)

INTERNATIONAL
**T R A D E**
ADMINISTRATION

Comment 3.   Whether Commerce Should Analyze Investment Data on a Per-Unit Basis
Comment 4.   Whether to Depart from the Section 781(b)(2) "Minor or Insignificant"
             Methodology Applied in the *Preliminary Determination*s
Comment 5.   How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section
             781(b)(2)(E) of the Act
Comment 6.   Whether Material Costs Should Be Included in the Value of Third-Country
             Processing

**B.     Country-Specific Issues**

Comment 7.   Whether Third Country Processing was Minor-General
Comment 8.   Whether VSUN Is Eligible to Participate in the Certification Program
Comment 9.   Whether Commerce's Rejection of Red Sun Q&V Submission was Proper
Comment 10.  Whether Commerce Should Base Surrogate Financial Ratios on Websol Energy's
             Financial Statements

**C.     Overall Determinations**

Comment 11.  Whether Commerce's Country-wide Affirmative Circumvention Determination
             Appropriate
Comment 12.  Affirmative Circumvention Determinations Would not Be Appropriate Under
             Section 781(b)(1)(E) of the Act

**D.     Certification Issues**

Comment 13.  Whether Commerce Should Allow AFA Companies to Certify
Comment 14.  Whether Commerce Should Allow Vina's Affiliates to Certify
Comment 15.  Certification Requirements and Corrections
Comment 16.  Whether Commerce Can Require Certifications for U.S. Entries of Merchandise
             Not Covered by the *Orders*
Comment 17.  Whether Exporters and Importers Should Be Permitted to Submit Multiple
             Certifications, as Applicable
Comment 18.  Whether or Not Companies Found Not to Be Circumventing Should be Required
             to Certify and to Identify Their Wafer Suppliers
Comment 19.  Whether Commerce Should Reconsider Certification Eligibility in Changed
             Circumstances Reviews
Comment 20.  Whether Cadmium Telluride Thin Film Solar Products are Covered by
             Affirmative Final Determinations or Related Certification Requirements
Comment 21.  Clarification and Enforcement of the Utilization Requirement
Comment 22.  Whether the "Wafer-Plus-Three" Requirement is Appropriate

**E.     Other Issues**

Comment 23.  Whether Commerce Properly Placed Ex Parte Memoranda on the Record That
             Concerned the Circumvention Inquiries

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

Comment 24.   Whether Commerce's Determination to Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law

Comment 25.   Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

## II.    BACKGROUND

On December 8, 2022, Commerce published the *Preliminary Determination*.  Between February 6 and 9, 2023, we conducted verification in Vietnam.[2]  Pursuant to section 781(e) of the Act, on May 30, 2023, we notified the ITC of our affirmative preliminary determination of circumvention and informed the ITC of its ability to request consultations with Commerce regarding the possible inclusion of the products in question within the *Orders* pursuant to section 781(e)(2) of the Act.[3]  The ITC did not request consultations with Commerce.

In accordance with 19 CFR 351.309, we invited parties to comment on the *Preliminary Determination* and our verification findings.[4]  Between March 6 and May 9, 2023, parties submitted case and rebuttal briefs.[5]  Additionally, numerous parties requested a hearing.[6]  On July 18, 2023, Commerce held a public hearing.[7]

## III.    SCOPE OF THE *ORDERS*

The merchandise covered by the *Orders* is crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

The *Orders* cover crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone

---

[2] *See* Boviet's Verification Report.
[3] *See* ITC Notification Letter.
[4] *See* First Tranche Briefing Schedule; and Second Tranche Briefing Schedule for Vietnam.
[5] *See* Auxin's March 6, 2023 Case Brief; BYD HK's March 6, 2023 Case Brief; CSIL's March 6, 2023 Case Brief's; First Solar Malaysia's March 6, 2023 Case Brief; First Solar Vietnam's March 6, 2023 Case Brief March 6, 2023 Case Brief; Hanwha's March 6, 2023 Case Brief; Jinko's March 6, 2023 Case Brief; Maxeon's March 6, 2023 Case Brief; New East's March 6, 2023 Case Brief; NextEra's March 6, 2023 Case Brief; Risen's March 6, 2023 Case Brief; Silfab's March 6, 2023 Case Brief; TTL's March 6, 2023 Case Brief's; Vina's March 6, 2023 Case Brief; VSUN's March 6, 2023 Case Brief; Auxin's March 17, 2023 Rebuttal Brief; Boviet's March 17, 2023 Rebuttal Brief; BYD HK's March 17, 2023 Rebuttal Case Brief; CSIL's March 17, 2023 Rebuttal Brief; First Solar Malaysia's March 17, 2023 Rebuttal Brief; First Solar Vietnam's March 17, 2023 Rebuttal Brief; JA Solar, LONGi, Vina and VSUN's March 17, 2023 Rebuttal Brief; Hanwha's March 17, 2023 Rebuttal Brief; Jinko's March 17, 2023 Rebuttal Brief; Maxeon's March 17, 2023 Rebuttal Brief; Next Era's March 17, 2023 Rebuttal Brief; Risen's March 17, 2023 Rebuttal Brief; Silfab's March 17, 2023 Rebuttal Brief; TTL's March 17, 2023 Rebuttal Brief; Auxin's April 19, 2023 Case Brief; CSIL's April 19, 2023 Case Brief; NextEra's April 19, 2023 Case Brief; Trina April 19, 2023 Case Brief; Silfab's April 19, 2023 Case Brief; Vina's April 19, 2023 Case Brief; Red Sun's April 19, 2023 Case Brief; Auxin's April 28, 2023 Rebuttal Brief; Boviet's April 28, 2023 Rebuttal Brief; First Solar's April 28, 2023 Rebuttal Brief; NextEra's April 28, 2023 Rebuttal Brief; and Vina's April 28, 2023 Rebuttal Brief.
[6] *See, e.g.*, Silfab's Hearing Request; Auxin's Hearing Request; TTL and Red Sun Hearing Request; JA Solar Hearing Request; and CSIL Hearing Request.
[7] *See* Hearing Transcript.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

Barcode:4419747-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Vietnam 2022

other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

Merchandise under consideration may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits.  Such parts that otherwise meet the definition of merchandise under consideration are included in the scope of the *Orders*.

Excluded from the scope of the *Orders* are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of the *Orders* are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell.  Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Additionally, excluded from the scope of the *Orders* are panels with surface area from 3,450 mm$^2$ to 33,782 mm$^2$ with one black wire and one red wire (each of type 22 AWG or 24 AWG not more than 206 mm in length when measured from panel extrusion), and not exceeding 2.9 volts, 1.1 amps, and 3.19 watts.  For the purposes of this exclusion, no panel shall contain an internal battery or external computer peripheral ports.

Also excluded from the scope of the *Orders* are:

1)   Off grid crystalline silicon photovoltaic cells (CSPV) panels in rigid form with a glass cover, with the following characteristics:

   (A) A total power output of 100 watts or less per panel;
   (B) a maximum surface area of 8,000 cm2 per panel;
   (C) do not include a built-in inverter;
   (D) must include a permanently connected wire that terminates in either an 8mm male barrel connector, or a two-port rectangular connector with two pins in square housings of different colors;
   (E) must include visible parallel grid collector metallic wire lines every 1–4 millimeters across each solar cell; and
   (F) must be in individual retail packaging (for purposes of this provision, retail packaging typically includes graphics, the product name, its description and/or features, and foam for transport); and

2)   Off grid CSPV panels without a glass cover, with the following characteristics:

   (A) A total power output of 100 watts or less per panel;
   (B) a maximum surface area of 8,000 cm2 per panel;

4

Barcode:4419747-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Vietnam 2022

(C) do not include a built-in inverter;

(D) must include visible parallel grid collector metallic wire lines every 1–4 millimeters across each solar cell; and

(E) each panel is

    1. permanently integrated into a consumer good;

    2. encased in a laminated material without stitching, or

    3. has all of the following characteristics:  (i) the panel is encased in sewn fabric with visible stitching, (ii) includes a mesh zippered storage pocket, and (iii) includes a permanently attached wire that terminates in a female USB–A connector.

In addition, the following CSPV panels are excluded from the scope of the *Orders*:

1)     Off-grid CSPV panels in rigid form with a glass cover, with each of the following physical characteristics, whether or not assembled into a fully completed off-grid hydropanel whose function is conversion of water vapor into liquid water:

    (A) A total power output of no more than 80 watts per panel;

    (B) A surface area of less than 5,000 square centimeters (cm2) per panel;

    (C) Do not include a built-in inverter;

    (D) Do not have a frame around the edges of the panel;

    (E) Include a clear glass back panel; and

    (F) Must include a permanently connected wire that terminates in a two-port rectangular connector.

Additionally excluded from the scope of the Orders are off-grid small portable crystalline silicon photovoltaic panels, with or without a glass cover, with the following characteristics: (1) a total power output of 200 watts or less per panel; (2) a maximum surface area of 16,000 cm2 per panel; (3) no built-in inverter; (4) an integrated handle or a handle attached to the package for ease of carry; (5) one or more integrated kickstands for easy installation or angle adjustment; and (6) a wire of not less than 3 meters either permanently connected or attached to the package that terminates in an 8mm diameter male barrel connector.

Modules, laminates, and panels produced in a third country from cells produced in China are covered by the *Orders*; however, modules, laminates, and panels produced in China from cells produced in a third country are not covered by the *Orders*.

Merchandise covered by the *Orders* is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.71.0000, 8501.72.1000, 8501.72.2000, 8501.72.3000, 8501.72.9000, 8501.80.1000, 8501.80.2000, 8501.80.3000, 8501.80.9000, 8507.20.8010, 8507.20.8031, 8507.20.8041, 8507.20.8061, 8507.20.8091, 8541.42.0010, and 8541.43.0010.  These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of the *Orders* is dispositive.[8]

---

[8] *See Orders*; *see also Solar CCR Excluding Certain Off-Grid Solar Products*.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

## IV.    SCOPE OF THE CIRCUMVENTION INQUIRY

This circumvention inquiry covers:  (A) crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the *Orders*, subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in Vietnam from wafers produced in China; and (B) modules, laminates, and panels consisting of crystalline silicon photovoltaic cells, subject to the exclusions for certain panels in the scope of the *Orders*, whether or not partially or fully assembled into other products, that were produced in Vietnam from wafers produced in China and where more than two of the following components in the module/laminate/panel were produced in China:  (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes.  If modules, laminates, and panels consisting of crystalline silicon photovoltaic cells do not meet both of the conditions in item (B) above, then this circumvention inquiry does not cover the modules, laminates, and panels, or the crystalline silicon photovoltaic cells within the modules, laminates, and panels, even if those crystalline silicon photovoltaic cells were produced in Vietnam from wafers produced in China.  Wafers produced outside of China with polysilicon sourced from China are not considered to be wafers produced in China for purposes of this circumvention inquiry.

## V.    PERIOD OF THE CIRCUMVENTION INQUIRY

The period of the inquiry is January 1, 2008, through December 31, 2021.

## VI.    CHANGES SINCE THE *PRELIMINARY DETERMINATION*

As detailed below and/or in the *Federal Register* notice accompanying this memorandum, we applied AFA to Vina, which precludes it from participating in the certification programs that we established for exports of solar cells and modules from Vietnam.[9]  We are no longer applying AFA to VSUN, which allows it to participate in these certification programs (*see* Comment 8).  For a complete description of our analysis, *see* the *Preliminary Determination*

## VII.    DISCUSSION OF THE ISSUES

**Methodological Issues**

**Comment 1.    Whether Solar Cells With a p/n Junction Formed Outside of China Should Be Subject to the Circumvention Inquiries**

*CSIL*[10]
- Because Commerce has long held that solar cells and modules with a p/n junction formed outside of China are not subject to the *Orders*,[11] solar cells and modules with p/n junctions formed in the four inquiry countries should not be subject to these circumvention inquiries.

---

[9] *See* the accompanying *Federal Register* notice.
[10] *See* CSIL's March 6, 2023 Case Brief at 2-3.
[11] *Id.* at 2 (citing the *Orders*).

6

*Auxin*[12]

- Commerce's practice with respect to the p/n junction does not prevent it from issuing an affirmative circumvention finding that solar cells and modules with a country of origin other than China are covered by the scope of the *Orders*.[13]  Thus, solar cells and modules with a p/n junction formed outside of China should be subject to the circumvention inquiries.

**Commerce's Position:**  We disagree with CSIL.  Commerce previously determined that it is the addition of a p/n junction that transforms a silicon wafer into a solar cell.[14]  Thus, the country where the p/n junction is formed is the country-of-origin of the solar cell.  While products with a country-of-origin other than the country subject to the order are not normally covered by the order, the Act expressly provides an exception to this rule under the circumvention provisions in section 781 of the Act.  Circumvention inquiries under section 781(b) of the Act can bring within the discipline of an order merchandise that would not be subject to the order under a country-of-origin analysis.[15]

The circumvention provisions in section 781(b)(1)(A) of the Act, only require that the merchandise imported into the United States be of the same class or kind as the merchandise produced in the country that is the subject of the order.  It does not require the merchandise to have the same country-of-origin as the merchandise that is the subject of the order.

In fact, "{c}ircumvention can only occur if the articles are from a country not covered by the relevant AD or CVD orders."[16]  To read section 781(b) of the Act as applying to a class or kind of merchandise that is covered by an AD and/or CVD order only when the country of origin of the merchandise is the order country would render section 781(b) of the Act moot.  Hence, there is no basis for not examining the solar cells and solar modules at issue (*i.e.*, solar cells and solar modules where the country-of-origin is Cambodia, Malaysia, Thailand, or Vietnam) in these circumvention inquiries.

**Comment 2.  Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China**

*Whether Wafers Sliced from Chinese Polysilicon Outside of China Should Be Considered a Chinese Input*

Commerce preliminarily defined inquiry merchandise as solar cells produced in Cambodia, Malaysia, Thailand, or Vietnam, from wafers produced in China, and solar modules produced in Cambodia, Malaysia, Thailand, or Vietnam that contain such solar cells where three or more of the following components in the module/laminate/panel were produced in China:  (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6)

---

[12] *Id.* at 9-13; *see also* Auxin's March 17, 2023 Rebuttal Brief at 30-31.
[13] *See* Auxin's March 17, 2023 Rebuttal Brief at 30-31 (citing *Bell Supply CAFC*, 888 F.3d at 1229-31).
[14] *See* Solaria Scope Ruling.
[15] *See 2021 Regulations Final Rule*, 86 FR at 52342.
[16] *See Bell Supply CAFC*, 888 F.3d at 1229.

7

junction boxes.  Commerce also preliminarily determined that wafers produced outside of China using polysilicon sourced from China are not Chinese wafers for purposes of the circumvention inquiries.

*Auxin*[17]

- Commerce should determine that wafers sliced from Chinese-origin polysilicon ingots outside of China are Chinese wafers for purposes of defining inquiry merchandise.
- Commerce's decision to the contrary is arbitrary, inconsistent with record evidence, and undermines its affirmative findings of circumvention.
- Slicing Chinese-origin polysilicon ingots into wafers outside of China does not constitute substantial transformation of the ingot; thus, the wafers remain of Chinese-origin. Significant processing is required to produce polysilicon ingots used to make wafers (*i.e.,* several stages of melting and doping polysilicon, crystal growth, use of 70 percent of the total energy consumed in producing a wafer); whereas slicing the ingots into wafers is minor (*i.e.*, cutting the ingot, submerging it in a chemical bath, cleaning, and inspecting).[18]
- Commerce's decision allows parties to continue to exclusively rely on Chinese-origin materials to produce solar cells and modules and evade AD and CVDs by simply slicing polysilicon ingots into wafers outside of China.  Commerce should not permit this.
- The CAFC held that Commerce has discretion to fashion a remedy in its proceedings that will prevent simple avoidance of AD/CVDs and that it should do so.[19]

*BYD HK*,[20] *CSIL*,[21] *Jinko*,[22] *NextEra*,[23] *TTL*,[24] and *Silfab*[25]

- Granting Auxin's request would inappropriately expand the coverage of the circumvention inquiries which were initiated to examine cell and module assembly outside of China only where "all of the manufacturing process up through the production of wafers takes place in China."[26]  Commerce should reject Auxin's *post hoc* attempts to expand the circumvention inquiries.
- Auxin's argument that the country of origin of the wafer should be based on the location of the polysilicon ingot production because of the significance of that production is undermined by its separate argument that Commerce should determine that any wafer produced from Chinese-origin polysilicon—regardless of where the ingot is produced, is a Chinese wafer for purposes of the circumvention inquiries.[27]

---

[17] *See* Auxin's March 6, 2023 Case Brief at 4-9; *see also* Auxin's March 17, 2023 Rebuttal Brief at 5-13.
[18] *See* Auxin's March 6, 2023 Case Brief at 4-6 (citing Circumvention Request at 18-19 and the *NREL Report* in Exhibit 97).
[19] *Id.* at 7 (citing *Canadian Solar CAFC,* 918 F.3d at 919).
[20] *See* BYD HK's March 17, 2023 Rebuttal Brief at 3-7.
[21] *See* CSIL's March 6, 2023 Rebuttal Brief at 6-10.
[22] *See* Jinko's March 17, 2023 Rebuttal Brief at 1-5.
[23] *See* NextEra's March 17, 2023 Rebuttal Brief at 3-6.
[24] *See* TTL's March 17, 2023 Rebuttal Brief at 3-6.
[25] *See* Silfab's March 17, 2023 Rebuttal Brief at 7-8.
[26] *See* NextEra's March 6, 2023 Case Brief at 5 (citing Circumvention Request at 67).
[27] *See* NextEra's March 17, 2023 Rebuttal Brief at 5 (citing Auxin's March 6, 2023 Case Brief at 5-6).

- Auxin's arguments about the polysilicon and wafer-making processes and substantial transformation are irrelevant because polysilicon and wafers are not subject merchandise.[28]
- Commerce should not examine whether a product is circumventing an AD/CVD order simply because an input into an input in that product comes from the order country. To do so here essentially means that solar cells produced anywhere in the world from Chinese polysilicon would be subject to the *Orders,* which would render the original scope of the *Orders*, *i.e.*, solar cells from China, meaningless.[29]
- Auxin failed to demonstrate how domestic producers of solar cells and modules are harmed by Commerce's decision that wafers produced outside of China using polysilicon sourced from China are not Chinese wafers for purposes of the circumvention inquiries.[30]
- Commerce should exercise its "substantial discretion in interpreting" the circumvention provisions in the Act and continue to find that solar cells made from wafers produced outside of China are not inquiry merchandise. [31]

*Whether Wafers Sliced from Non-Chinese Polysilicon Inside China Should Be Considered a Chinese Input*

*TTL,*[32] *NextEra,*[33] *Maxeon,*[34] *Risen,*[35] and *Jinko*[36]
- Inquiry merchandise should not include solar cells and modules assembled in an inquiry country using Chinese wafers made from non-Chinese polysilicon because Auxin did not request circumvention inquiries with respect to such merchandise. Rather, Auxin requested circumvention inquiries with respect to solar cells and modules produced in an inquiry country where, "all of the manufacturing process up through the production of wafers takes place in China."[37]
- Auxin explained that the examples of circumvention described in its request for circumvention inquiries "involve exporters {in Cambodia, Malaysia, Thailand, and Vietnam} that do not produce polysilicon ingots or wafers — the key upstream inputs in CSPV cells and modules — in those countries, but instead sourced these and other necessary materials and inputs *from China*" (emphasis added).[38] Thus, it is clear that Chinese-origin polysilicon is a key factor in the circumvention inquiries. As such, wafers produced from non-Chinese origin polysilicon should be excluded from the circumvention inquiries.[39]
- Commerce incongruently considers solar cells/modules made in the inquiry countries from non-Chinese wafers containing Chinese polysilicon to be outside the scope of these

---

[28] *See* Jinko's March 17, 2023 Rebuttal Brief at 3.

[29] *Id.* at 2.

[30] *Id.* at 4.

[31] *Id.* at 3.

[32] *See* TTL's March 6, 2023 Case Brief at 3-7; *see also* TTL's March 17, 2023 Rebuttal Brief at 5-6.

[33] *See* NextEra's March 6, 2023 Case Brief at 2-4.

[34] *See* Maxeon's March 6, 2023 Case Brief at 2-3; *see also* Maxeon's March 17, 2023 Rebuttal Brief at 2-3.

[35] *See* Risen's March 6, 2023 Case Brief at 1-5; *see also* Risen's March 17, 2023 Rebuttal Brief at 1-2.

[36] *See* Jinko's March 17, 2023 Rebuttal Brief at 1-5.

[37] *See, e.g.*, NextEra's March 6, 2023 Case Brief at 3 (citing Circumvention Request at 67).

[38] *See* Risen's March 6, 2023 Case Brief at 3.

[39] *Id.*

inquiries, while it considers solar cells/modules made in the inquiry countries from Chinese wafers containing non-Chinese polysilicon to be inquiry merchandise even though those cells and module contain much less Chinese content than the former solar cells/modules. Commerce should correct this inconsistency and find solar cells/modules made in the inquiry countries from Chinese wafers containing non-Chinese polysilicon are not inquiry merchandise.[40]

- It neither makes sense, nor comports with the law, to find solar cells that are assembled in the inquiry countries from non-Chinese polysilicon to be circumventing the *Orders* when the value added in China for such solar cells may be less than 33 percent of the total value of the solar cell.[41] A circumvention determination that is not properly targeted to provide relief only for cell assembly in a third country that is truly circumventing the *Orders* will exacerbate the solar cell shortages faced by module assemblers in the United States.[42]

- Moreover, because the value of the polysilicon in solar cells/modules is a significant portion of the total value of the solar cells/modules, if the wafers in those products were made from non-Chinese polysilicon it is less likely that the solar cells and modules would meet the criterion for finding circumvention under section 781(b)(1)(D) of the Act (*i.e.,* the value of the merchandise produced in the order country is a significant portion of the total value of the merchandise exported to the United States).[43]

- Under certain existing measures, CBP already requires U.S. importers to identify the origin of the polysilicon in imported solar modules.[44] Thus, administration of a decision that solar cells/modules with wafers containing non-Chinese polysilicon are not inquiry merchandise would not be burdensome.

*Auxin*[45]

- Auxin's request for circumvention inquiries was not limited to solar cells and modules that contain Chinese-origin polysilicon; rather Auxin requested that Commerce initiate circumvention inquiries with respect to solar cells and modules assembled in the inquiry countries where "the vast majority of the materials and equipment … {were} sourced from China."[46]

- Auxin's description of inquiry merchandise as solar cells and modules produced in an inquiry country where, "all of the manufacturing process up through the production of wafers takes place in China," was simply a factual description of the nature of the circumvention that was occurring.[47]

---

[40] *See* TTL's March 6, 2023 Case Brief at 6-7 (citing TTL's May 19, 2022, and JA Solar's May 2, 2022 Comments at Exhibit 2).

[41] *See* Maxeon's March 6, 2023 Case Brief at 2-3 (citing *NREL Report* included in NextEra May 2, 2022 Comments at Attachment 24).

[42] *Id.* at 3.

[43] *See* NextEra's March 6, 2023 Case Brief at 3 (citing the *NREL Report* in NextEra's May 2, 2022 Comments at Attachment 24).

[44] *See* Risen's March 6, 2023 Case Brief at 3; *see also* TTL's March 6, 2023 Case Brief at 7 (citing *DHS Order Re: Forced Labor in Xinjiang*; *see also* the Uyghur Forced Labor Prevention Act).

[45] *See* Auxin's March 17, 2023 Rebuttal Brief at 6-13.

[46] *Id.* at 11.

[47] *Id.* at 9.

10

- In order to find circumvention, the Act requires, among other things, that the merchandise imported into the United States be assembled in a foreign country from merchandise produced in the order country and that the value of the merchandise produced in the order country be a significant portion of the total value of the imported merchandise. The Act does not require that every component assembled in the foreign country be sourced from the order country.
- Polysilicon accounts for less than 10 percent of the cost of a solar module.[48] It makes no sense to exclude solar modules made with non-Chinese polysilicon from inquiry merchandise when all the other module components, representing over 90 percent of the value of the module, may have been sourced from China.

**Commerce's Position:** For purposes of this inquiry, we have continued to find that a wafer is produced in China if the ingot was sliced to form the wafer in China. The circumvention provisions under section 781(b) of the Act involve merchandise imported into the United States that was completed or assembled in a foreign country from merchandise that was produced in the order country. The phrase "produced in" is not further explained or defined in the Act. We find the Senate Report concerning the Omnibus and Trade Competitiveness Act of 1988, and other sections of the circumvention provisions in the Act provide insights into how to properly apply the phrase "produced in" to the present facts.

When Congress passed the Omnibus and Trade Competitiveness Act in 1988, it explained that section 781 of the Act "addresses situations where 'parts and components … are *sent* from the country subject to the order to the third country for assembly and completion"[49] (emphasis added). Additionally, section 781(b)(1)(c) of the Act provides that when determining whether an AD or CVD order should cover merchandise assembled or completed in a third-country, Commerce should examine whether third-country imports of the merchandise that was produced in the order country and assembled or completed in that third country increased after initiation of the investigation that led to the order. These provisions, which indicate that the focus is on the part or component exported (sent) from the order country in the form ultimately used in the finished product in the third country, taken together with the "produced in" requirement, lead us to conclude that the "production" that must occur in the order country involves those production steps that transform the raw materials into the part or component that is sent to the third country for assembly into the finished product. In other words, we have considered merchandise to be "produced in" the order country for purposes of section 781(b)(1)(B)(ii) of the Act if the final manufacturing step occurs there.

Auxin identified three stages of wafer production: (1) refining polysilicon; (2) forming the refined polysilicon into an ingot; and (3) processing the ingot into wafers.[50] Only the last stage of production results in the merchandise that was shipped from China to the inquiry countries for assembly and completion into solar cells and solar modules. Neither of the intermediate products produced in this process (refined polysilicon and polysilicon ingots) is the merchandise that was shipped/exported to the third country for assembly into the final product. Hence, wafers processed outside of China from ingots made of Chinese polysilicon do not satisfy the "produced

---

[48] *Id.* at 12 (citing the *NREL Report* in NextEra's May 2, 2022 Comments at PDF page 496).
[49] *See Senate Report 100-71* at 101.
[50] *See, e.g.*, Circumvention Request at 15.

11

Barcode:4419747-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Vietnam 2022

in" the order country requirement of section 781(b)(1)(B)(ii) of the Act (the production step that resulted in the part or component that is used in completion or assembly in the third country (the wafer) did not occur in China). Similarly, wafers processed in China from ingots made of non-Chinese polysilicon do satisfy the "produced in" the order country requirement of section 781(b)(1)(B)(ii) of the Act (the production step that resulted in the part or component (the wafer) that is used in completion or assembly in the third country occurred in China).

Auxin contends that Commerce should conduct a substantial transformation analysis and find that wafers processed outside of China from ingots made of Chinese polysilicon are "produced in" China for purposes of section 781(b)(1)(B)(ii) of the Act because minimal processing is required to process an ingot into wafers. However, we do not find that a substantial transformation analysis is the appropriate analysis here.

Commerce typically conducts a substantial transformation analysis to determine whether the country of origin of a product that is within the class or kind of merchandise covered by an AD/CVD order, is the country covered that order. First, wafers are not in a class or kind of merchandise covered by any AD/CVD order. Second, the only requirement in section 781(b)(1)(B)(ii) of the Act is that the merchandise be "produced in the foreign country with respect to which such order or finding applies" not that its country of origin is the country to which such order or finding applies. Thus, we need only identify the country where the raw materials were transformed into the part or component that was used in assembly in the inquiry country. There is no need to consider the substantial transformation criteria (*e.g.*, the class or kind of the upstream and downstream products, where the essential component of the product is substantially transformed, and the extent and value of the processing) to identify the country where the ingots are sliced into wafers, thus forming the product that was used as an input. Consequently, we have not used a substantial transformation analysis to determine whether wafers were "produced in" China for purposes of section 781(b)(1)(B)(ii) of the Act where the relevant production steps occurred in multiple countries.

While Auxin contends that Commerce's focus on the country where the ingot was sliced into wafers allows parties to evade AD and CVDs by simply slicing Chinese polysilicon ingots into wafers outside of China, Auxin did not point to anything in the Act or Commerce's practice in circumvention cases that compels Commerce to determine that a component was "produced in" the order country for purposes of section 781(b)(1)(B)(ii) of the Act based on where an input into that component was produced. There is no mention in section 781(b)(1)(B)(ii) of the Act of inputs into components. Rather, section 781(b)(1)(B)(ii) of the Act requires that the component that was assembled in the third country be produced in the order country. Moreover, in prior circumvention inquiries involving merchandise completed or assembled in third countries, Commerce focused its analysis on where the component that was assembled into the finished product in the third country was produced, not where the materials that were used to produce the component were produced. For example, in *CORE from China (UAE)*,[51] which typically involved processing HRS made in China into CORE in the UAE, Commerce did not consider where the iron ore or billets that were used to make the HRS were sourced, but rather it considered where the HRS was produced.

---

[51] *See CORE from China (UAE) Final*, 85 FR at 41957.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

We find that the country in which the ingot is sliced to form the wafer is, pursuant to the language in section 781(b)(1)(B)(ii) of the Act, the most reasonable interpretation of where the wafer is produced.  To the extent that this raises evasion concerns, we do not find that such concerns are sufficient to warrant a deviation from our interpretation of the statute.  Indeed, Auxin's proposed alternative would potentially require Commerce to find circumvention based on wafers that, in our interpretation, are not "produced" in China.  While this alternative may address evasion concerns, it is contrary to the statute, and therefore, impermissible.

We also disagree with interested parties' arguments that Auxin's request for these circumvention inquiries established that inquiry merchandise must contain wafers made from Chinese-origin polysilicon.  Although Auxin noted in its request that all the manufacturing processes for the merchandise subject to the inquiries, up through the production of wafers, takes place in China, Auxin appears to have been describing the existing situation that it viewed as constituting circumvention.  In fact, Auxin explained in its request that "{r}easonably available evidence establishes that certain companies may complete the production process through polysilicon refinement, ingot formation, and the production of the wafers in China, after which the wafers are converted to CSPV cells in the third country using additional and substantial Chinese-origin components."[52]  However, the circumvention inquiries that Auxin specifically requested, and on which Commerce initiated, cover solar cells and modules assembled and completed in Cambodia, Malaysia, Thailand, or Vietnam using Chinese-produced inputs, not necessarily Chinese-produced inputs where all the materials that were used to produce the input in China were also produced in China.

Interested parties that oppose finding circumvention also argued that it makes no sense to find solar cells and solar modules containing wafers made from non-Chinese polysilicon to be circumventing the *Orders*, because the wafers in those solar cells and modules have very little Chinese content.  However, those parties did not provide a basis in the Act, Commerce's regulations, or its practice, for interpreting the "produced in" the order country requirement in section 781(b)(1)(B)(ii) of the Act as a content percentage requirement.  Rather, the plain meaning of "produced" is to make from components or raw materials.  Thus, "produced in" the order country means the production steps that transformed the raw materials into the part or component that is sent to the third country for assembly into the finished product occurred in the order country.

Therefore, based on the foregoing, we consider wafers to be a product of China if the ingot was sliced to form the wafer in China.  As a result, we have not defined inquiry merchandise as solar cells and solar modules assembled in an inquiry country from wafers produced outside of China using Chinese polysilicon (as advocated by Auxin), and we have not excluded from our definition of inquiry merchandise solar cells and solar modules assembled in an inquiry country from wafers produced inside China using polysilicon produced outside of China (as advocated by parties opposed to finding circumvention).

Lastly, certain interested parties argued that determining whether wafers were produced in China based on the country-of-origin of the polysilicon in the wafer would not be administratively burdensome because under certain existing measures, CBP already requires U.S. importers to

---

[52] *See* Circumvention Request at 27.

identify the origin of the polysilicon in imported solar modules. Because we deem the country of origin of polysilicon to be irrelevant to the question of whether a wafer is produced in China, this argument is moot. In any case, it is not clear that it is administratively feasible to uniformly apply "percentage-of-Chinese-content" or "source-of-component-inputs" definitions of the phrase "produced in" in section 781(b)(1)(B)(ii) of the Act to all the components that could be exported from China to the inquiry countries for assembly into solar cells and solar modules (such as aluminum frames, junction boxes, etc.). Such a rule appears to be complicated and administratively burdensome given that there could be as many as 100 different inputs used to produce a solar module.

## Comment 3.   Whether Commerce Should Analyze Investment Data on a Per-Unit Basis

*NextEra*[53]

- Commerce must consider the large upstream industry in China that supplies virtually all of the world's demand for wafers. Failing to do so results in an overly simplistic and distortive comparison that does not properly account for differences in scale and market structure.
- Consistent with legislative history, Commerce's past practice, and congressional intent, an alternative approach is warranted in this case. Commerce has also acknowledged that there is no one-size-fits-all approach and that it may determine an appropriate analysis. Thus, Commerce should analyze investment on a per-unit basis for these final determinations.
- Commerce has the data needed to calculate the investment of mandatory respondents on a per-megawatt basis, which allows Commerce to account for differences in scale, market size, and demand, and thus more accurately compare the size of investments in the two countries.

*Auxin*[54]

- NextEra argues that a per-MW analysis is more appropriate because it accounts for differences in scale, market size, and demand, and thus more accurately compares the size of investments in the two countries.[55]
- However, it has been Commerce's practice under section 781(b)(2) of the Act to evaluate the absolute level of investment, as opposed to the per-unit level of investment, because it is a proper and relevant analysis for identifying the level of investment in the third country.[56]
- Commerce's practice is grounded in the recognition that per-unit levels of investment can be distortive, fail to reflect initial threshold levels of investment, and thus fail to capture circumventing activity.
- CSPV production facilities in China require significant threshold levels of investment to capitalize on economies of scale. Commerce should therefore follow its practice and compare the absolute level of investment rather than the per-unit level of investment.

---

[53] *See* NextEra's March 24, 2023 Case Brief at 20-22.
[54] *See* Auxin's April 3, 2023 Rebuttal Brief at 36-41.
[55] *Id.* (citing NextEra's March 24, 2023 Case Brief at 20-22).
[56] *Id.* (citing *CORE from China (Vietnam)*, *CORE from China (UAE)*; and *CRS from China (Vietnam)*).

14

- In *CORE from China (Vietnam)*, Commerce rejected per-unit comparisons because comparing per-unit investment overlooks the relative requirements for establishing integrated production facilities in China, as compared with processing facilities in the third country, as they dilute the large necessary initial investments required by the volume of the facilities.[57]
- If Commerce were to utilize a per-unit comparison, it would delay closing the circumvention loophole because only when the circumventing company achieved scale would it achieve a per-unit investment figure that approaches the per-unit investment figure of a fully scaled production facility in the original country.
- Benefiting from economies of scale is crucial to realize lower per-megawatt investment costs for polysilicon, ingot and wafer manufacturing.
- NextEra fails to recognize that Chinese over-investment in its CSPV production process has decimated the industry in the United States and allowed Chinese producers to realize lower per-unit costs.
- Commerce should continue to evaluate the level of investment on an absolute basis because such an analysis is consistent with Commerce's practice and ensures that China's industrial policy, heavy subsidies to its PV industry, and other non-market practices do not distort Commerce's overall analysis by failing to capture initial threshold levels of investment in China.

**Commerce's Position:** We agree with Auxin that Commerce should evaluate investment on an absolute basis as opposed to a per-unit basis. For these final determinations, we continue to find that the absolute level of investment is a proper and relevant analysis for evaluating the level of investment in Vietnam under section 781(b)(2)(A) of the Act.

The statute does not instruct Commerce to employ a particular analysis when evaluating the level of investment in the foreign country for purposes of section 781(b)(2)(A) of the Act. Given the statute's silence on the issue, Commerce may determine an appropriate analysis to apply. We find that a comparison between the level of investment in the third country and the level of investment of respondents' Chinese affiliates, on an absolute as opposed to a per-megawatt basis, is a proper and relevant analysis for identifying "the level of investment in the third country" under the Act. We disagree with NextEra's argument that we should compare the levels of investment on a per-unit basis because we find the proposed alternative of adjusting for per-unit production capacity to be inappropriate in this case. Comparing per-unit investment overlooks the relative requirements of establishing ingot and wafer production facilities in China, as compared with the cell and module production facilities in Vietnam, as this would dilute the large necessary initial investments required by the production volume of the facilities.

Accounting for the threshold level of investment in the Chinese facilities, therefore, captures the investment in the production process that would otherwise be ignored if we were to compare per-unit investment or that would otherwise not be representative if we adjusted for capacity. Thus, the absolute level of investment of the finishing process relative to the production process of the respondents' affiliates is the appropriate comparison.

---

[57] *Id.* (citing *CORE from China (Vietnam)*).

In addition to the high levels of investments and large manufacturing facilities required for ingot and wafer manufacturing, the size of China's solar industry can also have a direct impact on the economies of scale that can be realized, allowing ingot and wafer manufacturers to realize lower per-unit investment costs, and thus distorting our analysis. China's dominance in the global ingot and wafer manufacturing capacity means Chinese ingot and wafer producers are able to benefit from economies of scale in order to achieve lower per-unit investment costs. China currently accounts for 97 percent of global wafer manufacturing capacity, a feat achieved thanks to economies of scale, supply chain integration, and government support.[58] China has a lower global manufacturing capacity for cells and modules, accounting for 80 percent and 70 percent of the world's production capacity, respectively.[59] China's ingot and wafer manufacturing industries have therefore been able to benefit heavily from economies of scale, they have been able to achieve steep drops in manufacturing costs at every step of the production process, thus diluting investment amounts in a per-unit figures analysis.[60]

As explained above, the much larger threshold levels of investment required to establish ingot and wafer manufacturing facilities and the resulting economies of scale distort the investment figures for a per-unit analysis. Therefore, with respect to section 781(b)(2)(A) of the Act, we have continued to compare the investments of the cell and module production process in Vietnam to investments of the ingot and wafer production process in China on an absolute basis.

**Comment 4.   Whether to Depart from the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the *Preliminary Determination*s**

*Auxin*[61]

*Commerce Arbitrarily Broke with its Longstanding Practice Without Explanation*
- Commerce departed from its longstanding merchandise-centric comparative methodology when conducting its "minor or insignificant" analysis under section 781(b)(1)(C) of the Act in favor of a new affiliate-centric approach without explanation. Commerce is required to explain the reasons for a departure from its practice. Its failure to do so here is arbitrary and unlawful.[62]
- Since 2012, Commerce has applied a consistent merchandise-centric comparative methodology, which follows the flow of goods, when conducting its "minor or insignificant" analysis under sections 781(b)(1)(C) and (b)(2) of the Act. This approach has been applied by Commerce in circumvention cases involving a broad range of merchandise and industries.[63]

---

[58] *See* Auxin's July 29, 2022 Comments at Exhibit 1 (citing IEA Report at 24).

[59] *Id.* (citing IEA Report at 24-27).

[60] *Id.* (citing IEA Report at 17); *see also* Auxin's April 3, 2023 Rebuttal Brief at 39-41.

[61] *See* Auxin's April 19, 2023 Case Brief at 1-29, 32-35, and 48-55.

[62] *Id.* (citing *Save Domestic Oil*, 357 F.3d at 1283; and *Encino Motorcars*, 579 U.S. at 212).

[63] In all of the following cases cited in Auxin's April 19, 2023 Case Brief, Commerce compares operations, R&D and investment in the third country to the order country with identifying affiliation as a consideration: In *SDGE from China (UK)*, Commerce explained that "the purpose of the analysis set out in sections 781(b)(1)(C) and (b)(2)(E) of the Act is to evaluate whether a process is minor or insignificant within the context of the totality of the production of subject merchandise. That is, {Commerce's} analysis addresses the relative size and significance of

16

- Commerce's approach has been affirmed by the CIT as a reasonable interpretation of the circumvention statue and consistent with its past practice in section 781(b) cases. Specifically, the CIT explained that "a determination of the third country's portion of the total sum of investment is useful to gauge the level of investment in a third country. Comparative analysis helps also to ensure that larger companies with much smaller operations in a third country – operations that may appear significant in absolute terms given the size of the firm, but that comprise a small share of total operations – will not be able to elude an AD/CVD order simply on account of the firm's large overall size. Accordingly, a comparative analysis was reasonable."[64]

- The CIT affirmed Commerce's analysis, in part, because it was consistent with Commerce's longstanding practice. The CIT noted that Commerce had a longstanding practice of "us{ing} a similar type of comparative analysis and arrived at similar conclusions" and therefore Commerce's merchandise-centric comparative methodology "aligns with its past practice."[65]

- In recent cases Commerce has continued to apply its merchandise-centric comparative framework comparing the production steps taken by the mandatory respondents in those cases to the entire production process in the order country.[66]

- In *SDGE from China (UK)*, *CORE from China (Vietnam)*, *CRS from China (Vietnam)*, and *HFC from China (India)*, Commerce found the process of completion in the third country to be minor or insignificant even when the respondents were not affiliated with producers or exporters in the country subject to the order.[67]

- Commerce's affiliate-centric methodology is inconsistent with the language and purpose of the statute as it raises affiliation to a mandatory criterion for finding circumvention.

- Sections 781(b)(1)(C) and 781(b)(2) of the Act do not instruct Commerce to consider affiliation when determining whether the process of assembly or completion is minor or insignificant. Under section 781(b) of the Act, only sub-paragraph (3) specifies affiliation as a consideration.

---

the processing provided by {the respondent} in comparison to the processing necessary to produce the overall finished product." *See SDGE from China (UK)*, 77 FR at 47599. In *PET Film from the UAE (Bahrain)*, Commerce repeated that under its section 781(b) of the Act analysis, "{i}t is appropriate to compare the cost of the process and completion in the third-country facilities with the cost of the process and completion of the facilities needed to produce the subject merchandise in the home country." *See PET Film from the UAE (Bahrain)* IDM at Issue 2; In *CORE from China (Vietnam)*, Commerce again reiterated that its practice has been to "compare the total investment required (as well as, separately, the R&D, production process, and facilities) from the beginning of the production process in the country subject to an antidumping or countervailing duty order to the investment required (as well as, separately, the R&D, production process, and facilities) to finish the final product in a third country, rather than to compare the investments (as well as, separately, the R&D production process, and facilities) required to perform the same finishing steps in each country." *See CRS from China (Vietnam)* IDM at Comment 5; *CORE from Taiwan (Malaysia)* IDM at Comment 1; *OCTG from China* (*Brunei and the Philippines)* IDM at Comment 1; and *HFCs from China (India)* IDM at Comment 3.

[64] *See* Auxin's April 19, 2023 Case Brief (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368).
[65] *Id.*
[66] *Id.* (citing *SSSS from China (Vietnam) Preliminary* PDM at 20; *see also Pipe and Tube from India (UAE and Oman)* IDM at Comment 6).
[67] *Id.* (citing *SDGE from China (UK)*, 77 FR at 47600; *CORE from China (Vietnam)* IDM at Comment 12; *CRS from China (Vietnam)* IDM at Comment 12; and *HFC from China (India) Preliminary* PDM at 22, unchanged in *HFC from China (India)*.

17

- Commerce's affiliate-centric methodology allows unaffiliated entities to circumvent AD/CVD orders with impunity, such that, many of Commerce's previous affirmative findings of circumvention since 2012 would now require a negative finding of circumvention under this framework. Not only is this requirement unnecessary, but it contradicts frequent Commerce determinations that affiliation is not a necessary condition for circumvention.[68]

- Commerce's condition that it will only consider affiliated operations in the order country as a basis for comparison would allow a party to easily evade detection of circumvention by selling inputs through an unaffiliated trading company in the order country.

- When amending the circumvention statute as part of the implementation of the URAA, Congress codified the "minor or insignificant" standard Commerce had already been using, thereby endorsing the overall production process (*i.e.*, merchandise-centric) comparative framework.[69]

- In post-URAA cases, Commerce continued to adopt a merchandise-centric comparative framework to analyze third country assembly operations in the context of the totality of the production of subject merchandise.[70]

- In *Diamond Sawblades from China (Thailand)* and *Aluminum Extrusions from China (Vietnam)*, Commerce again described its practice of analyzing the significance of the assembly and completion process in the third country relative to the full production process for the subject merchandise, noting that it is consistent with prior practice.[71]

- In *Plywood from China (Vietnam) Preliminary*, Commerce compared third country assembly operations to the full production process of subject merchandise in the country subject to the order.[72]

- Commerce has continued up until this case to follow its practice of comparing third country assembly operations to the full production process of subject merchandise in the country subject to the order.[73]

- It is rare that Commerce has not conducted a minor or insignificant comparative analysis, and only when the record of a proceeding lacked sufficient data for such an analysis or

---

[68] *Id.* (citing *Butt-Weld Pipe Fittings from China (Thailand)* IDM at Comment 3, where Commerce explained that "a relationship between the Chinese manufacturer and Thai converter/exporter is not a necessary condition for finding circumvention" and "{i}t is possible for circumvention to occur between unrelated companies."; In *Brass Sheet and Strip from Canada* IDM at Comment 5 Commerce mentioned "{w}hile we have noted that it is 'more likely' for related parties to engage in circumvention activity, a relationship between the exporter and importer is not a necessary condition for finding circumvention. While circumvention may be more likely to occur between related parties, it is also possible for circumvention to occur between unrelated companies"; In *CORE from China (Vietnam)* IDM at Comment 12; and *CRS from China (Vietnam)* IDM at Comment 12 Commerce once again reiterated recently that the "lack of affiliation does not constitute evidence that circumvention is not occurring.").

[69] *Id.* (citing *Granular PTFE Resin from Italy*).

[70] *Id.* (citing *Tissue Paper from China (Vietnam) Preliminary Determination*, 73 FR at 21584, unchanged in *Tissue Paper from China (Vietnam) Final Determination* IDM).

[71] *Id.* (citing *Diamond Sawblades (Thailand)* IDM at Comment 3; and *Aluminum Extrusions from China (Vietnam)* IDM at 9).

[72] *Id.* (citing *Plywood from China (Vietnam) Preliminary*).

[73] *Id.* (citing *LWR from China (Vietnam) Preliminary* PDM at 20; *LWR from Taiwan (Vietnam) Preliminary* PDM at 13; and *Circular Welded Carbon-Quality Steel Pipe from China (Vietnam) Preliminary* PDM at 18).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

when the third country operations being evaluated pre-dated the issuance of the relevant order.[74]

- In departing from its established practice in the *Preliminary Determinations*, Commerce did not conclude that the record lacked sufficient data or that the respondents' operations pre-dated the issuance of the order.

- In *Hot-Rolled Lead and Bismuth*, Commerce acknowledged that it was departing from comparing to a fully integrated producer explaining that "rolling mills which subsequently roll lead billets into hot-rolled lead bar predate the order and have always been considered a distinct part of the industry."[75]

- In *Ferrovanadium from Russia Final Determination*, Commerce rejected petitioner's "argument that {Commerce} should compare the U.S. vanadium pentoxide process to the overall ferrovanadium process" finding that such an analysis was "misplaced in this case."[76]  Commerce acknowledged the standard practice and explained that "{w}here the company completing the processing is unaffiliated to foreign producers/exporters and the processing activity … existed prior to the antidumping order, {Commerce} finds the analysis which it employed for the Preliminary Results of U.S. processing activity without comparison to overall production activities is the appropriate analysis."[77]

- For Boviet, there is no record evidence demonstrating that the company was established before the imposition of the *Orders* and Boviet is affiliated with a Chinese exporter of solar cells and modules.  Thus, Commerce's reasoning in *Ferrovanadium from Russia Final Determination* does not justify a departure from its comparative minor or insignificant methodology with respect to Boviet.

*Commerce's Approach Results in It Ignoring the Most Important Stage of Production*

- Commerce's affiliate-centric approach results in its analysis ignoring the first stage of the production process:  the mining and refining of solar-grade polysilicon.[78]  As noted by the ITC, polysilicon is the "main underlying raw material input" for solar cells.[79]  Commerce has previously recognized that "{b}y any reasonable measurement, polysilicon is the most important input used in solar modules."[80]

- Producing and achieving the requisite level of purity for solar-grade polysilicon "requires large capital investments to build a plant, large corporate investment to learn and refine the production process, highly skilled labor to operate the plant, and low electricity costs due to the large amount of energy needed to produce polysilicon."[81]

---

[74] *See* Auxin's April 19, 2023 Case Brief (citing *Uncovered Innerspring Units from China (Malaysia) Preliminary Determination*, 80 FR at 64393 ("Because Goldon failed to respond to the questionnaire, the record does not contain complete information regarding the factors set forth in section 781(b)"), unchanged in *Uncovered Innerspring Units from China (Malaysia) Final Determination*, 80 FR at 74758; and *Tissue Paper from China (Thailand) Final Determination* (applying AFA to the respondent for "refus{ing} to respond to the {Commerce's} questionnaire")).
[75] *Id.* (citing *Hot-Rolled Lead and Bismuth* IDM at Comment 5).
[76] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 1; *see also Ferrovanadium from Russia Preliminary Determination*, 77 FR at 6537.
[77] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 1).
[78] *Id.* (citing *Vietnam* PDM at 18).
[79] *Id.* (citing *ITC Solar Monitoring* at I-60 and VI-1).
[80] *Id.* (citing *Solar Cells from China 2017-2018 AR* IDM at Comment 4).
[81] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5).

19

- Auxin's circumvention request explicitly identified production of solar-grade polysilicon in China as the first stage of solar cell/module production.[82]
- The statute requires Commerce to "determine whether the difference between the value of the merchandise imported into a third country {for further processing} and the value of the completed merchandise exported to the United States is small."[83]  Consistent with the statutory language, Commerce began assessing third-country production "within the context of the overall production process."[84]  Commerce consistently adopted this approach in its pre- URAA circumvention inquiries.[85]
- Auxin uploaded information on the record showing that the average investment required to produce subject merchandise in China is $4.7 billion.  Should Commerce change its analysis for the final to a "merchandise-centric approach" it should compare third country operations to the $4.7 billion.[86]
- IEA and DOE reports placed on the record by Auxin note that polysilicon, ingots, and wafers require a higher level of investment compared to solar cell and module production.[87]

*NextEra*[88] and *Boviet*[89]

*The Act Does Not Mandate a Specific Methodology Under Section 781(b)(2)*

- Auxin's comments overgeneralize past practice and fail to appreciate that Commerce's analysis will "vary from case to case depending on the particular circumstances unique to each circumvention inquiry."[90]
- While section 781(b)(2) of the Act does not instruct Commerce to consider affiliation when determining whether the process of assembly or completion in a third country is minor or insignificant, the statute does not preclude Commerce from considering affiliation.  Commerce has stated that it has the discretion under the circumvention statute to determine the appropriate minor or insignificant analysis under section 781(b)(2) "depending on the totality of the circumstances of the particular anti-circumvention inquiry."[91]  Thus, Auxin reads a limitation into the statute where one does not exist.
- Although the CAFC may have upheld Commerce's merchandise-centric approach in *Al Ghurair CAFC 2023*, the CAFC noted in that case that "Commerce is not bound by its prior determinations" if there is reason to deviate from past practice.[92]
- In the CIT *Al Ghurair* determination that the CAFC affirmed in *Al Ghurair CAFC 2023*, the CIT prefaced its decision by stating that "the statute does not outline a specific

---

[82] *Id.* (citing Circumvention Request at 27).
[83] *Id.* (citing SAA at 893).
[84] *Id.* (citing *Granular PTFE Resin from Italy*, 58 FR at 26102).
[85] *Id.* (citing *Butt-Weld Pipe Fittings from China (Thailand)*, 59 FR at 15156; and *Brass Sheet and Strip from Canada* IDM at Comment 2).
[86] *Id.* (citing Auxin's July 29, 2022 Investment and R&D Information).
[87] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5; and Auxin's July 29, 2022 Investment and R&D submission at Exhibit 1).
[88] *See* NextEra's April 28, 2023 Rebuttal Brief at 4-19.
[89] *See* Boviet's April 28, 2023 Rebuttal Brief at 1-10.
[90] *Id.* (citing *Vietnam* PDM at 16)
[91] *See* NextEra's April 28, 2023 Rebuttal Brief (citing *CORE from China (Vietnam)* IDM at 7).
[92] *Id.* (citing *Al Ghurair CAFC 2023*, 65 F.4th at 1351).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

methodology for Commerce to follow to determine the level of investment."[93]  The CIT further explained that when there is an absence of a designated methodology, Commerce has the discretion on its own method of analysis.[94]

- Congress did not mandate a rigid one-size-fits-all methodology for circumvention out of "recognition that different cases present different factual situations."[95]  Instead, it granted Commerce "substantial discretion in interpreting the {} terms" of section 781(b) "so as to allow it flexibility to apply the provisions in an appropriate manner" in each case.[96]  Commerce reasonably exercised this discretion and determined to make an affiliation comparison for its analysis for certain factors.

- The SAA explains that "Commerce will evaluate each of {the statutory} factors as they exist either in the United States or a third country, depending on the particular circumvention scenario."[97]  This guidance has been adopted in various circumvention cases cited by Auxin, including *PET Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia)*, *HFCs from China (India)*, *OCTG from China (Philippines and Brunei)*.[98]

- Commerce has repeatedly stated that its analysis must be tailored to the particular facts of the case,[99] based on the "factors as they exist in the third country, depending on the totality of the circumstances of the particular anti-circumvention inquiry."[100]

- As such, Auxin is incorrect that its "merchandise-centric" analysis is appropriate because it is product and industry neutral.  Instead, Commerce's analysis must be tailored to the specific facts of the circumvention inquiries.

*Commerce's Reliance on Affiliation Accurately Represents Auxin's Request*

- Commerce's affiliate-centric approach is consistent with Auxin's original request for circumvention and record evidence.  Auxin's circumvention request defined the alleged circumventing activity as "assemblers of CSPV cells and modules … that use affiliated Chinese input suppliers and a fully integrated Chinese supply chain to circumvent the existing Orders."[101]  Moreover, Auxin clarified that its allegations "rely heavily upon the relationships between certain Chinese input suppliers and their affiliates in the targeted third countries," and claimed that the affiliation relationships " narrow{} the alleged circumvention activity in this petition to major Chinese companies that use other countries as export platforms."[102]  Auxin specifically framed its circumvention request

---

[93] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368).

[94] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368 (citing *Timken Co.*, 968 F. Supp. 2d at 1286 n.7, *aff'd* 589 F. App'x 995 (Fed. Cir. 2015))).

[95] *Id.* (citing *Senate Report 100-71* at 100).

[96] *Id.* (citing *Senate Report 100-71* at 100; and *Ausimont*, 882 F. Supp. at 1098).

[97] *Id.* (citing *SAA* at 893)

[98] *Id.* (citing *PET Film from the UAE (Bahrain) Preliminary* PDM at 5; *CRS from China (Vietnam)* IDM at comment 5; *CORE from Taiwan (Malaysia)* IDM at 19-20; *HFCs from China (India) Preliminary* PDM at 17; and *OCTG from China (Philippines and Brunei) Preliminary* PDM at 9).

[99] *Id.* (citing *PET Film from the UAE (Bahrain) Preliminary* PDM at 5; *CORE from China (Vietnam)* IDM at 7).

[100] *Id.* (citing *CORE from China (Vietnam)* IDM at 7; *CRS from China (Vietnam)* IDM at comment 5;  *HFCs from China (India) Preliminary* PDM at 11-12, 17; *CORE from Taiwan (Malaysia)* IDM at 8; *OCTG from China (Philippines and Brunei) Preliminary* PDM at 6; *SSSS from China (Vietnam)* IDM at 15; *Pipe and Tube from India (UAE and Oman)* IDM at 8, 12).

[101] *Id.* (citing Circumvention Request at 1-2).

[102] *Id.* (citing Circumvention Request at 87).

around assemblers in the third countries "that use affiliated Chinese input suppliers and a fully integrated Chinese supply chain to circumvent the existing Orders."[103]

*Chinese Solar Producers are not Integrated with Polysilicon Producers*

- Information on the record, such as a report from the DOE placed on the record by Auxin, confirms that any integration in the solar industry occurs at the later stages of the solar cell and module production process (*i.e.*, from wafers through module production).[104] This demonstrates that solar cell and module production is not fully integrated in China back to the polysilicon refinement stage of production.

- Auxin identified only one company in China with investments in progress for production of polysilicon, ingot, wafers, cells, and modules; and most companies Auxin identified produce at only one or two of these production stages.[105]

- In steel cases Commerce used the facts on the record to compare final processing steps in the third country to the operations of integrated steel mills in the country subject to the order.[106] However, there is no such facts regarding integration in the solar industry.

- Thus, including the polysilicon stage as part of Commerce's consideration of the Chinese solar industry would unfairly distort the analysis and ignore the reality of the industry subject to the inquiry.

*Auxin's Suggested Remedies are Unreasonable*

- In the numerous cases cited by Auxin, it never provides a case, as it argues Commerce should do here, where Commerce calculated an absolute investment figure by averaging the investments of various producers at different stages of the supply chain and summing them to create an estimate of the cost of a hypothetical fully integrated facility. For the solar industry, doing so would not represent the actual structure of the industry and, thus, would be an inappropriate basis for Commerce's comparison.

- The investment data that Auxin argues should be relied upon under a merchandise-specific approach conflates projected investments with actual investments, often citing companies' announcements of long-term investment plans with projected capacity over the next five to ten years.[107] Many of the investment and capacity figures used by Auxin do not represent the initial start-up investment required to construct a facility in China, and the figures also include anticipated investments that have not yet been made in China.

- A direct comparison between Auxin's investment data and the mandatory respondents' investment data would lead to inaccurate and misleading results by comparing projected investments in China to third country investments.

*Commerce has Considered Affiliation in Performing Its Analysis under 782(b)(2)*

- Contrary to Auxin's claims, Commerce has focused on comparisons with affiliates in prior circumvention inquiries. In *PET Film from the UAE (Bahrain)*, Commerce collected data from a third-country manufacturer in Bahrain and its affiliate in the UAE

---

[103] *Id.* (citing Circumvention Request at 1-2).
[104] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5).
[105] *Id.* (citing Auxin's Investment and R&D Information at Excel Attachment).
[106] *Id.* (citing *CORE from China (Vietnam)*; *CRS from China (Vietnam)*; and *SSSS from China (Vietnam)*).
[107] *Id.* (citing Auxin's Investment and R&D Submission at Excel Attachment and Exhibit P-7b).

22

to conduct its comparative analysis, making the same comparison between affiliates' investments and operation that Auxin asserts is not appropriate here.[108]  In *CRS from Korea (Vietnam)* and *Diamond Sawblades Thailand*, Commerce had data on the record from affiliated parties and opted to make a direct comparison between the respondents' investments and the operations of its affiliate in the country subject to the order.[109]  Auxin ignores the significant portion of Commerce's analysis that did not consider affiliation at all.  When analyzing the factors under section 781(b)(2) of the Act, Commerce did not consider affiliation when evaluating section 781(b)(2)(C) and 781(b)(2)(E) of the Act.

**Commerce's Position:**  We disagree with Auxin that Commerce should revise its application of the "minor or insignificant" factors, as enumerated in section 781(b)(2) of the Act.[110]  The statute and the SAA grant Commerce discretion in evaluating the five minor or insignificant factors.  The statute only provides that Commerce "shall take into account" the five factors, without further instruction.  According to the SAA, Commerce will evaluate the five factors under section 781(b)(2) of the Act "as they exist either in the United States or a third country, depending on the *particular circumvention scenario*," and that "{n}o single factor will be controlling."[111]  Thus Commerce must tailor its analysis to the facts on the record.  Here, we place particular emphasis on affiliation, aided by the circumvention request itself, because the 'circumvention scenario' alleged by Auxin is unique and distinguishable from most of those examined in our previous circumvention inquiries.

In this circumvention inquiry, the particular circumvention scenario, per Auxin's request, is centered around third country companies using "affiliated Chinese input suppliers and a fully integrated supply chain to circumvent the existing *Orders*."[112]  Auxin notes that "{t}he circumvention allegations contained herein rely heavily upon the relationships between certain Chinese input suppliers and their affiliates in the targeted third countries, a factor that Commerce must consider."[113]  Again, Auxin describes that the "fact pattern significantly narrows the alleged circumventing activity in this petition to major Chinese companies that use other countries as export platforms to continue selling cheap CSPV cells and modules to the United States."[114]  In accordance with the SAA's language instructing Commerce to "evaluate the factors … depending on the particular circumvention scenario," we applied our minor and insignificant analysis, with respect to the respondents' level of investment, level of research and development, and extent of production facilities, using a comparative approach that accounts for the production activities of the upstream affiliates of the third country producers, mirroring Auxin's request.

---

[108] *Id.* (citing *PET Film from the UAE Preliminary Determination* PDM at 5-6, unchanged in *PET Film from the UAE (Bahrain)*).

[109] *See* April 28, 2023 Rebuttal Brief (citing *CRS from Korea (Vietnam) Preliminary* PDM at 14-17, unchanged in *CRS from Korea (Vietnam)*; and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*).

[110] The five factors listed under section 781(b)(2) of the Act:  (A) level of investment in the foreign country; (B) level of research and development in the foreign country; (C) nature of the production process in the foreign country; (D) extent of production facilities in the foreign country; and value of processing performed in the foreign country.

[111] *See* SAA at 893 (emphasis added).

[112] *See* Circumvention Request at 1-2.

[113] *Id.* at 87.

[114] *Id.*

Auxin's circumvention request is why we also disagree with Auxin's arguments that we should adopt a "merchandise-centric" comparative approach for the final determination and include solar-grade polysilicon in our 781(b)(2) analysis. Auxin focuses on the language in *SDGE from China (UK)* stating that the purpose of the analysis under section 781(b)(1)(C) of the Act is to "evaluate whether a process is minor or insignificant within the context of the totality of the production of subject merchandise" such that Commerce's analysis addresses "the relative size and significance of the processing provided by {the respondent} in comparison to the processing necessary to produce the overall finished product."[115] Again, Congress and our past practice require us to consider the unique facts and circumstances of each specific case. In *Al Ghurair CAFC 2023*, the CAFC noted that Commerce "is not bound by its prior determinations" and should there be a reason to deviate from its past practice, Commerce may explain why it is appropriate to do so.[116] In the underlying CIT decision, the CIT noted that Commerce has the discretion to decide its own analysis to determine the level of investment as section 781(b)(2) of the Act does not outline a specific methodology."[117] In accordance with *Timken Co.*, the CIT provided Commerce the discretion "to adapt to different factual circumstances to address circumvention."[118] In *CRS from China (Vietnam)*, Commerce applied a similar logic where it stated that the statute does not instruct Commerce to apply a particular analysis, and therefore, "Commerce may determine an appropriate analysis to apply."[119] Again, Congress and our past practice require us to consider the unique facts and circumstances of each specific case. In accordance with the recognized discretion granted to Commerce in circumvention inquiries, for this inquiry, Commerce utilized an approach which is specific to the upstream affiliates of each respondent. Because none of the respondents to this inquiry were affiliated with upstream producers of polysilicon, we did not consider Chinese polysilicon production as part of our comparative analysis of the 'minor or insignificant' factors.

Auxin's circumvention request alleges a circumvention fact pattern that involves integrated Chinese solar producers spinning off the last steps of production (*i.e.*, solar cell and solar module production) to the inquiry countries to undermine the existing *Orders* and avoid ADs/CVDs. With that fact pattern in mind, after selecting the largest producers/exporters of solar cells and/or solar modules in the third countries, we requested a litany of information related to the corporate structure and operations of the respondents, examining any affiliation links to producers involved in the production of solar cells and modules in China. After examining the information placed on the record by the respondents, the facts indicated that: (1) none of our respondents' affiliates in China had fully integrated production back to the mining and refining of solar-grade polysilicon during the period of inquiry; and (2) there is no substantial record evidence of fully integrated production in China during the period of inquiry.[120] Boviet provided information that the company did not have any upstream input affiliates in China, thus we found it appropriate to not compare the level of investment, R&D, and extent of production facilities in Vietnam to

---

[115] *See SDGE from China (UK)*, 77 FR at 47599.

[116] *See Al Ghurair CAFC 2023*, 65 F.4th at 1360 (citing *Hyundai Electricity CAFC*, 15 F.4th at 1089).

[117] *See Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368 (citing *Timken Co.*, 968 F. Supp. 2d at 1286 n.7, *aff'd* 589 F. App'x 995 (Fed. Cir. 2015)).

[118] *Id.*

[119] *See CRS from China (Vietnam) Final* IDM at Comment 5; *CORE from China (Vietnam) Final* IDM at 34; and *OCTG from China (Brunei and the Philippines) Final* IDM at 7.

[120] *See* Boviet Preliminary Analysis Memorandum at 2.

facilities in China.[121]  Such facts, on the respondent-specific level, were subsequently authenticated by us when conducting the verification of Boviet.

Based on the facts above, we disagree with Auxin's insistence that Commerce include in its comparison to the order country the first stage of production of solar cells and modules, the mining and refining of solar-grade polysilicon.  The pre-URAA cases Auxin relies on in support of starting the comparative analysis at the first stage of the production process, *Granular PTFE Resin from Italy* and *Brass Sheet and Strip from Canada*, are cases where Commerce compared third country operations to fully integrated producers in the country subject to the order.[122]  Moreover, other post-URAA cases cited by Auxin, *CORE from China (Vietnam)*, *CRS from China (Vietnam)*, and *SSSS from China (Vietnam)*, are cases where Commerce used the facts on the record to compare fully integrated steel producers in China to the operations conducted in the third country.  These cases are not comparable to the present circumvention proceeding as our record demonstrates that fully integrated production (*i.e.*, production facilities that manufacture polysilicon, wafers, ingots, solar cells, and solar modules) is not typical of the solar industry in China.  Auxin's argument that Commerce should compare the level of production in the third country to a fully integrated producer in China, as it did in prior circumvention inquiries, is therefore inapposite.  Even if Commerce were to determine that such an approach was appropriate to evaluate the circumvention scenario alleged by Auxin, the record lacks evidence of a 'fully integrated' solar cell and module producer comparable to the fully integrated steel mills which has been used as a basis for comparison in other cases.

The solar industry is distinguishable from the industries involved in the cases cited by Auxin, and therefore warrants a different methodological approach, when considering the 'minor or insignificant' factors, to that applied in past cases.  In the steel industry, producers in the order country typically are fully integrated starting at the first stage of production.[123]  We do not have a similar fact pattern on this record.  Prior to the *Preliminary Determinations*, we provided all parties, including Auxin, an opportunity to place investment and R&D information on the record of the proceeding.  However, no party provided substantial record evidence of fully integrated production in China during the period of inquiry.  Regarding the Chinese solar industry as a whole, Auxin, in its July 29, 2022 Investment and R&D submission, identified only one company in China with in-progress investments in all stages of production, *i.e.*, solar-grade polysilicon, ingot, wafers, solar cells, and solar modules.[124]  An interested party, NextEra, placed information on the record indicating that the solar industry is not composed of fully integrated producers starting with mining or refining solar-grade polysilicon.[125]  In fact, a report Auxin

---

[121] *See Vietnam* PDM at 17.

[122] *See Granular PTFE Resin from Italy* IDM at 12-13, n.16 (citing *Brass Sheet and Strip from Canada*, 58 FR at 33613 ("compar{ing} {respondents' rerolling} activities to that of *vertically integrated producers*, such as brass mills, which cast, roll, and finish the product") (emphasis added)).

[123] *See CORE from China (Vietnam) Preliminary* PDM at 18, n. 82.

[124] *See* Auxin's Investment and R&D Information at Excel Attachment.  Auxin did not provide information establishing that this company had actually commenced production of solar cells and modules.

[125] *See* NextEra's May 2, 2022 Comments at Att. 2 and at 9 ("Of the leading global polysilicon producers by capacity in 2021, only two, the Chinese companies GCL and Tongwei, participate in supply chain stages other than polysilicon. Of these two companies, GCL is a significant wafer producer, and Tongwei is a leading CSPV cell producer. All other polysilicon producers … operate exclusively in the polysilicon stage of the CSPV manufacturing supply chain.").

25

itself placed on the record, and cited in its April 19, 2023 Case Brief, confirms that integration in the Chinese solar industry does not begin at the mining and refining of solar-grade polysilicon stage of production, and instead involves the later stages of the solar cell and module production process (*i.e.*, wafer through module production).[126]  Auxin argues that we should use its July 29, 2022 Investment and R&D submission to extrapolate an estimate of the investment and R&D needed for one fully integrated solar cell and module producer in China from a number of different companies that operate in different stages of the production process and use those estimates as the basis for our comparison to the order country.  Given the fragmented nature of the solar industry in China, we find a comparison to a fully integrated producer in China, in accordance with Auxin's proposed "merchandise-centric" approach to be inappropriate.

The solar industry is also unique in other respects.  First, solar cell production is more technically complex and dependent on skilled labor to a greater degree than most other products that Commerce has examined in prior circumvention inquiries.[127]  For this reason, we placed particular emphasis on the "level of research and development" factor when evaluating whether the production in the third country was minor or insignificant.  *See* Comment 7.  However, the nature of research and development is such that, once carried out, it is easily transmissible across national borders.  Further, solar cells and modules are unique products insofar as one country, here China, accounts for almost one hundred percent of the global production of a primary upstream input, *i.e.*, solar wafers.[128]  These factors, when taken into consideration together, contribute to a circumvention scenario in which large solar conglomerates are incentivized to 'spin off' production of solar cells into third countries, and in which third country producers are left with little choice but to source solar wafers from China.  Our comparative analysis of the 'minor or insignificant' factors, in which we compare respondents' level of investment, level of research and development, and extent of production facilities to those of their affiliated Chinese input suppliers, is the most appropriate manner in which to account for *these particular facts*, which again are unique to the solar industry.

Further, contrary to the language Auxin cites from *SDGE from China (UK)*, there is precedent for Commerce to not examine whether the process of assembly in the third country is minor or insignificant in comparison to the entirety of the production process in the order country.  This was the case in *PET Film from the UAE Preliminary Determination*, where Commerce found it appropriate to compare PET film facilities in the third country, Bahrain, to PET film facilities in the order country, and did not include all production stages in the comparative analysis.[129]  This was also the case in *SSSS from China (Vietnam), Pipe and Tube from India (UAE and Oman)*, *CORE from China (UAE)*, and *OCTG from China (Brunei and the Philippines)* where similar to this circumvention inquiry, for the factors under section 781(b)(2) of the Act, Commerce compared upstream production in the order country to downstream production in the third country.[130]

---

[126] *See* Auxin's May 16, 2022 Comments at Exhibit 5.

[127] *See* ITC Solar Final at I-15 (solar cell production is "a highly automated, capital intensive, and technologically sophisticated process, requiring skilled technicians and employees with advanced degrees.").

[128] *See* Circumvention Request at 28-30 (citing BloombergNEF Report at 1, 9).

[129] *See* PET Film from the UAE Preliminary Determination IDM at 5.

[130] *See* CORE from China (UAE) IDM at Comment 1; SSSS from China (Vietnam) IDM at 18-19 (where Commerce compared the R&D activities of the upstream hot-rolling of stainless steel in China to the R&D activities of the

26

Citing *Ferrovanadium from Russia Final Determination* and *Hot-Rolled Lead and Bismuth*, cases where Commerce decided against conducting a comparative analysis under section 781(a)(2) of the Act, Auxin argues that the absence of a comparative analysis under section 781(a)(2) of the Act  is only appropriate where there is "no affiliation between the relevant parties ***and*** third country (or U.S.) operations pre-existed the relevant order."[131]  Although these two cases were circumvention inquiries conducted under section 781(a) of the Act, similar statutory language applies to sections 781(a)(2) and 781(b)(2) of the Act.  While we agree with Auxin that these are two important aspects to consider, in this specific case, we also consider Auxin's circumvention request, which focused heavily on upstream solar input producers working in tandem with affiliated third country solar cell and solar module producers to circumvent the existing *Orders*, an important distinction that must be considered.  Auxin's proposed standard, which aims to compare third country producers to the entire solar cell and module production process in the order country, fails to account for the rapid growth of the solar cell industry in the years following the issuance of the *Orders*, and may inappropriately target certain third country producers with no upstream affiliates in the order country.[132]  Therefore, for third country solar cell and module producers with no upstream input affiliates in the order country, we find a comparative analysis in the manner requested by Auxin for sections 781(b)(2)(A), (B), and (D) of the Act to be inappropriate.

Auxin also argues that we have gone against our practice by elevating affiliation to a mandatory criterion under section 781(b)(2) of the Act, therefore making affiliation a prerequisite for finding circumvention.  However, this point by Auxin is a misrepresentation of our minor or insignificant analysis applied in the *Preliminary Determinations*.  Although Auxin is correct that, in this specific case, for our evaluation of the level of investment, the level of research and development, and the extent of the production process, we centered our analysis around upstream input affiliates, Auxin incorrectly conflates our analysis with respect to sections 781(b)(2)(A), (B), and (D) of the Act to the entire determination made under section 781(b)(1)(C) of the Act and our circumvention finding writ-large.  In evaluating whether the process of assembly in the third country was minor, for the criterion under section 781(b)(2)(C) of the Act, nature of production process, we compared third country operations to the production of a silicon wafer in China, starting from the solar-grade polysilicon stage of production, regardless of affiliation.  Specifically, in the *Preliminary Determination*, we found that the nature of the production process, as examined under section 781(b)(2)(C) of the Act, is "not minor or insignificant compared to either ***processing polysilicon into wafers***, or ingots into wafers, in China, which does not weigh in favor of finding circumvention."[133]  Similarly, when examining the criteria under section 781(b)(2)(E) of the Act, value of processing, in the *Preliminary Determinations*, we again did not factor in affiliation and note that the silicon wafer is naturally inclusive of the

---

further processor in the third country); *Pipe and Tube from India (UAE and Oman)* IDM at Comment 6; and *OCTG from China (Brunei and the Philippines) Preliminary* PDM at 10, unchanged in *OCTG from China (Brunei and the Philippines)* IDM at Comment 1.

[131] *See* Auxin's April 19, 2023 Case Brief at 25-28.

[132] *See* Circumvention Request at 57-58, n. 231.

[133] *See* Vietnam PDM at 21.  Our approach with respect to section 781(b)(2)(C) of the Act, nature of the production process in the foreign country, remains unchanged in this final determination.

27

polysilicon that went into it.[134]  As such, Auxin's reliance on *Butt-Weld Pipe Fittings from China (Thailand)* and *CORE from China (Vietnam*) where Commerce noted that affiliation does not have to be present for circumvention to occur, is misplaced as we did not, in this case, elevate affiliation to a mandatory criterion under section 781(b)(2) of the Act or consider affiliation a prerequisite to finding circumvention.  For similar reasons, Auxin's dependence on *SDGE from China (UK)*, affirmed in *U.K. Carbon & Graphite, CORE from Vietnam (China), Retail Carrier Bags from Taiwan Final Determination, CRS from China (Vietnam), Tissue Paper from China (India), SDGE from China (UK)*, and *HFC from China (India)*, *i.e.*, prior circumvention cases where the process of assembly was found minor even for respondents that did not have affiliates in the order country, adds no value within the context of this proceeding as the methodology applied in the *Preliminary Determinations* does not preclude a company with no affiliates in the order country from being found to be circumventing an order.

We note that Commerce, in the cases cited by Auxin, has opted to conduct a direct comparison under section 781(b)(2) of the Act between a respondent's third country operations and the operations of its affiliate in the country subject to an AD/CVD order.  For example, *PET Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia)*, *CRS from Korea (Vietnam)*, and *Diamond Saw Blades from China (Thailand)* are examples of prior circumvention cases where Commerce conducted a direct comparison between the respondents and their affiliates in the country subject to the order when examining the criteria under section 781(b)(2)(A) of the Act, level of investment, section 781(b)(2)(B) of the Act, R&D, section 781(b)(2)(C) of the Act, nature of production process, and section 781(b)(2)(D) of the Act, extent of production facilities.[135]  In line with *PET Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia)*, *CRS from Korea (Vietnam)*, and *Diamond Saw Blades from China (Thailand)*, when examining section 781(b)(2)(A) of the Act, level of investment, section 781(b)(2)(B) of the Act, R&D, and section 781(b)(2)(D) of the Act, extent of production facilities, we reasonably opted to make a direct comparison between a respondent's operations in the third country and its upstream affiliates in the country subject to an AD/CVD order.

Therefore, the assumption by Auxin that unaffiliated suppliers will get a free path to circumvent the existing *Orders* is false.  Rather, in accordance with the SAA, our finding as to whether the extent of processing was minor or insignificant was supported by our evaluation of all five factors listed in section 781(b)(2) of the Act, including the nature of the production process and the value added in the third country, which Commerce evaluated without comparison to respondents' upstream affiliates.

Therefore, our minor or insignificant determination, under section 781(b)(1)(C) of the Act was a "multi-factor"[136] analysis and did not rely merely on affiliation or the exclusion of a stage of production as the linchpins of our circumvention findings.  For these reasons, for the final

---

[134] *Id.* at 22.  Our approach with respect to section 781(b)(2)(E) of the Act, value of processing in the foreign country, remains unchanged in this final determination.
[135] *See PET Film from the UAE (Bahrain) Preliminary* PDM at 5-6, unchanged in *PET Film from the UAE (Bahrain)*); *CORE from Taiwan Preliminary Determination* PDM at 14-17, unchanged in *CORE from Taiwan Final*); and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*)).
[136] *See Al Ghurair CAFC 2023*, 65 F.4th at 1363.

28

determination, we will not depart from the minor or insignificant analysis applied in the *Preliminary Determination*.

**Comment 5.   How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act**

*Auxin*[137]
- Section 781(b)(2)(E) of the Act requires Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."
- Commerce should base the value of the merchandise that is imported into the United States on the COM of that merchandise rather than U.S. sales price because U.S. sales prices could be transfer prices, prices that reflect dumping or subsidization, or prices below costs.
- Commerce has acknowledged that section 781 of the Act does not define "value," and it explained that in determining value under that section of the Act it considers the items that are being valued and the "availability and reliability of reported prices and costs."[138]
- In *Plywood from China (Vietnam) Preliminary*, Commerce valued the merchandise imported into the United States using COM where it noted that " … the U.S. price is insufficient to cover even the Chinese veneer content of the finished hardwood plywood."[139]
- This same logic should be applied in these circumvention inquiries where Commerce finds a similar fact pattern when comparing the cost of Chinese inputs used in the inquiry merchandise (based on surrogate values) to the sales value of the merchandise imported into the United States.

*NextEra*[140]
- Using COM to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act directly conflicts with Commerce's statutory mandate and is inconsistent with its practice.
- In *Glycine from China (India)*, Commerce explained that "although the statute does not specify a method for determining value {under section 781(b)(2)(E) of the Act}, it does clearly specify that this is a *value-based test,* and *not a cost-based test*."[141]
- In *PET Film from the UAE (Bahrain)*, Commerce confirmed that it must use "the value of the merchandise exported to the United States," not costs, in its calculations under section 781(b)(2)(E) of the Act, "consistent with use of the phrase 'value of processing performed'" in that section of the Act.[142]
- In *Plywood from China (Vietnam)*, Commerce was forced to base its calculations under section 781(b)(2)(E) of the Act on whatever facts were available since there were no

---

[137] *See* Auxin's April 19, 2023 Case Brief at 70-73.
[138] *Id.* (citing *SDGE from China (UK)* IDM at Comment 3).
[139] *Id.* (citing *Plywood from China (Vietnam) Preliminary*).
[140] *See* NextEra's April 28, 2023 Rebuttal Brief at 37-39 (Vietnam).
[141] *Id.* (citing *Glycine from China (India)* IDM at 18).
[142] *Id.* (citing *PET Film from the UAE (Bahrain)* IDM at 5).

29

usable data from respondents on the record (Commerce applied total AFA).  The unique methodology used in that case is not relevant here.[143]

*Boviet*[144]

- Section 781(b)(2)(E) of the Act requires Commerce to make a value-based comparison without giving it any discretion to make a cost-based comparison when certain facts are present.[145]
- In *Glycine from China (India)*, Commerce explained that the comparison under section 781(b)(2)(E) of the Act is a "*value-based test* and *not a cost-based test*."[146]
- In *PET Film from the UAE (Bahrain),* Commerce explained that it will use "the value of the merchandise exported to the United States" in its calculations under section 781(b)(2)(E) of the Act.
- Commerce's section 781(b)(2)(E) calculations in *Plywood from China (Vietnam)* are deeply flawed, have been challenged in court, and were based on AFA because respondents did not provide data.  This unique situation does not apply here.[147]
- Auxin bases its argument that Commerce should use COM to value U.S. imports of Boviet's merchandise under section 781(b)(2)(E) of the Act, rather than sales price, on its claim that Boviet is dumping.  This claim is baseless.  Commerce has not determined that Boviet is dumping, Commerce does not make such a determination in a circumvention inquiry, and the numeric analysis that Auxin relied on to conclude that Auxin was dumping is not the same as the dumping calculations used by Commerce.

**Commerce's Position:**  We disagree with Auxin's position that Commerce should use COM to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.  Although the word "value" is not defined in section 781(b)(2)(E) of the Act, Congress described this section of the Act as determining "whether the value of the processing performed in … the third country represents a small portion of the value of the merchandise sold in, or imported into, the United States."[148]  The phrase "value of the merchandise sold" indicates a sales value that generally reflects all costs incurred, not just the cost of materials, labor, and factory overhead (COM), as well as a profit.

Commerce has taken this position in other cases.  In *Glycine from China (India)* Commerce explained that "although the statute does not specify a method for determining value {in section 781(b)(2)(E) of the Act,} it does clearly specify that this is a value-based test, and not a cost-based test."[149]  This plain reading of the statute is also consistent with Commerce's calculations in other circumvention inquiries.[150]

---

[143] *Id.* (citing *Plywood from China (Vietnam) Preliminary* PDM at 15, 24).
[144] *See* Boviet's April 28, 2023 Rebuttal Brief at 17-18 .
[145] *Id.* (citing section 781(b)(2)(E) of the Act).
[146] *Id.* (citing *Glycine from China (India)* IDM at 18).
[147] *Id.* (citing *Vietnam Finewood; Far East American*).
[148] *See* S. Rep. No. 103-412 (1994), at 82.
[149] *See Glycine from China (India)* IDM at 18.
[150] *See, e.g., CORE from China (UAE) Preliminary* PDM at 21, unchanged in *CORE from China (UAE)*; *Pipe and Tube from India (Oman and UAE)* IDM at 37; and *OCTG from China (Brunei and Philippines) Preliminary* PDM at 13, unchanged in *OCTG from China (Brunei and Philippines)*.

Neither *SDGE from China (UK)* nor *Plywood from China (Vietnam)* supports Auxin's position. The issue in *SDGE from China (UK)* involved how to value third-country processing (the numerator in the ratio of third-country processing divided by the value of the merchandise imported into the United States), not how to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.[151]

In *Plywood from China (Vietnam)*, Commerce did not have any usable data from Vietnamese producers or exporters of hardwood plywood to determine the relative value of the processing performed in Vietnam. Consequently, Commerce used data that were provided by the requester of the circumvention inquiry and submitted in the *Vietnam Finewood* scope inquiry. The requester in *Plywood from China (Vietnam)* argued that most of the production costs for hardwood plywood were incurred in China and thus Vietnamese processing is relatively minor. In the absence of data from Vietnamese producers or exporters of hardwood plywood, Commerce attempted to confirm the requester's allegation by examining the percentage of COM represented by core veneers from China and Vietnamese processing (*i.e.*, Commerce sought to confirm whether most costs were incurred in China). Although Commerce applied AFA in its determination, it noted that it based its analysis on "the value associated with completing hardwood plywood using Chinese-origin core veneers (and potentially Chinese face and back veneers) in Vietnam is relatively insignificant in comparison to the primary stages of production that are completed in China."[152] Thus, Commerce's cost-based approach in *Plywood from China (Vietnam)*, was unique to the facts of that case and should not necessarily stand as precedent for all circumvention inquiries. In fact, in the final determination in *Plywood from China (Vietnam)*, Commerce explained that:

> Although the U.S. Importers and {Vietnamese} Exporters assert that the methodology relied on in other circumvention inquiries to calculate the value added in a third country differs from the methodology Commerce used in the Preliminary Determination, we continue to find that our determination relied on the best available information on our record. … Given the limited information available on the record, we have continued to apply our quantitative analysis from the Preliminary Determination.[153]

Lastly, we do not find Auxin's arguments that the reported U.S. prices are distorted to be persuasive. Auxin based its arguments on a comparison of the total value, based on surrogate values, of Chinese inputs in a solar module, to the U.S. sales value of the module. However, Commerce calculated the total value of Chinese inputs in a solar cell or solar module that Auxin used in its comparison for purposes of section 781(b)(1)(D) of the Act, not section 781(b)(2)(E) of the Act. Auxin never explains why it would be distortive to compare the cost of processing solar cells and modules in, for example, Cambodia, Malaysia, or Thailand, to the U.S. sales value of those solar cells and modules when presumably, the sales value would reflect the processing

---

[151] *See SDGE from China (UK)* IDM at Comment 3 ("… UKCG requests that the {Commerce} reconsider the methodology used to determine the numerator of the quantitative portion of the analysis of further processing … As discussed below, {Commerce} has indeed reconsidered its calculation of the value included in the numerator").

[152] *See Plywood from China (Vietnam) Preliminary* PDM at 10, 23, and 24.

[153] *See Plywood from China (Vietnam) Final* IDM at Comment 2.

costs incurred in those countries.  Moreover, it is not appropriate to find that inquiry merchandise is being dumped or unfairly subsidized in the context of a circumvention proceeding.

For the foregoing reasons, we have continued to use U.S. sales prices to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.

**Comment 6.  Whether Material Costs Should Be Included in the Value of Third-Country Processing**

*Auxin*[154]

- When applying section 781(b)(2)(E) of the Act (*i.e.*, determining whether the value of the processing performed in the third country represents a small proportion of the value of the merchandise imported into the United States), Commerce must exclude the value of material inputs in the value of the processing.  By using the phrase "processing performed," the Act focused on the processing operations in the third country, not the value of the material inputs used in those processing operations.
- This interpretation is consistent with *HFCs from China (India)* where Commerce determined that "when the Act is referring to the value of the processing, it is referring to the process of completion or assembly of the parts or components, not the process to manufacture the parts or components."[155]
- In *HFCs from China (India)*, Commerce noted that "Congress acknowledged in {certain} passages of the SAA that, under the previous statutory criteria, the inclusion of the parts or components from a third country proved to be problematic.  Therefore, Congress enacted the revisions to section 781(b) of the Act, which allowed Commerce to focus on whether the process of assembly or completion is minor or insignificant pursuant to section 781(b)(2) of the Act." [156]
- Rather, material inputs used in third-country processing should be considered when determining the total value of the exported merchandise under section 781(b)(1)(D) of the Act (where Commerce must determine whether the portion of the product produced in the order country is a significant portion of the total value of the product exported to the United States) and sections 781(b)(2)(A) (level of investment in the third country), (C) (nature of the production process in the third country), and (D) (extent of the production facilities in the third country) of the Act.[157]

*Boviet*[158] and *NextEra*[159]

- Commerce has a longstanding practice of including the value of material inputs used in third-country processing in the value of that processing under section 781(b)(2)(E) of the Act and should not depart from that practice here.[160]

---

[154] *See* Auxin's April 19, 2023 Case Brief at 66-70.
[155] *Id.* (citing *HFCs from China (India)* IDM at 17).
[156] *Id.*
[157] *Id.*
[158] *See* Boviet's April 28, 2023 Rebuttal Brief at 14-16.
[159] *See* NextEra's April 28, 2023 Rebuttal Brief at 35-37.
[160] *See CORE from China (UAE)* IDM at 20; *CRS from Korea (Vietnam) Preliminary* PDM at 17, unchanged in *CRS from Korea (Vietnam)*; and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*).

- Auxin did not explain why Commerce should depart from its overwhelming prior practice based on a single instance (*HFCs from China (India)*) where Commerce excluded the value of material inputs used in third-country processing from the value of that processing.[161]
- The cost of third-country assembly and completion reasonably includes the cost of obtaining the inputs needed in the third country to assemble or complete the merchandise. Reasonable "interpretations of ambiguous statutory terms articulated in the course of {Commerce's} antidumping determinations" are entitled to "*Chevron* deference."[162]

**Commerce's Position:**  We disagree with Auxin's position that in this circumvention inquiry, Commerce should exclude material costs from the value of processing for purposes of section 781(b)(2)(E) of the Act.

Section 781(b)(2)(E) of the Act directs Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."  Although Auxin claims that the phrase "the value of the processing performed" means the value of the processing operations performed in the third country, not the value of the material inputs used in those processing operations, the phrase "processing operations" is not further defined in the Act, and the individual items to be included in, or excluded from, the value of processing are not identified in the Act.  Moreover, Auxin did not cite any accounting authority or other authority showing that a manufacturer's processing costs do not include material costs.

Processing generally entails subjecting something to a series of actions in order to achieve a particular result or the act of taking something through a set of prescribed procedures.  For example, the Executive Summary and portions of the narrative in the *Bloomberg Report*, which is a report that Auxin relied on in its Circumvention Request, indicate that processing refers to the entire manufacturing activity[163] and processing costs refer to the total cost of a certain stage of production.[164]  In contrast, a graph in the *Bloomberg Report* indicates that processing costs include depreciation and fixed overhead costs.[165]  Therefore, it appears that the word "processing" is not consistently used to refer to the same types of costs.  Thus, the plain meaning of "processing," as used in section 781(b)(2)(E) of the Act, does not answer the question of whether the value of processing includes material costs.

Auxin primarily rests its argument on Commerce's decision in *HFCs from China (India)* and Commerce's discussion of the SAA in that case.  When Commerce calculated the value of processing for purposes of section 781(b)(2)(E) of the Act in *HFCs from China (India)*, it did not include the processing and material costs that the respondent incurred in the third country to produce the HFC component (R-125) that the respondent blended with the Chinese HFC component (R-32) to form the HFC blend (R-410A) sold in the United States.  Commerce explained that "when the Act is referring to the value of the processing, it is referring to the

---

[161] *See* NextEra's April 28, 2023 Rebuttal Brief at 36-37.
[162] *See* Boviet's April 28, 2023 Rebuttal Brief at 16 (citing *Pesquera Mares*, 266 F.3d 1372, 1380).
[163] *See Bloomberg Report* at the Executive Summary at PDF page 5, item 5.
[164] *Id.* PDF page 15.
[165] *Id.* at Figure 9.

Barcode:4419747-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Vietnam 2022

process of completion or assembly of the parts or components, *not the process to manufacture the parts or components*.  This interpretation of the language in the Act is consistent with Congress' intent towards this portion of the statute" (emphasis added).[166]

Thus, the issue in *HFCs from China (India)* involved the material costs that the respondent incurred to self-produce a product that it used to "complete" the Chinese product, and not the question of whether the cost of materials and supplies used when assembling and completing the Chinese product in the third-country should be included in the value of processing for purposes of section 781(b)(2)(E) of the Act.  In fact, in *HFCs from China (India)*, the respondent did not use any materials in its "completion" of the Chinese R-32, it merely blended the self-produced R-125 with the Chinese R-32 to form the HFC blend (R-410A) sold in the United States.[167] Hence, we do not find Commerce's decision in *HFCs from China (India)*, to be directly applicable in this case.

Moreover, the decision in *HFCs from China (India)*, which Commerce described as "consistent with Congress' intent towards this portion of the statute,"[168] was to focus on the process of completing the Chinese components in the third country, as opposed to the process of manufacturing parts that were used to finish the Chinese components in the third country. Commerce's decision in *HFCs from China (India)* was to not focus on the processing that had nothing to do with the assembly or completion of the merchandise imported from the order country (China).  Thus, this decision was entirely consistent with Congress' revisions to Section 781(b) which directed "Commerce to focus on whether the process of assembly or completion {in the third-country} is minor or insignificant pursuant to section 781(b)(2) of the Act."[169] Additionally, Commerce's decision in *HFCs from China (India)* was fact specific and did not necessarily establish a broader practice regarding which costs should be included in the value of processing being performed in the foreign country for purposes of section 781(b)(2)(E) of the Act.

Auxin's argument is based, in part, on Commerce's citation in *HFCs from China (India)* to the SAA's discussion of a "third-country parts" problem that existed in the pre-URAA version of the Act, which required that the difference between the value of the order country product that was processed in the third country and the final product imported into the United States be small to find circumvention.  Congress found this provision was ineffective in identifying circumvention because in some cases only minor assembly was performed in the third country, yet the difference in value was not small (*e.g.*, a "screwdriver" operation in the third country where high value third-country electronic components were simply connected together with electronic components from the order country into a finished product).  Therefore, Congress revised the Act by removing the "difference in value" provision and adding, among other things, section 781(b)(2)(E) of the Act (whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States).[170]

---

[166] *See HFCs from China (India)* PDM at Comment 3.
[167] *Id*. ("… we valued only the respondents' direct labor, manufacturing overhead, SG&A expenses, and net interest expenses in valuing the production process as these are the *only* expenses incurred by GFL … in performing the processing on the components to make HFC blends" (emphasis added).
[168] *Id*.
[169] *Id*.
[170] *See* SAA at 892-94.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

However, after discussing the third-country parts problem, the SAA simply explains that new section 781(b)(2)(E) of the Act requires that Commerce determine whether the value of the third-country processing is small and notes that this requirement is consistent with the overall focus of revisions to the Act, which is to determine whether the process of assembly or completion in the third country is minor or insignificant. The SAA never indicated that the cost of all the materials used in third country processing should be excluded from the value of that processing for purposes of section 781(b)(2)(E) of the Act, and Commerce has not taken that position in numerous prior circumvention cases.[171]

A discussion of this matter is in Commerce's summary of the comments that it received on its revisions to the regulations that it proposed pursuant to the Uruguay Round Agreements Act. Specifically, one party "argued that because the emphasis in anticircumvention inquiries concerning completion or assembly in … a third country is now on whether that process is minor or insignificant, any parts or components sourced from third countries should not be included in making that judgement."[172] Commerce replied to that comment by stating that "we have not adopted this suggestion."[173] While Commerce went on to explain that third-country parts and components must still be considered under section 781(b)(1)(D) of the Act, the issue raised by the commenter was clearly focused on the issue at hand here, namely how third-country parts should be treated in determining whether completion or assembly in a third country was minor.[174] Yet, Commerce did not indicate, at that time, that its policy would be to exclude the cost of materials from the value of the processing in all circumvention inquiries, as suggested by Auxin.

Moreover, Commerce's regulations under 19 CFR 351.226(i) specify that "{i}n determining the value of … processing performed … under section 781(b)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(e) of the Act—or, in the case of nonmarket economies, on the basis of section 773(c) of the Act." Thus, Commerce's regulations discuss valuing parts or components when determining the value of processing under section 781(b)(2)(E) of the Act.

Similarly, we do not find it appropriate to exclude the cost of processing materials from the value of third-country processing in this circumvention inquiry. Here, we are not facing the situation described in the SAA, where a few high value third-country components are being connected together with components from the order country into a finished product. Auxin itself claimed that "{t}he total cost components from China represent a significant portion of the total value of the merchandise ultimately exported to the United States."[175] Moreover, the process of completing some of the Chinese components in the third country involves more than simply attaching Chinese and third-country components together. Some third-country materials are applied to, or infused into, the Chinese components to modify their properties (*e.g.*, phosphorus is diffused into wafers to effect a molecular-level impregnation that changes the electrical

---

[171] *Id*.
[172] *See Antidumping Duties; Countervailing Duties*, 62 FR at 27329.
[173] *Id*.
[174] *Id*.
[175] *See* Circumvention Request at 78.

properties of the wafer).[176]  As a result, the processing involves more than just the activities performed on the components; it includes third-county materials interacting with the Chinese components to change the properties of the component.  It is not clear, in this case, that all third-country materials should be excluded from the value of third-country processing, even the materials that form the nature of the processing.

Moreover, we do not find it reasonable to apply Auxin's interpretation of the SAA in this case, given the cost structure of solar cells and solar modules.  Record evidence indicates that non-material costs account for significantly less than half the price for solar modules.  The ITC noted that "{r}aw material costs for the production of solar modules (much of which are the cost of the cells) accounted for 81.5 percent of U.S. producers' total cost of goods sold."[177]  The *Bloomberg Report* (2021), indicates that material inputs account for 67 percent of the cost of converting a solar cell into a solar module while other processing costs account for 13 percent and labor and electricity costs accounted for 20 percent of total costs.[178]  Given that the total non-material costs incurred to produce solar cells and solar modules, even in China, are limited, we do not find that Auxin's proposal to only consider non-material costs when calculating the value of third-country processing would provide a meaningful measure of the significance of the assembly or completion in the third-country.  Therefore, in order to calculate a meaningful measure of third-country processing of solar cells and solar modules under section 781(b)(2)(E) of the Act, and for the other reasons explained above, we have continued to include material costs in the value of processing performed in the foreign country for purposes of section 781(b)(2)(E) of the Act.

**Country-Specific Issues**

**Comment 7.   Whether Third Country Processing was Minor-General**

**The Level of Investment in Vietnam**

*Silfab*[179] and *Trina*[180]
- Commerce's recognition of the ITC determination that cell production is "the most capital intensive part of the manufacturing process" cannot be ignored.[181]  Commerce cannot find that cell production is a major, capital intensive process, while at the same time determine that some producers have an insignificant level of investment for solar cell and module production.
- It is evident through Commerce's prior circumvention decisions that the "minor and insignificant" factors go hand in hand.  That is, if a production process involves numerous steps and sophisticated machinery and workers, then it likely also requires significant production facilities and capital investment.  The formation of a p/n junction is a transformative step in the manufacture of a solar cells, which requires significant investment.

---

[176] *Id.* at 20.
[177] *See USITC Solar Investigation Final* at V-1.
[178] *See Bloomberg Report* at PDF page 18 and Figure 12 and PDF page 22 and Figure 18.
[179] *See* Silfab's April 29, 2023 Rebuttal Brief at 14-15.
[180] *See* Trina's April 19, 2023 Case Brief at 6.
[181] *Id.* (citing the *Preliminary Determination* PDM at 20).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

*Auxin*[182]

- The ITC's analysis of the CSPV industry is now more than a decade old. Today "polysilicon and ingots/wafers together account for almost 70% of all investment in solar PV manufacturing due to their high capital requirements."[183] The IEA's own survey found that of "recently commissioned plant and equipment price data, polysilicon plants and ingot and wafer factories are significantly more CAPEX-heavy than cell- and module-manufacturing facilities."[184]

**Commerce's Position:** With regard to arguments concerning Commerce's comparison methodology, as stated in Comment 4, we have continued to compare the investment in the inquiry countries to that of their affiliates in China, and thus, we have not addressed Auxin's comments that we should do otherwise or its submissions of investments of other parties here. No party submitted any additional argument regarding Boviet and so, consistent with the *Preliminary Determination*, because Boviet invested in solar cell/module production operations in Vietnam, but has no affiliated producers in China, we find that Boviet's level of investment in Vietnam is not minor or insignificant, and thus, weighs against finding circumvention.

In the *Preliminary Determination*, Commerce found Vina's level of investment in Vietnam to be minor or insignificant, compared to the level of investment in production operations in China, and thus, weighs in favor of finding circumvention. We have since applied AFA to Vina.[185] In our *Preliminary Determination*, we found the levels of investment in Vietnam of the companies to which we applied AFA are minor relative to their levels of investment in China, which weighs in favor of finding circumvention. No party has argued that we should not apply AFA to the non-cooperating companies, including Vina, and we find the levels of investment in Vietnam of the companies to which we have applied AFA, including Vina, to be minor relative to their levels of investment in China, which weighs in favor of finding circumvention.

While parties have cited investment information on the record, we have stated from the *Initiation* that a company's failure to completely respond to Commerce's requests for information may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.[186] To the extent parties are arguing that we should not rely on the circumvention findings of Vina and other companies to which we applied AFA in making a country-wide determination, as we noted in the *Preliminary Determination*, Vina and the AFA companies account for a significant volume of solar cells and modules exported from Vietnam to the United States.[187] Thus, consistent with the *Preliminary Determination*, because Commerce was unable to examine all Vietnamese producers of solar cells and modules, Commerce determines that a country-wide determination is most appropriate to prevent further circumvention of the *Orders* by non-examined producers of

---

[182] *See* Auxin's April 29, 2023 Rebuttal Brief at 7.
[183] *See* Auxin's April 29, 2023 Rebuttal Brief at 7 (citing to the *IEA Report* in Auxin's July 29, 2022 Comments at the Investment & R&D at Exhibit 1).
[184] *Id.* (citing to the *IEA Report* in Auxin's July 29, 2022 Comments at the Investment & R&D at Exhibit 1).
[185] *See* the *Final Determination Federal Register Notice.*
[186] *See* the *Initiation Notice*, 87 FR at 19072.
[187] *See Preliminary Determination* PDM at 27.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

inquiry merchandise in Vietnam, with the exception of shipments of inquiry merchandise from Boviet.  We have further discussed our country-wide determination at Comment 11.

**The Level of R&D in Vietnam**

**Commerce's Position:**  With regard to arguments concerning Commerce's comparison methodology, as stated in Comment 4, we have continued to compare the R&D of companies in the inquiry countries to that of their affiliates in China, and so we have not addressed Auxin's comments that we should do otherwise or its submissions of R&Ds of other parties here.  No party submitted any additional argument regarding Boviet and so, consistent with the *Preliminary Determination*, because Boviet invested in solar cell/module production operations in Vietnam, but has no affiliated producers in China, we find that Boviet's level of R&D in Vietnam is not minor or insignificant, and thus, weighs against finding circumvention.

In the *Preliminary Determination*, Commerce found Vina's level of R&D in Vietnam to be minor or insignificant, compared to the level of R&D in production operations in China, and thus, it weighed in favor of finding circumvention.  We have since applied AFA to Vina.[188]  We found levels of R&D in Vietnam of the companies to which we applied AFA are minor relative to their levels of R&D in China, which weighs in favor of finding circumvention.  No party has argued that we should not apply AFA to the non-cooperating companies, including to Vina, and we find levels of R&D in Vietnam of the companies to which we have applied AFA, including Vina, to be minor relative to their levels of R&D in China.

As we noted in the *Preliminary Determination*, Vina and the AFA companies account for a significant volume of solar cells and modules exported from Vietnam to the United States.[189]  Thus, consistent with the *Preliminary Determination*, because Commerce was unable to examine all Vietnamese producers of solar cells and modules, Commerce determines that a country-wide determination is most appropriate to prevent further circumvention of the *Orders* by non-examined producers of inquiry merchandise in Vietnam.  We have further discussed our country-wide determination at Comment 11.

**Nature of Production**

*Auxin*[190]
- Commerce's incorrectly determined, based on the nature of third-country processing, that the processing is not minor or insignificant[191]  In making that decision, Commerce failed to properly weigh:  (1) capital requirements; (2) costs associated with building; (3) the time required to build, the manufacturing facility; (4) technical hurdles associated with starting up operations; (5) energy to require to produce the product; (6) labor demands; (7) number of stages of production; and (8) number of inputs used to produce the product.[192]  Each of these items are addressed below.

---

[188] *See* the accompanying *Federal Register* notice.
[189] *See Vietnam* PDM at 27.
[190] *See* Auxin's April 19, 2023 Case Brief  at 47, 51-65.
[191] *See* Auxin's April 19, 2023 Case Brief (citing *Vietnam* PDM at 21).
[192] *See* Auxin's April 19, 2023 Case Brief (citing *Vietnam* PDM at 18-21).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

- Commerce based its finding that solar cell production is the most capital intensive part of the manufacturing process on outdated data from 2009 to 2012.[193]  Recent data from IEA's 2021 report, show that "polysilicon and ingots/wafers together account for almost 70% of all investment in solar PV manufacturing due to their high capital requirements"[194] and "polysilicon plants and ingot and wafer factories are significantly more CAPEX-heavy than cell- and module-manufacturing facilities."[195]

- The IEA reported that "… polysilicon and ingots/wafers together account for almost 70% of all investment in solar PV manufacturing …" while cells and modules have low minimum investment requirements.[196]

- The BloombergNEF Report indicated that polysilicon and wafer facilities "take the longest to construct"[197] (12-40 months for polysilicon plants but only 3-12 months for cell and module facilities according to IEA; 3-4 years for polysilicon plants but only 1-3 years for ingot, wafer, solar cell and module facilities according to DOE).[198]

- The BloombergNEF Report concluded that "{t}echnical hurdles are highest for plants that make polysilicon and wafers;"[199] thus, "{g}iven low technical and financial barriers, it is also easier for module companies to open shop in other countries in response to tariffs or other policy developments."[200]  The DOE noted that "the module production process … does not require the same level of technical skill …"[201]

- According to the IEA, "{p}olysilicon production accounts for 40% of all energy consumed to manufacture solar PV modules, the largest {energy consumption} of all supply chain segments" followed by ingot and wafer production."[202]  Less than one third of energy consumption is for the production of solar cells and solar modules.

- The DOE found ingot and wafer production to be the most labor-intensive stages of solar cell production.  Although there are lower labor requirements for polysilicon production, it "requires highly skilled labor to operate a plant."[203]

- Based on information from the ITC and the DOE, there are 21-24 discrete steps to produce polysilicon, ingots, and wafers (seven steps to produce polysilicon and 14 to 17

---

[193] *See* Auxin's April 19, 2023 Case Brief (citing *Vietnam PDM* at 20).

[194] *See* Auxin's April 19, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47)).

[195] *See* Auxin's April 19, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 85)).

[196] *See* Auxin's April 19, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47 and 86)).

[197] *See* Auxin's April 19, 2023 Case Brief (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 1)).

[198] *See* Auxin's April 19, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 65); Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 12)).

[199] *See* Auxin's April 19, 2023 Case Brief (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 1)).

[200] *See* Auxin's April 19, 2023 Case Brief (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 3.4)).

[201] *See* Auxin's April 19, 2023 Case Brief (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 45)).

[202] *See* Auxin's April 19, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 36-37)).

[203] *See* Auxin's April 19, 2023 Case Brief (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 25)).

steps to produce wafers depending on the type of wafer produced) but only 17 -19 steps to produce solar cells and modules.

- Although more inputs are used to produce solar cells and modules than polysilicon, ingots, and wafers, the greater time and costs to start up, the significant energy required to run, and the higher technical hurdles associated with, polysilicon, ingot, and wafer facilities compared to solar cells and module facilities, and the fact that most inputs used to the produce solar cells and modules in the inquiry country are sourced from China, support finding solar cell and module production in the inquiry country to be minor or insignificant.

*NextEra*[204]

- Record evidence indicates that the nature of production in the inquiry country is not minor, but is a multi-step process that involves sophisticated machinery and is labor intensive compared to the production of polysilicon, ingots, and wafers in China.

- FTI Consulting, Inc. and the ITC described solar cell production as a multi-step process requiring uniquely designed and calibrated machines and a skilled force.[205]

- Auxin stated that "the production of cells and modules requires capital, technological sophistication, and R&D and Auxin does not dispute this unmarkable point."[206]

- Auxin certified before the ITC that "{m}anufacturing CSPV products is capital intensive and technologically sophisticated"[207] and that "CSPV manufacturers also must invest in cutting edge equipment and continued R&D."[208]  In contrast, record evidence shows that the technology used to produce wafers has stayed the same since it was originally created.[209]

- The *IEA Report* indicates that producing solar cells and modules requires more sophisticated equipment and is more labor-intensive than producing polysilicon, ingots, and wafers.[210]

- The CEA report indicates that cell production is the most capital-intensive part of the production process and requires the highest capital expenditure of any of the CSPV production stages.[211]

- Processing in the inquiry country creates the p/n junction which forms the solar cell and it is "where the essence of a solar module is realized."[212]  As the petitioner in the underlying investigation noted, a wafer's " … only notable characteristics are its crystal structure and positive potential orientation."[213]  Thus, transformation of the wafer into a solar cell and module is clearly "significant."

---

[204] *See* NextEra's April 28, 2023 Rebuttal Brief at 20-29.

[205] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 3 (citing *FTI Report* at 11) and Attachment 37-A (citing *ITC Solar Safeguard Proceeding 2017* at I-2 to I-23).

[206] *Id.* (citing Auxin March 7, 2022 Comments at 10).

[207] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 4 (citing *Auxin's ITC Posthearing Brief* at II-24)).

[208] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 19 (citing *Auxin's ITC Prehearing Brief* at 20)).

[209] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 3 (citing *FTI Report* at 11) and Attachment 19 (citing *Auxin's ITC Prehearing Brief* at 20)).

[210] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 35-36, 45)).

[211] *Id.*  (citing *CEA Report* at 11-12)).

[212] *Id.*  (citing *Vietnam* PDM at 18).

[213] *Id.*  (citing NextEra's May 2, 2022 Submission at Attachment 18).

40

- According to the *FTI Report, Denis De Ceuster Report*, *Auxin's ITC Posthearing Brief,* and *Auxin's ITC Prehearing Brief*, producing wafers from polysilicon is less extensive than producing solar modules from wafers.[214]  Auxin failed to address record information about the transformative nature of production in the inquiry country, ignored information regarding the production equipment used, and relied on irrelevant facts regarding energy consumption and lead times in its analysis.
- Although Auxin claimed that the ITC's findings on which Commerce relied are outdated, the ITC has reaffirmed its earlier findings that "CSPV cell production is capital intensive and requires a skilled workforce."[215]
- In sum, solar cell and solar module production in the inquiry country requires substantial initial and ongoing investments, extensive production facilities, sophisticated and highly technical equipment, and skilled laborers with specialized training.

*Boviet*[216]
- Commerce's conclusion regarding the nature of production follows from its long-standing view that formation of the p/n junction is the critical step that transforms the product into subject merchandise.

**Commerce's Position:**  We continue to find that the nature of the production process in the inquiry country is not minor or insignificant.

As an initial matter, it is useful to repeat here our description of the production process from the *Preliminary Determination,* which is not specific to any one respondent but encompasses the essence of the manufacturing performed by all the respondents.  As described in the *Preliminary Determination*:

> According to the ITC, to produce ingots, polysilicon rocks are placed into a quartz crucible along with a small amount of boron, which is used to provide a positive electric orientation.  The crucible is then heated in a furnace to approximately 2,500 degrees Fahrenheit to produce monocrystalline silicon, currently the most common form of polysilicon used in producing solar cells.  Once the polysilicon is melted, a seed crystal is lowered into the material and rotated, with the crucible rotated in the opposite direction.  The melt starts to solidify on the seed and the seed is slowly raised out of the melt—creating a single long crystal.  The crystal is then cooled before it is moved onto the next step.  The process of growing the crystal takes approximately 2.5 days.[217]

> To produce wafers, the top and tail of the ingot are cut off and the remaining portion is cut into equal length pieces and then squared.  A wire saw is used to

---

[214] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 1 (*Denis De Ceuster Report* at 8), Attachment 3 (citing *FTI Report* at 12), Attachment 4 (citing *Auxin's ITC Posthearing Brief* at 20), and Attachment 19 (citing *Auxin's ITC Prehearing Brief* at 20)).

[215] *Id.* (citing NextEra's May 2, 2022 Submission at Attachment 37-C (citing *ITC Solar Safeguard Proceeding 2017* at I-22)).

[216] *See* Boviet's April 28, 2023 Rebuttal Brief at 8-10.

[217] *See Vietnam* PDM at 19 (citing *ITC Solar Monitoring* at I-62).

41

slice the ingots into wafers.  Typically, diamond wire saws are used for monocrystalline wafer slicing.  The wafers are then cleaned, dried, and inspected.[218]

Solar cell production typically involves phosphorus being diffused into a thin layer on the wafer surface at high heat, which gives the surface of the wafer its negative potential electrical orientation.  The combination of that layer, and a boron-doped layer below, creates the positive-negative (p/n), junction.  A thin layer of silicon is removed from the edge of the solar cell to separate the positive and negative layers.  A silicon nitride antireflective coating is then added to the solar cell to increase the absorption of sunlight and metals are printed on the solar cell to collect electricity.  Aluminum and silver layers are applied, and then the solar cell is placed in a furnace, where the high temperature causes the silver paste to become imbedded in the surface of the silicon layer, forming a reliable electrical contact.  The final step in the process is testing and sorting the solar cells based on their characteristics and efficiency.[219]

To assemble solar cells into solar modules, a piece of glass is placed on the production line, and EVA or another encapsulant is placed on top of the glass.  Then a group of solar cells is placed in a line and soldered together, creating a string.  The strings are then placed on top of the encapsulant, and the string interconnections are soldered together.  After this, another layer of EVA and a backsheet are added, and the product is laminated and cured.  Usually a frame is added, and a junction box is attached to the back of the module.[220]

As explained in Comment 4, we did not consider the production of polysilicon in our analysis because none of the respondents' affiliates in China produced polysilicon, and there is no substantial evidence on the record to support finding that the Chinese solar industry is vertically integrated from the production of polysilicon to the production of solar modules.

We examined the nature of the production process by comparing the production of solar cells and solar modules in the inquiry country to the production of ingots and/or wafers in China, depending on whether the respondents' affiliates in China produced ingots and/or wafers.

Because Auxin claims that Commerce failed to properly weigh certain factors in its analysis of the nature of third-country processing (*i.e.*, capital requirements, building costs and time, technical hurdles, energy consumed in production, labor demands, number of production stages, and number of inputs used) we have addressed each of Auxin's factors below.  While we have addressed each of the factors relied upon by Auxin, it is important to note that Commerce has not established these factors as criteria for analyzing the nature of the production process in the foreign country, but examines the nature of that production process on a case-by-case basis.

---

[218] *Id.* (citing *ITC Solar Monitoring* at I-64).
[219] *Id.* at 17 (citing *ITC Solar Monitoring* at I-65 to I-66).
[220] *Id.* (citing *ITC Solar Monitoring* at I-67).

For the final determination, we have not considered capital expenditures/requirements or the cost associated with building production facilities in our analysis of the nature of production because we analyzed the level of investment in the production facilities under section 781(b)(2)(A) of the Act.  Thus, Auxin's comments regarding capital requirements and the cost to build manufacturing facilities are moot.

With respect to the time required to construct each type of production facility, according to the *DOE Solar Deep Dive*, ingot and wafer facilities, solar cell facilities, and solar module facilities require one to three years to build.[221]  Thus, this factor does not indicate that the nature of solar cell and solar module production in the inquiry country differs from the production of ingots and wafers in China.

With respect to technical hurdles, the *Bloomberg Report* notes that wafer factories "bear many technical hurdles, which makes it difficult for new factories to be built outside of China,"[222] whereas "{c}ell manufacturing … compared to wafers and polysilicon … has lower technical hurdles"[223]  and "{b}uilding a new module factory has low technical hurdles compared with wafer and polysilicon."[224]  Nonetheless, record evidence indicates that there are significant technical requirements that must be met for, and changing technologies with respect to, producing solar cells.

According to the *FTI report*, "the equipment and technology, as well as the number of processing steps required to produce a {solar} cell are far more technically sophisticated than those of the polysilicon or wafer manufacturing operations. … Cell manufacturing alone requires a fully integrated, multi-step manufacturing line with equipment to perform {multiple} processes … . Each of these processes requires one or more uniquely designed and calibrated machines to advance the wafer from a commodity product to a finished cell …"[225]

Moreover, while the technology required to produce ingots has not significantly changed since it was created,[226] the same is not true for solar cells.  "Technology improvements in the wafer-to-cell process are responsible for most of the performance improvements of solar panels."[227]  Because of technological improvements to solar cells, module makers must regularly upgrade their production lines to avoid becoming obsolete.[228]  Hence, there are also meaningful technological requirements that must be met before producing solar cells.

Regarding energy, according to the *IEA Report* ingot and wafer production consumes higher amounts of energy when compared to the solar cell and solar module production, which "require less heat and lower temperatures for drying and cooling, and most of the electricity is used for automated mechanical work."[229]  However, it is not clear that energy consumption is necessarily

---

[221] *See DOE Solar Deep Dive* at 12.
[222] *See Bloomberg Report* at 3.2.
[223] *Id.* at 3.3.
[224] *Id.* at 3.4.
[225] *See FTI Report at 11.*
[226] *See Denis De Ceuster Report* at 9.
[227] *Id.* at 1.
[228] *See Bloomberg Report* at 3.4.
[229] *See IEA Report* at 37.

43

informative when examining whether the nature of the production process is minor or insignificant. Energy consumption may have more to do with the type of processing required than the scale or extent of the processing. Therefore, the record does not support a finding that the lower energy consumption required to produce solar cells and modules contributes in a meaningful way to our evaluation of the nature of the production process.

With respect to labor, according to the *DOE Solar Report* 0.40-0.80 direct employees are required per MW of ingot and wafer production, while 0.15-0.45 and 0.50-0.70 direct employees are required per MW of solar cell and solar module production, respectively.[230] This means that a one GW ingot and wafer production facility requires 400-800 direct manufacturing workers, while one GW solar cell and solar module production facilities require 150-450 direct manufacturing workers and 500-700 direct manufacturing workers, respectively.[231] Based on this information, the labor requirements for a solar cell and solar module facility are greater than the labor requirements for an ingot and wafer production facility.

With respect to the skill level, the ITC reported that processing wafers into solar cells involves sophisticated machinery, which requires "skilled technicians and employees with advanced degrees."[232] There is no information on the record that indicates that the production of ingots and wafers require skilled workers.

According to the *DOE Solar Deep Dive,* producing ingots and wafers requires 14 or 17 steps (depending on the type of wafer produced, *i.e.*, monocrystalline or multicrystalline), producing solar cells requires seven or 11 steps (depending on whether a full-area AI-BSF cell or full-area PERC cell is being produced), and producing solar modules requires nine steps.[233] Thus, it requires fewer steps to produce ingots and wafers in China, than to produce solar cells and solar modules in the inquiry country.

More significant, however, is the nature of the production performed in each production step. The *IEA Report* specifies that while each segment of the manufacturing processes require various types of special equipment, solar cell production requires sophisticated, precise and advanced automation equipment, and solar module production requires "highly automated machinery and accurate quality-testing equipment at multiple stages."[234] Meanwhile, the *IEA Report* indicates that ingot production uses "simpler, more conventional equipment …"[235] Therefore, producing solar cells and solar modules in the inquiry country involves a multi-step production process that requires more precise and sophisticated equipment at multiple stages compared to producing ingots and wafers in China.

Regarding inputs, solar cell and solar module production requires approximately 100 different inputs, whereas converting polysilicon into wafers only involves a handful of inputs.[236]

---

[230] *See DOE Solar Report* at 11.

[231] *Id.* at 11.

[232] *See ITC Solar Final* at I-18; *see also ITC Solar Safeguard Proceeding 2017* at I-22 to I-23.

[233] *See DOE Solar Deep Dive* at 30-31, 35-36, and 44.

[234] *See IEA Report* at 35.

[235] *Id.* at 3.

[236] *See Vietnam* PDM at 20.

44

More importantly, producing wafers from polysilicon in China is less extensive of a transformation of the input than producing solar cells and solar modules from wafers in the inquiry country.  The essence of the solar module is realized in solar cell production.  In the *Preliminary Determination*, we noted that:

> once a wafer is doped and an opposite electrical orientation is imparted on the surface, it results in the creation of a p/n junction.  When sunlight strikes the cell, the positive and negative charge carriers are released, causing electrical current to flow.  It is at this point that the cell is capable of generating electricity from sunlight.[237]

> Therefore, Commerce has determined that it is only when the p/n junction is created that a wafer is no longer just a wafer, but is a solar cell that is subject to *the Orders*.[238]

In sum, the production of solar cells and solar modules in the inquiry countries has greater labor demands, more steps, and requires more inputs than ingot and wafer production in China.  Moreover, the multi-step solar cell and solar module production process requires sophisticated, precise, and technologically advanced equipment, and a skilled workforce.  Production of solar cells and wafers involves more than attaching Chinese components together.  Solar cell and solar modules production involve exacting processes (*e.g.*, molecular-level impregnation of phosphorus into the wafer at a high heat,[239] printing solar cells (metals, such as silver paste, are printed onto the solar cell to collect electricity[240])) and treatments to, and preparation of, inputs used in production (such as lamination and curing of EVA, solar cells, and the backsheet).[241]

Importantly, the essential nature of the final product is imparted and realized through production in the inquiry country when the p/n junction is formed in the wafer.  The p/n junction "… results in the creation of solar cells—albeit unfished solar cells—capable of converting sunlight into electricity via the photovoltaic effect."[242]  Moreover, other components in the solar cell and solar module are important to its ability to function because they channel the electricity out of the cell so that the product can be used as intended.  We do not believe that the technical hurdles associated with ingot and wafer production outweigh the above facts when comparing the nature of producing ingots and wafers to the nature of producing solar cells and solar modules.

Based on the foregoing, we continue to find that the nature of the production process in the inquiry country performed by the mandatory respondent(s) does not support finding the process of assembly or completion in the inquiry country to be minor or insignificant.

---

[237] *Id.* at 21 (citing Solaria Scope Ruling at 10-11).
[238] *Id.* (citing SunSpark Scope Ruling at 6).
[239] *See* Circumvention Request at 20.
[240] *Id.* at 20.
[241] *Id.* at 21.
[242] *See* ET Solar Scope Ruling at 7.

45

## Extent of the Production Facilities

*Auxin*[243]
- Instead of conducing a meaningful facility analysis, Commerce merely stated that "{b}ecause Boviet does not have Chinese affiliates with solar production facilities … the extent of Boviet's production facilities in Vietnam does not support a finding of minor or insignificant assembly or completion in Vietnam …"
- Commerce failed to follow its longstanding practice of comparing assembly facilities in the inquiry country to facilities for all the stages required to produce subject merchandise (a merchandise-centric approach).
- Record evidence demonstrates that the extent of production facilities in China that are required to produce subject solar cells and modules is significantly greater than the extent of Boviet's production facilities in Vietnam.[244]

*Boviet*[245]
- Auxin's analysis is flawed because it did not make an apples-to-apples comparison or take into account Commerce's approach, in this inquiry, to analyzing the extent of production facilities.
- Auxin inappropriately compared Boviet's non-integrated facilities in Vietnam to a fictitious fully-integrated Chinese solar module producer.
- Auxin's focus on absolute size and capacity fails to take into account the fact that Boviet is simply a smaller producer.  A per-watt comparison supports Commerce's findings.
- Auxin also failed to consider Commerce's decision, in this inquiry, to compare a respondent's activities in the inquiry country to its affiliates' activities in the order country and to exclude polysilicon production from the analysis.
- Boviet has facilities to completely perform the complex and capital-intensive process of converting wafers into solar cells and solar modules which indicates that the extent of its production facilities is not minor or insignificant.

*NextEra*[246]
- Commerce correctly concluded that Boviet's production facilities are not minor or insignificant.
- Commerce officials verified the extent of Boviet's solar cell and solar module production facilities in Vietnam and witnessed its sophisticated and technologically advanced operations.

**Commerce's Position:**  We disagree with Auxin.  Boviet has complete facilities for converting wafers into solar cells and assembling solar cells into solar modules.  Those facilities include all the production and testing equipment required to fully perform the necessary processing steps.  Moreover, the information that Boviet provided regarding the square footage and capacity of its

---

[243] *See* Auxin's April 19, 2023 Case Brief at 43-47.
[244] *Id.* at 44-46 (citing Auxin's July 29, 2022 Comments at Exhibit 1 (*IEA Report* at 27 and 85) and Exhibit P-2, and Circumvention Request at 69-70 and Exhibits 14 and 96).
[245] *See* Boviet's April 28, 2023 Rebuttal Brief at 10-14.
[246] *See* NextEra's April 28, 2023 Rebuttal Brief at 29-31.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

Vietnamese facilities, and the number of workers employed in them, indicate that the extent of the facilities is neither minor nor insignificant.[247]

Commerce often will gauge the extent of production facilities based on comparisons.[248] However, Boviet is not affiliated with any Chinese solar producers to which we can compare its facilities. Moreover, for the reasons explained in Comment 4, in this particular inquiry, we do not find it appropriate to compare the extent of Boviet's production facilities in Vietnam to facilities of unaffiliated Chinese producers for each stage required to produce the merchandise under consideration.

Additionally, as explained in Comment 4, we do not find it appropriate to consider facilities for the production of polysilicon in our facilities analysis. We have not done so because none of the mandatory respondents have affiliates that produce polysilicon, and there is no substantial evidence on the record that the Chinese solar industry is vertically integrated from polysilicon production to solar module production.

Hence, we do not find Auxin's square footage and capacity comparisons between Boviet and unaffiliated Chinese solar producers to be persuasive.

Therefore, we continue to find that the extent of Boviet's production facilities in Vietnam indicates that its assembly and completion of Chinese components in the inquiry country is minor or insignificant.

**The Value of Processing in Vietnam**

*Silfab*[249] and *Trina*[250]
- Because Commerce relies on surrogate values for its value-added analysis, Commerce should limit the weight of the statutory criteria necessitating the reliance on surrogate values.
- Commerce wrongly focused solely on a quantitative, value-added analysis, without a broader view of the production process. Congress has directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the parts and components imported into the processing country."[251]
- Commerce found that "{o}nly a handful of inputs are used to convert polysilicon rocks into wafers, whereas converting solar cell into a solar module requires approximately 100 different inputs."[252]
- It is evident through Commerce's prior circumvention decisions that the "minor and insignificant" factors go hand in hand. That is, if a production process involves

---

[247] *See Vietnam* PDM at 21. Due to the business proprietary nature of the information provided, Commerce included a complete analysis of the extent of the production facilities in the Boviet Preliminary Analysis Memorandum.
[248] *See, e.g.*, *HFCs from China (India) Preliminary* PDM at 19, unchanged in *HFCs from China (India)*.
[249] *See* Silfab's April 29, 2023 Rebuttal Brief at 14-15.
[250] *See* Trina's April 19, 2023 Case Brief at 7.
[251] *Id.* (citing *Cold Rolled Steel from China (Vietnam) Preliminary Determination* PDM at 19).
[252] *Id.* at 7 (citing *Vietnam* PDM at 20).

numerous steps and sophisticated machinery and workers, then it likely also requires significant production facilities and capital investment. It then follows that with significant levels of investment, production processes, and production facilities, the value added is also likely to be significant.

**Commerce's Position:**  In the *Preliminary Determination*, Commerce found that the value of the processing performed in Vietnam by Boviet and Vina is not a small proportion of the value of the inquiry merchandise imported into the United States.  We have since applied AFA to Vina.[253] In the *Preliminary Determination* for the other companies to which we applied AFA, we found that the value of its processing performed in Vietnam is a small proportion of the value of the inquiry merchandise imported into the United States, which weighs in favor of finding circumvention.  No party has argued that we should not apply AFA to the non-cooperating companies, including to Vina, and we continue to find that for the other companies to which we have applied AFA, including to Vina, the value of its processing performed in Vietnam is a small proportion of the value of the inquiry merchandise imported into the United States, which weighs in favor of finding circumvention.

While parties arguing that we should not find circumvention have cited to value information on the record and how we should treat and weigh it, we have not addressed these comments because they are moot because we continue to find Boviet's value of processing not to constitute a small share of U.S. price.  These comments are also moot because we have applied AFA to Vina and no party has argued that we should not apply AFA to Vina.  We stated from the *Initiation* that a company's failure to completely  respond to Commerce's requests for information may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences,  pursuant to section 776(b) of the Act.[254]  To the extent parties are arguing that we should not rely on the circumvention findings of Vina and other companies to which we applied AFA in making a country-wide determination, as we noted in the *Preliminary Determination*, Vina and the AFA companies account for a significant volume of solar cells and modules exported from Vietnam to the United States.[255]  Thus, consistent with the *Preliminary Determination*, because Commerce was unable to examine all Vietnamese producers of solar cells and modules, Commerce determines that a country-wide determination is most appropriate to prevent further circumvention of the orders by non-examined producers of inquiry merchandise in Vietnam, with the exception of shipments of inquiry merchandise from Boviet. We have further discussed our country-wide determination at Comment 11.

**Overall Determination of Section 781(b)(1)(C)**

*CSIL*,[256] *NextEra*,[257] *Silfab*,[258] and *Trina*[259]
   •   The Circumvention Request mischaracterizes the manufacturing operations required to transform a raw polysilicon wafer into a functional solar cell as "minor and insignificant.

---

[253] *See* the accompanying *Federal Register* notice in the section entitled "Application of AFA."
[254] *See Initiation Notice*, 87 FR at 19072.
[255] *See Vietnam* PDM at 27.
[256] *See* CSIL's April 19, 2023 Case Brief at 4-12.
[257] *See* NextEra's April 19, 2023 Case Brief at 1-6.
[258] *See* Silfab's April 19, 2023 Case Brief at 3-4 and 13-20.
[259] *See* Trina's April 19, 2023 Case Brief at 4-9.

48

Record evidence gathered by Commerce demonstrates that the processing required to create solar cells and modules from a wafer is extensive, complicated, and a high-value generating operation and is not minor.  However, Commerce has incorrectly relied on Auxin's mischaracterization in reaching its *Preliminary Determination* that found circumvention in the targeted countries.

- Commerce should ground its final determinations in the agency's longstanding interpretation of the scope of the *Orders* and determine that solar cells and modules with p/n junctions formed outside of China are not circumventing the *Orders* and that merchandise not subject to these circumvention inquiries should also include solar cells and modules comprising a p/n junction formed outside of China, irrespective of the production location of the wafer, ingot, polysilicon, or other upstream material.

- The Circumvention Request mischaracterizes the manufacturing operations required to transform a raw polysilicon wafer into a functional solar cell as "minor and insignificant. Record evidence gathered by Commerce demonstrates that the processing required to create solar cells and modules from a wafer is extensive, complicated, and a high-value generating operation and is not minor.  However, Commerce has incorrectly relied on Auxin's mischaracterization in reaching its *Preliminary Determination* that found circumvention in the targeted countries.

- The formation of a p/n junction is a transformative step in the manufacture of a solar cell. This crucial operation requires significant investment, technological sophistication, a skilled labor force, and a complex manufacturing process.[260]  Solar industry leaders, Commerce, the ITC, and CBP have all consistently acknowledged the primacy of p/n junction formation.  It is impossible that the process of forming the p/n junction could at the same time be considered the "essential" step and also "minor or insignificant." As such, whether imported solar cells and modules produced outside of China are subject to the underlying *Orders* should depend on the location of the formation of the p/n junction, not the source of the manufacturing of the upstream wafer (or any other input such as polysilicon).

- When Commerce examined the third-country production processes it clearly found these processes to be substantial, stating in its *Preliminary Determination*s the following findings:
  – "{W}e find that the nature of the production performed by the respondents in the third country is not minor or insignificant compared to either processing polysilicon into wafers, or ingots into wafers, in China, which does not weigh in favor of finding circumvention."
  – "Commerce previously noted that cell production is where the essence of a solar module is realized."
  – "{T}he process for turning wafers into solar cells requires an expensive, multi-stage assembly line requiring high-technological machinery and workers with strong technological knowledge."
  – "Only a handful of inputs are used to convert polysilicon rocks into wafers, whereas converting a solar cell into a solar module requires approximately 100 different inputs."

---

[260] *See* Silfab's April 19, 2023 Case Brief at 14 (citing Circumvention Request at 47).

– "{R}elative to ingot and wafer production, solar cell and module production involves a greater number of stages, each requiring a high level of technological sophistication."

– "{M}odule production also involves a large number of varied inputs consumed in a complex, multi-step production process that requires precision, highly skilled workers, and accurate quality-testing equipment at multiple stages."[261]

- Congress has required that Commerce consider the totality of the evidence presented regarding processing undertaken in the inquiry countries, and that Commerce must make its determinations "on a case-by-case basis, in recognition that the facts of individual cases and the nature of specific industries are widely variable"[262] and Commerce has stated in the *Vietnam* PDM that "… no single factor listed in section 781(b)(2) of the Act will be controlling."  However, Commerce has given too much weight to the level of R&D conducted in the inquiry country in its *Preliminary Determination*.

- It is incongruous and fundamentally contradictory for Commerce to find that the nature of the production process is not minor or insignificant, and yet reach a conclusion that the process of assembly or completion in the targeted countries is nonetheless minor or insignificant.  While the nature of production is not the sole factor under 781(b)(1)(c) of the Act determining whether the third country processing is minor or insignificant, relying heavily on the nature of the production process in reaching a circumvention determination is consistent with past practice, the statute, and legislative history.[263] Commerce appears to have never previously reached an affirmative circumvention determination while also concluding that the nature of the production process in the third country was not minor or insignificant.

- Commerce's emphasis on R&D is inconsistent across circumvention cases. Commerce has repeatedly indicated that the level of R&D is *less* informative in determining whether third-country processing is minor or insignificant than the other statutory factors under section 781(b)(2) of the Act.[264]

- The plain language of the statute also indicates the nature of the production process is an important factor. "Process" is a foundational term in the statute. Pursuant to section 781(b)(1)(C) of the Act Commerce cannot include in the scope of an existing order products manufactured in a third country unless "the process of assembly or completion in the foreign country … is minor or insignificant."

- The SAA repeatedly refers to circumventing activity as the establishment of a "screwdriver operation" in the United States or third country, and also notes that it would be "relatively easy" for a foreign exporter to circumvent orders by establishing such screwdriver operations.[265]  The solar cell and module production in the targeted countries is clearly not a simple and small-scale "screwdriver operation" as described in the URAA.

---

[261] *Id.* at 18 (citing *Vietnam* PDM at 20).
[262] *See* CSIL's April 19, 2023 Case Brief at 12 (citing *CWCS from India (Oman and India) Preliminary* PDM at 16, unchanged in *CWCS from India (Oman and India) Final* ).
[263] *See* NextEra's April 19, 2023 Case Brief (citing *Aluminum Foil from China Circumvention Preliminary Determination (Korea)* PDM at 15).
[264] *See* CSIL's April 19, 2023 Case Brief at 17 (citing *Aluminum Foil from China (Korea and Thailand) Preliminary* PDM at 14)
[265] *See* NextEra's April 19, 2023 Case Brief at 5-6 (citing SAA at 893-94).

- Because Commerce relies on surrogate values for its value-added analysis, Commerce should limit the weight of the statutory criteria necessitating the reliance on surrogate values.
- Commerce's decision with regard to the nature of processing did not rely on mandatory respondent data. Thus, regardless of whether Commerce could verify other aspects of the responses by mandatory respondents, Commerce's determination with regard to the nature of cell production and module cannot change since this factor was so clear to Commerce and did not rely on information reported by respondents.

*Auxin*[266]

- Silfab's contention that Auxin mischaracterized the solar cell production process, or that Commerce and Auxin ignored section 781(b)(1)(E), is without record support.  Auxin outlined Commerce's longstanding practice of employing a comparative methodology when evaluating whether completion or assembly in a third country is minor or insignificant.  Employing this framework, Auxin demonstrated that the process of completing or assembling solar cells from Chinese-origin wafers, and completing or assembling solar modules from solar cells, was "minor or insignificant" under Commerce practice.  Auxin's analysis is consistent with the U.S. Department of Energy's and the International Energy Agency's own analysis of the solar production process.

**Commerce's Position:**  Aside from its rebuttal of Silfab's comments, Auxin's comments concerning section 782(b)(1)(C) of the Act were focused on the criteria used as a basis for making a determination itemized under section 782(b)(2) of the Act, which we have addressed above.  Based on the factors listed under section 781(b)(2) of the Act, we continue to find that pursuant to section 781(b)(1)(C) of the Act, Boviet's production process of inquiry merchandise in Vietnam is not minor or insignificant.

In the *Preliminary Determination*, Commerce found that based on the factors listed under section 781(b)(2) of the Act, pursuant to section 781(b)(1)(C) of the Act, that the production of inquiry merchandise in Vietnam is minor or insignificant for Vina.  We have since applied AFA to Vina.[267]  In the *Preliminary Determination* for the other companies to which we applied AFA, we found that that the production of inquiry merchandise in Vietnam is minor or insignificant, which weighs in favor of finding circumvention.  No party has argued that we should not apply AFA to the non-cooperating companies, including to Vina, and we continue to find that for the companies to which we have applied AFA, including to Vina, that the production of inquiry merchandise in Vietnam is minor or insignificant, which weighs in favor of finding circumvention.

While parties arguing that we should not find circumvention have made numerous comments and cited to information on the record and how we should treat and weigh it, we have not addressed these comments because they are moot because we have applied AFA to Vina and no party has argued that we should not apply AFA to the non-cooperating companies, including Vina.[268]  We stated from the *Initiation Notice* that a company's failure to completely respond to Commerce's

---

[266] *See* Auxin's March 6, 2023 Rebuttal Brief at 28-31; Auxin's April 19, 2023 Case Brief at 30-47.
[267] *See* the accompanying *Federal Register* notice.
[268] *Id.* at the section titled "Application of AFA."

51

requests for information may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences,  pursuant to section 776(b) of the Act.[269]  To the extent parties are arguing that we should not rely on the circumvention findings of Vina and other companies to which we applied AFA in making a country-wide determination, as we noted in the *Preliminary Determination*, Vina and the AFA companies account for a significant volume of solar cells and modules exported from Vietnam to the United States.[270]  Thus, consistent with the *Preliminary Determination*, because Commerce was unable to examine all Vietnamese producers of solar cells and modules, Commerce determines that a country-wide determination is most appropriate to prevent further circumvention of the orders by non-examined producers of inquiry merchandise in Vietnam, with the exception of shipments of inquiry merchandise from Boviet.  We have further discussed our country-wide determination at Comment 11.

With regard to other sections of the Act, no party has commented on our *Preliminary Determination* under sections 781(b)(1)(A) and (B) of the Act that the inquiry merchandise imported into the United States is within the same class or kind of merchandise as the class or kind of merchandise subject to the *Orders* and that this merchandise is being completed and assembled, in part, from parts and components produced in China, the country with respect to which the applicable *Orders* apply.  We continue to find that the conditions under sections 781(b)(1)(A) and (B) of the Act have been met.

No party has commented on our *Preliminary Determination* that pursuant to section 781(b)(1)(D) of the Act the value of the merchandise produced in China that was used to produce inquiry merchandise is a significant portion of the total value of the merchandise exported from Vietnam to the United States for Boviet and, based on AFA, the non-responsive companies listed in Appendix II of the *Federal Register* notice accompanying this memorandum, including Vina.  We continue to find that the conditions under section 781(b)(1)(D) of the Act have been met for Boviet and the non-responsive companies, including Vina.

Furthermore, as detailed in Comment 12, we determine that action is warranted to prevent evasion of the *Orders* pursuant to section 781(b)(1)(E) of the Act.

Concerning the three factors under section 781(b)(3) of the Act (*i.e.*, pattern of trade and sourcing, affiliations, and whether imports of parts and components from China increased), as addressed in *Preliminary Determination*,[271] Commerce finds that each of these factors supports an affirmative determination of circumvention for Boviet, and based on AFA, the non-responsive companies listed in Appendix II of the accompanying *Federal Register* notice, including Vina.

Based on an analysis of the totality of the information on the record of these circumvention inquiries related to Boviet, we find that Boviet is not circumventing the *Orders* in accordance with section 781(b) of the Act.  Thus, we find that Boviet's exports of inquiry merchandise produced with wafers exported by the specific companies reported in its questionnaire responses are not subject to this finding.  However, based on AFA, we find that the non-responsive firms

---

[269] *See* the *Initiation Notice*, 87 FR at 19072.
[270] *See* the *Vietnam* PDM at 27.
[271] *Id.* at 23-24.

listed Appendix II of the Federal Register notice, including Vina, are circumventing the *Orders* in accordance with section 781(b) of the Act.

Because Commerce was unable to examine all Vietnamese producers of solar cells and modules, Commerce determines that a country-wide determination is most appropriate to prevent further circumvention of the orders by non-examined producers of inquiry merchandise in Vietnam. Therefore, Commerce is applying this affirmative determination of circumvention to all shipments of inquiry merchandise from Vietnam on or after April 1, 2022, the date of publication of the *Preliminary Determination*.

We disagree with Silfab's assertion that Commerce has relied on Auxin's research in reaching its *Preliminary Determination*. As detailed throughout the *Preliminary Determination* our determination was based overwhelmingly on the respondents' own information.

**Comment 8.   Whether VSUN Is Eligible to Participate in the Certification Program**

*VSUN*[272]
- Consistent with its post-*Preliminary Determination* corrections, where Commerce noted that it incorrectly listed VSUN as an uncooperative AFA company which was ineligible to participate in the certification program, Commerce must allow VSUN to participate in the certification program.

No other interested parties commented on this issue.

**Commerce's Position:**  We agree with VSUN.  Because VSUN timely responded to Commerce's Q&V questionnaire, we have not applied AFA to VSUN and it may participate in the certification program.[273]

**Comment 9.   Whether Commerce's Rejection of Red Sun Q&V Submission was Proper**

*Red Sun*[274]
- Commerce should place Red Sun's Q&V information on the record and permit Red Sun to file certifications under Appendix VI.
- Commerce's decision was an unlawful abuse of discretion.  The fact that Commerce made its respondent selection decision 13 days after ACCESS registered a Q&V response by Red Sun demonstrates that this response arrived with sufficient time to minimize any finality concerns that Commerce may have had regarding respondent selection. Meanwhile, it took Commerce 216 days after Red Sun's attempted Q&V filing to reject it.[275]
- Red Sun was not represented by counsel at the time of filing its Q&V response.  Thus, Red Sun was both a *pro se* and first-time respondent before Commerce.  Further, there may be additional circumstances surrounding Red Sun's filing which are missing from

---

[272] *See* VSUN's March 6, 2023 Case Brief at 2.
[273] *See* Preliminary Determination Corrections at 1-2.
[274] *See* Red Sun's April 19, 2023 Case Brief at 3-12.
[275] *Id.* (citing Commerce's December 1, 2022 Rejection Letter).

53

the ACCESS record of this inquiry, despite Red Sun's request that Commerce supplement the record.[276]  This information is relevant to Red Sun's contention that it tried to cooperate to the best of its ability.

- For example, the current record lacks information to evaluate whether Commerce followed guidance in section 782(c)(2) of the Act that it "shall take into account any difficulties experienced by the interested parties, particularly small companies … and shall provide to such interested parties any assistance that is practicable."

- Similarly, if Red Sun attempted to file its Q&V response on or before April 20, 2022, the record lacks information to understand whether or the extent to which Commerce provided Red Sun "a written explanation of the reasons for not accepting the information" as instructed in section 782(f) of the Act.  Along this same line, if Red Sun attempted to file a Q&V response within the established due date but the submission did not conform to requirements for establishing business proprietary treatment of information under 19 CFR 351.304, the current ACCESS record would lack information to evaluate whether Commerce provided "a written explanation" to Red Sun regarding the reasons for the rejection and its options to conform the submission as described in 19 CFR 351.304(d)(1).

- While ACCESS is an important tool for managing the administrative record and for permitting participation in Commerce proceedings, it is not always the complete administrative record.  The administrative record is defined to include "all information presented to or obtained by the {agency} … during the course of the administrative proceeding."[277]

- The CIT has explained that the administrative record is not necessarily "those documents that the agency has compiled and submitted as 'the' administrative record"; rather the administrative record "consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position."[278]

- That Red Sun was acting *pro se* provides a general indication regarding the size of this company and the size of its interest in this inquiry.  It is reasonable to assume that such a company would not represent any significant share of exports such that it might be selected as a mandatory respondent.

- In *Grobest*,[279] the CIT considered Commerce determination to reject as untimely a separate rate certification submitted by a respondent 95 days late to be an abuse of discretion.  While the facts in *Grobest* related to a late separate rate certification filing, the rationale logically extends to the facts here.  Additionally, in *Grobest* the separate rate certification was needed to determine whether the respondent qualified for a separate rate, whereas here Red Sun's Q&V response was a formality and not likely to change any determination by Commerce in this inquiry.

- In *Oman Fasteners*, the CIT found that Commerce abused its discretion not to grant a retroactive extension of the due date.[280]  In addition, the CIT has recently and repeatedly held that, when a party's submission is untimely and causes no prejudice, Commerce is

---

[276] *Id.* (citing Red Sun's January 6, 2023 Request Letter).
[277] *See* Red Sun's April 19, 2023 Case Brief (citing section 516A(b)(2)(A)(i) of the Act).
[278] *Id.* (citing *Hyundai Electric CIT*, 477 F. Supp. 3d at 1324 (citing *F Lli De Cecco* 477 F. Supp at 488-89).
[279] *Id.* (citing *Grobest*, 815 F. Supp. 2d at 1366-67).
[280] *Id.* (citing *Oman Fasteners*, Slip Op. 23-17 at 6-7).

"not free to apply" its deadline "in so harshly a way as to produce an unjust and punitive result."[281]

- Even if Commerce continues to reject Red Sun's submission, Commerce is not permitted to apply facts available with an adverse inference to Red Sun because Commerce's determination that Red Sun failed to cooperate is not supported by the record. Commerce's claim that Red Sun did not indicate it was having difficulty responding or otherwise attempting to respond in a timely manner is not supported by the record and Commerce has not yet supplemented the record with information relevant to this issue.

- Moreover, as the CIT has repeatedly explained, Commerce may not base its use of an adverse inference "on what was no more than a minor incident of non-compliance with an ACCESS filing requirement that had no appreciable effect on the proceeding."[282]

*Auxin*[283]

- Commerce should reject Red Sun's arguments and should continue to apply AFA to Red Sun.

- The CAFC explains that "Commerce generally does not consider untimely factual information."[284]  This is because, in "order for Commerce to fulfill its mandate to administer the antidumping duty law, including its obligations to calculate accurate margins, it must be permitted to enforce the time frame provided in its regulations."[285] To that end, "Commerce's regulations require that it reject untimely-filed factual information unless the record is reopened or, where appropriate, an extension is sought."[286]

- The deadline to respond to Commerce's Q&V questionnaire was no later than 5:00 p.m. ET on April 22, 2022.  Red Sun did not file its Q&V questionnaire until April 29, 2022.[287]

- Red Sun cites to no evidence that it encountered difficulties filing its Q&V.  Additionally, Red Sun did not file its Q&V questionnaire response until a week later.  Thus, Red Sun's argument that Commerce's rejection of Red Sun's Q&V questionnaire response was an abuse of discretion is wholly without merit.

- None of the cases cited by Red Sun concerning Commerce's enforcement of its deadlines applies to the facts of this case because Red Sun did not point to any record evidence demonstrating that it encountered technical difficulties in attempting to submit its Q&V questionnaire response.  For example, in *Oman Fasteners*, the respondent encountered technical difficulties on ACCESS but was ultimately able to file its supplemental questionnaire response less than 30 minutes after the deadline.[288]  Similarly in *Ajmal Steel Tubes* the "total delay to the investigation by Ajmal, caused by its operational adjustments due to COVID-19, consisted of less than two hours."[289]  Likewise, in *Celik*

---

[281] *Id.* (citing, *e.g.*, *Celik Halat* 557 F. Supp. 3d at 1361; and *Ajmal Steel*, Slip Op. 22-121 at 4).
[282] *See* Red Sun's April 19, 2023 Case Brief (citing, *e.g.*, *Celik Halat*, 557 F. Supp. 3d at 1357).
[283] *See* Auxin's April 28, 2023 Rebuttal Brief at 44-47.
[284] *Id.* (citing *Essar Steel*, 678 F.3d at 1278).
[285] *Id.* (citing *Dongtai Peak*, 777 F.3d 1351).
[286] *Id.* (citing *Mid Continent*, Slip Op. 2023-45 at 5-6 (citing 19 CFR 351.302(d)).
[287] *Id.* (citing Commerce's December 1, 2022 Rejection Letter).
[288] *Id.* (citing *Oman Fasteners*, Slip-Op 2023-14 at 4-7).
[289] *Id.* (citing *Ajmal Steel*, Slip-Op. 2022-121 at 4).

*Halat*, the respondent encountered technical difficulties in filing on ACCESS but was able to file 21 minutes after the 5:00 p.m. deadline.[290]

**Commerce's Position:** We agree with Auxin that we properly rejected Red Sun's untimely Q&V questionnaire response and that we should continue applying AFA to Red Sun. The deadline to respond to Commerce's March 30, 2022, Q&V questionnaire was 5:00 p.m., ET, on April 22, 2022.[291] Red Sun officially filed its Q&V questionnaire response through ACCESS seven days after it was due.[292] Commerce explicitly stated in its Q&V questionnaire that all submissions must be made electronically using Commerce's ACCESS website at https://access.trade.gov.[293]

Red Sun argues that there is no information on the record to evaluate whether Commerce followed section 782©(2) of the Act. In *Stainless Steel Bar from India*, Commerce stated that while it "affords respondents additional assistance (*e.g.,* small companies) when they have difficulty meeting reporting requirements, … all respondents are still required to submit information in a timely manner."[294] Additionally, Red Sun argues that there is no information on the record about whether it attempted to file Q&V responses within the established due date, and whether a written explanation was provided to reject any filing attempt due to any issues related to business proprietary treatment of information. Commerce explicitly provided filing instructions in the Q&V questionnaires.[295] Regardless of whether the record contains any information about the items described above, Red Sun's Q&V questionnaire response was untimely.

Pursuant to 19 CFR 351.302(c), parties may request an extension of a time limit before the applicable time limit expires, and an untimely filed extension request will not be considered unless the party demonstrates that an extraordinary circumstance exists. Red Sun did not submit a request for an extension deadline and did not provide an explanation as to why it filed its Q&V questionnaire response late.

Red Sun cited to *Oman Fasters, Ajmal Steel* and *Celik Halat,* where responses to questionnaires were submitted shortly after 5:00 p.m. on the due date because of technical issues and Commerce accepted the untimely responses. The facts in this case are different, because Red Sun's Q&V questionnaire response was seven days late, and it did not provide a written explanation to why its response was late or if it encountered technical difficulties.

We disagree with Red Sun that the Court's decision in *Grobest* requires Commerce to accept its Q&V questionnaire response. Red Sun argues that accepting its Q&V questionnaire response would not have placed a procedural burden on Commerce because it issued its *Vietnam RSM* 13 days after Red Sun submitted its Q&V questionnaire response. Red Sun further contends that its Q&V questionnaire response was merely a formality as Red Sun would not have been chosen as

---

[290] *Id.* (citing *Celik Halat*, 557 F. Supp. 3d at 1361-62).
[291] *See* Q&V Questionnaire; *see also* Q&V Questionnaire Deadline Extension at 1.
[292] *See* Commerce's December 1, 2022 Rejection Letter at 1.
[293] *See* Q&V Questionnaire at 11.
[294] *See Stainless Steel Bar from India* IDM at Comment 1.
[295] *See* Q&V Questionnaire at 11.

a mandatory respondent. However, the procedural burden at issue here does not necessarily come from reviewing a Q&V questionnaire response but stems from accepting untimely Q&V questionnaire responses. As stated in *Solar Cells from China Investigation*, "{i}t is important for {Commerce} to receive Q&V questionnaire responses in a timely fashion so that it can adhere to a schedule that allows it to meet the statutory deadlines for completing the {proceeding}."[296] The CIT sustained Commerce's decision to reject an untimely Q&V in the *Solar Cells from China Investigation*.[297] Further, even if the decision were applicable, *Grobest* involved the late filing of a separate rate certification that was consistent with information provided to Commerce in several earlier administrative reviews of the same company and was unlikely to prompt further investigation by Commerce. Commerce uses the information in Q&V questionnaires to select mandatory respondents, thus, the examination of mandatory respondents cannot begin until after Commerce receives and analyzes the Q&V questionnaire responses. Additionally, Red Sun's eligibility to participate in the certification regime was contingent upon its timely response to the Q&V questionnaire, a fact that further demonstrates that Red Sun's Q&V questionnaire response was not a mere formality.

We also continue to find Red that Sun's untimely submission of its Q&V questionnaire response constitutes a failure to act to the best of its ability and warrants the application of AFA under section 776(b) of the Act. In *Nippon Steel*, the CAFC explained that:

> Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information. Compliance with the "best of its ability" standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.[298]

Thus, Red Sun's actions fall squarely within the circumstances addressed by the CAFC in *Nippon Steel*. Commerce did not require "perfection" from Red Sun, a *pro se* party at the time of the Q&V questionnaire response deadline. However, consistent with *Nippon Steel*, we do not condone Red Sun's inattentiveness in failing to follow the filing guidelines specified in the Q&V questionnaire, namely the guidelines concerning the need for respondents to timely file public versions of the proprietary responses by the deadline specified in Q&V questionnaire cover letter.[299] Further, consistent with *Nippon Steel*, we do not condone Red Sun's carelessness in failing to request an extension request via ACCESS ahead of the Q&V questionnaire due date.

Therefore, consistent with *CRS from Korea (Vietnam),* we determine that we have the statutory authority to apply AFA to respondents that did not submit timely Q&V questionnaires, in accordance with sections 776(a) and 776(b) of the Act.[300] Thus, we continue to apply AFA to

---

[296] *See Solar Cells from China Investigation* IDM at Comment 45.
[297] *See Jiasheng*, 28 F. Supp. 3d at 1329-33.
[298] *See Nippon Steel*, 337 F.3d at 1382.
[299] *Id.*
[300] *See CRS from Korea (Vietnam)* IDM at Comment 4.

Red Sun because it did not submit a timely response to Commerce's Q&V questionnaire and, therefore, preclude them from participating in the certification regime.[301]

**Comment 10. Whether Commerce Should Base Surrogate Financial Ratios on Websol Energy's Financial Statements**

*Auxin*[302]

- Commerce should base surrogate financial ratios on Tata Power's financial statements but not on Websol Energy financial statements because there is evidence the company was subsidized and Commerce's established practice is "to disregard financial statements where {it has} reasons to suspect that the company has received actionable subsidies, and where there is other usable data on the record."[303]
- Websol Energy's 2020-2021 FY financial statements and 2020-2021 FY (third quarter) press release indicate that it benefited from the PLI Scheme in 2021,[304] which, according to its annual report, the Indian government enacted to promote the renewable energy sector.  In its annual report, Websol Energy acknowledged participating in the PLI scheme which enhanced its production capacity and noted that it plans to further boost its presence in the Indian and foreign market.[305]
- In the press release, Websol Energy reported that improvements in the company's position were the result of the forward-looking government policy regarding the energy sector, and it would utilize the PLI scheme to build a "broad based, competitive and sustainable organization."[306]
- By providing production-linked incentives to companies, the Indian government conferred a financial contribution.
- Commerce found equivalent programs to be countervailable in *Silicon Metal from Brazil* (finding "Tax Incentives Provided by SUDAM and SUDENE" and "Tax Incentives in the State of Para (ICMS)" countervailable) and *CRS from Brazil* (finding "Reduction of IPI for Machines and Equipment" and "Exemption of Payroll Taxes" countervailable).[307]

*Boviet*[308]

- Commerce should continue to base surrogate financial ratios on Websol Energy's financial statements because:  (1) Websol Energy's annual report does not indicate that it received subsidies under the PLI scheme program; and (2) Commerce does not reject financials statements based on possible subsidies "unless {Commerce} ha{s} previously found the specific export subsidy program to be countervailable"[309] and there is no evidence that Commerce found India's PLI scheme program to be countervailable.

---

[301] *See* Comment 13, *infra*.
[302] *See* Auxin's April 9, 2023 Case Brief at 73-75.
[303] *Id.* (citing *Omnibus Trade & Competitiveness Act*).
[304] *Id.* (citing Boviet's July 27, 2020 SV Comments at Exhibit SV-16, p.65.; Auxin's August 3, 2022 SV Rebuttal Comments at Exhibit 2).
[305] *See* Auxin's April 9, 2023 Case Brief (citing Boviet's July 27, 2020 SV Comments at Exhibit SV-16, p.65).
[306] *Id.* (citing Auxin's August 3, 2022 SV Rebuttal Comments at Exhibit 2).
[307] *Id.* (citing *Silicon Metal from Brazil* IDM at 10; and *CRS from Brazil* IDM at 9-11).
[308] *See* Boviet's April 28, 2023 Rebuttal Brief at 19-20.
[309] *Id.* (citing *Activated Carbon from China* IDM at 9).

58

- Tata Power's financial statements show receipt of countervailable subsidies under the EPCG scheme which Commerce has countervailed.[310] Commerce should not reject Websol Energy's financial statements for supposed countervailable subsidies while relying on Tata Power's financial statements, which demonstrate receipt of countervailable subsidies.

**Commerce's Position:** We disagree with both parties that Tata Power's 2021-2022 and Websol Energy's 2020-2021 financial statements contain evidence of receipt of countervailable subsidies. While it is Commerce's practice not to calculate surrogate financial ratios from financial statements that are distorted or otherwise unreliable, such as financials statements that indicate the company received countervailable subsidies,[311] Commerce will only disregard financial statements for purposes of calculating surrogate financial ratios if they contain "explicit evidence of determined countervailable subsidies."[312] Commerce has not found the PLI scheme to be countervailable in a CVD proceeding involving India. Therefore, consistent with Commerce's practice, we find no basis to disregard Websol Energy's financial statements for purposes of calculating surrogate financial ratios.

While Commerce has found the EPCG scheme in India to be countervailable,[313] Note 21 of Tata Power's 2021-2022 financial statements indicates that it did not use the EPCG grant for the production of merchandise because it did not meet the export obligations specified under the EPCG scheme, and because of that the EPCG grant was not recognized as income in the 2020-2021 and 2021-2022 profit and loss statements. Thus, we find that Tata Power's 2021-2022 financial statements are not distorted by the EPCG scheme and there is no basis to disregard its financial statements for purposes of calculating surrogate financial ratios.

Consequently, we have continued to calculate surrogate financial ratios using data from Tata Power's 2021-2022 and Websol Energy's 2020-2021 financial statements.

**Overall Determinations**

**Comment 11. Whether Commerce's Country-wide Affirmative Circumvention Determination was Appropriate**

*CSIL*,[314] *NextEra*,[315] and *TTL*[316]
- Commerce's negative circumvention determination for one mandatory respondent, potential AFA determination for the second mandatory respondent, and AFA

---

[310] *Id.* (citing Auxin's July 27, 2022 SV Comments at Exhibit 17; Boviet's August 3, 2022 SV Rebuttal Comments at Exhibit SVR-1).
[311] *See, e.g., Fish Fillets from Vietnam* IDM at Comment 4; *see also Activated Carbon from China* IDM at Comment 6.
[312] *See Shenzhen Xinboda*, 494 F. Supp. 3d at 1355.
[313] *See, e.g., Glycine from India CVD* IDM at Comment 7.
[314] *See* CSIL's April 19, 2023 Case Brief at 16-20.
[315] *See* NextEra's April 19, 2023 Case Brief at 6-10, 39-41; *see also* NextEra's April 28, 2023 Rebuttal Brief at 39-40.
[316] *See* TTL's April 19, 2023 Case Brief at 15-16.

determinations for eight companies that did not respondent to the Q&V questionnaire do not support a country-wide affirmative circumvention determination.[317]

- Twenty-three companies responded to Commerce Q&V questionnaire and the eight non-responsive Q&V companies only accounted for a limited volume of sales of Vietnamese produced solar cells and modules to the United States.

- Commerce's countrywide affirmative determination of circumvention is effectively an AFA determination that it has applied to the fully cooperative companies that responded to is Q&V questionnaire. However, Commerce cannot apply an AFA determination, including an AFA determination with respect to Vina, to fully cooperative respondents such as CSIL.

- The Act and Commerce's regulations do not permit,[318] and the courts have not allowed Commerce to apply an AFA determination to fully cooperative companies.[319]

- Commerce's practice is to apply its non-AFA determinations with respect to mandatory respondents to other companies, not to apply its AFA determinations for certain respondents to other companies.[320]

- Moreover, there is sufficient information on the record for Commerce to make a country-wide negative circumvention determination based on the negative determination for one of the mandatory respondents, and ample publicly available information demonstrating that the nature of the production process in Vietnam is not minor or insignificant.

- Making a country-wide negative circumvention determination here is consistent with Commerce's determinations in other circumvention inquiries.[321]

- The Act permits Commerce to include imported merchandise within the scope of an order if it determines that such action is appropriate. If Commerce continues to issue a country-wide affirmative circumvention determination, in the alternative it should exercise its discretion and reach a negative determination for all cooperative companies.

---

[317] *See* CSIL's April 19, 2023 Case Brief at 17; and NextEra's April 19, 2023 Case Brief at 7.

[318] *See* CSIL's April 19, 2023 Case Brief at 17-18; and NextEra's April 19, 2023 Case Brief at 7-8 (citing section 776(b) of Act, which provides that if "an interested party has failed to cooperate … "Commerce may apply "an inference that is adverse to the interests of *that party*" emphasis added).

[319] *Id.* at 18 (citing *Amanda Foods CIT*; and NextEra's April 19, 2023 Case Brief at 8 (citing *Yangzhou CAFC* and *Yangtai CIT* (not permitting Commerce to calculate dumping margins for cooperative companies by averaging dumping margins that included an AFA rate); and *SKF CIT* (remanding application of AFA against a cooperative respondent based on noncooperation by an unaffiliated supplier because "{t}he court cannot accept a construction of {section 772(b) of the Act} under which the party who suffers the effect of the adverse inference is not the party who failed to cooperate").

[320] *Id.* at 19 (citing, *e.g.*, *Soybean Meal from India AD*, 87 FR at 16459 (applying a zero-percent cash deposit rate as the "All-Others Rate" on the basis of the rate assigned to the only "individually examined" mandatory respondent, despite multiple other mandatory respondents being otherwise subject to AFA and a penalty rate); *Soybean Meal from India CVD*, 87 FR at 16453–54 ( "In this investigation, the only individually calculated rate that is not zero, *de minimis* or based entirely on facts otherwise available is the rate calculated for Bergwerff. Consequently, the rate calculated for Bergwerff is also assigned as the rate for all other producers and exporters not individually examined in this investigation."); *Nails from Oman*, 87 FR at 78639 ("We based the dumping margin entirely on AFA for the sole mandatory respondent … . Therefore, we assigned the companies not selected for examination the all-others rate applied in prior segments of this proceeding (*i.e.*, 9.10 percent)").

[321] *Id.* at 20 (citing *CORE from China (Guatemala) Preliminary* PDM at 8-10; *CORE from China (South Africa) Preliminary* PDM at 2-4, 10-11). CSIL claims this also reflects Commerce's practice in AD/CVD investigations. Specifically, if Commerce reaches a negative final determination for all mandatory respondents in an investigation, the investigation is terminated an no AD/CVD order is imposed.

60

Doing otherwise would undermine efforts to fight climate change and would harm the American solar energy industry.

*Auxin*[322]

- Commerce's preliminary affirmative determination of circumvention on a country-wide basis is supported by substantial evidence and is appropriate. [323]

- Commerce determined that a country-wide determination was appropriate to prevent further circumvention of the orders by non-examined producers of inquiry merchandise. As the CAFC observed, country-wide circumvention analyses necessitate a "broader inquiry."[324]

- In this inquiry, Commerce found that the Vietnamese companies that failed to respond to the Q&V questionnaire were circumventing the *Orders*, and it should reach the same conclusion with respect to the mandatory respondent that withdrew from verification. Together these companies account for a significant volume of sales of Vietnamese produced solar cells and modules to the United States. Thus, there are ample grounds to reach a final country-wide affirmative circumvention.

- Parties' arguments that a country-wide affirmative circumvention determination amounts to AFA are misplaced. As Commerce noted in another circumvention inquiry, its "application of a country-wide finding … is not based on AFA."[325] *Yangzhou CAFC* is not relevant because it involved selection of an AFA rate,[326] but Commerce does not determine AD or CVD rates in circumvention inquiries.[327]

- Moreover, cooperative parties are not subject to an adverse decision here because any cooperative party not circumventing *the Orders* may file the appropriate certification and avoid liability for ADs and CVDs.

**Commerce's Position:**  We disagree with CSIL, NextEra, and TTL.  As an initial matter it is important to note that while CSIL, NextEra, and TTL stated that Commerce issued a preliminary negative circumvention determination for Boviet, Commerce's preliminary negative circumvention determination only applied to Boviet's exports of inquiry merchandise produced with wafers exported by the specific party reported in its questionnaire responses.  Thus, U.S. entries of inquiry merchandise from Boviet could still be covered by Commerce's country-wide affirmative circumvention determination if Boviet used a different wafer exporter from the one that it reported in the period of inquiry.

Regardless of that fact, while Commerce reached a narrow negative wafer-exporter specific circumvention determination with respect to Boviet, it found, based on AFA, that multiple other companies, including the second mandatory respondent, Vina, which withdrew from

---

[322] *Id.* at 79; *see also* Auxin's April 28, 2023 Rebuttal Brief at 35-38.

[323] *See* Auxin's April 28, 2023 Rebuttal Brief at 35.

[324] *Id.* at 36 (citing *Al Ghurair CAFC 2023,* 65 F.4th at 1351).

[325] *Id.* at 37 (citing *Aluminum Extrusions from (Vietnam) China* IDM at Comment 2).

[326] *Id.* (citing *Yangzhou CAFC* at 1374).

[327] *Id.* (citing *Tissue Paper from China (Vietnam)* IDM at Comment 5).

verification,[328] which together accounted for a significant volume[329] of Vietnamese solar cells and modules exported to the United States during the inquiry period, were circumventing the *Orders*.[330]  Legislative history, Commerce's practice, and Court rulings support Commerce's broad authority to address circumvention of AD/CVD orders and to apply circumvention determinations on a country-wide basis, in particular when multiple firms circumvent the underlying AD/CVD order(s) using the same general approach.[331]  Here, as AFA, Commerce determined that multiple firms are circumventing the *Orders* and the Circumvention Request for this circumvention inquiry contained evidence demonstrating that companies in Vietnam are using the same general approach to such circumvention (*i.e.*, assembling Chinese wafers into solar cells and modules in the inquiry countries "using additional and substantial Chinese-origin components.").[332]

It would not be appropriate to apply the narrow negative wafer-exporter specific circumvention determination for Boviet to other companies that Commerce specifically determined were circumventing the *Orders* or to assume that the negative wafer-exporter specific circumvention determination for Boviet applies to all companies in Vietnam given that Commerce made affirmative circumvention determinations for multiple companies in Vietnam.  Although Commerce may limit its examination to individual respondents in a country-wide circumvention inquiry, it cannot limit its decision solely to the results of its analysis of the individually examined respondents, but must consider the entire results of its inquiry.  The results of this inquiry show that multiple firms in Vietnam are circumventing the *Orders*.  Therefore, we have continued to reach a country-wide affirmative circumvention determination.

Our approach here is consistent with Commerce's prior decisions involving AFA.  For example, in the *Uncoated Paper from China Final Determination*, Commerce issued a country-wide affirmative circumvention determination based solely on AFA.[333]  In *FDPSF from Taiwan and FDPSF from Korea,* Commerce issued an AD order based on its AFA determinations for one or more uncooperative mandatory respondents even though it calculated a zero percent dumping margin for the only cooperative mandatory respondent.[334]  Similarly, here Commerce issued a country-wide affirmative circumvention determination based on its AFA decision with respect to certain uncooperative companies even though it issued a negative circumvention determination for the cooperative mandatory respondent when it used certain wafer exporters.  The cases cited by CSIL to support its position are inapposite because, in those cases, all parties responded to Commerce's Q&V questionnaire and Commerce did not find that any companies were circumventing the relevant order.[335]

---

[328] Prior to Vina withdrawing from verification, Commerce preliminarily found that Vina was circumventing the *Orders*.
[329] While NextEra contends the volume is not significant, NextEra did not include the volume of exports for all of the companies to which Commerce applied AFA.
[330] *See Vietnam* PDM at 27.
[331] *See CORE from China (Vietnam)* IDM at Comment 3; *Butt-Weld Pipe Fittings from China (Malaysia)* IDM at Comment 1; *see also Aluminum Extrusions from China Minor Alterations Circumvention* IDM at Comment 4.
[332] *See* Circumvention Request at 27.
[333] *See Uncoated Paper from China Preliminary Determination*, 85 FR at 72624, unchanged in *Uncoated Paper from Chin*a Final Determination.
[334] *See PSF from Taiwan*; and *PSF from Korea*.
[335] *See CORE from China (Guatemala) Preliminary* PDM; *see also CORE from China (South Africa) Preliminary* PDM.

We disagree with the assertion that there is no need to resort to facts available because the necessary facts have been provided on the record.  Commerce considers the quantity and value information that it requested to be necessary facts for purposes of respondent selection.  Because certain companies did not respond to Commerce's Q&V questionnaire, those necessary facts are not on the record.  Because that information was withheld, Commerce properly resorted to AFA with respect to the uncooperative companies pursuant to section 776(b) of the Act.  It would not be appropriate to make a determination with respect to the uncooperative companies based on information that has been provided by cooperative companies or based on Commerce's decisions regarding whether the process of assembling and completing Chinese components into solar cells and modules in Vietnam is, or is not, minor or insignificant.  Such an approach would contradict the AFA provision that was intended to induce cooperation by ensuring that uncooperative parties do not benefit from their lack of cooperation.  It would also undermine Commerce's authority to conduct circumvention inquiries, because large third-country producers could refuse to cooperate with Commerce's requests for information and nonetheless benefit from a negative country-wide determination.

Moreover, we disagree with CSIL, NextEra, and TTL that we applied AFA to cooperative companies by issuing a country-wide affirmative circumvention determination.  We did not use adverse inferences against cooperating companies based on the noncooperation of other unaffiliated companies.  Rather, we specifically limited our AFA determination to the uncooperative companies.  Specifically, Commerce stated that "{a}s AFA, we preliminarily find that the non-responsive companies produced and/or exported solar cells and modules subject to these inquiries and … that the criteria for finding circumvention with respect to these companies have been met."[336]  Furthermore, our determination placed the cooperative companies in a different position than companies that failed to cooperate by not responding to Commerce's requests for information in this inquiry.  In particular, unlike the uncooperative companies, the cooperative companies may fully participate in the Certification regime established in this circumvention inquiry and, if the company meets the certification requirements, entries of its inquiry merchandise will not be subject to ADs or CVDs.[337]

The cases that CSIL, NextEra, and TTL cited demonstrate that Commerce may not base a cooperative party's dumping margin, even in part, on AFA are factually distinguishable from this inquiry.  Specifically, the cases cited by the respondents – *Yangzhou CAFC*, *Yangtai CIT*, and *SKF CIT* – concern the calculation of dumping margins for cooperative companies based, at least in part, on AFA.  Commerce did not assign dumping margins based, even in part, on AFA to the cooperative companies in this inquiry because Commerce does not determine dumping margins in circumvention inquiries.  Rather, pursuant to Commerce's affirmative circumvention determination, importers may use a cooperative exporter/producer's cash deposit rate, or that of its wafer exporter, under the existing order if either of them has a rate.  If neither the cooperative company, nor its wafer exporter has a cash deposit rate, the import and exporter of the cooperative company's merchandise may complete any of the applicable certifications so that no cash deposit will be required.

---

[336] *See Vietnam* PDM at 14.
[337] *Id.*, 87 FR at 75221, 75224-25 and PDM at 11-12 and 25.

If the exporter, or its wafer exporter, does not have a separate rate and the importer and exporter do not complete the applicable certification for an entry, cash deposits equal to the China-wide AD rate and the All Others CVD rate will be required.  While the respondents argued that being subject to the China-wide AD rate is effectively an AFA determination, it is not application of AFA but application of Commerce's separate rates policy.  Exporters that do not have a separate rate are part of the China-wide entity.  The Courts have recognized this fact.  For example, in *Advanced Technology*, the CIT stated:

> Commerce did not apply adverse facts available to {respondent}, Commerce rather found that {respondent} had not rebutted the presumption of state control and assigned it the {China}-wide rate.  These are two distinct legal concepts:  a separate AFA rate applies to a respondent who has received a separate rate but has otherwise failed to cooperate to the best of its ability whereas the {China}-wide rate applies to a respondent who has not received a separate rate.[338]

Thus, we do not find the present facts equivalent to the facts in the cases relied upon by the respondents, nor do we find that Commerce's affirmative circumvention determination means that Commerce applied AFA under section 776(b) of the Act to the cooperative companies in this inquiry.

Rather, we find that the present facts are similar to the case where Commerce issues an AD or CVD order on a country solely based on an AFA determination for one or more uncooperative companies (such as in *PSF from Taiwan* and *PSF from Korea,* referenced above).[339]  In such a situation, the order applies to the entire country, and companies in that country are subject to the order even if Commerce did not request any information from the company or find it uncooperative.  Such an order was not issued to apply AFA to cooperative companies, but was issued because Commerce found sufficient statutory grounds to issue the order.  Here, Commerce initiated a country-wide circumvention inquiry and found sufficient statutory grounds to make an affirmative circumvention determination.  It is on that basis, rather than as AFA, that Commerce is subjecting the cooperative companies to the existing *Orders*.

While we acknowledge NextEra's concerns regarding climate change, Commerce has "a clear duty to properly administer the law in order "{t}o protect domestic industries from unfair competition by imported products"[340] and "an obligation to administer the law in a manner that prevents evasion of the *Orders*"[341]  Consistent with that obligation, we have continued to reach a country-wide affirmative circumvention determination.

---

[338] *See Advanced Technology*, 938 F. Supp. 2d at 1351 (citing *Watanabe Group*, 34 CIT 1545, Slip Op. 10-139 at 9, n. 8).
[339] *See PSF from Taiwan*; and *FDPSF from Korea*.
[340] *See Diamond Sawblades Coalition CIT*, 816 F.Supp.2d at 1357 (citing *Federal–Mogul Corp.*, 63 F.3d at 1575).
[341] *See Max Fortune Industrial Co.*, Slip Op. 13-52 at 20.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

## Comment 12. Affirmative Circumvention Determinations Would not be Appropriate Under Section 781(b)(1)(E) of the Act

*CSIL*[342]

Commerce did not provide any discussion regarding the appropriateness of the action, as required by section 781(b)(1)(E) of the Act.

- The CAFC instructed that Commerce must consider each factor enumerated in section 781(b) of the Act.[343]
- Neither the Act nor the SAA provides a specific definition of "appropriate" to be applied in the circumvention context; however, the Supreme Court has explained that the determination of whether a federal agency's actions are "appropriate" hinges on whether the agency has demonstrated its consideration of "all the relevant factors," and pays "at least some attention to cost.".[344]
- The U.S. Supreme Court has further indicated that "{n}o regulation is 'appropriate' if it does significantly more harm than good."[345]
- Affirmative final determinations by Commerce in these inquiries to expand the scope of the *Orders* to cover solar cells and/or modules completed in Malaysia, Thailand, Vietnam, and Cambodia using Chinese-origin components would be inappropriate and contradict the definition of "appropriateness" provided by the Supreme Court.[346]
- Commerce has previously confirmed that it is inappropriate to conduct a circumvention inquiry where merchandise was "expressly and intentionally excluded from the scope of the Orders," as is the case here.[347]
- Commerce itself indicated in its original investigation that converting Chinese-origin wafers into solar cells in a third country would not warrant circumvention inquiries.[348]
- Pursuant to *Presidential Proclamation 10414*, the President made clear that duties on imports within the scope of these circumvention inquiries are inappropriate due to the current energy emergency instructed Commerce to waive new duties on solar modules from Thailand, Vietnam, Malaysia, and Cambodia for two years.[349]
- Affirmative determinations would run contrary to the goals of the President's directive and to Commerce's regulations,[350] thus unnecessarily sowing doubt in the very solar supply chain to which the President sought to restore calm and certainty.
- Commerce's approach in the *Preliminary Determinations* is contrary to its own recently promulgated circumvention regulations which states that "the purpose of the proposed modifications is not to penalize companies acting in good faith, but to ensure that

---

[342] *See* CSIL's April 19, 2023 Case Brief at 13-16.
[343] *Id.* (citing *Al Ghurair CAFC 2023*, 65 F.4th at 1351).
[344] *Id.* (citing *Orders*, 77 FR at 73018).
[345] *Id.* (citing *Michigan*, 576 U.S. 743, 752 (citation omitted)).
[346] *Id.* (citing *Michigan*, 576 U.S. 743, 752 (citation omitted)).
[347] *Id.* (citing *Walk-Behind Lawn Mowers from China Circumvention Rescission*, 88 FR 13434 (notice of intent to rescind circumvention inquiry on the AD/CVD orders) ("We find that the inquiry merchandise is excluded from the scope of the orders … .  We also find that it is *not appropriate* to conduct a circumvention inquiry on such excluded merchandise." (emphasis added)).
[348] *Id.* (citing *Orders* at 80).
[349] *Id.* (citing *Presidential Proclamation 10414*, 87 FR 35067).
[350] *Id.* (citing *2021 Regulations Final Rule*, 86 FR at 52300).

circumvention determinations are properly applied to merchandise found to be circumventing an order."[351]

- Commerce should issue negative final determinations because affirmative determinations in these inquiries act to expand the scope of the *Orders* while ignoring and contradicting Commerce's longstanding precedents regarding the nature and significance of certain vital processes in the production of solar cells and modules.

*NextEra*[352]

- Commerce can reach a negative final determination under section 781(b)(1)(E) of the Act which states that Commerce "may" (not "shall" or "must") include products completed in third countries within the scope of an order.
- Including solar cells and modules produced in Cambodia, Malaysia, Thailand, and Vietnam within the scope of the *Orders* is not appropriate since there is no evasion to prevent when the processing that occurs in the third country is so significant.
- AD/CVD proceedings are not exempt from the directive to integrate climate considerations into its policies, strategic planning, and programs.[353]

*Silfab*[354]

- The final determinations must address whether expanding the scope of the *Orders* to encompass cells manufactured in third countries (and the modules produced using those cells) would be appropriate under section 781(b)(1)(E) of the Act.
- Auxin and Commerce have not met the requirements for appropriateness because: (1) no other U.S. producers support Auxin's petitions before Commerce; (2) an unwarranted expansion of the existing *Orders* would cause substantial harm to the U.S. solar industry; and (3) the requested relief would further impede the development of the U.S. solar industry, making it impossible to achieve the Biden administration's green energy initiatives.
- U.S. manufacturers have been denied due process in the form of procedural safeguards and eligibility requirements governing AD/CVD relief under U.S. law and Commerce's regulations. Put simply, Auxin unlawfully made an end-run around the strict procedures and eligibility requirements governing AD/CVD relief under U.S. law, sections 701 and 703 of the Act and 19 CFR 351.203.
- U.S. manufacturers sourced cells from locations outside of China to enable U.S. manufacturing of solar modules in good-faith recognition of existing AD/CVD orders as they had been administered by Commerce and CBP for a decade.
- U.S. manufacturers were never given any notice that such cells could be circumventing the *Orders*. In fact, as explained above, Commerce's administration of the *Orders* throughout this period consistently confirmed that such merchandise was not subject to the *Orders*. Accordingly, affirmative final determinations would, without notice, potentially penalize Silfab for its good-faith efforts to comply with U.S. law and grow U.S. module manufacturing.

---

[351] *Id.* (citing *2021 Regulations Final Rule*, 86 FR at 52300, 52338).
[352] *See* NextEra's April 19, 2023 Case Brief.
[353] *Id.* (citing NextEra's May 2, 2022 Comments at Att. 12 (U.S. Department of Commerce, Department Administrative Order 216-22, Addressing the Climate Crisis).
[354] *See* Silfab's March 6, 2023 Case Brief at 4; and Silfab's April 19, 2023 Case Brief at 5-13.

66

- Affirmative final determinations would contradict the emergency declared in *Presidential Proclamation 10414*.

*Trina*[355]

- Commerce must make a determination that action is appropriate to prevent evasion under section 781(b)(1)(E) of the Act before making an affirmative finding of circumvention.
- After Auxin filed its circumvention allegation, numerous interested parties explained why there is no appropriate reason to implement a circumvention inquiry of the *Orders*.
- Because Commerce has determined that the p/n junction formation determines country-of-origin for purposes of the *Orders*, Commerce has already foreclosed the possibility that p/n junction formation could be minor processing.
- Commerce stated in its original scope determination:  the factors we consider for making country-of-origin determinations inherently reflect the agency's concern that the relief afforded by AD/CVD orders not be eviscerated by moving minor processing outside of the country covered by the order.  Thus, circumvention concerns are reflected in the country-of-origin determination.[356]
- Auxin has no standing because prior to initiation, Commerce received dozens of letters from members of the U.S. solar industry who expressed deep concern for Auxin's circumvention allegation.
- By allowing a small company like Auxin to circumvent standing requirements for AD/CVD petitions, Commerce is inviting future frivolous claims which may result in multi-million-dollar market impacts.[357]

*Auxin*[358]

- Commerce appropriately determined that a circumvention inquiry for the *Orders* is appropriate under section 781(b)(1)(E) of the Act.
- The arguments put forth by several interested parties that Commerce's actions are not "appropriate" notwithstanding Commerce's affirmative finding of circumvention are false.
- Commerce followed its practice in determining that action is appropriate to address circumvention pursuant to section 781(b)(1)(E) of the Act in the *Preliminary Determinations*.[359]
- Commerce and the CIT have held as a matter of statutory interpretation that Commerce's evaluation of whether action is appropriate to prevent evasion pursuant to section 781(b)(1)(E) of the Act is tied to consideration of the factors outlined in section 781(b)(3) of the Act.[360]

---

[355] *See* Trina's April 19, 2023 Case Brief at 9-15.

[356] *Id.* (citing Solar Investigation Scope Clarification Memorandum at 1).

[357] *Id.* (citing American Clean Power Letter (noting that Auxin's allegation creates a precedent to "misuse. . . trade laws for the benefit of a single company rather than an entire domestic industry.")).

[358] *See* Auxin's March 17, 2023 Rebuttal Brief at 28-30 and Auxin's April 28, 2023 Rebuttal Brief at 20-30.

[359] *See* Auxin's April 28, 2023 Rebuttal Brief (citing, *e.g.*, the *Vietnam* PDM at 23-26, Boviet Preliminary Analysis Memorandum at 4-7, and Vina Preliminary Analysis Memorandum at 4-7).

[360] *Id.* (citing *CORE from China (Vietnam)* IDM at 11; *CORE from China (Vietnam)* IDM; *Tung Mung CIT*, 219 F. Supp. 3d 1333, 1343; and *Peer Bearing Co.*, 36 CIT 1700, 1707).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

- Commerce did not address circumvention in the underlying investigation of the *Orders* because its substantial transformation analysis at that time was limited to comparing cell fabrication to module assembly and not comparing cell fabrication to module assembly to prior stages of solar cell production, which is the analysis Commerce is conducting now pursuant to 781(b)(1) of the Act.[361]

- Commerce stated in the *Solar Cells from China Investigation* that the "{p}etitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country" which does not indicate that Commerce meant that future circumvention inquiries regarding solar cells would not be warranted.[362]

- The CAFC stated in *Bell Supply CAFC* that "if Commerce applies the substantial transformation test and concludes that the imported article has a country of origin different from the country identified in an AD or CVD order, then Commerce can include such merchandise within the scope of an AD or CVD order only if it finds circumvention under" section 781 of the Act.[363]

- Auxin is an interested party as defined by section 771(9)(C) of the Act and was, and is, well within its rights to request that Commerce initiate and conduct these circumvention inquiries.

- Congress rejected a standing requirement for circumvention inquiries when it enacted section 781(b) of the Act, which allows any interested party, including small and medium-size businesses like Auxin, to enforce U.S. trade laws.[364]

- Commerce does not have discretion under the statute to disregard circumventing behavior based on a concern that such a finding would impede other government policy objectives, or any other factor not explicitly provided for in the statute.

- Commerce previously rejected arguments that an affirmative final determination is not appropriate and would impose economic costs by stating that comments regarding economic impact address issues outside the purview of the analysis prescribed by section {781(b)} of the Act.[365]

- This circumvention inquiry does not threaten growth of U.S. solar deployment or hinder efforts to address climate change because as noted by the DOE there has been a steady increase in installed PV capacity from 2010-2020 in spite of the *Orders* and temporary safeguard measures.[366]

- The DOE confirmed that rehabilitating U.S. solar manufacturing by effectively enforcing U.S. trade laws and combatting climate change are not mutually exclusive.[367]

- Auxin's analysis of the solar cell production process is consistent with analyses from the DOE and the IEA, and was ultimately vindicated by Commerce's preliminary affirmative findings of circumvention.

- Silfab's argument that these circumvention queries violate its due process are unfounded since Congress enacted the circumvention section of the Act in 1988 in order to prevent

---

[361] *See* Auxin's May 9, 2023 Rebuttal Brief (citing *Solar Cells from China Investigation* IDM at Comment 1).
[362] *Id.* (citing *Solar Cells from China Investigation* IDM at Comment 1).
[363] *Id.* (citing *Bell Supply CAFC*, 888 F.3d 1222, 1230; and *Diamond Sawblades (Thailand)* IDM at Comment 3).
[364] *Id.* (citing 19 CFR 351.226(c)).
[365] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 4).
[366] *Id.* (citing Auxin's May 16, 2023 Comments at Exhibit 5 (DOE Solar Deep Dive at 2)).
[367] *Id.* (citing Auxin's May 16, 2023 Comments at Exhibit 5 (DOE Solar Deep Dive at iv)).

evasion and circumvention of AD/CVD orders and did not establish an industry support requirement.

- Silfab's argument that its due process rights have been violated is belied by the fact that it has been allowed to participate in this inquiry from the very start.[368]
- Silfab USA's contention that affirmative final determinations would contradict the emergency declared in *Presidential Proclamation 10414* is similarly without merit because although the proclamation effectively eliminates the remedy that Auxin is entitled to by law, nothing in *Presidential Proclamation 10414* is inconsistent with affirmative final determinations in these inquiries.

**Commerce Position:**  We disagree with CSIL, NextEra, Silfab, and Trina's assertions that we did not determine the appropriateness of the instant circumvention inquiries pursuant to section 781(b)(1)(E) of the Act.  As an initial matter, we conducted a full analysis pursuant to section 781(b) of the Act in order to determine if the merchandise assembled or completed in a foreign country is within the scope of the *Orders*.[369]  Section 781(b)(1)(E) of the Act authorizes Commerce to include merchandise alleged to be circumventing in the scope of an order if Commerce "determines that action is appropriate … to prevent evasion of such order or finding."  Commerce found that the criteria for a finding circumvention of the *Orders* was met, and further that the factors listed in 781(b)(3) indicated that circumvention of the *Orders* was occurring.  The statute does direct Commerce to consider factors other than whether action under the circumvention statute is appropriate to prevent evasion of the *Orders*.  Here, because we have found that the criteria for finding circumvention were met, and the factors under 781(b)(3) further evinced the existence of circumventing behavior, and because no information on the record suggested that circumvention would cease absent inclusion of inquiry merchandise in the scope of the *Orders*, we find that action is appropriate under 781(b)(1)(E) of the Act.

With respect to Auxin's standing to request a circumvention inquiry, there is no stipulation in the regulations regarding who can and cannot bring a circumvention inquiry beyond that it be an interested party.  Pursuant to 19 CFR 351.226(c), an interested party may submit a circumvention inquiry request as long as it follows the proper procedures and include the requisite product information necessary for Commerce to make an initiation determination.  In the instant case, we examined Auxin's circumvention requests and determined that it satisfied the criteria under 19 CFR 351.226(c), thus giving it standing to proceed.[370]

We also disagree with the arguments raised by CSIL, NextEra, Silfab, and Trina that Commerce precluded future circumvention inquiries on the inquiry merchandise in the language of the investigation.  In the investigation, we stated that there was the option for bringing additional petitions regarding assembly of solar cells and modules in a third country,[371] but did not prelude circumvention inquiries, which are requested in response to specific trade pattern and activities that may constitute circumvention as defined in the Act.  As noted above, Auxin followed

---

[368] *Id.* (citing *Techsnabexport, Ltd.*, 795 F. Supp. 428 (noting the "essential elements of due process are notice and the opportunity to be heard"))

[369] *See Vietnam* PDM at the section, "Summary of Statutory Analysis."

[370] *See Initiation Notice*, 87 FR at 19071-72.

[371] *See Solar Cells from China Investigation* IDM at Comment 1.

69

Commerce's requisite procedures for requesting a circumvention inquiry and thus we proceeded accordingly.

Further, we disagree with Silfab's claim that it and other U.S. cell and module producers have been denied due process in the instant inquiry. Silfab claims that because U.S. manufacturers were never given any notice that their cells could be circumventing the *Orders,* its rights to due process were violated. The Act and Commerce's regulations provide for ample notification and comment on Commerce's *Preliminary Determinations* by interested parties. In accordance with the CIT's ruling in *Techsnabexport, Ltd.*, the "essential elements of due process are notice and the opportunity to be heard." [372] As evidenced by the case record of the instant circumvention inquiries Silfab as well as both domestic and foreign solar cell producers have had ample opportunity to file comments and thus be heard throughout these inquiries.

Finally, we disagree with CSIL's, NextEra's, Silfab's, and Trina's contention that these circumvention inquiries contradict *Presidential Proclamation 10414*. Nothing in the proclamation states that Commerce cannot conduct circumvention inquiries with respect to solar cells and modules. In fact, in response to *Presidential Proclamation 10414*, Commerce added Part 362 to its regulations to implement the Proclamation and these regulations, as well as CBP instructions issued by Commerce, specify that no ADs/CVDs will be collected on solar cells and modules entering the United States to which *Presidential Proclamation 10414* applies.[373] Thus, Commerce's affirmative circumvention findings cannot be implemented until the provisions of the *Presidential Proclamation 10414* expires.

**Certification Issues**

**Comment 13. Whether Commerce Should Allow AFA Companies to Certify**

*Vina*[374]
- Commerce may apply AFA to reach its determination that Vina is circumventing the *Orders*; however, it cannot rely on AFA to unlawfully expand its authority to prohibit Vina from participating in any certification regimes which is a distinct process.
- Pursuant to section 776(b) of the Act, Commerce must make the determination whether the producers of solar cells and modules in Cambodia, Malaysia, Thailand, and Vietnam are using certain Chinese inputs to circumvent the *Orders*.[375]
- Commerce may only use AFA to replace information missing from the record in reaching the applicable determination pursuant section 776(a) of the Act and not to determine that Vina is ineligible to participate in the certification regime.
- Contrary to Auxin's arguments, *Nippon Steel, Building Sys. De Mex.*, and *Mukund Fed. Cir*. do not support the proposal that Commerce can unlawfully expand its use of AFA

---

[372] *See Techsnabexport, Ltd.*, 795 F. Supp at 428.
[373] *See Vietnam* PDM at "Certification Process and Country-Wide Affirmative Determination of Circumvention" and *Appendix IV-Certification for "Applicable Entries".*
[374] *See* Vina's April 19, 2023 Case Brief at 1-10; and Vina's April 28, 2023 Rebuttal Brief at 1-18.
[375] *Id.* (citing *Preliminary Determinations*, 87 FR at 75221).

beyond its applicable circumvention determination to preclude Vina from participating in a certification regime.[376]

- The CAFC has repeatedly held that Commerce's discretion to rely on AFA is not unlimited and the AD laws are not designed to impose punitive results. Thus, Commerce cannot unlawfully expand its use of AFA beyond its applicable circumvention determination to preclude Vina from participating in a certification regime.[377]

- Pursuant to *PrimeSource Bldg. Prods.*, Congress has the power to set and collect duties and not the Executive branch/Commerce in accordance with the principles of separation of powers.[378]

- An application of AFA by Commerce resulting in an affirmative finding of circumvention can only relate to whether a producer is using Chinese inputs to circumvent the *Orders*.

- Commerce cannot prospectively or retroactively prohibit Vina from participating in the certification regime based on AFA.

- Commerce cannot prohibit Vina from certifying shipments that occurred after verification since Commerce did not, and could not, have verified information concerning the possibility of Chinese-origin parts composing goods not yet shipped in accordance with *Fish Fillets from Vietnam (Cambodia)*.[379]

- Commerce permits companies subject to an AFA finding to provide the Appendix IV certification but preliminarily disallows them from certifying with respect to Appendix VI regarding the wafer in combination with other components of the module exported to the United States.[380]

- The CAFC has said that even though Commerce has discretion with respect to applying AFA, there are limits to that discretion because antidumping laws are remedial and designed to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins.[381]

- Commerce's regulatory authority only refers to the "implementation of certification requirement," and nowhere indicates that Commerce can rely on AFA to prohibit a company from participating in a certification regime pursuant to 19 CFR 351.226(m)(1)(iv).

- Allowing a company that terminated a verification to at least participate in a certification regime for shipments that occurred *after, but not before,* verification is consistent with Commerce's past practice in *Fish Fillets from Vietnam (Cambodia)*.[382]

- In *Fish Fillets from Vietnam (Cambodia)*, respondent Liang Heng was assigned AFA after cancelling its verification; however, Commerce still allowed Lian Heng to

---

[376] *See* Vina's April 28, 2023 Rebuttal Brief (citing *Nippon Steel,* 337 F.3d at 1378, *Building Sys. De Mex.,* 567 F. Supp. 3d at 1310, and *Mukund Fed. Cir.*, 767 F.3d at 1304-05).

[377] *Id.* (citing *F Lli De Cecco Fed. Cir.*, 216 F.3d 1027, 1032; KYD, Inc., 607 F.3d 760, 767-68; and *Changzhou Trina Solar Energy v. U.S. (2018)* 352 F. Supp. 3d 1316, 1342 ("AFA is not a magic phrase that permits Commerce to skip an analysis of the record.")).

[378] *See* Vina's April 19, 2023 Case Brief (citing PrimeSource Bldg. Prods., 497 F. Supp. 3d 1333, 1337; *see also Youngstown Sheet & Tube Co.*, 343 U.S. 579, 587-88).

[379] *Id.* (citing *Fish Fillets from Vietnam (Cambodia)* IDM at 1).

[380] *Id.* (citing the *Preliminary Determination* FR at 75222-75224 and 75230).

[381] *Id.* (citing *F Lli De Cecco*, 216 F.3d 1027, 1032; *BMW of N. Am. LLC*, 926 F.3d 1291, 1301; *KYD, Inc.*, 607 F.3d 760, 767-68 (citations omitted); *Gallant Ocean (Thai.) Co.*, 602 F.3d 1319, 1323; and *Shakeproof Tool Works, Inc.*, 268 F.3d 1376, 1382).

[382] *Id.* (citing *Fish Fillets from Vietnam (Cambodia)* IDM at 32).

participate in the certification regime for its entries after July 16, 2005, while prohibiting its participation in the certification regime for its entries prior to its verification termination).[383]

- Pursuant to Commerce's regulations and *Torrington*, all entries, including for companies found to be circumventing the *Orders*, made prior to the "Date of Termination," cannot be excluded from participating in any certification regime.[384]

- Under *Presidential Proclamation 10414*, the President intended for all entries of solar cells, regardless of Commerce's final circumvention determination, to be duty free until June 6, 2024, or the termination of the national emergency.[385]

- Moreover, Part 362 of the *Presidential Proclamation 10414 Final Rule Preamble* confirms that the regulations are intended to apply to Applicable Entries up to the termination of the national emergency on June 6, 2024.[386]

- Commerce also stated in the *Preliminary Determinations* that it would not direct CBP to suspend liquidation, and require cash deposits based on the affirmative preliminary determinations of circumvention on, any ''Applicable Entries''(*i.e.* "entries of Southeast Asian-Completed Cells and Modules that are entered into the United States, or withdrawn from warehouse, for consumption before the Date of Terimination and, for entries that enter after November 15, 2022, are used in the United States by the Utilization Expiration Date") [387]

- Thus, if Commerce makes a final affirmative circumvention determination against Vina as the result of the application of AFA, it then cannot prospectively deny Vina the ability to certify that its entries are not subject to the *Orders* and do not fall within the scope of this circumvention inquiry.

*Red Sun*[388]

- Commerce should remove Red Sun from the list of companies ineligible to submit certifications under Appendix VI of the *Preliminary Determination*.

- Commerce's authority to apply AFA to respondent parties for failures to cooperate is proscribed by section 776(b)(2) of the Act; however, Commerce can only derive adverse inferences from the petition, a final determination, any previous administrative review, or any other information placed on the record.

- Commerce may rely on Auxin's allegation of circumvention under section 776(b)(2)(D) of the Act ("any other information placed on the record") as the facts available to make an AFA determination.

- However, Red Sun's Q&V response has no connection to a prospective certification process because the applicable determination in this case could only be Commerce's selection of the mandatory respondents and, perhaps, which companies among those alleged by Auxin are circumventing the *Orders*.

- There is no information missing from the record of this inquiry regarding the origin of material inputs into the modules Red Sun may export to the United States in the future.

---

[383] *Id.* (citing *Fish Fillets from Vietnam (Cambodia)*, 71 FR at 38610).
[384] *See* Vina's April 28, 2023 Rebuttal Brief (citing 19 CFR 362.103(b)(1)(ii); and *Torrington*, 82 F.3d 1039, 1049).
[385] *Id.* (citing *Presidential Proclamation 10414*, 87 FR at 35067, 35068).
[386] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56868, 56877).
[387] *Id.* (citing *Preliminary Determination* FR, 87 FR at 75221, 75223).
[388] *See* Red Sun's April 19, 2023 Case Brief at 10-12.

- Commerce has not and cannot explain what source of information under section 776(b)(2) of the Act it relies when determining to deny Red Sun the ability to certify the contents of its future exports of modules to the United States.
- The CAFC in *BMW of N. Am. LLC* has clearly instructed that an adverse inference rate cannot be punitive or aberrational and must "reflect {} the seriousness of the non-cooperating party's misconduct."[389]

*Auxin*[390]

- Contrary to Red Sun's and Vina's arguments, Commerce's most recent practice in *CRS from Korea (Vietnam)* is to bar uncooperative respondents from its certification regimes.[391]
- Vina's separation-of-powers argument is also wrong because Congress gave Commerce wide latitude to apply AD and CVD orders in such a way as to prevent circumvention and diversion of U.S. law with the implementation of section 781(b) of the Act in 1988.[392]
- The cases and precedents relied upon by Vina and Red Sun to support their positions all relate to the selection of an AFA rate in an investigation or administrative review and are not applicable to a circumvention inquiry since the purpose of a circumvention inquiry is to determine whether the class or kind of merchandise assembled in the inquiry country using parts and components from the subject country are circumventing the applicable orders.[393]
- The Court explained that the SAA makes clear that "application of AFA is a tool given to Commerce 'to ensure that {a} party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'"[394]
- *In Ferrostaal Metals GmbH*, the CIT found that Commerce acted reasonably by applying AFA to the respondent, barring them from participating in the certification regime, and determining that the respondent circumvented the *Orders*.[395]
- Commerce should preclude Vina, Red Sun, and all other non-cooperative parties in this inquiry from participating in any certification regime resulting from an affirmative determination of circumvention based on the recent precedents in *Ferrostaal Metals GmbH and CRS from Korea (Vietnam)*.
- The CIT stated that the SAA makes clear that "application of AFA is a tool given to Commerce 'to ensure that {a}party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'"[396]

---

[389] *Id.* (citing *BMW of N. Am. LLC*, 926 F.3d 1291, 1301, *citing Papierfabrik Aug. Koehler SE v. United States*, 710 F. App'x 889 (Fed. Cir. 2018) (wherein, the AFA rate selected was specifically based on "the seriousness of the type of misconduct" committed by the uncooperating party)).

[390] *See* Auxin's April 19, 2023 Case Brief at 76-79.

[391] *See* Auxin's April 28, 2023 Rebuttal Brief (citing *CRS from Korea (Vietnam)* IDM at Comment 6).

[392] *Id.* (citing S. Rep. No. 71, 100th Cong. 1st Sess. (1987) at 101).

[393] *Id.* (citing *F.Lli di Cecco*, 216 F.3d 1027, 1032; *BMW of N. Am. LLC*, 926 F.3d 1291, 1301; and *Tissue Paper from China (Vietnam) Final Determination* IDM at Comment 5).

[394] *Id.* (citing *Ferrostaal Metals GmbH*, 518 F. Supp. 3d at 1374-75 (citing SAA at 870).

[395] *Id.* (citing *Ferrostaal Metals GmbH*, 518 F. Supp. 3d 1357, 1376).

[396] *See* Auxin's March 17, 2023 Rebuttal Brief (citing *Ferrostaal Metals GmbH*, 518 F. Supp. 3d 1357, 1374-1375 (citing SAA at 870)).

73

- The CIT also noted that in prior circumvention inquiries in which Commerce allowed non-responsive companies to participate in the certification process, there was a lack of responses to issued Q&Vs.[397]
- Commerce's initial Q&V warned recipients that a failure to respond to the questionnaire would result in the use of an inference in selecting from the facts otherwise available, in accordance with section 776(b) of the Act.[398]
- Accordingly, Commerce should follow its longstanding, court-affirmed practice of precluding non-cooperative companies (either by not responding to the Q&V questionnaires or cancelling verification) from participation in any certification regime.
- Commerce's preliminary findings with respect to NE Solar and Vina were premised on their respective questionnaire responses being accurate, complete, and verified. Thus, their cancellation of verification warrants AFA pursuant to sections 776(a), (b) of the Act.
- Pursuant to *Building Sys. De Mex., Mukund CIT*, and *Mukund Fed. Cir.*, if a gap exists because a party failed to cooperate to the best of its ability, Commerce may use an adverse inference when selecting facts available. In particular, total AFA is appropriate 'where none of the reported data is reliable or usable.'[399]
- In *Fish Fillets from Vietnam (Cambodia)* Commerce applied total adverse facts available to a respondent who cancelled verification and determined that the information was unreliable pursuant to section 781(b) of the Act.[400]
- Accordingly, Commerce should find, as AFA, that NE Solar, Red Sun, and Vina are circumventing the *Orders* and should be precluded from participating in any resulting certification regimes.

**Commerce's Position:** Commerce's decision to bar uncooperative respondents from the certification process is an agency practice affirmed by the CIT, is not impermissibly punitive, and minimizes the impact of AFA findings on parties not found circumventing, while ensuring that Commerce's AFA finding induces cooperation, consistent with Commerce's established practice. As noted by Auxin, Commerce has the authority to and the discretion to determine the eligibility of parties to participate in the certification regime.[401]

Commerce notified interested parties that it was initiating the circumvention inquiry on a country-wide basis (*i.e.*, not exclusive to the producers mentioned) and would solicit information from certain Cambodian, Malaysian, Thai, and Vietnamese companies concerning their production and shipment of solar cells and modules to the United States.[402] Commerce also stated in the *Initiation Notice* that a company's failure to completely respond to our request for information may result in the application of partial or total facts available which may include adverse inferences.[403] In conducting a country-wide circumvention inquiry, Commerce must

---

[397] *Id.* (citing *Ferrostaal Metals GmbH*, 518 F. Supp. 3d 1357, 1375).
[398] *See* Auxin's April 19, 2023 Case Brief (citing the Q&V Questionnaire at 1).
[399] *Id.* (citing *Building Sys. De Mex.*, 567 F. Supp. 3d 1306, 1316; *Mukund CIT*, 37 C.I.T. 443, 452; and *Mukund Fed. Cir.*, 767 F.3d 1300, 1308).
[400] *Id.* (citing *Fish Fillets from Vietnam (Cambodia)* IDM at Comment 2).
[401] *See Cold-Rolled Steel from Korea* IDM at Comment 6.
[402] *See Initiation Notice*, 87 FR at 19072.
[403] *Id.*

74

evaluate a representative selection of companies to determine whether merchandise has been completed or assembled in the third country, and must take necessary action to prevent evasion.[404]  Commerce is not required by the Act or regulations to impose a certification regime in instances where such a regime is inconsistent with preventing evasion and permits uncooperative parties to benefit from their lack of cooperation.  Commerce's previous findings that foreign producers' ability to "trace the country of origin of its shipments and identify which shipments to the United States are of Chinese origin on a transaction-specific basis," is crucial to administration of affirmative anti-circumvention findings.[405]  Commerce is not obligated to permit a previously uncooperative party to certify if that party has, by its unwillingness to cooperate, prevented Commerce from using that party's information to conduct its analysis, or to assess and verify such party's ability to trace its inputs to particular U.S. sales.  Rather, Commerce's establishment of a certification process in which non-cooperative respondents may not participate is consistent with our obligation to administer the law in a manner that prevents evasion of the *Orders*.[406]

Thus, we disagree with the arguments submitted by Red Sun and Vina that excluding uncooperative producers and their importers from the certification process is overly punitive and not supported by evidence.  Commerce's decision to preclude uncooperative respondents from participating in the certification process is necessary to ensure cooperation and does not go beyond what is minimally necessary and reasonable to ensure cooperation.  The reliance on *Oman Fasteners* as an example of the CIT finding Commerce's decision to apply AFA as impermissibly punitive is inapplicable here, where the question is whether precluding companies from certifying based on an adverse inference is permissible; not whether the application of AFA itself is warranted.

We agree with Auxin that the Court's decision in *Ferrostaal Metals GmbH* applies to the facts here.  Respondents argue that there is not a gap in the record which warrants the application of AFA.  However, we disagree, and find that the record lacks information pertaining to the Q&V information for non-cooperative respondents.  The Court in *Ferrostaal Metals GmbH* held that such a gap, in a similar circumvention proceeding, warranted the application of AFA, and sustained Commerce's determination to "bar {non-cooperative respondent} from participating in the certification program and determine that { non-cooperative respondent} was circumventing the orders."[407]

We also disagree with Red Sun's contention that the language in *BMW of N. Am. LLC* means that Commerce cannot, as AFA, preclude parties from participating in certification regimes as a result of a circumvention inquiry.  As noted by Red Sun, the Court's decision in *BMW of N. Am. LLC* states that an adverse inference rate cannot be punitive or aberrational and must "reflect {} the seriousness of the non-cooperating party's misconduct" committed by the respondent party.[408]  The ruling in *BMW of N. Am. LLC* also states that when determining an AFA rate, an

---

[404] *See* Vietnam RSM at "Selection of Respondents."
[405] *See Butt-Weld Pipe Fittings from China (Malaysia)* IDM at Comment 3; *Hangers from China (Vietnam)* IDM at Comment 4; and *Tissue Paper from China (India) Final Determination* IDM at Comment 2.
[406] *See Butt-Weld Pipe Fittings from China (Malaysia) Preliminary* PDM at 12-13, and 22 (unchanged in *Butt-Weld Pipe Fittings from China (Malaysia)*).
[407] *See Ferrostaal Metals GmbH*, 518 F. Supp. 3d at 1375-76.
[408] *See BMW of N. Am. LLC*, 926 F.3d 1291, 1301.

unusually high rate is permissible when it is necessary to serve the purpose of deterrence.[409]  In the instant case, as AFA, we are precluding non-cooperative companies from participating in the certification process as a means to deter other respondents from non-cooperation with Commerce's request for information in future circumvention inquiries.  We are not determining any AFA rates for the non-cooperative companies, and a company barred from the Chinese components certification regime will still receive its own margin or rate for non-Applicable Entries under the *Orders*, or (if it does not have its own margin or rate), the margin or rate of the Chinese company that exported the wafer(s) to it.

Contrary to Vina's arguments, the "Applicable Entries" language does not limit Commerce's ability to prohibit participation in the certification regime as AFA.  Commerce is authorized under 19 CFR 351.226(m)(1) to take the appropriate remedy to address circumvention, including the application of the determination on a country-wide basis to all products from the same country as the product at issue.  Commerce has repeatedly applied certification requirements in other circumvention inquiries which were subject to an affirmative country-wide decision.[410] Therefore, in a case where the affirmative circumvention determination is made entirely on record evidence, uncooperative respondents would be able to benefit from their failure to cooperate (*e.g.* not filing timely Q&Vs or not participating in verification) merely by the fact that they avoided the inconvenience and expense of participating, including being selected as a mandatory (complete questionnaire) respondent, knowing that their lack of participation might not (or would not) alter Commerce's finding of circumvention.  Such non-cooperation could also frustrate Commerce's ability to conduct a circumvention inquiry, should the largest third-country producers fail to provide Q&V responses.  Finally, an uncooperative respondent retains the right to participate in a future review, and thus remedy its uncooperative status and potentially gain the opportunity to participate in a certification regime.  For these reasons, Commerce's decision to preclude non-cooperating respondents from the certification regime is legitimately based on the need to induce cooperation and is not punitive.

We also disagree with the arguments that *Presidential Proclamation 10414* and the Act limits the use of AFA to Commerce's circumvention inquiry determinations and that the application of AFA in an inquiry cannot affect a company's subsequent import activities, which are governed by customs law.  We also disagree with arguments that Commerce ignores the statute in precluding companies subject to an AFA finding from the certification regime.  Commerce has previously precluded uncooperative parties from certification processes in circumvention inquiries and this practice has been upheld by the CIT.[411]  In addition, *Presidential Proclamation 10414* allows Commerce to institute certification regimes with the only restriction being that such measures cannot be implemented until the Presidential emergency expires.[412]  Therefore, for the final determination, Commerce will preclude companies subject to a finding based on AFA from participating in the certification regimes for Cambodia, Malaysia, Thailand, and Vietnam.

---

[409] *Id.*, 926 F.3d at 1300.
[410] *See Butt-Weld Pipe Fittings from China (Malaysia)*; *CRS from China (Vietnam)*; *CORE from China (Vietnam)*; and *CORE from China (UAE)*.
[411] *See Ferrostaal Metals GmbH*, 518 F. Supp. 3d 1357, 1374-1375.
[412] *See Proclamation Procedures*, 87 FR at 56868, 56869.

**Comment 14. Whether Commerce Should Allow Vina's Affiliates to Certify**

*Vina*[413]

- Commerce cannot apply AFA or preclude Vina's affiliates (*e.g.*, Vina Cell and LONGi HK) from participating in any certification regime even if Commerce applies AFA to Vina based on its termination of verification.
- Commerce has consistently treated Vina and Vina Cell as separate entities regardless of their affiliation throughout this circumvention inquiry as evidenced by Commerce issuing separate questionnaires to each company and the fact that both companies responded separately to said questionnaires.[414]
- Commerce stated in the Vietnam RSM regarding selecting its mandatory respondents that "{c}onsistent with {its} practice, {Commerce} did not collapse any of these companies with companies that allegedly are affiliated with them in deriving these Q&V figures."[415]
- In the Vietnam RSM, Commerce rejected arguments that it should collapse Vina with its other affiliates for the purpose of respondent selection and stated it "selected one of these companies, Vina, as a mandatory respondent based on its own shipment volumes."[416].
- Commerce directed its verification preparedness questionnaire, verification agenda, and verification cancellation memorandum only to Vina.[417]  Thus, the termination of verification, *i.e.*, the sole reason for any potential application of AFA by Commerce in its final circumvention determination, concerns Vina alone and was not based on the lack of cooperation by or inaccurate information from any of Vina's affiliates.
- Under section 776(b)(1) of the Act an application of AFA against Vina Cell, in particular, given that Commerce treated Vina Cell as a separate entity throughout its investigation, would be unlawful because Vina Cell fully cooperated with Commerce's circumvention inquiry.[418]
- In *Soybean Meal from India AD* Commerce applied an AFA rate against the non-cooperative mandatory respondent but applied the "all-other" exporters rate to the respondent's affiliate because there was no evidence to consider the two companies a single entity.[419]
- Given that Commerce has not performed a collapsing analysis to treat Vina and its affiliates as a single entity, Commerce cannot apply AFA against Vina's affiliates to preclude them from participating in Commerce's certification regime.

*Auxin*[420]

- As AFA, Commerce should find that Vina is circumventing the *Orders* and should preclude Vina and its affiliates from participation in any resulting certification regime.

---

[413] *See* Vina's April 19, 2023 Case Brief at 1-10; and Vina's April 28, 2023 Rebuttal Brief at 1-18.

[414] *See* Vina's April 28, 2023 Rebuttal Brief (citing Vina's Q&V Questionnaire, Vina Cell's Q&V Questionnaire, and Vina's Initial Questionnaire).

[415] *See* Vina's April 28, 2023 Rebuttal Brief (citing Vietnam RSM at 9, n. 33).

[416] *See* Vina's April 28, 2023 Rebuttal Brief (citing Vietnam RSM at 12).

[417] *See* Vina's April 28, 2023 Rebuttal Brief (citing Vina's Verification Questionnaire, Vina's Verification Agenda, and Vina's Verification Memorandum).

[418] *See* Vina's April 28, 2023 Rebuttal Brief (citing Vina Cell's Q&V Response).

[419] *See* Vina's April 28, 2023 Rebuttal Brief (citing *Soybean Meal from India AD* IDM at Comment 6).

[420] *See* Auxin's April 19, 2023 Case Brief at 76-79.

**Commerce's Position:**  Commerce has treated Vina and its affiliates, including Vina Cell and LONGi HK, as separate entities throughout the proceeding.  Because Commerce lacks a basis to find that any of Vina's affiliates failed to cooperate, we have only applied AFA to Vina.  Thus, the result of our application of AFA to Vina is that we have only precluded Vina from participating in the certification programs that are established for exports of solar cells and modules from Vietnam.

## Comment 15. Certification Requirements and Corrections

*BYD HK*[421]
- Commerce should simplify its certifications by replacing them with declarations from only importers that the entry(ies) meet the requirements for duty-free treatment based on the *Presidential Proclamation 10104* (*i.e.*, the entry is an "Applicable Entry") or Commerce's determinations in these circumvention inquiries (*i.e.*, either Commerce's negative circumvention determination applies to the entry or the merchandise that was entered into the United States meets the non-Chinese content requirements identified by Commerce).
- CBP already enforces other duty exemptions using simplified certifications and requiring anything more than simple declarations will impede the flow of goods into the United States.
- Commerce should provide importers 60 days to provide simplified declarations for entries that have already been made.

*Jinko*[422]
- To avoid CBP requiring AD/CVD cash deposits on entries with deficient certifications: (1) an importer should be allowed to appeal CBP's decision that a certification is deficient to Commerce and submit a corrected certification, if necessary; (2) an importer should be allowed to submit corrected certifications in the absence of gross negligence or fraudulent intent; and (3) the documentation required to be maintained in connection with the certification should be limited to documents that demonstrate that the entry is an "Applicable Entry" (*i.e.*, the p/n junction in the solar cells was not formed in China) or not an entry of inquiry merchandise (*i.e.*, the solar cells do not contain wafers produced in China).

*Auxin*[423]
- Commerce should continue to require exporters to complete the requisite certifications because:  (1) Commerce's preliminary affirmative country-wide circumvention determination applies to all exporters in the inquiry countries; (2) exporters possess certain information necessary for completing the certifications that imports may not have; and (3) BYD HK never explained why requiring certifications from exporters would be burdensome.
- Contrary to BYD HK's claim that "there is no legitimate need or purpose for Commerce to require certifications from exporters or to require the level of factual detail specified in

---

[421] *See* BYD HK's March 6, 2023 Case Brief at 2-3.
[422] *See* Jinko's March 6, 2023 Case Brief at 1-5.
[423] *See* Auxin's March 17, 2023 Rebuttal Brief at 26-28.

the current certifications," Commerce has specifically stated that the "addition of the certification requirements…strengthens the administration and enforcement of the AD and CVD orders by reducing the possibility that entries may be inaccurately classified by importers."[424]

**Commerce's Position:**  We have decided not to revise the certifications as suggested by BYD HK because:  (1) requiring exporters to complete the certifications is consistent with Commerce's practice and is necessary,; and (2) BYD HK never explicitly identified which parts of the certifications are too burdensome.  Commerce has a history of requiring both importers and expoers of goods that are entered into the United States to complete and maintain certifications in certain proceedings or proceeding segments, including as a result of circumvention inquiries.[425]  Certifications from exporters are particularly important for implementing the results of this circumvention inquiry because whether merchandise is inquiry merchandise is based on the country where the merchandise was produced and whether certain inputs into that merchandise were produced in China.[426]  Neither of these characteristics can be determined through a physical inspection of the merchandise at the border.  Moreover, entry documents that are typically available to the importer may not be helpful in identifying where certain inputs in the imported merchandise were produced, as the source of such inputs may not be apparent from invoices, bills of lading, *etc.*, especially where the input passed through multiple parties (producer, exporter, trading company).  As Commerce noted in the Preamble to its regulations:

> Given the complex supply chains that may be involved with certain types of subject merchandise (which may involve input producers, intermediate processors, producers, exporters, trading companies, importers, *etc.*), certifications provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order.[427]

Requiring exporters to complete and maintain certifications provides the added assurance that adequate information was obtained to accurately certify to the facts listed in the certifications. Moreover, simply requiring "declarations" from importers that an entry qualifies as an "Applicable Entry" or meets the non-Chinese content requirements does not provide the same level of assurance that the entry meets those requirements as the certifications that Commerce developed for this circumvention inquiry.  Commerce's certifications contain a list of each requirement that must be met to make clear that the importer and exporter have been informed of each requirement by way of the certification and both have specifically certified that each and every requirement has been met.

---

[424] *See* Auxin's March 17, 2023 Rebuttal Brief at 27 (citing *Core from China (Vietnam)* IDM at Comment 4.
[425] *See* CORE from China (UAE)*; see also Aluminum Extrusions from China Minor Alterations Circumvention Final*, 82 FR at 34631-32.
[426] *See Preliminary Determination*, 87 FR at Appendix IV.
[427] *See 2021 Regulations Final Rule*, 87 FR at 52364.

Furthermore, we disagree that it is inappropriate for Commerce to "require the level of factual detail specified in the current certifications" as argued by BYD HK.[428]  "As a general matter, importers are expected to perform their due diligence and exercise reasonable care {when completing entry documents} … .  {A} reasonable importer may be expected to know, at a minimum, the identity of certain parties in the transaction chain, understand the imported product, including where it was made, how it was made, and the components of the product (and, in some instances, the source of those components)."[429]  Commerce's certifications do not go beyond these already existing expectations for importers.  Hence, we have not revised the certifications as suggested or waived the certification requirement with respect to exporters.

We now turn to the comments regarding deficient or incorrect certifications and the documentation that must be maintained in connection with the certifications.  If CBP determines that an importer or exporter's certification does not conform to Commerce's requirements, such that the entry is subject to the *Orders*, the importer or exporter can request an administrative review of that entry wherein Commerce will determine the appropriate AD/CVD assessment for the entry.  Regarding corrections to certifications, CBP already has provisions in place for importers to correct entry summary information, including certification information, through such means as a post summary correction or a prior disclosure.

With respect to documentation requirements, parties who complete the "Applicable Entries" certification must certify to more than the fact that the solar cells or solar modules were not already subject to the *Orders*; or the AD order on certain crystalline silicon photovoltaic products from Taiwan (certain existing solar orders).  For example, such parties must certify that the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated.

Similarly, parties who complete the "Chinese Component" certification must certify to more than the fact that the solar cells or solar modules do not contain wafers produced in China.  For example, such parties must certify that the solar cells and/or solar modules were not already subject to the *Orders*.

Consequently, it would not be appropriate to limit the documentation requirements as suggested by Jinko.  Commerce noted in the certifications that the certifying party "is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, *etc.*)."[430]  This means that the certifying party must maintain sufficient documentation to support the certification in its entirety.  Therefore, we have not limited the documentation requirement as requested by Jinko.

---

[428] *See* BYD HK's March 6, 2023 Case Brief at 3.
[429] *See 2021 Regulations Final Rule*, 87 FR at 52347-48.
[430] *See Preliminary Determination*, 87 FR at Appendix VI.

80

## Comment 16. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*

*NE Solar*[431]

- Commerce cannot require exporters of solar cells or solar modules that were not manufactured using Chinese wafers to certify to that fact because such merchandise is not subject to the circumvention inquiry. Commerce cannot change the language of the *Orders* or interpreted that language "in a way contrary to {its} terms.[432]
- Thus, Commerce should revise its certifications to remove references to merchandise that is outside the scope of the circumvention inquiries and that is not subject to the underlying *Orders* (*i.e.*, language in the certification that the imported or exported solar cells and solar modules were not manufactured using wafers produced in China).

No other interested party commented on this issue.

**Commerce's Position:** We disagree with NE Solar's claim that Commerce cannot place certification requirements on interested parties who exported solar cells and/or solar modules to the United States that were produced in the countries under consideration that do not meet the definition of inquiry merchandise. Commerce's regulations at 19 CFR 351.226(m)(1)(iv), provide that "{i}n conducting a circumvention inquiry under this section, the Secretary shall consider, based on the available record evidence, the appropriate remedy to address circumvention and to prevent evasion of the order. Such remedies may include … {t}he implementation of a certification requirement under 19 CFR 351.228." Under 19 CFR 351.228, Commerce may require "an importer or other interested party" to "{m}aintain a certification for entries of merchandise into the customs territory of the United States" and that if such certificate is not maintained or is false, Commerce "may instruct the Customs Service to suspend liquidation of entries of the importer or entries associated with the other interested party and require a cash deposit of estimated duties at the applicable rate …"

Thus, the certification described in 19 CFR 351.228 relates to an entry that was not declared as subject to ADs or CVDs, such as the entries described by NE Solar, since only if the certification was not maintained or was found to be false would such duties be imposed. This interpretation is consistent with Commerce's statement in the Preamble to the regulations that "Commerce uses the certification program, as described in {section} 351.228 of these regulations, to allow parties who have not engaged in the practices which Commerce determined were circumventing an order to certify that they did not participate in such conduct." Therefore, requiring importers and exporters to certify that the imported/exported solar cells or solar modules produced in the countries under consideration were not manufactured using wafers produced in China is entirely consistent with Commerce's regulations and its authority to administer the Act in a manner that prevents evasion of its determinations, including developing certifications that it finds will be effective in preventing such evasion. As the CIT noted, "Commerce has a certain amount of discretion to act in order to 'prevent {} the intentional evasion or circumvention' of the Act … .

---

[431] *See* NE Solar's March 6, 2023 Case Brief at 5-8.
[432] *Id*. at 5-7 (citing *Wheatland*, 161 F.3d at 1370 (quoting *Smith Corona*, 915 F.2d at 686; and *Ericsson*, 60 F.3d at 782).

To that end, Commerce may impose measures such as mandatory certification programs where it believes they will be effective in preventing future circumvention of its orders."[433]

Such certifications are particularly important in this circumvention inquiry because inquiry merchandise is not physically distinguishable from non-inquiry merchandise (inquiry and non-inquiry merchandise only differ with respect to the countries where certain materials in the merchandise were produced). As Commerce noted in the Preamble to its regulations:

> We note that Commerce frequently imposes certifications in instances in which CBP may not be able to ascertain certain identifying details relevant to the product's classification as either subject to, or not subject to, an AD and/or CVD proceeding through physical inspection or the relevant sales documentation accompanying the entry summary, and, thus, could not confirm through these means alone whether a particular entry has been properly designated as {subject to antidumping or countervailing duties}. In such instances, both CBP and Commerce would rely on the certifications as an additional tool to ascertain whether the entry correctly was filed as an entry type not subject to an AD and/or CVD proceeding.[434]

Commerce went on to note in the Preamble that:

> … enforcement of the AD/CVD laws, including taking steps to prevent evasion and circumvention of AD and CVD orders by producers, exporters, and importers, is well within Commerce's authority and is of paramount importance to Commerce. The addition of a certification requirement, where necessary based on a given case, strengthens the administration and enforcement of the AD and CVD orders by reducing the possibility that entries may be inaccurately filed by importers. Given the complex supply chains that may be involved … certifications provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order.[435]

Revising the certification as suggested by NE Solar by removing statements that the imported/exported merchandise was not manufactured using wafers, and/or certain other materials, produced in China would contravene the purpose of the certification at issue which is to "provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order."[436]

---

[433] *See Appleton Papers Inc.*, 929 F. Supp. 2d at 1337 (citing *Tissue Paper from China (Vietnam) Final Determination* IDM at 9-12); *Solar Cells from China Investigation* IDM at 80-81 (finding that a certification regime is necessary and appropriate to prevent evasion of the AD/CVD orders on solar cells); *CORE from China (UAE)*, 85 FR at 41957, 41958.
[434] *See Adoption of CFR 351.228*, 86 FR at 52364.
[435] *Id.*
[436] *Id.*

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

Lastly, Commerce's certifications do not redefine the scope of the *Orders* or inquiry merchandise.  Rather, the certifications are tools used to enforce the *Orders* and the circumvention determination in this proceeding so as to prevent evasion of such determinations.

## Comment 17. Whether Exporters and Importers Should Be Permitted to Submit Multiple Certifications, as Applicable

*BYD HK*[437] *and CSIL*[438]
- Commerce should clarify that exporters and importers eligible to complete both the Appendix IV "Certification for 'Applicable Entries' Under 19 CFR Part 362 Importer Certification" and Appendix VI "Certification Regarding Chinese Components Importer Certification" certifications may file both certifications.
- Commerce's clarification would provide certainty to importers whose imports comply with the conditions of both certifications should *Presidential Proclamation 10414* and/or Commerce's related September 16, 2022 Final Rule be amended or terminated.[439]
- There is no principled basis for Commerce to preclude parties from filing two certifications and clarifying an importer's ability to submit more than one certification would assist in Commerce's administration of the final determination in these inquiries.
- Commerce should amend its certifications and related appendices to allow importers to submit both the Appendix IV "Certification for 'Applicable Entries' Under 19 CFR Part 362 Importer Certification" and Appendix VI "Certification Regarding Chinese Components Importer Certification" certifications to clarify the certification regime, and in turn, promote its administrability.

No other interested party commented on this issue

**Commerce's Position:**  We confirm that importers and exporters may complete certifications under ***both*** Appendix IV and Appendix VI of the *Preliminary Determination.*  Following the release of the *Preliminary Determinations,* Commerce informed interested parties of the certification requirement[440] and established the following types of certifications to administer *Presidential Proclamation 10414* and the findings from the *Preliminary Determinations*:  (1) importer and exporter certifications that specific entries meet the regulatory definition of "Applicable Entries"; (2) importer and exporter certifications that specific entries are not subject to suspension of liquidation or the collection of cash deposits based on the preliminary negative circumvention determinations (in combination with certain of its wafer exporters); and (3) importer and exporter certifications that specific entries of inquiry merchandise are not subject to suspension of liquidation or the collection of cash deposits pursuant to this preliminary country-wide affirmative determination of circumvention because the merchandise was not manufactured using certain components produced in China.[441]  Copies of the certifications and information regarding the certification requirements were provided in the Appendices to the *Preliminary*

---

[437] *See* BYD HK's March 6, 2023 Case Brief at 4-6.
[438] *See* CSIL's March 6, 2023 Case Brief at 3-4.
[439] *See* BYD HK's March 6, 2023 Case Brief (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56868).
[440] *See Preliminary Determination*, 87 FR at 75225.
[441] *See Vietnam* PDM at 27.

*Determination.*[442] Appendix IV of the *Preliminary Determination* related to the certification for "Applicable Entries" under 19 CFR Part 362 whereas Appendix VI relates to the certification regarding Chinese components. We acknowledge that exporters/importers shipping inquiry merchandise from the four countries subject to the circumvention inquiry (*i.e.*, Cambodia, Malaysia, Thailand, and Vietnam) may qualify under the "Applicable Entries" Appendix IV certification related to the *Presidential Proclamation 10414* and the Chinese components Appendix VI certification. Thus, exporters/importers may elect to complete both the Appendix IV and Appendix VI certifications.

**Comment 18. Whether or Not Companies Found Not to be Circumventing Should Be Required to Certify and to Identify Their Wafer Suppliers**

*Hanwha*[443]

*Commerce Should Not Request Certifications for Companies Found Not to Be Circumventing the Orders*

- The significance of a negative determination of circumvention is that merchandise exported by a respondent found not to be circumventing the orders is not within the scope of the relevant AD/CVD orders.[444] Yet, contrary to law, Commerce has imposed a certification regime on Hanwha's entries.
- Commerce has the discretion to act to prevent the evasion or circumvention of AD law.[445] Commerce may impose measures such as a certification regime if they believe it will be effective in the prevention of future circumvention.[446]
- Hanwha was found not to be circumventing and, thus, Commerce should not require any certification on exports of solar cells and modules produced by Hanwha because they are not subject merchandise.
- Commerce's stated objective is to craft certification language that targets as closely as possible the merchandise that is circumventing the orders. Imposing a certification requirement on merchandise exported by Hanwha is contrary to this principle.
- Commerce should take reasonable steps to ensure that merchandise from an exporter found not to be circumventing the orders is not subject to suspension of liquidation and ADs/CVDs.[447]
- In prior negative circumvention determinations, Commerce has consistently not adopted any certification requirements.[448] Therefore, companies for which Commerce reaches a negative determination should be exempt from a certification requirement.
- Commerce may implement a certification requirement under 19 CFR 351.228 if Commerce finds the merchandise subject to the inquiry pursuant to 19 CFR

---

[442] *See Preliminary Determination*, 87 FR at 75227-31.
[443] *See* Hanwha's March 6, 2023 Case Brief at 2-15.
[444] *Id.* (citing 19 CFR 351.226(g)(2)).
[445] *Id.* (citing *Tung Mung CIT*).
[446] *Id.* (citing *Butt-Weld Pipe Fittings from China (Malaysia)*).
[447] *Id.* (citing *Mitsubishi Heavy Industries*).
[448] *Id.* (citing *CORE from China (Guatemala)*; *CORE from China (South Africa)*; *PET Film from the UAE (Bahrain)*; and *Pipe and Tube from India (Oman and UAE)*).

84

351.226(m)(1)(iv).  However, neither the statue nor Commerce's regulations require a certification requirement in the event of a negative circumvention determination.

- If Commerce makes a negative determination, it is required to terminate the proceeding and terminate the suspension of liquidation with a refund of any cash deposit.[449] Therefore, if Commerce makes a negative final circumvention determination, that merchandise must not be included in the *Orders* or subject to duties.
- Because Hanwha is not disclosing its wafer suppliers it is unfairly placed in the same position as the respondents for which Commerce made an affirmative circumvention finding.  This is inconsistent with the statute and Commerce's own regulations, which requires Commerce to terminate the suspension of liquidation in the event of a negative determination in an antidumping investigation.

*Commerce Has Requested Certifications Where Exporters Reported No Shipments but that Situation is Not Analogous to a Negative Determination*

- Commerce has previously imposed certification requirements on companies found to have no shipments in affirmative circumvention determinations.  Those scenarios are not the same as a negative circumvention determination.[450]
- In these cases, Commerce found the companies to have no shipments, finding that there are no reviewable entries or no reviewable shipments and not investigating a company's books and records to determine if it is circumventing pursuant to section 781(b) of the Act.
- Conversely, a negative circumvention determination is made after Commerce has analyzed a respondent's information.  Hanwha has provided multiple questionnaire responses, thousands of pages of confidential information, and conducted verification of all information needed.
- In *Pipe and Tube from India (Oman and UAE)*, Commerce reached a negative country-wide determination and did not impose any certification requirements.[451]  Similar to this, Hanwha was found not to be circumventing, a certification is not required and requiring one is contrary to law.

*If Commerce Continues to Require Certifications for Companies Found Not to Be Circumventing, Commerce Should Modify the Appendix V Certification Requirement and Allow Hanwha to Certify Without Disclosing the Identity of its Wafer Exporters[452]*

- Hanwha objects to the requirement of publicly disclosing the names of its wafer exporters in order to use the certification regime imposed in the *Preliminary Determination*, as it is contrary to Commerce's APO practice and imposes significant harm to Hanwha's business relationships.
- Specifically, 19 CFR 351.105(c)(6) states that Commerce will normally consider the names of particular customers, distributors or suppliers as BPI if so designated by the

---

[449] *Id*. (citing section 731(c)(3) of the Act).

[450] *Id*. (citing *Butt-Weld Pipe Fittings from China (Malaysia)*; and *CORE from China (UAE)*).

[451] *Id*. (citing *Pipe and Tube from India (Oman and UAE)*).

[452] Hanwha refers to the wafer exporters (the companies that ship the wafers from China to Malaysia) as wafer suppliers.  For our analysis these terms are interchangeable.  We note that the Appendix V certification asks for companies to confirm their wafer "exporter."

85

submitter.  Hanwha has properly requested BPI treatment of the names of its unaffiliated suppliers.

- Requiring Hanwha to disclose the identity of its wafer exporters is therefore inconsistent with the APO, and also seems to violate the spirit of the Trade Secrets Act.
- The identity of wafer exporters/suppliers is extremely sensitive for a variety of commercial reasons, making it virtually impossible for Hanwha to comply.
- None of the five statutory factors under section 781(b)(1)(C) of the Act required an examination of the identity of Hanwha's wafer exporters/suppliers, beyond the fact that the wafers were of Chinese origin.
- Commerce should allow Hanwha to certify that the solar cells and modules are produced in the same general manner as examined in the investigation, without requiring it to trace such exports to a specific wafer supplier.
- The identity of the wafer exporters/suppliers also has no bearing on Commerce's analysis with respect to section 781(b)(1)(D) of the Act.
- In past cases where Commerce has established certification requirements, such as in *CORE from China (UAE)*, respondents were not required to provide the names of their substrate providers. The respondents were simply required to certify that the substrate was not Chinese.
- The identity of an input supplier has never been part of any certification regime in a circumvention inquiry.
- The proposed certification regime does not take into account that Hanwha and others may qualify new wafer suppliers.  Hanwha seeks confirmation that it will not be barred from using new wafer suppliers for future shipments, should Commerce continue to require the identification of wafer suppliers.
- If Commerce believes a certification regime is necessary, Commerce should modify the certification language and allow a company who received a negative determination to certify that the subject merchandise was produced by that company using a substantially similar production process, without having to publicly disclose the identity of its wafer suppliers.
- Companies found not to be circumventing should be allowed to certify that cells exported to the U.S. are for use in modules produced by affiliated parties in the U.S. Such a certification would be easy to enforce and administer by CBP and would not be detrimental to the U.S. industry in any way as the cells would be dedicated for consumption by an affiliated supplier to produce U.S. modules.
- While Hanwha's inability to use the Appendix V certification could be mitigated by using the Applicable Entries certification, it is inadequate for a company found not to be circumventing.

*Boviet*[453]

- The inclusion of a specific wafer supplier requirement is unnecessary to prevent circumvention, is unrelated to the reasoning underlying Commerce's negative determination, imposes an unnecessary burden on Boviet, and complicates administrability for CBP.

---

[453] *See* Boviet's March 6, 2023 Case Brief at 1-4.

- Commerce reached a *Preliminary Determination* that Boviet is not circumventing, based on a number of factors, none of which has any connection to the identity of the Chinese exporter supplying Boviet wafers.
- Boviet's wafer supplier was not a part of Commerce's negative determination for Boviet, and as it is not related to Commerce's determination, Commerce should remove this aspect of the certification requirement.
- The wafer supplier restriction unnecessarily complicates Boviet's compliance with and CBP's administration of Commerce's certification. It hinders Boviet's ability to make normal commercial decisions regarding its supply of wafers.
- Boviet requests that Commerce modify the Appendix V certification to exclude the wafer exporter/supplier requirement for the importer in paragraph F(3) and for the exporter in paragraph D(3), if not remove the certification requirement altogether.

*Auxin*[454]

- Commerce should not weaken its certification regime by carving out certain solar producers, exporters, or importers, making certain requested changes, or delaying its implementation.
- Hanwha argues that Commerce should not impose a certification requirement for companies that received a negative circumvention determination, but because of Commerce's preliminary country-wide affirmative circumvention findings, such a certification regime is necessary to give full effect to Commerce's determination.
- Auxin's proposed certification regime as provided in section II of the rebuttal brief, should make certification easy for companies like Hanwha that have been found to not be circumventing.
- Allowing a producer temporary or permanent exemption from the affirmative ruling and its certification requirements because it is not currently relying on Chinese substrate creates the possibility of future circumvention by that producer.[455]
- With respect to *CORE from China (Guatemala)*, *CORE from China (South Africa)*, *PET Film from the UAE (Bahrain)*, and *Pipe and Tube from India (UAE)*, these were negative country-wide circumvention determinations, and therefore, Commerce did not institute certification regimes.
- Where a certification requirement is imposed, it must be imposed on a country-wide basis to avoid evasion of the order and circumvention findings.
- Commerce should alter its certification regime by applying rules proposed by Auxin. Adopting these rules would obviate respondents' arguments regarding the need to publicly identify their wafer suppliers, provide flexibility to respondents in qualifying new wafer suppliers, allow respondents to make commercial decisions, and simplifies the records importers are required to maintain.
- Auxin's proposal is better because it:  (1) avoids the need for respondents to publicly identify their wafer suppliers, (2) provides flexibility to respondents so they are not locked into certain wafer suppliers, (3) allows respondents to determine what is best for their commercial interests when securing Chinese inputs, and (4) simplifies the types of records needed to be maintained by importers.

---

[454] *See* Auxin's March 17, 2023 Rebuttal Brief at 17-21.
[455] *Id.* (citing *CRS from China (Vietnam)*).

87

**Commerce's Position:**  We continue to find the certification requirements implemented in the *Preliminary Determinations* to be adequate and appropriate.  For the final determinations, we have made slight modifications regarding the wafer exporter language included in the certifications at Appendix V.

Based on record information, Commerce initiated a country-wide circumvention inquiry to determine whether imports of solar cells and modules exported from, and produced in, Cambodia, Malaysia, Thailand, and Vietnam were circumventing the *Orders*.[456]  On December 8, 2022, we preliminarily found that solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam were circumventing the *Orders* on a country-wide basis.  Under 19 CFR 351.226(m)(1), Commerce is authorized to take the appropriate remedy to address circumvention and prevent evasion of an order, including the application of a determination on a country-wide basis.  Therefore, Commerce applied the affirmative determination of circumvention to all shipments of inquiry merchandise from all four countries on or after April 1, 2022, the date of publication of the *Initiation Notice.*

As stated in the *Preliminary Determinations*, we determined that shipments of inquiry merchandise by Hanwha, in combination with certain wafer exporters, completed in Malaysia using certain parts and components manufactured in China are not circumventing the *Orders*.  In order to administer the country-wide affirmative determination of circumvention, and the company-specific negative determinations of circumvention, Commerce established the certification regime.  The certification regime was implemented to ensure that the merchandise from Hanwha using the specific supply-chain that was found to be not circumventing the *Orders*, is not improperly subject to the *Orders*.

Hanwha argues that companies found not to be circumventing the *Orders* should not be required to certify, as the negative determination of circumvention means that the merchandise exported by the respondent is not within the scope of the relevant order.  In previous negative circumvention determinations, Hanwha notes, Commerce has not adopted any certification requirements.[457]  Additionally, Hanwha contends that in accordance with section 735(c)(2) of the Act, Commerce is required to terminate the proceeding following a negative determination, and to terminate the suspension of liquidation.  The CIT has held that Commerce is expected to take reasonable steps to prevent the suspension of liquidation of non-subject merchandise.  According to Hanwha, based on past precedent where Commerce reached a negative determination, Commerce has indicated that importers and exporters are no longer required to certify their products, lifted the suspension of liquidation, and ordered CBP to refund any cash deposits.[458]

As stated above, Commerce is authorized under 19 CFR 351.226(m)(1) to take the appropriate remedy to address circumvention, including the application of the determination on a country-wide basis to all products from the same country as the product at issue.  Accordingly, Commerce initiated these circumvention inquiries on a country-wide basis and reached an

---

[456] *See Initiation Notice.*
[457] *See* Hanwha's March 6, 2023 Case Brief (citing *CORE from China (Guatemala)*; *CORE from China (South Africa)*; *Pipe and Tube from India (UAE)*;and *PET Film from the UAE (Bahrain)*).
[458] *See* Hanwha's March 6, 2023 Case Brief (citing *Shelter Forest*).

affirmative country-wide determination in its *Preliminary Determinations*. Therefore, we find the facts of the cases cited by Hanwha not to be analogous to these inquiries. Commerce did not require certifications in *CORE from China (Guatemala)*, *CORE from China (South Africa)*, and *Pipe and Tube from India (UAE and Oman)* because these were negative country-wide determinations. In *PET Film from the UAE (Bahrain)*, the proceeding was initiated on a specific respondent, not on a country-wide basis. Commerce has repeatedly applied certification requirements in other circumvention inquiries which were subject to an affirmative country-wide decision.[459] Hanwha also asserted that the facts in *Butt-Weld Pipe Fittings from China (Malaysia)* and *CORE from China (UAE)* were not relevant due to the respondents reporting no shipments. However, we find these cases to be relevant as they were circumvention inquiries initiated on a country-wide basis and found to be affirmative. The country-wide affirmative decision was what resulted in the need for certifications for importers and exporters.

Given the affirmative country-wide determinations in the instant inquiries, there is no basis for Commerce to terminate the inquiries, and instead, pursuant to section 781(b)(1)(E) of the Act and 19 CFR 351(m)(1)(iv), Commerce deems a certification regime to be necessary and appropriate administer the determinations and prevent evasion of the *Orders* in the future. The certification regime allows companies found not to be circumventing the *Orders* opportunities to avoid the application of ADs/CVD. As such, we find the certification regime to be a reasonable step to prevent the suspension of liquidation of non-subject merchandise. Thus, requiring Hanwha to complete certification requirements is not equivalent to treating Hanwha as an affirmative company, but a measure to ensure that Hanwha can certify entries that are not subject to the *Orders* as a consequence of the negative determination regarding Hanwha, while also allowing for the continued administration and enforcement of *Orders*. If Hanwha and other parties are accurately filling out the certifications, they will not be subject to the *Orders*. The facts of this case do not resemble those of *Shelter Forest* as we reached an affirmative country-wide determination in this case. In *Shelter Forest*, Commerce made a negative determination and as a result, indicated that respondents no longer needed to certify, lifted the suspension of liquidation, and ordered CBP to refund any cash deposits.[460] Therefore, we find the facts of *Shelter Forest* to not be relevant.

Hanwha next argues that should Commerce continue to require companies found not to be circumventing, Commerce should modify the Appendix V certification and allow Hanwha to certify without disclosing the identity of its wafer suppliers/exporters. Specifically, Hanwha notes that requiring it to publicly disclose the names of its wafer suppliers/exporters is contrary to APO practice, and pursuant to 19 CFR 351.105(c)(6), a supplier's identity should be treated as BPI. Additionally, per Hanwha, the identity of specific wafer suppliers has no bearing on Commerce's analysis under sections 781(b)(1)(C) and 781(b)(1)(D) of the Act. Boviet further contends that the inclusion of a specific wafer supplier is unnecessary and is unrelated to the reasoning underlying Commerce's determination.

Commerce finds the request to treat the names of wafer exporters/suppliers as BPI within the Appendix V certification to be appropriate and has modified the certification accordingly. 19

---

[459] *See Butt-Weld Pipe Fittings from China (Malaysia)*; *CRS from China (Vietnam)*; *CORE from China (Vietnam)*; and *CORE from China (UAE)*.
[460] *See Shelter Forest*.

CFR 351.105(c)(6) states that Commerce will normally consider the names of particular customers, distributors, or suppliers to be BPI, if so designated by the submitter. As Hanwha has requested the business proprietary treatment of its unaffiliated wafer suppliers, the regulations state that Commerce will normally treat it as BPI. Therefore, Commerce has modified the certification under Appendix V to allow the business proprietary treatment of wafer exporters for all respondents found not to be circumventing. Certifications submitted to CBP as part of an entry package are not made publicly available, and such information will not be publicly disclosed.

With respect to arguments related to the inclusion of specific wafer exporters in the certification, we continue to find it necessary for the names of specific wafer exporters to still be required on the certification under Appendix V, with the modification for BPI treatment described above. In the *Preliminary Determinations*, and as affirmed in this final determination, we performed an analysis based on the particular supply chains of each mandatory respondent. The *Preliminary Determination* specifically states that we determined that Hanwha's exports of inquiry merchandise produced with wafers exported by the specific parties reported in their questionnaire responses are not subject to the *Orders*. Therefore, the certification under Appendix V is established to provide companies found not to be circumventing on a company-specific basis to certify that their specific supply chain is not subject to the *Orders*. As a result, Commerce continues to require respondents found not to be circumventing to include the names of its wafer exporters in the certification. Our analysis under section 781(b)(2) of the Act is done at an exporter-specific level and the country of origin of the wafer is a critical aspect of our analysis. Because we are permitting parties to certify shipments as not circumventing only if the shipment utilizes the supply chain examined in this inquiry and we are requiring both the exporter and importer to certify this, the exporter may need to disclose their wafer supplier to their importer. Should respondents wish to use new wafer suppliers for future shipments, the certifications under Appendix IV and Appendix VI remain available to all companies found not to be circumventing.

Lastly, Auxin commented that Commerce should alter its certification regime by adopting the rules it proposed. Doing so, according to Auxin, would obviate the need for respondents to publicly identify their wafer suppliers, provide flexibility to respondents in qualifying new wafer suppliers, allow respondents to make commercial decisions, and simplifies the records importers are required to maintain. Commerce has addressed Auxin's proposal under Comment 18.

Based on the analysis above, Commerce finds the certification regime established at the *Preliminary Determinations* to be appropriate. With respect to the certification listed under Appendix V, Commerce continues to require the names of specific wafer exporters but will allow respondents to treat them as BPI.

## Comment 19. Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews

*Vina/LONGi*[461]

- A changed circumstances review is preferable to an administrative review as a proceeding segment in which Commerce could reconsider a company's eligibility to participate in the solar circumvention certification regime.

- The Act and Commerce's regulations indicate that administrative reviews are used to determine final liabilities for ADs/CVDs, not to address matters related to circumvention inquiries.[462]

- It would take too long for a company to gain access to the solar circumvention certification regime through an administrative review and the company would need to participate in multiple administrative reviews.

- For example, under *Presidential Proclamation 10414* and Commerce's implementing regulations (which provide that Commerce will instruct CBP to discontinue suspension of liquidation and the collection of cash deposits on "Applicable Entries" of inquiry merchandise on or before June 6, 2024, (the current Date of Termination of *Presidential Proclamation 10414*)), unless a company incorrectly declared that it had a reviewable suspended entry before June 6, 2024, it will not have any reviewable entries until the twelfth administrative review of the AD *Order* (which covers the period December 1, 2023, through November 30, 2024).  The final results of 2023-2024 AD review may not be issued until as late as June 2026.  Meanwhile, the company would not be able to use solar circumvention certifications during the POR of the thirteenth administrative review of the AD *Order* (covering the period December 1, 2024, through November 30, 2025) and would need to request that its shipments/entries during the 2024-2025 POR be reviewed.  The final results of that review may not be issued until as late as June 2027.

- Moreover, if a company in an inquiry country requested an administrative review and was selected as a mandatory respondent, it would be a waste of resources to conduct a complete analysis of the company's exports/entries when the reason the company requested the review was to establish its eligibility to certify that its solar cells and/or solar modules are not inquiry merchandise subject to review.

- In contrast, in changed circumstances reviews Commerce does not need to issue a questionnaire,[463] or conduct the full analysis performed for mandatory respondents but may focus on the precise reason the company was determined to be ineligible to participate in the solar circumvention certification regime.

- In a changed circumstances review a company could be given the opportunity to establish its eligibility to participate in the solar circumvention certification regime by demonstrating that it is able to trace the components in solar cells or modules to the country in which the wafer and other significant material inputs were produced and thus satisfy the certification requirements.

---

[461] *See* Vina/LONGi's March 6, 2023 Case Brief at 3-6.
[462] *Id.* (citing section 751(a)(A)-(B) of the Act).
[463] *Id.* at 5 (citing 19 CFR 351.221(c)(3)(iii)).

91

- Thus, Commerce can address a "change" in its determination that a company was not eligible to participate in the solar circumvention certification regime in a changed circumstances review. Commerce followed this approach in *OCTG from China CCR*.[464]
- Commerce should consider examining certification eligibility in changed circumstances reviews as an alternative to reviewing such eligibility in administrative reviews.

No other interested party commented on this issue.

**Commerce's Position:** We disagree with Vina/LONGi's position that Commerce should reconsider a company's ineligibility to participate in the solar circumvention certification regime in changed circumstances reviews. Rather, Commerce will consider requests for eligibility to participate in the solar circumvention certification regime in administrative reviews.

Section 751(b)(1) of the Act provides that "{w}henever {Commerce} receives information concerning, or a request from an interested party for a review of {a final determination, suspension agreement, or continued investigation} which shows changed circumstances sufficient to warrant a review of such determination or agreement, {Commerce} shall conduct a review of the determination or agreement …" The phrase "changed circumstances" is not defined in the Act, the SAA, or Commerce's regulations and none of those primary and secondary sources contain an explanation of what aspects of a determination may be reconsidered in light of changed circumstances. While Commerce has broad discretion in determining whether to initiate a changed circumstances review and in deciding the range of matters that can be considered in such a proceeding, its discretion is limited by the statutory requirement that there be "changed circumstances sufficient to warrant a review" of the antidumping order.[465] In practice, Commerce has conducted changed circumstances reviews to address a wide variety of issues, some of which could also be addressed in the context of an administrative review.[466] Commerce's practice is to determine, on a case-by-case basis, whether changed circumstances sufficient to warrant a review exist.[467]

Here, Vina/LONGi failed to identify any circumstance that has changed. Rather, Vina/LONGi argued that "… a changed circumstances review can address a "change" in Commerce's determination that a company was not eligible to participate in its certification program." However, the circumstance that led Commerce to prohibit importers/exporters from certifying as to the non-Chinese content in inquiry merchandise from certain companies[468] is the fact that those companies did not cooperate in the circumvention inquiry (they either failed to respond to Commerce's quantity and value questionnaire or failed to permit Commerce to verify their

---

[464] *Id.* at (citing *OCTG from China CCR*, 87 FR at 15915).
[465] *See* section 751(b)(1) of the Act.
[466] *See, e.g.*, *Aluminum Extrusions from China Preliminary CCR*, 83 FR at 34548 (finding sufficient information to initiate a changed circumstances review to recalculate certain cash deposit rates); *see also Nails from Malaysia CCR Initiation*, 80 FR at 71772 (finding sufficient information and "good cause" to initiate a changed circumstances review to evaluate whether a company was properly utilizing the correct cash deposit rate); and *Pure Magnesium from Canada CCR Initiation*, 57 FR at 41473 (finding sufficient information and "good cause" to initiate a changed circumstances review to evaluate changes to the major subsidy program at issue in the underlying investigation).
[467] *See Tapered Roller Bearings from China*, 67 FR at 10665.
[468] Commerce did not prohibit exporters or importers from certifying that an entry was an "Applicable Entry" under 19 CFR 362.102.

questionnaire responses).  The fact that these companies did not cooperate in the inquiry has not changed.  Without any changed circumstances, we find no basis for conducting a changed circumstances review.

In contrast, in *OCTG from China CCR*, the case cited by Vina/LONGi to support its position, there was a change in the facts underlying Commerce's determination.  Specifically, in the underlying circumvention inquiry, Commerce did not implement certifications "because the HLD companies were "unable to track welded OCTG to the country of origin of inputs used in the production of welded OCTG …"[469]  In the related changed circumstances review Commerce found that there was a change in circumstances because "the HLD companies are now able to identify and effectively segregate welded OCTG produced by either HLDS (B) in Brunei or HLD Clark in the Philippines using non-Chinese hot-rolled steel from other OCTG produced at their facilities."[470]  We do not have this fact pattern in this circumvention inquiry, and *OCTG from China CCR* did not involve or address companies that failed to cooperate in the earlier circumvention inquiry.

Our approach is consistent with *Plywood from China (Vietnam)* where Commerce stated that "we decline to reconsider eligibility for the certification programs established by these circumvention inquiries in the context of a CCR and instead, determine that the appropriate mechanism by which to assess previously ineligible exporters' eligibility for the certification programs for purposes of this proceeding is in the ongoing ARs of the *Orders*."[471]  In that case Commerce explained that in contrast to other cases where companies subsequently claimed that they had changed the methods by which they tracked their raw materials, and Commerce conducted CCRs to verify these new facts, "companies always had the ability to participate or to provide accurate data, and we do not see this as a change in the future."[472]

Vina/LONGi contends that it is preferable for Commerce to consider a company's eligibility to participate in the solar circumvention certification regime in a changed circumstance review, rather than an administrative review for a number of reasons.  Specifically, Vina/LONGi contends that the purpose of an administrative review is to determine final liabilities for ADs and CVDs, not to address matters related to circumvention inquiries. Moreover, Vina/LONGi maintains that it would take too long and require multiple reviews to gain access to the certification regime, and it could lead to significant and unnecessary work and analysis (*e.g.*, a party simply seeking access to the certification regime may have to file a separate rate application and could be selected as a mandatory respondent).  We have responded to those concerns below.

First, Commerce must determine if entries of solar cells or modules are inquiry merchandise or not, and how to assess duties on merchandise deemed subject to these circumvention inquiries.  Certifications are relevant to that decision because whether or not importers and exporters have met the certification requirements affects whether or not AD/CVDs will be assessed on the entries.  Because the Act directs Commerce to determine final assessment rates in administrative

---

[469] *See OCTG from China CCR*, 87 FR at 15915.
[470] *Id.*, 87 FR at 15916.
[471] *See Plywood from China (Vietnam) Final* IDM at Comment 13.
[472] *Id.*

reviews, we find that considering certification eligibility in administrative reviews is consistent with the purpose of that proceeding segment as provided in the Act.

Second, we do not find that our decision to reconsider certification eligibility in an AR places importers or exporters of inquiry merchandise from AFA companies in a different position, in terms of timing or requesting multiple reviews, than if they were to import or export subject merchandise from a company that currently has a dumping margin based on AFA. In both cases, parties would need to wait until the anniversary month of the AD/CVD order to request an administrative review and then would need to wait until the final results of that review were published before, depending on the outcome of the review, entries may no longer be subject to an AFA rate. Exporters/producers seeking reconsideration with respect to certification eligibility would face a similar timeline before certifications could be used.

Moreover, Commerce did not prohibit importers/exporters from certifying that entries of inquiry merchandise from AFA companies are "Applicable Entries" under 19 CFR 362.102.[473] Thus, importers and exporters of inquiry merchandise from AFA companies may currently participate in that part of the certification regime and do not need to wait for an administrative review. Furthermore, in the *Preliminary Determination*, which was issued on December 1, 2022, Commerce noted that:

> If it is determined that an importer and/or exporter has not met the certification and/or related documentation requirements for certain entries, Commerce intends to instruct CBP to suspend, pursuant to these preliminary country-wide affirmative determinations of circumvention and the *Orders*, all unliquidated entries for which these requirements were not met and require the importer to post applicable AD and CVD cash deposits equal to the rates noted above.[474]

> Interested parties that wish to have their suspended non-"Applicable Entries," if any, reviewed, and their ineligibility for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders* (*i.e.*, December 2022 for the *Solar Cells AD Order* and December 2023 for the *Solar Cells CVD Order*).[475]

As indicated above, Vina/LONGi claims that unless a company incorrectly declared that it had a reviewable suspended entry before June 6, 2024, it will not have any reviewable suspended entries until the twelfth administrative review of the *AD Order* (which covers the period December 1, 2023, through November 30, 2024) and could not request an administrative review until December 2024. Under section 751(a) of the Act, Commerce does not conduct an administrative review of an exporter/producer absent a suspended entry of subject merchandise from that exporter/producer.[476] However, a U.S. entry of inquiry merchandise made prior to the

---

[473] *See Preliminary Determinations*, 87 FR at 75221, 75223. "Applicable Entries" are not subject to suspension of liquidation or the collection of AD or CVDs.

[474] *See Preliminary Determinations*, 87 FR at 75221, 75225.

[475] *Id.*, 87 FR at 75223.

[476] *See Shanghai Sunbeauty Trading Co. v. United States*, 380 F. Supp. 3d. 1328 (CIT 2019) (affirming Commerce's decision not to conduct a review absent a suspended entry).

date of termination of the Proclamation (currently June 6, 2024), that does not meet the "Applicable Entries" certification requirements, could be suspended by CBP.  Specifically, 19 CFR 362.103(b)(iii) provides that "{i}n the event of an affirmative preliminary or final determination of circumvention in the Solar Circumvention Inquiries, the Secretary will direct CBP to suspend liquidation of entries of, and collect cash deposits of estimated duties on, imports of Southeast Asian-Completed Cells and Modules that are not Applicable Entries." Commerce has so directed CBP.[477]  Therefore, an AFA company could have a reviewable suspended entry before the AD administrative review covering the period December 1, 2023, through November 30, 2024.

Furthermore, as explained above, if such a company's inquiry merchandise was entered into the United States as an "Applicable Entry" before the date of termination of the Proclamation, such an entry will not be subject to ADs or CVDs.  In other words, "Applicable Entries" of Vina/LONGi's inquiry merchandise prior to June 2024 are not treated any differently in a substantive way than if the company had been able to participate in the components portion of the certification program.

Lastly, as noted above, Vina/LONGi expressed concerns that if a party requests an administrative review of an AFA company for Commerce to reconsider certification ineligibility, the AFA company could be selected as a mandatory respondent or need to unnecessarily complete a separate rate application.  In such cases, the requestor should note in the request for an administrative review that it believes that all the imported merchandise from the AFA company would meet the certification requirements and it is seeking a review in order for Commerce to reconsider the exporters/producer's eligibility to certify to that fact.  Commerce could then establish segment-specific procedures in the administrative review for addressing such situations.

In sum, neither the facts in this case, nor Vina/LONGi's arguments, provide a basis for reconsidering certification ineligibility for AFA companies in a changed circumstances review. As noted in the *Preliminary Determinations*, "{i}nterested parties that wish to have their … ineligibility for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders*."[478]

### Comment 20. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements

*First Solar Malaysia*[479] and *First Solar Vietnam*[480]
- Commerce did not include CdTe thin film photovoltaic products in its definition of inquiry merchandise.
- Because CdTe thin film photovoltaic products were excluded from the definition of inquiry merchandise and are explicitly excluded from the *Orders* scope language, the circumvention inquiries do not cover CdTe thin film photovoltaic products.

---

[477] *See* CBP Messages Memorandum at msg. no. 3041408 at paragraphs 5, 9, and 12b.
[478] *See Preliminary Determinations*, 87 FR at 75221, 75223.
[479] *See* First Solar Malaysia's March 6, 2023 Case Brief at 2-6.
[480] *See* First Solar Vietnam's March 6, 2023 Case Brief at 2-6.

- The ITC intentionally excluded CdTe thin film products from its injury analysis in the underlying affirmative final material injury determinations.[481]
- Given the ITC's intentional exclusion of CdTe products, Commerce cannot lawfully include CdTe thin film products in its circumvention inquiries.[482]
- Auxin limited its request for circumvention inquiries to CSPV products and Commerce initiated on that request stating that the class or kind of circumventing merchandise is identical to the CSPV products completed in China that are subject to the *Orders*.[483]
- The certification requirements in the *Preliminary Determinations* do not apply to CdTe thin film products.  The three certifications created by Commerce are instead meant to cover CSPV cells or modules.
- The certification requirements in the *Preliminary Determinations* do not pertain to CdTe thin film products.  However, given the language of the certifications, it is possible for mistakes to occur, such as a misinterpretation of the term "solar cells and/or solar modules."
- Commerce should take steps to minimize the risk that any affirmative final determination and related certification requirements would be misinterpreted to extend beyond certain CSPV products.
- Should Commerce continue using terms such as "solar cells and modules" or "solar cells and/or solar modules", Commerce should clearly define such terms upon first use to indicate that the terms only pertain to CSPV products.[484]

No other interested party commented on this issue.

**Commerce's Position:**  We confirm that the final affirmative determinations and the related certification requirements apply only to CSPV cells and modules but disagree with First Solar Malaysia and First Solar Vietnam that an affirmative determination of circumvention could be inadvertently applied to non-CSPV products.  As described in the *Preliminary Determinations*, the scope of the *Orders* explicitly exclude "thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide."[485] When discussing the merchandise subject to the circumvention inquiry, the *Vietnam* PDM and *Federal Register* notice described that "{t}his circumvention inquiry covers, "crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the underlying AD/CVD orders, subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in {Cambodia, Malaysia, Thailand, and Vietnam} from wafers produced in China."[486]  Therefore, CdTe thin film solar products are not covered by the final affirmative determinations and the related certification requirements.  Given the exclusionary language referenced within the scope of the *Orders*, we find it unnecessary to update the language included in the certifications.

---

[481] *See* First Solar Malaysia's March 6, 2023 Case Brief at 3 (citing *ITC Solar Final* at Attachment 37-A.).
[482] *Id.* (citing *Wheatland,* 161 F.3d at 1371).
[483] *Id.* (citing Initiation Memorandum at 6).
[484] *See* First Solar Malaysia's March 6, 2023 Case Brief at 6.
[485] *See Vietnam* PDM at 6.
[486] *Id.* at 8.

**Comment 21. Clarification and Enforcement of the Utilization Requirement**

To qualify to enter inquiry merchandise under *Presidential Proclamation 10414* without regard to ADs and CVDs inquiry merchandise imported into the United States after November 15, 2022, but on or before the Date of Termination of the proclamation, must be used or installed in the United States by no later than 180 days after the Date of Termination of the proclamation (the Utilization Expiration Date).[487]

*Auxin*[488]

- Commerce and CBP cannot administer or enforce the use provision in Part 362 of the regulations because: (1) the Utilization Expiration Date is unknown at the time of importation (the *Presidential Proclamation 10414* can be terminated before the stipulated June 6, 2024, date); (2) the definition of "utilization and utilized" is too vague; and (3) no enforcement mechanism has been provided (CBP possesses limited means to track how inquiry merchandise is used once it is entered into the United States). These deficiencies in the regulation create an enormous loophole through which parties can enter inquiry merchandise without regard to AD and CVDs.[489]
- Commerce could redress these deficiencies by implementing the provisions under 19 CFR 358, which include, among other things, use of importer- or exporter-specific duty waiver requests that contain detailed information related to intended uses of the imported product and other relevant information. 19 CFR 358 also includes an enforcement mechanism to address abuses and violations that could include seizures and other penalties.[490]
- Commerce should not consider the resale of inquiry merchandise to an unaffiliated U.S. customer who commits to use the merchandise within 180 days of the Date of Termination of the *Presidential Proclamation 10414*, as use. Commerce specifically stated in 19 CFR 362.102 that resales do not constitute use for this provision. Additionally, it is not clear how Commerce or CBP could confirm that the purchaser honored its commitment.[491]

*TTL*[492]

- Commerce must provide guidance on how to comply with the use requirement in 19 CFR 362 because the requirement could be interpreted in multiple ways.
- Principally, Commerce must confirm that reselling inquiry merchandise to another party does not automatically mean that the use requirement is not met. Because most importers of solar modules do not use the solar modules but sell them to other parties, this interpretation must be correct because to interpret the use requirement otherwise would mean that the requirement limits the precise activity that *Presidential Proclamation*

---

[487] *See* 19 CFR 362.102.
[488] *See* Auxin's March 6, 2023 Case Brief at 24-26; *see also* Auxin's March 17, 2023 Rebuttal Brief at 31.
[489] *Id.* (citing CBP Messages Memorandum at msg. no. 3041408).
[490] *See* Auxin's March 6, 2023 Case Brief at 25-26 (citing *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 FR at 63230).
[491] *See* Auxin's March 17, 2023 Rebuttal Brief at 32 (citing *Preliminary Determinations*, 87 FR at 75223).
[492] *See* TTL's March 6, 2023 Case Brief at 8-13.

*10414* was intended to permit (it was intended to allow sufficient U.S. imports of solar modules from the inquiry countries).

- Even if U.S. resale is permissible, but insufficient to demonstrate use, under 19 CFR 362, further clarification is required regarding how parties engaged in resales can comply with the use requirement.

- The majority of parties who import solar modules do not install the solar modules that they import, but resell them directly, or indirectly, to other parties in diverse distribution networks that include utility developers, distributors, contractors, subcontractors, and residential and commercial installers.  It is unreasonable, and would be an unprecedented burden, to require the companies, most of which do not have access to entry documents, to maintain records for at least five years that allow them to track the installation dates for specific solar modules and link those dates to specific entries of solar modules.  This is an unnecessary burden and cost, especially considering the limited possibility that distributors and contractors would stockpile solar modules.

- Thus, Commerce must clarify that the use requirement in 19 CFR 362 is met if evidence is maintained that shows:  (1) solar modules sold to utility developers were sold for a specific project; (2) the unaffiliated purchaser committed, either by contract or certification, to install the purchased solar modules within 180 days after the Date of Termination of the *Presidential Proclamation 10414*; or (3) imported solar cells were incorporated in a solar module in the United States within 180 days after the Date of Termination.

*BYD HK*[493]

- Commerce must clarify that the use requirement of 19 CFR 362 is met if the inquiry merchandise is used or installed in the United States within 180 days after the Date of Termination of *Presidential Proclamation 10414*, even if another entity takes ownership of the merchandise and is responsible for its use or installation.

*NextEra*[494]

- Auxin's arguments regarding administration of the use requirement in 19 CFR 362 are unpersuasive.

- Contrary to Auxin's claim, the Utilization Expiration Date is known because it is specified in 19 CFR 362 as 180 days after the Date of Termination of *Presidential Proclamation 10414*.  In the unlikely event that *Presidential Proclamation 10414* is terminated before the currently specified termination date, provisions could be made at the time to address Auxin's concerns.

- While Auxin claims that the definition of "utilization and utilized" is too vague, those terms are clearly defined in 19 CFR 362 as "used or installed in the United States."  However, Commerce should clarify that "used" includes solar modules that are dedicated to a particular project or delivered to a project site by the utilization expiration date.

- Although Auxin contends that Commerce did not provide any mechanism for enforcing the provisions of 19 CFR 362, Commerce followed its practice by requiring certifications for entries that purportedly qualify for duty free treatment under *Presidential*

---

[493] *See* BYD HK's March 6, 2023 Case Brief at 4.
[494] *See* NextEra's March 17, 2023 Rebuttal Brief at 19-23.

98

*Proclamation 10414.* In those certifications, importers and exporters must certify to various facts regarding the relevant entries and acknowledge that they are "aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government."[495] This passage provides an adequate deterrence against parties submitting fraudulent certifications.

- Part 358 of the regulations contains nothing to improve enforcement of *Presidential Proclamation 10414* and Commerce specifically noted in 19 CFR 362.103(a) that "Part 358 of this chapter shall not apply to {duty free imports under Part 362}."[496]

**Commerce's Position:** Interested parties have raised concerns and some questions regarding the use requirement in 19 CFR Part 362. We have addressed those concerns and questions below.

The waiver of ADs and CVDs and estimated duties pursuant to 19 CFR Part 362 only applies to certain Southeast Asian-completed solar cells and modules that are entered into the United States, or withdrawn from warehouse, for consumption before the termination of *Presidential Proclamation 10414*, and, for entries after November 15, 2022, are used in the United States by no later than 180 days after termination of the emergency described in *Presidential Proclamation 10414* (the Utilization Expiration Date). In the Preamble to 19 CFR Part 362, Commerce also used the word "utilized" when it noted that the duty waiver provided by this part of the regulations applies only to Southeast Asian-Completed solar cells and modules entered into the United States after November 15, 2022, "that are utilized in the United States by the Utilization Expiration Date." Under 19 CFR 362.102, Commerce defines "utilized and "utilization" as follows:

> Utilization and utilized means the Southeast Asian-Completed Cells and Modules will be used or installed in the United States. Merchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions.

"Used" means the solar cells or solar modules are in operation or functioning in the United States by the Utilization Expiration Date. "Installed" means the solar cells or solar modules have been affixed to the structure or in the system in the United States on which, or in which, they will operate by the Utilization Expiration Date, but they are not in operation by that date. The mere sale of solar modules to a party for a specific project, incorporating solar cells into a solar module in the United States, dedicating solar cells or solar modules to a particular project, or delivering solar cells or solar modules to a project site do not constitute being "used" or "installed." Additionally, as noted in 19 CFR 362.102, "{m}erchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions."

---

[495] *See* NextEra's March 17, 2023 Rebuttal Brief at 22 (citing *Preliminary Determinations*, 87 FR at 75228-29).
[496] *Id.* at 20.

The use requirement in 19 CFR Part 362 was added because this part of the regulations was "not intended to benefit those who would stockpile {Southeast Asian}-Completed Cells and Modules for an extended period of time … .  It is not Commerce's goal to have merchandise that enters before the Date of Termination be used in projects long into the future, as the emergency declared by the President exists at this very moment."[497]

The act of reselling solar cells or solar modules to another party who will use or install the merchandise does not, in itself, mean that the use requirement in 19 CFR Part 362 cannot be met. However, in order for an importer who sells the solar cells or solar modules that it imported to accurately certify that the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated, the importer must have knowledge of, and documentation supporting, this fact.  TTL has argued that a commitment by a purchaser, either by contract or certification, to install the purchased solar modules within 180 days after the Date of Termination of the *Presidential Proclamation 10414*, should satisfy this documentation requirement.  However, the documentation that must be maintained is documentation that supports the actual use or installation of the solar cells or solar module by the Date of Termination and that will allow the party completing the certification to certify to the use or installation by that date.  Parties that falsify such certifications will be in violation of U.S. law (including, but not limited to, 18 USC section 1001) that imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.  Given the range of companies that could be involved in the transaction chain between the importer of the solar cells and solar modules and the ultimate end-user of those solar cells and solar modules and the potential complexity of the supply chain, we find that it is not feasible for Commerce to list specific types of supporting documentation.

We disagree with Auxin's claim that the use provision in Part 362 of the regulations cannot be administered because the Date of Termination of *Presidential Proclamation 10414* could change and thus the Utilization Expiration Date is unknown at the time of importation.  The Date of Termination is not a constantly changing date but is presently a fixed date, June 6, 2024, that has been publicly announced and thus is known to importers.  In the Preamble to Part 362 of the regulations, Commerce noted that in setting a suspension of liquidation and collection of cash deposit date upon early termination of the Presidential Proclamation, it would "consider the implementation and direction of the President in terminating the emergency."[498]  Similarly, if *Presidential Proclamation 10414* is terminated early, at that time, Commerce will "consider the implementation and direction of the President in terminating the emergency" when determining what additional guidance, if any, should be provided regarding the impact of such an early termination on other provisions and requirements in Part 362 of the regulations.

We also disagree with Auxin's claim that no enforcement mechanism has been provided with respect to the use requirement.  U.S. law (including, but not limited to, 18 USC section 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government, including fines and imprisonment for not more than 5 years. Moreover, 19 USC section 1592 provides civil penalties for fraud, gross negligence, and

---

[497] *See Presidential Proclamation 10414 Final Rule* Preamble, 87 FR at 56879.
[498] *Id.*, 87 FR at 56880.

negligence.  Thus, there are enforcement mechanisms in place and significant consequences for parties who falsely certify that the use requirement will be met.

Additionally, Commerce informed certifying parties that they must maintain sufficient documentation supporting the facts to which the party certified for the later of five years after the last entry covered by the certification or three years after the conclusion of any litigation in United States courts regarding such entries.[499]  Commerce also informed certifying parties that they are required to provide CBP and/or Commerce with any documents supporting the certification upon the request of either agency and that the claims made in the certification are subject to verification by CBP and/or Commerce.[500]  In addition, Commerce informed certifying parties that failure to maintain the required certifications and supporting documentation, failure to substantiate the claims made in the certifications, or not allowing CBP and/or Commerce to verify the claims made in the certifications, may result in suspension of liquidation of all unliquidated entries for which the requirements were not met, the importer being required to post antidumping duty and countervailing duty cash deposits on those entries, and the importer being precluded from participating in the certification process.[501]  These certification provisions mirror Commerce's regulations at 19 CFR 351.228, which provide that Commerce may instruct CBP to suspend liquidation of entries and required cash deposits of estimated ADs or CVDs where, among other things, "the certification contained materially false, fictitious or fraudulent statements or representations, or contained material omissions."  Therefore, contrary to Auxin's claim, Commerce clearly explained the requirements that must be fulfilled to ensure compliance with the certification regime, including the end use provision, and the consequences of not meeting those requirements.  Hence, Commerce has instituted enforcement mechanisms with respect to the certifications.

While Auxin contends that CBP possesses limited means to track how inquiry merchandise is used once it is entered into the United States, it is incumbent on importers and exporters to maintain sufficient documentation to substantiate their claims in the certifications, including their claims regarding the use requirement.  Moreover, CBP has experience administering similar certifications, namely end-use certifications, in other inquiries,[502] and experience in this proceeding where importers and exporters must track the source of the solar cells used in solar modules imported into the United States in order to certify that the solar cells were not produced in China.

Finally, we disagree with Auxin that provisions in 19 CFR Part 358 should be applied here.  As an initial matter, according to 19 CFR 362.103(a), "Part 358 of this chapter shall not apply to {the importation of Applicable Entries}."  In addition, as Commerce explained in the Preamble to Part 362 of its regulations, "{t}he purpose of the {Presidential} Proclamation is to increase the supply of United States solar energy for electricity generation purposes … and "to allow for

---

[499] *See Preliminary Determinations*, 87 FR at, *e.g.*, Appendix VI.

[500] *Id.*

[501] *Id.*

[502] *See Wire Rod from Korea and United Kingdom CCR*, 84 FR 13888 ("Consequently, we are changing the scope of the orders on wire rod from Korea and the United Kingdom by adding exclusion language related to grade 1078 and higher tire cord quality wire rod and requiring that a certification of end-use be filed with CBP at the time of the filing of the Entry Summary with CBP as provided in the Attachment to this notice.").

more imports …"[503] Part 358 of the regulations, which covers the importation of supplies used for  emergency relief work free of AD/CVDs, requires that a party mail an advance request, in triplicate, to the Secretary of Commerce in which the party asks for approval to import the merchandise free of AD/CVDs, and supplies detailed information about the shipment such as the price, quantity, proposed date of entry, mode used to transport, the destination, and the intended uses of, the imported merchandise and other relevant information, much of which does not relate to the date of use.  Part 358 of the regulations also includes an enforcement mechanism to address abuses and violations of Section 318(a) of the Act that could include seizures and other penalties.[504]  Requirements such as these, including the need for Commerce to specifically approve the importation of solar cells/solar modules free of AD/CVDs for each and every entry, could reduce, rather than increase, the supply of United States solar energy for electricity generation purposes and thus is not in keeping with the purpose of *Presidential Proclamation 10414* .  Moreover, Commerce typically requires CBP to suspend liquidation and collect AD/CVD cash deposits for entries where the certification requirement was not met, rather than seizing the imported merchandise.  Therefore, we have not implemented the requirements of Part 358 of the regulations in this case.

## Comment 22. Whether the "Wafer-Plus-Three" Requirement is Appropriate

In the *Preliminary Determination*, Commerce stated that a solar module produced in one of the inquiry countries would be subject to its affirmative circumvention determination only if the solar module contains solar cells produced from Chinese-produced wafers and three or more of the following components in the module were produced in China:  (1) silver paste; (2) aluminum frames; (3) glass; (4) backsheets; (5) EVA sheets; and (6) junction boxes.  Below we have referred to this prerequisite as the "Wafer-Plus-Three" requirement.

*Auxin*[505]
- Commerce's "Wafer-Plus-Three" requirement is arbitrary, inconsistent with how it has applied the *Orders* in the past, and allows companies to use a high percentage of Chinese components and not be covered by Commerce's affirmative circumvention determination.
- Commerce arbitrarily selected the six components used and the four non-Chinese component rule in its requirement without any explanation.
- Commerce previously determined that if a solar module contains subject solar cells, it is subject to the *Orders*, regardless of the country where the solar module was produced.  Commerce should follow that rule here.  Because Commerce reached an affirmative circumvention determination that solar cells produced in Cambodia, Malaysia, Thailand, or Vietnam from Chinese-produced wafers are covered by the scope of the *Orders*, solar modules produced from those solar cells must be subject to the *Orders* irrespective of Commerce's "Wafer-Plus-Three" requirement.
- The "Wafer-Plus-Three" requirement provides an inexpensive path for companies to continue to evade the *Orders* by continuing to heavily rely on Chinese-produced components while sourcing the four least expensive components outside of China.[506]

---

[503] *See Presidential Proclamation 10414 Final Rule Preamble,* 87 FR at 56878.
[504] *See* generally 19 CFR 358.103.
[505] *See* Auxin's March 6, 2023 Case Brief at 9-17; *see also* Auxin's March 17, 2023 Rebuttal Brief at 5-6.
[506] *Id.* at 15 (citing the *Preliminary Determination* calculations for all four determinations).

- Commerce should discard its "Wafer-Plus-Three" requirement and determine that a solar module produced in a third country that contains in-scope solar cells is also in scope. Alternatively, Commerce should determine that only solar modules where at least 50 percent of the value of the solar module comes from components produced outside of China are not subject to Commerce's affirmative circumvention determination.

- A percentage of value test is administrable (companies maintain the records required by CBP) and has been used before (*e.g.*, the United States-Mexico-Canada Agreement).

- Moreover, a percentage of value test benefits exporters/producers because:  (1) there is no need for them to use certain wafer suppliers or publicly identify their wafer supplier; (2) it provides them with the flexibility to determine which inputs they will obtain from inside, or outside, of China; and (3) it simplifies the types of records that importers must maintain.

- Moreover, a percentage of value test benefits exporters/producers because:  (1) there is no need for them to use certain wafer suppliers or publicly identify their wafer supplier; (2) it provides them with the flexibility to determine which inputs they will obtain from inside, or outside, of China; and (3) it simplifies the types of records that importers must maintain.

*BYD HK*,[507] *CSIL*,[508] *Jinko*,[509] *NextEra*,[510] *Risen*,[511] and *TTL*[512]

- Contrary to Auxin's claim, Commerce did not arbitrarily select the six components that it used in the "Wafer-Plus-Three" requirement.  Rather, Commerce selected these components because it knows, based on information in this segment of the proceeding (including Auxin identifying these components as the "most important and significant" factors of production) and its experience in other segments of the proceeding, that these are the most significant components used to produce solar modules.[513]

- By requiring at least four of the six components to be sourced from outside China, Commerce's "Wafer-Plus-Three" requirement ensures that a substantial portion of value of the module is added in the inquiry country.

- Based on the scope of the *Orders*, modules produced in a third-country from solar cells produced in China (subject solar cells) are covered by the *Orders* (*i.e.*, solar modules with subject solar cells are covered by the *Orders*).  Meanwhile solar modules not containing subject solar cells are not covered by the *Orders*.  Commerce's "Wafer-Plus-Three" requirement is consistent with this principle because Commerce indicated that the solar cells in a solar module that meets the "Wafer-Plus-Three" requirement are not covered by the circumvention inquiry and the solar module is also not covered by the circumvention inquiry (the solar cells are not in-scope merchandise and the solar module is not in-scope merchandise).

- Auxin has made contradictory arguments.  On the one hand, Auxin requested a circumvention inquiry, which resulted in Commerce ignoring the scope of the *Orders* that

---

[507] *See* BYD HK's March 17, 2023 Rebuttal Brief at 7-13.
[508] *See* CSIL's March 17, 2023 Rebuttal Brief at 10-14.
[509] *See* Jinko's March 17, 2023 Rebuttal Brief at 5-13.
[510] *See* NextEra's March 17, 2023 Rebuttal Brief at 6-11.
[511] *See* Risen's March 17, 2023 Rebuttal Brief at 2-3.
[512] *See* TTL's March 17, 2023 Rebuttal Brief at 6-10.
[513] *See* Risen's March 17, 2023 Rebuttal Brief at 2; *see also* NextEra's March 17, 2023 Rebuttal Brief at 8-9.

103

requires subject solar modules to contain Chinese produced subject solar cells (subject solar cells). Subsequent to Commerce's finding that solar cells produced in Southeast Asian countries from Chinese wafers are "subject solar cells," Auxin argues that Commerce must return to the "subject solar cell requirement" in the scope of the *Orders* and find that all modules, irrespective of where they are manufactured and the other components that they contain, are subject merchandise if they contain Southeast Asian produced "subject solar cells."

- Auxin's argument that solar modules containing solar cells with Chinese-produced wafers should be subject to Commerce's affirmative circumvention determination, regardless of the other components that they contain, contradicts its own allegation that companies are circumventing the *Orders* by using various Chinese components to produce solar modules in the inquiry countries. Moreover, Auxin's argument is inconsistent with Commerce's approach in this inquiry of examining the module production process to determine whether parties selling modules to the United States that were produced in an inquiry county are circumventing the *Orders*, rather than making that determination based on the solar cells in the solar module.[514]

- Auxin's percentage of value test should be rejected because Auxin arbitrarily determined the 50 percent requirement.[515] There is no precedent, or basis in the Act or Commerce's regulations, for using such a test, which would require Commerce to speculate as to future values of solar module components and use a yet undetermined certification.[516]

- Moreover, Auxin failed to consider that significant swings in market prices could skew the test and dramatic changes in surrogate values may mean that the actual value added in the third country is not properly reflected by the test.[517]

- Auxin's percentage of value test is also contrary to Commerce's practice of conducting a qualitative, rather than a quantitative (*e.g.*, a value added) analysis of third-country processing.[518]

- Auxin's percentage of value test means that even if as much as 49.99 percent of the value of the solar module was added outside of China (such as in an inquiry country), the module would be covered by Commerce's affirmative circumvention determination, thus, indicating that the third-country processing of the module was "minor or insignificant." This is illogical.[519]

- Furthermore, Auxin failed to adequately support its argument that the "Wafer-Plus-Three" requirement allows a significant proportion of Chinese components to be used if the four least expensive components out of the six components in that requirement are sourced from outside of China. Auxin's argument is based on erroneous calculations and incorrect figures.[520] Additionally, expenses, such as conversion costs[521] and G&A expenses, are missing from Auxin's calculations, and the source of certain figures that

---

[514] *See* NextEra's March 17, 2023 Rebuttal Brief at 7-8.
[515] *See* NextEra's March 17, 2023 Rebuttal Brief at 10.
[516] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9.
[517] *See* Jinko's March 17, 2023 Rebuttal Brief at 8-10.
[518] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9-10 (citing *Pasta from Italy Circumvention*); *see also* Jinko's March 17, 2023 Rebuttal Brief at 10-12; and CSIL's March 17, 2023 Rebuttal Brief at 12.
[519] *See* BYD HK's March 17, 2023 Rebuttal Brief at 10.
[520] *Id.* at 11-12 and Exhibit 1 (citing Auxin's March 6, 2023 Case Brief at 13-17).
[521] *See* Risen's March 17, 2023 Rebuttal Brief at 2.

104

Auxin used in its calculations is unclear.[522]  Auxin's argument also ignores its claim that these six factors are the "principal" and some of the "most important and significant" factors of production.[523]  It is commercially unrealistic to conclude that companies in the inquiry countries would suddenly source all their raw materials from China.[524]

- Because China is an NME country, Commerce uses surrogate values to determine the cost of material inputs from China.  Auxin's percentage of value test is not administrable because Commerce/CBP would need to verify the prices of, and surrogate values for, solar module components.  CBP is not structured to handle certifications based on value[525] and, because it has no experience selecting and applying surrogate values, it would not be able to verify the accuracy of such value-added based certifications.[526]

- Additionally, no parties, including Commerce and CBP, would know the appropriate surrogate values for solar module components when the solar module was exported to, or imported into, the United States.  This information is needed to determine the Chinese and non-Chinese content percentages required for Auxin's test.[527]  Alternatively, Commerce would have to use actual costs in China to implement Auxin's percentage of value test, which is contrary to its practice.[528]

- Auxin's claim that its percentage of value test is administrable based on the procedures that CBP uses for the United States-Mexico-Canada Agreement is misplaced.  CBP evaluates regional value content under the United States-Mexico-Canada Agreement, but this is not certified on an entry-by-entry basis.[529]  Confirming the sources of materials is less burdensome than establishing valuation.[530]

**Commerce's Position:**  We disagree with Auxin's contention that, based on Commerce's affirmative circumvention determination, solar modules produced in the inquiry countries, or any country, using solar cells from the inquiry countries made from Chinese-produced wafers are automatically covered by the *Orders*.  Auxin based its argument on a mischaracterization and misapplication of Commerce's country-of-origin determination from the investigations underlying these *Orders*.  In the underlying investigations, Commerce conducted a substantial transformation analysis and determined "that where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced."[531]

The purpose of a substantial transformation analysis is to determine whether merchandise that is further processed outside the order country remains the product of the order country, and thus subject merchandise.  The purpose of the analysis conducted under section 781(b) of the Act is to determine whether minor assembly or completion of merchandise from the order country in a

---

[522] *See* BYD HK's March 17, 2023 Rebuttal Brief at 11-12; *see also* CSIL's March 17, 2023 Rebuttal Brief at 13; and TTL's March 17, 2023 Rebuttal Brief at 8-9.
[523] *See* NextEra's March 17, 2023 Rebuttal Brief at 9-10.
[524] *See* Risen's March 17, 2023 Rebuttal Brief at 2-3.
[525] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9-13; *see also* TTL's March 17, 2023 Rebuttal Brief at 9.
[526] *See* NextEra's March 17, 2023 Rebuttal Brief at 11.
[527] *See* Jinko's March 17, 2023 Rebuttal Brief at 12 and NextEra's March 17, 2023 Rebuttal Brief at 11.
[528] *See* NextEra's March 17, 2023 Rebuttal Brief at 11.
[529] *See* TTL's March 17, 2023 Rebuttal Brief at 9.
[530] *Id.*
[531] *See* Trina's May 2, 2022 Comments at Attachment 8, page 8.

third-country was used to circumvent the order. As Commerce noted in the Preamble to its regulations "Commerce's substantial transformation analysis under {19 CFR} 351.225(j) and the test for determining whether a product was completed or assembled in other foreign countries under {19 CFR} 351.226(i) (and section 781(b) of the Act) are two distinct analyses used for different purposes … "[532]

Nowhere in the Act or Commerce's regulations is there a provision to use a substantial transformation analysis to identify circumvention. To determine whether solar modules are covered by this affirmative circumvention determination based on Commerce's country-of-origin rule from the underlying investigations ignores the criterion in section 781(b) of the Act, including determining whether the value of the order country merchandise that is assembled in the third country is a significant portion of, and the value of the third-country processing is a small proportion of, the total value of the solar module. Moreover, in applying Commerce's country-of-origin rule to identify solar modules covered by the affirmative circumvention determination, Auxin has ignored the Chinese content of the solar module. Auxin's approach is inconsistent with how Commerce has analyzed circumvention in other circumvention inquiries (*i.e.,* Commerce applies the circumvention criteria to the merchandise entering the United States, in this case the solar module,, and not a component within the imported product, the solar cell, and determines whether the order country input(s) is a significant share, and the processing in the third country is a minor or insignificant share, of the value of the merchandise entering the United States)[533] and disregards the very nature of the alleged circumvention that Auxin requested that Commerce investigate. Specifically, Auxin requested "that Commerce promptly initiate an anti-circumvention inquiry concerning {solar} cells and modules assembled and completed in Malaysia, Thailand, Vietnam, and Cambodia using Chinese-produced inputs."[534] In contrast to Auxin's approach of focusing on the solar cell, Commerce's "Wafer-Plus-Three" requirement focuses on the Chinese content of the solar module and reflects the nature of the production in the third-country. Furthermore, the "Wafer-Plus-Three" requirement is consistent with section 781(b)(1) of the Act, which requires Commerce's circumvention determination to be made with respect to the "merchandise imported into the United States." Hence, when a solar module is the merchandise that is imported into the United States, Commerce must examine the components of that solar module, not the solar cells alone.

In its Circumvention Request, Auxin simply described inquiry merchandise as solar modules assembled and completed in one of the inquiry countries using Chinese-produced inputs.[535] This

---

[532] *See 2021 Regulations Final Rule*, 86 FR at 52342.
[533] *See e.g., CORE from China (UAE) Preliminary* PDM at 1 and 27-28 (unchanged in *CORE from China (UAE)*) where we determined whether exporters of CORE from the UAE to the United States must pay AD duties based on whether the CORE contains Chinese hot-or cold-rolled steel. The certification requirement in that case was based on a determination that "the value of hot-or cold-rolled steel represents a significant portion of the total value of the {CORE} exported to the United States." *See CORE from China (UAE) Preliminary* PDM at 23. However, the solar cells that Auxin argues we should solely consider when determining whether the solar module containing such solar cells is covered by the circumvention determination, are not entirely made in China (as opposed to the hot-or cold-rolled steel in *CORE from China (UAE)*) and Auxin has not explained to what extent the solar cell should contain Chinese inputs to be considered covered by the *Orders*. Auxin has additionally failed to explain, contrary to Commerce determinations in *CORE from China (UAE)* and other circumvention proceedings, why such solar cell content is a sufficient basis for determining that the solar module should be covered by the *Orders*.
[534] *See* Circumvention Request at 88.
[535] *Id*.

broad description of inquiry merchandise could have the unintended consequence of including solar modules with miniscule Chinese content (such as a bolt and a screw) as inquiry merchandise. Therefore, Commerce found it necessary to define the relevant Chinese content to consider a solar module as inquiry merchandise.[536] As explained in more detail below, we find that it is reasonable, and consistent with Auxin's Circumvention Request, to use the "Wafer-Plus-Three" requirement to define solar modules as inquiry merchandise where the wafer and at least three of the other primary materials in the solar module were produced in China.

We did not arbitrarily select the seven material inputs used in the "Wafer-Plus-Three" requirement, but based our selection on record evidence, including data provided by the respondents and solar industry surveys in which wafers and the six material inputs used in the "Wafer-Plus-Three" requirement are identified as major solar cell/module inputs.[537] Auxin itself identified the primary materials from the order country that it claims were being assembled and completed in the inquiry countries to circumvent the *Orders*. Specifically, Auxin stated that "reasonably available evidence indicates that the primary direct material inputs used to complete {solar} cells in the subject third countries, *i.e.*, wafers, silane, phosphorus oxychloride (POCl3), aluminum and/or silver paste, and the additional components used to assemble the {solar} cells into modules, *i.e.*, solar glass, EVA, backsheet, aluminum frames, and junction boxes, were sourced from China, the country subject to *the Orders*."[538] We did not include silane and phosphorus oxychloride (POCl3) in the "Wafer-Plus-Three" requirement because, as opposed to wafers and the six other inputs identified in the "Wafer-Plus-Three" requirement, they were not identified as major inputs in the majority of the solar industry reports/surveys that are on the record and no parties argued that other material inputs should be included in the requirement or that some of the material inputs should be removed from the requirement.

We determine that the "Wafer-Plus-Three" requirement is appropriate on a qualitative basis. The circumvention activity alleged by Auxin involves Chinese-produced wafers being converted into solar cells and solar modules in a third country using additional and substantial Chinese-origin components. Commerce's "Wafer-Plus-Three" requirement directly addresses the situation described by Auxin in its Circumvention Request because it requires producers in the inquiry countries to either no longer use Chinese wafers, which are the products that are being assembled and completed in the inquiry country, or to source less than half of the other major components that are required to convert the wafers into solar cells/modules from China. We have determined

---

[536] *See Preliminary Determinations*, 87 FR at 75221, 75222.

[537] *See, e.g.*, the *Bloomberg Report* below Figure 17 (identifying aluminum frames, glass; backsheets, ethylene vinyl acetate sheets, and junction boxes as the most important solar module inputs) and above Figure 12 (identifying silver as the costliest input added at the cell processing stage). The *Bloomberg Report* also emphasizes the importance of wafers and indicates the importance of these aforementioned seven inputs in making solar modules; *see also* the *NREL 2018 Report* at 37 (identifying wafers, metallization pastes (silver), glass, backsheets and junction boxes as the costliest items to produce solar modules) and 33 (identifying the principal solar module input materials as cell stringing and tabbing ribbons, front glass, backsheet, ethylene-vinyl acetate (EVA), encapsulant (2 sheets), Al (aluminum) frame and edge sealant, junction box, junction box potting agent and tape, and coded module sticker label), and the *DOE Solar Deep Dive* at iii ({s}ilicon wafers are processed to make the solar cells that are interconnected and sandwiched between glass and plastic sheets to make c-Si modules"), 36 ("{s}ilver paste is an important component in c-Si solar cells"), and 44 (identifying the aluminum frame, glass, backsheet, encapsulant ("the predominant resins used to make encapsulant are ethylene vinyl acetate (EVA) …" (*see* page 19)), and the junction box as the components of a solar module).

[538] *See* Circumvention Request at 73.

107

that this qualitative approach to defining inquiry merchandise is reasonable because it focuses on the number of major components sourced from China.  This approach is also consistent with the concerns described by Auxin that led it to request the circumvention inquiries, namely its claim that "the vast majority — if not all — of the other materials used to convert the Chinese wafers to cells and then assemble the cells into modules in Malaysia, Thailand, Vietnam, and Cambodia are obtained from China."[539]  Under the "Wafer-Plus-Three" requirement, where the majority of the major inputs used to convert the Chinese wafers to cells and then assemble the cells into modules were obtained from (produced in) China, the module is inquiry merchandise and will be subject to Commerce's affirmative circumvention determination.

Further, Auxin itself noted that where:

> the primary direct material inputs used to complete {solar} cells in the subject third countries, *i.e.*, wafers, silane, phosphorus oxychloride (POCl3), aluminum and/or silver paste, and the additional components used to assemble the {solar} cells into modules, *i.e.*, solar glass, EVA, backsheet, aluminum frames, and junction boxes, were sourced from China … a qualitative analysis itself would be sufficient to conclude that the value of processing in {the inquiry countries}" would represent "a small proportion of the value of the merchandise imported to the United States.[540]

Thus, by limiting the amount of Chinese content in the solar module, the "Wafer-Plus-Three" requirement addresses, on a qualitative basis, Auxin's concern and increases the non-Chinese portion of the value of the merchandise.

We also determine that the "Wafer-Plus-Three" requirement is appropriate on a quantitative basis.  Under the "Wafer-Plus-Three" requirement, a solar module is not inquiry merchandise if it has no Chinese-produced wafers, or where four of its six major inputs, other than the wafer, were not produced in China.  Based on record evidence regarding the value of wafers and conversion costs in a solar module,[541] and the statement in the *Bloomberg Report* that "Southeast Asian nations account for just 27% of the value of a typical {solar} module exported to the U.S."[542] we find that the "Wafer-Plus-Three" requirement would not result in a small value of inputs from outside of China as contended by Auxin.[543]

Moreover, we find there are flaws with the analysis that Auxin provided to support its claim that the "Wafer-Plus-Three" requirement would continue to allow a solar module to contain a significant proportion of Chinese inputs and not be subject to Commerce's affirmative circumvention determination.  Specifically, Auxin provided a table of per-unit costs for the inputs identified in the "Wafer-Plus-Three" requirement showing that a solar module could contain

---

[539] *Id.* at 30.
[540] *Id.* at 73.
[541] *See* our summary of the data in the *DOE Solar Deep Dive*, *IEA Report*, and Bloomberg Report, as well as our calculations based on these reports showing the costs of the wafers and other six inputs in the Solar Survey Analysis Memorandum.
[542] *See* the *Bloomberg Report* at the narrative below Figure 22. that "Southeast Asian nations account for just 27% of the value of a typical PV module exported to the U.S."
[543] *See* Auxin's March 6, 2023 Case Brief at 15 and Solar Survey Analysis Memorandum.

Chinese components that represent a high percentage of the total per-unit direct material cost of a solar module and yet, under the "Wafer-Plus-Three" requirement, the solar module would not be considered inquiry merchandise.[544]  Besides the questions raised by certain respondents regarding the source of Auxin's per-unit costs, we find that Auxin failed to account for other material costs and conversion costs incurred in the inquiry countries in its analysis.  Further, if one accounts for these additional material and conversion costs, even relying on Auxin's per-unit costs, non-Chinese inputs would comprise much more than the "small" percentage of total value claimed by Auxin.[545]

Thus, we find that Auxin's analysis does not provide the proper measure of the extent to which companies in an inquiry country are using Chinese-produced inputs to convert wafers into solar modules.  In contrast, by defining solar modules subject to the inquiry as solar modules where the wafer and at least three of the other major inputs were produced in China, Commerce has addressed Auxin's concern that "major Chinese companies have set up minor assembly operations in Southeast Asia — using their existing dedicated supply base in China for almost the entirety of the bill of materials — to circumvent the Orders …"[546]  Additionally, the "Wafer-Plus-Three" requirement is consistent with Congressional direction away from a rigid numerical approach.[547]  This approach is also consistent with how Commerce has identified inquiry merchandise in other circumvention inquiries, namely based on whether certain content in the merchandise came from the order country.[548]

We also find that Auxin's percentage of value test is not administrable.  Because the *Orders* apply to China, an NME country, Chinese-produced components are valued based on surrogate values.[549]  However, Auxin never explained how Commerce's NME methodology would be used in its proposed percentage of value test.  For example, Auxin never explained, under its proposal, whether surrogate values would be used to determine total value and, if so, how importers and exporters would properly select any surrogate values used.  Commerce normally selects surrogate values in a proceeding segment after considering record evidence and comments provided by interested parties.[550]  However, Auxin never explained how Commerce would evaluate any surrogate values used in the percentage of value test, or the type proceeding in which Commerce would conduct such an evaluation.  Furthermore, it is not feasible for Commerce to evaluate and examine potentially numerous surrogate value calculations that could change from entry to entry.

Auxin claimed that "{g}iven the records kept and maintained by the foreign producers, these data can be supplied to CBP to validate the value-added calculation."[551]  However, applying Commerce's NME methodology to the percentage of value test would require the use of surrogate values.  CBP is not charged with evaluating surrogate value selections, and it cannot be

---

[544] *Id.*

[545] *Id.*

[546] *See* Circumvention Request at 32.

[547] *See* SAA at 893-94.

[548] *See, e.g.*, *CORE from China (UAE) Preliminary* PDM at 1, 23, and 27-28, unchanged in *CORE from China (UAE)*.

[549] *See* section 773(c) of the Act.

[550] *See Vietnam* PDM at 4-5 and 8-9.

[551] *See* Auxin's March 6, 2023 Case Brief at 16.

expected to validate a value-added test based on surrogate values.  Additionally, we find it would not be feasible for exporters and importers that are unfamiliar with Commerce's NME methodology to select the appropriate surrogate values to determine the percentage of a solar module's total value represented by Chinese components.  Thus, we find that it is unclear how Auxin's proposed percentage of value test would be implemented in light of Commerce's NME methodology.

Lastly, Auxin maintains that its proposed percentage of value test benefits exporters/producers because there is no need for them to publicly identify their wafer supplier and simplifies the types of records that importers must maintain.  Neither claim is valid.  Exporters do not need to publicly identify their wafer supplier(s) under Commerce's "Certification Regarding Chinese Components."[552]  Thus, in this regard, Auxin's proposed percentage of value test, in which exporters would not need to publicly identify their wafer supplier(s), does not provide any benefit to exporters that is not already in place.  Further, it is unclear how Auxin's proposed percentage of value test would simplify record keeping when solar modules can have hundreds of inputs and exporters/producers would need to maintain records to determine whether each input was produced in China or outside of China and to calculate the value of the non-Chinese and/or Chinese inputs in the solar module.  Moreover, under Auxin's proposed approach, a number of records, such as surrogate value information, that are generally not kept in the ordinary course of business would need to be maintained.  In contrast, when using the "Certification Regarding Chinese Components" parties need to maintain records to determine where only the seven inputs listed in Commerce's "Wafer-Plus-Three" requirement were produced.

**Other Issues**

**Comment 23. Whether Commerce Properly Placed *Ex Parte* Memoranda on the Record That Concerned the Circumvention Inquiries**

*Auxin*[553]
- Commerce unlawfully omitted communication related to the issuance of *Presidential Proclamation 10414* and Commerce's final rule implementing aspects of that proclamation.[554]
- Commerce's omission resulted in an incomplete administrative record for the circumvention inquiries.

No other interested party commented on this issue.

**Commerce's Position:**  We disagree.  By statute, Commerce shall maintain a record of any *ex parte* meeting between interested parties or other persons providing factual information in connection with a segment of an AD/CVD proceeding and the person charged with making the determination if information relating to that AD/CVD proceeding was presented or discussed at

---

[552] *See Preliminary Determinations*, 87 FR at Appendix VI.
[553] *See* Auxin's April 19, 2023 Case Brief at 80.
[554] *See* Auxin's April 19, 2023 Case Brief (citing *Presidential Proclamation 10414*, 87 FR 35067; and *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56868).

such meeting.[555] Throughout the course of the circumvention inquiries, Commerce consistently placed summaries of *ex parte* contacts concerning the circumvention inquiries on the administrative record.[556]  Commerce was not required to memorialize for the record communications on matters distinct from the AD/CVD inquiries at hand, including *Presidential Proclamation 10414* or the rulemaking resulting from that Proclamation.[557]

## Comment 24. Whether Commerce's Determination to Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law

*Auxin*[558]

- Commerce unlawfully retroactively applied regulations developed pursuant to the declaration of emergency announced in *Presidential Proclamation 10414*.  Specifically, Commerce waived application of affirmative circumvention findings to all entries of inquiry merchandise after initiation of these inquiries on April 1, 2022, but before the *Presidential Proclamation 10414*  was issued on June 6, 2022.[559]
- The retroactive application of *Presidential Proclamation 10414* is:  "(a) *ultra vires* because Commerce possesses no independent legal authority to issue an emergency declaration; (b) is contrary to the explicit wording of *Presidential Proclamation 10414*; (c) is unlawful under the statutory authority under which the proclamation was issued, and (d) is otherwise inconsistent with Commerce's circumvention regulations, which require Commerce to issue suspension of liquidation and cash deposit instructions to CBP in the event of an affirmative finding of circumvention."[560]
- Commerce should "follow its regulations and request that CBP suspend liquidation and collect cash deposits on all entries after April 1, 2022, until June 6, 2022."[561]
- In the *Preliminary Determinations,* Commerce stated that entries prior to the Date of Termination that have met the certification requirements will not be subject to suspension of liquidation, or the cash deposit requirements described above.[562]  Commerce justified this departure from its practice and regulations by citing to 19 CFR Part 362.
- Commerce specifically stated that pursuant to 19 CFR 362.103(b)(1)(i), "Commerce will direct U.S. Customs and Border Protection (CBP) to discontinue the suspension of

---

[555] *See* section 777(a)(3) of the Act "{AD/CVD} proceedings are investigatory rather than adjudicatory in nature, and {the ex parte} provision is intended to ensure that all parties to the preceeding {*sic*} are more fully aware of the presentation of factual information to the administering authority or the ITC");" and S. Rep. No. 96-249, at 99-100 (1979); *F Lli De Cecco,* 980 F. Supp 485.

[556] *See, e.g.,* Memoranda, "Meeting with Counsel for Auxin," dated November 14, 2022, and NE Solar January 29, 2023 *Ex Parte* Memorandum.

[557] *See Baker Hostetler,* 473 F.3d 312 (conversations focused on matters other than AD/CVD proceedings do not fall under the section 777(a)(3) *ex parte* provision).

[558] *See* Auxin's March 6, 2023 Case Brief at 17-24.

[559] *Id.* at 17-18 and n. 41.  "In making this argument and stating that June 6, 2022, is the operable date for lifting of suspension and collection of cash deposits, Auxin is not suggesting in any way that *Presidential Proclamation 10414* and/or Commerce's implementing regulations are lawful. Indeed, Auxin has explained in detail in previous submissions on this record and in response to Commerce's request for comments why *Presidential Proclamation 10414* and Commerce's regulations were devoid of any factual underpinnings to support the purported emergency and that Commerce superseded existing regulations to implement the proclamation."

[560] *Id.* (citing 19 CFR 351.226(l)(2)(ii) and 19 CFR 351.226(l)(2)(iii).

[561] *Id.*

[562] *Id. (*citing *Preliminary Determinations*, 87 FR at 75224).

liquidation and collection of cash deposits that were ordered based on Commerce's initiation of these circumvention inquiries.  In addition, pursuant to 19 CFR 362.103(b)(1)(ii) and (iii), Commerce will not direct CBP to suspend liquidation, and require cash deposits, of estimated ADs and CVDs based on these affirmative preliminary determinations of circumvention on, any 'Applicable Entries.'"[563]

- Commerce confirmed that "suspension of liquidation procedures would only apply to 'imports of Southeast Asian-Completed solar cells and modules that are not 'Applicable Entries' that were entered, or withdrawn from warehouse, for consumption on or after April 1, 2022."[564]

- First, Commerce possesses no legal authority to declare a national emergency and does not cite any such authority in its *Preliminary Determination.*  Commerce explicitly expanding the scope of *Presidential Proclamation 10414* by applying it to entries of inquiry merchandise that entered the United States prior to the identification of the emergency while lacking such legal authority renders the decision *ultra vires.*[565]

- Second, Commerce's retroactive actions are not consistent with the authority relied upon for adoption of Part 362 of its regulations:  *Presidential Proclamation 10414.*  The Proclamation does not authorize retroactive effect of the national emergency declared on June 6, 2022.[566]

- *Presidential Proclamation 10414* specifically states that any actions taken by Commerce to permit duty-free entries of solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam last "until 24 months *after* the date of this proclamation or until the emergency declared herein has terminated, whichever occurs first."[567]

- *Presidential Proclamation 10414* does not authorize any actions for entries before the June 6, 2022, date.  Thus, *Presidential Proclamation 10414* does not authorize Commerce to take any action affecting entries before June 6, 2022.

- Third, section 318(a) of the Act, the statutory authority under which *Presidential Proclamation 10414* was issued, does not allow action before the declaration of an emergency, and only authorizes action "*during* the continuance of" an emergency "declare{d}" by presidential proclamation.[568]  No emergency was declared prior to June 6, 2022.

- The *Preliminary Determination* is inconsistent with the statute and regulations as Commerce's circumvention regulations state that following an affirmative preliminary determination:  (1) the Secretary will direct the Customs service to continue the suspension of liquidation and apply the applicable cash deposit rate; and (2) direct the Customs service to begin the suspension of liquidation and require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry on or after the date of publication of the notice of initiation of the inquiry.[569]

---

[563] *Id.* (citing *Preliminary Determinations,* 87 FR at 75223).
[564] *Id.* (citing *Clarification of Product Coverage Memorandum* at 2).
[565] *Id.* (citing *Cf. Stark v. Wickard,* 321 U.S at 288; *Merck Sharp & Dohme Corp. v. Albrecht,* 139 S. Ct. at 1679).
[566] *Id.* (citing *Presidential Proclamation 10414,* 87 FR at 35067-69).
[567] *Id.* (citing *Presidential Proclamation 10414,* 87 FR at 35068).
[568] *Id.* (citing Section 318(a) of the Act).
[569] *Id.* (citing 19 CFR 351.226(1)(2)(i)-(ii)).

- In the *Initiation Notice,* Commerce notified all interested parties of the initiation of circumvention inquiries, including a description of the products subject to the inquiries and an explanation of the reasons for Commerce's decision to initiate such inquiries.[570]
- With respect to suspension of liquidation, Commerce explained that it would follow 19 CFR 351.226(l)(1), notifying CBP of its initiation and direct CBP to continue suspension of liquidation and apply the cash deposit rate that would be applicable if the products were determined to be covered by the scope of *the Orders.*  Commerce also mentioned that it would follow the suspension of liquidation rules under 19 CFR 351.226(l)(2)-(4) should it issue preliminary or final circumvention determinations.[571]
- Thus, Commerce provided all interested parties with notice of initiation, the reasons for initiation, and Commerce's intention to suspend liquidation for merchandise that entered after the date of initiation, April 1, 2022, consistent with Commerce's regulations.  As such, suspension of liquidation retroactive to the date of initiation was appropriate and lawful.[572]
- Commerce's failure to suspend liquidation and collect cash deposits from April 1, 2022, through June 6, 2022, is unlawful for many reasons and should be reversed in the final determination.

*NextEra,*[573] *BYD HK,*[574]*CSIL,*[575] *TTL,*[576] *Silfab,*[577] and *Risen*[578]

- Auxin's argument that Commerce "unlawfully retroactively applied" its regulations in 19 CFR Part 362 has no place in these circumvention inquiries, which are meant to examine whether circumvention has taken place under the relevant statute and regulations, and not to assess whether Commerce's regulations are proper.
- Commerce has no basis to disregard the 19 CFR Part 362 regulations that exempt entries between April 1, 2022, and June 6, 2022 (and certain entries made after June 6, 2022) from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from these inquiries, without engaging in a new notice-and-comment procedure separate from this circumvention inquiry.
- Although Auxin urges Commerce to suspend liquidation and collect cash deposits on merchandise entered between April 1, 2022 and June 6, 2022, it is unlawful for Commerce to do so as "Commerce, like other agencies, must follow its own regulations."[579]
- Pursuant to 19 CFR Part 362, entries between April 1, 2022, and June 6, 2022, are exempt from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from this circumvention inquiry.  Specifically, 19 CFR 362.103

---

[570] *Id.* (citing *Initiation Notice* 87 FR at 19072).

[571] *Id.*

[572] *Id.* (citing *Aluminum (Taishan) Co. v. United States,* 983 F.3d 487).

[573] *See* Next Era's March 17, 2023 Case Brief at 11-18.

[574] *See* BYD HK's March 17, 2023 Rebuttal Brief at 13-18.

[575] *See* CSIL's March 17, 2023 Rebuttal Brief at 14-20.

[576] *See* TTL's March 17, 2023 Rebuttal Brief at 10-11.

[577] *See* Silfab's March 17, 2023 Rebuttal Brief at 8-13.

[578] *See* Risen's March 17, 2023 Rebuttal Brief  at 3-4.

[579] *See* NextEra's March 17, 2023 Rebuttal Brief (citing *See Torrington*, 82 F.3d at 1049; *see also, e.g., Fort Stewart*, 495 U.S. at 654 ("It is a familiar rule of administrative law that an agency must abide by its own regulations."); and *Saddler*, 68 F.3d at 1358 (finding that agency "must abide by its own regulation")).

113

exempts "Applicable Entries" from those obligations.  19 CFR 362.102 defines
"Applicable Entries" as "entries of Southeast Asian-Completed Cells and Modules that
are entered into the United States, or withdrawn from warehouse, for consumption before
the Date of Termination."[580]

- Commerce's regulations apply to all entries made prior to the "Date of Termination," and
there is no basis to limit application of the exemptions to entries made after June 6, 2022.
Moreover, the *Presidential Proclamation 10414 Final Rule Preamble* confirms that the
19 CFR Part 362 regulations are intended to apply to entries made between April 1, 2022,
and June 6, 2022.[581]

- Given that "agency regulations are to be interpreted in a similar manner to statutes, which
includes a consideration of the text, history, and purpose of a regulation, 19 CFR Part 362
clearly requires Commerce to exempt entries between April 1, 2022, and June 6, 2022,
from any suspension of liquidation, cash deposits, or final duties resulting from these
inquiries."[582]

- Commerce "promulgated the Part 362 regulations through notice-and-comment
rulemaking.[583]  The APA requires notice-and-comment procedures to be followed not
only when rules are formulated, but also when they are amended or repealed."[584]

- Commerce cannot amend and implement regulations without a new informal rulemaking
process under the APA.[585]

- The Supreme Court has explained that the APA requires agencies to "use the same
procedures when they amend or repeal a rule as they used to issue the rule in the first
instance."[586]

- Commerce may not repeal or amend the portions of 19 CFR Part 362 exempting entries
between April 1, 2022, and June 6, 2022, from duties as part of its final determination in
this circumvention inquiry.  Instead, Commerce would be required to publish a notice of
proposed rulemaking informing the public that it is considering a change to 19 CFR Part
362 of its regulations, allow an opportunity for comment, and then publish a final rule
responding to such comments.[587]  There is no basis for Commerce to depart from 19 CFR
Part 362 in the final determination until Commerce does so.

- Although Auxin claims that Commerce has no legal authority to declare a national
emergency and expanded the scope of *Presidential Proclamation 10414* or acted
inconsistently with *Presidential Proclamation 10414* by extending the duty waiver to
entries made between April 1, 2022, and June 6, 2022, Commerce did not declare a

---

[580] *Id.*  "Date of Termination" in turn is defined as "June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* has been terminated, whichever occurs first." *See also* 19 CFR 362.102.
[581] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877).
[582] *Id.* (citing *Kisor*, 139 S. Ct. at 2423-24).
[583] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble;* and *Presidential Proclamation 10414 Proposed Rule*).
[584] *See* BYD HK's March 17, 2023 Rebuttal Brief (citing 5 U.S.C. § 551(5); 5 USC 553).
[585] *Id.* (citing *Alaska*, 177 F.3d at 1033–34, 1036:  In clarifying this requirement, the Supreme Court has interpreted the APA to require the same procedures when an agency amends or repeals a rule as to when the agency issued that rule)).
[586] *Id.* (citing *Perez,* 575 U.S. at 101; see also *Ass'n of Priv. Sector*, 681 F.3d at 462-63 (finding that agency violates the APA when it does not give notice of proposed rule and opportunity to affected parties to comment); *Invenergy*, 422 F. Supp. 3d at 1285 ("The court concludes that the Exclusion constituted agency rulemaking. Repealing the rule, therefore, also requires rulemaking subject to APA notice and comment.")).
[587] *Id.* (citing 5 USC 553).

national emergency.  Instead, it was the President that made the declaration in *Presidential Proclamation 10414*, as allowed by section 318(a) of the Act.

- Commerce addressed the arguments regarding the consistency of 19 CFR Part 362 with *Presidential Proclamation 10414* when it promulgated the regulation.  Commerce is "taking action now (*i.e.*, during the period of the emergency) to extend the period before it directs CBP to suspend liquidation and collect cash deposits and to waive any AD/CVD estimated duties and duties for these unliquidated goods."[588]

- Commerce's Part 362 regulations are prospective in application because "Commerce's regulation stated prior to the imposition of duties that there would be no such duties, and because Commerce was extending the deadline for actions that it had not yet taken."[589]

- Commerce also explained that the authorization to waive duties under *Presidential Proclamation 10414's* "until 24 months after the date of this proclamation or until the emergency declared herein has terminated" specified only the end date for duty-free treatment, without specifying a start date or limiting application of the waiver to entries made after the *Presidential Proclamation 10414*.[590]

- Commerce recognized that providing duty-free treatment to entries made prior to June 6, 2022, furthers the emergency relief goals reflected in *Presidential Proclamation 10414* (specifically, the market uncertainty caused by the initiation of these circumvention inquiries).[591]

- Subjecting entries made prior to June 6, 2022, to AD/CVD cash deposit rates that were unknown at the time of entry and to assessment rates that would not be determined until many months or even years in the future would have increased, not decreased, the market uncertainty the *Presidential Proclamation 10414* and Commerce's Part 362 were seeking to address.[592]  Such an application would limit the capital available to complete solar projects and otherwise build capacity.[593]

- Auxin's arguments regarding the scope of authority provided in section 318(a) of the Act are also meritless as Auxin reads far too much into the following statutory language:  the President "may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act."[594]  At most this provision of the statute prevents extension of deadlines after the emergency subsided.

- The provision noted by Auxin does not prohibit the application of the statute to entries that remain unliquidated at the time of the emergency declaration and Commerce's extension of deadlines for ordering cash deposits and assessment of duties occurred after the emergency was declared.

- Section 318(a) of the Act contains two separate grammatical clauses stating what the President may authorize the Secretary to do:  (1) the President "may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act;" and (2) the President "may authorize

---

[588] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877).

[589] *Id.*

[590] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble,* 87 FR at 56877 and 56878).

[591] *See* NextEra's March 17, 2023 Rebuttal Brief (citing *Presidential Proclamation 10414 Proposed Rule*, 87 FR at 39430; *see also Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56872, 56875-77).

[592] *Id.* (citing *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56875-78).

[593] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble,* 87 FR at 56878).

[594] *Id.* (citing Auxin March 17, 2023 Case Brief at 20).

the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work." The use of the word "authorize" a second time in a separate clause indicates that the authority in the second clause is distinct from the first.

- The language "during the continuance of such emergency" qualifies only the authority in the first clause (the authority to extend deadlines), not the second (the separate authority to waive duties). Therefore, the authority to permit the duty-free importation of supplies for emergency relief work is less constrained than the authority to extend deadlines under the Tariff Act.[595]

- Commerce explained in the *Presidential Proclamation 10414 Final Rule Preamble* that applying the waiver to entries that remained unliquidated at the time of the President's Proclamation harmonizes the authority provided under section 318(a) of the Act with the retrospective AD/CVD system, which is also part of the Tariff Act.

- Even if Commerce did not have authority under section 318(a) to waive duties on entries made prior to *Presidential Proclamation 10414*, Commerce possesses separate authority to exempt such entries from ADs/CVDs.

- Commerce invoked its authority to issue regulations pertaining to section 781 of the Act when it promulgated 19 CFR Part 362 of its regulations.[596] Section 781 of the Act states that Commerce "may include within the scope" merchandise completed or assembled in other foreign countries if certain criteria are met.[597] Thus, even if the criteria for an affirmative circumvention determination are found, section 781 provides Commerce with the discretion to determine whether to include merchandise within the scope of an AD/CVD order.

- Section 781 is silent on when an order will be applied after Commerce determines to extend the order to cover merchandise completed or assembled in other foreign countries. Commerce exercised its gap-filling authority regarding the administration of section 781 by issuing 19 CFR 351.226. However, nothing in the statute mandates the particular procedures that Commerce adopted in 19 CFR 351.226 and that Auxin would like Commerce to apply.

- Commerce is free to adopt additional regulations through notice-and-comment rule making that supersede the provisions in 19 CFR 351.226 in order to address the policy issues raised by this case. Commerce recognized this in the *Presidential Proclamation Final Rule 10414 Preamble*.[598]

- It was reasonable for Commerce to exempt merchandise entered prior to June 6, 2022, from duties when that merchandise was outside of the scope of the *Orders* as a matter of law at the time of entry and the nature of the cell and/or module production process occurring in Southeast Asia is significant.

- Auxin does not cite any language from the AD/CVD statute or section 318(a) of the Act requiring Commerce to apply ADs/CVDs to pre-*Presidential Proclamation 10414* entries. Additionally, Auxin does not cite any authority that would require Commerce to suspend

---

[595] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877-78).
[596] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877-78; *and Presidential Proclamation 10414 Proposed Rule*, 87 FR at 39429).
[597] *Id.* (citing 19 CFR 351.226(b)(1)).
[598] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56876-78).

liquidation, apply cash deposit, and duty assessment provisions in 19 CFR 351.226(1) instead of the exception to those rules found in Part 362.

- 19 CFR Part 362 regulations were adopted following notice-and-comment rulemaking to address the situation presented in these circumvention inquiries and should prevail over general provisions in 19 CFR 351.226(1).[599]  Moreover, the 19 CFR Part 362 regulations make it clear that they are intended to be employed as an exception to any otherwise applicable rules found within 19 CFR 351.226 through the language "notwithstanding {section} 351.226(l) of this chapter."

- Given that 19 CFR Part 362 is explicitly identified as an exception to 19 CFR 351.226(l), Auxin's argument that Commerce was required to follow 19 CFR 351.226(l) is incorrect.

- *Presidential Proclamation 10414, Presidential Proclamation 10414 Final Rule Preamble,* Commerce's affirmative circumvention determinations, and the accompanying instructions issued to CBP by Commerce, clearly state that merchandise entered for consumption between April 1, 2022, and June 6, 2022, are not subject to AD/CVD liability.[600]

- Auxin's argument that Commerce unlawfully retroactively applied regulations promulgated pursuant to the declaration of emergency announced in *Presidential Proclamation 10414* is not made in the proper forum.  Commerce is bound by law to follow the requirements of *Presidential Proclamation 10414* and 19 CFR Part 362 of its regulations.

- This policy, combined with the meaning of 19 CFR Part 362, means that Commerce cannot retroactively impose duties on imports designated as "Applicable Entries" in the final determinations, especially given the general presumption against retroactive applications of law.[601]

- Amending or repealing 19 CFR Part 362 in the context of these circumvention inquiries would create unfair surprise and deprive parties of a meaningful opportunity to comment on a significant change in Commerce's regulations.[602]

- Commerce should continue to exempt entries made between April 1, 2022, and June 6, 2022, from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from these circumvention inquiries.

**Commerce's Position:**  Commerce disagrees with Auxin that the regulations promulgated under *Presidential Proclamation 10414* are unlawfully retroactive.  Auxin makes four primary claims that the regulations are unlawful, none of which we find to be persuasive or sufficient to change our reasoning with respect to this circumvention inquiry.

First, Auxin claims that Commerce possesses no legal authority to declare a national emergency, yet "explicitly expanded the scope" of *Presidential Proclamation 10414 ultra vires* by applying it to inquiry merchandise that entered the United States "prior to the identification of the

---

[599] *Id.* (citing *Romani,* 523 U.S. at 532 (later, more specific statute governs); *Fourco Glass Co.,* 353 U.S. at 228 ("However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment.")).

[600] *See* BYD HK's March 17, 2023 Rebuttal Brief (citing CBP MSGs Memorandum at Message No. 3047409).

[601] *Id.* (citing *Bowen,* 488 U.S. at 208*;* and *I.N.S., 533 U.S. at 316.*

[602] *Id. (*citing *Kisor*, 139 S Ct. at 2418-2419); *see also* CSIL's March 17, 2023 Rebuttal Brief *(citing Skidmore,* , 323 U.S. at 140 (1944)*;* and *Cathedral Candle,* 400 F.3d at 1366).

117

Barcode:4419747-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Vietnam 2022

emergency."[603]  However, as Auxin notes, Commerce has already addressed the legality of its authority to issue the regulations under *Presidential Proclamation 10414 Final Rule Preamble*, itself.[604]  That rule, which was issued pursuant to lawful notice and comment process, confirms that "Commerce is taking action now (*i.e.*, during the period of the emergency) to extend the period before it directs CBP to suspend liquidation and collect cash deposits and to waive any AD/CVD estimated duties and duties for these unliquidated goods."[605]  "In other words, the final rule stated, ahead of any imposition of such duties, that there will be no such duties."[606] Such a statement is not expanding the scope of the emergency retroactively; rather, "such a decision is prospective in its application"[607] because it concerns the establishment of duties that have not yet been determined but may be determined during the course of the emergency.

Second, Auxin argues that the retroactive application of *Presidential Proclamation 10414* is contrary to the explicit wording of the proclamation itself, because it only authorizes Commerce to take actions to permit duty-free entries of solar cells "until 24 months after the date of this proclamation."[608]  Auxin argues that because the *Presidential Proclamation 10414* only authorizes Commerce to take action *after* the date of *Presidential Proclamation 10414*, Commerce is precluded from taking action with respect to entries prior to June 6, 2022.[609] Commerce addressed this argument in the notice and comment period, as discussed in the *Presidential Proclamation 10414 Final Rule Preamble*.[610]  While the *Presidential Proclamation 10414* does declare an end date to the time period of duty-free treatment, it did not specify a start date, nor did it limit the application of the waiver to only entries made after *Presidential Proclamation 10414*.[611]  Additionally, the goods that entered the country prior to *Presidential Proclamation 10414* remain unliquidated, and have yet to have a final decision with respect to applicable duties.  By taking action with respect to those goods, in accordance with the regulations promulgated in *Presidential Proclamation 10414 Final Rule*, Commerce is not acting retroactively:  before any duties were determined to be applicable to these entries, the regulations stated that there would be no duties imposed on these entries.[612]  We also agree with the respondents that the actions taken by Commerce in enacting this rule to provide duty-free treatment to entries prior to June 6, 2022, furthers the relief goals for the national emergency declared in *Presidential Proclamation 10414*, and subjecting entries made prior to June 6, 2022, to duties would increase uncertainty in the market for solar cells and run contrary to the intent of *Presidential Proclamation 10414*.[613]

Third, Auxin argues that the *Presidential Proclamation 10414 Final Rule* is inconsistent with *Presidential Proclamation 10414* and the authority under which it was issued (*i.e.*, section 318(a) of the Act), which provides for action to be taken "during" an emergency.  Auxin states that there

---

[603] *See* Auxin's March 6, 2023 Case Brief at 17-18.
[604] *Id.*
[605] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.
[606] *Id.*, 87 FR at 56877-78.
[607] *Id.*, 87 FR at 56877.
[608] *See* Auxin's March 6, 2023 Case Brief (quoting *Presidential Proclamation 10414*, 87 FR at 35068).
[609] *Id.* at 20.
[610] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.
[611] *Id.*, 87 FR at 56877-78.
[612] *Id.*, 87 FR at 56877.
[613] *Id.*, 87 FR at 56875-78.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:45 AM, Submission Status: Approved

was no emergency declared prior to June 6, 2022; therefore, the Act does not allow Commerce act before that date.[614]  We disagree with this interpretation.  Section 318(a) of the Act states "{w}henever the President shall by proclamation declare an emergency to exist … he may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act, and may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work."[615]  This provision contains two distinct clauses:  (1) authorizing the Secretary to "extend during the continuance of such emergency the time … for the performance of any act," and (2) authorizing the Secretary to "permit … the importation free of duty of food, clothing, and medical, surgical, and other supplies."[616]  We agree with respondents' argument that the grammatical construction of the statute, in particular using the word "authorize" in each of the two clauses, indicates that the authority in the second clause is independent from the authority in the first.  Accordingly, the President may authorize individually each of these two actions, or both, and the actions are not necessarily required to be implemented in unison or otherwise qualify each other.  In any event, Auxin's interpretation of the phrase "during the continuance of such emergency" is misleading.  Because these two clauses are independent, the phrase "during the continuance of such emergency" applies only to the first clause and does not limit the second clause concerning the waiver of duties.  Additionally, while it is true that the entries in question entered the country prior to June 6, 2022, Commerce's *taking action* with respect to setting a definitive amount of duties for those entries (which were unliquidated at the time of the rule, with no final amount of duties set) is not retroactive in nature as it is occurring during the continuance of the emergency as declared by the President.[617]

We also disagree with Auxin's reading of section 318 of the Act as prohibiting the retrospective application of duties (or lack thereof) to unliquidated merchandise because the general operation of the AD/CVD system in the United States is a retrospective one.  The "final liability for duties is determined after the merchandise is imported," and under this system entries are suspended and cash deposits are collected in order to wait for the final ascertainment of duties at a later time.[618]  That is the same situation of "retrospective" application of duties that Auxin is concerned about here; that merchandise entered the country and remains unliquidated while awaiting the final amount of duties owed.  To argue that section 318 of the Act prohibits this type of action is to ignore the fact that the passage by Congress of these provisions underpinning the AD/CVD system in the same Act supports reading them in harmony.[619]

Fourth, Auxin argues that the regulations promulgated under the *Presidential Proclamation 10414* are inconsistent with Commerce's circumvention regulations, which require Commerce to

---

[614] *See* Auxin's March 6, 2023 Case Brief at 20.
[615] *See* section 318(a) of the Act.
[616] *Id.*
[617] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.
[618] *Id.*, 87 FR at 56877 (citing 19 CFR 351.212(a) and sections 703(d), 705(c), 706, 733(d), 735(c), and 736 of the Act).
[619] *Id.*, 87 FR at 56877 (citing *FDA v. Brown & Williamson*, 529 U.S. at 132-133 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme … A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme … and fit, if possible, all parts into an harmonious whole."))

issue suspension of liquidation and cash deposit instructions to CBP in the event of an affirmative finding of circumvention.[620] Auxin also states that this language was also included in Commerce's *Initiation Notice* and *Preliminary Determination*, which supposedly means that any failure to suspend liquidation and collect cash deposits from April 1, 2022, to June 6, 2022 is unlawful and should be reversed in the final determination.[621] We disagree that Commerce must continue to follow the liquidation and cash deposit rules provided for in 19 CFR 351.226 in this specific case. The 19 CFR Part 362 regulations carve out an exception to otherwise applicable rules (*i.e.*, those found in 19 CFR 351.226).[622] Specifically, the 19 CFR Part 362 regulations state that "notwithstanding 351.226(l) … the Secretary shall instruct CBP to discontinue the suspension of liquidation of entries and collection of cash deposits for any Southeast-Asian-Completed Cells and Modules that were suspended pursuant to {section} 351.226(l) of this chapter."[623] If Commerce were to follow the liquidation and cash deposit rules provided for in 19 CFR 341.226, it would be acting contrary to the explicit language of the 19 CFR Part 362 regulations.

Furthermore, in situations in which a regulation is adopted following a notice and comment process and is more specific than an existing regulation, the more specific regulation prevails.[624] Therefore, if a conflict arises between 19 CFR 362 and 19 CFR 351.226, the stipulations of 19 CFR 362 prevail.

## Comment 25. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

*NextEra*[625]
- If Commerce reaches a country-wide affirmative circumvention determination, it should permit third-country exporters that neither have their own AD cash deposit rate, nor use a wafer exporter in China with its own AD cash deposit rate, to deposit ADs based on the separate rate determined in the China AD solar cells proceeding, rather than deposit ADs at the cash deposit rate of the China-wide entity.
- In *CORE from China (Vietnam)*, Commerce applied the AD cash deposit rate of Chinese companies granted a separate rate in the China AD investigation to imports of CORE produced in Vietnam using Chinese substrate." [626]
- Commerce cannot assume that companies in a third-country are part of the China-wide entity like it does for companies in China that cannot demonstrate their independence from the Chinese government. Moreover, Commerce should not apply its NME methodology to companies in Cambodia, Malaysia, or Thailand, which are independent market economy countries.

---

[620] *See* Auxin's March 6, 2023 Case Brief at 18 (citing 19 CFR 351.226(l)(2)(ii) and (iii)).

[621] *Id.* at 20-21.

[622] *See* 19 CFR 362.103(b)(1).

[623] *See* 19 CFR 362.103(b)(1)(i).

[624] *See Romani*, 523 U.S. at 532 (discussing the statutory canon that a later, more specific statute governs in the case of conflict); *Fourco Glass Co.*, 353 U.S. at 228 (holding that the general language of a statute "will not be held to apply to a matter specifically dealt with in another part of the same enactment."); *see also Roberto*, 440 F.3d at 1350 ("{t}he rules of statutory construction apply when interpreting an agency regulation.").

[625] *See* NextEra's March 6, 2023 Case Brief at 4-8.

[626] *Id.* (citing *CORE from China (Vietnam)* IDM at Comment 3).

120

- Commerce clearly explained in the *AD Order* that the China-wide AD rate is based on AFA. The purpose of the statutory AFA provision is to encourage respondents' cooperation and ensure that they do not obtain a more favorable result by failing to cooperate than if they had cooperated.[627] The third-country exporters fully cooperated with Commerce's requests for information in the circumvention inquires, and thus, there is no reason to apply an AFA rate, *i.e.*, the China-wide rate, to these exporters.

- Secretary Raimondo testified before Congress that a tariff rate in the range of 200 percent is "excessive" and "exceedingly unlikely."[628] The China-wide AD cash deposit rate is 238.95 percent. To avoid uncertainty and limit the damage to solar deployment in the United States, Commerce should permit third-country companies without their own AD rate, or without a Chinese wafer exporter with its own AD rate, to deposit ADs at the cash deposit rate of companies granted a separate rate in the China AD solar cells proceeding.

- Alternatively, Commerce should establish a procedure for companies to obtain separate rate status either by submitting separate rate applications in this inquiry, submitting separate rate applications in the ongoing AD administrative review in this proceeding, even if the exporter is not under review, or requesting a changed circumstances review to establish separate rate status on an expedited basis.

*Auxin*[629]

- Consistent with its long-standing practice, Commerce should continue to assign exporters without an individual AD rate or without a separate AD rate, the China-wide AD rate.[630]

- Commerce applied that practice in *CRS from China (Vietnam)*,[631] and contrary to NextEra's claim, in *CORE from China (Vietnam)*.[632]

- The purpose of a circumvention inquiry is to determine whether circumvention of an order has occurred, not conduct a separate rates analysis. If Commerce reaches an affirmative circumvention determination, then it will order the suspension of liquidation of entries of inquiry merchandise and the collection of AD/CVD cash deposits pending conduct of an administrative review where Commerce will, among other things, determine the appropriate cash deposit rates and conduct separate rate analyses.[633]

**Commerce's Position:** We disagree with NextEra. Pursuant to Commerce's affirmative country-wide circumvention determinations, duties under the *Orders* will apply to U.S. entries of inquiry merchandise from Cambodia, Malaysia, Thailand, and Vietnam unless at least one of the certification requirements is met. Because the applicable *Orders* are on China, in this circumvention inquiry Commerce followed the methodology that it employs in AD proceedings involving China to determine the appropriate AD cash deposit rate for U.S. entries of inquiry merchandise. Commerce considers China to be an NME country.[634] In proceedings involving NME countries, Commerce maintains a rebuttable presumption that all exporters are subject to

---

[627] *Id.* (citing SAA at 200; and *Changzhou Wujin Fine Chem*, 701 F.3d at 1378).

[628] *Id.* (citing NextEra's May 19, 2022 Comments at Attachment 3).

[629] *See* Auxin's March 17, 2023 Rebuttal Brief at 13-16.

[630] *Id.* (citing *Preliminary Determination*, 87 FR at 75224; Policy Bulletin 05.1).

[631] *Id.* (citing *CRS from China (Vietnam)*, 83 FR at 23892).

[632] *Id.* (citing *CORE from China AD Investigation*, 81 FR at 35318).

[633] *Id.* (citing *Tissue Paper from China (Vietnam) Final Determination* IDM at Comment 5; and *Hangers from China (Vietnam)* IDM at Comment 5).

[634] *See Aluminum Foil* PDM at the section, "China's Status as a Non-Market Economy."

121

government control and, thus, should be assigned a single antidumping duty deposit rate. It is Commerce's policy to assign all exporters of subject merchandise this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate.[635]  Therefore, as we explained in the *Preliminary Determination*, entries from Cambodia, Malaysia, Thailand, and Vietnam will be assessed at the China-wide entity rate unless either: (1) the relevant cell or module exporter from Cambodia, Malaysia, Thailand, or Vietnam has its own company-specific AD and/or CVD rate under the *Orders* or; (2) if it does not, the Chinese company that exported the wafers to that third-country cell/module exporter has its own company-specific AD and/or CVD rate under the *Orders*.[636]

Although NextEra asserts that Commerce cannot assume that companies in a third-country are part of the China-wide entity, Commerce's position in AD proceedings involving China is clear - "'the {China}-wide rate applies to all entries of subject merchandise' unless Commerce has determined a firm is eligible for a separate rate … If a third-country exporter of subject merchandise wishes to have its own rate, it is incumbent upon that exporter to request a review."[637]

While exporters that are wholly-foreign owned do not need to demonstrate *de jure* and *de facto* independence from government control to receive a separate rate, they must nonetheless demonstrate that they are wholly owned by entities located in market-economy countries and that their ultimate owners are located in market-economy countries to receive a separate rate.[638]  Such entities must demonstrate this by completing the relevant portions of Commerce's separate rate application.[639]  As the CIT explained, while "… Commerce recognizes that companies organized outside of China are *per se* independent from the control of the {Chinese} government" it is only "{o}nce a party demonstrates that it is foreign owned, {that} Commerce accords that company a rate separate from the {China}-wide rate."[640]  Thus, Commerce's practice in NME cases is to require exporters inside and outside the NME country to demonstrate that they are not part of the NME-wide entity in order to obtain separate rate status.

There is no basis in this circumvention inquiry to grant separate rate status to companies that currently do not have a separate rate, or whose wafer suppliers do not have a separate rate. Commerce does not conduct a separate rates analysis in circumvention inquiries and did not do so here.  The purpose of the circumvention statute is to give Commerce the authority, and the criteria to follow, to administer "AD and {CVD} orders in such a way as to prevent

---

[635] *See Sparklers from China*, 56 FR at 20588; *see also Silicon Carbide from China*, 59 FR at 22585; and 19 CFR 351.107(d).

[636] *See Preliminary Determination* 87 FR at 75224.

[637] *See Xanthan Gum from China 2016-2017* IDM at Comment 1.

[638] *See Chlorinated Isocyanurates from China 2019-2020 Preliminary Results* PDM ("{t}o establish whether a company is sufficiently independent to be eligible for a separate, company-specific rate, Commerce analyzes each exporting entity in an NME country under the test established in *Sparklers* as amplified in *Silicon Carbide*, and further refined by *Diamond Sawblades*.  However, if Commerce determines that a company is wholly foreign-owned or located in a market economy (ME) country, then a separate-rate analysis is not necessary to determine whether it is independent from government control."); unchanged in *Chlorinated Isocyanurates from China 2019-2020 Final Results*.

[639] *See* https://enforcement.trade.gov/nme/nme-sep-rate.html.

[640] *See Decca Hospitality Furnishings*, 391 F. Supp. 2d at 1300.

122

circumvention and diversion of U.S. law."[641]  Therefore, Commerce focused its analysis in the circumvention inquiry on applying the relevant methodology in section 781 of the Act to determine whether circumvention was occurring and did not conduct a separate rates analysis. Commerce conducts separate rates analyses in administrative reviews.[642]  Commerce conducts administrative reviews to determine "the amount of any antidumping duty,"[643] and a separate rates analysis is integral to this.  Separately, Commerce conducts circumvention inquiries to establish whether certain goods must be subject to an order,[644] not to establish the duty rates for those goods.  Further, Commerce's application of the China-wide entity AD rate to exporters that do not have their own separate rate, or whose wafer suppliers do not have a separate rate, in this circumvention inquiry is consistent with its practice in other circumvention inquiries involving China including, contrary to NextEra's claim, *CORE from China (Vietnam)* in which Commerce stated that it "will instruct CBP to require AD cash deposits equal to the rate established for the China-wide entity (199.43 percent) …"[645]

We disagree with NextEra's claim that Commerce reached a determination based on adverse facts available with respect to certain cooperative third-country exporters that do not have a separate rate by requiring cash deposits equal to the China-wide rate on U.S. entries of their inquiry merchandise.  Commerce made determinations based on adverse facts available only with respect to uncooperative companies.  As adverse facts available, Commerce determined that the uncooperative companies "exported inquiry merchandise and that U.S. entries of that merchandise are circumventing the *Orders*."[646]  Additionally, Commerce prohibited importers and exporters from using certain certifications with respect to U.S. entries of inquiry merchandise from the uncooperative companies.[647]  Commerce did not require a cash deposit equal to the China-wide rate on U.S. entries of inquiry merchandise from any company as part of an adverse facts available determination.  Rather, Commerce required that importers deposit ADs equal to the China-wide rate on entries of inquiry merchandise from cooperative third-country exporters only where the third-country exporters or their Chinese wafer supplier(s) do not have a separate rate.  In fact, a company that is barred from certifying that its exports contain no Chinese wafers or module components may still receive a company-specific rate if it already has such a rate under the *Orders* or if its Chinese wafer exporter has its own rate under the *Orders*.[648]

---

[641] *See Senate Report 100-71* at 101; *see also Tissue Paper from China (Vietnam) Final Determination* at Comment 1 ("The overall purpose of an anti-circumvention inquiry is to prevent the evasion of an AD order").

[642] *See Tissue Paper from China (Vietnam) Final Determination* IDM at Comment 5 ("{c}ontrary to MFVN's suggestion, in conducting this inquiry, {Commerce} has not determined a cash deposit rate, conducted a separate rate analysis, or calculated an individual margin of dumping for MFVN, which is done during an administrative review.").

[643] *See* section 751(a)(1)(B) of the Act.

[644] *See* section 781(b) of the Act; *see also Bell Supply CAFC.*

[645] *See CORE from China (Vietnam)*, 83 FR at 23896; *see also CORE from China AD Investigation*, 81 FR at 35318; *Tissue Paper from China (India) Final Determination* IDM at 15; *Aluminum Extrusions from China (Vietnam),* 84 FR at 39806; *Butt-Weld Pipe Fittings from China (Malaysia),* 84 FR at 29165; and *SDGE from China (UK)* IDM at Comment 5*.*

[646] *See Preliminary Determinations*, 87 FR at 75221, 75223.

[647] *Id.*

[648] *See Preliminary Determination*, 87 FR at 75224; *see also* the section *"*Entries on or After Termination of the Proclamation" in the final determination notice dated concurrently with this memorandum.

123

Both the CIT and the CAFC recognized that even if Commerce based the China-wide entity's dumping margin on adverse facts available, that "does not change its applicability to an NME entity that cooperated, but ultimately failed to qualify for a separate rate."[649]  For example, in *Advanced Technology*, the CIT stated:

> Commerce did not apply adverse facts available to {respondent}, Commerce rather found that {respondent} had not rebutted the presumption of state control and assigned it the {China}-wide rate.  These are two distinct legal concepts:  a separate AFA rate applies to a respondent who has received a separate rate but has otherwise failed to cooperate to the best of its ability whereas the {China}-wide rate applies to a respondent who has not received a separate rate.[650]

Consequently, we will continue to instruct CBP to require a cash deposit equal to the China-wide rate on U.S. entries of inquiry merchandise from any company that neither has its own AD cash deposit rate, nor uses a wafer exporter in China with its own AD cash deposit rate.

## VIII.  RECOMMENDATION

Based on our analysis of the comments received and our findings at verification, we recommend adopting the above positions.  We recommend finding, based on the analysis and findings detailed above and in the *Preliminary Determination*, that imports of solar cells and modules, completed in Vietnam using certain parts and components manufactured in China, are circumventing the *Orders*, except for shipments complying with the certification requirements described in the *Federal Register* notice.

If this recommendation is accepted, we will publish the final determination in these inquiries in the *Federal Register*.

☒                           ☐
_____        _____
Agree                    Disagree

                              8/17/2023

X   *Lisa W. Wang*
_____

Signed by: LISA WANG
Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[649] *See Walk-Behind Lawn Mowers from China* IDM at Comment 9 (citing *Diamond Sawblades Coalition*, 866 F.3d at 1313).
[650] *Id.* at Comment 9 (citing *Advanced Technology*, 938 F. Supp. 2d at 1351 (citing *Watanabe Group*, 34 CIT 1545, Slip Op. 10-139 at 9, n. 8)).

**Appendix I - Acronyms/Abbreviations**

| Acronym/Abbreviation | Complete Name |
|---|---|
| $ | United States Dollars |
| ACCESS | Antidumping and Countervailing Duty Centralized Electronic Service System |
| AD | Antidumping Duty |
| AFA | Adverse Facts Available |
| APA | Administrative Procedure Act |
| APO | Administrative Protective Order |
| AR | Administrative Review |
| Auxin | Auxin Solar Inc. |
| bn | Billion |
| Boviet | Boviet Solar Technology Co., Ltd. |
| BPI | Business Proprietary Information |
| BYD HK | BYD (H.K.) Co., Ltd. |
| Shangluo BYD | BYD (Shangluo) Industrial Co., Ltd. |
| CAFC | U.S. Court of Appeals for the Federal Circuit |
| Cambodia | Kingdom of Cambodia |
| Canadian Solar or the Canadian Solar Group | Canadian Solar International Limited; Canadian Solar Manufacturing (Changshu) Inc.; Canadian Solar Manufacturing (Luoyang) Inc.; CSI Cells Co., Ltd.; CSI Solar Co., Ltd.; CSI Manufacturing (Fu Ning) Co., Ltd.; Canadian Solar Manufacturing (Thailand) Co., Ltd.; and Canadian Solar Manufacturing Vietnam Co., Ltd. |
| CBP | U.S. Customs and Border Protection |
| CCR | Changed Circumstances Review |
| CdTe | Cadmium Telluride |
| CEA | Clean Energy Associates, LLC |
| China | The People's Republic of China |
| CIT | U.S. Court of International Trade |
| COM | Cost of manufacturing |
| Commerce | The U.S. Department of Commerce |
| CORE | Certain Corrosion-Resistant Steel Products |
| CRS | Certain Cold-Rolled Steel Flat Products |
| CSIL | Canadian Solar International Limited |
| CSIL | Canadian Solar International Limited.  Also, any reference to the author of case briefs and rebuttals submitted by CSIL and any member of the Canadian Solar Group. |

| | |
|---|---|
| CSPV | Crystalline Silicon Photovoltaic |
| CVD | Countervailing Duty |
| Date of Termination | Date of termination of Presidential Proclamation 10414 |
| DOE | United States Department of Energy |
| EPCG | Export Promotion Capital Goods |
| ET | Eastern Time |
| EVA | Ethylene Vinyl Acetate |
| FA | Facts Available |
| First Solar Malaysia | First Solar Malaysia Sdn. Bhd. |
| First Solar Vietnam | First Solar Vietnam Manufacturing Co., Ltd. |
| FY | Fiscal Year |
| GW | Gigawatt |
| G&A | General and Administrative Expenses |
| Hanwha | Hanwha Q Cells Malaysia Sdn. Bdh. |
| HFC | Hydrofluorocarbon |
| HRS | Hot Rolled Steel |
| HTS | Harmonized Tariff Schedule |
| IDM | Issues and Decision Memorandum |
| IEA | International Energy Agency |
| Inquiry Countries | Cambodia, Malaysia, Thailand and Vietnam |
| ITC | U.S. International Trade Commission |
| Jinko | Jinko Solar Technology Sdn. Bhd./ Jinko Solar (Malaysia) Sdn. Bhd. |
| Le Shan Jinko | Jinko Solar (Le Shan) Co., Ltd |
| KHR | Cambodian Riel |
| LONGi | LONGi (H.K) Trading Limited in the Vietnam segment, and LONGi (Kuching) Sdn. Bhd. and LONGi Technology (Kuching) Sdn. Bhd. in the Malaysia segment |
| LWRPT | Light-Walled Rectangular Pipe and Tube |
| Maxeon | Maxeon Solar Technologies, Ltd. |
| mn | Million |
| MW | Megawatts |
| MYR | Malaysian Ringgit |
| NE Solar | New East Solar Energy (Cambodia) Co., Ltd. |
| NextEra | NextEra Energy Constructors, LLC |
| Ningbo Kyanite | Ningbo Kyanite International Trade Co., Ltd |
| NME | non-market economy |

| OCTG | Oil Country Tubular Goods |
| --- | --- |
| p/n | Positive/Negative |
| PDM | Preliminary Decision Memorandum |
| PERC | Passivated Emitter and Rear Contact |
| PET Film | Polyethylene Terephthalate Film, Sheet, and Strip |
| PLI | Product-Linked Incentive |
| POR | Period of Review |
| Q&V | Quantity and Value |
| R&D | Research and Development |
| Red Sun | Red Sun Energy Long An Company Limited |
| Risen | Risen Solar Technology Sdn. Bhd |
| RMB | Renminbi |
| Silfab | Silfab Solar WA Inc. |
| solar cells and modules | certain crystalline silicon photovoltaic cells, whether or not assembled into modules |
| Sonali | Sonali Energees USA LLC |
| Tata Power | Tata Power Solar System Limited |
| TBH | Thai Bhat |
| Thailand | Kingdom of Thailand |
| the Act | Tariff Act of 1930, as amended |
| The LONGi Group | LONGi (Kuching) Sdn. Bhd., LONGi Technology (Kuching) Sdn. Bhd. , LONGi (H.K.) Trading Limited, LONGi Solar Technology (H.K.) Limited, LONGi Solar Technology (U.S.) Inc. |
| THSM | Canadian Solar Manufacturing (Thailand) Co., Ltd. |
| Trina or the Trina Group | Trina Solar (Vietnam) Science & Technology Co., Ltd, Trina Solar Energy Development Company Limited, and Trina Solar Co., Ltd. in Vietnam segment and Trina Solar Science & Technology (Thailand) Ltd. in Thailand segment |
| TTL | Trina Solar Science & Technology (Thailand) Ltd. |
| TTL | Trina Solar Science & Technology (Thailand) Ltd. Also, any reference to the author of case briefs and rebuttals submitted by TTL and any member of the Trina Group. |
| TSSD | Trina Solar (Singapore) Science & Technology Pte. Ltd. |

|  |  |
|---|---|
| TCZ | Trina Solar Co., Ltd. |
| URAA | Uruguay Round Agreements Act |
| Vietnam | Socialist Republic of Vietnam |
| Vina | Vina Solar Technology Company Limited |
| Vina Cell | Vina Cell Technology Company Limited |
| VND | Vietnamese Dong |
| VSUN | Vietnam Sunergy Joint Stock Company |
| Websol Energy | Websol Energy System Limited |

Barcode:4419747-02 A-570-979 CIRC - Anti Circumvention Inquiry  -  from Vietnam 2022

**Appendix II - Court and Case Citation Table**
**This Section is Sorted by Short Citation**

| Short Citation | Administrative Case Determinations |
|---|---|
| *2003 Policy Bulletin* | *Proposed Policies Regarding the Conduct of Changed Circumstance Reviews of the Countervailing Duty Order on Softwood Lumber from Canada (C 122 839)*, 68 FR 37456 (June 24, 2003) |
| *2021 Regulations Final Rule* | *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021) |
| *Activated Carbon from China* | *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 53214 (October 22, 2018), and accompanying IDM |
| *Orders* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order*, 77 FR 73017 (December 7, 2012) |
| *AD Order* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012) |
| *Adoption of CFR 351.228* | *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021) |
| *Advanced Technology* | *Advanced Technology & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1351 (CIT 2013) (citing Watanabe Group v. United States, 34 CIT 1545 (CIT 2010), Slip Op. 10-139 |
| *Ajmal Steel* | *Ajmal Steel Tubes & Pipes Indus. LLC v. United States*, Slip Op. 22-121 (CIT October 28, 2022) |
| *AK Steel Corp.* | *AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) |
| *Al Ghurair CAFC 2023* | *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351 (Fed. Cir. 2023) |
| *Al Ghurair CIT 2021* | *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (CIT 2021) |

| | |
|---|---|
| *Alaska* | *Alaska Pro. Hunters Ass'n v. FAA*, 177 F.3d 1030, 1033-34, 1036 (D.C. Cir. 1999) |
| *Albemarle Corp.* | *Albemarle Corp. & Subsidiaries v. United States*, 8*21 F.3d 1345 (Fed. Cir. 2016)* |
| *Allegheny v. U.S.* | *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368 (Fed. Cir. 2003) |
| *Aluminum (Taishan) Co.* | *Aluminum (Taishan) Co. v. United States,* 983 F.3d 487 (Fed. Cir. 2020) |
| *Aluminum Extrusions from China* | *Aluminum Extrusions from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 76 FR 18524 (April 4, 2011) |
| *Aluminum Extrusions from China (Vietnam)* | *Aluminum Extrusions from the People's Republic of China:  Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders, and Partial Rescission*, 84 FR 39805 (August 12, 2019) |
| *Aluminum Extrusions from China Minor Alterations Circumvention Final* | *Aluminum Extrusions from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders and Rescission of Minor Alterations Anti-Circumvention Inquiry*, 82 FR 34630 (July 26, 2017), and accompanying IDM |
| *Aluminum Extrusions from China Preliminary CCR* | *Aluminum Extrusions from the People's Republic of China:  Initiation and Preliminary Results of Expedited Changed Circumstances Review*, 83 FR 34548 (July 20, 2018) |
| *Aluminum Foil from China* | *Certain Aluminum Foil from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 83 FR 9282 (March 5, 2018) |
| *Aluminum Foil from China (Korea and Thailand)* | *Antidumping and Countervailing Duty Orders on Certain Aluminum Foil from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to the Republic of Korea and the Kingdom of Thailand,* 88 FR 17177 (March 22, 2023) |
| *Aluminum Foil from China (Korea and Thailand) Preliminary* | *Antidumping and Countervailing Duty Orders on Certain Aluminum Foil from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to the Republic of Korea and the Kingdom of Thailand*, 88 FR 17177 (March 22, 2023), and accompanying PDM |
| *Aluminum Foil from Oman* | *Certain Aluminum Foil from the Sultanate of Oman: Final Affirmative Countervailing Duty Determination*, 86 FR 52888 (September 23, 2021) |

| | |
|---|---|
| *Aluminum Foil PDM* | *Antidumping Duty Investigation of Certain Aluminum Foil from the People's Republic of China:  Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination*, 82 FR 50858, 50861 (November 2, 2017), and accompanying PDM (citing Memorandum, "China's Status as a Non-Market Economy," dated October 26, 2017) |
| *Aluminum Sheet from Bahrain* | *Common Alloy Aluminum Sheet from Bahrain:  Final Affirmative Countervailing Duty Determination*, 86 FR 13333 (March 8, 2021) |
| *Amanda Foods CIT* | *Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d at 1381 |
| *Antidumping and Countervailing Duties FR* | *Antidumping Duties; Countervailing Duties*, 61 FR 7308 (February 27, 1996) |
| *Antidumping Duties; Countervailing Duties; Final Rule* | *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27340 (May 19, 1997) |
| *API v. U.S.* | *API v. United States EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) |
| *Appelton Papers Inc.* | *Appelton Papers Inc. v. United States*,  37 CIT 1034 Slip Op.13-87 (July 2013) |
| *Archer Daniels* | *Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1279 (CIT 2014) |
| *Ass'n of Priv. Sector* | *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462-63 (D.C. Cir. 2012) |
| *Ausimont* | *Ausimont United States v. United States*, 882 F. Supp. 1087, 1098 (CIT 1995) |
| *B.F. Goodrich v. U.S.* | *B.F. Goodrich Co. v. United States*, 794 F. Supp. 1148 (CIT 1992) |
| *Baker Hostetler* | *Baker Hostetler v. United States*, 473 F.3d 312 (D.C. Cir. 2006) |
| *Ball Bearings from Thailand* | *Final Affirmative Countervailing Duty Determination and Partial Countervailing Duty Order:  Ball Bearings and Parts Thereof from Thailand; Final Negative Countervailing Duty Determinations:  Antifriction Bearings (Other Than Ball or Tapered Roller Bearings) and Parts Thereof from Thailand*, 54 FR 19130 (May 3, 1989) |
| *Beijing Tianhai* | *Beijing Tianhai Industry Co. v. United States*, 52 F. Supp. 3d 1351 (CIT 2015) |
| *Bell Supply CAFC* | *Bell Supply Co., LLC v. United States*, 888 F.3d 1222 (Fed. Cir. 2018) |

| | |
|---|---|
| *Bethlehem Steel v. U.S.* | *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (CIT 2001) |
| *Bloomberg Report* | BloombergNEF, Solar PV Trade and Manufacturing: A Deep Dive (2021) |
| *BMW of N. Am. LLC* | *BMW of N. Am. LLC v. United States*, 926 F.3d 1291 (Fed. Cir. 2019) |
| *Bomont Indus.* | *Bomont Indus. v. United States*, 733 F. Supp. 1507 (CIT 1990) |
| *Borusan v. American Cast Iron Pipe* | *Borusan Mannesmann Boru Sanayi v. American Cast Iron Pipe Co.*, Ct. No. 20-2014 2021 U.S. App. (Fed. Cir. 2021) |
| *Borusan 2015* | *Borusan Mannesmann Boru Sanayi v Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (CIT 2015) |
| *Borusan 2017* | *Borusan Mannesmann Boru Sanayi v Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1327-30, *aff'd* 857 F.3d 1353 (Fed. Cir. 2017) |
| *Bowen* | *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) |
| *Brass Sheet and Strip from Canada* | *Brass Sheet and Strip from Canada: Final Affirmative Determination of Circumvention of Antidumping Duty Order,* 58 FR 33610 (June 18, 1993), and accompanying IDM |
| *Building Sys. De Mex.* | *Building Sys. De Mex., S.A. de C.V. v. United States*, 567 F. Supp. 3d 1306, 1316 (CIT 2022) |
| *Butt-Weld Pipe Fittings from China (Malaysia)* | *Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 84 FR 29164 (June 21, 2019) |
| *Butt-Weld Pipe Fittings from China (Thailand)* | *See Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 59 FR 15155 (March 31, 1994) |
| *Canada – Feed-In Tariff Program* | *Canada – Measures Relating to the Feed-In Tariff Program, (WT/DS426/AB/R)*, adopted May 6, 2013 |
| *Canadian Solar CAFC* | *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 919 (Fed. Cir. 2019) |
| *Carbon and Alloy Steel Wire Rod from Italy* | *Countervailing Duty Investigation of Carbon and Alloy Steel Wire Rod from Italy: Final Affirmative Determination*, 83 FR 13242 (March 28, 2018) |
| *Carbon Steel Flanges from Italy* | *Finished Carbon Steel Flanges from Italy: Final Determination of Sales at Less Than Fair Value*, 82 FR 29481 (June 29, 2017), and accompanying IDM |

| | |
|---|---|
| *Carlisle Tire & Rubber v. U.S.* | *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (CIT 1983) |
| *Cathedral Candle* | *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1366 (Fed. Cir. 2005) |
| *Celik Halat* | *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348 (CIT 2022) |
| *Ceramica Regiomontana* | *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (CIT 1986) |
| *Certain Pasta from Italy AR11* | *Certain Pasta from Italy: Final Results of the Eleventh (2006) Countervailing Duty Administrative Review*, 74 FR 5922 (February 3, 2009) |
| *Certain Pasta from Italy AR7* | *Certain Pasta from Italy: Final Results of the Seventh Countervailing Duty Administrative Review*, 69 FR 70657 (December 7, 2004) |
| *Certain Steel Products from Korea* | *Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations: Certain Steel Products from Korea*, 58 FR 37338 (July 9, 1993) |
| *Certain Wheat from Canada* | *Final Affirmative Countervailing Duty Determinations: Certain Durum Wheat and Hard Red Spring Wheat from Canada*, 68 FR 52747 (September 5, 2003) |
| *Cf. Stark v. Wickard* | *Cf. Stark v. Wickard,* 321 U.S. 288 (1944) |
| *CFS from China* | *Coated Free Sheet Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 72 FR 60645 (October 25, 2007) |
| *Changzhou Trina Solar Energy v. U.S. (2016)* | *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334 (CIT 2016) aff'd 264 F. Supp. 3d 1325, 1334 (CIT 2017) |
| *Changzhou Trina Solar Energy v. U.S. (2018)* | *Changzhou Trina Solar Energy Co. Ltd. v. United States*, 352 F. Supp. 3d 1316 (CIT 2018) |
| *Changzhou Trina Solar Energy v. U.S. (2020)* | *Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287 (CIT 2020) |
| *Changzhou Wujin Fine Chem* | *Changzhou Wujin Fine Chem. Factory Co. v. United States,* 701 F.3d 1367 (Fed. Cir. 2012) |
| *Chevron* | *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) |
| *Chlorinated Isocyanurates from China* | *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Countervailing Duty Administrative Review, and Partial Rescission of Countervailing Duty Administrative Review*, 82 FR 27466 (June 15, 2017) |

| | |
|---|---|
| *Chlorinated Isocyanurates from China 2019-2020 Final Results* | *Chlorinated Isocyanurates from the People's Republic of China: Final Determination of No Shipments; 2019–2020 Administrative Review*, 86 FR 36253 (July 9, 2021) |
| *Chlorinated Isocyanurates from China 2019-2020 Preliminary Results* | *Chlorinated Isocyanurates from the People's Republic of China: Preliminary Determination of No Shipments; 2019-2020*, 86 FR 13291 (March 8, 2021) |
| *Cinsa* | *Cinsa, S.A. de C.V. v. United States*, 966 F. Supp. 1230 (CIT 1997) |
| *Circular Welded Carbon-Quality Steel Pipe from China (Vietnam) Preliminary* | *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 88 FR 21975 (April 12, 2023) |
| *Circular Welded Carbon-Quality Steel Pipe from Oman* | *Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman: Final Affirmative Countervailing Duty Determination*, 77 FR 64473 (October 22, 2012) |
| *CITIC Trading Company, Ltd. Remand* | *Final Results of Redetermination Pursuant to Court Remand, CITIC Trading Company, Ltd. v. United States of America and ABC Coke, et al: Final Results Pursuant to Remand*, Court No. 01-00901, Slip Op. 03-23 (CIT March 4, 2003), dated June 17, 2003, available at https://access.trade.gov/resources/remands/03-23.pdf |
| *Citric Acid from China* | *Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of Countervailing Duty Administrative Review*, 77 FR 72323 (December 5, 2012) |
| *COALITION I* | *Comm. Overseeing Action for Lumber Int'l Trade Investigations v. United States*, 483 F. Supp. 3d 1253 (CIT 2020) |
| *COALITION II* | *Comm. Overseeing Action for Lumber Int'l Trade Investigations v. United States*, 535 F. Supp. 3d 1336 (CIT 2021) |
| *Coated Paper from China* | *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 FR 59212 (September 27, 2010) |
| *Cold Rolled Steel from China (Vietnam) Preliminary* | *Certain Cold-Rolled Steel Flat Products from the People's Republic of China: Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 82 FR 58178 (December 11, 2017) |

| | |
|---|---|
| *CORE from China (Guatemala)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Negative Final Determination of Circumvention Involving Guatemala*, 85 FR 41954 (July 13, 2020) |
| *CORE from China (Guatemala) Preliminary* | *Negative Preliminary Determination of Circumvention Involving Guatemala:  Certain Corrosion-Resistant Steel Products from the People's Republic of China*, 85 FR 8840 (February 18, 2020) |
| *CORE from China (Malaysia) Final* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention Involving Malaysia*, 86 FR 30263 (June 7, 2021) |
| *CORE from China (Malaysia) Preliminary* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention Involving Malaysia*, 85 FR 8823 (February 18, 2020) |
| *CORE from China (South Africa)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Negative Final Determination of Circumvention Involving South Africa*, 86 FR 30253 (June 7, 2021), and accompanying IDM |
| *CORE from China (South Africa) Preliminary* | *Negative Preliminary Determination of Circumvention Involving South Africa:  Certain Corrosion-Resistant Steel Products from the People's Republic of China*, 85 FR 8844 (February 18, 2020) |
| *CORE from China (UAE)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 FR 41957 (July 13, 2020) |
| *CORE from China (UAE) Preliminary* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention Involving the United Arab Emirates*, 85 FR 8841 (February 18, 2020) |
| *CORE from China (Vietnam)* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 FR 23895 (May 23, 2018) |

| | |
|---|---|
| CORE from China AD Investigation | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 35316 (June 2, 2016) |
| CORE from Korea (Vietnam) | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Final Determinations of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 84 FR 7034 (December 26, 2019) |
| CORE from Taiwan (Malaysia) | *Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Final Determination of Circumvention Involving Malaysia*, 86 FR 30257 (June 7, 2021) |
| CORE from Taiwan Final | *Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Final Determination of Circumvention Inquiry on the Antidumping Duty Order*, 84 FR 70937 (December 26, 2019) |
| CORE from Taiwan Preliminary Determination | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 32875 (July 10, 2019) |
| CRS from Brazil | *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from Brazil:  Final Affirmative Determination,* 81 FR 49940 (July 29, 2016), and accompanying IDM |
| CRS from China (Vietnam) | *Certain Cold-Rolled Steel Flat Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 FR 23891 (May 23, 2018) |
| CRS from Korea (Vietnam) | *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Affirmative Final Determinations of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 70948 (December 26, 2019) |
| CRS from Korea (Vietnam) Preliminary | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 32875 (July 10, 2019) |

| | |
|---|---|
| *CVD Order* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order*, 77 FR 73017 (December 7, 2012) |
| *CVP 23 from China* | *Carbazole Violet Pigment 23 from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 75 FR 36630 (June 28, 2010) |
| *CWCS from India (Oman and India) Final* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India: Final Negative Determinations of Circumvention of the Antidumping Duty Order*, 88 FR 12917 (March 1, 2023) |
| *CWCS from India (Oman and India) Preliminary* | *Preliminary Negative Determinations of Circumvention of the Antidumping Order: Certain Welded Carbon Steel Standard Pipes and Tubes from India*, 87 FR 52507 (August 26, 2022) |
| *DAK Americas* | *DAK Americas LLC v. United States*, 517 F. Supp. 3d 1349, 1360 (CIT 2021) |
| *Decca Hospitality Furnishings* | *Decca Hospitality Furnishings, LLC, et al. v. United States*, 391 F. Supp. 2d 1298 (August 2005) |
| *Diamond Sawblades (Thailand)* | *Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Determination of AntiCircumvention Inquiry*, 84 FR 33920 (July 16, 2019) |
| *Diamond Sawblades (Thailand) Preliminary* | *Diamond Sawblades and Parts Thereof from the People's Republic of China: Preliminary Affirmative Determination of Circumvention*, 83 FR 57425 (November 15, 2018) |
| *Diamond Sawblades Coalition* | *Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304, 1313 (Fed. Cir. 2017) |
| *Diamond Sawblades Coalition CIT* | *Diamond Sawblades Manufacturers Coalition v. United States*, 816 F. Supp. 2d 1342 (CIT January 2012) |
| *Dillinger France* | *Dillinger France S.A. v. United States,* 981 F.3d 1318, 1322 (Fed. Cir. 2020) |
| *Dongtai Peak* | *Dongtai Peak Honey Indus. v. United States,* 777 F.3d 1343 (Fed. Cir. 2015) |
| *Encino Motorcars* | *Encino Motorcars, LLC v. Navarro*, 570 U.S. 211 (2016) |
| *Ericsson* | *Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995) |
| *Essar Steel* | *Essar Steel Ltd. v. United States,* 678 F.3d 1268 (Fed. Cir. 2012) |

| | |
|---|---|
| *F Lli De Cecco* | *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 980 F. Supp 485 (CIT 1997) |
| *F Lli De Cecco Fed. Cir.* | *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) |
| *FDA v. Brown & Williamson* | *FDA v. Brown & Williamson Tobacco*, 529 U.S. 120 (2000) |
| *PSF from Korea* | *Fine Denier Polyester Staple Fiber from the Republic of Korea:  Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24743 (May 30, 2018) |
| *PSF from Taiwan* | *Fine Denier Polyester Staple Fiber from Taiwan: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24745 (May 30, 2018) |
| *Federal–Mogul Corp.* | Federal–Mogul Corp. v. United States, 63 F.3d 1572, 1575 (Fed. Cir. 1995) |
| *Ferrostaal Metals GmbH* | *Ferrostaal Metals GmbH v. United States*, 518 F. Supp. 3d 1357 (CIT 2021) |
| *Ferrovanadium from China Final Determination* | *Notice of Final Determination of Sales at Less Than Fair Value:  Ferrovanadium from the People's Republic of China*, 67 FR 71137 (November 29, 2002) |
| *Ferrovanadium from China Preliminary Determination* | *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Ferrovanadium from the People's Republic of China*, 67 FR 45088 (July 8, 2002) |
| *Ferrovanadium from Russia Final Determination* | *Ferrovanadium and Nitrided Vanadium from the Russian Federation:  Negative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 46712 (August 6, 2012) |
| *Ferrovanadium from Russia Preliminary Determination* | *Preliminary Negative Determination and Extension of Time Limit for Final Determination of Circumvention of the Antidumping Duty Order on Ferrovanadium and Nitrided Vanadium from the Russian Federation*, 77 FR 6537 (February 8, 2012) |
| *Fish Fillets from Vietnam* | *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and New Shipper; 2010-2011*, 78 FR 17350 (March 21, 2013), and accompanying IDM |

| | |
|---|---|
| *Fish Fillets from Vietnam (Cambodia)* | *Circumvention and Scope Inquiries on the Antidumping Duty Order on Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Partial Affirmative Final Determination of Circumvention of the Antidumping Duty Order, Partial Final Termination of Circumvention Inquiry and Final Rescission of Scope Inquiry*, 71 FR 38608 (July 7, 2006) |
| *Fort Stewart* | *Fort Stewart Schs. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990) |
| *Fource Glass Co.* | *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222 (1957) |
| *Gallant Ocean (Thai.) Co.* | *Gallant Ocean (Thai.) Co., v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) |
| *Glycine from China (India)* | *Glycine from the People's Republic of China:  Final Partial Affirmative Determination of Circumvention of the Antidumping Duty Order*, 77 Fed. Reg. 73,426 (December 10, 2012) |
| *Glycine from India CVD* | *Glycine from India:  Final Results of Countervailing Duty Administrative Review; 2020,* 87 FR 76611 (December 15, 2022) |
| *Granular PTFE Resin from Italy* | *Polytetrafluoroethylene Resin from Italy:  Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 58 FR 26100 (April 30, 1993) |
| *Graphite Electrodes from China (U.K.) Prelim* | *Small Diameter Graphic Electrodes from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 77 FR 33405, 33413 (June 6, 2012) |
| *Grobest* | *Grobest & I-Mei Industries (Vietnam) Co., Ltd. v. United States*, 815 F. Supp. 2d 1342 (CIT 2012) |
| *Hangers from China (Vietnam)* | *Steel Wire Garment Hangers from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 76 FR 66895 (October 28, 2011), and accompanying IDM |
| *Hangers from China (Vietnam) Preliminary Determination* | *Steel Wire Garment Hangers from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Order and Extension of Final Determination*, 76 FR 27007 (May 10, 2011) |

| | |
|---|---|
| *Hardwood Plywood from China* | *Certain Hardwood Plywood Products from the People's Republic of China:  Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 FR 46470 (July 20, 2023) |
| *HFCs from China (India)* | *Hydrofluorocarbon Blends from the People's Republic of China:  Final Negative Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-401A Blend; Affirmative Final Determination of Circumvention of the Antidumping Duty Order by Indian Blends Containing Chinese Components*, 85 FR 61930 (October 1, 2020) |
| *HFCs from China (India) Preliminary* | *Hydrofluorocarbon Blends from the People's Republic of China:  Preliminary Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-410A Blend; Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Indian Blends Containing Chinese Components*, 85 FR 20244 (April 10, 2020) |
| *Hot-Rolled Lead and Bismuth* | *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom; Negative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders*, 64 FR 40336 (July 26, 1999) |
| *Hot-Rolled Steel from Korea AD* | *Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 32720 (July 9, 2019) |
| *Huvis* | *Huvis Corp. v. United States*, 570 F.3d 1347, 1356 (Fed. Cir. 2009) |
| *Hyundai Electricity CAFC* | *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078 (Fed. Cir. 2021) |
| *Hyundai Electricity CIT* | *Hyundai Electric & Energy Systems Co., Ltd v. United States*, 477 F. Supp.3d 1324, 132 (CIT 2020) |
| *I.N.S.* | *I.N.S. v. Enrico St. Cyr*, 533 U.S. 289, 316 (2001) |
| *Initiation Notice Dated February 2, 2023* | *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 FR 7060, 71062 (February 2, 2023) |
| *Inmax SDN* | *Inmax SDN v. United States,* 277 F. Supp. 3d 1367 (CIT 2017) |
| *Invenergy* | Invenergy Renewables LLC v. United States, 422 F. Supp. 3d 1255, 1285 (CIT 2019) |
| *Jiasheng* | *Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States,* 28 F. Supp. 3d 1317 (CIT 2014) |
| *Kisor* | *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) |

| | |
|---|---|
| *KYD, Inc.* | *KYD, Inc. v. United States*, 607 F.3d 760, 767-68 (Fed. Cir. 2010) |
| *Lined Paper Products from India* | *Certain Lined Paper Products from India: Notice of Final Results of the First Antidumping Duty Administrative Review*, 74 FR 17149 (April 14, 2009) |
| *LWR from China (Vietnam) Preliminary* | *Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 88 FR 21985 (April 12, 2023) |
| *LWR from Taiwan (Vietnam) Preliminary* | *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty Order*, 88 FR 21980 (April 12, 2023) |
| *Macao CIT* | *Macao Commer. & Indus. Spring Mattress Mfr. v. United States,* 437 F. Supp. 3d 1324 (CIT 2020) |
| *Max Fortune Indus. Co.* | *Max Fortune Indus. Co. v. United States*, Slip Op. 13-52 (CIT 2013), 37 CIT 549, 560-62 (CIT 2013) |
| *Merck Sharp & Dohme Corp. v. Albrecht* | *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) |
| *Michigan* | *Michigan v. EPA*, 576 U.S. 743, 752 (2015) |
| *Mid Continent* | *Mid Continent Steel & Wire, Inc. v. United States*, Slip Op. 2023-45 (CIT 2023) |
| *Mitsubishi Elec. Corp.* | *Mitsubishi Elec. Corp. v. United States,* 700 F. Supp. 538, 555 (CIT 1988), *aff'd* 898 F. 2d 1577 (Fed. Cir. 1990) |
| *Mitsubishi Heavy Industries* | *Mitsubishi Heavy Industries v. United States,* 986 F. Supp. 1428 (CIT 1997) |
| *Mukund CIT* | *Mukand, Ltd. v. United States*, 37 CIT 443, 452 (CIT 2013) |
| *Mukund Fed. Cir.* | *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir. 2014) |
| *Nails from Malaysia CCR Initiation* | *Certain Steel Nails from Malaysia: Initiation of Antidumping Duty Changed Circumstances Review*, 80 FR 71772 (November 17, 2015) |
| *Nails from Oman* | *Final Results of Antidumping Duty Administrative Review; 2021: Certain Steel Nails from the Sultanate of Oman*, 87 FR 78639 (December 22, 2022) |
| *Nippon Steel* | *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) |

| | |
|---|---|
| *OCTG from China (Brunei and Philippines)* | *Oil Country Tubular Goods from the People's Republic of China:  Final Affirmative Determinations of Circumvention,* 86 FR 67443 (November 26, 2021) |
| *OCTG from China (Brunei and Philippines) Preliminary* | *Oil Country Tubular Goods from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention,* 86 FR 43627 (August 10, 2021) |
| *OCTG from China CCR* | *Oil Country Tubular Goods from the People's Republic of China:  Final Results of Antidumping and Countervailing Duty Changed Circumstances Reviews,* 87 FR 15915 (March 21, 2022) |
| *Off-the-Road Tires from China* | *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 40485 (July 15, 2008), and accompanying IDM |
| *Oman Fasteners* | *Oman Fasteners LLC v. United States*, Slip Op. 23-17 (February 22, 2023) |
| *Omnibus Trade & Competitiveness Act* | Conference Report to the 1988 Omnibus Trade & Competitiveness Act, H.R. Rep. No. 100-576, (1988), at 590, reprinted in 1988 U.S.C.C.A.N. 1547, 1623-24 |
| Omnibus Trade Act, Report of the Senate Finance Committee | Omnibus Trade Act, Report of the Senate Finance Committee, S. Rep. No. 71, 100th Cong., 1st Sess. 100 (1987) |
| *Paper from Brazil SII* | *Certain Uncoated Paper from Brazil:  Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Successor-in-Interest Determination; 2019-2020,* 86 FR 30000 (June 4, 2021), unchanged in *Certain Uncoated Paper from Brazil:  Final Results of Antidumping Duty Administrative Review; 2019-2020,* 86 FR 55820 (October 7, 2021) |
| *Pasta from Italy (U.S.) Circumvention* | *Certain Pasta from Italy:  Affirmative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders,* 68 FR 54888 (September 19, 2003) |
| *Pasta from Italy (U.S.) Circumvention Preliminary* | *Certain Pasta from Italy:  Affirmative Preliminary Determinations of Circumvention of Antidumping and Countervailing Duty Orders,* 68 FR 46571 (August 6, 2003) |
| *Pasta from Italy Circumvention Final* | *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order,* 63 FR 54672 (October 13, 1998) |

| | |
|---|---|
| *Pasta from Italy Circumvention Preliminary* | *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 63 FR 18364 (April 15, 1998) |
| *Peer Bearing Co.* | *Peer Bearing Co. v. United States*, 36 CIT 1700 (2012) |
| *Perez* | *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) or *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015) |
| *Pesquera Mares* | Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1380 (Fed. Cir. 2001) |
| *PET Film from India* | *Polyethylene Terephthalate Film, Sheet, and Strip from India:  Preliminary Results of Countervailing Duty Administrative Review, and Rescission, in Part; 2020,* 87 FR 48453 (August 9, 2022), and accompanying PDM |
| *PET Film from India Final* | *Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from India:  Final Results of Countervailing Duty Administrative Review; 2020,* 87 FR 76024 (December 12, 2022), and accompanying IDM |
| *PET Film from the UAE Preliminary Determination* | *Preliminary Negative Determination of Circumvention of the Antidumping Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, 80 FR 26229 (May 7, 2015) |
| *PET Film from the UAE (Bahrain)* | *Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates:  Negative Final Determination of Circumvention of the Antidumping Duty Order*, 80 FR 47463 (August 7, 2015) |
| *Pipe and Tube from India (Oman and UAE)* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India:  Final Negative Determinations of Circumvention of the Antidumping Order*, 88 FR 12917 (March 1, 2023) |
| *Pipe and Tube from India (Oman and UAE) Preliminary* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India:  Preliminary Negative Determinations of Circumvention of the Antidumping Order*, 87 FR 52507 (August 26, 2022) |
| *Plywood from China (Vietnam) Final* | *Certain Hardwood Plywood Products from the People's Republic of China:  Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders,* 88 FR 46740 (July 20, 2023), and accompanying IDM |

| | |
|---|---|
| *Plywood from China (Vietnam) Preliminary* | *Certain Hardwood Plywood Products from the People's Republic of China: Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders,* 87 FR 45753 (July 29, 2022), and accompanying PDM |
| Policy Bulletin 05.1 | Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in Investigations involving Non-Market Economy Countries," (April 5, 2005), available on Commerce's website at https://www.trade.gov/policy-bulletin-051 |
| Policy Bulletin 94.1 | Enforcement and Compliance's Policy Bulletin No. 94.1, regarding, "Cost of Production - Standards for Initiation of Inquiry," (March 25, 1994), available on Commerce's website at https://www.trade.gov/policy-bulletin-941 |
| *Polyvinyl Alcohol from China Final Determination* | *Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol from the People's Republic of China,* 68 FR 47538 (August 11, 2003) |
| *Polyvinyl Alcohol from China Preliminary Determination* | *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Polyvinyl Alcohol from the People's Republic of China,* 68 FR 13674 (March 20, 2003) |
| *Preamble (Final Rule)* | *Antidumping Duties; Countervailing Duties,* 62 FR 27296 (May 19, 1997) |
| *Preserved Mushrooms from China* | *Certain Preserved Mushrooms from the People's Republic of China: Final Results and Final Partial Rescission of the Sixth Administrative Review,* 71 FR 40477 (July 17, 2006) |
| *Presidential Proclamation 10414* | *Proclamation No. 10414, Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia,* 87 FR 35067 (June 9, 2022) |
| *Presidential Proclamation 10414 Final Rule Preamble* | *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414,* 87 FR 56868 (September 16, 2022) |
| *Presidential Proclamation 10414 Proposed Rule* | *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414: Proposed Rule,* 87 FR 39426 (July 1, 2022) |

| | |
|---|---|
| *PrimeSource Bldg. Prods.* | *PrimeSource Bldg. Prods. v. United States*, 497 F. Supp. 3d 1333 (CIT 2021) (citing U.S. Const. art I, § 8, cl. 1 & cl. 3) |
| *Procedures for Importation of Supplies for Use in Emergency Relief Work* | *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 FR 63230 (October 30, 2006) |
| *Pure Magnesium from Canada CCR Initiation* | *Initiation of Changed Circumstances Countervailing Duty Administrative Reviews; Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 41473 (September 10, 1992) |
| *QSPs from China CCRs* | *Certain Quartz Surface Products from the People's Republic of China: Initiation of Antidumping and Countervailing Duty Changed Circumstances Reviews; Global Stone*, 88 FR 41377 (June 26, 2023); and *Certain Quartz Surface Products from the People's Republic of China: Initiation of Antidumping and Countervailing Duty Changed Circumstances Reviews; AM Stone*, 88 FR 41386 (June 26, 2023) |
| *Retail Carrier Bags from Taiwan Final Determination* | *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 79 FR 61056 (October 9, 2014)) |
| *Retail Carrier Bags from Taiwan Preliminary Determination* | *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 79 FR 31302 (June 2, 2014) |
| *Roberto* | *Roberto v. Dep't of Navy*, 440 F.3d 1341 (Fed. Cir. 2006) |
| *Romani* | *United States v. Est. of Romani*, 523 U.S. 517 (1998) |
| S. Rep. No. 103-412 | Joint Report of the Committee on Finance, Committee on Agriculture Nutrition and Forestry, Committee on Governmental Affairs of the United States Senatre to Accompany S. 2467, Uruguay Round Agreements Act |
| SAA | Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, Vol. I (1994) |
| *Saddler* | *Saddler v. Dep't of the Army*, 68 F.3d 1357, 1358 (Fed. Cir. 1995) |
| *Save Domestic Oil* | *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004) |
| *SDGE from China* | *Small Diameter Graphite Electrodes from the People's Republic of China: Final Results of the First Administrative Review of the Antidumping Duty Order and Final Rescission of the Administrative Review, in Part*, 76 FR 56397 (September 13, 2011) |

| | |
|---|---|
| *SDGE from China (UK)* | *Small Diameter Graphite Electrodes from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 47596 (August 9, 2012) |
| *Senate Report 100-71* | *U.S. Senate, Committee on Finance, Omnibus Trade Act of 1987*, S. Rep. No. 100-71, at 101 (1987) |
| *Shakeproof Tool Works, Inc.* | *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) |
| *Shanghai Sunbeauty Trading Co.* | *Shanghai Sunbeauty Trading Co. v. United States*, 380 F. Supp. 3d. 1328 (CIT 2019) |
| *Shelter Forest CIT* | *Shelter Forest Int'l Acquisition, Inc. v. United States*, Slip Op. 2021-90 (CIT 2021) |
| *Shenzhen Xinboda* | *Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 494 F. Supp. 3d 1347 (CIT 2021) |
| *Shrimp from China* | *Certain Frozen Warmwater Shrimp from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 85 FR 83891 (December 23, 2020), and accompanying IDM |
| *Silicon Carbide from China* | *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994), |
| *Silicon Metal from Brazil* | *Silicon Metal from Brazil: Final Affirmative Countervailing Duty Determination*, 83 FR 9838 (March 8, 2018), and accompanying IDM |
| *SKF CIT* | *SKF USA Inc. v. United States*, 675 F. Supp. 2d 1264 (CIT 2009) |
| *Skidmore* | *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) |
| *Smith Corona* | *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Cir. 1990)) |
| *Softwood Lumber from Canada* | *Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017), and accompanying IDM |
| *Solar Cells from China 2017-2018 AR* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 62275 (October 2, 2020), and accompanying IDM |
| *Solar Cells from China Investigation* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Determination of Sales at Less Than* |

| | |
|---|---|
| | *Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012) |
| Solar Products from China | *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China:  Final Determination of Sales at less Than Fair Value*, 79 FR 76970 (December 23, 2014) |
| Solaria Scope Ruling | Memorandum, "The Solaria Corporation Scope Ruling," dated April 8, 2021 (placed on the record in NextEra's Letter, "Pre-Preliminary Determination Comments," dated October 20, 2022, at Attachment 22 |
| *Sonali Scope Application* | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Sonali Scope Application," dated January 25, 2023 |
| *Sonali Scope Inquiry* | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Sonali Scope Inquiry," dated January 20, 2023 |
| *Soybean Meal from India AD* | *Final Affirmative Determination of Sales at Less than Fair Value:  Organic Soybean Meal from India*, 87 FR 16458 (March 23, 2022) |
| *Soybean Meal from India CVD* | *Final Affirmative Countervailing Duty Determination of Sales at Less than Fair Value:  Organic Soybean Meal from India*, 87 FR 16453 (March 23, 2022) |
| *Sparklers from China* | *Notice of Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588 (May 6, 1991) |
| *SSF from India SII* | *Stainless Steel Flanges from India:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Successor-in-Interest Determination, and Partial Rescission; 2019-2020,* 86 FR 60792 (November 4, 2021), unchanged in *Stainless Steel Flanges from India:  Final Results of Antidumping Duty Administrative Review; 2019–2020*, 87 FR 27568 (May 9, 2022) |
| *SSSS from China (Vietnam)* | *Stainless Steel Sheet and Strip from the People's Republic of China:  Final Scop Ruling and Final Affirmative Determination of Circumvention for Exports from the Socialist Republic of Vietnam*, 88 FR 18521 (March 29, 2023) |
| *SSSS from China (Vietnam) Preliminary* | *Stainless Steel Sheet and Strip from the People's Republic of China:  Scope Ruling and Preliminary Affirmative Determination of Circumvention for Exports from the Socialist Republic of Vietnam*, 87 FR 56626 (September 15, 2022) |

| | |
|---|---|
| Steel Flanges from India | *Finished Carbon Steel Flanges from India: Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86 FR 500032 (September 7, 2021), and accompanying PDM |
| Steel Flanges from India Final | *Finished Carbon Steel Flanges from India:  Final Results of Countervailing Duty Administrative Review; 2019*, 86 FR 67909 (November 30, 2021), and accompanying IDM |
| Steel Flanges from Spain AD | *Finished Carbon Steel Flanges from Spain:  Final Results of Antidumping Duty Administrative Review; 2017–2018*, 85 FR 7919 (February 12, 2020) |
| Steel Threaded Rod from Thailand Final | *Steel Threaded Rod from Thailand:  Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 79 FR 14476 (March 14, 2014) |
| Steel Threaded Rod from Thailand Preliminary | *Steel Threaded Rod from Thailand:  Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 FR 79670 (December 31, 2013) |
| Steel Tubing from Taiwan Preliminary Results (Taiwan) | *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan*, 88 FR 21980 (April 12, 2023) |
| Tapered Roller Bearings from China | *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 FR 3987 (January 22, 2009) |
| Tapered Roller Bearings from China | *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of New Shipper Reviews*, 67 FR 10665 (March 8, 2002) |
| Techsnabexport, Ltd. | *Techsnabexport, Ltd. v. United States*, 795 F.Supp. 428 (CIT 1992) |
| Timken Co. | *Timken Co. v. United States*, 968 F. Supp. 2d 1279 (2014), *aff'd* 589 F. App'x 995 (Fed. Cir. 2015) |
| Tissue Paper from China (India) Final Determination | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 83 FR 40101 (July 3, 2013) |
| Tissue Paper from China (India) Preliminary Determination | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 78 FR 14514 (March 6, 2013), and accompanying IDM |
| Tissue Paper from China (Thailand) Final Determination | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Final Determination of* |

| | |
|---|---|
| | *Circumvention of the Antidumping Duty Order*, 74 FR 29172 (June 19, 2009) |
| *Tissue Paper from China (Vietnam) Final Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 73 FR 57591 (October 3, 2008) |
| *Tissue Paper from China (Vietnam) Preliminary Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 73 FR 21580 (April 22, 2008) |
| *Torrington* | U.S. Senate, Committee on Finance, Omnibus Trade Act of 1987, S. Rep. No. 100-71, at 101 (1987) |
| *TPP from China (Thailand)* | *Affirmative Final Determinations of Circumvention of the Antidumping Order:  Certain Tissue Paper Products from the People's Republic of China*, 73 FR 57591 (October 3, 2008) |
| *Tung Mung CIT* | *Tung Mung Dev. Co. v. United States*, 219 F. Supp. 3d 1333, 1343 (CIT 2002) |
| *U.K. Carbon and Graphite* | *U.K. Carbon and Graphite Co., Ltd. v United States*, 931 F. Supp. 2d 1322 (CIT 2013) |
| *Uncoated Paper from China Final Determination* | *Certain Uncoated Paper from Brazil, the People's Republic of China, and Indonesia:  Affirmative Final Determinations of Circumvention of the Antidumping Duty Orders and Countervailing Duty Orders for Certain Uncoated Paper Rolls*, 86 FR 71025 (December 14, 2021) |
| *Uncoated Paper from China Preliminary Determination* | *Certain Uncoated Paper from the People's Republic of China:  Affirmative Preliminary Determinations of Circumvention of the Antidumping and Countervailing Duty Orders for Uncoated Paper Rolls*, 85 FR 72624 (November 13, 2020) |
| *Uncovered Innerspring Units from China (Malaysia) Final Determination* | *Uncovered Innerspring Units from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 80 FR 74758 (November 30, 2015) |
| *Uncovered Innerspring Units from China (Malaysia) Preliminary Determination* | *Uncovered Innerspring Units from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 80 FR 64392, 64393 (October 23, 2015) |
| *USITC Solar 2021 Determination* | *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. No. TA-201-75 (Extension), USITC Pub. 5266 (December 2021) |

| | |
|---|---|
| *USITC Solar Investigation Final* | *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. No. TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (November 2012) |
| *Uyghur Forced Labor Prevention Act:  U.S. Customs and Border Protection Operational Guidance for Importers* | *Uyghur Forced Labor Prevention Act:  U.S. Customs and Border Protection Operational Guidance for Importers June 13, 2022*, CBP Publication No. 1793-0522 |
| *Vietnam Finewood* | *Vietnam Finewood Company Limited, et.al v. United States*, 466 F. Supp. 3d 1273 (CIT 2023) |
| *Walk-Behind Lawn Mowers from China* | *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 27384 (May 20, 2021) |
| *Walk-Behind Lawn Mowers from China Circumvention Rescission* | *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China:  Notice of Intent to Rescind Circumvention Inquiry on the Antidumping and Countervailing Duty Orders*, 88 FR 13434 (March 3, 2023) |
| *Walgreen Co.* | *Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) |
| *Wantanabe Group* | *Watanabe Group v. United States*, 34 CIT 1545, Slip Op. 10-139 (CIT 2010) |
| *Wheatland* | *Wheatland Tube Co. v. United States* 161 F.3d 1365, 1371 (Fed. Cir. 1998) |
| *Wire Rod from Korea and United Kingdom CCR* | *Carbon and Alloy Steel Wire Rod from the Republic of Korea and the United Kingdom:  Notice of Final Results of Antidumping Duty Changed Circumstances Review*, 84 FR 13888 (April 8, 2019) |
| *Xanthan Gum from China 2016-2017* | *Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Discontinuation of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 65142 (December 19, 2018) |
| *Yangtai CIT* | *Yantai Oriental Juice Co. v. United States*, Slip Op. 03-33 (CIT March 21, 2003) |
| *Yangzhou CAFC* | *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) |
| *Youngstown Sheet & Tube Co.* | *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) |

**Appendix III -Documents on Record**
**This Section is Sorted by Short Citation**

| Short Citation | Document Title and Date |
|---|---|
| *Appendix IV-Certification for "Applicable Entries"* | *Preliminary Determination at Appendix IV; Certification for "Applicable Entries"* |
| *Appendix V-Certification for Non-Circumventing Companies* | *Preliminary Determination at Appendix IV; Certification for Entries of Inquiry Merchandise from Companies Preliminarily Found Not to Be Circumventing* |
| *Appendix VI-Certification Regarding Chinese Components* | *Preliminary Determination at Appendix IV; Certification Regarding Chinese Component* |
| Auxin November 9, 2022 *Ex Parte* Memorandum | Memorandum, "Meeting with Counsel for Auxin," dated November 14, 2022 |
| Auxin's April 26, 2023  Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)—Thailand," dated April 26, 2023 |
| Auxin's April 26, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)—Thailand," dated April 26, 2023 |
| Auxin's August 3, 2022 SV Rebuttal Comments | Auxin's Letter, "Rebuttal Surrogate Value Comments and Information," dated August 3, 2022 |
| Auxin March 24, 2023 Case Brief | Auxin's Letter,  "Auxin's Case Brief (Tranche 2)," dated March 24, 2023 |
| Auxin's April 19, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche2)—Vietnam," dated April 19, 2023 |
| Auxin's April 24, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2) - Malaysia," dated April 24, 2023 |
| Auxin's April 27, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Case Brief (Tranche2)—Thailand," dated April 27, 2023 |
| Auxin's April 28, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)—Vietnam," dated April 28, 2023 |
| Auxin's April 3, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)," dated April 3, 2023 |
| Auxin's Hearing Request | Auxin's Letter, "Auxin Solar, Inc.'s Request for Public Hearing," dated December 29, 2022 |
| Auxin's Investment and R&D Information | Auxin's Letter, "Submission of Investment and Research and Development Information," dated July 29, 2022 |
| *Auxin's ITC Posthearing Brief* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products): Posthearing Brief on Behalf of Auxin Solar Inc.*, Inv. No. TA-201-75 (Safeguard Extension) (November 2021) |
| *Auxin's ITC Prehearing Brief* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products): Prehearing Brief on Behalf of Auxin Solar Inc.*, Inv. No. TA-201-75 (Safeguard Extension) (October 2021) |

| | |
|---|---|
| Auxin's July 27, 2022 SV Comments | Auxin's Letter, "Submission of Surrogate Value Information for Vietnamese Factors of Production," dated July 27, 2022 |
| Auxin's July 29, 2022 Comments | Auxin's Letter, "Submission of Investment and Research and Development Information," dated July 29, 2022 |
| Auxin's March 17, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 1)," dated March 17, 2023 |
| Auxin's March 24, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)," dated March 24, 2023 |
| Auxin's March 6, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 1)," dated March 6, 2023 |
| Auxin's March 7, 2022 Submission | Auxin's Letter, "Response to NextEra's Request to Reject Anti-Circumvention Ruling Requests," March 7, 2022 |
| Auxin's May 16, 2022 Comments | Auxin's Letter, "Auxin's Response to Rebuttal Comments and Factual Information," dated May 16, 2022 |
| Auxin's May 5, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2) - Malaysia," dated May 5, 2023 |
| Auxin's May 9, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)," dated May 9, 2023 |
| Auxin's October 20, 2023 Pre-Preliminary Comments | Auxin's Letter, "Pre-Preliminary Comments Concerning Jinko Solar Technology Sdn. Bhd. and Hanwha Q Cells Malaysia Sdn. Bhd.," dated October 20, 2022 |
| *Bloomberg Report* | BloombergNEF, *Solar PV Trade and Manufacturing: A Deep Dive* (2021) |
| Boviet 1st SQR | Boviet's Letter, "Boviet First Supplemental Questionnaire Response," dated August 11, 2022 |
| Boviet 2nd SQR | Boviet's Letter, "Boviet Second Supplemental Questionnaire Response," dated August 12, 2022 |
| Boviet 3rd SQR | Boviet's Letter, "Boviet Third Supplemental Questionnaire Response," dated October 7, 2022 |
| Boviet 4th SQR | Boviet's Letter, "Boviet Fourth Supplemental Questionnaire Response," dated November 2, 2022 |
| Boviet Final Analysis Memorandum | Memorandum, "Final Analysis Memorandum for Boviet Solar Technology Co., Ltd.," dated concurrently with this memorandum |
| Boviet Preliminary Analysis Memorandum | Memorandum, "Preliminary Analysis Memorandum for Boviet Solar Technology Co., Ltd.," dated December 1, 2022 |
| Boviet's May 5, 2023 Rebuttal Brief | Boviet's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Second Tranche Rebuttal Brief," dated May 5, 2023 |

| | |
|---|---|
| Boviet's April 28, 2023 Rebuttal Brief | Boviet's Letter, "Boviet Rebuttal Brief re Tranche II," dated April 28, 2023 |
| Boviet's August 3, 2022 SV Rebuttal Comments | Boviet's Letter, "Boviet Rebuttal Surrogate Value Information," dated August 3, 2022 |
| Boviet's IQR Part I | Boviet's Letter, "Boviet Initial Circumvention Inquiry Questionnaire Response," dated June 3, 2022 |
| Boviet's IQR Part II | Boviet's Letter, "Boviet Circumvention Inquiry Questionnaire Response – Part II," dated June 23, 2022 |
| Boviet's July 27, 2020 SV Comments | Boviet's Letter, "Boviet Surrogate Value Information," dated July 27, 2022 |
| Boviet's March 17, 2023 Rebuttal Brief | Boviet's Letter, "Boviet's Letter in Lieu of Rebuttal Brief re Tranche 1," dated March 17, 2023 |
| Boviet's March 6, 2023 Case Brief | Boviet's Letter, "Boviet Case Brief re Tranche 1," dated March 6, 2023 |
| BYD HK Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Cambodia:  Final Analysis Memorandum for BYD (H.K.) Co., Ltd.," dated concurrently with this memorandum |
| BYD HK Hearing Request | BYD HK's Letter, "Request for Hearing," dated January 6, 2023 |
| BYD HK Initial QR Part I | BYD HK's Letter, "Response to Initial Questionnaire," dated June 7, 2022 |
| BYD HK Initial QR Part II | BYD HK's Letter, "Response to Second Circumvention Inquiry Questionnaire," dated June 23, 2022 |
| BYD HK 1st SQR | BYD HK's Letter, "Response to First Supplemental Questionnaire," dated August 9, 2022 |
| BYD HK 2nd SQR | BYD HK's Letter, "Response to Second Supplemental Questionnaire," dated August 19, 2022 |
| BYD HK 3rd SQR | BYD HK's Letter, "Response to Third Supplemental Questionnaire," dated October 12, 2022 |
| BYD HK Verification Exhibits | BYD HK's Letter, "Verification Exhibits of BYD (HK) Co., Ltd.," dated February 16, 2023 |
| BYD HK's Verification Report | Memorandum, "Verification of the Questionnaire Responses of BYD (H.K.) Co., Ltd. in the Circumvention Inquiry of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - with Respect to Cambodia," dated March 15, 2023 |
| BYD HK Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Cambodia:  Preliminary Analysis Memorandum for BYD (H.K.) Co., Ltd.," dated December 1, 2022 |
| BYD HK's April 3, 2023 Rebuttal Brief | BYD HK's Letter, "Second Tranche Rebuttal Brief of BYD HK," dated April 3, 2023 |

| | |
|---|---|
| BYD HK's March 17, 2023 Rebuttal Brief | BYD HK's Letter, "First Tranche Rebuttal Brief of BYD," dated March 17, 2023 |
| BYD HK's March 24, 2023 Case Brief | BYD HK's Letter, "Second Tranche Case Brief," dated March 24, 2023 |
| BYD HK's March 6, 2023 Case Brief | BYD HK's Letter, "First Tranche" Letter in Lieu of Case Brief of BYD," dated March 6, 2023 |
| *Cambodia* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia," dated December 1, 2022 |
| Cambodia RSM | Memorandum, "Circumvention Inquiry with Respect to Cambodia:  Respondent Selection," dated May 12, 2022 |
| CBP Data Release Memorandum | Memorandum," Release of Customs and Border Protection Entry Data," dated March 29, 2022 |
| CBP Messages Memorandum | Memorandum, "Placement of Customs and Border Protection (CBP) Messages on Record of Proceedings," dated February 17, 2023 |
| *CEA Report* | Clean Energy Associates, *Crystalline Silicon PV - Sector Background* (2022) |
| Circumvention Questionnaires | Circumvention Inquiry Questionnaire," dated May 13 and 16, 2022 |
| Circumvention Request | Auxin's Letter, "Auxin Solar's Request for an Anti-Circumvention Ruling to Section 781(b) of the Tariff Act of 1930, As Amended," dated February 8, 2022 |
| Clarification of Product Coverage Memorandum | Memorandum, "Clarification of Product Coverage," dated December 19, 2022 |
| May 2, 2022 Memorandum | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Comments on Potential Certification Requirements," dated May 19, 2022 Circumvention Inquiries With Respect to Cambodia, Malaysia,  Thailand, and Vietnam – Potential Certification Requirements," dated May 2, 2022 |
| Commerce's December 1, 2022 Rejection Letter | Commerce's Letter, "Rejection Letter of Red Sun's Q&V Questionnaire Response," dated December 1, 2022 |
| CSIL Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand:  Final Analysis Memorandum for Canadian Solar International Limited," dated concurrently with this memorandum |
| CSIL's 1st SQR | CSIL's Letter, "Response to First Supplemental Questionnaire," dated August 8, 2022 |
| CSIL's 2nd SQR | CSIL's Letter, "Response to Second Supplemental Questionnaire," dated August 12, 2022 |
| CSIL's 3rd SQR | CSIL's Letter, "Response to Third Supplemental Questionnaire," dated October 7, 2022 |

| CSIL's 4th SQR | CSIL's Letter, "Response to Fourth Supplemental Questionnaire," dated November 2, 2022 |
| CSIL's April 19, 2023 Case Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 19, 2023 |
| CSIL's April 26, 2023 Rebuttal Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 26, 2023 |
| CSIL's April 27, 2023 Case Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 27, 2023 |
| CSIL's Hearing Request | CSIL's Letter, "Request for Hearing," dated January 6, 2023 |
| CSIL's IQR Part I | CSIL's Letter, "Response to Circumvention Inquiry Questionnaire," dated June 3, 2022 |
| CSIL's IQR Part II | CSIL's Letter, "Response to Second Circumvention Inquiry Questionnaire," dated June 23, 2022 |
| CSIL's March 17, 2023 Rebuttal Brief | CSIL's Letter, "First Tranche Rebuttal Brief," dated March 17, 2023 |
| CSIL's March 6, 2023 Case Brief | CSIL's Letter, "First Tranche Case Brief," dated March 6, 2023 |
| CSIL's May 9, 2023 Rebuttal Brief | CSIL's Letter, "Second Tranche Rebuttal Case Brief of Canadian Solar International Limited," dated May 9, 2023 |
| CSIL's October 20, 2022 Pre-Preliminary Comments | CSIL's Letter, "Comments in Advance of the Preliminary Determination," dated October 20, 2022 |
| CSIL Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand:  Preliminary Analysis Memorandum for Canadian Solar International Limited," dated December 1, 2022 |
| CSIL's Verification Exhibits | CSIL's Letter, "Verification Exhibits," dated February 22, 2023 |
| CSIL's Verification Report | Memorandum, "Verification of the Information Reported by Canadian Solar International Limited," dated April 19, 2023 |
| *Denis De Ceuster Report* | Denis De Ceuster and DDC Solar LLC, *Crystalline Silicon Photovoltaic Supply Chain:  from Polysilicon to Solar Panel* (2022) |
| DHS Order Re:  Forced Labor in Xinjiang | The Department of Homeland Security Issues Withhold Release Order on Silica-Based Products Made by Forced Labor in Xinjiang," U.S CUSTOMS AND BORDER PROTECTION (June 24, 2021), available at https://www.cbp.gov/newsroom/national-media-release/departmenthomeland- security-issues-withhold-release-order-silica |

| | |
|---|---|
| *DOE Solar Deep Dive* | *U.S. Department of Energy Response to Executive Order 14017 "America's Supply Chains," Solar Photovoltaics: Supply Chain Deep Dive Assessment* (February 24, 2022) included in the memorandum, "Meeting with the Department of Energy," dated June 3, 2022 |
| ET Solar Scope Ruling | Memorandum, "Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China: ET Solar Inc.," dated June 15, 2021 |
| Factor Valuation Memorandum | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - Circumvention Inquiries with Respect to Cambodia, Malaysia and Thailand: Factor Valuation Memorandum," dated December 1, 2022 |
| First Solar Malaysia's April 24, 2023 Case Brief | First Solar Malaysia's Letter, "Letter in Lieu of Case Brief for Second Tranche of Issues," dated April 24, 2023 |
| First Solar Malaysia's Hearing Request | First Solar Malaysia's Letter, "Request to Participate at Hearing," dated January 6, 2023 |
| First Solar Malaysia's March 17, 2023 Rebuttal Brief | First Solar Malaysia's Letter, "Letter in Lieu of Rebuttal Brief for First Tranche of Issues," dated March 17, 2023 |
| First Solar Malaysia's March 6, 2023 Case Brief | First Solar Malaysia's Letter, "Case Brief for First Tranche of Issues," dated March 6, 2023 |
| First Solar Malaysia's May 5, 2023 Case Brief | First Solar Malaysia's Letter, "Letter in Lieu of Rebuttal Brief for Second Tranche of Issues," dated May 5, 2023 |
| First Solar Vietnam's April 28, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief for Second Tranche of Issues," dated April 28, 2023 |
| First Solar Vietnam's March 17, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief for First Tranche of Issues," dated March 17, 2023 |
| First Solar Vietnam's March 6, 2023 Case Brief | First Solar Vietnam's Letter, "Case Brief for First Tranche of Issues," dated March 6, 2023 |
| First Solar's April 28, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief of Second Tranche of Issues," dated April 28, 2023 |
| First Tranche Briefing Schedule | Memorandum, "Announcement of Briefing Schedule for First Tranche of Case and Rebuttal Briefs," dated February 22, 2023 |
| *FTI Report* | FTI Consulting, Inc., *The Photovoltaic Value Chain In Southeast Asia:  Response to BloombergNEF's Solar PV Trade and Manufacturing:  Deep Dive* (2021) |

| | |
|---|---|
| Hanwha Final Analysis Memorandum | Memorandum, "Hanwha Q CELLS Malaysia Sdn. Bhd. (Hanwha) – Final Analysis Memorandum," dated concurrently with this memorandum |
| Hanwha IQR Part I | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Response to Circumvention Inquiry Questionnaire (Part I)," dated June 3, 2022 |
| Hanwha IQR Part II | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Response to Circumvention Inquiry Questionnaire (Part II)," dated June 23, 2022 |
| Hanwha's 1st SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s First Supplemental Questionnaire Response," dated August 9, 2022 |
| Hanwha's 2nd SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Second Supplemental Questionnaire Response," dated August 19, 2022 |
| Hanwha's 3rd SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Fourth Supplemental Questionnaire Response," dated October 11, 2022 |
| Hanwha Preliminary Analysis Memorandum | Memorandum, "Hanwha Q CELLS Malaysia Sdn. Bhd. (Hanwha) – Preliminary Analysis Memorandum," dated December 1, 2022 |
| Hanwha's April 24, 2023 Case Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Case Brief Regarding Comments on Certification Issues (Second Tranche)," dated April 24, 2023 |
| Hanwha's December 14, 2022 Certification Comments | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd's Comments on Proposed Certification Process," dated December 14, 2022 |
| Hanwha's Hearing Request | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Hearing Request," dated January 6, 2023 |
| Hanwha's March 17, 2023 Rebuttal Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Rebuttal Brief Regarding Comments on Certification Issues (First Tranche)," dated March 17, 2023 |
| Hanwha's March 6, 2023 Case Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Case Brief Regarding Comments on Certification Issues (First Tranche)," dated March 6, 2023 |
| Hanwha's May 5, 2023 Rebuttal Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Rebuttal Brief (Second Tranche)," dated May 5, 2023 |
| Hearing Transcript | Hearing Transcript, "Solar Cells from China Circumvention Inquiries covering Cambodia, Malaysia, Thailand and Vietnam," dated July 25, 2023 |
| IEA Report | International Energy Agency, *Solar PV Global Supply Chains* (2022) |

| Initiation Memorandum | Memorandum, "Initiation of Circumvention Inquiries," dated March 25, 2022 |
|---|---|
| *Initiation Notice* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders*, 87 FR 19071 (April 1, 2022) |
| ITC Notification Letter | Commerce's Letter, "Notification of Affirmative Preliminary Determinations of Circumvention," dated May 30, 2023 |
| *ITC Solar Final* | *Crystalline Silicon Photovoltaic Cells and Modules from China,* Inv. No. 701-TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (November 2012) |
| *ITC Solar Monitoring* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled into Other Products: Monitoring Developments in the Domestic Industry,* Inv. No. TA-201-75 (Monitoring), USITC Pub. 5021 (February 2020) |
| *ITC Solar Safeguard Proceeding 2017* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products),* Inv. No. TA-201-75 (Safeguard), USITC Pub. 4739 (November 2017) |
| *ITC Solar Safeguard Proceeding 2019* | *Crystalline Silicon Photovoltaic Cells and Modules from China,* Inv. No. 701-TA-481 and 731-TA-1190 (Review), USITC Pub. 4874 (March 2019) |
| JA Solar, LONGi, VINA and VSUN's March 17, 2023 Rebuttal Brief | VSUN's Letter, "Letter in Lieu of Rebuttal Brief," dated March 17, 2023 |
| JA Solar's Hearing Request | JA Solar's Letter, "JA Solar's Request for Hearing," dated January 6, 2023 |
| JA Solar's May 2, 2022 Comments | JA Solar's Letter, "JA Solar Comments and Rebuttal Factual Information on Anti-Circumvention Inquiry Request," dated May 2, 2022 |
| Jinko Final Analysis Memorandum | Memorandum, "Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. – Final Analysis Memorandum," dated concurrently with this memorandum |
| Jinko IQR Part I | Jinko's Letter, "Jinko Initial Questionnaire Part I Questionnaire Response," dated June 6, 2022 |
| Jinko IQR Part II | Jinko's Letter, "Jinko Initial Questionnaire Part II Questionnaire Response," dated June 23, 2022 |
| Jinko's 1st SQR | Jinko's Letter, "Jinko First Supplemental Questionnaire Response," dated August 8, 2022 |

| | |
|---|---|
| Jinko's 2nd SQR | Jinko's Letter, "Jinko Second Supplemental Questionnaire Response," dated August 19, 2022 |
| Jinko's 3rd SQR | Jinko's Letter, "Jinko Third Supplemental Questionnaire Response," dated October 11, 2022 |
| Jinko's 4th SQR | Jinko's Letter, "Jinko Fourth Supplemental Questionnaire Response," dated November 2, 2022 |
| Jinko Preliminary Analysis Memorandum | Memorandum, "Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. – Preliminary Analysis Memorandum," dated December 1, 2022 |
| Jinko Verification Report | Memorandum, "Verification of the Questionnaire Responses of Jinko," dated April 12, 2023 |
| Jinko's April 24, 2023 Case Brief | Jinko's Letter, "Jinko Second Tranche Case Brief," dated April 24, 2023 |
| Jinko's Hearing Request | Jinko's Letter, "Jinko Request to Participate at Hearing," dated January 6, 2023 |
| Jinko's March 17, 2023 Rebuttal Brief | Jinko's Letter, "Jinko First Tranche Rebuttal," dated March 17, 2023 |
| Jinko's March 6, 2023 Case Brief | Jinko's Letter, "Jinko First Tranche Letter Concerning Certification Requirements," dated March 6, 2023 |
| Jinko's May 5, 2023 Rebuttal Brief | Jinko's Letter, "Jinko Second Tranche Rebuttal Brief," dated May 5, 2023 |
| *Malaysia* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to Malaysia," dated December 1, 2022 |
| Malaysia RSM | Memorandum, "Circumvention Inquiries With Respect to Malaysia: Respondent Selection," dated May 12, 2022 |
| Maxeon's Hearing Request | Maxeon's Letter, "Request to Appear at Public Hearing," dated January 2, 2023 |
| Maxeon's March 17, 2023 Rebuttal Brief | Maxeon's Letter, "Maxeon's Rebuttal Brief," dated March 17, 2023 |
| Maxeon's March 6, 2023 Case Brief | Maxeon's Letter, "Maxeon's Case Brief," dated March 6, 2023 |
| NE Solar IQR Part I | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Initial Questionnaire Response," dated June 3, 2022 |
| NE Solar IQR Part II | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China;-Circumvention Inquiry Initial Questionnaire Response," dated June 23, 2022 |

| | |
|---|---|
| NE Solar Hearing Request | NE Solar's Letter, "New East Solar Energy's Request to Participate in Hearing," dated January 6, 2023 |
| NE Solar January 29, 2023 *Ex Parte* Memorandum | Memorandum, "Meeting with Counsel for New East Solar," dated January 29, 2023 |
| NE Solar Preliminary Analysis Memorandum | Memorandum, "Preliminary Analysis Memorandum for New East Solar (Cambodia) Co., Ltd.," dated December 1, 2022 |
| NE Solar's August 17, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Surrogate Value Questionnaire Response," dated August 17, 2022 |
| NE Solar's November 4, 2022 SQR | NE Solar's Letter, " Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire Response," dated November 4, 2022 |
| NE Solar's October 11, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire III Response," dated October 11, 2022 |
| NE Solar's August 8, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire I Response," dated August 8, 2022 |
| NE Solar's March 6, 2023 Case Brief | NE Solar's Letter, "New East Solar Energy's Case Brief," dated March 6, 2023 |
| Next Era's March 17, 2023 Rebuttal Brief | Next Era's Letter, "First Tranche Rebuttal Brief," dated March 17, 2023 |
| Next Era's March 6, 2023 Case Brief | Next Era's Letter, "Tranche 1 Case Brief," dated March 6, 2023 |
| NextEra's April 28, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 28, 2023 |
| NextEra's April 3, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 3, 2023 |
| NextEra's May 19, 2022 Comments | NextEra's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Comments on Potential Certification Requirements," dated May 19, 2022 |
| NextEra's May 9, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated May 9, 2023 |

| | |
|---|---|
| NextEra's April 19, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 19, 2023 |
| NextEra's April 24, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 24, 2023 |
| NextEra's April 26, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 26, 2023 |
| NextEra's April 28, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 28, 2023 |
| NextEra's Hearing Request | NextEra's Letter, "Request to Appear at Hearing," dated January 6, 2023 |
| NextEra's March 24, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated March 24, 2023 |
| NextEra's May 2, 2022 Comments | NextEra's letter, "NextEra Comments on Auxin's Circumvention Ruling Request," dated May 2, 2022 |
| NextEra's May 2, 2022 Submission | NextEra's Letter, "NextEra Comments on Auxin's Circumvention Ruling Request," dated May 2, 2022 |
| NextEra's May 5, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated May 5, 2023 |
| *NREL 2018 Report* | National Renewable Energy Laboratory, *Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing* (February 2020) at Attachment 24 of NextEra's 5.2.22 Submission |
| *NREL Report* | National Renewable Energy Laboratory, *Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing* (2020) |
| *Preliminary Determinations* | *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 FR 75221 (December 8, 2022) |
| Preliminary Determination Corrections | Memorandum, "Preliminary Determinations Corrections," dated January 24, 2023 |
| Q&V Questionnaire | Quantity and Value Questionnaire for Circumvention Inquiries With Respect to Cambodia, Malaysia, Thailand, and Vietnam, dated March 30, 2022 |
| Q&V Questionnaire Deadline Extension | Memorandum, "Extension of the Deadline to Respond to the Quantity and Value Questionnaire," dated April 20, 2022 |
| Red Sun's April 19, 2023 Case Brief | Red Sun's Letter, "Red Sun's Second Tranche Case Brief," dated April 19, 2023 |

| Red Sun's January 6, 2023 Request Letter | Red Sun's Letter, "Request to Supplement Rejection Memo and Place Correspondence with Red Sun on the Record," dated January 6, 2023 |
|---|---|
| Request for Comments on Surrogate Countries | Memorandum, "Request for Economic Development, Surrogate Country Comments and Information," dated May 13, 2022 |
| Risen's March 17, 2023 Rebuttal Brief | Risen's Letter, "Risen Solar Rebuttal Brief – Tranche 1," dated March 17, 2023 |
| Risen's March 6, 2023 Case Brief | Risen's Letter, "Risen Solar Case Brief – Tranche 1," dated March 6, 2023 |
| Risen's May 5, 2023 Rebuttal Brief | Risen's Letter, "Risen Solar Rebuttal brief - Tranche II," dated May 5, 2023 |
| Second Tranche Briefing Schedule for Cambodia | Memorandum, "Announcement of Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for Cambodia," dated March 15, 2023 |
| Second Tranche Briefing Schedule for Malaysia | Memorandum, "Announcement of Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for Malaysia," dated April 12, 2023 |
| Second Tranche Briefing Schedule for Thailand | Memorandum, "Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for the Circumvention Inquiry Covering the Kingdom of Thailand (Thailand)," dated April 19, 2023 |
| Second Tranche Briefing Schedule for Vietnam | Memorandum, "Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for the Circumvention Inquiry Covering the Socialist Republic of Vietnam (Vietnam)," dated April 12, 2023 |
| Silfab's April 19, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated April 19, 2023 |
| Silfab's April 24, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc., "dated April 24, 2023 |
| Silfab's April 26, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated April 26, 2023 |
| Silfab's Hearing Request | Memorandum, "Request for Hearing," dated January 6, 2023 |
| Silfab's March 17, 2023 Rebuttal Brief | Silfab's Letter, "Letter in Lieu of First Tranche Rebuttal Brief of Silfab Solar WA Inc.," dated March 17, 2023 |
| Silfab's March 24, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated March 24, 2023 |
| Silfab's March 6, 2023 Case Brief | Silfab's Letter, "First Tranche Letter in Lieu of Case Brief of Silfab Solar WA Inc.," dated March 6, 2023 |

| | |
|---|---|
| Silfab's May 2, 2022 Comments | Silfab's Letter, "Comments and Factual Information to Rebut, Clarify and Correct Factual Information Contained in Auxin's Request for a Circumvention Ruling, dated May 2, 2022 |
| *Solar CCR Excluding Certain Off-Grid Solar Products* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Changed Circumstances Reviews, and Revocation of Antidumping and Countervailing Duty Orders, in Part*, 86 FR 71616, 71617 (December 17, 2021) (excluding certain off-grid CSPV) |
| Solar Surveys Analysis Memorandum | Memorandum, "Analysis Memorandum Regarding Solar Industry Surveys," dated concurrent with this memorandum. |
| Solar Investigation Scope Clarification Memorandum | Memorandum, "Scope Clarification:  Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, A-570-979, C-570-980," dated March 19, 2012. |
| Solaria Scope Ruling | Memorandum, "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China, and Certain Crystalline Silicon Photovoltaic Product from Taiwan:  The Solar Corporation Scope Ruling," dated April 8, 2021 |
| SunSpark Scope Ruling | Memorandum, "SunSpark Technology Inc. Scope Ruling," dated October 23, 2020 |
| *Thailand* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Thailand," dated December 1, 2022 |
| Thailand RSM | Memoranda, "Circumvention Inquiry With Respect to Thailand:  Respondent Selection," dated May 12, 2022 |
| Third Supplemental Questionnaire | Commerce's Letter, "Third Supplemental Questionnaire," dated September 23, 2022 |
| Trina's April 19, 2023 Case Brief | Trina's Letter, "Trina's Second Tranche Case Brief," dated April 19, 2023 |
| Trina's March 17, 2023 Rebuttal Brief | Trina's Letter, "Trina's First Tranche Rebuttal Brief," dated March 17, 2023 |
| Trina's March 6, 2023 Case Brief | Trina's Letter, "First Tranche Case Brief of Trina," dated March 6, 2023 |
| Trina's May 2, 2022 Comments | Trina's Letter, "Trina's Comments on Auxin's Circumvention Inquiry Request and Factual Information Submission to Rebut, Clarify, or Correct Facial Information Contained in Auxin's Request," dated May 2, 2022 |

| | |
|---|---|
| TTL Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand:  Final Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd.," dated concurrently with this memorandum |
| TTL IQR Part II | TTL's Letter, "May 16, 2022 Anti-Circumvention Inquiry Initial Questionnaire Response," dated June 23, 2022 |
| TTL Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand:  Preliminary Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd.," dated December 1, 2022 |
| TTL's May 9, 2023 Rebuttal Brief | TTL's Letter, "TTL's Second Tranche Rebuttal Brief," dated May 9, 2023 |
| TTL's 1st SQR | TTL's Letter, "First Supplemental Questionnaire," dated August 8, 2022 |
| TTL's 2nd SQR | TTL's Letter, "Second Supplemental Questionnaire," dated August 9, 2022 |
| TTL's 3rd SQR | TTL's Letter, "Third Supplemental Questionnaire," dated October 7, 2022 |
| TTL's 4th SQR | TTL's Letter, "Fourth Supplemental Questionnaire," dated November 2, 2022 |
| TTL's April 26, 2023 Case Brief | TTL's Letter, "TTL's Second Tranche Case Brief," dated April 26, 2023 |
| TTL's April 27, 2023 Rebuttal Brief | TTL's Letter, "Trina's First Tranche Rebuttal Brief," dated April 27, 2023 |
| TTL's Hearing Request | Memorandum, "Request for Public Hearing," dated January 6, 2023 |
| TTL's IQR Part I | TTL's Letter, "May 13, 2022 Anti-Circumvention Inquiry Initial Questionnaire Response," dated June 3, 2022 |
| TTL's May 19, 2022 Comments | TTL's Letter, "Trina's Comments on Potential Certification Requirements," dated May 19, 2022, Thailand. |
| TTL's Verification Report | Memorandum, "Verification of the Information Reported by Trina Solar Science & Technology (Thailand) Co. Ltd.," dated April 19, 2023 |
| Uyghur Forced Labor Prevention Act | Uyghur Forced Labor Prevention Act," U.S CUSTOMS AND BORDER PROTECTION, available at https://www.cbp.gov/trade/forced-labor/UFLPA |
| *Vietnam* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Socialist Republic of Vietnam," dated December 1, 2022 |
| Vietnam Preliminary SV Memo | Commerce's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not, Assembled Into Modules, from the People's Republic of China - Circumvention |

| | |
|---|---|
| | Inquiries with Respect to the Socialist Republic of Vietnam: Factor Valuation Memorandum," dated December 1, 2022 |
| Vietnam RSM | Memoranda, "Circumvention Inquiry With Respect to the Socialist Republic of Vietnam: Respondent Selection," dated May 12, 2022 |
| Vina Cell's Q&V Questionnaire | Commerce's Letter, "Vina Cell re: Quantity and Value Questionnaire for Circumvention Inquiries with Respect to Cambodia, Malaysia, Thailand, and Vietnam," dated March 30, 2022 |
| Vina Cell's Q&V Response | Vina Cell's Letter, "Quantity and Value Questionnaire," dated April 21, 2022 |
| Vina Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Vietnam: Preliminary Analysis Memorandum for Vina Solar Technology Company Limited," dated December 1, 2022 |
| Vina/LONGi's March 6, 2023 Case Brief | Vina/LONGi's Letter, "Case Brief on General Issues," dated March 6, 2023 |
| Vina's 1st SQR | Vina's Letter, "Vina Solar's Response to the Department's First Supplemental Questionnaire," dated August 10, 2022 |
| Vina's April 19, 2023 Case Brief | Vina's Letter, "Letter in Lieu of Case Brief on Additional Issues," dated April 19, 2023 |
| Vina's April 28, 2023 Rebuttal Brief | Vina's Letter, "Rebuttal Case Brief (Tranche 2) - Vietnam," dated April 28, 2023 |
| Vina's Initial Questionnaire | Commerce's Letter, "Vina Circumvention Inquiry Questionnaire," dated May 16, 2022 |
| Vina's IQR Part I | Vina's Letter, "Vina Solar's Response to Part 1 of the Department's Questionnaire," dated June 7, 2022 |
| Vina's IQR Part II | Vina's Letter, "Vina Solar's Response to Part 2 of the Department's Questionnaire," dated June 23, 2022 |
| Vina's Q&V Questionnaire | Commerce's Letter, "Vina Solar re: Quantity and Value Questionnaire for Circumvention Inquiries with Respect to Cambodia, Malaysia, Thailand, and Vietnam," dated March 30, 2022 |
| Vina's Q&V Response | Vina's Letter, "Quantity and Value Questionnaire," dated April 21, 2022 |
| Vina's Verification Agenda | Commerce's Letter, "Verification of Vina Solar Technology Company Limited's Questionnaire Responses," dated February 2, 2023 |
| Vina's Verification Memorandum | Memorandum, "Verification of Vina Solar Technology Company Limited," dated April 12, 2023 |
| Vina's Verification Questionnaire | Commerce's Letter, "Verification Preparedness Questionnaire," dated October 12, 2022 |

| VSUN's March 6, 2023 Case Brief | VSUN's Letter, "VSUN's Letter in Lieu of Case Brief," dated March 6, 2023 |
|---|---|

# EXHIBIT 6

**Imports For Consumption | Monthly data for 2022**
**HTS Codes: 8541420010, 8541406035, 8541430010, 8541406025, 8541406045, 8541430080, 8541406015, 8541420080**

| Data Type | Country | Unit | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Customs Value | Cambodia | USD | $37,592,036 | $53,046,771 | $53,775,986 | $58,852,877 | $40,817,970 | $62,069,622 | $99,730,271 | $120,034,652 | $172,373,539 |
| Customs Value | Malaysia | USD | $137,717,893 | $148,489,145 | $128,778,686 | $130,558,261 | $126,169,592 | $141,724,608 | $185,544,400 | $119,268,817 | $156,310,701 |
| Customs Value | Thailand | USD | $121,519,812 | $141,293,269 | $143,510,282 | $112,854,656 | $109,350,233 | $123,190,520 | $173,770,431 | $177,216,656 | $201,471,825 |
| Customs Value | Vietnam | USD | $166,568,554 | $201,816,790 | $208,098,881 | $168,948,710 | $369,838,459 | $364,378,170 | $445,626,995 | $428,706,627 | $458,149,710 |
| | Total: | USD | $463,398,295 | $544,645,975 | $534,163,835 | $471,214,504 | $646,176,254 | $691,362,920 | $904,672,097 | $845,226,752 | $988,305,775 |

Source: USITC Dataweb

| SUM for April through August | $2,659,598,863 |
|---|---|

# EXHIBIT 7

# Cambodia Pre-Preliminary Comments (Excerpt)



**Thomas M. Beline**

tbeline@cassidylevy.com
**Direct** 202 567-2316
**Main** 202 567 2300

October 20, 2022

**VIA ELECTRONIC FILING**

The Honorable Gina M. Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case Nos: A-570-979, C-570-980
Circumvention Inquiries—Cambodia 2022
Total No. of Pages: 91
AD/CVD Operations Office IV

**PUBLIC VERSION**
Proprietary Information from BYD on Pages 5-6, 8-9, 11, 28, 30, 32-33, 41, 43-44, 48-49, 51-52, 54-55, and 59-62, Proprietary Information from NE Solar on Pages 5-6, 9-11, 29-30, 32-33, 40-43, 49, 51-52, 54-55, 59-62, and Proprietary Information Placed on the Record by Commerce on Pages 69-70, Proprietary Information in Exhibits 1-2, Removed from Brackets.

Re:  **Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Auxin's Pre-Preliminary Comments—Cambodia**

Dear Secretary Raimondo:

On behalf of Auxin Solar, Inc. ("Auxin"), we herein provide comments in advance of the preliminary determination in the above-captioned anti-circumvention inquiry, currently expected on November 28, 2022.[1] These comments reflect a still-developing factual record, which remains open at the time of this submission. Auxin's comments take into account all questionnaire

---

[1] *See* 19 CFR § 351.226(e)(1); *see also* Commerce Memorandum, "Extension of Preliminary Determination in Circumvention Inquiries" (Aug. 22, 2022).

PUBLIC VERSION

The Hon. Gina M. Raimondo
October 20, 2022
Page 62

inquiry merchandise."[171] Accordingly, BYD's and NE Solar's affiliation with Chinese CSPV

input producers supports a country-wide finding of circumvention within the meaning of section

781(b)(3)(B) of the Act.

### III.    Commerce Must Take Necessary Measures to Enforce a Preliminary Affirmative Determination of Circumvention

As demonstrated above, record evidence supports a preliminary affirmative determination

that certain CSPV imports completed or assembled in Cambodia using Chinese-origin inputs are

circumventing the *Solar I* Orders. Upon making that preliminary affirmative finding of

circumvention, Commerce's regulations require it to direct U.S. Customs and Border Protection

("CBP") to begin or continue suspension of liquidation and to initiate the collection of cash

deposits of estimated duties on entries of merchandise subject to the inquiry.[172] Commerce also

is required by its regulations to impose such measures retroactively to the date of initiation of the

anti-circumvention inquiry or an earlier date should circumstances warrant.[173] Based on evidence

provided by Auxin showing a surge of imports of solar cells and modules from Cambodia after

filing of the request to conduct the anti-circumvention inquiry, but before initiation, earlier

application of enforcement measures is warranted upon a preliminary affirmative determination

of circumvention.[174]

---

[171] NE Solar IQR Part I at 6.

[172] *See* 19 CFR § 351.226(l)(2)(i)-(ii).

[173] *See* 19 CFR § 351.226(l)(2)(iii).

[174] *See* Letter from Auxin, "Post-Petition Surge of Imported Solar Cells and Modules Covered by Auxin's Circumvention Petition" (Mar. 21, 2022).

PUBLIC VERSION

The Hon. Gina M. Raimondo
October 20, 2022
Page 63

On September 16, 2022, Commerce published a final rule that precludes any immediate enforcement of an affirmative preliminary and/or final determination of circumvention.[175] Commerce issued the Final Rule to effectuate Presidential Proclamation 10414. Presidential Proclamation 10414 invoked section 318(a) of the Act to declare a national emergency "with respect to the threats to the availability of sufficient electricity generation to meet expected customer demand" and to recommend that Commerce permit the importation free of AD and CVD duties of merchandise subject to the ongoing anti-circumvention inquiries for a period not exceeding 24 months.[176] But the Final Rule is contrary to law, antithetical to Commerce's enforcement mission, and unadministrable. Commerce should reconsider its application to these affirmative determinations of circumvention and apply existing regulations to solve for the perceived, but not real, "emergency."

### A.    Commerce's Final Rule Is Contrary to Law and Antithetical to Commerce's Enforcement Mission

Auxin already commented upon the dubious legal and factual underpinnings of Commerce's proposed rule that are not repeated here, but Commerce's failure to enforce an affirmative preliminary circumvention finding here will be contrary to law. As Congress required in 1988, products found to be circumventing the *Solar I* Orders must be subject to the discipline

---

[175] *See Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022) (final rule) ("Final Rule").

[176] *Proclamation No. 10414*, *Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules From Southeast Asia*, 87 Fed. Reg. 35,067, 35,068 (June 9, 2022) ("Presidential Proclamation 10414").

**PUBLIC VERSION**

The Hon. Gina M. Raimondo
October 20, 2022
Page 64

of those orders for the U.S. trade remedy laws to have their intended effect.[177] Yet Commerce

through its rulemaking will deny Auxin and other domestic manufacturers of CSPV cells and

modules relief to which they are entitled under the law upon a preliminary affirmative finding of

circumvention. Making matters worse, evidence indicating that Presidential Proclamation 10414

and the final rule are the result of a Chinese-led special-interest lobbying campaign create the

regrettable perception that Commerce's actions here are the result of outside political influence

and not any credible emergency.[178] That perception presents much cause for alarm, as other

domestic industries that have successfully benefitted from the U.S. trade remedy laws have every

reason to worry that they too will be denied relief entitled to them for no reason other than

political expediency. Commerce should dispel such concerns by reevaluating the legitimacy of

the Final Rule and, upon such reflection, take necessary and appropriate enforcement action

upon a preliminary affirmative determination of circumvention. At the very least, Commerce

must abide by its legal obligations to complete the administrative record with the *ex parte*

communications concerning the issuance of Presidential Proclamation 10414 and the Final Rule.

Doing otherwise runs contrary to the statute and deprives Auxin of due process under the law.

---

[177] *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1321, 102 Stat. 1107, 1192-95; *see also* S. Rep. No. 71, 100th Cong. 1st Sess. (1987) at 99-101.

[178] *See* Letter from Auxin, "Request for Commerce to Complete the Administrative Record With All *Ex Parte* Materials" (June 9, 2022).

PUBLIC VERSION

The Hon. Gina M. Raimondo
October 20, 2022
Page 65

**B.**    **Commerce's "Utilization Expiration Date" Is Unadministrable and Unenforceable**

Despite having a regulatory regime in place that guards against stockpiling and ensures that imports are being used to remedy and redress a declared emergency, Commerce's Final Rule introduced the concept of an "Utilization Expiration Date." Commerce devised this "Utilization Expiration Date" to prevent stockpiling, which requires duty-free imported inquiry merchandise to be "used" or "installed" in the United States within 180 days of the expiration of the national emergency declared by Presidential Proclamation 10414.[179] But the Final Rule is conspicuously silent on how Commerce intends to administer and enforce that provision of the new regulations, leaving it for Commerce to address in a preliminary and/or final affirmative determination, potentially through the availability of certifications as permitted by future section 362.104 of Commerce's regulations.[180]

Whether through certifications or other means, Commerce lacks any practical ability to administer and enforce the concept of an "Utilization Expiration Date" upon an affirmative determination of circumvention, thereby creating an enormous loophole through which circumventing producers, exporters, and importers can enter inquiry merchandise without regard to AD and CVD duties that otherwise should be subject to remedial duties under the Final Rule. Among the most significant obstacles precluding Commerce from administering and enforcing the "Utilization Expiration Date" are, without limitation, the following:

---

[179] *See* Final Rule, 87 Fed. Reg. at 56,869-71.

[180] *See id.* at 56,879-80.

PUBLIC VERSION

The Hon. Gina M. Raimondo
October 20, 2022
Page 66

- Because the President may terminate the national emergency early before the expiration of 24 months, the "Utilization Expiration Date" is **unknown at the time of importation**, thus making it **impossible** for Commerce and/or CBP to determine at the time of entry what qualifies as an "Applicable Entry" that will be used by the "Utilization Expiration Date."

  The tariff moratorium is intended to apply to "Applicable Entries," which is defined, in part, for entries that enter after November 15, 2022, as those "used in the United States by the Utilization Expiration Date."[181] "Utilization Expiration Date" means "the date 180 days after the Date of Termination," while "Date of Termination" means "June 6, 2024, or the date the emergency described in Presidential Proclamation 10414 has been terminated, whichever occurs first."[182] The final rule is silent on how Commerce and/or CBP are to ascertain and how importers and/or other interested parties are to attest whether merchandise corresponding to a particular entry or entries will be used by the "Utilization Expiration Date" when that date is subject to change at the President's discretion at the time of importation.

- Commerce's definition of "utilization and utilized" is **too vague** to be administrable and enforceable.

  The final rule defines "utilization and utilized" to mean "the Southeast Asian-Completed Cells and Modules will be used or installed in the United States."[183] As those appear to be generic, rather than industry-specific terms, what Commerce means by "used or installed in the United States" is unclear. For instance:

  o Must the products be "used or installed" in any particular way?

  o Does the meaning of "used or installed" vary depending on whether the products at issue are cells or modules?

  o What if the products are not "used or installed" for their intended purpose?

  o Although the definition in the final rule attempts to clarify that "{m}erchandise which remains in inventory or a warehouse in the United

---

[181] 19 CFR § 362.102 (effective November 15, 2022).

[182] *Id.*

[183] *Id.*

PUBLIC VERSION

The Hon. Gina M. Raimondo
October 20, 2022
Page 67

States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions,"[184] are those the only instances in which merchandise will not be considered "used or installed" once it is imported into the United States free of AD and CVD duties?

Without any additional elaboration of what is meant or intended by "used or installed," the final rule provides only an arbitrary standard by which to determine whether products are properly subject to the tariff moratorium.

- The final rule provides ***no enforcement mechanism*** to curb likely abuses of the "Utilization Expiration Date" provision.

Without clearly defined enforcement tools, importers and other interested parties are incentivized by the prospect of duty-free treatment to attest or certify at the time of entry that merchandise will be used by the "Utilization Expiration Date." After all, should the national emergency run the full 24 months, compliance with the "Utilization Expiration Date" requirement may not be assessed until December 2024 at the earliest, at which point Commerce and/or CBP may not have the time, resources, or inclination to confirm that inquiry merchandise imported without suspension of liquidation and without regard to AD and CVD duties actually qualified as "Applicable Entries" because of when they were "utilized." And even if certain entries from 2022 or 2023 were found in late 2024 or early 2025 not to be used by the "Utilization Expiration Date," there would be no recourse for interested parties such as Auxin to obtain relief because those entries are likely to have been subject to final liquidation without regard to AD and CVD duties, and the opportunities to request administrative reviews of any such entries found to be circumventing the *Solar I* Orders are likely to have passed. Absent clearly defined enforcement tools and commitments in the final rule, Commerce's ability to ensure compliance with the "Utilization Expiration Date" is severely constrained.

In its current form, the "Utilization Expiration Date" is a capricious fig leaf intended to mollify concerns raised under the final rule about stockpiling without actually addressing stockpiling. Although possible requirements, such as the use of a bonded warehouse, may

---

[184] *Id.*

The Hon. Gina M. Raimondo
October 20, 2022
Page 68

address administrability and enforcement concerns, in part, Commerce and CBP possess limited means to track how inquiry merchandise is utilized once it enters into the U.S. stream of commerce.

The aforementioned issues could be meaningfully redressed by use of the regulations adopted by Commerce in 2006 to address emergency measures under section 318(a) of the Act.[185] But Commerce — or perhaps, the Chinese special interests lobbying the Administration – – has explicitly rejected their use here.[186] Having rejected the use of preexisting regulations, Commerce now confronts a tremendous challenge in administering and enforcing the Final Rule to ensure that only qualifying inquiry merchandise benefits from the tariff moratorium upon an affirmative finding of circumvention. Much to the domestic industry's detriment, Commerce lacks the resources and tools to ensure that abuse does not occur. Commerce must explain how it will enact safeguards to ensure that the tariff moratorium is not abused by Chinese-affiliated companies that intend to stockpile inquiry merchandise in the United States to avoid tariffs. These anti-circumvention inquiries establish the vast resources such companies have at their disposal to evade the application of the U.S. fair trade laws.

---

[185] *See* 19 CFR Part 358; *see also Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 Fed. Reg. 63,230 (Oct. 30, 2006) (final rule).

[186] *See* Final Rule, 87 Fed. Reg. at 56,876-77.

# Malaysia Pre-Preliminary Comments (Excerpt)



**Thomas M. Beline**

tbeline@cassidylevy.com
**Direct** 202 567-2316
**Main** 202 567 2300

October 20, 2022

<u>**VIA ELECTRONIC FILING**</u>

The Honorable Gina M. Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case Nos:  A-570-979, C-570-980
Circumvention Inquiries—Malaysia 2022
Total No. of Pages: 111
AD/CVD Operations Office VII

**PUBLIC VERSION**
Proprietary Information from Jinko on Pages 6-7, 9-11, 30-32, 34-38, 46-47, 50-51, 56-58, 60, 62-64, 66-67, 70-77 Proprietary Information from HQCMY on Pages 6-7, 10-12, 32-38, 46-47, 50-51, 59-60, 62-64, 67, 71, 74-75 Proprietary Information Placed on the Record by Commerce on Page 85, and Proprietary information in Exhibits 1-2, Removed from Brackets.

**Re:**   **Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Pre-Preliminary Comments Concerning Jinko Solar Technology Sdn. Bhd. and Hanwha Q Cells Malaysia Sdn. Bhd.**

Dear Secretary Raimondo:

On behalf of Auxin Solar, Inc. ("Auxin"), we hereby request that the U.S. Department of

Commerce ("Commerce") issue an affirmative preliminary determination in the above-

referenced anti-circumvention inquiry regarding certain imports of crystalline silicon

photovoltaic ("CSPV") cells, whether or not assembled into modules from the People's Republic

of China that are finished in Malaysia.  Auxin further requests that the preliminary determination

be applied on a country-wide basis, consistent with Auxin's request for this anti-circumvention

The Hon. Gina M. Raimondo
October 20, 2022
Page 78

**PUBLIC VERSION**

Accordingly, this factor supports a preliminary finding of circumvention.

## III.    Commerce Must Take Necessary Measures to Enforce a Preliminary Affirmative Determination of Circumvention

As demonstrated above, record evidence supports a preliminary affirmative determination that certain CSPV imports completed or assembled in Malaysia using Chinese-origin inputs are circumventing the *Solar I* Orders.  Upon making that preliminary affirmative finding of circumvention, Commerce's regulations require it to direct U.S. Customs and Border Protection ("CBP") to begin or continue suspension of liquidation and to initiate the collection of cash deposits of estimated duties on entries of merchandise subject to the inquiry.[225]  Commerce also is required by its regulations to impose such measures retroactively to the date of initiation of the anti-circumvention inquiry or an earlier date should circumstances warrant.[226]  Based on evidence provided by Auxin showing a surge of imports of solar cells and modules from Malaysia after filing of the request to conduct the anti-circumvention inquiry, but before initiation, earlier application of enforcement measures is warranted upon a preliminary affirmative determination of circumvention.[227]

---

[225] *See* 19 CFR § 351.226(l)(2)(i)-(ii).

[226] *See* 19 CFR § 351.226(l)(2)(iii).

[227] *See* Letter from Auxin, "Post-Petition Surge of Imported Solar Cells and Modules Covered by Auxin's Circumvention Petition" (Mar. 21, 2022).

The Hon. Gina M. Raimondo
October 20, 2022
Page 79

**PUBLIC VERSION**

On September 16, 2022, Commerce published a final rule that precludes any immediate enforcement of an affirmative preliminary and/or final determination of circumvention.[228] Commerce issued the Final Rule to effectuate Presidential Proclamation 10414.  Presidential Proclamation 10414 invoked section 318(a) of the Act to declare a national emergency "with respect to the threats to the availability of sufficient electricity generation to meet expected customer demand" and to recommend that Commerce permit the importation free of AD and CVD duties of merchandise subject to the ongoing anti-circumvention inquiries for a period not exceeding 24 months.[229]  But the Final Rule is contrary to law, antithetical to Commerce's enforcement mission, and unadministrable.  Commerce should reconsider its application to these affirmative determinations of circumvention and apply existing regulations to address the purported, but not real, "emergency."

### A. Commerce's Final Rule Is Contrary to Law and Antithetical to Commerce's Enforcement Mission

Auxin will not repeat its prior comments detailing all of the numerous legal and factual deficiencies of Commerce's propose rule, now implemented in the Final Rule.  Auxin must, however, emphasize that a failure by Commerce to enforce a preliminary affirmative circumvention finding here would be contrary to law.  As Congress required in 1988, products

---

[228] *See Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022) (final rule) ("Final Rule").

[229] *Proclamation No. 10414*, *Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules From Southeast Asia*, 87 Fed. Reg. 35,067, 35,068 (June 9, 2022) ("Presidential Proclamation 10414").

The Hon. Gina M. Raimondo
October 20, 2022
Page 80

PUBLIC VERSION

found to be circumventing the *Solar I* Orders must be subject to the discipline of those orders for the U.S. trade remedy laws to have their intended effect.[230]  Yet Commerce through its rulemaking will deny Auxin and other domestic manufacturers of CSPV cells and modules relief to which they are entitled under the law upon a preliminary affirmative finding of circumvention. Making matters worse, evidence indicating that Presidential Proclamation 10414 and the final rule are the result of a Chinese-led special-interest lobbying campaign create the regrettable perception that Commerce's actions here are the result of outside political influence and not any credible emergency.[231]  That perception presents much cause for alarm, as other domestic industries that have successfully benefitted from the U.S. trade remedy laws have every reason to worry that they too will be denied relief entitled to them for no reason other than political expediency.  Commerce should dispel such concerns by reevaluating the legitimacy of the Final Rule and, upon such reflection, take necessary and appropriate enforcement action upon a preliminary affirmative determination of circumvention.  At the very least, Commerce must abide by its legal obligations to complete the administrative record with the *ex parte* communications concerning the issuance of Presidential Proclamation 10414 and the Final Rule. Doing otherwise runs contrary to the statute and deprives Auxin of due process under the law.

---

[230] *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1321, 102 Stat. 1107, 1192-95; *see also* S. Rep. No. 71, 100th Cong. 1st Sess. (1987) at 99-101.

[231] *See* Letter from Auxin, "Request for Commerce to Complete the Administrative Record With All *Ex Parte* Materials" (June 9, 2022).

The Hon. Gina M. Raimondo
October 20, 2022
Page 81

PUBLIC VERSION

### B.    Commerce's "Utilization Expiration Date" Is Unadministrable and Unenforceable

Despite having a regulatory regime in place that guards against stockpiling and ensures that imports are being used to remedy and redress a declared emergency, Commerce's Final Rule introduced the concept of an "Utilization Expiration Date." Commerce devised this "Utilization Expiration Date" to prevent stockpiling, which requires duty-free imported inquiry merchandise to be "used" or "installed" in the United States within 180 days of the expiration of the national emergency declared by Presidential Proclamation 10414.[232] But the Final Rule is conspicuously silent on how Commerce intends to administer and enforce that provision of the new regulations, leaving it for Commerce to address in a preliminary and/or final affirmative determination, potentially through the availability of certifications as permitted by future section 362.104 of Commerce's regulations.[233]

Whether through certifications or other means, Commerce lacks any practical ability to administer and enforce the concept of an "Utilization Expiration Date" upon an affirmative determination of circumvention, thereby creating an enormous loophole through which circumventing producers, exporters, and importers can enter inquiry merchandise without regard to AD and CVD duties that otherwise should be subject to remedial duties under the Final Rule. Among the most significant obstacles precluding Commerce from administering and enforcing the "Utilization Expiration Date" are, without limitation, the following:

---

[232] *See* Final Rule, 87 Fed. Reg. at 56,869-71.

[233] *See id.* at 56,879-80.

The Hon. Gina M. Raimondo
October 20, 2022
Page 82

PUBLIC VERSION

- Because the President may terminate the national emergency early before the expiration of 24 months, the "Utilization Expiration Date" is ***unknown at the time of importation***, thus making it ***impossible*** for Commerce and/or CBP to determine at the time of entry what qualifies as an "Applicable Entry" that will be used by the "Utilization Expiration Date."

  The tariff moratorium is intended to apply to "Applicable Entries," which is defined, in part, for entries that enter after November 15, 2022, as those "used in the United States by the Utilization Expiration Date."[234]  "Utilization Expiration Date" means "the date 180 days after the Date of Termination," while "Date of Termination" means "June 6, 2024, or the date the emergency described in Presidential Proclamation 10414 has been terminated, whichever occurs first."[235] The final rule is silent on how Commerce and/or CBP are to ascertain and how importers and/or other interested parties are to attest whether merchandise corresponding to a particular entry or entries will be used by the "Utilization Expiration Date" when that date is subject to change at the President's discretion at the time of importation.

- Commerce's definition of "utilization and utilized" is ***too vague*** to be administrable and enforceable.

  The final rule defines "utilization and utilized" to mean "the Southeast Asian-Completed Cells and Modules will be used or installed in the United States."[236] As those appear to be generic, rather than industry-specific terms, what Commerce means by "used or installed in the United States" is unclear.  For instance:

  - Must the products be "used or installed" in any particular way?

  - Does the meaning of "used or installed" vary depending on whether the products at issue are cells or modules?

  - What if the products are not "used or installed" for their intended purpose?

  - Although the definition in the final rule attempts to clarify that "{m}erchandise which remains in inventory or a warehouse in the United

---

[234] 19 CFR § 362.102 (effective November 15, 2022).

[235] *Id.*

[236] *Id.*

CASSIDY LEVY KENT

The Hon. Gina M. Raimondo
October 20, 2022
Page 83

States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions,"[237] are those the only instances in which merchandise will not be considered "used or installed" once it is imported into the United States free of AD and CVD duties?

Without any additional elaboration of what is meant or intended by "used or installed," the Final Rule provides only an arbitrary standard by which to determine whether products are properly subject to the tariff moratorium.

- The Final Rule provides *no enforcement mechanism* to curb likely abuses of the "Utilization Expiration Date" provision.

Without clearly defined enforcement tools, importers and other interested parties are incentivized by the prospect of duty-free treatment to attest or certify at the time of entry that merchandise will be used by the "Utilization Expiration Date." After all, should the national emergency run the full 24 months, compliance with the "Utilization Expiration Date" requirement may not be assessed until December 2024 at the earliest, at which point Commerce and/or CBP may not have the time, resources, or inclination to confirm that inquiry merchandise imported without suspension of liquidation and without regard to AD and CVD duties actually qualified as "Applicable Entries" because of when they were "utilized."  And even if certain entries from 2022 or 2023 were found in late 2024 or early 2025 not to be used by the "Utilization Expiration Date," there would be no recourse for interested parties such as Auxin to obtain relief because those entries are likely to have been subject to final liquidation without regard to AD and CVD duties, and the opportunities to request administrative reviews of any such entries found to be circumventing the *Solar I* Orders are likely to have passed.  Absent clearly defined enforcement tools and commitments in the final rule, Commerce's ability to ensure compliance with the "Utilization Expiration Date" is severely constrained.

In its current form, the "Utilization Expiration Date" is a fig leaf intended to mollify concerns raised under the final rule about stockpiling without actually addressing stockpiling. Although possible requirements, such as the use of a bonded warehouse, may address

---

[237] *Id.*

The Hon. Gina M. Raimondo
October 20, 2022
Page 84

administrability and enforcement concerns, in part, Commerce and CBP possess limited means

to track how inquiry merchandise is utilized once it enters into the U.S. stream of commerce.

The aforementioned issues could be meaningfully redressed by use of the regulations

adopted by Commerce in 2006 to address emergency measures under section 318(a) of the

Act.[238] But Commerce has explicitly rejected their use here.[239]  Having rejected the use of

preexisting regulations, Commerce now confronts a tremendous challenge in administering and

enforcing the Final Rule to ensure that only qualifying inquiry merchandise benefits from the

tariff moratorium upon an affirmative finding of circumvention.  Much to the domestic

industry's detriment, Commerce lacks the resources and tools to ensure that abuse does not

occur.  Commerce must explain how it will enact safeguards to ensure that the tariff moratorium

is not abused by Chinese-affiliated companies that intend to stockpile inquiry merchandise in the

United States to avoid tariffs.  These anti-circumvention inquiries establish the vast resources

such companies have at their disposal to evade the application of the U.S. fair trade laws.

## IV.    Commerce Should Issue a Country-Wide Determination and Implement a Certification Regime

Commerce should issue a preliminary country-wide circumvention determination with

respect to Malaysia.  Commerce's regulations provide that in conducting a circumvention

inquiry, Commerce "shall consider, based on the available record evidence, the appropriate

---

[238] *See* 19 CFR Part 358; *see also Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 Fed. Reg. 63,230 (Oct. 30, 2006) (final rule).

[239] *See* Final Rule, 87 Fed. Reg. at 56,876-77.

# Thailand Pre-Preliminary Comments (Excerpt)



**Thomas M. Beline**

tbeline@cassidylevy.com
**Direct** 202 567-2316
**Main** 202 567 2300

October 20, 2022

<u>**VIA ELECTRONIC FILING**</u>

The Honorable Gina M. Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case Nos:  A-570-979, C-570-980
Circumvention Inquiries—Thailand 2022
Total No. of Pages: 91
AD/CVD Operations Office IV

**PUBLIC VERSION**
Proprietary Information from CSIL on Pages
5-6, 8-10, 28-30, 32-34, 41-42, 44-46, 50, 53-
57, 61, 63, Proprietary Information from TTL
on Pages 6, 8, 10, 29-30, 41-42, 45-46 ,51, 53-
57, 62-63, Proprietary Information Placed on
the Record by Commerce on Pages 5 and 72,
Proprietary Information in Exhibits 1-2,
Removed from Brackets.

**Re:**    **Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into
Modules from the People's Republic of China: Auxin's Pre-Preliminary
Comments—Thailand**

Dear Secretary Raimondo:

On behalf of Auxin Solar, Inc. ("Auxin"), we herein provide comments in advance of the

preliminary determination in the above-captioned anti-circumvention inquiry, currently expected

on November 28, 2022.[1] These comments reflect a still-developing factual record, which remains

open at the time of this submission, but account for the questionnaire responses of CSIL and

---

[1] *See* 19 CFR § 351.226(e)(1); *see also* Commerce Memorandum, "Extension of Preliminary
Determination in Circumvention Inquiries" (Aug. 22, 2022).

PUBLIC VERSION

The Hon. Gina M. Raimondo
October 20, 2022
Page 65

**IV.    Commerce Must Take Necessary Measures to Enforce a Preliminary Affirmative Determination of Circumvention**

As demonstrated above, record evidence supports a preliminary affirmative determination that certain CSPV imports completed or assembled in Thailand using Chinese-origin inputs are circumventing the *Solar I* Orders. Upon making that preliminary affirmative finding of circumvention, Commerce's regulations require it to direct U.S. Customs and Border Protection ("CBP") to begin or continue suspension of liquidation and to initiate the collection of cash deposits of estimated duties on entries of merchandise subject to the inquiry.[178] Commerce also is required by its regulations to impose such measures retroactively to the date of initiation of the anti-circumvention inquiry or an earlier date should circumstances warrant.[179] Based on evidence provided by Auxin showing a surge of imports of solar cells and modules from Thailand after filing of the request to conduct the anti-circumvention inquiry, but before initiation, earlier application of enforcement measures is warranted upon a preliminary affirmative determination of circumvention.[180]

On September 16, 2022, Commerce published a final rule that precludes any immediate enforcement of an affirmative preliminary and/or final determination of circumvention.[181]

---

[178] *See* 19 CFR §§ 351.226(l)(2)(i)-(ii).

[179] *See* 19 CFR § 351.226(l)(2)(iii).

[180] *See* Letter from Auxin, "Post-Petition Surge of Imported Solar Cells and Modules Covered by Auxin's Circumvention Petition" (Mar. 21, 2022).

[181] *See Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022) (final rule) ("Final Rule").

**PUBLIC VERSION**

The Hon. Gina M. Raimondo
October 20, 2022
Page 66

Commerce issued the Final Rule to effectuate Presidential Proclamation 10414. Presidential

Proclamation 10414 invoked section 318(a) of the Act to declare a national emergency "with

respect to the threats to the availability of sufficient electricity generation to meet expected

customer demand" and to recommend that Commerce permit the importation free of AD and

CVD duties of merchandise subject to the ongoing anti-circumvention inquiries for a period not

exceeding 24 months.[182] But the Final Rule is contrary to law, antithetical to Commerce's

enforcement mission, and unadministrable. Commerce should reconsider its application to these

affirmative determinations of circumvention and apply existing regulations to address the

purported, but not real, "emergency."

**A.    Commerce's Final Rule Is Contrary to Law and Antithetical to Commerce's Enforcement Mission**

Auxin will not repeat its prior comments detailing all of the numerous legal and factual

deficiencies of Commerce's proposed rule, now implemented in the Final Rule. Auxin must,

however, emphasize that a failure by Commerce to enforce a preliminary affirmative

circumvention finding here would be contrary to law. As Congress required in 1988, products

found to be circumventing the *Solar I* Orders must be subject to the discipline of those orders for

the U.S. trade remedy laws to have their intended effect.[183] Yet Commerce through its

---

[182] *Proclamation No. 10414, Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules From Southeast Asia*, 87 Fed. Reg. 35,067, 35,068 (June 9, 2022) ("Presidential Proclamation 10414").

[183] *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1321, 102 Stat. 1107, 1192-95; *see also* S. Rep. No. 71, 100th Cong. 1st Sess. (1987) at 99-101.

PUBLIC VERSION

The Hon. Gina M. Raimondo
October 20, 2022
Page 67

rulemaking will deny Auxin and other domestic manufacturers of CSPV cells and modules relief

to which they are entitled under the law upon a preliminary affirmative finding of circumvention.

Making matters worse, evidence indicating that Presidential Proclamation 10414 and the final

rule are the result of a Chinese-led special-interest lobbying campaign create the regrettable

perception that Commerce's actions here are the result of outside political influence and not any

credible emergency.[184] That perception presents much cause for alarm, as other domestic

industries that have successfully benefitted from the U.S. trade remedy laws have every reason to

worry that they too will be denied relief entitled to them for no reason other than political

expediency. Commerce should dispel such concerns by reevaluating the legitimacy of the Final

Rule and, upon such reflection, take necessary and appropriate enforcement action upon a

preliminary affirmative determination of circumvention. At the very least, Commerce must abide

by its legal obligations to complete the administrative record with the *ex parte* communications

concerning the issuance of Presidential Proclamation 10414 and the Final Rule. Doing otherwise

runs contrary to the statute and deprives Auxin of due process under the law.

**B.    Commerce's "Utilization Expiration Date" Is Unadministrable and Unenforceable**

Despite having a regulatory regime in place that guards against stockpiling and ensures

that imports are being used to remedy and redress a declared emergency, Commerce's Final Rule

introduced the concept of an "Utilization Expiration Date." Commerce devised this "Utilization

---

[184] *See* Letter from Auxin, "Request for Commerce to Complete the Administrative Record With All *Ex Parte* Materials" (June 9, 2022).

PUBLIC VERSION

The Hon. Gina M. Raimondo
October 20, 2022
Page 68

Expiration Date" to prevent stockpiling, which requires duty-free imported inquiry merchandise to be "used" or "installed" in the United States within 180 days of the expiration of the national emergency declared by Presidential Proclamation 10414.[185] But the Final Rule is conspicuously silent on how Commerce intends to administer and enforce that provision of the new regulations, leaving it for Commerce to address in a preliminary and/or final affirmative determination, potentially through the availability of certifications as permitted by future section 362.104 of Commerce's regulations.[186]

Whether through certifications or other means, Commerce lacks any practical ability to administer and enforce the concept of an "Utilization Expiration Date" upon an affirmative determination of circumvention, thereby creating an enormous loophole through which circumventing producers, exporters, and importers can enter inquiry merchandise without regard to AD and CVD duties that otherwise should be subject to remedial duties under the Final Rule. Among the most significant obstacles precluding Commerce from administering and enforcing the "Utilization Expiration Date" are, without limitation, the following:

- Because the President may terminate the national emergency early before the expiration of 24 months, the "Utilization Expiration Date" is *unknown at the time of importation*, thus making it *impossible* for Commerce and/or CBP to determine at the time of entry what qualifies as an "Applicable Entry" that will be used by the "Utilization Expiration Date."

  The tariff moratorium is intended to apply to "Applicable Entries," which is defined, in part, for entries that enter after November 15, 2022, as those "used in

---

[185] *See* Final Rule, 87 Fed. Reg. at 56,869-71.

[186] *See id.* at 56,879-80.

PUBLIC VERSION

The Hon. Gina M. Raimondo
October 20, 2022
Page 69

the United States by the Utilization Expiration Date."[187] "Utilization Expiration Date" means "the date 180 days after the Date of Termination," while "Date of Termination" means "June 6, 2024, or the date the emergency described in Presidential Proclamation 10414 has been terminated, whichever occurs first."[188] The final rule is silent on how Commerce and/or CBP are to ascertain and how importers and/or other interested parties are to attest whether merchandise corresponding to a particular entry or entries will be used by the "Utilization Expiration Date" when that date is subject to change at the President's discretion at the time of importation.

- Commerce's definition of "utilization and utilized" is **too vague** to be administrable and enforceable.

The final rule defines "utilization and utilized" to mean "the Southeast Asian-Completed Cells and Modules will be used or installed in the United States."[189] As those appear to be generic, rather than industry-specific terms, what Commerce means by "used or installed in the United States" is unclear. For instance:

  o Must the products be "used or installed" in any particular way?

  o Does the meaning of "used or installed" vary depending on whether the products at issue are cells or modules?

  o What if the products are not "used or installed" for their intended purpose?

  o Although the definition in the final rule attempts to clarify that "{m}erchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions,"[190] are those the only instances in which merchandise will not be considered "used or installed" once it is imported into the United States free of AD and CVD duties?

---

[187] 19 CFR § 362.102 (effective November 15, 2022).

[188] *Id.*

[189] *Id.*

[190] *Id.*

PUBLIC VERSION

The Hon. Gina M. Raimondo
October 20, 2022
Page 70

Without any additional elaboration of what is meant or intended by "used or installed," the Final Rule provides only an arbitrary standard by which to determine whether products are properly subject to the tariff moratorium.

- The Final Rule provides **no enforcement mechanism** to curb likely abuses of the "Utilization Expiration Date" provision.

  Without clearly defined enforcement tools, importers and other interested parties are incentivized by the prospect of duty-free treatment to attest or certify at the time of entry that merchandise will be used by the "Utilization Expiration Date." After all, should the national emergency run the full 24 months, compliance with the "Utilization Expiration Date" requirement may not be assessed until December 2024 at the earliest, at which point Commerce and/or CBP may not have the time, resources, or inclination to confirm that inquiry merchandise imported without suspension of liquidation and without regard to AD and CVD duties actually qualified as "Applicable Entries" because of when they were "utilized." And even if certain entries from 2022 or 2023 were found in late 2024 or early 2025 not to be used by the "Utilization Expiration Date," there would be no recourse for interested parties such as Auxin to obtain relief because those entries are likely to have been subject to final liquidation without regard to AD and CVD duties, and the opportunities to request administrative reviews of any such entries found to be circumventing the *Solar I* Orders are likely to have passed. Absent clearly defined enforcement tools and commitments in the final rule, Commerce's ability to ensure compliance with the "Utilization Expiration Date" is severely constrained.

In its current form, the "Utilization Expiration Date" is a fig leaf intended to mollify concerns raised under the final rule about stockpiling without actually addressing stockpiling. Although possible requirements, such as the use of a bonded warehouse, may address administrability and enforcement concerns, in part, Commerce and CBP possess limited means to track how inquiry merchandise is utilized once it enters into the U.S. stream of commerce.

The aforementioned issues could be meaningfully redressed by use of the regulations adopted by Commerce in 2006 to address emergency measures under section 318(a) of the

PUBLIC VERSION

The Hon. Gina M. Raimondo
October 20, 2022
Page 71

Act.[191] But Commerce has explicitly rejected their use here.[192] Having rejected the use of

preexisting regulations, Commerce now confronts a tremendous challenge in administering and

enforcing the Final Rule to ensure that only qualifying inquiry merchandise benefits from the

tariff moratorium upon an affirmative finding of circumvention. Much to the domestic industry's

detriment, Commerce lacks the resources and tools to ensure that abuse does not occur.

Commerce must explain how it will enact safeguards to ensure that the tariff moratorium is not

abused by Chinese-affiliated companies that intend to stockpile inquiry merchandise in the

United States to avoid tariffs. These anti-circumvention inquiries establish the vast resources

such companies have at their disposal to evade the application of the U.S. fair trade laws

## V.  Commerce Should Issue a Country-Wide Determination and Implement a Certification Regime

Commerce should issue a preliminary country-wide circumvention determination with

respect to Thailand. Commerce's regulations provide that in conducting a circumvention inquiry,

Commerce "shall consider, based on the available record evidence, the appropriate remedy to

address circumvention and to prevent evasion of the order," including whether a country-wide

determination is appropriate.[193] In initiating this inquiry, Commerce recognized that "multiple

companies in…Thailand…, rather than a single company, have facilities necessary to conduct

---

[191] *See* 19 CFR Part 358; *see also Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 Fed. Reg. 63,230 (Oct. 30, 2006) (final rule).

[192] *See* Final Rule, 87 Fed. Reg. at 56,876-77.

[193] 19 CFR § 351.226(m)(1).

# Vietnam Pre-Preliminary Comments (Excerpt)



**Thomas M. Beline**

tbeline@cassidylevy.com
**Direct** 202 567-2316
**Main** 202 567 2300

October 20, 2022

<u>**VIA ELECTRONIC FILING**</u>

The Honorable Gina M. Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case Nos:  A-570-979, C-570-980
Circumvention Inquiries—Vietnam 2022
Total No. of Pages: 89
AD/CVD Operations Office IV

**PUBLIC VERSION**
Proprietary Information from Boviet on Pages
5-6, 8-9, 11, 27-30, 32, 40-41, 43, 49, 52-53,
55-56, 60-61, and Exhibit 1, Proprietary
Information from Vina Solar on Pages 6, 8, 10-
11, 28-30, 32-33, 43-44, 50, 52-53, 56, 61, and
Exhibit 2, and Proprietary Information Placed
on the Record by Commerce on Pages 70-71
Removed from Brackets.

Re:     **Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into
Modules from the People's Republic of China: Auxin's Pre-Preliminary
Determination Comments—Vietnam**

Dear Secretary Raimondo:

On behalf of Auxin Solar, Inc. ("Auxin"), we herein provide comments in advance of the

preliminary determination in the above-captioned anti-circumvention inquiry, currently expected

on November 28, 2022.[1]  These comments are timely filed in accordance with the deadline

established by Commerce for pre-preliminary determination comments.[2]

---

[1] *See* Commerce Memorandum, "Extension of Preliminary Determinations in Circumvention
Inquiries" (Aug. 22, 2022).

[2] *See* Commerce Memorandum, "Second Deadline Extension for Pre-Preliminary Determination
Comments" (Oct. 14, 2022).

The Honorable Gina M. Raimondo
October 20, 2022
Page 63

PUBLIC VERSION

merchandise from an NME country.[175]  The CIT has affirmed Commerce's practice of treating

such anti-circumvention inquiries as NME proceedings.[176]  Likewise, the CIT has affirmed

"Commerce's decision to use a surrogate value methodology in determining the value of inputs

from a NME country in an anticircumvention inquiry, because it is a reasonable construction of

the statute."[177]  Because this inquiry concerns circumvention of the *Solar I* Orders, which

implicate an NME country, this inquiry is appropriately conducted as an NME proceeding.

Accordingly, Commerce should reject any assertion that it is inappropriate for Commerce to

apply its NME methodology in this inquiry.  Instead, it is appropriate and reasonable for

Commerce to rely on surrogate values to value factors of production in the NME countries of

China and Vietnam when conducting its circumvention analysis in this case.

## IV.    Commerce Must Take Necessary Measures to Enforce a Preliminary Affirmative Determination of Circumvention

As demonstrated above, record evidence supports a preliminary affirmative determination

that certain CSPV imports completed or assembled in Vietnam using Chinese-origin inputs are

circumventing the *Solar I* Orders.  Upon making that preliminary affirmative finding of

circumvention, Commerce's regulations require it to direct U.S. Customs and Border Protection

---

[175] *See, e.g.*, *CORE from China—Vietnam*, IDM at Comment 6; *CRS from China—Vietnam*, IDM at Comment 6.

[176] *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357, 1377-78 (Ct. Int'l Trade 2021)

[177] *U.K. Carbon & Graphite Co. v. United States*, 37 C.I.T. 1295, 1311-1312 (2013); *see also Al Ghurair*, 536 F. Supp. 3d at 1377-78.

The Honorable Gina M. Raimondo
October 20, 2022
Page 64

**PUBLIC VERSION**

("CBP") to begin or continue suspension of liquidation and to initiate the collection of cash deposits of estimated duties on entries of merchandise subject to the inquiry.[178]  Commerce also is required by its regulations to impose such measures retroactively to the date of initiation of the anti-circumvention inquiry or an earlier date should circumstances warrant.[179]  Based on evidence provided by Auxin showing a surge of imports of solar cells and modules from Vietnam after filing of the request to conduct the anti-circumvention inquiry, but before initiation, earlier application of enforcement measures is warranted upon a preliminary affirmative determination of circumvention.[180]

On September 16, 2022, Commerce published a final rule that precludes any immediate enforcement of an affirmative preliminary and/or final determination of circumvention.[181] Commerce issued the Final Rule to effectuate Presidential Proclamation 10414.  Presidential Proclamation 10414 invoked section 318(a) of the Act to declare a national emergency "with respect to the threats to the availability of sufficient electricity generation to meet expected customer demand" and to recommend that Commerce permit the importation free of AD and CVD duties of merchandise subject to the ongoing anti-circumvention inquiries for a period not

---

[178] *See* 19 CFR § 351.226(l)(2)(i)-(ii).

[179] *See* 19 CFR § 351.226(l)(2)(iii).

[180] *See* Letter from Auxin, "Post-Petition Surge of Imported Solar Cells and Modules Covered by Auxin's Circumvention Petition" (Mar. 21, 2022).

[181] *See Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022) (final rule) ("Final Rule").

The Honorable Gina M. Raimondo
October 20, 2022
Page 65

PUBLIC VERSION

exceeding 24 months.[182]  But the Final Rule is contrary to law, antithetical to Commerce's

enforcement mission, and unadministrable.  Commerce should reconsider its application to these

affirmative determinations of circumvention and apply existing regulations to address the

purported, but not real, "emergency."

> **A.** **Commerce's Final Rule Is Contrary to Law and Antithetical to Commerce's Enforcement Mission**

Auxin will not repeat its prior comments detailing all of the numerous legal and factual

deficiencies of Commerce's proposed rule, now implemented in the Final Rule.  Auxin must,

however, emphasize that a failure by Commerce to enforce a preliminary affirmative

circumvention finding here would be contrary to law.  As Congress required in 1988, products

found to be circumventing the *Solar I* Orders must be subject to the discipline of those orders for

the U.S. trade remedy laws to have their intended effect.[183]  Yet Commerce through its

rulemaking will deny Auxin and other domestic manufacturers of CSPV cells and modules relief

to which they are entitled under the law upon a preliminary affirmative finding of circumvention.

Making matters worse, evidence indicating that Presidential Proclamation 10414 and the final

rule are the result of a Chinese-led special-interest lobbying campaign create the regrettable

perception that Commerce's actions here are the result of outside political influence and not any

---

[182] *Proclamation No. 10414, Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules From Southeast Asia*, 87 Fed. Reg. 35,067, 35,068 (June 9, 2022) ("Presidential Proclamation 10414").

[183] *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1321, 102 Stat. 1107, 1192-95; *see also* S. Rep. No. 71, 100th Cong. 1st Sess. (1987) at 99-101.

The Honorable Gina M. Raimondo
October 20, 2022
Page 66

**PUBLIC VERSION**

credible emergency.[184]  That perception presents much cause for alarm, as other domestic

industries that have successfully benefitted from the U.S. trade remedy laws have every reason to

worry that they too will be denied relief entitled to them for no reason other than political

expediency.  Commerce should dispel such concerns by reevaluating the legitimacy of the Final

Rule and, upon such reflection, take necessary and appropriate enforcement action upon a

preliminary affirmative determination of circumvention.  At the very least, Commerce must

abide by its legal obligations to complete the administrative record with the *ex parte*

communications concerning the issuance of Presidential Proclamation 10414 and the Final Rule.

Doing otherwise runs contrary to the statute and deprives Auxin of due process under the law.

### B.    Commerce's "Utilization Expiration Date" Is Unadministrable and Unenforceable

Despite having a regulatory regime in place that guards against stockpiling and ensures

that imports are being used to remedy and redress a declared emergency, Commerce's Final Rule

introduced the concept of an "Utilization Expiration Date."  Commerce devised this "Utilization

Expiration Date" to prevent stockpiling, which requires duty-free imported inquiry merchandise

to be "used" or "installed" in the United States within 180 days of the expiration of the national

emergency declared by Presidential Proclamation 10414.[185]  But the Final Rule is conspicuously

silent on how Commerce intends to administer and enforce that provision of the new regulations,

---

[184] *See* Letter from Auxin, "Request for Commerce to Complete the Administrative Record With All *Ex Parte* Materials" (June 9, 2022).

[185] *See* Final Rule, 87 Fed. Reg. at 56,869-71.

The Honorable Gina M. Raimondo
October 20, 2022
Page 67

leaving it for Commerce to address in a preliminary and/or final affirmative determination,

potentially through the availability of certifications as permitted by future section 362.104 of

Commerce's regulations.[186]

Whether through certifications or other means, Commerce lacks any practical ability to

administer and enforce the concept of an "Utilization Expiration Date" upon an affirmative

determination of circumvention, thereby creating an enormous loophole through which

circumventing producers, exporters, and importers can enter inquiry merchandise without regard

to AD and CVD duties that otherwise should be subject to remedial duties under the Final Rule.

Among the most significant obstacles precluding Commerce from administering and enforcing

the "Utilization Expiration Date" are, without limitation, the following:

- Because the President may terminate the national emergency early before the expiration of 24 months, the "Utilization Expiration Date" is ***unknown at the time of importation***, thus making it ***impossible*** for Commerce and/or CBP to determine at the time of entry what qualifies as an "Applicable Entry" that will be used by the "Utilization Expiration Date."

  The tariff moratorium is intended to apply to "Applicable Entries," which is defined, in part, for entries that enter after November 15, 2022, as those "used in the United States by the Utilization Expiration Date."[187] "Utilization Expiration Date" means "the date 180 days after the Date of Termination," while "Date of Termination" means "June 6, 2024, or the date the emergency described in Presidential Proclamation 10414 has been terminated, whichever occurs first."[188] The Final Rule is silent on how Commerce and/or CBP are to ascertain and how importers and/or other interested parties are to attest whether merchandise corresponding to a particular entry or entries will be used by the "Utilization

---

[186] *See id.* at 56,879-80.

[187] 19 CFR § 362.102 (effective November 15, 2022).

[188]  *Id.*

The Honorable Gina M. Raimondo
October 20, 2022
Page 68

PUBLIC VERSION

Expiration Date" when that date is subject to change at the President's discretion at the time of importation.

- Commerce's definition of "utilization and utilized" is ***too vague*** to be administrable and enforceable.

  The Final Rule defines "utilization and utilized" to mean "the Southeast Asian-Completed Cells and Modules will be used or installed in the United States."[189] As those appear to be generic, rather than industry-specific terms, what Commerce means by "used or installed in the United States" is unclear.  For instance:

  o Must the products be "used or installed" in any particular way?

  o Does the meaning of "used or installed" vary depending on whether the products at issue are cells or modules?

  o What if the products are not "used or installed" for their intended purpose?

  o Although the definition in the final rule attempts to clarify that "{m}erchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions,"[190] are those the only instances in which merchandise will not be considered "used or installed" once it is imported into the United States free of AD and CVD duties?

  Without any additional elaboration of what is meant or intended by "used or installed," the Final Rule provides only an arbitrary standard by which to determine whether products are properly subject to the tariff moratorium.

- The Final Rule provides ***no enforcement mechanism*** to curb likely abuses of the "Utilization Expiration Date" provision.

  Without clearly defined enforcement tools, importers and other interested parties are incentivized by the prospect of duty-free treatment to attest or certify at the time of entry that merchandise will be used by the "Utilization Expiration Date."

---

[189] *Id.*

[190] *Id.*

CASSIDY LEVY KENT

The Honorable Gina M. Raimondo
October 20, 2022
Page 69

After all, should the national emergency run the full 24 months, compliance with the "Utilization Expiration Date" requirement may not be assessed until December 2024 at the earliest, at which point Commerce and/or CBP may not have the time, resources, or inclination to confirm that inquiry merchandise imported without suspension of liquidation and without regard to AD and CVD duties actually qualified as "Applicable Entries" because of when they were "utilized." And even if certain entries from 2022 or 2023 were found in late 2024 or early 2025 not to be used by the "Utilization Expiration Date," there would be no recourse for interested parties such as Auxin to obtain relief because those entries are likely to have been subject to final liquidation without regard to AD and CVD duties, and the opportunities to request administrative reviews of any such entries found to be circumventing the *Solar I* Orders are likely to have passed. Absent clearly defined enforcement tools and commitments in the final rule, Commerce's ability to ensure compliance with the "Utilization Expiration Date" is severely constrained.

In its current form, the "Utilization Expiration Date" is a fig leaf intended to mollify concerns raised under the final rule about stockpiling without actually addressing stockpiling. Although possible requirements, such as the use of a bonded warehouse, may address administrability and enforcement concerns, in part, Commerce and CBP possess limited means to track how inquiry merchandise is utilized once it enters into the U.S. stream of commerce.

The aforementioned issues could be meaningfully redressed by use of the regulations adopted by Commerce in 2006 to address emergency measures under section 318(a) of the Act.[191] But Commerce has explicitly rejected their use here.[192] Having rejected the use of preexisting regulations, Commerce now confronts a tremendous challenge in administering and enforcing the Final Rule to ensure that only qualifying inquiry merchandise benefits from the

---

[191] *See* 19 CFR Part 358; *see also Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 Fed. Reg. 63,230 (Oct. 30, 2006) (final rule).

[192] *See Final Rule*, 87 Fed. Reg. at 56,876-77.

The Honorable Gina M. Raimondo
October 20, 2022
Page 70

PUBLIC VERSION

tariff moratorium upon an affirmative finding of circumvention.  Much to the domestic

industry's detriment, Commerce lacks the resources and tools to ensure that abuse does not

occur.  Commerce must explain how it will enact safeguards to ensure that the tariff moratorium

is not abused by Chinese-affiliated companies that intend to stockpile inquiry merchandise in the

United States to avoid tariffs.  These anti-circumvention inquiries establish the vast resources

such companies have at their disposal to evade the application of the U.S. fair trade laws.

## V.    Commerce Should Issue a Country-Wide Determination and Implement a Certification Regime

Commerce should issue a preliminary country-wide circumvention determination with

respect to Vietnam.  Commerce's regulations provide that in conducting a circumvention inquiry,

Commerce "shall consider, based on the available record evidence, the appropriate remedy to

address circumvention and to prevent evasion of the order," including whether a country-wide

determination is appropriate.[193]  In initiating this inquiry, Commerce recognized that "multiple

companies in…Vietnam…, rather than a single company, have facilities necessary to conduct the

processing in question and that subsidiaries of Chinese companies that are located in {Vietnam}

source numerous solar cell and panel inputs from China."[194]  This is confirmed by the CBP data

on the record, which identify [                                    ] CSPV cells and modules to the

---

[193] 19 CFR § 351.226(m)(1).

[194] Commerce Memorandum, "Initiation of Circumvention Inquiries" (Mar. 25, 2022) at 15; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders*, 87 Fed. Reg. 19071 (Apr. 1, 2022).