**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| AUXIN SOLAR INC. AND CONCEPT CLEAN ENERGY, INC., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| UNITED STATES; UNITED STATES DEPARTMENT OF COMMERCE; GINA M. RAIMONDO, SECRETARY OF COMMERCE; UNITED STATES CUSTOMS AND BORDER PROTECTION; AND TROY A. MILLER, UNITED STATES CUSTOMS AND BORDER PROTECTION ACTING COMMISSIONER, | ) ) ) ) ) ) ) ) |
| Defendants, | ) ) ) |
| and | ) ) ) |
| AMERICAN CLEAN POWER ASSOCIATION; CANADIAN SOLAR (USA) INC.; CANADIAN SOLAR INTERNATIONAL LIMITED; SOLAR ENERGY INDUSTRIES ASSOCIATION; JA SOLAR USA, INC.; JA SOLAR VIETNAM COMPANY LIMITED; JA SOLAR MALAYSIA SDN. BHD.; JA SOLAR INTERNATIONAL LIMITED; NEXTERA ENERGY, INC.; BYD (H.K.) CO., LTD.; BYD AMERICA LLC; INVENERGY RENEWABLES LLC; INVENERGY SOLAR EQUIPMENT MANAGEMENT LLC; TRINA SOLAR (U.S.) INC. TRINA SOLAR (VIETNAM) SCIENCE AND TECHNOLOGY CO., LTD.; TRINA SOLAR ENERGY DEVELOPMENT COMPANY LIMITED; TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.; AND RISEN SOLAR TECHNOLOGY SDN. BHD., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendant-Intervenors. | ) ) ) |

Court. No. 23-00274

**ORDER**

Upon consideration of Plaintiffs' Rule 56.1 Motion for Judgment on the Agency Record, all responses thereto, and all other relevant papers and proceedings herein, it is hereby:

**ORDERED** that Plaintiffs' Rule 56.1 Motion for Judgment on the Agency Record is **GRANTED**; and it is further

**ORDERED** that *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022), is **VACATED**; and it is further

**ORDERED** that, within 20 days of the issuance of judgment in this action, Defendants shall publish notice of said vacatur in the *Federal Register*; and it is further

**ORDERED** that, within 90 days of the issuance of judgment in this action, Defendants shall identify, collect any uncollected antidumping and countervailing duties, and reliquidate all entries of crystalline silicon photovoltaic ("CSPV") cells and modules from Malaysia, Thailand, Vietnam, and Cambodia found to be circumventing the antidumping and countervailing duty orders on CSPV products from the People's Republic of China ("PRC") in *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Aug. 23, 2023), for which the now-vacated *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022), were applied; and it is further

**ORDERED** that Defendants shall hereafter suspend liquidation and collect antidumping and countervailing duty cash deposits on any presently unliquidated entries and all future entries of CSPV cells and modules from Cambodia, Malaysia, Thailand, and Vietnam found to be

circumventing the antidumping and countervailing duty orders on CSPV products from the PRC in *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Aug. 23, 2023), without regard to the now-vacated *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022).

**SO ORDERED.**

Date:_____     Signed:_____
      New York, New York           Timothy M. Reif, Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| AUXIN SOLAR INC. AND CONCEPT CLEAN ENERGY, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES; UNITED STATES DEPARTMENT OF COMMERCE; GINA M. RAIMONDO, SECRETARY OF COMMERCE; UNITED STATES CUSTOMS AND BORDER PROTECTION; AND TROY A. MILLER, UNITED STATES CUSTOMS AND BORDER PROTECTION ACTING COMMISSIONER, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| AMERICAN CLEAN POWER ASSOCIATION; CANADIAN SOLAR (USA) INC.; CANADIAN SOLAR INTERNATIONAL LIMITED; SOLAR ENERGY INDUSTRIES ASSOCIATION; JA SOLAR USA, INC.; JA SOLAR VIETNAM COMPANY LIMITED; JA SOLAR MALAYSIA SDN. BHD.; JA SOLAR INTERNATIONAL LIMITED; NEXTERA ENERGY, INC.; BYD (H.K.) CO., LTD.; BYD AMERICA LLC; INVENERGY RENEWABLES LLC; INVENERGY SOLAR EQUIPMENT MANAGEMENT LLC; TRINA SOLAR (U.S.) INC. TRINA SOLAR (VIETNAM) SCIENCE AND TECHNOLOGY CO., LTD.; TRINA SOLAR ENERGY DEVELOPMENT COMPANY LIMITED; TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.; AND RISEN SOLAR TECHNOLOGY SDN. BHD., | ) Court. No. 23-00274 |
| | ) |
| Defendant-Intervenors. | ) |
| | ) |

**PLAINTIFFS' RULE 56.1 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.1 of the Rules of the United States Court of International Trade (the "Court" or "CIT"), Plaintiffs Auxin Solar Inc. and Concept Clean Energy, Inc. hereby move for judgment on the agency record in the above-referenced action.

For the reasons set forth in Plaintiffs' Memorandum of Law in Support of Their Rule 56.1 Motion for Judgment on the Agency Record, Plaintiffs request that this Court hold *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022) ("*Solar Duty Holiday*"), to be arbitrary, capricious, an abuse of discretion, unlawful *ab initio*, and/or otherwise contrary to the standards set forth in 5 U.S.C. § 706(2), and order vacatur of the same. Unliquidated and future entries of crystalline silicon photovoltaic ("CSPV") cells and modules from Malaysia, Thailand, Vietnam, and Cambodia found to be circumventing the antidumping and countervailing duty orders on CSPV products from the People's Republic of China ("PRC") should hereafter be subject to suspension of liquidation and the assessment of antidumping and countervailing duties without regard to the *Solar Duty Holiday*. Furthermore, because the *Solar Duty Holiday* was applied to unlawfully permit the duty-free importation of circumventing crystalline silicon photovoltaic ("CSPV") cells and modules from Malaysia, Thailand, Vietnam, and Cambodia liable for antidumping and countervailing duties pursuant to the orders on CSPV products from the People's Republic of China, the Court should order Defendants to identify all such duty-free entries, collect any uncollected antidumping and countervailing duties, and reliquidate the same.

In the alternative, if the *Solar Duty Holiday* were not vacated in its entirety, then Solar Plaintiffs request that this court order Defendants to assess antidumping and countervailing duties and reliquidate any entries that entered duty-free during periods and under conditions in which the

*Solar Duty Holiday* violated the standards of 5 U.S.C. § 706(2), and grant such other relief as this court deems just and proper.

Respectfully submitted,

/s/ Thomas M. Beline

Thomas M. Beline
Roop K. Bhatti
James E. Ransdell
Chase J. Dunn
Sydney C. Reed

**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania Ave. N.W.
Suite 300
Washington, D.C. 20037

Phone: (202) 567-2316
Fax: (202) 567-2301

*Counsel for Auxin Solar Inc. and
Concept Clean Energy, Inc.*

July 22, 2024

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| AUXIN SOLAR INC. AND CONCEPT CLEAN ENERGY, INC., ) <br><br> Plaintiffs, ) <br><br> v. ) <br><br> UNITED STATES; UNITED STATES DEPARTMENT OF COMMERCE; GINA M. RAIMONDO, SECRETARY OF COMMERCE; UNITED STATES CUSTOMS AND BORDER PROTECTION; AND TROY A. MILLER, UNITED STATES CUSTOMS AND BORDER PROTECTION ACTING COMMISSIONER, ) <br><br> Defendants, ) <br><br> and ) <br><br> AMERICAN CLEAN POWER ASSOCIATION; CANADIAN SOLAR (USA) INC.; CANADIAN SOLAR INTERNATIONAL LIMITED; SOLAR ENERGY INDUSTRIES ASSOCIATION; JA SOLAR USA, INC.; JA SOLAR VIETNAM COMPANY LIMITED; JA SOLAR MALAYSIA SDN. BHD.; JA SOLAR INTERNATIONAL LIMITED; NEXTERA ENERGY, INC.; BYD (H.K.) CO., LTD.; BYD AMERICA LLC; INVENERGY RENEWABLES LLC; INVENERGY SOLAR EQUIPMENT MANAGEMENT LLC; TRINA SOLAR (U.S.) INC. TRINA SOLAR (VIETNAM) SCIENCE AND TECHNOLOGY CO., LTD.; TRINA SOLAR ENERGY DEVELOPMENT COMPANY LIMITED; TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.; AND RISEN SOLAR TECHNOLOGY SDN. BHD., ) <br><br> Defendant-Intervenors. ) | Court. No. 23-00274 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RULE 56.1 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Thomas M. Beline
Roop K. Bhatti
James E. Ransdell
Chase J. Dunn
Sydney C. Reed

**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania Ave. N.W.
Suite 300
Washington, D.C. 20037

Phone: (202) 567-2316
Fax: (202) 567-2301

*Counsel for Auxin Solar Inc. and
Concept Clean Energy, Inc.*

July 22, 2024

# <u>Table of Contents</u>

<div align="right"><u>Page</u></div>

STATEMENT PURSUANT TO RULE 56.1 ................................................................. 3

    A.   Administrative Determination Under Review .............................................. 3

    B.   Issues Presented ........................................................................................... 3

    C.   Request for Relief ........................................................................................ 3

STATEMENT OF FACTS ......................................................................................... 4

SUMMARY OF ARGUMENT .................................................................................. 8

    A.   Section 318(a) Does Not Authorize Duty-Free Importation of CSPV Cells and Modules .............................................................................................. 9

    B.   Commerce Has Unlawfully Permitted Importers to Obtain Duty-Free Treatment for Products Not Imported for Use in Emergency Relief Work ................................... 12

ARGUMENT .............................................................................................................. 15

I.    Standard of Review .................................................................................................. 15

II.   The Unprecedented *Solar Duty Holiday* Violates the Underlying Statute ............................ 17

    A.   Traditional Tools of Statutory Construction and Contemporaneous Sources Establish 19 U.S.C. § 1318(a) Does Not Authorize Duty-Free Importation of CSPV Cells and Modules ....................................................... 18

        1.   The Categories of Goods Expressly Named in Section 318(a), in their Ordinary, Contemporaneous Meanings, Do Not Encompass CSPV Cells and Modules ....................................................................... 19

        2.   The Final Category, "Other Supplies," Must Resemble Medical Supplies and Surgical Supplies and Does Not Encompass CSPV Cells and Modules........ 21

        3.   Limiting Language at the End of Listed Items Cannot Be Read to Render the List Itself Redundant ....................................................... 23

        4.   Commerce's Interpretation of Section 318(a) Violates All of the Foregoing Canons of Construction and Finds No Countervailing Support........................... 26

        5.   Past Practice Corroborates Solar Plaintiffs' Construction of Section 318(a); Commerce's Outlier Example Invoked a Separate Grant of Authority ........................................................ 28

<div align="center">i</div>

B.  Even if CSPV Cells and Modules Could Be Covered by 19 U.S.C. § 1318(a), Commerce's *Solar Duty Holiday* Violates the Statute and the Explicit Terms of *Proclamation 10414* by Granting Duty-Free Treatment to Products "Import{ed}" Before the Emergency ........................................................................ 31

C.  Commerce's *Solar Duty Holiday* Violates 19 U.S.C. § 1318(a) by Granting Duty-Free Treatment to Products Not Actually "Use{d}" in Emergency Relief Work" ........................................................................................................ 36

    1.  Obtaining Duty-Free Benefits by Certifying that Goods Will Be Used After the Emergency's Conclusion Violates the Statutory Requirement that Duty-Free Goods Be "Use{d} in Emergency Relief Work" ................................ 37

    2.  Commerce Unlawfully Awarded Duty-Free Benefits Based on Certifications of Deficient "Uses" Incapable of "Relieving" the Declared Emergency ........................................................................................................ 39

    3.  Commerce's Method for Ensuring Compliance Is Inadequate ............................ 40

III.  Intervenors' Affirmative Defenses Are Inapplicable ............................................................. 42

A.  Absent Section 318(a) Authority, Commerce's *Solar Duty Holiday* Cannot Survive ........................................................................................................ 42

B.  Laches Cannot Bar Solar Plaintiffs' Relief .................................................................. 43

IV.  Conclusion and Request for Relief ...................................................................................... 45

## Table of Authorities

Page(s)

U.S. Constitution

U.S. CONST. art. I, § 8 ................................................................................25

Statutes

5 U.S.C. § 706 ................................................................................... *passim*

5 U.S.C. § 706(2) .............................................................................. *passim*

19 U.S.C. § 1318(a) .......................................................................... *passim*

19 U.S.C. § 1677j ............................................................................ 1-2, 42

28 U.S.C. § 1581(i) .................................................................................15

28 U.S.C. § 2640(e) ................................................................................15

Regulations

19 C.F.R. § 101.1 ....................................................................................32

19 C.F.R. § 159.11(a) ..............................................................................41

19 C.F.R. § 351.212(a) ............................................................................32

19 C.F.R. § 351.226(l) ..............................................................................2

19 C.F.R. § 351.226(l)(2) ..........................................................................6

19 C.F.R. § 351.226(l)(2)(ii) ....................................................................36

19 C.F.R. § 351.226(l)(3) ................................................................1, 7, 36

19 C.F.R. § 358.103(c) ............................................................................38

19 C.F.R. § 358.103(d) ............................................................................38

19 C.F.R. § 361.103(b)(i) .........................................................................40

19 C.F.R. § 361.103(b)(ii) ........................................................................40

19 C.F.R. § 362.102 ..........................................................................8, 37-40

19 C.F.R. § 362.103(a) ...................................................................... *passim*

19 C.F.R. § 362.103(b)(1)(iii)................................................................................40

<u>Decisions by Article III Courts</u>

*Advoc. Health Care Network v. Stapleton*, 581 U.S. 468 (2017) ............................25, 27

*Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008)..............................................22

*Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490 (1981) .................................19

*Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368 (Fed. Cir. 2002).........................3

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003)..................................................26

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ..............................................................19

*Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89 (1983) ...................16

*Robers v. United States*, 572 U.S. 639 (2014) .....................................................25, 33

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ..............15

*City of Waukesha v. EPA*, 320 F.3d 228 (D.C. Cir. 2003)..........................................39

*Crane v. C.I.R.*, 331 U.S. 1 (1947)..........................................................................20

*Deacero S.A. De C.V. v. United States*, 817 F.3d 1332 (Fed. Cir. 2016) .....................2

*Ex Parte Bakelite Corp.*, 279 U.S. 438 (1929) ........................................................31

*GPX Int'l Tire Corp. v. United States*, 666 F.3d 732 (Fed. Cir. 2011).........................18

*Gray v. Powell*, 314 U.S. 402 (1941)........................................................................16

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008) .....................................27

*Invenergy Renewables LLC v. United States*, 552 F. Supp. 3d 1382 (Ct. Int'l Trade 2021)...........3

*K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281 (1988) ..................................................28

*Leocal v. Ashcroft*, 543 U.S. 1 (2004).................................................................. 19-20

*Loper Bright Ent. v. Raimondo*, 144 S. Ct. 2244 (2024) ....................................... *passim*

*MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994)...........19

*Nielsen v. Preap*, 139 S. Ct. 954 (2019) ...........................................................21, 24

*NLRB v. Hearst Publications, Inc.*, 322 U.S. 111 (1944)...........................................16

*Paroline v. United States*, 572 U.S. 434 (2014)................................................................23, 27

*Perrin v. United States*, 444 U.S. 37 (1979) ................................................................19

*Petrella v. Metro–Goldwyn–Mayer, Inc.*, 572 U.S. 663 (2014) ................................................43

*Porto Rico Railway, Light & Power Co. v. Mor*, 253 U.S. 345 (1920)........................................23

*SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328 (2017)............43

*Shakeproof Indus. Prods. Div. of Ill. Tool Works Inc. v. United States*, 104 F.3d 1309 (Fed. Cir. 1997) ................................................15

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ................................................17

*Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022) ................................................22, 27

*Taylor v. United States*, 495 U.S. 575 (1990)................................................19

*Tung Mung Dev. Co. v. United States*, 216 C.I.T. 969 (2002)................................................2

*U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439 (1993) ................21

*United States v. Dickson*, 15 Pet. 141 (1841) ................................................16

*United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989) ................................................21

*United States v. Turkette*, 452 U.S. 576 (1981) ................................................25

*United States v. Vonn*, 535 U.S. 55 (2002) ................................................26

*Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067 (2018) ................................................19, 20, 27

<u>Decisions by Article I Courts</u>

*Border Brokerage Co. v. United States*, 24 Cust. Ct. 44 (Cust. Ct. 1950)................................................30

*Border Brokerage Co. v. United States*, 27 Cust. Ct. 223 (Cust. Ct. 1951)................................................30

*Mussman & Shafer, Inc. v. United States*, 27 Cust. Ct. 180 (Cust. Ct. 1951) ................................................30

*Mussman & Shafer, Inc. v. United States*, 40 C.C.P.A. 108 (C.C.P.A. 1953)................................................30

<u>Presidential Documents</u>

*Proclamation 2093: Emergency Due to Drought—Free Importation of Feed for Livestock,* 49 Stat. 3,404 (Aug. 10, 1934) ................................................28, 34

*Proclamation 2223: Emergency Due to Flood Conditions—Free Importation of Food, Clothing, and Medical, Surgical, and Other Supplies for Use in Emergency Relief Work,* 2 Fed. Reg. 273 (Feb. 3, 1937) ............................................................................................................28, 35

*Proclamation 2498: Emergency Due to Drought—Free Importation of Forage for Livestock,* 6 Fed. Reg. 3,715 (July 29, 1941) ............................................................................28, 34

*Proclamation 2545: Free Importation of Jerked Beef,* 7 Fed. Reg. 2,611 (Apr. 7, 1942) .....28, 34

*Proclamation 2553: Emergency Due to State of War—Free Importation by the American National Red Cross of Food, Clothing, and Medical, Surgical, and Other Supplies,* 7 Fed. Reg. 3,143 (Apr. 30, 1942) ............................................................................................28, 34

*Proclamation 2708: Emergency Due to Housing Shortage—Free Importation of Timber, Lumber, and Lumber Products*, 11 Fed. Reg. 12,695 (Oct. 29, 1946) ................................ *passim*

*Proclamation 2735: Free Importation of Timber, Lumber, and Lumber Products*, 12 Fed. Reg. 4255 (July 2, 1947) ............................................................................................29

*Proclamation 10414: Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules From Southeast Asia,* 87 Fed. Reg. 35,067 (June 9, 2022) .................................................................................... *passim*

Administrative Determinations

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders*, 87 Fed. Reg. 19,071 (Apr. 1, 2022)........................................ *passim*

*Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Aug. 23, 2023) .................................................................... *passim*

*Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam,* 87 Fed. Reg. 75,221 (Dec. 8, 2022) ............................................................................................................6, 40

*Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414,* 87 Fed. Reg. 56,868 (Sept. 16, 2022) .......................... *passim*

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300 (Sept. 20, 2021) .......................................................................2

*T.D. 48798*, 2 Fed. Reg. 339 (Feb. 11, 1937) ...........................................................................35

*T.D. 50449*, 6 Fed. Reg. 4,071 (Aug. 15, 1941) ................................................. 34-35, 38, 40

*T.D. 50599*, 7 Fed. Reg. 2,776 (Apr. 14, 1942) ....................................................... 34-35, 38, 40

*T.D. 50626*, 7 Fed. Reg. 3,358 (May 6, 1942) ....................................................34, 35, 38

*T.D. 51565*, 11 Fed. Reg. 13,459 (Nov. 14, 1946) .............................................30, 34, 38

Other Legislative Materials

Customs Administration Act of 1890, 26 Stat. 131 .......................................................30

H. Doc. 15 (May 9, 1929) .............................................................................................22

H.J. Res. 39 (2023) .........................................................................................11, 18, 31

H.R. Conf. Rep. 107-624 at 675 (2002).........................................................................18

Inflation Reduction Act, Pub. L. 117-169, 136 Stat. 1818 (2022)...................................1

Pub. L. 69-304, 44 Stat. 669 (1926)..............................................................................31

S. Rep. 100-71 (1987)...................................................................................................2

S. Rep. 37 (Sept. 4, 1929) ...........................................................................................23

Tariff Act of 1930, Pub. L. 71-361, 46 Stat. 590...................................................*passim*

The Trade Act of 2002, Pub. L. 107-210, 116 Stat. 933 (2002) ...................................18

The Trade Facilitation and Trade Enforcement Act of 2015,
Pub. L. 114-125, 130 Stat. 122 (2015).........................................................................18

Veterans Emergency Housing Act of 1946, Pub. L. 79-388, 60 Stat. 207 .......... 11, 29-30

Other Administrative Materials

Message No. 3041408 (Feb. 10, 2023) ..................................................................... 39-40

T.D. 47236, 66 Treas. Dec. Int. Rev. 221 (1935) ...................................24, 34-35, 38-40

Unfairly traded circumventing crystalline silicon photovoltaic ("CSPV") cells and modules have entered the U.S. market duty-free because of an unlawful regulation that denies the relief to which CSPV manufacturers in the United States are entitled under law and provides a tariff holiday to Chinese-backed circumventers operating from Cambodia, Malaysia, Thailand, and Vietnam. *See Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Aug. 23, 2023) ("*Final Circumvention Determinations*").  Acting contrary to law in promulgating devastating policy, the U.S. Department of Commerce ("Commerce") paved the way for unprecedented import volumes that have driven prices to staggering lows, rendered the domestic CSPV market uneconomic, and created an existential crisis for legacy CSPV producers in the United States.[1]

As required by law, when Commerce found unlawful circumvention of existing antidumping ("AD") and countervailing duty ("CVD") orders on CSPV cells and modules from the People's Republic of China ("PRC") by Southeast Asian export platforms, Commerce <u>should have</u> immediately "direct{ed} the Customs Service to begin the suspension of liquidation and require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product not yet suspended, entered, or withdrawn from warehouse, for consumption on or after the date of publication of the notice of initiation of the inquiry until appropriate liquidation instructions are issued." 19 C.F.R. § 351.226(l)(3); *see also* 19 U.S.C. § 1677j.  This would have leveled the playing field for U.S. manufacturers by including the circumventing merchandise

---

[1] We use the term "legacy" to identify those limited U.S. CSPV producers left standing after an onslaught of cheap Chinese imports decimated the industry that had existed prior to 2012 as contrasted with new market entrants enticed by the benefits conferred through the Inflation Reduction Act, Pub. L. 117-169, 136 Stat. 1818 (2022).

within the scope of the existing AD/CVD orders, as Congress intended. *See, e.g.*, *Tung Mung Dev. Co. v. United States*, 216 C.I.T. 969, 979 (2002) (paraphrasing Commerce's recognition that it "has a duty to avoid the evasion of antidumping duties"); S. Rep. No. 100-71 (1987) at 99 ("aggressive implementation of {the circumvention statute} by the Commerce Department can foreclose these practices."); *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,338 (Sept. 20, 2021) ("If Commerce ultimately finds that the merchandise is circumventing the order, such merchandise will be determined to be covered by the scope of the order for AD/CVD purposes despite not falling within the physical description of the subject merchandise of the scope of the order."); *see also, e.g.*, *Deacero S.A. De C.V. v. United States*, 817 F.3d 1332, 1337 (Fed. Cir. 2016) ("In order to effectively combat circumvention of antidumping duty orders, Commerce may determine that certain types of articles are within the scope of a duty order, even when the articles do not fall within the order's literal scope.").

But Commerce eschewed clear congressional intent, abrogated its statutory and regulatory duties, and in practical terms did nothing to stave off the death of a U.S. industry caused by unfairly traded imports. *See Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord with Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022) ("*Solar Duty Holiday*").  Rather, Commerce and the U.S. Customs and Border Protection ("CBP"), under its direction, embraced Chinese-funded circumvention and their injuriously low pricing of CSPV cells and modules by negating relief otherwise lawfully due to domestic manufacturers. *See* 19 U.S.C. § 1677j; 19 C.F.R. § 351.226(l).

## STATEMENT PURSUANT TO RULE 56.1

### A.   Administrative Determination Under Review

This action seeks vacatur of *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022).

### B.   Issues Presented

1.  Has Commerce deviated from the ordinary meaning of "food, clothing, and medical, surgical, and other supplies" in Section 318(a) by affording duty-free treatment to CSPV cells and modules, which are not food, nor clothing, nor medical supplies, nor surgical supplies, nor other healthcare supplies of similar kind? (**Section II.A**)

2.  Has Commerce exceeded the authority granted under Section 318(a) by extending duty-free benefits to goods whose "importation" occurred before any emergency had been proclaimed under Section 318(a)? (**Section II.B**)

3.  Has Commerce exceeded the authority granted under Section 318(a) by granting duty-free benefits based on representations that merchandise would be used in ways that cannot effectuate "emergency relief work" under *Proclamation 10414*? (**Section II.C**)

### C.   Request for Relief

Auxin Solar Inc. and Concept Clean Energy, Inc. (together "Solar Plaintiffs") request that this Court find Defendants' *Solar Duty Holiday* to be unlawful and otherwise inconsistent with the standards set forth in 5 U.S.C. § 706(2), hold it to be void *ab initio*, and order it to be vacated. *See, e.g.*, *Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1379 (Fed. Cir. 2002) (prevailing plaintiff under APA "is entitled to a remedy under the statute, which normally will be a vacatur of the agency's order."); *Invenergy Renewables LLC v. United States*, 552 F. Supp. 3d 1382, 1404 (Ct. Int'l Trade 2021) ("the court's conclusion that USTR lacks statutory or delegated authority to withdraw an exclusion requires vacatur"). To ensure no circumventing entries benefit from unlawful duty-free treatment, Plaintiffs further request that this Court order

reliquidation of all entries that utilized the *Solar Duty Holiday* with applicable antidumping and countervailing duties.

Alternatively, were the Court to not vacate the *Solar Duty Holiday* in its entirety, Solar Plaintiffs request that this court order Defendants to assess antidumping and countervailing duties and reliquidate all entries that benefited from duty-free treatment due to the *Solar Duty Holiday*'s unlawful extension of benefits to goods imported prior to the declared emergency and/or not used in emergency relief work, and such other relief as this court deems just and proper.

## STATEMENT OF FACTS

Antidumping and countervailing duty orders were imposed on CSPV cells and modules from the PRC in 2012. Thereafter, CSPV cells and modules from Cambodia, Malaysia, Thailand, and Vietnam completely replaced imports from the PRC, increasing from a total value of $578 million in 2011 to $5.6 billion in 2021. The sudden and significant increase of CSPV imports from these countries was not just happenstance; rather, it was caused by concerted efforts of Chinese multinationals funded by the Chinese Communist Party to use these countries as export platforms to harm U.S. manufacturers of CSPV products. Yet, because final assembly operations were the only part of the production process that the Chinese offshored, nearly 100% of the inputs used to assemble CSPV products in these countries were still Chinese origin components.

This wave of low-priced CSPV imports hollowed out the U.S. solar manufacturing base, leaving only a handful of U.S. producers remaining. A small company, stifled in its growth by these unfair trade practices, petitioned for Commerce to address this rampant circumvention. But just two months after Commerce found merit in the allegations and initiated circumvention inquiries, *Notice of Initiation*, 87 Fed. Reg. at 19,071 (Apr. 1, 2022), President Biden sided with special interests and the Chinese Communist Party and took the unprecedented step of declaring

an "emergency" to exist under 19 U.S.C. § 1318(a) "with respect to the threats to the availability of sufficient electricity generation capacity to meet expected consumer demand," *Proclamation 10414: Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules From Southeast Asia*, 87 Fed. Reg. 35,067, 35,068 (June 9, 2022) ("*Proclamation 10414*").[2]  Acting out of prescience or just convenience, the President foreordained that the "emergency" would endure for specifically two years, until June 6, 2024.  *See id.*

Despite the ostensible breadth of the "emergency" for electricity generation capacity, the "emergency authority" was circumscribed <u>exclusively</u> to enabling Commerce to "consider taking appropriate action" to permit duty-free imports of "solar cells and modules, exported from the Kingdom of Cambodia, Malaysia, the Kingdom of Thailand, and the Socialist Republic of Vietnam"—*i.e.*, the specific products subject to these circumvention inquiries. *See id.* Commerce and CBP announced no similar pause to other enforcement initiatives affecting CSPV imports, *e.g.*, AD/CVD duties on products from Taiwan or the review of forced labor in CCP-linked solar supply chains.  Even more importantly, Commerce did not ease regulatory impediments to CSPV electrical generation, *e.g.*, installation or grid management. The President, Commerce, and CBP did not subsidize existing U.S. producers to counteract the CCP's out-of-control subsidization that created a global oversupply of CSPV modules. Auxin Solar identified these regulatory and domestic industry support issues, among others, as more pressing means of relieving the

---

[2] As Solar Plaintiffs made clear in their Complaint, this action does not name the President as a defendant or present challenges to *Proclamation 10414* itself for review by the Court.  Rather, Solar Plaintiffs' action assumes *arguendo* that *Proclamation 10414* constitutes the declaration of an emergency pursuant to 19 U.S.C. § 1318(a). *See* Solar Plaintiffs' Complaint, ECF Doc. 14 (Jan. 17, 2024) (Conf. Ver.) at 26 n.5.

emergency.  Indeed, Auxin Solar and other domestic producers had capacity to help redress the emergency.

Acting in response to "*Proclamation 10414* and pursuant to its authority under section 318(a)," Commerce ignored its pre-existing Section 318(a) regulations adopted after Hurricane Katrina and hastily prepared parallel regulations that would absolve CSPV cells and modules imported from Cambodia, Malaysia, Thailand, and Vietnam of any AD/CVD duty liability were Commerce to render affirmative circumvention determinations—the *Solar Duty Holiday*.  *See* 87 Fed. Reg. at 56,868. Consequently, despite (1) Commerce issuing affirmative *Preliminary Affirmative Circumvention Determinations* on December 8, 2022, finding that CSPV cells and modules from all four countries were circumventing the AD/CVD orders on products from the PRC, and (2) Commerce regulations, 19 C.F.R. § 351.226(l)(2), obligating Commerce to instruct CBP to suspend liquidation and collect cash deposits for such entries, Commerce instead cited the *Solar Duty Holiday* as justification for refusing to do so.  *See Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 Fed. Reg. 75,221, 75,221-27 (Dec. 8, 2022) ("*Preliminary Affirmative Circumvention Determinations*"). Liquidation was not suspended, and AD/CVD cash deposits were not collected on any unfairly traded and circumventing CSPV cells or modules from Cambodia, Malaysia, Thailand, and Vietnam that the *Solar Duty Holiday* deemed "Applicable Entries;" essentially any such entries that importers certified would be "utilized" within 180 days <u>after expiration</u> of the purported "emergency." *See id.*

Commerce finalized its affirmative country-wide circumvention findings on August 23, 2023. *See Final Circumvention Determinations*, 88 Fed. Reg. at 57,419. Again, Commerce's well-established regulations obliged it to instruct CBP to suspend liquidation and collect

AD/CVD cash deposits on such entries. 19 C.F.R. § 351.226(l)(3).  But again, Commerce relied

upon the crudely designed *Solar Duty Holiday* in refusing to take these mandatory steps. *See*

*Final Circumvention Determinations*, 88 Fed. Reg. at 57,419-23. Consequently, despite

affirmative findings of circumvention and Defendants' clear regulatory obligation to suspend

liquidation and collect cash deposits vis-à-vis such entries, this is not being done and domestic

CSPV module producers are being denied the protection of the AD/CVD orders on CSPV

products from the PRC to the detriment of America's ability to manufacture solar energy

products that could redress the specific "emergency" cited in *Proclamation 10414*.

Indeed, U.S. imports of CSPV cells and modules from the circumventing countries

reached an unprecedented $7.37 billion in 2022, $6 billion of which coincided with the gaping

hole in otherwise-enforceable duties created by *Proclamation 10414* and the *Solar Duty Holiday*.

*See* Solar Plaintiffs' Response to Motion to Dismiss, ECF Doc. 55 (Feb. 16, 2024) at Exhibit 6

(USITC Dataweb Results for April through December 2022). The situation grew exponentially

worse in 2023, as U.S. imports from the circumventing countries exceeded $14 billion—more

than double the value that precipitated the petition for circumvention inquiries. *See* USITC

Dataweb Query Results (**Exhibit 1**). This rapid growth continued in 2024, which saw a 30%

year-over-year increase in imports from these sources between January and May.[3] *See id.*

Although the emergency declared by *Proclamation 10414* expired on June 6, 2024,

global warming, warming seas, and the drastic effects of climate change continue, reflecting the

absurdity of the temporary "emergency" identified in *Proclamation 10414*. And notwithstanding

this "emergency's" end, Commerce's *Solar Duty Holiday* continues to afford duty-free benefits

---

[3] At the time of filing, official import data published by the U.S. Census Bureau are not presently
available for months after May 2024. Data inclusive of June 2024 will be released two weeks
from the date of this filing.

to circumventing entries installed no more than 180 days <u>after</u> the "emergency" ended. *See* 19 C.F.R. § 362.102 (definition of "utilization expiration date"). As a result, prices for solar panels today are even lower than they were when Auxin Solar deemed it necessary to petition for circumvention inquiries.

The *Solar Duty Holiday* is invalidated by its fundamental legal and procedural infirmities. It exceeds both the bounds of the statute on which *Proclamation 10414* is based, as well as the terms of *Proclamation 10414* itself. Moreover, Commerce's rushed and untransparent process for promulgating the *Solar Duty Holiday* failed to address material comments raised during the notice and comment period, rendering it procedurally flawed.

## SUMMARY OF ARGUMENT

When Congress empowered the President to proclaim an emergency and thereafter authorize duty-free importation of "food, clothing, and medical, surgical, and other supplies" in 1930, Congress understood that implementing agencies would permit duty-free treatment of the specific types of named goods for the purpose of meeting immediate humanitarian needs, *i.e.*, "for use in emergency relief work." The duty-free imports purportedly authorized by the *Solar Duty Holiday* unlawfully exceed this statutory grant of authority, as well as the terms of *Proclamation 10414* itself. The Court must vacate Defendants' *ultra vires* actions. The U.S. Supreme Court's decision in *Loper Bright Ent. v. Raimondo*, 144 S. Ct. 2244 (2024), precludes this Court from granting any deference to Commerce's interpretation of the statute. Independent application of the tools of statutory construction to 19 U.S.C. § 1318(a) establishes the unlawfulness of the *Solar Duty Holiday*.

### A. Section 318(a) Does Not Authorize Duty-Free Importation of CSPV Cells and Modules

Section 318(a) enumerates five types of goods that are eligible duty-free treatment: "food, clothing, and medical, surgical, and other supplies." Interpreting these terms requires ascertaining their meaning at the time Congress enacted the statute. As understood in 1930, none of these categories encompassed CSPV cells and modules, or even predecessor technologies. As defined in the leading American English dictionary of the day, none of these terms would be commonly understood as extending to imported merchandise intended to be used to produce electricity from the sun. That such articles are not "food" or "clothing" is beyond cavil. (**Section II.A.1**).

The meaning of the three-part list which concludes the series is just as conclusive. Grammar governs statutory meaning, and the fact that "medical, surgical, and other supplies" are preceded by the word "and" offset by a comma, plus the fact that the concluding term "supplies" is necessary to make grammatical sense of "medical," "surgical," and "other" (but not "food" or "clothing"), establishes that these three terms form a list of their own. The *ejusdem generis* canon instructs the court to interpret the term "other supplies" as akin to "medical supplies" and "surgical supplies." As provided for in a contemporaneous dictionary, the latter two terms were understood in 1930 as encompassing specialized items used in healthcare applications, and therefore the best meaning of "other supplies" encompasses other merchandise bound for healthcare applications. (**Section II.A.2**).

Commerce did not grapple with the foregoing in promulgating the *Solar Duty Holiday* but appears to have treated the final portion of "food, clothing, and medical, surgical, and <u>other supplies for use in emergency relief work</u>" (emphasis supplied) as a standalone term that would broadly encompass anything used to relieve an emergency. Under *Loper Bright*, the Court cannot

grant deference to this interpretation. Moreover, this interpretation finds no support in established canons of statutory interpretation. The concluding phrase "for use in emergency relief work" is a commonsense *proviso* of general application that serves to limit the duty-free beneficiaries in every named category of merchandise to goods actually tied to the declared emergency. The Tariff Act of 1930 begins with nearly 100 pages of comprehensive duty provisions covering all manner of goods. By limiting "for use in emergency relief work" to "other supplies" Commerce's reading would yield the absurd result that all manner of food, clothing, medical supplies, and surgical supplies could be made eligible for duty-free importation in response to any emergency proclamation, whatever its character and whatever their end use.

To be sure, Congress certainly <u>could</u> have provided a more open-ended grant of authority for duty-free importation of any "goods for emergency relief." But Congress instead included a series of five categories which forms an integral part of the statutory text. Once "for use in emergency relief work" is understood as limiting each named category, Commerce's notion that any good used in emergency relief constitutes an eligible "other supply" runs afoul of the surplusage canon by rendering the terms "food, clothing, and medical, surgical…supplies" of no practical importance. Moreover, having devoted the majority of the Tariff Act of 1930 to assigning tariffs to all manner of goods—including producers of electricity—Congress was manifestly aware that naming only "food, clothing, and medical, surgical, and other supplies" excluded a long list of merchandise. These named categories should not arbitrarily be given a broader meaning in Section 318(a) than elsewhere in the same Act. Applying the foregoing principles, the "best meaning" of Section 318(a) does not encompass CSPV cells and modules. (**Sections II.A.3-4**).

10

Because the *Solar Duty Holiday* marks the first invocation of Section 318(a) for duty-free purposes since 1946, all prior practice reflects a far more contemporaneous understanding of the 1930 statute. In contrast to the *ultra vires* actions challenged herein, all proclamations between 1930 and 1945 either copied the statutory language or named goods falling squarely within its plain terms (*e.g.*, feed for livestock and jerked beef) when naming eligible goods. Commerce's *Solar Duty Holiday* pointed to a 1946 proclamation, which permitted duty-free timber and lumber imports, as support. Far from providing authority for its action here, that proclamation demonstrates that the President needed additional statutory authority to grant such merchandise duty-free treatment.

When citing the lumber proclamation as authority for transforming a CSPV module into food, clothing, or healthcare supplies, Commerce failed to account for the Veterans Emergency Housing Act of 1946, Pub. L. 79-388 ("VEHA"). The lumber proclamation invokes the VEHA for the emergency housing shortage and empowers the VEHA's "Housing Expediter" to "designate{} and certify{y}" the goods eligible for duty-free treatment. 11 Fed. Reg. at 12,695. The same section of the VEHA that created the "Housing Expediter" further instructed that "executive agencies of the Government shall exercise their emergency powers…for the purpose of aiding in the solution of the problems created by the existing housing emergency," a *sui generis* grant of authority understood as temporarily widening the scope of Section 318. Both Proclamation 2708 and its implementing regulations provided that duty-free treatment would automatically cease no later than the VEHA's December 31, 1947, expiration. Here, by contrast, Congress enacted no additional law expanding Section 318(a) to reach CSPV cells and modules. Rather, through H.J. Res. 39, Congress expressed that Commerce had stretched Section 318(a) too far and voted under the Congressional Review Act to deprive those unlawful regulations of

11

any "force or effect." Past practice suggests that Section 318 was consistently understood over the first fifteen years after its enactment to be a narrow grant of authority. (**Section II.A.5**).

**B.    Commerce Has Unlawfully Permitted Importers to Obtain Duty-Free Treatment for Products Not Imported for Use in Emergency Relief Work**

Even if CSPV cells and modules <u>could</u> fit within the classes of goods eligible for duty-free treatment under Section 318(a), Commerce has unlawfully afforded duty-free treatment to products not "import{ed}…for use in emergency relief work," either because the products were already imported before the declared emergency, or because the use to which the importer certified in exchange for duty-free treatment would not relieve the declared emergency.

*Proclamation 10414* declared an emergency to exist on June 6, 2022, and purported to authorize duty-free importation of CSPV cells and modules "until 24 months <u>after</u> the date of this proclamation." 87 Fed. Reg. at 35,068. Yet, Commerce's *Solar Duty Holiday* grants duty-free benefits to such products "that entered the United States both <u>before</u> and after the signing of the Proclamation." 87 Fed. Reg. at 56,869-70 (emphasis supplied). As Commerce transparently admits, no authority permitted it to invalidate congressional intent to close circumventing loopholes. Rather, it was driven by Commerce's desire to "uniform{ly}" absolve <u>all</u> CSPV cells and modules circumventing the AD/CVD orders on the PRC of any liability for that circumvention, 87 Fed. Reg. at 56,878 n.65, and simplify its workload. Yet, Section 318(a) precludes Commerce from expanding the declared emergency.

Commerce claimed that its actions were permissible because the goods in question were "unliquidated," but this theory contravenes the text of Section 318(a). The statute permits duty-free "importation" of certain merchandise; it does not provide for duty-free "liquidation," which typically occurs about one year later. "Import" and "liquidate" are terms of art used throughout the Tariff Act of 1930 and, just as under current law, they serve as bookends to the lifecycle of

an entry—importation being the very first step, and liquidation typically being the last. Likewise, past regulations implementing Section 318 proclamations consistently limited duty-free treatment to post-proclamation entries. This Court should order Defendants to rescind and reverse the unlawful expansion of duty-free benefits.  (**Section II.B**).

Commerce also unilaterally and arbitrarily expanded the emergency on the back end, by allowing imports to benefit from duty-free treatment merely by attesting that their products would be used within 180 days <u>after</u> the emergency terminated on June 6, 2024, a *de facto* 25% expansion of the two-year "emergency." Section 318(a) permits duty-free benefits for goods that are imported "for use in emergency relief work." Commerce's certification is legally inadequate because it expressly awarded duty-free benefits to goods committed to nothing more than use <u>after</u> the President's declared emergency had ended. Of course, one cannot relieve an emergency after it has already ended, and there is no precedent in prior Section 318 duty-free regulations for granting duty-free importation to goods merely represented to be used sometime after the declared emergency's termination. Commerce exceeded its statutory authority by granting duty-free treatment based on such representations. All such certifications are inadequate as a matter of law. (**Section II.C.1**).

Commerce's certification regime is also legally deficient as concerns the period of the emergency itself, because it deems "install{ation} in the United States" to be "emergency relief work" sufficient to qualify for duty-free importation. But to "relieve" an emergency one must alleviate the emergent condition, which per *Proclamation 10414*, was  "the <u>availability</u> of sufficient electricity generation capacity to <u>meet</u> expected consumer demand." 87 Fed. Reg. at 35,068 (emphasis supplied). Merely fixing a CSPV cell or module into place (*i.e.*, "install{ing}" it) does nothing to make electricity available to satisfy consumer demand unless and until it is

<u>also</u> connected to the electrical grid. Auxin's regulatory comments provided evidence that this gap between installation and connection was real and pervasive, yet Commerce's standard did nothing to address this inadequacy. Granting duty-free treatment based on a promise to undertake acts that would do nothing to relieve the emergency exceeds Commerce's statutory authority, which is limited to permitting duty-free importation for merchandise "for use in emergency relief work." (**Section II.C.2**).

Finally, Commerce's failure to provide for meaningful enforcement in the *Solar Duty Holiday* undermines even the unlawfully low "hurdles" that importers must clear before obtaining duty-free benefits. Past practice demonstrates that eligible Section 318 beneficiaries were limited to non-profits, disaster relief groups, and government agencies; and/or were required to certify to specific emergency-related uses before obtaining duty-free benefits in Commerce's post-Hurricane Katrina regulations. Commerce's *Solar Duty Holiday* not only tosses aside such safeguards, but it fails to provide for mechanisms which meaningfully ensure Commerce's meagre requirements are satisfied in practice. This is especially troubling given that importers are often not installers, and thus lack a direct line of sight to the duty-free good's ultimate use. Prescribing procedures that provide a gloss of legality to a lawless, unregulated environment is contrary to Congress' intent.  Commerce's *Solar Duty Holiday* is inadequate in these most basic respects, even though Commerce was advised of such loopholes. (**Section II.C.3**).

Defendant-Intervenors' affirmative defenses are baseless and otherwise precluded. (**Section III**). Solar Plaintiffs request that this court hold the *Solar Duty Holiday* to be void and vacate it as contrary to the standards set forth in 5 U.S.C. § 706.

## ARGUMENT

### I.    Standard of Review

The Court has subject matter jurisdiction over Solar Plaintiffs' action pursuant to 28

U.S.C. § 1581(i). Slip Op. 24-58 at 17-26. Therefore, the "Administrative Procedure Act

standard of review applies." *Shakeproof Indus. Prods. Div. of Ill. Tool Works Inc. v. United

States*, 104 F.3d 1309, 1313 (Fed. Cir. 1997); *see also* 28 U.S.C. § 2640(e). In relevant part, the

APA requires the Court to:

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>
>> . . .
>>
>> (C) in excess of statutory…authority…;
>>
>> (D) without observance of procedure required by law; {or}
>>
>> (E) unsupported by substantial evidence…

5 U.S.C. § 706(2). When applying this standard, the APA provides that "the reviewing court

shall decide all relevant questions of law {and} interpret constitutional and statutory provisions."

*Id.* § 706. While courts formerly invoked the two-step framework of *Chevron U.S.A. Inc. v.

Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984), the Supreme Court

overruled *Chevron* this past term, *Loper Bright*, 144 S. Ct. at 2273.  In doing so, the Supreme

Court applied Section 706 of the APA, explaining the interpretive framework as follows:

> The APA…codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment. It specifies that courts, not agencies, will decide "all relevant questions of law" arising on review of agency action, § 706 (emphasis added)—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it. And it prescribes no deferential standard for courts to employ in answering those legal questions.

*Id.* at 2261. Stated simply, regardless of any ambiguity in a statute, the government's interpretation of the law is not entitled to <u>any</u> deference. Instead, the Court's duty in applying 5 U.S.C. § 706 is to discern the statute's "best meaning" by "deploying its full interpretive toolkit." *See id.* at 2271.

The caveat, applied inconsistently and not pertinent here, provides for deference where "a particular statute empowered an agency to decide how a broad statutory term applied to specific facts found by the agency." *Id.* at 2259-60 (discussing the definition of coal "producer" in *Gray v. Powell*, 314 U.S. 402 (1941) and definition of "employee" in *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 130 (1944)). Unlike *Gray* and *Hearst*, however, Section 318 does not expressly envision any administrative process by which the defendant agencies might develop a factual record and define the meaning of any statutory term disputed by Solar Plaintiffs' challenge (*i.e.*, "importation" or "food, clothing, and medical, surgical, and other supplies for use in emergency relief work"). 19 U.S.C. § 1318(a).

*Loper Bright* otherwise observes that an agency, on equal footing with any other litigant, may succeed in persuading the court of the correctness of its legal interpretation. It suggests that an agency's interpretation may be particularly persuasive "when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time," *Loper Bright*, 144 S. Ct. at 2258 (citing *United States v. Dickson*, 15 Pet. 141, 161 (1841)), or where "it rests on factual premises within {the agency's} expertise," 144 S. Ct. at 2267 (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98, n.8 (1983)). Otherwise, persuasiveness "would 'depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements,

and all those factors which give it power to persuade, if lacking power to control.'" 144 S. Ct. at 2259 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

None of these "persuasiveness" factors applies to the present dispute. The 2022 *Solar Duty Holiday* is no contemporary of the 1930 statute invoked therein and repeatedly contradicts the limited, but far more contemporaneous, prior duty-free practice under 19 U.S.C. § 1318. Nor were the challenged aspects of Commerce's rulemaking premised upon expert fact-finding. For example, the *Solar Duty Holiday* does not weigh evidence and articulate how CSPV cells and modules constitute "supplies" akin to "medical" and "surgical" materials within the meaning of Section 318, nor could it ever do so, given the plain meaning of those terms. The *Solar Duty Holiday* is the product of a rushed attempt to whitewash circumvention by shoehorning duty-free treatment into inapposite statutory authority—not a model of "thoroughness," "validity," "consistency," or even common sense. Under *Skidmore* (and the rule of law), results-oriented expediency imbues no special powers of persuasion.

## II.    The Unprecedented *Solar Duty Holiday* Violates the Underlying Statute

Solar Plaintiffs bring three challenges under the Administrative Procedure Act and Declaratory Judgment Act to Commerce's *Solar Duty Holiday*. Defendants' duty holiday for circumventing CSPV cells and modules exceeds the authority conferred by 19 U.S.C. § 1318(a), the statute relied upon to promulgate the *Solar Duty Holiday*. (**Section II.A**).  And even if CSPV cells and modules were theoretically within the scope of that statute, the *Solar Duty Holiday* nevertheless contravenes the statute and the President's authorization by extending duty relief outside the bounds of "importation…for use in emergency relief work."  (**Sections II.B-C**).

17

**A. Traditional Tools of Statutory Construction and Contemporaneous Sources Establish 19 U.S.C. § 1318(a) Does Not Authorize Duty-Free Importation of CSPV Cells and Modules**

19 U.S.C. § 1318 became law in 1930 and Congress has never altered the subsection at issue in this appeal.[4] *See* Tariff Act of 1930, Pub. L. 71-361, § 318, 46 Stat. 590, 696. Thus, since its inception, Section 318(a) has permitted duty-free "importation…of food, clothing, and medical, surgical, and other supplies for use in emergency relief work." This statutory clause circumscribes duty-free treatment in two ways. *First*, only the five named types of goods ("food, clothing, and medical, surgical, and other supplies") are eligible for duty-free treatment. *See* 19 U.S.C. § 1318(a). (**Sections II.A.1-2**). *Second*, goods of an eligible type may only be afforded duty-free treatment if "use{d} in emergency relief work." *See id.* (**Sections II.A.3**). By extending duty-free treatment to CSPV cells and modules — which are neither food, clothing, nor medical, surgical, and other supplies — Commerce's *Solar Duty Holiday* plainly exceeds the bounds of what Section 1318(a) authorizes. (**Section II.A.4-5**). *Loper Bright* explains that this Court cannot defer to Commerce's evidently contrary view, *Loper Bright*, 144 S. Ct. at 2261, 2273, and traditional tools of statutory construction demonstrate that Commerce's stretching of

---

[4] 19 U.S.C. § 1318 has been amended only twice since originally becoming law in 1930. The Trade Act of 2002 created a new subsection (b) that concerns service hours at customs offices during times of declared emergencies and is not relevant to this action. *See* Pub. L. 107-210, § 342, 116 Stat. 933, 981 (2002). The Trade Facilitation and Trade Enforcement Act of 2015 deemed references to the "Commissioner of Customs" or the "Commissioner of the Customs Service" to designate the Commissioner of U.S. Customs and Border Protection. *See* Pub. L. 114-125, § 802(d)(2), 130 Stat. 122, 210 (2015). The associated legislative history contains no indication that Congress' clerical adjustments to Section 318(a) constituted ratification. *See GPX Int'l Tire Corp. v. United States*, 666 F.3d 732, 739-40 (Fed. Cir. 2011); *e.g.*, H.R. Conf. Rep. 107-624 at 675 (2002) (omitting any mention of duty-free provision). Moreover, given that Section 318's duty-free provision had most recently been invoked in the 1930s and 1940s and the absence of any judicial interpretation of the relevant language, existing practice was hardly "widely known" at the time of the 2002 and 2015 amendments. *See GPX*, 666 F.3d at 739. Rather than ratification, Congress' first comment on duty-free practice under Section 318 was its disapproval of the *Solar Duty Holiday Rule*. *See* H.J. Res. 39.

the statutory terms beyond recognition is contrary to Congressional intent and far from the "best meaning" of Section 318(a).

1.   *The Categories of Goods Expressly Named in Section 318(a), in their Ordinary, Contemporaneous Meanings, Do Not Encompass CSPV Cells and Modules*

The Supreme Court has recently reaffirmed that statutory terms must be given their ordinary meaning. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023) ("statutory permission to 'modify' does not authorize 'basic and fundamental changes in the scheme' designed by Congress. Instead, that term carries 'a connotation of increment or limitation,' and must be read to mean 'to change moderately or in minor fashion.'") (internal citations omitted); *see also, e.g.*, *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) ("When interpreting a statute, we must give words their 'ordinary or natural' meaning"); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 509 (1981) (deriving "{t}he plain meaning of the word 'feasible'" from dictionary definitions). Moreover, "it's a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary, contemporary, common meaning…at the time Congress enacted the statute.'" *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)); *see also Taylor v. United States*, 495 U.S. 575, 593-98 (1990) (looking to the "contemporary" meaning of burglary in 1986); *MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994) ("In 1934, when the Communications Act became law—the most relevant time for determining a statutory term's meaning—Webster's Third was not yet even contemplated") (internal citations omitted). Here, it is beyond cavil that the CSPV cells and modules given duty-free treatment by Commerce's *Solar Duty Holiday*, *see* 87 Fed. Reg. at 56,872, are not "food," nor "clothing," nor "medical supplies," nor "surgical supplies" as ordinarily understood in 1930 (or today).

19

To begin with, neither human nor animal could safely consume or be clothed by CSPV cells or modules. Turning to the three-part offset list—"medical, surgical, and other supplies"—CSPV cells and modules fare no better. 19 U.S.C. § 1318(a); *see, e.g.*, *Nebraska*, 143 S. Ct. at 2368; *Leocal*, 543 U.S. at 9; *Donovan*, 452 U.S. at 509. The leading American English dictionary of the day,[5] published in 1934, defined the adjective "medical" as "Of, pert{aining} to, or dealing with, the healing art, or the science of medicine, esp{ecially} in the narrower sense; as, the *medical* profession; *medical* services." *Webster's New International Dictionary* (2d Ed.) (1934) (excerpted as **Exhibit 2**). In Section 318(a), "medical…supplies" should also be understood "in the narrower sense." Likewise, the adjective "surgical" was defined as "Of, or pertaining to surgeons or surgery; done by, or used in, surgery." **Exhibit 2**. The noun "surgery," in turn, was "That branch of medical science, art, and practice, which is concerned with the correction of deformities and defects, the repair of injuries, the diagnosis and cure of diseases, the relief of suffering and the prolongation of life, by manual and instrumental operations." **Exhibit 2**.[6] Consequently, "surgical…supplies" in Section 318(a) refers to goods used in manual and instrumental medical operations.

In sum, "at the time Congress enacted the statute" at issue, *Wisconsin*, 138 S. Ct. at 2074, it selected terms understood to encompass goods used for concrete healthcare applications. These do not contemplate utility-scale electricity generation. And "the whole point of having written statutes {is that} 'every statute's meaning is fixed at the time of enactment.'" *Loper Bright*, 144 S. Ct. at 2266 (quoting *Wisconsin*, 585 U.S. at 284). Indeed, because CSPV cells and modules,

---

[5] This edition is cited in dozens of Supreme Court cases and described as among the "principal standard dictionaries" in *Crane v. C.I.R.*, 331 U.S. 1, 8 (1947).

[6] An alternative definition was "The work done by a surgeon; as, the operation was a skillful piece of bloodless *surgery*." **Exhibit 2**.

the first practical device for converting solar energy to electricity, were not even invented until 1954, *see, e.g.*, Solar Plaintiffs' Motion for Preliminary Injunction, ECF Doc. 15 (Jan. 17, 2024) at Exhibit 1 (*Smithsonian Magazine* and *American Physical Society News* articles), Congress <u>could not</u> have had them in mind in 1930 when providing for duty-free importation of "food, clothing, and medical, surgical, and other supplies."[7] CSPV cells and modules fall far outside the scope of the specifically named categories of goods.

2. *The Final Category, "Other Supplies," Must Resemble Medical Supplies and Surgical Supplies and Does Not Encompass CSPV Cells and Modules*

"{T}he rules of grammar govern statutory interpretation unless they contradict legislative intent or purpose." *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019). Here, the last category of goods identified in Section 318(a), "other supplies," comes at the end of a three-part list set off by a comma and the word "and"—"and medical, surgical, and other supplies." *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (citing drafters' use of a comma to set aside a particular phrase from the following language to interpret statute); *U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993) ("the meaning of a statute will typically heed the commands of its punctuation."). The concluding term "supplies" is necessary to make grammatical sense of "medical," "surgical," and "other" (but not "food" or "clothing"), further confirming the tripartite nature of this list. The parallelism of the three-part list is further cemented by the fact that "medical…supplies" and "surgical…supplies" are each defined by their field of application, unlike "food" or "clothing."

---

[7] Although a fraught technique for interpreting statutes, Section 318(a) also lacks anything that one might attempt to bootstrap into encompassing CSPV cells and modules. The text makes no reference whatsoever to predecessor technologies (*e.g.*, coal-fired or hydroelectric power plants) or similar applications (*i.e.*, electricity production).

As explained below, just as yet-to-be-invented CSPV cells and modules could not have fallen within the ordinary meaning of "medical…supplies," or "surgical…supplies" in 1930, it necessarily follows that they were not encompassed by the general term "other supplies." *See* 19 U.S.C. § 1318(a). Because "other supplies" concludes a list, the *ejusdem generis* canon of interpretation requires that "other supplies" be something akin to the preceding terms, medical supplies and surgical supplies. *See, e.g.*, *Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789 (2022) ("the *ejusdem generis* canon, which instructs courts to interpret a 'general or collective term' at the end of a list of specific items in light of any 'common attribute{s}' shared by the specific items.") (*quoting Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 225 (2008)). There is not even the remotest possibility that Congress in 1930 considered then-nonexistent CSPV cells and modules to share meaningful attributes with "medical supplies" and "surgical supplies" of the day.[8] Read in context, the most natural reading of "other supplies" is that—like "medical" supplies and "surgical" supplies, which are both defined by their use—Congress simply intended to capture other items used in healthcare applications.

For the avoidance of doubt, the legislative history associated with the text of Section 318(a) is both limited in substance and otherwise consistent with the foregoing analysis. It juxtaposes the relevant section of the 1922 Tariff Act as only "authoriz{ing} the extension of time limitations" during a Presidentially proclaimed emergency, noting that Section 318 of the 1930 Tariff Act was "broadened to {also} permit the free importation of food, clothing and supplies for use in relief work in connection with any such emergency…." H. Doc. 15 (May 9, 1929) at 334 (House Ways & Means Committee comparative print of H.R. 2667 and Tariff Act

---

[8] This conclusion would not change even if grammar and construction were ignored and "other supplies" were treated as concluding a five-part list that also included food and clothing of the 1930s.

of 1922). In other words, the House committee report acknowledges that the duty-free import clause is new to the 1930 text. The duty-free import clause itself is summarized, but not discussed. *See id.* at 155, 334 (statutory text identical to enacted version). Later in the legislative process, the Senate committee report did not mention Section 318. *See* S. Rep. 37 (Sept. 4, 1929) at 61-62 (Senate Finance Committee report on H.R. 2667). There is nothing in the legislative history to overcome the inherently dubious proposition that the authors of the 1930 Tariff Act considered yet-to-be invented CSPV cells and modules (or even predecessor technologies) to constitute "medical, surgical, and other supplies." 19 U.S.C. § 1318(a). Commerce's efforts to enact a duty holiday for circumventing CSPV cells and modules falls well outside the "best meaning" of what Congress intended.

3.    *Limiting Language at the End of Listed Items Cannot Be Read to Render the List Itself Redundant*

"When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Paroline v. United States*, 572 U.S. 434, 447 (2014) (quoting *Porto Rico Railway, Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920)). Here, after listing the five types of goods eligible for duty-free treatment ("food, clothing, and medical, surgical, and other supplies"), Congress concluded with a limiting *proviso* of general application ("for use in emergency relief work"). 19 U.S.C. § 1318(a). Logically, this *proviso* ensures that any duty-free benefits are, in fact, promoting relief of the Presidentially proclaimed emergency. It would defy common sense for Congress to open the door for any and all "food," "clothing," "medical" supplies, and "surgical" supplies to enter duty-free following the proclamation of some emergency, regardless of the nature of the emergency or the goods' intended use.

Grammatically, this reading is further compelled because the word "supplies"—without which the phrase "for use in emergency relief work" makes no sense—is equally integral to the preceding terms "medical," "surgical," and "other." *See Nielsen*, 139 S. Ct. at 965. Moreover, that Congress specifically provided for the issuance of "regulations" to facilitate duty-free imports under Section 318(a), and the nature of the regulations ultimately issued pursuant to that authority, implies that it foresaw a need for additional procedures to ensure compliance with the use requirement. *See, e.g.*, *T.D. 47236*, 66 Treas. Dec. Int. Rev. at 221 (**Exhibit 3**) (requiring certification of use). Were it merely a matter of selecting the correct type of good, usual import paperwork would suffice. *See, e.g.*, Tariff Act of 1930, Pub. L. 71-361, §§ 481(a)(3), (a)(10), 46 Stat. 590, 719-20 (requiring that imported goods be accompanied by an invoice containing "{a} detailed description of the merchandise, including the name…, the grade or quality, and the marks, numbers, or symbols under which sold by the seller or manufacturer…" and "{a}ny other facts deemed necessary to a proper…classification of the merchandise that the Secretary of the Treasury may require").

Congress <u>could</u> have designed Section 318(a) to permit the President to declare an emergency, and thereafter authorize duty-free importation of any "goods for emergency relief," thereby permitting the President to enable duty-free importation of any good connected to the emergency defined by the President. Indeed, the Tariff Act of 1930 began with nearly 100 pages spelling out duty rates for all manner of goods, *see* Pub. L. 71-361, Titles I-II, 46 Stat. 590, 590-685, including a 35% *ad valorem* tariff for "{a}ll articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy," *id.* § 1(353), 46 Stat. at 618. That Section 318 appeared among the "miscellaneous" provisions immediately following these "dutiable" and "free" lists, *see id.*, 46 Stat. at 685, 696, underscores' Congress' awareness that

the universe of imported goods subject to duty went well beyond "food, clothing, and medical, surgical, and other supplies." *Cf. Robers v. United States*, 572 U.S. 639, 639 (2014 ("Generally, identical words used in different parts of the same statute are…presumed to have the same meaning.") (internal quotation marks omitted). Yet, Congress identified <u>only</u> these <u>specific</u> categories rather than enabling open-ended duty-free importation, or naming additional types of disaster relief supplies, such as shelter, transportation, or communication. In this way, Congress constrained the President's ability to override Congress' constitutional authority to "lay and collect Taxes, Duties, Imposts and Excises" and "regulate Commerce with foreign Nations." U.S. CONST. art. I, § 8. The structure of the Tariff Act of 1930 and its overarching purposes to "provide revenue," "regulate commerce," "encourage the industries of the United States," and "protect American labor," Pub. L. 71-361, 46 Stat. at 590, are incompatible with the notion that every line of Congress' intricate system of tariffs set forth in Titles I & II was meant to be one Presidentially proclaimed emergency away from nullification. *See, e.g.*, *United States v. Turkette*, 452 U.S. 576, 589 (1981) (referring to declared statutory purpose and structure of Titles to interpret provision).

The phrase "for use in emergency relief work" is a limitation, not an independent grant of authority. Thus, "other supplies for use in emergency relief work" cannot reasonably be construed as encompassing any good, whatever the type, capable of relieving a Presidentially declared emergency. To do so would fail to "give effect, if possible, to every clause and word of a statute." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017). It would render the reference to "food, clothing, and medical, surgical…supplies" superfluous and inconsequential. 19 U.S.C. § 1318(a). Eschewing such a tortured construction, the "best meaning" takes heed of the canon that where items expressed in a statutory listing "are members

of an 'associated group or series,'" the expression of one thing (*i.e.*, food, clothing, medical supplies, and surgical supplies) "justif{ies} the inference that items not mentioned were excluded by deliberate choice, not inadvertence" (*e.g.*, petrochemicals, rolling stock, or machinery for producing electricity). *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)).

In sum, "other supplies for use in emergency relief work" encompasses other healthcare supplies akin to medical supplies and surgical supplies, *see* Section II.A.2, *supra*, if used to relieve the proclaimed emergency. By invoking this limited phrase to permit duty-free entry of CSPV cells and modules, *Solar Duty Holiday*, 87 Fed. Reg. at 56,872, Defendants have far exceeded Section 318(a)'s congressional grant of authority.

4. *Commerce's Interpretation of Section 318(a) Violates All of the Foregoing Canons of Construction and Finds No Countervailing Support*

Commerce's *Solar Duty Holiday* only briefly addresses the language of Section 318(a), beginning from the flawed premise that "supplies for use in emergency relief work" is a standalone grant of authority. *Solar Duty Holiday*, 87 Fed. Reg. at 56,871. Commerce then labels electricity "a basic necessity of life in the United States" that could "enable necessary medical care,[9] national defense, and provide{} for essential communications and for health and safety in extreme temperatures" and asserts that CSPV cells and modules are therefore "supplies for use in emergency relief work," given that the declared emergency relates to electricity generation capacity. *Id.* at 56,872. Commerce never addresses the remainder of Section 318(a)'s text. *See id.*

---

[9] Nothing in the *Solar Duty Holiday Rule* or its associated certification regime considers whether imported CSPV cells and modules benefiting from duty-free treatment are used in healthcare applications.

But Commerce's expansive and expedient interpretation of Section 318(a) finds no support in any canon of statutory construction.

Indeed, not only do the principles invoked in Sections II.A.1-3, *supra*, support Solar Plaintiffs' understanding of Section 318(a), each undercuts Commerce's formulation. To summarize, *first,* reading "other supplies" as encompassing <u>any</u> product used in emergency relief flatly violates the rule against surplusage by rendering the statutory reference to "food, clothing, and medical, surgical…supplies" an irrelevant nullity. *See Advoc. Health*, 581 U.S. at 477.

*Second,* Commerce made no attempt to address how its reading comports with *ejusdem generis* limitations upon the three-part list of "medical, surgical, and other supplies." *See Sw. Airlines*, 142 S. Ct. at 1789. Indeed, Commerce inverts *ejusdem generis* by ignoring the terms "medical" and "surgical" that <u>precede</u> "other," *see Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) ("when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows"), while implicitly treating the postpositive modifier "for use in emergency relief work" as a separate grant of authority, *see Solar Duty Holiday*, 87 Fed. Reg. at 56,872. In fact, "for use in emergency relief work" is a series qualifier applied to each category named in Section 318(a) to ensure that duty-free benefits serve the purpose of emergency relief. *See Paroline*, 572 U.S. at 447.

*Third,* treating not-yet-invented CSPV cells and modules as encompassed by Section 318(a) violates the requirement that statutory terms be given their ordinary meaning "at the time Congress enacted the statute," *Wisconsin*, 138 S. Ct. at 2074, given that none of the terms were defined to encompass any product remotely similar to CSPV cells and modules in 1930, *see* **Exhibit 2**.

*Finally*, treating the listed product categories as essentially limitless contravenes the overarching structure of the Tariff Act of 1930, which imposed duties on an exhaustive list of specific goods, including machines that produce electricity, Pub. L. 71-361, §1(353), 46 Stat. at 618, yet targeted only a handful of goods for possible emergency duty relief, *id.* § 318, 46 Stat. at 696. *See, e.g.*, *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.").

5.  *Past Practice Corroborates Solar Plaintiffs' Construction of Section 318(a); Commerce's Outlier Example Invoked a Separate Grant of Authority*

While Section 318(a) has not often been used to permit duty-free imports, past applications (and those most proximate to Section 318's enactment) have either employed the statutory language itself or named goods falling squarely within its plain meaning. *See Proclamation 2093: Emergency Due to Drought—Free Importation of Feed for Livestock*, 49 Stat. 3,404 (Aug. 10, 1934); *Proclamation 2223: Emergency Due to Flood Conditions—Free Importation of Food, Clothing, and Medical, Surgical, and Other Supplies for Use in Emergency Relief Work*, 2 Fed. Reg. 273 (Feb. 3, 1937); *Proclamation 2498*: *Emergency Due to Drought— Free Importation of Forage for Livestock*, 6 Fed. Reg. 3,715 (July 29, 1941); *Proclamation 2545: Free Importation of Jerked Beef*, 7 Fed. Reg. 2,611 (Apr. 7, 1942); *Proclamation 2553*: *Emergency Due to State of War—Free Importation by the American National Red Cross of Food, Clothing, and Medical, Surgical, and Other Supplies*, 7 Fed. Reg. 3,143 (Apr. 30, 1942). These examples of past practice corroborate the exhaustive analysis of Section 318(a)'s language set forth in Sections II.A.1-3, *supra*. Proclamation 2708, the only example to the contrary and the only example acknowledged by Commerce, *see Solar Duty Holiday*, 87 Fed. Reg. at 56,872, makes no attempt to explain how timber constitutes "food, clothing, and medical, surgical, and

28

other supplies," *see* 11 Fed. Reg. at 12,695. For the same reasons explained in Sections II.A.1-3, *supra*, it does not.

Moreover, Proclamation 2708 originated with the timebound Veterans Emergency Housing Act of 1946 ("VEHA"), which expired automatically on December 31, 1947.[10] *See* Pub. L. 79-388, §1(b), 60 Stat. 207, 208. The Proclamation first cites the "unprecedented emergency shortage of housing" recognized by the VEHA, *compare* Proclamation 2708, 11 Fed. Reg. at 12,695, *with* Pub. L. 388, §1(a), 60 Stat. at 207, and concludes by authorizing duty-free importation "of any articles which <u>the Housing Expediter designates and certifies as</u> timber, lumber, or lumber products suitable for the construction or completion of housing accommodations," 11 Fed. Reg. at 12,695 (emphasis supplied). This "Housing Expediter" was a temporary position created by the VEHA "to overcome the serious shortages and bottlenecks with respect to building materials, to expedite the production of such materials, {and} to allocate them for house construction and other essential purposes…" Pub. L. 388, §§ 1(a), 2(a), 60 Stat. at 207-08. The same section that created the "Housing Expediter" further instructed that "executive agencies of the Government shall exercise their emergency powers…for the purpose of aiding in the solution of the problems created by the existing housing emergency," *id.* § 2(c), 60 Stat. at 209, a *sui generis* grant of authority understood as temporarily widening the scope of Section 318. Both Proclamation 2708 and the Treasury Department's implementing regulations[11] viewed this authorization of duty-free treatment as subject to the VEHA, insofar as duty-free

---

[10] Proclamation 2708 itself was terminated effective August 15, 1947. *Proclamation 2735: Free Importation of Timber, Lumber, and Lumber Products*, 12 Fed. Reg. 4255 (July 2, 1947).

[11] Administrative responsibility for implementing duty-free treatment pursuant to Section 318 originally lay with the U.S. Department of the Treasury, but was subsequently transferred to the U.S. Department of Commerce. *See Reorganization Plan No. 3 of 1979*, 93 Stat. 1381, 1383 (1979).

treatment was to automatically cease upon the earlier of "termination of the provisions of the Veterans' Emergency Housing Act" or a further Presidential declaration terminating the emergency. *Proclamation 2708*, 11 Fed. Reg. at 12,695; *T.D. 51565*, 11 Fed. Reg. 13,459, 13,459 (Nov. 14, 1946) (19 C.F.R. § 53.3(a)). In contrast to Congress temporarily expanding the scope of Section 318(a) in 1946, Congress explicitly rejected Commerce's expansion of Section 318(a) authority here.

No court ever considered, much less endorsed, Proclamation 2708's lawfulness. Two decisions of the U.S. Customs Court (then an Article I tribunal) reviewed protests that relied upon Proclamation 2708 to claim duty-free treatment. *See Border Brokerage Co. v. United States*, 24 Cust. Ct. 44, 45 (Cust. Ct. 1950) ("*Border Brokerage I*"); *Mussman & Shafer, Inc. v. United States*, 27 Cust. Ct. 180, 183 (Cust. Ct. 1951), *aff'd*, 40 C.C.P.A. 108 (1953). There, neither the claimants who sought duty-free treatment nor the government defendants had any incentive to question Proclamation 2708's legality. *Border Brokerage I*, 24 Cust. Ct. at 45 (stipulating to Proclamation 2708's effective dates); *Mussman & Shafer*, 27 Cust. Ct. at 184 (analyzing date of entry for purposes of eligibility for duty-free treatment); *see also Border Brokerage Co. v. United States*, 27 Cust. Ct. 223, 225 (Cust. Ct. 1951) (incorporating *Border Brokerage I*'s rationale by reference and otherwise considering unrelated arguments about the Shingles Quota Act of 1940). Thus, the U.S. Customs Court never considered this threshold question.[12] Indeed, as an Article I tribunal with limited powers, it likely lacked the power to do so. *See* Customs Administration Act of 1890, Ch. 407 §§ 13, 15, 26 Stat. 131, 138 (empowering

---

[12] Moreover, *Border Brokerage I*'s reasoning mooted the question of Section 318's product coverage, rejecting plaintiffs' appeal because "{o}nly red cedar shingles in excess of the annual quota provided by the Shingles Quota Act were dutiable," "the quota was not exceeded during the term of the emergency," and "proclamation No. 2708 could have effect only on such excess-of-quota shingles." *See* 24 Cust. Ct. at 48.

Board of General Appraisers to determine the "dutiable value" of merchandise, whereas the Circuit Courts of Appeal were tasked with "hear and determine the questions of law" if any appeal were pursued); Pub. L. 69-304, 44 Stat. 669 (1926) (renaming Board of General Appraisers as U.S. Customs Court and otherwise maintaining "jurisdiction, powers, and duties"); *Ex Parte Bakelite Corp.*, 279 U.S. 438 (1929) (holding both the U.S. Customs Court and Court of Customs Appeals to be Article I tribunals).

Proclamation 2708 thus likely went unchallenged due to the superseding, yet long-since expired, authority conferred by the Veterans Emergency Housing Act of 1946. Here, by contrast, the legislative activity surrounding the *Solar Duty Holiday* points in the opposite direction. Congress voted on a bipartisan basis to deprive the *Solar Duty Holiday* of any "force or effect" under the Congressional Review Act. H.J. Res. 39 (2023). Moreover, every Presidential Proclamation authorizing duty-free treatment pursuant to Section 318 in the first fifteen years after its enactment supports Solar Plaintiffs' commonsense understanding of the terms "food, clothing, and medical, surgical, and other supplies," which is the "best meaning" as Congress intended in 1930.

**B.**  **Even if CSPV Cells and Modules Could Be Covered by 19 U.S.C. § 1318(a), Commerce's *Solar Duty Holiday* Violates the Statute and the Explicit Terms of *Proclamation 10414* by Granting Duty-Free Treatment to Products "Import{ed}" <u>Before</u> the Emergency**

The statute permits duty-free "importation" only where certain preconditions are met, including "{w}henever the President shall by proclamation declare an emergency to exist…"  19 U.S.C. § 1318(a). Yet, Commerce's *Solar Duty Holiday* expressly applies to CSPV cells and modules "that entered the United States <u>both before</u> and after the signing of the Proclamation," and waives any potential duty liability until "the Date of Termination (defined as June 6, 2024, or the date the emergency described in Presidential Proclamation 10414 has been terminated,

31

whichever occurs first)." 87 Fed. Reg. at 56,869-70 (emphasis supplied); *see also* 19 C.F.R. § 362.103(a). Commerce's lead rationale for unilaterally expanding the emergency period is that affording duty-free benefits to pre-emergency goods is acceptable because they "are unliquidated." *Id.* at 56,877. This violates the terms of Section 318(a), is *ultra vires Proclamation 10414*, and contradicts all past practice.

The plain text of 19 U.S.C. § 1318(a) contemplates duty-free "importation" after an emergency has been declared, not duty-free treatment for any eligible good liquidated after the start of an emergency, whenever imported. "Date of Importation" is defined for customs purposes as "the date on which the vessel arrives within the limits of a port in the United States with intent then and there to unlade such merchandise." 19 C.F.R. § 101.1; *see also id.* §§ 101.1, 141.68 (defining "Date of Entry" by reference to various post-arrival activities); *Solar Duty Holiday*, 87 Fed. Reg. at 56,877 & n.58 (quoting 19 C.F.R. § 351.212(a)) (Commerce's own Preamble quoting a regulation stating that duty assessment occurs "after merchandise is imported").

Though Commerce relies on conflating the statutory term "importation" with "liquidation," *see Solar Duty Holiday*, 87 Fed. Reg. at 56,877, the Tariff Act of 1930 treats these concepts as distinct. As under the modern framework, there are three main steps: (1st) importation, (2nd) entry, and (3rd) liquidation. After merchandise is imported, the consignee must make entry within "forty-eight hours, exclusive of Sundays and holidays, after the entry of the importing vessel or report of the vehicle…." Pub. L. 71-361, § 484(a), 46 Stat. at 722. When making entry, the consignee must produce, *e.g.*, a certified invoice and bill of lading, *id.*, and "shall deposit…the amount of duty estimated to be payable thereon," *id.* § 505, 46 Stat. at 732. Thereafter:

> Upon receipt of the appraiser's report and of the various reports of landing, weight, gauge, or measurement the collector shall ascertain, fix, and liquidate the rate and amount of duties to be paid on such merchandise as provided by law and shall give notice of such liquidation…and collect any increased or additional duties due or refund any excess duties deposited as determined on such liquidation.

*Id.* Thus, consistent with the remainder of the Tariff Act of 1930, *see, e.g.*, *Robers*, 572 U.S. at 639 ("Generally, identical words used in different parts of the same statute are…presumed to have the same meaning."), and Congress' understanding of the unaltered term "importation" at the time of enactment, *see, e.g.*, *Telecommunications Corp.*, 512 U.S. at 228 (describing the "{year} the Communications Act became law {as} the most relevant time for determining a statutory term's meaning"), Plaintiffs submit that the "best meaning" of "authoriz{ing}…importation free of duty" under Section 318(a) precludes duty-free treatment for goods imported prior to the President's proclamation of an emergency.

Commerce otherwise claimed that *Proclamation 10414* "does not specify a start date" "to consider for duty-free treatment" and that Commerce believed it was "appropriate" to unilaterally extend the emergency period to treat all circumventing goods "in a uniform fashion." *Solar Duty Holiday*, 87 Fed. Reg. at 56,878 n.65. But Commerce's rogue desire to deny domestic producers even a few months' protection from PRC-linked circumventing CSPV cells and modules cannot overcome the absence of any statutory authority for <u>Commerce</u> to declare or extend an emergency. *See* 19 U.S.C. § 1318(a). The statute specifically constrains duty-free "importation" to "{w}henever the <u>President</u>…declare{s} an emergency," 19 U.S.C. § 1318(a) (emphasis supplied), and *Proclamation 10414* "hereby declare{d} an emergency to exist" on June 6, 2022—<u>not before</u>. 87 Fed. Reg. at 35,068.

Commerce's specious suggestion that *Proclamation 10414* omits a start date butchers the English language. *Proclamation 10414* authorizes Commerce to "permit, until 24 months after the date of this proclamation…" extending duty-free treatment to circumventing CSPV cells and

modules. 87 Fed. Reg. at 35,068. This phrasing—"permit until {XYZ date}"—has been in nearly every other Section 318(a) proclamation authorizing duty-free treatment, *see Proclamation 2093*, 50 Stat. at 3404; *Proclamation 2498*, 6 Fed. Reg. at 3,715; *Proclamation 2545*, 7 Fed. Reg. at 2,611; *Proclamation 2553*, 7 Fed. Reg. at 3,143; *Proclamation 2708*, 11 Fed. Reg. at 12,695, and has consistently been implemented as commencing duty-free treatment no earlier than the date of the proclamation itself, *see T.D. 47236*, 66 Treas. Dec. Int. Rev. at 221 (**Exhibit 3**); *T.D. 50449*, 6 Fed. Reg. at 4,072; *T.D. 50599*, 7 Fed. Reg. at 2,777; *T.D. 50626*, 7 Fed. Reg. at 3,358; *T.D. 51565*, 11 Fed. Reg. at 13,459. One would not ordinarily understand authorization granted on day X to extend backwards to some arbitrary point in time absent some specific instruction, and syncing the duty-free treatment with dates relevant to some other proceeding is not a consideration contemplated anywhere in Section 318(a), *see* 19 U.S.C. § 1318(a), nor is the circumvention proceeding mentioned anywhere in *Proclamation 10414*, *see* 87 Fed. Reg. at 35,067-69.[13]

Unsurprisingly, Commerce's results-oriented interpretation conflicts with <u>all</u> past exercises of this statutory authority. Regulations implementing Proclamation 2708 permitted duty-free importation only "if entered for consumption or withdrawn from warehouse for consumption on and after the date of the proclamation." *T.D. 51565*, 11 Fed. Reg. 13,459, 13,459 (Nov. 14, 1946) (19 C.F.R. § 53.3(a)); *see also Solar Duty Holiday*, 87 Fed. Reg. at 56,872 (citing Proclamation 2708). Likewise, implementing regulations for Proclamations 2093, 2498, 2545, and 2593 each concluded with language materially identical to the following: "The free entry herein authorized shall apply only with respect to importations entered for consumption on

---

[13] Even if Section 318(a) permitted the President to authorize duty-free treatment during a period that pre-dates an emergency, the President's authorization here was limited to providing prospective tariff relief for only 24 months.

and after the date of the approval of these regulations…" *T.D. 47236*, 66 Treas. Dec. Int. Rev.

218, 221 (1935) (attached for convenience as **Exhibit 3**); *see also T.D. 50449*, 6 Fed. Reg. 4,071,

4,072 (Aug. 15, 1941) (19 C.F.R. § 8.79a(g)); *T.D. 50599*, 7 Fed. Reg. 2,776, 2,777 (Apr. 14,

1942) (19 C.F.R. § 8.79b(b)); *T.D. 50626*, 7 Fed. Reg. 3,358 (May 6, 1942) (19 C.F.R. §

8.79c(b)). And customs officers were not "authorized {to} permit free entry" until several days

after Proclamation 2223. *T.D. 48798*, 2 Fed. Reg. 339 (Feb. 11, 1937).[14]

But Commerce was correct about one thing. Absent its *ultra vires* expansion in the name

of "uniform{ity}," *Solar Duty Holiday*, 87 Fed. Reg. at 56,878 n.65, several months' worth of

entries would have been ineligible for duty-free treatment. Because Commerce published notice

of its initiation of anti-circumvention inquiries on April 1, 2022, *see Crystalline Silicon*

*Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of*

*China: Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty*

*Orders*, 87 Fed. Reg. 19,071, 19,071 (Apr. 1, 2022), Commerce's issuance of affirmative

---

[14] Solar Plaintiffs recognize that these examples of past practice appear to implicitly apply the statutory term "importation" as "entry." None, however, explain this disconnect. Congress understood the distinction between "importation" and "entry" in 1930. Just one page before Section 318, the Tariff Act of 1930 refers to "merchandise previously imported, for which no entry has been made" as owing duties prescribed by the Tariff Act of 1930 (not the earlier Tariff Act of 1922) upon entry. Pub. L. 71-361, § 315, 46 Stat. at 695. The Act also states that the consignee "shall make entry" for "imp<u>orted</u> merchandise" in the section entitled "Entry of Merchandise," *id.* § 484(a), 46 Stat. at 722 (emphasis supplied), refers to "importation without entry thereof having been made" as a form of unclaimed merchandise, *id.* § 491, 46 Stat. at 726, and otherwise references "the time provided by law" for "entry of any imp<u>orted</u> merchandise," *id.* § 490, 46 Stat. at 726 (emphasis supplied). In this respect, therefore, Solar Plaintiffs consider the examples of past practice incorrect. Section 318(a) uses the term "importation," which denoted an act distinct from—and prior to—"entry" at the time of enactment. Nevertheless, even if the Court were to embrace this alternative reading of Section 318(a), Commerce has still unlawfully extended duty-free treatment to over $1 billion dollars' worth of goods "entered" before the Presidentially declared emergency. *See* Solar Plaintiffs' Response to Motion to Dismiss, ECF Doc. 55 (Feb. 16, 2024) at Exhibit 6 (USITC Dataweb Results for April & May 2022).

preliminary circumvention determinations <u>should have</u> occasioned by operation of law "the suspension of liquidation and require a cash deposit of estimated duties…for each unliquidated entry of the product…on or after the date of the publication of the notice of initiation of the circumvention inquiry." 19 C.F.R. § 351.226(l)(2)(ii); *see also id.* § 351.226(l)(3) (same following final affirmative circumvention determinations). Only Commerce's unlawful and unilateral expansion of duty-free treatment to pre-emergency dates in its *Solar Duty Holiday* prevented it from implementing its regulatory obligation. Thus, products imported before June 6, 2022, and entered on or after April 1, 2022, were unlawfully given duty-free treatment. *See* Solar Plaintiffs' Response to Motion to Dismiss, ECF Doc. 55 (Feb. 16, 2024) at Exhibit 6 ($1 billion dollars' worth of entries over this period, and likely more in imports, given upward entry trend).

### C. Commerce's *Solar Duty Holiday* Violates 19 U.S.C. § 1318(a) by Granting Duty-Free Treatment to Products Not Actually "Use{d} in Emergency Relief Work"

Even if CSPV cells and modules were to come within the ambit of 19 U.S.C. § 1318(a), a point Solar Plaintiffs contest, duty-free importation applies only to products "for use in emergency relief work." *See* Section II.A.3, *supra*. Conversely, if a product is not "use{d} in emergency relief work," duty-free importation thereof is not authorized by 19 U.S.C. § 1318(a).

Commerce's *Solar Duty Holiday* violates the statutory "use" prerequisite in three major respects. *First*, it permits products granted duty-free treatment to be utilized after the conclusion of the purported emergency. (**Section II.C.1**). *Second*, it unreasonably defines "utilization" in emergency relief work in terms that afford no actual relief of the emergency specifically identified in *Proclamation 10414*. (**Section II.C.2**). And *third*, Commerce's preclusion of suspension of liquidation and its weak *ex ante* "certification" regime are unreasonable means of

ensuring that duty-free products are used in emergency relief, as the statute requires. (**Section II.C.3**). Any one of these faults renders the *Solar Duty Holiday* unlawful.

1.  *Obtaining Duty-Free Benefits by Certifying that Goods Will Be Used <u>After</u> the Emergency's Conclusion Violates the Statutory Requirement that Duty-Free Goods Be "Use{d} in Emergency Relief Work"*

Commerce's *ad hoc* rule permits duty-free "importation" until the "Date of Termination" of the emergency, defined in relevant part as "June 6, 2024." *See* 19 C.F.R. §§ 362.102,[15] 362.103(a); *see also, e.g.*, *Solar Duty Holiday*, 87 Fed. Reg. at 56,870 (explaining that suspending liquidation and collecting cash deposits "after the Date of Termination…will ensure that, <u>once this emergency has passed</u>, suspension of liquidation and collection of cash deposits of any AD/CVD estimated duties and duties will be instituted and applied…") (emphasis supplied); *id.* at 56,871 (describing this as "the steps the Secretary will take in the event that <u>the emergency is terminated</u> on June 6, 2024") (emphasis supplied); *id.* at 56,880 (describing this as "address{ing} the scenario in which the <u>emergency terminates</u> on June 6, 2024….") (emphasis supplied). The emergency declared by *Proclamation 10414* indeed terminated on June 6, 2024. *See* 87 Fed. Reg. at 35,068; Customs Message 4165404 (June 13, 2024) (addressing "Termination of Presidential Proclamation 10414 and Imposition of Cash Deposit Requirements") (**Exhibit 4**). Problematically, however, whereas Section 318(a) requires that goods be "for use in emergency relief work" to qualify for duty-free treatment, Commerce's *Solar Duty Holiday* had allowed all imported CSPV cells and modules to claim duty-free benefits by representing merely that they would be used within 180 days <u>after</u> the emergency's

---

[15] Commerce also provided for the discontinuation of duty-free importation were the emergency terminated ahead of schedule by separate Proclamation. *See* 19 C.F.R. § 362.102. As this did not occur, Solar Plaintiffs do not discuss it further.

termination. *See* 87 Fed. Reg. at 56,869; 19 C.F.R. §§ 362.102, 362.103(a) (definition of "Applicable Entries" and "Utilization Expiration Date").

In effect, Commerce rewrites *Proclamation 10414* to extend the length of the emergency to be "relieved" by 25% beyond the two years President Biden specified. But by definition, "emergency relief work" is only possible during an "emergency." And 19 U.S.C. § 1318(a) commits the "declar{ation of} an emergency to exist" to the President's sole discretion. Commerce itself acknowledged that "declaration of {an} emergency is committed by section 318 to the President's discretion." *Solar Duty Holiday*, 87 Fed. Reg. at 56,872. Thus, Commerce's attempt to extend duty-free benefits of the emergency period beyond its Date of Termination and thereby override the President is *ultra vires* and unlawful.

Nor is there any precedent for Commerce's provision of additional duty-free benefits in reliance on the *ex ante* extension of "emergency relief" operations into the post-emergency period. *Compare T.D. 47236*, 66 Treas. Dec. Int. Rev. at 221 (**Exhibit 3**); *and T.D. 50449*, 6 Fed. Reg. at 4,072; *and T.D. 50599*, 7 Fed. Reg. at 2,777; *and T.D. 50626*, 7 Fed. Reg. at 3,358; *and T.D. 51565*, 11 Fed. Reg. at 13,459, *with* 19 C.F.R. §§ 362.102, 362.103(a). Notably, Commerce's preexisting regulations governing duty-free treatment under 19 U.S.C. § 1318(a) set forth a default requirement that goods benefiting from a duty waiver enter the United States within 60 days of approval and provides penalties for non-use in relieving the emergency. *See* 19 C.F.R. § 358.103(c)–(d). The *Solar Duty Holiday* unlawfully jettisons the requirements of explicit approval and time-delimited emergency relief use contrary to statute and *Proclamation 10414* without any analysis or reasoned rulemaking.

2.    *Commerce Unlawfully Awarded Duty-Free Benefits Based on Certifications of Deficient "Uses" Incapable of "Relieving" the Declared Emergency*

*Proclamation 10414* defines the "emergency" as "the <u>availability</u> of sufficient electricity generation capacity to <u>meet</u> expected consumer demand." 87 Fed. Reg. at 35,068 (emphasis supplied). Yet, Commerce's new regulations and its certifications define emergency "utilization" as CSPV cells or modules simply being "used or installed in the United States." 19 C.F.R. § 362.102 (definition of "Utilization"); Message No. 3041408 (Feb. 10, 2023) at ¶14a(F)5. This definition is inadequate as a matter of law, insofar as a CSPV cell or module could easily be "installed" without making any electricity "available" to "meet" any consumer demand, *e.g.*, by being fixed into place but not connected to the electricity grid and thus unusable by any "consumer." Thus, in contravention of Section 318(a), Commerce has granted duty-free benefits based on promises to undertake actions that, even if performed, would not constitute "emergency relief work."

This unlawful standard was first introduced in the final version of Commerce's regulation, ostensibly "to address comments concerning stockpiling." *Solar Duty Holiday*, 87 Fed. Reg. at 56,870-71. Yet, Commerce authorized stockpiling but with extra steps. Commerce was informed during the public comment period that import duties were far less of an impediment to solar energy deployment than the lack of infrastructure needed to connect solar panels to the grid such that electricity could be generated and transmitted to consumers through the grid. *See, e.g.*, Exhibit 3 to Solar Plaintiffs' Complaint (Auxin Solar Comments in Opposition to Proposed Solar Duty Holiday at 41). Merely "installing" a grid-unconnected CSPV module does nothing to produce electricity, much less make it "available" to consumers. Commerce failed to address this fact.

Commerce also failed to account for the crux of the declared "emergency." Its definition of "use in emergency relief work" is arbitrary, inconsistent with both *Proclamation 10414* and 19 U.S.C. § 1318(a), and constitutes an unlawful failure to "respond in a reasoned manner to {comments} that raise significant problems." *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003). This stands in stark contrast to examples of prior certifications, which instructed importers to affirm, *e.g.*, that imported feed "will be used for the feeding of livestock in a drought-affected area," *T.D. 47236*, 66 Treas. Dec. Int. Rev. at 221 (**Exhibit 3**); *T.D. 50449*, 6 Fed. Reg. at 4,071 (same), or that imported jerked beef "will be sold or distributed solely to consumers in Puerto Rico" to relieve a shortage of staple proteins there, *T.D. 50599*, 7 Fed. Reg. at 2,777. Here, an importer's certification that a CSPV product will be "utilized" does not promise any emergency relief and is not a lawful basis for granting duty-free treatment under Section 318(a).

   3. *Commerce's Method for Ensuring Compliance Is Inadequate*

Commerce's *Solar Duty Holiday* is notably silent as to how it would meaningfully enforce the requirement on importers that duty-free CSPV cell and module imports be "utilized" in relief of the declared "emergency" before a certain date, *see* 19 C.F.R. § 362.102 (definitions of "Utilization" and "Applicable Entry"); *id.* § 362.103(a), while also precluding CBP from suspending liquidation of those CSPV cells and modules, *see id.* § 361.103(b)(i)-(ii). Insofar as CBP is instructed to suspend liquidation of CSPV cells and modules that are "not Applicable Entries," *i.e.*, not yet "Utilized," then CBP should need to suspend all entries until their qualifying use has been confirmed in some form or fashion, *see* 19 C.F.R. § 362.103(b)(1)(iii). But Commerce's new regulations require no such confirmation. *See id.* § 362.104 (permitting "certifications," but providing no detail). All that Commerce's certification regime actually requires is a vague promise by the importer that the duty-free CSPV cells or modules will be

"utilized" by Commerce's unlawful, post-"emergency" deadline. *See Preliminary Affirmative Determinations of Circumvention*, 87 Fed. Reg. at 75,227 (¶(F)5); *Final Affirmative Determinations of Circumvention*, 88 Fed. Reg. at 57,426 (¶(F)6) (same); Message No. 3041408 (Feb. 10, 2023) at ¶¶14a(F)5. But importers are often not installers. Commerce has failed to grapple with the a disconnect between the party required to certify (importers) and the party who actually determines end use (installers).

It is telling that Commerce claims merely "encouraging imports" somehow "provide{s} relief to this emergency." *Solar Duty Holiday*, 87 Fed. Reg. at 56,872. Given the putative length of this "emergency" (plus Commerce's unlawful 180-day add-on), a CSPV cell or module could enter the United States in December 2022, liquidate by operation of law one year later, *see* 19 C.F.R. § 159.11(a), and never be "use{d} in emergency relief work," 19 U.S.C. § 1318(a), but instead sit stockpiled in a warehouse well after the expiration of the "emergency." Such a CSPV cell or module would thus benefit from duty-free treatment in contravention of the requirements of 19 U.S.C. § 1318(a) and neither Commerce nor CBP would have any way to redress the failure of the importer to pay duties. Indeed, in this scenario, the U.S. importer would not have any reason to know that its certification of timely use ended up being untrue.

The only justification Commerce provides for its haphazard and unworkable rulemaking is a supposed need for "market certainty," despite acknowledging that this is "inherently speculative." *See Solar Duty Holiday*, 87 Fed. Reg. at 56,878. Such considerations are also outside the bounds of any lawful consideration under 19 U.S.C. § 1318(a), which was designed to facilitate "emergency relief work," not for Commerce to intervene in the U.S. market to Commerce's liking. And while Commerce erected this permissive regime based on extra-statutory considerations, Defendants' windfall for circumvention has caused severe damage,

41

decimating the U.S. industry through unrestrained volumes of unfairly traded low-priced

imports. *See, e.g.*, Solar Plaintiffs' Complaint, ECF Doc. 14 (Jan. 17, 2024) (Conf. Ver.) at ¶20.

## III. Intervenors' Affirmative Defenses Are Inapplicable

### A. Absent Section 318(a) Authority, Commerce's *Solar Duty Holiday* Cannot Survive

Defendant-Intervenors assert that it is irrelevant whether the *Solar Duty Holiday* was

consistent with Section 318(a), theorizing that Commerce's name-check of its "authority to issue

regulations pertaining to Section 781 of the Act," 87 Fed. Reg. at 56,870, "provides an

independent legal basis" for the *Solar Duty Holiday* as a whole. Defendant-Intervenors' Answer,

ECF Doc. 80 (June 6, 2024) at ¶33. That Defendant-Intervenors resort to such specious

arguments underscores how plainly the boundaries of Section 318(a) have been trampled.

Commerce's own summary of its regulation, which cites only Commerce's statutory

"authority under Section 318(a) of the Tariff Act of 1930," *Solar Duty Holiday*, 87 Fed. Reg. at

56,868, and the Code of Federal Regulations, which identifies the "authority" for Part 362 as "19

U.S.C. § 1318; Proc. 10414," 19 C.F.R. Part 362, make plain that Section 318(a) is the true

source of these regulations. The regulations characterize themselves as "set{ting} forth the

actions the Secretary is taking to respond to the emergency declared in Presidential Proclamation

10414," 19 C.F.R. § 362.101, which invoked Section 318(a) and omitted any mention of

circumvention proceedings, *see Proclamation 10414*, 87 Fed. Reg. at 35,067-69. Moreover, the

*Solar Duty Holiday* applied well beyond Section 781, to "antidumping and countervailing duties

and estimated duties under sections 701, 731, 751, and 781 of the Act." 19 C.F.R. § 362.103(a).

Most fundamentally, nothing in Section 781 (19 U.S.C. § 1677j) empowers Commerce to

permit duty-free importation of "food, clothing, and medical, surgical, and other supplies" to

relieve a presidentially declared emergency. That is the exclusive purview of Section 318(a).

Indeed, what Commerce appears to have meant by invoking its Section 781 regulatory authority was specifically to bolster its rationale for extending duty-free treatment to pre-emergency entries. *See Solar Duty Holiday*, 87 Fed. Reg. at 56,877-78 (observing that retrospective duty assessment "as it relates specifically to circumvention proceedings under section 781 of the Tariff Act, is authorized by Commerce's implementing regulations."). Regardless, as detailed in Section II.B, *supra*, such considerations are irrelevant to Commerce's authority to permit duty-free "importation" under Section 318(a). Section 318(a) is integral to the *Solar Duty Holiday*, which depends upon that statute for its authority. Because that authority was exceeded, the regulation must be vacated.

### B.    Laches Cannot Bar Solar Plaintiffs' Relief

Implicitly recognizing the legal merits are against them, Defendant-Intervenors devote most of their Answer to the equitable principle of laches, arguing in essence that they should be able to keep their ill-gotten gains because certain of their number forewent their opportunity to request an administrative review and/or file a lawsuit challenging the affirmative circumvention determinations before Solar Plaintiffs' action was initiated. *See* Defendant-Intervenors' Answer, ECF Doc. 80 (June 6, 2024) at ¶15-30. But the Supreme Court has clearly and unequivocally foreclosed this argument, holding:

> When Congress enacts a statute of limitations, it speaks directly to the issue of timeliness and provides a rule for determining whether a claim is timely enough to permit relief. The enactment of a statute of limitations necessarily reflects a congressional decision that the timeliness of covered claims is better judged on the basis of a generally hard and fast rule rather than the sort of case-specific judicial determination that occurs when a laches defense is asserted. Therefore, applying laches within a limitations period specified by Congress would give judges a "legislation-overriding" role that is beyond the Judiciary's power. As we stressed in *Petrella*, "courts are not at liberty to jettison Congress' judgment on the timeliness of suit."

*SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328, 334-35 (2017) (citing *Petrella v. Metro–Goldwyn–Mayer, Inc*., 572 U.S. 663, 667, 680 (2014)) (internal citations omitted). Because Solar Plaintiffs commenced this action well before the expiration of the statutory limitations period prescribed by 28 U.S.C. § 2636(i), *see* Solar Plaintiffs' Complaint, ECF Doc. 14 (Jan. 17, 2024) (Conf. Ver.) at ¶23, laches cannot be applied to bar the relief sought herein.

Moreover, Defendant-Intervenors were repeatedly warned that the duration of this duty-free treatment was uncertain. *Proclamation 10414* concludes as follows:

> This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

87 Fed. Reg. at 35,068. Without an emergency, the *Solar Duty Holiday* and duty-free benefits derived therefrom would be inoperative. *See id.* (authorizing duty relief "until 24 months after the date of this proclamation <u>or until the emergency declared herein has terminated, whichever occurs first</u>") (emphasis supplied); 19 U.S.C. § 1318(a) (limiting duty-free importation to "use in emergency relief work"). Similarly, the *Solar Duty Holiday* acknowledged that "{Commerce} do{es} not know at this time if the emergency will continue to exist through June 6, 2024, or will be terminated earlier than that date." 87 Fed. Reg. at 56,880.

That certain Defendant-Intervenors made the strategic choice not to request an administrative review or file a lawsuit challenging the affirmative circumvention determinations, despite knowing that the emergency could be rescinded at any time, does not entitle them to keep that which was unlawfully received. Solar Plaintiffs commenced this action on December 29, 2023, well over half a year before the expiration of the limitations period, and with over five months remaining in *Proclamation 10414*'s default emergency period. The harm was then

ongoing, and instead of restraining exports in response to Solar Plaintiffs' court challenge, exporters increased their 2024 shipments by 30% year-over-year before the emergency expired. *See* **Exhibit 1**. Defendant-Intervenors, many of whom were opposite Auxin Solar in the circumvention inquiries that created the duty liability absolved by the *Solar Duty Holiday*, could not have reasonably assumed those regulations would go unchallenged. Because of Commerce's repeated extensions, the circumvention inquiries did not even conclude until late August 2023, *see Final Circumvention Determinations*, 88 Fed. Reg. at 57,420, which was the first point that Solar Plaintiffs could be confident that <u>but for</u> the *Solar Duty Holiday* the duties in question would remain.

This case was initiated well within the statute of limitations, is based on an administrative record, and relies entirely on statutory interpretation. None of the traditional concerns invoked to deny relief under laches apply, and the Supreme Court has precluded laches under these circumstances.

## IV. Conclusion and Request for Relief

The *Solar Duty Holiday* is unlawful and exceeds the bounds of 19 U.S.C. § 1318(a) and *Proclamation 10414*. Solar Plaintiffs therefore request that this court vacate the *Solar Duty Holiday*, order Defendants to assess antidumping and countervailing duties and reliquidate any entries that entered duty-free in reliance upon the *Solar Duty Holiday*, and collect cash deposits and suspend liquidation of any other entries of CSPV cells and modules from Cambodia, Malaysia, Thailand, and Vietnam found to be circumventing the AD/CVD orders on CSPV products from the PRC, without regard to the *Solar Duty Holiday*.

Were the *Solar Duty Holiday* not vacated in its entirety, Solar Plaintiffs then request that this court order Defendants to assess antidumping and countervailing duties and reliquidate any goods that entered duty-free during periods and under conditions in which the *Solar Duty*

*Holiday* violated the standards of 5 U.S.C. § 706(2) and grant such other relief as this court

deems just and proper.

<div align="center">*    *    *</div>

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Thomas M. Beline

Thomas M. Beline
Roop K. Bhatti
James E. Ransdell
Chase J. Dunn
Sydney C. Reed

**CASSIDY LEVY KENT (USA)** LLP
2112 Pennsylvania Ave. N.W.
Suite 300
Washington, D.C. 20037

Phone: (202) 567-2316
Fax: (202) 567-2301

*Counsel for Auxin Solar Inc. and*
*Concept Clean Energy, Inc.*

</div>

July 22, 2024

**Certificate of Compliance with Chambers Procedures 2(B)(1)**

The undersigned hereby certifies that the foregoing memorandum of law contains 13,996 words, exclusive of the caption block, table of contents, table of authorities, signature block, certificates of counsel, and square brackets and therefore complies with the maximum 14,000-word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By: /s/ Thomas M. Beline
Thomas M. Beline

# EXHIBIT 1

**Imports For Consumption**

HTS Codes: 8541420010, 8541406035, 8541430010, 8541406025, 8541406045, 8541430080, 8541406015, 8541420080

| Country | Year 2023 | 2023 YTD (Jan - May) | 2024 YTD (Jan - May) |
|---|---|---|---|
| Cambodia | 2,392,055,411 | 880,209,324 | 619,580,363 |
| Malaysia | 3,145,393,039 | 1,028,162,109 | 1,311,982,376 |
| Thailand | 4,080,318,966 | 1,578,788,173 | 1,734,750,002 |
| Vietnam | 4,856,278,828 | 1,829,275,812 | 3,257,432,204 |
| Total | 14,474,046,244 | 5,316,435,418 | 6,923,744,945 |

Unit: USD

Source: USITC Dataweb

# EXHIBIT 2

# Webster's New International Dictionary (2nd Ed.)
## Published 1934
## Reprinted 1950



Webster, Noah

# WEBSTER'S
# NEW INTERNATIONAL
# DICTIONARY
OF THE
# ENGLISH LANGUAGE

## Second Edition
### UNABRIDGED

UTILIZING ALL THE EXPERIENCE AND RESOURCES OF MORE THAN
ONE HUNDRED YEARS OF GENUINE WEBSTER DICTIONARIES

*A Merriam-Webster*
REG. U.S. PAT. OFF.

WILLIAM ALLAN NEILSON, Ph.D., LL.D., L.H.D., Litt.D.
*Editor in Chief*

THOMAS A. KNOTT, Ph.D.
*General Editor*

PAUL W. CARHART
*Managing Editor*



# G. & C. MERRIAM COMPANY, PUBLISHERS
## SPRINGFIELD, MASS., U.S.A.
### 1950

# CONTENTS

## INTRODUCTORY

| | PAGES |
|---|---|
| PUBLISHERS' STATEMENT | iv |
| PREFACE | v–vi |
| INTRODUCTION | vii–xvi |
| EDITORS | xvii–xxi |
| PRONUNCIATION | xxii–lxxviii |
| WEBSTER PRONUNCIATION SYMBOLS | xxii |
| INTERNATIONAL PHONETIC ALPHABET | xxii |
| STANDARD PRONUNCIATION | xxiii–xxvi |
| PHONETIC PRINCIPLES | xxvii–xxxix |
| ENGLISH SOUNDS CLASSIFIED ACCORDING TO SPELLING | xxxix |

| | PAGES |
|---|---|
| PRONUNCIATION OF LATIN; GREEK; NAMES FROM HEBREW; FRENCH; GERMAN; SPANISH; AND ITALIAN | liv–lviii |
| SYLLABIC DIVISION OF WORDS | lviii–lix |
| WORDS DIFFERENTLY PRONOUNCED | lix–lxxviii |
| ORTHOGRAPHY | lxxviii–lxxx |
| RULES FOR SPELLING | lxxix–lxxx |
| PRONUNCIATION CONSULTANTS | lxxxi |
| HISTORY OF THE ENGLISH LANGUAGE | lxxxii–xc |
| ABBREVIATIONS USED IN THIS WORK | xci–xcii |
| EXPLANATORY NOTES | xciii–xcvi |
| ADDENDA SECTION | xcvii–cxxxii |

## A DICTIONARY OF THE ENGLISH LANGUAGE . . . . . . . 1–2987

## APPENDIXES

| | PAGES |
|---|---|
| ABBREVIATIONS | 2989–3000 |
| ARBITRARY SIGNS AND SYMBOLS USED IN WRITING AND PRINTING | 3001–3011 |
| FORMS OF ADDRESS | 3012–3014 |
| POPULATION FIGURES (1940 CENSUS) FOR PLACES IN UNITED STATES ABOVE 5000 | 3014A–3014D |

| | PAGES |
|---|---|
| PREFATORY REMARKS TO THE GAZETTEER AND BIOGRAPHICAL DICTIONARY | 3015–3017 |
| PRONOUNCING GAZETTEER, OR GEOGRAPHICAL DICTIONARY OF THE WORLD | 3019–3150 |
| PRONOUNCING BIOGRAPHICAL DICTIONARY | 3151–3214 |

## PLATES AND FULL-PAGE ILLUSTRATIONS

FLAGS, SEALS, COATS OF ARMS, ETC.
(8 PLATES IN COLORS) . . . . *preceding* Frontispiece
I. OFFICIAL FLAGS OF THE UNITED STATES; HISTORIC FLAGS OF THE UNITED STATES. II. GREAT SEALS OF THE UNITED STATES AND TERRITORIES. III. STATE FLAGS OF THE UNITED STATES. IV. ARMS OF VARIOUS NATIONS. V. ARMS AND FLAGS OF THE BRITISH EMPIRE. VI. FLAGS OF VARIOUS NATIONS. VII. FLAGS OF VARIOUS NATIONS, WIND AND WEATHER FLAGS, AND INTERNATIONAL CODE OF SIGNALS. VIII. HOUSE FLAGS OF STEAMSHIP LINES.

PORTRAIT OF NOAH WEBSTER (IN COLORS) . . Frontispiece

AIRCRAFT: EARLY TYPES, WORLD WAR I TYPES, RECENT TYPES (4 PLATES) . . . . . *following* p. 64

CHIEF FOREIGN ALPHABETS . . . . . . . . p. 75

TEN NOTABLE EXAMPLES OF AMERICAN ARCHITECTURE . . . . . . . . . . . *facing* p. 128

ARCHITECTURE: EXAMPLES OF HISTORIC STYLES . . p. 143

AUTOMOBILES: EARLY AND LATER TYPES (2 PLATES) . . . . . . . . . *following* p. 192

COMMON BIRDS OF AMERICA (IN COLORS) . *facing* p. 256

BRIDGES: NOTED EXAMPLES . . . . *facing* p. 320

BUTTERFLIES AND MOTHS (IN COLORS) . . *facing* p. 384

CATHEDRALS AND OTHER RELIGIOUS EDIFICES . . . . . . . . . . . . . *facing* p. 448

COINS OF THE WORLD (2 PLATES IN COLORS) *following* p. 512

COLOR CHARTS AND SPECTRUM (2 PLATES IN COLORS) . . . . . . . . . *following* p. 576

CONSTELLATIONS AND STARS (2 PLATES) . *following* p. 640

EMBLEMS OF FRATERNAL AND SERVICE ORGANIZATIONS (IN COLORS) . . . . . *facing* p. 960

GEMS (IN COLORS) . . . . . . . . *facing* p. 1024

INSECTS (IN COLORS) . . . . . . . *facing* p. 1280

MAN: MUSCLES AND SKELETON . . . *following* p. 1472

MEDALS AND ORDERS OF HONOR AND OF MERIT (IN COLORS) . . . . . . . *facing* p. 1536

TYPES OF NAVAL VESSELS (2 PLATES) . *following* p. 1600

ORCHIDS (IN COLORS) . . . . . . . *facing* p. 1664

ORDERS OF KNIGHTHOOD AND OF MERIT (IN COLORS) . . . . . . . . . *facing* p. 1728

POISONOUS PLANTS (IN COLORS) . . . *facing* p. 1856

SAILS: FORE-AND-AFT AND SQUARE . . . . p. 2201

SHIP: PRINCIPAL ROPES, SPARS, ETC. . . . p. 2315

STATE FLOWERS (2 PLATES IN COLORS) . *following* p. 2432

TREES . . . . . . . . . . . . . . . p. 2701

WILD FLOWERS OF AMERICA (IN COLORS) . *facing* p. 2944

(iii)

**2.** *Astron.* The southing of a celestial body; meridian passage; culmination. *Obs.*

**3.** *Internat. Law.* Intercession of one power between other powers on their invitation or consent to arrange amicably differences between them.

**4.** *Music.* In a Gregorian psalm tone or an Anglican chant, the part between the two reciting notes.

For there is one God, and one *mediator* between God and men, the man Christ Jesus. *1 Tim. ii. 5.*

**2.** An intermediary or interagent; a go-between. *Obs.*

**3.** *Card Playing.* Ombre, or a variety of it.

**4.** *Immunol.* An ambocceptor.

**me′di-a-to′ri-al** (-ā-tō′rĭ-ăl; 181), *adj.* Of, pertaining to, like, or characteristic of, a mediator or mediation.
— **me′di-a-to′ri-al-ly** (-lĭ̇m), *n.* — **me′di-a-to′ri-al-ly**, *adv.*

**me′di-a-to′ri-ous** (-tō′rĭ-ŭs), *adj.* Mediatorial. *Obs.*

**me′di-a-to′ry** (mē′dĭ-a-tō′rĭ; -ter′ĭ), *adj.* Of, pertaining to, or of the nature of, mediation; mediating; mediatorial.

**me′di-a′tress** (mē′dĭ-ā′trĕs; -trĭs; 110), *n.* [From MEDIATOR.] A female mediator.

**me′di-a′trice** (-trĭs), *n.* = MEDIATRESS.

**me′di-a′trix** (-ā′trĭks), *n.* [LL.] = MEDIATRESS.

**med′ic** (mĕd′ĭk), *n.* [L. *medica*, fr. Gr. *mēdikḗ* (sc. *poa*) a kind of clover introduced from *Media*, fr. *Mēdikos* Median.] Any plant of the genus *Medicago*, esp. *M. sativa*.

**Me′dic** (mē′dĭk), *n.* Also **Me′di-an** (mē′dĭ-ăn). The Iranian language of ancient Media. See IRANIAN.

**med′ic** (mĕd′ĭk), *adj.* [L. *medicus.*] Medical. *Rare.*

**med′ic**, *n.* **a** A physician. **b** *Colloq.* A medical student.

**Me′dic** (mē′dĭk), *adj.* Median.

**med′i-ca-ble** (mĕd′ĭ-ka-b′l), *adj.* [L. *medicabilis*, fr. *medicare*, *medicari*, to heal, fr. *medicus* physician. See MEDICAL.] **1.** Capable of being medicated, cured, or healed.

**2.** Capable of curing or healing; medicative. *Obs.*

**Med′i-ca′go** (-kā′gō), *n.* [NL. See ¹st MEDIC.] *Bot.* A large genus of Old World cloverlike herbs of the pea family (Fabaceae). *M. sativa*, the alfalfa or lucern, yields valuable forage and hay crops.

**med′i-cal** (mĕd′ĭ-kăl), *adj.* [F. *médical*, fr. LL. *medicalis*, fr. L. *medicus* physician; akin to L. *mederi* to heal, remedium remedy, *hi- vi-med-* physician, to Gr. names of healing deities, *Mēdos, Mēdē, Medusa, Agamēdē*, and to Av. *mādes*, *pl.*, counsels, plans, arts, L. *mediari* to think over, to practice. See MEDITATE; cf. MEDEA, MEDICO.] **1.** Of, pert. to, or dealing with, the healing art, or the science of medicine, esp. in the narrower sense; as, the *medical* profession; *medical* services.

**2.** Requiring medical treatment;— said of certain diseases.

**3.** Medicinal; as, the *medical* properties of a plant. *Rare.*

**med′i-cal**, *n.* Short for *medical examiner*, *medical man*, etc. *Colloq.*

**Medical Administrative Corps.** *Mil.* A corps of the Medical Department, U. S. Army, the members of which are concerned with administration and discipline in the Department. See INSIGNIA, *Illust.*

**Medical Corps.** **a** *Mil.* A constituent of the Medical Department of the U. S. Army. See INSIGNIA, *Illust.* **b** *Navy.* A constituent part of the United States Navy, comprising the medical officers. They are commissioned as medical directors, medical inspectors, surgeons, passed assistant surgeons, and assistant surgeons, etc.

**Medical Department.** *Mil.* In the United States, a service of the regular army, under the head of a major general with the title of Surgeon General. It consists of the Medical Corps, the Dental Corps, the Veterinary Corps, the Army Nurse Corps, etc.

**medical examiner.** *Law.* A governmental official, usually appointed (who must be a person trained in medicine, whose functions are to make post-mortem examinations of bodies dead from violence, suicide, crime, etc. and to investigate the circumstances of the death. Usually the medical examiner exercises most of the functions of a coroner. See CORONER, n., 1.

**medical ionization.** = IONTOPHORESIS, 2.

**medical jurisprudence.** The science that treats of the relation and application of medical facts to legal principles; — more properly called *forensic*, or *legal*, *medicine*.

**med′i-cal-ly** (mĕd′ĭ-kăl-ĭ), *adv.* of *medical*.

**medical man.** A man who practices medicine; — used widely to include physician, surgeon, accoucheur, etc.

**me-dic′a-ment** (mē-dĭk′a-mĕnt; mĕd′ĭ-ka-), *n.* [F. *médicament*, fr. L. *medicamentum*, fr. *medicare*, *medicari*, to heal. See MEDICABLE.] Anything used for healing diseases or wounds; a medicine; a healing application. — **med′i-ca-men′tal** (mĕd′ĭ-ka-mĕn′tăl; -t′l), *adj.* *Rare.* — **med′i-ca-men′tal-ly**, *adv. Rare.* — **med′i-ca-men′ta-ry** (-ter′ĭ), *adj.*

**me-dic′a-ment**, *v. t.* To treat with medicaments. — **med′i-ca-men-ta′tion** (mĕd′ĭ-ka-mĕn-tā′shŭn), *n.*

**med′i-ca-men′tous** (mĕd′ĭ-ka-mĕn′tŭs), *adj.* Medicamental.

**med′i-cas′ter** (mĕd′ĭ-kăs′tẽr), *n.* [Cf. F. *médicastre.* See MEDICAL; 2d -ASTER.] A medical charlatan or quack.

**med′i-cate** (mĕd′ĭ-kāt), *v. t.; -CAT′ED* (-kāt′ĕd; -ĭd); *-CAT′ING* (-kāt′ĭng). [L. *medicatus*, past part. of *medicare*, *medicari*. See MEDICABLE.] **1.** To tincture or imbue with anything medicinal; to drug; as, *medicated* candle. See MEDICABLE.]

**2.** To impregnate with anything medicinal; to drug; as, *medicated* waters.

**3.** To treat for a special purpose, as with a drug. *Obs.*

**me′di-a-tor-ship**, *n.* See -SHIP.
**me′di-a′tri-va** (mē′dĭ-ā′trĭ-va?); etc.
[L.], *fem.* (mē′dĭ-ā′trĭ-va?).
**me′dic, ci-a.** [L.] = MEDIC, a
*clover*, etc.
**Me′di-a** (mē′dĭ-a), *n.* = MEDEA.
**PEC-TING CANDLE.** See MEDICABLE.
**med′i-ca′tio.** Medicative. *Ref. Sp.*

**4.** To impregnate, as a liquor, with something deleterious; as a poison; to "doctor." *Obs.*
— *Intrans.* To practice medicine. *Rare.*

**med′i-ca′tion** (mĕd′ĭ-kā′shŭn), *n.* [L. *medicatio*; cf. F. *médication.*] Act or process of medicating; also, a medicament. — **med′i-ca-tive** (mĕd′ĭ-ka-tĭv), *adj.*

**med′i-ca-tive** (mĕd′ĭ-kā′tĭv; -kȧ-tĭv), *adj.* Medicinal; acting like a medicine or curative.

**med′i-ca-to-ry** (mĕd′ĭ-kȧ-tō′rĭ or, *esp.* Brit., -kā′tō-rĭ), *adj.* Medicative.

**medic bur** *or* **clover.** The bur clover *Medicago hispida.*

**Me′di-ci** (mē′dĭ-chē or *Ital.* mĕ′dē-chē), *n.* Of or pert. to a Florentine family, the Medici, of the 14th, 15th, and 16th centuries.

**Modicean planets** *or* **stars.** *Astron.* The four satellites of Jupiter discovered by Galileo.

**Med′i-ci** (mĕd′ĭ-sē), *adj.* Medicean.

**Medici blue.** A color, bluish green-blue in hue, of low saturation and medium brilliance. Cf. COLOR.

**Medici collar.** *Dressmaking.* A high stiff collar at the sides and back of the neck, rolling out at the top.

**me-dic′i-na-ble** (mē-dĭs′ĭ-na-b′l; mĕd′ĭ-sĭn-a-b′l; *the second is the older pron., as in Shakespeare), adj.* **1.** Medicinal; having the power of healing. *Archaic.*

**2.** Of or pertaining to medicine. *Obs.*

**me-dic′i-nal** (mē-dĭs′ĭ-năl; -n′l; *formerly* mĕd′ĭ-sīnăl, *as in Milton & Shakespeare*, *or* mĕd′ĭ-sĭ′năl, *also in Shakespeare*), *adj.* [OF., fr. L. *medicinalis*. See MEDICINE.] **1.** Curative or alterative; as, *medicinal* tinctures, plants.

**2.** Of or pertaining to medicine; medical. *Obs.*

**me-dic′i-nal**, *n.* **1** A medicinal substance.

**2.** pl. Medicinal matters. *Obs.*

**me-dic′i-nar-y** (mē-dĭs′ĭ-năr-ĭ; -nĕr-ĭ), *adj.* Medicinal. *Obs.*

**med′i-cine** (mĕd′ĭ-sĭn; *esp. Brit., except in Scotland, usually* mĕd′sĭn *or, esp. in sense* 2, mĕd′ĭ-sĭn), *n.* [F. *médicine*, *medecine*, medeguen, fr. OF. *medicine*, medecine, fr. L. *medicina*, fr. *medicus.* See MEDICAL.] **1.** Any substance or preparation used in treating disease.

By *medicine*, life may be prolonged. *Shak.*

**2. a** The science and art dealing with the prevention, cure, or alleviation of disease. **b** In a narrower sense, that part of the science and art of restoring and preserving health which is the province of the physician as distinguished from the surgeon and obstetrician.

**3.** A drug or the like used for a purpose not curative, as a love potion, a poison, the alchemists' elixir, etc. *Obs.*

**4. a** Among the North American Indians, any object supposed to give control over natural or magical forces, to act as a protective or healing charm; also, magical power itself; hence, a magical rite or practice. Cf. MANITO. **b** Hence, a similar object or agency among other primitive peoples.

**5.** Short for MEDICINE MAN.

**6.** Intoxicating liquor; drink. *Slang.*
— **take one's medicine.** To submit to what one must.

**med′i-cine**, *v. t.; -CINED* (-sĭnd; -sĭnd); *-CIN′ING* (-sĭn-ĭng; -s′n-ĭng). [OF. *medeciner*. See MEDICINE, *n.*] To give medicine to; to treat or bring for or as by medicinal agency.

Great *spirits* I see *medicine* the less. *Shak.*

**med′i-cine**, *v. i.* To practice medicine. *Obs.*

**medicine animal.** An animal which is the "medicine" (sense 4) of an individual. Cf. MEDICINE, n., 4, cit.

**medicine bag.** A bag, often the skin of an animal, containing "medicine" (sense 4) and worn about the person.

**medicine ball.** *Gymnastics.* A large leather-covered ball stuffed with soft material and weighing several pounds. It is designed to be tossed and caught for exercise.

**medicine case.** *Med.* A box, bag, or other container for holding medicines.

**medicine dance.** A ceremonial dance of the Plains Indians, esp. of the Cheyennes, in which the participators mutilate and torture themselves.

**medicine dropper.** = DROPPER, 6 a.

**medicine glass.** A small glass vessel, graduated as in ounces, drams, or milliliters, for measuring medicines.

**medicine lodge.** Among the North American Indians, a lodge for ceremonial dances, initiations, etc.

**medicine man.** Among the North American Indians and other primitive peoples, a person who professes to cure sickness, by drugs, charms, and fetishes; a shaman; magician.

**me-dic′i-ner** (mē-dĭs′ĭ-nẽr; mĕd′ĭ-sĭn-ẽr; mĕd′sĭn-ẽr; -s′n-ẽr), *n.* **1.** One who practices medicine; a physician. **2.** = MEDICO. **a** A physician, surgeon, or doctor. **b** A sorcerer; a medicine man.

**medicine tree.** = HORSE-RADISH TREE, a.

**med′i-co** (mĕd′ĭ-kō), *n.; pl.* MEDICOS (-kōz). [Sp. *médico* physician, or It. *medico.*] **1.** A physician, surgeon, or medical student. *Colloq.*

**2.** [Sp.] A surgeonfish.

**med′i-co-** (mĕd′ĭ-kō; n., -kŏ). A combining form, from Latin *medicus*, medical, signifying: **a** *Medical*, as in *medico-le′gal*, *medi′co-psy-cho′lo-gy*. **b** *Medical* and, as in **medicoobotanical**    **medicolegally**    **medicopsychologic**    **medicochirurgical**    **medicostatistical**    **medicomechanical**    **medicosurgical**    **medicomoral**    **medicozoölogic**    **medicodental**    **medicoïpathologic**

**med′ics** (mĕd′ĭks), *n.* The science of medicine. *Obs.*

**med′i-cus** (mē-dĭk′ŭs; mē-), *n.* [L. *medicus.* See MOIETY.] The bundle of a heretic having more than one incumbent. *Obs. exc. Law.*

**2.** *Obs.* A Middle or intermediate part, state, or quality. **3.** Moderation; temperance.

**me′di-e′val, me′di-æ′val** (mē′dĭ-ē′văl *or, esp.* Brit., mĕd′ĭ-; 277), *adj.* [L. *medius* middle + *ævum* age. See MID; AGE.] Of, pertaining to, or characteristic of the Middle Ages; as, *medieval* architecture; like or imitative of the literature, art, etc., of the Middle Ages. — n. One who lived in the Middle Ages. — **me′di-e′val-ism**, *n.* Either part of an indenture. *Archaic.*

**medieval history.** History dealing with the Middle Ages, chiefly in Europe.

**me′di-e′val-ism, me′di-æ′val-ism** (-ĭz'm), *n.* Medieval belief or practice; the method or spirit of the Middle Ages; devotion to the institutions, arts, and practices of the Middle Ages; also, a survival from the Middle Ages.

**me′di-e′val-ist, me′di-æ′val-ist** (-ĭst), *n.* One who has a taste for, or is versed in, the history, art, etc., of the Middle Ages; one in sympathy with medieval spirit or forms; a practicer of medievalism, as in religion. — **me′di-e′val-is′tic, me′di-æ′val-is′tic** (-ĭs′tĭk), *adj.*

**Medieval Latin.** See LATIN, n., 1 b.

**me′di-e′val mode.** *Music.* See 1st MODE, 7.

**med′i-fixed** (mĕd′ĭ-fĭkst?), *adj. Bot.* Attached by the middle.

**me′di-gla′cial** (mē′dĭ-glā′shăl), *adj.* [*medi-* + *glacial.*] Situated between or amidst glaciers.

**Me′di′na** (mē′dĭ′nȧ), *n.* [Prob. *Medina*, N. Y.] *Geol.* A formation of the American (Upper) Silurian. See GEOLOGY, *Chart.* The formation is chiefly sandstones. — **Me′di′na**, *adj.*

**Me′di′na worm** (mē′dĭ′nȧ). [Prob. from *Médina*, French *Sudan.*] The guinea worm.

**Me′di-ni′las** (mē′dĭ-nĭ′ȧ), *n.* [NL., after D. J. de *Medinilla y* Pineda, Spanish governor of the Ladrone Islands.] *Bot.* A large genus of tropical Old World shrubs, family Melastomaceae, often grown for ornament.

**me′di′no** (mē-dē′nō), *n.* Also **man′di′no** (mȧn-dē′nō; mȧ-dē′nō), **me′di′nee** (-dē′nē), **me′di′no**, *n.; pl.* -NOES. [F. *médin*, Ar. Ar. *mayyidi*, corrupt, fr. *ma′ayyadi* belonging to al-Mu′ayyad, a sultan of Egypt and Syria, 15th century.] A former bronze coin and money of account of Egypt, worth 1/24 piaster. Also, formerly, a small coin of Syria and North Africa.

**me′di-o** (mē′dĭ-ō), *adj.* (Sp.). Half; as, *medio* peso, a half peso; also, midway; middle; as, *mediodía*, midday.

**me′di-o-** (mē′dĭ-ō; mĕd′ĭ-ō; 70; -), *adj.* [See MEASURE, *Table.* **b** The half real in Latin American countries. See COIN, *Table.* **c** A *medio* peso.

**me′di-o-** (mē′dĭ-ō-), **me′di-** (mē′dĭ-). A combining form from Latin *medius*, meaning *middle*, used to denote: **a** *Medially*, as in **me′di-o-be-pressed′**, the **mi′o-posit′ive.** **b** Intermediate, as in *mediosilicic*. **c** In, or relating to, *the middle* or *medium plane of a* (specified) part; — in adjectives, as in *mediopalatal.* For words below, see the word with which main *-o-*, combines.
**mediopectoral    mediocarpal    mediotemporal**
**mediopalatal    mediogastral    mediotransverse**
**mediolateral    medioïlateral    mediodorsal**
**mediodigital    mediopalatine    mediolatal**
**mediofrontal    mediopalal    medioventral**

**me′di-o-cral** (mē′dĭ-ō′krăl), *adj.* Mediocre. *Obs.*

**me′di-o-cre** (mē′dĭ-ō′kẽr or, *esp.* Brit., mē′-), *adj.* [F. *médiocre*, fr. L. *mediocris* (; pl. -TIES (-tĭz). [F. *médiocrité*, fr. L. *mediocritas.*] **1.** Quality or state of being *mediocre*; a middle, intermediate, or mean state, degree, or quality; moderate mental capacity, ability, skill, etc.

**2.** A mediocre person. "*Mediocrities* and respectabilities of every description." *J. A. Symonds.*

**3.** *Now Rare.* **a** That which is intermediate between extremes; a, or the, mean. **b** A middle course; moderation; temperance. **c** Moderate or temperate state, action, etc., or amount. **d** Medium size. **e** Moderate possessions or condition in life.

**Me′di-o-cris** (mē′dĭ-ō′krĭs; mĕd′ĭ-ō), *n.* A cross vein (sense b).

**me′di-o-pal′a-tal** (-păl′ȧ-tăl; -t′l), *adj.* [*medio-* + *palatal.*] *Phonet.* Formed between the front of the tongue and the middle part of the hard palate (as in *ye*).

**me′di-o-pas′sive** (-păs′ĭv), *adj.* [*medio-* + *passive.*] *Gram.* Pertaining to, or designating, a form or voice of a transitive verb, which by origin is of the middle voice or is reflexive and (1) shows by its meaning that it is developing toward passive use; or (2) is used in both middle and passive meanings; or (3) is used only in passive meanings. Thus most of the tense forms of the Gr. *middle* and later *passive* voice developed passive meanings and were the normal forms of the passive voice.

**me′di-o-pas′sive**, *n. Gram.* A mediopassive voice or form.

**me′di-o-si-lic′ic** (-sĭ-lĭs′ĭk), *adj. Petrog.* Having a composition intermediate between an acid (persilicic) and a basic (subsilicic) rock.

**med′i-sance** (mĕd′ĭ-săns), *n.* [F. *médisance.*] Slander. *R.*

**me′di-sect′** (mē′dĭ-sĕkt?), *v. t.* [*medi-* + L. *sectus*, past part. of *secare* to cut.] *Zoöl.* To divide through the mesial plane into right and left halves. — **section** (-sĕk′shŭn), *n.*

**Med′ish** (mĕd′ĭsh), *adj.* & *n.* Median.

**Med′ism** (mĕd′ĭz'm), *n.* [Gr. *Mēdismos.*] **1.** *Gr. Hist.* Attitude or conduct favoring the Medes (or Persians).

**2.** A word or idiom peculiar to the Medes.

**med′i-ta-bund′** (mĕd′ĭ-tȧ-bŭnd?), *adj.* [L. *meditabundus.*]

**med′i-tance** (mĕd′ĭ-tȧns), *n.* Meditation. *Obs.*

**med′i-tant** (mĕd′ĭ-tănt), *adj.* [L. *meditans, -antis*, pres. part.] Meditating. — n. A meditator.

**med′i-tate** (mĕd′ĭ-tāt), *v. t.; -TAT′ED* (-tāt′ĕd; -ĭd); *-TAT′ING* (-tāt′ĭng). [L. *meditatus*, past part. of *meditari* to meditate. See MEDE; 1.] *Transitive:* **1.** To contemplate; to keep the mind or attention fixed upon; to watch; to study; to muse upon; or invent; to ponder. *Now Rare.*

**2.** To purpose; intend; plan; as, to *meditate* a war. — *Intransitive:* To keep the mind in a state of contemplation; to dwell in thought; to muse; cogitate; reflect.

In his law doth he *meditate* day and night. *Ps. i. 2.*

**Syn.** — Weigh, revolve. See CONSIDER.
*meditate* means: To pass away, as time, in meditating.

**meditate the Muse.** To exercise oneself in, or practice, the composition of poetry. *Milton*, after Latin *Musam meditari*, Vergil *(Ecl., 1. 2).*

**med′i-ta′tion** (mĕd′ĭ-tā′shŭn), *n.* [OF., fr. L. *meditatio.*] **1.** Act of meditating; thought; esp., close or continued thought; serious contemplation.

Let the words of my mouth and the *meditation* of my heart be acceptable in thy sight. *Ps. xix. 14.*

**2.** A form of private devotion or spiritual exercise consisting in deep, continued reflection on some religious theme.

**3.** A discourse treating a theme meditatively or so as to lead to meditation; as, Hervey's *Meditations.*

**med′i-ta′tion-ist**, *n.* A writer of meditations.

**med′i-ta′tist** (mĕd′ĭ-tā′tĭst), *n.* One given to meditation.

**med′i-ta-tive** (mĕd′ĭ-tȧ-tĭv), *adj.* [LL. *meditativus.*] **1.** Disposed or given to meditate; or to meditation; meditating; as, a *meditative* turn of mind. **2.** Devoted to, indicative of, or promotive of, meditation. — **med′i-ta-tive-ly**, *adv.* — **med′i-ta-tive-ness**, *n.*

**med′i-ta′tor** (mĕd′ĭ-tā′tẽr), *n.* One who meditates.

**med′i-ter-ra′ne-an** (mĕd′ĭ-tẽ-rā′nē-ăn), *adj.* & *n.* Also **med′i-ter-ra′ne-al** (-ăl).

**See MEASURE, *Table.*
**me-din′, mi-dine′.** Var. of MEDINO.
**me′di-tance.** Medisance. *Ref. Sp.*

**med′i-cin-al.** Of MEDIEVAL. +*Obs.*
[L.] in a middle course you
will go most safely.
**med′i-ci′na-re** (mĕ′dē-chē′nä-rē?), *n.*
[It.] Medicant. Modiant begins
one MEDICINE, 1, lost part of MEDICINE.

**Medi′o-Meso′val′is-ing, etc. &c.**, *n.*
Also **med′i-ta-ting-ly**, *adv.*

Case 1:23-cv-00274-TMR     Document 93     Filed 07/22/24     Page 71 of 81

**surface printing.** Printing by any process, as the lithographic or gelatin process, which employs a plane printing surface. Cf. INTAGLIO PRINTING; RELIEF PRINTING.

**sur·fac·er** (sûr'fās·ẽr), n. One who or that which surfaces; specif.: **a** A machine for planing or dressing the surface of wood, metal, stone, etc. Cf. CYLINDER PLANER, BUZZ PLANER. **b** A device used in gauging railroad ties for tie plates. **c** One who surfaces furniture, etc. **d** An undercoat of paint used to level up inequalities of a surface.

**surface railway.** See ELECTRIC RAILWAY.

**surface resistance** or **resistivity.** *Elec.* The electrical resistance of a surface layer to a current.

**surface rib.** *Arch.* A merely ornamental rib on the surface of a vault, etc.

**surface spherical harmonic.** See SPHERICAL HARMONIC (of the nth degree).

**surface strain.** *Mech.* See 4th STRAIN, 6 d.

**surface switch.** *Elec.* See SWITCH, n., 5.

**surface tension.** *Physics.* That property, due to molecular forces, which exists in the surface film of all liquids and tends to bring the contained volume into a form having the least superficial area. Particles bring below this film, being equally acted on from all sides, are in equilibrium as to surface conditions; but those in the film are on the whole attracted inward, and tension results. Surface tension is numerically equal to the force acting at right angles to a line of unit length (say one centimeter) lying on the surface, and in this sense is called also the *constant of capillarity* and is represented by the symbol T. It is also equal to the work required to enlarge the surface by a unit area (say one square centimeter). It measures the work done in bringing molecules from the interior to the surface of a liquid.

**sur·fac·ing** (sûr'fās·ĭng), *pres. part. & verbal n. of* SURFACE. Hence: n., **1.** Act or process of one who or that which surfaces; specif.: **a** Gold digging on the surface. **b** The motion of a tool, or part of a tool, used in planing or finishing a surface. **c** *Tracklaying.* The act of bringing the top of the rail to a true grade line. — **2.** Material forming or used to form a surface; as, the *surfacing* for a road; to wash the *surfacing* for gold.

**sur·fac·y** (-ĭ), *adj.* Superficial.

**surf·bird** (sûrf'bûrd'), n. A shore bird (*Aphriza virgata*) of the Pacific coasts of North and South America, allied to the turnstones, but somewhat like the golden plover in form and habits. It is readily distinguished in all plumages by its tail, which is blackish at the tip and broadly white at the base.

**surf·board** (-bôrd'; 181), n. A long, narrow board used in the sport of riding the surf, as at the Hawaiian seashore.

**surf·board·ing**, n. To ride the surf on a surfboard.

**surf'boat·ing**, n. *Naut.* A boat fit for use in heavy surf, esp. one built strong and buoyant and with a marked sheer to ride the seas better. — **surf'boat·man**, n.

**surf clam.** A large clam (*Spisula, syn. Mactra, solidissima*) common on ocean beaches of the eastern United States — called also *sea, hen,* and *beach, clam.* Also, a related species (*S. polynyma*).

**surf coot.** Surf scoter.

**surf duck.** A scoter, esp. surf scoter.

**sur·feit** (sûr'fĭt), n. [ME. *surfet,* fr. OF. *surfait, sorfait,* excess, crime, fr. *surfaire, sorfaire,* to set the advantage, prop., to overdo (F. *surfaire* to overcharge), fr. *sur* over + *faire* to make, do, fr. L. *facere.* See SUR-; FEAT, n., FACT. Cf. FORFEIT.] **1.** Excess; superfluity; overabundant supply; yield, etc.; as, to have a *surfeit* of fruit on the trees; a *surfeit* of goods on the market. **2.** Intemperate or immoderate indulgence, as in food or drink; also, Obs., any sin of intemperance, as gluttony. **3.** Any morbid condition arising from excess in eating and drinking, as fullness and oppression of the system or urticaria; as, to suffer from a *surfeit.* **4.** Disgust caused by excess; satiety.

 Supplied abundantly, and even to *surfeit.                   Burke.*
 *Scot.*

**[Hand]** COMBINATIONS (all adjectives) are: surfeit-gorged, surfeit-slain, surfeit-swelled, surfeit-swollen, surfeit-taking.

**sur·feit,** v. t. *-FEIT·ED; -FEIT·ING.* To feed, supply, give, etc., to surfeit; to disgust or sicken by excess; to satiate; cloy; as, to *surfeit* oneself with sweets; he *surfeits* us with compliments. — v. i. To indulge to satiety in any gratification, esp. in the gratification of appetite; also, to suffer from overindulgence.

**Syn.** — See SATIATE.

**sur'feit·er** (-ẽr), n. One who surfeits or cloys.

**surfeit water.** *Old Pharm.* A water to cure surfeit.

**sur'feit·ing** (-ĭng), n. Surfeit. — Surf scoter. *Local, U. S.*

**surf fish.** Any of numerous small or medium-sized fishes constituting the family Embiotocidae and ordering Holocopidae, not much of which live in shallow water along the Pacific coast of North America. They are perchlike in form and are locally known as perches, etc., but differ greatly from the perches in their anatomy and in some viviparous.

Surf Fish (*Rhacochilus toxotes*), with a portion cut away to show the young.

**sur·fi'cial** (sûr·fĭsh'ăl), *adj.* [Cf. SUPERFICIAL.] **1.** Of or pertaining to a surface, esp. the earth's surface; — opp. to *subterranean.* **2.** *Geol.* = SUPERFICIAL, 5.

**surf'i·er.** = SUPERFICIAL, 5.

**sur'fle** (sûr'f'l), v. t. [Cf. SULPHUR.] *Obs.* **a** To embroider. **b** To wash or tint with a cosmetic, said to be prepared from sulphur. — n. An embroidered edge; also, a face wash. *Obs.*

**surf line.** A line of foam-crested waves breaking on a shoal or the like.

**surf'man** (sûrf'măn), n.; pl. *-MEN* (-mĕn). One who is skilled in handling a boat in surf; specif., one of the lowest rating in the lifesaving branch of the Coast Guard. — **surf'man·ship,** n.

**surf plant.** A camaphyte.

**sur'rup'gy'** (sûr'ĭ·spĭ?), *adj.* [F., past part. of *surfrapper,* fr. *sur* over + *frapper* to strike.] *Numis.* Overstruck; made by impressing a new design on an already existing coin.

**surfacing machine.** = SURFACER, n., a.

**surflike,** *adj.* See -LIKE.

**surf·per,** n. = SURGEON. *Obs.*

**surge.** = CIERGE, SERGE.

**surgeful,** *adj.* See -FUL.

---



Surf Scoter, Male. (⅙)

**surf scoter.** A common American scoter (*Melanitta perspicillata*) having conspicuous white markings upon the head and neck of the adult male, the female and young being grayish brown.

**surf scoter·fish'** or **-fisher.** A small California surf fish (*Cymatogaster aggregatus*).

**surf smelt.** A smelt (*Hypomesus pretiosus*) of the coast of California and northward which spawns in the surf.

**surf snipe.** The sanderling.

**sur·fine'** (sûr·fēn'; F.; *cf.* FINE) *cool.* — **sur·fu'sion** (-fū'zhŭn), n.  To supercool.

**surf whiting.** = SILVER WHITING.

**surfy** (sûrf'ĭ), *adj.* Of, abounding in, or like, surf.

**surge** (sûrj), n. [From L. *surgere, surrectum,* to raise, to rise, fr. *sub* (or *sub* under = *regere* to direct, govern. See 1st RIGHT; cf. INSURRECTION; RESURRECTION; SOURCE, SURGE, n.]. *Intransitive:* **1.** To rise or spurt high, as a spring; now, of water, etc., to rise in surges, or high waves; to swell as though agitated; hence, to move, blow, sound, etc., with a surge or in surges; as, the lava *surged* over the city; the troops *surged* forward; the organ *surged* as they entered. **2.** *Elec.* To rise suddenly to an excessive or abnormal value, as current or potential; to rise and fall from such a value successively. **3.** *Naut.* **a** Of a vessel at anchor, to rise and fall with much motion. **b** [Cf. SURGE to slacken.] To slip, as around a windlass, capstan, or bitts; — said of a rope or the like. — *Transitive:* **1.** To cause to rise or fall with a surge or in surges.

**2.** *Naut.* To let go or slacken gradually, as a rope; as, to *surge* a hawser or messenger to prevent its parting; to slacken.

**surge·chamber.** = SURGE TANK.

**surge gap.** *Elec.* A spark gap, as in an arrester, for the discharge of surges due to lightning, etc.

**sur'gent** (sûr'jĕnt), *adj.* [L. *surgens,* pr. AP. *surgian,* contr. fr. OF. *surrigian, cirurgien* (F. *chirurgien*). See CHIRURGEON, SURGERY.] **1.** One who practices surgery. In the Middle Ages, it was customary to combine the professions of barber and surgeon. In modern times, the designation of *surgeon* is restricted to qualified, licensed medical practitioners who have specialized in operative technique.

**2.** *Mil. & Nav.* A medical officer. Formerly, in the United States Army, a surgeon had the rank of major, an assistant surgeon that of captain or first lieutenant. By an act of Congress approved Mar. 23, 1908, the titles surgeon and assistant surgeon were abolished and the purely military titles, such as general, colonel, major, etc., were substituted therefor. In the United States Navy, a surgeon has the rank of lieutenant commander; a passed assistant surgeon, of lieutenant; an assistant surgeon, of lieutenant junior grade.

**3.** A surgeonfish.

**surgeon,** v. t. To treat by surgery.

**surgeon apothecary.** In Great Britain, one who unites the practice of a surgeon with that of an apothecary.

**surgeon bird.** The jaçana.

**surgeon commandant.** *Nav.* In the British Navy, an officer in the medical corps having the rank of commander.

**sur'geon·cy** (sûr'jŏn·sĭ), n. The position of a surgeon, as in the naval or military service.

**surgeon dentist.** A dental surgeon; a dentist.

**sur'geon·fish'** (sûr'jŭn·fĭsh'), n.; pl. *-FISH, -FISHES* [Fish'·ĕz; -ĭz; 191)]. *Note.* Any of numerous spiny-finned fishes of the genus *Acanthurus* (syn. *Teuthis*) and family *Acanthuridae*; — called also *tang* and *barberfish.* They are related to the chaetodonts, but are usually less conspicuously colored and have a more elongate body, bearing on each side near the base of the tail one or more movable lancelike spines. They occur in most warm seas, esp. in the East Indies. Some are considered poisonous.

**surgeon general,** pl. SURGEONS GENERAL. **a** [cap.] In the United States Army, the chief of the Medical Department, having the rank of major general. **b** [cap.] In the United States Navy, the chief of the Bureau of Medicine and Surgery, having the rank of rear admiral. **c** In staff of the Army. **d** [cap.] The chief medical officer of the United States Bureau of Public Health.

**surgeon major.** In the British Army, the ranking surgeon of a regiment.

---

**sur'geon's-ag·a·ric** (sûr'ĕnz), *Pharm.* A preparation, in the form of a powder or thick fellike sheets, of an agaric (*Fomes fomentarius*), used as a hemostatic.

**surgeon's knot.** Any of several knots used in tying ligatures, stitches, etc.; esp., a reef knot in which the first knot has two turns. See 2d KNOT, *Table.*

**sur'ger·ize** (sûr'jẽr·īz), v. t. To subject to surgery.

**sur'ger·y** (sûr'jẽr·ĭ), n. [ME. *surgerie,* fr. OF. *surgerie, cirurgie* (F. *chirurgie*), fr. L. *chirurgia,* fr. Gr. *cheirurgia,* fr. *cheirourgos,* fr. *cheir* hand + *ergon* work. See CHIRURGEON.] **1.** That branch of medical science, art, and practice, which is concerned with the correction of deformities and defects, the repair of injuries, the diagnosis and cure of diseases, the relief of suffering, and the prolongation of life, by manual and instrumental operations. See also SURGEON. Cf. -ECTOMY; -PLASTY; -STOMY, 2; -TOMY.

**2.** A surgeon's operating room or laboratory.

**3.** The work done by a surgeon; as, the operation was a skillful piece of bloodless *surgery.*

**4.** The treatment of other than human ills or diseases by methods analogous to, or as drastic as, those of a surgeon; as, tree *surgery.*

**surge tank.** *Hydraulic Engin.* A standpipe or storage reservoir at the downstream end of a closed aqueduct or feeder pipe (as for a water wheel), to prevent sudden variations of pressure and to furnish water quickly.

**sur'gi·cal** (sûr'jĭ·kăl), *adj.* [See SURGERY, CHIRURGICAL.] **1.** Of or pertaining to surgeons or surgery; done by, or used in, surgery.

**2.** Resulting from a surgical operation or an injury usually caused by special operation; as, *surgical* fever. — **sur'gi·cal·ly,** *adv.*

**surgical anatomy.** See ANATOMY, 2.

**surgical hospital.** See MILITARY HOSPITAL.

**surgical kidney.** *Med.* Any inflammatory disease of the kidney for which the best treatment is surgical, esp. suppurative pyelonephritis secondary to inflammation of the lower urinary tract.

**surgical knot.** Surgeon's knot. See 2d KNOT, *Table.*

**surgical needle.** See NUMERUS a.

**sur'ging** (sûr'jĭng), n. **1.** The act or operation of one that surges.

**2.** = DANCING, n., 2.

**3.** A crosscurrent, esp. one in an electric circuit.

**surg'ing,** *adj.* That surges, as a wave or current.

**su'ri·a·na** (sû'rĭ·ā'nā), n. [NL., after J. *Surian,* French botanist.] *Bot.* A genus of tropical seashore shrubs or small trees constituting a family, **Su'ri·a·na'ce·ae** (-ā·sē'ē), of the order Geraniales. The only known species, *S. maritima,* the bay cedar, or tassel plant, is common along the coasts of tropical America. See BAY CEDAR.

**su'ri·ca·te** (sû'rĭ·kāt), n. [F. *suricate,* of uncert. origin.] A viverrine fourtoothed mammal (*Suricata tetradactyla*) of Cape Colony, allied to the mongooses, but having only four toes. It is grayish banded with black. It is diurnal and social, and has the habit of sitting on its haunches before its burrow like a prairie dog, and is often kept as a pet. It constitutes a genus, **Su'ri·ca'ta** (-kā'tä).

**su'ri·gu** (sû'rĭ·gŏŏ), n. The nagkassar (*Ochrocarpus longifolius*).

**Su'ri·nam'** (sŏŏ'rĭ·năm'), n. A Dutch colony in South America. See GUIANA.

**Surinam cabbage tree.** A tree (*Andira retusa*) of Guiana. Its bark (**Surinam bark**) is an anthelmintic and cathartic. Cf. WORM BARK.

**Surinam cherry.** **a** A tropical American tree (*Malpighia glabra*); also, its edible aromatic fruit. **b** A Brazilian tree (*Eugenia uniflora*) often cultivated in California and Florida; also, its spicy, red, cherrylike fruit, which makes excellent jelly.

**Surinam disease.** = PANAMA DISEASE.

**su'ri·nam'ine** (sŏŏ'rĭ·năm'ēn; -ĭn), n. [From *Surinam bark.*] Also *-in. Chem.* A white, crystalline alkaloid, $C_{11}H_{15}NO_3$, found in the bark of a South American tree (*Andira retusa*) and in other plants; N-methyl-l-tyrosine.

**Surinam poison.** A fish poison derived from a tropical American plant (*Tephrosia toxicaria*).

**Surinam quassia.** The tree *Quassia amara*; also, the drug obtained from it. See QUASSIA, 2.

**Surinam toad.** An aquatic aglossate toad (*Pipa pipa,* syn. *americana*) of the Guianas and parts of Brazil. As the eggs are laid they are distributed by the male over the back of the female, where they become embedded in the skin, each in a separate cavity with a lid formed from the outer capsule of the egg. Within this cavity the tadpole lives and metamorphoses.

Surinam Toad Female.

**sur'lo pa've'** (sûr' lō pȧ·vā'). [F.] Literally, on the paving; destitute.

**sur'lo ta'pis'** (tȧ·pē'). [F.] On the carpet, under CARPET, n. See *on the carpet.*

**sur'ly** (sûr'lĭ), *adj.* | SUR'LI·ER (-LI·EST). [From earlier *sirly,* fr. *sir;* cf. LORDLY. See SIR.] **1.** Arrogant; haughty; domineering. *Now Rare.*

**2.** Ill-natured, abrupt, and rude; gruffly crabbed; churlishly cross; as, *surly* language; a *surly* dog or old man.

**3.** Of inanimate things: **a** Making or accompanied by threatening sounds; menacing. "When o'er the hills beat *surly* storms."          *Burns.* **b** Difficult to manage; intractable; — chiefly of soils.

**Syn. and Ant.** — See SULLEN.

— **sur'li·ly** (sûr'lĭ·lĭ), *adv.* — **sur'li·ness,** n.

**sur'ly,** *adv.* Surlily.                   *Shak.*

---

āle, châotic, câre, ădd, ȧccount, ärm, ȧsk, sofȧ; ēve, hêre (116), ëvent, ĕnd, silĕnt, makĕr; īce, ĭll, charĭty; ōld, ōbey, ôrb, ŏdd, sŏft, cŏnnect; fōōd, fŏŏt;

‖ Foreign Word.   + Obsolete Variant of.   ‡ combined with.   = equals.   Abbreviations, Signs, etc., are explained on pages immediately preceding the Vocabulary.

# EXHIBIT 3

# TREASURY DECISIONS

### UNDER CUSTOMS AND
### OTHER LAWS

## VOL. 66

## JULY–DECEMBER 1934

#### HENRY MORGENTHAU, JR.
Secretary of the Treasury



INDIANA UNIVERSITY
LIBRARY

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1935

For sale by the Superintendent of Documents, Washington, D.C. - - - - - - - - - - Price $2.00 (Buckram)

manner of connection of the electric motor which furnishes the power for operating the device. The motor is small, and spherical in shape, and is compactly fitted into the bottom of the machine and is closely associated with the various metal parts of the same.

As so described, the machine with its incorporated electric motor, would seem to be a complete unit, and as such included within the kind or class of articles mentioned in said paragraph 353. But before definitely passing upon its tariff status the court felt that certain testimony which was not allowed at the original hearing should be received. On this point the court said: "We think the importer had the right to prove whether or not the machine involved was designed and constructed to be used interchangeably by both hand power and electrical power in the sense that is indicated in our views hereinbefore expressed. * * * We conclude that the best interests will be subserved by reversing the judgment of the trial court and remanding the cause for a new trial." It would therefore seem that, even where the electric motor is unquestionably incorporated in and forms an integral part of a machine, the latter is not within the paragraph if it can be operated interchangeably by a power other than electricity. The mechanism must not only contain the electrical element or device, but the latter must be an essential feature of the machine.

Applying that principle to the present importations, the latter must be classified as outside the purview of paragraph 353. Therefore, inasmuch as we have found that the imported merchandise consists of articles or parts of articles which are complete mechanisms containing no electrical element or device whatever, but which utilize energy or force for the transmission of motion, and are mechanical contrivances, we hold them properly dutiable under paragraph 372 as machines or parts thereof not specially provided for composed in chief value of metal, as alleged by the plaintiffs. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.

---

(T.D. 47236)

*Emergency—Free entry of feed for livestock*

Certain feed for livestock to be admitted free of duty under a proclamation of the President, made pursuant to section 318, Tariff Act of 1930

TREASURY DEPARTMENT, *August 30, 1934.*

To Collectors of Customs and Others Concerned:

The proclamation of the President dated August 10, 1934, made pursuant to the provisions of section 318 of the Tariff Act of 1930, declaring an emergency to exist by reason of drought conditions in

219

[T.D. 47236]

certain areas of the United States, and authorizing the Secretary of the Treasury to permit entry free of duty of such feed for livestock as he may designate, is published for your information and guidance:

*Emergency due to drought—Free importation of feed for livestock*

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

Whereas an unusual lack of rain in the States of North Dakota, South Dakota, Nebraska, Texas, Missouri, Utah, and Nevada, and to a lesser extent in other States, has caused an acute shortage of feed for livestock, particularly in the affected area and elsewhere in the United States; and

Whereas Section 318 of the Tariff Act of 1930 (ch. 497, 46 Stat. 590, 696) provides in part as follows:

Whenever the President shall by proclamation declare an emergency to exist by reason of a state of war, or otherwise, he may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act, and may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work. * * *

Now, therefore, I, Franklin D. Roosevelt, President of the United States of America, by virtue of the authority vested in me by the said section of the Tariff Act of 1930, and by virtue of all other authority vested in me, do hereby proclaim an emergency to exist and do hereby authorize the Secretary of the Treasury to permit, until June 30, 1935 (unless before that date it has been determined by the President and declared by his Proclamation that the emergency has terminated), within such limits and subject to such conditions as he may deem necessary to meet the emergency, the importation of such feed for livestock as the Secretary of the Treasury may designate and under such regulations as he may impose, free of duty when imported by or directly for the account of any owner of livestock in any drought affected area, or by or for the account of any relief organization, not operated for profit, for distribution among distressed owners of livestock.

In witness whereof, I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the City of Washington on this 10th day of August in the year of our Lord nineteen hundred and thirty-four, and of the Independence of the United States of America the one hundred and fifty-ninth.

FRANKLIN D. ROOSEVELT.

By the President:
    CORDELL HULL,
        *Secretary of State.*

REGULATIONS

The following regulations are hereby promulgated pursuant to the provisions of the foregoing proclamation:

(1) Hay and straw to be used as feed for livestock and such other feeds for livestock dutiable under the Tariff Act of 1930 as may be designated from time to time shall be admitted free of duty, when imported at any port of entry, provided there is filed in connection with the entry, in addition to other papers and documents required by the customs regulations, a certificate, in duplicate, of a county

agricultural agent or other person, duly designated by the Secretary of Agriculture, in substantially the following form:

```
---------------------------------------------
                                        (Place)
```

```
---------------------------------------------
                                        (Date)
```

*To Collector of Customs:*

```
-----------------------------------
            (Port of entry)
```

This is to certify that the subscriber of this certificate, ------------------
(Name)

-------------------------, -------------------------, has been duly authorized by the
(Title)                    (Address)

Secretary of Agriculture in a letter of ---------------, numbered ---------------,
(Date)                    (Serial No.)

to execute certificates for the importation of feed for livestock free of duty under the proclamation of the President of the United States, made on August 10, 1934, and the regulations of the Secretary of the Treasury promulgated pursuant thereto;

That this certificate is issued by me pursuant to the authority granted to me by the Secretary of Agriculture as aforesaid;

That ------------------------------ is an owner of livestock in a drought-
(Name and address of ultimate consignee)

affected area of the United States, or a relief organization not operated for profit; and

That I have investigated the matter and verily believe that the merchandise described below (is to be) (has been) imported directly by or for the account of the ultimate consignee named above, and that it will be used for the feeding of livestock in a drought-affected area.

| Commodity | Approximate quantity | To be shipped via |
|---|---|---|
| ......................... | .................. | ......................... |
| ......................... | .................. | ......................... |
| ......................... | .................. | ......................... |

```
--------------------------------
       (Signature and title)
```

(2) The original copy of the above-mentioned certificate shall be filed with the entry papers, and the duplicate copy shall be promptly forwarded by the collector of customs to the Secretary of Agriculture, Washington, D.C. (Attention:------------------).

(3) If the above-mentioned certificate is not presented at the time of entry, a bond shall be taken for the production of the same within six months from the date of entry. Where a consumption entry bond has been taken, a special bond need not be required, but in such event, the report of appraisement shall be suspended until the required certificate has been filed, or six months have expired, whichever is earlier, and the six-months' period allowed for production of the certificate shall not be extended.

(4) Lists of the names of county agricultural agents and other persons designated by the Secretary of Agriculture to execute the certificates contemplated by paragraph (1) of these regulations will be furnished to collectors of customs from time to time.

(5) The free entry herein authorized shall apply only with respect to importations entered for consumption on and after the date of the approval of these regulations and prior to July 1, 1935, or such earlier date as may be proclaimed by the President if he shall declare by proclamation that the emergency has terminated.

H. MORGENTHAU, Jr.,
*Secretary of the Treasury.*

---

### (T.D. 47237)

*Antidumping—Black cobalt oxide from Germany*

The Secretary of the Treasury finds that the issuance of a finding of dumping covering black cobalt oxide from Germany is not justified

TREASURY DEPARTMENT, *August 24, 1934.*

*To Collectors of Customs and Others Concerned:*

Reference is made to the notices of suspected dumping issued by the appraising officer at Pittsburgh, Pa., on June 11, 1934, under the provisions of the Antidumping Act of 1921, covering black cobalt oxide from Germany.

After investigation and careful consideration of the evidence presented, I have reached the conclusion that a finding of dumping with respect to black cobalt oxide from Germany is not justified.

Appraising officers who have been withholding appraisements of black cobalt oxide from Germany, by virtue of the issuance of the notices of suspected dumping, are authorized to make their appraisement reports without regard to the question of dumping.

(81–1/2.)

L. W. ROBERT, Jr.,
*Acting Secretary of the Treasury.*

---

### (T.D. 47238)

*Port of entry*

Mahukona, Hawaii, designated as a customs port of entry

TREASURY DEPARTMENT,
OFFICE OF THE COMMISSIONER OF CUSTOMS,
*Washington, D.C., August 29, 1934.*

*To Collectors of Customs and Others Concerned:*

There is published below for the information of customs officers and others concerned the following Executive order, dated August

# EXHIBIT 4

| | | | |
|---|---|---|---|
| **MESSAGE NO.** | 4165404 | **MESSAGE DATE** | 06/13/2024 |
| **STATUS** | Active | **INACTIVATED DATE** | |
| **TYPE** | CD-Cash Deposit | **FR CITE** | 88 FR 57419 |
| **SUB-TYPE** | CIRC INQ-Circumvention Inquiry | **FR DATE** | 08/23/2023 |
| **CATEGORY ACCESS** | AD | **EFFECTIVE DATE** | 06/06/2024 |
| **TYPE** | Public [✓]   Non-Public [ ] | **POI/POR DATE** | - |
| **Notice of lifting of Suspension Date** | | **PERIOD COVERED** | - |

**SHORT CASE NAME**

Solar Cells

**COURT CASE #s**

**REF MESSAGE #s**

3243401

**PRINCIPAL CASE #s**

A570979

**3rd Country CASE #s**

A549988;A552988;A555902;A557988

**RE:** Termination of Presidential Proclamation 10414 and Imposition of Cash Deposit Requirements (Commerce Case Numbers: A-570-979, C-570-980. Third Country Case Numbers: A-555-902, C-555-903, A-557-988, C-557-989, A-549-988, C-549-989, A-552-988, C-552-989)

1. On August 23, 2023, the U.S. Department of Commerce (Commerce) published in the Federal Register (88 FR 57419) its final determination that imports of certain crystalline silicon photovoltaic cells, whether or not assembled into modules (crystalline silicon solar cells and solar modules), that were produced (i.e., completed) in the Kingdom of Cambodia, Malaysia, the Kingdom of Thailand, or the Socialist Republic of Vietnam (inquiry countries), using parts and components produced in the People's Republic of China (China), and subsequently exported from one of the inquiry countries to the United States (hereinafter Southeast Asian-Completed Cells and Modules) are circumventing the antidumping duty and countervailing duty orders on crystalline silicon solar cells and solar modules from China (A-570-979 and C-570-980).

2. Based on the above-referenced affirmative final determination of circumvention, Commerce directed U.S. Customs and Border Protection (CBP) to collect cash deposits of estimated antidumping and countervailing duties on imports of Southeast Asian-Completed Cells and Modules for which certain certification requirements have not been met, including the requirement to certify, if applicable, that the entry is covered by Presidential Proclamation 10414 (i.e., that the entry is an "Applicable Entry").  See message number 3243401 dated 08/31/2023.

3. Presidential Proclamation 10414, "Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules From Southeast Asia" (87 FR 35067), provided for the importation, free of the collection of antidumping and countervailing duties and estimated duties, of certain Southeast Asian-Completed Cells and Modules for a period of 24 months after the date of the proclamation ("Applicable Entries").  That 24 month period ended on 06/05/2024.

4. Therefore, for Southeast Asian-Completed Cells and Modules that were entered, or withdrawn from warehouse, for consumption on or after 06/06/2024, for which the certification requirements described in either paragraph 15, 16, 17, or 18 of message number 3243401 have not been met, CBP shall suspend liquidation of those entries under the appropriate case number(s) identified in paragraph 7 of message number 3243401, or under any other appropriate case number(s) established by Commerce, and require the applicable antidumping and countervailing duty cash deposits described in paragraphs 5b through 5d of message 3243401.

5. If there are any questions by the importing public regarding this message, please contact the Call Center for the Office of AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce at (202) 482-0984. CBP ports should submit their inquiries through authorized CBP channels only. (This message was generated by OIV:HS).

6. There are no restrictions on the release of this information.

Alexander Amdur