IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| AUXIN SOLAR, INC., and CONCEPT CLEAN ENERGY, INC., ) ) )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES; UNITED STATES DEPARTMENT OF COMMERCE; GINA M. RAIMONDO, SECRETARY OF COMMERCE; UNITED STATES CUSTOMS AND BORDER PROTECTION; AND TROY A. MILLER, UNITED STATES CUSTOMS AND BORDER PROTECTION ACTING COMMISSIONER, ) ) ) ) ) ) ) ) ) )<br><br>Defendants, )<br><br>AMERICAN CLEAN POWER ASSOCIATION; CANADIAN SOLAR (USA) INC.; CANADIAN SOLAR INTERNATIONAL LIMITED; SOLAR ENERGY INDUSTRIES ASSOCIATION; JA SOLAR USA, INC.; JA SOLAR VIETNAM COMPANY LIMITED; JA SOLAR MALAYSIA SDN. BHD; JA SOLAR INTERNATIONAL LIMITED; NEXTERA ENERGY, INC.; BYD (HK) CO. LTD.; BYD AMERICA LLC; INVENERGY RENEWABLES LLC; INVENERGY SOLAR EQUIPMENT MANAGEMENT LLC; TRINA SOLAR (U.S.) INC.; TRINA SOLAR (VIETNAM) SCIENCE AND TECHNOLOGY CO., LTD.; TRINA SOLAR ENERGY DEVELOPMENT COMPANY, LIMITED; TRINA SOLAR SCIENCE AND TECHNOLOGY (THAILAND) CO. LTD.; and RISEN SOLAR TECHNOLOGY SDN. BHD., ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Defendant-Intervenors, ) | Court No. 23-00274 |

DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

Of Counsel

PATRICIA M. McCARTHY
Director

ELIO GONZALEZ
Senior Counsel
SPENCER NEFF
Attorney
Office of the Chief Counsel for
    Trade Enforcement and Compliance
United States Department of Commerce

TARA K. HOGAN
Assistant Director

DOUGLAS G. EDELSCHICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division

EMMA L. TINER
Attorney
Office of the Assistant Chief Counsel
U.S. Customs and Border Protection

United States Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9303

October 29, 2024

Attorneys for Defendants

## TABLE OF CONTENTS

Page:

TABLE OF AUTHORITIES ................................................................................................. iii

STATEMENT PURSUANT TO RULE 56.1(c)(1) ......................................................................1

I.    Administrative Determination Under Review .................................................................1

II.    Issues Presented For Review ...........................................................................................1

STATEMENT OF FACTS ..........................................................................................................2

I.    Initiation Of The Circumvention Inquiries .....................................................................2

II.    Presidential Proclamation 10414 And The Supply Chain Emergency ...........................2

III.    The Duty Suspension Rule ..............................................................................................3

IV.    The Circumvention Inquiries ..........................................................................................4

V.    This Litigation .................................................................................................................6

SUMMARY OF THE ARGUMENT ...........................................................................................6

ARGUMENT ...............................................................................................................................8

I.    Standard Of Review .......................................................................................................8

II.    Congress Delegated Rulemaking Authority To Commerce Under 19 U.S.C. § 1318(a) ....9

III.    Upon The Declaration Of The Supply Chain Emergency In Proclamation 10414, 19 U.S.C. § 1318(a) Authorized Commerce To Permit The Duty-Free Importation Of Solar Cells And Modules As "Other Supplies For Use In Emergency Relief Work" ........................................................................................................................... 12

    A.    Section 1318(a) Permits Duty-Free Treatment Of Solar Cells And Modules In Response To A Supply Chain Emergency ..........................................13

    B.    Commerce Engaged In Reasoned Decisionmaking Within The Bounds Of Its Delegated Authority ............................................................................................17

    C.    Plaintiffs' Statutory Interpretation Arguments Are Without Merit ......................18

IV.    Section 1318(a) Permits Commerce to Waive Duties During The Emergency For Entries Made Prior To The Emergency Declaration ........................................................27

## **TABLE OF CONTENTS (continued)**

**Page:**

V. Commerce Reasonably Imposed A Utilization Requirement To Discourage Stockpiling ...................................................................................................32

VI. Plaintiffs Are Not Entitled To The Relief Requested .......................................37

 A. Plaintiffs Fail To Establish The Injunction Factors Including Irreparable Harm ..............................................................................................37

 B. A Retroactive Remedy Is Not Warranted .............................................40

 C. The Court Should Not Order Reliquidation Of Pre-Suit Entries ..........................43

CONCLUSION.....................................................................................................43

## <u>TABLE OF AUTHORITIES</u>

**Cases:**                                                                                               **Page(s):**

*Advocate Health Care Network v. Stapleton*, 581 U.S. 468 (2017)................................22

*Am. Ass'n of Exporters & Importers*, 751 F.2d 1239 (Fed. Cir. 1985)........................16

*Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431 (2014)........................................20

*AM/NS Calvert LLC v. United States*, 654 F. Supp. 3d 1324 (Ct. Int'l Trade 2023)...................37

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252 (Fed. Cir. 2024) ..............................................................12

*Auxin Solar, Inc. v. United States*, 698 F. Supp. 3d 1353 (Ct. Int'l Trade 2024) ...........................6

*Barr v. United States*, 324 U.S. 83, 90 (1945) ................................................................19

*Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600 (1979)........................................29

*Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) ............................................9, 10

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 535 F. Supp. 3d 1336 (Ct. Int'l Trade 2021).........................................40, 41

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 66 F.4th 968 (Fed. Cir. 2023) .......................................................40

*Cornetta v. United States*, 851 F.2d 1372 (Fed. Cir. 1988) ........................................39

*CSC Sugar LLC v. United States*, 461 F. Supp. 3d 1363 (Ct. Int'l Trade 2020) ................... 39-40

*Davis v. Michigan Dep't of Treasury*, 489 U.S. 803 (1989)........................................28

*Diamond v. Chakrabarty*, 447 U.S. 303 (1980)................................................................19

*Dixon Ticonderoga Co. v. United States*, 468 F.3d 1353 (Fed. Cir. 2006) ....................................8

*Dolan v. United States Postal Serv.*, 546 U.S. 481 (2006) ....................................... 29-30

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)........................................38

*Florsheim Shoe Co. v. United States*, 744 F.2d 787 (Fed. Cir. 1984) ...........................16

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .................28

*Gemtron Corp. v. Saing-Gobain* Corp, 572 F.3d 1371 (Fed. Cir. 2009)........................38

## TABLE OF AUTHORITIES (continued)

**Cases (continued):**                                               **Page(s):**

*Home Products Int'l, Inc. v. United States*,
　405 F. Supp. 3d 1368 (Ct. Int'l. Trade 2019) ............................................39, 43

*In re Section 301 Cases*, 570 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) ......................................36

*Lamar v. United States*, 241 U.S. 103 (1916)................................................................14

*Lichter v. United States*, 334 U.S. 742 (1948) .............................................................12

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ........................................... *passim*

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)..................................................37, 38

*Motion Sys. Corp. v. Bush*, 437 F.3d 1356 (Fed. Cir. 2006)..........................................................13

*Motor Vehicle Mfr.'s Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983) ......................8, 36

*Nat'l Fuel Gas Supply Corp. v. FERC*, 59 F.3d 1281 (D.C. Cir. 1995) ............................................40

*Silfab Solar, Inc. v. United States*, 892 F.3d 1340 (Fed. Cir. 2018) ......................................13, 37

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ..............................................................23

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 (Fed. Cir. 2006)............................39

*Solid Waste Agency of N. Cook Cty. v. United States Army Corps of Eng'rs*,
　531 U.S. 159 (2001) ...........................................................................16

*Sw. Airlines Co. v. Saxon*, 596 U.S. 450 (2022) ....................................................... 20-21

*Telecare Corp. v. Leavitt*, 409 F.3d 1345 (Fed. Cir. 2005) ............................................14

*United States v. Am. Home Assur. Co.*, 789 F.3d 1313 (Fed. Cir. 2015)......................................20

*United States v. George S. Bush & Co.*, 310 U.S. 371 (1940)......................................................13

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ...............................................................38

*Wind Tower Trade Coal. v. United States*, 741 F.3d 89 (Fed. Cir. 2014) .....................................38

*Winter v. NRDC*, 555 U.S. 7 (2008) .............................................................................37

**TABLE OF AUTHORITIES (continued)**

**Statutes And Legislative History:**                                    Page(s):

5 U.S.C. § 556 ......................................................................................................8

5 U.S.C. § 557 ......................................................................................................8

5 U.S.C. § 706 ......................................................................................................8

18 U.S.C. § 1001 ..................................................................................................5

19 U.S.C. § 1318 ..........................................................................................*passim*

19 U.S.C. § 1516a ..............................................................................................41

19 U.S.C. § 1671 ...........................................................................................3, 11

19 U.S.C. § 1673 ..................................................................................................3

19 U.S.C. § 1677j ..................................................................................................3

19 U.S.C. § 2171 (note) .....................................................................................11

28 U.S.C. § 1581 ...............................................................................8, 36, 41, 43

28 U.S.C. § 2640 ..................................................................................................8

42 U.S.C. § 5846 ................................................................................................10

42 U.S.C. § 7412 ................................................................................................10

Act of Sept. 6, 1966, Pub. L. No. 89-554 (1966) ............................................11

Veterans Emergency Housing Act of 1946, Pub. L. 79-388 (1946) ................25

*Reorganization Plan No. 3 of 1979*, 44 Fed. Reg. 69,273 (Dec. 3, 1979) ......11

Comparative Print of The Tariff Act of 1922 with H.R. 2667,
     H.R. Doc. No. 15 (May 9, 1929) ............................................................16

**Presidential Proclamations:**

Proclamation 10414 of June 6, 2022, *Declaration of Emergency and Authorization for
     Temporary Extensions of Time and Duty-Free Importation of Solar Cells and
     Modules from Southeast Asia*, 87 Fed. Reg. 35,067 (June 9, 2022) ......... *passim*

*Proclamation 2093:  Emergency Due to Drought – Free Importation of Feed for
     Livestock,* 49 Stat. 3,404 (Aug. 10, 1934) (*Livestock Feed Proclamation*) ...........23, 24, 31

<u>**TABLE OF AUTHORITIES (continued)**</u>

**Presidential Proclamations (continued):**                                    **Page(s):**

*Proclamation 2498:  Emergency Due to Drought – Free Importation of Forage for
    Livestock*, 6 Fed. Reg. 3,715 (July 29, 1941) (*Livestock Forage Proclamation*) ..23, 24, 31

*Proclamation 2545:  Free Importation of Jerked Beef,* 7 Fed. Reg. 2,611 (Apr. 7, 1942)
    (*Jerked Beef Proclamation*) .................................................................................31

*Proclamation 2553:  Emergency Due to State of War – Free Importation by the American
    National Red Cross of Food, Clothing, and Medical, Surgical, and Other
    Supplies*, 7 Fed. Reg. 3,143 (Apr. 30, 1942) (*Red Cross Proclamation*) ............. 23-25, 31

*Proclamation 2708*, 11 Fed. Reg. 12,695 (Oct. 29, 1946) (*Lumber Proclamation*)............... 25-26

**Regulations:**

19 C.F.R. § 101.1 ...............................................................................................28

19 C.F.R. § 351.212 .......................................................................................29, 42

19 C.F.R. § 358.103 ..........................................................................................34

19 C.F.R. part 362 .........................................................................................1, 3

19 C.F.R. § 362.101 ..........................................................................................13

19 C.F.R. § 362.102 .....................................................................................4, 13, 33

19 C.F.R. § 362.103 .....................................................................................4, 13, 27

19 C.F.R. § 362.104 ..........................................................................................13

*Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord
    With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Dep't of Commerce
    Sept. 16, 2022) (Duty Suspension Rule).................................................................. *passim*

*Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 Fed.
    Reg 63,230 (Dep't of Commerce Oct. 30, 2006) (*Commerce Emergency
    Relief Rule*).................................................................................... 15, 26, 34-35

*T.D. 47236*, 66 Treas. Dec. Int. Rev. 218 (Dep't of Treasury Aug. 30, 1934)
    (*Livestock Feed Rule*) ...............................................................................31, 32, 34

*T.D. 50449*, 6 Fed. Reg. 4,071 (Dep't of Treasury Aug. 15, 1941) (*Livestock
    Forage Rule*) ...........................................................................................31, 32, 34

*T.D. 50599*, 7 Fed. Reg. 2,776 (Dep't of Treasury Apr. 14, 1942) (*Jerked Beef Rule*).....31, 32, 34

**TABLE OF AUTHORITIES (continued)**

**Regulations (continued):**                                                    **Page(s):**

*T.D. 50626*, 7 Fed. Reg. 3,358 (Dep't of Treasury May 6, 1942) (*Red Cross
    Rule*)....................................................................................................24, 25, 31, 32, 34

*T.D. 51565*, 11 Fed. Reg. 13,460 (Dep't of Treasury Nov. 14, 1946) (*Lumber Rule*) .................25

**Administrative Decisions:**

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation*,
    88 Fed. Reg. 83,917 (Dep't of Commerce Dec. 1, 2023) (notice of
    opportunity to request administrative reviews)....................................................42

*CSPVs, Whether or Not Assembled Into Modules, from China*, 77 Fed. Reg. 73,018
    (Dep't of Commerce Dec. 7, 2012) (AD Order)....................................................2

*CSPVs, Whether or Not Assembled Into Modules, from China*, 77 Fed. Reg. 73,017
    (Dep't of Commerce Dec. 7, 2012) (CVD Order) .................................................2

*CSPVs, Whether or Not Assembled Into Modules, from China*, 87 Fed. Reg. 75,221,
    75,222 (Dep't of Commerce Dec. 8, 2022)
    (*Preliminary Circumvention Determinations*)........................................2, 4, 5, 39

*CSPVs, Whether or Not Assembled Into Modules, from China*, 88 Fed. Reg.
    57,419 (Dep't of Commerce Aug. 23, 2023)
    (*Final Circumvention Determinations*)......................................5, 36, 39, 42, 43

*CSPVs, Whether or Not Assembled Into Modules, from China*, 89 Fed. Reg. 55,562
    (Dep't of Commerce July 5, 2024) (final results AD admin. review) .............................42

**Other Authorities:**

Webster's New International Dictionary (1934)..................................................... 14-15

Pursuant to Rule 56.1 of this Court's rules, defendants respectfully submit this response to the motion for judgment on the agency record filed by plaintiffs (Pls. Br.).[1]

## STATEMENT PURSUANT TO RULE 56.1(c)(1)

I.    Administrative Determination Under Review

The matter under review is *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Dep't of Commerce Sept. 16, 2022) (Duty Suspension Rule), codified as 19 C.F.R. part 362, which implemented Proclamation 10414 of June 6, 2022, *Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia*, 87 Fed. Reg. 35,067 (June 9, 2022) (Proclamation 10414).

II.    Issues Presented For Review

1.    Whether Congress delegated rulemaking authority to Commerce in 19 U.S.C. § 1318(a).

2.    Whether duty-free treatment for applicable entries of solar cells and modules from four Southeast Asian countries is consistent with 19 U.S.C. § 1318(a) and Proclamation 10414.

3.    Whether duty-free treatment for applicable entries that entered before the declaration of emergency but remained unliquidated at the beginning of the emergency is consistent with 19 U.S.C. § 1318(a) and Proclamation 10414.

4.    Whether Commerce's inclusion of a utilization requirement in the Duty Suspension Rule is consistent with 19 U.S.C. § 1318(a) and Proclamation 10414.

---

[1]  In this brief, we refer to parties as follows:  (1) plaintiff Auxin Solar, Inc. (Auxin); (2) plaintiff Concept Clean Energy, Inc. (CCE); (3) defendant United States Department of Commerce (Commerce); and (4) defendant United States Customs and Border Protection (CBP).

5.      Whether plaintiffs' request for injunctive relief should be denied because they entirely fail to demonstrate (or even mention) irreparable harm and the other injunction factors.

## STATEMENT OF FACTS

### I.      Initiation Of The Circumvention Inquiries

Commerce administers antidumping duty (AD) and countervailing duty (CVD) orders covering crystalline silicon photovoltaic cells (CSPVs), whether or not assembled into modules (solar cells and modules), from the People's Republic of China (China).  *CSPVs, Whether or Not Assembled Into Modules, from China*, 77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012) (AD Order); *CSPVs, Whether or Not Assembled Into Modules, from China*, 77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012) (CVD Order) (collectively, the Orders).  On April 1, 2022, Commerce initiated inquiries to determine whether imports of solar cells and modules produced in Cambodia, Malaysia, Thailand, and Vietnam (the Southeast Asian countries) circumvented the Orders by incorporating parts and components from China.  *See CSPVs, Whether or Not Assembled Into Modules, from China*, 87 Fed. Reg. 75,221, 75,222 (Dep't of Commerce Dec. 8, 2022) (*Preliminary Circumvention Determinations*).

### II.      Presidential Proclamation 10414 And The Supply Chain Emergency

Congress conferred upon the President the power to "declare an emergency to exist" and to authorize regulations prescribing "the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work."  19 U.S.C. § 1318(a).  On June 6, 2022, President Biden issued Proclamation 10414, which found that:  (1) "[a] robust and reliable electric power system is … not only a basic human necessity, but is also critical to national security and national defense," (2) there is an "acute shortage of solar modules and module components" in the "solar supply chain," and (3) "[i]mmediate action is needed to ensure … access to a sufficient supply of solar modules to assist in meeting our electricity generation

needs." In light of these solar supply chain problems, President Biden declared "an emergency to exist with respect to the threats to the availability of sufficient electricity generation capacity to meet expected customer demand."[2]

Proclamation 10414 authorized Commerce "[t]o provide relief from the emergency" and directed that Commerce "shall consider taking appropriate action under" 19 U.S.C. § 1318(a), to permit the importation of certain solar cells and modules from the Southeast Asian countries, free of the collection of antidumping and countervailing duties, if otherwise applicable under 19 U.S.C. §§ 1671 (CVD orders), 1673 (AD orders), and 1677j (prevention of circumvention of AD and CVD orders). The President directed that Commerce do so "under such regulations and under such conditions as the Secretary may prescribe" and that the duration of any such relief would be through "24 months after the date of this proclamation or until the emergency declared herein has terminated, whichever occurs first."

III.    The Duty Suspension Rule

In July 2022, pursuant to Proclamation 10414, Commerce issued a proposed rule to provide relief from the emergency declared by the President. *See* Duty Suspension Rule, 87 Fed. Reg. at 56,869. In September 2022, Commerce promulgated its final rule with an effective date of November 15, 2022. *Id.* at 56,868. Commerce received 16 comments on its proposed rule, 11 of which were generally supportive. *Id.* at 56,869. Commerce responded to public comments and implemented certain changes to the proposed rule. *Id.* at 56,870-82.

The Duty Suspension Rule added part 362 to title 19 of the Code of Federal Regulations, which required that Commerce instruct CBP to discontinue the suspension of liquidation and to

---

[2]  As noted in the text, President Biden declared an emergency because an "acute shortage" of solar cells and modules in the "solar supply chain" posed "threats to the availability of sufficient electricity generation capacity." Proclamation 10414. For ease of reference in this brief, we refer to this emergency declared by the President as a "supply chain emergency."

liquidate "Applicable Entries" of solar cells and modules free of duties that are covered by the circumvention inquiries (that initiated on April 1, 2022) and entered prior to the "Date of Termination" (that occurred on June 6, 2024).  Duty Suspension Rule, 87 Fed. Reg. at 56,886-87; 19 C.F.R. §§ 362.103(a) ("The Secretary will permit the importation of Applicable Entries free of the collection of antidumping and countervailing duties and estimated duties under sections 701, 731, 751 and 781 of the Act until the Date of Termination."); 362.102 ("Date of Termination means June 6, 2024, or the date the emergency described in Presidential Proclamation 10414 has been terminated, whichever occurs first."); *id.* ("Applicable Entries" mean entries of "Southeast Asian-Completed Cells and Modules," which, in turn, mean entries subject to the circumvention inquiries).

To limit potential abuse in the form of "stockpiling," Commerce imposed a limitation that to qualify for duty-free treatment under the rule, the solar cells and modules must be "used in the United States by the Utilization Expiration Date" (180 days after the Date of Termination).  Duty Suspension Rule, 87 Fed. Reg. at 56,879, 56,886-87; 19 C.F.R. § 362.102 (definitions of Applicable Entries, Utilization Expiration Date, and Utilization).  Commerce explained that the waiver of "duties on the specified goods will provide relief to this emergency by encouraging imports and increasing solar energy capacity."  Duty Suspension Rule, 87 Fed. Reg. at 56,872.

IV.     The Circumvention Inquiries

In December 2022, Commerce issued preliminary determinations that certain imports of solar cells and modules from the Southeast Asian countries are circumventing the Orders.  *Preliminary Circumvention Determinations*, 87 Fed. Reg. 75,221.  However, pursuant to the Duty Suspension Rule, Commerce directed CBP to discontinue the suspension of liquidation and collection of cash deposits that were ordered on Applicable Entries because of the circumvention inquiries.  *Id.* at 75,223 (citing 19 C.F.R. § 362.103(b)(1)(i)).

Commerce established a complex hierarchy with respect to the collection of cash deposits on non-Applicable Entries that entered during the pendency of the emergency. *See Preliminary Circumvention Determinations*, 87 Fed. Reg. at 75,223. Commerce also imposed certification requirements for imports of solar cells and modules from the Southeast Asian countries to qualify for duty-free treatment: (1) certifications that each entry meets the definition of "Applicable Entries" as established by the Duty Suspension Rule; (2) certifications that specific entries are not subject to the suspension of duties based on a preliminary negative determination of circumvention; and (3) certifications that specific entries are not subject to the suspension of liquidation and collection of duties based on certain component content requirements. *Id.* at 75,224-25, 75,227-31. Commerce explained that it would not order CBP to suspend liquidation or collect cash deposits for entries when any of the foregoing certifications was provided indicating that duties were not owed (either because the goods were covered by the Duty Suspension Rule or were not subject to duties). *Id.* at 75,224.

In August 2023, Commerce published final determinations that certain imports of solar cells and modules from the Southeast Asian countries are circumventing the Orders. *See CSPVs, Whether or Not Assembled Into Modules, from China*, 88 Fed. Reg. 57,419 (Dep't of Commerce Aug. 23, 2023) (*Final Circumvention Determinations*). Commerce continued to impose certification requirements for imports of solar cells and modules from the Southeast Asian countries to qualify for duty-free treatment. *Id.* at 57,422. For Applicable Entries to qualify for duty-free treatment under the Duty Suspension Rule, Commerce included a requirement that importers certify – on personal knowledge, while maintaining supporting documentation, and subject to 18 U.S.C. § 1001 – that the solar cells and modules will be utilized by the Utilization Expiration Date. *Id.* at 57,426. Commerce also continued to instruct CBP to collect cash

deposits for entries from those countries for which no certification was provided demonstrating

that the goods were entitled to duty-free treatment.  *Id.* at 57,422.

V.     This Litigation

On December 29, 2023, plaintiffs commenced this action.  Compl., ECF No. 2.  In

January 2024, plaintiffs and defendants filed a joint stipulation, in which defendants agreed that

they "will not oppose plaintiffs' argument about the Court's authority to order reliquidation of

entries that remain unliquidated as of the date when the Court rules on this stipulation," but

defendants "reserve[d] the right to make arguments regarding whether the Court should order

reliquidation as a remedy in the event that plaintiffs prevail on the merits."  ECF No. 19.  In May

2024, the Court ruled on the stipulation and granted it.  *Auxin Solar, Inc. v. United States*, 698 F.

Supp. 3d 1353, 1371-72 (Ct. Int'l Trade 2024).

SUMMARY OF THE ARGUMENT

Plaintiffs claim that the Duty Suspension Rule exceeds the lawful bounds of 19 U.S.C.

§ 1318.  Specifically, plaintiffs argue that solar cells and modules used to remedy a supply chain

emergency declared by the President cannot constitute "other supplies for use in emergency

relief work" within the meaning of section 1318.  However, plaintiffs' statutory arguments are

inconsistent with Congress' broad delegation of rulemaking authority in section 1318 and the

plain meaning of the statutory text, which leaves flexibility for Commerce to respond to an

emergency declared by the President.  Under *Loper Bright Enterprises v. Raimondo*, 144 S. Ct.

2244, 2268 (2024), that delegation in section 1318 requires this Court to decide whether

Commerce's rulemaking is reasonable, and if so, to sustain it.  Commerce's interpretation of

section 1318 is both reasonable and consistent with the best reading of the statute.

Plaintiffs offer a strained textual analysis of section 1318, selectively engage in

dictionary shopping, and seek to impose limitations on Executive authority that Congress did not

provide.  Section 1318 expressly delegated to the President discretion to authorize regulations to

waive duties for "other supplies for use in emergency relief work."  Congress did not limit what

type of emergencies might be declared by the President or what "other supplies" might be used

for the work to relieve them.  Plaintiffs do not dispute that the President lawfully declared an

emergency to exist because of an acute shortage of solar supplies, and they do not dispute that

the importation of solar cells and modules can increase solar supplies and thus mitigate threats to

future electricity generation capacity.  In the context of this supply chain emergency, Commerce

reasonably concluded that solar cells and modules constituted "other supplies" to remedy that

emergency.  Commerce also reasonably concluded that pre-proclamation entries that remained

unliquidated *during the emergency* could be "for use in emergency relief work" given the

retrospective system of duty assessment.  Finally, Commerce reasonably concluded that entries

made *during the emergency* could be "for use in emergency relief work," even if the solar cells

and modules could be used during a discrete amount of time after the emergency terminated,

when this short-term utilization requirement was implemented to discourage stockpiling.

      With respect to remedies, plaintiffs demand extraordinary injunctive relief without any

discussion of the four injunction factors.  Most notably, plaintiffs fail to demonstrate irreparable

harm, even though that is an important requirement for obtaining a permanent injunction in this

case.  At this time, the emergency declared by the President has terminated, all of the relevant

shipments have entered the United States, and CBP has resumed collecting cash deposits on

entries of solar cells and modules from the Southeast Asian countries consistent with the final

determinations in the circumvention inquiries.  Plaintiffs will neither pay duties nor receive

payment of any duties based on the outcome of this lawsuit.  Plaintiffs waited more than *15

months* after Commerce issued the Duty Suspension Rule before filing suit.  After all this time

has passed, plaintiffs' opening brief does not cite any evidence, or offer one word of argument, as to how *they* will suffer irreparable harm in the absence of a permanent injunction ordering reliquidation or liquidation notwithstanding the Duty Suspension Rule. The Court cannot simply presume that such harm exists. And a permanent injunction would impose substantial burdens on the Government, disrupt the administration of the trade laws, and prejudice importers who are participating as defendant-intervenors in this lawsuit. Plaintiffs' request for a permanent injunction should be denied.

<u>ARGUMENT</u>

I.    <u>Standard Of Review</u>

In an action brought under 28 U.S.C. § 1581(i), the Court "shall review the matter as provided in section 706 of title 5." 28 U.S.C. § 2640(e). Specifically, the Court will "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"[3] 5 U.S.C. § 706(2)(A); *see Dixon Ticonderoga Co. v. United States*, 468 F.3d 1353, 1354 (Fed. Cir. 2006)). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfr.'s Ass'n v. State Farm Mut. Auto. Ins*., 463 U.S. 29, 43 (1983). The agency need only "examine the relevant data and articulate a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Id.* (citations omitted).

---

[3] Plaintiffs' passing reference to the "unsupported by substantial evidence" standard of review is inapposite, Pls. Br. 15, because that standard only applies "in a case subject to" 5 U.S.C. §§ 556, 557 (evidentiary hearings), "or otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E).

II.    Congress Delegated Rulemaking Authority To Commerce Under 19 U.S.C. § 1318(a)

Congress delegated broad rulemaking authority to Commerce in section 1318(a).  Given this delegation of authority, the Court must determine whether Commerce engaged in reasoned decisionmaking by:  (i) interpreting "other supplies" to cover solar cells and modules needed to address the supply chain emergency declared in Proclamation 10414; (ii) interpreting "for use in emergency relief work" to cover pre-proclamation entries that remained unliquidated during this emergency; and (iii) interpreting "for use in emergency relief work" to cover entries made during this emergency but that might not be utilized until a discrete time after the emergency terminated.  Plaintiffs incorrectly argue that under *Loper Bright*, "this Court cannot defer to Commerce's evidently contrary view" of what plaintiffs contend the statute authorizes.  Pls. Br. 18-31.  As demonstrated below, this argument misreads *Loper Bright* and is not consistent with Congress' delegation of authority to Commerce.

In *Loper Bright,* the Supreme Court overruled the second step of the *Chevron* framework, in which courts previously had deferred to agencies' reasonable interpretations of silent or ambiguous statutes.  144 S. Ct. at 2273 (overruling *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984)).  Instead, "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.*  However, the Supreme Court recognized there are instances in which a statute either expressly or impliedly authorizes an agency to exercise discretion and flexibility:

> [T]he statute's meaning may well be that the agency is authorized to exercise a degree of discretion.  Congress has often enacted such statutes.  For example, some statutes expressly delegate{} to an agency the authority to give meaning to a particular statutory term.  Others empower an agency to prescribe rules to fill up the details of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as appropriate or reasonable.

*Loper Bright*, 144 S. Ct. at 2263 (internal citations and quotation marks omitted).  In such instances, reviewing courts "independently interpret the statute and effectuate the will of Congress subject to constitutional limits" "by recognizing constitutional delegations, fix{ing} the boundaries of {the} delegated authority, and ensuring the agency has engaged in reasonable decisionmaking within those boundaries."[4]  *Id.* (internal citations and quotation marks omitted).

*Loper Bright* cites several examples of statutes that expressly delegate authority for an agency to *define* statutory terms, including 42 U.S.C. § 5846(a)(2), which requires "notification to [the] Nuclear Regulatory Commission when a facility or activity licensed or regulated pursuant to the Atomic Energy Act 'contains a defect which could create a substantial safety hazard, *as defined by regulations which the Commission shall promulgate*.'"  144 S. Ct. at 2263 & n.5 (quoting 42 U.S.C. § 5846(a)(2)) (emphasis in original).  *Loper Bright* also cites several examples of statutes that expressly delegate rulemaking authority for an agency to *regulate* subject to the limits of a term or phrase that leaves agencies with flexibility, including 42 U.S.C. § 7412(n)(1)(A), which directs the Environmental Protection Agency "to regulate power plants 'if the Administrator finds such regulation is appropriate and necessary.'"  *Id.* at 2263 & n.6 (quoting 42 U.S.C. § 7412(n)(1)(a)).  Similar to the express delegation contained in 42 U.S.C. § 7412(n)(1)(A) and other statutory examples cited in *Loper Bright*, section 1318(a) contains an express delegation of rulemaking authority for Commerce to *regulate* what constitutes "other supplies" within the context of a particular emergency declared by the President.

Section 1318(a) provides:  "Whenever the President shall by proclamation declare an emergency to exist by reason of a state of war, or otherwise, he may authorize the Secretary of

---

[4]  Additionally, the Supreme Court directed that earlier cases relying on *Chevron* remain good law.  *Loper Bright*, 144 S. Ct. at 2273.

the Treasury to extend during the continuance of such emergency the time herein prescribed for

the performance of any act, and may authorize the Secretary … to *permit, under such regulations*

*as the Secretary … may prescribe, the importation free of duty of food, clothing, and medical,*

*surgical, and other supplies for use in emergency relief work*." 19 U.S.C. § 1318(a) (emphasis

supplied). In 1979, the authority conferred by section 1318(a), was transferred from the

Secretary of the Treasury to the Secretary of Commerce insofar as it related to Commerce's

authority under the AD and CVD laws (19 U.S.C. §§ 1671 *et seq*.).[5] 19 U.S.C. § 2171 (note);

*Reorganization Plan No. 3 of 1979*, § 5(a)(1)(E), 44 Fed. Reg. 69,273, 69,275 (Dec. 3, 1979); *see*

*also* Act of Sept. 6, 1966, Pub. L. No. 89-554, §§ 903, 906, 80 Stat. 394-96 (1966) (executive

reorganization plans).

Therefore, when an emergency is declared to exist, the President may authorize

Commerce to permit the duty-free importation of certain goods "*under such regulations as the*

*Secretary … may prescribe*." 19 U.S.C. § 1318(a) (emphasis added). This delegation appears in

the same sentence as the term "other supplies" and the phrase "for use in emergency relief

work." *Id.* What may constitute "other supplies" in the context of one type of emergency may

not constitute "other supplies" in the context of another type of emergency. Congress thus

empowered Commerce "to prescribe rules to fill up the details of [the] statutory scheme" and to

regulate within the bounds of those flexible terms. *See Loper Bright*, 144 S. Ct. at 2263. Under

these circumstances, Commerce "is authorized to exercise a degree of discretion" in giving

---

[5] Commerce's authority under section 1318(a) is separate from authority retained by the Secretary of the Treasury or otherwise transferred or delegated to the Secretary of Homeland Security, which is not at issue in this case. Within the context of the delegation of authority to Commerce in section 1318(a), we use the term duty-free importation to mean importation free of antidumping and countervailing duties. Commerce's Duty Suspension Rule did not address any other types of duties that may apply to solar cells and modules from Southeast Asian countries.

meaning to these terms, and the Court's review is limited to "ensuring the agency has engaged in reasoned decisionmaking." *See id.*

Likewise, the Federal Circuit has recognized that certain statutory terms are "general in nature, indicating that Congress intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce." *Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259 (Fed. Cir. 2024). The Federal Circuit explained that "broad," "nonspecific statutory language" reflects an "expression of [Congress'] well-considered judgment as to the degree of administrative authority which it was necessary to grant." *Id.* at 1259-60 (citing *Lichter v. United States*, 334 U.S. 742, 784 (1948)). If a term is "general but not ambiguous," a case is "more properly viewed as one involving implied delegation of adjudicative authority to the agency rather than deference to the agency's interpretation of an ambiguous statute." *Id.* at 1261. Thus, in addition to its express delegation of authority, the statute contains an implied delegation empowering Commerce to interpret certain capacious and broad terms, such as the term "other supplies," in section 1318(a).

Given the delegation of rulemaking authority to Commerce in section 1318(a), this Court's proper role is to ensure that Commerce has "engaged in reasonable decisionmaking" within the boundaries of that delegation. *See Loper Bright*, 144 S. Ct. at 2263. As demonstrated below, the challenged aspects of Commerce's Duty Suspension Rule are reasonable and consistent with the best reading of the statute.

III.    Upon The Declaration Of The Supply Chain Emergency In Proclamation 10414, 19 U.S.C. § 1318(a) Authorized Commerce To Permit The Duty-Free Importation Of Solar Cells And Modules As "Other Supplies For Use In Emergency Relief Work"

Invoking the authority conferred by 19 U.S.C. § 1318(a)*, the President issued Proclamation 10414 to declare the existence of a supply chain emergency and that "[i]mmediate action is needed to ensure … access to a sufficient supply of solar modules to assist in meeting

our electricity generation needs."  In light of the declared emergency, Proclamation 10414

directed that Commerce "shall consider taking appropriate action under" 19 U.S.C. § 1318(a), to

permit the duty-free importation of certain solar cells and modules from the Southeast Asian

countries, "under such regulations and under such conditions as the Secretary may prescribe."

Consistent with Proclamation 10414, and after notice and comment, Commerce implemented the

President's emergency declaration by promulgating the Duty Suspension Rule to permit duty-

free importation of solar cells and modules.[6]  19 C.F.R. §§ 362.101-104.  The Duty Suspension

Rule "set[] forth the actions [Commerce] is taking to respond to the emergency declared in

Presidential Proclamation 10414."  19 C.F.R. § 362.101.  As demonstrated below, Commerce's

actions are reasonable and consistent with the best reading of section 1318(a).

      A.      Section 1318(a) Permits Duty-Free Treatment Of Solar Cells And Modules In Response To A Supply Chain Emergency

When interpreting statutes, the Court begins with the "ordinary meaning … at the time

Congress enacted the statute" of the statute's text.  *Perrin v. United States*, 444 U.S. 37, 42

---

[6]  The Duty Suspension Rule and Proclamation 10414 are identical insofar as both invoked section 1318 to permit certain solar cells and modules from the Southeast Asian countries to enter duty-free.  Proclamation 10414; 19 C.F.R. § 362.101.  Plaintiffs do not (and cannot) argue that the Duty Suspension Rule applied to different types of solar cells and modules than what the President specifically identified in the proclamation.  When plaintiffs challenge whether any solar cells and modules may constitute "other supplies for use in emergency relief work" under section 1318(a), *see* Pls. Br. § II-A, this arguably is a challenge to what the President directed Commerce to do in the proclamation, rather than a challenge to the Duty Suspension Rule itself.  As the Federal Circuit has explained, "there are limited circumstances when a presidential action may be set aside if the President acts beyond his statutory authority, but such relief is only rarely available."  *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018).  Presidential actions are reviewable only for a determination of whether the President "violated an explicit statutory mandate," *Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (*en banc*), and the President's findings of fact and exercise of discretion are not reviewable at all.  *United States v. George S. Bush & Co.*, 310 U.S. 371, 379-80 (1940).  Even assuming that the plaintiffs' challenges to the Duty Suspension Rule are cognizable here under the Administrative Procedure Act (APA), for the reasons discussed in the text, the rule constitutes a reasonable and correct interpretation of section 1318(a).

(1979); *accord Bostock v. Clayton Cty., Georgia*, 590 U.S. 644, 654 (2020).  If the statutory text

does not answer the precise question, courts rely on "traditional tools of statutory construction."

*Loper Bright*, 144 S. Ct. at 2268.  The statute at issue, 19 U.S.C. § 1318(a), provides:

> Whenever the President shall by proclamation declare an
> emergency to exist by reason of a state of war, or otherwise, he
> may authorize the Secretary … to extend during the continuance of
> such emergency the time herein prescribed for the performance of
> any act, and may authorize the Secretary … to permit, under such
> regulations as the Secretary … may prescribe, the importation free
> of duty of food, clothing, and medical, surgical, and other supplies
> for use in emergency relief work.  The Secretary … shall report to
> the Congress any action taken under the provisions of this section.

Thus, by its plain terms, section 1318(a) provides that once the President declares that an

emergency exists, certain categories of goods are authorized to be imported "free of duty," or as

pertinent here, without regard to antidumping and countervailing duties.  *Id.*

The statute lists several categories of goods that may enter duty-free:  "food, clothing,

and medical, surgical, and other supplies for use in emergency relief work."  19 U.S.C.

§ 1318(a).  "Food" and "clothing" are not at issue in this case.  The remaining terms, "medical,"

"surgical," and "other" are adjectives modifying the noun "supplies," and they are followed by

the phrase "for use in emergency relief work," signifying that "medical" supplies, "surgical"

supplies, and "other" supplies are various types of supplies that may be used in emergency relief

work.  None of these statutory terms are defined.  In the absence of a statutory definition, "the

plain meaning of a statute is to be ascertained using standard dictionaries in effect at the time of

the statute's enactment."  *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1353 (Fed. Cir. 2005) (citing

*Lamar v. United States*, 241 U.S. 103, 113 (1916)).

The term "other" is defined broadly as (1) "being the one of two (or more) distinct from

the one[s] already mentioned," or (2) "additional," "not the same," or "different."  *Other*,

Webster's New International Dictionary (1934).[7]  Moreover, "supplies" are defined as

(1) "[a]ssistance; succor; aid;" (2) "filling a want, need, void, place, etc.;" or (3) "*chiefly pl.*

[p]rovisions, clothing, arms, raw materials, etc., set aside to be dispensed at need."  *Supply*,

Webster's New International Dictionary (1934).  Thus, the plain meaning of "other supplies" in

section 1318(a) encompasses any materials dispensed to fill a *need* that are different from the

"medical" supplies and "surgical" supplies already mentioned.  *See id.*  In this context, the *need*

is to relieve an emergency declared by the President.  Thus, "other supplies" is a general, catchall

term, that provides the President (and Commerce) with flexibility to give meaning to the term

"depend[ing] on the circumstances of a specific declared emergency and the particular needs of

persons affected by that emergency."  *See* Duty Suspension Rule, 87 Fed. Reg. at 56,871-72

(quoting *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 Fed. Reg

63,230 (Dep't of Commerce Oct. 30, 2006) (*Commerce Emergency Relief Rule*)).  "Other

supplies for use in emergency relief work" are simply any supplies (other than medical and

surgical supplies) that are needed for work to relieve a particular emergency declared by the

President.

    The limited legislative history on this statutory provision further supports this

interpretation, or at a minimum, does not detract from it.  Prior to the enactment of section 1318

as part of the Tariff Act of 1930, a similar provision existed in the Tariff Act of 1922, which

"authorize[d] the Secretary of the Treasury to extend during the continuance of such emergency

the time herein prescribed for the general performance of any act."  During the legislative

process that eventually led to the Tariff Act of 1930, a House committee issued a report stating

---

[7]  The parties agree that definitions in the cited 1934 dictionary reflect the plain meaning of terms as they were understood when Congress enacted section 1318(a) in 1930.  Pls. Br. 20. Copies of the cited definitions are attached in the accompanying exhibit.

that the provision in the Tariff Act of 1922 was "broadened to permit the free importation of

food, clothing and supplies for use in relief work in connection with any such emergency," in

addition to the authority to extend performance of deadlines during the declared emergency.  *See*

Comparative Print of The Tariff Act of 1922 with H.R. 2667, H.R. Doc. No. 15 at 334 (May 9,

1929).  The provision that was ultimately codified in the Tariff Act of 1930 included several

examples of supplies (medical and surgical), along with the general and unambiguous catch-all

term "other supplies," to encompass whatever other supplies may be necessary to address an

emergency, depending on the particular facts and nature of the emergency itself.  This is

consistent with the legislative objective of broadening the authority provided in the statute to

ensure the availability of any supplies that are needed to remedy emergencies declared by the

President.[8]  *See id.*

There also is a canon of construction "[i]n the area of international trade" providing that

"congressional authorizations of presidential power should be given a broad construction and not

be 'hemmed in' or 'cabined, cribbed, or confined' by anxious judicial blinders.'"  *Am. Ass'n of*

*Exporters & Importers*, 751 F.2d 1239, 1248 (Fed. Cir. 1985) (quoting *Florsheim Shoe Co. v.*

*United States*, 744 F.2d 787, 793 (Fed. Cir. 1984)).  This lends further support to a broad

construction of the phrase, "other supplies for use in emergency relief work," in section 1318(a).

Here, the declared emergency relates to "threats to the availability of sufficient electricity

generation capacity" given an "acute shortage" of solar cells and modules in the United States.

---

[8]  Plaintiffs also refer in passing to a joint resolution passed by the 118th Congress that
would have disapproved of the Duty Suspension Rule had it not been vetoed by President Biden.
Pls. Br. 31.  The views of the 118th Congress that failed to enact legislation into law in 2023 is
not evidence of the intent of the 71st Congress that enacted section 1318 in 1930.  *See Solid*
*Waste Agency of N. Cook Cty. v. United States Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001)
("subsequent [legislative] history is less illuminating than the contemporaneous evidence.").

Proclamation 10414; *see also* Duty Suspension Rule, 87 Fed. Reg. at 56,872.  Finding that "[a] robust and reliable electric power system is … not only a basic human necessity, but is also critical to national security and national defense," Proclamation 10414 authorized Commerce "[t]o provide relief from the emergency."  *See also* Duty Suspension Rule, 87 Fed. Reg. at 56,872.

Plaintiffs do not challenge Proclamation 10414 or contend that the supply chain emergency declared by the President was outside the scope of section 1318.  Indeed, Congress did not limit what type of emergencies might be declared by the President.  But this emergency related to an "acute shortage" of solar cells and modules, Proclamation 10414, could not be addressed with "food, clothing," "medical" supplies, or "surgical" supplies.  *See* 19 U.S.C. § 1318(a).  Thus, plaintiffs' crabbed reading of section 1318 rests on the illogical premise that Congress broadly authorized the President to declare emergencies, but narrowly limited the President's ability to respond to those emergencies.  To avoid such an illogical result, the best reading of section 1318 is that Congress' broad reference to "other supplies" was intended to encompass any supplies (other than medical and surgical supplies) that are needed to respond to a particular emergency.

B.    Commerce Engaged In Reasoned Decisionmaking Within The Bounds Of Its Delegated Authority

Because Commerce's interpretation of "other supplies" is the best interpretation of the statute or, at the very least, reasonable, Commerce engaged in "reasoned decisionmaking" within the bounds of its delegated authority.  *See Loper Bright*, 144 S. Ct. at 2263.  Nothing in the statute limits "other supplies" to certain types of goods, such as healthcare-related goods, as plaintiffs argue.  *See* Pls. Br. 19-31.  As Commerce explained in the Duty Suspension Rule, "[w]hat supplies might be needed for use in emergency relief work will depend on the

circumstances of a specific declared emergency and the particular needs of the persons affected by that emergency." 87 Fed. Reg. at 56,872 (citation omitted). This declared emergency relates to "threats to the availability of sufficient electricity generation capacity" given an "acute shortage" of solar cells and modules in the United States. Proclamation 10414; *see also* Duty Suspension Rule, 87 Fed. Reg. at 56,872. Commerce explained that "[e]lectricity is a basic necessity of life in the United States similar to housing, food, and water" and that it "enables necessary medical care, national defense, and provides for essential communications, and for health and safety in extreme temperatures." *Id.* As noted above, this emergency related to an acute shortage of solar cells and modules could not be addressed with "food, clothing," "medical" supplies, or "surgical" supplies. *See* 19 U.S.C. § 1318(a). Thus, Commerce's interpretation of solar cells and modules as "other supplies" in the context of this supply chain emergency is reasonable, and indeed comports with the best interpretation of the statute.

Accordingly, consistent with Proclamation 10414 that declared a supply chain emergency, Commerce lawfully and reasonably determined that solar cells and modules were "other supplies" to remedy that emergency within the meaning of section 1318(a).

C.    Plaintiffs' Statutory Interpretation Arguments Are Without Merit

Plaintiffs seek to impose limitations that Congress did not establish for the purpose of excluding solar cells and modules from "other supplies" in section 1318(a). As demonstrated below, plaintiffs' arguments are without merit.

For example, plaintiffs argue that Congress "selected terms understood to encompass goods used for concrete healthcare applications," and that the statute cannot apply to solar cells and modules because they had not been invented yet. Pls. Br. 19-22. As discussed above, however, the statutory term "other supplies" is not limited to healthcare-related goods, much less

to only those goods in existence at the time of the statute's enactment.  To the contrary, Congress selected the broad, catch-all term "other supplies" to provide the agency with flexibility depending on the particular facts and nature of a given emergency.  The supplies that might be needed for use in emergency relief work will naturally depend on the circumstances of the specific declared emergency and the particular needs of persons affected by the emergency.  *See* Duty Suspension Rule, 87 Fed. Reg. at 56,868.  Had Congress intended to limit the term "other supplies" to only healthcare-related goods, as argued by plaintiffs, Congress would have enacted a statute that permitted the duty-free importation of "food, clothing, and medical, surgical, and other *healthcare* supplies for use in emergency relief work."  Moreover, Congress could have limited the President's discretion to declare an emergency to *healthcare* emergencies; it did not do so.

Congress surely understood that it could not foresee every possible scenario or emergency that might arise at the time it enacted section 1318.  Accordingly, Congress used broad language affording flexibility for the agency to address the particular circumstances of a given emergency.  *Barr v. United States*, 324 U.S. 83, 90 (1945) ("But if Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators."); *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980) ("This Court frequently has observed that a statute is not to be confined to the 'particular [applications] … contemplated by the legislators'") (alterations in original, quoting *Barr*, 324 U.S. at 90).

And while "every statute's meaning is fixed at the time of enactment," Pls. Br. 20 (citing *Loper Bright*, 144 S. Ct. at 2266), "[i]t is well established that, even though a statute is presumed to speak from the time of its enactment, a statute later embraces all such persons or things as

subsequently fall within its scope." *United States v. Am. Home Assur. Co.*, 789 F.3d 1313, 1325 (Fed. Cir. 2015) (collecting cases, internal quotation marks omitted); *see also generally Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 451 (2014) (determining that the "transmit clause" of the Copyright Act, which Congress added in 1976 intending to cover community antenna television systems, applied to services for internet streaming devices); *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 453 (2022) (holding that the Federal Arbitration Act, passed in 1925, applied to the modern airline cargo transportation industry). That Congress did not intend a static interpretation of section 1318 is further underscored by the delegation to Commerce to adopt regulations interpreting and implementing its authority under the statute.

Plaintiffs also misplace reliance on the *ejusdem generis* canon of interpretation to argue that "other supplies" must mean something *similar* to the preceding terms, "medical" supplies and "surgical" supplies. Pls. Br. 21-23, 27-28. The *ejusdem generis* canon instructs courts to consider a general or collective term at the end of a list of specific items "in light of any common attributes shared by the specific items," rather than simply requiring that it be "akin" to those terms. *Sw. Airlines*, 596 U.S. at 458. But plaintiffs' search for common attributes disregards the common attribute that Congress actually identified in the statute. Section 1318(a) extends to "medical" supplies, "surgical" supplies, and "other supplies" that are "*for use in emergency relief work*." 19 U.S.C. § 1318(a) (emphasis supplied). The additional language – "for use in emergency relief work" – is the common attribute between the enumerated categories in the statutory text, and that is the only limitation on "other supplies" that Congress established. *Cf. Sw. Airlines*, 596 U.S. at 459 (determining that cargo loaders for airlines can constitute a "class of workers in foreign or interstate commerce" because they are analogous to the seamen and

railroad employees enumerated directly in the Federal Arbitration Act as being exempt from the Act's coverage).

And even if plaintiffs were correct that "other supplies" must be limited to healthcare related supplies (and they are not), solar cells and modules still would fit any reasonable understanding of this term. As Commerce explained, "[e]lectricity is a basic necessity of life in the United States similar to housing, food, and water." Duty Suspension Rule, 87 Fed. Reg. at 56,872. "It enables *necessary medical care*, national defense, and provides for essential communications, and for health and safety in extreme temperatures." *Id.* (emphasis supplied). Plaintiffs cannot deny that without sufficient electricity generation, hospitals and other medical facilities would be severely impacted in their ability to provide medical or surgical care. In that sense, electricity is like other goods that are appropriately viewed as related to healthcare. Thus, even under plaintiffs' unduly restrictive interpretation of the statute, it is reasonable to interpret "other supplies" to include solar cells and modules because they provide a key resource – electricity – without which individual health and welfare would be put in jeopardy.

Next, Plaintiffs contend that the term "for use in emergency relief work" serves as a limitation, such that duty-free benefits can only be provided to the goods specified in the statute that are capable of "promoting relief of the Presidentially proclaimed emergency." Pls. Br. 23, 27. Far from assisting their position, however, plaintiffs' argument merely underscores why Commerce's interpretation is at least a reasonable, if not the best, interpretation of section 1318. As discussed above, the nature of the declared emergency here was "threats to the availability of sufficient electricity generation capacity" given an "acute shortage" of solar cells and modules, Proclamation 10414, and there can be no serious dispute that increasing the number of solar cells and modules was capable of "promoting relief of the Presidentially proclaimed emergency."

Plaintiffs also argue that construing "other supplies for use in emergency relief work" as encompassing any good capable of addressing the declared emergency renders the "reference to 'food, clothing, and medical, surgical … supplies' superfluous and inconsequential." Pls. Br. 23-27. This argument overlooks the adjective "other" in the statute, which distinguishes "other supplies" from the "medical" supplies and "surgical" supplies mentioned previously. While Congress could have elected to use fewer and more general words (*e.g.,* by authorizing duty-free status for any "supplies for emergency relief work"), that does not mean that its identification of specific examples ("medical" supplies and "surgical" supplies) along with a broad catch-all provision ("other supplies"), intended to strictly limit the statute to those specific examples. Otherwise, Congress would not have also included the broad, catchall term "other supplies" in the statute. Thus, plaintiffs' interpretation ignores the actual words Congress adopted and "would fail to 'give effect, if possible, to every clause and word of a statute.'" *See* Pls. Br. 25, 27 (quoting *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017)). Contrary to plaintiffs' narrow reading of the statute, by using the term "other supplies" after listing certain categories of goods, Congress delegated flexibility for the President (and Commerce) to permit duty-free status of other supplies, so long as they are for use in the work to relieve the emergency declared by the President.

Plaintiffs also observe that "the Tariff Act of 1930 began with nearly 100 pages spelling out duty rates for all manner of goods," including "articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy." Pls. Br. 24-25, 28. They claim that because section 1318 appeared in the "miscellaneous" provisions following these lists of goods, Congress was aware of the universe of goods subject to duties but did not identify "additional types of disaster relief supplies, such as shelter, transportation, or communication" in section

1318.  *Id.*  But Congress did not need to devote another 100 pages to listing all types of supplies that could conceivably be used in emergency relief work.  Congress instead chose to delegate flexibility to the President (and, as relevant here, to Commerce).  As noted, Congress delegated flexibility by including the catch-all term "other supplies," and by delegating authority to proceed "under such regulations as the Secretary … may prescribe."  19 U.S.C. § 1318(a).  In sum, there is nothing inherently incompatible with one section of the statute listing the duty rates of particular goods for purposes of ordinary duty collection, and a separate section authorizing duty-free status for certain goods, including "other supplies" as they relate to a declared emergency by the President.

Plaintiffs also contend that past practice corroborates their interpretation that section 1318(a) applies only to the specifically listed goods in the statute, or to "other supplies" related to healthcare.  Pls. Br. 28-31 (citing, *e.g., Proclamation 2093:  Emergency Due to Drought – Free Importation of Feed for Livestock,* 49 Stat. 3,404 (Aug. 10, 1934) (*Livestock Feed Proclamation*); *Proclamation 2498:  Emergency Due to Drought – Free Importation of Forage for Livestock*, 6 Fed. Reg. 3,715 (July 29, 1941) (*Livestock Forage Proclamation*); *Proclamation 2553:  Emergency Due to State of War – Free Importation by the American National Red Cross of Food, Clothing, and Medical, Surgical, and Other Supplies*, 7 Fed. Reg. 3,143 (Apr. 30, 1942) (*Red Cross Proclamation*)).  These selective citations do not support plaintiffs' interpretation.

Plaintiffs' cited examples of Executive actions under section 1318(a) have limited relevance to the statutory interpretation question in this case.  Although prior Executive actions may be relevant to the reasonableness of the Duty Suspension Rule,[9] sporadic actions by the

---

[9]  Consistency with prior agency interpretations also can be a relevant consideration when considering whether *Skidmore* deference is appropriate.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  We have not argued for *Skidmore* deference in this case.

Executive branch in the decades following Congress' enactment of section 1318(a) in 1930 are not evidence of either the plain meaning of the text or the legislative intent of that provision.

The specific goods that prior proclamations authorized to enter duty-free also are grounded in the particular facts and circumstances surrounding the declared emergency in those cases. Accordingly, the fact that prior emergencies did not address a shortage of solar supplies and that prior proclamations did not authorize duty free imports of solar cells and modules does not undermine the conclusion that "other supplies" can include solar cells and modules for use in a particular emergency related to "threats to the availability of sufficient electricity generation capacity" given an "acute shortage" of solar cells and modules.

The cited past proclamations also do not support plaintiffs' narrow construction of the meaning of "other supplies for use in emergency relief work." For example, the *Livestock Feed Proclamation* and the *Livestock Forage Proclamation* provide for the duty-free importation of feed and forage supplies for livestock, but these "other supplies" have no relationship to healthcare. And the *Red Cross Proclamation* and its implementing regulations apply broadly to "food, clothing, and medical, surgical, and other supplies" for use by the American National Red Cross, without limiting "other supplies" to goods akin to "medical" supplies or "surgical" supplies. *T.D. 50626*, 7 Fed. Reg. 3,358 (Dep't of Treasury May 6, 1942) (*Red Cross Rule*).

Moreover, plaintiffs are wrong that 19 U.S.C. § 1318(a) has only been interpreted to apply to the specifically listed goods in the statute. To the contrary, as Commerce explained, there is "historical precedent for invoking the statute to permit the duty-free importation of a broader variety of goods" than those specifically named in the statute. *See* Duty Suspension Rule, 87 Fed. Reg. at 56,872. In 1946, President Truman declared an emergency shortage of housing and invoked section 1318(a) to permit the importation free of duty of "timber, lumber,

or lumber products suitable for the construction or completion of housing accommodations." *Proclamation 2708*, 11 Fed. Reg. 12,695 (Oct. 29, 1946) (*Lumber Proclamation*). These "other supplies" of lumber products were to relieve the housing emergency declared by President Truman, and they were not related to healthcare goods like "medical" supplies or "surgical" supplies. *See also T.D. 51565*, 11 Fed. Reg. 13,460 (Dep't of Treasury Nov. 14, 1946) (*Lumber Rule*) (promulgating regulations pursuant to *Lumber Proclamation*).

Plaintiffs attempt to distinguish the *Lumber Proclamation* without success. Pls. Br. 29-31. According to plaintiffs, the *Lumber Proclamation* originated with the Veterans Emergency Housing Act of 1946 (VEHA), Pub. L. 79-388, § 1, 60 Stat. 207-08 (1946), which separately recognized that an emergency shortage of housing existed. Although Congress and President Truman agreed that an emergency existed, section 1318(a) was the only statutory authority for President Truman to authorize the duty-free importation of "other supplies" such as lumber to relieve this housing emergency. 19 U.S.C. § 1318(a). And contrary to plaintiffs' suggestion, there is no reference in the VEHA to tariffs, duties, or duty-free importation.

The VEHA was only relevant to the *Lumber Proclamation* insofar as President Truman declared the emergency would last "until the termination of the provisions of the [VEHA], or until the President shall have declared the emergency declared herein has terminated, whichever shall first occur," and because President Truman required that the goods imported duty-free had to be certified by an official (called the "housing expediter") whose position was created by the VEHA. *Compare Red Cross Rule*, 7 Fed. Reg. 3,358 (implementing regulations issued pursuant to the *Red Cross Proclamation*, which similarly required a declaration by a duly authorized representative of the American National Red Cross that the "food, clothing, and medical, surgical, and other supplies" were imported by the Red Cross for use in emergency relief work).

- 25 -

Notwithstanding that there were separate responses to the same emergency by two coordinate branches of the Government, the historical precedent of the *Lumber Proclamation* plainly supports the reasonableness of an interpretation that 19 U.S.C. § 1318 permits the duty-free importation of a broader variety of goods than simply those related to healthcare.

The preamble to Commerce's regulations at 19 C.F.R. part 358 further undermines plaintiffs' argument that the interpretation of section 1318 in the Duty Suspension Rule is inconsistent with past practice.  In 2006, in response to parties who argued that Commerce should only allow for waivers of duties on merchandise considered necessary for emergency relief by the Federal Emergency Management Agency (FEMA), Commerce stated:

> What supplies might be needed for use in emergency relief work will depend on the circumstances of a specific declared emergency and the particular needs of persons affected by that emergency. While a FEMA list of needed emergency supplies, if created, could be instructive, the Department believes that it is appropriate for the Secretary to have maximum flexibility to review waiver requests in the context of a specific emergency and to make waiver determinations on an emergency-by-emergency basis.  As discussed above, the Department does not believe that temporary limited waiver of antidumping and countervailing duties will exacerbate injury to the domestic industry.

*See Commerce Emergency Relief Rule*, 71 Fed. Reg. at 63,233.  Following the same reasoning, Commerce promulgated the Duty Suspension Rule "in the context of a specific emergency" and determined to waive duties for "other supplies" – solar cells and modules – based on what was needed to relieve the supply chain emergency at issue.  The Duty Suspension Rule is not unprecedented and is consistent with Commerce's past statements on this issue.

Finally, plaintiffs argue that "[n]o court ever considered, much less endorsed, [the *Lumber Proclamation's*] lawfulness."  Pls. Br. 31-32.  Regardless, no court has ever considered, much less endorsed, plaintiffs' unduly narrow interpretation of the statute.

In summary, plaintiffs' arguments (Pls. Br. § II-A) are inconsistent with section 1318(a) and the delegation of rulemaking authority to Commerce in that provision. Because Commerce's interpretation of "other supplies" is the best interpretation of the statute or, at the very least, reasonable, Commerce engaged in "reasoned decisionmaking" within the bounds of its delegated authority. *See Loper Bright*, 144 S. Ct. at 2263.

IV.    Section 1318(a) Permits Commerce to Waive Duties During The Emergency For Entries
       Made Prior To The Emergency Declaration

Plaintiffs argue that Commerce misapplied the statute by granting duty-free treatment to products imported before the President declared an emergency. *See* Pls. Br. 31-36. However, it is plaintiffs who would misapply the statute by reading words out of context and in a manner contrary to the statute's overall purpose. Because Commerce's Duty Suspension Rule reasonably (and indeed correctly) interprets the statute, it should be upheld.

The Duty Suspension Rule establishes procedures for Commerce to waive the assessment of antidumping and countervailing duties on "applicable entries." *See* 19 C.F.R. § 362.103(c). Commerce determined to apply the Duty Suspension Rule to entries made before June 6, 2022 – the date when the President declared an emergency to exist in Proclamation 10414 – after considering Commerce's retrospective duty assessment system under which the final amount of antidumping and countervailing duty liability is not determined until months or years after merchandise is imported to the United States. *See* 87 Fed. Reg. at 56,877. In other words, failing to apply the Duty Suspension Rule to imports made before June 6, 2022, could have resulted in antidumping and countervailing duties being imposed on those same imports *after* June 6, 2022 (*i.e.*, during the period of the declared emergency). Thus, because 19 U.S.C. § 1318(a) and Proclamation 10414 permit the importation of solar cells "free of duty," and the duties had not yet been assessed on those pre-proclamation entries, Commerce decided to "apply

this final rule to relevant entries that entered the country prior to the date the Proclamation was signed, but that remain unliquidated" as of the date of the Duty Suspension Rule. *Id.*

Plaintiffs argue that the statute prohibits Commerce from waiving duties on pre-Proclamation 10414 imports. Pls. Br. 31-36. Plaintiffs contend that the "date of importation" is defined generally as the date on which a vessel arrives in port with the intent to unlade the imported merchandise, such that Commerce could not reach merchandise that entered the United States prior to Proclamation 10414. *Id.* at 32 (citing 19 C.F.R. § 101.1). But this modern regulatory definition offers no probative insight into Congress' intent in enacting section 1318(a) in 1930, especially because the statute does not use the term "date of importation," and instead refers to "importation" that is "free of duty."

Similarly, plaintiffs contend that Congress used different words in the Tariff Act of 1930 to describe "importation" and "liquidation," and importation only referred to an entry's physical arrival into the United States. *See* Pls. Br. 32. This argument ignores the context and purpose of the statutory provision. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'") (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)). By focusing solely on the term "importation" and taking it out of its statutory context, plaintiffs imply that the statute authorizes Commerce to "prescribe the importation" of supplies used in emergency relief work. However, the statute does not authorize Commerce to prescribe the *importation* of emergency supplies. Instead, the statute authorizes Commerce to permit "the *importation free of duty*" of such merchandise. *See* 19 U.S.C. § 1318(a) (emphasis added). And section 1318(a) does not provide for when a given import may be deemed "free of duty." In the

context of antidumping and countervailing duties, however, the date at which imports are determined to be free of duty must necessarily come *after* the date of importation because of how those duties are calculated. *See* Duty Suspension Rule, 87 Fed. Reg. at 56,877 (explaining that "[t]he pre-Proclamation goods at issue are unliquidated – that is, there has yet to be a ''final computation or ascertainment of duties.''") (quotation omitted); *see also* 19 C.F.R. § 351.212(a) ("[u]nlike the systems of some other countries, the United States uses a 'retrospective' assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported").

Because the statute does not define "importation free of duty," but rather delegates this authority, the Court must defer to Commerce's regulations if they are "reasoned." *See Loper Bright*, 144 S. Ct. at 2263. As set forth above, the Duty Suspension Rule accounts for the unique features of the antidumping and countervailing laws. Moreover, Commerce found that it was appropriate to interpret 19 U.S.C. § 1318(a) in a manner consistent with the reality of how antidumping and countervailing duties are assessed. *See* Duty Suspension Rule, 87 Fed. Reg. at 56,877 ("[J]ust as Commerce could take action today, under the AD/CVD system established under the Tariff Act, to affect the duty status of goods that previously entered the country but that are still unliquidated, section 318 of the Tariff Act likewise allows Commerce to take action today to affect the duty status of those same unliquidated entries."). That determination was not unreasonable, and indeed constitutes the best interpretation of the statute in these circumstances.

Moreover, the overall purpose of the statute and Proclamation 10414 support Commerce's decision to waive duties on merchandise imported before the date of Proclamation 10414. A statute should be interpreted "in light of the purposes Congress sought to serve." *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 608 (1979); *see also Dolan v. United*

*States Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."). Section 1318(a) permits duty-free treatment to promote the availability and use of supplies for emergency relief work. Likewise, Commerce explained that "the purpose of the Proclamation is to increase the supply of United States solar energy for electricity generation purposes." Duty Suspension Rule, 87 Fed. Reg. at 56,878. Given that goal, it would make little sense to assess duties on entries of supplies that were imported prior to the declaration of an emergency, when the assessment of such duties would discourage investments in emergency relief work during the emergency.

Commerce explained that firms using solar cells and modules "should not be financially restricted from investing in near-term or future solar capacity additions because they had to pay cash deposits on merchandise that entered the United States just a few months, or even days, before the signing of the Proclamation." Duty Suspension Rule, 87 Fed. Reg. at 56,878. To promote investments in emergency relief work, Commerce reasonably determined to apply the Duty Suspension Rule to pre-proclamation entries. *Id.* In contrast, plaintiffs' interpretation would frustrate emergency relief by tying Commerce's authority to the date of importation without regard for the statutory goal of promoting emergency relief.

Commerce also found that the application of the Duty Suspension Rule to imports of subject merchandise made before Proclamation 10414 was likely to "promote the market stability that the President sought to achieve when he issued the Proclamation." Duty Suspension Rule, 87 Fed. Reg. at 56,878. Indeed, three interested parties commented that "applying duties to pre-Proclamation entries would 'sow confusion in the market' and otherwise discourage production of [CSPV] solar products." *Id.* Under these circumstances, Commerce

reasonably concluded that uncertainty regarding the amount of duties to be assessed later "might discourage further investment" in solar projects during the emergency, whereas applying the Duty Suspension Rule to pre-Proclamation entries was "likely to promote" market stability. *Id.* Therefore, Commerce's decision to apply the Duty Suspension Rule to pre-Proclamation 10414 imports was necessary to help relieve the supply chain emergency and in that respect is consistent with the intent and purpose of the statute. *Id.* (finding that applying the Duty Suspension Rule to "pre-Proclamation entries" will further the goal of increasing the supply of solar energy).

Finally, plaintiffs cite several instances in which the Department of the Treasury promulgated implementing regulations providing for the duty-free treatment of supplies used in emergency relief work commencing on the date of the proclamations at issue. Pls. Br. 34-35 and attach. 3 (citing *T.D. 47236*, 66 Treas. Dec. Int. Rev. 218, 221 (Dep't of Treasury Aug. 30, 1934) (*Livestock Feed Rule*) (promulgating regulations in accordance with *Livestock Feed Proclamation*); *T.D. 50449*, 6 Fed. Reg. 4,071, 4,072 (Dep't of Treasury Aug. 15, 1941) (*Livestock Forage Rule*) (promulgating regulations in accordance with *Livestock Forage Proclamation*); *Red Cross Rule*, 7 Fed. Reg. 3,358 (promulgating regulations pursuant to *Red Cross Proclamation*); *T.D. 50599*, 7 Fed. Reg. 2,776, 2,777 (Dep't of Treasury Apr. 14, 1942) (*Jerked Beef Rule*) (promulgating regulations pursuant to *Proclamation 2545: Free Importation of Jerked Beef,* 7 Fed. Reg. 2,611 (Apr. 7, 1942) (*Jerked Beef Proclamation*)).

None of these regulations purport to interpret section 1318(a). Rather, under the circumstances of those prior emergencies in the 1930s and 1940s, the implementing regulations reflected a judgment by the Secretary of the Treasury that the date of the proclamation would be an appropriate starting point for duty-free entries. There is no discussion in those regulations

concerning whether an earlier date could have been selected consistent with section 1318(a) and the proclamations at issue.  Unlike the regulations implementing those prior proclamations, in this case, Commerce articulated a need to promote investments and market certainty that contributed to its decision to apply the Duty Suspension Rule to the limited subset of imports that arrived before the issuance of Proclamation 10414 but remained unliquidated on the date when the President issued it.  *See* Duty Suspension Rule, 87 Fed. Reg. at 56,877-78.  The Treasury Department, in the regulations cited by plaintiffs, did not articulate a similar need when limiting duty waiver to entries made after the declaration of an emergency.  *See, e.g.*, *Livestock Feed Rule*; *Livestock Forage Rule*; *Jerked Beef Rule*; *Red Cross Rule*.

V.    <u>Commerce Reasonably Imposed A Utilization Requirement To Discourage Stockpiling</u>

Plaintiffs contend that Commerce's Duty Suspension Rule misapplies the statute by extending duty-free relief to products not "use[d] in emergency relief work" within the meaning of 19 U.S.C. § 1318(a).  In particular, plaintiffs argue that the Duty Suspension Rule: (1) unlawfully permits duty-free products to be utilized after the emergency concludes; (2) unreasonably defines utilization in emergency relief work "in terms that afford no actual relief of the emergency specifically identified in Proclamation 10414"; and (3) provides a "weak" enforcement mechanism that does not ensure that the statutory requirements are met. Pls. Br. 37-42.  As set forth below, each of these claims lacks merit.

Proclamation 10414 authorizes Commerce to prescribe, "until 24 months after the date of this proclamation or until the emergency declared herein has terminated, whichever occurs first … the importation, free of the collection of duties and estimated duties" for applicable entries. 87 Fed. Reg. at 35,068.  The statute empowers Commerce "under such regulations as [it] may prescribe" to permit the importation of supplies "for use in emergency relief work."  19 U.S.C.

§ 1318(a).  Neither Proclamation 10414 nor the statute specifies how such a determination must be made, and in this context the statute delegates that decision to Commerce.

In response to comments expressing concern that duty-free imports would be stockpiled, Commerce imposed a "utilization requirement" as part of its Duty Suspension Rule.  86 Fed. Reg. at 56,870-71.  Commerce defined Applicable Entries (*i.e.*, entries entitled to duty-free treatment) as those entries which are "used in the United States by the Utilization Expiration Date."  19 C.F.R. § 362.102.  Commerce's regulations provide:

> Utilization and utilized means the Southeast Asian-Completed Cells and Modules will be used or installed in the United States. Merchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions.

*Id.*  Commerce defined the "Utilization Expiration Date" as the date 180 days after the Date of Termination, with Date of Termination defined as "June 6, 2024, or the date the emergency described in Presidential Proclamation 10414 has been terminated, whichever occurs first." *Id.*  When Commerce promulgated the Duty Suspension Rule, it explained that "[i]t is not Commerce's goal to have merchandise that enters before the Date of Termination be used in projects long into the future, as the emergency declared by the President exists at this very moment."  Duty Suspension Rule, 87 Fed. Reg. at 56,879.

Plaintiffs incorrectly argue that Commerce unlawfully "extended" the length of the solar emergency by waiving the collection of duties on merchandise that was entered before the termination of the emergency, but was utilized in the 180-day period following termination.  *See* Pls. Br. 37-38.  This argument incorrectly presumes that the utilization of solar cells and modules was necessary for "emergency relief work" in the context of this supply chain emergency.  This emergency related to "*threats* to the availability of sufficient electricity generation capacity to

meet *expected* customer demand" given an "acute shortage" of solar cells and modules.

Proclamation 10414 (emphasis added).  The importation of solar cells and modules *during* the

emergency relieved "threats" to future "sufficient generation capacity" from the "acute shortage"

of solar supplies, regardless of whether those solar cells and modules were utilized before or

shortly after the date the emergency ends.[10]  Neither section 1318(a) nor the proclamation

requires the utilization of all solar cells and modules during this supply chain emergency.  Given

this silence, and the delegation in section 1318(a), Commerce's adoption of a utilization

requirement to discourage stockpiling is rational.  Duty Suspension Rule, 87 Fed. Reg. at 56,880.

Plaintiffs cite previous instances in which the Department of Treasury invoked section

1318(a), arguing that Commerce's determination to impose a utilization requirement constitutes

an expansion of the duty-free treatment prescribed in past cases.  Pls. Br. 38 (citing *Livestock*

*Feed Rule*; *Livestock Forage Rule*; *Jerked Beef Rule*; *Red Cross Rule*).  Plaintiffs also argue that

Commerce's own regulations impose time limitations on importers, and that the Duty

Suspension Rule "jettisoned" those requirements.  *Id.* (citing 19 C.F.R. § 358.103(c)-(d)).

Plaintiffs are correct that the utilization requirement imposed in the Duty Suspension

Rule is novel.  But this novelty actually cuts against plaintiffs' argument.  In past instances,

agencies invoking section 1318(a) have only required declarations at the time of importation

stating that imports will be used in emergency relief work.  *See, e.g.*, *Livestock Feed Rule*;

*Livestock Forage Rule*; *Jerked Beef Rule*; *Red Cross Rule*.  Commerce's regulations at 19 C.F.R.

§ 358.103 also do not contain a utilization requirement, and Commerce specifically declined to

impose a specific post-entry enforcement mechanism as part of that rulemaking.  *See Commerce*

---

[10]  Lead times for new solar projects "can range from 'one to four years.'"  Duty
Suspension Rule, 87 Fed. Reg. at 56,875 (quoting AR 462).

*Emergency Relief Rule*, 71 Fed. Reg. at 63,233.  So plaintiffs have turned past precedent on its head – the Duty Suspension Rule does *more*, not less, to discourage stockpiling and ensure utilization than prior agency invocations of section 1318(a).

The additional certification requirement that merchandise be utilized within six months of the Date of Termination also did not purport to "extend" the period of the emergency, as plaintiffs argue.  The emergency established by Proclamation 10414 expired on the Date of Termination – June 6, 2024 – not some later date.  The Duty Suspension Rule similarly provided for the waiver of duties for entries made through the Date of Termination.  The Duty Suspension Rule is consistent with the statute and with Proclamation 10414, both of which permit Commerce to prescribe the duty-free treatment of imports used in emergency relief, and do not require Commerce to impose a utilization requirement post-entry.  That Commerce determined to include a utilization requirement here to discourage stockpiling of merchandise during the emergency does not render the Duty Suspension Rule inconsistent with the statute.  Indeed, the entire purpose of the utilization requirement is to ensure that entries for which duties are waived under the Duty Suspension Rule are used to increase future electricity generation capacity.

Plaintiffs also argue that the utilization requirement is unlawful because it only requires that importers use or install imports of solar cells and modules rather than certify that the solar cells and modules will be used to meet expected consumer electricity demand.  Pls. Br. 39-40.  Plaintiffs might have preferred that Commerce drafted the wording of the certification differently, but the emergency declared by the President was due to an "acute shortage" of solar cells and modules.  Proclamation 10414, 87 Fed. Reg. at 35,067-68; Duty Suspension Rule, 87 Fed. Reg. at 56,878.  Commerce recognized the importance of increasing solar energy capacity, and it also recognized the importance of increasing the availability of solar cells and modules in

response to this supply chain emergency. Duty Suspension Rule, 87 Fed. Reg. at 56,879. While plaintiffs may disagree with how Commerce addressed comments regarding stockpiling, Commerce must only "offer a rational connection between the facts found and the choice made," a standard that is "not particularly demanding."[11] *In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1338 (Ct. Int'l Trade 2022) (quoting *State Farm*, 463 U.S. at 43). Commerce rationally explained the reasoning behind its utilization requirement, and its inclusion of that requirement in the Duty Suspension Rule is lawful.

Finally, plaintiffs challenge the adequacy of Commerce's method for ensuring compliance with the utilization requirement. Pls. Br. 40-42. Commerce explained in the Duty Suspension Rule that it would not impose a certification requirement as part of that rulemaking, and Commerce expressly stated that nothing in the Duty Suspension Rule would preclude Commerce from adopting a certification regime in the circumvention inquiries pursuant to 19 C.F.R. § 351.228. Duty Suspension Rule, 87 Fed. Reg. at 56,879-80. Indeed, Commerce did establish a detailed certification regime pursuant to section 351.228 as part of its *Final Circumvention Determinations*. 88 Fed. Reg. at 57,422-23, 57,425-33. Auxin challenged the certification regime in the *Final Circumvention Determinations* by filing cases pursuant to 28 U.S.C. § 1581(c), but voluntarily dismissed those challenges in May 2024. *Auxin Solar, Inc. v.*

---

[11] Likewise, Commerce addressed Auxin's comments regarding the link between the declared emergency and the remedy provided, Commerce disagreed with Auxin's assessment, and Commerce explained rational reasons for that disagreement. Duty Suspension Rule, 87 Fed. Reg. at 56,874-85. Auxin had argued that a lack of infrastructure was an impediment to solar emergency development, and that there is a long lead time for new solar projects to get off the ground, AR 168, *cited by* Pls. Br. 39, but Commerce found that added solar capacity was expected to account for over half of new electric sector capacity in 2022 and 2023, and that "solar equipment shortages could reduce … deployment by 12-15 gigawatts (GW) over the next year, equivalent to the electricity needs of more than 2 million homes." Duty Suspension Rule, 87 Fed. Reg. at 56,874-75 (citing AR 460-62; AR 654-57).

*United States*, Court Nos. 23-223, 23-224, 23-225, and 23-226.  Insofar as plaintiffs disagree

with Commerce's choice not to include a certification requirement in the Duty Suspension Rule

and instead to address that issue in the circumvention inquiries, Commerce's determination must

be sustained because Commerce addressed the comments it received and provided a reasonable

explanation for its determination not to include such a requirement in the Duty Suspension Rule

itself.  *See* Duty Suspension Rule, 87 Fed. Reg. at 56,879-80.

VI.    <u>Plaintiffs Are Not Entitled To The Relief Requested</u>

Plaintiffs request that the Court vacate the Duty Suspension Rule.  Pls. Br. 3.  Plaintiffs

also request that the Court order liquidation or reliquidation of entries that "utilized the [Duty

Suspension Rule] with applicable antidumping and countervailing duties."  *Id.* at 3-4.  The Duty

Suspension Rule is lawful as discussed above, and in any event, injunctive relief is not warranted

in this case.

A.    <u>Plaintiffs Fail To Establish The Injunction Factors Including Irreparable Harm</u>

A permanent injunction is a "drastic and extraordinary remedy, which should not be

granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165

(2010); *accord Silfab Solar*, 892 F.3d at 1345.  Injunctive relief "may only be awarded upon a

clear showing that the plaintiff is entitled to" it.  *Winter v. NRDC*, 555 U.S. 7, 22 (2008).

Although the parties stipulated to the Court's authority to order reliquidation of certain entries in

this case, *see* Joint Stipulation, ECF No. 19, the exercise of that authority remains subject to

"ordinary equitable principles."  *AM/NS Calvert LLC v. United States*, 654 F. Supp. 3d 1324,

1346 (Ct. Int'l Trade 2023).  Under those principles, a plaintiff seeking a permanent injunction in

a civil action must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies
> available at law, such as monetary damages, are inadequate to

compensate for that injury; (3) that, considering the balance of
hardships between the plaintiff and defendant, a remedy in equity
is warranted; and (4) that the public interest would not be disserved
by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citing *Weinberger v. Romero-*

*Barcelo*, 456 U.S. 305, 313 (1982)).  Courts cannot presume that irreparable harm exists, and the

burden is on the plaintiff to demonstrate it.  *Monsanto*, 561 U.S. at 156-58; *eBay*, 547 U.S. at

391.

        Plaintiffs demand extraordinary injunctive relief without discussing the four injunction

factors.  Most glaringly, plaintiffs fail to mention irreparable harm, even though this is an

important requirement to obtain permanent injunctive relief.  At this time, the emergency

declared by the President has terminated, all of the relevant shipments have entered the United

States, the December 6, 2024 deadline for utilization of any remaining merchandise will pass

soon, and CBP has resumed collecting cash deposits on entries of solar cells and modules from

the Southeast Asian countries consistent with the final determinations in the circumvention

inquiries.  *See Wind Tower Trade Coal. v. United States*, 741 F.3d 89, 101 (Fed. Cir. 2014)

(finding that irreparable injury did not exist when movant "will not suffer concrete financial

hardship" and is "protected by prospective assessment of duties").  Plaintiffs will neither pay nor

receive any payment of duties based on the outcome of this lawsuit.  Plaintiffs only vaguely

*allege* that the non-collection of duties due to the Duty Suspension Rule poses an "existential

threat" to their businesses, Compl. at 11, but they did not offer any evidentiary support for any

claim of irreparable harm.  *See Gemtron Corp. v. Saing-Gobain* Corp, 572 F.3d 1371, 1380 (Fed.

Cir. 2009) (observing that "unsworn attorney argument . . . is not evidence.").  Plaintiffs'

opening brief does not even argue that *they* will suffer irreparable harm absent a permanent

injunction ordering reliquidation or liquidation notwithstanding the Duty Suspension Rule.

Moreover, plaintiffs' own delay vitiates any suggestion of irreparable harm.  Before filing

suit, plaintiffs waited more than *15 months* after Commerce issued the Duty Suspension Rule,

they waited more than *one year* after Commerce applied the Duty Suspension Rule in the

*Preliminary Circumvention Determinations*, and they waited more than *four months* after

Commerce applied the Duty Suspension Rule in the *Final Circumvention Determinations*.  As

this Court has previously held:

> In balancing the equities of the parties, the old maxim that equity
> aids the vigilant does come into play, and what most likely tips the
> balance in one direction or the other is how quickly the party with
> an interest in a judgment moved to assert their rights once they
> *knew* or *should have known* about the error.  If they move quickly,
> the court may correct the error; if too much time passes, however,
> the court will likely let the liquidation stand.  This court has
> previously been guided by the time periods of § 1514 as a suitable
> benchmark in deciding whether relief should issue.  Basically, did
> the party petition the court within 180 days of the error's actual or
> constructive revelation?

*Home Products Int'l, Inc. v. United States*, 405 F. Supp. 3d 1368, 1374 (Ct. Int'l. Trade 2019)

(collecting cases, internal citations omitted); *see also Cornetta v. United States*, 851 F.2d 1372,

1375 (Fed. Cir. 1988) ("equity aids the vigilant not those who slumber on their rights").

Plaintiffs waited 15 months – much longer than 180 days – to challenge the Duty Suspension

Rule, so the balance of equities tips squarely against their request for a permanent injunction.

Moreover, a retroactive remedy in the form of injunctive relief is not in the public interest

because it would frustrate the proper administration of the antidumping and countervailing duty

laws and burden the Government, as demonstrated in the next section below.

By failing to address the injunction factors in their opening brief, plaintiffs have waived

this issue.  *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006)

("arguments not raised in the opening brief are waived"); *CSC Sugar LLC v. United States*, 461

F. Supp. 3d 1363, 1373 (Ct. Int'l Trade 2020) (deeming argument waived because the plaintiff

"failed to make this argument with any reference to the proper legal framework") (collecting cases), *aff'd without op.*, 854 F. App'x 375 (Fed. Cir. 2021). Under these circumstances and given their total failure to address the injunction factors, their request for a permanent injunction should be denied, and any relief should be limited to a declaratory judgment and prospective vacatur of the Duty Suspension Rule.

B.        A Retroactive Remedy Is Not Warranted

Plaintiffs seek a permanent injunction ordering reliquidation of all entries that benefitted from duty-free treatment by virtue of the Duty Suspension Rule. Pls. Br. 3-4, 45. However, the Court should not order this retroactive remedy.

As a general matter, decisions of Federal courts are presumed to apply retrospectively. *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 535 F. Supp. 3d 1336, 1358 (Ct. Int'l Trade 2021) (citing *Nat'l Fuel Gas Supply Corp. v. FERC*, 59 F.3d 1281, 1288 (D.C. Cir. 1995)), *rev'd and remanded on other grounds*, 66 F.4th 968 (Fed. Cir. 2023) (*COALITION*). But the presumption of retroactivity may not apply in specific circumstances, such as trade cases, where a Court finds "a principle of law ... that limits the principle of retroactivity itself." *See id.*

In *COALITION*, this Court held unlawful and vacated Commerce's expedited review regulation.[12] *COALITION*, 535 F. Supp. 3d at 1357. Because an expedited review had resulted in certain companies being excluded from a CVD order, the Court addressed whether vacatur would apply retroactively or prospectively (*i.e.*, whether Commerce must restore the cash deposit and liquidation status of subject entries "to the position they would have been in had the

---

[12] The Federal Circuit reversed this holding on appeal and, therefore, did not reach the question of how the Court's judgment should be applied. *COALITION*, 66 F.4th 968.

proceeding never occurred"). *Id.* at 1357-64. The Court considered the impracticality of imposing a retroactive remedy given the passage of time, during which "opportunities to request administrative reviews have come and gone with concomitant consequences," and the fact that the "proponent of retroactivity" (there, the petitioner) had no "direct stake in its application" because it would not have received retroactively collected duties. *Id.* at 1361-62. Under these circumstances, the Court concluded that "it is simply not possible to fully 'unscramble the egg'" with a retroactive remedy. *Id.* at 1361. The Court explained that "[t]he interplay between the tripartite interests of domestic producers, foreign exporters/producers, and the U.S. government is a characteristic of trade cases and sets trade cases apart from other cases addressing the principle of retroactivity in which the proponent of retroactivity has a direct stake in its application." [13] *Id.* at 1362.

Similar considerations apply here. Plaintiffs are domestic firms who will neither pay nor receive any payment of duties if they prevail in this case. The importers who may become responsible for payment of duties if plaintiffs prevail have forever lost the opportunity to request or otherwise participate in administrative reviews that would determine the amount of any duties owed on certain entries. Plaintiffs also fail to acknowledge significant complexities associated with determining what the applicable duty rates would be for merchandise that was not previously subject to a suspension of liquidation.

For example, plaintiffs do not explain what duties might be "applicable" if the Court orders a retroactive remedy (liquidation or reliquidation where liquidation already has occurred)

---

[13] The Court also held that "a decision … 'not in harmony with' Commerce's determination in a CVD investigation or administrative review is prospective unless the court grants an interested party's request for injunctive relief." *COALITION*, 535 F. Supp. 3d at 1359-60 (quoting 19 U.S.C. § 1516a(c)(1)). Section 1516a applies in certain cases brought under 28 U.S.C. § 1581(c), but not in this case filed under 28 U.S.C. § 1581(i).

in accordance with the *Final Circumvention Determinations*.  In those determinations,

Commerce did not find that all solar cells and modules from the Southeast Asian countries are

circumventing the Orders.  Rather, Commerce allowed importers to certify that their goods are

entitled to enter duty-free for various reasons using different certifications, only one of which

involved the Duty Suspension Rule.  *Final Circumvention Determinations*, 88 Fed. Reg. at

57,422, 57,425-33.  Therefore, CBP would need to consider any such certifications prior to any

liquidation or reliquidation and determine whether the basis of each duty-free certification was

the Duty Suspension Rule.

Beyond the complexities associated with *which* entries had certifications that depend

solely upon the Duty Suspension Rule, it is also unclear *what* the assessment rate should be.  Had

the Applicable Entries been suspended, Commerce would have calculated rates in an

administrative review, if requested, and parties would have had an opportunity to advocate for

their interests.  *See* 19 C.F.R. § 351.212(b) and (c).  But the deadline for parties to request an

administrative review for most 2022 entries passed in December 2023.[14]  *See Antidumping or*

*Countervailing Duty Order, Finding, or Suspended Investigation*, 88 Fed. Reg. 83,917, 83,918

(Dep't of Commerce Dec. 1, 2023).  Moreover, the deadline for parties to request reviews for

most 2023 entries is expected to pass in December 2024, before the Court is scheduled to resolve

this matter.  *See* Order at 2, June 3, 2024, ECF No. 79.  The deadline for parties to request

reviews for 2024 entries is not expected until December 2025, but plaintiffs' request for

retroactive relief *now* fails to account for the fact that those entries otherwise would have to be

---

[14]  Commerce has concluded its review of the AD order for the December 2021 through November 2022 period of review.  *CSPVs, Whether or Not Assembled Into Modules, from China*, 89 Fed. Reg. 55,562 (Dep't of Commerce July 5, 2024) (final results AD admin. review).  The preliminary results in Commerce's review of the CVD order for the January 2022 through December 2022 period of review are due on December 18, 2024.

liquidated in accordance with the final results of those administrative reviews. Therefore, the remedy requested by plaintiffs would unlawfully undermine the administrative review process, and that result is neither equitable nor in the public interest.

Another layer of uncertainty ignored by plaintiffs is the ongoing challenges to the *Final Circumvention Determinations* in section 1581(c) cases, the result of which could impact what duties might apply and whether duties should apply at all. Court Nos. 23-221, 23-222, 23-227, 23-228, 23-229. Ordering retroactive relief in this case without regard for the final outcome of that separate litigation would be improper.

For these additional, independent reasons, the Court should not order any retroactive relief in the form of an injunction, and therefore should limit any relief to a declaratory judgment and the prospective vacatur of the Duty Suspension Rule.

      C.    <u>The Court Should Not Order Reliquidation Of Pre-Suit Entries</u>

As noted above, plaintiffs waited more than 15 months after Commerce published the final Duty Suspension Rule before commencing their challenge to it. In light of plaintiffs' lengthy delay, and the complexities and burdens described above that flow from the passage of time, it would be neither equitable nor appropriate for the Court to order reliquidation of entries made prior to the commencement of this action on December 29, 2023. *See Home Products Int'l*, 405 F. Supp. 3d at 1374. The Court should not order any permanent injunction or retroactive remedy in this case, but even if the Court were to do so, any such remedy should be limited to entries made on or after December 29, 2023, when plaintiffs commenced this lawsuit.

<u>CONCLUSION</u>

For these reasons, plaintiffs' motion for judgment on the agency record should be denied and judgment should be entered in favor of defendants.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

Of Counsel:

ELIO GONZALEZ
Senior Counsel
SPENCER NEFF
Attorney
Office of the Chief Counsel for
    Trade Enforcement and Compliance
United States Department of Commerce

EMMA L. TINER
Attorney
Office of the Assistant Chief Counsel
U.S. Customs and Border Protection

October 29, 2024

 s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

 s/ Douglas G. Edelschick
DOUGLAS G. EDELSCHICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9303

Attorneys for Defendants

CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limitation of Court of International

Trade Standard Chambers Procedures § 2(B)(1) and contains 13,825 words, excluding the parts

of the brief exempted from the word limitation.  In preparing this certificate of compliance, I

have relied upon the word count function of the word processing system used to prepare the

brief.

 s/ Douglas G. Edelschick