IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| AUXIN SOLAR, INC., and CONCEPT CLEAN ENERGY, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, et al., | ) ) Court No. 23-00274 |
| Defendants, | ) ) |
| and | ) ) |
| AMERICAN CLEAN POWER ASSOCIATION, et al., | ) ) |
| Defendant-Intervenors. | ) ) ) |

## DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Matthew R. Nicely
Daniel M. Witkowski
Julia K. Eppard
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4046
mnicely@akingump.com

*Counsel to NextEra Energy, Inc. and Solar Energy Industries Association*

Jonathan T. Stoel
Michael G. Jacobson
Nicholas R. Sparks
Lindsay K. Brown
**HOGAN LOVELLS US LLP**
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-6634
jonathan.stoel@hoganlovells.com

*Counsel to Canadian Solar (USA) Inc. and Canadian Solar International Limited*

Craig A. Lewis
Nicholas W. Laneville
Gregory M.A. Hawkins
**HOGAN LOVELLS US LLP**
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-8613
craig.lewis@hoganlovells.com

*Counsel to BYD (H.K.) Co., Ltd. and BYD
America LLC*

Jonathan M. Freed
Kenneth N. Hammer
MacKensie R. Sugama
**TRADE PACIFIC PLLC**
700 Pennsylvania Ave, SE
Washington, DC 20003
(202) 223-3760
jfreed@tradepacificlaw.com

*Counsel for Trina Solar (U.S.), Inc., Trina
Solar Science & Technology (Thailand) Ltd.,
Trina Solar Energy Development Company
Limited, and Trina Solar (Vietnam) Science &
Technology Co., Ltd.*

John B. Brew
Robert L. LaFrankie
Amanda S. Berman
Alexander H. Schaefer
Weronika Bukowski
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2720
jbrew@crowell.com

*Counsel to Invenergy Renewables LLC and
Invenergy Solar Equipment Management LLC*

Jeffrey S. Grimson
Kristin H. Mowry
Bryan P. Cenko
Clemence D. Kim
Evan P. Drake
**MOWRY & GRIMSON, PLLC**
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
(202) 688-3610
trade@mowrygrimson.com

*Counsel to JA Solar USA Inc., JA Solar
Vietnam Company Limited, JA Solar
Malaysia Sdn. Bhd., JA Solar International
Limited and American Clean Power
Association*

David M. Morrell
**JONES DAY**
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3652
dmorrell@jonesday.com

*Counsel to Boviet Solar Technology Co., Ltd.
and Boviet Solar USA., Ltd.*

Gregory S. Menegaz
Alexandra H. Salzman
J. Kevin Horgan
**DEKIEFFER & HORGAN, PLLC**
1156 Fifteenth Street, N.W., Suite 1101
Washington, D.C. 20005
(202) 783-6900
gmenegaz@dhlaw.com

*Counsel to Boviet Solar Technology Co., Ltd.
and Boviet Solar USA., Ltd. and Counsel to
Risen Solar Technology Sdn. Bhd.*

Ned H. Marshak*
Jordan C. Kahn
**GRUNFELD DESIDERIO LEBOWITZ
SILVERMAN & KLESTADT LLP**
*599 Lexington Avenue FL 36
New York, NY 10022-7648
(212) 557-4000
-and-
1201 New York Avenue NW Ste 650
Washington, DC 20005-3917
(202) 783-6881
nmarshak@gdlsk.com

*Counsel to Jinko Solar (U.S.) Industries Inc.,
JinkoSolar (U.S.) Inc., Jinko Solar
Technology Sdn. Bhd., Jinko Solar (Malaysia)
Sdn. Bhd., JinkoSolar (Vietnam) Co., Ltd.,
JinkoSolar Holding Co., Ltd., Jinkosolar
Middle East DMCC, JINKOSOLAR
INVESTMENT LIMITED (f/k/a Jinkosolar
Technology Limited), and Jinkosolar
(Vietnam) Industries Company Limited*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ i

STATEMENT PURSUANT TO RULE 56.1(c)(1) .................................................... 1

    I.    Administrative Determination Under Review ....................................... 1

    II.    Issues Presented for Review .................................................................. 1

STATEMENT OF FACTS .......................................................................................... 2

SUMMARY OF THE ARGUMENT .......................................................................... 2

ARGUMENT .............................................................................................................. 3

    I.    Standard of Review ................................................................................ 3

    II.    Plaintiffs' Claims Are Moot Because They Have Failed to Demonstrate a Redressable Injury ................................................................................... 4

    III.    Plaintiffs' Arguments Fail Because Plaintiffs Have Not Challenged the Underlying Legal Authority for Duty Suspension—Proclamation 10414 ............. 8

        A.    The Final Rule Administers the President's Duty Suspension in Accordance with the Proclamation and Its Definition of Solar Products as Emergency Relief Supplies ........................................ 11

            1.    The President Acted to Define Emergency Relief Supplies and Instruct Suspension of Duties through the Proclamation ........ 12

            2.    The Final Rule Faithfully Administers the Proclamation ............. 15

        B.    Plaintiffs Could Have Brought a Suit Challenging the Presidential Proclamation ...................................................................................... 17

    IV.    Commerce's Utilization Condition Is Consistent with Relieving the Emergency Defined in the Proclamation ............................................. 19

        A.    The President Did Not Limit the Energy-Related Emergency to Installations During the Two-Year Duty Suspension Period ................... 19

        B.    Commerce Properly Considered and Addressed Public Comments Concerning the Energy-Related Emergency Proclaimed by the President and the Need for Imports ...................................................... 21

    V.    In the Alternative, the Final Rule Is Authorized by 19 U.S.C. § 1677j ................ 25

    VI.    Commerce Lawfully Waived Antidumping and Countervailing Duties for Pre-Proclamation Entries ..................................................................... 29

    VII.    The Relief Sought by Plaintiffs Is Inequitable and Should be Denied ................ 31

    VIII.    This Court Lacks Authority to Order Reliquidation of Entries ............................ 38

CONCLUSION ....................................................................................................... 42

<u>**TABLE OF AUTHORITIES**</u>

**CASES**

*Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d 1335 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed. Cir. 2020) ................................................................................. 17

*Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167 (1990) ............................................................ 32

*American Signature, Inc. v. U.S.*, 598 F.3d 816 (Fed. Cir. 2010) ................................................ 41

*Canadian Lumber Trade All. v. United States*, 517 F.3d 1319 (Fed. Cir. 2008) ........................... 5

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ............................................. 17

*Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007) ...................................... 32

*Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, 535 F. Supp. 3d 1336 (Ct. Int'l Trade 2021) .................................................. 32

*Consolidated Bearings Co. v. United States*, 348 F.3d 997 (Fed.Cir.2003) ................................ 40

*Craker v. DEA*, 44 F.4th 48 (1st Cir. 2022) ................................................................................. 29

*Davis v. United States*, 564 U.S. 229 (2011) ................................................................................ 32

*Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016) ......................... 18

*FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024) .......................................................... 4

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ......................................................................... 17

*Fraserview Remanufacturing Inc. v. United States*, Ct. No. 22-00244, Slip. Op. 24-8 (Jan. 25, 2024) ............................................................................................................................ 39

*In re Section 301 Cases*, 524 F. Supp. 3d 1355 (Ct Int'l Trade 2021) ......................................... 41

*James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529 (1991) ................................................... 32

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31; AFL-CIO*, 942 F.3d 352 (7th Cir. 2019) .......................................................................................................................... 32

*Koyo Corp. of USA v. United States*, 497 F.3d 1231 (Fed. Cir. 2007) ......................................... 39

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) .................................................. 19

*Los Angeles Cnty. v. Davis*, 440 U.S. 625 (1979) ......................................................................... 4

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ....................................................................... 4, 7

*Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985) ...................................... 3, 18

*Motion Sys. Corp. v. Bush*, 28 C.I.T. 806 (2004), *aff'd*, 437 F.3d 1356 (Fed. Cir. 2006)............. 17

*Nader v. Fed. Election Comm'n*, 725 F.3d 226 (D.C. Cir. 2013) ................................................... 6

*NEC Corp. v. United States*, 151 F.3d 1361 (Fed. Cir. 1998) ...................................................... 36

*People for the Ethical Treatment of Animals, Inc. v. United States Fish & Wildlife Serv.*,
     59 F. Supp. 3d 91 (D.D.C. 2014) .......................................................................................... 8

*Petrella v. Metro–Goldwyn–Mayer, Inc.*, 572 U.S. 663 (2014) .............................................. 32, 37

*Powell v. Nevada*, 511 U.S. 79 (1994) ......................................................................................... 32

*PSSI Glob. Servs., LLC v. Fed. Commc'ns Comm'n*, 983 F.3d 1 (D.C. Cir. 2020)....................... 5

*Shinyei Corp. of America v. United States*, 355 F.3d 1297 (Fed. Cir. 2004)......................... 40, 41

*Silfab Solar, Inc. v. United States*, 892 F.3d 1340 (Fed. Cir. 2018) ........................................... 18

*Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885 (Fed. Cir. 2023) ............................... 18

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ................................................................................ 7

*State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48 (D.C. Cir. 2015).......................................... 6

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)..................................................... 5, 6

*Sumecht NA, Inc. v. United States*, 923 F.3d 1340 (Fed. Cir. 2019)............................................ 41

*U. S. Cane Sugar Refiners' Ass'n v. Block*, 544 F. Supp. 883 (Ct. Int'l Trade 1982),
     *aff'd*, 683 F.2d 399 (C.C.P.A. 1982) ................................................................................... 17

*Ugine v. United States*, 452 F.3d 1289 (Fed. Cir. 2006)............................................................. 41

*Ugine*, 452 F.3d 1289 (Fed. Cir. 2006)....................................................................................... 41

*United States v. Lott*, 750 F.3d 214 (2d Cir. 2014)...................................................................... 28

*United States v. Manning*, 786 F.3d 684 (8th Cir. 2015)............................................................. 28

*United States v. Stevenson*, 676 F.3d 557 (6th Cir. 2012) ..................................................... 28, 29

*United States v. Texas*, 599 U.S. 670 (2023) ................................................................................ 4

*Weinstein v. Bradford*, 423 U.S. 147 (1975)................................................................................. 8

## STATUTES

5 U.S.C. § 553(b)(2) ................................................................................... 28

5 U.S.C. § 706 ............................................................................................ 28

5 U.S.C. § 706(2) .......................................................................................... 3

19 U.S.C. § 1318 ................................................................................... passim

19 U.S.C. § 1318(a) .............................................................................. passim

19 U.S.C. § 1504 ................................................................................... 38, 39

19 U.S.C. § 1504(d) ..................................................................................... 39

19 U.S.C. § 1514 ................................................................................... 38, 40

19 U.S.C. § 1514(a)(5) ................................................................................. 38

19 U.S.C. § 1516 .......................................................................................... 33

19 U.S.C. § 1516(b) ..................................................................................... 33

19 U.S.C. § 1516a ........................................................................................ 38

19 U.S.C. § 1516a(a)(1) ................................................................................. 7

19 U.S.C. § 1516a(c) .................................................................................... 33

19 U.S.C. § 1516(f) ...................................................................................... 33

19 U.S.C. § 1671(a) ..................................................................................... 26

19 U.S.C. § 1673 .......................................................................................... 26

19 U.S.C. § 1675(a)(1) ................................................................................... 7

19 U.S.C. § 1675(a)(2)(C) ...................................................................... 40, 41

19 U.S.C. § 1677j ................................................................................. passim

28 U.S.C. § 1581(i) ......................................................................... 3, 38, 40

28 U.S.C. § 2631(i) ........................................................................................ 7

28 U.S.C. § 2640(e) ....................................................................................... 3

## REGULATIONS

19 C.F.R. § 351.213(b) ................................................................ 35

19 C.F.R. § 351.213(e) ................................................................ 35

19 C.F.R. § 351.226 ................................................................... 26

19 C.F.R. § 351.226(l) ............................................................ 26, 29

19 C.F.R. § 362.102 ................................................................. 4, 20

19 C.F.R. Part 362 ...................................................................... 1

*Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022) ................. *passim*

*Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 39,426 (July 1, 2022) .............. 22, 27, 30

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300 (Sept. 20, 2021) ........................................... 26

## ADMINISTRATIVE DECISIONS

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Aug. 23, 2023) ............ 34

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review and Join Annual Inquiry Service List*, 87 Fed. Reg. 73,752 (Dec. 1, 2022) ............................................................ 34

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review and Join Annual Inquiry Service List*, 88 Fed. Reg. 83,917 (Dec. 1, 2023) ............................................................ 35

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2021-2022*, 89 Fed. Reg. 457 (Jan. 4, 2024) ...................... 35

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Rescission in Part; 2021*, 88 Fed. Reg. 88,575 (Dec. 22, 2023) ......................... 36

**PRESIDENTIAL PROCLAMATIONS**

*Proclamation 10414 of June 6, 2022, Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia*, 87 Fed. Reg. 35,067 (June 6, 2022) ................................................. *passim*

**LEGISLATIVE HISTORY**

H.R. Rep. No. 100-576 (1988), 1988 U.S.C.C.A.N. 1547 ......................................................... 25

S. Rep. No. 95–778, 95th Cong., 2nd Sess. 31-32 (1978), U.S. Code Cong. & Admin. News 1978........................................................................................................................................... 39

Pursuant to Rule 56.1 of this Court's rules, Defendant-Intervenors respectfully submit this response to the motion for judgment on the agency record filed by Plaintiffs ("Pls. Br."), ECF No. 93. Defendant-Intervenors broadly support the legal positions taken by Defendants ("the Government") in their response brief ("Gov. Resp."), ECF No. 95, and, consistent with those positions and the additional grounds set forth below, urge this Court to deny Plaintiffs' motion for judgment.

## STATEMENT PURSUANT TO RULE 56.1(c)(1)

### I. Administrative Determination Under Review

The matter under review is *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868 (Sept. 16, 2022) ("Final Rule"), *codified as* 19 C.F.R. Part 362, which implemented President Biden's *Proclamation 10414 of June 6, 2022, Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia*, 87 Fed. Reg. 35,067 (June 6, 2022) ("Proclamation 10414").

### II. Issues Presented for Review

1. Whether Plaintiffs have standing to challenge the Final Rule promulgated by the U.S. Department of Commerce ("Commerce"), implementing Proclamation 10414.

2. Whether Plaintiffs failed to state a claim for which relief may be granted for failing to challenge the underlying legal authority for duty suspension, Proclamation 10414.

3. Whether Commerce's "utilization" condition is consistent with relieving the emergency defined in the Proclamation.

4. Whether, in the alternative, the Final Rule is authorized by 19 U.S.C. § 1677j.

5. Whether Commerce lawfully waived the collection of antidumping and countervailing ("AD/CVD") duties for pre-Proclamation entries.

6.   Whether the relief sought by Plaintiffs is inequitable and should be denied.

7.   Whether this Court lacks authority to order reliquidation of entries.

**STATEMENT OF FACTS**

Defendant-Intervenors adopt the statement of facts set forth in the Government's Brief.  To the extent that additional facts not mentioned by the Government are relevant to Defendant-Intervenors' arguments, they are discussed within the context of the arguments set forth below.

**SUMMARY OF THE ARGUMENT**

Plaintiffs challenge Commerce's Final Rule, suspending AD/CVD duties for certain entries of solar cells and modules for two years to address the emergency declared by the President in Proclamation 10414.  Plaintiffs' claims must fail for several reasons, including those identified in the Government's Response brief, with which Defendant-Intervenors fully agree.  Defendant-Intervenors address here several additional grounds for rejecting the arguments Plaintiffs made in their opening brief.

First, Plaintiffs' suit is moot for lack of standing for failing to identify any injury that would be redressable through retroactive imposition of duties if their suit is successful.  Second, Plaintiffs did not state a claim for which relief may be granted.  Plaintiffs did not challenge the President's Proclamation of the energy-related emergency pursuant to 19 U.S.C. § 1318(a), or the President's identification of supplies (i.e., certain solar cells and modules from Southeast Asia) needed to alleviate the emergency.  Commerce's Final Rule lawfully implemented the President's decision and Plaintiffs missed (indeed, waived) the opportunity to challenge the underlying legal premise for the Final Rule.  Third, the Final Rule reasonably provided for the suspension of AD/CVD duties for certain entries of solar cells and modules, meaning that importation of those materials during the two-year period was critical to ensure sufficient supply to ongoing solar energy projects.  Commerce solicited and considered public comments and implemented the President's direction

to address the emergency regarding supplies for energy projects, including the need for solar cells and modules to be installed after the two-year period.  Fourth, the Final Rule must stand because 19 U.S.C. § 1677j is an alternative source of authority, as cited by Commerce in its own rulemaking.  Fifth, Commerce lawfully declined to impose AD/CVD duties on certain entries made prior to Proclamation 10414.  The Government's interpretation of 19 U.S.C. § 1318(a) is reasonable in light of the U.S. retrospective duty assessment system, and Commerce's discretion to issue rules as needed to implement circumvention determinations.  Sixth, Plaintiffs' requested relief is inequitable and therefore should not be granted even if Plaintiffs were to otherwise prevail on the merits.  Defendant-Intervenors and other parties will not have the opportunity to demonstrate in administrative reviews that their merchandise was not dumped or subsidized and, in turn, to establish applicable AD/CVD rates.  Seventh, the Court lacks authority to order reliquidation of entries if Plaintiffs are successful.  Such an order would undermine the certainty to importers of liquidating entries within a specified time period, as afforded by the liquidation statute.

## **ARGUMENT**

### I.    **Standard of Review**

In cases challenging agency authority under 28 U.S.C. § 1581(i), the Court "shall review the matter as provided in section 706 of title 5."  28 U.S.C. § 2640(e).  This is the standard under the Administrative Procedure Act ("APA") for reviewing agency action, pursuant to which the Court will "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  However, where an action challenges decisions of the President, the Federal Circuit has explained that a more limited and deferential standard of review applies.  *See, e.g.*, *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985) ("For a court to interpose, there has to

be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority.  On the other hand, the President's findings of fact and the motivations for his action are not subject to review." (internal quotation marks and alteration omitted)).

II.    **Plaintiffs' Claims Are Moot Because They Have Failed to Demonstrate a Redressable Injury**

Article III of the Constitution requires Plaintiffs to establish a redressable injury caused by Defendants' conduct that persists throughout the entire case.  *United States v. Texas*, 599 U.S. 670, 676 (2023); *Los Angeles Cnty. v. Davis*, 440 U.S. 625 (1979).  And in contrast to suits challenging "{g}overnment regulations that require or forbid some action by the plaintiff" itself, Article III standing is "substantially more difficult to establish" where, as here, a plaintiff challenges the government's "regulation (or lack of regulation) of <u>someone else</u>."  *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (emphasis added).  In cases like this, "it becomes the burden of the plaintiff to adduce facts showing" that the third parties will respond "in such manner as to produce causation and permit redressability of injury."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).

Here, Plaintiffs have failed to explain how they have met that burden in seeking a court order that would do nothing more than compel the Government to <u>retroactively</u> assess and impose duties on the products of third-party importers.  Pls. Br. 45.  As the Government observes, Gov. Resp. 38, that request is flawed: it would not remedy any injury <u>to Plaintiffs</u> now that the emergency that gave rise to duty-free entry has ended, all relevant imports have entered the country, and all products have been sold to and utilized by end-users (or at least will be by the time the Court resolves Plaintiffs' Motion).  *See* 19 C.F.R. § 362.102 (providing a utilization deadline of December 3, 2024).  So, what interest do Plaintiffs have in demanding after-the-fact imposition of such duties, apart from the "psychic satisfaction" of seeing its view of the law vindicated?  *See*

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("{A}lthough a suitor may derive great comfort and joy from the fact that the United States Treasury is not cheated… or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy"). The answer is: "none." Plaintiffs therefore no longer have standing to press their claims.

Plaintiffs might invoke "competitor standing"—a doctrine that "relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors." *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008); *see also id.* at 1333 (explaining that the "doctrine of 'competitor standing' is not yet well-developed in this Circuit," and looking to D.C. Circuit cases for guidance). But "a party asserting competitor standing" still "must make a concrete showing that it is in fact likely" to suffer an injury redressable by the relief sought. *PSSI Glob. Servs., LLC v. Fed. Commc'ns Comm'n*, 983 F.3d 1, 11 (D.C. Cir. 2020) (emphasis added; internal quotation marks omitted). Consistent with that principle, a plaintiff "cannot establish competitor standing merely by claiming that a rival's favorable tax treatment has created an unfair competitive atmosphere" or a "skewed playing field." *Id.* (internal quotation marks omitted). Rather, a plaintiff must prove that it is "more likely than not" that the requested relief would remedy its alleged injury. *Canadian Lumber*, 517 F.3d at 1333 (in case where challenged government distributions to plaintiffs' competitors were ongoing, finding competitor standing after a two-day evidentiary hearing).

Plaintiffs here have not even attempted to satisfy that requirement—and they cannot plausibly do so, given the fundamental mismatch between their claimed injury and the relief they seek. The Complaint suggests that Plaintiffs would be harmed by the Final Rule because it allows

imported solar cells and modules to enter the country duty-free during a presidentially declared emergency, which terminated nearly six months ago.  Yet, Plaintiffs waited until the competitive window for those products had all but closed before filing this Motion, and still they demand a court order compelling the Government to retroactively assess and impose duties on the products <u>after</u> they had entered the country and been sold to and utilized by end-users.  *See* Pls. Br. 45.  In other words, Plaintiffs seek a remedy aimed at restricting importers' ability to compete in the June 2022 to June 2024 solar market <u>after</u> competition within it ended.  Plaintiffs cannot mix-and-match injuries and remedies in this fashion.  *See Steel Co*, 523 U.S. at 107 ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court.").  As the D.C. Circuit explained in an analogous competitor-standing context, a plaintiff cannot leverage competitor-standing principles to demand civil "enforcement against {its competitors} after the {relevant competition} has run its course."  *Nader v. Fed. Election Comm'n*, 725 F.3d 226, 228-29 (D.C. Cir. 2013).  After-the-fact enforcement can neither "reverse the {past} harms" to competition during the relevant period (since those harms have already occurred) nor "compensate" for them (since plaintiffs cannot get damages from the Government and, here, cannot receive any portion of the assessed duties).  *Id.* at 229.  At this point, any marketplace effects on Plaintiffs from duties imposed on third-party importers after the fact—in many cases, <u>years</u> after the fact—would be "speculative" at best.  *Id.*; *see also, e.g.*, *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (D.C. Cir. 2015) (emphasizing that competitor standing is unavailable when the link between injury and relief is "attenuated" or "speculative").

In other words, as *Nader* emphasizes, competitor standing is "prospective" in nature. 725 F.3d at 229.  Yet, at the time Plaintiffs brought suit, much of the relief they sought was already retrospective, because they waited over <u>15 months</u> after the Final Rule's issuance to file their

Complaint, meaning that countless products had already entered duty free and been sold to end-users. Even then, Plaintiffs declined to pursue a preliminary injunction against the Final Rule's application to future entries, opting instead to "stipulate" to the availability of certain after-the-fact remedies "in lieu of" injunctive relief. ECF No. 19. As this Court correctly recognized, however, litigants cannot expand a court's Article III powers by stipulation. *See* Order, Mar. 20, 2024, ECF No. 71. No matter what Plaintiffs or the Government stipulate—and even if retroactive relief could be available in <u>some</u> cases as an abstract matter—this Court cannot award that relief when there is no longer an Article III controversy supporting such relief in <u>this</u> case. Plaintiffs lacked standing to seek such relief at least in part when they filed their complaint. Now, their request for such relief has become moot in whole.

These facts are unique and nothing like those involved in ordinary challenges to the final results of administrative reviews that involve the calculation of rates for entries suspended pursuant to AD/CVD proceedings. First, Congress authorized any "interested party," aggrieved or not, to seek judicial review of the final results of administrative reviews, 19 U.S.C. § 1516a(a)(1), 28 U.S.C. § 1581(c), and thereby exercised its "'power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) (quoting *Lujan*, 504 U.S. at 578). Congress did no such thing here. *See* 28 U.S.C. § 2631(i) (authorizing suit only by those "aggrieved" by agency action). Second, whereas administrative reviews have both retroactive <u>and</u> prospective effects—they determine the "duty to be assessed" on prior entries and the "estimated duty to be deposited" on future entries, *see* 19 U.S.C. § 1675(a)(1)—the relief here would have only retroactive effect. Finally, the final results of administrative reviews are also replaced annually and generally impact the same industry players year after year, implicating the evading-review exception to mootness.

*See, e.g.*, *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (evading-review exception applies where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again").  Neither condition is satisfied here, and, regardless, Plaintiffs' conduct of the litigation and its delay in commencing it are fatal to any attempt to invoke the exception.  *See People for the Ethical Treatment of Animals, Inc. v. United States Fish & Wildlife Serv.*, 59 F. Supp. 3d 91, 97–98 (D.D.C. 2014) (noting uniform agreement among federal Courts of Appeals that a plaintiff cannot invoke the evading-review exception to mootness unless it "ma{de} a full attempt to prevent {its} case from becoming moot, an obligation that includes filing for preliminary injunctions" (citations omitted)).

Accordingly, Plaintiffs must prove an ongoing redressable injury under basic standing principles.  Because they cannot do so, this Court should deny their Motion on this basis alone.

## III.  Plaintiffs' Arguments Fail Because Plaintiffs Have Not Challenged the Underlying Legal Authority for Duty Suspension—Proclamation 10414

Even if mootness were not dispositive, Plaintiffs' Motion would fail on the merits.  The most fundamental elements of Plaintiffs' arguments must be dismissed because they fail to challenge the action that is the actual source of their grievance: Proclamation 10414.  The heart of Plaintiffs' challenge is a series of claims directed against the scope and terms of the Proclamation, not the Final Rule.  All of the actions challenged by Plaintiffs – from the interpretation of 19 U.S.C. § 1318(a) to the scope and timing of the remedy imposed by Commerce – are embodied in and draw their legal authority from Proclamation 10414.  Absent the unchallenged actions of the President, Commerce would have no authority under 19 U.S.C. § 1318(a) to take the actions it did. After all, it is the President who proclaimed the emergency, as required by the statute, and it is the President who defined the supplies needed to alleviate that emergency.  Yet, Plaintiffs deliberately

chose <u>not</u> to challenge Proclamation 10414 in this action.  Pls. Br. 5 n.2.  Plaintiffs have thus raised

arguments and corresponding legal standards targeting primarily the wrong action.[1]

As Defendant-Intervenors identified in their Answer, Plaintiffs' decision to duck from any

direct challenge to Proclamation 10414 means that they have failed to state a claim upon which

relief can be granted.[2]  They have not challenged the foundational source of their alleged harm,

Proclamation 10414, and instead solely make claims directed at the Final Rule under the APA.

Critically, Pls. Br. 15, and fatally for Plaintiffs, the APA is not an appropriate basis for judicial

review of presidential action.  This Court should not allow Plaintiffs to elide the elevated burden

on their claims.[3]

Plaintiffs request that this Court order Defendants to "identify, collect any uncollected

{AD/CVD duties}, and reliquidate all entries" of solar cells that were not assessed AD/CVD duties

in accordance with the Final Rule.  Pls. Br. Proposed Order, ECF No. 93 (July 22, 2024).  But, it

was the President, not Commerce, who declared an ongoing national emergency and exercised the

---

[1] The Government raises this issue in its response brief.  Gov. Resp. 13 n.6 ("When plaintiffs challenge whether any solar cells and modules may constitute 'other supplies for use in emergency relief work' under section 1318(a), *see* Pls. Br. Sec. II-A, this arguably is a challenge to what the President directed Commerce to do in the proclamation, rather than a challenge to the Duty Suspension Rule itself.").

[2] *See* Defendant-Intervenors' Answer, ECF No. 80 at 9 (noting Plaintiffs' failure to state a claim upon which relief can be granted).

[3] Indeed, Plaintiffs have not stated a claim upon which relief can be granted because they have failed to (1) levy a claim against the action that actually caused any of their alleged harms, namely Proclamation 10414; (2) advance their claims under the correct legal standard regarding the President's interpretation of the governing statute; and (3) demonstrate that, even if the Final Rule were nullified, Plaintiffs could receive their requested relief with Proclamation 10414 remaining in effect and undisturbed.  Plaintiffs are fundamentally challenging Proclamation 10414, which declared an emergency to exist, defined solar cells and modules as "supplies for use in emergency relief work" under Section 1318(a), and temporarily authorized duty-free importation.  The Court should therefore dismiss this case.

authority granted by 19 U.S.C. § 1318 to define a class of relief supplies in light of that emergency and accordingly instruct suspension of tariff requirements. Plaintiffs' claims against Commerce under the APA regarding the interpretation of Section 1318 and the meaning of "supplies for use in emergency relief work" are thus misplaced; these determinations were made <u>by the President</u>, not Commerce, in Proclamation 10414. Pls. Br. Sec. II.

On June 6, 2022, the President declared a national emergency to exist with respect to the threats to the availability of sufficient electricity generation capacity to meet expected customer demand and directed Commerce to take action to provide relief from the emergency. *Proclamation 10414*, 87 Fed. Reg. at 35,068. The President invoked the powers authorized in 19 U.S.C. § 1318 and "direct{ed}" Commerce to act pursuant to that authority. *Id*. As a result of this Proclamation, Commerce paused duty requirements for the limited duration specified by the President. Here, Plaintiffs contest Commerce's Final Rule and concede that "this action does not name the President as a defendant or present challenges to Proclamation 10414 itself for review by the Court." Pls. Br. 5 n.2.[4] Nevertheless, Plaintiffs repeatedly criticize the President's actions in their Complaint and Brief. *See, e.g*., Compl. ¶ 51 (Dec. 29, 2023), ECF No. 2 ("President Biden took the unprecedented and incongruous step of declaring an 'emergency' to exist under 19 U.S.C. § 1318(a) . . . ."); Pls. Br. 4-5 ("President Biden sided with special interests and the Chinese Communist Party and took the unprecedented step of declaring an 'emergency' to exist under

---

[4] *See also* Compl. 26 n.5 ("Solar Plaintiffs consider Proclamation 10414 itself to be *ultra vires* and unlawful, but this action does not name the President as a defendant or present challenges to Proclamation 10414 itself for review by the USCIT. Rather, for purposes of the instant Complaint, it is assumed *arguendo* that *Proclamation 10414* constitutes an emergency declaration issued pursuant to 19 U.S.C. § 1318(a). Solar Plaintiffs reserve their right to challenge that emergency declaration and *Proclamation 10414* in a separate action.").

19 U.S.C. § 1318(a) 'with respect to the threats to the availability of sufficient electricity generation capacity to meet expected consumer demand.'").

Plaintiffs' criticisms of the President's action betray the true target of their challenge: Proclamation 10414. Plaintiffs' intentional failure to challenge the President's Proclamation is fatal, and this Court should dismiss their claims. Regardless, the Court should determine the legality of Commerce's actions through the additional authority provided by the President in Proclamation 10414. In doing so, the Court should use heightened deference (of that accorded the President) when determining the reasonableness of the statutory interpretations underlying Commerce's actions. We discuss this below.

### A.  The Final Rule Administers the President's Duty Suspension in Accordance with the Proclamation and Its Definition of Solar Products as Emergency Relief Supplies

Plaintiffs' contention that the Government has acted unlawfully rests almost entirely on their erroneous assertion that "traditional tools of statutory construction and contemporaneous sources establish 19 U.S.C. § 1318(a) does not authorize duty-free importation of CSPV cells and modules." Pls. Br. Sec. II (formatting omitted). The Government has thoroughly disproven this claim in its brief, Gov. Resp. Sec III, no matter what standard of review is applied. But the flaw in Plaintiffs' argument is not merely that their interpretation of the statute is wrong; they also fail to acknowledge that it was the Presidential Proclamation that not only declared the emergency but also defined solar cells and modules as emergency relief supplies, authorized the challenged duty suspension, and defined its scope and duration. *Proclamation 10414*, 87 Fed. Reg. at 35,068. The Final Rule merely administered the parameters directed by the President. Plaintiffs' inference that the President's direction was nothing more than a suggestion to a subsidiary cabinet department that serves at the pleasure of the President is not supported by the facts or law.

1.      **The President Acted to Define Emergency Relief Supplies and Instruct Suspension of Duties through the Proclamation**

On June 6, 2022, pursuant to Section 1318(a), the President declared "an emergency to exist with respect to the threats to the availability of sufficient electricity generation capacity to meet expected customer demand" and announced steps "{t}o provide relief from the emergency." *Proclamation 10414*, 87 Fed. Reg. at 35,068.  In its accompanying Fact Sheet, the White House announced:

> Today, President Biden is using his powers to create a 24-month bridge for certain solar imports while reinforcing the integrity of our trade laws and processes.  Specifically, the President is: Temporarily facilitating U.S. solar deployers' ability to source solar modules and cells from Cambodia, Malaysia, Thailand, and Vietnam by providing that those components can be imported free of certain duties for 24 months in order to ensure the U.S. has access to a sufficient supply of solar modules to meet electricity generation needs while domestic manufacturing scales up{.}

Attachment 1, *FACT SHEET: President Biden Takes Bold Executive Action to Spur Domestic Clean Energy Manufacturing* (June 6, 2022) (emphases added).  In order to effectuate this action, the President ordered:

> To provide relief from the emergency, the Secretary shall consider taking appropriate action under section 1318(a) . . . to permit, until 24 months after the date of this proclamation or until the emergency declared herein has terminated . . . under such regulations and under such conditions as the Secretary may prescribe, the importation, free of the collection of duties and estimated duties . . .  of certain solar cells and modules . . . .

*Proclamation 10414*, 87 Fed. Reg. at 35,068 (emphases added).  The Proclamation delegated to Commerce limited discretion in the effective implementation and administration of the duty suspension, allowing for "regulations" or other "conditions."  The Proclamation did not permit Commerce, however, to create a list of other "supplies for use in emergency relief work" that could

be helpful for resolving the state of emergency, decline to recognize the emergency, or craft relief distinct from the suspension of duties.

Also on June 6, 2022, Commerce officials acknowledged and confirmed receipt of the President's order.  Mere hours after the President signed the Proclamation and months before the Final Rule became effective, Assistant Secretary of Commerce for Enforcement and Compliance Lisa Wang announced: "In accordance with the President's declaration, no solar cells or modules imported from Cambodia, Malaysia, Thailand, and Vietnam will be subject to new {AD/CVD} duties during the period of the emergency."  Attachment 2, Press Release, Department of Commerce Statement on President Biden's Proclamation on Solar Cells and Modules (June 6, 2022) (emphasis added).  Secretary of Commerce Gina Raimondo expounded on the President's order as follows: "I remain committed to upholding our trade laws and ensuring American workers have a chance to compete on a level playing field.  The President's emergency declaration ensures America's families have access to reliable and clean electricity while also ensuring we have the ability to hold our trading partners accountable to their commitments."  *Id*. (emphasis added).

Even Plaintiff Auxin Solar Inc. ("Auxin") understood, in 2022, that the Proclamation, not agency action, was the source of the duty suspension's authorization and key parameters.  In August 1, 2022 comments on Commerce's Proposed Rule, Auxin wrote:

> In purporting to authorize Commerce to take action pursuant to Section 318(a) of the Act, the President exceeded his statutory authority, rendering any resulting actions by Commerce, including adoption of the Proposed Regulations as a final rule, unlawful as well.  The 'emergency' asserted in Proclamation 10414 is a mere fig leaf to mask an unlawful directive that Commerce abdicate enforcement obligations in service of dumped and subsidized imports of CSPV cells and modules imported from Southeast Asia to the detriment of domestic manufacturers and workers.

Compl., Exh. 3 at 6 (emphases added) (footnote omitted).  There, Auxin argued that the President

was forcing Commerce to act pursuant to an unlawful command:

> The <u>President's unprecedented decision to resort to Section 318(a)</u>
> <u>is contrary to law</u> for those and potentially other reasons, including
> that Proclamation 10414 fails to conform with the requirements of
> the National Emergencies Act.  <u>In light of the President's ultra vires</u>
> <u>action in issuing Proclamation 10414</u>, Commerce should refrain
> from taking additional steps to carry out his unlawful directives.

*Id*. at 10-11 (emphases added).  In the underlying circumvention proceeding, Auxin likewise

emphasized to Commerce that it considered the Proclamation to be "legally dubious."  Compl.,

Exh. 14 at 3.  Plaintiffs' sudden insistence in this litigation that Commerce, not the President, is

the Government actor who directed and decided the duty suspension is thus surprising and

inconsistent with its own claims that the Proclamation constituted an "unlawful directive."

The Final Rule itself confirms that it was issued pursuant to the President's instructions.

For instance, the Final Rule explains, "{c}<u>onsistent with the Proclamation</u>, this rule provides for

the temporary importation free of AD/CVD duties and estimated duties, if otherwise applicable,

for certain {Southeast Asian}-Completed Cells and Modules."  *Final Rule*, 87 Fed. Reg. at 56,872

(emphasis added).

Finally, when the President vetoed a congressional measure that sought to disapprove the

Final Rule, the White House plainly stated that the Proclamation allowed the duty suspension and

defined the covered relief and class of merchandise.  In vetoing the measure, the President

explained: "{S}ince I took office, 51 new and expanded solar equipment manufacturing plants

have been announced, and America is now on track to increase domestic solar panel manufacturing

capacity eight-fold.  <u>The fact is: my plan is working</u>."  Attachment 3, Statement from President

Joe Biden on His Veto of H.J. Res. 39 (May 16, 2023) (emphasis added).  In short, the President

and Commerce (and even Auxin) understood that the duty suspension was effectuated pursuant to

the Proclamation, which interpreted 19 U.S.C. § 1318, declared a national emergency to redress the electricity project crisis, and defined the class of emergency relief supplies needed to address that crisis. This simple truth underscores the fundamental flaw in Plaintiffs' claim challenging <u>Commerce's</u> interpretation of this statute. The reality is that Plaintiffs are challenging the <u>President's</u> interpretation of the statute, not Commerce's, and this Court must adjudicate their claims consistent with that reality.[5] Importantly, as will be discussed later in this brief, the President's interpretation and administration of the applicable statutory provisions is entitled to heightened deference under the law, particularly when dealing with emergencies and matters of international trade and relations.

## 2.    The Final Rule Faithfully Administers the Proclamation

Plaintiffs intimate that the Final Rule may be a suitable sole target for this suit to the extent it deviates from the Proclamation, by applying to entries of solar products that had entered the United States and were positioned to alleviate the emergency as of June 6, 2022. Pls. Br. 33 ("Commerce's specious suggestion that *Proclamation 10414* omits a start date butchers the English language."). It is correct that the Final Rule is more detailed than the Proclamation, describes the logistics of the duty suspension procedures, and implements comments received from the interested public regarding Commerce's administration of the President's order. Nonetheless, Plaintiffs are wrong to assert that the Final Rule deviates from the Proclamation and is thus the appropriate action to challenge because (1) Plaintiffs' requested relief addresses actions emanating from the Proclamation, and (2) the Final Rule faithfully administers the Proclamation.

---

[5] *See* Section III.B *infra* for discussion of the correct standard for courts reviewing Presidential interpretation of a statute.

As a threshold matter, in their prayer for relief, Plaintiffs ask this Court to require Commerce to direct the collection of duties for entries previously made duty-free in accordance with both the Proclamation and the Final Rule.  Compl. 63; Pls. Br. Proposed Order.  This request underscores that the action causing the alleged harm is the Proclamation.  Plaintiffs argue that they are entitled to relief for all entries made duty-free based on the interpretation of the term "supplies for use in emergency relief work," Pls. Br. Sec. II-A, but their argument wholly ignores that it was the President who performed this interpretation, not Commerce.

Moreover, as explained in the Government's Response Brief, the Final Rule is consistent with the temporal scope of the authorization enunciated by the President.  *See* Gov. Resp. Sec. IV.  The Proclamation directed immediate action to address a fully developed state of emergency "now," and the Final Rule carefully implemented how the Proclamation should be understood to treat entries made prior to June 6, 2022, and concluded that unliquidated entries served a valuable role in responding to the declared emergency.  *Proclamation 10414*, 87 Fed. Reg. at 35,067 ("In order to ensure electric resource adequacy, utilities and grid operators must engage in advance planning to build new capacity <u>now</u> to serve expected customer demand.") (emphasis added).[6]  Accordingly, Plaintiffs have failed to show deviations between the Final Rule and the Proclamation justifying their failure to challenge the Proclamation.

---

[6] Cash deposits had not been required on entries made prior to June 6, 2022, and the Final Rule simply confirmed that duties would not be assessed on those entries in the future.  Commerce explained:  "In other words, the final rule is stating, ahead of any imposition of such duties, that there will be no such duties.  Such a decision is prospective in its application." *Final Rule*, 87 Fed. Reg. at 56,877.

**B.**    **Plaintiffs Could Have Brought a Suit Challenging the Presidential Proclamation**

Plaintiffs' acknowledgement that they do not challenge the Proclamation is dispositive. Both the U.S. Court of International Trade ("CIT") and the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") have made clear that presidential actions may be challenged pursuant to 28 U.S.C. § 1581(i).[7]  *Motion Sys. Corp. v. Bush*, 28 C.I.T. 806 (2004), *aff'd*, 437 F.3d 1356 (Fed. Cir. 2006) (confirming that suits related to presidential trade actions may be brought under Section 1581(i)); *Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d 1335, 1343 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed. Cir. 2020) (reviewing a Section 232-related proclamation pursuant to Section 1581(i)); *U. S. Cane Sugar Refiners' Ass'n v. Block*, 544 F. Supp. 883 (Ct. Int'l Trade 1982), *aff'd*, 683 F.2d 399 (C.C.P.A. 1982) (upholding the validity of a presidential proclamation and finding jurisdiction under Section 1581(i)).  A plaintiff may challenge presidential action through a suit against an executive agency, but the plaintiff must name the challenged presidential action and correct legal standards in its complaint and briefing. *See, e.g.*, *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1339 (D.C. Cir. 1996) (reviewing the legality of an executive order in a suit against the Secretary of Labor).

The Supreme Court, Federal Circuit, and CIT have also made clear that judicial review of presidential actions is not subject to the APA and is governed by a different standard of review. *E.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements.").  In order to demonstrate to this Court that a Presidential proclamation of

---

[7] This Court found that subject matter jurisdiction is available in this suit pursuant Section 1581(i). ECF No. 75 (May 9, 2024).  A proper challenge to the Presidential Proclamation would have clarified the jurisdictional basis for this action at the outset.

statutorily authorized action relating to international trade is unlawful, plaintiffs must demonstrate a clear misconstruction of the law. *Solar Energy Indus. Ass'n v. United States*, 86 F.4th 885, 896 (Fed. Cir. 2023) (considering a challenge to Presidential proclamation and applying a "clear misconstruction" standard of review), *adhered to on reh'g*, 111 F.4th 1349 (Fed. Cir. 2024); *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1346 (Fed. Cir. 2018) ("{T}here are limited circumstances when a presidential action may be set aside if the President acts beyond his statutory authority, but such relief is only rarely available."); *Maple Leaf Fish Co.*, 762 F.2d at 89 ("In international trade controversies of this highly discretionary kind-involving the President and foreign affairs-this court and its predecessors have often reiterated the very limited role of reviewing courts."); *see also Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100-01 (D.D.C. 2016) (collecting cases) ("{A}n agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA."); *id.* at 104 ("Discretionary presidential acts are outside the scope of APA review regardless of whether the President or the agency takes the final action.").

Here, Plaintiffs did not challenge the Proclamation and thus have not addressed whatsoever these binding precedents or the correct standard of review. [8]  Plaintiffs instead disingenuously build their entire case on the faulty premise that Commerce wrongly interpreted the statutory provisions at issue. *See e.g.* Pls. Br. 18-26 (claiming that Commerce was "stretching . . . the statutory terms beyond recognition.").  Plaintiffs assert that *Loper Bright* "precludes this Court from granting any deference to Commerce's interpretation of the statute." *Id.* at 8.  But as explained above, it was

---

[8] Indeed, as the Government correctly notes in its brief, Presidential action may only be set aside in this context in "limited circumstances" and "such relief is only rarely available." Gov. Resp. 13 n.6.

the President and not Commerce who interpreted those provisions of the law.  Creative pleading by Plaintiffs cannot obviate this reality, nor can it change the proper deference and standard of review to be applied by the Court in this case.  Indeed, Plaintiffs' emphasis on the Supreme Court's holding in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), Pls. Br. 8, 15-20, appears to be a misguided attempt to distract this Court from the fact that challenges to Presidential action (like the one at issue here) are not subject to the APA.  As such, this Court should recognize that Plaintiffs' claims are not properly developed and cannot succeed.

## IV.    Commerce's Utilization Condition Is Consistent with Relieving the Emergency Defined in the Proclamation

Plaintiffs argue that the Final Rule exceeds the statute's limitation of duty-free importation of goods for "use in emergency relief work" because it "extend{s}" duty-free treatment to solar cells and modules imported during the emergency but not utilized until after the Date of Termination.  Pls.' Br. 37-38.  As the Government noted, "{t}he importation of solar cells and modules <u>during</u> the emergency relieved 'threats' to future 'sufficient generation capacity' from the 'acute shortage' of solar supplies, regardless of whether those solar cells and modules were utilized before or shortly after the emergency ends."  Gov. Resp. 34 (emphasis original).  Plaintiffs' argument fails for the simple reason that it interprets the nature of the emergency differently from the President and as articulated by Commerce.  The Final Rule was promulgated after notice and comment where Commerce received, and considered, significant public input and data supporting its conclusion that the emergency required relief by the duty-free importation of solar cells and modules, including those utilized within a proscribed time after the Date of Termination.

### A.    The President Did Not Limit the Energy-Related Emergency to Installations During the Two-Year Duty Suspension Period

The President did not identify the emergency as a mere lack of solar capacity <u>installed</u> between two dates, expiring at the Date of Termination, as Plaintiffs suggest.  *See* Pls. Br. 37-38.

19

Rather, the President correctly described solar deployment as an ongoing and long-term process requiring utilities and grid operators to "engage in advance planning to build new capacity now to serve expected customer demand." *Proclamation 10414*, 87 Fed. Reg. at 35,067. According to the President, "{t}he unavailability of solar cells and modules jeopardizes those planned additions." *Id.* The President then identified the emergency not as a current lack of <u>installation</u> during the emergency period, as Plaintiffs imagine, but rather, as an inability to <u>import</u> solar modules during the emergency period:

> the United States has been <u>unable to import solar modules in sufficient quantities</u> to ensure solar capacity additions necessary to achieve our climate and clean energy goals, ensure electricity grid resource adequacy, and help combat rising energy prices. This <u>acute shortage of solar modules</u> and module components has abruptly put at risk <u>near-term solar capacity additions</u> that could otherwise have the potential to help ensure the sufficiency of electricity generation to meet customer demand. Roughly half of the domestic deployment of solar modules that had been <u>anticipated</u> over the next year is currently in jeopardy as a result of insufficient supply. Across the country, solar projects are being postponed or canceled.
>
> *            *            *
>
> Immediate action is needed to ensure in the interim that the United States has access to a <u>sufficient supply</u> of solar modules to assist in meeting our electricity generation needs.

*Id.* at 35,067-68 (emphases added).

The emergency therefore is not limited to installation of solar modules but rather the impairment of <u>imports</u> of solar cells and modules affecting planned solar capacity deployment. As the Government noted, nowhere in the Proclamation did the President limit the emergency only to the <u>installation</u> of solar modules during the emergency period. *See* Gov. Resp. 33-34. That condition was added by Commerce in its regulation. *See Final Rule*, 87 Fed. Reg. at 56,869; *see also* 19 C.F.R. § 362.102. Far from being an unlawful "extension" of the relief beyond the

emergency period, as Plaintiffs claim, the Final Rule is more properly read as a restriction on the imports identified by the President that are necessary to relieve the emergency under the statute. Plaintiffs' assertion that Commerce unlawfully extended relief beyond the identified emergency depends entirely on Plaintiffs' alternative, and unsupported, view of the emergency and fails to identify any aspect of the statute that is violated by the condition placed by Commerce.

**B.**  **Commerce Properly Considered and Addressed Public Comments Concerning the Energy-Related Emergency Proclaimed by the President and the Need for Imports**

Commerce was well aware of the critical need for imports during the emergency period as well as the harm posed to ongoing solar development projects by the uncertainty of potential AD/CVD duties.  In is Proposed Rule, Commerce stated:

> Across the country, solar projects are being postponed or canceled, and an insufficient supply of solar modules jeopardizes planned capacity additions, which in turn threatens the availability of sufficient electricity generation to meet customer demands.
>
> Moreover, electricity produced using solar energy is critical to reducing the United States' dependence on electricity generated through burning fossil fuels, which drives climate change, a recognized threat to the United States' national security.  If U.S. entities cannot import sufficient quantities of solar materials for the foreseeable future, the United States will be unable to ensure sufficient electricity grid resources and meet climate and clean energy goals.
>
> *           *           *
>
> Drought conditions coupled with heatwaves are simultaneously causing projected electricity supply shortfalls and record electricity demand.  The United States has been unable to import solar modules in sufficient quantities to achieve our climate and clean energy goals, help combat rising energy prices, and, most immediately, ensure electricity grid resource adequacy. As explained above, imports of solar modules from Southeast Asia account for approximately three-quarters of all solar module imports, so it is vital that we address this issue. Roughly half of solar deployment that had been anticipated over the next year is currently in jeopardy, with solar projects being postponed or canceled.

*Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 39,426, 39,427-29 (July 1, 2022) ("Proposed Rule").  Commerce solicited comments from the public regarding the need to remove "market uncertainty":

> In taking the proposed actions described in this proposed rule, Commerce would act to respond to the emergency identified in the Proclamation. The proposed actions would remove uncertainty concerning potential antidumping and countervailing estimated duties or duties that might otherwise be owed on merchandise subject to the circumvention inquiries and entered before the Date of Termination. <u>The uncertainty surrounding the potential antidumping and countervailing estimated duties or duties may be contributing to the circumstances surrounding the insufficient imports of modules from Southeast Asia</u>. Given the strong interest in ensuring access to a sufficient supply of solar modules to assist in meeting the United States' electricity generation needs, we would remove this source of market uncertainty in order to encourage sufficient imports of modules from these Southeast Asian countries until the Date of Termination and while domestic capacity expands. However, <u>we lack data to quantify these effects, and we seek public comment on these impacts</u>.

*Id.* at 39,430 (emphases added).

Commerce received 16 comments totaling more than 300 pages, including a wealth of data supporting the need for imports during the emergency period.  *See Procedures Covering Suspension of Liquidation, Duties and Estimated Duties*, International Trade Administration, Docket ITA-2022-0006, Admin. Rec. Index, ECF No. 78-3.    Commerce considered a U.S. Department of Energy ("DOE") report detailing the need for imports to meet the U.S. energy needs "for the 'next several years.'"  *Final Rule*, 87 Fed. Reg. at 56,873.  Commerce stated:

> Considering DOE's conclusions in the DOE Report, as well as the various other documents identified and cited in this Preamble and the resources provided by several of the parties who filed comments in response to the proposed rule, the record supports the conclusions of the President that an electricity supply emergency exists in the United States, and that <u>to address the energy supply emergency with</u>

> solar energy technology, the United States must rely, in part, on
> imported solar modules for the immediate future.

*Id.* (emphasis added). Commerce specifically considered, and rejected, comments claiming that no emergency exists, finding that "certain data used by those critics are unpersuasive." *Id.* For example, Commerce reviewed and dismissed Auxin's reliance on data from the National Renewable Energy Laboratory ("NREL") "to argue that there is not a solar panel shortage." *Id.; Comments on Proposed Rule: Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414, 87 Fed. Reg. 39,426 (July 1, 2022),* Cassidy Levy Kent (USA) LLP on Behalf of Auxin Solar Inc. (Aug. 1, 2022) at 47, Admin. Rec. 174, ECF No. 78-1 ("Auxin Cmts. on Proposed Reg.").[9]

After considering all the comments filed by the parties, Commerce sided with DOE, rather than Auxin and other commenters arguing that no emergency existed:

> Thus, in sum, Commerce agrees with DOE's assessments of the nature of the emergency declared by the Proclamation. Commerce also finds it appropriate that this final rule provides a remedy that addresses that emergency and allows for importation of certain {Southeast Asian}-Completed Cells and Modules without requiring the suspension of liquidation and the collection of cash deposits until the emergency has passed, in accord with the Proclamation and section 318(a) of the Act.

*Final Rule*, 87 Fed. Reg. at 56,874 (emphasis added).

─────────────

[9] Commerce further considered arguments that imports from the four Southeast Asian countries were increasing and concluded that, to the contrary, "imports (in watts) for crystalline-silicon modules in the first half of 2022 were down by roughly 25 percent from the first half of 2021." *Final Rule*, 87 Fed. Reg. at 56,874. Commerce found that because "commenters referenced select import data, such as import data from only one or two countries, such discussion offers a limited picture of the broader electricity emergency threatening the United States as described in the Proclamation." *Id.* Notably, in this instance, Auxin did not try to spin the data and instead admitted that imports from the four Southeast Asian countries actually declined from 2021 to 2022 but urged Commerce to construe the "modest" decline as insufficient to amount to a shortage. Auxin Cmts. on Proposed Reg. at 46, Admin. Rec. 173.

Commerce also considered, and rejected, claims by three commenters (including Auxin)[10] that the proposed relief from circumvention was too broad in that it was not narrowly tailored to modules designated only for projects stalled by the uncertainty of the pending circumvention action. *See id.* at 56,874. Seven commenters, conversely, cited to widespread disruption caused by the threat of the pending circumvention case." *Id.* (referring for example to information that "24 GWs of solar installations and $30 billion in investments from 2022-2023 are in jeopardy without the final rule"). After considering these comments, Commerce disagreed that relief could be more narrowly tailored, considering the Government's own data establishing the heavy reliance by the United States on imports from the four Southeast Asian countries. *See id.* (explaining that "the DOE report indicates that two-thirds of imports of solar modules in 2020 and 2021 to the United States were exported from Cambodia, Malaysia, Thailand and Vietnam"). Relying on additional data provided by investors and developers of solar projects in the United States, Commerce concluded that "this final rule will provide stability and commercial certainty for its duration." *Id.* at 56,875.

The Government is correct that Commerce lawfully implemented the Proclamation by including a requirement for duty-free solar cells and modules to be utilized within a set time after the Date of Termination. *See* Gov. Resp. 33-34. The Final Rule was promulgated after notice and comment that Plaintiffs do not contest as procedurally flawed under the APA. Plaintiffs'

---

[10] Auxin was joined in its opposition by commenters in industries other than solar who nevertheless argued that the regulation at issue in this case is unlawful. *See, e.g.*, *Comments on Proposed Rule: Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414, 87 Fed. Reg. 39,426 (July 1, 2022)*, Kelley Drye & Warren LLP, (Aug. 1, 2022), Admin. Rec. 233-36, ECF No. 78-1 (submitting comments in its capacity as a law firm that represents domestic manufacturers and agricultural producers and noting that "Kelley Drye strongly opposes adoption of the Proposed Regulations in their current or modified form, both as a policy and legal matter").

interpretation of the nature of the emergency and how it should be relieved has no basis in Proclamation 10414, which is not limited to solar cells and modules utilized prior to the Date of Termination. While Auxin may disagree with the President's view of the emergency and how it could be relieved, Commerce solicited and received ample public comment and data supporting Commerce's approach, including data from the government's subject matter expert, DOE. Commerce's utilization requirement was consistent with the emergency defined in Proclamation 10414 and was supported by information obtained during the rulemaking that Commerce reasonably considered. Plaintiffs' arguments to the contrary must be rejected.

## V.    In the Alternative, the Final Rule Is Authorized by 19 U.S.C. § 1677j

Even if the Court were to erroneously conclude that the Final Rule or elements thereof are inconsistent with 19 U.S.C. § 1318(a), the Final Rule is alternatively valid as a lawful exercise of Commerce's authority under 19 U.S.C. § 1677j and therefore should be upheld in its entirety.

Section 1677j enumerates five cumulative criteria that Commerce must find are met before it includes imports from a third country within the scope of an order. 19 U.S.C. § 1677j(b)(1). But even if Commerce rules affirmatively with respect to each of the criteria, the statute does not require Commerce to take action at all. Rather, the statute is permissive, stating that Commerce "may"—not "must"—include imported merchandise found to be circumventing within the scope of an order. *Id.* (emphasis added).[11] This permissive language stands in contrast to other

---

[11] Section 1677j(a)(1) was added to the statute at the same time as Section 1677j(b)(1) and uses the same "may" language in permitting—rather than mandating—the inclusion of circumventing merchandise within an order. The conference report from the Omnibus Trade and Competitiveness Act of 1988 explicitly states that the authority provided to Commerce in Section 1677j(a)(1) "is discretionary (e.g., Commerce may apply the order to the imported parts of components but is not required to do so)." H.R. Rep. No. 100-576, at 599 (1988), 1988 U.S.C.C.A.N. 1547, 1632. This statement logically applies to Section 1677j(b)(1) as well, since both provisions use the same permissive "may" language.

provisions of the law, which provide that AD/CVD duties "shall" be applied. *See, e.g.*, 19 U.S.C. § 1671(a); 19 U.S.C. § 1673. Section 1677j also is silent as to when an order will be applied after Commerce determines to extend the order to cover such merchandise.

Given that Commerce retains independent authority under Section 1677j(b) whether to expand an order to cover merchandise that the agency finds to be circumventing and given the silence in the statute as to which entries an affirmative circumvention determination should be applied, Commerce has significant discretion as to how to apply an affirmative circumvention determination. Commerce issued 19 C.F.R. § 351.226(l) to guide how it would exercise that discretion in applying an affirmative circumvention determination. However, nothing in the statute mandates procedures that Commerce adopted in 19 C.F.R. § 351.226(l). Commerce has even said as much. When promulgating 19 C.F.R. § 351.226, Commerce explained that "although {19 U.S.C. § 1677j} describes certain applicable procedures and standards for circumvention determinations, the Act does not provide direction to Commerce regarding the suspension of liquidation for entries subject to a circumvention inquiry" and that it was promulgating that regulation "{i}n the absence of any such statutory guidance." *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,338 (Sept. 20, 2021); *see also id.* at 52,344. Because the statute did not compel the approach that Commerce took in 19 C.F.R. § 351.226, Commerce was free to modify that approach, as long as it employed the proper procedures for changing a regulation—namely by conducting a new rulemaking through notice and comment. *Cf. Final Rule*, 87 Fed. Reg. at 56,876 (explaining that Commerce was free to adopt an approach that differed from Part 358 of its regulations if it engaged in notice-and-comment rulemaking and determined that the revised procedures are better suited to address the emergency at hand).

The Final Rule should be upheld in the alternative as a valid exercise of Commerce's authority to issue regulations to implement Section 1677j.  In both the Proposed Rule and the Final Rule, Commerce stated that it was "invoking all authorities provided for in the Proclamation, pursuant to section 318(a) of the Act, <u>as well as Commerce's authority to issue regulations under section 781 of the Act (19 U.S.C. 1677j)</u>, to take these proposed steps to respond to the emergency declared in the Proclamation."  *Proposed Rule*, 87 Fed. Reg. at 39,429 (emphasis added); *Final Rule*, 87 Fed. Reg. at 56,870 (emphasis added).[12]  Elsewhere in the Final Rule, in response to arguments regarding the application of the Final Rule to pre-Proclamation entries, Commerce explained that its rules regarding the timing of suspension of liquidation in circumvention inquiries were based in its regulations implementing Section 1677j, and that it could "also use notice-and-comment rulemaking to address the declared emergency" by creating exceptions to those regulations.  *See Final Rule*, 87 Fed. Reg. at 56,878.  Section 1677j grants Commerce significant leeway as to whether, when, and how Commerce will apply an AD/CVD order to merchandise found to be circumventing under Section 1677j.  Plaintiffs do not point to any language in Section 1677j that would preclude the approach that Commerce took in this case to address the unique policy issues that arose from the presidentially declared emergency.

To the extent that Plaintiffs argue that Commerce's summary of its regulation and the rule as published in the Code of Federal Regulations do not identify Section 1677j as the "authority" for the Final Rule, that argument is unpersuasive.  The APA requires the notice of proposed rulemaking to include "reference to the legal authority under which the rule is proposed."  5 U.S.C.

---

[12] Proclamation 10414 made clear that that the Proclamation shall not "be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency." *Proclamation 10414*, 87 Fed. Reg. at 35,068.  Accordingly, Commerce was not precluded from employing its other regulatory powers to address the emergency identified in Proclamation 10414.

§ 553(b)(2).  The APA is otherwise silent as to how an agency must identify the authority upon which it is relying when it issues a regulation.  In both the Proposed Rule and the Final Rule, Commerce plainly stated that it was relying on both Section 1318 pursuant to Proclamation 10414 and its general authority to issue regulations under Section 1677j.  And even if the discussion of Proclamation 10414 was critical and more prominent, as addressed in Section III above, that does not change the fact that Commerce put the public on notice that it was pursuing the goal of addressing the emergency identified in Proclamation 10414 through means beyond just Section 1318, which is all the APA required.  *See, e.g.*, *United States v. Manning*, 786 F.3d 684, 687 (8th Cir. 2015) ("The APA requires only that a proposed rule provide some notice of its legal authority for that rule so the public has sufficient opportunity to comment."); *United States v. Lott*, 750 F.3d 214, 218 (2d Cir. 2014) ("The APA requires only that a proposed rule provide <u>some notice of the legal authority</u> for that rule—it does not prescribe the <u>form that notice must take</u>." (emphases added)); *United States v. Stevenson*, 676 F.3d 557, 563 (6th Cir. 2012) ("The APA does not require that the proposed rule cite the relevant legal authority in a certain location, but rather requires just that notice must be given for any proposed rule.").

Moreover, even if Commerce should have cited Section 1677j in the "authority" heading in the Final Rule as it appears in the Code of Federal Regulations—even though that is not required by the plain text of the APA—any such error was harmless.  The APA specifically provides that "due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706.  Commerce publicly stated twice in the *Federal Register*, in both the Proposed Rule and the Final Rule, that it was invoking its authority under Section 1677j to issue the regulation.  Plaintiffs thus cannot credibly be prejudiced by that authority not being specifically cited in the rule as published in the Code of Federal Regulations or in the one-paragraph summary of the rule.  *Cf. Craker v. DEA*, 44 F.4th 48,

57 (1st Cir. 2022) (finding any error harmless when "the petitioners can point to no prejudice resulting from this supposed failure to include more detail about the legal basis of the Proposed Rule"); *Stevenson*, 676 F.3d at 565 ("Finally, any error with respect to the Attorney General's recitation of the proper legal authority was not prejudicial.").

In sum, Plaintiffs' challenge to the Final Rule must fail because the Final Rule is lawfully authorized under Section 1318 or alternatively Section 1677j.

## VI.   Commerce Lawfully Waived Antidumping and Countervailing Duties for Pre-Proclamation Entries

Plaintiffs wrongly claim that Commerce unlawfully waived AD/CVD duties for entries that were made prior to the date that the President declared the supply chain emergency.  Pls. Br. 31-36. For the reasons explained in the Government's response brief, the Government's interpretation of Section 1318 is reasonable and the best construction of the statute as it relates to AD/CVD duties in light of the United States' retrospective duty assessment system.  Gov. Resp. 27-32.  Applying the duty suspension to these entries also furthered the goal of Proclamation 10414, which was to relieve the supply chain emergency regarding solar products.  *Id.* at 29-32.

Beyond Section 1318, Section 1677j provides additional authority for waiving AD/CVD duties for pre-Proclamation entries.  As explained above, Section 1677j does not mandate how Commerce must apply an affirmative circumvention determination, and Commerce was free to use the same authority it relied upon to issue 19 C.F.R. § 351.226(l) (i.e., Section 1677j) to create an exception to that regulation in light of the unique circumstances present in this case.

Moreover, imported merchandise during the pre-Proclamation period was outside of the literal scope of the AD/CVD orders and cannot be described as subject merchandise until after Commerce made its affirmative circumvention determination.  *See, e.g.*, *Final Rule*, 87 Fed. Reg. at 56,869 (explaining that, at the time the Final Rule was published, "{Southeast Asian}-

29

Completed Cells and Modules are by definition not covered by the scope of the AD and CVD orders on solar cells and modules from China"); *id.* at 56,876 ("Prior to an affirmative determination, entries of merchandise subject to the circumvention inquiry are not subject to an order."). Even assuming that Commerce has the discretion to apply circumvention findings to entries prior to a finding of circumvention, nothing in the statute requires it to do so, and Commerce certainly was free to issue new regulations under Section 1677j through notice-and-comment procedures that would exempt merchandise from an affirmative circumvention determination when the merchandise was entered at a time before the scope had been expanded to cover that merchandise.

As explained above, Commerce stated in both the Proposed Rule and the Final Rule that it was "invoking all authorities provided for in the Proclamation, pursuant to section 318(a) of the Act, <u>as well as Commerce's authority to issue regulations under section 781 of the Act (19 U.S.C. 1677j)</u>, to take these proposed steps to respond to the emergency declared in the Proclamation." *Proposed Rule*, 87 Fed. Reg. at 39,429 (emphasis added); *Final Rule*, 87 Fed. Reg. at 56,870 (emphasis added). Commerce specifically emphasized that its rule providing for the retroactive suspension of liquidation and imposition of duties in circumvention inquiries was a product of rulemaking under Section 1677j and could be changed pursuant to notice-and-comment rulemaking. *See Final Rule*, 87 Fed. Reg. at 56,878. Plaintiffs even acknowledge that Commerce invoked its "Section 781 regulatory authority . . . to bolster its rationale for extending duty-free treatment to pre-emergency entries." Pls. Br. 43. If the application of circumvention determinations to merchandise entered before an affirmative determination is a matter of discretionary regulatory authority under Section 1677j, then Commerce had the regulatory authority under Section 1677j to issue new regulations to exempt such entries from AD/CVD

liability if and when Commerce finds that circumstances so warrant.  That is what Commerce did here, and the separate authority under Section 1677j for applying the Final Rule to pre-Proclamation entries is fatal to Plaintiffs' argument.

For the reasons explained by the Government and those articulated elsewhere in this brief, the application of the duty suspension rule to entries made prior to the Proclamation was consistent with the Proclamation and with Section 1318.  The authority under Section 1677j is an additional reason why Plaintiffs' arguments are meritless.  And to the extent that Plaintiffs' argument regarding Commerce's failure to cite Section 1677j in the summary of its regulation and in the Final Rule published in the Code of Federal Regulations applies to the narrower issue of the authority to exempt pre-Proclamation entries from AD/CVD duties, that failure at most constitutes harmless error, as explained above.

## VII.    <u>The Relief Sought by Plaintiffs Is Inequitable and Should be Denied</u>

While Plaintiffs' claims thus fail many times over on the merits, their request for relief is doomed as well.  This Court must deny Plaintiffs' unlawful request for injunctive relief that would retroactively impose AD/CVD duties on entries that benefited from the Final Rule.   Plaintiffs have failed to argue why they are entitled to an order so enjoining the Government, and so Plaintiffs' request for retroactive relief should be considered waived, as the Government argues.  Gov. Resp. 38-40.  Furthermore, granting such relief would also upset the normal operation of the AD/CVD laws and would be grossly inequitable.  The Court should deny Plaintiffs' undeveloped request for relief.

To the extent that Plaintiffs even addressed the issue of relief in their brief, they merely argue that the doctrine of laches does not bar relief because Plaintiffs brought this action within the statute of limitations.   Pls. Br. 43-45.  Even if laches does not require dismissal of Plaintiffs'

claims, the Court is entitled to consider the equities, including Plaintiffs' delay in bringing this action, when deciding the appropriate relief, if any, to be granted.

Plaintiffs indirectly cite *Petrella v. Metro–Goldwyn–Mayer, Inc.*, 572 U.S. 663 (2014) in support of their argument that laches does not apply. The Supreme Court concluded that laches did not apply in that case, but the Court cautioned that a delay in commencing suit nevertheless could curtail the relief awarded to the plaintiff. *Id.* at 685. The Court then cited approvingly a Sixth Circuit decision that denied relief to the plaintiff at the outset of the litigation because the plaintiff failed to promptly take action to protect its interests, and the relief requested would work an unjust hardship on the defendants and innocent third parties. *Id.* at 685-86 (citing *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007)).

Courts, including the Supreme Court, have stressed that the right to assert a claim and even the establishment of a rule of law that applies retroactively do not necessarily entitle a plaintiff to retroactive relief. *See, e.g.*, *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31; AFL-CIO*, 942 F.3d 352, 361–62 (7th Cir. 2019) (citing *Davis v. United States*, 564 U.S. 229, 243 (2011); *Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 189 (1990) (plurality opinion); *Powell v. Nevada*, 511 U.S. 79, 84 (1994); *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 544 (1991)). Of particular relevance, this Court concluded in *Committee Overseeing Action for Lumber International Trade Investigations or Negotiations v. United States*, 535 F. Supp. 3d 1336, 1358 (Ct. Int'l Trade 2021), *rev'd on other grounds*, 66 F.4th 968 (Fed. Cir. 2023) ("*COALITION*"), that granting relief in the form of the retroactive application of countervailing duties would be inappropriate in a case very similar to the one at bar. The Government's brief discusses the *COALITION* case at length, so Defendant-Intervenors will not repeat all of the Government's

arguments with respect to that case.  Instead, we elaborate on certain aspects of the *COALITION* decision and its relevance to this case.

First, the retroactive imposition of AD/CVD duties in this litigation would violate Congressional intent.  Like this case, the *COALITION* case was brought under Section 1581(i) jurisdiction.  535 F. Supp. 3d at 1347.  Nevertheless, the Court found it important that the relief requested involved a retroactive change in how AD/CVD duties were applied—again, just like this case—and Congress had expressed an "unambiguous" intent that relief in trade remedy cases normally should be prospective via 19 U.S.C. § 1516a(c), which applies to cases arising under Section 1581(c).  *Id.* at 1360.  Imposing AD/CVD duties retroactively in this case would violate Congress's expectations as to how the AD/CVD laws would be applied.  As the Court recognized in *COALITION*, and as explained in the Government's response brief and further here, because of the intricate system for determining the appropriate amount of AD/CVD liability, it is generally not possible to "unscramble the egg" for past entries or to restore the status quo ante.  *Id.* at 1361.

We also note that in the other statutory provision that specifically authorizes a domestic producer to challenge the customs treatment of an importer's entries, 19 U.S.C. § 1516, a determination in favor of the domestic producer is applied only prospectively.  19 U.S.C. § 1516(b) (providing that successful petitions by domestic producer will only apply to "merchandise entered for consumption or withdrawn from warehouse for consumption more than thirty days after the date such notice {of the determination} to the petitioner is published in the weekly Customs Bulletin"); *id.* § 1516(f) (providing that favorable court opinion in favor of the petitioning domestic producer will be applied only to merchandise "entered for consumption or withdrawn from warehouse for consumption after the date of publication in the Federal Register by the Secretary or the administering authority of a notice of the court decision").  This provision further

demonstrates that Congress generally did not intend for importers to face the possibility of retroactive liability based on a court challenge brought by domestic producers.

Second, Defendant-Intervenors and other parties that exported or imported merchandise benefitting from the Final Rule have never been provided an opportunity to either demonstrate that their merchandise is not dumped or subsidized or to establish that a rate lower than the China-wide entity AD rate or the all-others CVD rate should apply.   Commerce emphasized in the circumvention inquiries that it was not determining whether the merchandise at issue was in fact dumped or subsidized or the amount of AD/CVD duties that should be owed.  *See, e.g.*, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Aug. 23, 2023), and accompanying Issues and Decision Memorandum for Vietnam at 63, 93-94, 122-23 (Aug. 17, 2023).  Rather, the proper vehicle for interested parties to establish individual rates was through administrative reviews.

But, by the time this Court issues a decision on the merits in this proceeding, the opportunity to request administrative reviews for all entries covered by the Final Rule will have passed.  The Final Rule applied to merchandise entered between April 1, 2022, and June 6, 2024. The opportunity to request an AD administrative review for entries made between December 1, 2021, and November 30, 2022, passed on January 3, 2023.  *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review and Join Annual Inquiry Service List*, 87 Fed. Reg. 73,752 (Dec. 1, 2022) (setting deadline of December 31, 2022, or next business day, as deadline for requesting administrative review).  The opportunity to request an AD administrative review for entries made between December 1, 2022,

34

and November 30, 2023, passed on January 2, 2024. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review and Join Annual Inquiry Service List*, 88 Fed. Reg. 83,917 (Dec. 1, 2023) (setting deadline of December 31, 2023, or next business day, as deadline for requesting administrative review).  And the opportunity to request an AD administrative review for entries made between December 1, 2023, and November 30, 2024, will expire on December 31, 2024, before the deadline to file the joint appendix and motions for oral argument in this case.[13]  *See* 19 C.F.R. § 351.213(b), (e) (requiring review requests to be filed by the end of the anniversary month of the order, which is December for the underlying AD/CVD orders).  The opportunity to request a countervailing duty administrative review for entries through the end of 2023 will expire on December 31, 2024 as well.  *See id.*

Plaintiffs assert that Defendant-Intervenors made a "strategic choice" not to request administrative reviews, Pls. Br. 44, but that position is either entirely disingenuous or reflects an ignorance of how Commerce conducts administrative reviews.  Commerce has often explained, including in Federal Register notices related to the underlying AD/CVD orders, that there must be a reviewable entry suspended under the relevant order (i.e., a Type 3 entry) for Commerce to conduct a review of a particular company.  *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2021-2022*, 89 Fed. Reg. 457, 458 (Jan.

---

[13] While this review request period remains open, for the reasons explained in the paragraph that follows, entries that are targeted by the present litigation cannot form the basis of requests for administrative reviews while they are unsuspended.

4, 2024); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Rescission in Part; 2021*, 88 Fed. Reg. 88,575, 88,576 (Dec. 22, 2023). Similarly, Commerce's separate rate application instructions provide that a company must have a suspended entry of subject merchandise during the period of review to obtain a separate rate. People's Republic of China Separate Rate Application at 2, 5, 11-12, available https://enforcement.trade.gov/nme/sep-rate-files/app-20190221/prc-sr-app-022119.pdf (last visited Nov. 18, 2024). Commerce did <u>not</u> suspend liquidation for the entries covered by the Final Rule. Because the entries were not suspended under the AD/CVD orders, interested parties could not obtain an administrative review or request a separate rate in those reviews with respect to entries covered by the Final Rule.

As the Government points out, given that the deadline to request administrative reviews has passed or will have passed for the entries benefiting from the Final Rule, requiring the imposition of AD/CVD duties on those past entries would create a tremendous burden on the Government in identifying which entries were actually circumventing the AD/CVD orders and what rate should be applied. Gov. Resp. 39, 41-43. But importers would be even more prejudiced. Relying on a regulation that had been issued following notice and comment, they imported merchandise covered by the Final Rule with the expectation that their merchandise would not be subject to AD/CVD duties, but they would instead face significant liability after the fact if Plaintiffs have their way. Not only that, importers would be deprived of an opportunity to show that the merchandise they imported was not actually dumped or subsidized or that a lower AD or CVD rate was warranted. "{A}n importer may be entitled to procedural due process regarding the resolution of disputed facts involved in a case of foreign commerce when the importer faces a deprivation of

'life, liberty, or property' by the Federal Government." *NEC Corp. v. United States*, 151 F.3d 1361, 1370 (Fed. Cir. 1998). Procedural due process includes a right to be heard. *Id.* Plaintiffs ask that the Government be ordered to collect money from importers for past entries. This would constitute a deprivation of the importers' property (i.e., money) by the Federal Government, triggering the procedural due process requirement. Plaintiffs' attempt to force the Government to impose duty liability on importers for past entries not only would contravene the normal application of the AD/CVD laws and cause unjust hardship for innocent parties, *Petrella*, 572 U.S. at 686, but it would violate importers' due process rights as well.

Third, Plaintiffs have no economic stake in the prior entries. As the Government observes, Plaintiffs are not entitled to any of the duties that might be collected. Gov. Resp. 38. Instead of filing suit and seeking to enjoin the Final Rule shortly after it was issued, when Plaintiffs were potentially competing with imports entered duty-free under the Final Rule, Plaintiffs waited 15 months after the rule was issued to file suit, and they have never sought to enjoin the ongoing application of the Final Rule. The delay in bringing suit and the lack of any effort to pause the application of the Final Rule undercut any claim of economic harm that Plaintiffs may belatedly seek to develop. Meanwhile, opportunities to request administrative reviews have come and gone for importers and other parties with an interest in the entries benefitting from the Final Rule.

At this point, when the Final Rule has already expired, imposing retroactive duties on importers would greatly harm the importers who relied on the Rule, create a significant administrative burden for the Government, and provide no demonstrated benefit to Plaintiffs. This gross imbalance in the equities strongly weighs against granting the relief that Plaintiffs seek, as the Court similarly found when addressing an analogous situation in *COALITION*. The Court accordingly should deny Plaintiffs' request for any retroactive relief.

**VIII.**   **This Court Lacks Authority to Order Reliquidation of Entries**

Even if this Court were to determine that retroactive relief were appropriate, despite Congressional intent and the equities weighing strongly against such relief, this Court does not have authority, under these circumstances, to order reliquidation of entries that have already liquidated.  The Federal Circuit has found in certain cases brought under 28 U.S.C. § 1581(i) that the finality of liquidation is not a bar to court-ordered liquidation, but this Court cannot order reliquidation under the facts here.  Such an order would run afoul of the purpose of the statute, which affords importers certainty by liquidating entries within a specified time period.  *See* 19 U.S.C. §§ 1504, 1514.

Section 1514 makes liquidation final and conclusive on all parties including the United States absent a valid and timely-filed protest.  19 U.S.C. § 1514(a)(5) ("the liquidation or reliquidation of an entry . . . shall be final and conclusive upon all persons (including the United States and any officer thereof) unless a protest is filed in accordance with this section").  The finality of liquidation ensures certainty for importers.  Once liquidation occurs, the duty amounts owed are finalized and only subject to certain time-sensitive enumerated exceptions, *e.g.*, a civil action is brought before the CIT pursuant to 19 U.S.C. § 1516a.  Liquidation thus is ultimately a mechanism to ensure certainty and finality, and to foreclose the possibility that the Government or another party will attempt to re-open entries and create importer liability years after those entries were made.

The deemed liquidation provision set forth in 19 U.S.C. § 1504 similarly operates to create certainty and finality.  Deemed liquidation of entries establishes a clear timeframe for Customs and Border Protection ("CBP") to finalize the duty calculation on imported goods, ensuring certainty for importers and preventing unnecessary delays by automatically liquidating entries if not acted upon within a specified period.  In enacting that provision, Congress decried the then-

prevailing prospect of unpredictable liability, explaining that "{u}nder the present law, an importer may learn years after goods have been imported and sold that additional duties are due, or may have deposited more money for estimated duties than are actually due but be unable to recover the excess for years as he awaits liquidation." *Koyo Corp. of USA v. United States*, 497 F.3d 1231, 1239-40 (Fed. Cir. 2007) (quoting S. Rep. No. 95–778, 95th Cong., 2nd Sess. 31-32 (1978), U.S. Code Cong. & Admin. News 1978, pp. 2211, 2243).  Indeed, "Congress enacted the deemed liquidation statute to prevent Customs from belatedly assessing additional duties and from indefinitely retaining duties deposited in excess."   *Id*. at 1240; *see also Fraserview Remanufacturing Inc. v. United States*, Ct. No. 22-00244, Slip. Op. 24-8, at 13 (Jan. 25, 2024) (citing 19 U.S.C. § 1504(d)) ("{T}o provide finality to importers, the statute requires that Customs liquidate entries within six months after Customs receives notice of the removal of the suspension of liquidation.  If Customs fails to do so, the merchandise is liquidated by operation of law.") (citations omitted).

In short, the finality of liquidation was incorporated into the statute to protect importers from precisely the sort of belated and unpredictable liability that Plaintiffs seek to impose here. Importantly, Plaintiffs are not importers of solar cells or modules seeking redress in the form of reliquidation that would yield duty *refunds*.  Rather, Plaintiffs produce and design solar cells or modules domestically and argue here that the Government incorrectly suspended certain duties on products imported by Defendant-Intervenors and other non-parties, effectively seeking to increase importer liability, including on entries that have long since liquidated.  Further, Plaintiffs brought this action well over a year after the Final Rule was issued.  In this scenario, this Court cannot reliquidate Defendant-Intervenor's entries subject to this case.  Such a finding would be at odds

with Congressional intent to ensure that importers can be certain of the amount that is due upon liquidation.

A finding that this Court does not have authority to disturb the finality of liquidation and re-open entries that have already been liquidated is consistent with case law as well. Although the Federal Circuit has held that this Court may use its equitable powers to compel reliquidation, it has done so only in the context of allowing importers to obtain *refunds* of duty overpayments. The Federal Circuit has never held that it may use its equitable powers to disturb the finality of liquidation to an importer's detriment, nor could it, since doing so would squarely contravene the purpose underlying the liquidation statute.

In *Shinyei Corp. of America v. United States*, 355 F.3d 1297, 1305, 1312 (Fed. Cir. 2004), the Federal Circuit recognized that the CIT's equitable powers allowed it to order reliquidation in a Section 1581(i) action brought by an importer seeking a "refund of … overpaid duties." *Id.* at 1306. *Shinyei* involved an APA challenge to Commerce's liquidation instructions that failed to reflect the amended final results of an administrative review in violation of 19 U.S.C. § 1675(a)(2)(C). The CIT found that it no longer had jurisdiction once the entries in question were liquidated because 19 U.S.C. § 1514 prohibited reliquidation. *Shinyei*, 355 F.3d at 1309. The Federal Circuit disagreed, reasoning that a challenge to Commerce's instructions on the ground that they do not correctly implement the published, amended administrative review results is not an action defined under Section 1516a but instead an APA action pursuant to Section 1581(i). *Shinyei*, 355 F.3d at 1309 (citing *Consolidated Bearings Co. v. United States*, 348 F.3d 997, 1002 (Fed.Cir.2003)). The Federal Circuit further explained that Section 1516a cannot be "fairly constructed to prohibit reliquidation in all cases, <u>particularly when the alleged error is with</u> <u>Commerce instructions as in violation of section 1675(a)(2)(C), not 'decisions of the Customs</u>

Service' as to liquidation." *Id.* at 1311 (emphasis added).    The Federal Circuit's own language establishes that it was concerned with scenarios in which importers who had overpaid duties would be left without recourse other than through the deployment of an equitable remedy.  That is fundamentally different than Plaintiffs' proposition here that the Court should be able to use its equitable authority to create <u>liability</u> for importers years after the fact, thus frustrating the very purpose of the liquidation statute.  The Federal Circuit has never made any such suggestion, and this Court should decline to do so.

In that regard, in several cases following *Shinyei*, the Federal Circuit has clarified that its holding was limited to the narrow facts at issue presented there.  In *Ugine v. United States*, 452 F.3d 1289 (Fed. Cir. 2006), the Federal Circuit found that "{i}t is unclear . . . whether the rule of *Shinyei* would apply to a case such as this one" because unlike the plaintiff in *Shinyei*, Ugine did not allege that Commerce's instructions were a ministerial violation 19 U.S.C. § 1675(a)(2)(C).  *Id.* at 1296.  This trend continued in a number of cases following *Shinyei*.  *American Signature, Inc. v. U.S.*, 598 F.3d 816 (Fed. Cir. 2010) (finding that *Shinyei* relief was in doubt when an importer challenged Commerce's attempt to correct an error in the final results of an administrative review); *Sumecht NA, Inc. v. United States*, 923 F.3d 1340 (Fed. Cir. 2019).  In so doing, "the Court of Appeals has consistently refrained from relying on that language in finding the CIT has authority to order reliquidation or refunds in 1581(i) cases."  *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1365-66 (Ct Int'l Trade 2021).

In sum, the Federal Circuit has been hesitant to apply the holding of *Shinyei* even in other cases challenging Commerce's instructions to CBP in the wake of an AD/CVD proceeding.  *Ugine*, 452 F.3d at 1296 (Fed. Cir. 2006); *see In re Section 301 Cases*, 524 F. Supp. 3d at 1365 (recognizing that, "{b}y describing *Shinyei* in such narrow terms—suggesting that a different type

of challenge to Commerce's liquidation instructions might lead to a different result and failing to even mention the CIT's statutory authority to fashion relief—*Ugine* casts doubt as to the availability of reliquidation.").  Here, there were no erroneous instructions to CBP at issue, and much more importantly it is not the importer of the entries in question that is seeking redress.  The facts are thus fundamentally different from those at issue in *Shinyei*—in that case, the practical effect of using the Court's equitable authority to order reliquidation inured to the benefit of the wronged importer.  As such, the purpose of the liquidation statute, which is designed to provide importers with a temporal limit on the potential for additional liability, was not frustrated.  Here, precisely the opposite would be true—an order to reliquidate liquidated entries would create new, unforeseen liability of precisely the sort that the liquidation statute is designed to foreclose.  Such a result finds no purchase in either the statute or the case law.

## CONCLUSION

For these reasons, Plaintiffs' motion for judgment on the agency record should be denied and judgment should be entered in favor of Defendants and Defendant-Intervenors.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Daniel M. Witkowski
Julia K. Eppard
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4046
mnicely@akingump.com

*Counsel to NextEra Energy, Inc. and Solar Energy Industries Association*

/s/ Jonathan T. Stoel
Jonathan T. Stoel
Michael G. Jacobson
Nicholas R. Sparks
Lindsay K. Brown
**HOGAN LOVELLS US LLP**
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-6634
jonathan.stoel@hoganlovells.com

*Counsel to Canadian Solar (USA) Inc. and Canadian Solar International Limited*

/s/ Craig A. Lewis
Craig A. Lewis
Nicholas W. Laneville
Gregory M.A. Hawkins
**HOGAN LOVELLS US LLP**
Columbia Square
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
(202) 637-8613
craig.lewis@hoganlovells.com

*Counsel to BYD (H.K.) Co., Ltd. and BYD America LLC*

/s/ Jonathan M. Freed
Jonathan M. Freed
Kenneth N. Hammer
MacKensie R. Sugama
**TRADE PACIFIC PLLC**
700 Pennsylvania Ave, SE
Washington, DC 20003
(202) 223-3760
jfreed@tradepacificlaw.com

*Counsel for Trina Solar (U.S.), Inc., Trina Solar Science & Technology (Thailand) Ltd., Trina Solar Energy Development Company Limited, and Trina Solar (Vietnam) Science & Technology Co., Ltd.*

/s/ John B. Brew
John B. Brew
Robert L. LaFrankie
Amanda S. Berman
Alexander H. Schaefer
Weronika Bukowski
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2720
jbrew@crowell.com

*Counsel to Invenergy Renewables LLC and Invenergy Solar Equipment Management LLC*

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Kristin H. Mowry
Bryan P. Cenko
Clemence D. Kim
Evan P. Drake
**MOWRY & GRIMSON, PLLC**
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
(202) 688-3610
trade@mowrygrimson.com

*Counsel to JA Solar USA Inc., JA Solar Vietnam Company Limited, JA Solar Malaysia Sdn. Bhd., JA Solar International Limited and American Clean Power Association*

/s/ David M. Morrell
David M. Morrell
**JONES DAY**
51 Louisiana Ave. NW
Washington, DC 20001
(202) 879-3652
dmorrell@jonesday.com

*Counsel to Boviet Solar Technology Co., Ltd.
and Boviet Solar USA., Ltd.*

/s/ Ned H. Marshak
Ned H. Marshak*
Jordan C. Kahn
**GRUNFELD DESIDERIO LEBOWITZ
SILVERMAN & KLESTADT LLP**
*599 Lexington Avenue FL 36
New York, NY 10022-7648
(212) 557-4000
-and-
1201 New York Avenue NW Ste 650
Washington, DC 20005-3917
(202) 783-6881
nmarshak@gdlsk.com

*Counsel to Jinko Solar (U.S.) Industries Inc.,
JinkoSolar (U.S.) Inc., Jinko Solar
Technology Sdn. Bhd., Jinko Solar (Malaysia)
Sdn. Bhd., JinkoSolar (Vietnam) Co., Ltd.,
JinkoSolar Holding Co., Ltd., Jinkosolar
Middle East DMCC, JINKOSOLAR
INVESTMENT LIMITED (f/k/a Jinkosolar
Technology Limited), and Jinkosolar
(Vietnam) Industries Company Limited*

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
J. Kevin Horgan
**DEKIEFFER & HORGAN, PLLC**
1156 Fifteenth Street, N.W., Suite 1101
Washington, D.C. 20005
(202) 783-6900
gmenegaz@dhlaw.com

*Counsel to Boviet Solar Technology Co., Ltd.
and Boviet Solar USA., Ltd. and Counsel to
Risen Solar Technology Sdn. Bhd.*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains 13,606 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

/s/ Matthew R. Nicely

**Attachment 1**

*FACT SHEET: President Biden Takes Bold Executive Action to Spur Domestic Clean Energy Manufacturing* (June 6, 2022)

*Available at* https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/06/fact-sheet-president-biden-takes-bold-executive-action-to-spur-domestic-clean-energy-manufacturing/

JUNE 06, 2022

# FACT SHEET: President Biden Takes Bold Executive Action to Spur Domestic Clean Energy Manufacturing

*Historic Actions Include Authorizing Defense Production Act to Lower Energy Costs, Strengthen Power Grid, and Create Good-Paying Jobs*

Today's clean energy technologies are a critical part of the arsenal we must harness to lower energy costs for families, reduce risks to our power grid, and tackle the urgent crisis of a changing climate. From day one, President Biden has mobilized investment in these critical technologies. Thanks to his clean energy and climate agenda, last year marked the largest deployment of solar, wind, and batteries in United States history, and our nation is now a magnet for investment in clean energy manufacturing.

Since President Biden took office, the private sector has committed over $100 billion in new private capital to make electric vehicles and batteries in the United States. We have made historic investments in clean hydrogen, nuclear, and other cutting-edge technologies. And companies are investing billions more to grow a new domestic offshore wind industry.

We are also now on track to triple domestic solar manufacturing capacity by 2024. The expansions to domestic solar manufacturing capacity announced since President Biden took office will grow the current base capacity of 7.5 gigawatts by an additional 15 gigawatts. This would total 22.5 gigawatts by the end of his first term – enough to enable more than 3.3 million homes to switch to clean solar energy each year.

While President Biden continues pushing Congress to pass clean energy investments and tax cuts, he is taking bold action to rapidly build on this progress and create a bridge to this American-made clean energy future. Today, President Biden is taking action to:

- Authorize use of the Defense Production Act (DPA) to accelerate domestic production of clean energy technologies, including solar panel parts;

- Put the full power of federal procurement to work spurring additional domestic solar manufacturing capacity by directing the development of master supply agreements, including "super preference" status; and

- Create a 24-month bridge as domestic manufacturing rapidly scales up to ensure the reliable supply of components that U.S. solar deployers need to construct clean energy projects and an electric grid for the 21st century, while reinforcing the integrity of our trade laws and processes.

Together, these actions will spur domestic manufacturing, construction projects, and good-paying jobs – all while cutting energy costs for families, strengthening our grid, and tackling climate change and environmental injustice. With a stronger clean energy arsenal, the United States can be an even stronger partner to our allies, especially in the face of Putin's war in Ukraine.

The stakes could not be higher. That is why President Biden also continues to urge Congress to quickly pass tax cuts and additional investments that advance U.S. clean energy manufacturing and deployment. Failing to take these actions would deny consumers access to cost-cutting clean energy options, add risks to our power grid, and stall domestic clean energy construction projects that are critical to tackling the climate crisis. At the same time, President Biden will keep using his executive authority to take bold action to build an American-made clean energy future.

## <u>INVOKING THE DEFENSE PRODUCTION ACT FOR CLEAN ENERGY</u>

Today, President Biden is authorizing the use of the Defense Production Act (DPA) to accelerate domestic production of clean energy technologies – unlocking new powers to meet this moment. Specifically, the President is authorizing the Department of Energy to use the DPA to rapidly expand American manufacturing of five critical clean energy technologies:

- Solar panel parts like photovoltaic modules and module components;

- Building insulation;

- Heat pumps, which heat and cool buildings super efficiently;

- Equipment for making and using clean electricity-generated fuels, including electrolyzers, fuel cells, and related platinum group metals; and

- Critical power grid infrastructure like transformers.

In deploying the DPA, the Biden-Harris Administration will strongly encourage the use of strong labor standards, including project labor agreements and community benefits agreements that offer wages at or above the prevailing rate and include local hire provisions. The Administration also will strongly encourage projects with environmental justice outcomes that empower the clean energy transition in low-income communities historically overburdened by legacy pollution.

Following this announcement, the White House and the Department of Energy will convene relevant industry, labor, environmental justice, and other key stakeholders as we maximize the impact of the DPA tools made available by President Biden's actions and strengthen domestic clean energy manufacturing.

## BOOSTING MADE-IN-AMERICA CLEAN ENERGY WITH FEDERAL PROCUREMENT

President Biden is also putting the full power of federal procurement to work spurring additional domestic solar manufacturing capacity. Today, the President directed the development of two innovative tools to accelerate Made-in-America clean energy:

- Master Supply Agreements for domestically manufactured solar systems to increase the speed and efficiency with which domestic clean electricity providers can sell their products to the U.S. Government; and

- So-called "Super Preferences" to apply domestic content standards for federal procurement of solar systems, including domestically manufactured solar photovoltaic components, consistent with the Buy American Act.

These federal procurement measures can stimulate demand for up to a gigawatt of domestically produced solar modules in the near term, and up to

10 gigawatts over the next decade from U.S. government demand alone. To further increase the impact of these actions, the Administration will also partner with state and local governments and municipal utilities in these innovative arrangements – increasing the potential market impact over the next decade to as much as over 100 gigawatts. These procurement actions will provide a significant demand anchor for a revitalized domestic solar manufacturing industry.

**SUPPORT FOR U.S. GRID-STRENGTHENING, CLEAN ENERGY CONSTRUCTION PROJECTS**

Because of private investor confidence in President Biden's leadership and our national commitment to a clean energy future, the United States is now on track to triple its solar manufacturing capacity by 2024. The expansions to domestic solar manufacturing capacity announced since the President took office will grow the current 7.5 gigawatts of capacity by an additional 15 gigawatts of capacity, for a total of 22.5 gigawatts by the end of his first term – enough to enable more than 3.3 million homes to switch to clean solar energy every year. To rapidly build on this progress and create a bridge to this American-made clean energy future, we need to boost short-term solar panel supply to support construction projects in the United States right now. This is because grid operators around the country are relying on planned solar projects to come online to ensure there is sufficient power to meet demand, and to ensure we can continue to deploy solar at the rates needed to keep us on track to meet the President's climate goals.

Today, President Biden is using his powers to create a 24-month bridge for certain solar imports while reinforcing the integrity of our trade laws and processes. Specifically, the President is:

- Temporarily facilitating U.S. solar deployers' ability to source solar modules and cells from Cambodia, Malaysia, Thailand, and Vietnam by providing that those components can be imported free of certain duties for 24 months in order to ensure the U.S. has access to a sufficient supply of solar modules to meet electricity generation needs while domestic manufacturing scales up; and

- Reinforcing his commitment to safeguarding the integrity and independence of all ongoing trade investigations by career officials at the

Department of Commerce and recognizing the vital role these processes play in strengthening our economy.

## ADDITIONAL STEPS TO CUT COSTS, SUPPORT GOOD-PAYING JOBS, AND ADVANCE ENVIRONMENTAL JUSTICE

Today's actions build on this Administration's existing initiatives to grow domestic clean energy innovation and manufacturing and to lower energy costs for Americans, including:

- **Permitting More Clean Energy on Public Lands.** As part of the Biden-Harris Permitting Action Plan, a new five-agency collaboration is expediting reviews of clean energy projects on public lands through the Department of the Interior, helping us race ahead toward permitting at least 25 gigawatts by 2025 – enough to power around five million homes. These actions have already increased clean energy permitting activities by 35 percent, including major solar project approvals and leases. We have also launched five new Renewable Energy Coordination Offices and reduced rents and fees by more than 50 percent for solar and wind projects on public lands.

- **Boosting Community-Based Clean Energy in Cities and Rural Areas.** The Biden-Harris Administration is helping 17 local communities remove red tape with the SolarAPP+ online tool to enable same-day approvals for residential solar installation permits, and an additional 400 interested communities are in the pipeline. The National Climate Task Force launched new initiatives on increasing deployment of Distributed Energy Resources, including rooftop solar, with a focus on bringing the benefits of these projects to underserved communities. The United States Department of Agriculture provided the largest-ever investment in rural renewable energy last year. In addition, the Department of Energy and the Department of Health and Human Services are partnering to develop and pilot a digital platform that will connect customers who are eligible for the Low Income Home Energy Assistance Program with community solar subscriptions, to further reduce customer energy costs. Likewise, the U.S. Department of Housing and Urban Development is working with municipalities to enable residents of affordable housing to directly benefit from low-cost community solar power without seeing a rent increase or adjustment to their utility allowance.

- **Supporting a Diverse Solar Workforce with Good-Paying Jobs, including pathways to stable careers with the free and fair choice to join a union.** Solar industry jobs consistently rank among the top fastest-growing in the nation, and many require only a high school education or GED. The Economic Development Administration recently awarded funding to support solar employment training in tribal and coal-impacted communities. In addition, the Department of Energy has issued a Request for Information and hosted six workshops to determine common goals and needs from stakeholders, including industry, unions, and training organizations. DOE will continue to explore these issues, including by providing funding, new collaborations with industry, other federal agencies, and state-based job boards to develop equitable worker-centric training and education programs, work-based learning opportunities, and support services such as career counseling, mentorship, and job readiness programs.

- **Developing Clean Energy Domestic Manufacturing for Export and Building Capacity in Allied Nations.** The Export-Import Bank of the United States (EXIM) Make More in America Initiative, approved by the EXIM board in April, will prioritize investments to expand clean energy manufacturing. The U.S. International Development Finance Corporation supports building resilient clean energy manufacturing supply chains in allied nations around the world, reducing global dependence on China.

- **Investing in Clean Energy for Resilience in Puerto Rico:** The Biden-Harris Administration joined forces with the Commonwealth of Puerto Rico to advance dozens of solar energy projects that will enable Puerto Rico to meet its target of 100% renewable electricity, while improving power sector resilience and increasing access to more affordable energy and cleaner air.

###

**Attachment 2**

*Department of Commerce Statement on President Biden's Proclamation on Solar Cells and Modules* (June 6, 2022)


*Available at* https://www.commerce.gov/news/press-releases/2022/06/department-commerce-statement-president-bidens-proclamation-solar-cells

An official website of the United States government  Here's how you know

**U.S. Department of Commerce**

MENU

Home »  News »  Press Releases

All news

Press releases

Blog

Speeches

Fact sheets

Op-eds

Photos and videos

Livestreams

Archives

Media contacts

**Was this page helpful?**

 👍 **Helpful**

 👎 **Not helpful**

**Was this page helpful?**

👍 **Helpful**

👎 **Not helpful**

# Department of Commerce Statement on President Biden's Proclamation on Solar Cells and Modules

   

📄 Export and investment promotion

Today, Secretary of Commerce Gina Raimondo released the below statement following President Biden's emergency declaration regarding the temporary duty-free importation of solar cells and modules from Southeast Asia to avoid disruptions to the electric power system:

FOR IMMEDIATE RELEASE

Monday, June 6, 2022

Office of Public Affairs

publicaffairs@doc.gov

"The Department of Commerce remains committed to protecting our economic and national security against unprecedented challenges. As

droughts cripple the West and Russia's unwarranted invasion of Ukraine have placed increasing strains on America's energy market, preventing disruptions to the electric power system, diversifying our energy sources and responding to the climate crisis have never been more urgent, and solar energy is an essential component of meeting those needs.

"As we invest in expanding domestic solar manufacturing and strengthening supply chains to protect our long-term energy security, imported solar panels remain an important component to addressing the immediate demands of bringing additional energy sources online and addressing the energy needs of the American people.

"I remain committed to upholding our trade laws and ensuring American workers have a chance to compete on a level playing field. The President's emergency declaration ensures America's families have access to reliable and clean electricity while also ensuring we have the ability to hold our trading partners accountable to their commitments."

Assistant Secretary of Commerce for Enforcement and Compliance Lisa Wang also released a statement:

"The President has declared an emergency with respect to the inadequate supply of solar cells and modules. Pursuant to the President's Proclamation, the Department of Commerce will issue regulations to temporarily permit for up to 24 months duty-free access to solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam. We will continue to rigorously enforce U.S. trade laws, hold our trading partners accountable, and defend U.S. industries and workers from unfair imports.

"The Commerce Department's anti-circumvention proceeding continues uninterrupted, and whatever conclusion Commerce reaches when the investigation concludes will apply once this short-term emergency period is over. In accordance with the President's declaration, no solar cells or modules imported from Cambodia, Malaysia, Thailand, and Vietnam will be subject to new antidumping or countervailing duties during the period of the emergency. Existing

duties on Chinese and Taiwanese imports of solar cells and modules remain in effect."

BUREAUS AND OFFICES

Bureau of Industry and Security    International Trade Administration

LEADERSHIP

Gina M. Raimondo

TAGS

 Export Controls

**Explore**

Issues

News

Data and reports

Work with us

**Get in touch**

Contact us

Open government

FOIA

**About us**

Our mission

Strategic plan

Bureaus and offices

Privacy program



1401 Constitution Ave NW
Washington, DC 20230

      



**Attachment 3**

*Statement from President Joe Biden on His Veto of H.J. Res. 39* (May 16, 2023)

*Available at* https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/16/statement-from-president-joe-biden-on-his-veto-of-h-j-res-39/

MAY 16, 2023

# Statement from President Joe Biden on His Veto of H.J. Res. 39

My Investing in America agenda is mobilizing hundreds of billions of dollars in private sector manufacturing and clean energy investments, and creating good-paying jobs. When it comes to solar, since I took office, 51 new and expanded solar equipment manufacturing plants have been announced, and America is now on track to increase domestic solar panel manufacturing capacity eight-fold. The fact is: my plan is working.

I vetoed H.J. Res. 39 because we cannot afford to create new uncertainty for American businesses and workers in the solar industry. We can and must strengthen our energy security by maintaining our focus on expanding U.S. capacity that is ready to come on line as this temporary bridge concludes in June 2024.

###