**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| AUXIN SOLAR INC. AND CONCEPT CLEAN ENERGY, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES; UNITED STATES DEPARTMENT OF COMMERCE; GINA M. RAIMONDO, SECRETARY OF COMMERCE; UNITED STATES CUSTOMS AND BORDER PROTECTION; AND TROY A. MILLER, UNITED STATES CUSTOMS AND BORDER PROTECTION ACTING COMMISSIONER, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| AMERICAN CLEAN POWER ASSOCIATION; CANADIAN SOLAR (USA) INC.; CANADIAN SOLAR INTERNATIONAL LIMITED; SOLAR ENERGY INDUSTRIES ASSOCIATION; JA SOLAR USA, INC.; JA SOLAR VIETNAM COMPANY LIMITED; JA SOLAR MALAYSIA SDN. BHD.; JA SOLAR INTERNATIONAL LIMITED; NEXTERA ENERGY, INC.; BYD (H.K.) CO., LTD.; BYD AMERICA LLC; INVENERGY RENEWABLES LLC; INVENERGY SOLAR EQUIPMENT MANAGEMENT LLC; TRINA SOLAR (U.S.) INC. TRINA SOLAR (VIETNAM) SCIENCE AND TECHNOLOGY CO., LTD.; TRINA SOLAR ENERGY DEVELOPMENT COMPANY LIMITED; TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.; AND RISEN SOLAR TECHNOLOGY SDN. BHD., | ) |
| | ) |
| Defendant-Intervenors. | ) |
| | ) |

Court. No. 23-00274

**NONCONFIDENTIAL VERSION**

Proprietary Information Removed from Brackets on pages 2, 23, 25, 28.

**REPLY IN SUPPORT OF PLAINTIFFS' RULE 56.1 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Thomas M. Beline
Roop K. Bhatti
James E. Ransdell
Chase J. Dunn
Sydney C. Reed

**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania Ave. N.W.
Suite 300
Washington, D.C. 20037

Phone: (202) 567-2316
Fax: (202) 567-2301

*Counsel for Auxin Solar Inc. and
Concept Clean Energy, Inc.*

December 19, 2024

NONCONFIDENTIAL VERSION

## **Table of Contents**

Page

I.   Plaintiffs' Injury and Requested Relief Easily Satisfy Constitutional Requirements ............. 1

II.   Plaintiffs and Defendants Agree on the Relevant Standard of Review ................................. 2

III.  Section 318 Does Not Delegate Authority to Define Relevant Terms ................................. 3

IV.  Defendants Identify No Support for CSPV Cells or Modules Falling Within the Statute's "Best Meaning" ........................................................................................................... 5

      A.   A Reading that Renders Most of the Statutory Clause Redundant and Ignores a List's Characteristics Is Not the "Best Reading" ........................................... 5

           1.   Elementary Interpretive Canons Yield a Clear Result ............................................ 5

           2.   The Court Need Not Parse Past Practice or Legislative History, But these Also Support Plaintiffs' Interpretation .................................................. 9

      B.   Defendants' Ancillary Interpretive Arguments Do Not Withstand Scrutiny ............... 11

V.   Were CSPV Cells and Modules Covered by Section 318(a), Defendants' Framework Nevertheless Violated Minimum Statutory Requirements ................................................. 13

      A.   Section 318 Permits Duty-Free "Importation" During an Emergency; All Authorities Support Plaintiffs' Understanding of That Term ....................................... 13

      B.   Commerce's Certification Program Permits Importation Based on Legally Inadequate Representations ........................................................................................... 16

VI.  Plaintiffs Have Demonstrated the Appropriateness of Injunctive Relief ............................ 19

      A.   Plaintiffs Previously Briefed the Permanent Injunction Factors; Waiver Is Inapplicable ..................................................................................................................... 20

      B.   The Three Remaining Permanent Injunction Factors Favor Granting Plaintiffs' Requested Injunction ................................................................................. 22

           1.   Plaintiffs Readily Demonstrate Irreparable Harm ................................................. 22

           2.   Public Interest Favors Injunctive Relief ................................................................. 25

           3.   Balance of Harms Is Greatest for Plaintiffs ........................................................... 28

      C.   No Exception to Retroactivity Applies Here ................................................................ 29

VII. Intervenors' Remaining Arguments ...................................................................................... 30

**NONCONFIDENTIAL VERSION**

A.    Intervenors' Arguments Exceed the Bounds of Piggyback Standing ........................... 30

B.    Plaintiffs' Action Does Not Challenge the Presidential Proclamation ........................ 30

C.    Commerce's Rulemaking Authority Under 19 U.S.C. § 1677j Cannot Salvage the *Solar Duty Holiday* ............................................................................................. 33

D.    The Court's Remedial Power Encompasses the Relief Sought ................................... 34

VIII. Conclusion ............................................................................................................ 35

NONCONFIDENTIAL VERSION

## Table of Authorities

Page(s)

Statutes

5 U.S.C. § 702 ....................................................................................................35

7 U.S.C. § 1854 ............................................................................................. 11-12

19 U.S.C. § 1318(a) ................................................................................30, 31, 35

19 U.S.C. § 1318(a) .......................................................................................*passim*

19 U.S.C. § 1313(c)(1)(D) ...................................................................................14

19 U.S.C. § 1313(j)(2) .........................................................................................14

19 U.S.C. § (p)(2)(E) ...........................................................................................14

19 U.S.C. § 1516a(c) ...........................................................................................29

19 U.S.C. § 1516a(d) .............................................................................................1

19 U.S.C. § 1675(a) .............................................................................................28

19 U.S.C. § 1677(9)(C) ..........................................................................................1

19 U.S.C. § 1677j ..............................................................................................1, 33

28 U.S.C. § 1581(i) .......................................................................................20, 35

29 U.S.C. § 213(a)(15) ...........................................................................................3

42 U.S.C. § 5846(a)(2) ...........................................................................................3

42 U.S.C. § 7412(c)(3) ...........................................................................................4

42 U.S.C. § 7412(n)(1)(A) .....................................................................................4

Regulations

19 C.F.R. § 6.9(d)(3) ...........................................................................................15

19 C.F.R. § 6.6 ....................................................................................................15

19 C.F.R. § 6.8(b) ...............................................................................................15

19 C.F.R. § 14.2(a) .............................................................................................15

**NONCONFIDENTIAL VERSION**

19 C.F.R. § 101.1 ........................................................................................................16

19 C.F.R. § 101.9(b) ...................................................................................................27

19 C.F.R. § 351.226(c)(1) ............................................................................................1

19 C.F.R. § 351.101 .....................................................................................................7

19 C.F.R § 351.226(l) .............................................................................................1, 23

19 C.F.R. § 358.103 ...................................................................................................19

19 C.F.R. § 351.226 ...................................................................................................33

19 C.F.R. § 362.103(a) ...............................................................................................33

<u>Court Decisions</u>

*Adee Honey Farms v. United States*, 107 F.4th 1322 (Fed. Cir. 2024).   ......................10

*Allstate Ins. Co. v. Fougere*, 581 F. Supp. 3d 307 (D. Mass. 2022) ............................21

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239 (Fed. Cir. 1985)............................................................................... 11-12

*Am. Broad. Companies, Inc. v. Aereo, Inc*., 573 U.S. 431 (2014)................................11

*Am. Mail Line v. United States*, 6 Cust. Ct. 90 (Cust. Ct. 1941) ..................................15

*AM/NS Calvert LLC v. United States*, 654 F. Supp. 3d 1324 (Ct. Int'l Trade 2023)....................35

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531(1987)............................................20

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252 (Fed. Cir. 2024) ..................................................................................4

*Auxin Solar, Inc. v. United States*, 698 F. Supp. 3d 1353 (Ct. Int'l Trade 2024) ..................29, 32

*Batterton v. Francis*, 432 U.S. 416 (1977) ....................................................................3

*Bowen v. Georgetown Univ. Hosp*., 488 U.S. 204 (1988) ..............................................5

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) ...................................................2

*Canadian Lumber v. United States*, 517 F.3d 1319 (Fed. Cir. 2008) .............................1

*Celsis In Vitro, Inc. v. CellzDirect, Inc*., 664 F.3d 922 (Fed. Cir. 2012).......................22

**NONCONFIDENTIAL VERSION**

*Chafin v. Chafin*, 133 S. Ct. 1017 (2013) ................................................................. 2

*Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007) ..................... 24

*Cir. City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) .............................................. 6-7

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 535 F. Supp. 3d 1336 (Ct. Int'l Trade 2021) ..................................... 29

*Crutchfield v. U.S. Army Corps of Eng'rs*, 192 F. Supp. 2d 444 (E.D. Va. 2001) ......... 21

*Cunard S.S. Co. v. Mellon*, 262 U.S. 100 (1923) ....................................................... 15

*eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388 (2006) .......................... 19-20, 24-25

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018) ...................................................... 5-8

*FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Cir. 2002) ............................ 33

*Fischer v. United States*, 603 U.S. 480 (2024) ......................................................... 7

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ...................................................... 32

*FTC v. Bunte Brothers, Inc.*, 312 U.S. 349 (1941) ..................................................... 9

*Fuel & Petrochemical Manufacturers v. Env't Prot. Agency*, 3 F.4th 373 (D.C. Cir. 2021) ................................................................................................................. 31

*GE Cap. Com., Inc. v. Wright & Wright, Inc.*, 2009 WL 5173954 (N.D. Tex. Dec. 31, 2009) .............................................................................................................. 21

*Guangdong Wireking Housewares & Hardware Co. v. United States*, 745 F.3d 1194 (Fed. Cir. 2014) ......................................................................................... 26

*Home Products Int'l, Inc. v. United States*, 405 F. Supp. 3d 1368 (Ct. Int'l Trade 2019) ................................................................................................................... 25

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31; AFLCIO*, 942 F.3d 352 (7th Cir. 2019) ............................................................................................. 24

*Jarecki v. G.D. Searle & Co.*, 367 U.S. 303 (1961) ................................................... 6

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ................................................ 33

*Laclede Steel Co. v. United States*, 928 F. Supp. 1182 (Ct. Int'l Trade 1996) ............ 20

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018) .................................... 8

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020) ..................................................................................................30

*Loper Bright Ent. v. Raimondo,* 144 S. Ct. 2244 (2024) ........................ 2-4, 8

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ..........................................1

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) ...............................................................................................35

*Michigan v. E.P.A.,* 576 U.S. 743 (2015) ...............................................4, 17

*Milner v. Dep't of Navy*, 562 U.S. 562 (2011).............................................10

*Motion Sys. Corp. v. Bush*, 437 F.3d 1356 (Fed. Cir. 2006).........................32

*Nat. Res. Def. Council, Inc. v. Ross*, 331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018). .....................28

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................25

*Paroline v. United States*, 572 U.S. 434 (2014).........................................7-8

*Perrin v. United States*, 444 U.S. 37 (1979) ..............................................10

*Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014).....................24

*Psychopathic Recs., Inc. v. Anderson*, 2010 WL 4683470 (E.D. Mich. Nov. 10, 2010) ............................................................................................21

*Ryder v. United States,* 515 U.S. 177 (1995). ........................................ 28-29

*SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod.*, LLC, 580 U.S. 328 (2017)...............................................................................................24

*Seattle Audubon Soc. v. Evans*, 771 F. Supp. 1081 (W.D. Wash. 1991)......21

*Shinyei Corp. of America v. United States*, 355 F.3d 1297 (Fed. Cir. 2004).................... 34-35, 42

*Sierra Forest Legacy v. Sherman*, 646 F.3d 116 (9th Cir. 2011) .................21

*SoftView LLC v. Apple Inc.,* 108 F.4th 1366 (Fed. Cir. 2024).......................4

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ...........................................1

*Sumecht NA, Inc. v. United States*, 923 F.3d 1340 (Fed. Cir. 2019).............23

*Sw. Airlines Co. v. Saxon,* 596 U.S. 450 (2022) ..................................... 10-11

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978)...................................26

**NONCONFIDENTIAL VERSION**

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ........................................................30

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ....................................................................5

*Tung Mung Dev. Co. v. United States*, 354 F.3d 1371 (Fed. Cir. 2004).........................9

*United States v. Am. Home Assur. Co*., 789 F.3d 1313 (Fed. Cir. 2015)............... 10-11

*United States v. City & Cnty. of San Francisco*, 310 U.S. 16 (1940)...........................26

*United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011) ....................................7

*United States v. Stinson*, 729 F. App'x 891 (11th Cir. 2018) ......................................25

*Upton v. Tribilcock*, 91 U.S. 45 (1875).....................................................................26

*W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022)....................................... 5, 12-13

*Wirtgen Am., Inc. v. United States*, 447 F. Supp. 3d 1359 (Ct. Int'l Trade 2020).........................19


Presidential Documents

*Proclamation 10414: Declaration of Emergency and Authorization for
Temporary Extensions of Time and Duty-Free Importation of Solar Cells and
Modules From Southeast Asia,* 87 Fed. Reg. 35,067 (June 9, 2022)..................................... *passim*


Administrative Determinations

Lumber Proclamation, 11 Fed. Reg. 12,695 (Oct. 29, 1946)...........................................9

*Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in
Accord With Presidential Proclamation 10414,* 87 Fed. Reg. 56,868 (Sept. 16,
2022) ("*Solar Duty Holiday*") ...................................................................... *passim*

*Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71
Fed. Reg. 63,230 (Oct. 30, 2006)................................................................................7

*T.D. 48798*, 2 Fed. Reg. 339 (Feb. 11, 1937) ...............................................................18

*T.D. 50449*, 6 Fed. Reg. 4,071 (Aug. 15, 1941) ...........................................................18

*T.D. 50599*, 7 Fed. Reg. 2,776 (Apr. 14, 1942) ...........................................................18

*T.D. 50626*, 7 Fed. Reg. 3,358 (May 6, 1942)..............................................................18

*T.D. 51565*, 11 Fed. Reg. 13,460 (Nov. 14, 1946) .......................................................18

**NONCONFIDENTIAL VERSION**

Other Legislative Materials

Antidumping Act of 1921, Pub. L. 67-10, 42 Stat. 11 ....................................................13

H.J. Res. 39 (2023) .........................................................................................................9

Tariff Act of 1930, Pub. L. 71-361, 46 Stat. 590 .............................................. *passim*

Veterans Emergency Housing Act of 1946, Pub. L. 79-388, 60 Stat. 207 ....................9


Other Administrative Materials

T.D. 47236, 66 Treas. Dec. Int. Rev. 221 (1934) .........................................................18

NONCONFIDENTIAL VERSION

Plaintiffs have standing.  Defendants' statutory arguments lack textual support and find no basis in statutory interpretive tools, case precedent, or legislative history.  Section 318(a) of the Tariff Act of 1930, as amended, provides circumscribed authority to the U.S. Department of Commerce ("Commerce") to permit duty-free imports.  That authority was exceeded in this case. As such, Plaintiffs have demonstrated entitlement to the relief sought — *vacatur* and duty assessment.  Intervenors' arguments do not undermine this conclusion.

## I.    Plaintiffs' Injury and Requested Relief Easily Satisfy Constitutional Requirements

Constitutional standing requires "(1)…an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Intervenors argue that Plaintiffs were not injured, intimating that because duty-free benefits are not presently affecting new entries, Intervenors "got away with it."  *See* Def.-Ints.Br. at 4-8.  But Plaintiffs straightforwardly satisfy standing requirements.

Auxin Solar, Inc. ("Auxin") relied upon the potential for remedies under 19 U.S.C. § 1677j and 19 C.F.R § 351.226(l) in filing anti-circumvention petitions.  Compl., Ex.6 ¶11-12. Thereafter, the *Solar Duty Holiday*, 87 Fed. Reg. 56,868 (Sept. 16, 2022), caused Plaintiffs' injury; *viz*., the denial of hard-won anti-circumvention protections including suspended liquidation and antidumping and countervailing duty ("AD/CVD") assessments.[1]  Given the tripartite structure of U.S. trade remedies, domestic producers are themselves "an object of the action (or foregone action)" wherever such protections are short-circuited, including by the *Solar*

---

[1] Plaintiffs need not rely upon "competitor standing" and *Canadian Lumber* is distinguishable. *See* Def.-Ints.Br. at 5-8.  There, claimants sought to narrow the CDSOA to cut off U.S. competitors' benefits.  Claimants' own protections were not at issue.  *See generally Canadian Lumber v. United States*, 517 F.3d 1319 (Fed. Cir. 2008).

NONCONFIDENTIAL VERSION

*Duty Holiday. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992);[2] *cf., e.g.*, 19 U.S.C. §

1677(9)(C) (interested parties); 19 C.F.R. § 351.226(c)(1) (permitted to request circumvention

inquiry); 19 U.S.C. § 1516a(d) (permitting to bring suit).  If not remedied, the unlawful denial of

anti-circumvention protections [

]. *See* Compl., ¶20 & Ex.6.

Nor, as Intervenors' keen interest indicates, is this matter moot.  *See* Def.-Ints.Br. at 8.

"A case becomes moot…only when it is impossible for a court to grant any effectual relief

whatever to the prevailing party." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016); *see*

*also Chafin v. Chafin*, 133 S.Ct. 1017, 1023 (2013) (case is not moot "{a}s long as the parties

have a concrete interest, however small, in the outcome").  Here, Defendants' *ultra vires Solar*

*Duty Holiday* violated Plaintiffs' right to otherwise forthcoming anti-circumvention protections.

Given the presence of unliquidated duty-free entries and Defendants' further stipulation as to the

availability of reliquidation, *see* Joint Stipulation, ECF Doc. 19 (Jan. 25, 2024), the Court can

rectify Defendants' violation by ordering Defendants to apply anti-circumvention protections to

the affected entries, *i.e.*, collect the AD/CV duties.  That, in turn, will arrest or reverse ongoing

price erosion and enable Plaintiffs [                              ].

## II.   Plaintiffs and Defendants Agree on the Relevant Standard of Review

Plaintiffs and Defendants agree that this case should be resolved through the application

of *Loper Bright* standards.  *See* Defs.Br. at 6.  Although Defendants emphasize *Loper Bright*'s

recognition that some statutes expressly delegate definition of their terms to the implementing

agency, *see id.* at 9-10, the standard of review remains unaltered.  The reviewing Court's duty

---

[2] Intervenors wrongly analogize challenges to regulating "third parties," citing *Lujan*.  Def.-
Ints.Br. at 4.  *Lujan* plaintiffs challenged an agency's failure to apply an environmental
regulation extraterritorially. 504 U.S. at 558-59.

NONCONFIDENTIAL VERSION

remains to discern for itself the statute's "best reading." *Loper Bright*, 144 S. Ct. at 2263; Pls.Br. at 15-17. In particular, the Court cannot defer to Defendants' assertion that Section 318(a) delegates relevant authority. *See Loper Bright*, 144 S. Ct. at 2263. Defendants do not suggest otherwise. *See* Defs.Br. at 8-12.

## III. Section 318 Does Not Delegate Authority to Define Relevant Terms

The linchpin of the Government's defense is that Congress delegated authority to Commerce to define products eligible for duty relief under Section 318(a). *See* Defs.Br. at 11-12. Section 318(a) provides that the President may declare an emergency and "authorize {Commerce} to permit, under such regulations as {Commerce} may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work." Defendants claim that the clause authorizing Commerce to promulgate regulations includes yet broader authority to define what constitutes "food, clothing, and medical, surgical, and other supplies." Defs.Br. at 11-12. But whereas authority to promulgate implementing regulations is a feature of many statutes, authority to unilaterally define statutory terms is exceedingly rare. Defendants' own authorities disprove their assertion that Section 318(a) confers definition-making authority.

To guide the courts, *Loper Bright* identified examples of Congress delegating interpretive authority. Three concerned "express{}" delegations for an agency to define a term. *See Loper Bright*, 144 S. Ct. at 2263 & n.5; *Batterton v. Francis*, 432 U.S. 416, 418 n.2, 425 (1977) (finding statutory phrase "unemployment (as determined in accordance with standards prescribed by the Secretary)" had "expressly delegated" definition of "unemployment" to agency); *see also* 29 U.S.C. § 213(a)(15) ("(as such terms are defined and delimited by regulations of the Secretary)"); 42 U.S.C. § 5846(a)(2) ("as defined by regulations which the Commission shall

**NONCONFIDENTIAL VERSION**

promulgate"). Contrary to Defendants' suggestion, *see* Defs.Br. at 10, Section 318(a) contains

no similar language.

     *Loper Bright* also noted that statutory terms "such as 'appropriate' or 'reasonable'" may

"leave{} agencies with flexibility." *Loper Bright*, 144 S. Ct. at 2263. Defendants analogize

Congress' instruction that the U.S. Environmental Protection Agency regulate power plants "if

the Administrator finds such regulation is appropriate and necessary." *Id.* at 2263 n.6 (quoting

42 U.S.C. § 7412(n)(1)(A)). In interpreting the capacious "appropriate and necessary" clause of

Section 7412(n)(1)(A), the Supreme Court contrasted subsections that "established cabined

criteria," *e.g.*, requiring "a threat of adverse effects to human health or the environment."

*Michigan v. E.P.A.*, 576 U.S. 743, 752 (2015) (contrasting 42 U.S.C. § 7412(c)(3)); *see also*

*Loper Bright*, 144 S. Ct. at 2263 (citing *Michigan*). Here, by limiting duty-free treatment to "the

importation free of duty of food, clothing, and medical, surgical, and other supplies for use in

emergency relief work," Congress likewise prescribed "cabined criteria for {the agency} to

apply." *Michigan*, 576 U.S. at 752. Congress named particular product categories (*e.g.*, "food")

that appear in the dictionary and elsewhere in the Tariff Act of 1930. Even assuming the product

categories were "general but not ambiguous," *Asociacion de Exportadores e Industriales de*

*Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1261 (Fed. Cir. 2024), the "boundaries of

the delegated authority" cannot exceed the "best meaning" of the operative words when the

statute was enacted. *See Loper Bright*, 144 S. Ct. at 2263.

     At most, Section 318(a)'s commonplace proviso that duty-free importation may be

permitted "under such regulations as {Commerce} may prescribe" allows Commerce to "fill up

{certain} details" of a statutory scheme. *See Loper Bright*, 144 S. Ct. at 2263. Doubtless, there

are practical matters that Section 318(a), in its brevity, does not mention. But Commerce cannot

NONCONFIDENTIAL VERSION

lawfully expand Section 318(a) to reach imports outside the "best meaning" of Congress's specifically named product categories.  *See SoftView LLC v. Apple Inc*., 108 F.4th 1366, 1372 & n.2 (Fed. Cir. 2024) (concluding that statutory authority to issue regulations beyond "procedural rules" "is not unbounded" nor does it "grant the {agency} authority to legislate new patent laws" and that the "limits of this statutory provision" would be decided by applying *Loper Bright*).

Authority to promulgate regulations is not unusual, but "an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp*., 488 U.S. 204, 208 (1988).  And "enabling legislation is generally not an open book to which the agency {may} add pages and change the plot line." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022).  Vacatur is required because the plain meaning of Section 318(a)'s terms is incompatible with Commerce's expanded meaning in the *Solar Duty Holiday*.

## IV.    Defendants Identify No Support for CSPV Cells or Modules Falling Within the Statute's "Best Meaning"[3]

### A.    A Reading that Renders Most of the Statutory Clause Redundant and Ignores a List's Characteristics Is Not the "Best Reading"

#### 1.    *Elementary Interpretive Canons Yield a Clear Result*

Defendants advocate finding an exception that swallows the rule, *i.e.*, that Commerce may extend duty free treatment to *any* "other supplies for use in emergency relief work." Defs.Br. at 14-15.  However, "a statute's meaning does not always turn solely on the broadest imaginable definitions of its component words.  Linguistic and statutory context also matter." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018).  Plaintiffs have explained that the canons of *ejusdem generis* and *noscitur a sociis* and "cardinal principle of statutory construction"

---

[3] Intervenors offer no further statutory arguments.

5

**NONCONFIDENTIAL VERSION**

disfavoring superfluity, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001), are core tools for the

Court to ascertain Section 318(a)'s "best meaning."  *See* Pls.Br. at 18-28.

      Defendants assert that *ejusdem generis* is inapplicable to "medical, surgical, and other

supplies" because the statute provides an overriding "common attribute," *viz.*, that the three

named categories be "for use in emergency relief work."  *See* Defs.Br. at 20.  Defendants

identify no authority for using a residual phrase to negate the *ejusdem generis* canon.  In fact, the

Supreme Court has rejected Defendants' approach explicitly.  In interpreting the structurally

identical phrase "seamen, railroad employees, or any other class of workers engaged in foreign

or interstate commerce," the Supreme Court held:

> the words "any other class of workers engaged in…commerce" constitute a residual
> phrase, following, in the same sentence, explicit reference to "seamen" and
> "railroad employees." Construing the residual phrase to exclude all employment
> contracts fails to give independent effect to the statute's enumeration of the specific
> categories of workers which precedes it; there would be no need for Congress to
> use the phrases "seamen" and "railroad employees" if those same classes of
> workers were subsumed within the meaning of the "engaged in ... commerce"
> residual clause….Under th{e *ejusdem generis*} rule of construction the residual
> clause should be read to give effect to the terms "seamen" and "railroad
> employees," and should itself be controlled and defined by reference to the
> enumerated categories of workers which are recited just before it…

*Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (internal citations omitted); *see*

*also Epic Sys.*, 584 U.S. at 512 (catchall term "other concerted activities for the purpose

of…other mutual aid or protection" was constrained by preceding list, *e.g.*, "assist{ing} labor

organizations" and "bargain{ing} collectively").  The Supreme Court's analysis of "other class

of workers" in *Cir. City* and "other concerted activities" in *Epic. Sys.* also demonstrates that, in

Section 318(a), Congress need not insert "*healthcare*" to make "other supplies" something akin

to "medical" and "surgical" supplies.  *See* Defs.Br. at 19; *see also Jarecki v. G.D. Searle & Co.*,

367 U.S. 303, 307 (1961) ("The maxim *noscitur a sociis* is often wisely applied where a word is

**NONCONFIDENTIAL VERSION**

capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress").

Defendants' argument to make "emergency relief" the only constraint upon the meaning of "other supplies" would impermissibly nullify the preceding list terms "medical" and "surgical." *See* Defs.Br. at 22. Nor does Defendants' connection of "emergency relief" exclusively to "medical, surgical, and other supplies" make grammatical sense. "{U}se in emergency relief work" is a prerequisite of duty-free importation for *all* products within Section 318(a)'s scope—including "food" or "clothing." *See* Pls.Br. at 23-26; *Paroline v. United States*, 572 U.S. 434, 447 (several words "followed by a clause which is applicable as much to the first and other words as to the last" are constructed so "that the clause be read as applicable to all"). Commerce understood as much in prior regulations. *See* 19 C.F.R. § 351.101 (establishing "procedures for importation of supplies for use in emergency relief work free of…duties, as authorized under section 318(a)"); *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 Fed. Reg. 63,230, 63,230 (Oct. 30, 2006) ("Any waiver of…duties would be both temporary and limited to supplies for use in emergency relief work…") ("*Section 318(a) Regulations*"). Plaintiffs' reading avoids these interpretive problems. *See* Pls.Br. at 26-28.

Defendants claim that unless the adjective "other" in "other supplies" is given the vast meaning that Defendants ascribe, then "other" would become inconsequential. *See* Defs.Br. at 22. This turns the superfluity canon on its head. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("we will not read a 'catchall' provision to impose general obligations that would include those specifically enumerated"). It also contradicts the Supreme Court's treatment of "other" clauses in *Cir. City Stores*, 532 U.S. at 114–15, and *Epic Sys.*, 584 U.S. at 512. Consistent with Defendants' own definitions, *see* Defs.Br. at 14, the "other" in Section

NONCONFIDENTIAL VERSION

318(a) encompasses "remaining" or "additional" supplies like the specifically enumerated "medical" and "surgical" supplies, thus "ensur{ing}…no{} specific parts are made redundant by a clause literally broad enough to include them," *see Fischer v. United States*, 603 U.S. 480, 488 (2024).  Nor do Defendants meaningfully rebuff Plaintiffs' overarching assessment of the intricate tariff system created by Tariff Act of 1930, which implies that Congress meant what it said when defining the list of items eligible for emergency duty relief.  *Compare* Defs.Br. at 22-23, *with* Pls.Br. at 24-25.

Finally, Defendants make a *post hoc* assertion that CSPV cells and modules *are* healthcare supplies akin to medical and surgical supplies because Commerce's regulatory preamble mentioned, *inter alia*, electricity's use in "necessary medical care."  Defs.Br. at 21 (quoting *Solar Duty Holiday*, 87 Fed. Reg. at 56,872).  But the *Solar Duty Holiday* did not provide reduced electricity rates for use in medical care.  Nor were duty-free CSPV cells or modules dedicated to generating electricity for, *e.g.*, hospitals, as opposed to "national defense," *id.* at 56,874, or "communications," *id.* at 56,872.  And even if Commerce had narrowed its focus as Defendants wish, Commerce still would have stretched the statutory terms past their breaking point.  Just because *some* CSPV cells or modules *could* generate electricity for a healthcare application does not make *all* CSPV cells and modules "similar in nature," *Epic Sys.*, 584 U.S. at 512, or "similar in type to th{e} specifically enumerated" medical supplies and surgical supplies, *Paroline*, 572 U.S. at 447.  A member of Congress in 1930 (or today) presented with a utility-scale module and surgical scalpel would be hard-pressed to "spot the similarity."

NONCONFIDENTIAL VERSION

    2.   *The Court Need Not Parse Past Practice or Legislative History, But these Also Support Plaintiffs' Interpretation*

Because the statutory text is clear, *Loper Bright* eliminates any need to parse subsequent administrative practice,[4] although practice immediately following Section 318's passage nevertheless supports Plaintiffs' interpretation. *See* Pls.Br. at 28-31. Defendants deride Plaintiffs' "selective citations," yet identify no additional example from the statute's near-century of existence. *See* Defs.Br. at 23-27. All prior examples plainly concerned "food" (for animals or humans) or employed language directly from the statute. *See* Pls.Br. at 28. "{T}he want of {prior} assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941).

Defendants attempt to rehabilitate their inapposite reliance on the *Lumber Proclamation*, *see* Defs.Br. at 24-26, which relied upon extraordinary authority conferred by the Veterans Emergency Housing Act of 1946 ("VEHA"). But Defendants acknowledge that the *Lumber Proclamation* invoked both the VEHA (first) and Section 318 (second), required a VEHA-created official (rather than the "Secretary of the Treasury," as per Section 318) to identify products eligible for duty-free treatment, and precluded duty-free treatment from outlasting the VEHA. *See* Def Br. at 25; *Lumber Proclamation*, 11 Fed. Reg. 12,695, 12,695 (Oct. 29, 1946); *T.D. 51565*, 11 Fed. Reg. 13,460 (Nov. 14, 1946). The *Lumber Proclamation* is the exception that proves the rule. By its terms, it could not exist without the VEHA. Unlike the *Lumber*

---

[4] Agency interpretations did not predate Congress' passage of the Act. Congress could not have acted upon them. *See, e.g.*, *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 721–22 (2018).

NONCONFIDENTIAL VERSION

*Proclamation*'s extraordinary *ex ante* Congressional authorization, Congress reacted to the *Solar Duty Holiday* with extraordinary condemnation. *See* H.J. Res. 39 (2023).

Defendants then invoke preambular language from the 2006 *Section 318(a) Regulations* where Commerce declined to limit eligible supplies to a Federal Emergency Management Agency ("FEMA") list. Defs.Br. at 26 (quoting *Section 318(a) Regulations*, 71 Fed. Reg. at 63,233). These general comments relate to alternative regulations that Commerce eschewed here. *See Tung Mung Dev. Co. v. United States*, 354 F.3d 1371, 1380 (Fed. Cir. 2004) (declining to rely on preamble that "does not reflect a fully settled policy for situations such as this."). Commerce reasoned that a limiting list might interfere with "mak{ing} waiver determinations on an emergency-by-emergency basis," 71 Fed. Reg. at 63,233, which simply reflects that statutory categories like "food" and "clothing" are themselves broad. Moreover, Commerce acknowledged that a FEMA list "could be instructive," *id.*, reflecting a view of Section 318(a) as encompassing traditional "disaster relief"—not utility-scale CSPV cells and modules.

Finally, "{b}ecause the text yields a clear answer, {the Court} need not consider legislative history." *Adee Honey Farms v. United States*, 107 F.4th 1322, 1334 (Fed. Cir. 2024). Nonetheless, Defendants echo Plaintiffs' quote from the House Committee's Comparative Print of the Tariff Acts of 1922 and 1930 reporting that the latter was "broadened to permit the free importation of food, clothing and supplies for use in relief work in connection with an{} emergency." *Compare* Defs.Br. at 15-16, *with* Pls.Br. at 22-23. As to its relevance, Defendants equivocate, concluding "at a minimum, {it} does not detract from" Defendants' reading. Def Br. at 15. Indeed, the statement lacks substance needed to undermine or support *any* reading of Section 318(a). *See* Pls.Br. at 22-23. "Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011).

10

NONCONFIDENTIAL VERSION

A one-sentence paraphrase in the House Committee's Comparative Print does not meaningfully

clarify understanding of Section 318(a) beyond its plain text and statutory context.

> **B.    Defendants' Ancillary Interpretive Arguments Do Not Withstand Scrutiny**

Defendants' response raises several ancillary strains of argument.  None support

Defendants' reading of Section 318(a).

*First*, Defendants assert that "a statute later embraces all such…things as subsequently

fall within its scope."  Defs.Br. at 19-20 (quoting *United States v. Am. Home Assur. Co.*, 789

F.3d 1313, 1325 (Fed. Cir. 2015)).  But this notion exists in harmony with the canon that

statutory terms carry their "ordinary meaning … at the time Congress enacted the statute."

*Perrin v. United States*, 444 U.S. 37, 42 (1979).  Thus, *Sw. Airlines*, cited by Defendants,

analyzed whether a modern-day group fit within statutory terms *as defined at the time of the*

*statute's enactment*.  *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 456 (2022) (interpreting definition

of "worker" in 1925 act by reference to dictionaries dated 1913, 1922, and 1933).[5]  Modern-day

CSPV cells and modules do not fall within the 1930s definition of "food," "clothing," "medical

{supplies}," "surgical {supplies}," or other healthcare supplies.  *See* Pls.Br. at 19-23.

*Second*, Defendants suggest something "illogical" in circumscribing products eligible for

duty-free treatment without equally circumscribing the possible emergencies.  Defs.Br. at 17.

There is nothing strange about this.  As its name implies, the *Tariff* Act of 1930 concerned the

application of tariffs to imported goods.  *See* 46 Stat. at 590.  Section 318(a) reflects the 71st

Congress' judgment that the hoped-for economic benefit of tariffs provided earlier in the Act

---

[5] Defendants' remaining examples concern highly general verbs and unqualified nouns unlike the
statutory categories at issue here.  *See* Defs.Br. at 20; *Am. Home*, 789 F.3d at 1325 (interpreting
"{a}ll bonds"); *Am. Broad. Companies, Inc. v. Aereo, Inc*., 573 U.S. 431, 449 (2014)
(interpreting "perform" and "publicly").

11

**NONCONFIDENTIAL VERSION**

would not outweigh benefits of cost-cutting in the event *the named goods* were needed for emergency relief. Congress' "goods-limiting" formulation made specifying emergencies practically redundant, and, as Defendants recognize, *see* Defs.Br. at 19, provided greater clarity as to Section 318(a)'s limits than would a fraught attempt to predict and describe all emergency scenarios that might implicate such goods.

*Finally*, Defendants elevate a statement from *AAEI* concerning the "broad construction" of Congressional authorizations into a canon of statutory interpretation "in the area of international trade." *See* Defs.Br. at 16 (quoting *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1248 (Fed. Cir. 1985) ("*AAEI*")). No such generalized canon exists. *AAEI* interpreted 7 U.S.C. § 1854, which provided that "whenever he determines such action appropriate,"[6] the President may negotiate intergovernmental trade agreements and "*the President* is authorized to issue regulations…to carry out {those trade agreements}." *AAEI*, 751 F.2d at 1241 (emphasis supplied). The President had delegated regulation-making authority to an interagency committee. *Id.* at 1242. Plaintiffs claimed that the committee had exceeded Section 1854's authority to "carry out" trade agreements. *Id.* Rejecting this, *AAEI* emphasized that trade agreement authority "confer{ed} upon the President" by Section 1854 interacted with "the President's constitutional power to oversee the political side of foreign affairs" and changes in international economic relationships "have many an important political corollary." *Id.* at 1248. Thereafter follows the statement Defendants invoke, omitting the italicized portion: "In the area of international trade, *intimately involved in foreign affairs*, congressional authorizations of presidential power should be given a broad construction…." *Id.*

---

[6] *AAEI* also characterized this as "a broad grant of authority," 751 F.2 at 1247; *see also Loper Bright*, 144 S. Ct. at 2263 ("flexible terminology"). No such language appears in Section 318(a).

NONCONFIDENTIAL VERSION

(internal quotation marks omitted); *see* Defs.Br. at 16. *AAEI*'s observations are inapplicable to Section 318(a), which is (1) inward-facing, addressing internal emergency response, and (2) assigns implementing details relevant here directly to Commerce.

Were any "special" interpretive canon applicable, it is opposite what Defendants suggest. Defendants' unprecedented assertion of authority to make *any* emergency-related product duty-exempt makes this case one where the "economic and political significance of th{e agency's} assertion {of authority} provide{s} a reason to hesitate before concluding that Congress meant to confer such authority." *W. Virginia*, 597 U.S. at 721 (internal quotation marks omitted). "Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." *Id.* at 723. "The agency instead must point to clear congressional authorization for the power it claims." *Id.* Section 318(a) contains nothing of the sort.

## V. Were CSPV Cells and Modules Covered by Section 318(a), Defendants' Framework Nevertheless Violated Minimum Statutory Requirements

### A. Section 318 Permits Duty-Free "Importation" During an Emergency; All Authorities Support Plaintiffs' Understanding of That Term[7]

Defendants concede that the *Solar Duty Holiday* rule absolved duty liability for "entries" (and thus "imports") made before "the date when the President declared an emergency to exist in Proclamation 10414." *See* Def Br. at 27. This was permitted, Defendants argue, because AD/CV duties were not technically "assessed" before liquidation. *See id.* at 27-29. Defendants assert that permitting "importation free of duty" does not presuppose "when a given import may be deemed 'free of duty,'" and that imports otherwise subject to {AD/CVD} orders can only be

---

[7] Intervenors identify no additional authority. *See* Def-Int. Br. at 15-16. As previously explained, *Proclamation 10414* did not authorize duty relief for pre-emergency importations. In that way, the *Solar Duty Holiday* is *ultra vires* the Proclamation. *See* Pls.Br. at 33-34.

NONCONFIDENTIAL VERSION

"determined to be free of duty…*after* the date of importation" because a "final liability for {AD/CV} duties is determined after merchandise is imported." *Id* at 28-20.  This is illogical.

As today, the United States had both a retroactive tariff assessment system and antidumping laws in 1930.  *See* Tariff Act of 1930, Pub. L. 71-361, §§ 505, 651(d)(5), 46 Stat. 590, 732, 762-63 (final duty computation and assessment after entry; Antidumping Act of 1921).  Whatever the AD and/or CV duty amount(s) finally computed at liquidation, Section 318(a) empowers Commerce to determine at importation that a qualifying good for use in emergency relief work will pay no such duties upon final liquidation.  Where Commerce applies Section 318(a), telling an importer at the time of importation (*i.e.*, the procedure's very beginning) that their duty liability will be "zero," that constitutes "importation free of duty," and the amount of AD and/or CV duties finally calculated, if any, becomes irrelevant.

Conversely, where, as here, an importer has already entered products subject to later-calculated AD/CV duties, the subsequent forgiveness of previously assumed duty liability is disconnected from any increase to the "availability and use of *supplies* for emergency relief work."  *See* Defs.Br. at 30 (emphasis supplied).  Defendants' discussion of Section 318(a)'s purpose fails to recognize that already-entered products, whatever their future duties, are "available" for "use" in emergency relief work.  *See id.* at 29-30.  Defendants' expedient speculation about possible knock-on effects of post-entry duty forgiveness, *see* Defs.Br. at 29-31, cannot override Congress' limitation to "*importation* free of duty."

Setting aside Defendants' claims about Section 318(a)'s purpose, as a textual matter Defendants do not dispute that Plaintiffs have correctly summarized the use of the terms at issue in the Tariff Act of 1930, including Section 318.  *Compare* Defs.Br. at 28, *with* Pls.Br. at 31-36.  As in *Adee Honey*, "look{ing} to other provisions of the Tariff Act at the time the {provision at

**NONCONFIDENTIAL VERSION**

issue} was enacted" can assist the Court "{t}o understand {the meaning of} these statutory criteria." 107 F.4th at 1332. Congress' use of "importation"—rather than "entry" or "liquidation"—in Section 318 is dispositive. As the Government recently argued in another pending matter, "{i}f 'importation' and 'entry' were synonymous then there would have been no need to use both terms. And to equate these two terms would contravene the interpretive canon against surplusage…." *See* Defendant's Response, CIT Ct. No. 24-134, ECF Doc. 20 (Nov. 27, 2024) at 9-10 & n.11 (addressing terms' meaning in 19 U.S.C. §§ 1313(c)(1)(D), (j)(2), (p)(2)(E)).

At most, Defendants suggest that the modern regulatory definition of "importation," *see* 19 C.F.R. § 101.1, may not match the Tariff Act of 1930, leaving that question hanging unanswered. *See* Defs.Br. at 28. Upon scrutiny, 1938 Treasury Department regulations implementing the Tariff Act of 1930 indicate no material difference.[8] *See* **Exhibit 1**. Then, as now, "Importation" was understood to precede "entry," which in turn preceded "liquidation":

> Entry, as required by section 484, Tariff Act of 1930, must be made of all importations…

19 C.F.R. § 6.6.

> {T}he consignee of imported merchandise shall make entry therefor…

19 C.F.R. § 6.8(b).

> {T}he consignee {named on a bill of lading} shall produce a certificate…for each portion of the shipment for which separate entry is desired. The certificate shall be in the following form: {*requiring recordation of the place and date the merchandise was "imported*" to request "author{ty}…to make customs entry for the above-described merchandise"}.

19 C.F.R. § 6.9(d)(3) (Certificate reproduced in **Exhibit 1**).

---

[8] Quoted regulations implemented Tariff Act of 1930, §§ 484, 505. No relevant statutory amendment occurred between 1930 and 1938.

NONCONFIDENTIAL VERSION

> Liquidation of entries is the final computation or ascertainment of the duties accruing thereon.

19 C.F.R. § 14.2(a). Contemporaneous judicial interpretations further corroborate Plaintiffs' understanding. *See, e.g.*, *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122 (1923) ("Importation…consists in bringing an article into a country from the outside. If there be an actual bringing in it is importation…Entry through a custom house is not of the essence of the act."); *Am. Mail Line v. United States*, 6 Cust. Ct. 90, 93 (Cust. Ct. 1941) ("any merchandise brought into the United States with the intention to unlade constitutes an importation within the meaning of section 1, Tariff Act of 1930.").

Without contesting the absence of *pre*-Proclamation duty-free practice under Section 318(a), Defendants assert "{n}one of {Plaintiffs' collected} regulations purport to interpret Section 1318(a)" because none affirmatively stated that permitting pre-Proclamation importation would violate the statute. *See* Defs.Br. at 31. But each regulation specifically implements authority statutorily vested in "the Secretary of Treasury." *See* Pls.Br. at 28-31. "Magic words" are unnecessary. It is substantively instructive that across several successive "emergencies"— including drought, flooding, and war, when minimizing response time equates to minimizing loss of life—the Secretary of Treasury never extended duty-free importation before the emergency's formal Proclamation date.

### B. Commerce's Certification Program Permits Importation Based on Legally Inadequate Representations[9]

Defendants attempt to reinvent the *proclaimed* emergency as a "supply chain emergency" and recast their emergency period extension as a "utilization requirement to discourage

---

[9] Intervenors identify no additional authority. *See* Def.-Ints.Br. at 19-25. Indeed, Intervenors further transmogrify the emergency into the "inability to *import* solar modules." *See id.* at 20. That unusual interpretation fails for the same reasons described below.

NONCONFIDENTIAL VERSION

stockpiling." *See* Defs.Br. at 32-36. Putting aside that stockpiling happened and CSPV cells and modules were being given away at the end of the "Utilization Period," Section 318(a) imposes limits. It requires that duty-free importations be "for use in emergency relief work." Attempting to satisfy this limitation, Commerce introduced a certification requirement that was facially inadequate to the statutorily-mandated task.

Defendants assert that Commerce has some leeway in determining how precisely it satisfies statutory prerequisites. *See* Defs.Br. at 33. Accepting this as true, it does not permit flagrantly flaunting a statute's limits. *See, e.g.*, *Michigan*, 576 U.S. at 750 (agency must act "within the scope of its lawful authority"). Here, Commerce granted duty-free treatment based on certification that "use" would occur sometime before six months *after the emergency had ended*. That manifestly fails to ensure duty-free importations are "for use in emergency relief work."

Because the timeline is so inarguably violated, Defendants attempt to salvage things by transforming the emergency into a "supply chain emergency" and arguing that this technocratic circumstance was relieved merely by bringing CSPV cells and modules across the U.S. border. *See* Defs.Br. at 33-35. Problematically for Defendants—and dispositive—a "supply chain emergency" is not what the President proclaimed. Rather, *Proclamation 10414* "declare{s} an emergency to exist with respect to the threats to *the availability of sufficient electricity generation capacity to meet expected customer demand*." 87 Fed. Reg. 35,067, 35,068 (June 9, 2022) (emphasis supplied). Imported products only make electricity "available" to "consumers" after being connected to the grid. This is no "presum{ption}," *see* Defs.Br. at 33, but a straightforward reading of the Proclamation's text.

NONCONFIDENTIAL VERSION

Defendants also insert a word found nowhere in *Proclamation 10414*—"future"—to argue that "expected consumer demand" meant "expected" at some later point. *Compare* Defs.Br. at 34, *with* 87 Fed. Reg. at 35,067-69. In fact, *Proclamation 10414* states that "utilities and grid operators must…build new capacity *now*," that "{i}mmediate action is needed," and references "domestic deployment…anticipated over the next year" as well as "planned additions" within the two-year emergency period, 87 Fed. Reg. at 35,067-68 (emphasis supplied). Even if the "consumer demand" in question were in a post-emergency future (which *Proclamation 10414* never states), post-emergency "utilization" of CSPV cells and modules would remain inadequate to provide "emergency relief." As *Proclamation 10414* contemplates, installation must occur *during the emergency* to be "available…to meet" demand *after the emergency*. *See id.* at 35,068. Thus, Commerce's utilization certification is legally inadequate because it permits duty-free importation based on assurances that, even if realized, would not satisfy Section 318(a)'s requirement of being "for use in emergency relief work."

Defendants contrast their "utilization requirement" with prior Section 318 implementing regulations, claiming that earlier examples "only required declarations at the time of importation stating that imports will be used in emergency relief work." Defs.Br. at 34. This is flatly untrue. For example, materially identical declarations were required during the 1934 and 1941 emergencies. Thes required pre-authorization, limited potential consignees to defined groups, and required that the ultimate beneficiary be named and use the imported product to relieve the emergency. *See* **Exhibit 2** (T.D. 50449 (1941); T.D. 47236 (1934)). Commerce has exercised less oversight now than was undertaken in the depths of the Great Depression. Other Section 318 actions strictly limited beneficiaries. For example, in the case of jerked beef, to "import{s} by or directly for the account of a{} public agency, relief organization not operated for profit, or

18

NONCONFIDENTIAL VERSION

dealer in foodstuffs." *T.D. 50599*, 7 Fed. Reg. 2,776, 2,777 (Apr. 14, 1942); *see also T.D. 50626*, 7 Fed. Reg. 3,358 (May 6, 1942); *T.D. 48798*, 2 Fed. Reg. 339 (Feb. 11, 1937) (both similar).

Commerce's *Section 318(a) Regulations* make no reference to future use. This is because of an orderly process for *pre*-importation authorization, which required, *inter alia*, "the quantity, the proposed date of entry…, the person for whose account the merchandise will be brought into the United States, the destination, {and} the use to be made of the merchandise at the designated destination." *See* 19 C.F.R. § 358.103. Defendants' assertion that the *Solar Duty Holiday* does "more…to discourage stockpiling" by allowing billions of dollars' worth of CSPV cells and modules to obtain duty-free treatment based on no more than an unverified promise to be used six months *after* the emergency defies reality. *See* Defs.Br. at 35. Commerce was more honest about the relative robustness of each process in the *Solar Duty Holiday* preamble, having claimed the *Section 318(a) Regulations* would somehow frustrate "immediate relief" and be less "efficient{}." 87 Fed. Reg. at 56,877. Most fundamentally, Commerce's approach here is facially inconsistent with Section 318(a)'s requirement that "importation free of duty" be "for use in emergency relief work."

## VI.    Plaintiffs Have Demonstrated the Appropriateness of Injunctive Relief

A permanent injunction is appropriate where a plaintiff "has suffered an irreparable injury," (2) "remedies available at law…are inadequate to compensate for that injury," (3) "the balance of hardships between the plaintiff and defendant" warrants an equitable remedy, and (4) "the public interest would not be disserved." *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006). Plaintiffs clearly satisfy these standards. The second factor is undisputed, as both Defendants and Intervenors concede Plaintiffs will neither "pay nor receive any payment of duties if they prevail," Defs.Br. at 41; *see also* Def.-Ints.Br. at 6 (materially same), and thus

19

NONCONFIDENTIAL VERSION

cannot obtain *any* remedies at law, *see also Wirtgen Am., Inc. v. United States*, 447 F. Supp. 3d

1359, 1372 (Ct. Int'l Trade 2020) ("Damage to business relationships and the loss of future sales

to loyal customers cannot be repaired by money damages available at law.").  Regarding the

remaining three *eBay* factors, Defendants make a *pro forma* waiver claim (**Section VI.A**), and

otherwise misstate Plaintiffs' harm and argue that performing familiar administrative functions

to obtain unpaid duties constitutes relief-defeating hardship (**Section VI.B**).  Injunctive relief is

well-supported here.

### A.    Plaintiffs Previously Briefed the Permanent Injunction Factors; Waiver Is Inapplicable

Defendants suggest Plaintiffs waived the injunctive relief requested in both Plaintiffs'

Complaint and Motion for Judgment, *see* Complaint, ECF Doc. 14 (Jan. 17, 2024) at 63; Rule

56.1 Motion for Judgment, ECF Doc. 93 (July 22, 2024), because Plaintiffs did not specifically

address the *eBay* factors, Defs.Br. at 39; *see also* Def.-Ints.Br. at 31 (same).  Defendants fail to

acknowledge that the three disputed injunction factors are "essentially the same" in both

preliminary and permanent injunction contexts, *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S.

531, 546 n.12 (1987), and that Plaintiffs' Motion for Preliminary Injunction addressed these at

length, *see* Plaintiffs' Motion for Preliminary Injunction, ECF Doc. 15 (Jan. 17, 2024) at 9-17,

26-31 ("Pls. PI Mot."); *cf. also* CIT Rule 65(a)(2) (including admissible evidence received on

preliminary injunction motion on trial record).  Defendants' stance is especially surprising

considering their joint stipulation with Plaintiffs, which left no reasonable doubt as to the relief

sought.  *See* Joint Stipulation in Lieu of Preliminary Injunction, ECF Doc. 19 (Jan. 25, 2024).

The only waiver-related authority Defendants proffer are rote references to generalized

rules of practice before the U.S. Court of Appeals for the Federal Circuit.  *See* Defs.Br. at 39.

Neither case applied waiver principles to bar a form of relief, as opposed to a merits argument.

**NONCONFIDENTIAL VERSION**

Moreover, unlike CIT Rule 56.2(a)(4), which provides a clear deadline for requesting injunctive relief, CIT Rule 56.1, which governs these 28 U.S.C. § 1581(i) proceedings, contains no such provision. *See Laclede Steel Co. v. United States*, 928 F. Supp. 1182, 1185 (Ct. Int'l Trade 1996) (permanent injunction motion timely where "no clear deadline exists by which {movant} could take definitive guidance.").

Because success on the merits is a prerequisite for permanent injunction, that "is a remedy generally contemplated at the conclusion of a trial, at the remedy phase of a legal proceeding." *GE Cap. Com., Inc. v. Wright & Wright, Inc*., 2009 WL 5173954, at *9 (N.D. Tex. Dec. 31, 2009); *see also, e.g.*, *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1185 (9th Cir. 2011) (contrasting "judicial review of an agency decision" with subsequent "consideration of the equities after a violation of law has been found" in weighing preliminary injunction); *Allstate Ins. Co. v. Fougere*, 581 F. Supp. 3d 307, 312 (D. Mass. 2022) (holding plaintiff had not waived injunctive relief after obtaining preliminary injunction despite failing to reference permanent injunction in proposed judgment; permitting standalone permanent injunction motion), *aff'd,* 79 F.4th 172 (1st Cir. 2023); *Seattle Audubon Soc. v. Evans*, 771 F. Supp. 1081, 1087-88 (W.D. Wash. 1991) (adjudicating injunctive relief following issuance of order on motions for summary judgment), *aff'd*, 952 F.2d 297 (9th Cir. 1991); *Crutchfield v. U.S. Army Corps of Eng'rs*, 192 F. Supp. 2d 444, 452 (E.D. Va. 2001) (granting motion for permanent injunction filed after prevailing on the merits). And, for the avoidance of doubt, Courts have even awarded permanent injunctions after merits briefing where the plaintiff omitted discussion of the test and made no prior motion for preliminary injunction. *See Psychopathic Recs., Inc. v. Anderson*, 2010 WL 4683470, at *4 (E.D. Mich. Nov. 10, 2010) (permanent injunction warranted despite failure

NONCONFIDENTIAL VERSION

discuss test).  Under the circumstances presented here, barring injunctive relief based on

"waiver" would be inappropriate.

**B.    The Three Remaining Permanent Injunction Factors Favor Granting Plaintiffs' Requested Injunction**

To consolidate matters, and because the relevant rationales were already before the

parties and the Court in Plaintiffs' Motion for Preliminary Injunction, Plaintiffs hereby

incorporate those arguments, in full.  Below, Plaintiffs address Defendants' and Intervenors'

critiques, summarize the irreparable harm faced by Plaintiffs, and explain that both the balance

of hardships and public interest favor Plaintiffs' request for equitable relief.[10]

1.    *Plaintiffs Readily Demonstrate Irreparable Harm*

The Federal Circuit has held that "{p}rice erosion, loss of goodwill, damage to

reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."

*E.g.*, *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).  Here, as

explained in Plaintiffs' opening brief, Auxin has experienced and continues to experience

precisely such conditions with *Solar Duty Holiday* imports being given away for free through the

December 3, 2024, expiration of the "Utilization Period."  Initially "stifled in its growth

by…unfair {circumvention} trade practices," Auxin sought protection available under U.S. law

through a circumvention inquiry.  Pls.Br. at 4; *see* Compl, Ex. 6 ¶6-10.  After the President

subsequently declared an emergency, and despite Auxin "ha{ving} the capacity to help redress

the emergency," it was unable to compete with the relentless waves of low-priced imports that

the *Solar Duty Holiday* enabled to circumvent AD/CVD payments.  Pls.Br. at 6-7; *see* Compl.,

---

[10] Defendants question the possible interplay between Plaintiffs' relief and pending Section 1581(c) challenges to Commerce's circumvention determinations.  *See* Defs.Br. at 43.  As Defendants propose no specific approach, *see id.*, Plaintiffs respectfully submit that such details be addressed separately if Plaintiffs prevail on the merits here.

**NONCONFIDENTIAL VERSION**

Ex. 6 ¶27-29.  Consequently, "prices for solar panels today are even lower than they were when
Auxin deemed it necessary to petition for circumvention inquiries."  Pls.Br. at 8; *see* Compl., Ex.
6 ¶28.  This "caused severe damage, decimating the U.S. industry through unrestrained volumes
of unfairly traded low-priced imports."  *Id.* at 41-42; *see also* PI Motion at 27 (noting "the
immense economic harm" wrought by the *Solar Duty Holiday*).  This "decimation"
unquestionably extends to Auxin.  *See generally* Compl., Ex. 6.  As attested in a Declaration
attached to Plaintiffs' Complaint, if left unremedied, the harm is [

], *id.* at Ex. 6 ¶30, has [

], *id.* at Ex. 7, and results in CSPV modules entering [

], *id.* at Ex. 6 ¶29; *see also* PI Motion at 28.  Auxin has suffered reputational harm for
exercising its right to pursue circumvention remedies, Compl., Ex.6 ¶15, only for remedies on
which Auxin relied to be summarily extinguished, *id.*, Ex.6 ¶11-12.  And because of the
unrelenting volumes of imports that entered during the "emergency," *see* PI Motion at Ex. 2;
Pls.Br. at Ex. 1, market prices remain depressed into the foreseeable future.

Indeed, in promulgating its circumvention regulation, Commerce recognized this cause-
and-effect relationship, stating that "effect{ing} foreign exporters' behavior" was a matter of
"having to pay additional cash deposits and duties on those {circumventing} exports when they
are imported," and the requirements of 19 C.F.R. § 351.226(l) would "allow Commerce to better
fulfill the Congressional intent behind the AD/CVD laws—namely, to remedy the injurious
effects of unfairly traded imports."  *Regulations To Improve Administration and Enforcement of
Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,303, 52,338 (Sept. 20,
2021) ("*Circumvention Regulation*").  Framed in legal terms, the *Solar Duty Holiday* has denied
Auxin protection otherwise due under anti-circumvention laws and regulations. Compl., Ex. 6.

23

NONCONFIDENTIAL VERSION

Absent some practical redress for the unlawfully denied market safeguards, judicial relief would be as meaningless as when liquidation prevents the review of an administrative proceeding. *See Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1346 (Fed. Cir. 2019).

Defendants and Intervenors skip past all of this and suggest that Plaintiffs' claims of irreparable harm are defeated by a supposed "delay" in filing suit, disingenuously characterizing Plaintiffs as having waited "15 months" after the action ripened. *See* Defs.Br. at 39; Def-Int. Br. at 32. That is *laches*, and the Supreme Court has unequivocally held that where, as here, the action was launched within the statutory limitations period, the litigant has satisfied "a rule for determining whether a claim is timely enough to permit relief." *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod.*, LLC, 580 U.S. 328, 334-35 (2017). Thus, in weighing the *eBay* factors and fashioning injunctive relief, timing cannot be construed against Plaintiffs, as doing so "would give judges a 'legislation-overriding' role that is beyond the Judiciary's power." *See id.*

Intervenors cite cases that either predate *SCA* or, with respect to *Janus*, do not deny relief based on (un)timeliness. *See* Def.-Ints.Br. at 32 (citing *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31; AFLCIO*, 942 F.3d 352, 361–62 (7th Cir. 2019) (recognizing good faith defense)). Intervenors also highlight *Petrella*'s discussion of "extraordinary circumstances" in *Chirco*. *See* Def.-Ints.Br. at 32 (citing *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014); *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007)). But *Petrella*'s *dicta* conflicts with *SCA*. Moreover, *Chirco* was factually dissimilar. *Chirco*'s plaintiff "knew of the defendants' construction plans before they broke ground," "took *no steps* to halt {a} housing development until more than 168 units were built" and 109 were occupied, and could otherwise pursue money damages for claimed copyright infringement. *Petrella*, 572 U.S. at 686 (emphasis supplied). Thus, "an order mandating destruction of the housing project" would be

**NONCONFIDENTIAL VERSION**

unjust. *Id.* Circumstances could hardly be more different here. From the beginning, importers were put on notice of Auxin's opposition to the *Solar Duty Holiday* through regulatory comments and arguments during circumvention proceedings. *See* Compl., ¶¶14, 57-58 & Exs. 3, 11-14. Congress even disapproved of the regulation. *See* Compl., ¶97 & Ex. 15. Nor are Plaintiffs seeking to "destr{oy a} housing project," *Petrella*, 572 U.S. at 686, but simply to have Defendants reliquidate the entries with the AD/CV duties that were owed all along because of importers' circumventing behavior.

As a factual matter, moreover, "15 months" is a misleading exaggeration. The *Solar Duty Holiday* was a practical nullity *until* Commerce reached affirmative circumvention determinations. Plaintiffs likely could not have established an Article III case or controversy beforehand. *See Lujan*, 497 U.S. at 891 ("a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review…until…some concrete action applying the regulation…."). Once affirmative preliminary determinations were published on December 8, 2022, *see* Compl., ¶15, the *Solar Duty Holiday*'s unlawful short-circuiting of relief from circumvention could nevertheless have been mooted by negative final determinations. Given this uncertainty and Plaintiffs' [                    ], they reasonably opted to sue after Commerce's affirmative determinations became final, *see* Compl., ¶16, filing four months thereafter. Defendants cite *Home Products*, which appears to impermissibly resurrect a *laches* test contrary to *SCA*; nonetheless, Plaintiffs comfortably satisfied *Home Products*' 180-day litmus test. *See* Defs.Br. at 39 (citing *Home Products Int'l, Inc. v. United States*, 405 F. Supp. 3d 1368, 1374 (Ct. Int'l Trade 2019)).

    2.  *Public Interest Favors Injunctive Relief*

Defendants primarily target the remaining *eBay* factors, which "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). *See* Defs.Br. at

NONCONFIDENTIAL VERSION

39-43.  Defendants and Intervenors conspicuously ignore the public interest in transmitting

unlawfully forgone AD/CV duties to the U.S. Treasury, *cf. United States v. Stinson*, 729 F.

App'x 891, 898 (11th Cir. 2018) ("By defrauding the IRS, a tax return preparer is in reality

defrauding every law-abiding American who…pays their due"), and the interest in faithfully

implementing Congress' policy of "aggressive implementation of {the circumvention statute},"

S. Rep. 100-71 (1987) at 99, 101; *see also Circumvention Regulation*, 86 Fed. Reg. at 52,303

(characterizing "Congressional intent behind the AD/CVD laws" as "to remedy the injurious

effects of unfairly traded imports"), thereby "level{ing} the playing field for particular American

manufacturers," *Guangdong Wireking Housewares & Hardware Co. v. United States*, 745 F.3d

1194, 1206 (Fed. Cir. 2014).  *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184-88 (1978)

(weighing Congress' purpose in enacting underlying statute when considering injunction).

Equitable doctrines "do not militate against the capacity of a court of equity as a proper forum in

which to make a declared policy of Congress effective."  *United States v. City & Cnty. of San

Francisco*, 310 U.S. 16, 31 (1940).  Section 318(a), having been violated, cannot be to the

contrary.  Moreover, Commerce previously characterized Section 318(a) as compatible with

"do{ing} everything within the parameters prescribed by Congress to ensure that domestic

industries obtain effective relief from dumped and subsidized imports."  *Section 318

Regulations*, 71 Fed. Reg. at 63,230.

      Defendants incorrectly narrow "the public" to importers of circumventing CSPV cells

and modules and emphasize such importers' supposed "lost…opportunity to request or otherwise

participate in administrative reviews that would determine the amount of duties owed on certain

entries" through November (AD) and December (CVD) 2022.  Defs.Br. at 41-42.  But a *public*

interest factor should not force the domestic industry (including Plaintiffs) to bear the brunt of

NONCONFIDENTIAL VERSION

certain importers' strategic decisions. *Cf. Upton v. Tribilcock*, 91 U.S. 45, 55 (1875) ("Equity will not assist {one} whose condition is attributable only to that want of diligence which may be fairly expected from a reasonable person."). For example, contrary to Intervenors' claims, *see* Def.-Ints.Br. at 35-37, nothing prevented Intervenors from foregoing *Solar Duty Holiday* treatment for some entries during each review period to satisfy the preconditions for requesting administrative reviews. As Plaintiffs explained, *Proclamation 10414* created no legal rights or guaranteed duration and given the value at stake and actively contested nature of Commerce's regulations, managing imports to allow flexibility would have been prudent. *See* Pls.Br. at 44-45. Moreover, even after entry, nothing prevented Intervenors from, *e.g.*, electronically filing a post summary correction to reclassify imports as subject to the AD/CVD orders before liquidation, *see, e.g.*, 19 C.F.R. §§ 101.9(b), 141.64; CSMS #15-000743 Post Summary Correction where AD/CVD Duty is Due (Oct. 5, 2015), easily providing suspended entries on which to request an administrative review, *see* Def.-Int. Br. at 35.[11]

Defendants' closing proposal to limit relief based on December 2023 *entry* dates is arbitrary. *See* Defs.Br. at 43. At minimum, Intervenors could have reclassified imports between entry and liquidation, giving them every opportunity to activate retroactive review procedures. For their part, Defendants' unlawful promulgation of a regulation is no basis for a "free pass" on performing statutorily mandated administrative reviews. Indeed, the administrative reviews are likely to proceed, regardless, with other interested parties. *See* Defs.Br. at 42 n.14. There is nothing especially more "complex" about that task here than in any other administrative review.

---

[11] Given the tremendously low prices offered at the time, Intervenors' implicit premise that they could have obtained low dumping margins would have been a near impossibility anyway.

NONCONFIDENTIAL VERSION

    3.   *Balance of Harms Is Greatest for Plaintiffs*

As for balance of harms, Plaintiffs are the *only* parties to have asserted that the Court's decision with respect to injunctive relief, if adverse, threatens [

].  *See* Compl., Ex. 6.  Simply put, no party has claimed greater harm.  Indeed, the other parties' claimed harms are relatively ordinary for those who import.

Although Defendants would stand to recover duties on billions of dollars' worth of entries (hardly a "harm"), Defendants instead focus on claims of "complexity" respecting the identification of which entries and what duty rate should apply.  Defs.Br. at 41.  But these are merely "routine administrative costs."  *Nat. Res. Def. Council, Inc. v. Ross*, 331 F. Supp. 3d 1338, 1369, 1371 n.22 (Ct. Int'l Trade 2018).  Regarding the identification of entries, Defendants' observations demonstrate they have already strategized ways to narrow the task by excluding, *e.g.*, importers excluded from Commerce's circumvention determinations and importers that did not invoke the *Solar Duty Holiday*.  *See id.* at 42.  This further minimizes administrative burdens.

As for the duty rate, Defendants flip the burden upon Plaintiffs to determine "what duties might be 'applicable' if the Court orders a retroactive remedy."  *Id.* at 41.  But Commerce will simply be responsible for conducting administrative reviews, if requested, as is already the case under 19 U.S.C. § 1675(a).  Although Defendants appear to imply otherwise, *see* Defs.Br. at 42-43, nothing in Plaintiffs' request for relief intends to preclude importers whose *Solar Duty Holiday* period entries are subjected to the discipline of AD/CVD orders from pursuing administrative reviews to obtain specific rates different from the estimated duty rates that should have already been collected.  Indeed, Plaintiffs specifically requested that not-yet-liquidated entries be suspended, which would, as Intervenors themselves acknowledge, *see* Def.-Ints.Br. at 35-36, enable such activity.  Nor is it a "harm" for importers, who will at minimum reap the

NONCONFIDENTIAL VERSION

benefit of the *Solar Duty Holiday*'s temporary cash flow boon, to hereafter pay AD/CV duties lawfully owed.

### C.    No Exception to Retroactivity Applies Here

Only when there is "grave disruption or inequity involved in awarding retrospective relief to the petitioner" does the option of pure prospectivity enter into play.  *Ryder v. United States*, 515 U.S. 177, 184–85 (1995).  Both Defendants and Intervenors rely exclusively on *COALITION* to argue that such conditions are met here because "a principle of law…limits the principle of retroactivity itself."  *See* Defs.Br. at 40-41; Def.-Ints.Br. at 32-33 (discussing *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 535 F. Supp. 3d 1336 (Ct. Int'l Trade 2021)).

But *COALITION* was fundamentally different.  *COALITION* adjudicated Commerce's administration of the CVD statute to establish CVD liability, and thus in devising a remedy the Court looked to laws governing revisions to CVD rates arising out of Section 1581(c) actions.  *See* 535 F. Supp. 3d at 1359-60 (discussing 19 U.S.C. § 1516a(c)).  Although *COALITION* considered Commerce's proceeding to have been a rogue CVD review, for all practical purposes it was a CVD review that otherwise followed familiar AD/CVD procedures.  Conversely, *this* case "challenge{s} Commerce's authority to issue and apply the {*Solar Duty Holiday*}."  *See Auxin Solar, Inc. v. United States*, 698 F.Supp.3d 1353, 1367 (Ct. Int'l Trade 2024).  Although Plaintiffs' harm stems from the *Solar Duty Holiday*'s summary negation of protections established through an ordinary AD/CVD proceeding, such outside interference falls well outside of any "principle" Congress may have established respecting appellate revisions to ordinary AD/CVD appeals.  Nor, for all the reasons described in Section VI.B, *supra*, does retroactive relief risk a "grave disruption or inequity" to either Defendants or Intervenors.  *See Ryder*, 515

NONCONFIDENTIAL VERSION

U.S. at 184-85.  Were Plaintiffs denied all practical relief by foreclosing retroactive remedies, a "grave disruption or inequity" would occur.  *See id.*

## VII.    Intervenors' Remaining Arguments

### A.    Intervenors' Arguments Exceed the Bounds of Piggyback Standing

In evaluating Intervenors' motions to intervene, the Court concluded that piggyback standing requirements were, at that time, satisfied.  *See Auxin*, 698 F.Supp.3d at 1373.  However, whereas "standing is not dispensed in gross" and must be demonstrated "for each claim," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), a 'piggyback' litigant cannot maintain a claim that "pursue{s} relief that is broader than or different from" an aligned litigant with independent Article III standing, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020).  With respect to all three arguments below, Intervenors violate this mandate by raising arguments in direct conflict with the position of the Government, on whom Intervenors' standing depends.

### B.    Plaintiffs' Action Does Not Challenge the Presidential Proclamation

Intervenors stand alone in their incorrect suggestion that this challenge of Defendants' *Solar Duty Holiday* should be resolved under standards applicable to Presidential acts.  *See* Def.-Ints.Br. at 8-19.  Intervenors' position is fundamentally incompatible with Defendants' position that Section 318(a) delegated the determinations in question to Commerce, *compare* Defs.Br. at 9-12, 23, *with* Def.-Ints.Br. at 8-19, and intervening importers cannot quarterback the Government's allocation of decision-making authority.

Substantively, Intervenors conflate a prerequisite with the challenged action itself.  *See id.*  True, Commerce could not act unless and until the President proclaimed an emergency and "authorize{d}" Commerce to extend deadlines and/or "authorize{d}" Commerce to permit duty-free imports.  *See* 19 U.S.C. § 1318(a).  Here, *Proclamation 10414* first "provid{ed} additional

NONCONFIDENTIAL VERSION

authority *to the Secretary of Commerce*" by "invok{ing} and *ma{king} available*" "the authority under Section 1318(a)" and then separately instructed Commerce to "consider taking appropriate action *under Section 1318(a)*" to permit duty-free importation of circumventing CSPV cells and modules.  87 Fed. Reg. at 35,068 (emphasis supplied).  This reflects Section 318(a), which makes Commerce the ultimate actor that "extend{s}" deadlines or "permit{s}" duty-free importation.  And ultimately, Commerce's Assistant Secretary for Enforcement and Compliance signed the challenged *Solar Duty Holiday*.  *See* 87 Fed. Reg. at 56,887.

Intervenors ignore the nature of the President's authorization, and argue that *Proclamation 10414* foreordained everything, because the President circumscribed the products for which Commerce ultimately "permit{ted}" duty-free importation in the *Solar Duty Holiday*.  *See* Def.-Ints.Br. at 9-10.  The President did no such thing.  As quoted above, Section 1(a) of *Proclamation 10414* makes Section 318(a) authority broadly available to Commerce "according to {the statute's} terms" and "to respond to the emergency herein declared."  87 Fed. Reg. at 35,068.  The Proclamation otherwise contemplates Commerce's "exercis{e of}…any of the authorities set forth in Section 1318(a)."  *Id.*  Separately, Section 1(b) directs Commerce to specifically "consider taking appropriate action under Section 1318(a)" to permit duty-free importation of CSPV cells and modules from circumventing countries, while Section 2(b) requires that implementation be "consistent with applicable law."  *Id.*  Thus, *Proclamation 10414* opened the door for *Commerce* to "exercise{e}" Section 318(a) authority while also naming a specific use case for "consider{ation}."  *See id.*

Plaintiffs assume *arguendo* the President could lawfully do so, but contend that Commerce's "exercis{e}" of authority and "consider{ation}" of the proposed use violated the law by exceeding Section 318(a)'s limits.  "Consideration" involves a measure of independent

**NONCONFIDENTIAL VERSION**

judgment, and courts have treated agency results of such Presidential instructions as reviewable under *Chevron* (now *Loper Bright*) and the APA. *See, e.g.*, *Little Sisters*, 591 U.S. at 674 (interim final rule promulgated without notice and comment following Presidential direction to "consider" certain action in *Executive Order 13798* reviewed under APA); *Am. Fuel & Petrochemical Manufacturers v. Env't Prot. Agency*, 3 F.4th 373, 376 (D.C. Cir. 2021) (result of notice & comment rulemaking following Presidential direction to "consider" certain action reviewed under *Chevron* and vacated).

Intervenors fail to address Sections 1(a) or 1(c) of *Proclamation 10414*, mistakenly treating Section 1(b) as its entirety. *See* Def.-Ints.Br. at 12-13. This just relitigates Intervenors' failed motions to dismiss this matter. *See Auxin*, 698 F.Supp.3d at 1370-71. The Court correctly recognized that the "true nature" of this action targets the *Solar Duty Holiday* regulation. *See id.* at 1368-70.

Intervenors otherwise discuss various ancillary documents, but every quoted passage is susceptible to several interpretations, including interpretations consistent with foregoing analysis, and none claims that Commerce understood *Proclamation 10414* to have required the particular result reached by the *Solar Duty Holiday*. *See* Def.-Ints.Br. at 11-16. Nor could they. Section 318(a) unambiguously requires Presidential action "by proclamation" (not "by fact sheet") and limits the President to "authoriz{ing}" further administrative action. That is exactly what *Proclamation 10414* did, whereupon the agency acted *ultra vires* of Section 318(a) authority.[12] The instant scenario is opposite *Franklin*, where the Supreme Court found action Presidential in nature because "{t}he President, not the Secretary, takes the final action that

---

[12] Intervenors' preferred standard of review would not change the result. Plaintiffs' argument demonstrates that an "explicit statutory mandate" was "violated." *See Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006).

NONCONFIDENTIAL VERSION

affects the {plaintiffs}." *Franklin v. Massachusetts*, 505 U.S. 788, 799 (1992).  Here, but for the *Solar Duty Holiday*, *Proclamation 10414* itself would have been harmless or even beneficial to domestic solar manufacturers if implemented in accordance with law.

### C.   Commerce's Rulemaking Authority Under 19 U.S.C. § 1677j Cannot Salvage the *Solar Duty Holiday*

Intervenors lack standing to override the Government's own sense of which statutory authorities it relied upon.  Without any support from the Government, Intervenors assert that the *Solar Duty Holiday* was a lawful exercise of Commerce's rulemaking authority under 19 U.S.C. § 1677j.  Def.-Int.Br. at 25-29.  As Plaintiffs explained, and underscored by the Government's silence in their response, the *Solar Duty Holiday* was not in fact an exercise in Section 1677j rulemaking.  *See* Pls.Br. at 42-43.  Not only was the circumvention regulation unaltered, *see* 19 C.F.R. § 351.226, but the *Solar Duty Holiday* purported to negate *all* AD/CVD duties, not only those stemming from circumvention, *see* 19 C.F.R. § 362.103(a).

Regardless, declining *ex ante* to enforce all AD/CVD duties based on a Presidentially declared emergency, as the *Solar Duty Holiday* did, would not be a valid exercise of anti-circumvention rulemaking.  Moreover, *Proclamation 10414* only "direct{ed}" Commerce to use Section 318(a) authority.  87 Fed. Reg. at 35,068.  Addressing a timebound Presidentially declared emergency is well outside the scope of what 19 U.S.C. § 1677j contemplates, and Intervenors identify no link between the two.  *See* Def.-Int.Br. at 25-29.

Plaintiffs need not identify language in 19 U.S.C. § 1677j that actively "preclude{s} the approach that Commerce took in this case to address….the presidentially declared emergency," *id.* at 27; "{i}t is indeed well established that the absence of a statutory prohibition cannot be the source of agency authority," *FAG Italia S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002).  Rather, "an agency literally has no power to act…unless and until Congress confers

NONCONFIDENTIAL VERSION

power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), and Intervenors have

failed to identify how the "best meaning" of 19 U.S.C. § 1677j could invest Commerce with

authority to issue emergency regulations preemptively waiving all AD/CVD duties during a

still-pending circumvention proceeding, *see Loper Bright*, 144 S. Ct. at 2271.

### D. The Court's Remedial Power Encompasses the Relief Sought

Intervenors conclude by challenging the Court's authority to order reliquidation. *See*

Def.-Ints.Br. at 38-42. Intervenors' position directly contradicts Defendants' acknowledgment

that "the Court would possess the remedial power to order reliquidation as set forth in the

proposed order that accompanied the joint stipulation." Response of Defendants to March 20,

2024, Order, ECF Doc. 72 (Mar. 27, 2024) at 2. Although Intervenors availed themselves of the

chance to oppose the joint stipulation, *see* Proposed Defendant-Intervenors' Comments

Regarding Proposed Stipulation, ECF Doc. 74-1 (Apr. 1, 2024), the Court granted the

stipulation. *See* Slip Op. 24-58, ECF Doc. 75 (May 9, 2024) at 26-27. Intervenors' view of the

matter is, therefore, legally irrelevant. It is the Government, and only the Government, that

would be subjected to a court order to reliquidate and collect duties. Because the Government

has stipulated that it "does not and will not oppose…the Court's authority to order reliquidation,"

Joint Stipulation, ECF Doc. 19 (Jan. 25, 2024) at 2, and because Intervenors are reliant solely on

piggyback standing which precludes them from "pursu{ing} relief that is broader than or

different from" the Government, *see Little Sisters*, 591 U.S. at 674 n.6, their arguments cannot be

countenanced.

Regardless, Intervenors' position is meritless. Intervenors identify various other customs

statutes concerning liquidation's finality. *See* Def.-Ints.Br. at 39-40. From these, Intervenors

extrapolate Congressional intent to deny this Court power to order duty-increasing liquidation,

noting also that *Shinyei* concerned an importers' duty refund request. *See* Def.-Ints.Br. at 40-42

NONCONFIDENTIAL VERSION

(citing *Shinyei Corp. of America v. United States*, 355 F.3d 1297 (Fed. Cir. 2004)).  Intervenors

otherwise incorrectly assert that this case, unlike *Shinyei*, did not involve "erroneous instructions

to CBP," *id.* at 42, when in fact Commerce's erroneous instructions to CBP (or lack thereof) in

reliance on the *Solar Duty Holiday* are squarely at issue.

      Moreover, as this Court explained in rejecting similar arguments based on the same

authorities, the Administrative Procedure Act, under which this case was brought, "generally

waives the Federal Government's immunity from a suit 'seeking relief other than money

damages and stating a claim that an agency or an officer or employee thereof acted or failed to

act in an official capacity or under color of legal authority,'" unless "{an}other statute that grants

consent to suit expressly or impliedly forbids the relief which is sought."  *AM/NS Calvert LLC v.

United States*, 654 F. Supp. 3d 1324, 1342 (Ct. Int'l Trade 2023) (quoting *Match-E-Be-Nash-

She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) and 5 U.S.C. §

702).

> *Patchak's* logic necessarily means that in all cases properly brought under this
> court's residual jurisdiction, equitable relief, including an injunction requiring
> reliquidation, is available under the CIT's "broad remedial powers." *Shinyei*, 355
> F.3d at 1312. That's because when a plaintiff properly invokes the CIT's § 1581(i)
> jurisdiction, no other statute can be "addressed to the type of grievance" for which
> the plaintiff seeks relief. *Patchak*, 567 U.S. at 216.

*AM/NS Calvert*, 654 F. Supp. 3d at 1343.  Thus, Intervenors' position that the Court lacks power

to order reliquidation is without merit.

   **VIII.   Conclusion**

      The *Solar Duty Holiday* is unlawful and exceeds the bounds of 19 U.S.C. § 1318(a) and

*Proclamation 10414*.  Plaintiffs therefore request relief as stated in their Rule 56.1 motion.

             \*      \*      \*

**NONCONFIDENTIAL VERSION**

Respectfully submitted,

/s/ Thomas M. Beline

Thomas M. Beline
Roop K. Bhatti
James E. Ransdell
Chase J. Dunn
Sydney C. Reed

**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania Ave. N.W.
Suite 300
Washington, D.C. 20037

Phone: (202) 567-2316
Fax: (202) 567-2301

*Counsel for Auxin Solar Inc. and
Concept Clean Energy, Inc.*

December 19, 2024

**Certificate of Compliance with Chambers Procedures 2(B)(1)**

The undersigned hereby certifies that the foregoing memorandum of law contains 10,485 words, exclusive of the caption block, table of contents, table of authorities, signature block, certificates of counsel, and square brackets and therefore complies with the maximum 10,500-word count limitation set forth in the Court's Order of December 18, 2024.

By: /s/ Thomas M. Beline
    Thomas M. Beline

# **EXHIBIT 1**

do not contain foreign materials to the value of more than 20 per centum of their total value, upon which no drawback of customs duties has been allowed therein, coming into the United States from such islands shall be admitted free of duty. (Mar. 3, 1917, c. 171, sec. 3, 39 Stat. 1133.)

(b) Compliance with these requirements of the law must be established by an official certificate of origin of the collector or deputy collector of customs at the port of shipment in the Virgin Islands. Such certificate will not, however, be required for shipments by mail or otherwise valued at $10 or less.

(c) In case merchandise arrives unaccompanied by a certificate of origin or any document necessary to complete entry is lacking bond for the production thereof may be taken, on customs Form 7551 or 7553, except that bond for the production of a bill of lading shall be taken on customs Form 7581 or 7587.

(d) Except as provided in § 6.16 (b), invoices certified by the collector or deputy collector of customs in the Virgin Islands will be required upon the entry of all dutiable merchandise from those islands valued at more than $100. When merchandise is covered by a certificate of origin, no certified invoice is required.

(e) Merchandise may be withdrawn from bonded warehouse under section 557, Tariff Act of 1930, for shipment to the Virgin Islands without payment of duty, or with benefit of drawback if the duties have been paid thereon. No drawback can be allowed under section 313, Tariff Act of 1930, on articles manufactured or produced in the United States with the use of imported merchandise or domestic tax-paid alcohol and shipped to the Virgin Islands.† (R.S. 251, secs. 482, 624, 46 Stat. 720, 759; 19 U.S.C. 66, 1482 (f), 1624) [Art. 272]

CROSS REFERENCE: For drawback regulations, see Part 20.

## PART 6—INVOICES, ENTRY, AND ASSESSMENT OF DUTIES

Sec.

Invoices

6.1 Invoices; contents.
6.2 Mode of certification of invoices.
6.3 Fee stamps to be affixed to invoices.
6.4 Invoice to be for single shipment.
6.5 Incomplete invoices.

Entry

6.6 Entry required.
6.7 Examination of merchandise prior to entry.
6.8 When and by whom entry may be made.
6.9 Evidence of right to make entry.
6.10 Disposition of bill of lading or carrier's certificate.
6.11 Release of merchandise.
6.12 Notice of lien.
6.13 Controverted liens.
6.14 Discharge of liens.
6.15 Requirements on entry.
6.16 Invoice to be filed with entry.
6.17 Declaration on entry.
6.18 Powers of attorneys.
6.19 Entered value to be determined by importers by adding to or deducting from the invoice value.
6.20 Additions because of advances by appraiser pending reappraisement.
6.21 Entry on triplicate invoices.
6.22 Incomplete entry; bonds for the production of documents.

Assessment of duties

6.23 Release of merchandise in customs custody after liquidation; merchandise refused by consignee.

Entry for consumption

6.24 Form.
6.25 Estimation of duties.
6.26 Designation of merchandise to be examined.
6.27 Bond; deposit of estimated duties; permit.

†For source citation, see note to § 5.1.

§ 6.1                TITLE 19—CUSTOMS DUTIES

Sec.
6.28 Release of examined packages.
6.29 Recall of merchandise released from customs custody.
     Entry for warehouse
6.30 Form and contents; articles not entitled to entry.
6.31 Substitution of bonds.
6.32 Divided importation.
6.33 Estimation of duties; bond.
6.34 Permit.
     Entry for rewarehouse
6.35 Procedure.
6.36 Value and classification.
6.37 Protest.
     Combined entry for rewarehouse and withdrawal for consumption
6.38 Form.
6.39 Procedure.
     Exportation under warehouse withdrawal for transportation
6.40 Procedure.
     Withdrawal at original and secondary ports for consumption
6.41 Entry; form and contents.
6.42 Computation and payment of duties.
6.43 Withdrawals; when completed.
6.44 Withdrawal by transferee.
6.45 Withdrawals before and after liquidation.
     Withdrawal at original and secondary ports for exportation
6.46 Form and contents.
6.47 Report of packages not laden.

Sec.
6.48 Withdrawal before liquidation; damage, etc.
6.49 Weight, gauge, or measure.
6.50 Distilled spirits, regauge.
6.51 Parcel post packages.
     Zinc and lead-bearing ores and crude copper-bearing materials
6.52 Entry and sampling of zinc and lead-bearing ores not for smelting in bond; bond.
6.53 Entry and sampling of crude copper-bearing materials not for smelting or refining in bond.
     Entry for exportation and by appraisement, informal entries, and packed packages
6.54 Entry for exportation; merchandise unentered or rejected, exportation.
6.55 Entry by appraisement.
6.56 Informal entries.
6.57 Packed packages; definition; marking; entry.
     Special delivery packages
6.58 Application.
6.59 Marking.
6.60 Liquidation; delivery.
6.61 Bond.
6.62 Cording and sealing.
6.63 Returned packages; refund of duty.
6.64 Unclaimed packages.
6.65 Invoice.
     Landing and delivery of articles for which immediate delivery is necessary
6.66 Application; entry; procedure.

CROSS REFERENCE

Regulations of the Department of State governing consular invoices: See Foreign Relations, 22 CFR Part 96.

INVOICES

**Section 6.1 Invoices; contents.** (a) When any of the component materials of an imported article affects its classification or appraisement, the "grade or quality" of the article shall be shown on the invoice by an analysis of the article or the formulae under which it was manufactured or produced showing the percentage of each such component material contained in the article if known or, if such percentage is unknown, by a statement that the article contains such material or materials.

(b) Whenever it shall be determined by the appraising officer that information as to the cost of production is necessary in the appraisement of certain merchandise, the importer shall be notified by the collector or appraiser and thereafter invoices covering shipments of such merchandise shall contain a verified statement by the manufacturer or producer as to the cost of production, as defined in section 402 (f), Tariff Act of 1930.

(c) (1) Notice of prescribed additional facts which are required from time to time to be included on invoices of certain classes of merchandise will be published in the weekly Treasury Decisions.

(2) Each invoice of colors, dyes, stains, color acids, color bases, color lakes, leuco-compounds, indoxyl, or indoxyl compounds, shall contain a plain, conspicuous, and truly descriptive statement of the following particulars:

(i) Trade name of article and manufacturer's name.

(ii) Percentage of dye, exclusive of diluent contained in the article.

(iii) Schultz or color index number, if any. If none, the chemical classification of the dye (whether azo, anthraquinone, sulphur, etc.), and the method of application (whether acid, basic, direct, etc., with after treatment, if any), together with a statement of the chemical composition or the intermediates from which the finished dye is made.

(iv) In the absence of a Schultz or color index number of a dye consisting of a mixture of two or more dyes, then the information required by items (i), (ii) and (iii) (except the method of application), of each component dye in the mixture shall be given, together with the method of application of the mixture. (T.D. 39744, July 17, 1923)

(3) Invoices of church bells shall contain specifications showing the weight, diameter, and value of each bell. (T.D. 42177, May 13, 1927)

(4) Invoices of imported tobacco must specify in detail the character of the tobacco contained in each bale, its origin as to country and province, the year of its production, and the grade or grades contained in each bale, specifying the number of carrots or pounds of each grade, when more than one grade is packed in a bale, the time when and the place where and from whom purchased, and the price paid or to be paid for each bale or package, if purchased by the bale or package, or for the vega or lot if purchased in bulk, and if obtained otherwise than by purchase, the actual market value per bale.

Invoices covering or including bales of tobacco which are part of a vega or lot purchased in bulk must contain or be accompanied by a full description of the vega or lot purchased, or, if such description has been furnished with a previous importation, specify the date and number of the consular invoice in which the same has been incorporated.

Packages or bales when containing filler leaf only shall be invoiced as filler; when containing both filler and wrapper, but not more than 35 percent of wrapper, shall be invoiced as mixed; and when containing more than 35 percent of wrapper, shall be invoiced as wrapper. Collectors will not permit entry of tobacco unless the invoice conforms to the above requirements. (T.D. 44854, May 7, 1931)

(5) Invoices covering articles taxable under section 601 (c) (7) of the Revenue Act of 1932 should contain statements as to the weight of the articles and the weight of the copper contained therein. (T.D. 45878, Sept. 8, 1932)

(6) All customs invoices of sugar in liquid form are hereby required to contain a statement showing with respect to each lot of such sugar the percentage by weight of total soluble solids (or Brix) and the percentage by weight of total sugars; and all customs invoices of articles composed in part of beet or cane sugar are hereby required to contain a statement showing with respect to each class

§ 6.2                    TITLE 19—CUSTOMS DUTIES

or kind of such articles the percentage by weight of total sugars derived from sugar beets or sugar cane. (T.D. 49400, Feb. 10, 1938)

(7) Invoices of imported braids, plaits, laces, and willow sheets or squares subject to the provisions of item 1504 (a) of the Swiss Trade Agreement (T.D. 48093), 49 Stat. 3917–3959, will be required to contain a statement showing the gross and the net weights of such articles. (T.D. 49501, Apr. 6, 1938).

(d) When the kind of currency is apparent from the invoice a specific statement that the currency is gold, silver, or paper need not be required. (Secs. 481, 484, 624, 46 Stat. 719, 722, 759; 19 U.S.C. 1481, 1484, 1624. Par. 602 : sec. 1, 46 Stat. 590; 19 U.S.C. 1001) [Art. 274, Cust. Reg. 1937, as amended by T.D. 49426, Feb. 18, 1938, and the Treasury decisions cited after subparagraphs (2)–(7), respectively, of paragraph (c) of this section]

    CROSS REFERENCE: For U. S. Tariff Commission's rules respecting equalization of costs of production, see §§ 202.1–202.5.

**6.2  Mode of certification of invoices.**  In the case of invoices requiring consular certification in accordance with section 482 (a), Tariff Act of 1930, the seller or shipper must sign all copies of the invoice, but only one copy need be signed by the consular officer, the signed copy invariably to be the original. However, the consular officer's name as well as the rubber seal of the consulate must be stamped on all copies of the invoice.†  (Secs. 482, 624, 46 Stat. 720, 759; 19 U.S.C. 1482, 1624)  [Art. 276]

    †The source of §§ 6.2 to 6.66, inclusive, (except for Treasury Decisions noted in the text,) is Customs Regulations of 1937, 2 F.R. 1512ff.

**6.3  Fee stamps to be affixed to invoices.**  The original of the invoice must be stamped and the stamp canceled by the consular officer to show the payment of the fee. No unstamped original invoice shall be accepted as valid, but an unstamped invoice may be used as a pro forma invoice and entry made thereon upon the giving of a bond for the production of a stamped invoice. If, however, the triplicate or the quadruplicate consular invoice shall bear a consular notation that the original was stamped, such invoice may be accepted the same as the stamped invoice when produced. Collectors should notify consular officers of the receipt of unstamped invoices.†  (Sec. 624, 46 Stat. 759; 19 U.S.C. 1624)  [Art. 278]

**6.4  Invoice to be for single shipment.**  (a) Every invoice must represent a distinct shipment by one consignor to one consignee by one vessel. If by reason of accident or short shipment a portion thereof should fail to arrive, an extract from the original invoice, certified by the collector or appraiser, may be used for entering the remaining packages.

(b) Except as provided in § 3.6 the consolidation of separate shipments on one invoice, or the breaking up of importations into small lots, each valued at less than $100, for the purpose of avoiding consular fees, shall not be permitted.†  (Sec. 624, 46 Stat. 759; 19 U.S.C. 1624)  [Art. 281]

**6.5  Incomplete invoices.**  (a) Collectors will reject certified invoices which are not made in accordance with the regulations in this

chapter, but entry may be permitted on a pro forma invoice and a bond taken for the production of a corrected consular invoice.

(b) Incomplete invoices covering merchandise valued at $100 or less will not be rejected if the classification and appraisement of the merchandise thereon can be made without endangering the revenue.† (Sec. 624, 46 Stat. 759; 19 U.S.C. 1624)    [Art. 282]

ENTRY

**6.6  Entry required.** Entry, as required by section 484, Tariff Act of 1930, must be made of all importations whether free or dutiable and regardless of their value, except (a) as provided in § 7.5; (b) as provided in § 14.12; (c) as provided in § 7.11 (b); and (d) in the case of parcels contained in packed packages where the individual parcel contains merchandise unconditionally free of duty and not exceeding $100 in value. When action is taken under (b) or (d) an appropriate notation as to the disposition of the articles and the authority under which they were passed free of duty or the statement "no dutiable value" shall be made on the manifest in lieu of the entry.†  (Sec. 484, 46 Stat. 722; 19 U.S.C. 1484 (a))  [Art. 283]

**6.7  Examination of merchandise prior to entry.** (a) Customs officers at the port of entry will not permit the opening, examination, or inspection of any package containing imported merchandise until proper entry therefor has been made, except as otherwise provided by law or regulation, or when a real necessity is shown and the consignee makes application therefor in writing, in which the carrier concurs.

(b) Upon written application by the consignee or his agent, concurred in by the carrier, perishable merchandise may be inspected before entry upon arrival at the port of entry, or while in transit under bond, but only for the purpose of determining its condition and under customs supervision. The additional expense, if any, of customs supervision, including actual expenses for travel and subsistence, but not the compensation of the customs officer, shall be paid by the party requesting the inspection.†  (R.S. 251, sec. 624, 46 Stat. 759; 19 U.S.C. 66, 1624)  [Art. 284]

**6.8  When and by whom entry may be made.** (a) Tariff Act of 1930, section 484 (a):

\* \* \* Such entry shall be made at the customhouse within forty-eight hours, exclusive of Sundays and holidays; after the entry of the importing vessel or report of the vehicle, or after the arrival at the port of destination in the case of merchandise transported in bond, unless the collector authorizes in writing a longer time. \* \* \*

(b) Tariff Act of 1930, section 484 (a):

Except as provided in sections 490, 498, 552, and 553 and in subdivision (j) of section 336 of this Act, and in subdivisions (h) and (i) of this section, the consignee of imported merchandise shall make entry therefor either in person or by an agent authorized by him in writing under such regulations as the Secretary of the Treasury may prescribe. \* \* \*

(c) The executor or administrator of the estate of a deceased consignee, the receiver or other legal representative of an insolvent consignee or the representative of a consignee appointed in any action or proceeding at law, shall not be permitted to make entry

†For source citation, see note to § 6.2.

unless he shall produce a duly indorsed bill of lading or a certificate from the carrier or a duplicate bill of lading, executed in accordance with subsections (h) and (i) respectively, of section 484 of the Tariff Act, showing him to be consignee for customs purposes.

(d) A non-resident consignee who appears in person at the customhouse has the right to make entry but the bond (customs Form 7551 or 7553) when required, shall have a resident corporate surety thereon.

(e) A foreign corporation can not enter merchandise for consumption unless it has, in the State where the port of entry is located, a resident agent authorized to accept service of process against such corporation and files a bond with resident corporate surety to secure the payment of any increased and additional duties which may be found due.† (Sec. 484, 46 Stat. 722; 19 U.S.C. 1484 (a)) [Art. 289]

**6.9 Evidence of right to make entry.** (a) A shipping receipt or other document presented in lieu of a bill of lading shall not be accepted as authority for making entry unless bearing a certificate of the carrier in accordance with subsection (h) or (i) of section 484 of the Tariff Act, or unless entry is made by the actual consignee in person or in his name by a duly authorized agent.

(b) When merchandise is not being transported by a common carrier, possession of the merchandise at the time of arrival in the United States shall be deemed sufficient evidence of the right to make entry.

(c) Entry may not be made on an extract from a bill of lading unless the same is certified to be genuine by the carrier bringing the merchandise to the port at which entry is made. Collectors of customs shall not certify extracts from bills of lading.

(d) Separate entries may be made for consolidated shipments upon compliance with the following requirements:

(1) The consignee of a consolidated shipment covering merchandise for various ultimate consignees who desire to make separate entries, shall deposit with the collector the original bill of lading, certified duplicate or carrier's certificate (or shipping receipt where no bill of lading has been issued) covering the entire shipment, and such document shall be permanently retained by the collector.

(2) If a bill of lading is filed it shall contain the following indorsement, signed by the consignee named therein:

As the within described merchandise belongs to various ultimate consignees who desire to make separate entries therefor, the undersigned consignee thereof hereby expressly waives the right granted by section 484 (j), Tariff Act of 1930, to have this bill of lading returned.

(3) At the time of depositing such bill of lading, or other document, the consignee named therein shall produce a certificate prepared and signed by him for each portion of the shipment for which separate entry is desired. The certificate shall be in the following form:

CHAPTER I—BUREAU OF CUSTOMS    § 6.9

Collection district No.____
Port of _____

### AUTHORITY TO MAKE ENTRY

Of merchandise imported at_____on_____19____
per_____from_____ shipped by
_____consigned to_____indorsed to
_____covered by_____(insert "bill of
lading", "certified duplicate bill of lading", "carrier's certificate", or "shipping
receipt") dated_____19____, at_____on file with
the collector of customs at_____

| Marks | Numbers | Description |
|---|---|---|
| ---------------- | ---------- | ------------------------------------- |
| ---------------- | ---------- | ------------------------------------- |
| ---------------- | ---------- | ------------------------------------- |

We }
I  } _____ the consignee in the above-mentioned
document covering merchandise for various ultimate consignees, hereby authorize
_____ or order, to make customs entry for the above-
described merchandise.

_____
(Consignee)

(4) Such certificates shall be compared with the supporting docu-
ment and after being checked by the entry clerk over his initials may
be returned to the consignee for the purpose of making entry.

(5) The authority to make entry carried by these certificates may
be made transferable by indorsement.

(e) When a carrier's certificate is used in making entry or is filed
therewith, it shall completely identify the merchandise or be made
on, or attached to, a copy, duplicate, or memorandum of the original
bill of lading certified to be a true copy of the original. Such cer-
tificate shall be in substantially the following form:

### CARRIER'S CERTIFICATE

The undersigned carrier bringing the merchandise to this port, to whom or
upon whose order the same must be released, hereby certifies that (name)
_____, (address) _____, is the owner
or consignee (as described in section 484 (h) of the Tariff Act) of the follow-
ing merchandise (or the merchandise described in the within or attached
document):

| Marks and nos. | Number and kind of packages, contents, and quantity |
|---|---|
| -------------- | ----------------------------------------------------- |
| -------------- | ----------------------------------------------------- |
| -------------- | ----------------------------------------------------- |

Name of carrier: _____
Agent: _____

§ 6.10                    TITLE 19—CUSTOMS DUTIES

(f) When entry is made on a certified duplicate bill of lading, the certificate thereon shall be in substantially the following form:

DUPLICATE BILL OF LADING CERTIFICATE

The undersigned carrier, bringing the within described merchandise to this port, hereby certifies that this signed copy of the bill of lading is genuine and may be used for the purpose of making customs entry as provided in section 484 (i) of the Tariff Act.

Name of carrier: _____

Agent: _____

(g) When a bond is given for the production of a bill of lading it should be on customs Form 7581 and should run in favor of the collector individually and as collector of customs. When the collector is in doubt as to the propriety of accepting entry on a bond for the production of a bill of lading he may, if he deems it advisable, require authority to do so from the Bureau.

(h) Inasmuch as the provisions of section 484 (c) of the Tariff Act do not apply in the case of entries made under subsections (h) and (i), no bond for the production of a carrier's certificate or certified duplicate bill of lading can be taken; but when entry is made on a bond for the production of a bill of lading, such bond may be considered as satisfied upon the production of a carrier's certificate or certified duplicate bill of lading, but shall not be canceled.

(i) Underwriters of abandoned merchandise or salvors of merchandise saved from a wreck, who are unable to produce a bill of lading, certified duplicate, or carrier's certificate, shall produce evidence satisfactory to the collector of their right to act.† (Sec. 484, 46 Stat. 722; 19 U.S.C. 1484) [Art. 290]

**6.10  Disposition of bill of lading or carrier's certificate.** (a) Tariff Act of 1930, section 484 (j):

* * * The collector shall return to the person making entry the bill of lading (if any is produced) with a notation thereon to the effect that entry for such merchandise has been made. * * *

(b) When the return of the bill of lading is requested, the collector may require a receipt therefor. If the original bill of lading is necessary to obtain a carrier's certificate or duplicate bill of lading from the carrier, such exchange should be made in advance of making entry.

(c) When a carrier's certificate or duplicate bill of lading is used in making entry, it shall be retained by the collector as evidence that the person making entry is authorized to do so.† (Sec. 484, 46 Stat. 722; 19 U.S.C. 1484) [Art. 291]

**6.11  Release of merchandise.** (a) Tariff Act of 1930, section 484 (j):

Merchandise shall be released from customs custody only to or upon the order of the carrier by whom the merchandise is brought to the port at which entry is made, except that merchandise in a bonded warehouse shall be released from customs custody only to or upon the order of the proprietor of the warehouse. * * *

(b) The delivery order from the carrier, which may be included in the certificate provided for in section 484 (h) of the Tariff Act or be indorsed on the certified duplicate bill of lading provided for

†For source citation, see note to § 6.2.

in section 484 (i) of the Tariff Act shall be in substantially the following form:

In accordance with section 484 (j) of the Tariff Act, authority is hereby given to release the above-described merchandise to: _____

This order may be qualified as follows:

(1) (If the merchandise is entered for warehouse.) For transfer to the bonded warehouse designated in the warehouse entry.

(2) (If the merchandise is entered for transportation in bond.) For transfer to the bonded carrier designated in the transportation entry.

(3) (If the merchandise is entered for exportation.) For transfer to the carrier designated in the export entry.

(c) A delivery order from the proprietor of a bonded warehouse covering merchandise therein shall be in substantially the same form.

(d) The merchandise may be released to the person named in the bill of lading in the absence of a specific delivery order from the carrier, provided the carrier concerned shall have filed a blanket order authorizing release to the consignee in such cases.† (Sec. 484, 46 Stat. 722, sec. 624, 46 Stat. 759; 19 U.S.C. 1484, 1624) [Art. 292]

**6.12  Notice of lien.** (a) Notices of lien filed with the collector under section 564, Tariff Act of 1930, shall be on customs Form 3485, signed by the authorized agent of the carrier and verified by his affidavit.

(b) When the cargo of a vessel is subject to contribution in general average a preliminary notice thereof may be filed with the collector and individual notices of lien may be filed thereafter. The collector shall thereupon withhold release of any merchandise imported in the vessel for 2 official days from and after the taking of such merchandise into customs custody, unless proof is submitted that the claim for contribution in general average has been paid or secured.

(c) Notice of lien upon goods entered for immediate transportation should be filed by the carrier with the collector of customs at destination. If such notice, however, be filed with the collector at the port of first arrival he will promptly transmit it to the collector at destination. When a notice of lien has been transmitted to the collector at destination and such lien afterwards is discharged at the port of first arrival the collector at such port will immediately notify the collector at destination.

(d) Liens may not be filed against goods after forfeiture under any provision of law; nor after sale thereof by the Government under section 491 or 559 of the Tariff Act; nor after customs release; nor, in the case of goods abandoned to the Government under section 506 (1) or 563 (b) of the Tariff Act, after the receipt and acceptance of the notice of abandonment. Notices of lien received thereafter should be returned with a statement thereon as to the reason for rejection. The acceptance of any notice of lien cannot in any manner disturb the order of disposition and accounting for the proceeds of sales of forfeited and abandoned property, as provided for in §§ 18.13–18.15, 13.7.† (Secs. 564, 624, 46 Stat. 747, 759; 19 U.S.C. 1564, 1624) [Art. 295]

†For source citation, see note to § 6.2.

§ 6.13            TITLE 19—CUSTOMS DUTIES

**6.13  Controverted liens.** (a) Collectors have no authority to adjudicate disputes respecting the validity of any lien, except that whenever the amount of such lien depends upon the quantity or weight of merchandise actually landed, the collector may hold that the lien may be satisfied upon the payment of an amount computed upon the basis of the return made by the United States appraiser, weigher, or gauger.

(b) When any doubt exists as to the validity of a lien filed with the collector, he may exact a bond of indemnity running to himself to save him harmless from any personal liability which may result from withholding the release of the goods.† (Secs. 564, 624, 46 Stat. 747, 759; 19 U.S.C. 1564, 1624)  [Art. 296]

**6.14  Discharge of liens.** Proof that the lien has been satisfied or discharged shall consist of a release in writing signed by the claimant, or a written receipt of such claimant, filed with the collector, showing the payment of the claim in full. Merchandise covered by liens may be released upon the filing of the above evidence of payment.† (Secs. 564, 624, 46 Stat. 747, 759; 19 U.S.C. 1564, 1624) [Art. 297]

**6.15  Requirements on entry.** (a) Entries shall be in legible writing, preferably typewriting, and if written by hand, ink, or indelible lead shall be used. They shall be in the forms prescribed by the regulations, and shall show the name, nationality, and motive power of the importing vessel or other carrier; the port or place of departure and the date of arrival; the place, date, and consular number of the certified invoices, if any; the marks, numbers, and number of packages, and the quantity of each kind of merchandise covered thereby described in terms of the Tariff Act and in accordance with statistical Schedule A of the Department of Commerce;[1] also the rates of duty, and, except in the case of entries by appraisement, the separate value for each classification. In order to show how he arrived at the entered value, the importer shall also show on the entry for each invoice covered thereby, and in the order named, the gross invoice value of the merchandise, the total nondutiable charges, the total dutiable charges, the totals of the additions or deductions, if any, to make value, and the net entered value. Where importers prepare and file customs Form 6417 (Summary of Entered Value, Examination, and Appraisement) with the entry, showing thereon the information required by the preceding sentence, such summary sheet shall be considered part of the entry for the purpose of this paragraph and, in such cases, it will be unnecessary to duplicate the information in question on the entry form.

(b) Consolidated shipments to one consignee for various ultimate consignees, and the several inclosures of a packed package, may be separately entered upon compliance with the provisions of §§ 6.9 (d), 6.57, respectively.† (Sec. 484, 46 Stat. 722; 19 U.S.C. 1484) [Art. 298]

---

[1] Schedule A of the Department of Commerce can be obtained from the Superintendent of Documents, Washington, D. C., at a nominal cost.

**6.16  Invoice to be filed with entry.**  (a) (1) Tariff Act of 1930, section 484 (b) :

No merchandise shall be admitted to entry under the provisions of this section without the production of a certified invoice therefor, except that entry may be permitted if—

(1) The collector is satisfied that the failure to produce such invoice is due to causes beyond the control of the person making entry.

(2) Such person makes a verified declaration in writing that he is unable to produce such invoice and (A) files therewith a seller's or shipper's invoice, or (B) if he is not in possession of a seller's or shipper's invoice files therewith a statement of the value, or the price paid, in the form of an invoice; and

(3) Such person gives a bond for the production of such certified invoice within six months.  *  *  *

(2)  Bonds for the production of consular invoices shall be on customs Form 7551 or 7553, or other appropriate bond containing such requirement.

(b)  Tariff Act of 1930, section 484 (b) :

*  *  *  The Secretary of the Treasury may by regulations provide for such exceptions from the requirements of this subdivision as he deems advisable.

Consular invoices will not be required for—

(1) Merchandise imported otherwise than in pursuance of a purchase or agreement to purchase, not exceeding $100 in dutiable value, and merchandise imported in pursuance of a purchase or agreement to purchase, when the purchase price of the merchandise, including all costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, as determined by the collector of customs, does not exceed $100.

(2) Merchandise damaged on the voyage of importation by fire or through marine casualty or any other cause, without fault on the part of the shipper. If a consular invoice is available it shall be produced for the information of the appraiser;

(3) Merchandise recovered from a wrecked or stranded vessel;

(4) Household effects used abroad and personal effects not imported in pursuance of a purchase or agreement for purchase and not intended for sale; and automobiles entered under bond for touring purposes and not intended for sale;

(5) Articles sent by persons in foreign countries as gifts to persons in the United States;

(6) Articles carried on the person or contained in the baggage of a person arriving in the United States, except merchandise (that is, articles not of a personal nature or which are intended for sale or were bought on commission for others) valued at more than $100;

(7) Tools of trade of a person arriving in the United States;

(8) Personal effects of citizens of the United States who have died in a foreign country;

(9) Merchandise within the provisions of sections 465 and 466, Tariff Act of 1930, at the first port of arrival;

(10) Merchandise when in the opinion of the Bureau of Customs the value thereof cannot be declared;

§ 6.16 TITLE 19—CUSTOMS DUTIES

(11) (i) The following articles, when unconditionally free of duty or subject only to a specific rate of duty not depending on value:

Forest products, crude, or not further manufactured than sawed into planks, boards, or deals, planed and tongued and grooved, except red cedar shingles.

Standard newsprint paper.

Pulpwood and wood pulp.

Agricultural products, crude or unmanufactured, except opium and coca leaves, wool of all kinds (including wool on the skin), hides and skins of all kinds, tea, coffee, and dairy products other than milk and cream, raw cotton, tobacco, and seeds imported subject to the provisions of the Federal Seed Act (37 Stat. 506, 44 Stat. 325; 7 U.S.C. 111–116), or for seeding (planting) purposes. Importers should be required by collectors of customs to furnish satisfactory evidence that the seeds are not imported for seeding purposes, when such claim is made the basis for exemption from the necessity of producing a consular invoice. When such evidence is not furnished at the time of entry and a bond is given for the production of a consular invoice, the required evidence may be accepted in satisfaction of the bond obligation if produced within the period prescribed in section 484 (b), Tariff Act of 1930.

Minerals, crude.

Live domestic animals.

Fertilizer and fertilizer materials.

News-reel films.

Fish.

Mother-of-pearl shells.

(ii) In such cases the commercial or pro forma invoice presented with the entry shall set forth all the necessary information for customs and statistical purposes.

(iii) For the purpose of this exception the terms used are defined as follows:

The term "crude" means in the natural state, not processed, manufactured, or advanced beyond the state necessary to the transportation of the article from the place of origin to the market.

The term "forest products" means crude vegetable substances, grown in or obtained from the forests, and includes logs, timber, and lumber, not further manufactured than sawed into planks, boards, or deals, and planed and tongued and grooved.

The term "standard newsprint paper" means the kind of paper chiefly used for printing newspapers, as defined by the Department in T.D. 40996 and T.D. 44317.

The term "pulpwood" means logs and timber cut to lengths for the purpose of manufacturing into wood pulp. The term "wood pulp" means the fibers of wood produced either mechanically or chemically for use in the manufacture of paper and pulpboard and other pulp products.

The term "agricultural products" means those things which are produced from the soil of farms, plantations, and estates, or which

are brought into condition for the use of society by the labor of those engaged in agricultural pursuits.

The term "minerals" means all inorganic matter occurring naturally and not advanced by any process of manufacture, and includes crude mineral oils, ores, earths, and clays.

(12) Stamps; postage or revenue stamps, canceled or uncanceled, and Government stamped envelopes or post cards bearing no other printing than the official imprint thereon.

(13) Merchandise shipped abroad, not delivered to the consignee, and returned to the United States.

(14) Merchandise (other than gold) consigned to a branch of the United States Government.

(15) Archaeological articles imported by an institution established for the encouragement of the arts, science, or education for exhibition and not for sale.

(16) Automobiles, aircraft, and other vehicles, boats, teams, and saddle horses taken abroad by the owner or his agent for noncommercial use, and returned by or for the account of such owner under the provisions of § 8.71.

(17) Imported merchandise which is exported from continuous customs custody.

(18) Merchandise imported as supplies, stores or equipment of the importing vessel and subsequently made subject to entry pursuant to the provisions of section 446, Tariff Act of 1930. (Secs. 484, 498, 46 Stat. 722, 728; 19 U.S.C. 1484, 1498) [Art. 299, Cust. Regs. 1937, as amended by T.D. 49499, Apr. 4, 1938, T.D. 49535, Apr. 28, 1938]

**6.17 Declaration on entry.** (a) The consignee in whose name an entry is made under the provisions of section 484, Tariff Act of 1930, shall execute the declaration applicable to the circumstances of the particular case.

(b) In the case of importations in successive parts of books, magazines, newspapers, and periodicals within the purview of section 485 (b), Tariff Act of 1930, one declaration filed at the time of arrival of the first importation will be sufficient.

(c) The agent referred to in section 485 (c), Tariff Act of 1930, is a person, acting under written authority from the consignee (section 484 (a), Tariff Act of 1930), who makes entry in the name of the consignee. A nominal consignee who makes entry in his own name is not an agent within the purview of such section 485 (c). When entry is made by an agent he should execute on the entry form as agent the declaration of the consignee applicable to the person for whom he acts as agent. An agent shall not execute the declaration of a nominal consignee unless he is acting as agent for a nominal consignee. If the consignee (whether the actual owner or a nominal consignee) is an individual or partnership and the agent is not in possession of the consignee's declaration on customs Form 3347–A at the time the agent makes entry, the bond required by such section 485 (c) must be given on customs Form 7551 or other appropriate form and must be conditioned for the production of the consignee's declaration. When the consignee is an individual or a partnership, the consignee's decla-

§ 6.18                    TITLE 19—CUSTOMS DUTIES

ration may be executed only by the individual (principal) or one of the partners, and may not be executed by an agent.

(d) In view of the specific provision in section 485 (f), Tariff Act of 1930, that when the merchandise is consigned to a corporation the consignee's declaration may be made by any officer of the corporation or by any other person specifically authorized by any officer of the corporation to make the same, such officer or other person who executes the declaration on behalf of the corporation is not considered to be an agent within the purview of section 485 (c), Tariff Act of 1930, and he is not required by such section 485 (c) to produce or give bond to produce any further declaration.

(e) A consignee in whose name an entry is made, who desires to be relieved from liability for the payment of increased and additional duties under section 485 (d), Tariff Act of 1930, should execute the declaration of nominal consignee on the entry form or, if entry is made by an agent, on customs Form 3347A.   The filing of the owner's declaration by the nominal consignee is optional and no bond should be taken for the production thereof when entry is made by a nominal consignee.   The owner's declaration, if filed, shall be on customs Form 3347, and may be filed only by the nominal consignee or his duly authorized agent.   A nonresident owner's declaration shall not be accepted as a compliance with section 485 (d) unless there is filed therewith a bond of such owner on customs Form 7551 or 7553, with a resident corporate surety thereon, and containing an added condition for the payment of any increased or additional duties which may become due on the merchandise covered by the entry.† (Secs. 485, 624, 46 Stat. 724, 759; 19 U.S.C. 1485, 1624)   [Art. 300]

**6.18  Powers of attorneys.**  (a) A power of attorney may be executed for the transaction of a specified part or for all the customs business of the principal, except that a separate power of attorney (customs Form 5295–A or 5295–B) will be required for filing protests. Customs Form 5291 may be used for powers of attorney for individuals and customs Form 5293 for corporations.   If a power of attorney is not on a prescribed customs form it must be as explicit in its terms as is the prescribed customs form.   If for the execution of sealed instruments it must be under seal.   A power of attorney given by a partnership for the execution of sealed instruments must be signed and sealed by each partner.   A power of attorney to a minor shall not be accepted.   A power of attorney executed under authority of another power of attorney may be accepted if the grantor of the original power of attorney is a nonresident and such original power contains express authority from the principal for the appointment of a subagent or subagents, but powers of attorney of residents shall be without power of substitution except for the purpose of executing shippers' export declarations.   A subagent so appointed may not delegate his authority.

(b) An individual, other than a married woman, may execute a power of attorney to sign as surety on customs bonds.   If the power is limited to bonds of one or several importers, such importers must be named.   Such power must have attached a justification of the donor in a specified amount.

(c) A trustee may execute a power of attorney for the transaction of customhouse business incident to the trusteeship.

(d) One member of a partnership may execute a power of attorney in the name of the partnership for the transaction of all its customs business, except the signing of bonds. Such power must recite the names of all members of the partnership and shall be limited to a period of not more than 2 years from the date of receipt of the power by the collector. When a new firm is formed by a change of membership, no power of attorney filed by the antecedent firm shall thereafter be recognized for any customs purpose.

(e) Before accepting powers of attorney executed on behalf of corporations, the collector shall require the following documents to be filed:

(1) A certificate from the proper public officer showing the legal existence of the corporation;

(2) A copy of that portion of the charter or articles of incorporation which shows the scope of the business of the corporation and the governing body thereof;

(3) If the authority of the donor is derived from the charter or articles of incorporation, there shall also be filed a copy of that portion thereof which contains such authority; or, if the authority is derived from the governing body, there shall be filed a copy of the document or part thereof which authorizes the governing body, through its by-laws or otherwise, to designate others to appoint attorneys or agents, together with a copy of the bylaw, resolution, or other document by which the authority was conferred on the donor.

All such documents, except the certificate of incorporation first above referred to, shall be certified as correct by the clerk or secretary of the corporation under its corporate seal. Collectors may waive the production of evidence of incorporation when such fact is a matter of common knowledge.

(f) If it is desired that the attorney in fact of a corporation shall make a declaration, the power must specifically so authorize.

(g) A power of attorney filed by a nonresident person (which includes individuals, partnerships, associations, and corporations) shall not be accepted unless the agent designated thereby is a resident of the United States and is authorized to accept service of process against such nonresident person.

(h) When a power of attorney which is not limited to acts transacted at a specified port has been filed, and it is desired to use it at another port, the collector at the port where it is filed will, upon request of the collector at the other port, or upon request from the person, firm, or corporation executing the same, forward a certified copy thereof. If the power be given by a corporation, the collector at the port where it is filed will state that there is on file in his office the evidence of authority above required. Any expense in connection with the preparation of such documents will be borne by the parties in interest. (R.S. 251, sec. 624, 46 Stat. 759; 19 U.S.C. 66, 1624) [Art. 301, Cust. Regs. 1937, as amended by T.D. 49524, Apr. 21, 1938]

**6.19  Entered value to be determined by importers by adding to or deducting from the invoice value.**  (a) Additions to or deductions from the invoice value of merchandise under section 487, Tariff Act of 1930, together with the items to which they refer, shall be clearly shown in detail on the invoice or a statement attached thereto.

(b) After an entry has been lodged in the customhouse, no change shall be made in the value thereon, except in the following manner:

(1) When the importer desires to amend an entry, he shall file the amendment with the collector in duplicate specifying the items affected and the amount of the addition or deduction made.  The amendment may be made on the same form as the original entry.

(2) When the supplemental duties resulting from the amendment, if any, are deposited, or at the time of filing of the amendment when no supplemental duties accrue, the amendment shall be accepted subject to the conditions of such section 487 and the time of acceptance noted thereon.

(3) If the invoice is with the collector, he shall attach the amendment thereto and forward both to the appraiser.  If the invoice is with the appraiser, the amendment shall be forwarded to that official, who shall note thereon whether or not the invoice or the merchandise came under the observation of the appraiser, the chief assistant appraiser, or the acting appraiser for the purpose of appraisement prior to the time of the acceptance of the amendment, attach it to the invoice and proceed with his appraisement.

(4) If, prior to the time of the acceptance of the amendment, the invoice or the merchandise came under the observation of the appraiser, the chief assistant appraiser, or the acting appraiser, for the purpose of appraisement, the amendment shall be disregarded.

(c) Information as to values shall not be given by customs officers in connection with amendment of entries except upon compliance with the provisions of § 12.8.†  (Sec. 487, 46 Stat. 725; 19 U.S.C. 1487)  [Art. 302]

**6.20  Additions because of advances by appraiser pending reappraisement.**  A consignee making an addition on entry, under section 503 (b), Tariff Act of 1930, should make his certificate at the time of entry in substantially the following form:

I hereby certify that the entered value of the merchandise mentioned below is higher than the dutiable value and that the goods are so entered because of advances by the appraiser in similar cases now pending on appeal for reappraisement. The similar cases now pending are entries Nos. ____, at the port _____, reappraisement Nos. ____.

CHAPTER I—BUREAU OF CUSTOMS    § 6.23

I contend that duty should be assessed on the basis of the dutiable value shown below:

| Items | Invoice value | Add to make dutiable value | Deduct to make dutiable value | Dutiable value | Add because of advances by appraiser in similar cases | Entered value |
|---|---|---|---|---|---|---|
| ------- | ------- | ------- | ------- | ------- | ------- | ------- |
| ------- | ------- | ------- | ------- | ------- | ------- | ------- |
| ------- | ------- | ------- | ------- | ------- | ------- | ------- |
| ------- | ------- | ------- | ------- | ------- | ------- | ------- |
| ------- | ------- | ------- | ------- | ------- | ------- | ------- |
| ------- | ------- | ------- | ------- | ------- | ------- | ------- |

---------- ----------
Importer.

†(Secs. 503, 624, 46 Stat. 731, 759; 19 U.S.C. 1503 (b), 1624) [Art. 303]

**6.21  Entry on triplicate invoices.**  An importer is not only permitted but required to make entry on the triplicate invoice where he has failed to receive his copy of the invoice, and no entry upon a pro forma invoice will be allowed unless it be shown that no triplicate is on file.† (Secs. 484, 624, 46 Stat. 722, 759; 19 U.S.C. 1484, 1624)  [Art. 304]

**6.22  Incomplete entry; bonds for the production of documents.**  Unless otherwise provided in the regulations in this chapter, a bond may be given on the appropriate form for the production of any document required which is not available at the time of entry.† (Secs. 490, 624, 46 Stat. 726, 749; 19 U.S.C. 1490, 1624)  [Art. 305]

ASSESSMENT OF DUTIES

**6.23  Release of merchandise in customs custody after liquidation; merchandise refused by consignee.**  (a) No merchandise remaining in customs custody after liquidation of the entry shall be released until the full amount of liquidated duties have been paid, if any are due. Collectors must not permit one importation to pass out of their custody when duties are unpaid, with a view of holding a lien upon a subsequent importation.

(b) Merchandise consigned to parties without their authority and refused by them should be treated as unclaimed.† (R.S. 251, sec. 624, 46 Stat. 759; 19 U.S.C. 66, 1624)  [Art. 307]

†For source citation, see note to § 6.2.

ENTRY FOR CONSUMPTION

**6.24  Form.** Entry for consumption shall be made in triplicate on a form substantially in accordance with customs Form 7501 and will be divided into two classes, free and dutiable.† (Sec. 484, 46 Stat. 722; 19 U.S.C. 1484)  [Art. 310]

**6.25  Estimation of duties.** (a) When the entry is filed, the classification and values stated therein will be compared with the description and values in the invoice and the proper amount of duties estimated.

(b) The rates of duty at which the entry is passed and the appropriate paragraphs shall be noted in black ink on the invoice by the importer in the left-hand margin.

(c) Special examination labels, customs Form 3359, will be attached to invoices of perishable goods and other articles for which immediate delivery is necessary.† (Secs. 484, 624, 46 Stat. 722, 759; 19 U.S.C. 1484, 1624)  [Art. 311]

**6.26  Designation of merchandise to be examined.** Pursuant to section 499, Tariff Act of 1930, the collector shall designate, on the summary sheet (customs Form 6417), the packages to be examined, and indicate them on the permit and, if he deems it necessary, on the entry.  The summary sheet may be signed only by the collector, the assistant collector, a deputy collector, or a customs officer officially acting for one of the officers named.  If the merchandise is bulky the collector will direct examination on the wharf or other suitable place, subject to the approval of the appraiser.  When merchandise is to be gauged, measured, or weighed, the collector will make such order on the entry, invoice, and permit.† (Secs. 499, 624, 46 Stat. 728, 759; 19 U.S.C. 1499, 1624)  [Art. 312]

**6.27  Bond; deposit of estimated duties; permit.** (a) When the importer desires the release from customs custody of any part of the merchandise before (1) the full amount of duties, including dumping or other special duties, and charges due thereon has been ascertained by liquidation of the entry, (2) before the right of such merchandise to admission into the United States, or to entry free of duty or at a reduced rate, has been determined by the proper officer, or (3) before any document relating thereto required by law or regulations has been furnished, he shall file a bond on customs Form 7551 or 7553 or other appropriate form, at the time of entry or prior to such release.  Such a bond shall not be required, however, when all of the merchandise in an importation has remained in customs custody at the public stores or on the wharf or other place in charge of a customs officer until it has been inspected, examined, and appraised, and has been found to comply with the law and regulations governing its admission into the commerce of the United States, and until there have been produced all documents for the production of which a bond is required by law or regulations if not filed at time of entry.  Term consumption entry bond, customs Form 7553, refers only to entries to be made at a single port and must not be modified to cover more than one port.

(b) Tariff Act of 1930, section 505:

The consignee shall deposit with the collector, at the time of making entry, unless the merchandise is entered for warehouse or transportation, or under bond, the amount of duty estimated to be payable thereon. * * *

(c) The estimated duties, if any, having been deposited and the bond filed, a permit on customs Form 7501–A may be issued and delivered to' the importer or his agent, to be by him sent to the inspector in charge of the merchandise, who will release to or upon the order of the carrier that part of the merchandise not designated for examination.

(d) Estimated duties need not be deposited on shipments consigned to Government departments or bureaus or authorized representatives thereof, nor will the bond above provided for be required in such cases. After due entry therefor has been made, such merchandise may be immediately released. On liquidation of the entry the collector will state the duties due on vouchers, in duplicate, and present them for payment to the proper department disbursing officer.† (Secs. 484, 505, 623, 624, 46 Stat. 722, 732, 759; 19 U.S.C. 1484, 1505, 1623, 1624) [Art. 314]

**6.28  Release of examined packages.** (a) If, upon the receipt of the appraiser's report, the estimated duties deposited are found to be sufficient, and the goods are correctly invoiced and otherwise comply with the law, the collector may issue a permit order for the release of the examined packages. The collector may designate an appraising officer to exercise this function.

(b) If it be estimated that any increased or additional duties upon all the merchandise covered by the entry will not in the aggregate exceed $50, the collector or such designated appraising officer may likewise permit the release of the examined packages, provided there has been filed with the collector a stipulation undertaking and agreeing to pay such duties in any amount not to exceed $50 on any one entry. No such stipulation shall be accepted unless executed by an individual, partnership, or corporation, other than the importer, found by the collector to be financially and otherwise responsible. Such stipulation by its terms may apply to all entries of a stated class or classes to be made during a period not to exceed 1 year, ' or may apply only to a particular entry, in which case it shall be endorsed on such entry.

(c) When the appraiser's return indicates that the increased or additional duties will exceed $50, the collector shall require a deposit of an amount sufficient to cover said duties before release of the examination packages.

(d) The collector may release any merchandise pending reappraisement which has not been advanced more than 100 percent upon a deposit by the consignee of an amount sufficient to pay the increased and additional duties, provided the appraiser has reported same to have been truly and correctly invoiced and found to comply with the requirements of the laws of the United States. (Secs. 499, 624, 46 Stat. 728, 759; 19 U.S.C. 1499, 1624) [Art. 315, Cust. Regs. 1937, as amended by T.D. 49410, Feb. 11, 1938]

†For source citation, see note to § 6.2.

**6.29  Recall of merchandise released from customs custody.** (a) If at any time after entry the collector determines, either from the appraiser's report or otherwise, that any of the merchandise contained in an importation is for any reason not entitled to admission into the commerce of the United States, he shall promptly demand the return to customs custody of any such merchandise which has been released.

(b) The collector may demand the return to customs custody of any merchandise which has been released therefrom, provided such demand is made within 20 days after the appraiser's report.

(c) A demand for the redelivery of the merchandise shall be made when the appraiser's report indicates that increased or additional duties will accrue, unless the increased and additional duties are promptly deposited, provided that such demand must be made within 20 days after the appraiser's report.† (Sec. 624, 46 Stat. 759; 19 U.S.C. 1624)  [Art. 316]

<div align="center">ENTRY FOR WAREHOUSE</div>

**6.30  Form and contents; articles not entitled to entry.** (a) Entry for warehousing shall be made in triplicate on a form substantially in accordance with customs Form 7502.

(b) An importer must designate upon the entry the bonded warehouse in which he desires his merchandise deposited and may designate thereon the bonded cartman or lighterman by whom he wishes the goods transferred.

(c) Dangerous and highly inflammable merchandise, though not classified as explosive may not be entered for warehouse without the written consent of the insurance company by whom the warehouse in which the merchandise is to be stored is insured.

(d) Merchandise, including American distilled spirits, withdrawn from warehouse at the end of the bonded period and shipped to a foreign country with the intention to bring the same back to this country cannot be warehoused again on its return to the United States.

(e) The procedure to be followed in connection with the preparation and filing of the entry, making notations on invoices, the preparation of customs Form 6417, the designation of examination packages, and the appraisement of the merchandise shall be the same as that prescribed in the case of consumption entries.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624)  [Art. 317]

**6.31  Substitution of bonds.**  A warehouse entry bond may be closed if there is substituted therefor a similar bond given by the one to whom the merchandise is transferred and which shall be satisfactory to the collector of customs.  Such bond shall be accepted as collateral security and will not relieve the importer of his liability for duties on the original bond.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624)  [Art. 318]

**6.32  Divided importation.** (a) Any portion of an invoice not less than an entire package, and if the merchandise be in bulk not less than 1 ton, may be entered for warehousing and the remainder

†For source citation, see note to § 6.2.

for immediate consumption. In such case the entries must be made simultaneously and the declarations made to conform thereto.

(b) Except in the case of merchandise cleaned, sorted, repacked, or otherwise changed in condition under the provisions of section 562, Tariff Act of 1930, and merchandise not ordered by the consignee and refused by him, no merchandise shall be withdrawn from warehouse under any form of withdrawal in a quantity less than the entire package, or 1 ton in weight if the merchandise be in bulk. Merchandise so withdrawn shall be in the original package in which imported unless the collector for its safety or preservation has permitted it to be repacked or transferred or it has been cleaned, sorted, repacked, or otherwise changed in condition, under said section 562.† (Secs. 557, 562, 624, 46 Stat. 744, 745, 759; 19 U.S.C. 1557, 1562, 1624) [Art. 319]

**6.33 Estimation of duties; bond.** After the duty has been estimated upon the warehouse entry in the same manner as upon an entry for consumption, the collector shall take a bond on customs Form 7555.† (Secs. 623, 624, 46 Stat. 759; 19 U.S.C. 1623, 1624) [Art. 320]

**6.34 Permit.** The bond having been executed, the collector will issue a permit to the inspector on customs Form 7502–A, to send the goods to the bonded warehouse, except such as may be designated for examination. This permit must also indicate what goods are to be weighed, gauged, or measured. Such weighing, gauging, or measuring is to be done before or at the time of the deposit of the goods in warehouse.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624) [Art. 321]

### ENTRY FOR REWAREHOUSE

**6.35 Procedure.** (a) Immediately after the receipt of the mail copy of the warehouse withdrawal for transportation (customs Form 7512) at the port of destination, the merchandise may be entered for rewarehouse by the consignee named in the withdrawal. The entry shall be on customs Form 7502 and shall be filed in triplicate. If the merchandise is not entered within 48 hours after its arrival, it shall be sent to the general order warehouse.

(b) If the consignee fails to make entry within 48 hours, the collector will notify the collector at the port where the original warehouse entry was filed by letter of the fact, and the goods shall not be sold or otherwise disposed of as unclaimed until the expiration of the original warehouse entry bond period.

(c) No declaration is required on entry, and unless a question is raised as to the correctness of the appraisement or classification, no examination of the merchandise will be made.

(d) When a bond on customs Form 7555 shall have been given a permit may be issued on customs Form 7502–A for sending the merchandise to the bonded warehouse designated on the entry. No bond will be required if the merchandise is entered by the consignee named in the original warehouse entry bond filed at the original port of entry.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624) [Art. 323]

†For source citation, see note to § 6.2.

§ 6.36                    TITLE 19—CUSTOMS DUTIES

**6.36  Value and classification.**  The value and duty as assessed at the port of original importation, and so stated in the copy of the entry or withdrawal for transportation forwarded to the port of destination, will in all cases be the value and duty to be charged on the rewarehouse entry, or, if the merchandise be withdrawn immediately on arrival, on the rewarehouse withdrawal, as the voucher and authority for the assessment of duty.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624)  [Art. 324]

**6.37  Protest.**  Protest against the assessment of duty cannot be received at the port of destination, except against the reliquidation, or against the refusal of the collector to so reliquidate, under a change in the law.† (Secs. 514, 557, 624, 46 Stat. 734, 744, 759; 19 U.S.C. 1514, 1557, 1624)  [Art. 325]

COMBINED ENTRY FOR REWAREHOUSE AND WITHDRAWAL FOR CONSUMPTION

**6.38  Form.**  If the consignee of merchandise withdrawn from warehouse for transportation desires to pay duty and get possession of the goods immediately on arrival at destination, a combined entry for rewarehouse and withdrawal for consumption may be made in quadruplicate (including permit) on customs Form 7519.† (Secs. 484, 557, 624, 46 Stat. 722, 744, 759; 19 U.S.C. 1484, 1557, 1624)  [Art. 326]

**6.39  Procedure.**  (a) In this case no rewarehouse bond will be required, but upon payment of the duties in the amount certified as payable on the transportation entry, the collector may issue a permit for release on customs Form 7519.

(b) On receipt of such permit the inspector will release the goods as directed and return the permit to the collector with his indorsement.

(c) No declaration will be required on the rewarehousing of such merchandise, and no further examination of the same will be made other than may be necessary for the identification of the goods.† (Secs. 484, 557, 624, 46 Stat. 722, 744, 759; 19 U.S.C. 1484, 1557, 1624)  [Art. 327]

EXPORTATION UNDER WAREHOUSE WITHDRAWAL FOR TRANSPORTATION

**6.40  Procedure.**  The consignee of merchandise withdrawn from warehouse for transportation desiring to export the same on arrival at destination, may so advise the collector at destination in writing, who shall thereupon make proper notation on the entry and manifest and permit the exportation of the merchandise under customs supervision.  The subsequent procedure shall be the same as that provided for warehouse or rewarehouse withdrawals for transportation and exportation.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624)  [Art. 328]

WITHDRAWAL AT ORIGINAL AND SECONDARY PORTS FOR CONSUMPTION

**6.41  Entry; form and contents.**  Withdrawal for consumption of merchandise in bonded warehouse shall be made in triplicate on

customs Form 7505 and shall show the number of the bond, the marks and numbers of the packages withdrawn, the vessel and date of importation, the description, quantity, rates of duty, separate value of each package, and total dutiable value of the merchandise, and shall be signed by the party making the withdrawal. No declaration is required.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624)   [Art. 329]

**6.42   Computation and payment of duties.**   On presentation of a withdrawal at the collector's office it shall be compared with the warehouse ledger, customs Form 5201. The duty payable shall be assessed on the withdrawal and recorded on the ledger.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624)   [Art. 330]

**6.43   Withdrawal; when completed.**   When the duties and other charges have been paid, a permit on customs Form 7505–A shall be issued and delivered to the person making the warehouse withdrawal. Upon the lodging of the permit with the storekeeper, he shall release the merchandise to or upon the order of the proprietor of the warehouse, in accordance with § 17.15, unless the person making the withdrawal requests by endorsement on the permit that release be withheld, subject to the provisions of § 18.5 until he shall have lodged with the storekeeper an order to release on customs Form 7505–B. If partial release is desired, the order may cover part only of the merchandise specified in the permit, but not less than an entire package or, if in bulk, 1 ton in weight. The storekeeper shall not release any merchandise under an order until after he has compared the order with the related permit. He shall note the date of release on all permits and orders and shall obtain the acknowledgment of such release from the proprietor in the space provided for on the forms. In the case of partial releases, the acknowledgment of the proprietor on the permit shall be obtained at the time of the last release thereunder. Proprietors may be permitted to make copies of permits and orders to release.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624)   [Art. 331]

**6.44   Withdrawal by transferee.**   (a) A transferee of merchandise in bonded warehouse may make a withdrawal therefor upon the order of the person who made the warehouse entry indorsed upon the withdrawal.

(b) If the importer does not wish to limit the right of withdrawal to one person, he may leave the space for the name of the transferee blank. Subsequent transfers may be made by delivery of the withdrawal, without notation on the records of the customhouse. The person paying the duties and charges must insert his name in the blank space in the withdrawal; whereupon the delivery permit may be delivered to him.

(c) In cases where the transferee does not desire to pay the duties and charges at the time the right to withdraw the merchandise is transferred to him, he may lodge the indorsed withdrawal in the customhouse as evidence of the transfer. A notation thereof shall be made on the customs records. The transferee may thereafter obtain the release of all or part of the merchandise, unless the transfer of the right to withdraw shall have been revoked, by filing proper

†For source citation, see note to § 6.2.

§ 6.45          TITLE 19—CUSTOMS DUTIES

withdrawals and otherwise complying with the provisions of §§ 6.41, 6.43. No indorsement of the person who has previously transferred the right to withdraw the merchandise shall be required on such withdrawals.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624) [Art. 332]

**6.45 Withdrawals before and after liquidation.** Merchandise may be withdrawn for consumption before liquidation of the entry upon payment of the estimated duties and after liquidation upon payment of the liquidated duties. If, upon liquidation or reliquidation of the entry, the amount of estimated duties collected on merchandise previously withdrawn differs from the amount of liquidated duties on such merchandise, a notice covering such difference shall be issued on customs Form 5107 or customs Form 5269 as the case may be.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624) [Art. 333]

WITHDRAWAL AT ORIGINAL AND SECONDARY PORTS FOR EXPORTATION

**6.46 Form and contents.** (a) Merchandise may be withdrawn from warehouse at original and secondary ports for exportation in accordance with § 16.27.

(b) If exported by other than the original importer, the same authority will be required as in case of withdrawal for consumption. The exportation shall be made under the original marks of importation. Port marks may be added by authority of the collector and under the supervision of a customs officer. The original and the port marks shall appear in all papers pertaining to the exportation.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624) [Art. 335]

**6.47 Report of packages not laden.** Inspectors will report goods not laden, by marks and numbers, and goods received and not laden will be sent to general order unless otherwise directed by the collector.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624) [Art. 336]

**6.48 Withdrawal before liquidation; damage, etc.** (a) In the case of merchandise subject to ad valorem rates of duty, no withdrawal for exportation shall be allowed before the liquidation of the warehouse entry, or a special liquidation of the items covering the merchandise to be exported, unless the appraiser's return shows no advance in value.

(b) Merchandise subject to specific rates of duty may be withdrawn at the entered quantities.

(c) In the case of merchandise withdrawn for transportation and exportation, no further examination or appraisal is necessary at the port of exit.

(d) In any case, if the merchandise is not exported, the liquidation on the original warehouse entry must be followed.

(e) There shall be no abatement or allowance of duties on account of damage, loss, or deterioration of the merchandise while in warehouse, except as provided by statute.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624) [Art. 337]

†For source citation, see note to § 6.2.

**6.49  Weight, gauge, or measure.**  (a) Merchandise in bulk and articles in packages bought and sold by weight, gauge, or measure may be withdrawn for export or transportation only at the actual quantities ascertained at the time of arrival in the United States, except as otherwise provided by law.

(b) In any case the collector may require a special return of weight, gauge, or measure, if he deems it necessary.† (Secs. 557, 562, 624, 46 Stat. 744, 745, 759; 19 U.S.C. 1557, 1562, 1624)  [Art. 338]

**6.50  Distilled spirits, regauge.**  Distilled spirits in casks and similar containers shall be regauged on withdrawal for exportation, and duty shall be collected on any deficiency from the original gauge unless the collector of customs is satisfied, after careful investigation, that the deficiency is due solely to evaporation.† (Secs. 557, 562, 624, 46 Stat. 744, 745, 759; 19 U.S.C. 1557, 1562, 1624)  [Art. 339]

**6.51  Parcel post packages.**  Merchandise in bonded warehouse may be withdrawn for exportation by mail in accordance with the provisions of § 7.21.† (Secs. 557, 624, 46 Stat. 744, 759; 19 U.S.C. 1557, 1624)  [Art. 340]

ZINC AND LEAD-BEARING ORES AND CRUDE COPPER-BEARING MATERIALS

**6.52  Entry and sampling of zinc and lead-bearing ores not for smelting in bond; bond.**  (a) When zinc or lead bearing ores imported under the proviso to paragraph 391 or 393, Tariff Act of 1930, are entered for consumption or warehouse at the port of first arrival, the merchandise may be weighed at the place of landing or on arrival at the plant where the same is to be used. It shall be transported to the place of sampling by bonded trucks or lighters.

(b) When the merchandise is not to be used at the port of first arrival, it may be transported without weighing to the sampling or smelting establishment under an I. T. entry (customs Form 7512) on which the estimated duties shall be shown in order to fix the penalty of the transportation bond. The transportation entry shall be forwarded to the collector of customs at the nearest port in the district where such establishment is located. The bond shall be on customs Form 7557 or 7559. Where the term bond is given the penalty shall be an amount which the collector deems sufficient to protect the revenue but not less than $10,000. The records kept and procedure followed will otherwise be the same as provided for transportation in bond, general provisions, § 16.2 and following.

(c) The sampling and weighing of the merchandise at points other than the port of entry will be at the expense of the parties in interest.

(d) Quantities and values of the different metals contained in the ore or base bullion will be stated in the entry according to the commercial assay of the consular invoice, or estimated from previous similar importations, the importer making such addition to or deduction from such values as he may deem necessary to make value.† (Pars. 391, 393: sec. 1, 46 Stat. 628; 19 U.S.C. 1001)  [Art. 341]

**6.53  Entry and sampling of crude copper-bearing materials not for smelting or refining in bond.**  With respect to the entry under section 601 (c) (7), Revenue Act of 1932, of crude copper-

§ 6.54                    TITLE 19—CUSTOMS DUTIES

bearing materials to be smelted or refined, but not in bond, and of copper-bearing ores and concentrates, not for smelting or refining in bond, the procedure outlined in § 6.52 shall be followed, provided that, when the material is not imported primarily for the recovery of metal, commercial samples shall be taken under customs supervision at the port of entry and the importer shall submit verified samples taken in accordance with T.D. 43095 at the plant where the material is treated for the purpose of checking the commercial samples taken at the port of entry. The assay shall be the electrolytic assay with a deduction of 1.3 units, which deduction shall be shown on the Government assay certificate but shall not apply to material to be refined only. If metallurgical losses are to be claimed there shall be filed in connection with the entry the statement provided for in § 17.68, and such allowances shall be determined in the manner provided in § 17.68.    (Sec. 601 (c) (7), 47 Stat. 260, 49 Stat. 431, 50 Stat. 358)    [T.D. 46096, Jan. 6, 1933]

ENTRY FOR EXPORTATION AND BY APPRAISEMENT, INFORMAL ENTRIES,
AND PACKED PACKAGES

**6.54  Entry for exportation; merchandise unentered or rejected, exportation.**    (a) Merchandise in customs custody, for which no entry has been made or completed, may be exported under the procedure outlined in § 16.34.

(b) Merchandise in continuous customs custody covered by an unliquidated consumption entry may be exported in like manner with refund of estimated duties paid; except that such merchandise when subject to an ad valorem duty shall be appraised, and if advanced in value, the additional duties shall be paid before exportation is permitted.

(c) Entered merchandise denied admission into the United States by any Government agency may be exported under like procedure as a nonimportation, with refund of estimated duty and without the assessment of additional duty.

(d) When merchandise to be exported from continuous customs custody is subject to duty and is covered by a liquidated entry, the drawback procedure provided in Part 20 shall be followed.†    (Sec. 624, 46 Stat. 759; 19 U.S.C. 1624)    [Art. 342]

**6.55  Entry by appraisement.**    (a) Articles enumerated in section 498 (a) (2), (3), (4), (5), (7), (8), and (10), and (b), Tariff Act of 1930, except as provided in paragraph (c) of this section, regardless of value, may be entered by appraisement on customs Form 7500, unless the articles accompany the owner, in which case they should be included in his baggage declaration.

(b) No consular invoice or bond for its production is required, but the consignee or owner shall in all cases furnish any bills or statements of cost relating to the articles which may be in his possession, and declare under oath that he has no other information as to the value of the articles and is unable to obtain the same or determine the value of the articles for the purpose of making formal entry thereof.

                              †For source citation, see note to § 6.2.

(c) Appraisement entries may be accepted under subsection (10) only for articles which are second-hand or damaged or deteriorated, or are not the subject of a commercial transaction, as, in the opinion of the Secretary of the Treasury, the value of such articles can not be declared; but when the value of any such articles exceeds $100, the approval of the Bureau of Customs must be obtained before the entry is officially accepted.

(d) The entry shall be forwarded to the appraiser who shall report the result of his appraisement on the entry and duties shall be assessed in accordance therewith, but the importer may substitute an entry for warehouse at any time within one year from the date of importation, provided the merchandise has remained in continuous customs custody.

(e) Any additional expense for cartage, storage, or labor occasioned by reason of an entry by appraisement shall be borne by the importer.† (Sec. 498, 46 Stat. 728; 19 U.S.C. 1498) [Art. 343]

**6.56 Informal entries.** (a) Merchandise not exceeding $100 in value, unless falling within the provisions of § 6.55, shall be entered on customs Form 5119, in quadruplicate, which may, in the discretion of the collector, be accepted at the customhouse, on the piers, at railroad stations, or other places where there are customs officers competent to examine and appraise the articles and assess the duties. This form may also be used for the entry of articles regardless of value covered by section 498 (a) (4), Tariff Act of 1930, arriving from contiguous foreign territory.

(b) The original copy of the entry shall be used as the collector's copy and one copy as the permit; one copy shall be immediately forwarded to the comptroller of customs and one copy issued as a receipt when duties are collected.

(c) The collector may, when he deems it necessary for the protection of the revenue, require a formal entry (customs Form 7501) for any such merchandise, and individual shipments for the same consignee, when such shipments are valued at $100 or less, may be consolidated on customs Form 7501.

(d) No consular invoice is required but in the case of merchandise imported pursuant to a purchase or agreement to purchase, or intended for sale, the consignee shall produce the commercial invoice covering the transaction or, in the absence thereof, an itemized statement of value.

(e) The collector may, in his discretion, require any merchandise entered in accordance with this section to be regularly examined and appraised.

(f) When such merchandise arrives under immediate transportation entry, the number of the transportation entry and port from which received should be noted on the upper left-hand corner of customs Form 5119 and handled in all other respects as if formal entry were made.† (Sec. 498, 46 Stat. 728; 19 U.S.C. 1498 (a)) [Art. 344]

---

†For source citation, see note to § 6.2.

§ 6.57                TITLE 19—CUSTOMS DUTIES

**6.57  Packed packages; definition; marking; entry.**  (a) Tariff
Act of 1930, section 484 (f):

* * * One or more packages arriving on one vessel or vehicle addressed
for delivery to one person and imported in another package containing pack-
ages addressed for delivery to other persons may be separately entered,
under such rules and regulations as the Secretary of the Treasury may
prescribe. * * *

(b) Such packages are known as packed packages and should be
marked to indicate their character. Discharging inspectors will
send such packages to the appraiser's stores immediately after land-
ing without a permit or specific order.

(c) Entire packed packages, or one or more of the inclosures
thereof, may be entered on any form of formal or informal entry
applicable thereto.† (Sec. 484, 46 Stat. 722; 19 U.S.C. 1484 (f))
[Art. 345]

SPECIAL DELIVERY PACKAGES

**6.58  Application.**  Application for the entry of special-delivery
packages under the provisions of the Act of June 8, 1896 (29 Stat.
263; 19 U.S.C. 472–475), may be made by the agent of the carrier
bringing the merchandise to the United States, which carrier must
be bonded under section 551 of the Tariff Act, and be in the following
form, which shall be treated in the same manner as an appraisement
entry:

APPLICATION TO ENTER AND ENTRY OF ARTICLES NOT MERCHANDISE IN-
TENDED FOR SALE UNDER THE PROVISIONS OF THE ACT OF JUNE 8, 1896

To THE COLLECTOR OF CUSTOMS, PORT OF _____
I, _____, of the firm of _____, hereby make ap-
plication to make special entry of _____ packages, containing articles not
merchandise intended for sale, and not exceeding five hundred dollars ($500)
in value nor weighing more than one hundred (100) pounds per package, im-
ported per steamship _____, a vessel of the United States, from
_____ on _____ for _____, ultimate consignee,
residing at _____.
And I do certify that there is but one consignment from any one consignor
to said ultimate consignee imported in the vessel above specified on the date
above mentioned.

_____

Declared to before me this _____ day of _____, _____.

_____,
Deputy Collector.

†(29 Stat. 263, sec. 498, 46 Stat. 728; 19 U.S.C. 472–475, 1498 (a))
[Art. 346]

**6.59  Marking.**  Every package imported under the provisions
of this Act must be plainly marked "Special delivery package."
Packages so marked may be landed on the dock immediately after
the entry of the vessel, and the inspector in charge will forthwith
forward such packages to the appraiser's stores, notifying the collector
of customs of his action, and stating the number and marks of the
packages and the vessel by which imported.† (29 Stat. 263, sec. 498,
46 Stat. 728; 19 U.S.C. 472–475, 1498 (a)) [Art. 347]

**6.60  Liquidation; delivery.**  (a) Upon receipt by the collector
of the appraiser's return the entry shall be immediately liquidated,

and upon payment of the ascertained duties the packages shall be released.

(b) The liquidation is final and conclusive against the owner, importer, consignee, or agent, except in the case of clerical error.† (29 Stat. 263, sec. 498, 46 Stat. 728; 19 U.S.C. 472–475, 1498 (a)) [Art. 348]

**6.61  Bond.**  The following form of bond shall be given by carriers making entry for special-delivery packages:

BOND UPON ENTRY UNDER ACT OF JUNE 8, 1896

Know all men by these presents, _____, of _____, a principal, and _____, of _____, and _____ _____, of as sureties, are held and firmly bound unto the United States of America in the sum of $10,000, for the payment whereof to the United States we firmly bind ourselves, our heirs, executors, administrators, and assigns, jointly and severally, by these presents, as witness our hands and seals at the port of _____, this _____ day of _____, nineteen hundred and _____.

Whereas the undersigned, principals on this bond, propose to enter at the customhouse, and to transport merchandise imported under the provisions of the Act entitled "An act to expedite the delivery of imported parcels and packages not exceeding five hundred dollars in value," approved June 8, 1896.

Now, therefore, the condition of this obligation is such that if the hereinmentioned obligors shall duly observe and faithfully comply with all the requirements and provisions of the above-specified Act, and with the regulations prescribed by the Secretary of the Treasury thereunder, then this obligation to be void; otherwise to remain in full force.

_____ [SEAL]
_____ [SEAL]
_____ [SEAL]

Signed, sealed, and delivered in presence of—
_____
_____

†(29 Stat. 263, sec. 498, 46 Stat. 728; 19 U.S.C. 472–475, 1498(a)) [Art. 349]

**6.62  Cording and sealing.**  Only packages as to which the common carrier may desire to reserve the right of returning to the customs authorities for refund of duties paid will be corded and sealed under customs supervision.  A record of such packages shall be kept.†    (29 Stat. 263, sec. 498, 46 Stat. 728; 19 U.S.C. 472–475, 1498 (a))    [Art. 350]

**6.63  Returned packages; refund of duty.**  If any package so corded and sealed shall be returned intact within 90 days from date of importation to the collector of customs at the port of entry, the duties shall be refunded and the common carrier relieved of any liability therefor.†    (29 Stat. 263, sec. 498, 46 Stat. 728; 19 U.S.C. 472–475, 1498 (a))    [Art. 351]

**6.64  Unclaimed packages.**  Whenever a package which has been sent to the appraiser's office under the provisions of this Act shall be found to contain articles of more than $500 in value, or to weigh over 100 pounds, a report of the facts shall be made to the collector, who shall cause the package to be treated as if unclaimed.†    (29 Stat. 263, sec. 498, 46 Stat. 728; 19 U.S.C. 472–475, 1498(a))    [Art. 352]

**6.65  Invoice.**  Nothing contained in §§ 6.58–6.64 shall be held to relieve importers from the necessity of submitting certified invoices

§ 6.66                    TITLE 19—CUSTOMS DUTIES

for any importation exceeding $100 in value when otherwise required. Whenever such invoice shall accompany the package, as provided in the Act, it shall be transmitted to the collector with the appraiser's report.† (29 Stat. 263, sec. 498, 46 Stat. 728; 19 U.S.C. 472–475, 1498 (a)) [Art. 353]

LANDING AND DELIVERY OF ARTICLES FOR WHICH IMMEDIATE DELIVERY IS NECESSARY

**6.66 Application; entry; procedure.** (a) Tariff Act of 1930, section 448 (b):

The Secretary of the Treasury is authorized to provide by regulations for the issuing of special permits for delivery, prior to formal entry therefor, of perishable articles and other articles, the immediate delivery of which is necessary.

(b) "Articles, the immediate delivery of which is necessary" includes, in addition to perishable articles, any other articles in connection with which it is definitely established that delay in securing release would occasion unusual loss or inconvenience to the importer or to the carrier bringing the merchandise to the port.

(c) Special permits for the delivery of articles of a class referred to in paragraph (b) of this section prior to formal entry shall be granted only in cases where the collector of customs shall be satisfied that such delivery can be permitted with safety to the revenue.

(d) Applications for special permits for the delivery of imported articles prior to formal entry therefor shall be made in triplicate on customs Form 3461 and shall be supported by evidence satisfactory to the collector of the right of the applicant to make entry for the articles with respect to which the application is filed. If the application is approved, one copy thereof shall be retained as an office record, one copy shall be executed as the permit, and the third copy shall be forwarded to the comptroller of customs. If the collector is satisfied that the conditions warrant such action, a special permit may be granted to cover the delivery prior to formal entry of a class or classes of articles particularly described in the application for such permit and imported during a period not to exceed 1 year. In such case the fact of release of the merchandise, together with such supplemental information as may be necessary to identify the shipment and determine its quantity and value, shall be noted on the manifest and initialed by the customs officer who releases the merchandise.

(e) Except as provided in paragraph (f) of this section, no permit for the delivery of imported articles prior to formal entry shall be issued until there has been filed in connection with the application therefor a special single entry bond on customs Form 7551–A, with approved corporate surety, in a sum equal to the value of the articles plus the estimated duties thereon, if any; or a special term bond on customs Form 7553–A, with approved corporate surety, in a sum which the collector deems sufficient, but not less than $10,000. The special term bond may be filed in connection with a single application to cover several importations during a period of not more than 1 year, or in connection with several applications to be filed during a period of not more than 1 year.

(f) If there is available sufficient information as to the quantities and values of the merchandise properly to estimate the duties, there may be filed with the application for a special permit a proper entry in regular form, accompanied by the estimated duties and supported by the regular entry bond (customs Form 7551 or 7553), in lieu of the special bond provided for in the preceding paragraph. Such an entry is not effective as such until after the merchandise covered thereby has actually arrived within the port limits and the entry has been officially accepted.

(g) No special permit will be required for the delivery of importations for which informal entry is permitted as provided for in § 6.56.

(h) In the case of articles of a class referred to in paragraph (b), except those entered in accordance with paragraph (g) of this section, arriving from Canada or Mexico when the customhouse is closed, and destined to places other than the port of arrival, the application and the evidence of the right to make entry may be submitted to the chief customs officer on duty and a special permit may be issued for their release, provided the person making application has on file in the customhouse a special term bond as described in paragraph (e) of this section.

(i) In cases where formal entry is not made and estimated duties deposited within 48 hours (exclusive of Sunday and holidays) after the release of the articles under special permit, the collector shall take immediate action to collect, as liquidated damages, the penal sum of the bond in the case of a single entry bond, or an amount equal to the value of the articles as to which there was default, plus the duties thereon, in the case of a term bond, and, unless the claim is promptly satisfied, shall discontinue allowing immediate delivery of articles imported by or for the account of the person in default.

(j) Except in the case of articles entered in accordance with paragraph (g) of this section, the collector shall give timely notice of the arrival of the vessel or vehicle to the appraiser, who shall promptly detail an officer to examine the merchandise, except that when the vessel or vehicle arrives at night or on a Sunday or holiday, and the articles consist of fruits or vegetables or other merchandise which it is practicable to appraise by means of samples, the discharging inspector shall take samples in such manner and in such quantities as the appraiser may direct, and retain the same for examination on the next business day. The discharging inspector shall not release the merchandise to the carrier until it shall have been examined, or adequate samples shall have been taken when appraisement is to be made by sample, and shall keep an accurate account of all releases made under the special permit, which he shall attach to his return of cargo discharged.

(k) In all other respects the procedure shall be the same as in the case of other imported merchandise.† (Sec. 448, 46 Stat. 714; 19 U.S.C. 1448 (b)) [Art. 354]

§ 13.12    TITLE 19—CUSTOMS DUTIES

(b) "Delivery" shall be construed to be effected at the time when merchandise is actually delivered by the carrier or on its order either directly to the importer or to the storekeeper in charge of a bonded warehouse. Where gauging is delayed until after the merchandise has been deposited in a bonded warehouse, date of delivery shall be construed to be the date of the completion of the gauging. Allowance shall be made only for such losses as occurred prior to the gauging of the merchandise.

(c) When merchandise is forwarded under an immediate transportation entry delivery shall be construed to be effected at the port of destination under the above conditions.

(d) The use of the term "broken or otherwise injured" precludes an allowance for loss resulting from ordinary leakage. Unlading inspectors should particularly note whether casks or packages which are in bad order are broken or injured. When a cask or package arrives with loose staves or headpieces breakage or injury will be presumed. Losses out of a package which has been plugged, but is otherwise in good condition, will be considered to be due to causes other than breakage or other injury.

(e) "Contents in condition as exported" is held to mean the invoiced quantities, provided specifications are given for each individual package, otherwise the "contents exported" shall be held to be the gross capacities returned by the gauger.

(f) Outages not within the scope of the preceding paragraphs of this section by reason of being under 10 percent or not being the kind of loss provided in the law, or by failure to file timely affidavit, will be subject to an allowance of $2\frac{1}{2}$ percent for normal outage from the capacity as shown by the gauger's return or the invoice quantity, according to the circumstances.† (Par. 813 : sec. 1, 46 Stat. 640; 19 U.S.C. 1001. R.S. 251, sec. 624, 46 Stat. 759; 19 U.S.C. 66, 1624) [Arts. 814, 815]

**13.12 Articles damaged and worthless at the time of importation.** When a shipment of merchandise, whether perishable or nonperishable, or any portion thereof which shall have been segregated from the remainder of the shipment under customs supervision at the expense of the importer, is found by the appraising officer to be entirely without commercial value by reason of damage or deterioration and is so reported to the collector in the appraisement return, an allowance in duties on such merchandise on the ground of nonimportation should be made in the liquidation of the entry.† (R.S. 251, sec. 624, 46 Stat. 759; 19 U.S.C. 66, 1624) [Art. 816]

## PART 14—LIQUIDATION OF DUTIES

Sec.
14.1 Liquidation required.
14.2 Definition of liquidation; procedure.
14.3 Notice of liquidation.
14.4 Suspension of liquidation.
14.5 Conversion of currency.
14.6 Weight, gauge, or measure.

Sec.
14.7 Articles in examination packages not specified in the invoice.
14.8 Excess of merchandise.
14.9 Change in classification; higher or lower rate; effective date.
14.10 Warehouse entries.

†For source citation, see note to § 13.1.

Sec.
14.11 Appraisement, baggage, informal, and mail entries.
14.12 Importations not exceeding $1 in value.
14.13 Errors, correction.
14.14 Taxes on imported oils and other products.
14.15 Additional duty arising from undervaluation.
14.16 Additional duty on articles not legally marked.
14.17 Discriminating duties.
14.18 Notice to importer before assessment of dumping duty.

Sec.
14.19 Method of computing dumping duty.
14.20 Cuban preference.
14.21 Tariff rate quotas.
14.22 Countervailing duties; declarations of bounties or grants.
14.23 Same; suspension of liquidation pending determination or estimation of amounts of bounties or grants; deposit required.
14.24 Proclamations approving changes in rates.
14.25 Trade agreement proclamations.

### CROSS REFERENCES

Appraisement: See Part 12.
Customs bonds: See Part 23.
Invoices, entry, and assessment of duties: See Part 6.
Protests and reappraisements: See Part 15.
Transportation in bond and merchandise in transit: See Part 16.
Regulations of the Bureau of Internal Revenue: See Internal Revenue, 26 CFR Chapter I.
Regulations of the Federal Alcohol Administration: See Intoxicating Liquors, 27 CFR Chapter I.

**Section 14.1 Liquidation required.** All entries covering imported merchandise, except those for transportation in bond, shall be liquidated in accordance with the following procedure.† (Secs. 505, 624, 46 Stat. 732, 759; 19 U.S.C. 1505, 1624) [Art. 817]

†The source of §§ 14.1 to 14.21, inclusive, (except for Treasury Decisions noted in the text,) is Customs Regulations of 1937, 2 F.R. 1618ff.

**14.2 Definition of liquidation; procedure.** (a) Liquidation of entries is the final computation or ascertainment of the duties accruing thereon.

(b) The collector should see that the report of the appraisement on customs Form 6417 is dated and signed by the appraiser, the chief assistant appraiser or an acting appraiser.

(c) The collector should determine whether the advisory classification of the appraiser is correct, and if it is not, he should so inform that officer. Where such classification is made under a paragraph providing a minimum or a maximum rate, the appraiser's duty is performed by properly describing the merchandise in tariff terms and citing the paragraph under which he advises classification (e. g., "men's gloves, chief value leather, 15 inches long, lined with wool, par. 1532 (a)"); it then becomes the duty of the collector to decide whether the advisory classification is correct, and if so, to calculate and determine whether the minimum or maximum rate of duty applies to each item of the invoice. In the case of mail and informal entries, a description of the merchandise in tariff terms and the paragraph under which the merchandise is dutiable should appear on the entry.

(d) (1) In the computation of duty on entries, ad valorem rates will be applied to the value in even dollars, fractional parts of a dollar less than 50 cents being disregarded and if 50 cents or more

§ 14.2                    TITLE 19—CUSTOMS DUTIES

being considered as $1; all merchandise in the same invoice subject to the same dutiable classification and the same rate of duty to be treated as a unit. When necessary, fractional parts of a dollar, whether more or less than 50 cents, may be dropped or taken up as whole dollars in order not to increase or decrease the total dutiable value of the invoice. If in such cases it is necessary to drop fractional parts of a dollar amounting to 50 cents or more, the lower fractions shall be dropped, and if it is necessary to take up as whole dollars fractional parts less than 50 cents, the larger fractions shall be taken. In the case of two equal fractions, the one subject to the lower rate of duty shall be dropped or taken up as the case may be. In determining a rate of duty dependent upon value, fractional parts of a dollar will be considered. If the rate of duty upon such entries is specific and $1 or less per unit, fractional quantities if less than one-half will be disregarded, and if one-half or more will be treated as a whole unit. If the specific rate is more than $1 per unit, duty will be assessed upon the exact quantity and the fractional part thereof, if any, expressed in the form of a decimal extended to two places.

(2) In the computation of internal-revenue taxes on distilled spirits imported in barrels, kegs, or similar containers the quantity shall be ascertained in accordance with the Internal Revenue Regulations; that is, the hundredths of a gallon less than one-tenth, or the second decimal figure, will be excluded on each package in determining the amount of tax due. Where distilled spirits are imported in bottles, jugs or similar containers, the internal-revenue taxes should be collected on the exact amount contained in each case or other outer container, fractional parts of a gallon being carried to three decimal places. The procedure for collecting internal-revenue taxes on still wines will be the same except that fractional parts of a gallon shall be carried to two decimal places for each package or other outer container.

(e) When the amount of duty assessed by the collector in a tentative liquidation of an entry, other than an informal mail entry, customs Form 3419, does not differ by so much as $1 from the total estimated duties (including any supplemental estimated duties deposited), the liquidator shall endorse the entry "as entered" over his initials in red ink. If there is a difference of $1 or more between the duties so assessed and the total estimated duties the liquidator shall make a new statement of duties over his initials in red ink. The same procedure shall be followed with respect to internal-revenue taxes, but the assessment of duties and internal-revenue taxes shall be separately stated when both accrue on the same importation. The duties and internal-revenue taxes assessed and stated on an informal mail entry, customs Form 3419, by a customs officer when he prepares the entry shall be the assessment by the collector for tentative liquidation purposes. In the case of mail entries, duty and internal revenue tax shall be exactly assessed, when the importer so requests, even though the change between the estimated and liquidated amounts be less than $1.

(f) Upon the return of entries to the collector after the assessment of duties and internal-revenue taxes has been verified by the comptroller, formal entries shall be immediately scheduled on a bulletin notice of liquidation, customs Form 4333. In the case of appraisement, baggage, informal, and mail entries a copy of the schedule of such entries, customs Form 5171, shall be used as the bulletin notice of liquidation as provided for in § 14.11. The bulletin notice of liquidation shall be posted as soon as possible in a conspicuous place in the customhouse for the information of importers and shall be dated with the date of posting. The entries for which the bulletin notice of liquidation has been posted shall be stamped "liquidated" and with the date of liquidation which shall be the same as the date of the bulletin notice of liquidation. Such stamping is the legal evidence of liquidation.

(g) Warehouse withdrawals for consumption covering manipulated merchandise withdrawn from class 8 warehouses and byproducts and wastes withdrawn from class 6 warehouses shall be liquidated and the liquidations posted. (Secs. 505, 624, 46 Stat. 732, 759; 19 U.S.C. 1505, 1624)    [Art. 818, Cust. Regs. 1937, as amended by T.D. 49487, Mar. 26, 1938]

CROSS REFERENCE: For classes of warehouses, see Part 17.

**14.3  Notice of liquidation.**  The bulletin notice of liquidations (customs Form 4333) covering entries filed at ports of entry will be posted at such ports.† (Secs. 505, 624, 46 Stat. 732, 759; 19 U.S.C. 1505, 1624)    [Art. 819]

**14.4  Suspension of liquidation.**  (a) The liquidation of entries involved in reappraisement, or on which bonds are open for the production of documents affecting the rate of duty, will be suspended pending a final decision of the reappraisement or a performance or nonperformance under the bond.

(b) The liquidation of entries covering articles entered at a conditionally reduced rate under paragraphs 502, 1530, or 1551, Tariff Act of 1930, or conditionally free of duty under paragraph 1691 or 1752, shall be suspended pending the production of the proof of use required by the regulations in §§ 8.90–8.95. Upon the production of such proof or failure to do so within the required time, the entries shall be liquidated accordingly.† (Secs. 505, 624, 46 Stat. 732, 759; 19 U.S.C. 1505, 1624)    [Art. 820]

**14.5  Conversion of currency.**  (a) The regulations in paragraphs (b) and (c) shall govern the conversion of currency pursuant to section 522 (b) and (c), Tariff Act of 1930.

(b) In determining the percentage of variation between the proclaimed rate and the Federal reserve rate, the difference between the two rates shall be divided by the Federal reserve rate.

(c) The date of exportation for currency conversion shall be fixed in accordance with § 12.12.† (Secs. 505, 624, 46 Stat. 732, 759; 19 U.S.C. 1505, 1624)    [Art. 822]

**14.6  Weight, gauge, or measure.**  (a) "Entry" in the sense used in section 315, Tariff Act of 1930, is held to be the time of landing. The same rule applies to merchandise entered for consumption.

§ 14.6                TITLE 19—CUSTOMS DUTIES

(b) If merchandise has been cleaned, sorted, repacked, or otherwise changed in condition under section 562, Tariff Act of 1930, the liquidation shall be made on the weight, gauge, or measure of such merchandise in its condition at the time of landing. Upon the withdrawal of such merchandise after manipulation, the duty shall be adjusted according to its condition, quantity, and weight at the time of withdrawal.

(c) When, in the case of merchandise not weighed by the weighing inspector, the invoice shows only the net weight, liquidation may be made on such weight if it is impracticable to obtain actual net weight without injury to the goods.

(d) Where goods are subject to an ad valorem rate of duty and it appears from the invoice, bill of lading or other source of information that the merchandise was bought on the basis of the gross weight or quantity, the appraiser's report should show whether the appraisement was made on the basis of the gross or net weight or quantity, and the liquidation should be made upon the same basis as that upon which the appraisement was made.

(e) Internal-revenue taxes on alcoholic beverages imported in barrels, casks, or similar containers shall be collected only on the number of proof gallons (or wine gallons if below proof) and fractional parts thereof actually entered or withdrawn for consumption. The quantity determined on the basis of the original customs gauge shall be considered the quantity actually entered or withdrawn and no regauge shall be made for the purpose of assessing internal-revenue taxes, unless the lapse of time or the condition of the containers prior to entry or withdrawal indicates that the quantity shown by such original gauge has been substantially reduced by evaporation or leakage, or unless prior to entry or withdrawal the person making the entry or withdrawal makes a written request for a regauge and, if less than 90 days have elapsed since the date of such original gauge, states in such request his reasons for believing that such original gauge does not correctly indicate the quantity to be withdrawn. Ordinary customs duties shall be collected on the gallonage determined on the basis of the original customs gauge.

(f) When imported distilled spirits upon which collectors of customs are required to collect internal-revenue taxes under the provisions of section 1150 (f), title 26, United States Code, and § 22.12, or imported wines upon which collectors of customs are required by the said section to collect such taxes, are regauged in accordance with paragraph (e) of this section in order that the internal-revenue taxes may be collected on the gallonage actually withdrawn from warehouse for consumption, as contemplated by sections 1150 (a) (1) and 1300 (a), title 26, United States Code, the internal-revenue taxes shall be adjusted on the warehouse withdrawal according to the gauge at the time of withdrawal. A notation shall be made on the withdrawal that the adjustment has been made in accordance with the provisions of this paragraph. No adjustment of ordinary customs duties shall be made as a result of a regauge for internal-revenue purposes, in view of the provisions of section 563 (a), Tariff Act of 1930.

(g) Applications for refund of internal-revenue taxes paid on imported distilled spirits or wines in excess of the quantity actually withdrawn from warehouse for consumption, should be filed by the claimant with the Commissioner of Internal Revenue through the collector of internal revenue for the district concerned.† (R.S. 251, secs. 315, 505, 624, 46 Stat. 695, 732, 759; 19 U.S.C. 66, 1315, 1505, 1624) [Art. 823]

**14.7    Articles in examination packages not specified in the invoice.**    When any article not corresponding with the description given in the invoice is found by the appraiser and is reported to the collector in accordance with section 499, Tariff Act of 1930, duties will be assessed on the goods actually found, and, if the discrepancy appears conclusively to be the result of a mistake and not of an intent to defraud, no proceedings for forfeiture will be taken: Provided, That when the entire shipment does not agree with the invoice a new entry should be required and the estimated duty paid on the original entry refunded on liquidation as in the case of a nonimportation.† (Secs. 499, 505, 624, 46 Stat. 728, 732, 759; 19 U.S.C. 1499, 1505, 1624) [Art. 824]

**14.8    Excess of merchandise.**    Increased duty only is incurred by a simple excess of quantity over the quantity stated in the invoice, but when the unit value of the goods as declared in the entry is less than the appraised value thereof, both increased and additional duties accrue upon the quantity of like goods found in excess.† (Secs. 505, 624, 46 Stat. 732, 759; 19 U.S.C. 1505, 1624) [Art. 825]

**14.9    Change in classification; higher or lower rate; effective date.**    (a) When a collector or appraiser is of the opinion that the classification of any merchandise should be advanced to a higher or reduced to a lower rate than it has been the well-established practice to assess thereon, he should so report to the Bureau, in order that general instructions in the matter may be issued.

(b) If the practice at the various ports has been uniform for a considerable time, a change in classification to a higher rate of duty, except as the result of a court decision, will be made only upon the Bureau's instructions and will be applicable only to merchandise entered for consumption after 30 days from the date of the publication of the Bureau's instructions in the weekly Treasury Decisions or, if entered for warehouse withdrawn for consumption after the expiration of such 30-day period, provided the warehouse entry is unliquidated or, if liquidated, that reliquidation thereof can be completed within 60 days from the date of liquidation.

(c) If the practice at the various ports has not been uniform for a considerable time, a change to a higher rate of duty may be made either upon the Bureau's instructions or upon information from the Customs Information Exchange, or otherwise, and will be applicable to all unliquidated entries, whether for consumption or warehouse, and also to liquidated warehouse entries covering merchandise remaining in warehouse after the date of the Bureau's instructions or, if published, the date of publication thereof in the weekly Treasury Decisions, or after the receipt of the information,

†For source citation, see note to § 14.1.

§ 14.9          TITLE 19—CUSTOMS DUTIES

provided the reliquidation thereof can be completed within 60 days from the date of liquidation.

(d) A change in classification to a lower rate of duty, except as the result of a court decision, will be made only upon the Bureau's instructions or upon the receipt of a Customs Information Exchange report showing the higher classification to be clearly erroneous and contrary to the present practice at the various ports. A change to a lower rate of duty, when decided upon, will be applicable to all unliquidated entries and to all protested entries involving the same issue which have not been forwarded to the Customs Court.

(e) The principles of decisions of the Customs Court or Court of Customs and Patent Appeals favorable to the Government shall be applied to merchandise identical with that passed on by the court, if such merchandise is covered by unliquidated entries, whether for consumption or warehouse, or by liquidated warehouse entries which can be reliquidated within 60 days from the date of liquidation, provided that, in the latter case, the merchandise remains in warehouse after the date of the publication of the decision in the weekly Treasury Decisions.

(f) The principles of such favorable decisions shall be applied to merchandise, though not identical with the merchandise the subject of the court's decision, if its classification is affected by such principle, provided that it has been entered for consumption or withdrawn from warehouse for consumption after 30 days from the date of publication of the court's decision in the weekly Treasury Decisions, and that, in the case of liquidated warehouse entries, the reliquidation can be completed within 60 days from the date of liquidation .

(g) In the event that the overruling of a protest is accompanied by a definite statement that a higher rate than that assessed by the collector was properly chargeable, such higher rate, when applicable, should be made effective as to merchandise entered for consumption or withdrawn from warehouse for consumption after 30 days from the date of the publication of the court's decision in the weekly Treasury Decisions, provided that, in the case of liquidated warehouse entries, reliquidation thereof can be completed within 60 days from the date of liquidation.

(h) The principles of decisions of the Customs Court or Court of Customs and Patent Appeals adverse to the Government shall be applied to unliquidated entries and protested entries which have not been forwarded to the Customs Court, in which the same issue is involved, provided the time within which an application for a rehearing or review may be filed has expired without such application having been made.

(i) When the rate of duty is changed by Act of Congress or by proclamation of the President, entries covering the classes of importations enumerated in section 315, Tariff Act of 1930, should be liquidated or reliquidated, as the case may be, on the basis of the new rate. The reliquidation in such cases shall be made in the district where the merchandise is in customs custody on the date of the change of rate.

(j) Merchandise upon which any duties or charges are unpaid, remaining in warehouse 3 years (or 10 months in the case of grain) from the date of importation, is deemed to be abandoned to the Government and, if withdrawn for consumption thereafter, is subject to duty at the rate applicable at the time of the expiration of the 3 years (or 10 months in the case of grain).

(k) Unclaimed merchandise becomes abandoned to the Government at the expiration of 1 year and, if entered for consumption thereafter, is subject to the rates applicable at the expiration of the year.† (Secs. 505, 624, 46 Stat. 732, 759; 19 U.S.C. 1505, 1624)   [Art. 828]

CROSS REFERENCE: For disposition of merchandise unclaimed or in warehouse beyond time fixed by law, see Part 18.

**14.10   Warehouse entries.**   Warehouse entries shall be liquidated by single packages when necessary for the purpose of withdrawal.† (Secs. 505, 624, 46 Stat. 732, 759; 19 U.S.C. 1505, 1624)   [Art. 829]

**14.11   Appraisement, baggage, informal, and mail entries.**   (a) Appraisement entries, customs Form 7500, baggage entries, customs Form 6059 or 6063, informal entries, customs Form 5119, and mail entries, customs Form 3419 or 3420, shall be formally liquidated after return by the comptroller, and a carbon copy of the bulletin, customs Form 5171, covering such entries, posted as the notice of liquidation. All such entries ready for liquidation during any 1 month may be liquidated on any convenient day during that month.   The date of posting shall be stamped on the bulletin as the date of liquidation of all liquidated entries covered thereby.

(b) Entries liquidated subsequent to the posting of the bulletin on which they originally appear, shall be listed on a new bulletin which shall be stamped liquidated as of the date of posting. The fact and date of liquidation shall be shown on the office copy of the bulletin on which the entries were originally scheduled.†   (Secs. 505, 624, 46 Stat. 732, 759; 19 U.S.C. 1505, 1624)   [Art. 830]

**14.12   Importations not exceeding $1 in value.**   Collectors may pass free of duty and without the preparation of an entry importations (except those subject to internal-revenue tax) having a value not exceeding $1.   Entry will be required for such importations if subject to internal-revenue tax and both duty and tax shall be assessed.†   (Secs. 498, 505, 624, 46 Stat. 728, 732, 759; 19 U.S.C. 1498, 1505, 1624)   [Art. 832]

**14.13   Errors, correction.**   Clerical errors in the returns of weight, gauge, or measure, errors in extension and other mathematical calculations, the inclusion of uniformly nondutiable charges in the entered value, and other clerical errors apparent from the papers, dock books, or other records may be corrected upon liquidation of the entry.   Such errors claimed or discovered after liquidation of the entry, unless covered by protest, can be corrected only on instructions from the Bureau.†   (Secs. 505, 624, 46 Stat. 732, 759; 19 U.S.C. 1505, 1624)   [Art. 833]

**14.14   Taxes on imported oils and other products.**   (a) The taxes imposed by section 601 (c) (8), Revenue Act of 1932, as amended, shall be levied, assessed, collected, and paid in accordance

with this chapter, insofar as it is applicable, and shall be scheduled, deposited, reported, and accounted for as and with other collections of duties on imports, in the same manner as duties imposed by the Tariff Act of 1930, as amended.

(b) In the case of any article, merchandise, or combination subject to a tax under section 601 (c) (8), Revenue Act of 1932, as amended, not less than 10 percent of the quantity by weight of which consists of or is derived directly or indirectly from one or more of the products (except seeds) specified in the said section or in section 602½, Revenue Act of 1934, as amended, U.S.C., Sup. III, title 26, sec. 999, the appraising officer shall indicate in his return on the invoice the percentage of the total net weight of the imported article which consists of or is derived directly or indirectly from each of the products above mentioned.  If the facts for the assessment of duty can not be determined from an examination of the imported article or from other available sources, the maximum tax likely to be due shall be collected and the liquidation of the entry suspended for a reasonable time to enable the importer to furnish the necessary information.  If a claim shall be filed in connection with the entry that, in view of section 703, Revenue Act of 1936, an article or part thereof is not taxable under section 601 (c) (8), as amended, because such article or part thereof was derived directly or indirectly from a waste not named in section 601 (c) (8), as amended, the appraising officer shall submit such additional report as will assist the collector in ascertaining the validity of the claim, and the collector may require such additional evidence, in the form of affidavits or otherwise, as may be necessary and suitable to determine the facts on which the claim is based.  (Sec. 602, 48 Stat. 762, secs. 701, 703, 49 Stat. 1742, 1743, 50 Stat. 358.  R.S. 161, 251; 5 U.S.C. 22, 19 U.S.C. 66) [T.D. 48469, Aug. 4, 1936]

**14.15  Additional duty arising from undervaluation.**  In imposing additional duty for undervaluation under section 489 of the Tariff Act of 1930, no fractional parts of a rate per centum shall be assessed, e. g., if the advance is 10¼ or 10⅞, the additional duty to be assessed will be 10 percent.†    (Secs. 489, 624, 46 Stat. 725, 759; 19 U.S.C. 1489, 1624)  [Art. 835]

**14.16  Additional duty on articles not legally marked.**  (a) Additional duty for failure to mark, under section 304, Tariff Act of 1930, does not accrue if either the article or its immediate container is legally marked at the time of importation.  When there is only one container of an article it is the immediate container.

(b) The liquidation of warehouse entries should not be suspended because the merchandise covered thereby is reported to be not legally marked.†  (Secs. 304, 624, 46 Stat. 687, 759; 19 U.S.C. 1304 (a), (b), 1624)   [Art. 837]

CROSS REFERENCE: For packing, stamping and marking, see Part 9.

**14.17  Discriminating duties.**  The discriminating duties provided by subsection 1 of paragraph J, section IV, Tariff Act of October 3, 1913, as amended by the Act of March 4, 1915 (38 Stat. 1193; 19 U.S.C. 128, 131), and the discriminating duties and penalties provided for in section 338, Tariff Act of 1930, will be imposed only

†For source citation, see note to § 14.1.

CHAPTER I—BUREAU OF CUSTOMS                § 14.20

in pursuance of specific instructions issued and published from time
to time by the Secretary of the Treasury.† (R.S. 251, sec. 624, 46
Stat. 759; 19 U.S.C. 66, 1624)    [Art. 839]

**14.18   Notice to importer before assessment of dumping duty.**
Before dumping duty is assessed the collector will notify the importer
of the appraiser's return as in the case of an advance in value,
and if the importer files an appeal to reappraisement liquidation
will be suspended until the final reappraisement is decided.† (R.S.
251, sec. 202, 42 Stat. 11; 19 U.S.C. 66, 161)    [Art. 843]

CROSS REFERENCE: For regulations regarding finding of dumping by the
Secretary and procedure under the Antidumping Act, see §§ 12.15–12.22.

**14.19   Method of computing dumping duty.** (a) After the Secre-
tary's finding the appraiser's subsequent report to the collector,
the collector's notice to the importer, and the decision of the reap-
praisement appeal, if any, above referred to, (1) if it appears that
the merchandise has been purchased by a person not the exporter
within the meaning of section 207, Antidumping Act, 1921 (42 Stat.
14; 19 U.S.C. 166), the special dumping duty shall equal the dif-
ference between the purchase price and the foreign market value
on the date of purchase, or, if there is no foreign market value,
between the purchase price and the cost of production, the currency
of the purchase price, or of the foreign market value, or both, being
converted into United States money as of the date of purchase or
agreement to purchase; (2) if it appears that the merchandise is
imported by a person who is the exporter within the meaning of
section 207 of the Antidumping Act, the special dumping duty shall
equal the difference between the exporter's sales price and the foreign
market value on the date of exportation, or, if there is no foreign
market value, between the exporter's sales price and the cost of
production, the currency of the exporter's sales price, or of the
foreign market value, or of both, being converted to United States
money as of the date of exportation.

(b) The fact that the importer has added on entry the difference
between the purchase price or the exporter's sales price and the
foreign market value or cost of production and the appraiser has
approved the resulting entered value, does not prevent the assessment
of the special dumping duty. But a mere difference between the
purchase price or exporter's sale price and the foreign market value
or cost of production, without a finding by the Secretary of the
Treasury, as above referred to, is not sufficient for the assessment
of the special dumping duty.

(c) If the necessary conditions are present, special dumping duty
will attach even to samples imported for the purpose of taking
orders and making sales in this country.† (R.S. 251, secs. 202, 207,
42 Stat. 11, 14; 19 U.S.C. 66, 161, 166)    [Art. 844]

NOTE: See reference at end of § 14.18.

**14.20   Cuban preference.** (a) The total and partial exemptions
from duty provided for in the trade agreement with the Republic of
Cuba of August 24, 1934 (49 Stat., Part 2, 3559), apply only to direct
shipments from Cuba, including shipments via other countries for

†For source citation, see note to § 14.1.                **Page 267**
                                                         [583]

§ 14.21                    TITLE 19—CUSTOMS DUTIES

which there is furnished proof that the merchandise was destined to the United States at the time of exportation from Cuba, and also a certificate of the proper customs officer of each foreign country through which the merchandise passed enroute to the United States, showing continuous customs custody of the shipment while in such foreign country.

(b) No evidence of origin will be required for any Cuban merchandise which is unconditionally free of duty under the tariff laws. Consular invoices will be required for merchandise of Cuban origin embraced within the classes enumerated in § 6.16 (b), if the right of the merchandise to any total or partial exemption from duty is dependent upon its Cuban origin and the value of the shipment exceeds $100. In the case of every shipment of Cuban articles for which any total or partial exemption from duty is sought under the provisions of articles I or III of the Cuban Trade Agreement, there shall be filed in connection with the entry, preferably on the invoice filed with the entry, a declaration of the shipper, or other person having actual knowledge of the facts, that the articles for which the exemption is sought are of the growth, produce, or manufacture of Cuba.† (49 Stat., Part 2, 3559.  R.S. 251, sec. 624, 46 Stat. 759; 19 U.S.C. 66, 1624)  [Art. 846]

**14.21  Tariff rate quotas.**  Collectors of customs shall report to the Commissioner of Customs, Washington, D. C. (attention Division of Statistics and Research), on Monday of each week for the week ending the previous Saturday, the entry number, date and port of entry, and quantity in respect of each importation of any commodity specified above which is the product of a country whose products are entitled to entry at the reduced duties under tariff rate quotas. Whenever any tariff rate quota approaches fulfillment, special instructions will be issued by the Commissioner of Customs to require more frequent reports and, when appropriate, to require the deposit of estimated duties and import tax at the full rate pending the determination of the application of the reduced rate to particular importations.†  (49 Stat., Part 2, 3960.  Sec. 624, 46 Stat. 759, R.S. 161; 19 U.S.C. 1624, 5 U.S.C. 22)  [Art. 847]

**14.22  Countervailing duties; declarations of bounties or grants.**  Pursuant to section 303, Tariff Act of 1930, or similar provisions of prior tariff acts, it has been ascertained and determined by the Secretary of the Treasury that bounties or grants are paid or bestowed by the countries named below upon the manufacture or production or export of the articles and merchandise listed below when manufactured or produced in such countries and imported directly or indirectly into the United States. The net amounts of such bounties or grants have been determined and declared by the Secretary as stated after the names of the articles and merchandise listed. The collectors of customs will collect additional duty on such articles or merchandise equal to the net amounts of bounties or grants so determined and declared.

CHAPTER I—BUREAU OF CUSTOMS                    § 14.22

| Articles and merchandise | Amount | Country | T.D. No. | Date |
|---|---|---|---|---|
| Engines, traction | Internal combustion engine type: Over 12 b. h. p. and np to 18 b. h. p. per tractor, £40; over 18 b. h. p. and up to 25 b. h. p. per tractor, £50; over 25 b. h. p. and up to 35 b. h. p. per tractor, £70; over 35 b. h. p., £90. Any other type: the rates fixed by the minister after inquiry and report by the tariff board. In fixing the rates, regard shall be had to the relative cost of production of the engine and an engine of the internal combustion type, having the same brake horsepower rating. | Australia | 40001 | 2–6–24 |
| Fencing, wire | £2 12s. per ton (2,240 lbs.) | Australia | 40001 | 2–6–24 |
| Fish, dried salt (unless there is filed with the entry a certificate of a United States consular officer stationed in Nova Scotia that no bounty has been paid or will be paid with respect to such fish.) | $1 per quintal of 112 lbs. of codfish and $0.66⅔ per quintal of 112 lbs. of pollock, hake, haddock or cusk. | Nova Scotia | 49196 49269 49351 | 10–12–37 11–26–37 1–18–38 |
| Galvanized sheets | £4 10s. per ton (2.240 lbs.) | Australia | 40001 45384 | 2–6–24 1–9–32 |
| Netting, wire | £3 8s. per ton (2,240 lbs.) | Australia | 40001 | 2–6–24 |
| Silk or artificial silk, the following manufactures of, including the silk or artificial silk content by weight contained in fabrics made from any combination of other yarns with any of those enumerated, and also including the silk or artificial silk fabric content of articles made in whole or in part from any of the fabrics enumerated: | | Great Britain & Northern Ireland. | 43634 44742 47475 47502 47594 | 10–30–29 3–25–31 1–16–35 1–28–35 3–23–35 |
| Artificial silk fabrics made from artificial silk on which a British excise tax of 12 pence per pound has been assessed and on which a drawback of 21 pence has been allowed. | 8³⁷⁄₁₀₀ pence per pound | | | |
| Artificial spun-silk fabrics made from artificial spun silk on which an excise tax of 6 pence per pound has been assessed and a drawback of 11 pence has been allowed. | 4⁶⁹⁄₁₀₀ pence per pound | | | |
| Silk fabrics made from British spun silk on which the import duty, 12 pence per pound on silk waste has been paid and on which a drawback of 66 pence has been allowed. (3 pounds waste used in making 1 pound spun-silk yarn.) | 26 pence per pound | | | |
| Silk fabrics made from raw silk on which the import duty of 36 pence per pound has been assessed and on which a drawback of 66 pence per pound has been allowed. | 12¾ pence per pound | | | |
| Silk fabrics made from British spun silk and raw silk. | 26 pence per pound on spun-silk content, 12¾ pence per pound on raw-silk content. | | | |
| Japanese habutai on which a British import duty of 78 pence is assessed and on which a drawback of 93 pence, when dyed, printed and finished. | 13 pence per pound | | | |
| Crêpe de chine imported into Great Britain in the gum on which an import duty of 63 pence is assessed and on which a drawback of 93 pence has been allowed on exportation when dyed, printed and finished. | 9 pence per pound | | | |

§ 14.22                    TITLE 19—CUSTOMS DUTIES

| Articles and merchandise | Amount | Country | T.D. No. | Date |
|---|---|---|---|---|
| Chinese pongee on which a British import duty of 63 pence has been assessed and on which a drawback of 93 pence has been allowed. | 12 pence per pound | | | |
| Weighted silk made from raw silk on which an import duty of 36 pence has been assessed and on which a drawback of 66 pence has been allowed. | 26 pence per pound | | | |
| Spun silk yarn produced in Great Britain from silk waste on which an import duty of 6 pence per pound has been assessed (3 pounds of waste produce 1 pound spun silk) and on which spun silk yarn a drawback of 49 pence per pound has been allowed. | 31 pence per pound | | | |
| Spun silk yarn produced in Great Britain from silk waste on which an import duty of 6 pence per pound has been assessed (3 pounds of waste produce 1 pound spun silk) and on which spun silk yarn a drawback of 30 pence per pound has been allowed. | 12 pence per pound | | | |
| Silk fabrics made in Great Britain from British spun silk on which the import duty of 6 pence per pound on silk waste has been assessed (3 pounds waste to 1 pound spun silk) and on which fabrics a drawback of 66 pence per pound has been allowed. | 46 pence per pound | | | |
| Silk fabrics made in Great Britain from raw silk on which the import duty of 18 pence per pound has been assessed and on which fabric a drawback of 66 pence per pound has been allowed. | 39½ pence per pound | | | |
| Silk fabrics made in Great Britain from British spun silk and raw silk. | 46 pence per pound on spun silk content; 39½ pence per pound on raw silk content. | | | |
| Eastern tissue known as Habutai if dyed or printed in the United Kingdom and produced from tissue imported not dyed or printed on which the import duty of 33 pence per pound and 25 percent has been assessed and on which a drawback of 66 pence has been allowed. | 10½ pence per pound | | | |
| Eastern tissues known as Shantung, Ninghai, Nanshan, Honan, and Antung, if dyed or printed in the United Kingdom from tissues of these varieties imported not dyed or printed on which the import duty of 33 pence per pound and 25 percent has been assessed and on which a drawback of 66 pence per pound has been allowed. | 12 pence per pound | | | |
| Weighted silk fabrics made in Great Britain from raw silk on which an import duty of 18 pence per pound has been assessed and on which a drawback of 66 pence per pound has been allowed. | 46 pence per pound | | | |
| Silk netting made in Great Britain from raw silk on which an import duty of 18 pence per pound has been assessed and on which a British drawback of 51 pence per pound has been allowed, and the silk net content of articles made in whole or in part of such netting. | 29 pence per pound | | | |

CHAPTER I—BUREAU OF CUSTOMS    § 14.22

| Articles and merchandise | Amount | Country | T.D. No. | Date |
|---|---|---|---|---|
| Silk fabrics made in Great Britain from British spun silk on which the import duty of 6 pence per pound on silk waste has been assessed (3 pounds waste to 1 pound spun silk) and on which fabric a drawback of 36 pence per pound has been allowed. | 16 pence per pound | | | |
| Silk fabrics made in Great Britain from raw silk on which the import duty of 18 pence per pound has been assessed and on which fabric a drawback of 36 pence per pound has been allowed. | 9½ pence per pound | | | |
| Silk netting made in Great Britain from raw silk on which an import duty of 18 pence per pound has been assessed and on which a British drawback of 27 pence per pound has been allowed, and the silk net content of articles made in whole or in part of such netting. | 5³⁄₁₀ pence per pound | | | |
| Artificial silk fabrics made from artificial silk on which a British excise tax of 6 pence per pound has been assessed and on which a drawback of 12 pence per pound has been allowed. | 5⁶⁹⁄₁₀₀ pence per pound | | | |
| Artificial spun silk fabrics made from artificial spun silk on which an excise tax of 3 pence per pound has been assessed and a drawback of 6 pence per pound has been allowed, if exported to the United States on or after December 1, 1934. | 2⁸⁵⁄₁₀₀ pence per pound | | | |
| Silk nets on which a British drawback of 51 pence per pound is recoverable, made from imported raw silk on which a British import duty of 36 pence per pound is assessed, and the silk net content of articles made in whole or in part of such nets. | 7¾ pence per pound, drawback weight. | | | |
| Spirits: | | | | |
| Plain British spirits, defined as any British spirits (except low wines and feints) which have not had any flavor communicated thereto or ingredient or material mixed therewith. | 3 pence per gallon computed at hydrometer proof. | Great Britain and Northern Ireland and Irish Free State. | 34466 47753 | 5-25-14 6-20-35 |
| Spirits in the nature of spirits of wine, "spirits of wine" being defined as rectified spirits of the strength of not less than 43° above proof. | 3 pence per gallon computed at hydrometer proof. | | | |
| British compounded spirits, defined as spirits redistilled or which have had any flavor communicated thereto or ingredient or material mixed therewith. | 5 pence per gallon computed at hydrometer proof. | | | |
| Home-made plain spirits, and spirits in the nature of spirits of wine (same classes as British plain spirits and spirits in the nature of wine). | 3 pence per gallon, computed at hydrometer proof. | | | |
| Home-made compounded spirits (same class as British compounded spirits). | 5 pence per gallon, computed at hydrometer proof. | | | |

§ 14.23                    TITLE 19—CUSTOMS DUTIES

| Articles and merchandise | Amount | Country | T.D. No. | Date |
|---|---|---|---|---|
| Sugar, refined_____ | When the British drawback of customs duty is allowed at the rate of 9s. 4d. per cwt. of 112 lbs.: 1d.—(0.94695539d. x percentage of sucrose in imported sugar). | Great Britain and Northern Ireland. | 49355 | 1-22-38 |
| | When the British drawback of customs duty is allowed at the rate of 5s. 2/3d. per cwt. of 112 lbs.: 0.54166667d.—(0.51265881d. x percentage of sucrose in imported sugar). | ----------------- | ----- | ------- |
| | When the British drawback of customs duty is allowed at the rate of 3s. 10.9d. per cwt. of 112 lbs.: 0.41875d.—(0.39653167d. x percentage of sucrose in imported sugar). | ----------------- | ----- | ------- |
| | When the British drawback of customs duty is allowed at the rate of 2s. 9.2d. per cwt. of 112 lbs.: 0.29642857d.—(0.28040454d. x percentage of sucrose in imported sugar.) | ----------------- | ----- | ------- |
| | When the British drawback of customs duty is allowed at the rate of 1s. 7.4d. per cwt. of 112 lbs.: 0.17321428d.—(0.16333328d. x percentage of sucrose in imported sugar). | ----------------- | ----- | ------- |

(Sec. 303, 46 Stat. 687; 19 U.S.C. 1303)    [Treasury Decisions cited above]

**14.23  Same; suspension of liquidation pending determination or estimation of amounts of bounties or grants; deposit required.** The Secretary of the Treasury, pursuant to section 303, Tariff Act of 1930, has ascertained and determined that bounties or grants are paid or bestowed by the countries named below upon the manufacture or production or export of the articles and merchandise listed below when manufactured or produced in such countries and imported directly or indirectly (unless otherwise stated) into the United States, but has not declared the net amounts of the bounties or grants. The liquidation of entries of such articles and merchandise shall be suspended pending determination or estimation and declaration of the net amounts of such bounties or grants and the amounts of countervailing duties to be collected. Estimated countervailing duties in the amounts stated after the names of the articles and merchandise listed will be required to be deposited at the time of entry, in addition to the estimated ordinary duties.

| Articles and merchandise | Amount | Country | T.D. No. | Date |
|---|---|---|---|---|
| Butter, shipped directly to the United States prior to Oct. 26, 1935, and imported on or after Nov. 10, 1935, and butter imported indirectly on or after Nov. 10, 1935. | Danish krone 0.3986 per kilogram. | Denmark_____ | 47896 48734 | 9-28-35 12-29-36 |
| Butter, imported on or after June 1, 1934_ | 3 pence per pound_____ | Australia_____ | 48551 | 10-2-36 |
| Butter_____ | 0.30 Lithuaniau litas per kilogram. | Lithuania_____ | 49122 | 8-7-37 |
| Cameras, exported pursuant to contract of purchase or other agreement entered into before July 26, 1936. | 45 per cent of invoice value__ | Germany_____ | 48360 48444 48463 48479 | 6- 4-36 7-22-36 8- 4-36 8-14-36 |

| Articles and merchandise | Amount | Country | T.D. No. | Date |
|---|---|---|---|---|
| China tableware, exported pursuant to contract of purchase or other agreement entered into before August 3, 1936. | 22½ per cent of invoice value. | Germany | 48360 48444 48463 48479 | 6-4-36 7-22-36 8-4-36 8-14-36 |
| Gloves, cotton and rayon, exported pursuant to contract of purchase or other agreement entered into before August 3, 1936. | 39 per cent of invoice value. | Germany | 48360 48444 48463 48479 | 6-4-36 7-22-36 8-4-36 8-14-36 |
| Gloves, leather, exported pursuant to contract of purchase or other agreement entered into before August 3, 1936. | 47 per cent of invoice value. | Germany | 48360 48444 48463 48479 | 6-4-36 7-22-36 8-4-36 8-14-36 |
| Leather, calf and kid, exported pursuant to contract of purchase or other agreement entered into before July 26, 1936. | 25 per cent of invoice value. | Germany | 48360 48444 48463 48479 | 6-4-36 7-22-36 8-4-36 8-14-36 |
| Paper, metal-covered, exported pursuant to contract of purchase or other agreement entered into before August 3, 1936. | 48 per cent of invoice value. | Germany | 48360 48444 48463 48479 | 6-4-36 7-22-36 8-4-36 8-14-36 |
| Peas, imported indirectly: Farm-cleaned or extra-cleaned green peas. | Guilders 2.00 per 100 kg. | The Netherlands | 47658 49114 | 4-26-35 8- 5-37 |
| Dried green peas. | Guilders 2.50 per 100 kilos. | | | |
| Split peas, hulled and polished in The Netherlands. | Guilders 3.00 per 100 kilos. | | | |
| Sugar, contained in fruit products and all other manufactured products. | | Australia | 49157 | 9-15-37 |
| Sugar, contained in fruit products. | 20 pounds, 11 shillings, 8 pence (Australian currency) for each ton of 2,240 pounds of sugar. | | | |
| Sugar, contained in all manufactured products other than fruit products. | 22 pounds, 15 shillings, 8 pence (Australian currency) for each ton of 2,240 pounds of sugar. | | | |
| Surgical instruments, exported pursuant to contract of purchase or other agreement entered into before July 26, 1936. | 56 per cent of invoice value. | Germany | 48360 48444 48463 48479 | 6-4-36 7-22-36 8-4-36 8-14-36 |
| Tacks, thumb, exported pursuant to contract of purchase or other agreement entered into before August 3, 1936. | 31 per cent of invoice value. | Germany | 48360 48444 48463 48479 | 6-4-36 7-22-36 8-4-36 8-14-36 |
| Tree ornaments, glass, exported pursuant to contract of purchase or other agreement entered into before August 3, 1936. | 52 per cent of invoice value. | Germany | 48360 48444 48463 48479 | 6-4-36 7-22-36 8-4-36 8-14-36 |
| Toys, dolls and toy figures, exported pursuant to contract of purchase or other agreement entered into before August 3, 1936. | 45 per cent of invoice value. | Germany | 48360 48444 48463 48479 | 6-4-36 7-22-36 8-4-36 8-14-36 |

(Sec. 303, 46 Stat. 687; 19 U.S.C. 1303)    [Treasury Decisions cited above]

**14.24 Proclamations approving changes in rates.** The following tabulation lists the paragraphs of title I of the Tariff Act of 1930 affected by proclamations of the President under section 336 of said Act, approving changes in rates of duty expressly fixed by said Act or changes in the basis of value for the computation of duties, which changes were specified in reports made by the United States Tariff Commission pursuant to said section 336. The dates, numbers and citations of the respective proclamations are shown opposite the numbers of the paragraphs affected.

§ 14.24                    TITLE 19—CUSTOMS DUTIES

| Number of paragraph | Date of procla-mation | Number of proc-lamation | Statutory reference |
|---|---|---|---|
| 41 | Mar. 16, 1931 | 1942 | 47 Stat. 2439. |
| 41 | Aug. 19, 1932 | 2007 | 47 Stat. 2529. |
| 52 | Mar.  2, 1933 | 2034 | 47 Stat. 2560. |
| 53 | June 24, 1931 | 1959 | 47 Stat. 2463. |
| 207 | Dec.  2, 1931 | 1980 | 47 Stat. 2491. |
| 219 | Dec.  2, 1931 | 1981 | 47 Stat. 2492. |
| 302 (j) | June 18, 1932 | 2002 | 47 Stat. 2518. |
| 318 | Mar. 16, 1931 | 1940 | 47 Stat. 2437. |
| 331 | Dec. 14, 1932 | 2017 | 47 Stat. 2541. |
| 355 | Apr.  3, 1933 | 2044 | 48 Stat. 1694. |
| 364 | June 24, 1931 | 1954 | 47 Stat. 2458. |
| 373 | Apr.  3, 1933 | 2044 | 48 Stat. 1694. |
| 396 | Dec. 14, 1932 | 2020 | 47 Stat. 2544. |
| 397 | Feb.  5, 1931 | 1934 | 46 Stat. 3046. |
| 397 | July  1, 1936 | 2181 | 50 Stat. 1733; 1 F. R. 713. |
| 412 | Feb.  5, 1931 | 1936 | 46 Stat. 3048. |
| 412 | June 24, 1931 | 1958 | 47 Stat. 2462. |
| 412 | Dec. 14, 1932 | 2020 | 47 Stat. 2544. |
| 501 | May  9, 1934 | 2085 | 48 Stat. 1742. |
| 503 | Feb.  5, 1931 | 1933 | 46 Stat. 3045. |
| 713 | June 24, 1931 | 1956 | 47 Stat. 2460. |
| 717 (a) | Jan. 23, 1936 | 2157 | 49 Stat. 3496. |
| 718 (a) | Dec. 14, 1933 | 2066 | 48 Stat. 1722. |
| 721 (b) | May  1, 1934 | 2081 | 48 Stat. 1739. |
| 769 | Dec.  2, 1931 | 1976 | 47 Stat. 2487. |
| 774 | Dec.  2, 1931 | 1977 | 47 Stat. 2488. |
| 774 | Dec.  2, 1931 | 1978 | 47 Stat. 2489. |
| 805 | Jan. 16, 1935 | 2115 | 49 Stat. 3434. |
| 904 (b) and (c) | May 21, 1936 | 2171 | 49 Stat. 3518; 1 F. R. 435. |
| 909 | Dec. 14, 1932 | 2019 | 47 Stat. 2543. |
| 909 | June 24, 1933 | 2049 | 48 Stat. 1700. |
| 1005 (a) (3) | June 24, 1931 | 1955 | 47 Stat. 2459. |
| 1022 | Dec. 14, 1932 | 2018 | 47 Stat. 2542. |
| 1114 (b) | Feb. 21, 1936 | 2158 | 49 Stat. 3497. |
| 1114 (d) | June 11, 1932 | 2001 | 47 Stat. 2517. |
| 1115 (b) | Mar. 16, 1931 | 1941 | 47 Stat. 2438. |
| 1504 (b) (4) | Feb.  5, 1931 | 1937 | 46 Stat. 3049. |
| 1530 (c) | Feb.  5, 1931 | 1935 | 46 Stat. 3047. |
| 1530 (e) | Dec.  2, 1931 | 1979 | 47 Stat. 2490. |
| 1530 (e) | Feb.  1, 1933 | 2027 | 47 Stat. 2552. |
| 1537 (b) | Feb.  1, 1933 | 2027 | 47 Stat. 2552. |
| 1539 (b) | Apr. 23, 1934 | 2080 | 48 Stat. 1738. |
| 1541 (a) | June 24, 1931 | 1957 | 47 Stat. 2461. |
| 1545 | Aug. 19, 1932 | 2008 | 47 Stat. 2530. |

(Sec. 336, 46 Stat. 701; 19 U.S.C. 1336)   [Presidential Proclamations cited above]

**14.25 Trade argeement proclamations.** The following is a list of proclamations by the President of foreign trade agreements entered into under section 350, Tariff Act of 1930:

| Country with which agreement has been made | Date of proclamation | Number of proclamation | Statutory reference | T.D. number |
|---|---|---|---|---|
| Belgo-Luxemburg Economic Union. | Apr.  1, 1935 | ¹ TA75 | 49 Stat. 3680__ | 47600 |
| Brazil_____ | Dec.  2, 1935 | ¹ TA82 | 49 Stat. 3808__ | 48034 |
| Canada_____ | Dec.  2, 1935 | ¹ TA91 | 49 Stat. 3960__ | 48033 |
| Canada (Supplementary)____ | May 14, 1936 | ¹ TA91 | 49 Stat. 3960__ | 48315 |
| Colombia_____ | Apr. 20, 1936 | ¹ TA89 | 49 Stat. 3875__ | 48258 |
| Costa Rica_____ | July  3, 1937 | ¹ TA102 | 50 Stat. 1582__ | 49072 |
| Cuba_____ | Aug. 24, 1934 | ¹ TA67 | 49 Stat. 3559__ | 47232 |
| Czechoslovakia_____ | Mar. 15, 1938 | _____ | _____ | 49458 |
| Czechoslovakia (Amendment) | Apr. 15, 1938 | _____ | _____ | 49512 |
| El Salvador_____ | May  1, 1937 | ¹ TA101 | 50 Stat. 1564__ | 48947 |
| Finland_____ | Oct.  3, 1936 | ¹ TA97 | 50 Stat. 1436__ | 48554 |
| France_____ | May 16, 1936 | _____ | _____ | 48316 |
| Guatemala_____ | May 16, 1936 | ¹ TA92 | 49 Stat. 3989__ | 48317 |
| Haiti_____ | May  4, 1935 | ¹ TA78 | 49 Stat. 3737__ | 47667 |
| Honduras_____ | Feb.  1, 1936 | ¹ TA86 | 49 Stat. 3851__ | 48131 |
| Netherlands_____ | Dec. 28, 1935 | ¹ TA100 | 50 Stat. 1504__ | 48075 |
| Nicaragua_____ | Sept.  1, 1936 | ¹ TA95 | 50 Stat. 1413__ | 48511 |
| Sweden_____ | July  8, 1935 | ¹ TA79 | 49 Stat. 3755__ | 47785 |
| Switzerland_____ | Jan.  9, 1936 | ¹ TA90 | 49 Stat. 3917__ | 48093 |
| Switzerland (Supplementary)_ | May  7, 1936 | ¹ TA90 | 49 Stat. 3917__ | 48314 |

¹ TA proclamation—Trade Agreement Proclamation.

(Sec. 1, Act of June 12, 1934, 48 Stat. 943, extended by the Act of March 1, 1937, 50 Stat. 24; 19 U.S.C. 1351 and Sup.) [Presidential Proclamations cited above]

## PART 15—PROTESTS AND REAPPRAISEMENTS

Sec.
15.1 Protest.
15.2 Form of protest.
15.3 Samples.
15.4 Appraiser's special report on protest.
15.5 Transmission of protests and samples to the United States Customs Court.
15.6 Reliquidation of entries under decisions of the United States Customs Court.
15.7 Reliquidation under decisions of the Court of Customs and Patent Appeals.
Sec.
15.8 Refund of duties.
15.9 Reappraisement and review; notice of advance.
15.10 Same; appeal; method.
15.11 Same; appeal, disposition; samples.
15.12 Notice to importer of reappraisement decision; review.
15.13 Remission of additional duty; procedure.
15.14 Antidumping; protests and appeals; procedure.
15.15 American producers' appeals and protests; procedure.

CROSS REFERENCES

Appraisement: See Part 12.
Customs financial and accounting procedure: See Part 22.
Invoices, entries, and assessment of duties: See Part 6.
Liquidation of duties: See Part 14.

# EXHIBIT 2

# T.D. 50449

The area described, including both public and non-public lands, aggregates 655,000 acres.

FRANKLIN D ROOSEVELT

THE WHITE HOUSE,
*August 8, 1941.*

[No. 8847]

[F. R. Doc. 41–5969; Filed, August 13, 1941; 2:59 p. m.]

---

## Rules, Regulations, Orders

---

### TITLE 7—AGRICULTURE

#### CHAPTER IX—SURPLUS MARKET-ING ADMINISTRATION

PART 1101—FOOD STAMP PLAN

Section 1101.400 *Action against violators*[1] (Section 400, Article IV of the "Food Stamp Plan Regulations" made and prescribed by the Secretary of Agriculture on May 17, 1941, effective May 19, 1941) is hereby amended as follows:

(1) By striking the first two sentences therefrom and inserting in lieu thereof the following:

Whenever the Administrator determines that any person has violated these regulations, the Administrator may issue an order denying such person the privilege of participating in the Food Stamp Plan. Such order may also include a provision denying such person the privilege of participating in the Cotton Stamp Plan. Pending a final determination by the Administrator, the Administrator, or such officer or employee of the Surplus Marketing Administration as the Administrator may designate for the purpose, may suspend payment on any claim or claims of an alleged violator and may deny the alleged violator the privilege of participating in the Food Stamp Plan, and may also deny the alleged violator the privilege of participating in the Cotton Stamp Plan.

(2) By inserting in the fourth sentence thereof the words "or cotton" after the words "supported by food" and preceding the word "stamps".

(3) By striking from the fourth sentence the word "these" following the words "in compliance with" and preceding the word "regulations" and inserting in lieu thereof the words "the applicable".

Done at Washington, D. C., this 13th day of August 1941. Witness my hand and the seal of the Department of Agriculture.

Effective date: August 13, 1941.

[SEAL]                PAUL H. APPLEBY,
            *Under Secretary of Agriculture.*

[F. R. Doc. 41–6000; Filed, August 14, 1941; 11:30 a. m.]

[1] 6 F.R. 2535.

---

PART 1121—COTTON STAMP PLAN REGULA-TIONS

Section 1121.400 *Action against violators*[1] (Section 400, Article IV of the "Cotton Stamp Plan Regulations" made and prescribed by the Acting Secretary of Agriculture on May 3, 1941, effective May 3, 1941) is hereby amended as follows:

(1) By striking the first two sentences therefrom and inserting in lieu thereof the following:

Whenever the Administrator determines that any person has violated these regulations, the Administrator may issue an order denying such person the privilege of participating in the Cotton Stamp Plan. Such order may also include a provision denying such person the privilege of participating in the Food Stamp Plan. Pending a final determination by the Administrator, the Administrator, or such officer or employee of the Surplus Marketing Administration as the Administrator may designate for the purpose, may suspend payment on any claim or claims of an alleged violator and may deny the alleged violator the privilege of participating in the Cotton Stamp Plan, and may also deny the alleged violator the privilege of participating in the Food Stamp Plan.

(2) By inserting in the fourth sentence thereof the words "or food" after the words "supported by cotton" and preceding the word "stamps".

(3) By striking from the fourth sentence the word "these" following the words "in compliance with" and preceding the word "regulations" and inserting in lieu thereof the words "the applicable".

Done at Washington, D. C., this 13th day of August 1941. Witness my hand and the seal of the Department of Agriculture.

Effective date: August 13, 1941.

[SEAL]                PAUL H. APPLEBY,
            *Under Secretary of Agriculture.*

[F. R. Doc. 41–5999; Filed, August 14, 1941; 11:30 a. m.]

---

### TITLE 19—CUSTOMS DUTIES

#### CHAPTER I—BUREAU OF CUSTOMS

[T. D. 50449]

PART 8—ARTICLES CONDITIONALLY FREE, SUBJECT TO REDUCED RATES, ETC.

CERTAIN FORAGE FOR LIVESTOCK TO BE ADMITTED FREE OF DUTY UNDER A PROCLAMATION OF THE PRESIDENT, MADE PURSUANT TO SECTION 318 OF THE TARIFF ACT OF 1930

AUGUST 12, 1941.

The Proclamation of the President dated July 25, 1941 (No. 2498), made pursuant to the provisions of section 318

[1] 6 F.R. 2302.

---

of the Tariff Act of 1930, declaring an emergency to exist by reason of drought conditions in certain areas of the United States, and authorizing the Secretary of the Treasury to permit entry free of duty of such forage for livestock as he may designate, was published in the FEDERAL REGISTER, July 29, 1941.[1]

The following regulations are hereby promulgated pursuant to the provisions of said Proclamation No. 2498:

§ 8.79a *F o r a g e   f o r   livestock.* (a) Such forage as is designated in paragraph (d) of this section shall be admitted free of duty, when imported for use in a drought-affected area described in paragraph (e), provided there is filed in connection with the entry, in addition to other papers and documents required by the customs regulations, a certificate, in duplicate, of such person as may be designated by the Secretary of Agriculture, in substantially the following form:

```
----------------------------------
            (Place)
----------------------------------
            (Date)
To Collector of Customs:
----------------------------------
         (Port of entry)
  This is to certify that the subscriber of
this certificate, ----------------------
                       (Name)
----------------------------------------
    (Title)              (Address)
has been duly authorized by the Secretary
of Agriculture in a letter of ------------
                                  (Date)
numbered --------------- to execute cer-
          (Serial No.)
tificates for the importation of forage for
livestock free of duty under the proclama-
tion of the President of the United States,
made on July 25, 1941, and the regulations
of the Secretary of the Treasury promulgated
pursuant thereto;
  That this certificate is issued by me pur-
suant to the authority granted to me by the
Secretary of Agriculture as aforesaid;
  That -------------------------------
    (Name and address of ultimate
           consignee)
is an owner of livestock, a relief organization
not operated for profit, or a dealer in forage,
in a drought-affected area of the United
States; and
  That I have investigated the matter and
verily believe that the merchandise described
below (is to be) (has been) imported by or
directly for the account of the ultimate con-
signee named above, and that it will be used
for the feeding of livestock in a drought-
affected area.
```

| Commodity | Approximate quantity | To be shipped via |
|-----------|---------------------|-------------------|
|           |                     |                   |
|           |                     |                   |
|           |                     |                   |
|           |                     |                   |

```
----------------------------------
        (Signature and title)
```

(b) The original copy of the above-mentioned certificate shall be filed with the entry papers, and the duplicate copy

[1] 6 F.R. 3715.

shall be promptly forwarded to the collector of customs to the Secretary of Agriculture, Washington, D. C. (Attention: M. S. Eisenhower).

(c) If the above-mentioned certificate is not presented at the time of entry, the usual customs single entry or term bond in such amount as is prescribed for such bonds in articles 1253 and 1254 of the Customs Regulations of 1937, as amended, shall be taken for the protection of the certificate within six months from the date of entry, and the six-months' period allowed for production of the certificate shall not be extended. The report of appraisement shall be suspended until the filing of the required certificate, or the expiration of six months, whichever is earlier.

(d) Pursuant to the recommendation of the Secretary of Agriculture, hay and straw are hereby designated as the types of forage which may be imported free of duty in accordance with the provisions of these regulations.

(e) The areas which have been designated by the Secretary of Agriculture as drought-affected areas are:

The counties of Clinton, Essex, Franklin, Jefferson, Lewis, Niagara, Oswego, St. Lawrence, Washington, Warren, and Saratoga, all in the State of New York.

(f) Lists of the names of the persons designated by the Secretary of Agriculture to execute the certificates contemplated by paragraph (a) of this section will be furnished to collectors of customs from time to time.

(g) The free entry herein authorized shall apply only with respect to importations entered for consumption on and after the date of the approval of the regulations in this section and prior to July 1, 1942, or such earlier date as may be proclaimed by the President if he shall declare by proclamation that the emergency has terminated. (Proc. 2498, July 25, 1941, 6 F.R. 3715)

[SEAL]	HERBERT E. GASTON,
*Acting Secretary of the Treasury.*

[F. R. Doc. 41-5971; Filed, August 13, 1941; 3:30 p. m.]

---

### TITLE 29—LABOR

#### CHAPTER V—WAGE AND HOUR DIVISION

PART 604—MINIMUM WAGE RATE IN THE CLAY PRODUCTS INDUSTRY

WAGE ORDER IN THE MATTER OF THE RECOMMENDATION OF INDUSTRY COMMITTEE NO. 24 FOR A MINIMUM WAGE RATE IN THE CLAY PRODUCTS INDUSTRY

Whereas on March 4, 1941, pursuant to section 5 (b) of the Fair Labor Standards Act of 1938, herein referred to as the Act, the Administrator of the Wage and Hour Division of the United States Department of Labor, by Administrative Order No. 87, appointed Industry Committee No. 24 for the Clay Products Industry, herein called the Committee, and directed the Committee to recommend a minimum wage rate for the Clay Prod-

ucts Industry in accordance with section 8 of the Act; and

Whereas the Committee included seven disinterested persons representing the public, a like number of person representing employers in the Clay Products Industry, and a like number of persons representing employees in the Industry, and each group was appointed with due regard to the geographical regions in which the Clay Products Industry is carried on; and

Whereas on May 1, 1941, the Committee, after investigating economic and competitive conditions in the Industry, filed with the Administrator a report containing its recommendation for a 34-cent minimum hourly wage rate in the Clay Products Industry; and

Whereas, after notice published in the FEDERAL REGISTER on May 13, 1941, Mr. Henry T. Hunt, Principal Hearings Examiner, the Presiding Officer designated by the Administrator, held a public hearing upon the Committee's recommendation at Washington, D. C., on June 10, 1941, at which all interested persons were given an opportunity to be heard; and

Whereas the complete record of the proceeding before the Presiding Officer has been transmitted to the Administrator; and

Whereas by notice given at the hearing, all persons who appeared at the hearing were given leave to file briefs on or before June 30, 1941; and

Whereas no request for oral argument having been received, oral argument on the Committee's recommendation was dispensed with in this proceeding; and

Whereas the Administrator, upon reviewing all the evidence adduced in this proceeding and giving consideration to the provisions of the Act with special reference to sections 5 and 8, has concluded that the Industry Committee's recommendation for the Clay Products Industry, as defined by Administrative Order No. 87, is made in accordance with law, is supported by the evidence adduced at the hearing, and taking into consideration the same factors as are required to be considered by the Industry Committee, will carry out the purposes of the Act; and

Whereas the Administrator has set forth his decision in an opinion entitled "Findings and Opinion of the Administrator in the Matter of the Recommendation of Industry Committee No. 24 for a Minimum Wage Rate in the Clay Products Industry," dated this day, a copy of which may be had upon request addressed to the Wage and Hour Division, United States Department of Labor, Washington, D. C.;

*Now, therefore, it is ordered that:*

§ 604.1 *Approval of recommendation of industry committee.* The Committee's recommendation is hereby approved.*

* §§ 604.1 to 604.6, inclusive, issued under the authority contained in sec. 8, 52 Stat. 1064; 29 U.S.C. Sup. 208.

§ 604.2 *Wage rate.* Wages at a rate of not less than 34 cents per hour shall be paid under section 6 of the Act by every employer to each of his employees in the Clay Products Industry who is engaged in commerce or in the production of goods for commerce.*

§ 604.3 *Posting of notices.* Every employer employing any employees so engaged in commerce or in the production of goods for commerce in the Clay Products Industry shall post and keep posted in a conspicuous place in each department of his establishment where such employees are working such notices of this Order as shall be prescribed from time to time by the Wage and Hour Division of the United States Department of Labor.*

§ 604.4 *Definition of the clay products industry.* The Clay Products Industry, to which this Wage Order shall apply, is defined as follows: The manufacture of all fired clay products except refractories, pottery and ceramic whiteware.*

§ 604.5 *Scope of the definition.* The definition of the clay products industry covers all occupations in the industry which are necessary to the production of the articles specified in the definition, including clerical, maintenance, shipping and selling occupations, *Provided, however,* That this definition does not include employees of an independent wholesaler or employees of a manufacturer who are engaged exclusively in marketing and distributing products of the industry which have been purchased for resale: *And provided further,* That where an employee covered by this definition is employed during the same workweek at two or more different minimum rates of pay, he shall be paid the highest of such rates for such workweek unless records concerning his employment are kept by his employer in accordance with applicable regulations of the Wage and Hour Division.*

§ 604.6 *Effective date.* This part shall become effective September 1, 1941.*

Signed at Washington, D. C., this 12th day of August 1941.

PHILIP B. FLEMING,
*Administrator.*

[F. R. Doc. 41-5996; Filed, August 14, 1941; 11:19 a. m.]

---

### TITLE 30—MINERAL RESOURCES

#### CHAPTER III—BITUMINOUS COAL DIVISION

[Docket No. A-939]

PART 337—MINIMUM PRICE SCHEDULE, DISTRICT NO. 17

ORDER GRANTING TEMPORARY RELIEF AND CONDITIONALLY PROVIDING FOR FINAL RELIEF IN THE MATTER OF THE PETITION OF DISTRICT BOARD NO. 17 FOR THE ESTABLISHMENT OF PRICE CLASSIFICATIONS AND MINIMUM PRICES FOR THE COALS PRODUCED AT CERTAIN MINES IN DISTRICT NO. 17

An original petition, and amendment thereto, pursuant to section 4 II (d) of

# T.D. 47236

# TREASURY DECISIONS

UNDER CUSTOMS AND
OTHER LAWS

## VOL. 66

## JULY–DECEMBER 1934

HENRY MORGENTHAU, JR.
Secretary of the Treasury



INDIANA UNIVERSITY
LIBRARY

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1935

For sale by the Superintendent of Documents, Washington, D. C. - - - - - - - - - - - Price $2.00 (Buckram)

manner of connection of the electric motor which furnishes the power for operating the device. The motor is small, and spherical in shape, and is compactly fitted into the bottom of the machine and is closely associated with the various metal parts of the same.

As so described, the machine with its incorporated electric motor, would seem to be a complete unit, and as such included within the kind or class of articles mentioned in said paragraph 353. But before definitely passing upon its tariff status the court felt that certain testimony which was not allowed at the original hearing should be received. On this point the court said: "We think the importer had the right to prove whether or not the machine involved was designed and constructed to be used interchangeably by both hand power and electrical power in the sense that is indicated in our views hereinbefore expressed. * * * We conclude that the best interests will be subserved by reversing the judgment of the trial court and remanding the cause for a new trial." It would therefore seem that, even where the electric motor is unquestionably incorporated in and forms an integral part of a machine, the latter is not within the paragraph if it can be operated interchangeably by a power other than electricity. The mechanism must not only contain the electrical element or device, but the latter must be an essential feature of the machine.

Applying that principle to the present importations, the latter must be classified as outside the purview of paragraph 353. Therefore, inasmuch as we have found that the imported merchandise consists of articles or parts of articles which are complete mechanisms containing no electrical element or device whatever, but which utilize energy or force for the transmission of motion, and are mechanical contrivances, we hold them properly dutiable under paragraph 372 as machines or parts thereof not specially provided for composed in chief value of metal, as alleged by the plaintiffs. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.

---

(T.D. 47236)

*Emergency—Free entry of feed for livestock*

Certain feed for livestock to be admitted free of duty under a proclamation of the President, made pursuant to section 318, Tariff Act of 1930

TREASURY DEPARTMENT, *August 30, 1934.*

*To Collectors of Customs and Others Concerned:*

The proclamation of the President dated August 10, 1934, made pursuant to the provisions of section 318 of the Tariff Act of 1930, declaring an emergency to exist by reason of drought conditions in

219        [T.D. 47236]

certain areas of the United States, and authorizing the Secretary of the Treasury to permit entry free of duty of such feed for livestock as he may designate, is published for your information and guidance:

*Emergency due to drought—Free importation of feed for livestock*

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

Whereas an unusual lack of rain in the States of North Dakota, South Dakota, Nebraska, Texas, Missouri, Utah, and Nevada, and to a lesser extent in other States, has caused an acute shortage of feed for livestock, particularly in the affected area and elsewhere in the United States; and

Whereas Section 318 of the Tariff Act of 1930 (ch. 497, 46 Stat. 590, 696) provides in part as follows:

Whenever the President shall by proclamation declare an emergency to exist by reason of a state of war, or otherwise, he may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act, and may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work. * * *

Now, therefore, I, Franklin D. Roosevelt, President of the United States of America, by virtue of the authority vested in me by the said section of the Tariff Act of 1930, and by virtue of all other authority vested in me, do hereby proclaim an emergency to exist and do hereby authorize the Secretary of the Treasury to permit, until June 30, 1935 (unless before that date it has been determined by the President and declared by his Proclamation that the emergency has terminated), within such limits and subject to such conditions as he may deem necessary to meet the emergency, the importation of such feed for livestock as the Secretary of the Treasury may designate and under such regulations as he may impose, free of duty when imported by or directly for the account of any owner of livestock in any drought affected area, or by or for the account of any relief organization, not operated for profit, for distribution among distressed owners of livestock.

In witness whereof, I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the City of Washington on this 10th day of August in the year of our Lord nineteen hundred and thirty-four, and of the Independence of the United States of America the one hundred and fifty-ninth.

FRANKLIN D. ROOSEVELT.

By the President:
    CORDELL HULL,
        *Secretary of State.*

REGULATIONS

The following regulations are hereby promulgated pursuant to the provisions of the foregoing proclamation:

(1) Hay and straw to be used as feed for livestock and such other feeds for livestock dutiable under the Tariff Act of 1930 as may be designated from time to time shall be admitted free of duty, when imported at any port of entry, provided there is filed in connection with the entry, in addition to other papers and documents required by the customs regulations, a certificate, in duplicate, of a county

T.D. 47236]                                   220

agricultural agent or other person, duly designated by the Secretary of Agriculture, in substantially the following form:

```
                                    ---------------------------------
                                              (Place)

                                    ---------------------------------
                                              (Date)

To Collector of Customs:

     --------------------------------
              (Port of entry)

  This is to certify that the subscriber of this certificate, ----------------
                                                                    (Name)
---------------------, ---------------------, has been duly authorized by the
       (Title)              (Address)
Secretary of Agriculture in a letter of ---------------, numbered ---------------,
                                            (Date)                    (Serial No.)
```

to execute certificates for the importation of feed for livestock free of duty under the proclamation of the President of the United States, made on August 10, 1934, and the regulations of the Secretary of the Treasury promulgated pursuant thereto;

That this certificate is issued by me pursuant to the authority granted to me by the Secretary of Agriculture as aforesaid;

That ---------------------------------- is an owner of livestock in a drought-
         (Name and address of ultimate consignee)
affected area of the United States, or a relief organization not operated for profit; and

That I have investigated the matter and verily believe that the merchandise described below (is to be) (has been) imported directly by or for the account of the ultimate consignee named above, and that it will be used for the feeding of livestock in a drought-affected area.

| Commodity | Approximate quantity | To be shipped via |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

```
                                              ---------------------------
                                                  (Signature and title)
```

(2) The original copy of the above-mentioned certificate shall be filed with the entry papers, and the duplicate copy shall be promptly forwarded by the collector of customs to the Secretary of Agriculture, Washington, D.C. (Attention: -------------------).

(3) If the above-mentioned certificate is not presented at the time of entry, a bond shall be taken for the production of the same within six months from the date of entry. Where a consumption entry bond has been taken, a special bond need not be required, but in such event, the report of appraisement shall be suspended until the required certificate has been filed, or six months have expired, whichever is earlier, and the six-months' period allowed for production of the certificate shall not be extended.

221

[T.D. 47237

(4) Lists of the names of county agricultural agents and other persons designated by the Secretary of Agriculture to execute the certificates contemplated by paragraph (1) of these regulations will be furnished to collectors of customs from time to time.

(5) The free entry herein authorized shall apply only with respect to importations entered for consumption on and after the date of the approval of these regulations and prior to July 1, 1935, or such earlier date as may be proclaimed by the President if he shall declare by proclamation that the emergency has terminated.

H. MORGENTHAU, Jr.,
*Secretary of the Treasury.*

---

(T.D. 47237)

*Antidumping—Black cobalt oxide from Germany*

The Secretary of the Treasury finds that the issuance of a finding of dumping covering black cobalt oxide from Germany is not justified

TREASURY DEPARTMENT, *August 24, 1934.*

*To Collectors of Customs and Others Concerned:*

Reference is made to the notices of suspected dumping issued by the appraising officer at Pittsburgh, Pa., on June 11, 1934, under the provisions of the Antidumping Act of 1921, covering black cobalt oxide from Germany.

After investigation and careful consideration of the evidence presented, I have reached the conclusion that a finding of dumping with respect to black cobalt oxide from Germany is not justified.

Appraising officers who have been withholding appraisements of black cobalt oxide from Germany, by virtue of the issuance of the notices of suspected dumping, are authorized to make their appraisement reports without regard to the question of dumping.

(81–1/2.)

L. W. ROBERT, Jr.,
*Acting Secretary of the Treasury.*

---

(T.D. 47238)

*Port of entry*

Mahukona, Hawaii, designated as a customs port of entry

TREASURY DEPARTMENT,
OFFICE OF THE COMMISSIONER OF CUSTOMS,
*Washington, D.C., August 29, 1934.*

*To Collectors of Customs and Others Concerned:*

There is published below for the information of customs officers and others concerned the following Executive order, dated August