Slip Op. 25-111

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **AUXIN SOLAR, INC., AND CONCEPT CLEAN ENERGY, INC.**, | |
| Plaintiffs, | |
| v. | **Before: Timothy M. Reif, Judge** |
| **UNITED STATES, et al.,** | |
| Defendants, | **Court No. 23-00274** |
| and | **PUBLIC VERSION** |
| **AMERICAN CLEAN POWER ASSOCIATION, et al.,** | |
| Defendant-Intervenors. | |

<u>**OPINION AND ORDER**</u>

[Granting Plaintiffs' Motion for Judgment on the Agency Record.]

Dated: August 22, 2025

<u>Thomas M. Beline</u> and <u>James E. Ransdell</u>, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for Plaintiffs Auxin Solar, Inc. and Concept Clean Energy, Inc.  With them on the briefs were <u>Roop K. Bhatti</u>, <u>Chase J. Dunn</u>, and <u>Sydney C. Reed</u>.

<u>Douglas G. Edelschick</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., <u>Spencer Neff</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C., and <u>Alexandra Khrebtukova</u>, Senior Attorney (Trade & Finance), U.S. Customs and Border Protection, of Washington, D.C., argued for Defendants.  With them on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Tara K. Hogan</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C.  Of counsel on the brief were <u>Elio Gonzalez</u>, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C., and <u>Emma L. Tiner</u>, Attorney, Office of the Assistant Chief Counsel, U.S. Customs and Border Protection, of Washington, D.C.

**PUBLIC VERSION**

Court No. 23-00274                                                                    Page 2


Jeffrey S. Grimson and Kristin H. Mowry, Mowry & Grimson, PLLC, of Washington, D.C., argued for Defendant-Intervenors American Clean Power Association, JA Solar USA, Inc., JA Solar Vietnam Co. Ltd., JA Solar Malaysia Sdn. Bhd., and JA Solar International Ltd.  With them on the brief were Bryan P. Cenko, Clemence D. Kim, and Evan P. Drake.

Jonathan T. Stoel, Craig A. Lewis, and Gregory M.A. Hawkins, Hogan Lovells US LLP, of Washington, D.C., argued for Defendant-Intervenors Canadian Solar (USA) Inc., Canadian Solar International Ltd., BYD (H.K.) Co., Ltd., and BYD America LLC.  With them on the brief were Michael G. Jacobson, Nicholas R. Sparks, Lindsay K. Brown, and Nicholas W. Laneville.

Matthew R. Nicely and Daniel M. Witkowski, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington, D.C., argued for Defendant-Intervenors Solar Energy Industries Association and NextEra Energy, Inc.  With them on the brief was Julia K. Eppard.

Weronika Bukowski and Robert L. LaFrankie, II, Crowell & Moring, LLP, of Washington, D.C., argued for Defendant-Intervenors Invenergy Renewables LLC and Invenergy Solar Equipment Management LLC.  With them on the brief were John B. Brew, Alexander H. Schaefer, and Amanda S. Berman.

Gregory S. Menegaz, The Inter-Global Trade Law Group, PLLC, of Washington, D.C., argued for Defendant-Intervenor Risen Solar Technology Sdn. Bhd.

David M. Morrell, Jones Day, of Washington, D.C., argued for Defendant-Intervenors Boviet Solar Technology Co., Ltd. and Boviet Solar USA., Ltd.

Jonathan M. Freed, Kenneth N. Hammer, and MacKensie R. Sugama, Trade Pacific PLLC, of Washington, D.C., for Defendant-Intervenors Trina Solar (U.S.) Inc., Trina Solar (Vietnam) Science & Technology Co., Ltd., Trina Solar Energy Development Company Ltd., and Trina Solar Science & Technology (Thailand) Ltd.

Ned H. Marshak and Jordan C. Kahn, Grunfeld Desiderio Lebowitz Silverman & Klestadt LLP, of New York, NY, for Defendant-Intervenors Jinko Solar (U.S.) Industries Inc., JinkoSolar (U.S.) Inc., Jinko Solar Technology Sdn. Bhd., Jinko Solar (Malaysia) Sdn. Bhd., JinkoSolar (Vietnam) Co., Ltd., JinkoSolar Holding Co., Ltd., Jinkosolar Middle East DMCC, JINKOSOLAR INVESTMENT LIMITED (f/k/a Jinkosolar Technology Limited), and Jinkosolar (Vietnam) Industries Co., Ltd.

                                                    * * *


        Reif, Judge:  Before the court is the motion for judgment on the agency record by

plaintiffs Auxin Solar, Inc. ("Auxin Solar") and Concept Clean Energy, Inc. ("CCE")

**PUBLIC VERSION**

Court No. 23-00274                                                                                        Page 3

(together, "plaintiffs").[1]  Plaintiffs invoke this Court's subject matter jurisdiction under 28

U.S.C. § 1581(i) and seek vacatur of the final rule of the Department of Commerce

("Commerce") published as *Procedures Covering Suspension of Liquidation, Duties and*

*Estimated Duties in Accord With Presidential Proclamation 10414* ("Duty Suspension

Rule"), 87 Fed. Reg. 56,868 (Dep't of Commerce Sept. 16, 2022) and codified as 19

C.F.R. pt. 362 (2022), which implemented Proclamation 10414 of June 6, 2022,

published as Proclamation No. 10414, *Declaration of Emergency and Authorization for*

*Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules*

*from Southeast Asia*, 87 Fed. Reg. 35,067 (June 9, 2022).

Plaintiffs allege that the Duty Suspension Rule is unlawful because it violates the

statutory authority, 19 U.S.C. § 1318(a), invoked by Proclamation 10414 in declaring an

emergency and by Commerce in promulgating the Duty Suspension Rule.  For the

reasons discussed below, the court grants plaintiffs' Rule 56.1 Motion for Judgment on

the Agency Record.

## BACKGROUND

### I.    Factual Background

#### A.    AD/CVD and Circumvention Determinations

Since 2012, Commerce has administered antidumping and countervailing duty

orders covering Crystalline Silicon Photovoltaic cells whether or not assembled into

modules ("CSPV cells and modules") from the People's Republic of China ("China").

*See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,*

---

[1] Auxin Solar is a domestic manufacturer of Crystalline Silicon Photovoltaic ("CSPV") modules.  Compl. ¶ 5, ECF No. 2.  CCE is a domestic designer of solar structures that incorporate domestically-manufactured CSPV modules.  *Id.* ¶ 6.

Court No. 23-00274                                                                 Page 4

*From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012).

On April 1, 2022, Commerce initiated inquiries to determine whether imports of CSPV cells and modules produced in Cambodia, Malaysia, Thailand and Vietnam (the "subject countries") circumvented the AD/CVD orders by incorporating parts and components from China. *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 Fed. Reg. 75,221-26 (Dep't of Commerce Dec. 8, 2022).

On August 23, 2023, Commerce issued a final determination concluding that CSPV cells and modules from the subject countries were circumventing the AD/CVD orders on CSPV cells and modules from China. *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam* ("Final Determination"), 88 Fed. Reg. 57,419-22 (Dep't of Commerce Aug. 23, 2023).

**PUBLIC VERSION**

### B.    Presidential Proclamation 10414 and the Duty Suspension Rule

On June 9, 2022, President Biden declared an emergency pursuant to 19 U.S.C. § 1318(a)[2] with respect to threats to the availability of sufficient electricity generation capacity to meet expected customer demand in the United States.  Proclamation 10414, 87 Fed. Reg. at 35,067-69.[3]  Proclamation 10414 authorized Commerce to take action under § 1318(a) to permit the importation of CSPV cells and modules from the subject countries into the United States "free of the collection of duties and estimated duties." *Id*. at 35,068.  The declared emergency was set to expire 24 months after the date of proclamation.  *Id*.  On June 6, 2024, the declared emergency expired, at which time

---

[2] Section 318 of the Tariff Act of 1930 provides that:

> Whenever the President shall by proclamation declare an emergency to exist by reason of a state of war, or otherwise, he may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act, and may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, *the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work*.  The Secretary of the Treasury shall report to the Congress any action taken under the provisions of this section.

19 U.S.C. § 1318(a) (emphasis supplied).

[3] President Biden declared that an emergency existed due to the threat that there would be insufficient electricity generation capacity available to meet expected demand. Proclamation No. 10414, *Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia*, 87 Fed. Reg. 35,067, 35,067-69 (June 9, 2022).  The proclamation identified multiple factors — including Russia's invasion of Ukraine and extreme weather events exacerbated by climate change — that contributed to the declaration of a state of emergency concerning access to electricity and energy.  *Id*.  Plaintiffs do not challenge Proclamation 10414 itself and plaintiffs' complaint "assumes *arguendo* that Proclamation 10414 constitutes the declaration of an emergency pursuant to . . . 19 U.S.C. § 1318(a)."  Pls. Mot. for J. on the Agency R. ("Pls. Br.") at 5 n.2, ECF No. 93; *see also* Compl. ¶ 51 n.5, ECF No. 2.

**PUBLIC VERSION**

relevant imports of CSPV cells and modules once again became subject to antidumping and countervailing duties.  *See* 19 C.F.R. §§ 362.102, 362.103(a).

On September 16, 2022, Commerce promulgated the final Duty Suspension Rule pursuant to Proclamation 10414.  Duty Suspension Rule, 87 Fed. Reg. at 56,868.  The Duty Suspension Rule, which became effective on November 15, 2022, provides the procedures governing the suspension of liquidation and collection of estimated duties in accordance with Proclamation 10414:

> Commerce shall instruct U.S. Customs and Border Protection ["Customs"] to discontinue the suspension of liquidation and collection of cash deposits for any [Southeast Asian]-Completed Cells and Modules that were suspended, in connection with initiation of the circumvention inquiries, pursuant to § 351.226(l)(1).  If, at the time Commerce issues instructions to [Customs], the entries are suspended only for purposes of the circumvention inquiries, Commerce will direct [Customs] to liquidate those entries without regard to AD/CVD duties and refund those cash deposits collected pursuant to the circumvention inquiries . . . .  If, before the [expiration of the emergency], Commerce issues an affirmative final determination in a circumvention inquiry covering [Southeast Asian]-Completed Cells and Modules, Commerce will not, at that time, direct [Customs] to suspend liquidation and collect cash deposits of estimated AD/CVD duties for entries of that merchandise entered, or withdrawn from warehouse, for consumption before, on, or after the date of initiation of that circumvention inquiry and that are to be utilized in the United States by the Utilization Expiration Date . . . .

*Id.* at 56,869-70.

As noted above, Commerce did issue an affirmative final circumvention determination prior to the expiration of the emergency.  *See* Final Determination, 88 Fed. Reg. at 57,419.  Pursuant to the Duty Suspension Rule, Commerce determined that it would "not direct [Customs] to suspend liquidation, and require cash deposits, of

PUBLIC VERSION

Court No. 23-00274                                                                 Page 7

estimated ADs and CVDs based on these affirmative determinations of circumvention on any 'Applicable Entries.'"[4]  *Id.* at 57,421.

## II.   Procedural History

On December 29, 2023, plaintiffs filed their public complaint contesting Commerce's final Duty Suspension Rule.  *See* Compl., ECF No. 2.  On January 17, 2024, plaintiffs filed both their confidential complaint and their motion for preliminary injunction.  Conf. Compl., ECF No. 14; Pls. Mot. for Prelim. Inj., ECF No. 15.  On January 22, 2024, defendants filed their motion to dismiss the case for lack of jurisdiction.  *See* Defs. Mot. to Dismiss, ECF No. 16.

On May 9, 2024, the court: (1) denied defendants' motion to dismiss and determined that exercise of jurisdiction is appropriate under the Court's residual jurisdiction statute, 28 U.S.C. § 1581(i); (2) granted the motions to intervene of nine defendant-intervenors;[5] and (3) granted defendant-intervenors' consent motion for a

---

[4] "Applicable Entries" are defined in the Duty Suspension Rule as "entries of Southeast Asian-Completed Cells and Modules that are entered into the United States, or withdrawn from warehouse, for consumption before the Date of Termination and, for entries that enter after November 15, 2022, are used in the United States by the Utilization Expiration Date."  19 C.F.R. § 362.102 (2022).  The "Utilization Expiration Date" is defined as "the date 180 days after the Date of Termination" on "June 6, 2024, or the date the emergency described in Presidential Proclamation 10414 has been terminated, whichever occurs first."  *Id.*

[5] These nine defendant-intervenors are: (1) American Clean Power Association ("ACP"); (2) Canadian Solar (USA) Inc. and Canadian Solar International Limited (collectively, "Canadian Solar"); (3) Solar Energy Industries Association ("SEIA"); (4) JA Solar USA, Inc., JA Solar Vietnam Company Limited, JA Solar Malaysia Sdn. Bhd. and JA Solar International Limited (collectively, "JA Solar"); (5) NextEra Energy, Inc. ("NextEra"); (6) BYD (H.K.) Co., Ltd. and BYD America LLC (collectively, "BYD"); (7) Invenergy Renewables LLC. and Invenergy Solar Equipment Management LLC (collectively, "Invenergy"); (8) Trina Solar (U.S.) Inc., Trina Solar (Vietnam) Science and Technology Co., Ltd., Trina Solar Energy Development Company Limited and Trina Solar Science &

**PUBLIC VERSION**

Court No. 23-00274                                                      Page 8

supplemental protective order governing those parties' information.  *Auxin Solar, Inc. v. United States* ("*Auxin Solar I*")*,* 48 CIT __, 698 F. Supp. 3d 1353, 1364 (2024).  The court granted also, in lieu of a preliminary injunction, the parties' Joint Stipulation that the court has the authority to "order reliquidation and direct the United States to reliquidate entries 'for which liquidation was not suspended and cash deposits were not collected pursuant to'" the Duty Suspension Rule.  *Id.* at 1364, 1371-72 (quoting Joint Stipulation ¶ 1, ECF No. 19).

On June 11, 2024, the court granted the motions to intervene of two further defendant-intervenors.[6]  Order Granting Def.-Intervenor Mot. to Intervene ("DI Order I"), ECF No. 90; Order Granting Def.-Intervenor Mot. to -Intervene ("D-I Order II"), ECF No. 91.

On July 22, 2024, plaintiffs filed their Rule 56.1 Motion for Judgment on the Agency Record requesting the court: (1) hold the Duty Suspension Rule arbitrary, capricious, an abuse of discretion, unlawful *ab initio*, and/or otherwise contrary to the standards set forth in 5 U.S.C. § 706(2); (2) order vacatur of the Duty Suspension Rule; and (3) order defendants to identify all relevant duty-free entries under the Duty

---

Technology (Thailand) Ltd. (collectively, "Trina Solar"); and (9) Risen Solar Technology Sdn. Bhd ("Risen Solar").  *Auxin Solar, Inc. v. United States* ("*Auxin Solar I*")*,* 48 CIT __, 698 F. Supp. 3d 1353, 1360 n.1 (2024).

[6] Subsequently approved defendant-intervenors are: (10) Boviet Solar Technology Sdn. Bhd. and Boviet Solar USA., Ltd. (collectively, "Boviet Solar"); and (11) Jinko Solar (U.S.) Industries Inc., JinkoSolar (U.S.) Inc., Jinko Solar Technology Sdn. Bhd., Jinko Solar (Malaysia) Sdn. Bhd., JinkoSolar (Vietnam) Co., Ltd., JinkoSolar Holding Co., Ltd., Jinkosolar Middle East DMCC, JINKOSOLAR INVESTMENT LIMITED (f/k/a Jinkosolar Technology Limited), and Jinkosolar (Vietnam) Industries Company Limited (collectively, "Jinko Solar").  Order Granting Def.-Intervenor. Mot. to Intervene ("DI Order I"), ECF No. 90; Order Granting Def.-Intervenor. Mot. to Intervene ("DI Order II"), ECF No. 91.

**PUBLIC VERSION**

Suspension Rule and reliquidate and collect any uncollected antidumping and countervailing duties.  Pls. Mot. for J. on the Agency R. ("Pls. Br.") at 2-3, ECF No. 93.

On October 29, 2024, defendants filed their response.  Defs. Resp. to Pls. Mot. for J. on the Agency R. ("Defs. Br."), ECF No. 95.  On November 19, 2024, defendant-intervenors filed their response in support of defendants.  Def.-Intervenors Resp. to Pls. Mot. for J. on the Agency R. ("D-I Br."), ECF No. 96.  On December 19, 2024, plaintiffs filed their reply to defendants' and defendant-intervenors' responses.  Pls. Rep. Supp. Mot. for J. on the Agency R. ("Pls. Rep. Br."), ECF No. 100.

On June 26, 2025, the court held oral argument.  *See* Oral Arg. Tr., ECF No. 114.

## JURISDICTION AND STANDARD OF REVIEW

Whether a court has subject matter jurisdiction to hear an action is a "threshold" inquiry.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  The Court has subject matter jurisdiction over plaintiffs' action pursuant to 28 U.S.C. § 1581(i)(1)(D). *See Auxin Solar I*, 48 CIT at __, 698 F. Supp. 3d at 1371 ("[T]he instant action . . . falls within the residual jurisdiction of the Court . . . because it pertains to the 'administration and enforcement' of Commerce's circumvention findings.").  Pursuant to 28 U.S.C. § 2640(e),[7] the court reviews the present matter under the Administrative Procedure Act ("APA"), codified at 5 U.S.C. § 706.  The APA provides in relevant part that "the reviewing court shall decide all relevant questions of law [and] interpret constitutional and statutory provisions."  5 U.S.C. § 706.

---

[7] 28 U.S.C. § 2640(e) reads: "In any civil action not specified in this section, the Court of International Trade shall review the matter as provided in [the Administrative Procedure Act]."

**PUBLIC VERSION**

Court No. 23-00274                                                                 Page 10

In agency cases, courts will analyze the meaning of statutes using "the traditional tools of statutory construction*." Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024).  Because agencies have "no special competence in resolving statutory ambiguities," *id.* at 400–01, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 412.  It is "the proper and peculiar province of the courts" to determine independently the best reading of a statute.  *Id.* at 385 (quoting The Federalist No. 78, at 525) (Alexander Hamilton) (Jacob Cooke ed., 1961)).

**DISCUSSION**

I.    **Whether the Duty Suspension Rule Violates 19 U.S.C. § 1318(a)**

The court addresses plaintiffs' challenge to the lawfulness of Commerce's Duty Suspension Rule.  Plaintiffs argue that the Duty Suspension Rule violates 19 U.S.C. § 1318(a) in three ways: (1) CSPV cells and modules are not encompassed within the types of goods eligible for duty-free treatment under section 1318(a); (2) Commerce exceeded its authority by extending duty-free treatment to goods imported prior to the declaration of emergency; and (3) Commerce exceeded its authority by granting duty-free treatment to goods based on certifications that the goods would be used within 180 days after the termination of the emergency.  *See* Pls. Br. at 8-14.

The court addresses each of these issues in turn.

A.    **Whether § 1318(a) Authorizes the Duty-Free Importation of CSPV Cells and Modules**

The court addresses first whether 19 U.S.C. § 1318(a) authorizes the duty-free importation of CSPV cells and modules.  For the reasons discussed below, the court

**PUBLIC VERSION**

Court No. 23-00274                                                                                    Page 11

concludes that § 1318(a) does not authorize the duty-free importation of CSPV cells and

modules.

Section 1318(a), enacted as part of the Tariff Act of 1930, is found at Subtitle II

("Special Provisions"), Part I ("Miscellaneous"), and is titled "Emergencies."  Section

1318(a) provides that "[w]henever the President shall by proclamation declare an

emergency to exist . . . he may authorize the Secretary . . . to permit, under such

regulations as the Secretary . . . may prescribe, the importation free of duty of food,

clothing, and medical, surgical, and other supplies for use in emergency relief work."

Plaintiffs argue that the plain meaning of § 1318(a) "circumscribes duty-free

treatment in two ways": (1) "only the five named types of goods ('food, clothing, and

medical, surgical, and other supplies') are eligible for duty-free treatment"; and (2)

"goods of an eligible type may only be afforded duty-free treatment if 'use[d] in

emergency relief work.'"  Pls. Br. at 18.

As to the first point, plaintiffs contend that "the categories of goods expressly

named . . . , in their ordinary, contemporaneous meanings, do not encompass CSPV

cells and modules."  *Id.* at 19.  Plaintiffs argue further that the final statutory category,

"other supplies," "must resemble medical supplies and surgical supplies and does not

encompass CSPV cells and modules."  *Id.* at 21.

As to the second point, plaintiffs assert that the ending clause, "for use in

emergency relief work," "is a limitation, not an independent grant of authority[,] . . . [and]

cannot reasonably be construed as encompassing any good, whatever the type,

capable of relieving a Presidentially declared emergency."  *Id.* at 25.

Court No. 23-00274                                                                     Page 12

Defendants argue in response that the plain meaning of "other supplies" in §

1318(a) "encompasses any materials dispensed to fill a *need* that are different from the

'medical' . . . and 'surgical' supplies already mentioned."  Defs. Br. at 15.  Defendants

assert therefore that "other supplies" is a "general, catchall term, that provides the

President (and Commerce) with flexibility" to define the term depending on the particular

needs of a specific declared emergency.  *Id.*  Additionally, defendants read together as a

single clause "other supplies for use in emergency relief work" to claim that § 1318(a)

permits duty-free treatment for "any supplies . . . that are needed for work to relieve a

particular emergency declared by the President."  *Id.*

The court notes that this appears to be an issue of first impression and that there

is no prior judicial interpretation of § 1318(a) on which to rely.  Therefore, the court will

apply the traditional tools of statutory construction "at [its] disposal to determine the best

reading of the statute and resolve" any ambiguity.  *Loper Bright*, 603 U.S. at 400, 401

("The very point of the traditional tools of statutory construction — the tools courts use

every day — is to resolve statutory ambiguities.").

### 1.    Whether the Ordinary Meaning of § 1318(a) Permits Duty-Free Treatment of CSPV Cells and Modules

The Supreme Court has, on numerous occasions, explained that the job of the

courts in interpreting a statutory term is to determine the "ordinary public meaning" of

the term "at the time of its enactment."  *Bostock v. Clayton County, Georgia*, 590 U.S.

644, 654 (2020); *see also Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A

fundamental canon of statutory construction is that, unless otherwise defined, words will

be interpreted as taking their ordinary, contemporary, common meaning.").  Here, none

of the relevant statutory terms of § 1318(a) are defined.  Therefore, the court will begin

**PUBLIC VERSION**

by ascertaining the ordinary and contemporary meaning of "food, clothing, and medical, surgical, and other supplies for use in emergency relief work." 19 U.S.C. § 1318(a).

The Supreme Court has held that "the plain meaning of a statute is to be ascertained using standard dictionaries in effect at the time of the statute's enactment." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1353 (Fed. Cir. 2005) (citing *Lamar v. United States*, 241 U.S. 103, 113 (1916)) (ascertaining the meaning of "responsible" using *Webster's Third New International Dictionary of the English Language*). The parties agree that *Webster's New International Dictionary Unabridged,* Second Edition (1934) ("*Webster's*"), provides definitions that reflect the ordinary and contemporary meaning of terms as understood when Congress enacted § 1318(a) in 1930. *See* Pls. Br. at 20; Defs. Br. at 15 n.7. Further, the Supreme Court in 1947 endorsed *Webster's* as one of the "principal standard dictionaries." *Crane v. Comm'r.*, 331 U.S. 1, 6, 6 n.14 (1947) (ascertaining the meaning of "property" in the Revenue Act of 1938).

As an initial matter, defendants concede that the ordinary and contemporary meanings of "food" and "clothing" do not encompass CSPV cells and modules. Defs. Br. at 14. Additionally, defendants do not argue that CSPV cells and modules fall within the ordinary and contemporary meaning of "medical [or] surgical . . . supplies."[8]  *See id.* at 14-15. Rather, defendants assert that the ordinary meaning of "other supplies" in § 1318(a) "encompasses any materials dispensed to fill a *need* that are different from the 'medical' . . . and 'surgical' supplies already mentioned." *Id.* at 15.

---

[8] *Webster's* defines "medical" as "[o]f, pert. to, or dealing with, the healing art, or the science of medicine, esp. in the narrower sense; as, the *medical* profession; *medical* services." *Webster's* at 1527. *Webster's* defines "surgical" as "[o]f or pertaining to surgeons or surgery; done by, or used in surgery." *Id.* at 2538.

**PUBLIC VERSION**

*Webster's* contains several possible definitions of "other."  As an adjective, which is how it functions in the term "other supplies," "other" has two primary definitions: (1) "[b]eing the one of two (or more) distinct from the one already mentioned or understood"; or (2) "[a]dditional; as without *other* resources; in any *other* place . . . . Not the same; different; as, in *other* circumstances; *other* than what he is."  *Webster's* at 1729.

Similarly, *Webster's* provides several possible definitions of "supply."  As a plural noun, which is how it is found in the term "other supplies," "supply" is defined as "[p]rovisions, clothing, arms, raw materials, etc., set aside to be dispensed at need; stores; as, to lay in *supplies* for the winter; in charge of *supplies* in a factory."  *Id.* at 2534.

Therefore, by combining the definitions of "other" and "supply," the court derives the ordinary meaning of the term "other supplies" as follows: provisions or materials dispensed to fill a need, which are distinct from, or additional to, the "medical" or "surgical" supplies already mentioned.  This meaning of "other supplies" is, on its face, a very broad one that appears to encompass CSPV cells and modules, as CSPV cells and modules are materials that may be dispensed to fill a need, i.e., energy demand, and are plainly distinct from "medical" or "surgical" supplies.  *See* Proclamation No. 10414, 87 Fed. Reg. at 35,067-68.

However, the Supreme Court has held also that the interpretation of a statutory term "does not turn solely on dictionary definitions of its component words."  *Yates v. United States*, 574 U.S. 528, 537 (2015).  Rather, the meaning of statutory language is "determined not only by reference to the language itself, but as well by the specific

Court No. 23-00274                                                                    Page 15

context in which that language is used, and the broader context of the statute as a

whole." *Id.* (citation modified) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341

(1997)). "Ordinarily, a word's usage accords with its dictionary definition," but

sometimes "the same words, placed in different contexts . . . mean different things." *Id.*;

*see also Comm'r. v. National Carbide Corp.*, 167 F.2d 304, 306 (2d Cir. 1948) ("[W]ords

are chameleons, which reflect the color of their environment . . . .").[9]

    In *Yates*, the Supreme Court was tasked with ascertaining the meaning of the

term "tangible object" as it appears in § 1519 of the Sarbanes-Oxley Act of 2002. *Yates*,

574 U.S. at 532. The Supreme Court, citing *Webster's Third New International*

*Dictionary*, acknowledged that the ordinary meaning of "an 'object' that is 'tangible,' as

stated in dictionary definitions, is 'a discrete . . . thing.'" *Id.* at 537. The Court noted

also that dictionary definitions of the words "tangible" and "object" suggested a broad

reading of "tangible object" that included any physical evidence, including "fish from the

sea";[10] however, the Court determined that those definitions were not dispositive. *Id.* at

---

[9] In *National Carbide Corp.*, the Second Circuit considered the meaning of "corporation"
within the Revenue Act of 1934 in a case concerning whether "a wholly owned
subsidiary of a parent corporation shall be treated for purposes of income taxation as a
separate taxable person." *Comm'r. v. National Carbide Corp.*, 167 F.2d 304, 305 (2d
Cir. 1948). The Second Circuit noted that although such subsidiaries "might be in some
contests a 'corporation,' . . . in a tax statute 'corporation' could not have been so
intended." *Id.* at 306. Therefore, the Second Circuit held that "corporation," as
"Congress must be understood to have used it," could not mean "a jural person created
. . . to serve merely as an escape from taxation." *Id.*

[10] The factual background of *Yates* involved a commercial fishing boat captain throwing
undersized red grouper overboard in an attempt to conceal the illegally caught fish from
a federal agent during an offshore inspection. *Id.* at 531. The captain was then charged
with, and convicted of, violating § 1519, which provides for fines or imprisonment for
"[w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes
a false entry in any record, document, or tangible object." *Id.* The captain challenged

537-38.  Rather, the Supreme Court applied several "[f]amiliar interpretive guides" to aid its construction of "tangible object," concluding that the context of § 1519 resisted the more expansive reading of the term proffered by defendants in that case.  *Id.* at 539, 549.

Likewise, in this case, the context of § 1318(a) "tugs strongly in favor of a narrower reading" of "other supplies."  *Id.* at 539.  The words immediately preceding "other supplies" in § 1318(a) — "food, clothing, and medical, surgical, and" — "cabin the contextual meaning of that term."  *Id.* at 543.  The principle of *noscitur a sociis*, which states that "a word is known by the company it keeps," instructs the court to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words.  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995);[11] *see also Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) ("The maxim *noscitur a sociis* . . . is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.") (emphasis supplied).

*Noscitur a sociis* operates in conjunction with the closely related canon of *ejusdem generis*, which counsels that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar

---

his conviction, arguing that § 1519's reference to "tangible object" encompasses "objects used to preserve [information]," such as "computers," not fish."  *Id.* at 536.

[11] In *Gustafson*, the Supreme Court interpreted the word "communication" in section 2(10) of the Securities Act of 1933 to refer to a public communication, rather than any communication, because "communication" appeared in a list with other words, namely "prospectus, notice, circular, advertisement [or] letter."  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).  The Court held that from those other words, it was "apparent that the list refer[red] to documents of wide dissemination," even though the list began with the word "any."  *Id.*

**PUBLIC VERSION**

in nature to those objects enumerated by the preceding specific words." *Wash. St.*

*Dept. of Social and Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384

(2003) (citation modified) (quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-

15 (2001)).

      The statutory interpretation question before this court has many parallels with the

statutory interpretation question in *Yates*.  As in *Yates*, the court is tasked with

ascertaining the meaning of a statutory term that: (1) consists of broad component

words that suggest a general, catchall meaning; and (2) is found at the end of a list of

more specific enumerated terms that cabin its otherwise broad meaning through the

application of long-recognized canons of construction.

      In *Yates*, the Supreme Court noted that "tangible object" appears last in a list of

terms that begins with "any record [or] document."  *Yates*, 574 U.S. at 544.  Therefore,

the Supreme Court, applying *noscitur a sociis*, concluded that the term was

"appropriately read to refer, not to any tangible object, but specifically to the subset of

tangible objects involving records and documents, *i.e.*, objects used to record or

preserve information."  *Id.*  Additionally, the Supreme Court narrowed the meaning of

"tangible object" in accordance with the list of actions proscribed by § 1519, namely

"*falsif[ying]*, or *mak[ing] a false entry* in any record, document, or tangible object."  *Id.*

The Court explained that those actions "typically take as grammatical objects records,

documents, or things used to record or preserve information, such as logbooks or hard

drives."  *Id.*  Last, the *Yates* Court applied *ejusdem generis*, reasoning that "[h]ad

Congress intended 'tangible object' . . . to be interpreted so generically as to capture

physical objects as dissimilar as documents and fish, Congress would have had no

**PUBLIC VERSION**

Court No. 23-00274                                                                                    Page 18

reason to refer specifically to 'record' or 'document.'" *Id.* at 546.  The Court added that

an "unbounded reading of 'tangible object' would render [record or document]

misleading surplusage." *Id.*

 Here, the application of *noscitur a sociis* and *ejusdem generis* to § 1318(a)

likewise points to a reading of "other supplies" that is narrower than "provisions or

materials dispensed to fill a need, which are distinct from, or additional to, 'medical' or

'surgical' supplies."  It is true that "other supplies" does contemplate emergency supplies

that are distinct from, or additional to, "medical" or "surgical" supplies.  However, the

most natural reading of "other supplies" is not "the entire universe of supplies other than

'medical' or 'surgical' supplies."  Such a reading would be inconsistent with the

enumeration of the preceding specific words and would render Congress' choice of

those specific words "misleading surplusage." *Id.*  Instead, *noscitur a sociis* and

*ejusdem generis* suggest that "other supplies" encompasses those supplies that are

similar in nature to, or share common attributes with, "medical" or "surgical" supplies.

*See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) (applying *ejusdem generis* to

"interpret a general or collective term at the end of a list of specific items in light of any

common attributes shared by the specific items.") (citation modified).

 In considering the contemporary definitions of "medical" and "surgical," *see supra*

note 8, "other supplies" is most naturally read to encompass items for use in healthcare-

related applications that are not for medical or surgical purposes.  It is not difficult to

think of any number of items that might potentially fall under this meaning of "other

supplies," e.g., pharmaceuticals, physical therapy equipment, nursing supplies or

hospital beds.  CSPV cells and modules do not share common attributes with "medical"

or "surgical" supplies and are plainly not for use in healthcare-related applications. Therefore, the court concludes that the plain meaning of the statute, including the term "other supplies" in § 1318(a), does not encompass CSPV cells and modules.

In addition, another relatively recent doctrine, the "elephants in mouseholes" principle, lends further support to a reading of "other supplies" narrower than that proffered by defendants. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not . . . hide elephants in mouseholes."). The *Yates* Court invoked this principle in concluding that it was "highly improbable that Congress would have buried a general spoliation statute covering objects of any and every kind in a provision targeting fraud in financial recordkeeping." 574 U.S. at 546.

Finally, the Tariff Act of 1930 (the "Tariff Act") is a lengthy and detailed law, consisting of nearly 200 pages of specific duty rates on thousands of enumerated goods. *See* Pub. L. No. 71-361, 46 Stat. 590. Included amongst these enumerated duty rates is a 35 percent ad valorem rate for "[a]ll articles suitable for producing . . . electrical energy." *Id*. at § 1(353), 46 Stat. at 618. Section 1318(a) can be found in the "Miscellaneous" subpart in the subtitle "Special Provisions" — a single paragraph sandwiched between a provision for duty-free exportation of tobacco products and a provision empowering the Legislature of Puerto Rico to impose duties upon coffee imported into Puerto Rico. *See id.* at § 318, 46 Stat. at 696. Defendants' virtually unbounded reading of "other supplies" in § 1318(a), which would permit potentially the entirety of Congress' lengthy and intricate tariff scheme to be nullified by the declaration

Court No. 23-00274                                                                    Page 20

of a presidential emergency, would appear inconsistent as well with the provision's

context in the Tariff Act.

Therefore, the court will not adopt a reading of "other supplies" that runs contrary

to the "elephants in mouseholes" canon as well as *noscitur a sociis* and *ejusdem*

*generis*.

## 2.    Consideration of Legislative History and Historical Use of § 1318(a)

In addition to the traditional textual tools of statutory interpretation, courts may

also consider contemporaneous legislative history and executive branch practice as

aids in the construction of ambiguous statutory provisions. *See, e.g., Edwards' Lessee*

*v. Darby*, 25 U.S. 206, 210 (1827) ("In the construction of a doubtful and ambiguous law,

the co[n]temporaneous construction of those who were called upon to act under the law,

and were appointed to carry its provisions into effect, is entitled to very great respect.").

Parties in fact rely on tools of contemporaneous legislative history in their submissions.

However, as explained above, the best meaning of "other supplies" in § 1318(a)

is neither "doubtful" nor "ambiguous" when analyzed using the traditional textual tools of

statutory interpretation.  The Supreme Court has emphasized repeatedly that a court's

interpretive inquiry is required to "begin and end . . . with the text." *See, e.g., Star*

*Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017).  Further, the

Supreme Court has stressed that clear statutory language and a court's construction of

that language's meaning are to control over potentially contrary legislative history and

executive branch practice.  *See Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011)

("Legislative history . . . is meant to clear up ambiguity, not create it . . . . When

presented, on the one hand, with clear statutory language and, on the other, with

**PUBLIC VERSION**

dueling committee reports, we must choose the language.");[12] *see also* *S.E.C. v. Sloan*, 436 U.S. 103, 118 (1978) ("[T]he existence of a prior administrative practice, even a well-explained one, [does not] relieve us of our responsibility to determine whether that practice is consistent with the agency's statutory authority.").

Here, the court finds itself in a simpler position. Even were the court to have to take into account legislative history and past executive branch use of § 1318(a), which the parties have put at issue, neither can be described as contrary to the court's analysis of the statute's text and structure.

To start, the legislative history of § 1318(a) is limited. The Senate Finance Committee report is devoid of any mention of § 318 or any similar emergency duty suspension provision. *See* S. Rep. No. 71-37, at 61-62 (1929) (discussing sections of H.R. 2667 in numerical order, jumping from § 313 to § 320 with no discussion of § 318). The House Ways & Means Committee comparative print of H.R. 2667 and the Tariff Act of 1922 notes only that § 622 of the 1922 Act was "broadened to permit the free importation of food, clothing and supplies for use in relief work in connection with [a presidentially declared] emergency" and that this change was embodied as § 318. *See* H.R. Doc. No. 71-15 at 334 (1929). In sum, this minimal legislative history does not provide a basis for overcoming the clear statutory language in § 1318(a).

---

[12] The Federal Circuit embodied this approach in a recent case concerning whether delinquency interest is excluded from distributions under the Continued Dumping and Subsidy Offset Act ("CDSOA"). *See Adee Honey Farms v. United States*, 107 F.4th 1322, 1334 (Fed. Cir. 2024) ("Because the [statutory] text yields a clear answer, we need not consider legislative history."). Nevertheless, the Federal Circuit went on to explain how, even if legislative history were considered, it did not contradict the Court's interpretation based on the statutory text and structure. *Id.*

Turning to executive branch practice, § 1318(a) has been invoked six prior times, all between 1930 and 1946. President Roosevelt invoked § 1318(a) five times between 1934 and 1942. *See* (1) Proclamation No. 2093, *Emergency Due to Drought–Free Importation of Feed for Livestock*, 49 Stat. 3,404 (Aug. 10, 1934); (2) Proclamation No. 2223, *Emergency Due to Flood Conditions—Free Importation of Food, Clothing, and Medical, Surgical, and Other Supplies for Use in Emergency Relief Work*, 2 Fed. Reg. 273 (Feb. 3, 1937); (3) Proclamation No. 2498, *Emergency Due to Drought–Free Importation of Forage for Livestock*, 6 Fed. Reg. 3,715 (July 29, 1941); (4) Proclamation No. 2545, *Free Importation of Jerked Beef,* 7 Fed. Reg. 2,611 (Apr. 7, 1942); and (5) Proclamation No. 2553, *Emergency Due to State of War—Free Importation by the American National Red Cross of Food, Clothing, and Medical, Surgical, and Other Supplies*, 7 Fed. Reg. 3,143 (Apr. 30, 1942). As their titles reflect, the Roosevelt proclamations limited duty-free treatment to goods that comport with the clear meaning of the statutory text. Three proclamations were limited to specific categories of foodstuffs for human or animal consumption, i.e. "forage" or "feed" for livestock, and "jerked beef." *See* Proclamation No. 2093, 49 Stat. at 3,404; Proclamation No. 2498, 6 Fed. Reg. at 3,715; Proclamation No. 2545, 7 Fed. Reg. at 2,611. The two other Roosevelt proclamations employ the statutory language itself in cabining their application and, from context, contemplate goods for disaster relief. *See* Proclamation No. 2223, 2 Fed. Reg. at 273 (citing "flood conditions" as the emergency); Proclamation No. 2553, 7 Fed. Reg. at 3,143 (providing for free importation "by the American National Red Cross" issued less than five months after the attack by the Empire of Japan on the

**PUBLIC VERSION**

United States Naval Station Pearl Harbor).  Nothing in the Roosevelt proclamations

provides a basis for overcoming the clear statutory language in § 1318(a).

In 1946, President Truman invoked § 1318(a) for the sixth and final time before

the instant proclamation.  *See* Proclamation No. 2708, *Emergency Due to Housing*

*Shortage—Free Importation of Timber, Lumber, and Lumber Products* ("Proclamation

2708"), 11 Fed. Reg. 12,695 (Oct. 29, 1946) (granting duty-free treatment to lumber

products used in housing construction).  Defendants cite Proclamation 2708 as

evidence that "other supplies" in § 1318(a) can encompass supplies such as lumber

unrelated to healthcare applications.  Defs. Br. at 24-25.

Proclamation 2708 differed from the Roosevelt proclamations in that it referenced

an additional statute, the Veterans' Emergency Housing Act of 1946 ("VEHA"),[13] to

support the proclamation's grant of duty-free treatment to imported lumber.

Proclamation No. 2708, 11 Fed. Reg. at 12,695.  President Truman linked Proclamation

2708 to the VEHA in two ways: (1) the duty-free treatment was set to expire

automatically no later than the expiration date of the VEHA; and (2) the proclamation

empowered the VEHA's Housing Expediter to "designate[] and certif[y]" the goods

eligible for duty-free treatment.  *Id.*  The proclamation's invocation of and reliance on the

---

[13] The Veterans' Emergency Housing Act of 1946 ("VEHA"), Pub. L. 79-388, 60 Stat.
207, was an Act to "expedite the availability of housing for veterans of World War II by
expediting the production and allocation of materials for housing purposes."  The VEHA
cited "an unprecedented emergency shortage of housing, particularly for veterans of
World War II and their families . . . [requiring] a program . . . to overcome the serious
shortages and bottlenecks with respect to building materials."  *Id.*  To do so, the VEHA
created an office of the Housing Expediter to "formulate such plans and programs as
are necessary to provide for an increased supply of housing . . . [and] issue such
orders, regulations, or directives to other executive agencies . . . consistent with the
execution of the aforesaid plans and programs."  *Id.* at 208.

authority granted by the VEHA, as well as the proclamation's sunset provision tied to the expiration date of the VEHA distinguish this use of § 1318(a) from the instant case, notwithstanding the inclusion by Proclamation 2708 of goods arguably not encompassed by § 1318(a).  At a minimum, Proclamation 2708's unique entwining with the VEHA is sufficient for the court to conclude that Proclamation 2708 does not provide a sufficient basis for overcoming the court's textual analysis.

In sum, in response to the arguments of the parties, neither the legislative history nor historical use of § 1318(a) is contrary to the plain meaning of the statute.  The court concludes that § 1318(a) does not authorize the duty-free importation of CSPV cells and modules and that the Duty Suspension Rule is ultra vires.

### B.    Whether § 1318(a) Authorizes Commerce to Waive Duties for Entries Made Prior to the Emergency Declaration

The court turns next to whether the Duty Suspension Rule violates § 1318(a) by granting duty-free treatment to CSPV cells and modules that entered the United States prior to the signing of Proclamation 10414.  The Duty Suspension Rule states that "duties will not be collected on entries of . . . Cells and Modules that entered the United States both before and after the signing of the Proclamation."  87 Fed. Reg. at 56,870.  Commerce noted that while Proclamation 10414 specified an end-date for duty-free treatment (June 6, 2024), it did not specify a start date.  *Id.* at 56,878 n.65.  Commerce therefore found it "appropriate, as well as consistent with the usual operation of our circumvention proceedings, to treat the goods in a uniform fashion until" the end of the declared emergency.  *Id.*

Plaintiffs argue that the "plain text of [§] 1318(a) contemplates duty-free 'importation' after an emergency has been declared, not duty-free treatment for any

eligible good liquidated after the start of an emergency, whenever imported."  Pls. Br. at

32.  Defendants argue that § 1318(a) "does not provide for when a given import may be

deemed 'free of duty,'" and instead "delegates this authority" to Commerce.  Defs. Br. at

28-29.

    The question of whether § 1318(a) allows for duty-free treatment of unliquidated

goods that entered the country prior to the declaration of emergency is rendered moot

by the court's conclusion in Part I.A of this opinion.  Therefore, the court declines to

reach the merits of this question.  *See NASA v. Nelson*, 562 U.S. 134, 147 n.10 (2011)

(holding that certain questions on a drug-use questionnaire did not violate the right to

informational privacy without providing "a definitive answer to the question [of] whether

there is a constitutional right to informational privacy").[14]

    In sum, the court will "decide the case before [it] and leave broader issues for

another day."  *Id.*

**C.    Whether § 1318(a) Authorizes Commerce's Utilization Requirement**

    The court turns next to whether Commerce violated § 1318(a) by providing duty-

free treatment to CSPV cells and modules under the condition that they be utilized

within 180 days of the expiration of the declared emergency (the "Utilization

Requirement").  The Duty Suspension Rule imposed as a requirement for duty-free

treatment that imported CSPV cells and modules be "utilized in the United States by the

---

[14] The Chief Justice of the Supreme Court has also endorsed a minimalist approach to
deciding cases.  *See* The Associated Press, *Chief Justice Says His Goal Is More
Consensus on Court*, N.Y. Times (May 22, 2006)
https://www.nytimes.com/2006/05/22/washington/22justice.html ("'If it is not necessary
to decide more to a case, then in my view it is necessary not to decide more to a case,'
Chief Justice Roberts said.").

Court No. 23-00274                                                                                          Page 26

Utilization Expiration Date, which is 180 days after" the expiration of the declared

emergency.  87 Fed. Reg. at 56,869.  The Rule defined "utilization" and "utilized" to

mean that the cells and modules "will be used or installed in the United States."  *Id.*

Plaintiffs argue that the Utilization Requirement violates § 1318(a)'s limitation of

duty-free importation to products "for use in emergency relief work" in three ways: (1) by

"permit[ting] products granted duty-free treatment to be utilized after the conclusion of

the purported emergency"; (2) by "unreasonably defin[ing] 'utilization' in emergency

relief work in terms that afford no actual relief of the emergency" declared in

Proclamation 10414; and (3) by using "unreasonable means of ensuring that duty-free

products are used in emergency relief," namely the "preclusion of suspension of

liquidation and [an] *ex ante* 'certification' regime."  Pls. Br. at 36-37.

Defendants argue that Commerce reasonably imposed the Utilization

Requirement to discourage stockpiling of merchandise and that nothing in § 1318(a)

limits the utilization of duty-free emergency supplies to the duration of the emergency.

Defs. Br. at 32-37.

For the same reasons as stated above, the question of whether § 1318(a)

authorizes Commerce's Utilization Requirement is rendered moot by the court's

conclusion in Part I.A of this opinion.  Therefore, the court declines to reach the merits

of this question as well.

Having concluded that the Duty Suspension Rule is unlawful, the court concludes

further that vacatur of the Rule is appropriate.  *See, e.g., Andrx Pharms., Inc. v. Biovail

Corp.*, 276 F.3d 1368, 1379 (Fed. Cir. 2002) (holding that under the APA a prevailing

plaintiff "is entitled to a remedy under the statute, which normally will be a vacatur of the

agency's order"); *Invenergy Renewables LLC v. United States*, 45 CIT __, __, 552 F.

Supp. 3d 1382, 1404 (2021) ("[T]he court's conclusion that USTR lacks statutory or

delegated authority to withdraw an exclusion requires vacatur . . . .").

## II.    Whether Plaintiffs Are Entitled to Injunctive Relief

Having concluded that plaintiffs prevail on the merits, the court turns now to

whether plaintiffs are entitled to their requested relief.  In their briefs, plaintiffs request

that the court order "reliquidation of all entries [of CSPV cells and modules] that utilized

the [Duty Suspension Rule] with applicable antidumping and countervailing duties."  Pls.

Br. at 3-4.

As noted above, the parties have already stipulated that the court has authority to

order such reliquidation.[15]  *See* Joint Stipulation; *Auxin Solar I*, 698 F. Supp. 3d at 1364,

1371-72.  However, at oral argument the government stated that it was "not aware of

any entries that were properly liquidated without AD or CVD duties, consistent with the

[Duty Suspension Rule]."  Oral Arg. Tr. at 8:10-12.[16]  The government explained that

---

[15] Independent of the Joint Stipulation, the Federal Circuit has "expressly confirmed the authority of the USCIT to . . . order reliquidation" in APA cases challenging Commerce's liquidation instructions.  *Auxin Solar I*, 698 F. Supp. 3d at 1369 n.14 (citing *Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1311-12 (Fed. Cir. 2004) ("The absence of an express reliquidation provision should not be read as a prohibition of such relief when [28 U.S.C. § 2643] provides the Court of International Trade with such broad remedial powers.  Here, the requested [reliquidation] is easily construed as 'any other form of relief that is appropriate in a civil action.'")); *see also AM/NS Calvert LLC v. United States*, 47 CIT at __, 654 F. Supp. 3d 1324, 1343 (2023) ("[In] *all* cases properly brought under [the CIT's] residual jurisdiction, equitable relief, including an injunction requiring reliquidation, is available under the CIT's 'broad remedial powers.'") (quoting *Shinyei*, 355 F.3d at 1312).

[16] At oral argument, the government stated that Customs began with "a total universe of approximately 44,000 entries that were made without AD or CVD cash deposits as potentially subject to the Duty Suspension Rule."  Oral Arg. Tr. at 6:22-25.  Out of those

**PUBLIC VERSION**

Customs, under 19 U.S.C. § 1504(b)(1),[17] has continuously extended the liquidation

period for each of the approximately 20,400 entries at issue and that each of those

entries is "live."[18]  *Id.* at 8:17-25.  Therefore, the government conceded that "the

remedies issue is primarily a question of whether liquidation should be ordered, rather

than reliquidation, because there are no liquidated entries that have coverage under the

[Duty Suspension Rule] that we know of."  *Id.* at 8:12-16.

However, the government acknowledged that due to "ongoing administrative

processes, . . . some . . . entries may flip . . . from one category to another over time."

*Id.* at 83:23-84:1.  Accordingly, the government requested that should the Court order

relief with respect to the unliquidated entries, such relief should "include some additional

provision that if Customs determines any liquidated entries fall within . . . the scope of

relief, . . . [those entries] should be reliquidated."  *Id.* at 83:15-23.

---

entries, the government explained that Customs determined that roughly 24,000 entries did not "qualify for coverage under the Duty Suspension Rule for one reason or another."  *Id.* at 7:1-18.  Therefore, the government concluded that there are approximately 20,400 entries that remain at issue in this case.  *Id.* at 7:18-19.

[17] 19 U.S.C. § 1504(a) provides that an entry of merchandise "shall be deemed liquidated" if not liquidated by Customs "within 1 year from . . . the date of entry [or warehouse withdrawal] of such merchandise" unless "extended under subsection (b)." Section 1504(b) provides that the one-year period available for liquidation may be extended for up to four years from the date of entry or warehouse withdrawal, i.e. Customs may grant no more than three one-year extensions beyond the standard one-year liquidation period.  *See St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 767 (Fed. Cir. 1993) (citing 19 C.F.R. § 159.12).

[18] The government explained further that Commerce's ability to continue to extend the liquidation period would begin to run out starting April 1, 2026, "because the first entry that would be potentially subject to the [Duty Suspension Rule] started with April 1st of [2022]."  Oral Arg. Tr. at 9:3-7.

**PUBLIC VERSION**

Therefore, the court will analyze the appropriateness of a mixed remedy consisting of: (1) an order to defendants to liquidate all applicable entries in accordance with Commerce's affirmative circumvention determination; and (2) an order to defendants to reliquidate any entries liquidated under the Duty Suspension Rule that Customs determines to fall within Commerce's affirmative circumvention determination.

A reliquidation order is an injunctive remedy requiring the court to weigh ordinary equitable principles.  *See*, *e.g.*, Charles H. Koch, Jr. & Richard Murphy, *Administrative Law & Practice* § 8:31 (3d ed. 2020) ("[I]njunctive relief under the APA is controlled by principles of equity . . . ."); *SSAB North American Div. v. Customs*, 32 CIT 795, 799-803, 571 F. Supp. 2d 1347, 1351-55 (2008) (analyzing the appropriateness of reliquidation by balancing equitable factors); *AM/NS Calvert LLC*, 47 CIT at ___, 654 F. Supp. 3d at 1343 (Equitable "relief is subject to ordinary equitable principles, no more and no less."). However, this Court has not engaged in the same equitable factors analysis when ordering liquidation.  *See*, *e.g.*, *Timken Co. v. United States*, 18 CIT 1, 6, 852 F. Supp. 1040, 1046 (1994), amended, 18 CIT 164 (1994) (ordering Commerce to "collect the full amount of antidumping duties calculated to be due . . . over all suspended entries of the subject merchandise" without balancing equitable factors); *Cemex, S.A. v. United States*, 27 CIT 1460, 1461 (2003) (ordering that an unliquidated entry be liquidated at the required rate without analyzing equitable principles); *LG Elecs. U.S.A., Inc. v. United States*, 21 CIT 1421, 1424-31, 991 F.Supp. 668, 672-77 (1997) (ordering Customs to liquidate entries without balancing equitable factors).

To buttress the appropriateness of a liquidation order, and because the requested remedy contemplates potential reliquidation, the court will weigh the ordinary equitable

factors here.  For the reasons discussed below, the court concludes that injunctive relief

in the form of liquidation and reliquidation orders is appropriate.

### A.    Legal Framework

"According to well-established principles of equity, a plaintiff seeking [injunctive

relief] must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v.*

*MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  A plaintiff must demonstrate that: (1)

"it has suffered an irreparable injury"; (2) "remedies available at law, such as monetary

damages, are inadequate to compensate for that injury"; (3) considering the balance of

hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4)

"the public interest would not be disserved by a permanent injunction."  *Id.*

### B.    Analysis

The court will analyze whether plaintiffs have met their burden with respect to

each equitable factor.

#### 1.    Irreparable Injury

An irreparable injury is a "viable threat of serious harm which cannot be undone."

*Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983) (quoting *S. J.*

*Stile Associates Ltd. v. Snyder*, 646 F.2d 522, 525 (C.C.P.A 1981); *see, e.g., In re*

*Section 301 cases*, 45 CIT __, __, 524 F. Supp. 3d 1355, 1362 (2021).  The Federal

Circuit has recognized that domestic producer plaintiffs have a "strong, continuing,

commercial-competitive stake in assuring that . . . competing importers will not escape

the monetary sanctions deliberately imposed by Congress" and that "[d]efeat of that

strong congressionally recognized competitive interest [constitutes] sufficient irreparable

injury." *Zenith Radio Corp.*, 710 F.2d at 810 (reversing the USCIT's denial of a preliminary injunction).

More recently, this Court has confirmed that domestic producer plaintiffs "derive a direct competitive benefit from the proper administration and enforcement of the antidumping laws, and more specifically, the proper assessment of antidumping duties."[19] *SSAB North American Div.*, 32 CIT at 799, 571 F. Supp. 3d at 1352. Where domestic producer plaintiffs are denied such benefit, the irreparable harm suffered is "apparent." *Id.*

Likewise, plaintiffs here have demonstrated that they suffered irreparable competitive harms resulting from the non-collection of antidumping and countervailing duties on entries of CSPV cells and modules from the subject countries. Plaintiffs have proffered evidence demonstrating that the massive influx of duty-free CSPV cells and modules depressed prices below plaintiffs' raw material costs. *See* Conf. Compl., Ex. 6 ("Rashid Decl.")[20] ¶ 29, ECF No. 14-5 ("Circumventing CSPV modules are being entered at prices . . . that are lower than Auxin's raw material costs, *i.e.*, below Auxin's cost of production . . . ."); Oral Arg. Tr. at 22:5-9 ("[P]rices crashed [from] above 30 cents

---

[19] Language from the Statement of Administrative Action accompanying the Uruguay Round Agreements Act of 1994 supports the view that Congress recognized the competitive benefit that domestic producers derive from the proper enforcement of the antidumping and countervailing duty laws. *See Statement as to How the Uruguay Round Agreements Achieve Congressional Negotiating Objectives in Uruguay Round Agreements Act, Statement of Administrative Action*, H.R. Doc. No. 103-316, vol. 1, at 1137 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4209 ("U.S. dumping and countervailing duty laws will continue to be the most important and most effective U.S. response to unfair trade practices.").

[20] Mamun Rashid is the Chief Executive Officer and co-founder of plaintiff Auxin Solar. *See* Rashid Decl. at ¶ 1.

Court No. 23-00274                                                                 Page 32

a watt, which is already squeezing the domestic industry's ability to break even on a sale, down to 14 cents/15 cents a watt."); *see also* Pls. Br., Ex. 1 (showing year-over-year increase in imports of CSPV cells and modules from the subject countries during the period of the emergency). Additionally, plaintiffs have provided evidence of lost business opportunities linked directly to the emergency proclamation. *See* Conf. Compl., Ex. 7, ECF No. 14-5 (showing Auxin customers reducing purchase orders in response to the emergency proclamation).

In sum, plaintiffs have demonstrated that they risk being forced out of the CSPV module production business entirely. *See* Rashid Decl. ¶ 30 ("Given current pricing, the only way for a solar company to break even is if cash deposits and suspension of liquidation requirements are applied to these circumventing CSPV cells and modules. Without this corrective action . . . Auxin will have to exit the CSPV module production business altogether."); Oral Arg. Tr. at 21:16-22 ("[T]he question of injunctive relief . . . is existential. It determines whether Auxin is able to continue in business . . . ."). The Federal Circuit has recognized "price erosion" and "loss of business opportunities" as valid forms of irreparable injury. *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).

Therefore, the court concludes that plaintiffs have demonstrated that they will suffer an irreparable injury absent injunctive relief.

## 2. Inadequacy of Remedies Available at Law

It is not disputed that plaintiffs have no remedy at law adequate to address their injuries. *See* Pls. Rep. Br. at 19-20; Defs. Br. at 41. Therefore, the court concludes that this factor weighs in favor of plaintiffs. *See Wirtgen Am., Inc. v. United States*, 44 CIT

__, __, 447 F. Supp. 3d 1359, 1372 (2020) ("Damage to business relationships and the loss of future sales to loyal customers cannot be repaired by money damages available at law.").

### 3.    Balance of Harms

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987)). "Each party" includes the interests of intervening parties. *Id.*; *see, e.g.*, *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1306 (Fed. Cir. 2012) (weighing the interests of defendant-intervenor). As addressed above, plaintiffs' injury claims stem from the lost competitive benefit of properly collected antidumping and countervailing duties. *See supra* Section II.B.1.

Defendants assert harms stemming from "significant [administrative] complexities associated with determining what the applicable duty rates would be for merchandise that was not previously subject to a suspension of liquidation." Defs. Br. at 41. However, this Court has previously held that the harm resulting from domestic producers' loss of competitive benefit "certainly outweighs the administrative inconvenience to Customs caused by reliquidation." *SSAB North American Div.*, 32 CIT at 801, 571 F. Supp. 2d at 1353. In *SSAB*, the Court noted that Customs' claims of administrative inconvenience were diminished by the fact that Customs "frequently must reliquidate entries several years after the original liquidations," such as in routine classification cases. *Id.* Here, where liquidations, not reliquidations, are likely to form

the bulk of the injunctive relief, defendants' claims of administrative inconvenience are even weaker.

Last, defendant-intervenors assert harms stemming from the "significant liability" that they would face if forced to pay antidumping and countervailing duties on merchandise that they imported in reliance on the Duty Suspension Rule.  D-I Br. at 36. In *SSAB*, the Court recognized, in the context of reliquidation, importers' interests in the finality of liquidation.  The *SSAB* Court held that importers' interests in the finality of liquidation stood "in equipoise with Plaintiffs' interests in the proper administration of the antidumping laws."  32 CIT at 801, 571 F. Supp. 2d at 1353.  However, given that the government has confirmed to the court that no applicable entries have been liquidated thus far, defendant-intervenors' finality interests are far weaker than if reliquidation were the primary remedy.  *See* Oral Arg. Tr. at 8:10-25.

Last, in evaluating the balance of harms, the Court has held previously that "what most likely tips the balance . . . is how quickly the [moving party] moved to assert their rights once they knew or should have known about the error."  *Home Prods. Int'l, Inc. v. United States*, 43 CIT __, __, 405 F. Supp. 3d 1368, 1374 (2019), *abrogated on other grounds by Target Corp. v. United States*, 134 F.4th 1307 (Fed. Cir. 2025).  The Court has used 180 days, equal to the limit to protest a Customs liquidation decision under 19 U.S.C. § 1514, from the "error's actual or constructive revelation" as the benchmark deadline for trade cases involving reliquidation.  *Id.*

Defendants and defendant-intervenors assert that plaintiffs delayed filing their challenge for "more than 15 months after Commerce published the final Duty Suspension Rule."  Defs. Br. at 43.  Plaintiffs respond that the Duty Suspension Rule

**PUBLIC VERSION**

Court No. 23-00274                                                                 Page 35

was "a practical nullity *until* Commerce reached affirmative circumvention determinations" and that plaintiffs "reasonably opted to sue after Commerce's affirmative determinations became final, . . . filing four months thereafter." Pls. Rep. Br. at 25. Plaintiffs argue further that they "likely could not have established an Article III case or controversy beforehand." *Id.*

The court declines to determine on what exact date the Duty Suspension Rule became ripe for judicial review, let alone the reasonableness of plaintiffs' legal strategy. However, given the facts before the court, it does not appear that plaintiffs engaged in such delay as to shift the balance of harms in favor of defendants and defendant-intervenors.[21]

With respect to liquidation, the court concludes that plaintiffs' asserted harms outweigh both defendants' claims of administrative inconvenience and defendant-intervenors' finality interests. With respect to any potential reliquidation, the court concludes that plaintiffs' asserted harms outweigh defendants' harms and stand equal with defendant-intervenors' finality interests.

###     4.    Public Interest

The Federal Circuit has held that the "public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." *American Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed.

---

[21] Related to their argument that plaintiffs delayed filing this action, defendants and defendant-intervenors asserted at oral argument that January 1, 2024 would be the "most appropriate" cut-off date for injunctive relief, i.e. that entries dated prior to January 1, 2024 should be outside the scope of any injunctive relief. *See* Oral Arg. Tr. at 68:8-11, 84:10-13, 85:21-24. Given that the court concludes that the timing of plaintiffs' action does not alter the balance of harms analysis, the court finds no reason to limit the scope of injunctive relief to after the filing of this action.

Cir. 2010).  Additionally, this Court has held that the public interest is best served by

ensuring governmental compliance with the trade laws.  *See, e.g., Ceramica*

*Regiomontana, S.A. v. United States*, 7 CIT 390, 397, 590 F. Supp. 1260, 1265 (1984)

("As for the public interest, there can be no doubt that it is best served by ensuring . . .

compli[ance] with the law . . . ."); *SSAB North American Div.*, 32 CIT at 801, 571 F.

Supp. 2d at 1354 ("[T]he public interest is served by the proper administration and

enforcement of the antidumping laws.").

        In this case, compliance with the trade laws was overridden by the government's

promulgation of the Duty Suspension Rule.  Therefore, the court concludes that the

public interest factor weighs in favor of plaintiffs.

### 5.    The Balance of Equities

        Having analyzed each of the four *eBay* factors, the court concludes that the

balance of equities favors granting plaintiffs injunctive relief.  With respect to a

liquidation order, plaintiff has satisfied each of the four factors.  With respect to a

potential reliquidation order, three factors weigh in plaintiffs' favor and one factor weighs

equally between plaintiffs and defendant-intervenors.  Considering the totality of the

circumstances, the balance of equities warrants reliquidation.  Therefore, the court will

grant plaintiffs injunctive relief in the form of a liquidation order and a reliquidation order,

should reliquidation of any entries prove necessary.

**PUBLIC VERSION**

**CONCLUSION**

For the foregoing reasons, the court grants plaintiffs' motion for judgment on the
agency record.  Accordingly, it is hereby

**ORDERED** that Plaintiffs' Rule 56.1 Motion for Judgment on the Agency Record is
**GRANTED**; it is further

**ORDERED** that *Procedures Covering Suspension of Liquidation, Duties and
Estimated Duties in Accord With Presidential Proclamation 10414*, 87 Fed. Reg. 56,868
(Dep't of Commerce Sept. 16, 2022), is **VACATED**; it is further

**ORDERED** that, within 20 days of the issuance of judgment in this action,
Defendants shall publish notice of said vacatur in the Federal Register; it is further

**ORDERED** that Defendants shall promptly liquidate and collect antidumping and
countervailing duties on any presently unliquidated entries found to be circumventing
the antidumping and countervailing duty orders on CSPV products from China in
*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells,
Whether or Not Assembled Into Modules, From the People's Republic of China: Final
Scope Determination and Final Affirmative Determinations of Circumvention With
Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57,419 (Dep't of
Commerce Aug. 23, 2023), for which the now-vacated *Procedures Covering
Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential
Proclamation 10414*, 87 Fed. Reg. 56,868 (Dep't of Commerce Sept. 16, 2022) were
applied; and it is further

**PUBLIC VERSION**

Court No. 23-00274                                                                    Page 38

    **ORDERED** that, should any of the aforementioned entries be liquidated prior to the

issuance of judgment in this action, Defendants shall promptly identify, collect any

uncollected antidumping and countervailing duties on, and reliquidate all such entries.

    **SO ORDERED.**

                                /s/     Timothy M. Reif

                                Timothy M. Reif, Judge

Dated: August 22, 2025
       New York, New York